**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD., Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION COMPLAINT</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| TEVA PHARMACEUTICALS INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, ROBERT KOREMANS, and MICHAEL DERKACZ, | |
| Defendants. | |

Plaintiff Halman Aldubi Provident and Pension Funds Ltd. ("Plaintiff"), individually and on behalf of all other persons and entities similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teva Pharmaceutical Industries Limited ("Teva" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Teva securities between October 29, 2015 and August 18, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Teva, a pharmaceutical company, develops, manufactures, markets, and distributes generic medicines, specialty medicines, and biopharmaceutical products in North America, Europe, and internationally.

3. Among Teva's products is Copaxone (glatiramer acetate), a prescription drug that is used to treat relapsing forms of multiple sclerosis ("MS"). Throughout the Class Period, Teva consistently described Copaxone as the Company's "leading specialty medicine," reporting Copaxone sales and revenues that consistently dwarfed the same metrics for other Teva specialty products. Teva attributed Copaxone's commercial success to "having the right mix" of, *inter alia*, "a fantastic underlying demand," "patients hav[ing] access to it," and an "unparalleled . . . track record of both efficacy and safety."

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the reasons for Copaxone's commercial success and the sustainability of Teva's Copaxone revenues. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Teva had made substantial illegal kickback payments to charitable foundations to cover Medicare co-payment obligations of patients taking Copaxone; (ii) accordingly, Teva's revenues derived from Copaxone were in part the product of unlawful conduct and thus unsustainable; (iii) the foregoing misconduct subjected Teva to a foreseeable risk of heightened regulatory scrutiny and enforcement, as well as reputational harm, when the truth became known; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5. On August 18, 2020, the United States Department of Justice ("DOJ") issued a press release announcing that it had filed a complaint against Teva under the False Claims Act. Specifically, "[t]he government alleges that, from 2007 through 2015, Teva paid The Assistance Fund (TAF) and Chronic Disease Fund (CDF) with the intent and understanding that the foundations would use Teva's money to cover the Medicare co-pays of patients taking Copaxone.

During the same period, Teva raised the price of Copaxone from approximately $17,000 per year to over $73,000 per year." The press release further explained, in relevant part:

> Teva largely effectuated its scheme through its vendor, Advanced Care Scripts Inc. (ACS), a specialty pharmacy to which Teva referred virtually all Copaxone patients who faced Medicare co-pays for the drug. Teva used information from ACS and from TAF and CDF to calculate how much money to pay each foundation to maintain coverage of the Medicare co-pays of Copaxone patients enrolled in each foundation. The U.S. further alleges that ACS coordinated the referral of newly-prescribed Copaxone patients to TAF and CDF with Teva, referring patients in batches at the same time that Teva made payments to the foundations, which ensured that Copaxone patients received the vast majority of the co-pay assistance TAF and CDF provided with money from Teva.

6.      On this news, Teva's American depositary receipt ("ADR") price fell $1.11 per ADR from its previous close on August 17, 2020, or 9.6%, to close at $10.48 per ADR on August 18, 2020, on unusually heavy trading volume.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Teva conducts business in this Judicial District and a significant portion of Defendants' actions took place within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

12.     Plaintiff, as set forth in the attached Certification, purchased Teva securities during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Teva, a pharmaceutical company, purports to develop, manufacture, market, and distribute generic medicines, specialty medicines, and biopharmaceutical products in North America, Europe, and internationally.  The Company is headquartered and incorporated in Petach Tikva, Israel.  Teva's securities trade on the New York Stock Exchange ("NYSE") and the Tel Aviv Stock Exchange ("TASE").

14.     Defendant Erez Vigodman ("Vigodman") served as Teva's Chief Executive Officer ("CEO") from prior to the start of the Class Period until February 2017.

15.     Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from prior to the start of the Class Period until June 2017.

16.     Defendant Robert Koremans ("Koremans") served as Teva's President & CEO— Global Specialty Medicines from April 2013 to December 2017.

17.     Defendant Michael M. Derkacz ("Derkacz") served as Teva's Senior Vice President & GM—Global CNS from January 2015 to June 2017.

18.     Defendants Vigodman, Desheh, Koremans and Derkacz are sometimes referred to herein as the "Individual Defendants."

