# EXHIBIT A

2020 WL 5796763
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE ALLERGAN PLC
SECURITIES LITIGATION

No. 18 Civ. 12089 (CM)(GWG)
|
Signed 09/29/2020

**DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION and GRANTING IN PART AND DENYING IN PART THE PARTIES' RESPECTIVE MOTIONS FOR PERMISSION TO FILE UNDER SEAL**

McMahon, C.J.:

**\*1** On April 19, 2019, Lead Plaintiff Boston Retirement System (hereinafter referred to as "BRS" or "Plaintiff") filed the Consolidated Amended Class Action Complaint ("CAC") against Defendant Allergan PLC ("Allergan" or the "Company") and certain of its executives (the "Executive Defendants"), alleging that Defendants had made materially false and misleading statements and omitted to make necessary disclosures about an alleged link between breast implant-associated anaplastic large cell lymphoma ("BIA-ALCL" or "ALCL") and the variety of silicone-gel breast implants manufactured by the Company. (CAC, Apr. 19, 2019, Dkt. No. 58.) Plaintiff now seeks to certify a class of all individuals and entities that purchased or otherwise acquired Allergan preferred stock between January 30, 2017 and December 19, 2018—the period during which Defendants' alleged misstatements and omissions caused the price of Allergan stock to artificially inflate.

There is absolutely no question that this action should proceed as a class action. It is a garden-variety securities fraud suit, a type of action particularly well suited to class treatment.

What has become clear, however, is that BRS is not the plaintiff who should be controlling the representation of the class. Because BRS is an inadequate representative of the class, its motion for class certification is DENIED.

The parties also move to seal certain exhibits to their briefs in support of and in opposition to Plaintiff's motion for class certification. That motion is GRANTED IN PART and DENIED IN PART, for the reasons stated in Section II, below.

This opinion shall be filed without redaction. While this opinion refers to matters that the parties wish to remain sealed, to that extent the court is denying the motion to file under seal, so the information that one or both parties would like to keep confidential is not, in the opinion of this court, confidential or proprietary.

**Relevant Factual Background**

The allegations of the CAC are accepted as true for purposes of the instant motion. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 86 n.5 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702, (2018) (citing *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978)). The Court presumes the parties' familiarity with the facts of this case, which this Court recited in detail in its earlier Decision and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Op. Granting in Part and Denying in Part Mot. to Dismiss, Sept. 20, 2019, Dkt. No. 81 ("MTD Order").) The following provides a summary of facts that the parties have deemed pertinent to class certification.

**a. Allergan's Breast Implants & ALCL**

Allergan is a global pharmaceutical and medical products company that develops, manufactures, and sells, among other things, breast implants. Allergan's Natrelle BIOCELL line of breast implants is the subject of this lawsuit. (CAC ¶ 2, 7.)

BIA-ALCL – a rare form of non-Hodgkin's lymphoma that typically occurs in the scar tissue surrounding the breast implant – was first reported in 1997. (CAC ¶¶ 3, 7, 64, 92, 111.) Since, a parade of medical studies and regulatory alerts have outlined the progression of BIA-ALCL-related knowledge, including several linking ALCL specifically to breast implants with a textured outer shell. (CAC ¶¶ 63-117.)

**\*2** Plaintiff alleges that Defendants misrepresented the relative strength of the link between reported cases of BIA-ALCL and Allergan's textured silicone-gel filled breast implants as compared to other manufacturers. (*See generally* CAC.)

### b. Incidence Reports

Beginning in 2015, scientists began to report that a disproportionately high number of cases of ALCL were linked to Allergan's textured breast implants. That March, a team of doctors published a study that identified 173 cases of BIA-ALCL. 97 of those cases (56%) named women who had Allergan's Biocell textured implants. (CAC ¶ 75.)

The studies and media reports that followed during the class period took varying forms. Many indicated that Allergan's implants were more closely associated with the incidence of BIA-ALCL than other breast implants on the market. For example:

- In April 2017, two doctors from the M.D. Anderson Cancer Center in Houston published an article that found that, of the total number of BIA-ALCL cases reported to the University of Southern California's ALCL Tracking Reporting system, 56% of them involved Allergan/Inamed/McGhan implants, while of the total number of BIA-ALCL cases reported to the FDA MAUDE database, 80.3% involved Allergan/Inamed/McGhan implants. (CAC ¶ 91.)

- In October 2017, another team of researchers who analyzed all cases of BIA-ALCL in Australia and New Zealand from 2007 to 2016 found that Allergan's Biocell salt textured implants accounted for 58.7% of the implants used, which meant that the risk of developing BIA-ALCL when one used Biocell implants was 14.11 times greater than when a leading competitor's textured implants were used. (CAC ¶¶ 100–01.)

- On January 4, 2018, another team of researchers from the Netherlands found that, between 1990 to 2016, there were twenty-three known cases of BIA-ALCL —twenty-two of which involved Allergan/Inamed/ McGhan implants. (CAC ¶ 103.)

