IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

HALMAN ALDUBI PROVIDENT AND          : CIVIL ACTION NO.
PENSION FUNDS LTD., Individually     : 20-4660
and On Behalf of All Others          :
Similarly Situated,                  :
                Plaintiff,           :
                                     :
     v.                              :
                                     :
TEVA PHARMACEUTICAL INDUSTRIES,      :
LIMITED, EREZ VIGODMAN, EYAL         :
DESHEH, ROBERT KOREMANS, and         :
MICHAEL DERKACZ,                     : MOTION HEARING
                Defendants.          :

_____

                                   James A. Byrne U.S. Courthouse
                                   601 Market Street
                                   Philadelphia, PA 19106
                                   March 15, 2021
                                   Commencing at 10:09 a.m.

_____

              BEFORE THE HONORABLE KAREN S. MARSTON

_____

                         -   -   -

              Ann Marie Mitchell, CRR, RDR, RMR
                   Official Court Reporter
              ann_marie_mitchell@paed.uscourts.gov
                       (267) 299-7250

Proceedings taken stenographically and prepared utilizing
computer-aided transcription

APPEARANCES:

| | |
|---|---|
| FOR THE PLAINTIFFS AND THE MOVANT MENORAH AND CLAL: | POMERANTZ LLP<br>BY:  JEREMY A. LIEBERMAN, ESQUIRE<br>600 Third Avenue<br>20th Floor<br>New York, New York 10016<br>(212) 661-1100<br>jalieberman@pomlaw.com |
| | KASKELA LAW LLC<br>BY:  DAVID SEAMUS KASKELA, ESQUIRE<br>201 King of Prussia Road<br>Suite 650<br>Radnor, Pennsylvania 19087<br>(484) 258-1585<br>skaskela@kaskelalaw.com |
| FOR THE MOVANTS THE INVESTOR GROUP AND FARIS AL KOOHEJI: | FARUQI & FARUQI LLP<br>BY:  ROBERT W. KILLORIN, ESQUIRE<br>3975 Rosewell Road<br>Suite A<br>Atlanta, Georgia 30342<br>(404) 847-0617<br>rkillorin@faruqilaw.com |
| | FARUQI & FARUQI LLP<br>BY:  JAMES M. WILSON, JR., ESQUIRE<br>685 Third Avenue<br>26th Floor<br>New York, New York 10017<br>(212) 983-9330<br>jwilson@faruqilaw.com |

APPEARANCES CONTINUED:


                        FARUQI & FARUQI LLP
                        BY:  TIMOTHY JOHN PETER, ESQUIRE
                        1617 John F. Kennedy Boulevard
                        Suite 1550
                        Philadelphia, Pennsylvania 19103
                        (215) 277-5771
                        tpeter@faruqilaw.com


FOR THE                 WINSTON & STRAWN LLP
DEFENDANTS:             BY:  JAMES P. SMITH, III, ESQUIRE
                        BY:  KERRY C. DONOVAN, ESQUIRE
                        200 Park Avenue
                        New York, New York 10166
                        (212) 294-6700
                        jpsmith@winston.com
                        kcdonovan@winston.com
                        (via teleconference)


                        OBERMAYER REBMANN MAXWELL & HIPPEL
                        LLP
                        BY:  MATHIEU J. SHAPIRO, ESQUIRE
                        Centre Square West
                        1500 Market Street, Suite 3400
                        Philadelphia, Pennsylvania 19102
                        (215) 665-3000
                        mathieu.shapiro@obermayer.com
                        (via teleconference)


                              -  -  -

(Court called to order at 10:09 a.m.)

THE COURT:  Good morning, everyone.  You may be seated.

RESPONSE:  Good morning, Your Honor.

THE COURT:  Thank you all.  I apologize if there was a -- there might have been a last-minute change on the courtroom, and some of you may have gotten stuck down at 10B, but luckily you found the way.  That shows you can figure things out.

MR. LIEBERMAN:  Thinking quickly on our feet.

THE COURT:  We're going to call the case -- I apologize if don't pronounce it correctly -- Halman Aldubi Provident and Pension Funds, Limited, individually and on behalf of others similarly situated, v. Teva Pharmaceutical Industries Limited as well as other individually named defendants.  This is Civil Docket 20-cv-4660.

Good morning to everyone.  I would ask that counsel state their names, please.  And I think we're going to start with everybody who is virtual with us, just to get that taken care of and so that I don't forget that you're there.

So I see -- I don't know if you know which person is up front and center, but it's a gentleman with a beard, if you could please tell me who you are.

MR. SMITH:  Your Honor, thank you.  Can anyone hear me speaking at the moment?

THE COURT:  We can.

MR. SMITH:  Great.  My mute button for some reason is showing it's on.

James Smith, Winston & Strawn on behalf of the defendants, Your Honor.

THE COURT:  Good morning.  Thank you.

I see we have two other individuals who are smaller sized.  I think maybe when you talk you'll take over his place, but there's a gentleman and there's a woman.  So whoever would like to go next, please do.

MS. DONOVAN:  Good morning, Your Honor.  My name is Kerry Donovan.  I'm also from Winston & Strawn on behalf of defendants.

THE COURT:  Good morning.  Thank you for being here.

MR. SHAPIRO:  And Mathieu Shapiro, Obermayer, Rebmann, Maxwell & Hippel on behalf defendants.

THE COURT:  Okay.  Good morning as well.  Thank you.

We have counsel in the room.  I'm not sure what our virtual friends are seeing.  You may just be seeing me, but I'm not exactly sure how this is set up.  But we do have counsel that's going to introduce themselves, please.

MR. LIEBERMAN:  Good morning, Your Honor.  Jeremy Lieberman on behalf of Plaintiff Halman Aldubi Provident and Pension Funds, Pomerantz LLP.  In addition, we represent the movants Clal & Menorah.

MR. KASKELA:  Good morning, Your Honor.  David Seamus Kaskela for the same parties.

THE COURT:  Great.  Thank you.

MR. KILLORIN:  Good morning, Your Honor.  Robert Killorin.  We represent movant the Investor Group.  This is my partner James Wilson and my partner Tim Peter from our Philadelphia office.

THE COURT:  Great.  Thank you all for being here.

Are we expecting anyone from ERJ?

MR. LIEBERMAN:  Your Honor, I think they have withdrawn their motion, and I don't believe they intend on appearing.

THE COURT:  Not even appearing virtually?

MR. LIEBERMAN:  I don't believe so, Your Honor.

THE COURT:  I thought they would still be appearing virtually, but that's -- okay.  I thought given all the movement in the last week, they might even, you know, reenter.  Just kidding.

All right.  So I did receive, obviously, the notice of withdrawal by one of the plaintiffs with the Investor Group.  And I also received the response.  I am going to take the response.

I see the motion to strike the response that I received last night as well as a supplemental response to be taken -- response to the response.  And I will accept that as

your response to the response.

I will note that for future practice before me, I think given that it is sort of a sur-sur-reply, I would have granted your request to file it, but I think the better practice would be to ask permission when we're this far down the road and we're dealing with sort of a response to a response to a response at this point. Okay? So let's make sure we make note of that.

I see there's been a little bit of maybe objecting to people's responses in the past. I think this might be the second time that the Investor Group has decided they want to object to the response, but if the Court were to go ahead with the response, then here is what we want to be acknowledged.

I guess -- the way I read it in terms of this notice to withdraw, obviously I'm going to have questions about that this morning. I certainly think that you all would have come with the arguments in hand that you gave to me on paper. So even though it was late last night, I did get through the paper that you sent, so -- much to the chagrin of some of the people in my household, if you're wondering, but I did.

And I have to think I found the opinion very interesting that was attached as Exhibit A.

I do have a question, why maybe that wasn't something that was brought to my attention sooner, because I do think that some of that may be relevant, and I think you will need to

address some of the issues that were brought up in that, because at this point, the way I look at things that I've seen, it seems like there might possibly be four law firms somewhere in the mix with people on this.

So with all of that, I decided very diplomatically to flip a coin this morning to decide who was going to go first, because I had a feeling that you both might think that you wanted to go first.

Am I right about that, or has someone already decided they'd rather hear from the other side first?

MR. LIEBERMAN:  Your Honor, we would like to go first this morning.

THE COURT:  Right.  Well, you lost the flip of the coin, so I am sorry to say that I have -- I did it with a coin downstairs in chambers, and you may go first.

MR. KILLORIN:  Thank you, Your Honor.

I am Bob Killorin representing the Investor Group.  We have a bench book with some slides.  I don't know if with COVID procedures --

THE COURT:  No.  I'll take a bench book.

MR. KILLORIN:  Great.

We will email the PowerPoint of this presentation to everybody that's virtual as we speak.

Where should I put this?

THE COURT:  Is it going to be the same thing that I'm

seeing here?

MR. KILLORIN:  It is.  We have slides --

THE COURT:  I would put it in that corner over there just for social distance purposes.

MR. KILLORIN:  Since we have the bench book, we really don't need the slides.  We can just work from that, Your Honor.

THE COURT:  That's fine.

Are you comfortable being there?  Because you are more than welcome to stay at your --

MR. KILLORIN:  Oh, wonderful.  I'd rather stay at the table.  Sure.

THE COURT:  I mean, I like seeing you there, but I think given COVID, it probably makes more sense just to stay at the table.

I even will take a North Carolina sit-down jurisdiction, so go for it.

MR. KILLORIN:  Oh, really?  So I can sit down as well?

THE COURT:  You can sit.  Sometimes people feel better standing.

MR. KILLORIN:  I love to sit down, so thank you, Your Honor.

If we could quickly -- I'm not going to take too long, because I want to save time to answer the Court's questions.  And we've briefed everything fairly thoroughly, so we certainly do rely on our filings.

However, this matter has some complexity because in my opinion, I've been doing 10b cases for about 16 years, they simply have some complexity. So I think it's wonderful the Court allowed us to come make oral argument, and we thank you.

If you would take a look at the first page of the bench book, this -- our basic argument is that the opposing movants are disqualified under Rule 23 as inadequate because they have inextricable conflicts of interest. And we think they have three of them.

The first one that has -- was briefed is that they are representing multiple parties, the Pomerantz firm, in Teva litigation, most of which are not in this case and not in this courtroom.

Teva Pharmaceuticals was guilty of -- or allegedly guilty of price fixing back before 2015. A whole myriad of cases got filed in Connecticut regarding that activity, including a 10b securities case.

However, Mr. Pomerantz and his firm and 22 of their clients, including the movants in this case, all filed lawsuits in Connecticut regarding that price-fixing scheme, and they all announced to the court that they did not wish to participate in the main 10b action, class action. They all said that they would stick to their guns and be opt-outs and have proceeded along those lines. They are --

THE COURT: Are they all consolidated?

MR. KILLORIN:  Yes.  They've been consolidated for discovery purposes only.

THE COURT:  Okay.

MR. KILLORIN:  And so they have -- it's -- they have characterized it -- naturally, I guess they would -- as de minimus, but we take issue with that characterization.  They say there's $4 billion in damages.  Their 22 clients are huge institutional pension funds and insurance companies.  We think that the Pomerantz firm owes a huge duty of loyalty and zealous advocacy and undivided attention representing those 22 large clients in their direct opt-out action pending in the courts of Connecticut.

They have now filed this action against Teva.  And I can understand they are knowledgeable about Teva because they have been litigating against Teva.  At this point they may have confidential information regarding Teva.

However, this case is distinct and unrelated.  It will not, we don't believe, get transferred to Connecticut.  This is a whole new set of claims based on a Department of Justice announcement of an investigation against Teva for a kickback scheme regarding its multiple sclerosis drug Copaxone.

And just to quickly review, we feel like the allegations are fairly egregious in that Teva was misusing charities simply for the purpose of getting its co-payments made so it could sell more Copaxone to desperate multiple

sclerosis patients who couldn't afford their co-payments. Under that umbrella of that cover, they were able to increase their prices many fold and increase their profits many fold.

So this case is separate and distinct from the generic drug price-fixing case. Copaxone has been both under patent, generic, and a hybrid, because the company keeps trying to reformulate it to extend patents for new formulations.

But the problem -- the conflict arises because they are both 10b cases. The direct actions are not a class action. They've opted out of the class action. But the same legal principles proving damages apply.

And in the Pennsylvania cases, they are alleging periods of deflation, in other words, periods where they say that Teva's statements as a company were revealing the fraud gradually.

And that's an important point in these cases, because it's relevant to DeKalb County's damages.

THE COURT: Revealing the fraud as it relates to this 10b-6?

MR. KILLORIN: No. It relates to that 10b case. And that's the problem.

During the same period they're saying that the fraud was being revealed as to that case, that they were saying the same statements -- very same statements on the very same day by the very same company were inflating the price of Teva in this

case, leading to the damages that matured at the end of the case when the fraud was fully revealed.

And so that -- that is the primary conflict, is they are arguing that on the very same day of the month, the very same public disclosures by Teva, they were intending to increase the damages in this case while they were intending to expose the fraud in the other case and give rise to mature damages. In other words, they were causing artificial inflation in one case, in this case; and in that case, the same disclosures were slowly revealing the fraud and causing the deflation to come out of the stock, thus giving rise to the damages.

So 10b law, ever since the Dura Pharmaceutical case, the principle is simple: That you have to show for damages not only that you purchased stock at an inflated price, but then the fraud was revealed and the value of your stock dropped and you suffered a loss. You know, before that there was arguments that all you had to do was show that you purchased at an inflated price in the abstract without the actual revelation of fraud.

Dura simply said, you've got to show that you purchased it at an inflated price and the fraud was revealed, the price came down. But it didn't specify how to calculate the damages. It didn't elaborate on that. It did say it was based in principle on loss causation theory.

Pardon me, my mouth is a little bit dry.

THE COURT:  If you have water, you may take a sip.

MR. KILLORIN:  Thank you.

THE COURT:  The second floor has a snack bar.  I think you could get bottled water there.

MR. KILLORIN:  Thank you, very much, Your Honor.

Anyway, in this case, while damage theory has gotten fairly complex in these 10b cases, as one of the cases we cite says, damages for purposes of a 10b case are not actually calculated at the beginning of the case during this lead plaintiff period.  Instead, what is calculated under the PSLRA is the largest financial interest.

That is not necessarily the same as damages.  And there's a good reason for that.  Under these cases, under the complexities of the law when there can be multiple disclosures over a period of years that are partial disclosures of the fraud mixed in with other compounding information, it takes a damage expert to calculate the damages.

And that -- an event study is what it's called.  The experts are expensive.  The event studies are huge, which is one reason that class actions are a great vehicle for this.  But that is also why the court took on to a short form way of calculating the largest financial interest, different than the ultimate damage calculation proved for a jury at trial.  The largest financial interest for a 10b case has come down to the

Olsen -- or the Lax-Olsen factors.

They are the losses under the LIFO or FIFO calculation.  LIFO and FIFO basically comes from capital gains tax law, when you're try to see how you did on a stock, you can either go first-in, first-out or last-in, last-out.  That's LIFO, FIFO.  Different courts have used different systems, but they've gravitated toward LIFO for these cases.

The courts also look at other factors like net shares purchased, net shares sold, and shares held at the end of the class period.

But the one thing that all courts agree on is that partial disclosures during a class period can lead to partial damage calculations.

And so -- but anyway, the first conflict that they have is there is a period where the two cases, the two overlap, where both Complaints are alleging that the stock was being inflated but for different reasons.  That means that a damage analysis would simply -- a damage expert would be conflicted on how to allocate that increase in the price of stock, the artificial inflation due to fraud between the two cases.

Now, it's going to be done, but it's best done by independent experts each with their sole loyalty and allegiance to their own group of plaintiffs.

After that, the conflict gets even worse.  That's for the first 11 months of our class period.

THE COURT:  Is it one specific time that they both allege the inflation, like a specific day?

MR. KILLORIN:  I'm sorry, Your Honor?

THE COURT:  Is it one specific day that they both allege the --

MR. KILLORIN:  Yes.

THE COURT:  So it's a specific moment in time?

MR. KILLORIN:  Actually, if you would not mind turning to the third page of the bench book, we have a chart there.

THE COURT:  Yes.  I think I see this.

MR. KILLORIN:  There are actually -- we identified just for this case during that period of overlap where we are saying that the price was being inflated in this case, and in the Connecticut cases they were saying that the price was being deflated because the truth was being revealed to the market slowly.  It's called leakage.  If bad things happened to the stock without any good explanation, then that may be a signal that the fraud is being revealed through what's called leakage.  And that's a partial exposure during the class period.

They have alleged four partial disclosures during the same period of time that this case alleges nothing but inflation.  It's a direct conflict in how you would calculate the damages between the two groups of plaintiffs, and we think that that is simply irreconcilable, inextricable, and if the same firm, the same damage expert was trying to do that

calculation in this case and do it in the Connecticut cases, which they will be, then it would simply lead to objections. It would lead to more big institutions wanting to opt out of this case in favor of having their own dedicated counsel and expert whose allegiance is not divided. And it would lead to -- it would be fertile ground for objectors at the end of this case that this case was not run in the best interest of the class because it was -- these decisions weren't being made by either the same expert or experts being paid by the same law firm. And that is just a tremendous conflict -- direct conflict of interest in our opinion. So that is our first argument for conflict.

The second argument is that both groups of plaintiffs would be going after the same pot of money from the same corporate defendant and from the same individual defendants.

Now, even if you were to accept the fact -- or accept the premise that during the course of lengthy securities litigation a corporation can't go bankrupt, which we don't believe is true, certainly individuals, defendants, have limited amounts of resources, and it's a conflict of interest to be going after the -- for two groups of plaintiffs to be going after the same individual defendants with limited resources.

And it's as to me an interesting aside, Your Honor. In their brief, they cited the Genworth case just for the

general proposition that a conflict has to be substantial to rebut the presumption of the most adequate lead plaintiff when a person has the largest losses.  Well, that's true.  That's great black letter law.  They cited Genworth for that.

Genworth is a case where our firm challenged the presumption of the most adequate lead plaintiff and showed the court the conflicts of interest which were similar to the conflicts in this case.  We overcame the presumption, and we were appointed the lead plaintiff in that case, having not having the largest losses up front but simply overcoming the presumption of the most adequate lead plaintiff, because of the conflicts.

Genworth was a 14a case.  We didn't cite it in our briefs just because we were -- there were plenty of 10b cases that are more on point, but Genworth is just another example of the presumption being overcome by conflicts of interest when the same plaintiff is trying to represent different parties.

In Genworth, the party was maintaining a derivative action against a corporation which is technically in the name of a corporation and also suing the corporation for 14a disclosure problems.

The court found that it was simply too much of a conflict of interest, even though the defendants vehemently argued no, no, the claims are totally related.  We won't be conflicted.  The court found things like it was different class

periods, the groups of plaintiffs would be slightly different, and the resources were not infinite, so there could be conflicts on how -- when and how to time the settlement of the case if the defendants started to have solvency issues.

In this case, on that score, if you look at the -- I believe it's the second page of our exhibit, of our bench book, you'll see where Teva's own filings show that they have $23 billion in debt.  So when the Menorah & Clal say, well, Teva is bulletproof, they've got $10 billion in market share, we would say, well, take judicial notice of their own filings that say they have $23 billion in debt and the analysts are taking a look at whether or not Teva will declare bankruptcy this year or sometime soon and are setting the odds pretty high.

So while that conflict is not tangible, if that was the only conflict of interest we had going, it probably wouldn't be sufficient.  But when you couple that with the clear and powerful conflict of interest on overlapping periods of damage and damage claims, then you've got enough, we think, to overcome the presumption.

But it gets worse.  If you look at the front page of this exhibit, the --

THE COURT:  Can I ask one --

MR. KILLORIN:  Yes.

THE COURT:  You keep saying overcome the presumption,

which I totally understand that you're trying to rebut the presumption.

MR. KILLORIN:  Yes.

THE COURT:  But do you also think that you have an argument they haven't even met the requirement to be considered as a presumptive lead plaintiff?

MR. KILLORIN:  Your Honor, you may --

THE COURT:  I'm just asking.

MR. KILLORIN:  You may have thought of something I haven't, but no.

THE COURT:  So you're --

MR. KILLORIN:  We believe that they met --

THE COURT:  I know the financial loss aspect of it in terms of their adequacy and their --

MR. KILLORIN:  Your Honor, as far as I know, they've met the initial bare bones requirements of showing that they have the largest loss.  They timely filed a motion to be considered lead plaintiff.  And there's nothing on the face of their filings that would -- where they've admitted that they're not qualified.  However, we just think that the evidence is there and the law is there.  So that's our position.

THE COURT:  Okay.  That's fine.  I just wanted to be sure.

MR. KILLORIN:  We're not challenging their damage calculation, Your Honor.

THE COURT:  No.  I know.  Well, yeah.  I understand that.

MR. KILLORIN:  Okay.  I may be misunderstanding the question then.

THE COURT:  No.  That...

MR. KILLORIN:  Okay.  So then -- but the -- and now what really is the biggest conflict -- so it's basically a trifecta of conflicts.

On the first page of this handout, they have retained two additional law firms which we have just learned about, who are under contract and agreement with the Menorah & Clal movants that they will jointly prosecute this litigation, this litigation being the class action that they are seeking to become lead plaintiff in and get certified in, to get certified as a class.

I had to sort of keep double checking the class numbers to see if that is even -- how that could be.

I don't know what their explanation for that is going to be.  I can't wait to hear it, frankly.  But it's a complete conflict of interest.

They have agreed now to use three law firms, two of which have not been disclosed to the court, have not been vetted by the court, because no information has been provided to the court to vet them.

The PSLRA says that the lead plaintiff has to

designate lead counsel, which must then be approved by the court.  So they're apparently asking you buy two pigs in a poke and a well-known law firm, which, you know, the Pomerantz firm has had great successes in its track record.  But we don't know anything about the other two law firms that want to be effective lead counsel because they are under contract to jointly prosecute the litigation.

Now, they can say, well, it's just -- we're going to be lead counsel.  They're just other counsel.

Well, that's being too cute by half, Your Honor.  They are all jointly prosecuting this.  They want it to become a certified class.  They want to be lead counsel and lead plaintiff.  And if lead plaintiff has three counsel, then that de facto makes them all lead counsel.

There is no explanation of how the three firms would resolve conflicts of interest between themselves.  There's no opportunity for the court to do its PSLRA-mandated duty of approving the other two counsel because no information has been provided about them.  In fact, their existence apparently was going to be withheld, which goes to, you know, one of our responses.  If you want to talk about a lack of transparency, this blows the roof off.

And Judge McMahon -- they did a similar thing in the Allergan case.  And when Judge McMahon said, yeah, sure, you guys have edged out DeKalb for lead plaintiff on, by the way,

their damage theory that there were partial disclosures that were not written up in the Complaint. That was part of their explanation. Well, that's -- we're going to use that argument in a minute. That's exactly why DeKalb does have damages in this case, because there are partial disclosures in this case or at least it looks like the evidence will show they will when we hire an investigator. That means that the inflation started to come out of this stock in 2017 when DeKalb still held its shares.

They brought in a new CEO. He apparently was doing some housecleaning. He announced a downward revision to their Copaxone sales projection. And we believe that was leakage of the prior fraud that had been committed with the Copaxone drug, which impacted DeKalb's holdings in this stock. So -- but I'm going to talk about that more fully in a minute.

But the point is, Your Honor, these three counsel have no plan of how they would resolve conflicts. The lead plaintiff movants would be bound to use all three of them under this retainer agreement to jointly prosecute the litigation. And that flies in the face of Moore's Federal Practice and many courts in this country that prefer a single counsel for class actions to control -- control the cost of litigation and other reasons, such as unity of leadership and lack of potential for conflicts of interest.

