**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TEVA PHARMACEUTICALS INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, ROBERT KOREMANS, and MICHAEL DERKACZ,<br><br>Defendants. | Case No. 2:20-cv-04660-JD<br><br><u>CLASS ACTION</u><br><br>**AMENDED CLASS ACTION COMPLAINT** |

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ............................................................. 1

II.     JURISDICTION AND VENUE ................................................................................. 6

III.    THE PARTIES.......................................................................................................... 6

IV.     SUBSTANTIVE ALLEGATIONS ........................................................................... 8

        A.      Background To The Kickback Scheme .......................................................... 8

                1.      Medicare Assistance and Charitable Foundations ...................... 9

                2.      The Federal False Claims Act and Anti-Kickback Statute ...................... 12

        B.      Teva Implements The Kickback Scheme To Inflate Copaxone Revenues........... 13

                1.      Teva Initiates the Scheme Through Its Shared Solutions Program .......... 13

                2.      Teva Employees Were Aware That Copaxone Sales Relied Upon
                        Charitable Donations .............................................................. 21

                3.      Teva's Senior Management Approved of the Kickback Scheme ............ 24

        C.      Defendants Materially Overstate Copaxone's Financial Results And
                Market Demand ............................................................................ 26

        D.      Defendants Make Materially False and Misleading Statements Regarding
                Teva's Shared Solutions Program........................................................... 43

        E.      Defendants Make Materially False and Misleading Statements Regarding
                Teva's Compliance with Federal Laws................................................... 47

        F.      Defendants Partially Disclose Their Fraud By Shaking Up Company Leadership
                And Belatedly Disclosing That The Department Of Justice Subpoenaed Teva
                About Donations To Charitable Foundations ......................................... 49

        G.      Defendants Continued To Make False And Misleading Statements Regarding
                Copaxone's Financial Results and Market Demand............................... 51

        H.      Defendants Continued To Make False And Misleading Statements Regarding
                Teva's Shared Solutions Program........................................................... 65

        I.      Defendants Continued To Make False And Misleading Statements Regarding
                Teva's Compliance With Federal Laws................................................... 66

        J.      The Truth Is Disclosed ............................................................................ 67

V.      ADDITIONAL SCIENTER ALLEGATIONS .................................................. 70

        A.      *Respondeat Superior* and Agency Principles Apply ............................. 70

        B.      Defendants Acted With Conscious Misbehavior Regarding The
                Kickback Payments ........................................................................ 70

        C.      Defendants' Financial And Pharmaceutical Experience ...................... 73

        D.      The Importance of Copaxone To Teva's Finacial Success ................. 76

        E.      Defendants Violated Teva's Code of Conduct .................................... 77

        F.      SOX Certifications ......................................................................... 78

VI.     LOSS CAUSATION ................................................................................... 80

VII.    CLASS ACTION ALLEGATIONS ............................................................ 83

VIII.   CONTROL PERSON LIABILITY .............................................................. 85

IX.     THE FRAUD ON THE MARKET PRESUMPTION ..................................... 86

X.      NO STATUTORY SAFE HARBOR ........................................................... 87

XI.     CAUSES OF ACTION .............................................................................. 89

XII.    PRAYER FOR RELIEF ............................................................................. 92

XIII.   JURY TRIAL DEMAND ........................................................................... 93

## TABLE OF DEFINED TERMS

| Term | Definition |
|---|---|
| ACS | Advanced Care Scripts, Inc. |
| ADR | American Depository Receipt |
| CDF | The Chronic Disease Fund |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Charitable PAP | Charitable Patient Assistance Program |
| Clark | Jennifer Clark, an Associate Director in Teva's Patient Services department |
| CMS | United States Centers for Medicare and Medicaid Services |
| CNS | Central Nervous System |
| The Company | Teva Pharmaceutical Industries Limited |
| Congressional Staff Report | U.S. House of Representatives' Committee on Oversight and Reform, *Drug Pricing Investigation – Copaxone* (2020) |
| Derkacz | Michael M. Derkacz, Teva's Senior Vice President and & GM – Global Central Nervous System from January 2015 to June 2017. |
| Desheh | Eyal Desheh, Teva's CFO until June 2017 |
| DOJ | United States Department of Justice |
| DOJ Complaint | The complaint filed by the Department of Justice in the action captioned *U.S. v. Teva Pharmaceuticals, Inc., et al.*, 1:20-cv-11548 (D. Mass. Aug. 18, 2020). |
| Hensley | Edward Hensley, the founder of ACS, TAF, and AssistRx |
| HHS | United States Department of Health and Human Services |
| Koremans | Robert Koremans, Teva's President & CEO – Global Specialty Medicines until December 2017 |
| Lead Plaintiff | Gerald Forsythe |
| Lynch | Denise Lynch, Teva's Director of Customer Resources |
| McClellan | Michael McClellan, Teva's Executive Vice President, CFO from November 2017 to November 2019 |

| | |
|---|---|
| **MS** | Multiple Sclerosis |
| **NYSE** | New York Stock Exchange |
| **O'Grady** | Brendan O'Grady, Teva's Executive Vice President & Head of North America |
| **SEC** | United States Securities and Exchange Commission |
| **TAF** | The Assistance Fund |
| **TASE** | Tel Aviv Stock Exchange |
| **Teva** | Teva Pharmaceutical Industries Limited |
| **Vigodman** | Erez Vigodman, Teva's CEO until February 2017 |

The allegations in this Amended Securities Class Action Complaint ("**Complaint**")[1] are based on the personal knowledge of Lead Plaintiff Gerald Forsythe ("**Lead Plaintiff**"), as to Lead Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein.  Lead Plaintiff's information and belief is based upon the substantial investigation by Lead Plaintiff's counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of public filings referenced herein made by Teva Pharmaceutical Industries Limited ("**Teva**" or the "**Company**") with the United States Securities and Exchange Commission ("**SEC**"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Teva and the Defendants named herein; (iii) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; and (iv) review and analysis of those other documents referenced herein.  Many additional facts supporting the allegations are known only to the Defendants and/or are within their exclusive custody or control.  Lead Plaintiff believes that substantial additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This federal securities class action arises from the difference between what Defendants told investors was driving Teva's soaring demand and price increases for its multiple sclerosis ("MS") treatment drug, Copaxone®, and the truth for Copaxone's success.  Defendants described Copaxone as the Company's "leading specialty medicine," reporting Copaxone sales and revenues that consistently dwarfed the same metrics for other Teva specialty products.

---

[1]    All internal citations and quotations are omitted and all emphases are added unless otherwise noted.

Defendants attributed Copaxone's commercial success to "having the right mix" of, *inter alia*, "a fantastic underlying demand," "patients hav[ing] access to it," and an "unparalleled . . . track record of both efficacy and safety.

2.     The truth, however, was that Copaxone's success was the result of Defendants' undisclosed unlawful use of a specialty pharmacy, Advanced Care Scripts, Inc. ("**ACS**"), and two charitable foundations, Chronic Disease Fund ("**CDF**") and The Assistance Fund ("**TAF**"), as pass-through entities to illegally fund Medicare patient co-payments for Copaxone.  Through its Shared Solutions program, Defendants used these entities as improper conduits whereby ACS enrolled Medicare patients on Copaxone, and then Teva would make donations to the charitable foundations for the purpose of  applying Teva's donations  to cover co-pays for ***only*** those Medicare patients taking Copaxone.

3.     The United States government has established multiple laws prohibiting this type of activity, including the federal anti-kickback statute which forbids pharmaceutical manufacturers from subsidizing the co-pay and cost-sharing obligations incurred by Medicare patients.  The Office of the Inspector General of the Department of Health and Human Services ("**HHS**") has advised that "the independent charity [patient assistance program] must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices."  Department of Health and Human Services, Office of Inspector General, *Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623 (Nov. 22, 2005).

4.     Defendants employed this scheme so that Teva could raise the price of Copaxone without Medicare patients bearing the brunt of the steep price increases, in order to be able to

artificially inflate revenues, and increase the price at which Teva's securities traded.[2] Due to this scheme, from late 2006 to 2015, Teva raised the price of Copaxone at a rate over 19 times the rate of inflation from approximately $17,000 per year to over $73,000 per year:[3]



5.      The Copaxone kickback scheme was a tremendous success totaling nearly $1 billion in revenues for numerous quarters and allowing Teva to seize control of the market share

---

[2]      Teva's American Depository Receipts ("**ADRs**") trade on the New York Stock Exchange ("**NYSE**") and the Tel Aviv Stock Exchange ("**TASE**") under the symbol "TEVA."  For convenience, Teva's ADRs are referred to as "shares", "securities", or "stock".

[3]      *See* Complaint (Dkt. No. 1) in *United States of America v. Teva Pharmaceuticals USA, Inc.* and *Teva Neuroscience., Inc.,* Civil Action No. 20-11548 (D. Mass.), attached hereto (with exhibits) at Exhibit A (the "**DOJ Complaint**").  The exhibits referred to herein as "Ex. A-__" are the exhibits attached to the DOJ Complaint.

for MS treatments while it was in effect.  Defendants concealed the kickback scheme from investors and attributed the incredible price and revenue increases to legitimate sources including the Company's relationships with patients and physicians through the Shared Solutions program. Defendants went so far to deflect attention from the dramatic price increases as to publicly claim that Teva was not associated with the price increase in specialty products and that it was playing a competitive game, playing it fairly and by the book and rules, and that Teva's exposure to any initiative on price reduction in the United States was as small as anybody can have.  Defendants never disclosed that Teva was using charitable foundations as conduits to cover Medicare co-pays in violation of federal laws.

6.      The kickback scheme also had the intended impact on Teva's share price, which increased to a high of $62.37 per share on December 24, 2015.

7.      Defendants' unlawful kickback scheme and its artificial positive impact on Teva's financial metrics and stock price began to unravel when Teva was subpoenaed on March 21, 2017 by the United States Attorneys' office in Boston, Massachusetts, a/k/a the U.S. Department of Justice (the "**DOJ**"), seeking information regarding Teva's donations to charitable foundations.  When the Company released its next quarterly earnings results on May 11, 2017 for the first quarter of 2017, however, no mention was made of the subpoena, but the Company did report that Copaxone generated robust revenues of $970 million, 48% of Teva's specialty-drug revenue.

8.      The fact that the federal government was investigating Teva for its kickback scheme finally came to light on August 3, 2017, when, as part of its second quarter earnings release, the Company disclosed before the market opened on August 3, 2017 that nearly four months earlier, on March 21, 2017, it had received the DOJ subpoena.  The price of Teva's

4

securities fell from a close of $31.25 on August 2, 2017 before the news was disclosed, to close at $23.75 at the end of trading on August 3, 2017.  In September of 2017, Teva brought in a new CEO, Kåre Schultz, to make improvements at Teva.  He announced major structural changes to the company and on November 2, 2017, among other news, Teva reported a decrease in global Copaxone revenues of 7% compared to the third quarter of 2016 and a decrease of U.S. Copaxone revenues of 8% compared to the third quarter of 2016.  On this news, Teva securities price fell approximately 20%, from a closing securities price of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017.

9.     Notwithstanding the government's investigation and major changes to the company, Teva did not fully dismantle its Copaxone kickback scheme and continued to make misleading statements touting the financial results and market demand for Copaxone, Teva's Shared Solutions Program, and the Company's compliance with federal laws.

10.     Teva's charade finally came to an end on August 18, 2020 when the  United States Attorneys' office  filed a complaint against the Company in federal court for the District of Massachusetts alleging that Teva had violated the federal False Claims Act and the Anti-kickback Statute by engaging in the scheme to use CDF and TAF as pass-through entities to cover Copaxone co-pays, with the aid of the specialty pharmacy ACS.  The market reacted promptly and efficiently when the true nature of Copaxone's success was disclosed on this date, with Teva's stock prices falling approximately 15% on this announcement.

11.     Due to Defendants' fraudulent acts, statements, and omissions which led to the precipitous declines in the market value of the Company's securities when the truth was revealed, Lead Plaintiff and other Class Members suffered significant damages.

## II.     JURISDICTION AND VENUE

12.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as certain of the acts and conduct complained of herein, including the dissemination and/or omission of materially false and/or misleading information to the investing public, occurred in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## III.    THE PARTIES

16.     Lead Plaintiff purchased Teva securities at artificially inflated prices during the Class Period and was damaged thereby when the truth was revealed, as set forth in the certifications submitted to the Court.  ECF No. 8-5.

17.     Defendant Teva is an Israeli pharmaceutical corporation with its principal executive offices located at 5 Basel St. Petach Tikva, 49131, Israel.  Teva's ADRs traded on the NYSE and TASE, both efficient markets, under the ticker symbol "TEVA."

18.     Defendant Erez Vigodman ("**Vigodman**") served as Teva's Chief Executive Officer ("**CEO**") and Chairman of the Board of Directors from February 2014 until February 2017.

19.     Defendant Eyal Desheh ("**Desheh**") served as Teva's Chief Financial Officer ("**CFO**") from April 2008 until June 2017.

20.     Defendant Robert Koremans ("**Koremans**") served as Teva's President & CEO— Global Specialty Medicines from April 2013 to December 2017.

21.     Defendant Michael M. Derkacz ("**Derkacz**") served as Teva's Senior Vice President & GM—Global Central Nervous System ("**CNS**") from January 2015 to June 2017.

22.     Defendant Kåre Schultz ("**Schultz**") has served as Teva's President and CEO and a member of the Board of Directors since November 1, 2017.

23.     Defendant Michael McClellan ("**McClellan**") served as Teva's Executive Vice President, CFO from November 2017 to November 2019.  He served as Teva's Interim Group Chief Financial Officer from July 2017 to November 2017.  From 2015 to November 2017, he served as Teva's Senior Vice President and CFO, Global Specialty Medicines.

24.     Defendant Brendan O'Grady ("**O'Grady**") has served as Teva's Executive Vice President and Head of North America, Commercial since December 2017.  He served as Teva's Chief Commercial Officer of Global Specialty Medicines from August 2016 until December 2017.

25.     Defendant Eli Kalif ("**Kalif**") has served as Teva's Executive Vice President, CFO since December 2019.

26.     Defendants Vigodman, Desheh, Koremans, Derkacz, Schultz, McClellan, O'Grady, and Kalif are collectively referred to herein as the "**Individual Defendants**" and together with Teva, as the "**Defendants**."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background To The Kickback Scheme

27.     Teva is a global pharmaceutical company focused on providing generics, specialty medicines, and biopharmaceuticals to patients worldwide.  *See* Teva Pharmaceutical Industries Limited, Annual Report (Form 10-K) 2 (Feb. 10, 2021) ("2020 10-K").  Teva is headquartered in Israel and operates its business through three segments: North America, Europe, and International Markets.  *Id.*  Each business segment manages Teva's entire product portfolio in its region, including generics, specialty medicines, and over-the-counter products. *Id.*

28.     One of Teva's primary products is Copaxone® (glatiramer acetate injection), a drug approved for the treatment of patients with relapsing forms of multiple sclerosis ("**MS**"). *Id.* at 6.  Copaxone is administered by injection and is available in two doses, either 20 mg/mL daily, or 40 mg/mL 3 days a week.  *See* Here With Dosing Options For Your Lifestyle, Copaxone, https://www.copaxone.com/about-copaxone/dosage-information (last visited May 17, 2021).

29.     Copaxone falls into Teva's "specialty medicines" portfolio, which was divided into three categories: central nervous system "CNS" and pain, respiratory, and oncology.  2020 10-K at 3.  Copaxone is one of the three drugs in Teva's CNS category, along with Azilect® and Nuvigil®.  Teva Pharmaceutical Industries Limited, Quarterly Report (Form 10-Q) 38 (Oct. 29, 2015).

30.     Copaxone makes up a critical portion of Teva's business.  The drug is one of the leading MS therapies in the United States, and at the beginning of the Class Period, Teva described Copaxone as its "leading specialty medicine[.]"  *See* 2020 10-K; Teva Pharmaceutical Industries Limited, Quarterly Report (Form 10-Q) 29 (Oct. 29, 2015).  Indeed, the drug was responsible for nearly half of the revenues for all specialty medicines combined.  *Id*.

### 1.     Medicare Assistance and Charitable Foundations

31.     Congress established Medicare in 1965 to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 1395 *et seq.*  In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D.  Under Medicare Part D, Medicare contracts with private entities, including pharmaceutical companies, known as Part D Plan Sponsors, to administer prescription drug plans.  *See* 42 C.F.R. § 423.4.

32.     Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("**CMS**"), which is part of the HHS.  *See* Ex A ¶ 15. Patients on Medicare Part D, a/k/a "Medicare Part D beneficiaries" who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor.  *Id.* ¶ 17.  Part D Sponsors, in turn, enter into subcontracts with pharmacies, or other "downstream entities," to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.  *Id.*  These downstream entities submit claims to Part D Plans that pay for the drug using funds provided by CMS from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund.  42 C.F.R. § 423.315(a).