5

19.     The Individual Defendants possessed the power and authority to control the contents of Teva's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Teva's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Teva, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     Teva and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Teva, a pharmaceutical company, develops, manufactures, markets, and distributes generic medicines, specialty medicines, and biopharmaceutical products in North America, Europe, and internationally.

22.     Among Teva's products is Copaxone (glatiramer acetate), a prescription drug that is used to treat relapsing forms of MS.  Throughout the Class Period, Teva consistently described Copaxone as the Company's "leading specialty medicine," reporting Copaxone sales and revenues that consistently dwarfed the same metrics for other Teva specialty products.  Teva attributed Copaxone's commercial success to "having the right mix" of, *inter alia*, "a fantastic underlying

demand," "patients hav[ing] access to it," and an "unparalleled . . . track record of both efficacy and safety."

**Materially False and Misleading Statements Issued During the Class Period**

23.    The Class Period begins on October 29, 2015, when Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the third quarter of 2015 (the "Q3 2015 6-K").  With respect to Teva's Copaxone sales and revenues, the Q3 2015 6-K stated, in relevant part:

> **Copaxone**®.  In the third quarter of 2015, Copaxone® (glatiramer acetate injection 20 mg/mL and 40 mg/mL), our leading specialty medicine, continued to be the leading multiple sclerosis therapy in the United States and globally.  Our sales of Copaxone® amounted to $1.1 billion, a decrease of 2% compared to the third quarter of 2014.
>
> Copaxone® revenues in the United States in the third quarter of 2015 were $878 million, an increase of 10% compared to the third quarter of 2014.  The increase was mainly due to higher sales volume in the third quarter of 2015, partially offset by net pricing declines.  The Copaxone® family's U.S. market shares in terms of new and total prescriptions were 27.1% and 29.3%, respectively, according to September 2015 IMS data.
>
> At the end of September 2015, Copaxone® 40 mg/mL three times a week in the United States accounted for approximately 76% of total Copaxone® prescriptions.  This was driven by patient and physician choice of the 40 mg/mL version, supported by payor access and patient support activities.
>
> \*\*\*
>
> Copaxone® revenues in the United States accounted for 81% of global Copaxone® revenues in the third quarter of 2015, compared to 72% in the third quarter of 2014.
>
> \*\*\*
>
> Copaxone® was responsible for approximately 22% of our revenues in the third quarter of 2015, and contributed a significantly higher percentage to our profits and cash flow from operations during such period.

24.     That same day, Teva hosted an earnings call with investors and analysts (the "Q3 2015 Earnings Call") to discuss the Company's financial and operating results for the third quarter of 2015.  On the call, Defendant Vigodman highlighted the Company's Copaxone sales and revenues, stating that "all the measures we conducted in order to maintain the Copaxone started to deliver."

25.     Later on the call, Defendant Desheh further touted the Company's Copaxone sales and revenues, stating, in relevant part:

> Copaxone continued to demonstrate amazing strength against oral competition, now also against generic competition.  You see the numbers.  You see the green line is market share of our 40 milligram, the biggest selling MS therapy in the world today with over 22% market share in the United States.  And we are seeing growth in market share in the ex-U.S. territories, as we introduce 40 milligram.  And wherever we introduce 40 milligram, we see it picking up and really gaining market share in every country.
>
> So Copaxone in total, strong quarter.  Actually a record quarter in the United States, just a little bit above Q2, $878 million.  All in all very, very strong quarter with $1.080 billion in total sales, a little over that.  So Copaxone [is] very, very durable in the—so what we believe is going to be the impact in certain scenarios starting 2017.

26.     On February 11, 2016, Teva filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the full year 2015 (the "2015 20-F"). The 2015 20-F advised investors that "Maintaining Copaxone® and other key specialty products" was among the six "key elements" of Teva's "business strategy to better leverage our strengths and differentiate ourselves in the pharmaceutical market," stating, in relevant part, that to this strategic end, Teva had "enhanced our multiple sclerosis ('MS') franchise through the introduction of our three-times-a-week Copaxone® 40 mg/mL product in the United States, Europe and other countries in 2015."