### c. Allegedly Misleading Statements and Omissions

Plaintiff alleges that Allergan was well-aware of the studies that found a higher incidence of BIA-ALCL in patients with Allergan's textured breast implants. (CAC ¶ 78.) Nonetheless, Plaintiff alleges, Defendants continued to downplay the strength of the link between its product and the illness. This took the form of both misstatements and omissions of information concerning the relative risk of developing BIA-ALCL after receiving Allergan textured implants as compared to other manufacturers' implants.

For example, on January 30, 2017 *ABC News* published an article reporting the cancellation of an Allergan post-approval study of textured breast implants. The article included a statement from Defendant Mark Marmur that "BIA-ALCL has been reported in patients in patients with textured breast implants *from all manufacturers*." (CAC ¶ 84 (emphasis added).) Plaintiff alleges that Allergan and its representatives made other similar remarks to the public during 2017 and 2018. (CAC ¶¶ 126, 159.)

Allergan continued to reaffirm the safety of its breast implants in its 2016 and 2017 annual reports filed on February 24, 2017, and February 26, 2018, respectively. The reports repeat the same stock phrase regarding incidences of BIA-ALCL: that "a breast implant manufacturer *that is not affiliated with the Company*" was subject to "negative reports from regulatory authorities in Europe." (CAC ¶¶ 134, 152 (emphasis added).)

**\*3** Plaintiff alleges that these and other similar statements and omissions made during the class period (1) gave the impression that Allergan's textured breast implants were no more closely associated with ALCL than implants made by other manufacturers, and (2) concealed the risk that Allergan's products could be recalled because of a possible link to BIA-ALCL, thereby causing Allergan's stock price to drop. (*See* MTD Order at 53-54.)

### d. Materialization of the Risk

On December 14, 2018, "GMED," the European regulatory body responsible for certifying the manufacture of medical devices in Europe, opted not to re-certify Allergan's breast implant portfolio, which was set to expire, and requested additional data from the manufacturer.

Four days later, on December 18, 2018, France's National Agency for the Safety of Medicines & Health Products ("ANSM") ordered the recall of textured breast implants manufactured by Allergan from the European market, announcing that the implants "have been linked to a rare form of cancer," referring to ALCL. (CAC ¶ 164.) The announcement reported that a committee of experts would interview patients, healthcare professionals and other stakeholders, after which it would make a decision on the use of textured-envelope breast implants in aesthetic and reconstructive surgery.

Allergan complied with the ANSM recall the following day. It released a statement stating that it had "suspended sales of textured breast implants and tissue expanders and [was] withdrawing any remaining supply in European markets." (CAC ¶ 165.) Plaintiff alleges that this disclosure was the first time that Allergan acknowledged that its prior statements to investors communicating that its breast implants were not reported to be linked to ALCL in Europe were inaccurate. (CAC ¶ 166.)

Plaintiff alleges that, following the materialization of these previously concealed risks, Allergan's stock price fell $10.20, or nearly 7%, to close at $136.56 on December 19, 2018.

**Relevant Procedural Background**

The first of two lawsuits alleging securities fraud on the facts outlined above was filed on December 20, 2018. After the expiration of the 60-day period for filing actions prescribed by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), five potential class representatives made motions to serve as lead plaintiffs, and to designate their lawyers as lead counsel. One motion was withdrawn and the Court considered the other four.

On March 21, 2019, the Court appointed BRS to serve as lead plaintiff. (Dec. and Order Appointing Lead Plaintiff, Consolidating Cases, and Setting Schedule, Mar. 21, 2019, Dkt. No. 49 ("Lead Plaintiff Order").) The only real contest was between BRS and another institutional plaintiff, DeKalb. I concluded, on the information then available, that BRS had the largest holding, which is the statutory tie-breaker for deciding who should serve as lead plaintiff if all other considerations are equal – and it appeared that they were. The only serious objection to the selection of BRS was that it was already the lead plaintiff in a number of class actions; the PSLRA provides that a party should not be lead plaintiff in more than five securities fraud actions during a three year period, and BRS would have run afoul of that rule, were there not an exception generally recognized for institutional investors. 15 U.S.C. § 78u-4(a)(3)(B)(vi); *see Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC,* 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (hereinafter "*Iron Workers*").

**\*4** The Court imposed one condition on the appointment of BRS as lead plaintiff. BRS was represented by two law firms – Pomerantz LLP ("Pomerantz") and the Thornton Law Firm ("Thornton") – and it proposed that they serve as co-lead counsel. This I was unwilling to do – a fact that I made perfectly clear:

> However, this court is not interested in appointing co-lead counsel in this matter. Unless there is some special reason why the services of two firms are needed, the appointment of co-lead counsel tends to inflate legal fees – a result this court is particularly anxious to avoid. No reason for having two law firms rather than one is suggested in BRS' moving papers. Since both the Pomerantz and Thornton firms would ably represent the class, and there is nothing to choose between them, BRS should select one of the two of them to serve as lead counsel.