And Judge McMahon ordered that only one lead counsel

operate in the Allergan case.  Well -- instead of the two that had moved to be appointed.  Well, they said, sure, Your Honor.  The Boston Retirement System wrote her a letter and said, we choose the Pomerantz firm.  That was all well and good until about a year-and-a-half later during class certification, and it came out that the other firm, the Thornton firm, had been operating in the shadows, in the background, coming to depositions, going to -- being on all the emails, and had simply reduced their fee from 50/50 to 45/55.

So again they were being too cute by half in their semantics, in their nomenclature.  They said, well, there was only one lead counsel and we just used some other counsel that we weren't really making a big deal about.

And Judge McMahon just said, gosh, I'm sorry I didn't notice that they had made some mention of this other law firm somewhere in the pleadings, but I said only one counsel.  This is just a clear violation of the spirit of my order.

She was not pleased, and she simply said, even though class should be certified in this case, lead plaintiff is not adequately -- lead counsel is not adequate, let's have a new -- reopen the motions for lead plaintiff.

Us and a number of other law firms applied.  She had already vetted us, and we had come in a close second in the initial round of hearings.  And she said DeKalb is a perfectly adequate lead plaintiff, and they timely filed under the PSLRA.

And so now we are the lead counsel in that case, and DeKalb County, our client, is lead plaintiff.

But again, I guess it's semantics, but Judge -- you can say, well, are you really lead counsel if somebody else has the title. Apparently you can be.

And these two law firms get almost a quarter of the fees, and they are under agreement by all parties to jointly prosecute the litigation with Pomerantz. So in our opinion, it would be semantics to call them anything other than co-lead counsel. They're undisclosed, and we think that that puts both the attorneys and their client in again an inextricable conflict of interest, not to mention the lack of transparency by not revealing that to the Court.

If you look at our papers, there are a number of courts that have said that it is -- it's a requirement that all counsel be revealed to the court initially as soon as they are retained if for no other reason that the court needs to conduct their own conflict of interest to see if there's any conflict with those lawyers.

So we just think this is a disqualifying conflict of interest, a third disqualifying conflict of interest. I guess really in fairness, there are two disqualifying conflicts of interest. And chasing after the same limited assets is sort of a kicker, and it would make -- but either one of the two make them sufficient to rebut the presumption of adequacy.

So that's a summary of our argument, which is, you know, pretty well fully briefed after all of these rounds of briefing and the papers.

Now, they make -- they make a point that DeKalb surely couldn't have damages in this case because they didn't hold stock at the end of the class period.  But that's not really the way it works, and they know it.

In the Allergan case, they didn't like one of our damage calculations where they came in behind us, and so they -- the fourth page of this is a slide that says, argument that the final Amended Complaint may contain additional allegations of disclosures during the class period which supports the use of LIFO loss calculation to determine lead plaintiff at the initial stage.

Well, this is their words.  They explain when they are trying to argue that they went on that damage calculation as well, that there could be partial disclosures that have not been written up yet.

The way these cases -- you know, as Your Honor knows, the lead plaintiff in this case is -- typically, and I think there's already an order in this case, will have a certain amount of time to file a Master Amended Complaint.

During that time --

THE COURT:  Is there an order already for that?

MR. KILLORIN:  I think there is, Your Honor.  I think

that was stipulated to.

MR. LIEBERMAN:  I think it might be 60 days from the time the lead plaintiff --

THE COURT:  Right.  Okay.  It's not like --

MR. KILLORIN:  During that period, whoever you appoint as lead plaintiff is surely going to be busy taking advantage of that time to hire private investigators and build the strongest case that they can, hire analysts, experts, and really, instead of a -- you know, what we call a thin Complaint filed initially in these cases which is 30 pages, you're probably going to see a thick Complaint that's more like 200. But that's going to be the result of investigation, expert analysis, and it may well have the partial disclosure in 2017 that we have identified.

And if you look at the last page of this slide, you'll see an article where Teva cuts forecast for 2017 amid competition to flagship Copaxone drug.

Well, that disclosure caused a price drop --

THE COURT:  You think that's leakage?

MR. KILLORIN:  Yes.  We think it could be, Your Honor. We're not going to commit to what the Amended Complaint would look like right now, because we haven't hired experts and we haven't hired -- but yes, we think it looks like leakage.  But that is exactly why, going back to my initial point, in these cases you don't do a damage calculation up front.  You just

look at the short form juris prudence on how to -- really, it's an estimate of financial interest. And therefore, the LIFO and FIFO calculation under which DeKalb lost $1 million has always taken great precedence, because we really don't know all the partial disclosures, but this looks like a great candidate, and I suspect it will be a partial disclosure in the Amended Complaint.

But the point is, DeKalb County had a million dollars in LIFO losses. And that means if they had not bought Teva stock at the end of the class period, they would have a million dollars more in their pension fund for their pensioners. And that is what the courts typically look to at the initial stage to evaluate financial interest of movants. And so we think that DeKalb is absolutely qualified to move forward in this case. They have a million dollars in LIFO losses. And we do, as I say, have a strong suspicion that there will be additional partial disclosures added to the Amended Complaint, just as learned counsel to my left argued in the Allergan case may be written up in that case as well. That's how it works.

THE COURT: You think the argument in the Allergan case supports page -- your argument? It's the same argument?

MR. KILLORIN: Yes. I think it's the same -- it's the same argument.

I actually just put the arrows just to say -- to show the same concepts. You know, it's the extra red arrows going

down our partial disclosures that were not written up in the standing Complaint before the Court, you know, at the time the brief is written.

They are hypothetical partial disclosures that make a lot of sense based on the evidence that may well appear in the Amended Complaint. And that -- that's what would lead to damages for DeKalb.

Let's see, Your Honor. I'm about to wrap up and answer any questions you have.

THE COURT: The plaintiff that has withdrawn from your group.

MR. KILLORIN: Mr. Kooheji. Yes, one of the members of our group has withdrawn, Your Honor. And I can comment on that.

THE COURT: Please.

MR. KILLORIN: One of the rank speculations was that he was jettisoned from the group.

Mr. Kooheji is a client of my firm. He remains a client of my firm. We represent him on other matters.

This -- in all honesty, Your Honor, it reminds me of a politician who said you can't tell what's in a bill until it's passed. In this case --

THE COURT: You can if you read it first.

MR. KILLORIN: Well, that's a fair point. That's a fair point.

But not entirely, because in this case, you can't tell what unique defenses a movant -- might be raised against a movant until you file their claim and see if any defenses are raised.

The first challenge of Mr. Kooheji was he must be -- filed a false certification, because the prices of the Teva stock he bought were different on those days.

He didn't file a false certification. He had this fairly complex -- and I will admit that, fairly complex note that caused him to buy Teva securities exactly as he reported and as backed up by his accounts.

Opposing counsel have now admitted that yes, he did buy the Teva securities, there's no problem there, but the note was too complex.

Well, you know, that is a defense. That is a unique defense, and that does subject the class to a waste -- wasted time, wasted litigation.

Mr. Kooheji is more than happy to participate as a class member and then let his claim for participate -- fair participation in the sum of the class be sorted out when he files it with the claims administrator.

THE COURT: You're not going to represent him in that or can --

MR. KILLORIN: Oh, gosh. No, we would not represent him in that. That might be a conflict. No. We -- as the

counsel handling the case, we are always happy to talk to claimants, you know, that want help filling out their claim form or talk to the administrator about working out issues, but no, we would not represent him in that at all any more so than we would any claimant that called in with a problem and wanted a dispute that sort of got escalated from the claims administrator to the attorney's office when there's a some anomaly or something, you know, complex.  But no, we would not represent him in that.

In fact, honestly, we may not comment on that because there might be a conflict if we're still representing him on other matters.  So yeah.  But that's the way that would go.

So Your Honor, I think that's the main points I had to make.  If you have any questions, I'm happy to address them.

THE COURT:  Did I read somewhere in the last couple days something about you're only allowed to be lead plaintiff or lead counsel, I'm not sure which, what, in three securities actions or -- did I see that somewhere?  Did somebody reference that?

MR. KILLORIN:  I can never remember that principle. Yes, there is something.

THE COURT:  I don't remember whether it's your filing or their filing.

MR. KILLORIN:  As far as I know, neither one of us run afoul of that rule.

MR. LIEBERMAN:  Five years -- five lead plaintiff -- five times -- five cases within three years.

THE COURT:  Five -- is it as to the lead plaintiff or as to the lead counsel?

MR. LIEBERMAN:  Lead plaintiff.  Lead counsel, absolutely not.

THE COURT:  In three years.  Okay.

So are you basically saying this unique defense that you now recognize as to Mr. Kooheji --

MR. KILLORIN:  Yes.

THE COURT:  I'm not sure I'm pronouncing correctly.

-- is one you didn't realize until they filed the paperwork?

MR. KILLORIN:  No, no.  Honestly, we didn't know it would be raised.  You know, he bought the Teva securities as claimed.  And we don't -- that's the whole thing -- that's why I'm saying the legislative analogy.  We don't know what defenses they're going to raise until they raise them.  And part of the qualifications are they can't be -- you don't want to subject the class to the problem of defending unique defenses.  But honestly, it doesn't say anything about whether the defenses have any merit or not.  And now we see defenses coming in against Mr. Kooheji.  We don't think they have merit.  But they are defenses that are causing time, trouble, briefing and effort.  So he's happy to just wait until the case

hopefully settles, and he can file his claim then.

THE COURT:  I guess my issue with that, though, is it's your competition for lead plaintiff that is raising this defense.  At the end of the day, we don't know what -- I mean, it is going to be the defendants who raise --

MR. KILLORIN:  That's correct, Your Honor.  I couldn't agree more.  Oh, I know.  These lead plaintiff fights, I always said, they are a healthy exercise to bring the cream of the crop to the top.

THE COURT:  To help out the defendants in their defenses.

MR. KILLORIN:  But they are training school for defendants.  And these same arguments often come back, reoccur.

THE COURT:  Okay.  All right.  Just making sure.

MR. KILLORIN:  Yes.

THE COURT:  So if for some reason I am not to buy into the argument that also obviously you say your competition here has also made in the past as to the standing issue --

MR. KILLORIN:  Yes.

THE COURT:  -- then Mr. Forsythe could come --

MR. KILLORIN:  Absolutely, Your Honor.  You're -- no one has laid a glove on Mr. Forsythe until the very last minute.  And thank you for pointing that out.  They said, oh, his retainers don't look right.  Well, there's nothing wrong with the retainers.  We've represented DeKalb for many, many

years.  And we have a standard with them that has a 28 percent cap.

And Mr. Kooheji is a new 10b client.  We -- I'm sorry, Mr. Forsythe is a new 10b client.  He got our standard new client retainer, but he gets the benefit of the cap that had been negotiated by DeKalb.  You can say, well, he wasn't aggressive in negotiating the 28 percent himself.  Well, he didn't need to because it was already there.  That was a part of group negotiated by DeKalb.  And the reality is that in a substantial case like this, we would love to get 28 percent, but it's all a matter of discretion with the court.  And if the settlement is substantial, the chances are it will be not 28 percent, it will be something less that's approved by the court.

THE COURT:  So if DeKalb is not part of this --

MR. KILLORIN:  Yes.

THE COURT:  -- the cap is still in place is what you're saying?

MR. KILLORIN:  No, Your Honor.  If DeKalb is not a part of this -- oh, oh, I see what you're saying.  Oh, I see what you're saying.  If DeKalb is not a part of this, no, then there is not a 28 percent cap.  However, I'll state right now, we won't seek more than 28 percent in this case.  That's going to apply no matter what.

THE COURT:  How did Mr. Forsythe find you all?

MR. KILLORIN:  He contacted us, Your Honor.  And we do publicize the cases that we're investigating and interested in, as does opposing counsel.  You know, it's sort of part of how our industry is operating these days.

THE COURT:  There is nothing -- if we go with what DeKalb's -- if I buy into the theory --

MR. KILLORIN:  Yes.

THE COURT:  -- partial disclosure theory, I guess it is.  Potential disclosure theory.

MR. KILLORIN:  Yes, Your Honor.

THE COURT:  -- there's nothing as to the type of security that they owned that's going to impact the typicality here?

MR. KILLORIN:  No.  No, Your Honor, not that I know of.

THE COURT:  Do you have any idea in terms of an estimate of what's the total recovery this class could be entitled to?

MR. KILLORIN:  Your Honor, I believe that it would be quite substantial, but I have not calculated it.

The estimate in the Connecticut cases is that $4 billion in harm was done to all of those investors.

THE COURT:  Is that in the class action?  Or --

MR. KILLORIN:  I believe that estimate was applied to everyone.  But just the harm that was done by Teva to all

investors was $4 billion was an estimate, obviously.  It's just an estimate.

I would -- I am an afraid to say, because I'm not an expert.  This doesn't count.  But I wouldn't think this is going to be as large, because it's a smaller market share.

THE COURT:  One drug.

MR. KILLORIN:  One drug.

THE COURT:  Does Mr. Forsythe have the requisite expertise to represent the interests of a class as the sole lead plaintiff?

MR. KILLORIN:  He does, Your Honor.  He has -- because what is -- the law is very clear that there is -- he's a sophisticated businessman.  He's a sophisticated investor.  He invests in other stocks.  He understands the market.  He understands this case.  He understands this Complaint.  He has shown interest and enthusiasm in coordinating.  He has shown interest in managing this case.  And that is more than is required under the PSLRA for a qualified lead plaintiff.

THE COURT:  I think that's all I have right now. Thank you.

MR. KILLORIN:  Thank you, Your Honor.

THE COURT:  All right.

MR. LIEBERMAN:  Thank you, Your Honor.

I'd like to address the first issue raised or new issue that's been raised is the Israeli counsel.

And Your Honor --

THE COURT:  I only know because we didn't know it before.

MR. LIEBERMAN:  Fair enough, Your Honor.  So the --

THE COURT:  When were you planning on telling us?

MR. LIEBERMAN:  Your Honor, typically we've done that -- these two counsel have worked together.  There's a need in these cases that involve Israeli securities to work together with the clients to coordinate with the Israeli action, to make sure that we understand properly Israeli law.  There's a necessity in a case like this, and if Forsythe and the Investor Group hasn't yet retained Israeli counsel, that's a significant issue, because already the securities at issue in this case and the class period in this case and the way the class is defined includes all Israeli securities, all securities of Teva, those purchased on the Tel Aviv stock exchange and those also purchased on the US stock exchange.  And you need Israeli counsel in order to -- there's currently pending in Tel Aviv district court a parallel class action.

And you need Israeli counsel in order to coordinate those cases.  Sometimes those cases are stayed.  And you then organize at some point in the settlements or during the litigation sharing of documents, and you need counsel in Israel who can coordinate with you and who can liaise with the counsel in the Israeli action.  And similarly, at any time where

there's going to be ultimate a recovery for investors, you actually need the support of the Israeli court in order to effectuate the system of allocation of settlement funds. There's an automated system in Israel that's used. And you need -- in those instances you need counsel to work with you in Israel in order to get approval of that system to make sure there's a distribution to Israeli shareholders.

So it's automatic you need -- in a case like this where it's an international litigation, you do need an international law firm. Our client did insist on that. We don't see anything nefarious on that.

We would have noticed an appearance for that counsel, but counsel is not admitted in the United States, so we couldn't put them on the papers and we couldn't have put in a pro hac vice motion. In the two other cases that Clal & Menorah are serving as lead counsel, at the time of class certification is when we -- is when we noted their involvement. Should we have done it earlier? Your Honor, I guess perhaps, but really, the fact of a lead plaintiff here, sophisticated institutional investor, saying I need Israeli counsel here to coordinate the Israeli action is simply -- is simply a matter of common sense. You need that done. You need that done at the outset. And so --

THE COURT: I guess I really don't understand if this is such a need and it seems like it's such a given from your

point of view that it wouldn't be part of, you know, the paperwork.

MR. LIEBERMAN:  Your Honor, it was part of the retainer agreement.

THE COURT:  Yeah.  I had to ask for that.  And then you didn't want to turn it over to opposing counsel, so --

MR. LIEBERMAN:  Right.

THE COURT:  They're not opposing.  I don't know what you guys are at this point, but whatever.  You're opposing --

MR. LIEBERMAN:  Your Honor, we -- the involvement of these firms and these two firms in representing Clal & Menorah are evident in the Perrigo case.  It's on the record.  It's evident in the -- it's evident also --

THE COURT:  When did it get on the record?

MR. LIEBERMAN:  At class certification.  At class certification is when we put it in.  Should we have done it earlier?  I guess so, Your Honor.  It very well could be.  For that we apologize.  We didn't -- there's no mechanism here we saw to disclose it.  There's no -- you don't put it on the certification.  They're --

THE COURT:  In those cases was the retainer agreement looked at?

MR. LIEBERMAN:  What's that?

THE COURT:  In those cases where you put it on the record at class certification, was the retainer agreement

looked at?

MR. LIEBERMAN: Yes. But even before. We put it in our opening motion, in the class certification motion, that these two firms were working with us, if you look at the Mylan case and the Perrigo case.

So that's where we naturally put it in is we put it in class certification. There was no mechanism here. They're not lead counsel. They're coordinating Israeli counsel. We needed advice regarding Israeli law. The Israeli institutional investors needed advice regarding Israeli law. We need to coordinate with the Israeli class action. Ultimately, if there's any recovery, there's going to need to be a coordination with the court in Israel in order to deal with the distribution of funds.

And so the -- and a sophisticated institutional investor like Menorah is going to require that. The fact that counsel for Forsythe hasn't thought about that and hadn't engaged in that process at all actually questions on their end, why haven't they engaged other counsel to figure out how they're going to deal with this case. Is the case going to be stayed in Israel?

Often in cases where there's a parallel US and Israeli case, the case in Israel is often stayed. Sometimes you can get the plaintiffs to stay, to agree to let the US case go, because a lot of times, actually often in dual-listed

securities, the Israeli court will recognize US law.  The Supreme Court has recognized that US law applies, so they'll stay the Israeli action.  You need someone to coordinate that issue with the Israeli case.

THE COURT:  What happens if they don't agree to stay?

MR. LIEBERMAN:  Then you're going to have two cases going at the same time.  I think that could -- and even then, if that occurs -- even -- first of all, ideally you get do a stay.  All securities can be heard in one court.  But even if you don't get a stay, you might then have the ability to get the benefit of discovery in that case or the filings in that case, and so you need someone on the ground in order to coordinate that.  That's the role that the Guy, Bachar and Eitan --

THE COURT:  Are you involved in the parallel litigation?

MR. LIEBERMAN:  In Israel?

THE COURT:  Yes.

MR. LIEBERMAN:  Only -- we've had outreach, actually, through those two firms from the plaintiffs in the parallel litigation.  They actually had reached out to see what type of coordination there can be.

So that's natural in these cases with dual-listed securities.  This is an international litigation, international scope.  And so for institutional investors to demand that there

be Israeli counsel is really respectfully nothing nefarious in that.

I guess in the future if -- we should put that in the papers initially by all means, and we apologize for that.  But we haven't tried to hide the ball.  The involvement of these two firms with these clients and other cases has been already been vetted and certified in classes, both in the Perrigo case and the Mylan case.  It's there for anyone who is researching these clients to see.  And so, Your Honor, we simply -- we weren't trying to hide the ball.  There's nothing to -- from our perspective too interesting in that.  We needed Israeli counsel here to help us with this case.  If counsel for DeKalb and Forsythe aren't going to employ Israeli counsel, I really question their ability to run this case in an effective manner.

THE COURT:  Do you get any share of what happens in that parallel litigation in Israel?

MR. LIEBERMAN:  No, Your Honor.  No.

THE COURT:  The reverse agreement is not in place?

MR. LIEBERMAN:  No.  Well, they're not lead counsel in that Israeli case.  They're there to help coordinate with Israeli counsel in that case.  We don't have any share of what happens in that case.  Likely what's going to happen, Your Honor, if Perrigo and Mylan are any precedent, is that likely at some point, the Israeli case will stay itself.  And then there will be a global settlement.  And then the counsel in

that case will likely seek a fee, either in the Israeli court or they might even come to this court.

THE COURT:  That would be important to know right now.

MR. LIEBERMAN:  I don't know that.  I don't know that, Your Honor.  We haven't arranged that.  We haven't worked on that at all.  We haven't dealt with that.  All we've had is Israeli counsel has reached out to our counsel in Israel to ask about how we could help coordinate the action together.

But the fact --

THE COURT:  If you are not lead plaintiff with your outreach to this counsel and they become lead plaintiff in some form or fashion, am I going to get some Israeli firm coming to me for attorney's fees?

MR. LIEBERMAN:  Your Honor, I don't know.  I simply -- I simply --  I'm not -- all I know is that --

THE COURT:  You're telling me there is a possibility of that happening as it stands right now in the relationship you have?

MR. LIEBERMAN:  In the -- no, Your Honor.  In the Ormat -- in the Ormat Securities Litigation, there's a global settlement with respect to -- with respect to all securities. In that case Israeli counsel sought reimbursement of expenses in the court in the District of Nevada, not the counsel -- not Eitan or Guy.  They're not lead counsel in that case.  Other Israeli counsel have sought that.

Now, there is a need, though, to coordinate the case ultimately with Israeli counsel. There's a need to figure out -- there's seeking -- there's an overlap here between the US securities and the Israeli securities. The class as defined in the Complaint say purchases of all Teva securities.

That is the class as defined in our case. And that includes also the Israeli securities. By nature it includes the Israeli securities. And in the Perrigo case and both the Mylan case as well, all securities are included in the classes in the United States. There was actually a class of Teva's shareholders that was certified in the United States and the Perrigo case.

And so by definition, there is a case in Israel, in Tel Aviv District Court, that's either going to be stayed or that's going to be in conflict with the case that occurs here.

And so our clients want to make sure that there is proper coordination, coordination between those two actions. And so --

THE COURT: How is it in conflict?

MR. LIEBERMAN: Because we represent all security holders, whether purchased in the United States or in Israel. And they represent all Israeli shares. So there is a portion of the class that's -- class definition that occurs in this case, that's defined in this case, that is -- that overlaps with the Israeli case in the Tel Aviv District Court.

And so we've had these issues repeatedly come up in Mylan, in Perrigo, in International Fragrance also, where Menorah & Clal, our lead plaintiffs, where that issue -- where if you don't coordinate, what happens is you'll have Israeli counsel come to court and try to stop some of the proceedings here with respect to the Israeli shares.

That's what happened in International Fragrances. We were unable to coordinate with any Israeli counsel there. And the -- actually, the firm there then started to try to trip up the progress of the case in the Southern District of New York in front of Judge Buchwald.

So that's -- that's a reality of this case. You're going to be hearing, unless -- unless Forsythe decides to cut the class or -- and say it's only on behalf of US purchasers. If there is an attempt to represent all investors of Teva Securities, then you're going to have ultimately -- by matter of fact, you're going to have conflict with the Israeli case. And it's best to work out that conflict if you can, if it's possible. And so we have Israeli counsel to help us on that issue. We have to consult on Israeli law.

If -- if like we did in the Perrigo and Mylan case, we got classes certified. Actually, in the Perrigo case we got a class certified on behalf of Teva's investors. You need someone with expertise in Israeli law in order to guide us and to guide us on nuances on Israeli law. We need Israeli

counsel, Your Honor.  It's just a matter -- it's a matter of fact.

And the only way that -- that Forsythe or -- or DeKalb or anyone can litigate this case on behalf of the class as currently defined in the Complaint is to have Israeli counsel to advise on Israeli law.  And so to say somehow we were trying to do something funny or some funny business, that's not the case, Your Honor.  We need -- we need Israeli counsel.  We need to coordinate with Israeli counsel.  Our clients have a longstanding relationship with -- we've worked together with these counsel on a number of cases and where classes have been certified.  And that's simply the relationship, Your Honor.

So that's -- that's for -- that's on that point.

THE COURT:  Okay.  I appreciate that.