33.     Under the statute, a Medicare Part D beneficiary may be required to make a partial payment for the cost of the prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "**co-pays**").  These co-pay obligations can be substantial for expensive medications and vary throughout the year, depending on the total Part D covered expenses the beneficiary has incurred in the year.  *See* 42 U.S.C. § 1395w-102. Congress included co-pay requirements in this program, in part, to encourage market forces to serve as a check on health care costs, including the prices that pharmaceutical manufacturers may charge for their drugs.  *See* Press Release, U.S. Attorney's Office District of Massachusetts, Foundations Resolve Allegations of Enabling Pharmaceutical Companies to Pay Kickbacks to Medicare Patients (Oct. 25, 2019).

34.     Generally, after a physician writes a prescription for a Medicare Part D beneficiary, the patient can take the prescription to a pharmacy or submit it to a mail order specialty pharmacy to be filled.  *See* Ex. A ¶ 26.  When the patient submits the prescription, the Medicare co-pay is due from the patient to complete the purchase of the drug and have the pharmacy fill the prescription.  *Id.* ¶ 27.  When the pharmacy dispenses a drug to a Medicare Part D beneficiary, the pharmacy submits a claim to the beneficiary's Part D Sponsor, which, in turn, submits an electronic record of the claim to CMS.  *Id.* ¶ 28.  After dispensing the drug, the pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the drug cost less the co-pay for which the Medicare Part D beneficiary was responsible.  *Id.*

35.     In order to assist patients with the Medicare Part D co-pays, Charitable Patient Assistance Programs ("**Charitable PAP**") have been established to provide financial assistance grants to Medicare Part D beneficiaries.  Healthwell Foundation, *When Health Insurance Is Not Enough: How Charitable Copay Assistance Organizations Enhance Patient Access to Care*, at 5

(2012), available at https://www.healthwellfoundation.org/wp-content/uploads/legacy/files/HWF-white%20paper%20for%20printing.pdf.  These charitable foundations are primarily funded by tax-exempt donations from pharmaceutical companies.  *Id.* at 7.  The Charitable PAPs must be carefully structured and operated in compliance with applicable legal requirements of the Social Security Act.  *Id.*  Section 1128B(b) of the Social Security Act attaches criminal penalties to the knowing and willful offer, payment, solicitation, or receipt of any donation if the intent of the donation is to provide prescriptions that are reimbursable by a federal health care program.  *Id.*  Therefore, the funds received through donations must be applied generally to all beneficiaries, and it is illegal for a Charitable PAP to apply the funds received to any particular drug.  *Id.*

36.     In 2005, HHS published a Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), which provided that "pharmaceutical manufacturers can donate to bona fide independent charity PAPs, provided appropriate safeguards exist."  70 Fed. Reg. 70625.  These safeguards against unlawful use of charities for specific funding purposes, include that a Charitable PAP "must not function as a conduit for payments by the pharmaceutical manufacturer to patients," and that a pharmaceutical manufacturer should not "solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products."  *Id.* at 70627.  In 2014, HHS published a supplemental bulletin reiterating the restrictions on Charitable PAPs, entitled the Supplemental Special Advisory Bulletin, Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120 (May 30, 2014).  The supplemental bulletin also advised that an action "indicative of a donor's intent

to channel its financial support to copayments of its own products, [] would implicate the anti-

kickback statute." 79 Fed. Reg. at 31123.

### 2.    The Federal False Claims Act and Anti-Kickback Statute

37.    The Federal False Claims Act, 31 U.S.C. §§ 3729 – 3733, was enacted in 1863 by

Congress to combat fraud against the United States government. *See* The False Claims Act,

United States Department of Justice, https://www.justice.gov/civil/false-claims-act (last visited

May 12, 2021). The False Claims Act provides that anyone who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for
> payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement
> material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A) [or] (B), . . . is liable to the
> United States Government for a civil penalty of not less than $5,000 and not more than
> $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28
> U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the
> Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

38.    The anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "**Anti-Kickback**

**Statute**"), was passed by Congress to address knowing and willful payments made to induce or

reward patient referrals or the generation of business involving any item or service payable by

the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or

Medicaid patients). *See* Roadmap for New Physicians: Fraud & Abuse Laws, Office of the

Inspector General, https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited

May 12, 2021). Congress determined that the inducements at issue would "contribute

significantly to the cost" of Federal health care programs absent federal penalties as a deterrent.

H.R. Rep. No. 95-393, at 53 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3056.

39.     The Anti-Kickback Statute provides:

(b) Illegal remunerations

>   (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

>>      (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

>>      (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.

42 U.S.C. § 1320a-7b(b)(2).

40.     In 2010, Congress amended the Anti-Kickback Statute to include language providing that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim" under the False Claims Act. 42 U.S.C. § 1320a-7b(g).  Thus, under 42 U.S.C. § 1320a-7b(g) of the statute, claims submitted to Federal health care programs that result from violations of the Anti-Kickback Statute are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a).  Accordingly, when a person submits or causes to be submitted claims to Federal health care programs violate the Anti-Kickback Statute, he or she also violates the False Claims Act.

**B.      Teva Implements The Kickback Scheme To Inflate Copaxone Revenues**

**1.      Teva Initiates the Scheme Through Its Shared Solutions Program**

41.     In order to increase patient enrollment on Copaxone, Teva provided a suite of services called its "Shared Solutions" Program.  Ex. A ¶ 48.  Through the Shared Solutions Program, Teva offered free injection devices to administer the drug, maintained staff of nurses

13

who provided patients with injection training, and assigned case managers to assist patients in obtaining insurance coverage for the drug. *Id.* Teva represented that it was committed to addressing the financial concerns raised by patients so that they were not faced with discontinuing therapy due to cost. *Id.* ¶ 49.

42.     As part of the Shared Solutions Program, in 2006, Teva entered into a contract with ACS, a specialty pharmacy. *Id.* ¶ 50. ACS was co-founded by Edward Hensley ("**Hensley**"), who had a prior working relationship with Teva's Director of Customer Resources at the time, Denise Lynch ("**Lynch**"). *Id.* As part of the contract, Teva sent to ACS the prescriptions for Copaxone received through the Shared Solutions Program for patients who either had or were eligible for Medicare Part D coverage. *Id.* If a patient was eligible for but did not already have Medicare Part D coverage, ACS would assist that patient with enrollment. *Id.* If the patient was eligible for Medicare co-pay coverage from a Charitable PAP, ACS would gather the information from the patient and submit the application to the foundation. *Id.* The two Charitable PAPs to which ACS referred Teva's Copaxone reimbursement payments were the CDF and TAF. Both CDF and TAF maintained "MS" funds, through which they provided co-pay assistance to patients for, ostensibly, any of the MS drugs on the market. Ex. A ¶ 3.

43.     ACS's founder, Hensley, founded TAF in 2009. *Id.* ¶ 52. As well, during that same year, his for-profit business that he also founded, AssistRx, began running Teva's free drug program for Copaxone patients who did not have insurance. *Id.* The free drug program is operated through Teva's non-profit organization called the Teva Cares Foundation that provides medications at no cost to patients who meet certain insurance and income criteria. *See* Welcome to the Teva Cares Foundation, Teva, https://www.tevacares.org/ (last visited May 17, 2021). While running that program, AssistRx identified Medicare-eligible patients who were receiving

free Copaxone from Teva.  Ex. A ¶ 52.  AssistRx arranged for those patients to instead obtain

Medicare coverage, and referred them to ACS, which then would seek foundation co-pay

funding for them.  *Id.*  In February 2015, AssistRx also took over ACS's role of arranging

Medicare co-pay funding for Copaxone patients referred through Shared Solutions.  *Id.*

44.     When Teva began working with ACS, Teva and Hensley came to the agreement

that the donations Teva provided to TAF and CDF would be used solely to reimburse Copaxone

co-payments and would not be applied to other drugs funded by the foundations.  *Id.* ¶ 55; Ex. A-

2.  ACS understood that Teva's goal was to use the Charitable PAPs as a "pass-through vehicle"

to generate revenues for Copaxone.  Ex. A ¶ 56.  Indeed, in a 2007 email, Hensley explained to

his colleagues at ACS that "particular manufacturer funds [should] go to their own drug as [that

was] what was the intent of the project was originally."  *Id.*; Ex. A-8.

45.     In fact, Teva instructed ACS to not refer Medicare patients to Teva's Copaxone

free drug program if foundation funds were accepting patients, because foundation-funded

patients generated revenue from reimbursement, whereas free drug payments did not.  Ex. A

¶ 57; A-10.  For example, in an email sent in April 2016, a Shared Solutions supervisor

explained that "[p]atients with government funded plans are not eligible to apply[]" for Teva's

free Copaxone program.  Ex. A-10.  Teva made an exception to this policy for Copaxone patients

who obtained prescriptions or Medicare Part D coverage near the end of the calendar year when

no foundation coverage was available.  Ex. A ¶ 57.  At the beginning of the following year,

Teva, ACS, and the Charitable PAPs worked to promptly move those patients onto foundation

coverage.  *Id.*  For example, in an April 2016 email, a Shared Solutions employee stated, "in the

past when a new Med D patient needs assistance and at that time (usually close to the end of the

calendar year) the Foundation has closed its funds[,] [i]f we want the patient to start drug we

15

provide free product for the remainder of the calendar year and tee them up for Foundation

Assistance for the following January when funds will be available."  A-12.

46.    Teva's intention was to provide exactly the amount of money needed to fund the

Copaxone co-payments to each foundation.  For example, on December 30, 2009 and January

25, 2010, Teva paid TAF $15.7 million, approximately 99.9% of which was paid to Copaxone

patients.  Ex. A ¶ 88.

47.    As well, given that Teva intended for the donation payments to fund all of its

Copaxone Medicare co-pays, Teva's Tax department determined in 2013 that the Company

should treat the payments to the Charitable PAPs as business expenses rather than charitable

donations.  *Id.* ¶ 63.  In a July 2013 memorandum, a manager in Teva's Tax department

reviewed Teva's recent payments to CDF and TAF and concluded that "[t]he payments . . . are

made with the expectation of financial return commensurate with the amount donated and should

therefore be deducted as business expense."  *Id.*; Ex. A-19.

48.    Further, Teva's payments to CDF and TAF were supposed to be applied to the

foundations' MS funds generally, and thus in theory could assist patients on any MS drug.

However, senior Teva executives recognized that was not the case and commonly referred to the

payments as "Copaxone donations."  Ex. A ¶ 64.  For example:

- A December 2014 e-mail from a Teva Senior Vice President directing her
  subordinate to "release $25M of *Copaxone donations* to be mailed on Dec
  29th[.]"  *Id.*

- A January 2015 e-mail from Desheh, approving a "*Copaxone Donation*
  payment."  Ex. A-21.

16

- A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines unit, with the subject "Response requested: Approval for **Copaxone donation** payment." Downey approved, and forwarded the e-mail to Koremans, who approved as well. Ex. A-22.

- An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and Support, approving a "**Copaxone Donation**" in the amount of $725,000. Ex. A-23.

- A January 2017 e-mail from a Teva NASM VP of Finance to Koremans regarding "**Copaxone donations** approval." Ex. A-24.

49.     Teva was able to accomplish this scheme through the mechanics of its arrangements with ACS, CDF, and TAF. Teva needed three data points to calculate how much to pay CDF and TAF at the end of each year to ensure that the foundations would continue to cover all of Copaxone patients' Medicare co-pays in the following year: (1) the number of Copaxone patients enrolled in each fund; (2) each fund's annual per-patient grant amount; and (3) each fund's administrative fee, which was generally 9%. Ex. A ¶ 79.

50.     Teva regularly received from CDF and TAF the per-patient grant amount that the foundations provided to Copaxone patients. *Id.* ¶ 80; Ex. A-2 ¶ 13. For example, an email Hensley sent to Lynch on September 17, 2011 (attached hereto as A-35), stated the following:

> The allocation per patient for 2012 is $4,600. To give you a historical number of what it has been in the past:
>
> 2012 - $4,600
> 2011 - $4,400
> 2010 - $5,600

17

51.     Then, Teva periodically obtained from ACS the number of Copaxone patients who were receiving co-pay coverage from each foundation.  Ex. A ¶ 82.  For example, on December 5, 2013, ACS employee David Blanc sent an email to Lynch with the latest numbers, showing "TAF 5614 . . . CDF . . . 1188 . . . LIS 3543[.]"  A-43.

52.     With those numbers in hand, Teva simply had to multiply the number of patients by the grant allocation per patient and factor in the administration fee to calculate how much to pay each foundation.  Ex. A ¶ 83.  As Jennifer Clark ("**Clark**"), an Associate Director in Teva's Patient Services department, explained:

> So, I would take an estimated number of Medicare patients, apply that towards what the typical average Medicare cost per patient might be for a calendar year, and then multiply that times those patients to determine what that might look like. And then I understood the administration fees for foundations were typically somewhere in the nine percent range, so I would do that calculation to determine how much we would need for the upcoming year.

*Id.* ¶ 84.

53.     For example, in September 2011, after having just learned that ACS was estimating that 5,572 Copaxone patients would be receiving foundation co-pay coverage by the end of that year, Clark put together the following budget spreadsheet:

| | A | D | E | F | G | H / I |
|---|---|---|---|---|---|---|
| 1 | | | 2011 | 2012 | 2013 | 2014 | "2013 is first year |
| 2 | 501c Funding per pt | | 4771 | 5004 | 5280 | |
| 3 | Katie's portion | | 1867 | 1900 | 1900 | "patient picks up more than p |
| 4 | Govt Portion | | | | | |
| 5 | Medicare Funding per pt | $ 6,250 | $ 6,638 | $ 6,904 | $ 7,180 | |
| 6 | Qual-new Medicare pt | $ 150 | $ 150 | $ 150 | $ 150 | |
| 7 | Requal-Medicare pt | $ 125 | $ 125 | $ 125 | $ 125 | |
| 8 | Adherence rate | 88% | 88% | 88% | 88% | |
| 9 | Admin fee | 3% | 3% | 3% | 3% | |
| 10 | Additional factor for | 120% | 120% | 120% | 120% | |
| 11 | Estimated Fund Carryover | | | | | |
| 12 | CCGS & Shipping & Handling - Med D Free - per month ($60+$70) | $ 130 | $ 130 | $ 130 | $ 130 | |
| 13 | Average # of Med D Free dispenses per pt | 4 | 3 | 3 | 3 | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | Beginning of Year | | 6300 | 5988 | 5330 | |
| 17 | Additional new pts - assistance donated | | 500 | 506 | 473 | |
| 18 | Med Free Roll-over | 525 | 525 | 463 | 452 | |
| 19 | Retention - Patients at year-end (full funding & partial LIS) | 5775 | 5004 | 5715 | 5107 | Per Zach, 6/31 |
| 20 | Full LIS | 2475 | 2723 | 2895 | 2750 | Per Zach, 8/31 |
| 21 | Total Patient Count | 8775 | 9232 | 9133 | 8308 | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | Qualification-new pts | $ 94,500.00 | 184,500.00 | 178,020.00 | 166,410.00 | |
| 25 | Qualification-existing pts | 78,750.00 | 1,098,750.00 | 1,046,592.00 | 938,212.67 | |
| 26 | TN 50% portion on assisted pts | | | | | |
| 27 | Donut Hole Funding | $ - | 32,442,800.00 | 32,494,259.87 | 30,639,197.37 | |
| 28 | Total Donation | $ - | 35,651,428.57 | 35,707,377.87 | 33,665,447.66 | |
| 29 | Admin fee | $ - | 3,208,628.57 | 3,213,718.01 | 3,030,250.29 | |
| 30 | Estimated Fund Carryover | $ - | $ - | - | - | |
| 31 | TOTAL Medicare - excl | $ 173,250.00 | $ 36,934,678.57 | 36,932,589.87 | 34,774,070.32 | $5.5 M donation made 12/31/2009 |

*Id.* ¶ 85; Ex. A-44.  The number "5775" on line 19 was the number Clark had received from ACS, rounded up, as indicated by the note, "Per Zach [Grammage at ACS], 8/31" in column H. *Id.*  The figure 525 in "Med Free Roll-Over" on line 18 had also been provided by ACS and represented the number of Copaxone patients who were then receiving the drug for free but would obtain foundation coverage in 2012.  *Id.*  Clark added 5,775 to 525 to arrive at 6,300, which appears in line 16 of the spreadsheet as the estimated "Beginning of the Year" patients who would receive foundation funding for 2012.  In line 17 of the spreadsheet, Clark estimated that an additional 500 patients would receive foundation co-pay coverage during the course of 2012.  Clark then added 6,300 to 500 to reach 6,800 as the estimated total number of patients receiving foundation co-pay coverage in 2012, and then multiplied that number by $4,771, the "501c Funding per pt" amount in line 2, to reach the "Donut Hole Funding" amount of $32,442,800 on line 27.  Clark then added the foundations' 9% administration fee to generate the

"Total Donation" amount of $35,651,428.57 on line 28.  *See also* Ex. A-48 showing the

Copaxone donation calculation for 2015.