27.    The 2015 20-F further touted the success of Copaxone, stating, in relevant part:

Copaxone® revenues in the United States in 2015 increased 4% to $3.2 billion, mainly due to higher volumes, partially offset by net pricing declines. Our U.S. market shares in terms of new and total prescriptions were 26.5% and 30.0%, respectively, according to December 2015 IMS data.

Revenues in the United States accounted for 81% of global Copaxone® revenues in 2015, an increase from 73% of global sales in 2014.

\*\*\*

Copaxone® accounted for 20% of our revenues in 2015, and a significantly higher percentage contribution to our profits and cash flow from operations during such period.

28.    On May 9, 2016, Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the first quarter of 2016 (the "Q1 2016 6-K"). With respect to Teva's Copaxone sales and revenues, the Q1 2016 6-K stated, in relevant part:

**Copaxone**® In the first quarter of 2016, Copaxone® (glatiramer acetate injection), continued to be the leading multiple sclerosis therapy in the United States and worldwide. Global sales of Copaxone® amounted to $1.0 billion, an increase of 9% compared to the first quarter of 2015. Over 81% of the total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version supported by payor access and patient support activities.

Copaxone® revenues in the United States in the first quarter of 2016 were $821 million, an increase of 12% compared to the first quarter of 2015. The increase was mainly due to higher net pricing, including a price increase of 7.9% in January 2016 on Copaxone® 20 mg/mL and 40 mg/mL. Our U.S. market shares in terms of new and total prescriptions were 28.1% and 29.8%, respectively, according to March 2016 IMS data.

Revenues in the United States accounted for 82% of global Copaxone® revenues in the first quarter of 2016, compared to 79% in the first quarter of 2015.

\*\*\*

Copaxone® accounted for approximately 21% of our revenues in the first quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period.

29.     That same day, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating performance for the first quarter of 2016. On the call, Defendant Vigodman touted the success of Copaxone, stating, in relevant part, that "Copaxone 40mg continued to gain market share, leading the MS market with 24.5% TRx [total prescriptions] share at the end of March versus 20.3% at the end of March 2015, and 82% share of the overall Copaxone family TRx."

30.     Later on the call, Defendant Koremans continued to highlight Copaxone's success and the purported reasons for its success, stating, in relevant part:

> So first, Copaxone is really doing well. . . . [W]e see a lot of the impact also from the net price increase of 7.9% that we did for both strengths in the beginning of the year. But it's actually really a result of a fantastic underlying demand. The product is keeping well. It's the number one product in new patients now, and Copaxone is actually really a very good alternative and patients have access to it, right? So in no way has the price been a limitation in that sense, and I think that's the key going forward is you'll always have to be able to demonstrate value to stakeholders, to patients, to payers, and overall for your products in whatever we offer. It's really important to be able to share the value of what you're doing. And it's not just about the price, but it's really an incredibly important thing to just talk about the value that you are offering.

> And clearly, for Copaxone, we're having the right mix. The product is much appreciated, unparalleled in its track record of both efficacy and safety, and available to just about 96% of lives in the U.S. So pricing there I see extremely good.

31.     On August 4, 2016, Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the second quarter of 2016 (the "Q2 2016 6-K"). With respect to Teva's Copaxone sales and revenues, the Q2 2016 6-K stated, in relevant part:

**Copaxone**® (glatiramer acetate injection) continued to be the leading multiple sclerosis therapy in the United States and worldwide in the second quarter of 2016. Global sales of Copaxone® were $1.1 billion, an increase of 8% compared to the second quarter of 2015.

Copaxone® revenues in the United States in the second quarter of 2016 were $955 million, an increase of 10% compared to the second quarter of 2015. The increase was mainly due to a reduction of sales in the Medicaid channel, resulting in both lower rebates in the current quarter and a change in the estimate for rebates in prior quarters, which had an overall positive impact. Sales were also impacted by a price increase of 7.9% in January 2016 for both Copaxone® 20 mg/mL and 40 mg/mL. Over 82% of the total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version supported by payer access and patient support activities. Our U.S. market shares in terms of new and total prescriptions were 24.9% and 29.1%, respectively, according to June 2016 IMS data.

Revenues in the United States accounted for 84% of global Copaxone® revenues in the second quarter of 2016, similar to the second quarter of 2015.

\*\*\*

Copaxone® accounted for approximately 23% of our revenues in the second quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period.