(Lead Plaintiff Order at 5.) The following day, BRS submitted a letter designating Pomerantz as Lead Counsel. (Dkt. No. 50.)

A month later, BRS filed the CAC, the operative complaint in this action, and on September 20, 2019, this Court granted in part and denied in part Defendants' motion to dismiss. (MTD Order.) The surviving claim alleges that Defendants' disclosures gave investors a false impression that Allergan's implants were no more linked with BIA-ALCL than those of other implants.

Plaintiff now moves to certify a class of:

> All individuals and entities that purchased or otherwise acquired Allergan preferred stock or common stock between January 30, 2017 and December 19, 2018, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are the Defendants; the officers, directors, and affiliates of Allergan, at all relevant times; Allergan's employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Allergan common stock through any such plan(s); any entity in which Defendants have or had controlling interest; immediate family members of any excluded person; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

In connection with Plaintiff's motion for class certification, the parties move to seal certain exhibits that they assert contain commercially sensitive and proprietary information. (Dkt. Nos. 125, 143.) In response to the motion to seal that accompanied Defendants' Opposition Brief, the Court ordered the parties to redact out references to material that has been designated as confidential and to explain why the information is confidential, rather than file the entire motion

under seal. (Dkt. No. 136.) Accordingly, the parties have filed their class certification briefs with redactions and filed the unredacted versions under seal. (*See* Dkt. No. 137.)

## I. The Motion for Class Certification Is Denied

### 1. Legal Standard

Plaintiff's motion for class certification is governed by the requirements of Fed. R. Civ. P. 23. Certification under Rule 23 is appropriate only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). As the Supreme Court has observed, the Rule 23(a) requirements "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks and citations omitted).

 **\*5**  Plaintiff must also satisfy one of the prongs of Rule 23(b). Because Plaintiff moves for class certification under Rule 23(b)(3), it must demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In addition to the express requirements of Rule 23, the Second Circuit has recognized an implied requirement that the class be "ascertainable." *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

If, after a "rigorous analysis" the Court finds that each of the requirements of Rule 23 are met, the Court may, in its discretion, certify the class. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *see also Wal-Mart Stores, Inc.*, 564 U.S. at 351.

A motion for class certification should not extend into a protracted mini-trial of substantial portions of the underlying litigation, and courts must refrain from examining the underlying merits of the case unless they are relevant to the class certification requirements. *See id.; see also Eisen*

*v. Carlisle & Jacquelin*, 41 U.S. 156, 177–78 (1974). Nonetheless, because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the cause of action, the analysis may require the courts to "probe behind the pleadings" and consider issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (internal quotation marks and citations omitted).

Plaintiff bears the burden of showing that Rule 23's requirements are satisfied by at least a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). "The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this one involving alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (internal citation omitted). In determining the appropriateness of class certification, the Court may consider the parties' declarations and appended supporting materials. *See, e.g.*, *Heredia v. Americare, Inc.*, No. 17 Civ. 6219 (WHP), 2018 WL 2332068, at \*2 (S.D.N.Y. May 23, 2018).

### 2. BRS Has Failed to Demonstrate That It Would Adequately Represent the Class

Defendants do not contest that Plaintiff meets the Rule 23(a)(1) and (a)(2) requirements of numerosity and commonality, and there is no question that those requirements are satisfied. Instead, Defendants contend that BRS is an atypical and inadequate class representative. (Memo of Law in Opposition to Mot. to Certify Class, July 28, 2020, Dkt. No. 128. ("Defs' Opp. Br.") at 21–32.) As I agree that BRS and its counsel have failed to demonstrate that they would adequately represent the class, I decline to certify on that basis.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In evaluating whether a proposed class representative has met this requirement, courts consider whether (1) plaintiff's interests are antagonistic to those of the class, and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *see*

*also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

 **\*6**  Class certification may be denied on adequacy grounds where the proposed class representative is "unwilling or unable to protect the interests of the class against the possibly competing interests of the attorneys." *Baffa*, 222 F.3d at 61. As my colleague Judge Buchwald explained in *In re IMAX Securities Litigation*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010):

> A key element in the determination of whether a plaintiff's interests are antagonistic to those of other members of the class is the relationship between the class representative and the class counsel. The rationale behind cases in which class certification has been denied because of the relationship between the class representative and class counsel is clear: courts are concerned that when a class representative is closely associated with class counsel, he or she may permit a settlement less favorable to the interests of absent class members.

(Internal citations and quotation marks omitted.) In evaluating the interests of and relationship between the proposed class representative and class counsel, "the possibility of inadequacy and impropriety are sufficient [ ] to deny certification of a class." *Id.* at 157.

That possibility has been demonstrated here.

When I appointed BRS as lead plaintiff, I gave an explicit instruction that there was to be one and only one law firm serving as lead counsel. It is this court's experience (and I have quite a bit of it) that the involvement of multiple firms tends to inflate legal fees to the detriment of the other class members. This is a result I am particularly anxious to avoid. (*See* Lead Plaintiff Order at 5.) So I directed that BRS select one law firm to serve as lead counsel. BRS selected Pomerantz to act as lead counsel. I expected BRS to do the work of lead counsel. And I expected it to do all of the work of lead counsel.