MR. LIEBERMAN:  Okay.  With respect to generally -- so then we have -- it's clear that the largest financial interest lies with Menorah & Clal.  And so the question then is, is whether we have a situation of some type of conflict of interest.  And as the Volkswagen court said, the conflict must be fundamental.  It must be a fundamental contrary -- conflict.  The interest of two investors or the two plaintiffs have to be in conflict.  And there simply is no conflict between our case and the pending cases with respect to the price-fixing scheme.

There -- and those allegations deal with a price-fixing scheme, where there were corrective disclosures

that hurt the market and hurt the share price in 2016, 2017.

Here the damages are alleged to deal with a collective disclosure in August 2020.

The way any securities plaintiff assesses damages and assesses inflation is a look at the stock drop when the bad news comes out.  And the expert will assess the value of that stock drop, and it will say --

THE COURT:  What about this idea of potential partial disclosure that could come out?  It seems that you have argued that in the past in other situations.

MR. LIEBERMAN:  Your Honor, first of all, if -- you would have to identify that partial disclosure, and you'd have to see if that partial disclosure conflicts somehow with our -- with the corrective disclosures in the price-fixing case.  And there simply is no conflict.

The date -- also we have a speculative date in 2017 that this may be a partial corrective disclosure.  I have to say, if DeKalb felt that this was a real corrective disclosure, they should have filed their own Complaints, alleged it, and it would be on the record.  And so there is no --

Dura makes very clear if you sell your shares prior to a corrective disclosure, you don't have standing, period.  DeKalb had every opportunity.  They had 60 days to look at our Complaint, to analyze it to see if anything was missing, and they didn't.  They simply could have alleged this corrective

disclosure if they believed in it.  But under Rule 11, for some reason, they didn't want to go ahead and make this allegation. And now there's some speculation, we may one day.  At the hearing last time, in -- a week-and-a-half ago, they said, well, we might find something in the future.  If there's a fine on Teva, we might amend the Complaint then to find the corrective disclosure.  Now they're saying, well, we might go back three years and find a corrective disclosure.

The only thing this court has on record in the case is the August 20th corrective disclosure.  That's the only thing on record.  And this Courts needs to make decisions based upon the record in front of it right now.

THE COURT:  Okay.  Well, then let's talk specifically about this idea of the Connecticut actions and this particular action and the deflation and inflation.

MR. LIEBERMAN:  Okay.  Let's talk about it.

There is -- Your Honor, they point to four dates out of 27 dates of alleged misstatements.  And they say on that day, you say that the stock was -- was inflated as a result of the Copaxone allegations, but it suffered -- it suffered damages when -- where there were other revelations regarding the generic drug pricing conspiracy.  That's the argument. Somehow those two are in conflict.  That's the argument.

So we're talking about 10-K or a 10-Q filed by Teva, which at the same time makes statements, false statements,

regarding Copaxone and its potential revenues and at the same time says, well, we're suffering regulatory scrutiny as a result of our generic drugs.

And I ask this Court, what exactly is the conflict? It's getting damaged just talking about a document that is potentially hundreds of pages, making hundreds of statements regarding various issues.  It's a $16 billion company.  And it's a -- revealing a fraud in one hand, and it's concealing a fraud on the other hand.  And there's simply no conflict to that whatsoever.

Once again, the damages expert in this case is going to look -- the Court only has right now the Amended Complaint, the Complaint filed -- the Halman Aldubi Complaint, the Complaint on file.  Right now the only corrective disclosure on file is the August 2020 disclosure.

What a damages analyst is going to do is he's going to look at that drop, he's going to net it against the industry and the against the market, and he's going to say there's a $4 net decline.  The inflation during the class period with respect to Copaxone is $4.  That's going to be his analysis.

Now, with respect to the price fixing, the expert is going to look at the drops on those alleged corrective disclosures that our clients alleged, and based on the drops back four years before, three-and-a-half years before, he's going to assess the inflation of the stock on those days.

There's simply no conflict.  There is no conflict in fact.

And the -- to accept there's a conflict, Forsythe and DeKalb and it used to be Kooheji -- I'm not sure how to pronounce it, his name -- they all now have the same conflict. They also are class members in the other case.

I think it's important to understand also where those opt-outs stand.  While our plaintiffs filed the case, they haven't yet opted out of the class action.  The class was just certified, and there's going to be a notice period.  And at that stage Clal & Menorah and also Forsythe and also DeKalb and everybody else is inside.

Do I want to get out and file my own claim, or do I want to go ahead and be in the class?  Clal & Menorah may very well decide to stay in the class in that case.  They have yet to make a decision on that issue.  They're going to make a decision on that at the appropriate time.

So to say there's --  they're really in the same situation as any investor.  The fact that they proactively filed the Complaint at this stage, well, they were doing that. They're a sophisticated institutional investor that wants to make sure that its interests are properly protected.  And so there may be issues -- if you don't file a Complaint now, there might be statute of repose issues that come up.  There might be statute of limitations issues that come up.  So they filed

proactively a Complaint, and they litigated claims with respect to that Complaint to protect their interests.  Whether or not they'll decide to get in the class and not opt out or whether they'll decide to pursue that claim, that's a decision to be made for the future.  A decision of --  Forsythe and DeKalb have to make the same exact decision going forward.

And so they -- so they're class members.  They want to benefit from that case.  Our -- our funds are class members as well.  So again, there has to be -- under Volkswagen, there has to be a defined, critical, antagonistic interest.  There's no antagonism between our case and -- and the price-fixing case.  Different theories, different damages theories, different class periods, different damages dates.

We've got here -- basically we've got a cutting of forecast because of competition due to Copaxone.  Nobody has alleged anything with respect to what that has to do with the claim here, the anti-kickback scheme here.  What it does -- what it actually does show is that DeKalb is somewhat desperate to find some disclosure in this case that gives it standing.  First they're going to tell us it was going to come in the future.  Don't worry, Your Honor, there will be a fine later on, the stock will decline, and we'll go ahead and we'll be able to plead that and we'll find our standing.

Now it does some more research.  They look back and say, well, this is a drop.  It has the word "Copaxone," even

though it has nothing to do with the anti-kickback scheme. There's nothing -- nothing alleged regarding that. They're saying, this could be our savior.

Your Honor, that's not how a lead plaintiff is appointed. In the Allergan decision that was cited, our client in that case, Boston Retirement, did have standing. They had held shares at the time of the alleged corrective disclosure.

But the argument by DeKalb was if you look at the drops on different disclosure dates and just look at how then they suffered more if you multiply shares times the drop. And we said, listen, there was a lot of corrective disclosures alleged, not like here where you have one alleged corrective disclosure. There are already multiple corrective disclosures and multiple set -- sources of information coming out, showing the fraud.

And we said to the court, listen, there's a lot going on in this class period. You can't -- that analysis right now doesn't make sense. But there is no question as to Boston Retirement's standing. Here, here, there's a question of standing for DeKalb.

As the Complaint is currently pleaded in the record before this Court, they simply do not have standing. So to appoint them as a lead plaintiff on the hope, on the whim that this might one day materialize into something to deal with the anti-kickback scheme or in a year from now, maybe they'll be

able to amend the Complaint and come up with a theory of standing, simply doesn't pass.

But I think also if we're talking about, you know -- we are talking about adequacy here.  We're talking about these issues, the issues that -- regarding -- the Investor Group came together as a group.  They only -- their declaration, they say, we want to go as a group.  None of them say in their declaration, we want to proceed separately as a separate movement.  They never make that statement.  They never filed anything saying we'd like to be considered separately, nothing that they've signed, that they filed, neither in their certification or neither in their declaration.

Now, as the group is crumbling -- and we've raised issues with regard to Kooheji.  We've raised issues regarding him starting December, saying, look at his transactions, there's something wrong here.  He may have gains on his securities.  He hasn't listed all of his securities in Teva, because those contracts that he has, those note contracts clearly weren't listed, and potentially he was getting 20 percent interest.  And we kept on hammering that point.

Finally, and every group member, if they're really a group member that was overseeing and zealously overseeing this litigation, they should have asked -- Forsythe should have asked their counsel or DeKalb should have asked their counsel, what is going on with Kooheji, is he a legitimate plaintiff or

not.

Finally, three days, three business days before the hearing, Kooheji makes his exit. Where was that two months ago? Where was that two months ago? What -- where was Forsythe on that issue?

Now, DeKalb also same question. Forsythe is sitting here. He's supposed to be the one who's going to litigate this claim vigorously on behalf of the class. Right? And he sees that his two -- one member, Kooheji, clearly has problems. DeKalb clearly doesn't even have standing, has to come in and invent some reason as to why they might have standing in the case.

Where is he asking his counsel, are these adequate plaintiffs? I'd like to know about their transactions. I want know what's going on. We don't hear anything from Forsythe himself. So where is this active -- where is this active lead plaintiff that is going to oversee counsel?

And the retainer agreements on their own tell the entire story, Your Honor. It makes it very clear.

One of the key issues, the key issues of a lead plaintiff is to oversee their counsel and to oversee -- and to look at the retainer agreements. And look at the retainer agreements you have here.

DeKalb did somewhat of a job as an institutional investor and negotiated a 28 percent fee. But DeKalb didn't

make sure the other lead plaintiffs were on board.  And so we've got -- we've got Forsythe and we've got Kooheji with zero cap whatsoever.  No oversight at all with differing retainer agreements.  If you look at the dates that they were signed, some of them were signed right before the lead plaintiff motions started.

Is this a real -- is Forsythe showing any active oversight of this case?  Zero, Your Honor.  He doesn't -- he didn't even want to -- he didn't even take any attempt to rein in the fees of his counsel.  And so that's clear, that's an important function of lead plaintiff.  It simply didn't occur here.  You have Forsythe, DeKalb and Kooheji got in, as I said before at the last conference, a motley assortment with a motley assortment of retainer agreements, completely all over the place, no effort to rein in counsel, no effort to make sure that the other members were adequate members.

Then let's look at the contrast.  Let's look at Menorah & Clal.  Menorah & Clal, if you look at their retainer agreements, they have a staggered system of retention.  Based upon the award given, it goes up -- it goes actually down on a gradual basis.  It goes down ultimately to its lowest amount, to 12.5 percent.

THE COURT:  But you still end up getting more at 12.5 percent than you would have if you were only at -- if you were at the first level, 19 percent.  Right?

MR. LIEBERMAN:  We always -- you don't make less money.

THE COURT:  Right, exactly.  Just making sure.

MR. LIEBERMAN:  You don't get less money.  But you know why Menorah & Clal negotiated that with us?  Because they've been in this business for over ten years.  They have other firms that come over.  They used to -- it could have been in prior years, it could be that we could have gotten a better retainer.  There is -- they are veterans in this business.  There's loads of other law firms coming and pitching them.  They've been lead plaintiff in numerous cases.  They negotiate a tight retainer agreement, close to -- close to 10 percent at the highest level lower than what DeKalb is able to negotiate.  And obviously --

THE COURT:  What do you estimate the total recovery to be?

MR. LIEBERMAN:  What the ultimately recovery will be?  I really don't know, Your Honor.  Damages could be, from what we see, just, you know, a rough guess, between 500 to -- to a billion.  I really don't know at this stage.  You have -- you know, you get appointed to lead, then you hire your friends the economists and do the real kind of crunching on that, so...

THE COURT:  I want to go back to the Connecticut action if I can.

MR. LIEBERMAN:  Yeah.

THE COURT: Do you -- I mean, is it the same group of lawyers at your firm representing the client, representing there?

MR. LIEBERMAN: Your Honor, my personal name is on -- is on both pleadings.

THE COURT: Okay.

MR. LIEBERMAN: If this Court is concerned, we can address that. So we could either take --

THE COURT: So far there's been no need to wall off any attorneys as to these two actions?

MR. LIEBERMAN: Well, I would say --

THE COURT: I'm pretty sure you're --

MR. LIEBERMAN: It's myself, a partner and associate who are involved in the Connecticut action. And then the team we have on this is really still like, you know, just the -- I'm acting as managing partner, and then we have also the kind of lead plaintiff team that deals with the litigation irrespective of the plaintiff. We can clearly separate the teams if the Court is concerned. We don't think that there is anything in the ethical rules that require that because the ethical rules do look to the content, the content of the matter. And here there's no subject matter conflict whatsoever.

THE COURT: So you don't see any defense of an issue or claim preclusion?

MR. LIEBERMAN: Your Honor, absolutely no. Absolutely

not.  It's not apparent from the pleadings.  You have to look at the pleadings.  Nothing in the price-fixing Complaints says the word "Copaxone."  Zero.  There's no mention of Copaxone.  It's not part of the Direct Action Complaints whatsoever.  And so that's simply not a subject of the case.

The counsel for the Investor Group came up with, I think in my view, a creative, cute theory as to how there could be a conflict, because one day you have inflation, on the same day you have deflation.  Once again, inflation and deflation on different subject matters, and that's all the difference.

And when you're talking about Teva or you're talking about Citigroup, you could have a potential fraud one day and a revelation on another issue on another day.  It's a vast, huge corporation with hundreds of drugs, and there could be problems that are disclosed in one and problems that are concealed in other.  And I think the Court, the parties and experts are well able to distinguish and differentiate the two.  It's a simple matter of, again, conflicts look at subject matter.  There's no subject matter conflict, not even when you look at damages.  Damages will be measured according to the corrective disclosures alleged in the Complaint.  That's how you measure inflation.

And when you do that, when you go through that process, you come up with -- if you're going to look at what happened in 2020 and you're going to see -- based on that,

you're going to say, what was the inflation of the fraud.  And that's the same thing we do with price-fixing.  Those two analyses are completely separate.  They're not disclosures on the same day.

If you have disclosures on the same day, we could potentially have a discussion.  Nothing alleged in the Complaint is a -- has corrective disclosures on the same day.

Indeed, the August 2020 -- August 2020 disclosures is three-and-a-half years, four-and-a-half years from any alleged corrective disclosure pointed to by counsel.

So I think the issues raised -- again, and if we have to do better with respect to putting these -- and we will do going forward with respect to the involvement of the Israeli counsel, which has always been out in the open as far as generally in cases.  If we have to do that at the beginning of the case, by all means, Your Honor, we'll take this -- we'll take this as a -- and we'll do that going forward.

Look at the plaintiff itself.  Does this plaintiff have the proper oversight of its counsel if you're comparing the groups?

I don't think the question is even close here.  The plaintiff here negotiated a firm retainer agreement.  The retainer agreements are identical here between our -- between our two plaintiffs.  You know why?  Because they called each other beforehand.  They know each other.  They said -- they

said -- and actually, one of them once had a more favorable agreement than the other one in one case.  And they said -- they said -- in two different cases.  And they heard about the lower agreement, and it was Menorah who said, I want Clal's deal.  And we had to do it because they're sophisticated. Because they're on top of it.

THE COURT:  Do you know if they considered other firms for this action?

MR. LIEBERMAN:  For this action, I don't believe that -- for this particular case, I don't believe that they considered another firm.  We have been doing a lot of work, which comes up in these cases, Your Honor, regarding dual-listed securities.  It's become somewhat of a -- there's a lot of complicated issues dealing with dual listed, because Israeli law says US law should apply, but under Morrison, it says that if you purchased outside the United States, US law does not apply.  So there's a conflict there.  You have to deal with it.  You have to work with it.  There's a lot of issues, and you need Israeli counsel's help for it, and that our clients insisted that you have Israeli counsel's help for it. And that's what we work through.

The client here is clearly not -- when you have an issue with a fee agreement and you have these potential fee agreements, the issue is -- really is somehow is a client not protecting the class.  That's the question.  Is it somehow not

doing its job and allowing other counsel to be involved and somehow to the detriment of the class.

That's the issue where a fee agreement comes in. Clearly here Menorah & Clal were able to negotiate a tight fee agreement much better than the Investor Group. They were uniform. And the showing by the Investor Group of their differing retainer agreements with different levels admitted by counsel here that it won't even apply. DeKalb's won't even apply to Forsythe if he's not -- if he's not -- if DeKalb is not appointed, but then generously, generously states, well, we'll hold ourselves to the 28 percent.

That's not how this goes, Your Honor. It's not up to Forsythe's counsel to nicely say, we'll limit our fees to 28 percent. That's not what the PSLRA requires. The client says what the fee is. The client tells you what the fee is. That's what Cendant wants.

And here the client told us what the fee is, and it's much lower and uniform than anything negotiated by Investor Group.

So, you know, again, in looking in hindsight, and we should have -- and we should have put it somewhere in the papers. It's not something you put in the certification. It's not something you put on the signature block, because they're not -- they can't make a pro hac vice application. They will be playing an important role in this case because you do need

to coordinate this case with the Israeli case, either at the outset or either -- at the outset if you can; during the course of litigation, if you get information; and then particularly if there's a settlement, you need to make sure that the Israeli court will allow for the automatic distribution for the Teva shareholders. And there's a program for that. And you need -- you need an Israeli counsel to go in and to make that application.

The firms that we're dealing with, they are doing that now in the Ormat case. They're going to Tel Aviv District Court and they're making that application to make sure there is an appropriate distribution.

So these are things demanded by counsel, by institutional investors that are veterans in this case -- in these courts and that have -- and that have been certified as class representatives in very high profile cases in courts throughout the United States. And so -- and with these same exact retainer agreements.

So Your Honor, if in hindsight should we put -- should we now proactively put it going forward, point taken and we should have done better. But that's not -- we're not trying to hide anything. It's no great secret. If you look in the other two, in the Perrigo and Mylan cases, it's there. It was there for defendants to ask questions about. We put them proactively in our class certification papers. And so it's not something

we're trying to hide the ball on.  We think it's clear here, if you look at it, Menorah has gotten a recovery of $225 million in the Converse case.  They are lead counsel in the Mylan case, which is a significant securities class action.  Clal is a -- currently a lead plaintiff in the Perrigo action.  These are significant large securities class actions where they've been vetted as class representatives and the imprimatur of the courts there involved.

If the Court is looking for a sophisticated institutional investor with a track record of getting serious recoveries for their plaintiffs and know how to deal with the complexities of dual-listed securities here, which is going to come up, it's clear who the right movant here is.

And by the way, as the PSLRA predicted, it's the one with the largest loss that has that ability.

On that, Your Honor, if Your Honor has any questions, I'm happy to answer.

THE COURT:  I don't think I have any further questions at this time for you.  Thank you.

MR. LIEBERMAN:  Thank you.

THE COURT:  Well, I just -- well, sorry.  One.

What do you say as to this argument regarding the -- I don't know what you call it -- the idea of bankruptcy at some unforeseeable point in the future?

MR. LIEBERMAN:  First, Your Honor, you know, getting a

snapshot of a Google page and saying there's a threat of bankruptcy isn't the way this is done.  It's very -- actually similar to the argument made about loss causation.  This might happen one day.  We might allege this.  Or this is something -- that's not how conflicts arise.  There's nothing put in the papers showing a critical threat of bankruptcy.

But let's say if we get there, and -- right?  And so first of all, assuming Menorah & Clal opt out of the case.  Right?  They have to make that move because they haven't formally opted out of the class.  They're currently class members.  That's an important point.  They --

THE COURT:  In Connecticut?

MR. LIEBERMAN:  In Connecticut they filed -- they filed an individual action.  They still had the opportunity to decide -- when there's a notice sent out, they have the opportunity to decide whether or not they're going to remain as a class member or they're going to pursue their own case.  That decision has not been made yet.  And actually in the same vein, DeKalb and Forsythe have the same thing.

So assuming that they go ahead and opt out, they formally opt out of the class and then there's a bankruptcy -- so I just really have to understand what the conflict is.

There's a claim.  The valuation of the claim in the price-fixing action is going to be driven to a fair degree largely by the class action.  That's just -- that's just the

matter of sorts. We are at the tail of the class action. Menorah & Clal are two of dozens of individual plaintiffs who are -- filed certain actions to protect their interests in that class action. That class action is going to be the one claiming as much as they can from those -- from those cases. And in an event of bankruptcy, Menorah & Clal will -- I guess will do the best they can to negotiate what they can.

I don't see how their involvement in this case is somehow going to compromise that or be compromised by their attempting in another action to get monies.

I mean, once again, whenever you have large entities -- and it really is part and parcel of being a sophisticated institutional investor. When you are a sophisticated institutional investor, you're going to have serious positions in companies. And actually, Cendant dealt with this when they dealt with whether there was a conflict of a company that continued to hold shares in the stock even while it was negotiating -- litigating a settlement. They said, maybe there's a conflict. It's a large investor. And maybe he'll want to keep the company viable so his stock will go up.

In a way, it's a similar issue here. They said, no. PSLRA wants sophisticated institutional investors. And once again, you're not coming to a critical -- what exactly is going to occur in this price-fixing case where they are one of dozens of opt-outs with a class at its head. And here where there

they're a class -- I don't see -- their argument would be somehow we say, give us a better recovery in this case, in bankruptcy, where you're talking basically to insurance carriers.  So give us better a premium in this case, and we'll let you go in the other case.  That would essentially be what the -- what somehow the conflict is.

There has to be some real -- there has to be some showing that that's actually something that could occur or something that's probable or likely.  It seems highly unlikely.  The insurance policies deal with different dates and different times and likely cover different periods.  And so just the concept that somehow that's going to be a -- some compromising relationship just isn't there.

And the cases in Goldman Sachs and JP Morgan cited in our briefs talk about this.

When we talk about conflicts between is where potentially there's limited funds and there's one plaintiff leading two classes.  Leading two classes is where you have that.  We're not leading two classes.  We're trying to lead one.  And then there's an issue -- and then we don't have a proof of limited funds here.

THE COURT:  I mean, I guess, if you stay -- if they were to stay in the class, but if you then become your own -- go forward with your own lawsuit --

MR. LIEBERMAN:  Again, so if there would be bankruptcy

and an inability to pay two judgments -- my adversary mentioned, well, you know, individual investors have limited monies.  The individual investors are identified by the corporation.  That's just a practicality.  For a securities lawsuit.

So the -- so you -- but here, so there are individual lawsuits, and then there's -- and then there's the lead of this class.  Again, I don't see -- there would be -- have to be some claim that somehow they'd say pay us more, you guys pay us more for the price-fixing claim and we'll give you a good deal on the -- on the other claim.  That's the potential conflict that is articulated.

I don't see that being practical.  I don't see -- I see that the recovery that's going to be gotten for the -- Menorah & Clal in the price-fixing case is going to be more dictated by how the class does.  And then the arguments by Menorah & Clal I think should get some premium because their positioning is better than the class members.  That's the typical way that those situations work out.  And we're speculating that -- the bankruptcy that we have a Google page apparently that came up with hits on a search engine.

THE COURT:  Okay.  Thank you.

Would you like to respond?

MR. KILLORIN:  I'm sorry?

THE COURT:  Would you like to respond?

MR. KILLORIN:  Yes, I would.  Thank you, Your Honor.

Your Honor, I heard every word that came out of his mouth, and I didn't understand a lot of it.  And a lot of it is just false.

When he said, for example, I thought he implied that firms are only disqualified when there's a conflict representing two classes.  But that's not true.  We cited the Krim case from Judge Sparks in Texas where a firm was disqualified because it simply was representing individuals that had conflicting claims with other individuals.

In fact, speaking of settlement, they were conflicted in part because there was a conflict of which cases to settle and which cases not to settle, and the different groups of plaintiffs were in conflict with each other.

On conflicts, I think -- I'm not sure.  I think he just identified a fourth conflict, that the two Israeli firms are now a part of the Israeli action.  But I'm not clear because I just heard a bunch of doubletalk.  It wasn't clear to me if they have a deal, they're working on a deal, is there going to be a fourth undisclosed conflict or not.

But I can tell you that the idea that you have to secretly hire counsel because you may have settlement issues at the end of the case is absurd.  We will happily, with the Court's permission and vetting and disclosure, hire all the Israeli firms we need to to effectuate a settlement of this

case when the time comes.

If the Israelis come to us and say, we want to stop this proceeding and get a better piece of the action, we want to work a deal, we'll work a deal or we'll hire whoever -- consult whoever we need to. That is completely academic. You talk about speculative. There's no need for that right now, at the lead plaintiff certification stage, where there's no motion to dismiss. There's simply no need for that.