54.     During the last week of December 2011 and the first week of January 2012, Teva

paid CDF and TAF a total of $33,200,000 from its foundation budget.  Ex. A ¶ 86.

55.     After the beginning of each calendar year, TAF closed its MS fund because it had

committed all of its funding to existing patients who had renewed their annual co-pay grants.  *Id.*

¶ 89.  In order to ensure that new Copaxone patients were able to sign up and receive funding

from TAF through the remainder of the year, Teva, ACS, and TAF engaged in a coordinated

process to enroll these patients.  *Id.* ¶ 90.  First, ACS would tell Teva how many new Copaxone

patients were awaiting Medicare co-pay funding at a particular time.  *Id.*  Second, TAF would

tell Teva the average per-patient Medicare co-pay grant amount at that time.  *Id.*  Third, Teva

would multiply those amounts together and factor in TAF's standard administration fee to

determine how much to donate to TAF.  *Id.*  Fourth, Teva would tell ACS how much it planned

to pay TAF.  *Id.*  Fifth, ACS would send a "batch file" of Copaxone co-pay coverage

applications to TAF as soon as TAF received funding from Teva.  *Id.*

56.     For example, on April 22, 2014, Lynch sent an email to her colleague Barb Ross,

requesting "the number of patients we have ready to go to ACS, May eligible and approx. how

many we are sending over a day."  Ex. A-76.  Later that day, ACS sent Ross an e-mail with the

subject line "CPA numbers" stating that ACS had "approx. 187 and 27 pending interviews."  Ex.

A-75.  Thereafter, Ross reported back to Lynch that "we have 187 ready to go, 27 that still need

financial assessments, and 40 for May eligible."  Ex. A-76.  At that time, TAF's per-patient grant

amount was $4,500 and its administrative fee was 9%.  Ex. A ¶ 100.  A calculation of those

amounts, (187 + 27 + 40) x $4,500 x 1.09, resulted in a total of $1,245,870.  *Id.*  Thus, on April

24, 2014, Teva paid TAF $1,275,000.  Ex. A-77.  Shortly after Teva sent the payment to TAF, ACS employee Blanc instructed his colleagues at ACS to "prepare a file for referral to TAF for Copaxone in the morning tomorrow."  Ex. A-78.

### 2. Teva Employees Were Aware That Copaxone Sales Relied Upon Charitable Donations

57.     Executives at the Company were aware that Teva's sales of Copaxone were directly correlated with the amount of money the Company donated to Charitable PAPs because all of the money Teva donated to the foundations was being used to cover only Copaxone co-pays.  *See* Ex. A ¶ 58.  According to Confidential Witness 1 ("**CW1**"), who served as Teva's Director of Marketing from June 2014 to August 2016 and Senior Director of Marketing from January 2018 to December 2018, donations to Charitable PAPs were included in the profit and loss statements under the individual line item, "Charitable Contributions."

58.     Further, in an e-mail dated January 9, 2015, Clark warned that, if Teva cut its foundation payments, the company's sales forecasts would be "overstated[,]" explaining that "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made."  Ex. A-15.  A few weeks later, on February 2, 2015, Alejandro Castro, a Teva financial analyst, emailed David Loughery, Teva's Vice President of Finance, to advise him that "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing donations."  Ex. A-16.  Castro continued on to explain that he was told by the Patient Access department "that they will need between $5M and $8M in donations soon to avoid losing an estimated 1,500 Medicare Patients."  Ex. A-16.  In response, Loughrey told Castro that, instead of cutting the budget, "we agreed yesterday to fund $8.5M today, which is ~$3M more than the remaining Q1 budget."  *Id.*

59.     Later that year, on August 13, 2015, Jennifer Clark warned Ryan Sloss, a Teva

finance manager, that "it's clear that if the $10M gets removed, the sales will decrease as well, as

there will be Medicare patients out there that won't be able to fill."  Ex. A-17.  Sloss agreed,

stating, "we either pay it and go over budget or we don't make our sales numbers."  *Id.*

60.     In October 2016, executives circulated a business plan that included a $40 million

"Medicare donation" as part of its Copaxone "marketing" strategy:



*See* U.S. House of Representatives' Committee on Oversight and Reform, *Drug Pricing*

*Investigation – Copaxone*, 18-19 (2020) ("**Congressional Staff Report**"), attached hereto as

Exhibit B.  The documents attached to the Congressional Staff Report are referred to herein as

"Ex. B-__".

61.     As Teva began planning for 2018, early drafts of one of the Company's strategic planning documents noted that eliminating its "Medicare Donation" to third-party foundations would cost Teva up to $261 million in Copaxone sales:



Congressional Staff Report at 20.  On August 30, 2017, Loughrey sent an email to John Hassler, Teva's General Manager, requesting that Hassler remove the analysis regarding the impact of the "Copaxone Donation" on net sales because he is "not comfortable including the sales impact of the reduced donations. . . . could you have someone send this to me with the 0-$128M range line excluded."  Ex. B-42.

62.     At the beginning of 2018, Defendant O'Grady received a presentation on the company plan for the year.  One slide, entitled "Copaxone Executive Summary," stated that "27% of patients on Copaxone 40mg are Medicare Part D" patients and if those patients are not able to receive funding in Q1, they "may not fill Rx and go off therapy, which would result in a

negative impact to the brand of $210-280M." Ex. B at 21.  In the speaker's note for the slide,

Teva executives identified "Donations" as one of the "High priority projects for execution."  *Id.*

A copy of the slide is shown below:



63.     On January 31, 2018, after being advised that an insurer had moved Copaxone 40

mg/mL to a non-preferred medication list for both commercial and Medicare patients, O'Grady

explained to a colleague that the non-preferred status "means little as ***we buy the patients [sic]***

***copay down to zero anyway***."  Ex. B-54.

### 3.     Teva's Senior Management Approved of the Kickback Scheme

64.     Senior management at Teva was aware of the donations to CDF and TAF because

large payments had to be approved by Teva's higher-ups. Ex. A ¶ 13.  According to Confidential

Witness 2 ("**CW2**"), who served as the Associate Director of Treasury from July 2015 to

September 2019, the largest disbursements to the Charitable PAPs always took place toward the

end of a given year.  A member of the treasury department would set up the payment and make

sure that all of the necessary management approvals were obtained.  CW1 explained that the approvals from top management depended upon the amount of the donation payment.  For example, a September 21, 2015 email discussing the Copaxone donations process set forth the following payment approval levels:

> Approval Authority Levels
> $0.5M Sr. Director
> $1M VP
> $5M SVP (Larry Downey in the past)
> $15M TEC members (Rob Koremans)
> $25M CFO (Eyal Desheh)
> >$25M CEO (Erez Vigodman)
> *** I'm not sure if there is a point in which Board of Directors approval is necessary.  Anna Khais or Roberta Diver can advise.

Ex. A-3.  Later in the email chain, on December 27, 2015, David Loughery, Teva's Vice President of Finance for North America, Specialty Medicines, emailed Eyal Desheh seeking approval of a large foundation payment, stating, "Please find attached a request for a $30M donation payment to be made to assist MS patients with their co-pay.  Based upon the size of this payment, I believe it may need approval from Erez as well."  *Id.*

65.     Koremans and Desheh approved payments earlier that year as well.  On January 9 and 10, 2015, Koremans and Desheh approved a "Copaxone Donation payment" of $25M.  Ex. A-21.  On February 4, 2015, Koremans approved a "Copaxone donation payment" of $8.5 million.  Ex. A-22.

66.     On January 29, 2016, David Loughrey emailed Larry Downey and Michael McClellan seeking approval of a wire transfer stating, "Attached is a request to pay another $10M for *Copaxone donations*.  Mike Sheehy has approved . . . . this is a common payment we make each year."  *See* Ex. B-39.

67.     In an email on January 13, 2017, a Teva employee explained the funding progress for the upcoming Copaxone donations, stating the following:

- [Name Redacted] to receive a request for Copaxone donations from The Assistance Fund – done, received from 3 funds

- [Name Redacted] to request the perspective of the Copaxone Marketing team [Name Redacted] and determine the Marketing budget available – done, [Redacted Name] confirms $38M available in Copaxone 2017 budget for donations

- [Redacted Name] to work with Dave Loughrey (NASM CFO) and Mike McClellan (GSM CFO) to determine timing of payment.  For example, Teva may pay a portion of the 2016 budgeted donations in the last few days of 2015.—In progress . . . .

Ex. B-38.

68.     Several days later, on January 19, 2017, David Loughery sought approval of the

$38M donation from Koremans.  Ex. A-24.  Loughrey emailed Koremans regarding "Copaxone

donations approval" and explaining the rationale behind the payments:

> "Very soon you will receive requests to approve 3 separate payments related to 2017 planned Copaxone donations totaling $38M. . . . These payments aid Medicare patients with their copays is [sic] they encounter the Donut Hole period. . . . The majority of patients would receive the benefit before the end of February, thus why we make these funds available for agencies early in the year. . . . The Corporate Social Responsibility Team has communicated to these agencies our intent to fund and these agencies are funding patients currently based upon the expected receipt of these amounts."

*Id.*

69.     While this scheme was going on, Teva raised the price of Copaxone at a rate of

over 19 times the rate of inflation, from approximately $17,000 per year to $73,000 per year.  Ex.

A ¶ 2.

### C.     Defendants Materially Overstate Copaxone's Financial Results And Market Demand

70.     During the Class Period, Defendants concealed Teva's scheme to use Charitable

PAPs as pass-through vehicles to fund sales of Copaxone by making false and/or misleading

statements regarding the financial results of Copaxone and the market demand for the drug.

71.    The Class Period begins on October 29, 2015, when Teva issued a press release that it filed with the SEC as a Form 6-K, reporting the Company's financial and operating results for the third quarter of 2015.  In regard to Copaxone, the press release stated, in relevant part:

> **Copaxone**®. In the third quarter of 2015, Copaxone® (glatiramer acetate injection 20 mg/mL and 40 mg/mL), our leading specialty medicine, ***continued to be the leading multiple sclerosis therapy in the United States and globally***. *Our sales of Copaxone® amounted to $1.1 billion*, a decrease of 2% compared to the third quarter of 2014.
>
> ***Copaxone® revenues in the United States in the third quarter of 2015 were $878 million***, an increase of 10% compared to the third quarter of 2014. ***The increase was mainly due to higher sales volume in the third quarter of 2015***, partially offset by net pricing declines. The Copaxone® family's U.S. market shares in terms of new and total prescriptions were 27.1% and 29.3%, respectively, according to September 2015 IMS data.
>
> At the end of September 2015, ***Copaxone® 40 mg/mL three times a week in the United States accounted for approximately 76% of total Copaxone® prescriptions. This was driven by patient and physician choice of the 40 mg/mL version, supported by payor access and patient support activities***.
>
> * * *
>
> ***Copaxone® revenues in the United States accounted for 81% of global Copaxone® revenues in the third quarter of 2015***, compared to 72% in the third quarter of 2014.
>
> * * *
>
> ***Copaxone® was responsible for approximately 22% of our revenues in the third quarter of 2015***, and contributed a significantly higher percentage to our profits and cash flow from operations during such period*.

72.    Following its press release, on October 29, 2015, Teva also filed a Quarterly Report for the third quarter of 2015 with the SEC on Form 6-K.  The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as ***$1,085,000,000*** for the "Three Months Ended September 30, 2015" and ***$3,939,000,000*** for the "Nine Months Ended September 30, 2015[.]"

73.     Later that day, Teva hosted an earnings conference call to discuss the Company's financial results for the third quarter of 2015.  On the call, defendant Vigodman highlighted the Company's Copaxone sales and revenues, stating that "all the measures we conducted in order to maintain the Copaxone started to deliver."  During the call, Desheh stated, in relevant part:

> *Copaxone continued to demonstrate amazing strength against oral competition, now also against generic competition*. You see the numbers. You see the green line is market share of our 40 milligram, *the biggest selling MS therapy in the world today with over 22% market share in the United States. And we are seeing growth in market share in the ex-U.S. territories, as we introduce 40 milligram*. And wherever we introduce 40 milligram, we see it picking up and really gaining market share in every country.
>
> *So Copaxone in total, strong quarter. Actually a record quarter in the United States, just a little bit above Q2, $878 million.  All in all very, very strong quarter with $1.080 billion in total sales, a little over that. So Copaxone [is] very, very durable in the—so what we believe is going to be the impact in certain scenarios starting 2017*.

74.     The statements by Defendants Teva, Vigodman, and Desheh in ¶¶ 71-73 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)      Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)      If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)      As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

75.     On November 19, 2015, defendant Desheh attended the Jefferies Autumn Global

Healthcare Conference.  During the conference, Desheh stated in relevant part:

> And by the way, Europe as well. And we are having in audience, Gerard van Odijk, who used to manage our European business for many, many years and a good friend. And he can tell you about the competition in generics everywhere in the world. So it's a highly competitive environment with players coming from all over the world, with a very fierce price competition. The price of generics went down 50% over the past 10 years. ***The price of specialty products went up by 200% over the past 10 years.***
>
> ***And Teva was not associated with any of that. So we are playing the competitive game. We are playing it fairly. We, of course, play by the book and by the rule. And we believe that our exposure to any initiative on price reduction in the United States is as small as anybody can have***. We went through this period in Europe with all the austerity measures through 2010, 2011, 2012; we saw the price being pushed down by governments that want to see that as a source to balance their budget. This is very legitimate.
>
>                         *   *   *
>
> ***And what we are seeing is something which is simply called brand loyalty.*** MS patients have a long life expectancy. And the quality of life is extremely important to them because they try to live normal lives like everybody else, have career, have children and raise them. That is extremely important to MS patients. ***And patients have been simply pushing back. They don't want a generic because they are not 100% sure that it would treat them as well as the original.***
>
> ***And by the way, why did we only convert 75%? Because 25% of MS patients who are on 20-milligram don't even want to make the change from 20 to 40.*** They said, I want Teva Copaxone 20-milligram, once-a-day injection. And that's what I want. Don't try to change. I don't want to take the risk that it will have an impact on the progression of the disease, of the quality of my life. ***And these people, who are the potential for the generic introduction, are pushing back the hardest. They simply want to stay on the therapy that they have. And that explains why the penetration of Glatopa is only 20% and flat for the past four months. And probably indicates that any attempt to reduce the price is not going to change it. So the manufacturers understand that what they do today in terms of price will probably also help them maximize their sales and revenues and profits.***

76.     The statements by Defendants Teva and Desheh in ¶ 75 above were false and/or

misleading when made because Defendants failed to disclose the following material, adverse

facts:

a)      Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)      Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take the less expensive generic version of the drug; and

c)      As a result, market demand for Copaxone and the drug's ability to compete with the available generic products were materially overstated during the Class Period.

77.     On February 11, 2016, Teva filed its Annual Report for the year ended December 31, 2015 on Form 20-F with the SEC (the "2015 20-F").  The 2015 20-F was signed by Desheh and listed Copaxone revenues as ***$4,023,000,000*** for the "Year Ended December 31, 2015[.]"  As well, in regard to Copaxone, the Annual Report stated in part:

> ***The key elements of our strategy consist of the following: . . . Maintaining Copaxone® and other key specialty products.***  We have enhanced our multiple sclerosis ("MS") franchise through the introduction of our three-times-a-week Copaxone® 40 mg/mL product in the United States, and will launch Copaxone® 40 mg/mL in Europe and other countries in 2015.  For many of our other specialty products, we are expanding into new markets, improving the products and taking further steps to protect the franchise while creating value for patients and payors.
>
>                                * * *
>
> ***Copaxone® revenues in the United States in 2015 increased 4% to $3.2 billion, mainly due to higher volumes***, partially offset by net pricing declines. Our U.S. market shares in terms of new and total prescriptions were 26.5% and 30.0%, respectively, according to December 2015 IMS data.
>
> ***Revenues in the United States accounted for 81% of global Copaxone® revenues in 2015***, an increase from 73% of global sales in 2014.

* * *

*Copaxone® accounted for 20% of our revenues in 2015, and a significantly higher percentage contribution to our profits and cash flow from operations during such period.*

78.     The statements by Defendants Teva and Desheh in ¶ 77 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

> a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;
>
> b)     If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and
>
> c)     As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

79.     On March 16, 2016, defendants Desheh and Derkacz attended the Barclays Global Healthcare Conference.  During the conference defendants Desheh and Derkacz stated, in relevant part:

> [Douglas Tsao, Analyst]: Then maybe turning to Copaxone, the conversion to the 40 mg has been a big success, probably much greater than anybody thought, especially in the fact that it seems like it's still taking place. What do you think has helped you really retain such strong share even within the 20 mg category in the phase of competition?
>
> [Derkacz]: . . . I think couple of things, Doug, that you mentioned are important here, one is the success of Copaxone and the conversion continues. In fact, *I know you're all aware of the TRx, the total prescription leadership that Copaxone 40 mg has achieved in the US marketplace, up 24% now, ahead of Tegretol. . . .*

*So if you think about where we were just a couple of years ago, I don't know how many people in the room would have thought that Copaxone 40 mg would have been the first product that physicians go to in 2016. But it's an incredible performance.* I say this because it's very important when we look to demonstrate our ability to launch in a marketplace where we have expertise and relationships.