32. That same day, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the second quarter of 2016. On the call, Defendant Derkacz stated, in relevant part:

So on the Copaxone share, I think we're very, very pleased with the fact that 40mg is about 83% the U.S. market. Of the number one product in the MS category now, of course, is 40mg at a 24.1% share. . . . And I think this just speaks to the support by payers, by patients, by physicians around the long-proven track record of safety and efficacy of the product and a tribute to the team's great work here.

33. On November 15, 2016, Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the third quarter of 2016 (the "Q3 2016 6-K"). With respect to Teva's Copaxone sales and revenues, the Q3 2016 6-K stated, in relevant part:

**Copaxone**® (glatiramer acetate injection) continued to be the leading multiple sclerosis therapy in the United States and worldwide in the third quarter of 2016. Global sales of Copaxone® were $1.1 billion, a decrease of 2% compared to the third quarter of 2015.

Copaxone® revenues in the United States in the third quarter of 2016 were $874 million, flat compared to the third quarter of 2015, mainly due to a price increase of 7.9% in January 2016, which was offset by a volume decrease for Copaxone® 20 mg/mL. Over 83% of the total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version supported by payer access and patient support activities. Our U.S. market shares in terms of new and total prescriptions were 27.0% and 29.2%, respectively, according to September 2016 IMS data.

Revenues in the United States accounted for 82% of global Copaxone® revenues in the third quarter of 2016, compared to 81% in the third quarter of 2015.

\*\*\*

Copaxone® accounted for approximately 19% of our revenues in the third quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period.

34. That same day, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the third quarter of 2016. On the call, Defendant Koremans stated, in relevant part:

What we have seen though in the last months is that Copaxone is actually being holding (*sic*) much better. And the performance shows really good, and I am extremely proud of all the teams that do this. Patient support programs will play an important role. And that's what we've seen people move into with less hope and the U.S often came back. Actually the biggest source of new to brands that comes from the focus changes in the U.S. when they switch, because of the value they place on our support programs, amongst which are the sales solutions. So, other than that, there is very little new information that we have product doing well and we are optimistic about the future in that respect.

35. On February 15, 2017, Teva filed an Annual Report on Form 20-F with the SEC, reporting the Company's financial and operating results for the full year of 2016 (the "2016 20-F"). The 2016 20-F advised investors that "maintaining Copaxone® and other key specialty products" was among the four "key elements" of Teva's "strategy . . . to capitalize on our strengths," stating,

in relevant part, that to this strategic end, Teva had "enhanced our MS franchise through the introduction of our three-times-a-week Copaxone® 40 mg/mL product in the United States in 2014 and in additional countries since 2015."

36.     The 2016 20-F further touted the success of Copaxone, stating, in relevant part:

> **Copaxone**® (glatiramer acetate injection) continued to be the leading multiple sclerosis therapy in the United States and worldwide in 2016.
>
> \*\*\*
>
> Global sales of Copaxone® were $4.2 billion, an increase of 5% compared to 2015.
>
> Copaxone® revenues in the United States in 2016 increased 7% to $3.5 billion, mainly due to higher net pricing, resulting from a change in patient mix which increased our selling price and a corresponding change in certain prior period rebate accrual estimates, as well as a price increase of 7.9% in January 2016, partially offset by lower volumes of Copaxone® 20mg/mL. Over 84% of total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version, supported by payer access and patient support activities. Our U.S. market shares in terms of new and total prescriptions were 27.9% and 29.3%, respectively, according to December 2016 IMS data.
>
> Revenues in the United States were 82% of global Copaxone® revenues in 2016, compared to 81% in 2015.
>
> \*\*\*
>
> Copaxone® accounted for approximately 19% of our revenues in 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during this period.

37.     On May 11, 2017, Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the first quarter of 2017 (the "Q1 2017 6-K"). With respect to Teva's Copaxone sales and revenues, the Q1 2017 6-K stated, in relevant part:

Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading multiple sclerosis therapy in the U.S. and globally, were $970 million in the first quarter of 2017, a decrease of 4% compared to the first quarter of 2016.