I have now learned that Thornton has not only remained involved in this litigation, albeit under the rubric of "additional counsel," but that it has effectively played the role of co-lead counsel – to the point that BRS' corporate representative has testified under oath that Thornton's responsibilities did not change *at all* in response to the lead plaintiff order. (Defs' Opp. Br. Ex. 43 at 183:24-184:4.) It is clear that Thornton has been fully involved in every aspect of this case to date. It has duplicated the efforts of Pomerantz by working on the CAC (it signed the pleading, so it has to have worked on it) and the motions to dismiss and for class

certification (ditto), by joining in meet and confer sessions with defense counsel, participating in depositions, and by getting (and so obviously reviewing) all correspondence. (Defs' Opp. Br. at 27 & Ex. 42, 43 at 2:13-22.)

Moreover, I have learned, in connection with the prosecution of this motion, that the Pomerantz and Thornton firms have entered into an agreement to split any fee earned from the prosecution of this lawsuit almost down the middle. The agreement calls for the fee earned by lead counsel to be split with 55% going to Pomerantz and 45% to Thornton – a division that is so close to the firms' original agreement of a 50-50 split, reached at a time when they anticipated being appointed co-lead counsel as to be a rather transparent substitute for co-lead counsel status. (*See* Declaration of Anna F. Connolly, July 28, 2020, Dkt. No. 129 ("Connolly Decl."), Ex. 45; Connolly Decl. Ex. 44.) This amended agreement between the two firms was dated six days after BRS designated Pomerantz as lead counsel. (*See id.*) The court was not informed about this arrangement, by BRS or anyone else.

 **\*7**  This Court is not fooled by the rebranding of Thornton as "additional counsel." When I ruled that there could not be co-lead counsel, I did not authorize the retention of "additional counsel" to assist lead counsel. Frankly, this lawsuit is not so complicated as to require more than one competent law firm to prosecute it. Had Pomerantz indicated that it was incapable of handling the lawsuit on its own, or that it was too busy with other matters to do so without assistance (an argument that was made by other potential class representatives, and rejected – erroneously, is seems – by the Court), I would have concluded that BRS was not an adequate class representative and appointed De Kalb – a perfectly competent institutional investor with a significant investment in Allergan that was represented by just one law firm – as the class representative.

The whole point of preferring institutional investors over individuals as lead plaintiffs is to prevent securities class actions from being "lawyer driven" lawsuits. *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) (citing S.Rep. No. 104–98 at 4 (1995), U.S. Code Cong. & Admin. News 1995, at 679, 683); *Iron Workers*, 616 F. Supp. 2d at 463 (citing *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006); *In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 337 (S.D.N.Y. 2005)); *In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 43-44 (S.D.N.Y. 1998) (quoting H.R. Conf. Rep. No. 104-369).[1] The undisclosed arrangement between the two

law firms, Pomerantz and Thornton, is the quintessential example of a "lawyer driven" arrangement. I said I would not appoint co-lead counsel, so I certainly will not tolerate lead counsel's privately appointing co-lead counsel – which is what Pomerantz has done by entering into its arrangement with Thornton. (*See* Connolly Decl. Ex. 43 (Deposition Tr. of Mr. Smyth) at 182:18-33.)

Plaintiff calls Allergan's argument against certification a "smear campaign," and contends that the division of work between Pomerantz and Thornton will save the class significant expense. (Reply Memo of Law in Support of Mot. to Certify Class, Aug. 20, 2020, Dkt. No. 145 ("Pl. Reply Br.") at 18.) But I disagree with the premise that two firms can litigate as cheaply as one, and I expressly rejected that premise when I declined to appoint co-lead counsel. My views on this subject were essential to my ruling on the lead plaintiff motion. BRS did not seek reargument on that question (not that reargument would have been granted); instead, it and its lawyers devised a secret workaround to my ruling. They thereby placed the interests of counsel ahead of those of the class. *See Plummer v. Chem. Bank*, 668 F.2d 654, 658 (2d Cir. 1982) (observing that "the interest of lawyer and class may diverge"). No matter how competent the lawyers from these law firms are at securities litigation – and I admit that they know their stuff – their behavior renders them inadequate to serve as class counsel. *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification.").

**\*8** Counsel also argue that BRS has been fully transparent about Thornton's participation in the litigation, as evidenced by Thornton's presence on pleadings and motions and by its appearance on the docket.

I probably should have noticed Thornton's name on the CAC and called plaintiff's counsel out at that point. I admit that I rarely, if ever, look at the cover pages of briefs, or focus on signature blocks at the end of pleadings, although it seems that I had better start doing so, at least in securities class actions.