But let's -- let's take them at their face. Suppose they think -- supposed you said, gosh, there isn't any -- we don't have any evidence that any other law firm in a situation like this has ever done this, but let's assume you assume there is a need. He said there's no mechanism to disclose that.

Well, funny, because that's why we made Exhibit Number 1 of this. The first thing -- one of the first things they filed in this case says Menorah & Clal have selected Pomerantz lead counsel and Kaskela as liaison. Both firms are experienced. Well, that would be a mechanism right there in what they filed. Instead of saying we selected two firms, here they are and they're both experienced, a good mechanism might have been to say we've selected five firms and here is the -- here are the resumes of the Israeli firms. For him to say there's no mechanism just is -- it's about as accurate as saying our investors are motley. It's wrong, it's insulting, and I've just been hearing doublespeak.

I don't know if there's a fourth conflict with his undisclosed attorneys in the Israeli case.  I suspect there is.

If we need to hire as -- an Israeli firm down the road, we will.  And we will let the Court know about it and approve the fees.

Menorah & Clal has filed a massive Amended Complaint in the Connecticut action with 22 plaintiffs all banded together.  They filed a bunch of individual actions.  Then they filed a huge Amended Complaint.  They are taking depositions right now.  There is absolutely no indication that they are going to change their intentions that they made to the district court in that case that they intend to pursue their claims as opt-outs.

THE COURT:  Do we know when that deadline is?

MR. KILLORIN:  I'm sorry?

THE COURT:  Do we know when that deadline is?

MR. KILLORIN:  No, I don't.  But I -- I don't know.

MR. LIEBERMAN:  Notice hasn't been issued, so there's no deadline yet.

MR. KILLORIN:  There is no indication they're going to quit taking depositions with their massive Amended Complaint with 22 huge institutions and all of a sudden decide that they will join the class action.

But the court order indicates that they were indicated that it was their commitment to stick with their opt-out

position.  So yeah, sure, maybe they'll change their mind, but you talk about speculative.  I would not put any -- I wouldn't bet on that at all.  I don't think any Google site would indicate there's a probability of that happening.

And then he said -- I think I heard him say -- again, I can't interpret his words very well.  I think he said there's no conflict of interest of inflation and deflation on the same day.  He said if there was, he said, we could have that discussion.

Let me just tell you something, there is a conflict of interest there.  The one Complaint alleges inflation on the same exact day for the same exact disclosures, and the other Complaint alleges deflation.  We can have that discussion right now.  And the end of that discussion is they have a hopeless conflict of interest.  Again, and they sort of try to slide around that, well, an expert can sort that out.  I think the quote was, it's not very complicated.

Your Honor, event studies just with -- done properly with no conflicts are that complicated.  They have to disentangle, disenfranchise, as he said, hundreds of pages of disclosures and decide what the inflationary or deflationary impact is or the net of the two from a single case for a single clause with a single set of claims.  The idea of having two claim -- one expert understand the two cases, it's a tremendous amount of judgments that is involved.

When you do an event study, you look at, say, a 10-K is filed or a 10-Q. That has tens or hundreds of pages of information. Some of it inflates the price; some of it pulls it down. An economist analyzes it and makes judgment calls, decisions and renders his expert opinion. I guarantee you the defense expert will find just the opposite of what the plaintiff expert does. And then you start, you know, with Daubert motions.

But the idea that a single expert in two different cases could fairly disentangle inflation versus deflation, and if you just look at our papers, what he said, it's just wrong. We clearly spell it out. One Complaint that says inflation on Sundays, the other Complaint says deflation on the very same days for the very same disclosures. You know, you just can't escape that fact. So if you acknowledge that, you realize that there is a huge conflict of interest in this case.

And then he said something about -- again, I wasn't very clear, indicating firms don't hypothetical -- hypothetically analyze partial disclosures if they're not in the Complaint. That's just wrong. That's exactly what they did in the Allergan case. And it happens all the time.

You know, I was in one hearing in the Beazer case, which we were appointed lead plaintiff, where they actually brought in experts, economists, at the lead plaintiff stage to go over their reports.

That was hugely expensive, a huge waste of time, and it shows why courts just look at LIFO and FIFO losses to see which plaintiffs have standing.  DeKalb has standing.  They lost a million dollars in Teva.  And it looks like they will -- they will have standing all the way through class certification, because it looks like there are partial disclosures in this case.  But if they don't, if they didn't have standing, Mr. Forsythe would carry on as lead plaintiff in this case, but I expect DeKalb would be there at his side.

And DeKalb has obtained substantial recovery.  They got a $173 million settlement in the Maxim case.  They got -- with me as named lead counsel, they got a $74 million settlement in the ArthroCare case.  DeKalb has a lot of experience.  And DeKalb is not going away, if at all, until the class certification stage.  But like I say, I expect DeKalb is going to be the lead plaintiff all the way through trial in this case if we go that far.

And then the other thing he said is, well, why mention secret Israeli counsel because we can't pro hac them in.  Well, actually, we looked at this last night.  It looks to us like under the rules you can pro hac in foreign attorneys.  There was simply no reason to try to keep the Israeli counsel secret, try to keep their fee agreement secret, except maybe that they were worried that more conflicts of interest with the Israeli counsel being involved in the Israeli cases would come to

light.  Like I say, there's a mystery whether there's a fourth inextricable conflict in this case or not.  I couldn't understand what he said.

And, you know, Your Honor, this is an American case brought in the district court of the United States for ADRs sold in America to investors who bought on the New York Stock Exchange.  Like I said, the idea that it's required, Israeli counsel as co-lead, at this stage is absurd.  There is no excuse for what they tried to pull off here.

DeKalb -- DeKalb and the firm of -- my firm of Faruqi & Faruqi is more than adequate as lead counsel.  The Investor Group is more than adequate as lead plaintiff.  We will vigorously prosecute this case, and we will seek the Court's permission to involve additional counsel if indicated.

THE COURT:  Thank you.  Briefly.

MR. LIEBERMAN:  Your Honor, just to make clear, we have no cites for -- Guy, Bachar in Tel Aviv mentioned in the retainer agreement.  We have no agreement with any other firm in Israel, period.  The purpose of having them on board and the purpose of having them involved in the case is to coordinate issues regarding Israeli law and to coordinate issues regarding the Israeli case that's proceeding.  There is clearly already at this date as we're speaking a overlap and potentially you can call it a -- there's an overlap between the Israeli class and the class as so dictated in our Complaint.

As a matter of course, you need to either deal with that conflict, fight it out, or you need to somehow come to a -- come to some type of agreement with the -- with that action to make sure either it's stayed or it doesn't conflict with this action, or they'll be coming to this court and objecting to the inclusion of the Israeli securities in this class.  That is a fact.  In order to deal with that, in order to deal with those issues, our client demanded that we have Israeli counsel retained.  We've done so.

THE COURT:  Thank you.

Let's take a five-minute break.

MR. SMITH:  Your Honor?  Your Honor?

THE COURT:  Yes.

MR. SMITH:  It's Mr. Smith on behalf of the defendants.

Your Honor, obviously as you pointed out at the recent status hearing, I don't have a dog in this fight, and I'm obviously not going to address the many statements and arguments and speculation by both movants with which the defendants disagree.

It will be almost -- it would be -- I just wanted to point out to Your Honor, it's my understanding, because there's been a lot of discussion about the parallel Israeli class action, and it's been stayed since late December or January.

THE COURT:  Thank you.  And I assume you don't have

any comment on any upcoming bankruptcy proceeding.  Right?

MR. SMITH:  Clearly not, Your Honor.  That's one of the many items of speculation that, you know, we're simply not going to address.  Our public filings speak for themselves about the financial condition of the company.

THE COURT:  Do you have any unique defenses that I should know about with any of the people that remain wanting to fight out the lead plaintiff that you haven't already heard about?

MR. SMITH:  Your Honor, you're tempting me here, but we're obviously going to reserve on all of that until an appropriate point in time, to the extent this case, once the Complaint is filed, survives a motion to dismiss.  But we're hopeful we never get there.

THE COURT:  All right.  Anything further from you? I'm sorry.  Mr. Smith, anything further?

MR. SMITH:  No, Your Honor.

THE COURT:  Okay.  We're going to take a five-minute recess and come right back.  Thank you.

(Recess at 11:47 a.m. until 11:50 a.m.)

THE COURT:  You may be seated.

I do have one question, though.

How do you not know about the stay with your Israeli contacts?

MR. LIEBERMAN:  Your Honor, it very well could be

that -- it could be that I was told that.  It could be that, you know -- I honestly -- until we're appointed to lead, we haven't been -- we haven't been dealing with that issue.  We haven't been, you know, tracking as much.  It could be that I was informed of that, I just wasn't dealing with it.

But again, even if it's stayed, you still need to ultimately -- you'll need to coordinate it, to coordinate the action.

THE COURT:  Well, there will be a point in time that it will be coordinated.

MR. LIEBERMAN:  There will be a point in time that it will be coordinated, correct.

THE COURT:  Potentially.  I do find it interesting with having them as part of your agreement that you wouldn't know that, though, I have to say.

Okay.  I don't need any more briefing, as much as I'm sure you all want to run back to your offices and give me some more paper.  I don't.

I will be getting you a decision shortly.

I appreciate everything you have filed and your arguments here today, and thank you for coming in person.

And stay safe.  And thank you all for being virtual.

I would ask -- I assume you all are going to order the transcript.  Correct?

MR. KILLORIN:  Yes, Your Honor.

MR. LIEBERMAN:  Yes, Your Honor.

THE COURT:  Thank you.

(Proceedings concluded at 11:51 a.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Ann Marie Mitchell*

Ann Marie Mitchell, CRR, RDR, RMR
Official Court Reporter

Date:  17th day of March, 2021

**$10** [1] - 19:9
**$16** [1] - 49:7
**$173** [1] - 73:11
**$225** [1] - 63:2
**$23** [2] - 19:8, 19:11
**$4** [1] - 49:20
**$74** [1] - 73:12
**1** [2] - 28:3, 69:15
**10** [1] - 56:12
**10-K** [2] - 48:24, 72:1
**10-Q** [2] - 48:24, 72:2
**10166** [1] - 3:10
**10:09** [1] - 4:1
**10B** [1] - 4:7
**10b** [12] - 10:2, 10:17, 10:22, 12:9, 12:20, 13:13, 14:8, 14:9, 14:25, 18:14, 34:3, 34:4
**10b-6** [1] - 12:19
**11** [2] - 15:25, 48:1
**11:47** [1] - 76:20
**11:50** [1] - 76:20
**11:51** [1] - 78:3
**12.5** [2] - 55:22, 55:24
**14a** [2] - 18:13, 18:20
**1500** [1] - 3:16
**1550** [1] - 3:4
**16** [1] - 10:2
**1617** [1] - 3:4
**17th** [1] - 78:10
**19** [1] - 55:25
**19102** [1] - 3:16
**19103** [1] - 3:5
**20** [1] - 53:20
**20-cv-4660** [1] - 4:16
**200** [2] - 3:9, 27:11
**2015** [1] - 10:15
**2016** [1] - 47:1
**2017** [5] - 23:8, 27:13, 27:16, 47:1, 47:16
**2020** [5] - 47:3, 49:15, 58:25, 59:8
**2021** [1] - 78:10
**20th** [1] - 48:10
**212** [1] - 3:10
**215** [2] - 3:5, 3:17
**22** [5] - 10:18, 11:7, 11:10, 70:7, 70:22
**23** [1] - 10:7
**27** [1] - 48:18
**277-5771** [1] - 3:5
**28** [9] - 34:1, 34:7, 34:10, 34:13, 34:22, 34:23, 54:25, 61:11, 61:14
**294-6700** [1] - 3:10
**30** [1] - 27:10
**3400** [1] - 3:16
**4** [4] - 11:7, 35:22, 36:1, 49:18

**45/55** [1] - 24:9
**50/50** [1] - 24:9
**500** [1] - 56:19
**60** [2] - 27:2, 47:23
**665-3000** [1] - 3:17
**a.m** [4] - 4:1, 76:20, 78:3
**ability** [3] - 41:10, 42:14, 63:15
**able** [6] - 12:2, 51:23, 53:1, 56:13, 58:17, 61:4
**above-entitled** [1] - 78:6
**absolutely** [6] - 28:14, 32:6, 33:21, 57:25, 70:10
**abstract** [1] - 13:19
**absurd** [2] - 68:23, 74:8
**academic** [1] - 69:5
**accept** [4] - 6:25, 17:16, 50:3
**according** [1] - 58:20
**accounts** [1] - 30:11
**accurate** [1] - 69:23
**acknowledge** [1] - 72:15
**acknowledged** [1] - 7:13
**acting** [1] - 57:16
**action** [39] - 10:22, 11:11, 11:13, 12:9, 12:10, 18:19, 21:13, 35:23, 37:9, 37:19, 37:25, 38:21, 40:11, 41:3, 43:8, 48:15, 50:9, 56:24, 57:14, 60:8, 60:9, 63:4, 63:5, 64:14, 64:24, 64:25, 65:1, 65:4, 65:10, 68:17, 69:3, 70:7, 70:23, 75:4, 75:5, 75:24, 77:8
**Action** [1] - 58:4
**actions** [10] - 12:9, 14:21, 23:22, 31:18, 44:17, 48:14, 57:10, 63:6, 65:3, 70:8
**active** [3] - 54:16, 55:7
**activity** [1] - 10:16
**actual** [1] - 13:19
**added** [1] - 28:17
**addition** [1] - 5:24
**additional** [4] - 21:10, 26:11, 28:16, 74:14
**address** [6] - 8:1, 31:14, 36:24, 57:8, 75:18, 76:4
**adequacy** [3] - 20:14, 25:25, 53:4
**adequate** [9] - 18:2, 18:6, 18:11, 24:20, 24:25, 54:13, 55:16, 74:11, 74:12
**adequately** [1] - 24:20
**administrator** [3] - 30:21, 31:3, 31:7
**admit** [1] - 30:9
**admitted** [4] - 20:19, 30:12, 38:13, 61:7
**ADRs** [1] - 74:5
**advantage** [1] - 27:6
**adversary** [1] - 67:1

**advice** [2] - 40:9, 40:10
**advise** [1] - 46:6
**advocacy** [1] - 11:10
**afford** [1] - 12:1
**afoul** [1] - 31:25
**afraid** [1] - 36:3
**aggressive** [1] - 34:7
**ago** [3] - 48:4, 54:4
**agree** [4] - 15:11, 33:7, 40:24, 41:5
**agreed** [1] - 21:21
**agreement** [19] - 21:11, 23:19, 25:7, 39:4, 39:21, 39:25, 42:18, 56:12, 59:22, 60:2, 60:4, 60:23, 61:3, 61:5, 73:23, 74:18, 75:3, 77:14
**agreements** [10] - 54:18, 54:22, 54:23, 55:4, 55:14, 55:19, 59:23, 60:24, 61:7, 62:18
**ahead** [5] - 7:12, 48:2, 50:14, 51:22, 64:20
**Aldubi** [3] - 4:12, 5:23, 49:13
**allegation** [1] - 48:2
**allegations** [4] - 11:23, 26:12, 46:24, 48:20
**allege** [3] - 16:2, 16:5, 64:4
**alleged** [15] - 16:20, 47:2, 47:19, 47:25, 48:18, 49:22, 49:23, 51:16, 52:2, 52:7, 52:12, 58:21, 59:6, 59:9
**allegedly** [1] - 10:14
**alleges** [3] - 16:21, 71:11, 71:13
**allegiance** [2] - 15:22, 17:5
**alleging** [2] - 12:12, 15:16
**Allergan** [7] - 22:24, 24:1, 26:8, 28:18, 28:20, 52:5, 72:21
**allocate** [1] - 15:19
**allocation** [1] - 38:3
**allow** [1] - 62:5
**allowed** [2] - 10:4, 31:16
**allowing** [1] - 61:1
**almost** [2] - 25:6, 75:21
**amend** [2] - 48:6, 53:1
**Amended** [10] - 26:11, 26:22, 27:21, 28:6, 28:17, 29:6, 49:12, 70:6, 70:9, 70:21
**America** [1] - 74:6
**American** [1] - 74:4
**amid** [1] - 27:16
**amount** [3] - 26:22, 55:21, 71:25
**amounts** [1] - 17:20
**analogy** [1] - 32:17
**analyses** [1] - 59:3
**analysis** [4] - 15:18, 27:13, 49:20, 52:17
**analyst** [1] - 49:16

**analysts** [2] - 19:11, 27:8
**analyze** [2] - 47:24, 72:19
**analyzes** [1] - 72:4
**Ann** [1] - 78:9
**announced** [2] - 10:21, 23:11
**announcement** [1] - 11:20
**anomaly** [1] - 31:8
**answer** [3] - 9:23, 29:9, 63:17
**antagonism** [1] - 51:11
**antagonistic** [1] - 51:10
**anti** [3] - 51:17, 52:1, 52:25
**anti-kickback** [3] - 51:17, 52:1, 52:25
**anyway** [2] - 14:7, 15:14
**apologize** [4] - 4:5, 4:12, 39:18, 42:4
**apparent** [1] - 58:1
**appear** [1] - 29:5
**appearance** [1] - 38:12
**APPEARANCES** [1] - 3:1
**appearing** [3] - 6:12, 6:13, 6:15
**application** [3] - 61:24, 62:8, 62:11
**applied** [2] - 24:22, 35:24
**applies** [1] - 41:2
**apply** [6] - 12:11, 34:24, 60:15, 60:17, 61:8, 61:9
**appoint** [2] - 27:5, 52:23
**appointed** [7] - 18:9, 24:2, 52:5, 56:21, 61:10, 72:23, 77:2
**appreciate** [2] - 46:14, 77:20
**appropriate** [3] - 50:17, 62:12, 76:12
**approval** [1] - 38:6
**approve** [1] - 70:5
**approved** [2] - 22:1, 34:13
**approving** [1] - 22:18
**argue** [1] - 26:16
**argued** [3] - 18:24, 28:18, 47:9
**arguing** [1] - 13:4
**argument** [19] - 10:4, 10:6, 17:12, 17:13, 20:5, 23:3, 26:1, 26:10, 28:20, 28:21, 28:23, 33:17, 48:22, 48:23, 52:8, 63:22, 64:3, 66:1
**arguments** [6] - 7:17, 13:17, 33:13, 67:16, 75:19, 77:21
**arise** [1] - 64:5
**arises** [1] - 12:8
**arranged** [1] - 43:5
**arrows** [2] - 28:24, 28:25
**ArthroCare** [1] - 73:13
**article** [1] - 27:16
**articulated** [1] - 67:12

artificial [2] - 13:8, 15:20
aside [1] - 17:24
aspect [1] - 20:13
assess [2] - 47:6, 49:25
assesses [2] - 47:4, 47:5
assets [1] - 25:23
associate [1] - 57:13
assortment [2] - 55:13, 55:14
assume [4] - 69:12, 75:25, 77:23
assuming [2] - 64:8, 64:20
attached [1] - 7:22
attempt [2] - 45:15, 55:9
attempting [1] - 65:10
attention [2] - 7:24, 11:10
attorney's [2] - 31:7, 43:13
attorneys [4] - 25:11, 57:10, 70:2, 73:21
August [5] - 47:3, 48:10, 49:15, 59:8
automated [1] - 38:4
automatic [2] - 38:8, 62:5
Avenue [1] - 3:9
Aviv [6] - 37:16, 37:18, 44:14, 44:25, 62:10, 74:17
award [1] - 55:20
Bachar [2] - 41:13, 74:17
backed [1] - 30:11
background [1] - 24:7
bad [2] - 16:16, 47:5
ball [3] - 42:5, 42:10, 63:1
banded [1] - 70:7
bankrupt [1] - 17:18
bankruptcy [10] - 19:12, 63:23, 64:2, 64:6, 64:21, 65:6, 66:3, 66:25, 67:20, 76:1
bar [1] - 14:4
bare [1] - 20:16
based [7] - 11:19, 13:25, 29:5, 48:11, 49:23, 55:19, 58:25
basic [1] - 10:6
basis [1] - 55:21
beard [1] - 4:22
Beazer [1] - 72:22
become [5] - 21:14, 22:11, 43:11, 60:13, 66:23
beforehand [1] - 59:25
beginning [2] - 14:10, 59:15
behalf [10] - 4:14, 5:4, 5:12, 5:16, 5:23, 45:14, 45:23, 46:4, 54:8, 75:14
behind [1] - 26:9
bench [6] - 8:18, 8:20, 9:5, 10:6, 16:9, 19:6
benefit [3] - 34:5, 41:11, 51:8
best [4] - 15:21, 17:7, 45:18,

65:7
bet [1] - 71:3
better [10] - 7:4, 9:18, 56:8, 59:12, 61:5, 62:21, 66:2, 66:4, 67:18, 69:3
between [12] - 15:20, 16:23, 22:16, 44:3, 44:17, 46:22, 51:11, 56:19, 59:23, 66:16, 74:24
big [2] - 17:3, 24:13
biggest [1] - 21:7
bill [1] - 29:21
billion [8] - 11:7, 19:8, 19:9, 19:11, 35:22, 36:1, 49:7, 56:20
bit [2] - 7:9, 14:1
black [1] - 18:4
block [1] - 61:23
blows [1] - 22:22
board [2] - 55:1, 74:19
Bob [1] - 8:17
bones [1] - 20:16
book [6] - 8:18, 8:20, 9:5, 10:6, 16:9, 19:6
Boston [3] - 24:3, 52:6, 52:18
bottled [1] - 14:5
bought [4] - 28:9, 30:7, 32:15, 74:6
Boulevard [1] - 3:4
bound [1] - 23:18
break [1] - 75:11
brief [2] - 17:25, 29:3
briefed [3] - 9:24, 10:10, 26:2
briefing [3] - 26:3, 32:24, 77:16
briefly [1] - 74:15
briefs [2] - 18:14, 66:15
bring [1] - 33:8
brought [5] - 7:24, 8:1, 23:10, 72:24, 74:5
Buchwald [1] - 45:11
build [1] - 27:7
bulletproof [1] - 19:9
bunch [2] - 68:18, 70:8
business [4] - 46:7, 54:2, 56:6, 56:9
businessman [1] - 36:13
busy [1] - 27:6
button [1] - 5:2
buy [5] - 22:2, 30:10, 30:13, 33:16, 35:6
calculate [3] - 13:23, 14:18, 16:22
calculated [3] - 14:10, 14:11, 35:20
calculating [1] - 14:23
calculation [8] - 14:24, 15:3, 17:1, 20:25, 26:13, 26:16,