\* \* \*

[Desheh]: Maybe, one more comment of what we've learned from the launch of Glatopa, what we have learned is that *there is a very, very significant pushback from doctors on the generic product or Copaxone, very strong pushback from the patient and MS patients are among the most knowledgeable patient about their disease and the treatment available to them. . . . And the reason -- there are two main reasons for that the way we understand it, one is the loyalty to the brand and the fact that, hey, I want a real thing and I'm going to live another 30 or 40 or 50 years,* because MS patients live a very long time and the life expectancy of an MS patient is only two to three years less than the average population.

80.     The statements by Defendants Teva, Desheh, and Derkacz in ¶ 79 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)     Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take the less expensive generic version of the drug; and

c)     As a result, market demand for Copaxone and the drug's ability to compete with the available generic products were materially overstated during the Class Period.

81.     On May 9, 2016, Teva issued a press release that it filed with the SEC as a Form

6-K, reporting the Company's financial and operating results for the first quarter of 2016.  In

regard to Copaxone, the press release stated, in relevant part:

> Copaxone® In the first quarter of 2016, Copaxone® (glatiramer acetate
> injection), continued to be the leading multiple sclerosis therapy in the United
> States and worldwide. ***Global sales of Copaxone® amounted to $1.0 billion, an
> increase of 9% compared to the first quarter of 2015. Over 81% of the total U.S.
> Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by
> patient and physician choice of the 40 mg/mL version supported by payor access
> and patient support activities***.
>
> ***Copaxone® revenues in the United States in the first quarter of 2016 were $821
> million***, an increase of 12% compared to the first quarter of 2015. The increase
> was mainly due to higher net pricing, including a price increase of 7.9% in
> January 2016 on Copaxone® 20 mg/mL and 40 mg/mL. Our U.S. market shares
> in terms of new and total prescriptions were 28.1% and 29.8%, respectively,
> according to March 2016 IMS data.
>
> ***Revenues in the United States accounted for 82% of global Copaxone®
> revenues in the first quarter of 2016***, compared to 79% in the first quarter of
> 2015.
>
> ***Copaxone® accounted for approximately 21% of our revenues in the first
> quarter of 2016, and a significantly higher percentage contribution to our
> profits and cash flow from operations during such period***.

82.     Following its press release, on May 9, 2016, Teva also filed a Quarterly Report

for the first quarter of 2016 with the SEC on Form 6-K.  The Quarterly Report was signed by

Desheh and listed the revenues for Copaxone as ***$1,006,000,000*** for the "Three Months Ended

March 31, 2016[.]"

83.     Later that day, Teva hosted an earnings conference call to discuss the Company's

financial results for the first quarter of 2016.  In regard to Copaxone, during the call Defendants

stated, in relevant part:

> [Vigodman]:   ***Copaxone 40mg continued to gain market share, leading the MS
> market with 24.5% TRx [total prescriptions] share at the end of March versus***

*20.3% at the end of March 2015, and 82% share of the overall Copaxone family TRx*

\* \* \*

[Desheh]:     *Copaxone sales were 21% of total,* 1% higher than in full-year 2015. The specialty business without Copaxone was 24% of sales, an improvement, compared to the 2015 average, of 2%. . . . *Copaxone contributed 44% of total profit,* compared to 42% for the whole year of 2015*. Speaking about Copaxone -- when we look at results quarter over quarter, total scripts were the same level as last year, with an increased proportion of 40-milligram, which contributes to our profit, where the small increase in units sold as well as the positive price effect leading to 9% sale growth mainly in the United States market.*

\* \* \*

[Koremans]:    First, the *Copaxone is really doing well*. . . . [W]e see a lot of the impact also from the net price increase of 7.9% that we did for both strengths in the beginning of the year. *But it's actually really a result of a fantastic underlying demand. The product is keeping well. It's the number one product in new patients now*, *and Copaxone is actually really a very good alternative and patients have access to it, right? So in no way has the price been a limitation in that sense, and I think that's the key going forward is you'll always have to be able to demonstrate value to stakeholders, to patients, to payers, and overall for your products in whatever we offer*.

It's really important to be able to share the value of what you're doing. *And it's not just about the price, but it's really an incredibly important thing to just talk about the value that you are offering*.

*And clearly, for Copaxone*, we're having the right mix. The product is much appreciated, unparalleled in its track record of both efficacy and safety, *and available to just about 96% of lives in the U.S. So pricing there I see extremely good*.

84.    The statements by Defendants Teva, Desheh, Vigodman, and Koremans in ¶¶ 81-83 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

34

    b)     If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

    c)     As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

85.    On June 9, 2016, defendant Derkacz attended the Jefferies Healthcare Conference.  During the conference, defendant Derkacz stated, in relevant part:

> [Dave Steinberg, Analyst]:  We'll start with Copaxone, then we'll move down the list to some of their near-term opportunities and earlier-term opportunities. . . . So we now have a generic on the market, Glatopa. First, do you think you can switch even more to the three times weekly with Glatopa on the market? And Glatopa has been on the market for a while. And really it hasn't done very well. Maybe you can discuss why. And will this poor performance continue?
>
> [Derkacz]: . . . So I think it's important to start with kind of where we are to date with Copaxone 40 milligram.  **Right now, we are at an 82% share for 40 milligram within the branded business.  So 82% for 40.  And the balance for 20 milligram.**
>
> **So if we look at the category, Copaxone 40 milligram is at about 24%, which puts it at the top, actually the leading TRx share in the MS category. And if you consider Glatopa, Glatopa has about a 6.5% share of the total Copaxone market, or about a 1%-- just a little bit over 1% of the MS category. . . .**
>
> **So I think this gives us an incredible amount of confidence that we've been able to increase and sustain that trajectory over a long period of time in the US. It really suggests that this business is very durable. . . .**

86.    The statements by Defendants Teva and Derkacz in ¶ 85 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

    a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)     Because Teva's kickback scheme resulted in Copaxone being free to

Medicare patients, those patients were not motivated to switch off of

Copaxone in order to take the less expensive generic version of the drug;

and

c)     As a result, market demand for Copaxone and the drug's ability to

compete with the available generic products were materially overstated

during the Class Period.

87.     On August 4, 2016, Teva issued a press release that it filed with the SEC as a

Form 6-K, reporting the Company's financial and operating results for the second quarter of

2016.  In regard to Copaxone, the press release stated, in relevant part:

> ***Copaxone® (glatiramer acetate injection) continued to be the leading multiple
> sclerosis therapy in the United States and worldwide in the second quarter of
> 2016.  Global sales of Copaxone® were $1.1 billion, an increase of 8%
> compared to the second quarter of 2015.***
>
> ***Copaxone® revenues in the United States in the second quarter of 2016 were
> $955 million***, an increase of 10% compared to the second quarter of 2015.  The
> increase was mainly due to a reduction of sales in the Medicaid channel, resulting
> in both lower rebates in the current quarter and a change in the estimate for
> rebates in prior quarters, which had an overall positive impact.  Sales were also
> impacted by a price increase of 7.9% in January 2016 for both Copaxone® 20
> mg/mL and 40 mg/mL.  Over 82% of the total U.S. Copaxone® prescriptions are
> now filled with the 40 mg/mL version, driven by patient and physician choice of
> the 40 mg/mL version supported by payer access and patient support activities.
> ***Our U.S. market shares in terms of new and total prescriptions were 24.9% and
> 29.1%, respectively, according to June 2016 IMS data***.
>
> ***Revenues in the United States accounted for 84% of global Copaxone®
> revenues in the second quarter of 2016,*** similar to the second quarter of 2015.
>
> \*  \*  \*
>
> ***Copaxone® accounted for approximately 23% of our revenues in the second
> quarter of 2016, and a significantly higher percentage contribution to our
> profits and cash flow from operations during such period***.

88.     Following its press release, on August 4, 2016, Teva also filed a Quarterly Report

for the second quarter of 2016 with the SEC on Form 6-K.  The Quarterly Report was signed by

Desheh and listed the revenues for Copaxone as *$1,141,000,000* for the "Three Months Ended

June 30, 2016" and *$2,147,000,000* for the "Six Months Ended June 30, 2016[.]"

89.     Later that day, Teva hosted an earnings conference call to discuss the Company's

financial results for the second quarter of 2016.  In regard to Copaxone, during the call Derkacz

stated, in relevant part:

> So on the Copaxone share, I think *we're very, very pleased with the fact that
> 40mg is about 83% the U.S. marke*t.  Of the number one product in the MS
> category now, of course, is *40mg at a 24.1% share. . . . And I think this just
> speaks to the support by payers, by patients, by physicians around the long-
> proven track record of safety and efficacy of the product and a tribute to the
> team's great work here*.

90.     On November 15, 2016, Teva issued a press release that it filed with the SEC as a

Form 6-K, reporting the Company's financial and operating results for the third quarter of 2016.

In regard to Copaxone, the press release stated, in relevant part:

> Copaxone® (glatiramer acetate injection) continued to be the leading multiple
> sclerosis therapy in the United States and worldwide in the third quarter of 2016.
> *Global sales of Copaxone® were $1.1 billion,* a decrease of 2% compared to the
> third quarter of 2015.
>
> *Copaxone® revenues in the United States in the third quarter of 2016 were
> $874 million*, flat compared to the third quarter of 2015, mainly due to a price
> increase of 7.9% in January 2016, which was offset by a volume decrease for
> Copaxone® 20 mg/mL. Over 83% of the total U.S. Copaxone® prescriptions are
> now filled with the 40 mg/mL version, driven by patient and physician choice of
> the 40 mg/mL version supported by payer access and patient support activities.
> *Our U.S. market shares in terms of new and total prescriptions were 27.0% and
> 29.2%, respectively, according to September 2016 IMS data*.
>
> *Revenues in the United States accounted for 82% of global Copaxone®
> revenues in the third quarter of 2016, compared to 81% in the third quarter of
> 2015*.

* * *

> *Copaxone® accounted for approximately 19% of our revenues in the third quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period*.

91.     Following its press release, on November 15, 2016, Teva also filed a Quarterly Report for the third quarter of 2016 with the SEC on Form 6-K.  The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as *$1,061,000,000* for the "Three Months Ended September 30, 2016" and *$3,208,000,000* for the "Nine Months Ended September 30, 2016[.]"

92.     The statements by Defendants Teva, Desheh, and Derkacz in ¶¶ 87-91 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)      Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)      If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)      As a result, Teva's sales and revenue for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

93.     On February 13, 2017, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the fourth quarter of 2016.  On the call, defendant Koremans stated, in relevant part:

> *So what we have had recent insights coming from patients and physicians, research and payer research suggests very clearly that when forced to use a generic of Copaxone, about 70% of patients and doctors would opt to an oral therapy, rather than to a generic.*

*We believe and as you well know, Copaxone is the number one in new patients,* not only in the US. But also in some of the key European markets.

94.     The statements by Defendants Teva and Derkacz in ¶ 93 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)     Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take the less expensive generic version of the drug; and

c)     As a result, market demand for Copaxone and the drug's ability to compete with the available generic products were materially overstated during the Class Period.

95.     On February 15, 2017, Teva filed its Annual Report for the year ended December 31, 2016 on Form 20-F with the SEC (the "2016 20-F"). The 2016 20-F was signed by Desheh and reported Copaxone revenue as *$4,223,000,000* for the "Year Ended December 31, 2016[.]" As well, in regard to Copaxone, the Annual Report stated in part:

*The key elements of our strategy are: . . . Maintaining Copaxone® and other key specialty products*. We enhanced our MS franchise through the introduction of our three-times-a-week Copaxone® 40 mg/mL product in the United States in 2014 and in additional countries since 2015.

\* \* \*

*Global sales of Copaxone® were $4.2 billion*, an increase of 5% compared to 2015.

*Copaxone® revenues in the United States in 2016 increased 7% to $3.5 billion*, mainly due to higher net pricing, resulting from a change in patient mix which increased our selling price and a corresponding change in certain prior period rebate accrual estimates, as well as a price increase of 7.9% in January 2016, partially offset by lower volumes of Copaxone® 20mg/mL. Over 84% of total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version, supported by payer access and patient support activities. *Our U.S. market shares in terms of new and total prescriptions were 27.9% and 29.3%, respectively, according to December 2016 IMS data*.

*Revenues in the United States were 82% of global Copaxone® revenues in 2016, compared to 81% in 2015.*

\* \* \*

*Copaxone® accounted for approximately 19% of our revenues in 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during this period*.

96.    The statements by Defendants Teva and Desheh in ¶ 95 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

        a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

        b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62);

        c)    As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

97.    On March 8, 2017, defendant Derkacz attended the Cowen Health Care Conference.  During the conference, defendant Derkacz stated, in relevant part:

40

I think, starting with COPAXONE, I'd like to kind of start with the market context and where we are. And I don't know how many are aware of this. *But over the last 12 months the 40 milligram now enjoys a full 5 share point differential between the next closest competitors. That's a share gain of over 2%, which I think is really a sign and a message that our team continues to focus on what we have control over. And it also is a tribute to the product and the way the market has really embraced the product for switches and for new patients.*

*So if we look at the 20 milligram, we actually still have just over 60% of that 20 milligram business. I think that's a tribute to, again, the team's focus on the dispense as written campaign, to also, of course, manage our contracting with our payers very proactively.* And I think we'll take a lot of those insights to the 40 milligram scenario if or when it occurs.

98.     The statements by Defendants Teva and Derkacz in ¶ 97 above were false and/or

misleading when made because Defendants failed to disclose the following material, adverse

facts:

a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and

TAF as unlawful conduits to fully cover the co-payments incurred by

Medicare patients taking Copaxone;

b)     Because Teva's kickback scheme resulted in Copaxone being free to

Medicare patients, those patients were not motivated to switch off of

Copaxone in order to take a competitor version of the drug; and

c)     As a result, market demand for Copaxone and the drug's ability to

compete with alternative drug products were materially overstated during

the Class Period.

99.     On May 11, 2017, Teva issued a press release that it filed with the SEC as a Form

6-K, reporting the Company's financial and operating results for the first quarter of 2017.  In

regard to Copaxone, the press release stated, in relevant part:

> ***Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading
> multiple sclerosis therapy in the U.S. and globally, were $970 million in the first
> quarter of 2017***, a decrease of 4% compared to the first quarter of 2016.
> ***Copaxone® revenues in the United States, were $782 million***, a decrease of 5%
> compared to the first quarter of 2016, mainly due to lower volumes of
> Copaxone® 20 mg/mL, partially offset by a price increase of 7.9% for both
> Copaxone® products in January 2017. At the end of the first quarter of 2017,
> according to March 2017 IMS data, our U.S. market shares for the Copaxone®
> products in terms of new and total prescriptions were 25.4% and 28.4%,
> respectively. Copaxone® 40 mg/mL accounted for over 85% of total Copaxone®
> prescriptions in the U.S.

100.    Following its press release, on May 11, 2017, Teva also filed a Quarterly Report

for the first quarter of 2017 with the SEC on Form 6-K.  The Quarterly Report was signed by

Desheh and listed the revenues for Copaxone as ***$970,000,000*** for the "Three Months Ended

March 31, 2017[.]"

101.    On August 3, 2017, Teva issued a press release that it filed with the SEC as a

Form 6-K, reporting the Company's financial and operating results for the second quarter of

2017.  In regard to Copaxone, the press release stated, in relevant part:

> ***Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading
> multiple sclerosis therapy in the U.S. and globally, were $1.0 billion, a decrease
> of 10% compared to the second quarter of 2016***.
>
> ***Copaxone® revenues in the United States, were $843 million***, a decrease of 12%
> compared to the second quarter of 2016, mainly due to lower volumes of
> Copaxone® 20 mg/mL as well as negative net pricing effects despite a price
> increase of 7.9% for both Copaxone® products in January 2017. At the end of the
> second quarter of 2017, according to June 2017 IMS data, our U.S. market shares
> for the Copaxone® products in terms of new and total prescriptions were 26.5%
> and 28.8%, respectively. Copaxone® 40 mg/mL accounted for over 85% of total
> Copaxone® prescriptions in the U.S.

102.    Following its press release, on August 3, 2017, Teva also filed a Quarterly Report

for the second quarter of 2017 with the SEC on Form 6-K.  The Quarterly Report was signed by

Desheh and listed the revenues for Copaxone as ***$1,230,000,000*** for the "Three Months Ended

March 31, 2017" and ***$1,993,000,000*** for the "Six Months Ended June 30, 2017[.]"