Copaxone® revenues in the United States, were $782 million, a decrease of 5% compared to the first quarter of 2016, mainly due to lower volumes of Copaxone® 20 mg/mL, partially offset by a price increase of 7.9% for both Copaxone® products in January 2017. At the end of the first quarter of 2017, according to March 2017 IMS data, our U.S. market shares for the Copaxone® products in terms of new and total prescriptions were 25.4% and 28.4%, respectively. Copaxone® 40 mg/mL accounted for over 85% of total Copaxone® prescriptions in the U.S.

38.    On August 3, 2017, Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the second quarter of 2017 (the "Q2 2017 6-K").   With respect to Teva's Copaxone sales and revenues, the Q2 2017 6-K stated, in relevant part:

Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading multiple sclerosis therapy in the U.S. and globally, were $1.0 billion, a decrease of 10% compared to the second quarter of 2016.

Copaxone® revenues in the United States, were $843 million, a decrease of 12% compared to the second quarter of 2016, mainly due to lower volumes of Copaxone® 20 mg/mL as well as negative net pricing effects despite a price increase of 7.9% for both Copaxone® products in January 2017. At the end of the second quarter of 2017, according to June 2017 IMS data, our U.S. market shares for the Copaxone® products in terms of new and total prescriptions were 26.5% and 28.8%, respectively. Copaxone® 40 mg/mL accounted for over 85% of total Copaxone® prescriptions in the U.S.

39.    On November 2, 2017, Teva issued a press release, and filed the same with the SEC appended as an exhibit to a Form 6-K, reporting the Company's financial and operating results for the third quarter of 2017 (the "Q3 2017 6-K").   With respect to Teva's Copaxone sales and revenues, the Q3 2017 6-K stated, in relevant part:

Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading multiple sclerosis therapy in the U.S. and globally, were $1.0 billion, a decrease of 7% compared to the third quarter of 2016.

Copaxone® revenues in the United States, were $802 million, a decrease of 8% compared to the third quarter of 2016, due to lower volumes of Copaxone® 20 mg/mL, negative net pricing effects, mainly as a result of an increase in managed care rebate accruals for inventory in the channel following the FDA approvals for additional generic competition, partially offset by a price increase of 7.9% in January 2017 for both the 20 mg/mL and 40 mg/mL versions. At the end of the third quarter of 2017, according to September 2017 IMS data, our U.S. market shares for the Copaxone® products in terms of new and total prescriptions were 25.6% and 28.7%, respectively. Copaxone® 40 mg/mL accounted for over 85% of total Copaxone® prescriptions in the U.S.

40.     On February 12, 2018, Teva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2017 (the "2017 10-K"). With respect to Teva's Copaxone sales and revenues, the 2017 10-K stated, in part:

> COPAXONE revenues in the United States in 2017 decreased by 12% to $3.0 billion, mainly due to generic competition which resulted in higher rebates and lower volumes, partially offset by a price increase of 7.9% in January 2017 for both the 20 mg/mL and 40 mg/mL versions.
>
> Revenues in the United States were 80% of global COPAXONE revenues in 2017, compared to 82% in 2016.
>
> ***
>
> COPAXONE accounted for approximately 17% of our revenues in 2017 and a significantly higher percentage of our profits and cash flow from operations during this period.

41.     On May 3, 2018, Teva filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2018 (the "Q1 2018 10-Q"). With respect to Teva's Copaxone sales and revenues, the Q1 2018 10-Q stated, in relevant part:

> COPAXONE® revenues in our North America segment in the first quarter of 2018 decreased by 40% to $476 million, compared to the first quarter of 2017,

mainly due to generic competition in the United States. COPAXONE revenues in the United States were $462 million in the first quarter of 2018.

Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in the first quarter of 2018, compared to 82% in the first quarter of 2017.

COPAXONE global sales accounted for approximately 13% of our global revenues in the first quarter of 2018 and a significantly higher percentage of our profits and cash flow from operations during this period.

42. On August 2, 2018, Teva filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2018 (the "Q2 2018 10-Q"). With respect to Teva's Copaxone sales and revenues, the Q2 2018 10-Q stated, in relevant part:

COPAXONE revenues in our North America segment in the second quarter of 2018 decreased by 46% to $464 million, compared to the second quarter of 2017, mainly due to generic competition in the United States. COPAXONE revenues in the United States were $448 million in the second quarter of 2018.

Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in the second quarter of 2018, compared to 84% in the second quarter of 2017.

COPAXONE global sales accounted for approximately 13% of our global revenues in the second quarter of 2018 and a significantly higher percentage of our profits and cash flow from operations during this period.

43. On November 1, 2018, Teva filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2018 (the "Q3 2018 10-Q"). With respect to Teva's Copaxone sales and revenues, the Q3 2018 10-Q stated, in relevant part:

COPAXONE revenues in our North America segment in the third quarter of 2018 decreased by 43% to $463 million, compared to the third quarter of 2017, mainly due to generic competition in the United States.

COPAXONE revenues in the United States were $446 million in the third quarter of 2018.

Revenues of COPAXONE in our North America segment were 77% of global COPAXONE revenues in the third quarter of 2018, compared to 83% in the third quarter of 2017.

44.     On February 19, 2019, Teva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2018 (the "2018 10-K").  With respect to Teva's Copaxone sales and revenues, the 2018 10-K stated, in relevant part:

COPAXONE revenues in our North America segment in 2018 decreased by 44% to $1,759 million, compared to 2017, mainly due to generic competition in the United States.

COPAXONE revenues in the United States were $1,697 million in 2018.

Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in 2018, compared to 82% in 2017.

COPAXONE global sales accounted for approximately 13% of our global revenues in 2018 and a significantly higher percentage of our profits and cash flow from operations during this period.

45.     On May 2, 2019, Teva filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 10-Q").  With respect to Teva's Copaxone sales and revenues, the Q1 2019 10-Q stated, in relevant part:

**COPAXONE** revenues in our North America segment in the first quarter of 2019 decreased by 56% to $208 million, compared to the first quarter of 2018, mainly due to generic competition in the United States.

COPAXONE revenues in the United States were $194 million in the first quarter of 2019.

Revenues of COPAXONE in our North America segment were 62% of global COPAXONE revenues in the first quarter of 2019, compared to 74% in the first quarter of 2018.

46.     On August 7, 2019, Teva filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the

"Q2 2019 10-Q").  With respect to Copaxone sales and revenues, the Q2 2019 10-Q stated, in

relevant part:

> COPAXONE revenues in our North America segment in the second quarter of 2019 decreased by 41% to $274 million, compared to the second quarter of 2018, mainly due to generic competition in the United States.
>
> COPAXONE revenues in the United States were $260 million in the second quarter of 2019.
>
> Revenues of COPAXONE in our North America segment were 69% of global COPAXONE revenues in the second quarter of 2019, compared to 74% in the second quarter of 2018.
>
> COPAXONE global sales accounted for approximately 9% of our global revenues in the second quarter of 2019 and a significantly higher percentage of our profits and cash flow from operations during this period.

47.     On November 7, 2019, Teva filed a Quarterly Report on Form 10-Q with the SEC,

reporting the Company's financial and operating results for the quarter ended September 30, 2019

(the "Q3 2019 10-Q").  With respect to Teva's Copaxone sales and revenues, the Q3 2019 10-Q

stated, in relevant part:

> COPAXONE revenues in our North America segment in the third quarter of 2019 decreased by 41% to $271 million, compared to the third quarter of 2018, mainly due to generic competition in the United States.
>
> COPAXONE revenues in the United States were $257 million in the third quarter of 2019.
>
> Revenues of COPAXONE in our North America segment were 68% of global COPAXONE revenues in the third quarter of 2019, compared to 77% in the third quarter of 2018.
>
> COPAXONE global sales accounted for approximately 9% of our global revenues in the third quarter of 2019 and a significantly higher percentage of our profits and cash flow from operations during this period.

48.     On February 21, 2020, Teva filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). With respect to Teva's Copaxone sales and revenues, the 2019 10-K stated, in relevant part:

> COPAXONE revenues in our North America segment in 2019 decreased by 42% to $1,017 million, compared to 2018, mainly due to generic competition in the United States.
>
> Revenues of COPAXONE in our North America segment were 67% of global COPAXONE revenues in 2019, compared to 74% in 2018.
>
> COPAXONE global sales accounted for approximately 9% of our global revenues in 2019 and a significantly higher percentage of our profits and cash flow from operations during this period.