But so what? Full transparency required advising the Court that, despite its ruling, two law firms intended to continue working on this matter, and had entered into a fee-sharing arrangement. It required advising the court that lawyers from both firms were attending conferences and reviewing pleadings (matters about which I could not possibly know

anything) – even though I specifically said there could not be co-lead counsel and explained that duplication of effort was the reason why. It required notifying the court that Thornton's role in the conduct of this lawsuit had not changed one iota as a result of my order directing that there not be two lead counsel, as BRS' corporate representative candidly testified. It is undisputed that the court was not notified of any of this by BRS, or by Pomerantz, or by Thornton. That is unacceptable. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 566 (S.D.N.Y. 2018).

Plaintiff's argument that Thornton's role will be limited to tasks related to discovery, class certification, and other discrete matters is (1) a lie, in light of the testimony of its corporate representative; and (2) utterly disingenuous. The preparation and defense of pleadings, discovery and class certification constitutes the entirety of representing a class plaintiff in almost every case, since few securities class actions actually go as far as summary judgment and fewer still go to trial. Thornton has plainly been involved in class discovery and class certification. By "other discrete matters," Thornton apparently means the preparation and defense of the CAC, since its lawyers had an ethical obligation to be involved in the preparation and review of those documents before putting the firm's name to them. (Pl. Reply Br. at 18.) That means Thornton has been involved in *every aspect of this matter* – a conclusion confirmed by the nearly equal fee splitting arrangement reached by the lawyers, and a practice that leads to precisely the sort of double billing that this Court hoped to guard against by appointing just one firm to serve as lead counsel. There is nothing "limited" about Thornton's representation. The arrangement between Pomerantz and Thornton violates both the letter and the spirit of the Court's order. And BRS's acquiescence in the arrangement renders hollow its promise to review the lawyers time records carefully.[2]

**\*9** BRS's agreement that just one of its two proposed firms could represent the plaintiff class was a condition of its being appointed lead plaintiff. BRS selected Pomerantz, with which it has a long-term standing arrangement regarding representation in securities fraud class actions. (Connolly Decl. Ex. 48). I interpreted its designation of Pomerantz as a sign that it agreed to the court's terms. Either BRS did not really acquiesce in my directive, or it is incapable of controlling its lawyers when they prove unwilling to abide by rulings of the court concerning who could serve as lead counsel. It doesn't matter which of those two things is true: either renders BRS an inadequate class representative,

notwithstanding its significant holdings in Allergan and its status as an institutional investor. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995) ("Both class representatives and class counsel have responsibilities to absent members of the class.").

I appreciate that Defendants are not making any argument of the sort that typically have given rise to a finding of a conflict between the interests of a named plaintiff or class counsel and the class as a whole.[3] *See, e.g.*, *IMAX*, 272 F.R.D. at 156-57. But the conduct of BRS and its counsel raises issues sufficient for this Court to deny certification of a class with BRS as its representative. *See id.* at 157 (citing *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 109 (N.D. Ill. 1996)). As a result, it is not necessary to address any of Allergan's other arguments about why BRS is an inadequate class plaintiff – or to address its arguments addressed to the issue of typicality.

The question then becomes what to do next. BRS is of course free to prosecute its claim individually, hiring (at its own expense) as many law firms as it likes, on whatever terms it wishes, including a contingency arrangement. Or it may be that some other putative class member will step up and seek to replace BRS as lead plaintiff; I will leave open that possibility for 30 days.

## II. The Motions to Seal Are Granted in Part and Denied in Part

The common law right of public access to judicial documents is a critical facet of the judicial system. As the Second Circuit has explained:

> The presumption of access is based on the need for federal courts ... to have a measure of accountability and for the public to have confidence in the administration of justice ... Although courts have a number of internal checks, ... professional and public monitoring is an essential feature of democratic control. Without monitoring, [ ] the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

For that reason, when parties to cases before me enter into protective orders – as is routinely done in securities fraud class actions – they must include an addendum acknowledging that documents that are not really confidential are often designated as such, and that this Court, which takes a dim view of such over-designation, reserves the right to decide whether documents really are confidential or not, and to direct that the documents be filed publicly if they are not. The pendency of these motions to seal requires me to engage in this exercise.

**\*10** To determine whether it is appropriate to allow documents to be filed under seal, courts undertake in a two-part inquiry. First, the court must decide if a document is a "judicial document," with reference to its role in the judicial process. If so, it is subject to a presumption of public access. In determining whether a document is "judicial," courts examine the "relevance of the document's specific contents to the nature of the proceeding." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (internal quotation marks omitted). Once a court has determined that a document constitutes a judicial document, it must balance the common law presumption of access against competing comparisons, including "the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120.