27:25, 28:3
calculations [2] - 15:13, 26:9
candidate [1] - 28:5
cap [5] - 34:2, 34:5, 34:17, 34:22, 55:3
capital [1] - 15:3
care [1] - 4:20
Carolina [1] - 9:15
carriers [1] - 66:4
carry [1] - 73:8
case [155] - 4:11, 10:12, 10:17, 10:19, 11:17, 12:4, 12:5, 12:20, 12:23, 13:1, 13:2, 13:6, 13:7, 13:9, 13:13, 14:7, 14:9, 14:10, 14:25, 16:12, 16:13, 16:21, 17:1, 17:4, 17:7, 17:25, 18:5, 18:8, 18:9, 18:13, 19:4, 19:5, 22:24, 23:5, 24:1, 24:19, 25:1, 26:5, 26:8, 26:20, 26:21, 27:8, 28:15, 28:18, 28:19, 28:21, 29:22, 30:1, 31:1, 32:25, 34:10, 34:23, 36:15, 36:17, 37:11, 37:13, 37:14, 38:8, 39:12, 40:5, 40:20, 40:23, 40:24, 41:4, 41:11, 41:12, 42:7, 42:8, 42:12, 42:14, 42:20, 42:21, 42:22, 42:24, 43:1, 43:22, 43:24, 44:1, 44:6, 44:8, 44:9, 44:12, 44:13, 44:15, 44:24, 44:25, 45:10, 45:12, 45:17, 45:21, 45:22, 46:4, 46:8, 46:22, 47:14, 48:9, 49:11, 50:6, 50:8, 50:15, 51:8, 51:11, 51:19, 52:6, 54:12, 55:8, 58:5, 59:16, 60:2, 60:10, 61:25, 62:1, 62:10, 62:14, 63:3, 64:8, 64:17, 65:8, 65:24, 66:2, 66:4, 66:5, 67:15, 68:8, 68:23, 69:1, 69:16, 70:2, 70:12, 71:22, 72:16, 72:21, 72:22, 73:7, 73:9, 73:11, 73:13, 73:17, 74:2, 74:4, 74:13, 74:20, 74:22, 76:12
cases [45] - 10:2, 10:16, 12:9, 12:12, 12:16, 14:8, 14:14, 15:7, 15:15, 15:20, 16:14, 17:1, 18:14, 26:19, 27:10, 27:25, 32:2, 35:2, 35:21, 37:8, 37:21, 38:15, 39:21, 39:24, 40:22, 41:6, 41:23, 42:6, 46:11, 46:23, 56:11, 59:15, 60:3, 60:12, 62:16, 62:23, 65:5, 66:14, 68:12, 68:13, 71:24, 72:10, 73:25
causation [2] - 13:25, 64:3
caused [2] - 27:18, 30:10

causing [3] - 13:8, 13:10, 32:24
Cendant [2] - 61:16, 65:15
center [1] - 4:22
Centre [1] - 3:15
CEO [1] - 23:10
certain [2] - 26:21, 65:3
certainly [3] - 7:16, 9:24, 17:19
certification [16] - 24:5, 30:6, 30:8, 38:17, 39:15, 39:16, 39:20, 39:25, 40:3, 40:7, 53:12, 61:22, 62:25, 69:7, 73:6, 73:15
certified [11] - 21:14, 22:12, 24:19, 42:7, 44:11, 45:22, 45:23, 46:12, 50:10, 62:15
certify [1] - 78:5
chagrin [1] - 7:19
challenge [1] - 30:5
challenged [1] - 18:5
challenging [1] - 20:24
chambers [1] - 8:15
chances [1] - 34:12
change [3] - 4:6, 70:11, 71:1
characterization [1] - 11:6
characterized [1] - 11:5
charities [1] - 11:24
chart [1] - 16:9
chasing [1] - 25:23
checking [1] - 21:16
choose [1] - 24:4
cite [2] - 14:8, 18:13
cited [5] - 17:25, 18:4, 52:5, 66:14, 68:7
cites [1] - 74:17
Citigroup [1] - 58:12
Civil [1] - 4:16
claim [15] - 30:3, 30:19, 31:2, 33:1, 50:13, 51:4, 51:17, 54:8, 57:24, 64:23, 67:9, 67:10, 67:11, 71:24
claimant [1] - 31:5
claimants [1] - 31:2
claimed [1] - 32:16
claiming [1] - 65:5
claims [9] - 11:19, 18:24, 19:19, 30:21, 31:6, 51:1, 68:10, 70:12, 71:23
Clal [21] - 5:25, 19:8, 21:11, 38:15, 39:11, 45:3, 46:17, 50:11, 50:14, 55:18, 56:5, 61:4, 63:4, 64:8, 65:2, 65:6, 67:15, 67:17, 69:16, 70:6
Clal's [1] - 60:4
class [85] - 10:22, 12:9, 12:10, 14:21, 15:10, 15:12, 15:25, 16:19, 17:8, 18:25, 21:13, 21:15, 21:16, 22:12, 23:21, 24:5, 24:19, 26:6,

26:12, 28:10, 30:16, 30:19, 30:20, 32:20, 35:17, 35:23, 36:9, 37:14, 37:19, 38:16, 39:15, 39:25, 40:3, 40:7, 40:11, 44:4, 44:6, 44:10, 44:23, 45:14, 45:23, 46:4, 49:19, 50:6, 50:9, 50:14, 50:15, 51:3, 51:7, 51:8, 51:12, 52:17, 54:8, 60:25, 61:2, 62:16, 62:25, 63:4, 63:6, 63:7, 64:10, 64:17, 64:21, 64:25, 65:1, 65:4, 65:25, 66:1, 66:23, 67:8, 67:16, 67:18, 70:23, 73:5, 73:15, 74:24, 74:25, 75:7, 75:23

**classes** [8] - 42:7, 44:9, 45:22, 46:11, 66:18, 66:19, 68:7

**clause** [1] - 71:23

**clear** [13] - 19:18, 24:17, 36:12, 46:16, 47:21, 54:19, 55:10, 63:1, 63:13, 68:17, 68:18, 72:18, 74:16

**clearly** [9] - 53:19, 54:9, 54:10, 57:18, 60:22, 61:4, 72:12, 74:22, 76:2

**client** [16] - 25:2, 25:11, 29:18, 29:19, 34:3, 34:4, 34:5, 38:10, 52:5, 57:2, 60:22, 60:24, 61:14, 61:15, 61:17, 75:8

**clients** [10] - 10:19, 11:7, 11:11, 37:9, 42:6, 42:9, 44:16, 46:9, 49:23, 60:20

**close** [4] - 24:23, 56:12, 59:21

**co** [4] - 11:24, 12:1, 25:9, 74:8

**co-lead** [2] - 25:9, 74:8

**co-payments** [2] - 11:24, 12:1

**coin** [3] - 8:6, 8:14

**collective** [1] - 47:2

**comfortable** [1] - 9:8

**coming** [8] - 24:7, 32:23, 43:12, 52:14, 56:10, 65:23, 75:5, 77:21

**comment** [3] - 29:13, 31:10, 76:1

**commit** [1] - 27:21

**commitment** [1] - 70:25

**committed** [1] - 23:13

**common** [1] - 38:22

**companies** [2] - 11:8, 65:15

**company** [7] - 12:6, 12:14, 12:25, 49:7, 65:17, 65:20, 76:5

**comparing** [1] - 59:19

**competition** [4] - 27:17,

33:3, 33:17, 51:15

**Complaint** [37] - 23:2, 26:11, 26:22, 27:9, 27:11, 27:21, 28:7, 28:17, 29:2, 29:6, 36:15, 44:5, 46:5, 47:24, 48:6, 49:12, 49:13, 49:14, 50:20, 50:23, 51:1, 51:2, 52:21, 53:1, 58:21, 59:7, 70:6, 70:9, 70:21, 71:11, 71:13, 72:12, 72:13, 72:20, 74:25, 76:13

**Complaints** [4] - 15:16, 47:19, 58:2, 58:4

**complete** [1] - 21:19

**completely** [3] - 55:14, 59:3, 69:5

**complex** [5] - 14:8, 30:9, 30:14, 31:8

**complexities** [2] - 14:15, 63:12

**complexity** [2] - 10:1, 10:3

**complicated** [3] - 60:14, 71:17, 71:19

**compounding** [1] - 14:17

**compromise** [1] - 65:9

**compromised** [1] - 65:9

**compromising** [1] - 66:12

**concealed** [1] - 58:15

**concealing** [1] - 49:8

**concept** [1] - 66:12

**concepts** [1] - 28:25

**concerned** [2] - 57:7, 57:19

**concluded** [1] - 78:3

**condition** [1] - 76:5

**conduct** [1] - 25:17

**conference** [1] - 55:13

**confidential** [1] - 11:16

**conflict** [62] - 12:8, 13:3, 15:14, 15:24, 16:22, 17:10, 17:11, 17:12, 17:20, 18:1, 18:23, 19:15, 19:16, 19:18, 21:7, 21:20, 25:12, 25:18, 25:20, 25:21, 30:25, 31:11, 44:15, 44:19, 45:17, 45:18, 46:18, 46:19, 46:20, 46:22, 47:15, 48:23, 49:4, 49:9, 50:1, 50:3, 50:5, 57:22, 58:8, 58:19, 60:17, 64:22, 65:16, 65:19, 66:6, 67:11, 68:6, 68:12, 68:14, 68:16, 68:20, 70:1, 71:7, 71:10, 71:15, 72:16, 74:2, 75:2, 75:4

**conflicted** [3] - 15:18, 18:25, 68:11

**conflicting** [1] - 68:10

**conflicts** [18] - 10:8, 18:7, 18:8, 18:12, 18:16, 19:3, 21:8, 22:16, 23:17, 23:24, 25:22, 47:13, 58:18, 64:5, 66:16, 68:15, 71:19, 73:24

**Connecticut** [13] - 10:16, 10:20, 11:12, 11:18, 16:14, 17:1, 35:21, 48:14, 56:23, 57:14, 64:12, 64:13, 70:7

**considered** [5] - 20:5, 20:18, 53:10, 60:7, 60:11

**consolidated** [2] - 10:25, 11:1

**conspiracy** [1] - 48:22

**consult** [2] - 45:20, 69:5

**contacted** [1] - 35:1

**contacts** [1] - 76:24

**contain** [1] - 26:11

**content** [2] - 57:21

**CONTINUED** [1] - 3:1

**continued** [1] - 65:17

**contract** [2] - 21:11, 22:6

**contracts** [2] - 53:18

**contrary** [1] - 46:20

**contrast** [1] - 55:17

**control** [2] - 23:22

**Converse** [1] - 63:3

**coordinate** [18] - 37:9, 37:20, 37:24, 38:21, 40:11, 41:3, 41:13, 42:20, 43:8, 44:1, 45:4, 45:8, 46:9, 62:1, 74:20, 74:21, 77:7

**coordinated** [2] - 77:10, 77:12

**coordinating** [2] - 36:16, 40:8

**coordination** [4] - 40:13, 41:22, 44:17

**Copaxone** [13] - 11:21, 11:25, 12:5, 23:12, 23:13, 27:17, 48:20, 49:1, 49:20, 51:15, 51:25, 58:3

**corner** [1] - 9:3

**corporate** [1] - 17:15

**corporation** [6] - 17:18, 18:19, 18:20, 58:14, 67:4

**correct** [4] - 33:6, 77:12, 77:24, 78:5

**corrective** [18] - 46:25, 47:14, 47:17, 47:18, 47:22, 47:25, 48:7, 48:8, 48:10, 49:14, 49:22, 52:7, 52:11, 52:12, 52:13, 58:20, 59:7, 59:10

**correctly** [2] - 4:12, 32:11

**cost** [1] - 23:22

**counsel** [97] - 4:17, 5:18, 5:20, 17:4, 22:1, 22:6, 22:9, 22:12, 22:13, 22:14, 22:18, 23:16, 23:21, 23:25, 24:12, 24:16, 24:20, 25:1, 25:4, 25:10, 25:16, 28:18, 30:12, 31:1, 31:17, 32:4, 32:5, 35:3, 36:25, 37:7, 37:12, 37:18, 37:20, 37:23, 37:24, 38:5,

38:12, 38:13, 38:16, 38:20, 39:6, 40:8, 40:17, 40:19, 42:1, 42:12, 42:13, 42:19, 42:21, 42:25, 43:7, 43:11, 43:22, 43:23, 43:24, 43:25, 44:2, 45:5, 45:8, 45:19, 46:1, 46:5, 46:8, 46:9, 46:11, 53:24, 54:13, 54:17, 54:21, 55:10, 55:15, 58:6, 59:10, 59:14, 59:19, 61:1, 61:8, 61:13, 62:7, 62:13, 63:3, 68:22, 69:17, 73:12, 73:19, 73:22, 73:25, 74:8, 74:11, 74:14, 75:9

**counsel's** [2] - 60:19, 60:20

**count** [1] - 36:4

**country** [1] - 23:21

**County** [2] - 25:2, 28:8

**County's** [1] - 12:17

**couple** [2] - 19:17, 31:15

**course** [3] - 17:17, 62:2, 75:1

**court** [13] - 37:19, 38:2, 41:1, 41:9, 43:1, 43:2, 45:5, 46:19, 48:9, 62:5, 70:12, 74:5, 75:5

**Court** [9] - 4:1, 41:2, 44:14, 44:25, 49:4, 52:22, 57:7, 62:11, 78:9

**Court's** [3] - 9:23, 68:24, 74:13

**courtroom** [2] - 4:7, 10:13

**Courts** [1] - 48:11

**courts** [11] - 11:11, 15:6, 15:8, 15:11, 23:21, 25:15, 28:12, 62:15, 62:16, 63:8, 73:2

**cover** [2] - 12:2, 66:11

**COVID** [2] - 8:18, 9:13

**cream** [1] - 33:8

**creative** [1] - 58:7

**critical** [3] - 51:10, 64:6, 65:23

**crop** [1] - 33:9

**CRR** [1] - 78:9

**crumbling** [1] - 53:13

**crunching** [1] - 56:22

**cut** [1] - 45:13

**cute** [3] - 22:10, 24:10, 58:7

**cuts** [1] - 27:16

**cutting** [1] - 51:14

**damage** [14] - 14:7, 14:18, 14:24, 15:13, 15:17, 15:18, 16:25, 19:19, 20:24, 23:1, 26:9, 26:16, 27:25

**damaged** [1] - 49:5

**damages** [26] - 11:7, 12:11, 12:17, 13:1, 13:6, 13:8, 13:12, 13:14, 13:24, 14:9, 14:13, 14:18, 16:23, 23:4, 26:5, 29:7, 47:2, 47:4, 48:21, 49:11, 49:16, 51:12, 51:13,

56:18, 58:19, 58:20
**date** [3] - 47:16, 74:23
**Date** [1] - 78:10
**dates** [6] - 48:17, 48:18, 51:13, 52:9, 55:4, 66:10
**Daubert** [1] - 72:8
**David** [1] - 6:1
**days** [9] - 27:2, 30:7, 31:16, 35:4, 47:23, 49:25, 54:2, 72:14
**de** [2] - 11:5, 22:14
**deadline** [3] - 70:14, 70:16, 70:19
**deal** [18] - 24:13, 40:13, 40:20, 46:24, 47:2, 52:24, 60:5, 60:17, 63:11, 66:10, 67:10, 68:19, 69:4, 75:1, 75:7, 75:8
**dealing** [5] - 7:6, 60:14, 62:9, 77:3, 77:5
**deals** [1] - 57:17
**dealt** [3] - 43:6, 65:15, 65:16
**debt** [2] - 19:8, 19:11
**December** [2] - 53:15, 75:24
**decide** [8] - 8:6, 50:15, 51:3, 51:4, 64:15, 64:16, 70:22, 71:21
**decided** [3] - 7:11, 8:5, 8:9
**decides** [1] - 45:13
**decision** [8] - 50:16, 50:17, 51:4, 51:5, 51:6, 52:5, 64:18, 77:19
**decisions** [3] - 17:8, 48:11, 72:5
**declaration** [3] - 53:6, 53:8, 53:12
**declare** [1] - 19:12
**decline** [2] - 49:19, 51:22
**dedicated** [1] - 17:4
**defendant** [1] - 17:15
**defendants** [15] - 4:16, 5:5, 5:13, 5:16, 17:15, 17:19, 17:22, 18:23, 19:4, 33:5, 33:10, 33:13, 62:24, 75:15, 75:20
**DEFENDANTS** [1] - 3:8
**defending** [1] - 32:20
**defense** [6] - 30:15, 30:16, 32:8, 33:4, 57:23, 72:6
**defenses** [9] - 30:2, 30:3, 32:18, 32:21, 32:22, 32:24, 33:11, 76:6
**defined** [6] - 37:14, 44:4, 44:6, 44:24, 46:5, 51:10
**definition** [2] - 44:13, 44:23
**deflated** [1] - 16:15
**deflation** [9] - 12:13, 13:11, 48:15, 58:9, 71:7, 71:13, 72:10, 72:13
**deflationary** [1] - 71:21

**degree** [1] - 64:24
**DeKalb** [44] - 12:17, 22:25, 23:4, 23:8, 24:24, 25:1, 26:4, 28:3, 28:8, 28:14, 29:7, 33:25, 34:6, 34:9, 34:15, 34:19, 34:21, 42:12, 46:3, 47:18, 47:23, 50:4, 50:11, 51:5, 51:18, 52:8, 52:20, 53:24, 54:6, 54:10, 54:24, 54:25, 55:12, 56:13, 61:9, 64:19, 73:3, 73:9, 73:10, 73:13, 73:14, 73:15, 74:10
**DeKalb's** [3] - 23:14, 35:6, 61:8
**demand** [1] - 41:25
**demanded** [2] - 62:13, 75:8
**Department** [1] - 11:19
**depositions** [3] - 24:8, 70:9, 70:21
**derivative** [1] - 18:18
**designate** [1] - 22:1
**desperate** [2] - 11:25, 51:18
**determine** [1] - 26:13
**detriment** [1] - 61:2
**dictated** [2] - 67:16, 74:25
**difference** [1] - 58:10
**different** [21] - 14:23, 15:6, 15:17, 18:17, 18:25, 19:1, 30:7, 51:12, 51:13, 52:9, 58:10, 60:3, 61:7, 66:10, 66:11, 68:13, 72:9
**differentiate** [1] - 58:17
**differing** [2] - 55:3, 61:7
**diplomatically** [1] - 8:5
**Direct** [1] - 58:4
**direct** [4] - 11:11, 12:9, 16:22, 17:10
**disagree** [1] - 75:20
**disclose** [2] - 39:19, 69:13
**disclosed** [2] - 21:22, 58:15
**disclosure** [25] - 18:21, 27:13, 27:18, 28:6, 35:8, 35:9, 47:3, 47:9, 47:12, 47:13, 47:17, 47:18, 47:22, 48:1, 48:7, 48:8, 48:10, 49:14, 49:15, 51:19, 52:7, 52:9, 52:13, 59:10, 68:24
**disclosures** [29] - 13:5, 13:10, 14:15, 14:16, 15:12, 16:20, 23:1, 23:5, 26:12, 26:17, 28:5, 28:17, 29:1, 29:4, 46:25, 47:14, 49:23, 52:11, 52:13, 58:21, 59:3, 59:5, 59:7, 59:8, 71:12, 71:21, 72:14, 72:19, 73:7
**discovery** [2] - 11:2, 41:11
**discretion** [1] - 34:11
**discussion** [5] - 59:6, 71:9, 71:13, 71:14, 75:23
**disenfranchise** [1] - 71:20

**disentangle** [2] - 71:20, 72:10
**dismiss** [2] - 69:8, 76:13
**dispute** [1] - 31:6
**disqualified** [3] - 10:7, 68:6, 68:9
**disqualifying** [3] - 25:20, 25:21, 25:22
**distance** [1] - 9:4
**distinct** [2] - 11:17, 12:4
**distinguish** [1] - 58:17
**distribution** [4] - 38:7, 40:14, 62:5, 62:12
**District** [5] - 43:23, 44:14, 44:25, 45:10, 62:10
**district** [3] - 37:19, 70:11, 74:5
**divided** [1] - 17:5
**Docket** [1] - 4:16
**document** [1] - 49:5
**documents** [1] - 37:23
**dog** [1] - 75:17
**dollars** [4] - 28:8, 28:11, 28:15, 73:4
**done** [14] - 15:21, 35:22, 35:25, 37:6, 38:18, 38:22, 39:16, 62:21, 64:2, 69:12, 71:18, 75:9
**DONOVAN** [2] - 3:9, 5:11
**Donovan** [1] - 5:12
**double** [1] - 21:16
**doublespeak** [1] - 69:25
**doubletalk** [1] - 68:18
**down** [12] - 4:7, 7:5, 9:15, 9:17, 9:20, 13:23, 14:25, 29:1, 55:20, 55:21, 70:3, 72:4
**downstairs** [1] - 8:15
**downward** [1] - 23:11
**dozens** [2] - 65:2, 65:24
**driven** [1] - 64:24
**drop** [6] - 27:18, 47:5, 47:7, 49:17, 51:25, 52:10
**dropped** [1] - 13:16
**drops** [3] - 49:22, 49:23, 52:9
**drug** [7] - 11:21, 12:5, 23:13, 27:17, 36:6, 36:7, 48:22
**drugs** [2] - 49:3, 58:14
**dry** [1] - 14:1
**dual** [5] - 40:25, 41:23, 60:13, 60:14, 63:12
**dual-listed** [4] - 40:25, 41:23, 60:13, 63:12
**due** [2] - 15:20, 51:15
**Dura** [3] - 13:13, 13:21, 47:21
**during** [14] - 12:22, 14:10, 15:12, 16:12, 16:19, 16:20, 17:17, 24:5, 26:12, 26:23, 27:5, 37:22, 49:19, 62:2