42

103.    The statements by Defendants Teva and Desheh in ¶¶ 99-102 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

    a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

    b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

    c)    As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

**D.    Defendants Make Materially False and Misleading Statements Regarding Teva's Shared Solutions Program**

104.    During the Class Period, Defendants touted the success of its Shared Solutions Program in keeping patients on Copaxone, while failing to disclose that the reason patients were staying on Copaxone was that the Shared Solutions Program was designed to guarantee payment of Medicare patients' co-pays, reducing their costs to $0.00.

105.    On October 29, 2015, Teva hosted a conference call to discuss the financial results of the third quarter of 2015.  During the conference call, defendant Koremans touted the Shared Solutions Program, stating, in relevant part:

*So when we talk about Copaxone, what we're seeing is really an incredible durability.  Basically patients, doctors continue to stick with the products*.  They feel confident.  They trust this product. And it is very important. And they have been on it for many years, right?

*And it's a combination of our patient solutions, the way we interact with our patients*, the trust they have in the brand itself.  ***And also doctors and really also***

*payers supporting it in full*. And the dynamics at the moment are better than we could have predicted two years ago. And we're seeing that going forward. We expect like -- this is not going to change dramatically.  So Copaxone really is an incredible product in that respect.  *And the way we bring it to market with the shared solutions, our sales force, the medical force*. And the relationship we have with the payers is working quite nicely. And we don't see that going forward, going to be changed dramatically at all. . . .

*The shared solutions, they really helping to two things and do -- first of all, make sure that patients have financial access, work with patients*.  *And help them to address their questions with their individual plans really well. And that really works*. Then second, they are there with nurses to help and coach. What you have to remember I think for MS, those patients they start on therapy, they don't feel a benefit immediately.

106.    On March 16, 2016, defendants Desheh and Derkacz attended the Barclays

Global Healthcare Conference.  During the conference, defendant Derkacz credited the Shared

Solutions Program in keeping patients on Copaxone, stating, in relevant part:

[Derkacz]: *And keep in mind, the shared solutions, service and the loyalty and trust and confidence that these patients have had for many years. They like the product. They don't want to be upset what is working well for them and they also don't want to lose that relationship and that support that they've come to appreciate and trust and recognize over the last many years.*

107.    On June 3, 2016, defendant Vigodman attended the Sanford C Bernstein Strategic

Decisions Conference.  During the conference, defendant Vigodman stated, in relevant part:

[Ronny Gal, Analyst]:  [Y]ou seem to make your assumptions about the impact of generic Copaxone if one enters the market as fairly low. Well it's a matter of perspective. But compared to losing the US sales, you are basically assuming that you will still retain not a small chunk of US profits throughout the product, even after generics enter. . . . Why should you be able to retain a significant profit stream from Copaxone from generics entering the United States?

[Vigodman]: . . . Look at the performance of 2014 and performance of top-line progression of (inaudible) today. *Look at the contribution of our shared services solution center to the brand and to the basically loyalty of our consumers and patients. Look at the effect, at the lack of human data pertaining to the generic versions of Copaxone. And when you look at all those things in the aggregate, I think it explains why erosion might be slower than what is expected.* . . .

108.     On June 9, 2016, defendant Derkacz attended the Jefferies Healthcare

Conference.  During the conference, defendant Derkacz stated, in relevant part:

> [Derkacz]:  Well why Glatopa? Why did it not do that well? Well I think you have to consider the category, the product. And the company.
>
> So if you think about category, this is a very heterogeneous disease. What may work for one patient may not work for the next. *And so when you have a patient that's doing well on therapy in MS, the likelihood and the resistance to switch -- the resistance to switch is very high. The likelihood to switch is very low. And I think payers recognize that if you push too hard on patients, there is that potential that they could move off to another more expensive branded therapy. So that,* coupled with the fact that we've had a long, proven track record of safety and efficacy, *coupled with the fact that we have an incredible relationship with patients and physicians primarily through our Shared Solutions service that we provide.*
>
> [Dave Steinberg, Analyst]: . . . Could you give us some color on how Shared Solutions works.  And what impact they've had on this switch?
>
> [Derkacz]: . . . So *Shared Solutions has been in place now for many years*, actually dating back to the early 2000s, just very soon after we launched Copaxone. *And it has evolved to the point where we actually provide a very high level of service to patients with MS, in particular those that are on Copaxone*. In fact, what many folks don't realize is that we actually have a group of clinical nurse educators that can actually visit the patient's home and help train them on how to take Copaxone, how to inject Copaxone, how to manage their product.
>
> *So there is this intimacy. There's this relationship that's long-standing. And we've been recognized as having a best-in-class service in MS, as rated by our most important customers, this being the patient for many years now. And so we think that not only is this very important for Copaxone 40 milligram moving forward.*

109.     On November 15, 2016, Teva hosted an earnings conference call to discuss the

Company's financial results for the third quarter of 2016.  In regard to Copaxone, during the call

Koremans stated, in relevant part:

> *What we have seen though in the last months is that Copaxone is actually being holding (sic) much better. And the performance shows really good, and I am extremely proud of all the teams that do this. Patient support programs will play an important role*. And that's what we've seen people move into with less hope and the U.S often came back. *Actually the biggest source of new to brands that*

*comes from the focus changes in the U.S. when they switch, because of the value they place on our support programs, amongst which are the sales solutions*. So, other than that, there is very little new information that we have product doing well and we are optimistic about the future in that respect.

110.    On March 15, 2017, defendants Desheh and Derkacz attended the Barclays

Global Healthcare Conference.  During the conference, defendant Derkacz stated, in relevant

part:

> [Doug Tsao, Analyst]: And Mike, you said you have learned a lot about the experience with the 20 milligram. I guess a follow-up for me would be what do you see as different in terms of facing competition in the 40 milligram assuming those competitors also had approval for their 20 milligram?
>
> [Derkacz]: *I think the key here is that we need to take those learnings that we had from 20 milligram. I can't disclose all of it. But certainly the contracting strategy that we deploy, the approach that we take with our customers ensuring that they come first, that we make it easy for physicians and we make it easy for patients to stay on our therapy*.

Barclays Global Healthcare Conference, Bloomberg Tr. at 4-5 (Mar. 15, 2017).

111.    On June 7, 2017, Dipankar Bhattacharjee, Teva's President and CEO of the

Global Medicines Group, Michael Hayden, Teva's Chief Scientific Officer, and Yitzhak

Peterburg, Teva's Interim President and CEO, attended the Jefferies Healthcare Conference.  On

the call, Peterburg and Hayden stated, in relevant part:

> [Peterburg]: *Coming back to what you said on Shared Solution, I think Shared Solution was a wonderful way of supporting the patient*.  Because at the end, it's all about patients. *And this is why we were able to substitute so significantly and so quickly.* And I think they have a very important role even going forward.
>
> Michael, could -- (for that)?
>
> [Hayden]: *Yes, I would just say Shared Solutions is critical and we're actually continuing to invest in these kind of patient services.* Of course, it's a model for some of our branded drugs in development as well and being launched right now.

112.     The statements by Teva, Desheh, Vigodman, Koremans, Hayden, Peterburg, and
Derkacz in ¶¶ 105-111 above were false and/or misleading when made because Defendants
failed to disclose the following adverse facts:

    a)    Teva used the Shared Solutions Program to carry out its illegal kickback
scheme whereby the Company fully covered the co-payments incurred by
Medicare patients taking Copaxone;

    b)    The reason that the Shared Solutions Program was successful in
maintaining patient loyalty and retention was because Teva's kickback
scheme made Copaxone free to Medicare patients, therefore patients were
motivated to continue taking the drug; and

    c)    As a result, market demand for Copaxone and patient retention on the drug
were materially overstated during the Class Period.

**E.     Defendants Make Materially False and Misleading Statements Regarding
Teva's Compliance with Federal Laws**

113.     During the Class Period, Defendants warned of the risks of Teva's failure to
comply with federal laws and regulations, while failing to disclose that the Company was already
engaged in a kickback scheme in violation of the False Claims Act and the Anti-Kickback
Statute.

114.     For example, on February 11, 2016, Teva filed its 2015 20-F with the SEC, which
was signed by Desheh.  In regard to the Company's legal compliance, the Annual Report stated
in part:

> ***Governmental investigations into sales and marketing practices, particularly for
> our specialty pharmaceutical products, may result in substantial penalties. . . .***
> We operate around the world in complex legal and regulatory environments, and
> ***any failure to comply with applicable laws, rules and regulations may result in
> civil and/or criminal legal proceedings***. As those rules and regulations change

*or as interpretations of those rules and regulations evolve, our prior conduct or that of companies we have acquired may be called into question.* In the United States, we are currently responding to federal investigations into our marketing practices with regard to several of our specialty pharmaceutical products, which could result in civil litigation brought on behalf of the federal government. . . .

*Any failure to comply with the complex reporting and payment obligations under the Medicare and Medicaid programs may result in further litigation or sanctions, in addition to those that we have announced in previous years. The U.S. laws and regulations regarding Medicare and/or Medicaid reimbursement and rebates and other governmental programs are complex.* Some of the applicable laws may impose liability even in the absence of specific intent to defraud. *The subjective decisions and complex methodologies used in making calculations under these programs are subject to review and challenge, and it is possible that such reviews could result in material changes.* A number of state attorneys general and others have filed lawsuits alleging that we and other pharmaceutical companies reported inflated average wholesale prices, leading to excessive payments by Medicare and/or Medicaid for prescription drugs. Such allegations could, if proven or settled, result in additional monetary penalties (beyond the lawsuits we have already settled) and possible exclusion from Medicare, Medicaid and other programs.

115.   On February 15, 2017, Teva filed its 2016 20-F with the SEC that was signed by Desheh.  The Annual Report contained substantially the same statement as the 2015 20-F in ¶ 114 above.

116.   The statements by Defendants Teva and Desheh in ¶¶ 114-115 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)   Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments for Medicare patients taking Copaxone in violation of the False Claims Act and the Anti-Kickback Statute; and

b)   Teva's illegal kickback scheme increased the likelihood that the Company would be subject to regulatory scrutiny, enforcement, and/or penalties.

**F.    Defendants Partially Disclose Their Fraud By Shaking Up Company Leadership And Belatedly Disclosing That The Department Of Justice Subpoenaed Teva About Donations To Charitable Foundations**

117.    At the beginning of 2017, Teva announced that the Company's CEO since February 2014, Erez Vigodman, was leaving the Company.  Dr. Yitzhak Peterburg, who had served as Chairman of the Board of Directors since January 2015, was appointed interim president and chief executive officer.

118.    Teva was subpoenaed on March 21, 2017 by the United States Attorneys' office in Boston, Massachusetts seeking information regarding Teva's donations to charitable foundations.  However, when the Company released its quarterly earnings results on May 11, 2017 for the first quarter of 2017, Defendants did not mention the subpoena, but the Company did report 4% decline in year-over-year Copaxone sales.

119.    On August 3, 2017, Teva announced that "[o]n March 21, 2017, Teva received a subpoena from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs.  Teva is in the process of responding to the subpoena."  Teva Pharmaceutical Industries Ltd., Quarterly Report (Form 6-K) 34 (Aug. 5, 2017).  This news amounted to a partial disclosure and leakage of the facts arising from the underlying fraud.  Beginning on that day, the price of Teva's shares dropped $12.51, or 41%, over the course of three trading days, from a close of $30.89 on August 3, 2017 to a close of $18.38 on August 7, 2017.

120.    Despite this subpoena, which should have put Teva on notice to dismantle its kickback scheme and to begin abiding by the law, based upon documents reviewed by the U.S. House of Representatives' Committee on Oversight and Reform, Teva's kickback scheme continued through at least 2018.  *See* Ex. B at 17.  Defendants also did not disclose Teva's

49

kickback scheme at that time and continued to make the same or similar misleading statements regarding Copaxone's financial results and market demand for the drug, Teva's Shared Solutions Program, and the Company's compliance with federal laws.

121.    On September 11, 2017, Teva announced that Kåre Schultz had been appointed CEO of Teva.

122.    On November 2, 2017, Teva, now under the new leadership of Schultz, shook the market when it cut its sales and earnings forecast for the year, which cuts were due in part to claimed weakening sales of Copaxone.  Teva issued a press release that it filed with the SEC as a Form 6-K, revising the "2017 outlook revised to non-GAAP EPS of $3.77 - $3.87" down from a forecast of $4.30 to $4.50.  Teva also reported lower revenues from Copaxone, stating:

> Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading multiple sclerosis therapy in the U.S. and globally, were $1.0 billion, a decrease of 7% compared to the third quarter of 2016.
>
> Copaxone® revenues in the United States, were $802 million, a decrease of 8% compared to the third quarter of 2016, due to lower volumes of Copaxone® 20 mg/mL, negative net pricing effects, mainly as a result of an increase in managed care rebate accruals for inventory in the channel following the FDA approvals for additional generic competition, partially offset by a price increase of 7.9% in January 2017 for both the 20 mg/mL and 40 mg/mL versions.

123.    Later that day, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the third quarter of 2017.  On the call, defendant McClellan, in relevant part:

> So for COPAXONE, revenues were almost $1 billion in Q3 2017, which is a decrease of 7% compared to the Third Quarter of 2016.  The revenues were down 7%, mainly due to lower sales in the U.S., impacted by a $55 million increase in managed care rebate accruals for the inventory in the channel at September 30, following the FDA approval of a generic competition to COPAXONE 40-milligram. And in addition, we had lower volumes of COPAXONE 20-milligram compared to 2016.

124.    On this news, including that Teva would miss its 2017 forecasts and that

Copaxone revenues had declined, Teva securities price fell approximately 20%, from a closing

securities price of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017.  This

news amounted to a partial disclosure of the fraud and leakage of the facts arising from the

underlying fraud.

### G. Defendants Continued To Make False And Misleading Statements Regarding Copaxone's Financial Results and Market Demand

125.    After Teva disclosed the shake up of leadership and that it received a subpoena

from the U.S. Attorney's office, Defendants continued to make false and/or misleading

statements regarding Copaxone's financial results and market demand for the drug.

126.    On February 12, 2018, Teva filed its Annual Report for the year ended December

31, 2017 on Form 10-K with the SEC (the "2017 10-K").  The 2017 20-F was signed by Schultz

and listed Copaxone revenue as ***$3,801,000,000*** for the "Year Ended December 31, 2017[.]"  In

regard to Copaxone, the Annual Report stated in part:

> ***COPAXONE revenues in the United States in 2017 decreased by 12% to $3.0 billion***, mainly due to generic competition which resulted in higher rebates and lower volumes, partially offset by a price increase of 7.9% in January 2017 for both the 20 mg/mL and 40 mg/mL versions.
>
> ***Revenues in the United States were 80% of global COPAXONE revenues in 2017, compared to 82% in 2016***.
>
> * * *
>
> ***COPAXONE accounted for approximately 17% of our revenues in 2017 and a significantly higher percentage of our profits and cash flow from operations during this period***.

127.    On that day, Teva also issued a press release that it filed with the SEC as a Form

8-K, reporting the Company's financial results for the full year and fourth quarter 2017.  The

press release made substantially the same statements as the 2017 20-F in ¶ 126 above.

128.    On May 3, 2018, Teva filed its Quarterly Report for the first quarter of 2018 on Form 10-Q with the SEC (the "Q1 2018 10-Q").  The Q1 2018 10-Q was signed by McClellan and listed the revenues for Copaxone in Teva's North America segment as *$645,000,000* for the "Three Months Ended March 31, 2018[.]"  As well, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE® revenues in our North America segment in the first quarter of 2018 decreased by 40% to $476 million*, compared to the first quarter of 2017, mainly due to generic competition in the United States. *COPAXONE revenues in the United States were $462 million in the first quarter of 2018*.

> *Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in the first quarter of 2018*, compared to 82% in the first quarter of 2017.

> *COPAXONE global sales accounted for approximately 13% of our global revenues in the first quarter of 2018 and a significantly higher percentage of our profits and cash flow from operations during this period*.

129.    Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the first quarter of 2018.  The press release made substantially the same statements as the Quarterly Report in ¶ 128 above.

130.    The statements by Defendants Teva and McClellan in ¶¶ 126-129 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

> a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

> b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)      As a result, Teva's sales and revenue for Copaxone and the market

demand for the drug were artificially inflated during the Class Period.