49.     On May 7, 2020 Teva filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2020 (the "Q1 2020 10-Q"). With respect to Teva's Copaxone sales and revenues, the Q1 2020 10-Q stated, in relevant part, that "COPAXONE revenues in our North America segment in the first quarter of 2020 decreased by 5% to $198 million, compared to the first quarter of 2019, mainly due to generic competition in the United States."

50.     On August 5, 2020, Teva filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2020 (the "Q2 2020 10-Q"). With respect to Teva's Copaxone sales and revenues, the Q2 2020 10-Q stated, in relevant part, that "COPAXONE revenues in our North America segment in the second quarter of 2020 decreased by 13% to $238 million, compared to the second quarter of 2019, mainly due to generic competition in the United States."

51.     The statements referenced in ¶¶ 23 – 50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material

adverse facts regarding the reasons for Copaxone's commercial success and the sustainability of Teva's Copaxone revenues. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Teva had made substantial illegal kickback payments to charitable foundations to cover Medicare co-payment obligations of patients taking Copaxone; (ii) accordingly, Teva's revenues derived from Copaxone were in part the product of unlawful conduct and thus unsustainable; (iii) the foregoing misconduct subjected Teva to a foreseeable risk of heightened regulatory scrutiny and enforcement, as well as reputational harm, when the truth became known; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

52.     On August 18, 2020, the DOJ issued a press release announcing that it had filed a complaint against Teva under the False Claims Act. Specifically, "[t]he government alleges that, from 2007 through 2015, Teva paid TAF and CDF with the intent and understanding that the foundations would use Teva's money to cover the Medicare co-pays of patients taking Copaxone. During the same period, Teva raised the price of Copaxone from approximately $17,000 per year to over $73,000 per year." The press release further stated, in relevant part:

> Teva largely effectuated its scheme through its vendor, Advanced Care Scripts Inc. (ACS), a specialty pharmacy to which Teva referred virtually all Copaxone patients who faced Medicare co-pays for the drug. Teva used information from ACS and from TAF and CDF to calculate how much money to pay each foundation to maintain coverage of the Medicare co-pays of Copaxone patients enrolled in each foundation. The U.S. further alleges that ACS coordinated the referral of newly-prescribed Copaxone patients to TAF and CDF with Teva, referring patients in batches at the same time that Teva made payments to the foundations, which ensured that Copaxone patients received the vast majority of the co-pay assistance TAF and CDF provided with money from Teva.

53.     On this news, Teva's ADR price fell $1.11 per ADR from its previous close on August 17, 2020, or 9.6%, to close at $10.48 per ADR on August 18, 2020, on unusually heavy trading volume.

54.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Teva securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Teva securities were actively traded on the NYSE and TASE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Teva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

58.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Teva;

- whether the Individual Defendants caused Teva to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Teva securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

61.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Teva securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and TASE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Teva securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

62.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

63.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

66.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Teva securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Teva securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

67.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Teva securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Teva's finances and business prospects.

68.     By virtue of their positions at Teva, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

69. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Teva, the Individual Defendants had knowledge of the details of Teva's internal affairs.

70. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Teva. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Teva's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Teva securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Teva's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Teva securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

71.     During the Class Period, Teva securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Teva securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Teva securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Teva securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

72.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

74.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75. During the Class Period, the Individual Defendants participated in the operation and management of Teva, and conducted and participated, directly and indirectly, in the conduct of Teva's business affairs. Because of their senior positions, they knew the adverse non-public information about Teva's misstatement of income and expenses and false financial statements.

76. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Teva's financial condition and results of operations, and to correct promptly any public statements issued by Teva which had become materially false or misleading.

77. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Teva disseminated in the marketplace during the Class Period concerning Teva's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Teva to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Teva within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Teva securities.

78. Each of the Individual Defendants, therefore, acted as a controlling person of Teva. By reason of their senior management positions and/or being directors of Teva, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Teva to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Teva and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

79. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Teva.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 23, 2020

Respectfully submitted,

*s/ D. Seamus Kaskela*
D. Seamus Kaskela (204351)
**KASKELA LAW LLC**
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Telephone: (888) 715-1740
skaskela@kaskelalaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100

Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff Halman Aldubi
Provident and Pension Funds Ltd.*