Here, BRS seeks to seal the following information: exhibits outlining the fee arrangement between Thornton and Pomerantz (Connolly Decl. Ex. 44, 45); exhibits consisting of any agreements between BRS and its counsel (Connolly Decl. Ex. 48, 50, 62, 64); testimony of and documents concerning the strategies used by BRS's investment manager (Connolly Decl. Ex. 40, 41; Declaration of Jeremy A. Lieberman in Support of Mot. to Certify Class, Aug. 20, 2020, Dkt. No. 146 ("Lieberman Decl."), Ex. 35); most of the testimony of BRS's corporate representative (Connolly Decl. Ex. 43; Lieberman Decl. Ex. 34); and the rebuttal report of Plaintiff's expert, Dr. Zachary Nye, who testified about the issue of predominance of individual issues over class-wide issues – a matter that the Court did not reach in deciding not to certify the class. (*See* Pl. Memo of Law in Support of Defs' Mot. to Seal, July 30, 2020, Dkt. No. 134; Pl. Memo of Law in Support of Mot. to Seal, Aug. 19, 2020, Dkt. No. 144.)

Defendants seek to seal the following information: six lines from its communications with GMED, the European regulatory body that decided not to re-certify Allergan's breast implants (Connolly Decl. Ex. 13, 14); five lines from the declaration of Plaintiff's confidential witness (Connolly Decl. Ex. 63); and 40 other internal Allergan documents, (Lieberman Decl. Ex. 2-22, 27-28, 31, 38[4]-52, 54) fifteen of

which Defendants also wish to strike from the record on the basis that they are irrelevant to the issue of class certification (Lieberman Decl. Ex. 5, 7-13, 18-22, 27-28). (*See* Defs' Memo of Law in Support of Mot. to Seal, July 28, 2020, Dkt. No. 126; Defs' Response to Pl. Mot. to Seal, Aug. 20, 2020, Dkt. No. 149.)

The parties also seek to seal the portions of their briefs that rely on those underlying documents.

All of these exhibits were submitted to the court in connection with the class certification motion. They are, therefore, presumptively "judicial documents," since they were meant to be considered by the court in deciding the motion. And most of them address issues that really are relevant to class certification, although it was not necessary for the court to reach all such issues in this case.

The motions are decided as follows:

*Plaintiff's Motion to Seal*
(1) Exhibits 43, 44, and 45 to Defendants' Opposition Brief may not be filed under seal. These documents outline the fee arrangements (which have varied over time) between Pomerantz and Thornton. There is nothing secret or proprietary about the fee sharing arrangement between the two law firms, so there is no privacy interest against which to do any balancing. I understand why the firms want these documents kept secret – it is embarrassing to be caught out in an effort to evade a court order. But in a securities fraud class action, or any class action, the public and class members have the right to know about fee arrangements. Fee awards are matters of public record and information relating to the fees of class counsel is supposed to be transparent.

 **\*11**  Moreover, as this particular fee arrangement is the basis for refusing to certify the class, sealing these documents would mean issuing a secret ruling on the motion for class certification, because it would be impossible for anyone to make sense of the court's ruling if information about the fee arrangement were redacted from this opinion. I do not issue secret opinions, especially relating to matters that implicate the interests of absent class members, who have only the public docket of the court to give them information about what is indisputably "their" lawsuit.

(2) Documents relating to the arrangements between BRS and Pomerantz concerning their longer-term relationship may not be filed under seal. This includes the Retainer

Agreement pursuant to which Pomerantz monitors BRS's portfolio of investments for potential violations of securities laws (Connolly Decl. Ex. 48), BRS's Request for Proposals for Portfolio Monitoring & Securities Litigation Services (Connolly Decl. Ex. 62), Pomerantz's response to the RFP (Connolly Decl. Ex. 50), and a standard engagement letter between BRS and Pomerantz (Connolly Decl. Ex. 64). The fact of representation and nature of a fee arrangement between an attorney and his client are not privileged. *Bernstein*, 815 F.3d at 145 (citing *In re Grand Jury Subpoenas*, 803 F.2d 493, 496 (9th Cir. 1986)). These documents, too, need to be transparent so that absent class members can understand the arrangements that are pertinent to the representation of their interests as absent parties, and so that class actions are not "lawyer-driven." It is certainly no secret that law firms that routinely handle securities fraud class actions have "stables" of regular (primarily institutional) clients who engage those firms on a long-term basis for the purpose of identifying potential cases and representing them in those cases. That has been well known for decades.

(3) Defendants argued that BRS was not a typical class member because its investment adviser used an algorithm to make investment decisions, which rendered it susceptible to the unique defense of lack of reliance. The court did not need to reach that issue to decide the motion. However, it is hardly a secret that institutional investors invest with advisers who use algorithms to make investment decisions; there are quite a few decisions out there discussing whether that fact renders named plaintiffs appropriate class representatives. *See, e.g.*, *City of Livonia Emps.' Ret. Sys. V. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012); *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH)(AKT), 2015 WL 3915477, at \*9 (E.D.N.Y. June 25, 2015); *Iron Workers*, 616 F. Supp. 2d at 466.

However, any details about the algorithm used by BRS' investment adviser would constitute trade secrets; and while those details may someday be relevant to BRS' ability to prove that it was defrauded, they are utterly unnecessary to a decision on a motion for class certification – and would have been unnecessary even if I had reached the issue. Therefore, BRS may file the following exhibits – Exhibits 40 and 41 to Defendants' Opposition Brief and Exhibit 35 to Plaintiff's Reply Brief – under seal – and may file any brief containing references to those exhibits under seal. However, BRS must place redacted versions of all these documents and briefs on the public record; redactions are limited to references to the details (as opposed to the fact) of the algorithm.