**duty** [2] - 11:9, 22:17
**economist** [1] - 72:4
**economists** [2] - 56:22, 72:24
**edged** [1] - 22:25
**effective** [2] - 22:6, 42:14
**effectuate** [2] - 38:3, 68:25
**effort** [3] - 32:25, 55:15
**egregious** [1] - 11:23
**Eitan** [2] - 41:14, 43:24
**either** [10] - 15:5, 17:9, 25:24, 43:1, 44:14, 57:8, 62:1, 62:2, 75:1, 75:4
**elaborate** [1] - 13:24
**email** [1] - 8:22
**emails** [1] - 24:8
**employ** [1] - 42:13
**end** [10] - 13:1, 15:9, 17:6, 26:6, 28:10, 33:4, 40:18, 55:23, 68:23, 71:14
**engaged** [2] - 40:18, 40:19
**engine** [1] - 67:21
**enthusiasm** [1] - 36:16
**entire** [1] - 54:19
**entirely** [1] - 30:1
**entities** [1] - 65:12
**entitled** [2] - 35:18, 78:6
**ERJ** [1] - 6:9
**escalated** [1] - 31:6
**escape** [1] - 72:15
**ESQUIRE** [4] - 3:3, 3:8, 3:9, 3:15
**essentially** [1] - 66:5
**estimate** [7] - 28:2, 35:17, 35:21, 35:24, 36:1, 36:2, 56:15
**ethical** [2] - 57:20
**evaluate** [1] - 28:13
**event** [5] - 14:19, 14:20, 65:6, 71:18, 72:1
**evidence** [4] - 20:20, 23:6, 29:5, 69:11
**evident** [3] - 39:12, 39:13
**exact** [4] - 51:6, 62:18, 71:12
**exactly** [8] - 5:20, 23:4, 27:24, 30:10, 49:4, 56:3, 65:23, 72:20
**example** [2] - 18:15, 68:5
**except** [1] - 73:23
**exchange** [2] - 37:16, 37:17
**Exchange** [1] - 74:7
**excuse** [1] - 74:9
**exercise** [1] - 33:8
**exhibit** [2] - 19:6, 19:22
**Exhibit** [2] - 7:22, 69:14
**existence** [1] - 22:19
**exit** [1] - 54:3
**expect** [2] - 73:9, 73:15
**expecting** [1] - 6:9

expenses [1] - 43:22
expensive [2] - 14:20, 73:1
experience [1] - 73:14
experienced [2] - 69:18, 69:20
expert [16] - 14:18, 15:18, 16:25, 17:5, 17:9, 27:12, 36:4, 47:6, 49:11, 49:21, 71:16, 71:24, 72:5, 72:6, 72:7, 72:9
expertise [2] - 36:9, 45:24
experts [7] - 14:20, 15:22, 17:9, 27:8, 27:22, 58:16, 72:24
explain [1] - 26:15
explanation [4] - 16:17, 21:18, 22:15, 23:3
expose [1] - 13:7
exposure [1] - 16:19
extend [1] - 12:7
extent [1] - 76:12
extra [1] - 28:25
face [3] - 20:18, 23:20, 69:9
fact [13] - 17:16, 22:19, 31:10, 38:19, 40:16, 43:9, 45:17, 46:2, 50:2, 50:19, 68:11, 72:15, 75:7
facto [1] - 22:14
factors [2] - 15:1, 15:8
fair [5] - 29:24, 29:25, 30:19, 37:4, 64:24
fairly [6] - 9:24, 11:23, 14:8, 30:9, 72:10
fairness [1] - 25:22
false [4] - 30:6, 30:8, 48:25, 68:4
far [6] - 7:5, 20:15, 31:24, 57:9, 59:14, 73:17
Faruqi [2] - 74:10, 74:11
FARUQI [2] - 3:3
fashion [1] - 43:12
favor [1] - 17:4
favorable [1] - 60:1
Federal [1] - 23:20
fee [11] - 24:9, 43:1, 54:25, 60:23, 61:3, 61:4, 61:15, 61:17, 73:23
fees [5] - 25:7, 43:13, 55:10, 61:13, 70:5
feet [1] - 4:10
felt [1] - 47:18
fertile [1] - 17:6
FIFO [5] - 15:2, 15:3, 15:6, 28:3, 73:2
fight [3] - 75:2, 75:17, 76:8
fights [1] - 33:7
figure [3] - 4:8, 40:19, 44:2
file [9] - 7:4, 26:22, 30:3, 30:8, 33:1, 49:14, 49:15, 50:13, 50:23

filed [27] - 10:16, 10:19, 11:13, 20:17, 24:25, 27:10, 30:6, 32:12, 47:19, 48:24, 49:13, 50:8, 50:20, 50:25, 53:9, 53:11, 64:13, 64:14, 65:3, 69:16, 69:19, 70:6, 70:8, 70:9, 72:2, 76:13, 77:20
files [1] - 30:21
filing [2] - 31:22, 31:23
filings [6] - 9:25, 19:7, 19:10, 20:19, 41:11, 76:4
filling [1] - 31:2
final [1] - 26:11
finally [2] - 53:21, 54:2
financial [8] - 14:12, 14:23, 14:25, 20:13, 28:2, 28:13, 46:16, 76:5
fine [4] - 9:7, 20:22, 48:5, 51:21
firm [26] - 10:11, 10:18, 11:9, 16:25, 17:10, 18:5, 22:3, 24:4, 24:6, 24:15, 29:18, 29:19, 38:10, 43:12, 45:9, 57:2, 59:22, 60:11, 68:8, 69:11, 70:3, 74:10, 74:18
firms [24] - 8:3, 21:10, 21:21, 22:5, 22:15, 24:22, 25:6, 39:11, 40:4, 41:20, 42:6, 56:7, 56:10, 60:7, 62:9, 68:6, 68:16, 68:25, 69:17, 69:19, 69:21, 69:22, 72:18
first [24] - 8:6, 8:8, 8:10, 8:11, 8:15, 10:5, 10:10, 15:5, 15:14, 15:25, 17:11, 21:9, 29:23, 30:5, 36:24, 41:8, 47:11, 51:20, 55:25, 63:25, 64:8, 69:15
first-in [1] - 15:5
first-out [1] - 15:5
five [8] - 32:1, 32:2, 32:3, 69:21, 75:11, 76:18
five-minute [2] - 75:11, 76:18
fixing [14] - 10:15, 10:20, 12:5, 46:23, 46:25, 47:14, 49:21, 51:11, 58:2, 59:2, 64:24, 65:24, 67:10, 67:15
flagship [1] - 27:17
flies [1] - 23:20
flip [2] - 8:6, 8:13
floor [1] - 14:4
fold [2] - 12:3
forecast [2] - 27:16, 51:15
foregoing [1] - 78:5
foreign [1] - 73:21
forget [1] - 4:20
form [4] - 14:22, 28:1, 31:3, 43:12
formally [2] - 64:10, 64:21

formulations [1] - 12:7
Forsythe [23] - 33:20, 33:22, 34:4, 34:25, 36:8, 37:11, 40:17, 42:13, 45:13, 46:3, 50:3, 50:11, 51:5, 53:23, 54:5, 54:6, 54:15, 55:2, 55:7, 55:12, 61:9, 64:19, 73:8
Forsythe's [1] - 61:13
forward [6] - 28:14, 51:6, 59:13, 59:17, 62:20, 66:24
four [5] - 8:3, 16:20, 48:17, 49:24, 59:9
four-and-a-half [1] - 59:9
fourth [5] - 26:10, 68:16, 68:20, 70:1, 74:1
Fragrance [1] - 45:2
Fragrances [1] - 45:7
frankly [1] - 21:19
fraud [18] - 12:14, 12:18, 12:22, 13:2, 13:7, 13:10, 13:16, 13:20, 13:22, 14:17, 15:20, 16:18, 23:13, 49:8, 49:9, 52:15, 58:12, 59:1
friends [2] - 5:19, 56:21
front [6] - 4:22, 18:10, 19:21, 27:25, 45:11, 48:12
fully [3] - 13:2, 23:15, 26:2
function [1] - 55:11
fund [1] - 28:11
fundamental [2] - 46:20
funds [6] - 11:8, 38:3, 40:14, 51:8, 66:17, 66:21
Funds [2] - 4:13, 5:24
funny [3] - 46:7, 69:14
future [6] - 7:2, 42:3, 48:5, 51:5, 51:21, 63:24
gains [2] - 15:3, 53:16
general [1] - 18:1
generally [2] - 46:15, 59:15
generic [4] - 12:4, 12:6, 48:22, 49:3
generously [2] - 61:10
gentleman [2] - 4:22, 5:9
Genworth [6] - 17:25, 18:4, 18:5, 18:13, 18:15, 18:18
given [5] - 6:16, 7:3, 9:13, 38:25, 55:20
global [2] - 42:25, 43:20
glove [1] - 33:22
Goldman [1] - 66:14
Google [3] - 64:1, 67:20, 71:3
gosh [3] - 24:14, 30:24, 69:10
gradual [1] - 55:21
gradually [1] - 12:15
granted [1] - 7:4
gravitated [1] - 15:7
great [10] - 5:2, 6:3, 6:8, 8:21, 14:21, 18:4, 22:4, 28:4,

28:5, 62:22
ground [2] - 17:6, 41:12
Group [11] - 6:5, 6:20, 7:11, 8:17, 37:12, 53:5, 58:6, 61:5, 61:6, 61:19, 74:12
group [11] - 15:23, 29:11, 29:13, 29:17, 34:9, 53:6, 53:7, 53:13, 53:21, 53:22, 57:1
groups [6] - 16:23, 17:13, 17:21, 19:1, 59:20, 68:13
guarantee [1] - 72:5
guess [13] - 7:14, 11:5, 25:3, 25:21, 33:2, 35:8, 38:18, 38:24, 39:17, 42:3, 56:19, 65:6, 66:22
guide [2] - 45:24, 45:25
guilty [2] - 10:14, 10:15
guns [1] - 10:23
Guy [3] - 41:13, 43:24, 74:17
guys [3] - 22:25, 39:9, 67:9
hac [4] - 38:15, 61:24, 73:19, 73:21
half [7] - 22:10, 24:5, 24:10, 48:4, 49:24, 59:9
Halman [3] - 4:12, 5:23, 49:13
hammering [1] - 53:20
hand [3] - 7:17, 49:8, 49:9
handling [1] - 31:1
handout [1] - 21:9
happily [1] - 68:23
happy [5] - 30:18, 31:1, 31:14, 32:25, 63:17
harm [2] - 35:22, 35:25
head [1] - 65:25
healthy [1] - 33:8
hear [4] - 4:24, 8:10, 21:19, 54:15
heard [6] - 41:9, 60:3, 68:2, 68:18, 71:5, 76:8
hearing [6] - 45:13, 48:4, 54:3, 69:25, 72:22, 75:17
hearings [1] - 24:24
held [3] - 15:9, 23:8, 52:7
help [8] - 31:2, 33:10, 42:12, 42:20, 43:8, 45:19, 60:19, 60:20
hide [4] - 42:5, 42:10, 62:22, 63:1
high [2] - 19:14, 62:16
highest [1] - 56:13
highly [1] - 66:9
himself [2] - 34:7, 54:16
hindsight [2] - 61:20, 62:19
Hippel [1] - 5:16
HIPPEL [1] - 3:14
hire [8] - 23:7, 27:7, 27:8, 56:21, 68:22, 68:24, 69:4, 70:3

**hired** [2] - 27:22, 27:23
**hits** [1] - 67:21
**hold** [3] - 26:5, 61:11, 65:17
**holders** [1] - 44:21
**holdings** [1] - 23:14
**honestly** [4] - 31:10, 32:14, 32:21, 77:2
**honesty** [1] - 29:20
**Honor** [86] - 4:4, 4:24, 5:5, 5:11, 5:22, 6:1, 6:4, 6:10, 6:14, 8:11, 8:16, 9:6, 9:21, 14:6, 16:3, 17:24, 20:7, 20:15, 20:25, 22:10, 23:16, 24:2, 26:19, 26:25, 27:20, 29:8, 29:13, 29:20, 31:13, 33:6, 33:21, 34:19, 35:1, 35:10, 35:14, 35:19, 36:11, 36:21, 36:23, 37:1, 37:4, 37:6, 38:18, 39:3, 39:10, 39:17, 42:9, 42:17, 42:23, 43:5, 43:14, 43:19, 46:1, 46:8, 46:12, 47:11, 48:17, 51:21, 52:4, 54:19, 55:8, 56:18, 57:4, 57:25, 59:16, 60:12, 61:12, 62:19, 63:16, 63:25, 68:1, 68:2, 71:18, 74:4, 74:16, 75:12, 75:16, 75:22, 76:2, 76:10, 76:17, 76:25, 77:25, 78:1
**hope** [1] - 52:23
**hopeful** [1] - 76:14
**hopefully** [1] - 33:1
**hopeless** [1] - 71:14
**housecleaning** [1] - 23:11
**household** [1] - 7:20
**huge** [8] - 11:7, 11:9, 14:20, 58:13, 70:9, 70:22, 72:16, 73:1
**hugely** [1] - 73:1
**hundreds** [5] - 49:6, 58:14, 71:20, 72:2
**hurt** [2] - 47:1
**hybrid** [1] - 12:6
**hypothetical** [2] - 29:4, 72:18
**hypothetically** [1] - 72:19
**idea** [8] - 35:16, 47:8, 48:14, 63:23, 68:21, 71:23, 72:9, 74:7
**ideally** [1] - 41:8
**identical** [1] - 59:23
**identified** [4] - 16:11, 27:14, 67:3, 68:16
**identify** [1] - 47:12
**III** [1] - 3:8
**impact** [2] - 35:12, 71:22
**impacted** [1] - 23:14
**implied** [1] - 68:5
**important** [6] - 12:16, 43:3, 50:7, 55:11, 61:25, 64:11

**imprimatur** [1] - 63:7
**inability** [1] - 67:1
**inadequate** [1] - 10:7
**included** [1] - 44:9
**includes** [3] - 37:15, 44:7
**including** [2] - 10:17, 10:19
**inclusion** [1] - 75:6
**increase** [4] - 12:2, 12:3, 13:6, 15:19
**indeed** [1] - 59:8
**independent** [1] - 15:22
**indicate** [1] - 71:4
**indicated** [2] - 70:24, 74:14
**indicates** [1] - 70:24
**indicating** [1] - 72:18
**indication** [2] - 70:10, 70:20
**individual** [8] - 17:15, 17:22, 64:14, 65:2, 67:2, 67:3, 67:6, 70:8
**individually** [2] - 4:13, 4:15
**individuals** [4] - 5:7, 17:19, 68:9, 68:10
**Industries** [1] - 4:15
**industry** [2] - 35:4, 49:17
**inextricable** [4] - 10:8, 16:24, 25:11, 74:2
**infinite** [1] - 19:2
**inflated** [6] - 13:15, 13:19, 13:22, 15:17, 16:13, 48:19
**inflates** [1] - 72:3
**inflating** [1] - 12:25
**inflation** [17] - 13:9, 15:20, 16:2, 16:22, 23:7, 47:5, 48:15, 49:19, 49:25, 58:8, 58:9, 58:22, 59:1, 71:7, 71:11, 72:10, 72:12
**inflationary** [1] - 71:21
**information** [7] - 11:16, 14:17, 21:23, 22:18, 52:14, 62:3, 72:3
**informed** [1] - 77:5
**initial** [5] - 20:16, 24:24, 26:14, 27:24, 28:12
**inside** [1] - 50:12
**insist** [1] - 38:10
**insisted** [1] - 60:20
**instances** [1] - 38:5
**instead** [4] - 14:11, 24:1, 27:9, 69:19
**institutional** [12] - 11:8, 38:20, 40:9, 40:15, 41:25, 50:21, 54:24, 62:14, 63:10, 65:13, 65:14, 65:22
**institutions** [2] - 17:3, 70:22
**insulting** [1] - 69:24
**insurance** [3] - 11:8, 66:3, 66:10
**intend** [2] - 6:11, 70:12
**intending** [2] - 13:5, 13:6

**intentions** [1] - 70:11
**interest** [34] - 10:8, 14:12, 14:23, 14:25, 17:7, 17:11, 17:20, 18:7, 18:16, 18:23, 19:16, 19:18, 21:20, 22:16, 23:24, 25:12, 25:18, 25:21, 25:23, 28:2, 28:13, 36:16, 36:17, 46:16, 46:19, 46:21, 51:10, 53:20, 71:7, 71:11, 71:15, 72:16, 73:24
**interested** [1] - 35:2
**interesting** [4] - 7:22, 17:24, 42:11, 77:13
**interests** [4] - 36:9, 50:22, 51:2, 65:3
**international** [4] - 38:9, 38:10, 41:24
**International** [2] - 45:2, 45:7
**interpret** [1] - 71:6
**introduce** [1] - 5:21
**invent** [1] - 54:11
**investigating** [1] - 35:2
**investigation** [2] - 11:20, 27:12
**investigator** [1] - 23:7
**investigators** [1] - 27:7
**Investor** [11] - 6:5, 6:20, 7:11, 8:17, 37:11, 53:5, 58:6, 61:5, 61:6, 61:18, 74:11
**investor** [10] - 36:13, 38:20, 40:16, 50:19, 50:21, 54:25, 63:10, 65:13, 65:14, 65:19
**investors** [14] - 35:22, 36:1, 38:1, 40:10, 41:25, 45:15, 45:23, 46:21, 62:14, 65:22, 67:2, 67:3, 69:24, 74:6
**invests** [1] - 36:14
**involve** [2] - 37:8, 74:14
**involved** [7] - 41:15, 57:14, 61:1, 63:8, 71:25, 73:25, 74:20
**involvement** [5] - 38:17, 39:10, 42:5, 59:13, 65:8
**irreconcilable** [1] - 16:24
**irrespective** [1] - 57:17
**Israel** [12] - 37:23, 38:4, 38:6, 40:13, 40:21, 40:23, 41:17, 42:16, 43:7, 44:13, 44:21, 74:19
**Israeli** [77] - 36:25, 37:8, 37:9, 37:10, 37:12, 37:15, 37:17, 37:20, 37:25, 38:2, 38:7, 38:20, 38:21, 40:8, 40:9, 40:10, 40:11, 40:22, 41:1, 41:3, 41:4, 42:1, 42:11, 42:13, 42:20, 42:21, 42:24, 43:1, 43:7, 43:12, 43:22, 43:25, 44:2, 44:4, 44:7, 44:8, 44:22, 44:25, 45:4, 45:6, 45:8, 45:17, 45:19, 45:20,

45:24, 45:25, 46:5, 46:6, 46:8, 46:9, 59:13, 60:15, 60:19, 60:20, 62:1, 62:4, 62:7, 68:16, 68:17, 68:25, 69:22, 70:2, 70:3, 73:19, 73:22, 73:24, 73:25, 74:7, 74:21, 74:22, 74:24, 75:6, 75:9, 75:23, 76:23
**Israelis** [1] - 69:2
**issue** [20] - 11:6, 33:2, 33:18, 36:24, 36:25, 37:13, 41:4, 45:3, 45:20, 50:16, 54:5, 57:23, 58:13, 60:23, 60:24, 61:3, 65:21, 66:20, 77:3
**issued** [1] - 70:18
**issues** [21] - 8:1, 19:4, 31:3, 45:1, 49:7, 50:23, 50:24, 50:25, 53:5, 53:14, 54:20, 59:11, 60:14, 60:18, 68:22, 74:21, 75:8
**items** [1] - 76:3
**itself** [2] - 42:24, 59:18
**James** [2] - 5:4, 6:6
**JAMES** [1] - 3:8
**January** [1] - 75:24
**Jeremy** [1] - 5:22
**jettisoned** [1] - 29:17
**job** [2] - 54:24, 61:1
**JOHN** [1] - 3:3
**John** [1] - 3:4
**join** [1] - 70:23
**jointly** [5] - 21:12, 22:7, 22:11, 23:19, 25:7
**JP** [1] - 66:14
**jpsmith@winston.com** [1] - 3:11
**Judge** [7] - 22:23, 22:24, 23:25, 24:14, 25:3, 45:11, 68:8
**judgment** [1] - 72:4
**judgments** [2] - 67:1, 71:25
**judicial** [1] - 19:10
**juris** [1] - 28:1
**jurisdiction** [1] - 9:16
**jury** [1] - 14:24
**Justice** [1] - 11:19
**KASKELA** [1] - 6:1
**Kaskela** [2] - 6:2, 69:17
**kcdonovan@winston.com** [1] - 3:11
**keep** [5] - 19:25, 21:16, 65:20, 73:22, 73:23
**keeps** [1] - 12:6
**Kennedy** [1] - 3:4
**kept** [1] - 53:20
**Kerry** [1] - 5:12
**KERRY** [1] - 3:9
**key** [2] - 54:20
**kickback** [4] - 11:20, 51:17, 52:1, 52:25

kicker [1] - 25:24
kidding [1] - 6:18
KILLORIN [60] - 6:4, 8:16, 8:21, 9:2, 9:5, 9:10, 9:17, 9:20, 11:1, 11:4, 12:20, 14:3, 14:6, 16:3, 16:6, 16:8, 16:11, 19:24, 20:3, 20:7, 20:9, 20:12, 20:15, 20:24, 21:3, 21:6, 26:25, 27:5, 27:20, 28:22, 29:12, 29:16, 29:24, 30:24, 31:20, 31:24, 32:10, 32:14, 33:6, 33:12, 33:15, 33:19, 33:21, 34:16, 34:19, 35:1, 35:7, 35:10, 35:14, 35:19, 35:24, 36:7, 36:11, 36:21, 67:24, 68:1, 70:15, 70:17, 70:20, 77:25
Killorin [2] - 6:5, 8:17
kind [2] - 56:22, 57:16
knowledgeable [1] - 11:14
known [1] - 22:3
knows [1] - 26:19
Kooheji [14] - 29:12, 29:18, 30:5, 30:18, 32:9, 32:23, 34:3, 50:4, 53:14, 53:25, 54:3, 54:9, 55:2, 55:12
Krim [1] - 68:8
lack [3] - 22:21, 23:23, 25:12
laid [1] - 33:22
large [5] - 11:10, 36:5, 63:6, 65:11, 65:19
largely [1] - 64:25
largest [8] - 14:12, 14:23, 14:25, 18:3, 18:10, 20:17, 46:16, 63:15
last [12] - 4:6, 6:17, 6:24, 7:18, 15:5, 27:15, 31:15, 33:22, 48:4, 55:13, 73:20
last-in [1] - 15:5
last-minute [1] - 4:6
last-out [1] - 15:5
late [2] - 7:18, 75:24
law [31] - 8:3, 13:13, 14:15, 15:4, 17:9, 18:4, 20:21, 21:10, 21:21, 22:3, 22:5, 24:15, 24:22, 25:6, 36:12, 37:10, 38:10, 40:9, 40:10, 41:1, 41:2, 45:20, 45:24, 45:25, 46:6, 56:10, 60:15, 60:16, 69:11, 74:21
lawsuit [2] - 66:24, 67:5
lawsuits [2] - 10:19, 67:7
lawyers [2] - 25:19, 57:2
Lax [1] - 15:1
Lax-Olsen [1] - 15:1
lead [82] - 14:10, 15:12, 17:2, 17:3, 17:5, 18:2, 18:6, 18:9, 18:11, 20:6, 20:18, 21:14, 21:25, 22:1, 22:6, 22:9, 22:12, 22:13, 22:14, 22:25,

23:17, 23:25, 24:12, 24:19, 24:20, 24:21, 24:25, 25:1, 25:2, 25:4, 25:9, 26:13, 26:20, 27:3, 27:6, 29:6, 31:16, 31:17, 32:1, 32:3, 32:4, 32:5, 33:3, 33:7, 36:10, 36:18, 38:16, 38:19, 40:8, 42:19, 43:10, 43:11, 43:24, 45:3, 52:4, 52:23, 54:16, 54:20, 55:1, 55:5, 55:11, 56:11, 56:21, 57:17, 63:3, 63:5, 66:19, 67:7, 69:7, 69:17, 72:23, 72:24, 73:8, 73:12, 73:16, 74:8, 74:11, 74:12, 76:8, 77:2
leadership [1] - 23:23
leading [4] - 13:1, 66:18, 66:19
leakage [5] - 16:16, 16:18, 23:12, 27:19, 27:23
learned [2] - 21:10, 28:18
least [1] - 23:6
left [1] - 28:18
legal [1] - 12:10
legislative [1] - 32:17
legitimate [1] - 53:25
lengthy [1] - 17:17
less [3] - 34:13, 56:1, 56:4
letter [2] - 18:4, 24:3
level [2] - 55:25, 56:13
levels [1] - 61:7
liaise [1] - 37:24
liaison [1] - 69:17
Lieberman [1] - 5:23
LIEBERMAN [48] - 4:10, 5:22, 6:10, 6:14, 8:11, 27:2, 32:1, 32:5, 36:23, 37:4, 37:6, 39:3, 39:7, 39:10, 39:15, 39:23, 40:2, 41:6, 41:17, 41:19, 42:17, 42:19, 43:4, 43:14, 43:19, 44:20, 46:15, 47:11, 48:16, 56:1, 56:4, 56:17, 56:25, 57:4, 57:7, 57:11, 57:13, 57:25, 60:9, 63:20, 63:25, 64:13, 66:25, 70:18, 74:16, 76:25, 77:11, 78:1
lies [1] - 46:17
LIFO [9] - 15:2, 15:3, 15:6, 15:7, 26:13, 28:2, 28:9, 28:15, 73:2
light [1] - 74:1
likely [5] - 42:22, 42:23, 43:1, 66:9, 66:11
limit [1] - 61:13
limitations [1] - 50:25
limited [6] - 17:20, 17:22, 25:23, 66:17, 66:21, 67:2
Limited [2] - 4:13, 4:15
lines [1] - 10:24

listed [7] - 40:25, 41:23, 53:17, 53:19, 60:13, 60:14, 63:12
listen [2] - 52:11, 52:16
litigate [2] - 46:4, 54:7
litigated [1] - 51:1
litigating [2] - 11:15, 65:18
Litigation [1] - 43:20
litigation [18] - 10:12, 17:18, 21:12, 21:13, 22:7, 23:19, 23:22, 25:8, 30:17, 37:23, 38:9, 41:16, 41:21, 41:24, 42:16, 53:23, 57:17, 62:3
LLP [4] - 3:3, 3:8, 3:14, 5:24
loads [1] - 56:10
longstanding [1] - 46:10
look [39] - 8:2, 10:5, 15:8, 19:5, 19:12, 19:21, 25:14, 27:15, 27:22, 28:1, 28:12, 33:24, 40:4, 47:5, 47:23, 49:12, 49:17, 49:22, 51:24, 52:8, 52:9, 53:15, 54:22, 55:4, 55:17, 55:18, 57:21, 58:1, 58:18, 58:19, 58:24, 59:18, 62:22, 63:2, 72:1, 72:11, 73:2
looked [3] - 39:22, 40:1, 73:20
looking [2] - 61:20, 63:9
looks [6] - 23:6, 27:23, 28:5, 73:4, 73:6, 73:20
loss [7] - 13:17, 13:25, 20:13, 20:17, 26:13, 63:15, 64:3
losses [6] - 15:2, 18:3, 18:10, 28:9, 28:15, 73:2
lost [3] - 8:13, 28:3, 73:4
love [2] - 9:20, 34:10
lower [3] - 56:13, 60:4, 61:18
lowest [1] - 55:21
loyalty [2] - 11:9, 15:22
luckily [1] - 4:8
main [2] - 10:22, 31:13
maintaining [1] - 18:18
managing [2] - 36:17, 57:16
mandated [1] - 22:17
manner [1] - 42:14
March [1] - 78:10
Marie [1] - 78:9
market [6] - 16:15, 19:9, 36:5, 36:14, 47:1, 49:18
Market [1] - 3:16
massive [2] - 70:6, 70:21
Master [1] - 26:22
materialize [1] - 52:24
MATHIEU [1] - 3:15
Mathieu [1] - 5:15
mathieu.shapiro@ obermayer.com [1] - 3:17
matter [15] - 10:1, 34:11,