131.    Also on May 3, 2018, Teva hosted an earnings call with investors and analysts to

discuss the Company's financial and operating results for the first quarter of 2018.  On the call,

defendant Schultz and O'Grady stated, in relevant part:

> [Schultz]:  ***COPAXONE is maintaining its share very nicely in the U.S. I'll give you some details on that. But it's really very steady at around 85% of the 40-milligram marketplace.*** And also in Europe, it's looking good.
>
> \* \* \*
>
> [Schultz]:  Another important element in our sales is, of course, COPAXONE. That's also nothing new.  It's been also reviewed and discussed by all of you for a long time. And what you see here is sort of the raw data on how many scripts, what's the TRx volume.  And as you can see here, it's kind of a boring graph because ***since the beginning of the year, it's completely flat around 10,000.  And that basically means that there hasn't been any real change to our market share and to the mix between our market share and that of competition. We have roughly 85% of the volume in 40-milligram. And we maintain a very high level of access*** . . . . . ***But as you can also see, we are basically hanging on to the volume share quite nicely.***
>
> \* \* \*
>
> [Liav Abraham, Analyst]: First question is on COPAXONE. Just given your experience with one generic 40-milligram on the market and the response of those customers and patients and payers, are there any changes to how you think this market will evolve with 2 generics on the market? Any change to your assumptions there regarding how the revenues will progress as a second generic enters the market? . . .
>
> [O'Grady]: Yes. Just a few things to add, Kåre. So I've been in this market a long time. And I've seen this market evolve. And I will tell you that I haven't seen any surprises as the way this market is shaped since 2013, 2014, as we've seen generic competition on 20-milligram as well as 40-milligram. So as Kåre mentioned, as we see another 40-milligram generic enter the market, I think there will be some downward pressure on price, probably a little on volume as well. ***But today, we maintain about 85% of the overall COPAXONE market. And it is following our expectations and our plans for the year***.

132.     The statements by Defendants Teva, Schultz, and O'Grady in ¶ 131 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

    a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

    b)    Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of Copaxone; and

    c)    As a result, Copaxone's market share and the drug's ability to compete with alternative drug products were materially overstated during the Class Period.

133.     On August 2, 2018, Teva filed its Quarterly Report for the second quarter of 2018 on Form 10-Q with the SEC (the "Q2 2018 10-Q").  The Q2 2018 10-Q was signed by McClellan and listed revenues for Copaxone in the North America segment as *$464,000,000* for the "Three Months Ended June 30, 2018" and *$940,000,000* for the "Six Months Ended June 30, 2018."  Also, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE revenues in our North America segment in the second quarter of 2018 decreased by 46% to $464 million*, compared to the second quarter of 2017, mainly due to generic competition in the United States. *COPAXONE revenues in the United States were $448 million in the second quarter of 2018*.

> *Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in the second quarter of 2018*, compared to 84% in the second quarter of 2017.

> *COPAXONE global sales accounted for approximately 13% of our global revenues in the second quarter of 2018 and a significantly higher percentage of our profits and cash flow from operations during this period*.

134.    Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the second quarter of 2018.  The press release made substantially the same statements as the Quarterly Report in ¶ 133 above.

135.    The statements by Defendants Teva and McClellan in ¶¶ 133-134 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

      a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

      b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

      c)    As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

136.    On September 14, 2018, defendant McClellan attended the Morgan Stanley Healthcare Conference.  During the conference, defendant McClellan stated, in relevant part:

> We are managing the COPAXONE situation. ***We've had some good ability to keep a very good share of that business in the last couple of months***.
>
> * * *
>
> So there's a couple of different dynamics going on. Of course, we're starting to see more competition to COPAXONE.  ***We did a good job in the first half versus the expectations and keeping market share at some good pricing levels.***  We do see that starting to accelerate in the second half.  We do see that starting to accelerate in the second half. The Sandoz-Momenta Glatopa product is now starting to pick up some market share. ***But so far so good***.

137.     The statements by Defendants Teva and McClellan in ¶¶ 136 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)     Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of Copaxone; and

c)     As a result, Copaxone's market share and the drug's ability to compete with alternative drug products were materially overstated during the Class Period.

138.     On November 1, 2018, Teva filed its Quarterly Report for the third quarter of 2018 on Form 10-Q with the SEC (the "Q3 2018 10-Q").  The Q3 2018 10-Q was signed by McClellan and listed revenues for Copaxone in the North America segment as *$463,000,000* for the "Three Months Ended September 30, 2018" and *$1,403,000,000* for the "Nine Months Ended September 30, 2018[.]"  Also, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE revenues in our North America segment in the third quarter of 2018 decreased by 43% to $463 million,* compared to the third quarter of 2017, mainly due to generic competition in the United States.
> *COPAXONE revenues in the United States were $446 million in the third quarter of 2018*.
>
> *Revenues of COPAXONE in our North America segment were 77% of global COPAXONE revenues in the third quarter of 2018,* compared to 83% in the third quarter of 2017.

139.    Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the third quarter of 2018.  The press release made substantially the same statements as the Quarterly Report in ¶ 138 above.

140.    The statements by Defendants Teva and McClellan in ¶¶ 138-139 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)    As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

141.    Also on November 1, 2018, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the third quarter of 2018. On the call, Defendant O'Grady stated, in relevant part:

> On the last slide for North America, which is Slide 13 for those of you who'll be following along, *I will highlight COPAXONE and say that we continue to compete in the MS market and are taking the appropriate measures to preserve market share and maximize profit*.  Formulary access of 40 milligram COPAXONE remains stable around 90% nationally.  *And COPAXONE continues to be a market leader with Q3 TRX exit share of 22.7% of the MS market*. Of the 40 milligram glatiramer segment, COPAXONE 40 milligram total market share was approximately 77% versus generic 40 milligram at approximately 23%.

142.     The statements by Defendants Teva and O'Grady in ¶ 141 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

    a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

    b)     Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of Copaxone; and

    c)     As a result, Copaxone's market share and the drug's ability to compete with alternative drug products were materially overstated during the Class Period.

143.     On February 13, 2019, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the fourth quarter and full year 2018.  In regard to Copaxone, the press release stated, in relevant part:

> *COPAXONE revenues in our North America segment in the fourth quarter of 2018 decreased by 44% to $356 million, of which $341 million were generated in the United States*, compared to the fourth quarter of 2017, mainly due to generic competition in the United States.

144.     On February 19, 2019, Teva filed its Annual Report for the year ended December 31, 2018 on Form 10-K with the SEC (the "2018 10-K").  The 2018 10-K was signed by Schultz and in listed revenues for Copaxone in Teva's North America segment as ***$1,759,000,000*** for the "Year Ended December 31, 2018[.]"  Also, in regard to Copaxone, the Annual Report stated in part:

*COPAXONE revenues in our North America segment in 2018 decreased by 44% to $1,759 million*, compared to 2017, mainly due to generic competition in the United States.

*COPAXONE revenues in the United States were $1,697 million in 2018.*

*Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in 2018*, compared to 82% in 2017.

*COPAXONE global sales accounted for approximately 13% of our global revenues in 2018 and a significantly higher percentage of our profits and cash flow from operations during this period*.

145.   On May 2, 2019, Teva filed its Quarterly Report for the first quarter of 2019 on Form 10-Q with the SEC (the "Q1 2019 10-Q").  The Q1 2019 10-Q was signed by McClellan and listed revenue for Copaxone from Teva's North America segment as ***$208,000,000*** for the "Three Months Ended March 31, 2019[.]"  Also, in regard to Copaxone, the Quarterly Report stated in part:

*COPAXONE revenues in our North America segment in the first quarter of 2019 decreased by 56% to $208 million*, compared to the first quarter of 2018, mainly due to generic competition in the United States.

*COPAXONE revenues in the United States were $194 million in the first quarter of 2019*.

*Revenues of COPAXONE in our North America segment were 62% of global COPAXONE revenues in the first quarter of 2019*, compared to 74% in the first quarter of 2018.

146.   Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the first quarter of 2019.  The press release made substantially the same statements as the Quarterly Report in ¶ 145 above.

147.   On August 7, 2019, Teva filed its Quarterly Report for the second quarter of 2019 on Form 10-Q with the SEC (the "Q2 2019 10-Q").  The Q2 2019 10-Q was signed by McClellan and listed revenues for Copaxone from Teva's North America segment as

*$274,000,000* for the "Three Months Ended June 30, 2019" and *$482,000,000* for the "Six

Months Ended June 30, 2019[.]"  Also, in regard to Copaxone, the Quarterly Report stated in

part:

> *COPAXONE revenues in our North America segment in the second quarter of 2019 decreased by 41% to $274 million*, compared to the second quarter of 2018, mainly due to generic competition in the United States.
>
> *COPAXONE revenues in the United States were $260 million in the second quarter of 2019*.
>
> *Revenues of COPAXONE in our North America segment were 69% of global COPAXONE revenues in the second quarter of 2019*, compared to 74% in the second quarter of 2018.
>
> *COPAXONE global sales accounted for approximately 9% of our global revenues in the second quarter of 2019 and a significantly higher percentage of our profits and cash flow from operations during this period*.

148.     Also on that day, Teva issued a press release that it filed with the SEC as a Form

8-K, reporting the Company's financial results for the second quarter of 2019.  The press release

made substantially the same statements as the Quarterly Report in ¶ 147 above.

149.     On November 7, 2019, Teva filed its Quarterly Report for the third quarter of

2019 on Form 10-Q with the SEC (the "Q3 2019 10-Q").  The Q3 2019 10-Q was signed by

McClellan and listed revenues for Copaxone in Teva's North America segment as *$271,000,000*

for the "Three Months Ended September 30, 2019" and *$753,000,000* for the "Nine Months

Ended September 30, 2019[.]"  Also, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE revenues in our North America segment in the third quarter of 2019 decreased by 41% to $271 million*, compared to the third quarter of 2018, mainly due to generic competition in the United States.
>
> *COPAXONE revenues in the United States were $257 million in the third quarter of 2019*.

*Revenues of COPAXONE in our North America segment were 68% of global COPAXONE revenues in the third quarter of 2019*, compared to 77% in the third quarter of 2018.

*COPAXONE global sales accounted for approximately 9% of our global revenues in the third quarter of 2019 and a significantly higher percentage of our profits and cash flow from operations during this period*.

150.    Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the third quarter of 2019.  The press release made substantially the same statements as the Quarterly Report in ¶ 149 above.

151.    The statements by Defendants Teva, McClellan, and Schultz in ¶¶ 143-150 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

       a)  Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

       b)  If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

       c)  As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

152.    Also on November 7, 2019, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the third quarter of 2019. On the call, Defendant Schultz stated, in relevant part:

Now if we then think about next year, it's too early for us to give guidance. And then you might ask, why can't you give guidance? *And one of the elements is, of course, your second question, COPAXONE, because you're right, we're seeing a stabilization. Basically, the last 3 quarters of COPAXONE have been very*

*stable. We see a marginal decline in the TRx volume.* We see a very stable development in Europe. And there's a lot of moving parts in this. *And if we take the U.S. first, then you can say the unknown factor of are we going to have 1 more generic competitor in the 40-milligram COPAXONE.*

153.    The statements by Defendants Teva and Schultz in ¶ 152 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)    Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of Copaxone; and

c)    As a result, Copaxone's market share and the drug's ability to compete with alternative drug products were materially overstated during the Class Period.

154.    On February 12, 2020, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the fourth quarter and full year 2019.  In regard to Copaxone, the press release stated, in relevant part:

*COPAXONE revenues in our North America segment in the fourth quarter of 2019 decreased by 26% to $264 million*, compared to the fourth quarter of 2018, mainly due to generic competition in the United States.

155.    On February 21, 2020, Teva filed its Annual Report for the year ended December 31, 2019 on Form 10-K with the SEC (the "2019 10-K").  The 2019 10-K was signed by Schultz and listed revenues for Copaxone in Teva's North America segment as *$1,017,000,000* for the

"Year Ended December 31, 2019[.]"  Also, in regard to Copaxone, the Annual Report stated in

part:

> ***COPAXONE revenues in our North America segment in 2019 decreased by 42% to $1,017 million***, compared to 2018, mainly due to generic competition in the United States.

> ***Revenues of COPAXONE in our North America segment were 67% of global COPAXONE revenues in 2019***, compared to 74% in 2018.

> ***COPAXONE global sales accounted for approximately 9% of our global revenues in 2019 and a significantly higher percentage of our profits and cash flow from operations during this period***.

156.    On May 7, 2020, Teva issued a press release that it filed with the SEC as a Form

8-K, reporting the Company's financial results for the first quarter of 2020.  In regard to

Copaxone, the press release stated, in relevant part:

> ***COPAXONE revenues in our North America segment in the first quarter of 2020 decreased by 5% to $198 million***, compared to the first quarter of 2019, mainly due to generic competition in the United States.

157.    On May 7, 2020, Teva filed its Quarterly Report for the first quarter of 2020 on

Form 10-Q with the SEC (the "Q1 2020 10-Q").  The Q1 2020 10-Q was signed by Kalif and

listed the revenues for Copaxone in Teva's North America segment as ***$198,000,000*** for the

"Three Months Ended March 31, 2020[.]"  Also, in regard to Copaxone, the Quarterly Report

stated, in relevant part, that "***COPAXONE revenues in our North America segment in the first***

***quarter of 2020 decreased by 5% to $198 million***, compared to the first quarter of 2019, mainly

due to generic competition in the United States."

158.    On August 5, 2020, Teva issued a press release that it filed with the SEC as a

Form 8-K, reporting the Company's financial results for the second quarter of 2020.  In regard to

Copaxone, the press release stated, in relevant part:

*COPAXONE revenues in our North America segment in the second quarter of 2020 decreased by 13% to $238 million*, compared to the second quarter of 2019, mainly due to generic competition in the United States.

159.     On August 5, 2020, Teva filed its Quarterly Report for the second quarter of 2020 on Form 10-Q with the SEC (the "Q2 2020 10-Q").  The Q2 2020 10-Q was signed by Kalif and listed revenues for Copaxone in Teva's North America segment as *$238,000,000* for the "Three Months Ended June 30, 2020" and *$435,000,000* for the "Six Months Ended June 30, 2020[.]" Also, in regard to Copaxone, the Quarterly Report stated, in relevant part, that "*COPAXONE revenues in our North America segment in the second quarter of 2020 decreased by 13% to $238 million*, compared to the second quarter of 2019, mainly due to generic competition in the United States."

160.     The statements by Defendants Teva, Schultz, and Kalif in ¶¶ 154-159 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

      a)      Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

      b)      If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62);

      c)      As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

**H.**    **Defendants Continued To Make False And Misleading Statements Regarding Teva's Shared Solutions Program**

161.    After announcing the subpoena from the U.S. Attorney's office, Defendants continued to make materially false and misleading statements touting the success of Teva's Shared Solutions Program in keeping patients on Copaxone.

162.    On March 13, 2018, Defendant McClellan attended the Cowen & Company Health Care Conference.  During the conference, McClellan stated, in relevant part:

> [Unverified Participant, Analyst]: Okay. COPAXONE Shared Solutions, you all know how to kind of manage managed care and patients. Is that being implemented at all with AUSTEDO and Huntington's in TD or that really is just totally separate, you're not wrapping around any special services or?
>
> [McClellan]: No, clearly in these high touch patient segments like HD and TD, we're taking all of the learnings that we had in the years at COPAXONE. It's a slightly different area. So you have to adjust the programs, but clearly that's part of the whole service. ***You need to make sure that you get the patients accustomed to the reimbursement process, get them through the hurdles that they may face on the payer side and also help them in many cases get accustomed to the therapy itself.  So there is a wrap around in that kind of situation.  You're talking about pretty low patient numbers, so you really have to tailor that to the needs of the individual patient.***

163.    The statements by Defendants Teva and McClellan in ¶ 162 above were false and/or misleading when made because Defendants failed to disclose the following adverse facts:

a)      Teva used the Shared Solutions Program to carry out its illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits whereby the Company fully covered the co-payments incurred by Medicare patients taking Copaxone;

b)      The reason that the Shared Solutions Program was successful in maintaining patient loyalty and retention was because Teva's kickback scheme made Copaxone free to Medicare patients, therefore patients were motivated to continue taking the drug; and

c)      As a result, market demand for Copaxone and patient retention on the drug
were materially overstated during the Class Period.

I.      **Defendants Continued To Make False And Misleading Statements Regarding
Teva's Compliance With Federal Laws**

164.    Despite receiving the subpoena from the U.S. Attorney's office investigating
Teva's compliance with the False Claims Act and the Anti-Kickback Statute, Teva continued to
make misleading statements warning of the risks of Teva's failure to comply with federal laws
and regulations, while failing to disclose that the Company was already engaged in a kickback
scheme in violation of those laws.