2020 WL 5796763

(4) Portions of the deposition testimony of the BRS corporate representative, which is excerpted in two exhibits – Exhibit 43 to Defendants' Opposition Brief and Exhibit 34 to Plaintiff's Reply Brief – may not be filed under seal. Although BRS has redacted every word of Exhibit 34 to Plaintiff's Reply Brief, as well as the last twelve pages of Exhibit 43 to Defendants' Opposition Brief, it does not identify anything on any of these pages that qualifies as confidential or proprietary information.

**\*12** There is no question that the following information in these documents cannot be filed under seal: information pertaining to the circumstances under which BRS became Lead Plaintiff, Pomerantz's retainer and monitoring agreement with BRS, the Lead Plaintiff Order, Thornton's role in this lawsuit, and the fee arrangement with Thornton. However much the class action Bar would like to think otherwise, those matters are not trade secrets; they are, however, very pertinent to whether BRS and its lawyers can adequately represent the plaintiff class. It was not, and would not be, possible to decide the motion for class certification without referring to these documents.

The remainder of the redacted information in Exhibit 43 to Defendants' Opposition Brief relates to Defendants' allegation that BRS's counsel made political donations, and a confidential witness statement (described below in category (6)) that Defendants argue demonstrates BRS's inability to control its counsel. The information about political contributions may be redacted. The degree to which BRS confirmed the accuracy of the confidential witness statement prior to the filing of the CAC is not confidential information and may not be filed under seal. The remainder of Exhibit 34 to Plaintiffs' Reply Brief relates to BRS's knowledge of and involvement in the litigation. That information may also not be filed under seal. It is not confidential or secret; it relates squarely to whether BRS would have been an adequate class representative.

(5) Finally, Plaintiff seeks to file a redacted version of the rebuttal report of Plaintiff's expert, Dr. Zachary Nye (Lieberman Decl. Ex. 1). Plaintiff asserts that it redacted the document because the report references and includes materials that Defendants designated as confidential, but that it takes no position of the propriety of the information; Defendants make no argument about the sealing of this exhibit.

Dr. Nye's report is not in itself confidential or proprietary. Allergan has not argued that it needs to be sealed. It should be filed publicly.

*Defendants' Motion to Seal*

(6) Defendants' request to seal portions of its communications with the GMED (Connolly Decl. Ex. 13 and 14) is denied unless, within five days, Allergan can point the court to some law that requires it to keep the reasoning of GMED for decertifying the implants a secret. The six lines that Defendants redacted report the GMED's reasons for decertifying Allergan's breast implants. Defendants placed the impact of the GMED's decision and subsequent ANSM recall at issue on this class certification motion, by arguing about the applicability of the fraud-on-the-market theory of reliance to this lawsuit and whether the ANSM recall was actually related to the alleged fraud. (*See* Defs' Opp. Br. at 14.) The European regulatory ruling is not an Allergan trade secret, nor is it proprietary to Allergan. While the applicability of the fraud on the market theory turned out to be irrelevant to the ultimate decision on class certification, the issue of the European decertification of its breast implants is very much a part of this lawsuit. Unless some European law bars this court from making public the reasoning of the European regulatory body, that information – which is analogous to a public record in this country – cannot and will not be kept secret.

(7) Allergan's motion to redact a portion of Exhibit 63 to Defendants' Opposition Brief - the declaration of BRS's confidential witness – is denied. Defendants cited the declaration in support of their argument that BRS was not an adequate class representative because it failed to oversee its counsel. This portion of the witness's statement describes the objectives of Allergan's "New Texture" project. Defendants have not convinced the Court that these general statements of purpose reveal any confidential corporate information or trade secrets.

**\*13** (8) Defendants also move to seal a number of Allergan's internal documents (Lieberman Decl. Ex. 2-22, 27-28, 31, 38-52, 54), including: (a) presentations reporting on the safety of Allergan's textured breast implants and incidence rates of ALCL (Ex. 2, 5, 14, 15, 19, 47); (b) intra-company emails discussing incidence rates of ALCL and the risks associated with Allergan's textured breast implants (Ex. 3, 4, 7, 17, 18, 20, 44, 50, 54); (c) drafts of and reactions to communications with the FDA, ANSM, and GMED (Ex. 6, 13, 16, 21, 38, 40, 41, 42, 45, 46, 52); (d) drafts of Allergan press releases concerning ALCL and guidance for employees responding

to media inquiries (Ex. 12, 31, 39, 49); (e) reports on and communications regarding an ANSM hearing on Allergan's overrepresentation among French ALCL cases (Ex. 27, 28); (f) other Allergan documents reporting on the safety of its textured breast implants (Ex. 8, 11, 22, 43, 51) and its share of the breast implant market (Ex. 9, 10); and (g) an ANSM report on BIA-ALCL.