34:24, 38:21, 45:16, 46:1, 57:21, 57:22, 58:18, 58:19, 65:1, 75:1, 78:6
matters [3] - 29:19, 31:12, 58:10
mature [1] - 13:7
matured [1] - 13:1
Maxim [1] - 73:11
MAXWELL [1] - 3:14
Maxwell [1] - 5:16
McMahon [4] - 22:23, 22:24, 23:25, 24:14
mean [5] - 9:12, 33:4, 57:1, 65:11, 66:22
means [5] - 15:17, 23:7, 28:9, 42:4, 59:16
measure [1] - 58:21
measured [1] - 58:20
mechanism [6] - 39:18, 40:7, 69:13, 69:18, 69:20, 69:23
member [5] - 30:19, 53:21, 53:22, 54:9, 64:17
members [8] - 29:12, 50:6, 51:7, 51:8, 55:16, 64:11, 67:18
Menorah [23] - 5:25, 19:8, 21:11, 38:16, 39:11, 40:16, 45:3, 46:17, 50:11, 50:14, 55:18, 56:5, 60:4, 61:4, 63:2, 64:8, 65:2, 65:6, 67:15, 67:17, 69:16, 70:6
mention [4] - 24:15, 25:12, 58:3, 73:18
mentioned [2] - 67:2, 74:17
merit [2] - 32:22, 32:23
met [3] - 20:5, 20:12, 20:16
might [21] - 4:6, 6:17, 7:10, 8:3, 8:7, 27:2, 30:2, 30:25, 31:11, 41:10, 43:2, 48:5, 48:6, 48:7, 50:24, 52:24, 54:11, 64:3, 64:4, 69:20
million [8] - 28:3, 28:8, 28:10, 28:15, 63:2, 73:4, 73:11, 73:12
mind [2] - 16:8, 71:1
minimus [1] - 11:6
minute [6] - 4:6, 23:4, 23:15, 33:23, 75:11, 76:18
missing [1] - 47:24
misstatements [1] - 48:18
misunderstanding [1] - 21:3
misusing [1] - 11:23
Mitchell [1] - 78:9
mix [1] - 8:4
mixed [1] - 14:17
moment [2] - 4:25, 16:7
money [3] - 17:14, 56:2, 56:4
monies [2] - 65:10, 67:3
month [1] - 13:4
months [3] - 15:25, 54:3,

54:4
**Moore's** [1] - 23:20
**Morgan** [1] - 66:14
**morning** [13] - 4:2, 4:4, 4:17, 5:6, 5:11, 5:14, 5:17, 5:22, 6:1, 6:4, 7:16, 8:6, 8:12
**Morrison** [1] - 60:15
**most** [4] - 10:12, 18:2, 18:6, 18:11
**motion** [8] - 6:11, 6:23, 20:17, 38:15, 40:3, 69:7, 76:13
**motions** [3] - 24:21, 55:6, 72:8
**motley** [3] - 55:13, 55:14, 69:24
**mouth** [2] - 14:1, 68:3
**movant** [4] - 6:5, 30:2, 30:3, 63:13
**movants** [7] - 5:25, 10:7, 10:19, 21:12, 23:18, 28:13, 75:19
**move** [2] - 28:14, 64:9
**moved** [1] - 24:2
**movement** [2] - 6:17, 53:9
**MR** [117] - 4:10, 4:24, 5:2, 5:15, 5:22, 6:1, 6:4, 6:10, 6:14, 8:11, 8:16, 8:21, 9:2, 9:5, 9:10, 9:17, 9:20, 11:1, 11:4, 12:20, 14:3, 14:6, 16:3, 16:6, 16:8, 16:11, 19:24, 20:3, 20:7, 20:9, 20:12, 20:15, 20:24, 21:3, 21:6, 26:25, 27:2, 27:5, 27:20, 28:22, 29:12, 29:16, 29:24, 30:24, 31:20, 31:24, 32:1, 32:5, 32:10, 32:14, 33:6, 33:12, 33:15, 33:19, 33:21, 34:16, 34:19, 35:1, 35:7, 35:10, 35:14, 35:19, 35:24, 36:7, 36:11, 36:21, 36:23, 37:4, 37:6, 39:3, 39:7, 39:10, 39:15, 39:23, 40:2, 41:6, 41:17, 41:19, 42:17, 42:19, 43:4, 43:14, 43:19, 44:20, 46:15, 47:11, 48:16, 56:1, 56:4, 56:17, 56:25, 57:4, 57:7, 57:11, 57:13, 57:25, 60:9, 63:20, 63:25, 64:13, 66:25, 67:24, 68:1, 70:15, 70:17, 70:18, 70:20, 74:16, 75:12, 75:14, 76:2, 76:10, 76:17, 76:25, 77:11, 77:25, 78:1
**MS** [1] - 5:11
**multiple** [6] - 10:11, 11:21, 11:25, 14:15, 52:13, 52:14
**multiply** [1] - 52:10
**must** [4] - 22:1, 30:5, 46:19, 46:20

**mute** [1] - 5:2
**Mylan** [8] - 40:4, 42:8, 42:23, 44:9, 45:2, 45:21, 62:23, 63:3
**myriad** [1] - 10:15
**mystery** [1] - 74:1
**name** [4] - 5:11, 18:19, 50:5, 57:4
**named** [2] - 4:15, 73:12
**names** [1] - 4:18
**natural** [1] - 41:23
**naturally** [2] - 11:5, 40:6
**nature** [1] - 44:7
**necessarily** [1] - 14:13
**necessity** [1] - 37:11
**need** [44] - 7:25, 9:6, 34:8, 37:7, 37:17, 37:20, 37:23, 38:2, 38:5, 38:8, 39:9, 38:20, 38:22, 38:25, 40:10, 40:12, 41:3, 41:12, 44:1, 44:2, 45:23, 45:25, 46:8, 57:9, 60:19, 61:25, 62:4, 62:6, 62:7, 68:25, 69:5, 69:6, 69:8, 69:13, 70:3, 75:1, 75:2, 77:6, 77:7, 77:16
**needed** [3] - 40:8, 40:10, 42:11
**needs** [2] - 25:17, 48:11
**nefarious** [2] - 38:11, 42:1
**negotiate** [4] - 56:11, 56:13, 61:4, 65:7
**negotiated** [6] - 34:6, 34:9, 54:25, 56:5, 59:22, 61:18
**negotiating** [2] - 34:7, 65:18
**net** [5] - 15:8, 15:9, 49:17, 49:19, 71:22
**Nevada** [1] - 43:23
**never** [4] - 31:20, 53:9, 76:14
**new** [8] - 11:19, 12:7, 23:10, 24:20, 34:3, 34:4, 36:24
**New** [4] - 3:10, 45:10, 74:6
**news** [1] - 47:6
**next** [1] - 5:10
**nicely** [1] - 61:13
**night** [3] - 6:24, 7:18, 73:20
**nobody** [1] - 51:15
**nomenclature** [1] - 24:11
**none** [1] - 53:7
**Nork** [1] - 3:10
**North** [1] - 9:15
**note** [5] - 7:2, 7:8, 30:9, 30:13, 53:18
**noted** [1] - 38:17
**nothing** [14] - 16:21, 20:18, 33:24, 35:5, 35:11, 42:1, 42:10, 52:1, 52:2, 53:10, 58:2, 59:6, 64:5
**notice** [7] - 6:19, 7:14, 19:10, 24:15, 50:10, 64:15, 70:18
**noticed** [1] - 38:12

**nuances** [1] - 45:25
**Number** [1] - 69:15
**number** [3] - 24:22, 25:14, 46:11
**numbers** [1] - 21:17
**numerous** [1] - 56:11
**Obermayer** [1] - 5:15
**OBERMAYER** [1] - 3:14
**object** [1] - 7:12
**objecting** [2] - 7:9, 75:6
**objections** [1] - 17:2
**objectors** [1] - 17:6
**obtained** [1] - 73:10
**obviously** [8] - 6:19, 7:15, 33:17, 36:1, 56:14, 75:16, 75:18, 76:11
**occur** [3] - 55:11, 65:24, 66:8
**occurs** [3] - 41:8, 44:15, 44:23
**odds** [1] - 19:13
**office** [2] - 6:7, 31:7
**offices** [1] - 77:17
**Official** [1] - 78:9
**often** [4] - 33:13, 40:22, 40:23, 40:25
**Olsen** [2] - 15:1
**once** [6] - 49:11, 58:9, 60:1, 65:11, 65:22, 76:12
**one** [50] - 6:20, 10:10, 13:9, 14:8, 14:21, 15:11, 16:1, 16:4, 19:23, 22:20, 23:25, 24:12, 24:16, 25:24, 26:8, 29:12, 29:16, 31:24, 32:12, 33:22, 36:6, 36:7, 41:9, 48:3, 49:8, 52:12, 52:24, 54:7, 54:9, 54:20, 58:8, 58:12, 58:15, 60:1, 60:2, 63:14, 63:21, 64:4, 65:4, 65:24, 66:17, 66:20, 69:15, 71:11, 71:24, 72:12, 72:22, 76:2, 76:22
**open** [1] - 59:14
**opening** [1] - 40:3
**operate** [1] - 24:1
**operating** [2] - 24:7, 35:4
**opinion** [5] - 7:21, 10:2, 17:11, 25:8, 72:5
**opportunity** [4] - 22:17, 47:23, 64:14, 64:16
**opposing** [6] - 10:6, 30:12, 35:3, 39:6, 39:8, 39:9
**opposite** [1] - 72:6
**opt** [11] - 10:23, 11:11, 17:3, 50:8, 51:3, 64:8, 64:20, 64:21, 65:25, 70:13, 70:25
**opt-out** [2] - 11:11, 70:25
**opt-outs** [4] - 10:23, 50:8, 65:25, 70:13
**opted** [3] - 12:10, 50:9, 64:10
**oral** [1] - 10:4

**order** [15] - 4:1, 24:17, 26:21, 26:24, 37:18, 37:20, 38:2, 38:6, 40:13, 41:12, 45:24, 70:24, 75:7, 77:23
**ordered** [1] - 23:25
**organize** [1] - 37:22
**Ormat** [3] - 43:20, 62:10
**ourselves** [1] - 61:11
**outreach** [2] - 41:19, 43:11
**outs** [4] - 10:23, 50:8, 65:25, 70:13
**outset** [3] - 38:23, 62:2
**outside** [1] - 60:16
**overcame** [1] - 18:8
**overcome** [3] - 18:16, 19:20, 19:25
**overcoming** [1] - 18:10
**overlap** [5] - 15:15, 16:12, 44:3, 74:23, 74:24
**overlapping** [1] - 19:18
**overlaps** [1] - 44:24
**oversee** [3] - 54:17, 54:21
**overseeing** [2] - 53:22
**oversight** [3] - 55:3, 55:8, 59:19
**owes** [1] - 11:9
**own** [11] - 15:23, 17:4, 19:7, 19:10, 25:18, 47:19, 50:13, 54:18, 64:17, 66:23, 66:24
**owned** [1] - 35:12
**page** [10] - 10:5, 16:9, 19:6, 19:21, 21:9, 26:10, 27:15, 28:21, 64:1, 67:20
**pages** [4] - 27:10, 49:6, 71:20, 72:2
**paid** [1] - 17:9
**paper** [3] - 7:17, 7:18, 77:18
**papers** [8] - 25:14, 26:3, 38:14, 42:4, 61:22, 62:25, 64:6, 72:11
**paperwork** [2] - 32:13, 39:2
**parallel** [6] - 37:19, 40:22, 41:15, 41:20, 42:16, 75:23
**parcel** [1] - 65:12
**pardon** [1] - 14:1
**Park** [1] - 3:9
**part** [14] - 23:2, 32:19, 34:8, 34:15, 34:20, 34:21, 35:3, 39:1, 39:3, 58:4, 65:12, 68:12, 68:17, 77:14
**partial** [21] - 14:16, 15:12, 16:19, 16:20, 23:1, 23:5, 26:17, 27:13, 28:5, 28:6, 28:17, 29:1, 29:4, 35:8, 47:8, 47:12, 47:13, 47:17, 72:19, 73:6
**participate** [3] - 10:21, 30:18, 30:19
**participation** [1] - 30:20
**particular** [2] - 48:14, 60:10

**particularly** [1] - 62:3
**parties** [5] - 6:2, 10:11, 18:17, 25:7, 58:16
**partner** [4] - 6:6, 57:13, 57:16
**party** [1] - 18:18
**pass** [1] - 53:2
**passed** [1] - 29:22
**past** [3] - 7:10, 33:18, 47:10
**patent** [1] - 12:5
**patents** [1] - 12:7
**patients** [1] - 12:1
**pay** [3] - 67:1, 67:9
**payments** [2] - 11:24, 12:1
**pending** [3] - 11:11, 37:18, 46:23
**Pennsylvania** [3] - 3:5, 3:16, 12:12
**Pension** [2] - 4:13, 5:24
**pension** [2] - 11:8, 28:11
**pensioners** [1] - 28:11
**people** [4] - 7:19, 8:4, 9:18, 76:7
**people's** [1] - 7:10
**percent** [14] - 34:1, 34:7, 34:10, 34:13, 34:22, 34:23, 53:20, 54:25, 55:22, 55:24, 55:25, 56:12, 61:11, 61:14
**perfectly** [1] - 24:24
**perhaps** [1] - 38:18
**period** [20] - 12:22, 14:11, 14:16, 15:10, 15:12, 15:15, 15:25, 16:12, 16:19, 16:21, 26:6, 26:12, 27:5, 28:10, 37:14, 47:22, 49:19, 50:10, 52:17, 74:19
**periods** [6] - 12:13, 19:1, 19:18, 51:13, 66:11
**permission** [3] - 7:5, 68:24, 74:14
**Perrigo** [11] - 39:12, 40:5, 42:7, 42:23, 44:8, 44:12, 45:2, 45:21, 45:22, 62:23, 63:5
**person** [3] - 4:21, 18:3, 77:21
**personal** [1] - 57:4
**perspective** [1] - 42:11
**Peter** [1] - 6:6
**PETER** [1] - 3:3
**Pharmaceutical** [2] - 4:14, 13:13
**Pharmaceuticals** [1] - 10:14
**Philadelphia** [3] - 3:5, 3:16, 6:7
**piece** [1] - 69:3
**pigs** [1] - 22:2
**pitching** [1] - 56:10
**place** [4] - 5:8, 34:17, 42:18, 55:15
**plaintiff** [58] - 14:11, 18:2,

18:6, 18:9, 18:11, 18:17, 20:6, 20:18, 21:14, 21:25, 22:13, 22:25, 23:18, 24:19, 24:21, 24:25, 25:2, 26:14, 26:20, 27:3, 27:6, 29:10, 31:16, 32:1, 32:3, 32:5, 33:3, 33:7, 36:10, 36:18, 38:19, 43:10, 43:11, 47:4, 52:4, 52:23, 53:25, 54:17, 54:21, 55:5, 55:11, 56:11, 57:17, 57:18, 59:18, 59:22, 63:5, 66:17, 69:7, 72:7, 72:23, 72:24, 73:8, 73:16, 74:12, 76:8
**Plaintiff** [1] - 5:23
**plaintiffs** [19] - 6:20, 15:23, 16:23, 17:13, 17:21, 19:1, 40:24, 41:20, 45:3, 46:21, 50:8, 54:14, 55:1, 59:24, 63:11, 65:2, 68:14, 70:7, 73:3
**plan** [1] - 23:17
**planning** [1] - 37:5
**playing** [1] - 61:25
**plead** [1] - 51:23
**pleaded** [1] - 52:21
**pleadings** [4] - 24:16, 57:5, 58:1, 58:2
**pleased** [1] - 24:18
**plenty** [1] - 18:14
**point** [25] - 7:7, 8:2, 11:15, 12:16, 18:15, 23:16, 26:4, 27:24, 28:8, 29:24, 29:25, 37:22, 39:1, 39:9, 42:24, 46:13, 48:17, 53:20, 62:20, 63:24, 64:11, 75:22, 76:12, 77:9, 77:11
**pointed** [2] - 59:10, 75:16
**pointing** [1] - 33:23
**points** [1] - 31:13
**poke** [1] - 22:2
**policies** [1] - 66:10
**politician** [1] - 29:21
**Pomerantz** [8] - 5:24, 10:11, 10:18, 11:9, 22:3, 24:4, 25:8, 69:17
**portion** [1] - 44:22
**position** [2] - 20:21, 71:1
**positioning** [1] - 67:18
**positions** [1] - 65:15
**possibility** [1] - 43:16
**possible** [1] - 45:19
**possibly** [1] - 8:3
**pot** [1] - 17:14
**potential** [7] - 23:23, 35:9, 47:8, 49:1, 58:12, 60:23, 67:11
**potentially** [6] - 49:6, 53:19, 59:6, 66:17, 74:23, 77:13
**powerful** [1] - 19:18

**PowerPoint** [1] - 8:22
**practical** [1] - 67:13
**practicality** [1] - 67:4
**practice** [2] - 7:2, 7:5
**Practice** [1] - 23:20
**precedence** [1] - 28:4
**precedent** [1] - 42:23
**preclusion** [1] - 57:24
**predicted** [1] - 63:14
**prefer** [1] - 23:21
**premise** [1] - 17:17
**premium** [2] - 66:4, 67:17
**presentation** [1] - 8:22
**presumption** [9] - 18:2, 18:6, 18:8, 18:11, 18:16, 19:20, 19:25, 20:2, 25:25
**presumptive** [1] - 20:6
**pretty** [3] - 19:13, 26:2, 57:12
**price** [25] - 10:15, 10:20, 12:5, 12:25, 13:15, 13:19, 13:22, 13:23, 15:19, 16:13, 16:14, 27:18, 46:23, 46:25, 47:1, 47:14, 49:21, 51:11, 58:2, 59:2, 64:24, 65:24, 67:10, 67:15, 72:3
**price-fixing** [12] - 10:20, 12:5, 46:23, 46:25, 47:14, 51:11, 58:2, 59:2, 64:24, 65:24, 67:10, 67:15
**prices** [2] - 12:3, 30:6
**pricing** [1] - 48:22
**primary** [1] - 13:3
**principle** [3] - 13:14, 13:25, 31:20
**principles** [1] - 12:11
**private** [1] - 27:7
**pro** [4] - 38:15, 61:24, 73:19, 73:21
**proactively** [4] - 50:19, 51:1, 62:20, 62:24
**probability** [1] - 71:4
**probable** [1] - 66:9
**problem** [5] - 12:8, 12:21, 30:13, 31:5, 32:20
**problems** [4] - 18:21, 54:9, 58:14, 58:15
**procedures** [1] - 8:19
**proceed** [1] - 53:8
**proceeded** [1] - 10:23
**proceeding** [3] - 69:3, 74:22, 76:1
**Proceedings** [1] - 78:3
**proceedings** [2] - 45:5, 78:6
**process** [2] - 40:18, 58:24
**profile** [1] - 62:16
**profits** [1] - 12:3
**program** [1] - 62:6
**progress** [1] - 45:10
**projection** [1] - 23:12

**pronounce** [2] - 4:12, 50:5
**pronouncing** [1] - 32:11
**proof** [1] - 66:21
**proper** [2] - 44:17, 59:19
**properly** [3] - 37:10, 50:22, 71:18
**proposition** [1] - 18:1
**prosecute** [5] - 21:12, 22:7, 23:19, 25:8, 74:13
**prosecuting** [1] - 22:11
**protect** [2] - 51:2, 65:3
**protected** [1] - 50:22
**protecting** [1] - 60:25
**proved** [1] - 14:24
**provided** [2] - 21:23, 22:19
**Provident** [2] - 4:13, 5:23
**proving** [1] - 12:11
**prudence** [1] - 28:1
**PSLRA** [8] - 14:11, 21:25, 22:17, 24:25, 36:18, 61:14, 63:14, 65:22
**PSLRA-mandated** [1] - 22:17
**public** [2] - 13:5, 76:4
**publicize** [1] - 35:2
**pull** [1] - 74:9
**pulls** [1] - 72:3
**purchased** [8] - 13:15, 13:18, 13:22, 15:9, 37:16, 37:17, 44:21, 60:16
**purchasers** [1] - 45:14
**purchases** [1] - 44:5
**purpose** [3] - 11:24, 74:19, 74:20
**purposes** [3] - 9:4, 11:2, 14:9
**pursue** [3] - 51:4, 64:17, 70:12
**put** [20] - 8:24, 9:3, 28:24, 38:14, 39:16, 39:19, 39:24, 40:2, 40:6, 42:3, 61:21, 61:22, 61:23, 62:19, 62:20, 62:24, 64:5, 71:2
**puts** [1] - 25:10
**putting** [1] - 59:12
**qualifications** [1] - 32:19
**qualified** [3] - 20:20, 28:14, 36:18
**quarter** [1] - 25:6
**questions** [8] - 7:15, 9:23, 29:9, 31:14, 40:18, 62:24, 63:16, 63:18
**quickly** [3] - 4:10, 9:22, 11:22
**quit** [1] - 70:21
**quite** [1] - 35:20
**quote** [1] - 71:17
**raise** [3] - 32:18, 33:5
**raised** [8] - 30:2, 30:4, 32:15,

36:24, 36:25, 53:13, 53:14, 59:11
**raising** [1] - 33:3
**rank** [1] - 29:16
**rather** [2] - 8:10, 9:10
**RDR** [1] - 78:9
**reached** [2] - 41:21, 43:7
**read** [3] - 7:14, 29:23, 31:15
**real** [4] - 47:18, 55:7, 56:22, 66:7
**reality** [2] - 34:9, 45:12
**realize** [2] - 32:12, 72:15
**really** [22] - 9:5, 9:17, 21:7, 24:13, 25:4, 25:22, 26:6, 27:9, 28:1, 28:4, 38:19, 38:24, 42:1, 42:13, 50:18, 53:21, 56:18, 56:20, 57:15, 60:24, 64:22, 65:12
**reason** [8] - 5:2, 14:14, 14:21, 25:17, 33:16, 48:2, 54:11, 73:22
**reasons** [2] - 15:17, 23:23
**Rebmann** [1] - 5:15
**REBMANN** [1] - 3:14
**rebut** [3] - 18:2, 20:1, 25:25
**receive** [1] - 6:19
**received** [2] - 6:21, 6:24
**recent** [1] - 75:16
**recess** [2] - 76:19, 76:20
**recognize** [2] - 32:9, 41:1
**recognized** [1] - 41:2
**record** [11] - 22:4, 39:12, 39:14, 39:25, 47:20, 48:9, 48:11, 48:12, 52:21, 63:10, 78:6
**recoveries** [1] - 63:11
**recovery** [9] - 35:17, 38:1, 40:12, 56:15, 56:17, 63:2, 66:2, 67:14, 73:10
**red** [1] - 28:25
**reduced** [1] - 24:9
**reenter** [1] - 6:17
**reference** [1] - 31:18
**reformulate** [1] - 12:7
**regard** [1] - 53:14
**regarding** [16] - 10:16, 10:20, 11:16, 11:21, 40:9, 40:10, 48:21, 49:1, 49:7, 52:2, 53:5, 53:14, 60:12, 63:22, 74:21
**regulatory** [1] - 49:2
**reimbursement** [1] - 43:22
**rein** [2] - 55:9, 55:15
**related** [1] - 18:24
**relates** [2] - 12:18, 12:20
**relationship** [4] - 43:17, 46:10, 46:12, 66:13
**relevant** [2] - 7:25, 12:17
**rely** [1] - 9:25
**remain** [2] - 64:16, 76:7