165.    For example, on February 12, 2018, Teva filed the 2017 10-K with the SEC,
which was signed by Schultz.  In regard to the Company's legal compliance, the Annual Report
stated in part:

> ***Governmental investigations into sales and marketing practices, particularly for
> our specialty pharmaceutical products, may result in substantial penalties.*** We
> operate around the world in complex legal and regulatory environments, and ***any
> failure to comply with applicable laws, rules and regulations may result in civil
> and/or criminal legal proceedings. As those rules and regulations change or as
> interpretations of those rules and regulations evolve, our prior conduct or that
> of companies we have acquired may be called into question***. In the United
> States, we are currently responding to federal investigations into our marketing
> practices with regard to several of our specialty pharmaceutical products, which
> could result in civil litigation brought on behalf of the federal government. . . .
>
> ***Any failure to comply with the complex reporting and payment obligations
> under the Medicare and Medicaid programs may result in further litigation or
> sanctions, in addition to those that we have announced in previous years.
> The U.S. laws and regulations regarding Medicare and/or Medicaid
> reimbursement and rebates and other governmental programs are complex***.
> Some of the applicable laws may impose liability even in the absence of specific
> intent to defraud. ***The subjective decisions and complex methodologies used in
> making calculations under these programs are subject to review and challenge,
> and it is possible that such reviews could result in material changes.*** A number
> of state attorney generals and others have filed lawsuits alleging that we and other
> pharmaceutical companies reported inflated average wholesale prices, leading to
> excessive payments by Medicare and/or Medicaid for prescription drugs. Such

allegations could, if proven or settled, result in additional monetary penalties (beyond the lawsuits we have already settled) and possible exclusion from Medicare, Medicaid and other programs. . . .

166.    On February 19, 2019, Teva filed the 2018 10-K with the SEC, which was signed by Schultz.  The Annual Report contained substantially the same statement as the 2017 10-K in ¶ 165 above.

167.    On February 21, 2020, Teva filed the 2019 10-K with the SEC, which was signed by Schultz.  The Annual Report contained substantially the same statement as the 2017 10-K in ¶ 165 above.

168.    The statements by Defendants Teva and Schultz in ¶¶ 165-167 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments for Medicare patients taking Copaxone in violation of the False Claims Act and the Anti-Kickback Statute; and

b)    Teva's illegal kickback scheme increased the likelihood that the Company would be subject to regulatory scrutiny, enforcement, and/or penalties, indeed Teva was already under investigation by the U.S. Attorney's office in Boston, Massachusetts in connection with its Copaxone donations.

## J.    The Truth Is Disclosed

169.    On August 18, 2020, the United States Department of Justice announced that, on that day, the U.S. Attorney's Office for the District of Massachusetts filed a complaint against Teva alleging that the Company knowingly and willfully violated the False Claims Act, 31

67

U.S.C. § 3729(a)(1)(A), (B) & (C), by making a total of $328,632,000 in kickback payments to

CDF and TAF between December 2006 and December 2015. Ex. A ¶¶ 121-36. The DOJ

explained that Teva used "ostensibly independent charitable foundations as vehicles to pay

hundreds of millions of dollars in kickbacks, all while raising the price of its drug, Copaxone, at

a rate over 19 times the rate of inflation[,]" leaving "American taxpayers to shoulder the high

prices that Teva set for Copaxone." Press Release, United States Department of Justice, United

States Files False Claims Act Complaint Against Drug Maker Teva Pharmaceuticals Alleging

Illegal Kickbacks (Aug. 18, 2020); Ex. A ¶ 7.

170. Specifically, "[t]he government alleged that, form 2007 through 2015, Teva paid

TAF and CDF with the intent and understanding that the foundations would use Teva's money to

cover the Medicare co-pays of patients taking Copaxone. During the same period, Teva raised

the price of Copaxone from approximately $17,000 per year to over $73,000 per year."|

171. The press release further stated, in relevant part:

Teva largely effectuated its scheme through its vendor, Advanced Care Scripts
Inc. (ACS), a specialty pharmacy to which Teva referred virtually all Copaxone
patients who faced Medicare co-pays for the drug. Teva used information from
ACS and from TAF and CDF to calculate how much money to pay each
foundation to maintain coverage of the Medicare co-poys of Copaxone patients
enrolled in each foundation. The U.S. further alleges that ACS coordinated the
referral of newly-prescribed Copaxone patients to TAF and CDF with Teva,
referring patients in batches at the same time that Teva made payments to the
foundations, which ensured that Copaxone patients received the vast majority of
the co-pay assistance TAF and CDF provided with money from Teva.

172. On this news, the price of Teva's shares dropped $1.69, or approximately 15%,

over the course of three trading days, from a close of $11.59 on August 17, 2020 to a close of

$9.90 on August 20, 2020.

173. The market voiced their disappointment with this news. A Jefferies analyst noted

that the case "represents another major risk for [Teva's] balance sheet" because "[a]pplying

treble damages plus interest could make this suit a major liability for Teva on top of its current balance sheet challenges."  David Steinberg, et al., *New DOJ Suit Ensnares Teva in Copaxone Kickback Scheme*, Jefferies (Aug. 19, 2020).  A Citi analyst stated that the "lawsuit amplifies Teva's significant legal risks" and noted that the "US government is entitled to recover treble damages . . . plus a civil monetary penalty ($5,000-$10,000) for each false or fraudulent claim." Navann Ty & Nicholas Reyner, *FCA and NY Insurance Fraud Cases Amplify Legal Risk*, Citi (Aug. 19, 2020).  An article on the investment website, the Motely Fool, noted, "How many red flags can investors overlook? . . . investors should also ask themselves if they want to own a company with what appears to be a morally bankrupt culture."  Maxx Chatsko, *Here's Why Teva Pharmaceutical Fell as Much as 15.4% Today*, Motely Fool (Aug. 18, 2020 3:25 pm), https://www.fool.com/investing/2020/08/18/heres-why-teva-pharmaceutical-fell-as-much-as-154/.

174.    The following month, on September 30, 2020, the U.S. House of Representatives' Committee on Oversight and Reform published a Staff Report based on its drug pricing investigation of Copaxone.  *See* Congressional Report.  In the report, the Committee concurred with the DOJ's findings that Teva had been engaged in a kickback scheme, explaining that "Teva's donations to third-party foundations were made as an 'investment' for future returns, with the expectation that such donations would drive Copaxone sales."  Ex. B at 15.  As well, "[d]ocuments reviewed by the Committee indicate that Teva continued its payments to TAF and other third-party foundations through at least 2018" and "suggest that Teva's donations continued to be based on the expectation that they ultimately would be delivered to Copaxone patients."  *Id.* at 17.

## V.      ADDITIONAL SCIENTER ALLEGATIONS

### A.      *Respondeat Superior* and Agency Principles Apply

175.      Teva is liable for the acts of Defendants and other Company officers, directors,

employees, and agents under the doctrine of *respondeat superior* and common law principles of

agency as all of the wrongful acts complained of herein were carried out within the scope of their

employment or agency with the authority or apparent authority to do so.  The scienter of

Defendants and other Company officers, directors, employees, and agents is similarly imputed to

Teva under *respondeat superior* and agency principles.

### B.      Defendants Acted With Conscious Misbehavior Regarding The Kickback Payments

176.      All Defendants had possession of or access to information showing that their

statements regarding Copaxone revenues and Teva's legal compliance were false and/or

misleading when made.

177.      Desheh, Koremans, and McClellan were aware that the donations to Charitable

PAPs were intended to be applied to only Copaxone co-payments because they were repeatedly

included in communications where the payments were described as a "Copaxone Donation

payment[,]" "Copaxone donations approval[,]" and "Copaxone donations."  *See* ¶¶ 48, 65, 66,

68.  Given that the Charitable PAPs were supposed to apply the donations from Teva to all MS

drugs indiscriminately, the only conclusion from the payment descriptions is that Teva

employees were aware that the payments were being only applied to Copaxone.

178.      Further, considering that the Charitable PAP donations were so large, the

Individual Defendants had to approve the payments before they were made.  Indeed, payments

over $15 million had to be approved by Teva Executive Committee Members, which included

defendant Koremans, and payments over $25 million had to be approved by the CFO and CEO

which included Desheh, McClellan, Kalif, Vigodman, and Schultz.  *See* ¶ 64.  The allegations above show that the Individual Defendants did in fact approve these payments prior to and during the Class Period.  In January 2015, Koremans and Desheh approved a "Copaxone Donation payment" of $25 million and in February 2015, Koremans approved a "Copaxone donation payment" of $8.5 million.  *See* ¶¶ 65, 66.  Later that year, in December 2015, Desheh and Vigodman approved a payment for a $30 million donation.  *See* ¶ 64.  In January 2016 McClellan approved a $10 million in "Copaxone donations" and in January 2017, McClellan and Desheh approved a $38 million donation payment.  *See* ¶¶ 66-68.

179.    If the Individual Defendants were not aware of the kickback scheme prior to 2017, they absolutely became aware of it in early 2017 when the United States government began to investigate the Company's donations to Charitable PAPs.  First, the IRS began an investigation into the donations pharmaceutical companies had been making to CDF.  As part of its probe, on February 16, 2017, the IRS served a summons on Teva seeking information regarding its donations.  *See* U.S.s' Mot. to Deny Pet. to Quash IRS Summons Issued To Third Party Teva Neuroscience Inc., and to Enforce at 1, *Chronic Disease Fund v. U.S.*, 2:17-cv-00322 (W.D. Pa. May 18, 2017) (ECF No. 12).  Then, on March 21, 2017, Teva was served with a subpoena from the U.S. Attorney's office in Boston, Massachusetts seeking information regarding Teva's donations to Charitable PAPs.  *See* ¶ 118.  At that time, Teva began to actively respond to the U.S. Attorney's investigation into the Company's payments to TAF and CDF by producing documents and information, which led to the complaint filed on August 18, 2020.  *See* ¶¶ 169-170.

180.    The Individual Defendants, as officers of the Company, were obligated to investigate the bases for the IRS summons and DOJ subpoena and would have discovered the

arrangement Teva had established with ACS, TAF, and CDF.  Further, McClellan signed the

Form 6-K in which the subpoena from the U.S. Attorney's office was disclosed, certifying to the

public that he was aware of the information regarding the investigation.  Teva Pharmaceutical

Industries Ltd., Quarterly Report (Form 6-K) 71 (Aug. 5, 2017).

181.    Defendant O'Grady was aware of Teva's kickback scheme during the Class

Period as well.  Not only was he aware that a failure to make Copaxone donations in 2018 would

result in up to $280 million in lost Copaxone sales (¶ 62), as he explained to a Teva colleague in

January 2018, "*we buy the patients [sic] copay down to zero*."  ¶ 63.  In his role as Head of

North America, O'Grady reports directly to CEO Schultz and CFO McClellan and has full

responsibility for specialty and generic pharmaceuticals in Teva's North American region.  *Id.*;

Press Release, Teva Announces New Organization Structure and Leadership Changes, Teva

Pharmaceutical Industries Ltd. (Nov. 27, 2017).  Therefore, O'Grady knew that the revenue

numbers for specialty medicines that he reported from the North America region to Teva's CEO

and CFO were overstated in light of the Company's kickback scheme to pass patient co-pays

through the Charitable PAPs.  O'Grady's knowledge of this information may be imputed to

Teva.

182.    Defendants' statements regarding the Shared Solutions Program also evince that

they understood how the program was used to fund Copaxone patient co-pays.  For example, on

October 29, 2015, Koremans explained how the Shared Solutions Program helps patients obtain

financial assistance, stating: "The shared solutions, they really helping to two things and do --

first of all, *make sure that patients have financial access, work with patients*.  *And help them to

address their questions with their individual plans really well. And that really works*."  ¶105.

On March 16, 2016, Derkacz explained that the Shared Solutions Program is one of the reasons

patients have continued to take Copaxone over the years, stating, "***the shared solutions, service and the loyalty and trust and confidence that these patients have had for many years.*** They like the product. They don't want to be upset what is working well for them and they also don't want to lose that relationship and that support that they've come to appreciate and trust and recognize over the last many years." ¶ 106.  The following year, on March 15, 2017, Derkacz explained that Teva goes out of its way to make it easy for patients to afford Copaxone, stating: "I can't disclose all of it.  But certainly the contracting strategy that we deploy, the approach that we take with our customers ensuring that they come first, that we make it easy for physicians and we make it easy for patients to stay on our therapy." ¶ 110.  As well, on June 3, 2016, Vigodman discussed the positive benefit the Shared Solutions Program has on patient retention on Copaxone, stating, "Look at the contribution of our shared services solution center to the brand and to the basically loyalty of our consumers and patients.  Look at the effect[.]" ¶ 107.

> ### C.   Defendants' Financial And Pharmaceutical Experience

183.   Defendants were highly educated, trained, and experienced in pharmaceutical sales, marketing, and/or financing and were therefore well-aware that their statements regarding Copaxone revenues and Teva's legal compliance were false and/or misleading and omitted material information.

184.   As set forth below, Defendants are sophisticated pharmaceutical executives who are well-versed in the customs and practices of their industry.  Therefore, Defendants were aware of the restrictions on donations to Charitable PAPs imposed by the United States government, or if they were not aware, knew that the investing public expected that they kept themselves abreast of the government's Medicare rules and restrictions.

185.    Michael Derkacz has more than 25 years of commercial operations and management experience in the pharmaceutical industry.  Prior to joining Teva, from 2008 to 2011, Derkacz served as Vice President, CNS for Cephalon, Inc.  Auspex Pharmaceuticals, Inc., Current Report (Form 8-K) 2 (May 25, 2015).  From 2003 to 2008, Derkacz served in various roles for pharmaceutical company, GlaxoSmithKline, ultimately becoming Executive Director, U.S. Marketing in 2008.  Michal Derkacz, LinkedIn, https://www.linkedin.com/in/mikederkacz/ (last visited May 16, 2021).  Derkacz received a B.A. in communications and advertising, with a minor in business administration and marketing, from the University of Texas, Arlington in 1991.  *Id.*

186.    Robert Koremans has more than 30 years of experience working at pharmaceutical companies.  In 1988 he began his career as a Business Unit Manager at Sanofi, S.A.  Robert Koremans, LinkedIn, https://www.linkedin.com/in/rob-koremans-5204096/?originalSubdomain=nl (last visited May 16, 2021).  He then worked for Serono, a Swiss biopharmaceutical company, and eventually became the President and CEO of pharmaceutical company, Zentiva in 2011.  *Id.*  Koremans has a medical degree from Erasmus University Rotterdam and an MBA from Babson college.  *Id.*

187.    Prior to joining Teva in 2015, Defendant McClellan spent nearly 20 years at global pharmaceutical company, Sanofi S.A., where he took on financial roles of increasing responsibility, resulting in ultimately becoming the U.S. CFO.  Teva Pharmaceutical Industries Ltd., Proxy Statement (Form 14A) 25 (Apr. 25, 2018).  McClellan received his BSBA, accounting and economics from the University of Missouri Trulaske College of Business.  *Id.*

188.    Defendant Schultz previously served as President and CEO of pharmaceutical company, H. Lundbeck A/S, from May 2015 to October 2017, after which time he joined Teva.

*Id.* at 10.  Prior to that, Schultz worked for nearly three decades at pharmaceutical company, Novo Nordisk, where he served in a number of leadership roles, including Chief Operating Officer.  *Id.*  Teva noted in its proxy statement published shortly after Schultz was hired, "Mr. Schultz's leadership positions in various healthcare corporations, including his experience as a chairman and a director of several international corporations and his service as the President and Chief Executive Officer at Teva, provides unique global perspective on the healthcare and pharmaceutical industries."  *Id.*

189.    Defendant O'Grady has spent his entire career working for pharmaceutical companies.  From 1995 to 2001, O'Grady worked for Sanofi-Aventis, ultimately becoming a Senior Regional Manager, Professional Education and Research.  In 2001, O'Grady joined Teva as a Regional Account Manager.  *See* Brendan O'Grady, LinkedIn, https://www.linkedin.com/in/brendan-o-grady-b108277/ (last visited May 19, 2021).  O'Grady held various roles in Teva's Managed Markets department and global division before becoming Executive Vice President and Head of North America Commercial in December 2017.  *Id.* O'Grady holds a Bachelor of Science from State University of New York College at Genesco and an MBA from Baker University.  *Id.*

190.    Defendant Vigdoman has more than 20 years serving in a CEO position.  Between 1998 and 2001, Vigdoman served as the CEO of Elite, a coffee and confectionary company in Israel.  From 2001 to 2009 he served as the President and CEO of Strauss Group, a global food and beverage company.  Erez Vigdoman, AAE Speakers, https://www.allamericanspeakers.com/celebritytalentbios/Erez+Vigdoman/416334 (last visited May 16, 2021).  Then, in 2010, Vigdoman became the President and CEO of Adama Agricultural Solutions, Ltd., the world's leading generic agricultural company.  *Id.*  Vigdoman is

a member of the Advisory Committee to the Israel National Economic Council and a member of the advisory board to the governor of the bank of Israel.  *Id.*

191.    Prior to joining Teva, Eyal Desheh served as the Executive Vice President and CFO of Checkpoint Software Technologies, Ltd. from 2000 to 2008.  Eyal Desheh, LinkedIn, https://www.linkedin.com/in/eyal-desheh-99bba51ba/?originalSubdomain=il (last visited May 16, 2021).  Desheh served on the board of directors for technology companies Stratasys, Ltd. from 2011 to 2016 and for Mobileye from 2013 to 2017.  *Id.*  Desheh holds an MBA and Bachelor's Degree in economics from the Hebrew University of Jerusalem.  *Id.*

192.    From 2001 to 2019 Defendant Kalif held various leadership and senior executive finance positions at Flex Ltd., a global technology, design and manufacturing service provider. Teva Pharmaceutical Industries, Inc., Proxy Statement (Form 14A) 29 (Apr. 22, 2020).  From 1996 to 2001, Kalif worked for Deloitte Israel in various positions as a certified public accountant.  *Id.*  Kalif received his bachelor degree in accounting and economics from the College of Management Academic Studies in Israel and is a Certified Public Accountant.  *Id.*

**D.    The Importance of Copaxone To Teva's Financial Success**

193.    Because the fraud alleged herein relates to the primary business of Teva, knowledge of the facts underlying the fraud may be imputed to Defendants.  Indeed, during the Class Period, Teva described Copaxone as "[o]ur leading medicine" and the drug made up half of revenues for all specialty medicines combined.  2015 20-F at 64; 2016 20-F at 69; 2017 10-K at 32, 68; 2018 10-K at 1, 59.  Teva disclosed that it "has relied heavily on sales of Copaxone[,]" 2016 20-F at F-79, as Copaxone made up 20% of Teva's total revenues in 2015, 19% of Teva's total revenues in 2016, 17% of Teva's total revenues in 2017, 13% of total revenues in 2018, and 9% in 2019, and "contributed a significantly higher percentage to Teva's profits and cash flow

from operations" during those periods.  *See* 2015 20-F at 29; 2016 20-F at 32; 2017 10-K at 68;

2018 10-K at 59; 2019 10-K at 60.  At the beginning of the Class Period, the Company also

advised that "[a]ny substantial decrease in the revenues derived from our specialty medicines

would have an adverse effect on our results of operations[.]"  2015 20-F at 5.  As well, during a

conference call on January 8, 2018, Schultz stated that Copaxone is "a major part of our revenue,

it's a major part of our earnings[.]"  JPMorgan Healthcare Conference, Bloomberg Tr. at 1-2

(Jan. 8, 2018).