To the extent that these exhibits were relevant at all on a motion for class certification, they did not ending up making any difference to the court's determination of the class certification motion; they were cited by the parties solely because of their relevance to the applicability of the fraud-on-the-market presumption of reliance should apply, an issue that was not necessary to address. They will inevitably be relevant once discovery concludes and the parties brief motions for summary judgment, but Allergan wants to keep them under seal for now.

Defendants have not even tried to demonstrate that the information contained in these exhibits constitutes trade secrets or is otherwise confidential, or that disclosure would put Allergan at a competitive disadvantage. Some of the information contained in some of these exhibits might be harmful to Allergan's reputation with the public, but, "the fact that business documents are secret or that their disclosure might result in adverse publicity does not automatically warrant a protective order." *See In re Parmalat Sec. Litig.,* 258 F.R.D. 236, 244, 257 (S.D.N.Y. 2009).

In their memorandum of law in response to Plaintiff's motion to file under seal, Defendants ask the Court to strike a subset of these exhibits (Lieberman Decl. Ex. 5, 7-13, 18-22, 27-28) on the basis of their purported irrelevancy to the class certification motion. This is not the proper way to make a motion. However, the only apparent use of these exhibits was as citations in the "Relevant Facts" section of Plaintiff's reply brief, which, to Allergan, suggests that they were added to the

record for an improper purpose and so can be stricken under Fed. R. Civ. P. 12(f) as "immaterial" matter. Unfortunately for Allergan, that rule is specifically directed to pleadings, not materials submitted in connection with a motion. *See Granger v. Gill Abstract Corp.,* 566 F. Supp. 2d 323, 334-35 (S.D.N.Y. 2008); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Hicks, Muse, Tate & Furst, Inc.,* No. 02, Civ. 1334(SAS), 2002 WL 1482625, at *6 (S.D.N.Y. July 10, 2002).

I direct that the exhibits that Allergan seeks to strike from the record be filed under seal, but only temporarily, until the point at which they do become relevant to a decision the court needs to make. At that point, they will almost certainly have to be unsealed.

As for the remaining Allergan documents, I will give Defendants ten days to point out what in those documents constitutes it believes constitutes proprietary information (as they did with Item (7) above), identifying that information line by line and explaining why it qualifies as a secret under decisional law.

## CONCLUSION

Plaintiff's motion to certify a class is denied in accordance with this opinion. Plaintiff's motion to seal is granted in part and denied in part.

The Clerk of Court is respectfully directed to close Dkt. Nos. 91 and 143.

It is so ordered.

## All Citations

Slip Copy, 2020 WL 5796763

---

Footnotes

1   The Seventh Circuit aptly described the risk attendant to lawyer-driven class actions in deciding an appeal of a class wide settlement:

Class counsel rarely have clients to whom they are responsive. The named plaintiffs in a class action, though supposed to be the representatives of the class, are typically chosen by class counsel; the other class members are not parties and have no control over class counsel. The result is an acute conflict of interest between class counsel, whose pecuniary interest is in their fees, and class members, whose pecuniary interest is in the award to the class.

*Pearson v. NBTY, Inc.,* 772 F.3d 778, 787 (7th Cir. 2014).

2   This Court's confidence in BRS's ability to supervise its counsel's time records is undermined by another court's recent admonishment of Thornton and another law firm, which the court discovered had deliberately submitted false timesheets

2020 WL 5796763

and encouraged double billing. *See Ark. Teacher. Ret. Sys. v. State St. Bank & Tr. Co.*, C.A. No. 11-10230-MLW, 2020 WL 949885, at **7, 23 (D. Mass Feb. 27, 2020)*. In a 160-page order, Judge Wolf wrote, "This case demonstrates that not all lawyers can be trusted when they are seeking millions of dollars in attorneys' fees and face no real risk that the usual adversary process will expose misrepresentations that they make." *Id.* at *11. Of course, those findings do not mean that Thornton would engage in similar practices during the course of this lawsuit. But they highlight the importance of a class representative that is actually driving the conduct of the litigation. A class representative who starts by ignoring the terms of the court's order appointing it as lead plaintiff cannot be trusted to monitor a law firm that was found guilty of double billing in another case.

3   Defendants suggest that the portfolio monitoring agreement between BRS and Pomerantz is evidence of an inappropriate business relationship between the two. While I do not need to address this argument in order to rule on the motion, I note that courts routinely appoint institutional investors who are subject to monitoring agreements as class representative. *See, e.g., Iron Workers*, 616 F. Supp. 2d at 466; *City of Livonia Emps.' Ret. Sys. V. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012); *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH)(AKT), 2015 WL 3915477, at *9 (E.D.N.Y. June 25, 2015).

4   Neither party moved to file Exhibit 38 to Plaintiff's Reply Brief under seal. However, because Exhibit 38 was, in fact, filed under seal and is an internal Allergan document stamped "Highly Confidential," the Court assumes that Defendants intended to so move.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---