**remains** [1] - 29:18
**remember** [2] - 31:20, 31:22
**reminds** [1] - 29:20
**renders** [1] - 72:5
**reoccur** [1] - 33:13
**reopen** [1] - 24:21
**repeatedly** [1] - 45:1
**reply** [1] - 7:3
**reported** [1] - 30:10
**Reporter** [1] - 78:9
**reports** [1] - 72:25
**repose** [1] - 50:24
**represent** [12] - 5:24, 6:5, 18:17, 29:19, 30:22, 30:24, 31:4, 31:9, 36:9, 44:20, 44:22, 45:15
**representatives** [2] - 62:16, 63:7
**represented** [1] - 33:25
**representing** [9] - 8:17, 10:11, 11:10, 31:11, 39:11, 57:2, 68:7, 68:9
**request** [1] - 7:4
**require** [2] - 40:16, 57:20
**required** [2] - 36:18, 74:7
**requirement** [2] - 20:5, 25:15
**requirements** [1] - 20:16
**requires** [1] - 61:14
**requisite** [1] - 36:8
**research** [1] - 51:24
**researching** [1] - 42:8
**reserve** [1] - 76:11
**resolve** [2] - 22:16, 23:17
**resources** [3] - 17:20, 17:23, 19:2
**respect** [11] - 43:21, 45:6, 46:15, 46:23, 49:20, 49:21, 51:1, 51:16, 59:12, 59:13
**respectfully** [1] - 42:1
**respond** [2] - 67:23, 67:25
**RESPONSE** [1] - 4:4
**response** [13] - 6:21, 6:22, 6:23, 6:24, 6:25, 7:1, 7:6, 7:7, 7:12, 7:13
**responses** [2] - 7:10, 22:21
**result** [3] - 27:12, 48:19, 49:3
**resumes** [1] - 69:22
**retained** [4] - 21:9, 25:17, 37:12, 75:9
**retainer** [18] - 23:19, 34:5, 39:4, 39:21, 39:25, 54:18, 54:22, 55:3, 55:14, 55:18, 56:9, 56:12, 59:22, 59:23, 61:7, 62:18, 74:18
**retainers** [2] - 33:24, 33:25
**retention** [1] - 55:19
**Retirement** [2] - 24:3, 52:6
**Retirement's** [1] - 52:19
**revealed** [7] - 12:23, 13:2,

13:16, 13:22, 16:15, 16:18, 25:16
**revealing** [5] - 12:14, 12:18, 13:10, 25:13, 49:8
**revelation** [2] - 13:19, 58:13
**revelations** [1] - 48:21
**revenues** [1] - 49:1
**reverse** [1] - 42:18
**review** [1] - 11:22
**revision** [1] - 23:11
**rise** [2] - 13:7, 13:11
**RMR** [1] - 78:9
**road** [2] - 7:6, 70:4
**Robert** [1] - 6:4
**role** [2] - 41:13, 61:25
**roof** [1] - 22:22
**room** [1] - 5:18
**rough** [1] - 56:19
**round** [1] - 24:24
**rounds** [1] - 26:2
**Rule** [2] - 10:7, 48:1
**rule** [1] - 31:25
**rules** [3] - 57:20, 73:21
**run** [4] - 17:7, 31:24, 42:14, 77:17
**Sachs** [1] - 66:14
**safe** [1] - 77:22
**sales** [1] - 23:12
**save** [1] - 9:23
**savior** [1] - 52:3
**saw** [1] - 39:19
**scheme** [7] - 10:20, 11:21, 46:23, 46:25, 51:17, 52:1, 52:25
**school** [1] - 33:12
**sclerosis** [2] - 11:21, 12:1
**scope** [1] - 41:25
**score** [1] - 19:5
**scrutiny** [1] - 49:2
**Seamus** [1] - 6:1
**search** [1] - 67:21
**seated** [2] - 4:3, 76:21
**second** [5] - 7:11, 14:4, 17:13, 19:6, 24:23
**secret** [4] - 62:22, 73:19, 73:22, 73:23
**secretly** [1] - 68:22
**Securities** [2] - 43:20, 45:16
**securities** [29] - 10:17, 17:17, 30:10, 30:13, 31:17, 32:15, 37:8, 37:13, 37:15, 41:1, 41:9, 41:24, 43:21, 44:4, 44:5, 44:7, 44:8, 44:9, 47:4, 53:17, 60:13, 63:4, 63:6, 63:12, 67:4, 75:6
**security** [2] - 35:12, 44:20
**see** [32] - 4:21, 5:7, 6:23, 7:9, 15:4, 16:10, 19:7, 21:17, 25:18, 27:11, 27:16, 29:8,

30:3, 31:18, 32:22, 34:20, 38:11, 41:21, 42:9, 47:13, 47:24, 56:19, 57:23, 58:25, 65:8, 66:1, 67:8, 67:13, 67:14, 73:2
**seeing** [4] - 5:19, 9:1, 9:12
**seek** [3] - 34:23, 43:1, 74:13
**seeking** [2] - 21:13, 44:3
**sees** [1] - 54:8
**selected** [3] - 69:16, 69:19, 69:21
**sell** [2] - 11:25, 47:21
**semantics** [3] - 24:11, 25:3, 25:9
**sense** [4] - 9:13, 29:5, 38:22, 52:18
**sent** [2] - 7:19, 64:15
**separate** [4] - 12:4, 53:8, 57:18, 59:3
**separately** [2] - 53:8, 53:10
**serious** [2] - 63:10, 65:15
**serving** [1] - 38:16
**set** [4] - 5:20, 11:19, 52:14, 71:23
**setting** [1] - 19:13
**settle** [2] - 68:12, 68:13
**settlement** [12] - 19:3, 34:12, 38:3, 42:25, 43:21, 62:4, 65:18, 68:11, 68:22, 68:25, 73:11, 73:13
**settlements** [1] - 37:22
**settles** [1] - 33:1
**shadows** [1] - 24:7
**Shapiro** [1] - 5:15
**SHAPIRO** [2] - 3:15, 5:15
**share** [5] - 19:9, 36:5, 42:15, 42:21, 47:1
**shareholders** [3] - 38:7, 44:11, 62:6
**shares** [10] - 15:8, 15:9, 23:9, 44:22, 45:6, 47:21, 52:7, 52:10, 65:17
**sharing** [1] - 37:23
**short** [2] - 14:22, 28:1
**shortly** [1] - 77:19
**show** [7] - 13:14, 13:18, 13:21, 19:7, 23:6, 28:24, 51:18
**showed** [1] - 18:6
**showing** [7] - 5:3, 20:16, 52:14, 55:7, 61:6, 64:6, 66:8
**shown** [2] - 36:16
**shows** [2] - 4:8, 73:2
**side** [2] - 8:10, 73:9
**signal** [1] - 16:17
**signature** [1] - 61:23
**signed** [3] - 53:11, 55:4, 55:5
**significant** [3] - 37:12, 63:4, 63:6
**similar** [4] - 18:7, 22:23,

64:3, 65:21
**similarly** [2] - 4:14, 37:25
**simple** [2] - 13:14, 58:17
**simply** [29] - 10:3, 11:24, 13:21, 15:18, 16:24, 17:2, 18:10, 18:22, 24:9, 24:18, 38:21, 42:9, 43:14, 43:15, 46:12, 46:22, 47:15, 47:25, 49:9, 50:1, 52:22, 53:2, 55:11, 58:5, 68:9, 69:8, 73:22, 76:3
**single** [5] - 23:21, 71:22, 71:23, 72:9
**sip** [1] - 14:2
**sit** [4] - 9:15, 9:17, 9:18, 9:20
**sit-down** [1] - 9:15
**site** [1] - 71:3
**sitting** [1] - 54:6
**situated** [1] - 4:14
**situation** [3] - 46:18, 50:19, 69:11
**situations** [2] - 47:10, 67:19
**sized** [1] - 5:8
**slide** [3] - 26:10, 27:15, 71:15
**slides** [3] - 8:18, 9:2, 9:6
**slightly** [1] - 19:1
**slowly** [2] - 13:10, 16:16
**smaller** [2] - 5:7, 36:5
**SMITH** [8] - 3:8, 4:24, 5:2, 75:12, 75:14, 76:2, 76:10, 76:17
**Smith** [3] - 5:4, 75:14, 76:16
**snack** [1] - 14:4
**snapshot** [1] - 64:1
**so..** [1] - 56:22
**social** [1] - 9:4
**sold** [2] - 15:9, 74:6
**sole** [2] - 15:22, 36:9
**solvency** [1] - 19:4
**someone** [4] - 8:9, 41:3, 41:12, 45:24
**sometime** [1] - 19:13
**sometimes** [3] - 9:18, 37:21, 40:23
**somewhat** [3] - 51:18, 54:24, 60:13
**somewhere** [5] - 8:3, 24:16, 31:15, 31:18, 61:21
**soon** [2] - 19:13, 25:16
**sooner** [1] - 7:24
**sophisticated** [10] - 36:13, 38:19, 40:15, 50:21, 60:5, 63:9, 65:13, 65:14, 65:22
**sorry** [8] - 8:14, 16:3, 24:14, 34:3, 63:21, 67:24, 70:15, 76:16
**sort** [8] - 7:3, 7:6, 21:16, 25:23, 31:6, 35:3, 71:15, 71:16

**sorted** [1] - 30:20
**sorts** [1] - 65:1
**sought** [2] - 43:22, 43:25
**sources** [1] - 52:14
**Southern** [1] - 45:10
**Sparks** [1] - 68:8
**speaking** [3] - 4:25, 68:11, 74:23
**specific** [4] - 16:1, 16:2, 16:4, 16:7
**specifically** [1] - 48:13
**specify** [1] - 13:23
**speculating** [1] - 67:20
**speculation** [3] - 48:3, 75:19, 76:3
**speculations** [1] - 29:16
**speculative** [3] - 47:16, 69:6, 71:2
**spell** [1] - 72:12
**spirit** [1] - 24:17
**Square** [1] - 3:15
**stage** [9] - 26:14, 28:12, 50:11, 50:20, 56:20, 69:7, 72:24, 73:15, 74:8
**staggered** [1] - 55:19
**stand** [1] - 50:8
**standard** [2] - 34:1, 34:4
**standing** [17] - 9:19, 29:2, 33:18, 47:22, 51:19, 51:23, 52:6, 52:19, 52:20, 52:22, 53:2, 54:10, 54:11, 73:3, 73:5, 73:8
**stands** [1] - 43:17
**start** [2] - 4:18, 72:7
**started** [4] - 19:4, 23:7, 45:9, 55:6
**starting** [1] - 53:15
**state** [2] - 4:18, 34:22
**statement** [1] - 53:9
**statements** [7] - 12:14, 12:24, 48:25, 49:6, 75:18
**states** [1] - 61:10
**States** [7] - 38:13, 44:10, 44:11, 44:21, 60:16, 62:17, 74:5
**status** [1] - 75:17
**statute** [2] - 50:24, 50:25
**stay** [14] - 9:9, 9:10, 9:13, 40:24, 41:3, 41:5, 41:9, 41:10, 42:24, 50:15, 66:22, 66:23, 76:23, 77:22
**stayed** [7] - 37:21, 40:21, 40:23, 44:14, 75:4, 75:24, 77:6
**stick** [2] - 10:23, 70:25
**still** [8] - 6:15, 23:8, 31:11, 34:17, 55:23, 57:15, 64:14, 77:6
**stipulated** [1] - 27:1
**stock** [21] - 13:11, 13:15,

13:16, 15:4, 15:16, 15:19, 16:17, 23:8, 23:14, 26:6, 28:10, 30:7, 37:16, 37:17, 47:5, 47:7, 48:19, 49:25, 51:22, 65:17, 65:20
**Stock** [1] - 74:6
**stocks** [1] - 36:14
**stop** [2] - 45:5, 69:2
**story** [1] - 54:19
**STRAWN** [1] - 3:8
**Strawn** [2] - 5:4, 5:12
**Street** [1] - 3:16
**strike** [1] - 6:23
**strong** [1] - 28:16
**strongest** [1] - 27:8
**stuck** [1] - 4:7
**studies** [2] - 14:20, 71:18
**study** [2] - 14:19, 72:1
**subject** [7] - 30:16, 32:20, 57:22, 58:5, 58:10, 58:18, 58:19
**substantial** [5] - 18:1, 34:10, 34:12, 35:20, 73:10
**successes** [1] - 22:4
**sudden** [1] - 70:22
**suffered** [4] - 13:17, 48:20, 52:10
**suffering** [1] - 49:2
**sufficient** [2] - 19:17, 25:25
**suing** [1] - 18:20
**Suite** [2] - 3:4, 3:16
**sum** [1] - 30:20
**summary** [1] - 26:1
**Sundays** [1] - 72:13
**supplemental** [1] - 6:24
**support** [1] - 38:2
**supports** [2] - 26:13, 28:21
**suppose** [1] - 69:9
**supposed** [2] - 54:7, 69:10
**Supreme** [1] - 41:2
**sur** [2] - 7:3
**sur-sur-reply** [1] - 7:3
**surely** [2] - 26:4, 27:6
**survives** [1] - 76:13
**suspect** [2] - 28:6, 70:2
**suspicion** [1] - 28:16
**System** [1] - 24:3
**system** [4] - 38:3, 38:4, 38:6, 55:19
**systems** [1] - 15:6
**table** [2] - 9:11, 9:14
**tail** [1] - 65:1
**tangible** [1] - 19:15
**tax** [1] - 15:4
**team** [2] - 57:14, 57:17
**teams** [1] - 57:18
**technically** [1] - 18:19
**Tel** [6] - 37:16, 37:18, 44:14, 44:25, 62:10, 74:17

**teleconference** [2] - 3:12, 3:18
**tempting** [1] - 76:10
**ten** [1] - 56:6
**tens** [1] - 72:2
**terms** [3] - 7:14, 20:14, 35:16
**Teva** [29] - 4:14, 10:11, 10:14, 11:13, 11:14, 11:15, 11:16, 11:20, 11:23, 12:25, 13:5, 19:9, 19:12, 27:16, 28:9, 30:6, 30:10, 30:13, 32:15, 35:25, 37:15, 44:5, 45:15, 48:6, 48:24, 53:17, 58:11, 62:5, 73:4
**Teva's** [4] - 12:14, 19:7, 44:10, 45:23
**Texas** [1] - 68:8
**that..** [1] - 21:5
**The court** [142] - 4:2, 4:5, 4:11, 5:1, 5:6, 5:14, 5:17, 6:3, 6:8, 6:13, 6:15, 7:12, 8:13, 8:20, 8:25, 9:3, 9:7, 9:12, 9:18, 10:3, 10:21, 10:25, 11:3, 12:18, 14:2, 14:4, 14:22, 16:1, 16:4, 16:7, 16:10, 18:6, 18:22, 18:25, 19:23, 19:25, 20:4, 20:8, 20:11, 20:13, 20:22, 21:1, 21:5, 21:22, 21:23, 21:24, 22:1, 22:17, 25:13, 25:16, 25:17, 26:24, 27:4, 27:19, 28:20, 29:2, 29:10, 29:15, 29:23, 30:22, 31:15, 31:22, 32:3, 32:7, 32:11, 33:2, 33:10, 33:14, 33:16, 33:20, 34:11, 34:13, 34:15, 34:17, 34:25, 35:5, 35:8, 35:11, 35:16, 35:23, 36:6, 36:8, 36:19, 36:22, 37:2, 37:5, 38:24, 39:5, 39:8, 39:14, 39:21, 39:24, 40:13, 41:5, 41:15, 41:18, 42:15, 42:18, 43:3, 43:10, 43:16, 43:23, 44:19, 46:14, 47:8, 48:13, 49:12, 52:16, 55:23, 56:3, 56:15, 56:23, 57:1, 57:6, 57:9, 57:12, 57:18, 57:23, 58:16, 60:7, 63:9, 63:18, 63:21, 64:12, 66:22, 67:22, 67:25, 70:4, 70:14, 70:16, 70:24, 74:15, 75:10, 75:13, 75:25, 76:6, 76:15, 76:18, 76:21, 77:9, 77:13, 78:2
**themselves** [3] - 5:21, 22:16, 76:4
**theories** [2] - 51:12
**theory** [8] - 13:25, 14:7, 23:1, 35:6, 35:8, 35:9, 53:1, 58:7
**therefore** [1] - 28:2
**they've** [10] - 11:1, 12:10,

15:7, 19:9, 20:15, 20:19, 53:11, 56:6, 56:11, 63:6
**thick** [1] - 27:11
**thin** [1] - 27:9
**thinking** [1] - 4:10
**third** [2] - 16:9, 25:21
**Thornton** [1] - 24:6
**thoroughly** [1] - 9:24
**threat** [2] - 64:1, 64:6
**three** [14] - 10:9, 21:21, 22:13, 22:15, 23:16, 23:18, 31:17, 32:2, 32:7, 48:8, 49:24, 54:2, 59:9
**three-and-a-half** [2] - 49:24, 59:9
**throughout** [1] - 62:17
**tight** [2] - 56:12, 61:4
**Tim** [1] - 6:6
**timely** [2] - 20:17, 24:25
**TIMOTHY** [1] - 3:3
**title** [1] - 25:5
**today** [1] - 77:21
**together** [6] - 37:7, 37:8, 43:8, 46:10, 53:6, 70:8
**took** [1] - 14:22
**top** [2] - 33:9, 60:6
**total** [2] - 35:17, 56:15
**totally** [2] - 18:24, 20:1
**toward** [1] - 15:7
**tpeter@faruqilaw.com** [1] - 3:6
**track** [2] - 22:4, 63:10
**tracking** [1] - 77:4
**training** [1] - 33:12
**transactions** [2] - 53:15, 54:14
**transcript** [2] - 77:24, 78:5
**transferred** [1] - 11:18
**transparency** [2] - 22:21, 25:12
**tremendous** [2] - 17:10, 71:25
**trial** [2] - 14:24, 73:16
**tried** [2] - 42:5, 74:9
**trifecta** [1] - 21:8
**trip** [1] - 45:9
**trouble** [1] - 32:24
**true** [3] - 17:19, 18:3, 68:7
**truth** [1] - 16:15
**try** [6] - 15:4, 45:5, 45:9, 71:15, 73:22, 73:23
**trying** [10] - 12:6, 16:25, 18:17, 20:1, 26:16, 42:10, 46:6, 62:21, 63:1, 66:19
**turn** [1] - 39:6
**turning** [1] - 16:8
**two** [47] - 5:7, 15:15, 15:20, 16:23, 17:21, 21:10, 21:21, 22:2, 22:5, 22:18, 24:1, 25:6,

25:22, 25:24, 37:7, 38:15, 39:11, 40:4, 41:6, 41:20, 42:6, 44:17, 46:21, 48:23, 54:3, 54:4, 54:9, 57:10, 58:17, 59:2, 59:24, 60:3, 62:23, 65:2, 66:18, 66:19, 67:1, 68:7, 68:16, 69:19, 71:22, 71:24, 72:9
**type** [4] - 35:11, 41:21, 46:18, 75:3
**typical** [1] - 67:19
**typicality** [1] - 35:12
**typically** [3] - 26:20, 28:12, 37:6
**ultimate** [2] - 14:24, 38:1
**ultimately** [6] - 40:11, 44:2, 45:16, 55:21, 56:17, 77:7
**umbrella** [1] - 12:2
**unable** [1] - 45:8
**under** [18] - 10:7, 12:2, 12:5, 14:11, 14:14, 15:2, 21:11, 22:6, 23:18, 24:25, 25:7, 28:3, 36:18, 48:1, 51:9, 60:15, 73:21
**undisclosed** [3] - 25:10, 68:20, 70:2
**undivided** [1] - 11:10
**unforeseeable** [1] - 63:24
**uniform** [2] - 61:6, 61:18
**unique** [5] - 30:2, 30:15, 32:8, 32:20, 76:6
**United** [7] - 38:13, 44:10, 44:11, 44:21, 60:16, 62:17, 74:5
**unity** [1] - 23:23
**unless** [2] - 45:13
**unlikely** [1] - 66:9
**unrelated** [1] - 11:17
**up** [25] - 4:22, 5:20, 8:1, 18:10, 23:2, 26:18, 27:25, 28:19, 29:1, 29:8, 30:11, 45:1, 45:9, 50:24, 50:25, 53:1, 55:20, 55:23, 58:6, 58:24, 60:12, 61:12, 63:13, 65:20, 67:21
**upcoming** [1] - 76:1
**US** [9] - 37:17, 40:22, 40:24, 41:1, 41:2, 44:4, 45:14, 60:15, 60:16
**valuation** [1] - 64:23
**value** [2] - 13:16, 47:6
**various** [1] - 49:7
**vast** [1] - 58:13
**vehemently** [1] - 18:23
**vehicle** [1] - 14:21
**vein** [1] - 64:18
**versus** [1] - 72:10
**vet** [1] - 21:24
**veterans** [2] - 56:9, 62:14
**vetted** [4] - 21:23, 24:23,

42:7, 63:7
**vetting** [1] - 68:24
**via** [2] - 3:12, 3:18
**viable** [1] - 65:20
**vice** [2] - 38:15, 61:24
**view** [2] - 39:1, 58:7
**vigorously** [2] - 54:8, 74:13
**violation** [1] - 24:17
**virtual** [4] - 4:19, 5:19, 8:23, 77:22
**virtually** [2] - 6:13, 6:16
**Volkswagen** [2] - 46:19, 51:9
**wait** [2] - 21:19, 32:25
**wall** [1] - 57:9
**wants** [3] - 50:21, 61:16, 65:22
**waste** [2] - 30:16, 73:1
**wasted** [2] - 30:16, 30:17
**water** [2] - 14:2, 14:5
**week** [2] - 6:17, 48:4
**week-and-a-half** [1] - 48:4
**welcome** [1] - 9:9
**well-known** [1] - 22:3
**West** [1] - 3:15
**whatsoever** [4] - 49:10, 55:3, 57:22, 58:4
**whim** [1] - 52:23
**whole** [3] - 10:15, 11:19, 32:16
**Wilson** [1] - 6:6
**WINSTON** [1] - 3:8
**Winston** [2] - 5:4, 5:12
**wish** [1] - 10:21
**withdraw** [1] - 7:15
**withdrawal** [1] - 6:20
**withdrawn** [3] - 6:11, 29:10, 29:13
**withheld** [1] - 22:20
**woman** [1] - 5:9
**wonderful** [2] - 9:10, 10:3
**wondering** [1] - 7:20
**word** [3] - 51:25, 58:3, 68:2
**words** [4] - 12:13, 13:8, 26:15, 71:6
**works** [2] - 26:7, 28:19
**worried** [1] - 73:24
**worry** [1] - 51:21
**worse** [2] - 15:24, 19:21
**wrap** [1] - 29:8
**written** [5] - 23:2, 26:18, 28:19, 29:1, 29:3
**wrote** [1] - 24:3
**year** [3] - 19:13, 24:5, 52:25
**year-and-a-half** [1] - 24:5
**years** [13] - 10:2, 14:16, 32:1, 32:2, 32:7, 34:1, 48:8, 49:24, 56:6, 56:8, 59:9
**York** [3] - 3:10, 45:10, 74:6
**zealous** [1] - 11:9

**zealously** [1] - 53:22
**zero** [3] - 55:2, 55:8, 58:3