194.    The frequency with which Defendants and analysts spoke about Copaxone also

indicates its importance to the Company, as it was often referenced on conference calls with

analysts.  *See* ¶¶ 73, 75, 79, 83, 85, 89, 93, 97, 105-111, 131, 136, 141, 152, 162.  Based on the

magnitude of the revenues attributed to Copaxone (¶¶ 193), Teva's public admissions regarding

its reliance on Copaxone, and the Individual Defendants' routine discussions of the drug, it is

reasonable to infer that Defendants were aware of the facts that were omitted and misrepresented

by them as alleged herein.

**E.    Defendants Violated Teva's Code of Conduct**

195.    Teva had established a company-wide policy for making charitable donations

entitled the "Integrity Principles Policy."  Ex. A ¶ 13; Ex. A-4.  The Integrity Principles Policy

provided that "[t]he review and approval process" for all charitable donations "is the

responsibility of the appropriate Review Committee (Corporate Responsibility, Medical

Advocacy, Medical Affairs and/or Compliance) which is separate from Sales and Marketing."

*Id.*  The Integrity Principles Policy also stated that "***Teva will not award charitable donations in***

***exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or***

***provide favorable formulary status for a Teva product***."  Ex. A-4.

196.     Defendants violated this policy for donations to CDF and TAF.  *Id.*  First, according to CW1, donation payments fell under the responsibility of the Corporate Responsibility department and thus, under the Integrity Policies, would have had to been approved by that department.  However, Teva's marketing and patient services teams determined the payments, and Teva's senior sales, marketing, and finance executives approved the payments.  *Id.*  Second, Teva made the donations to CDF and TAF with the understanding that the foundations would apply the money given by the Company to only Copaxone.  ¶¶ 44-45.  Further, because Defendants intended the "Copaxone Donations" to generate sales, Teva treated the donations to CDF and TAF as business expenses rather than charitable donations for tax purposes. Ex. A ¶ 63.

### F.     SOX Certifications

197.     Defendants Vigodman and Desheh signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Teva's February 11, 2016 Form 20-F annual report for the fiscal year ended December 31, 2015.  The certification states that the annual report "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  *See* Ex. 13 to Teva Form 20-F (filed Feb. 11, 2016).

The certifications also state, in relevant part:

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial

information included in this report, fairly present in all material respects the

financial condition, results of operations and cash flows of the company as of, and

for, the periods presented in this report;

*See* Exs. 12(i)-(ii) to Teva Form 20-F (filed Feb. 11, 2016).

198.    The February 15, 2017 Form 20-F contained substantially similar certifications

for the fiscal year ended December 31, 2016 signed by Defendants Peterburg and Desheh.  *See*

Exs. 12(i)-(ii), 13 to Teva Form 20-F (filed Feb. 15, 2017).

199.    The February 12, 2018 Form 10-K contained substantially similar certifications

for the fiscal year ended December 31, 2017 signed by Defendants Schultz and McClellan.  *See*

Exs. 31.1, 31.2, 32 to Teva Form 10-K (filed Feb. 12, 2018).

200.    The May 3, 2018 Form 10-Q contained substantially similar certifications for the

quarter ended March 31, 2018 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1,

31.2, 32 to Teva Form 10-Q (filed May 3, 2018).

201.    The August 2, 2018 Form 10-Q contained substantially similar certifications for

the quarter ended June 30, 2018 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1,

31.2, 32 to Teva Form 10-Q (filed Aug. 2, 2018).

202.    The November 1, 2018 Form 10-Q contained substantially similar certifications

for the quarter ended September 30, 2018 signed by Defendant Schultz and McClellan.  *See* Exs.

31.1, 31.2, 32 to Teva Form 10-Q (filed Nov. 1, 2018).

203.    The February 19, 2019 Form 10-K contained substantially similar certifications

for the fiscal year ended December 31, 2018 signed by Defendants Schultz and McClellan.  *See*

Exs. 31.1, 31.2, 32 to Teva Form 10-K (filed Feb. 19, 2019).

204.     The May 2, 2019 Form 10-Q contained substantially similar certifications for the quarter ended March 31, 2019 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed May 2, 2019).

205.     The August 7, 2019 Form 10-Q contained substantially similar certifications for the quarter ended June 30, 2019 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Aug. 7, 2019).

206.     The November 7, 2019 Form 10-Q contained substantially similar certifications for the quarter ended September 30, 2019 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Nov. 7, 2019).

207.     The February 21, 2020 Form 10-K contained substantially similar certifications for the fiscal year ended December 31, 2019 signed by Defendants Schultz and Kalif.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-K (filed Feb. 21, 2020).

208.     The May 7, 2020 Form 10-Q contained substantially similar certifications for the quarter ended March 31, 2020 signed by Defendants Schultz and Kalif.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed May 7, 2020).

209.     The August 5, 2020 Form 10-Q contained substantially similar certifications for the quarter ended June 30, 2020 signed by Defendants Schultz and Kalif.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Aug. 5, 2020).

## VI.     LOSS CAUSATION

210.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial damages.

211.     During the Class Period, Lead Plaintiff and other Class members purchased Teva securities at artificially inflated prices and suffered substantial losses and damages when the true

facts concealed by the Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Teva securities declined significantly causing Lead Plaintiff and other Class members to suffer losses and damages when the Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by the Defendants materialized.

212.     Defendants issued false and misleading statements and material omissions regarding Teva's revenues and market demand for Copaxone, the Company's Shared Solutions Program, and Teva's compliance with federal laws and regulations that impacted the price at which Teva securities traded.  On the strength of these false and misleading statements and material omissions, the price of the Company's securities was artificially inflated to a Class Period high of $62.37 per share on December 24, 2015.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities also served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Teva's business, operations, performance, and prospects.  On the dates that these false and misleading statements were corrected and/or the risks concealed by them materialized through the issuance of information regarding Teva's unlawful kickback scheme, the price at which Teva securities traded declined as a result of the truth being disclosed to the market and investors suffered losses due to this decline of  the price of Teva securities.

213.     The true facts and risks regarding Teva's kickback scheme which were omitted and/or misrepresented by the Defendants eventually caused the price of Teva securities to decline on two occasions, thereby causing harm to investors.

214.     First, Defendants' and Teva's statements were partially corrected, and the risks concealed by the undisclosed facts regarding Teva's kickback scheme materialized, on August 3, 2017 when Teva announced that it had received a subpoena from the U.S. Attorney's office in Boston, Massachusetts investigating the Company's charitable donations, causing investors to suffer losses as the price of Teva's shares dropped $12.51, or 41%, over the course of three trading days, from a close of $30.89 on August 3, 2017 to a close of $18.38 on August 7, 2017. *See* ¶ 117.

215.     Second, Defendants' and Teva's statements were further partially corrected, and the risks concealed by the undisclosed facts regarding Teva's kickback scheme materialized, on November 2, 2017, when Teva cut its forecasts for the remainder of 2017 and reported lower revenues for Copaxone, causing investors to suffer losses as the price of Teva's shares price fell approximately 20%, from a closing securities price of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017.  *See* ¶ 124.

216.     Third, Defendants' and Teva's statements were further partially corrected, and the risks concealed by the undisclosed facts regarding Teva's kickback scheme materialized, on August 18, 2020, when the U.S. Attorney's Office for the District of Massachusetts filed a complaint against Teva alleging that the Company violated the False Claims Act, causing investors to suffer losses as the price of Teva's shares dropped $1.69, or approximately 15%, over the course of three trading days, from a close of $11.59 on August 17, 2020 to a close of $9.90 on August 20, 2020.  *See* ¶¶ 169-170.

217.     Accordingly, as a result of their purchases of Teva's publicly traded securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic losses and damages.

## VII.   CLASS ACTION ALLEGATIONS

218.    Lead Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal

Rules of Civil Procedure on behalf of a Class consisting of  all those who purchased or otherwise

acquired Teva securities during the Class Period and were damaged on the revelations of the

alleged corrective disclosures. (the "**Class**").

219.    Excluded from the Class are the Defendants named herein, members of their

immediate families, any firm, trust, partnership, corporation, officer, director or other individual

or entity in which a Defendant has a controlling interest or which is related to or affiliated with

any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of

such excluded persons.

220.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Teva securities were actively traded on the NYSE

and TASE. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Teva or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class action.

221.    The members of the Class are so numerous that joinder of all members is

impracticable.  During the Class Period, Teva securities was actively traded on the NYSE and

TASE, which are efficient markets.  While the exact number of Class members cannot be

determined at this early stage, Lead Plaintiff believes that thousands of people held Teva

securities during the Class Period.  Record owners and other members of the Class may be

identified from records maintained by Teva or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

222.   Lead Plaintiff's claims are typical of the claims of the Class because Lead Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained herein.

223.   Lead Plaintiff will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiff have no interests that are contrary to or in conflict with those of the Class.

224.   Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

225.   Lead Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

    a)   Whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b)   Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    c)   Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Synergy's securities to be artificially inflated during the Class Period;

d)      Whether Defendants acted with the requisite level of scienter in omitting

and/or misrepresenting material facts;

e)      Whether Defendants were controlling persons of Synergy;

f)      Whether reliance may be presumed pursuant to the fraud-on-the-market

doctrine; and

g)      Whether Class members have sustained damages, and if so, the proper

measure of damages.

226.    Lead Plaintiffs know of no difficulty that will be encountered in the management

of this action that would preclude its maintenance as a class action.

227.    A class action is superior to all other available methods for the fair and efficient

adjudication of this action because, among other things, joinder of all members of the Class is

impracticable.  In addition, since the damages suffered by individual members of the Class may

be relatively small, the expense and burden of individual litigation would make it nearly

impossible for members of the Class to bring individual actions.

**VIII.   CONTROL PERSON LIABILITY**

228.    The Individual Defendants, because of their positions with Teva, possessed the

power and authority to control the contents of the Company's reports to the SEC, press releases,

advertisements, promotional materials, and presentations to securities analysts, money and

portfolio managers, and institutional investors.  Each Individual Defendant possessed the power

to direct or cause the direction of the management and policies of Teva.  Each Individual

Defendant had a duty to promptly disseminate complete, accurate, and truthful information with

respect to Teva's revenues and market demand for Copaxone, the Company's Shared Solutions

Program, and Teva's compliance with federal laws and regulations.  Each Individual Defendant

was provided with copies of the Company's SEC filings, reports, promotional materials, and

press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and

had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because

of their positions and access to material non-public information, each Individual Defendant knew

or recklessly disregarded that the adverse facts and omissions specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations and

omissions which were being made were then materially false and/or misleading.

## IX.    THE FRAUD ON THE MARKET PRESUMPTION

229.    The false and/or misleading statements alleged herein were material and public

and, at all relevant times, the market for Teva's securities was an efficient market for the

following reasons, among others:

a)    Teva's securities were listed on the NYSE and TASE stock markets,
highly efficient markets;

b)    As a registered and regulated issuer of securities, Teva filed periodic
reports with the SEC, in addition to the frequent voluntary dissemination
of information;

c)    Teva regularly communicated with public investors through established
market communication mechanisms, including through regular
dissemination of press releases on the national circuits of major newswire
services and through other wide-ranging public disclosures such as
communications with the financial press and other similar reporting
services;

d)    The market reacted to public information disseminated by Teva; and

e)      At least fourteen analysts followed Teva's business and wrote reports which were publicly available and affected the marketplace.

230.    As a result of the above, the market for Teva's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical daily trading prices and volumes of Teva securities are incorporated herein by reference.

231.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Teva's securities.  Without knowledge of the misrepresented or omitted facts, Lead Plaintiffs and other members of the Class purchased Teva securities between the time that the Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Teva's securities was artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## X.    NO STATUTORY SAFE HARBOR

232.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

233.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

234.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

235.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

236.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any pharmaceutical company, and misleadingly contained no factual disclosure of any of the specific details concerning Teva's kickback scheme, or similar important factors that would give investors adequate notice of such risks.

237.    Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Synergy who actually knew that each such statement was false or misleading when made.

## XI.    CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

238.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

239.    This Count is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

240.    During the Class Period, Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5(a) – (c) promulgated thereunder.

241.    The acts and scienter of Defendants and other Company employees are imputed to the Company under the principles of agency and *respondeat superior*.

242.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about Teva's revenues and market demand for Copaxone, the Company's Shared Solutions Program, and Teva's compliance with federal laws and regulations as reflected in the misrepresentations and omissions set forth above.

243.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately

refrained from taking steps necessary to discover whether the material facts were false or misleading.

244. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

245. Lead Plaintiff and other Class members purchased Teva securities, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In doing so, Lead Plaintiff and other Class members relied on the integrity of the market price for Teva securities that was artificially inflated due to the false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

246. Lead Plaintiff and other Class members were damaged as a result of Defendants' false and/or misleading statements and misrepresentations and omissions of material facts.  Lead Plaintiff and other Class members would not have purchased Teva securities at the prevailing prices had they known the truth about the matters discussed above.

247. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other Class members have suffered damages in connection with their purchases or acquisitions of Teva securities.

248. Lead Plaintiffs filed this action within two years after the discovery of the facts constituting the violation, including facts establishing scienter and other elements of Lead

Plaintiff's claims, and within five years after the violations with respect to Lead Plaintiff's investments.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

249.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

250.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

251.    As alleged herein, the Individual Defendants caused Teva to violate Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

252.    Each Individual Defendant, by reason of his status as a senior executive officer and/or director of Teva, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and other Class members, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases, and other statements related to Lead Plaintiff's and other Class members' investments in Teva securities within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

253.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC filings, press releases, promotional material, and other statements. Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the

opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

254.     The Individual Defendants knew or recklessly disregarded the fact that Teva's representations were materially false and misleading and/or omitted material facts when made, and are therefore culpable participants in the fraud.  In so doing, the Individual Defendants did not act in good faith.  By virtue of their high-level positions and their participation in and awareness of Teva's operations and public statements, the Individual Defendants were able to and did influence and control Teva's decision making, including controlling the content and dissemination of the documents that Lead Plaintiff and other Class members contend contained materially false and misleading information and on which Lead Plaintiff and other Class members relied.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on their own behalf, and on behalf of the Class, demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as Class representative;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and statements alleged herein;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert and consultant fees, and other costs;

      D.      Awarding damages in favor of Lead Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law; and

      E.      Awarding such other and further relief as this Court may deem just and proper.

## XIII.  JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: May 25, 2021

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By:    */s/ Timothy J. Peter*
        Timothy J. Peter

Timothy J. Peter
1617 John F Kennedy Blvd #1550
Philadelphia, PA 19103

James M. Wilson, Jr. (*pro hac vice* forthcoming)
Robert W. Killorin (*pro hac vice* forthcoming)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email:  jwilson@faruqilaw.com
        rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff and Lead Counsel for the putative Class*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 25, 2021, I caused true and correct copies of the

foregoing to be served on all counsel of record via CM/ECF.

Dated: May 25, 2021                                    By: /s/ *Timothy J. Peter*
                                                              Timothy J. Peter