# EXHIBIT B

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD., Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TEVA PHARMACEUTICALS INDUSTRIES LIMITED, EREZ VIGODMAN, EYAL DESHEH, ROBERT KOREMANS, and MICHAEL DERKACZ, <br><br> Defendants. | Case No. 2:20-cv-04660-JD <br><br> <u>CLASS ACTION</u> <br><br> **CORRECTED AMENDED CLASS ACTION COMPLAINT [CORRECTED PURSUANT TO MOTION TO STRIKE DATED AUGUST 9, 2021]** |

**TABLE OF CONTENTS**

I.    NATURE AND SUMMARY OF THE ACTION ................................................. 1

II.   JURISDICTION AND VENUE ...................................................................... 5

III.  THE PARTIES ................................................................................................ 6

IV.   SUBSTANTIVE ALLEGATIONS ................................................................ 7

      A.    Background To The Kickback Scheme ............................................. 7

            1.    Medicare Assistance and Charitable Foundations ..................................... 8

            2.    The Federal False Claims Act and Anti-Kickback Statute ....................... 11

      B.    Teva Implements The Kickback Scheme To Inflate Copaxone Revenues ........... 13

            1.    Teva Initiates the Scheme Through Its Shared Solutions Program .......... 13

            2.    Teva Employees Were Aware That Copaxone Sales Relied Upon
                  Charitable Donations .................................................................. 20

            3.    Teva's Senior Management Approved of the Kickback Scheme ............. 23

      C.    Defendants Materially Overstate Copaxone's Financial Results And
            Market Demand ............................................................................ 25

      D.    Defendants Make Materially False and Misleading Statements Regarding
            Teva's Shared Solutions Program ...................................................... 42

      E.    Defendants Make Materially False and Misleading Statements Regarding
            Teva's Compliance with Federal Laws ................................................ 46

      F.    Defendants Partially Disclose Their Fraud By Shaking Up Company Leadership
            And Belatedly Disclosing That The Department Of Justice Subpoenaed Teva
            About Donations To Charitable Foundations ......................................... 48

      G.    Defendants Continued To Make False And Misleading Statements Regarding
            Copaxone's Financial Results and Market Demand ................................. 50

      H.    Defendants Continued To Make False And Misleading Statements Regarding
            Teva's Shared Solutions Program ...................................................... 64

      I.    Defendants Continued To Make False And Misleading Statements Regarding
            Teva's Compliance With Federal Laws ............................................... 65

      J.    The Truth Is Disclosed .................................................................. 66

i

V.      ADDITIONAL SCIENTER ALLEGATIONS ................................................................ 69

        A.      *Respondeat Superior* and Agency Principles Apply.............................................. 69

        B.      Defendants Acted With Conscious Misbehavior Regarding The
                Kickback Payments .................................................................................................. 69

        C.      Defendants' Financial And Pharmaceutical Experience........................................ 72

        D.      The Importance of Copaxone To Teva's Financial Success.................................. 75

        E.      Defendants Violated Teva's Code of Conduct ...................................................... 76

        F.      SOX Certifications.................................................................................................. 77

VI.     LOSS CAUSATION...................................................................................................... 79

VII.    CLASS ACTION ALLEGATIONS ............................................................................. 81

VIII.   CONTROL PERSON LIABILITY................................................................................ 84

IX.     THE FRAUD ON THE MARKET PRESUMPTION ..................................................... 85

X.      NO STATUTORY SAFE HARBOR.............................................................................. 86

XI.     CAUSES OF ACTION ................................................................................................. 88

XII.    PRAYER FOR RELIEF ................................................................................................ 91

XIII.   JURY TRIAL DEMAND .............................................................................................. 92

**TABLE OF DEFINED TERMS**

| Term | Definition |
|------|------------|
| **ACS** | Advanced Care Scripts, Inc. |
| **ADR** | American Depository Receipt |
| **CDF** | The Chronic Disease Fund |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **Charitable PAP** | Charitable Patient Assistance Program |
| **Clark** | Jennifer Clark, an Associate Director in Teva's Patient Services department |
| **CMS** | United States Centers for Medicare and Medicaid Services |
| **CNS** | Central Nervous System |
| **The Company** | Teva Pharmaceutical Industries Limited |
| **Congressional Staff Report** | U.S. House of Representatives' Committee on Oversight and Reform, *Drug Pricing Investigation – Copaxone* (2020) |
| **Derkacz** | Michael M. Derkacz, Teva's Senior Vice President and & GM – Global Central Nervous System from January 2015 to June 2017. |
| **Desheh** | Eyal Desheh, Teva's CFO until June 2017 |
| **DOJ** | United States Department of Justice |
| **DOJ Complaint** | The complaint filed by the Department of Justice in the action captioned *U.S. v. Teva Pharmaceuticals, Inc., et al.*, 1:20-cv-11548 (D. Mass. Aug. 18, 2020). |
| **Hensley** | Edward Hensley, the founder of ACS, TAF, and AssistRx |
| **HHS** | United States Department of Health and Human Services |
| **Koremans** | Robert Koremans, Teva's President & CEO – Global Specialty Medicines until December 2017 |
| **Lead Plaintiff** | Gerald Forsythe |
| **Lynch** | Denise Lynch, Teva's Director of Customer Resources |
| **McClellan** | Michael McClellan, Teva's Executive Vice President, CFO from November 2017 to November 2019 |

| | |
|---|---|
| **MS** | Multiple Sclerosis |
| **NYSE** | New York Stock Exchange |
| **O'Grady** | Brendan O'Grady, Teva's Executive Vice President & Head of North America |
| **SEC** | United States Securities and Exchange Commission |
| **TAF** | The Assistance Fund |
| **TASE** | Tel Aviv Stock Exchange |
| **Teva** | Teva Pharmaceutical Industries Limited |
| **Vigodman** | Erez Vigodman, Teva's CEO until February 2017 |

The allegations in this Amended Securities Class Action Complaint ("**Complaint**")[1] are based on the personal knowledge of Lead Plaintiff Gerald Forsythe ("**Lead Plaintiff**"), as to Lead Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein.  Lead Plaintiff's information and belief is based upon the substantial investigation by Lead Plaintiff's counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of public filings referenced herein made by Teva Pharmaceutical Industries Limited ("**Teva**" or the "**Company**") with the United States Securities and Exchange Commission ("**SEC**"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Teva and the Defendants named herein; (iii) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; and (iv) review and analysis of those other documents referenced herein.  Many additional facts supporting the allegations are known only to the Defendants and/or are within their exclusive custody or control.  Lead Plaintiff believes that substantial additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This federal securities class action arises from the difference between what Defendants told investors was driving Teva's soaring demand and price increases for its multiple sclerosis ("MS") treatment drug, Copaxone®, and the truth for Copaxone's success.  Defendants described Copaxone as the Company's "leading specialty medicine," reporting Copaxone sales and revenues that consistently dwarfed the same metrics for other Teva specialty products.

---

[1]      All internal citations and quotations are omitted and all emphases are added unless otherwise noted.

1

Defendants attributed Copaxone's commercial success to "having the right mix" of, *inter alia*, "a fantastic underlying demand," "patients hav[ing] access to it," and an "unparalleled . . . track record of both efficacy and safety.

2.     The truth, however, was that Copaxone's success was the result of Defendants' undisclosed unlawful use of a specialty pharmacy, Advanced Care Scripts, Inc. ("**ACS**"), and two charitable foundations, Chronic Disease Fund ("**CDF**") and The Assistance Fund ("**TAF**"), as pass-through entities to illegally fund Medicare patient co-payments for Copaxone.  Through its Shared Solutions program, Defendants used these entities as improper conduits whereby ACS enrolled Medicare patients on Copaxone, and then Teva would make donations to the charitable foundations for the purpose of  applying Teva's donations  to cover co-pays for *only* those Medicare patients taking Copaxone.

3.     The United States government has established multiple laws prohibiting this type of activity, including the federal anti-kickback statute which forbids pharmaceutical manufacturers from subsidizing the co-pay and cost-sharing obligations incurred by Medicare patients.  The Office of the Inspector General of the Department of Health and Human Services ("**HHS**") has advised that "the independent charity [patient assistance program] must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices."  Department of Health and Human Services, Office of Inspector General, *Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623 (Nov. 22, 2005).

4.     Defendants employed this scheme so that Teva could raise the price of Copaxone without Medicare patients bearing the brunt of the steep price increases, in order to be able to

artificially inflate revenues, and increase the price at which Teva's securities traded.[2] Due to this scheme, from late 2006 to 2015, Teva raised the price of Copaxone at a rate over 19 times the rate of inflation from approximately $17,000 per year to over $73,000 per year:[3]



5.    The Copaxone kickback scheme was a tremendous success totaling nearly $1 billion in revenues for numerous quarters and allowing Teva to seize control of the market share

---

[2]    Teva's American Depository Receipts ("**ADRs**") trade on the New York Stock Exchange ("**NYSE**") and the Tel Aviv Stock Exchange ("**TASE**") under the symbol "TEVA."  For convenience, Teva's ADRs are referred to as "shares", "securities", or "stock".

[3]    *See* Complaint (Dkt. No. 1) in *United States of America v. Teva Pharmaceuticals USA, Inc.* and *Teva Neuroscience., Inc.,* Civil Action No. 20-11548 (D. Mass.), attached hereto (with exhibits) at Exhibit A (the "**DOJ Complaint**").  The exhibits referred to herein as "Ex. A-__" are the exhibits attached to the DOJ Complaint.

for MS treatments while it was in effect.  Defendants concealed the kickback scheme from investors and attributed the incredible price and revenue increases to legitimate sources including the Company's relationships with patients and physicians through the Shared Solutions program. Defendants went so far to deflect attention from the dramatic price increases as to publicly claim that Teva was not associated with the price increase in specialty products and that it was playing a competitive game, playing it fairly and by the book and rules, and that Teva's exposure to any initiative on price reduction in the United States was as small as anybody can have.  Defendants never disclosed that Teva was using charitable foundations as conduits to cover Medicare co-pays in violation of federal laws.

6.      The kickback scheme also had the intended impact on Teva's share price, which increased to a high of $62.37 per share on December 24, 2015.

7.      Defendants' unlawful kickback scheme and its artificial positive impact on Teva's financial metrics and stock price began to unravel when Teva was subpoenaed on March 21, 2017 by the United States Attorneys' office in Boston, Massachusetts, a/k/a the U.S. Department of Justice (the "**DOJ**"), seeking information regarding Teva's donations to charitable foundations.  When the Company released its next quarterly earnings results on May 11, 2017 for the first quarter of 2017, mention was made of the subpoena, but the Company did report that Copaxone generated robust revenues of $970 million, 48% of Teva's specialty-drug revenue.

8.      In September of 2017, Teva brought in a new CEO, Kåre Schultz, to make improvements at Teva.  He announced major structural changes to the company and on November 2, 2017, among other news, Teva reported a decrease in global Copaxone revenues of 7% compared to the third quarter of 2016 and a decrease of U.S. Copaxone revenues of 8% compared to the third quarter of 2016.  On this news, Teva securities price fell approximately

20%, from a closing securities price of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017.

9.     Notwithstanding the government's investigation and major changes to the company, Teva did not fully dismantle its Copaxone kickback scheme and continued to make misleading statements touting the financial results and market demand for Copaxone, Teva's Shared Solutions Program, and the Company's compliance with federal laws.

10.     Teva's charade finally came to an end on August 18, 2020 when the United States Attorneys' office  filed a complaint against the Company in federal court for the District of Massachusetts alleging that Teva had violated the federal False Claims Act and the Anti-kickback Statute by engaging in the scheme to use CDF and TAF as pass-through entities to cover Copaxone co-pays, with the aid of the specialty pharmacy ACS.  The market reacted promptly and efficiently when the true nature of Copaxone's success was disclosed on this date, with Teva's stock prices falling approximately 15% on this announcement.

11.     Due to Defendants' fraudulent acts, statements, and omissions which led to the precipitous declines in the market value of the Company's securities when the truth was revealed, Lead Plaintiff and other Class Members suffered significant damages.

## II.     JURISDICTION AND VENUE

12.     This action arises under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as certain of the acts and conduct complained of herein, including the dissemination and/or omission of materially false and/or misleading information to the investing public, occurred in this District.

15. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## III.   THE PARTIES

16. Lead Plaintiff purchased Teva securities at artificially inflated prices during the Class Period and was damaged thereby when the truth was revealed, as set forth in the certifications submitted to the Court.  ECF No. 8-5.

17. Defendant Teva is an Israeli pharmaceutical corporation with its principal executive offices located at 5 Basel St. Petach Tikva, 49131, Israel.  Teva's ADRs traded on the NYSE and TASE, both efficient markets, under the ticker symbol "TEVA."

18. Defendant Erez Vigodman ("**Vigodman**") served as Teva's Chief Executive Officer ("**CEO**") and Chairman of the Board of Directors from February 2014 until February 2017.

19. Defendant Eyal Desheh ("**Desheh**") served as Teva's Chief Financial Officer ("**CFO**") from April 2008 until June 2017.

20. Defendant Robert Koremans ("**Koremans**") served as Teva's President & CEO—Global Specialty Medicines from April 2013 to December 2017.

6

21.    Defendant Michael M. Derkacz ("**Derkacz**") served as Teva's Senior Vice President & GM—Global Central Nervous System ("**CNS**") from January 2015 to June 2017.

22.    Defendant Kåre Schultz ("**Schultz**") has served as Teva's President and CEO and a member of the Board of Directors since November 1, 2017.

23.    Defendant Michael McClellan ("**McClellan**") served as Teva's Executive Vice President, CFO from November 2017 to November 2019.  He served as Teva's Interim Group Chief Financial Officer from July 2017 to November 2017.  From 2015 to November 2017, he served as Teva's Senior Vice President and CFO, Global Specialty Medicines.

24.    Defendant Brendan O'Grady ("**O'Grady**") has served as Teva's Executive Vice President and Head of North America, Commercial since December 2017.  He served as Teva's Chief Commercial Officer of Global Specialty Medicines from August 2016 until December 2017.

25.    Defendant Eli Kalif ("**Kalif**") has served as Teva's Executive Vice President, CFO since December 2019.

26.    Defendants Vigodman, Desheh, Koremans, Derkacz, Schultz, McClellan, O'Grady, and Kalif are collectively referred to herein as the "**Individual Defendants**" and together with Teva, as the "**Defendants**."

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background To The Kickback Scheme**

27.    Teva is a global pharmaceutical company focused on providing generics, specialty medicines, and biopharmaceuticals to patients worldwide.  *See* Teva Pharmaceutical Industries Limited, Annual Report (Form 10-K) 2 (Feb. 10, 2021) ("2020 10-K").  Teva is headquartered in Israel and operates its business through three segments: North America,

7

Europe, and International Markets.  *Id.*  Each business segment manages Teva's entire product portfolio in its region, including generics, specialty medicines, and over-the-counter products. *Id.*

28.    One of Teva's primary products is Copaxone® (glatiramer acetate injection), a drug approved for the treatment of patients with relapsing forms of multiple sclerosis ("**MS**"). *Id.* at 6.  Copaxone is administered by injection and is available in two doses, either 20 mg/mL daily, or 40 mg/mL 3 days a week.  *See* Here With Dosing Options For Your Lifestyle, Copaxone, https://www.copaxone.com/about-copaxone/dosage-information (last visited May 17, 2021).

29.    Copaxone falls into Teva's "specialty medicines" portfolio, which was divided into three categories: central nervous system "CNS" and pain, respiratory, and oncology.  2020 10-K at 3.  Copaxone is one of the three drugs in Teva's CNS category, along with Azilect® and Nuvigil®.  Teva Pharmaceutical Industries Limited, Quarterly Report (Form 10-Q) 38 (Oct. 29, 2015).

30.    Copaxone makes up a critical portion of Teva's business.  The drug is one of the leading MS therapies in the United States, and at the beginning of the Class Period, Teva described Copaxone as its "leading specialty medicine[.]" *See* 2020 10-K; Teva Pharmaceutical Industries Limited, Quarterly Report (Form 10-Q) 29 (Oct. 29, 2015).  Indeed, the drug was responsible for nearly half of the revenues for all specialty medicines combined.  *Id*.

### 1.    Medicare Assistance and Charitable Foundations

31.    Congress established Medicare in 1965 to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 1395 *et seq.*  In 2003, Congress passed the Medicare Prescription Drug, Improvement, and

8

Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D.  Under Medicare Part D, Medicare contracts with private entities, including pharmaceutical companies, known as Part D Plan Sponsors, to administer prescription drug plans.  *See* 42 C.F.R. § 423.4.

32.     Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("**CMS**"), which is part of the HHS.  *See* Ex A ¶ 15. Patients on Medicare Part D, a/k/a "Medicare Part D beneficiaries" who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor.  *Id.* ¶ 17.  Part D Sponsors, in turn, enter into subcontracts with pharmacies, or other "downstream entities," to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.  *Id.*  These downstream entities submit claims to Part D Plans that pay for the drug using funds provided by CMS from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund.  42 C.F.R. § 423.315(a).

33.     Under the statute, a Medicare Part D beneficiary may be required to make a partial payment for the cost of the prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "**co-pays**").  These co-pay obligations can be substantial for expensive medications and vary throughout the year, depending on the total Part D covered expenses the beneficiary has incurred in the year.  *See* 42 U.S.C. § 1395w-102. Congress included co-pay requirements in this program, in part, to encourage market forces to serve as a check on health care costs, including the prices that pharmaceutical manufacturers may charge for their drugs.  *See* Press Release, U.S. Attorney's Office District of Massachusetts, *Foundations Resolve Allegations of Enabling Pharmaceutical Companies to Pay Kickbacks to Medicare Patients* (Oct. 25, 2019).

34.     Generally, after a physician writes a prescription for a Medicare Part D beneficiary, the patient can take the prescription to a pharmacy or submit it to a mail order specialty pharmacy to be filled. *See* Ex. A ¶ 26. When the patient submits the prescription, the Medicare co-pay is due from the patient to complete the purchase of the drug and have the pharmacy fill the prescription. *Id.* ¶ 27. When the pharmacy dispenses a drug to a Medicare Part D beneficiary, the pharmacy submits a claim to the beneficiary's Part D Sponsor, which, in turn, submits an electronic record of the claim to CMS. *Id.* ¶ 28. After dispensing the drug, the pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the drug cost less the co-pay for which the Medicare Part D beneficiary was responsible. *Id.*

35.     In order to assist patients with the Medicare Part D co-pays, Charitable Patient Assistance Programs ("**Charitable PAP**") have been established to provide financial assistance grants to Medicare Part D beneficiaries. Healthwell Foundation, *When Health Insurance Is Not Enough: How Charitable Copay Assistance Organizations Enhance Patient Access to Care*, at 5 (2012), available at https://www.healthwellfoundation.org/wp-content/uploads/legacy/files/HWF-white%20paper%20for%20printing.pdf. These charitable foundations are primarily funded by tax-exempt donations from pharmaceutical companies. *Id.* at 7. The Charitable PAPs must be carefully structured and operated in compliance with applicable legal requirements of the Social Security Act. *Id.* Section 1128B(b) of the Social Security Act attaches criminal penalties to the knowing and willful offer, payment, solicitation, or receipt of any donation if the intent of the donation is to provide prescriptions that are reimbursable by a federal health care program. *Id.* Therefore, the funds received through donations must be applied generally to all beneficiaries, and it is illegal for a Charitable PAP to apply the funds received to any particular drug. *Id.*

10

36.     In 2005, HHS published a Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), which provided that "pharmaceutical manufacturers can donate to bona fide independent charity PAPs, provided appropriate safeguards exist." 70 Fed. Reg. 70625. These safeguards against unlawful use of charities for specific funding purposes, include that a Charitable PAP "must not function as a conduit for payments by the pharmaceutical manufacturer to patients," and that a pharmaceutical manufacturer should not "solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products." *Id.* at 70627. In 2014, HHS published a supplemental bulletin reiterating the restrictions on Charitable PAPs, entitled the Supplemental Special Advisory Bulletin, Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120 (May 30, 2014). The supplemental bulletin also advised that an action "indicative of a donor's intent to channel its financial support to copayments of its own products, [] would implicate the anti-kickback statute." 79 Fed. Reg. at 31123.

### 2.     The Federal False Claims Act and Anti-Kickback Statute

37.     The Federal False Claims Act, 31 U.S.C. §§ 3729 – 3733, was enacted in 1863 by Congress to combat fraud against the United States government. *See* The False Claims Act, United States Department of Justice, https://www.justice.gov/civil/false-claims-act (last visited May 12, 2021). The False Claims Act provides that anyone who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (C) conspires to commit a violation of subparagraph (A) [or] (B), . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than

11

$10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

38.     The anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "**Anti-Kickback Statute**"), was passed by Congress to address knowing and willful payments made to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients).  *See* Roadmap for New Physicians: Fraud & Abuse Laws, Office of the Inspector General, https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited May 12, 2021).  Congress determined that the inducements at issue would "contribute significantly to the cost" of Federal health care programs absent federal penalties as a deterrent. H.R. Rep. No. 95-393, at 53 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3056.

39.     The Anti-Kickback Statute provides:

(b) Illegal remunerations

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.

42 U.S.C. § 1320a-7b(b)(2).

40.    In 2010, Congress amended the Anti-Kickback Statute to include language providing that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim" under the False Claims Act. 42 U.S.C. § 1320a-7b(g).  Thus, under 42 U.S.C. § 1320a-7b(g) of the statute, claims submitted to Federal health care programs that result from violations of the Anti-Kickback Statute are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a).  Accordingly, when a person submits or causes to be submitted claims to Federal health care programs violate the Anti-Kickback Statute, he or she also violates the False Claims Act.

**B.    Teva Implements The Kickback Scheme To Inflate Copaxone Revenues**

**1.    Teva Initiates the Scheme Through Its Shared Solutions Program**

41.    In order to increase patient enrollment on Copaxone, Teva provided a suite of services called its "Shared Solutions" Program.  Ex. A ¶ 48.  Through the Shared Solutions Program, Teva offered free injection devices to administer the drug, maintained staff of nurses who provided patients with injection training, and assigned case managers to assist patients in obtaining insurance coverage for the drug.  *Id.*  Teva represented that it was committed to addressing the financial concerns raised by patients so that they were not faced with discontinuing therapy due to cost.  *Id.* ¶ 49.

42.    As part of the Shared Solutions Program, in 2006, Teva entered into a contract with ACS, a specialty pharmacy.  *Id.* ¶ 50.  ACS was co-founded by Edward Hensley ("**Hensley**"), who had a prior working relationship with Teva's Director of Customer Resources at the time, Denise Lynch ("**Lynch**").  *Id.*  As part of the contract, Teva sent to ACS the prescriptions for Copaxone received through the Shared Solutions Program for patients who either had or were eligible for Medicare Part D coverage.  *Id.*  If a patient was eligible for but did

13

not already have Medicare Part D coverage, ACS would assist that patient with enrollment.  *Id.*  If the patient was eligible for Medicare co-pay coverage from a Charitable PAP, ACS would gather the information from the patient and submit the application to the foundation.  *Id.*  The two Charitable PAPs to which ACS referred Teva's Copaxone reimbursement payments were the CDF and TAF.  Both CDF and TAF maintained "MS" funds, through which they provided co-pay assistance to patients for, ostensibly, any of the MS drugs on the market.  Ex. A ¶ 3.

43.    ACS's founder, Hensley, founded TAF in 2009.  *Id.* ¶ 52.  As well, during that same year, his for-profit business that he also founded, AssistRx, began running Teva's free drug program for Copaxone patients who did not have insurance.  *Id.*  The free drug program is operated through Teva's non-profit organization called the Teva Cares Foundation that provides medications at no cost to patients who meet certain insurance and income criteria.  *See* Welcome to the Teva Cares Foundation, Teva, https://www.tevacares.org/ (last visited May 17, 2021).  While running that program, AssistRx identified Medicare-eligible patients who were receiving free Copaxone from Teva.  Ex. A ¶ 52.  AssistRx arranged for those patients to instead obtain Medicare coverage, and referred them to ACS, which then would seek foundation co-pay funding for them.  *Id.*  In February 2015, AssistRx also took over ACS's role of arranging Medicare co-pay funding for Copaxone patients referred through Shared Solutions.  *Id.*

44.    When Teva began working with ACS, Teva and Hensley came to the agreement that the donations Teva provided to TAF and CDF would be used solely to reimburse Copaxone co-payments and would not be applied to other drugs funded by the foundations.  *Id.* ¶ 55; Ex. A-2.  ACS understood that Teva's goal was to use the Charitable PAPs as a "pass-through vehicle" to generate revenues for Copaxone.  Ex. A ¶ 56.  Indeed, in a 2007 email, Hensley explained to

14

his colleagues at ACS that "particular manufacturer funds [should] go to their own drug as [that was] what was the intent of the project was originally." *Id.*; Ex. A-8.

45.    In fact, Teva instructed ACS to not refer Medicare patients to Teva's Copaxone free drug program if foundation funds were accepting patients, because foundation-funded patients generated revenue from reimbursement, whereas free drug payments did not. Ex. A ¶ 57; A-10. For example, in an email sent in April 2016, a Shared Solutions supervisor explained that "[p]atients with government funded plans are not eligible to apply[]" for Teva's free Copaxone program. Ex. A-10. Teva made an exception to this policy for Copaxone patients who obtained prescriptions or Medicare Part D coverage near the end of the calendar year when no foundation coverage was available. Ex. A ¶ 57. At the beginning of the following year, Teva, ACS, and the Charitable PAPs worked to promptly move those patients onto foundation coverage. *Id*. For example, in an April 2016 email, a Shared Solutions employee stated, "in the past when a new Med D patient needs assistance and at that time (usually close to the end of the calendar year) the Foundation has closed its funds[,] [i]f we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up for Foundation Assistance for the following January when funds will be available." A-12.

46.    Teva's intention was to provide exactly the amount of money needed to fund the Copaxone co-payments to each foundation. For example, on December 30, 2009 and January 25, 2010, Teva paid TAF $15.7 million, approximately 99.9% of which was paid to Copaxone patients. Ex. A ¶ 88.

47.    As well, given that Teva intended for the donation payments to fund all of its Copaxone Medicare co-pays, Teva's Tax department determined in 2013 that the Company should treat the payments to the Charitable PAPs as business expenses rather than charitable

15

donations. *Id.* ¶ 63. In a July 2013 memorandum, a manager in Teva's Tax department reviewed Teva's recent payments to CDF and TAF and concluded that "[t]he payments . . . are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense." *Id.*; Ex. A-19.

48.    Further, Teva's payments to CDF and TAF were supposed to be applied to the foundations' MS funds generally, and thus in theory could assist patients on any MS drug. However, senior Teva executives recognized that was not the case and commonly referred to the payments as "Copaxone donations." Ex. A ¶ 64. For example:

- A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of *Copaxone donations* to be mailed on Dec 29th[.]" *Id.*

- A January 2015 e-mail from Desheh, approving a "*Copaxone Donation* payment." Ex. A-21.

- A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines unit, with the subject "Response requested: Approval for *Copaxone donation* payment." Downey approved, and forwarded the e-mail to Koremans, who approved as well. Ex. A-22.

- An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and Support, approving a "*Copaxone Donation*" in the amount of $725,000. Ex. A-23.

- A January 2017 e-mail from a Teva NASM VP of Finance to Koremans regarding "*Copaxone donations* approval." Ex. A-24.

16

49.     Teva was able to accomplish this scheme through the mechanics of its arrangements with ACS, CDF, and TAF.  Teva needed three data points to calculate how much to pay CDF and TAF at the end of each year to ensure that the foundations would continue to cover all of Copaxone patients' Medicare co-pays in the following year: (1) the number of Copaxone patients enrolled in each fund; (2) each fund's annual per-patient grant amount; and (3) each fund's administrative fee, which was generally 9%.  Ex. A ¶ 79.

50.     Teva regularly received from CDF and TAF the per-patient grant amount that the foundations provided to Copaxone patients.  *Id.* ¶ 80; Ex. A-2 ¶ 13.  For example, an email Hensley sent to Lynch on September 17, 2011 (attached hereto as A-35), stated the following:

> The allocation per patient for 2012 is $4,600.  To give you a historical number of what it has been in the past:
>
> 2012 - $4,600
> 2011 - $4,400
> 2010 - $5,600

51.     Then, Teva periodically obtained from ACS the number of Copaxone patients who were receiving co-pay coverage from each foundation.  Ex. A ¶ 82.  For example, on December 5, 2013, ACS employee David Blanc sent an email to Lynch with the latest numbers, showing "TAF 5614 . . . CDF . . . 1188 . . . LIS 3543[.]"  A-43.

52.     With those numbers in hand, Teva simply had to multiply the number of patients by the grant allocation per patient and factor in the administration fee to calculate how much to pay each foundation.  Ex. A ¶ 83.  As Jennifer Clark ("**Clark**"), an Associate Director in Teva's Patient Services department, explained:

> So, I would take an estimated number of Medicare patients, apply that towards what the typical average Medicare cost per patient might be for a calendar year, and then multiply that times those patients to determine what that might look like. And then I understood the administration fees for foundations were typically

17

somewhere in the nine percent range, so I would do that calculation to determine how much we would need for the upcoming year.

*Id.* ¶ 84.

53.    For example, in September 2011, after having just learned that ACS was estimating that 5,572 Copaxone patients would be receiving foundation co-pay coverage by the end of that year, Clark put together the following budget spreadsheet:

| | A | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|
| 1 | | | 2011 | 2012 | 2013 | 2014 | | "2013 is first year |
| 2 | 501c Funding per pt | | | 4771 | 5004 | 5280 | | |
| 3 | Katie's portion | | | 1867 | 1900 | 1900 | | "patient picks up more than p |
| 4 | Govt Portion | | | | | | | |
| 5 | Medicare Funding per pt | $ | 6,250 | $ 6,638 | $ 6,904 | $ 7,180 | | |
| 6 | Qual-new Medicare pt | $ | 150 | $ 150 | $ 150 | 150 | | |
| 7 | Requal-Medicare pt. | $ | 125 | $ 125 | $ 125 | 125 | | |
| 8 | Adherence rate | | 88% | 88% | 88% | 88% | | |
| 9 | Admin fee | | 3% | 3% | 3% | 3% | | |
| 10 | Additional factor for | | 120% | 120% | 120% | 120% | | |
| 11 | Estimated Fund Carryover | | | | | | | |
| 12 | COGS & Shipping & Handling - Med D Free - per month ($60+$70) | $ | 190 | $ 130 | $ 130 | $ 130 | | |
| 13 | Average # of Med D Free dispenses per pt | | 4 | 3 | 3 | 3 | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | Beginning of Year | | | 6300 | 5988 | 5330 | | |
| 17 | Additional new pts - assistance donated | | | 500 | 506 | 473 | | |
| 18 | Med Free Roll-over | | 525 | 525 | 483 | 452 | | |
| 19 | Retention - Patients at year-end (full funding & partial LIS) | | 5775 | 5984 | 5715 | 5107 | Per Zach, 8/31 | |
| 20 | Full LIS | | 2475 | 2723 | 2995 | 2750 | Per Zach, 8/31 | |
| 21 | Total Patient Count | | 8775 | 9232 | 9193 | 8308 | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | Qualification-new pts. | $ | 94,500.00 | $ 184,500.00 | $ 178,020.00 | $ 166,410.00 | | |
| 25 | Qualification-existing pts. | $ | 78,750.00 | $ 1,098,750.00 | $ 1,046,592.00 | $ 938,212.67 | | |
| 26 | TN50% portion on assisted pts | | | | | | | |
| 27 | Donut Hole Funding | $ | -- | $ 32,442,800.00 | $ 32,494,259.87 | $ 30,639,197.37 | | |
| 28 | Total Donation | $ | - | $ 35,651,428.57 | $ 35,707,977.87 | $ 33,669,447.66 | | |
| 29 | Admin fee | $ | - | $ 3,208,628.57 | $ 3,213,718.01 | $ 3,030,250.29 | | |
| 30 | Estimated Fund Carryover | $ | - | $ - | $ - | - | | |
| 31 | TOTAL Medicare - excl | $ | 173,250.00 | $ 36,934,678.57 | $ 36,932,589.87 | $ 34,774,070.32 | | $5.5M donation made 12/31/2009 |

*Id.* ¶ 85; Ex. A-44.  The number "5775" on line 19 was the number Clark had received from ACS, rounded up, as indicated by the note, "Per Zach [Grammage at ACS], 8/31" in column H.

*Id.*  The figure 525 in "Med Free Roll-Over" on line 18 had also been provided by ACS and represented the number of Copaxone patients who were then receiving the drug for free but would obtain foundation coverage in 2012.  *Id.*  Clark added 5,775 to 525 to arrive at 6,300, which appears in line 16 of the spreadsheet as the estimated "Beginning of the Year" patients who would receive foundation funding for 2012.  In line 17 of the spreadsheet, Clark estimated

18

that an additional 500 patients would receive foundation co-pay coverage during the course of 2012.  Clark then added 6,300 to 500 to reach 6,800 as the estimated total number of patients receiving foundation co-pay coverage in 2012, and then multiplied that number by $4,771, the "501c Funding per pt" amount in line 2, to reach the "Donut Hole Funding" amount of $32,442,800 on line 27.  Clark then added the foundations' 9% administration fee to generate the "Total Donation" amount of $35,651,428.57 on line 28.  *See also* Ex. A-48 showing the Copaxone donation calculation for 2015.

54.     During the last week of December 2011 and the first week of January 2012, Teva paid CDF and TAF a total of $33,200,000 from its foundation budget.  Ex. A ¶ 86.

55.     After the beginning of each calendar year, TAF closed its MS fund because it had committed all of its funding to existing patients who had renewed their annual co-pay grants.  *Id.* ¶ 89.  In order to ensure that new Copaxone patients were able to sign up and receive funding from TAF through the remainder of the year, Teva, ACS, and TAF engaged in a coordinated process to enroll these patients.  *Id.* ¶ 90.  First, ACS would tell Teva how many new Copaxone patients were awaiting Medicare co-pay funding at a particular time.  *Id.*  Second, TAF would tell Teva the average per-patient Medicare co-pay grant amount at that time.  *Id.*  Third, Teva would multiply those amounts together and factor in TAF's standard administration fee to determine how much to donate to TAF.  *Id.*  Fourth, Teva would tell ACS how much it planned to pay TAF.  *Id.*  Fifth, ACS would send a "batch file" of Copaxone co-pay coverage applications to TAF as soon as TAF received funding from Teva.  *Id.*

56.     For example, on April 22, 2014, Lynch sent an email to her colleague Barb Ross, requesting "the number of patients we have ready to go to ACS, May eligible and approx. how many we are sending over a day."  Ex. A-76.  Later that day, ACS sent Ross an e-mail with the

19

subject line "CPA numbers" stating that ACS had "approx. 187 and 27 pending interviews." Ex. A-75. Thereafter, Ross reported back to Lynch that "we have 187 ready to go, 27 that still need financial assessments, and 40 for May eligible." Ex. A-76. At that time, TAF's per-patient grant amount was $4,500 and its administrative fee was 9%. Ex. A ¶ 100. A calculation of those amounts, (187 + 27 + 40) x $4,500 x 1.09, resulted in a total of $1,245,870. *Id.* Thus, on April 24, 2014, Teva paid TAF $1,275,000. Ex. A-77. Shortly after Teva sent the payment to TAF, ACS employee Blanc instructed his colleagues at ACS to "prepare a file for referral to TAF for Copaxone in the morning tomorrow." Ex. A-78.

### 2. Teva Employees Were Aware That Copaxone Sales Relied Upon Charitable Donations

57.     Executives at the Company were aware that Teva's sales of Copaxone were directly correlated with the amount of money the Company donated to Charitable PAPs because all of the money Teva donated to the foundations was being used to cover only Copaxone co-pays. *See* Ex. A ¶ 58. According to Confidential Witness 1 ("**CW1**"), who served as Teva's Director of Marketing from June 2014 to August 2016 and Senior Director of Marketing from January 2018 to December 2018, donations to Charitable PAPs were included in the profit and loss statements under the individual line item, "Charitable Contributions."

58.     Further, in an e-mail dated January 9, 2015, Clark warned that, if Teva cut its foundation payments, the company's sales forecasts would be "overstated[,]" explaining that "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made." Ex. A-15. A few weeks later, on February 2, 2015, Alejandro Castro, a Teva financial analyst, emailed David Loughery, Teva's Vice President of Finance, to advise him that "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing

20

donations." Ex. A-16. Castro continued on to explain that he was told by the Patient Access department "that they will need between $5M and $8M in donations soon to avoid losing an estimated 1,500 Medicare Patients." Ex. A-16. In response, Loughrey told Castro that, instead of cutting the budget, "we agreed yesterday to fund $8.5M today, which is ~$3M more than the remaining Q1 budget." *Id.*

59.    Later that year, on August 13, 2015, Jennifer Clark warned Ryan Sloss, a Teva finance manager, that "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill." Ex. A-17. Sloss agreed, stating, "we either pay it and go over budget or we don't make our sales numbers." *Id.*

60.    In October 2016, executives circulated a business plan that included a $40 million "Medicare donation" as part of its Copaxone "marketing" strategy:

## Marketing: Supporting Activities and Spend

KBQ: What supporting activities are needed to successfully execute key tactics?

$ million

| SI | CSF | Key Tactics | Supporting Activities | Owner | Start Month | End Month | Budget |
|----|-----|-------------|----------------------|-------|-------------|-----------|--------|
| 1 | a. | HCP Personal HCP Promotion | Field Sales and Materials | US Sales | Jan | Dec | 2 |
| | | | Speaker Programs | US Marketing/US Sales | Jan | Dec | 7 |
| | | | Conventions | US Marketing | Jan | Dec | 1 |
| 1 | a | HCP Non Personal Promotion | COPAXONEHCP.com | US Marketing | Jan | Dec | 4 |
| | | | MSKnowledgeSeries.com (unbranded) | | | | |
| | | | Email and other Digital Media | | | | |
| 2 | a | Medicare Donation | - | US Marketing | Jan | Dec | 40 |
| 1 | a | Advocacy | Charitable Donations and Sponsorships | US Marketing | Jan | Dec | 2 |

Continued on next slide

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR INTERNAL DISUCSSION ONLY

21

*See* U.S. House of Representatives' Committee on Oversight and Reform, *Drug Pricing Investigation – Copaxone*, 18-19 (2020) ("**Congressional Staff Report**"), attached hereto as Exhibit B.  The documents attached to the Congressional Staff Report are referred to herein as "Ex. B-__".

61.    As Teva began planning for 2018, early drafts of one of the Company's strategic planning documents noted that eliminating its "Medicare Donation" to third-party foundations would cost Teva up to $261 million in Copaxone sales:



Congressional Staff Report at 20.  On August 30, 2017, Loughrey sent an email to John Hassler, Teva's General Manager, requesting that Hassler remove the analysis regarding the impact of the "Copaxone Donation" on net sales because he is "not comfortable including the sales impact of the reduced donations. . . . could you have someone send this to me with the 0-$128M range line excluded."  Ex. B-42.

22

62.     At the beginning of 2018, Defendant O'Grady received a presentation on the

company plan for the year.  One slide, entitled "Copaxone Executive Summary," stated that

"27% of patients on Copaxone 40mg are Medicare Part D" patients and if those patients are not

able to receive funding in Q1, they "may not fill Rx and go off therapy, which would result in a

negative impact to the brand of $210-280M."  Ex. B at 21.  In the speaker's note for the slide,

Teva executives identified "Donations" as one of the "High priority projects for execution."  *Id.*

A copy of the slide is shown below:



63.     On January 31, 2018, after being advised that an insurer had moved Copaxone 40

mg/mL to a non-preferred medication list for both commercial and Medicare patients, O'Grady

explained to a colleague that the non-preferred status "means little as ***we buy the patients [sic]***

***copay down to zero anyway***."  Ex. B-54.

**3.     Teva's Senior Management Approved of the Kickback Scheme**

64. Senior management at Teva was aware of the donations to CDF and TAF because large payments had to be approved by Teva's higher-ups. Ex. A ¶ 13. According to Confidential Witness 2 ("**CW2**"), who served as the Associate Director of Treasury from July 2015 to September 2019, the largest disbursements to the Charitable PAPs always took place toward the

Approval Authority Levels
$0.5M Sr. Director
$1M VP
$5M SVP (Larry Downey in the past)
$15M TEC members (Rob Koremans)
$25M CFO (Eyal Desheh)
>$25M CEO (Erez Vigodman)
*** I'm not sure if there is a point in which Board of Directors approval is necessary. Anna Khais or Roberta Diver can advise.

end of a given year. A member of the treasury department would set up the payment and make sure that all of the necessary management approvals were obtained. CW1 explained that the approvals from top management depended upon the amount of the donation payment. For example, a September 21, 2015 email discussing the Copaxone donations process set forth the following payment approval levels:

Ex. A-3. Later in the email chain, on December 27, 2015, David Loughery, Teva's Vice President of Finance for North America, Specialty Medicines, emailed Eyal Desheh seeking approval of a large foundation payment, stating, "Please find attached a request for a $30M donation payment to be made to assist MS patients with their co-pay. Based upon the size of this payment, I believe it may need approval from Erez as well." *Id*.

65. Koremans and Desheh approved payments earlier that year as well. On January 9 and 10, 2015, Koremans and Desheh approved a "Copaxone Donation payment" of $25M. Ex. A-21. On February 4, 2015, Koremans approved a "Copaxone donation payment" of $8.5 million. Ex. A-22.

66. On January 29, 2016, David Loughrey emailed Larry Downey and Michael McClellan seeking approval of a wire transfer stating, "Attached is a request to pay another

24

$10M for *Copaxone donations*. Mike Sheehy has approved . . . . this is a common payment we make each year." *See* Ex. B-39.

67.    In an email on January 13, 2017, a Teva employee explained the funding progress for the upcoming Copaxone donations, stating the following:

- [Name Redacted] to receive a request for Copaxone donations from The Assistance Fund – done, received from 3 funds
- [Name Redacted] to request the perspective of the Copaxone Marketing team [Name Redacted] and determine the Marketing budget available – done, [Redacted Name] confirms $38M available in Copaxone 2017 budget for donations

- [Redacted Name] to work with Dave Loughrey (NASM CFO) and Mike McClellan (GSM CFO) to determine timing of payment. For example, Teva may pay a portion of the 2016 budgeted donations in the last few days of 2015.—In progress . . . .

Ex. B-38.

68.    Several days later, on January 19, 2017, David Loughery sought approval of the $38M donation from Koremans. Ex. A-24. Loughrey emailed Koremans regarding "Copaxone donations approval" and explaining the rationale behind the payments:

> "Very soon you will receive requests to approve 3 separate payments related to 2017 planned Copaxone donations totaling $38M. . . . These payments aid Medicare patients with their copays is [sic] they encounter the Donut Hole period. . . . The majority of patients would receive the benefit before the end of February, thus why we make these funds available for agencies early in the year. . . . The Corporate Social Responsibility Team has communicated to these agencies our intent to fund and these agencies are funding patients currently based upon the expected receipt of these amounts."

*Id.*

69.    While this scheme was going on, Teva raised the price of Copaxone at a rate of over 19 times the rate of inflation, from approximately $17,000 per year to $73,000 per year. Ex. A ¶ 2.

**C.    Defendants Materially Overstate Copaxone's Financial Results And Market**

25

**Demand**

70.    During the Class Period, Defendants concealed Teva's scheme to use Charitable PAPs as pass-through vehicles to fund sales of Copaxone by making false and/or misleading statements regarding the financial results of Copaxone and the market demand for the drug.

71.    The Class Period begins on October 29, 2015, when Teva issued a press release that it filed with the SEC as a Form 6-K, reporting the Company's financial and operating results for the third quarter of 2015.  In regard to Copaxone, the press release stated, in relevant part:

> **Copaxone**®. In the third quarter of 2015, Copaxone® (glatiramer acetate injection 20 mg/mL and 40 mg/mL), our leading specialty medicine, *continued to be the leading multiple sclerosis therapy in the United States and globally*. *Our sales of Copaxone® amounted to $1.1 billion*, a decrease of 2% compared to the third quarter of 2014.
>
> *Copaxone® revenues in the United States in the third quarter of 2015 were $878 million*, an increase of 10% compared to the third quarter of 2014. *The increase was mainly due to higher sales volume in the third quarter of 2015*, partially offset by net pricing declines. The Copaxone® family's U.S. market shares in terms of new and total prescriptions were 27.1% and 29.3%, respectively, according to September 2015 IMS data.
>
> At the end of September 2015, *Copaxone® 40 mg/mL three times a week in the United States accounted for approximately 76% of total Copaxone® prescriptions. This was driven by patient and physician choice of the 40 mg/mL version, supported by payor access and patient support activities*.
>
> \* \* \*
>
> *Copaxone® revenues in the United States accounted for 81% of global Copaxone® revenues in the third quarter of 2015*, compared to 72% in the third quarter of 2014.
>
> \* \* \*
>
> *Copaxone® was responsible for approximately 22% of our revenues in the third quarter of 2015*, *and contributed a significantly higher percentage to our profits and cash flow from operations during such period*.

72.    Following its press release, on October 29, 2015, Teva also filed a Quarterly Report for the third quarter of 2015 with the SEC on Form 6-K.  The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as *$1,085,000,000* for the "Three

26

Months Ended September 30, 2015" and *$3,939,000,000* for the "Nine Months Ended September 30, 2015[.]"

73.     Later that day, Teva hosted an earnings conference call to discuss the Company's financial results for the third quarter of 2015.  On the call, defendant Vigodman highlighted the Company's Copaxone sales and revenues, stating that "all the measures we conducted in order to maintain the Copaxone started to deliver."  During the call, Desheh stated, in relevant part:

> ***Copaxone continued to demonstrate amazing strength against oral competition, now also against generic competition***. You see the numbers. You see the green line is market share of our 40 milligram, ***the biggest selling MS therapy in the world today with over 22% market share in the United States. And we are seeing growth in market share in the ex-U.S. territories, as we introduce 40 milligram***. And wherever we introduce 40 milligram, we see it picking up and really gaining market share in every country.
>
> ***So Copaxone in total, strong quarter. Actually a record quarter in the United States, just a little bit above Q2, $878 million.  All in all very, very strong quarter with $1.080 billion in total sales, a little over that. So Copaxone [is] very, very durable in the—so what we believe is going to be the impact in certain scenarios starting 2017***.

74.     The statements by Defendants Teva, Vigodman, and Desheh in ¶¶ 71-73 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)      Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)      If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

27

c)      As a result, Teva's sales and revenues for Copaxone and the market

demand for the drug were artificially inflated during the Class Period.

75.      On November 19, 2015, defendant Desheh attended the Jefferies Autumn Global

Healthcare Conference.  During the conference, Desheh stated in relevant part:

And by the way, Europe as well. And we are having in audience, Gerard van Odijk, who used to manage our European business for many, many years and a good friend. And he can tell you about the competition in generics everywhere in the world. So it's a highly competitive environment with players coming from all over the world, with a very fierce price competition. The price of generics went down 50% over the past 10 years. *The price of specialty products went up by 200% over the past 10 years.*

*And Teva was not associated with any of that. So we are playing the competitive game. We are playing it fairly. We, of course, play by the book and by the rule. And we believe that our exposure to any initiative on price reduction in the United States is as small as anybody can have*. We went through this period in Europe with all the austerity measures through 2010, 2011, 2012; we saw the price being pushed down by governments that want to see that as a source to balance their budget. This is very legitimate.

* * *

*And what we are seeing is something which is simply called brand loyalty.* MS patients have a long life expectancy. And the quality of life is extremely important to them because they try to live normal lives like everybody else, have career, have children and raise them. That is extremely important to MS patients. *And patients have been simply pushing back. They don't want a generic because they are not 100% sure that it would treat them as well as the original.*

*And by the way, why did we only convert 75%? Because 25% of MS patients who are on 20-milligram don't even want to make the change from 20 to 40.* They said, I want Teva Copaxone 20-milligram, once-a-day injection. And that's what I want. Don't try to change. I don't want to take the risk that it will have an impact on the progression of the disease, of the quality of my life. *And these people, who are the potential for the generic introduction, are pushing back the hardest. They simply want to stay on the therapy that they have. And that explains why the penetration of Glatopa is only 20% and flat for the past four months. And probably indicates that any attempt to reduce the price is not going to change it. So the manufacturers understand that what they do today in terms of price will probably also help them maximize their sales and revenues and profits.*

28

76.     The statements by Defendants Teva and Desheh in ¶ 75 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

   a)   Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

   b)   Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take the less expensive generic version of the drug; and

   c)   As a result, market demand for Copaxone and the drug's ability to compete with the available generic products were materially overstated during the Class Period.

77.     On February 11, 2016, Teva filed its Annual Report for the year ended December 31, 2015 on Form 20-F with the SEC (the "2015 20-F").  The 2015 20-F was signed by Desheh and listed Copaxone revenues as *$4,023,000,000* for the "Year Ended December 31, 2015[.]"  As well, in regard to Copaxone, the Annual Report stated in part:

> ***The key elements of our strategy consist of the following: . . . Maintaining Copaxone® and other key specialty products.***  We have enhanced our multiple sclerosis ("MS") franchise through the introduction of our three-times-a-week Copaxone® 40 mg/mL product in the United States, and will launch Copaxone® 40 mg/mL in Europe and other countries in 2015.  For many of our other specialty products, we are expanding into new markets, improving the products and taking further steps to protect the franchise while creating value for patients and payors.
>
> <p style="text-align:center">* * *</p>
>
> ***Copaxone® revenues in the United States in 2015 increased 4% to $3.2 billion, mainly due to higher volumes***, partially offset by net pricing declines. Our U.S.

<p style="text-align:center">29</p>

market shares in terms of new and total prescriptions were 26.5% and 30.0%, respectively, according to December 2015 IMS data.

***Revenues in the United States accounted for 81% of global Copaxone® revenues in 2015***, an increase from 73% of global sales in 2014.

* * *

***Copaxone® accounted for 20% of our revenues in 2015, and a significantly higher percentage contribution to our profits and cash flow from operations during such period***.

78.     The statements by Defendants Teva and Desheh in ¶ 77 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)     If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)     As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

79.     On March 16, 2016, defendants Desheh and Derkacz attended the Barclays Global Healthcare Conference.  During the conference defendants Desheh and Derkacz stated, in relevant part:

[Douglas Tsao, Analyst]: Then maybe turning to Copaxone, the conversion to the 40 mg has been a big success, probably much greater than anybody thought, especially in the fact that it seems like it's still taking place. What do you think has helped you really retain such strong share even within the 20 mg category in the phase of competition?

30

[Derkacz]: . . . I think couple of things, Doug, that you mentioned are important here, one is the success of Copaxone and the conversion continues. In fact, *I know you're all aware of the TRx, the total prescription leadership that Copaxone 40 mg has achieved in the US marketplace, up 24% now, ahead of Tegretol. . . .*

*So if you think about where we were just a couple of years ago, I don't know how many people in the room would have thought that Copaxone 40 mg would have been the first product that physicians go to in 2016. But it's an incredible performance.* I say this because it's very important when we look to demonstrate our ability to launch in a marketplace where we have expertise and relationships.

\* \* \*

[Desheh]: Maybe, one more comment of what we've learned from the launch of Glatopa, what we have learned is that *there is a very, very significant pushback from doctors on the generic product or Copaxone, very strong pushback from the patient and MS patients are among the most knowledgeable patient about their disease and the treatment available to them. . . . And the reason -- there are two main reasons for that the way we understand it, one is the loyalty to the brand and the fact that, hey, I want a real thing and I'm going to live another 30 or 40 or 50 years,* because MS patients live a very long time and the life expectancy of an MS patient is only two to three years less than the average population.

80.     The statements by Defendants Teva, Desheh, and Derkacz in ¶ 79 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

      a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

      b)    Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take the less expensive generic version of the drug; and

31

c)    As a result, market demand for Copaxone and the drug's ability to compete with the available generic products were materially overstated during the Class Period.

81.    On May 9, 2016, Teva issued a press release that it filed with the SEC as a Form 6-K, reporting the Company's financial and operating results for the first quarter of 2016.  In regard to Copaxone, the press release stated, in relevant part:

> Copaxone® In the first quarter of 2016, Copaxone® (glatiramer acetate injection), continued to be the leading multiple sclerosis therapy in the United States and worldwide. *Global sales of Copaxone® amounted to $1.0 billion, an increase of 9% compared to the first quarter of 2015. Over 81% of the total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version supported by payor access and patient support activities*.
>
> *Copaxone® revenues in the United States in the first quarter of 2016 were $821 million*, an increase of 12% compared to the first quarter of 2015. The increase was mainly due to higher net pricing, including a price increase of 7.9% in January 2016 on Copaxone® 20 mg/mL and 40 mg/mL*.* Our U.S. market shares in terms of new and total prescriptions were 28.1% and 29.8%, respectively, according to March 2016 IMS data.
>
> *Revenues in the United States accounted for 82% of global Copaxone® revenues in the first quarter of 2016*, compared to 79% in the first quarter of 2015.
>
> *Copaxone® accounted for approximately 21% of our revenues in the first quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period*.

82.    Following its press release, on May 9, 2016, Teva also filed a Quarterly Report for the first quarter of 2016 with the SEC on Form 6-K.  The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as *$1,006,000,000* for the "Three Months Ended March 31, 2016[.]"

32

83.     Later that day, Teva hosted an earnings conference call to discuss the Company's financial results for the first quarter of 2016.  In regard to Copaxone, during the call Defendants stated, in relevant part:

[Vigodman]:    *Copaxone 40mg continued to gain market share, leading the MS market with 24.5% TRx [total prescriptions] share at the end of March versus 20.3% at the end of March 2015, and 82% share of the overall Copaxone family TRx*

* * *

[Desheh]:     *Copaxone sales were 21% of total,* 1% higher than in full-year 2015. The specialty business without Copaxone was 24% of sales, an improvement, compared to the 2015 average, of 2%. . . . *Copaxone contributed 44% of total profit,* compared to 42% for the whole year of 2015*. Speaking about Copaxone -- when we look at results quarter over quarter, total scripts were the same level as last year, with an increased proportion of 40-milligram, which contributes to our profit, where the small increase in units sold as well as the positive price effect leading to 9% sale growth mainly in the United States market.*

* * *

[Koremans]:    First, the *Copaxone is really doing well*. . . . [W]e see a lot of the impact also from the net price increase of 7.9% that we did for both strengths in the beginning of the year. *But it's actually really a result of a fantastic underlying demand. The product is keeping well. It's the number one product in new patients now*, *and Copaxone is actually really a very good alternative and patients have access to it, right? So in no way has the price been a limitation in that sense, and I think that's the key going forward is you'll always have to be able to demonstrate value to stakeholders, to patients, to payers, and overall for your products in whatever we offer*.

It's really important to be able to share the value of what you're doing. *And it's not just about the price, but it's really an incredibly important thing to just talk about the value that you are offering*.

*And clearly, for Copaxone*, we're having the right mix. The product is much appreciated, unparalleled in its track record of both efficacy and safety, *and available to just about 96% of lives in the U.S. So pricing there I see extremely good*.

33

84.      The statements by Defendants Teva, Desheh, Vigodman, and Koremans in ¶¶ 81-83 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)      Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)      If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)      As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

85.      On June 9, 2016, defendant Derkacz attended the Jefferies Healthcare Conference.  During the conference, defendant Derkacz stated, in relevant part:

[Dave Steinberg, Analyst]:  We'll start with Copaxone, then we'll move down the list to some of their near-term opportunities and earlier-term opportunities. . . . So we now have a generic on the market, Glatopa. First, do you think you can switch even more to the three times weekly with Glatopa on the market? And Glatopa has been on the market for a while. And really it hasn't done very well. Maybe you can discuss why. And will this poor performance continue?

[Derkacz]: . . . So I think it's important to start with kind of where we are to date with Copaxone 40 milligram.  *Right now, we are at an 82% share for 40 milligram within the branded business.  So 82% for 40.  And the balance for 20 milligram.*

*So if we look at the category, Copaxone 40 milligram is at about 24%, which puts it at the top, actually the leading TRx share in the MS category. And if you consider Glatopa, Glatopa has about a 6.5% share of the total Copaxone market, or about a 1%-- just a little bit over 1% of the MS category. . . .*

*So I think this gives us an incredible amount of confidence that we've been able to increase and sustain that trajectory over a long period of time in the US. It really suggests that this business is very durable. . . .*

34

86.     The statements by Defendants Teva and Derkacz in ¶ 85 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

    a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

    b)     Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take the less expensive generic version of the drug; and

    c)     As a result, market demand for Copaxone and the drug's ability to compete with the available generic products were materially overstated during the Class Period.

87.     On August 4, 2016, Teva issued a press release that it filed with the SEC as a Form 6-K, reporting the Company's financial and operating results for the second quarter of 2016.  In regard to Copaxone, the press release stated, in relevant part:

> *Copaxone® (glatiramer acetate injection) continued to be the leading multiple sclerosis therapy in the United States and worldwide in the second quarter of 2016.  Global sales of Copaxone® were $1.1 billion, an increase of 8% compared to the second quarter of 2015*.
>
> *Copaxone® revenues in the United States in the second quarter of 2016 were $955 million*, an increase of 10% compared to the second quarter of 2015.  The increase was mainly due to a reduction of sales in the Medicaid channel, resulting in both lower rebates in the current quarter and a change in the estimate for rebates in prior quarters, which had an overall positive impact.  Sales were also impacted by a price increase of 7.9% in January 2016 for both Copaxone® 20 mg/mL and 40 mg/mL.  Over 82% of the total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of

35

the 40 mg/mL version supported by payer access and patient support activities. *Our U.S. market shares in terms of new and total prescriptions were 24.9% and 29.1%, respectively, according to June 2016 IMS data*.

*Revenues in the United States accounted for 84% of global Copaxone® revenues in the second quarter of 2016,* similar to the second quarter of 2015.

<div align="center">* * *</div>

*Copaxone® accounted for approximately 23% of our revenues in the second quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period*.

88.    Following its press release, on August 4, 2016, Teva also filed a Quarterly Report for the second quarter of 2016 with the SEC on Form 6-K.  The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as *$1,141,000,000* for the "Three Months Ended June 30, 2016" and *$2,147,000,000* for the "Six Months Ended June 30, 2016[.]"

89.    Later that day, Teva hosted an earnings conference call to discuss the Company's financial results for the second quarter of 2016.  In regard to Copaxone, during the call Derkacz stated, in relevant part:

So on the Copaxone share, I think *we're very, very pleased with the fact that 40mg is about 83% the U.S. marke*t.  Of the number one product in the MS category now, of course, is *40mg at a 24.1% share*. . . . *And I think this just speaks to the support by payers, by patients, by physicians around the long-proven track record of safety and efficacy of the product and a tribute to the team's great work here*.

90.    On November 15, 2016, Teva issued a press release that it filed with the SEC as a Form 6-K, reporting the Company's financial and operating results for the third quarter of 2016. In regard to Copaxone, the press release stated, in relevant part:

Copaxone® (glatiramer acetate injection) continued to be the leading multiple sclerosis therapy in the United States and worldwide in the third quarter of 2016. *Global sales of Copaxone® were $1.1 billion,* a decrease of 2% compared to the third quarter of 2015.

*Copaxone® revenues in the United States in the third quarter of 2016 were $874 million*, flat compared to the third quarter of 2015, mainly due to a price

<div align="center">36</div>

increase of 7.9% in January 2016, which was offset by a volume decrease for Copaxone® 20 mg/mL. Over 83% of the total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version supported by payer access and patient support activities. *Our U.S. market shares in terms of new and total prescriptions were 27.0% and 29.2%, respectively, according to September 2016 IMS data*.

*Revenues in the United States accounted for 82% of global Copaxone® revenues in the third quarter of 2016, compared to 81% in the third quarter of 2015*.

<p style="text-align:center">* * *</p>

*Copaxone® accounted for approximately 19% of our revenues in the third quarter of 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during such period*.

91. Following its press release, on November 15, 2016, Teva also filed a Quarterly Report for the third quarter of 2016 with the SEC on Form 6-K. The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as *$1,061,000,000* for the "Three Months Ended September 30, 2016" and *$3,208,000,000* for the "Nine Months Ended September 30, 2016[.]"

92. The statements by Defendants Teva, Desheh, and Derkacz in ¶¶ 87-91 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a) Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b) If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

<p style="text-align:center">37</p>

c)    As a result, Teva's sales and revenue for Copaxone and the market

demand for the drug were artificially inflated during the Class Period.

93.    On February 13, 2017, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the fourth quarter of 2016.  On the call, defendant Koremans stated, in relevant part:

> *So what we have had recent insights coming from patients and physicians, research and payer research suggests very clearly that when forced to use a generic of Copaxone, about 70% of patients and doctors would opt to an oral therapy, rather than to a generic.*
> *We believe and as you well know, Copaxone is the number one in new patients,* not only in the US. But also in some of the key European markets.

94.    The statements by Defendants Teva and Derkacz in ¶ 93 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and

TAF as unlawful conduits to fully cover the co-payments incurred by

Medicare patients taking Copaxone;

b)    Because Teva's kickback scheme resulted in Copaxone being free to

Medicare patients, those patients were not motivated to switch off of

Copaxone in order to take the less expensive generic version of the drug;

and

c)    As a result, market demand for Copaxone and the drug's ability to

compete with the available generic products were materially overstated

during the Class Period.

95.    On February 15, 2017, Teva filed its Annual Report for the year ended December 31, 2016 on Form 20-F with the SEC (the "2016 20-F").  The 2016 20-F was signed by Desheh

and reported Copaxone revenue as ***$4,223,000,000*** for the "Year Ended December 31, 2016[.]"

As well, in regard to Copaxone, the Annual Report stated in part:

> ***The key elements of our strategy are: . . . Maintaining Copaxone® and other key specialty products***.  We enhanced our MS franchise through the introduction of our three-times-a-week Copaxone® 40 mg/mL product in the United States in 2014 and in additional countries since 2015.
>
> \* \* \*
>
> ***Global sales of Copaxone® were $4.2 billion***, an increase of 5% compared to 2015.
>
> ***Copaxone® revenues in the United States in 2016 increased 7% to $3.5 billion***, mainly due to higher net pricing, resulting from a change in patient mix which increased our selling price and a corresponding change in certain prior period rebate accrual estimates, as well as a price increase of 7.9% in January 2016, partially offset by lower volumes of Copaxone® 20mg/mL. Over 84% of total U.S. Copaxone® prescriptions are now filled with the 40 mg/mL version, driven by patient and physician choice of the 40 mg/mL version, supported by payer access and patient support activities. ***Our U.S. market shares in terms of new and total prescriptions were 27.9% and 29.3%, respectively, according to December 2016 IMS data***.
>
> ***Revenues in the United States were 82% of global Copaxone® revenues in 2016, compared to 81% in 2015***.
>
> \* \* \*
>
> ***Copaxone® accounted for approximately 19% of our revenues in 2016, and a significantly higher percentage contribution to our profits and cash flow from operations during this period***.

96.     The statements by Defendants Teva and Desheh in ¶ 95 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

> a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62);

c)    As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

97.    On March 8, 2017, defendant Derkacz attended the Cowen Health Care Conference. During the conference, defendant Derkacz stated, in relevant part:

I think, starting with COPAXONE, I'd like to kind of start with the market context and where we are. And I don't know how many are aware of this. ***But over the last 12 months the 40 milligram now enjoys a full 5 share point differential between the next closest competitors. That's a share gain of over 2%, which I think is really a sign and a message that our team continues to focus on what we have control over. And it also is a tribute to the product and the way the market has really embraced the product for switches and for new patients***.

***So if we look at the 20 milligram, we actually still have just over 60% of that 20 milligram business. I think that's a tribute to, again, the team's focus on the dispense as written campaign, to also, of course, manage our contracting with our payers very proactively.*** And I think we'll take a lot of those insights to the 40 milligram scenario if or when it occurs.

98.    The statements by Defendants Teva and Derkacz in ¶ 97 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)    Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of the drug; and

40

c)      As a result, market demand for Copaxone and the drug's ability to

compete with alternative drug products were materially overstated during

the Class Period.

99.     On May 11, 2017, Teva issued a press release that it filed with the SEC as a Form

6-K, reporting the Company's financial and operating results for the first quarter of 2017.  In

regard to Copaxone, the press release stated, in relevant part:

> ***Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading***
> ***multiple sclerosis therapy in the U.S. and globally, were $970 million in the first***
> ***quarter of 2017***, a decrease of 4% compared to the first quarter of 2016.
> ***Copaxone® revenues in the United States, were $782 million***, a decrease of 5%
> compared to the first quarter of 2016, mainly due to lower volumes of
> Copaxone® 20 mg/mL, partially offset by a price increase of 7.9% for both
> Copaxone® products in January 2017. At the end of the first quarter of 2017,
> according to March 2017 IMS data, our U.S. market shares for the Copaxone®
> products in terms of new and total prescriptions were 25.4% and 28.4%,
> respectively. Copaxone® 40 mg/mL accounted for over 85% of total Copaxone®
> prescriptions in the U.S.

100.    Following its press release, on May 11, 2017, Teva also filed a Quarterly Report

for the first quarter of 2017 with the SEC on Form 6-K.  The Quarterly Report was signed by

Desheh and listed the revenues for Copaxone as ***$970,000,000*** for the "Three Months Ended

March 31, 2017[.]"

101.    On August 3, 2017, Teva issued a press release that it filed with the SEC as a

Form 6-K, reporting the Company's financial and operating results for the second quarter of

2017.  In regard to Copaxone, the press release stated, in relevant part:

> ***Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading***
> ***multiple sclerosis therapy in the U.S. and globally, were $1.0 billion, a decrease***
> ***of 10% compared to the second quarter of 2016***.
>
> ***Copaxone® revenues in the United States, were $843 million***, a decrease of 12%
> compared to the second quarter of 2016, mainly due to lower volumes of
> Copaxone® 20 mg/mL as well as negative net pricing effects despite a price
> increase of 7.9% for both Copaxone® products in January 2017. At the end of the

41

second quarter of 2017, according to June 2017 IMS data, our U.S. market shares for the Copaxone® products in terms of new and total prescriptions were 26.5% and 28.8%, respectively. Copaxone® 40 mg/mL accounted for over 85% of total Copaxone® prescriptions in the U.S.

102.   Following its press release, on August 3, 2017, Teva also filed a Quarterly Report for the second quarter of 2017 with the SEC on Form 6-K.  The Quarterly Report was signed by Desheh and listed the revenues for Copaxone as *$1,230,000,000* for the "Three Months Ended March 31, 2017" and *$1,993,000,000* for the "Six Months Ended June 30, 2017[.]"

103.   The statements by Defendants Teva and Desheh in ¶¶ 99-102 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)   Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)   If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)   As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

**D.     Defendants Make Materially False and Misleading Statements Regarding Teva's Shared Solutions Program**

104.   During the Class Period, Defendants touted the success of its Shared Solutions Program in keeping patients on Copaxone, while failing to disclose that the reason patients were staying on Copaxone was that the Shared Solutions Program was designed to guarantee payment of Medicare patients' co-pays, reducing their costs to $0.00.

105.    On October 29, 2015, Teva hosted a conference call to discuss the financial

results of the third quarter of 2015.  During the conference call, defendant Koremans touted the

Shared Solutions Program, stating, in relevant part:

> *So when we talk about Copaxone, what we're seeing is really an incredible durability.  Basically patients, doctors continue to stick with the products*.  They feel confident.  They trust this product. And it is very important. And they have been on it for many years, right?
>
> *And it's a combination of our patient solutions, the way we interact with our patients*, the trust they have in the brand itself.  *And also doctors and really also payers supporting it in full*. And the dynamics at the moment are better than we could have predicted two years ago. And we're seeing that going forward. We expect like -- this is not going to change dramatically.  So Copaxone really is an incredible product in that respect.  *And the way we bring it to market with the shared solutions, our sales force, the medical force*. And the relationship we have with the payers is working quite nicely. And we don't see that going forward, going to be changed dramatically at all. . . .
>
> *The shared solutions, they really helping to two things and do -- first of all, make sure that patients have financial access, work with patients*.  *And help them to address their questions with their individual plans really well. And that really works*. Then second, they are there with nurses to help and coach. What you have to remember I think for MS, those patients they start on therapy, they don't feel a benefit immediately.

106.    On March 16, 2016, defendants Desheh and Derkacz attended the Barclays

Global Healthcare Conference.  During the conference, defendant Derkacz credited the Shared

Solutions Program in keeping patients on Copaxone, stating, in relevant part:

> [Derkacz]: *And keep in mind, the shared solutions, service and the loyalty and trust and confidence that these patients have had for many years. They like the product. They don't want to be upset what is working well for them and they also don't want to lose that relationship and that support that they've come to appreciate and trust and recognize over the last many years.*

107.    On June 3, 2016, defendant Vigodman attended the Sanford C Bernstein Strategic

Decisions Conference.  During the conference, defendant Vigodman stated, in relevant part:

> [Ronny Gal, Analyst]:  [Y]ou seem to make your assumptions about the impact of generic Copaxone if one enters the market as fairly low. Well it's a matter of

43

perspective. But compared to losing the US sales, you are basically assuming that you will still retain not a small chunk of US profits throughout the product, even after generics enter. . . . Why should you be able to retain a significant profit stream from Copaxone from generics entering the United States?

[Vigodman]: . . . Look at the performance of 2014 and performance of top-line progression of (inaudible) today. ***Look at the contribution of our shared services solution center to the brand and to the basically loyalty of our consumers and patients. Look at the effect, at the lack of human data pertaining to the generic versions of Copaxone. And when you look at all those things in the aggregate, I think it explains why erosion might be slower than what is expected.*** . . .

108.    On June 9, 2016, defendant Derkacz attended the Jefferies Healthcare Conference.  During the conference, defendant Derkacz stated, in relevant part:

[Derkacz]:  Well why Glatopa? Why did it not do that well? Well I think you have to consider the category, the product. And the company.

So if you think about category, this is a very heterogeneous disease. What may work for one patient may not work for the next. ***And so when you have a patient that's doing well on therapy in MS, the likelihood and the resistance to switch -- the resistance to switch is very high. The likelihood to switch is very low. And I think payers recognize that if you push too hard on patients, there is that potential that they could move off to another more expensive branded therapy. So that,*** coupled with the fact that we've had a long, proven track record of safety and efficacy, ***coupled with the fact that we have an incredible relationship with patients and physicians primarily through our Shared Solutions service that we provide.***

[Dave Steinberg, Analyst]: . . . Could you give us some color on how Shared Solutions works.  And what impact they've had on this switch?

[Derkacz]: . . . So ***Shared Solutions has been in place now for many years***, actually dating back to the early 2000s, just very soon after we launched Copaxone. ***And it has evolved to the point where we actually provide a very high level of service to patients with MS, in particular those that are on Copaxone***. In fact, what many folks don't realize is that we actually have a group of clinical nurse educators that can actually visit the patient's home and help train them on how to take Copaxone, how to inject Copaxone, how to manage their product.

***So there is this intimacy. There's this relationship that's long-standing. And we've been recognized as having a best-in-class service in MS, as rated by our most important customers, this being the patient for many years now. And so we think that not only is this very important for Copaxone 40 milligram moving forward.***

44

109.   On November 15, 2016, Teva hosted an earnings conference call to discuss the Company's financial results for the third quarter of 2016.  In regard to Copaxone, during the call Koremans stated, in relevant part:

> *What we have seen though in the last months is that Copaxone is actually being holding (sic) much better. And the performance shows really good, and I am extremely proud of all the teams that do this. Patient support programs will play an important role*. And that's what we've seen people move into with less hope and the U.S often came back. *Actually the biggest source of new to brands that comes from the focus changes in the U.S. when they switch, because of the value they place on our support programs, amongst which are the sales solutions*. So, other than that, there is very little new information that we have product doing well and we are optimistic about the future in that respect.

110.   On March 15, 2017, defendants Desheh and Derkacz attended the Barclays Global Healthcare Conference.  During the conference, defendant Derkacz stated, in relevant part:

> [Doug Tsao, Analyst]: And Mike, you said you have learned a lot about the experience with the 20 milligram. I guess a follow-up for me would be what do you see as different in terms of facing competition in the 40 milligram assuming those competitors also had approval for their 20 milligram?
>
> [Derkacz]: *I think the key here is that we need to take those learnings that we had from 20 milligram. I can't disclose all of it. But certainly the contracting strategy that we deploy, the approach that we take with our customers ensuring that they come first, that we make it easy for physicians and we make it easy for patients to stay on our therapy*.

Barclays Global Healthcare Conference, Bloomberg Tr. at 4-5 (Mar. 15, 2017).

111.   On June 7, 2017, Dipankar Bhattacharjee, Teva's President and CEO of the Global Medicines Group, Michael Hayden, Teva's Chief Scientific Officer, and Yitzhak Peterburg, Teva's Interim President and CEO, attended the Jefferies Healthcare Conference.  On the call, Peterburg and Hayden stated, in relevant part:

> [Peterburg]:  *Coming back to what you said on Shared Solution, I think Shared Solution was a wonderful way of supporting the patient*.  Because at the end, it's

45

all about patients. *And this is why we were able to substitute so significantly and so quickly.* And I think they have a very important role even going forward.

Michael, could -- (for that)?

[Hayden]: *Yes, I would just say Shared Solutions is critical and we're actually continuing to invest in these kind of patient services.* Of course, it's a model for some of our branded drugs in development as well and being launched right now.

112.    The statements by Teva, Desheh, Vigodman, Koremans, Hayden, Peterburg, and Derkacz in ¶¶ 105-111 above were false and/or misleading when made because Defendants failed to disclose the following adverse facts:

   a)    Teva used the Shared Solutions Program to carry out its illegal kickback scheme whereby the Company fully covered the co-payments incurred by Medicare patients taking Copaxone;

   b)    The reason that the Shared Solutions Program was successful in maintaining patient loyalty and retention was because Teva's kickback scheme made Copaxone free to Medicare patients, therefore patients were motivated to continue taking the drug; and

   c)    As a result, market demand for Copaxone and patient retention on the drug were materially overstated during the Class Period.

**E.    Defendants Make Materially False and Misleading Statements Regarding Teva's Compliance with Federal Laws**

113.    During the Class Period, Defendants warned of the risks of Teva's failure to comply with federal laws and regulations, while failing to disclose that the Company was already engaged in a kickback scheme in violation of the False Claims Act and the Anti-Kickback Statute.

46

114.    For example, on February 11, 2016, Teva filed its 2015 20-F with the SEC, which was signed by Desheh.  In regard to the Company's legal compliance, the Annual Report stated in part:

> ***Governmental investigations into sales and marketing practices, particularly for our specialty pharmaceutical products, may result in substantial penalties. . . .*** We operate around the world in complex legal and regulatory environments, and ***any failure to comply with applicable laws, rules and regulations may result in civil and/or criminal legal proceedings***. ***As those rules and regulations change or as interpretations of those rules and regulations evolve, our prior conduct or that of companies we have acquired may be called into question***. In the United States, we are currently responding to federal investigations into our marketing practices with regard to several of our specialty pharmaceutical products, which could result in civil litigation brought on behalf of the federal government. . . .
>
> ***Any failure to comply with the complex reporting and payment obligations under the Medicare and Medicaid programs may result in further litigation or sanctions, in addition to those that we have announced in previous years***. ***The U.S. laws and regulations regarding Medicare and/or Medicaid reimbursement and rebates and other governmental programs are complex.*** Some of the applicable laws may impose liability even in the absence of specific intent to defraud. ***The subjective decisions and complex methodologies used in making calculations under these programs are subject to review and challenge, and it is possible that such reviews could result in material changes***. A number of state attorneys general and others have filed lawsuits alleging that we and other pharmaceutical companies reported inflated average wholesale prices, leading to excessive payments by Medicare and/or Medicaid for prescription drugs. Such allegations could, if proven or settled, result in additional monetary penalties (beyond the lawsuits we have already settled) and possible exclusion from Medicare, Medicaid and other programs.

115.    On February 15, 2017, Teva filed its 2016 20-F with the SEC that was signed by Desheh.  The Annual Report contained substantially the same statement as the 2015 20-F in ¶ 114 above.

116.    The statements by Defendants Teva and Desheh in ¶¶ 114-115 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments for Medicare patients taking Copaxone in violation of the False Claims Act and the Anti-Kickback Statute; and

b)    Teva's illegal kickback scheme increased the likelihood that the Company would be subject to regulatory scrutiny, enforcement, and/or penalties.

**F.    Defendants Partially Disclose Their Fraud By Shaking Up Company Leadership And Belatedly Disclosing That The Department Of Justice Subpoenaed Teva About Donations To Charitable Foundations**

117.    At the beginning of 2017, Teva announced that the Company's CEO since February 2014, Erez Vigodman, was leaving the Company. Dr. Yitzhak Peterburg, who had served as Chairman of the Board of Directors since January 2015, was appointed interim president and chief executive officer.

118.    Teva was subpoenaed on March 21, 2017 by the United States Attorneys' office in Boston, Massachusetts seeking information regarding Teva's donations to charitable foundations. The quarterly earnings results on May 11, 2017 for the first quarter of 2017 did mention the subpoena.

119.    Despite this subpoena, which should have put Teva on notice to dismantle its kickback scheme and to begin abiding by the law, based upon documents reviewed by the U.S. House of Representatives' Committee on Oversight and Reform, Teva's kickback scheme continued through at least 2018. *See* Ex. B at 17. Defendants also did not disclose Teva's kickback scheme at that time and continued to make the same or similar misleading statements regarding Copaxone's financial results and market demand for the drug, Teva's Shared Solutions Program, and the Company's compliance with federal laws.

120. On September 11, 2017, Teva announced that Kåre Schultz had been appointed CEO of Teva.

121. On November 2, 2017, Teva, now under the new leadership of Schultz, shook the market when it cut its sales and earnings forecast for the year, which cuts were due in part to claimed weakening sales of Copaxone. Teva issued a press release that it filed with the SEC as a Form 6-K, revising the "2017 outlook revised to non-GAAP EPS of $3.77 - $3.87" down from a forecast of $4.30 to $4.50. Teva also reported lower revenues from Copaxone, stating:

> Global revenues of Copaxone® (20 mg/mL and 40 mg/mL), the leading multiple sclerosis therapy in the U.S. and globally, were $1.0 billion, a decrease of 7% compared to the third quarter of 2016.

> Copaxone® revenues in the United States, were $802 million, a decrease of 8% compared to the third quarter of 2016, due to lower volumes of Copaxone® 20 mg/mL, negative net pricing effects, mainly as a result of an increase in managed care rebate accruals for inventory in the channel following the FDA approvals for additional generic competition, partially offset by a price increase of 7.9% in January 2017 for both the 20 mg/mL and 40 mg/mL versions.

122. Later that day, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the third quarter of 2017. On the call, defendant McClellan, in relevant part:

> So for COPAXONE, revenues were almost $1 billion in Q3 2017, which is a decrease of 7% compared to the Third Quarter of 2016. The revenues were down 7%, mainly due to lower sales in the U.S., impacted by a $55 million increase in managed care rebate accruals for the inventory in the channel at September 30, following the FDA approval of a generic competition to COPAXONE 40-milligram. And in addition, we had lower volumes of COPAXONE 20-milligram compared to 2016.

123. On this news, including that Teva would miss its 2017 forecasts and that Copaxone revenues had declined, Teva securities price fell approximately 20%, from a closing securities price of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017. This

49

news amounted to a partial disclosure of the fraud and leakage of the facts arising from the underlying fraud.

**G.    Defendants Continued To Make False And Misleading Statements Regarding Copaxone's Financial Results and Market Demand**

124.    After Teva disclosed the shake up of leadership and that it received a subpoena from the U.S. Attorney's office, Defendants continued to make false and/or misleading statements regarding Copaxone's financial results and market demand for the drug.

125.    On February 12, 2018, Teva filed its Annual Report for the year ended December 31, 2017 on Form 10-K with the SEC (the "2017 10-K").  The 2017 20-F was signed by Schultz and listed Copaxone revenue as *$3,801,000,000* for the "Year Ended December 31, 2017[.]"  In regard to Copaxone, the Annual Report stated in part:

> ***COPAXONE revenues in the United States in 2017 decreased by 12% to $3.0 billion***, mainly due to generic competition which resulted in higher rebates and lower volumes, partially offset by a price increase of 7.9% in January 2017 for both the 20 mg/mL and 40 mg/mL versions.
>
> ***Revenues in the United States were 80% of global COPAXONE revenues in 2017, compared to 82% in 2016***.
>
> <div align="center">* * *</div>
>
> ***COPAXONE accounted for approximately 17% of our revenues in 2017 and a significantly higher percentage of our profits and cash flow from operations during this period***.

126.    On that day, Teva also issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the full year and fourth quarter 2017.  The press release made substantially the same statements as the 2017 20-F in ¶ 126 above.

127.    On May 3, 2018, Teva filed its Quarterly Report for the first quarter of 2018 on Form 10-Q with the SEC (the "Q1 2018 10-Q").  The Q1 2018 10-Q was signed by McClellan and listed the revenues for Copaxone in Teva's North America segment as *$645,000,000* for the

<div align="center">50</div>

"Three Months Ended March 31, 2018[.]"  As well, in regard to Copaxone, the Quarterly Report

stated in part:

> ***COPAXONE® revenues in our North America segment in the first quarter of 2018 decreased by 40% to \$476 million***, compared to the first quarter of 2017, mainly due to generic competition in the United States. ***COPAXONE revenues in the United States were \$462 million in the first quarter of 2018***.
>
> ***Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in the first quarter of 2018***, compared to 82% in the first quarter of 2017.
>
> ***COPAXONE global sales accounted for approximately 13% of our global revenues in the first quarter of 2018 and a significantly higher percentage of our profits and cash flow from operations during this period***.

128.     Also on that day, Teva issued a press release that it filed with the SEC as a Form

8-K, reporting the Company's financial results for the first quarter of 2018.  The press release

made substantially the same statements as the Quarterly Report in ¶ 128 above.

129.     The statements by Defendants Teva and McClellan in ¶¶ 126-129 above were

false and/or misleading when made because Defendants failed to disclose the following material,

adverse facts:

> a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;
>
> b)     If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and
>
> c)     As a result, Teva's sales and revenue for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

51

130. Also on May 3, 2018, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the first quarter of 2018. On the call, defendant Schultz and O'Grady stated, in relevant part:

[Schultz]: ***COPAXONE is maintaining its share very nicely in the U.S. I'll give you some details on that. But it's really very steady at around 85% of the 40-milligram marketplace.*** And also in Europe, it's looking good.

\* \* \*

[Schultz]: Another important element in our sales is, of course, COPAXONE. That's also nothing new. It's been also reviewed and discussed by all of you for a long time. And what you see here is sort of the raw data on how many scripts, what's the TRx volume. And as you can see here, it's kind of a boring graph because ***since the beginning of the year, it's completely flat around 10,000. And that basically means that there hasn't been any real change to our market share and to the mix between our market share and that of competition. We have roughly 85% of the volume in 40-milligram. And we maintain a very high level of access*** . . . . . ***But as you can also see, we are basically hanging on to the volume share quite nicely.***

\* \* \*

[Liav Abraham, Analyst]: First question is on COPAXONE. Just given your experience with one generic 40-milligram on the market and the response of those customers and patients and payers, are there any changes to how you think this market will evolve with 2 generics on the market? Any change to your assumptions there regarding how the revenues will progress as a second generic enters the market? . . .

[O'Grady]: Yes. Just a few things to add, Kåre. So I've been in this market a long time. And I've seen this market evolve. And I will tell you that I haven't seen any surprises as the way this market is shaped since 2013, 2014, as we've seen generic competition on 20-milligram as well as 40-milligram. So as Kåre mentioned, as we see another 40-milligram generic enter the market, I think there will be some downward pressure on price, probably a little on volume as well. ***But today, we maintain about 85% of the overall COPAXONE market. And it is following our expectations and our plans for the year***.

131. The statements by Defendants Teva, Schultz, and O'Grady in ¶ 131 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)   Teva was engaged in an illegal kickback scheme by using ACS, CDF, and

TAF as unlawful conduits to fully cover the co-payments incurred by

Medicare patients taking Copaxone;

b)   Because Teva's kickback scheme resulted in Copaxone being free to

Medicare patients, those patients were not motivated to switch off of

Copaxone in order to take a competitor version of Copaxone; and

c)   As a result, Copaxone's market share and the drug's ability to compete

with alternative drug products were materially overstated during the Class

Period.

132.   On August 2, 2018, Teva filed its Quarterly Report for the second quarter of 2018

on Form 10-Q with the SEC (the "Q2 2018 10-Q").  The Q2 2018 10-Q was signed by

McClellan and listed revenues for Copaxone in the North America segment as *$464,000,000* for

the "Three Months Ended June 30, 2018" and *$940,000,000* for the "Six Months Ended June 30,

2018."  Also, in regard to Copaxone, the Quarterly Report stated in part:

> ***COPAXONE revenues in our North America segment in the second quarter of 2018 decreased by 46% to $464 million***, compared to the second quarter of 2017, mainly due to generic competition in the United States. ***COPAXONE revenues in the United States were $448 million in the second quarter of 2018***.
>
> ***Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in the second quarter of 2018***, compared to 84% in the second quarter of 2017.
>
> ***COPAXONE global sales accounted for approximately 13% of our global revenues in the second quarter of 2018 and a significantly higher percentage of our profits and cash flow from operations during this period***.

133.   Also on that day, Teva issued a press release that it filed with the SEC as a Form

8-K, reporting the Company's financial results for the second quarter of 2018.  The press release

made substantially the same statements as the Quarterly Report in ¶ 133 above.

134.    The statements by Defendants Teva and McClellan in ¶¶ 133-134 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

      a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

      b)    If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

      c)    As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

135.    On September 14, 2018, defendant McClellan attended the Morgan Stanley Healthcare Conference.  During the conference, defendant McClellan stated, in relevant part:

> We are managing the COPAXONE situation. ***We've had some good ability to keep a very good share of that business in the last couple of months***.
>
> <div align="center">* * *</div>
>
> So there's a couple of different dynamics going on. Of course, we're starting to see more competition to COPAXONE.  ***We did a good job in the first half versus the expectations and keeping market share at some good pricing levels.*** We do see that starting to accelerate in the second half.  We do see that starting to accelerate in the second half. The Sandoz-Momenta Glatopa product is now starting to pick up some market share. ***But so far so good***.

136.    The statements by Defendants Teva and McClellan in ¶¶ 136 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

<div align="center">54</div>

a) Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b) Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of Copaxone; and

c) As a result, Copaxone's market share and the drug's ability to compete with alternative drug products were materially overstated during the Class Period.

137. On November 1, 2018, Teva filed its Quarterly Report for the third quarter of 2018 on Form 10-Q with the SEC (the "Q3 2018 10-Q"). The Q3 2018 10-Q was signed by McClellan and listed revenues for Copaxone in the North America segment as **$463,000,000** for the "Three Months Ended September 30, 2018" and **$1,403,000,000** for the "Nine Months Ended September 30, 2018[.]" Also, in regard to Copaxone, the Quarterly Report stated in part:

> **COPAXONE revenues in our North America segment in the third quarter of 2018 decreased by 43% to $463 million**, compared to the third quarter of 2017, mainly due to generic competition in the United States.
> **COPAXONE revenues in the United States were $446 million in the third quarter of 2018**.
>
> **Revenues of COPAXONE in our North America segment were 77% of global COPAXONE revenues in the third quarter of 2018**, compared to 83% in the third quarter of 2017.

138. Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the third quarter of 2018. The press release made substantially the same statements as the Quarterly Report in ¶ 138 above.

139.    The statements by Defendants Teva and McClellan in ¶¶ 138-139 above were

false and/or misleading when made because Defendants failed to disclose the following material,

adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and

TAF as unlawful conduits to fully cover the co-payments incurred by

Medicare patients taking Copaxone;

b)    If Teva had not covered the co-payments through its kickback scheme,

many patients would have stopped taking Copaxone, leading to hundreds

of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)    As a result, Teva's sales and revenues for Copaxone and the market

demand for the drug were artificially inflated during the Class Period.

140.    Also on November 1, 2018, Teva hosted an earnings call with investors and

analysts to discuss the Company's financial and operating results for the third quarter of 2018.

On the call, Defendant O'Grady stated, in relevant part:

> On the last slide for North America, which is Slide 13 for those of you who'll be following along, *I will highlight COPAXONE and say that we continue to compete in the MS market and are taking the appropriate measures to preserve market share and maximize profit*. Formulary access of 40 milligram COPAXONE remains stable around 90% nationally. *And COPAXONE continues to be a market leader with Q3 TRX exit share of 22.7% of the MS market*. Of the 40 milligram glatiramer segment, COPAXONE 40 milligram total market share was approximately 77% versus generic 40 milligram at approximately 23%.

141.    The statements by Defendants Teva and O'Grady in ¶ 141 above were false

and/or misleading when made because Defendants failed to disclose the following material,

adverse facts:

a)    Teva was engaged in an illegal kickback scheme by using ACS, CDF, and

TAF as unlawful conduits to fully cover the co-payments incurred by

Medicare patients taking Copaxone;

b)    Because Teva's kickback scheme resulted in Copaxone being free to

Medicare patients, those patients were not motivated to switch off of

Copaxone in order to take a competitor version of Copaxone; and

c)    As a result, Copaxone's market share and the drug's ability to compete

with alternative drug products were materially overstated during the Class

Period.

142.    On February 13, 2019, Teva issued a press release that it filed with the SEC as a

Form 8-K, reporting the Company's financial results for the fourth quarter and full year 2018.  In

regard to Copaxone, the press release stated, in relevant part:

> **COPAXONE revenues in our North America segment in the fourth quarter of**
> **2018 decreased by 44% to $356 million, of which $341 million were generated**
> **in the United States**, compared to the fourth quarter of 2017, mainly due to
> generic competition in the United States.

143.    On February 19, 2019, Teva filed its Annual Report for the year ended December

31, 2018 on Form 10-K with the SEC (the "2018 10-K").  The 2018 10-K was signed by Schultz

and in listed revenues for Copaxone in Teva's North America segment as **$1,759,000,000** for the

"Year Ended December 31, 2018[.]"  Also, in regard to Copaxone, the Annual Report stated in

part:

> **COPAXONE revenues in our North America segment in 2018 decreased by**
> **44% to $1,759 million**, compared to 2017, mainly due to generic competition in
> the United States.

> **COPAXONE revenues in the United States were $1,697 million in 2018.**

57

> *Revenues of COPAXONE in our North America segment were 74% of global COPAXONE revenues in 2018*, compared to 82% in 2017.

> *COPAXONE global sales accounted for approximately 13% of our global revenues in 2018 and a significantly higher percentage of our profits and cash flow from operations during this period*.

144.   On May 2, 2019, Teva filed its Quarterly Report for the first quarter of 2019 on Form 10-Q with the SEC (the "Q1 2019 10-Q").  The Q1 2019 10-Q was signed by McClellan and listed revenue for Copaxone from Teva's North America segment as *$208,000,000* for the "Three Months Ended March 31, 2019[.]"  Also, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE revenues in our North America segment in the first quarter of 2019 decreased by 56% to $208 million*, compared to the first quarter of 2018, mainly due to generic competition in the United States.

> *COPAXONE revenues in the United States were $194 million in the first quarter of 2019*.

> *Revenues of COPAXONE in our North America segment were 62% of global COPAXONE revenues in the first quarter of 2019*, compared to 74% in the first quarter of 2018.

145.   Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the first quarter of 2019.  The press release made substantially the same statements as the Quarterly Report in ¶ 145 above.

146.   On August 7, 2019, Teva filed its Quarterly Report for the second quarter of 2019 on Form 10-Q with the SEC (the "Q2 2019 10-Q").  The Q2 2019 10-Q was signed by McClellan and listed revenues for Copaxone from Teva's North America segment as *$274,000,000* for the "Three Months Ended June 30, 2019" and *$482,000,000* for the "Six Months Ended June 30, 2019[.]"  Also, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE revenues in our North America segment in the second quarter of 2019 decreased by 41% to $274 million*, compared to the second quarter of 2018, mainly due to generic competition in the United States.
>
> *COPAXONE revenues in the United States were $260 million in the second quarter of 2019*.
>
> *Revenues of COPAXONE in our North America segment were 69% of global COPAXONE revenues in the second quarter of 2019*, compared to 74% in the second quarter of 2018.
>
> *COPAXONE global sales accounted for approximately 9% of our global revenues in the second quarter of 2019 and a significantly higher percentage of our profits and cash flow from operations during this period*.

147.    Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the second quarter of 2019.  The press release made substantially the same statements as the Quarterly Report in ¶ 147 above.

148.    On November 7, 2019, Teva filed its Quarterly Report for the third quarter of 2019 on Form 10-Q with the SEC (the "Q3 2019 10-Q").  The Q3 2019 10-Q was signed by McClellan and listed revenues for Copaxone in Teva's North America segment as *$271,000,000* for the "Three Months Ended September 30, 2019" and *$753,000,000* for the "Nine Months Ended September 30, 2019[.]"  Also, in regard to Copaxone, the Quarterly Report stated in part:

> *COPAXONE revenues in our North America segment in the third quarter of 2019 decreased by 41% to $271 million*, compared to the third quarter of 2018, mainly due to generic competition in the United States.
>
> *COPAXONE revenues in the United States were $257 million in the third quarter of 2019*.
>
> *Revenues of COPAXONE in our North America segment were 68% of global COPAXONE revenues in the third quarter of 2019*, compared to 77% in the third quarter of 2018.
>
> *COPAXONE global sales accounted for approximately 9% of our global revenues in the third quarter of 2019 and a significantly higher percentage of our profits and cash flow from operations during this period*.

149.     Also on that day, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the third quarter of 2019.  The press release made substantially the same statements as the Quarterly Report in ¶ 149 above.

150.     The statements by Defendants Teva, McClellan, and Schultz in ¶¶ 143-150 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)     Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)     If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62); and

c)     As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

151.     Also on November 7, 2019, Teva hosted an earnings call with investors and analysts to discuss the Company's financial and operating results for the third quarter of 2019. On the call, Defendant Schultz stated, in relevant part:

> Now if we then think about next year, it's too early for us to give guidance. And then you might ask, why can't you give guidance? *And one of the elements is, of course, your second question, COPAXONE, because you're right, we're seeing a stabilization. Basically, the last 3 quarters of COPAXONE have been very stable. We see a marginal decline in the TRx volume.* We see a very stable development in Europe. And there's a lot of moving parts in this. *And if we take the U.S. first, then you can say the unknown factor of are we going to have 1 more generic competitor in the 40-milligram COPAXONE.*

152.   The statements by Defendants Teva and Schultz in ¶ 152 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a)   Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b)   Because Teva's kickback scheme resulted in Copaxone being free to Medicare patients, those patients were not motivated to switch off of Copaxone in order to take a competitor version of Copaxone; and

c)   As a result, Copaxone's market share and the drug's ability to compete with alternative drug products were materially overstated during the Class Period.

153.   On February 12, 2020, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the fourth quarter and full year 2019. In regard to Copaxone, the press release stated, in relevant part:

> ***COPAXONE revenues in our North America segment in the fourth quarter of 2019 decreased by 26% to $264 million***, compared to the fourth quarter of 2018, mainly due to generic competition in the United States.

154.   On February 21, 2020, Teva filed its Annual Report for the year ended December 31, 2019 on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Schultz and listed revenues for Copaxone in Teva's North America segment as ***$1,017,000,000*** for the "Year Ended December 31, 2019[.]" Also, in regard to Copaxone, the Annual Report stated in part:

61

*COPAXONE revenues in our North America segment in 2019 decreased by 42% to $1,017 million*, compared to 2018, mainly due to generic competition in the United States.

*Revenues of COPAXONE in our North America segment were 67% of global COPAXONE revenues in 2019*, compared to 74% in 2018.

*COPAXONE global sales accounted for approximately 9% of our global revenues in 2019 and a significantly higher percentage of our profits and cash flow from operations during this period*.

155. On May 7, 2020, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the first quarter of 2020. In regard to Copaxone, the press release stated, in relevant part:

*COPAXONE revenues in our North America segment in the first quarter of 2020 decreased by 5% to $198 million*, compared to the first quarter of 2019, mainly due to generic competition in the United States.

156. On May 7, 2020, Teva filed its Quarterly Report for the first quarter of 2020 on Form 10-Q with the SEC (the "Q1 2020 10-Q"). The Q1 2020 10-Q was signed by Kalif and listed the revenues for Copaxone in Teva's North America segment as *$198,000,000* for the "Three Months Ended March 31, 2020[.]" Also, in regard to Copaxone, the Quarterly Report stated, in relevant part, that "*COPAXONE revenues in our North America segment in the first quarter of 2020 decreased by 5% to $198 million*, compared to the first quarter of 2019, mainly due to generic competition in the United States."

157. On August 5, 2020, Teva issued a press release that it filed with the SEC as a Form 8-K, reporting the Company's financial results for the second quarter of 2020. In regard to Copaxone, the press release stated, in relevant part:

*COPAXONE revenues in our North America segment in the second quarter of 2020 decreased by 13% to $238 million*, compared to the second quarter of 2019, mainly due to generic competition in the United States.

158. On August 5, 2020, Teva filed its Quarterly Report for the second quarter of 2020 on Form 10-Q with the SEC (the "Q2 2020 10-Q"). The Q2 2020 10-Q was signed by Kalif and listed revenues for Copaxone in Teva's North America segment as *$238,000,000* for the "Three Months Ended June 30, 2020" and *$435,000,000* for the "Six Months Ended June 30, 2020[.]" Also, in regard to Copaxone, the Quarterly Report stated, in relevant part, that "*COPAXONE revenues in our North America segment in the second quarter of 2020 decreased by 13% to $238 million*, compared to the second quarter of 2019, mainly due to generic competition in the United States."

159. The statements by Defendants Teva, Schultz, and Kalif in ¶¶ 154-159 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a) Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments incurred by Medicare patients taking Copaxone;

b) If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62);

c) As a result, Teva's sales and revenues for Copaxone and the market demand for the drug were artificially inflated during the Class Period.

63

**H.    Defendants Continued To Make False And Misleading Statements Regarding Teva's Shared Solutions Program**

160.    After announcing the subpoena from the U.S. Attorney's office, Defendants continued to make materially false and misleading statements touting the success of Teva's Shared Solutions Program in keeping patients on Copaxone.

161.    On March 13, 2018, Defendant McClellan attended the Cowen & Company Health Care Conference.  During the conference, McClellan stated, in relevant part:

> [Unverified Participant, Analyst]: Okay. COPAXONE Shared Solutions, you all know how to kind of manage managed care and patients. Is that being implemented at all with AUSTEDO and Huntington's in TD or that really is just totally separate, you're not wrapping around any special services or?
>
> [McClellan]: No, clearly in these high touch patient segments like HD and TD, we're taking all of the learnings that we had in the years at COPAXONE. It's a slightly different area. So you have to adjust the programs, but clearly that's part of the whole service. ***You need to make sure that you get the patients accustomed to the reimbursement process, get them through the hurdles that they may face on the payer side and also help them in many cases get accustomed to the therapy itself.  So there is a wrap around in that kind of situation.  You're talking about pretty low patient numbers, so you really have to tailor that to the needs of the individual patient.***

162.    The statements by Defendants Teva and McClellan in ¶ 162 above were false and/or misleading when made because Defendants failed to disclose the following adverse facts:

a)    Teva used the Shared Solutions Program to carry out its illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits whereby the Company fully covered the co-payments incurred by Medicare patients taking Copaxone;

b)    The reason that the Shared Solutions Program was successful in maintaining patient loyalty and retention was because Teva's kickback scheme made Copaxone free to Medicare patients, therefore patients were motivated to continue taking the drug; and

64

c)    As a result, market demand for Copaxone and patient retention on the drug were materially overstated during the Class Period.

## I.    Defendants Continued To Make False And Misleading Statements Regarding Teva's Compliance With Federal Laws

163.    Despite receiving the subpoena from the U.S. Attorney's office investigating Teva's compliance with the False Claims Act and the Anti-Kickback Statute, Teva continued to make misleading statements warning of the risks of Teva's failure to comply with federal laws and regulations, while failing to disclose that the Company was already engaged in a kickback scheme in violation of those laws.

164.    For example, on February 12, 2018, Teva filed the 2017 10-K with the SEC, which was signed by Schultz.  In regard to the Company's legal compliance, the Annual Report stated in part:

> ***Governmental investigations into sales and marketing practices, particularly for our specialty pharmaceutical products, may result in substantial penalties.***  We operate around the world in complex legal and regulatory environments, and ***any failure to comply with applicable laws, rules and regulations may result in civil and/or criminal legal proceedings. As those rules and regulations change or as interpretations of those rules and regulations evolve, our prior conduct or that of companies we have acquired may be called into question***. In the United States, we are currently responding to federal investigations into our marketing practices with regard to several of our specialty pharmaceutical products, which could result in civil litigation brought on behalf of the federal government. . . .
>
> ***Any failure to comply with the complex reporting and payment obligations under the Medicare and Medicaid programs may result in further litigation or sanctions, in addition to those that we have announced in previous years. The U.S. laws and regulations regarding Medicare and/or Medicaid reimbursement and rebates and other governmental programs are complex***. Some of the applicable laws may impose liability even in the absence of specific intent to defraud. ***The subjective decisions and complex methodologies used in making calculations under these programs are subject to review and challenge, and it is possible that such reviews could result in material changes.*** A number of state attorney generals and others have filed lawsuits alleging that we and other pharmaceutical companies reported inflated average wholesale prices, leading to excessive payments by Medicare and/or Medicaid for prescription drugs. Such

65

allegations could, if proven or settled, result in additional monetary penalties (beyond the lawsuits we have already settled) and possible exclusion from Medicare, Medicaid and other programs. . . .

165. On February 19, 2019, Teva filed the 2018 10-K with the SEC, which was signed by Schultz. The Annual Report contained substantially the same statement as the 2017 10-K in ¶ 165 above.

166. On February 21, 2020, Teva filed the 2019 10-K with the SEC, which was signed by Schultz. The Annual Report contained substantially the same statement as the 2017 10-K in ¶ 165 above.

167. The statements by Defendants Teva and Schultz in ¶¶ 165-167 above were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts:

a) Teva was engaged in an illegal kickback scheme by using ACS, CDF, and TAF as unlawful conduits to fully cover the co-payments for Medicare patients taking Copaxone in violation of the False Claims Act and the Anti-Kickback Statute; and

b) Teva's illegal kickback scheme increased the likelihood that the Company would be subject to regulatory scrutiny, enforcement, and/or penalties, indeed Teva was already under investigation by the U.S. Attorney's office in Boston, Massachusetts in connection with its Copaxone donations.

**J.      The Truth Is Disclosed**

168. On August 18, 2020, the United States Department of Justice announced that, on that day, the U.S. Attorney's Office for the District of Massachusetts filed a complaint against Teva alleging that the Company knowingly and willfully violated the False Claims Act, 31

66

U.S.C. § 3729(a)(1)(A), (B) & (C), by making a total of $328,632,000 in kickback payments to CDF and TAF between December 2006 and December 2015. Ex. A ¶¶ 121-36. The DOJ explained that Teva used "ostensibly independent charitable foundations as vehicles to pay hundreds of millions of dollars in kickbacks, all while raising the price of its drug, Copaxone, at a rate over 19 times the rate of inflation[,]" leaving "American taxpayers to shoulder the high prices that Teva set for Copaxone." Press Release, United States Department of Justice, United States Files False Claims Act Complaint Against Drug Maker Teva Pharmaceuticals Alleging Illegal Kickbacks (Aug. 18, 2020); Ex. A ¶ 7.

169. Specifically, "[t]he government alleged that, form 2007 through 2015, Teva paid TAF and CDF with the intent and understanding that the foundations would use Teva's money to cover the Medicare co-pays of patients taking Copaxone. During the same period, Teva raised the price of Copaxone from approximately $17,000 per year to over $73,000 per year."|

170. The press release further stated, in relevant part:

Teva largely effectuated its scheme through its vendor, Advanced Care Scripts Inc. (ACS), a specialty pharmacy to which Teva referred virtually all Copaxone patients who faced Medicare co-pays for the drug. Teva used information from ACS and from TAF and CDF to calculate how much money to pay each foundation to maintain coverage of the Medicare co-poys of Copaxone patients enrolled in each foundation. The U.S. further alleges that ACS coordinated the referral of newly-prescribed Copaxone patients to TAF and CDF with Teva, referring patients in batches at the same time that Teva made payments to the foundations, which ensured that Copaxone patients received the vast majority of the co-pay assistance TAF and CDF provided with money from Teva.

171. On this news, the price of Teva's shares dropped $1.69, or approximately 15%, over the course of three trading days, from a close of $11.59 on August 17, 2020 to a close of $9.90 on August 20, 2020.

172. The market voiced their disappointment with this news. A Jefferies analyst noted that the case "represents another major risk for [Teva's] balance sheet" because "[a]pplying

treble damages plus interest could make this suit a major liability for Teva on top of its current balance sheet challenges." David Steinberg, et al., *New DOJ Suit Ensnares Teva in Copaxone Kickback Scheme*, Jefferies (Aug. 19, 2020). A Citi analyst stated that the "lawsuit amplifies Teva's significant legal risks" and noted that the "US government is entitled to recover treble damages . . . plus a civil monetary penalty ($5,000-$10,000) for each false or fraudulent claim." Navann Ty & Nicholas Reyner, *FCA and NY Insurance Fraud Cases Amplify Legal Risk*, Citi (Aug. 19, 2020). An article on the investment website, the Motely Fool, noted, "How many red flags can investors overlook? . . . investors should also ask themselves if they want to own a company with what appears to be a morally bankrupt culture." Maxx Chatsko, *Here's Why Teva Pharmaceutical Fell as Much as 15.4% Today*, Motely Fool (Aug. 18, 2020 3:25 pm), https://www.fool.com/investing/2020/08/18/heres-why-teva-pharmaceutical-fell-as-much-as-154/.

173.   The following month, on September 30, 2020, the U.S. House of Representatives' Committee on Oversight and Reform published a Staff Report based on its drug pricing investigation of Copaxone. *See* Congressional Report. In the report, the Committee concurred with the DOJ's findings that Teva had been engaged in a kickback scheme, explaining that "Teva's donations to third-party foundations were made as an 'investment' for future returns, with the expectation that such donations would drive Copaxone sales." Ex. B at 15. As well, "[d]ocuments reviewed by the Committee indicate that Teva continued its payments to TAF and other third-party foundations through at least 2018" and "suggest that Teva's donations continued to be based on the expectation that they ultimately would be delivered to Copaxone patients." *Id.* at 17.

## V.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   *Respondeat Superior* and Agency Principles Apply

174.   Teva is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of Defendants and other Company officers, directors, employees, and agents is similarly imputed to Teva under *respondeat superior* and agency principles.

### B.   Defendants Acted With Conscious Misbehavior Regarding The Kickback Payments

175.   All Defendants had possession of or access to information showing that their statements regarding Copaxone revenues and Teva's legal compliance were false and/or misleading when made.

176.   Desheh, Koremans, and McClellan were aware that the donations to Charitable PAPs were intended to be applied to only Copaxone co-payments because they were repeatedly included in communications where the payments were described as a "Copaxone Donation payment[,]" "Copaxone donations approval[,]" and "Copaxone donations."  *See* ¶¶ 48, 65, 66, 68.  Given that the Charitable PAPs were supposed to apply the donations from Teva to all MS drugs indiscriminately, the only conclusion from the payment descriptions is that Teva employees were aware that the payments were being only applied to Copaxone.

177.   Further, considering that the Charitable PAP donations were so large, the Individual Defendants had to approve the payments before they were made.  Indeed, payments over $15 million had to be approved by Teva Executive Committee Members, which included defendant Koremans, and payments over $25 million had to be approved by the CFO and CEO

69

which included Desheh, McClellan, Kalif, Vigodman, and Schultz.  *See* ¶ 64.  The allegations above show that the Individual Defendants did in fact approve these payments prior to and during the Class Period.  In January 2015, Koremans and Desheh approved a "Copaxone Donation payment" of $25 million and in February 2015, Koremans approved a "Copaxone donation payment" of $8.5 million.  *See* ¶¶ 65, 66.  Later that year, in December 2015, Desheh and Vigodman approved a payment for a $30 million donation.  *See* ¶ 64.  In January 2016 McClellan approved a $10 million in "Copaxone donations" and in January 2017, McClellan and Desheh approved a $38 million donation payment.  *See* ¶¶ 66-68.

178.   If the Individual Defendants were not aware of the kickback scheme prior to 2017, they absolutely became aware of it in early 2017 when the United States government began to investigate the Company's donations to Charitable PAPs.  First, the IRS began an investigation into the donations pharmaceutical companies had been making to CDF.  As part of its probe, on February 16, 2017, the IRS served a summons on Teva seeking information regarding its donations.  *See* U.S.s' Mot. to Deny Pet. to Quash IRS Summons Issued To Third Party Teva Neuroscience Inc., and to Enforce at 1, *Chronic Disease Fund v. U.S.*, 2:17-cv-00322 (W.D. Pa. May 18, 2017) (ECF No. 12).  Then, on March 21, 2017, Teva was served with a subpoena from the U.S. Attorney's office in Boston, Massachusetts seeking information regarding Teva's donations to Charitable PAPs.  *See* ¶ 118.  At that time, Teva began to actively respond to the U.S. Attorney's investigation into the Company's payments to TAF and CDF by producing documents and information, which led to the complaint filed on August 18, 2020.  *See* ¶¶ 169-170.

179.   The Individual Defendants, as officers of the Company, were obligated to investigate the bases for the IRS summons and DOJ subpoena and would have discovered the

arrangement Teva had established with ACS, TAF, and CDF.  Further, McClellan signed the Form 6-K in which the subpoena from the U.S. Attorney's office was disclosed, certifying to the public that he was aware of the information regarding the investigation.  Teva Pharmaceutical Industries Ltd., Quarterly Report (Form 6-K) 71 (Aug. 5, 2017).

180.    Defendant O'Grady was aware of Teva's kickback scheme during the Class Period as well.  Not only was he aware that a failure to make Copaxone donations in 2018 would result in up to $280 million in lost Copaxone sales (¶ 62), as he explained to a Teva colleague in January 2018, "*we buy the patients [sic] copay down to zero*."  ¶ 63.  In his role as Head of North America, O'Grady reports directly to CEO Schultz and CFO McClellan and has full responsibility for specialty and generic pharmaceuticals in Teva's North American region.  *Id.*; Press Release, Teva Announces New Organization Structure and Leadership Changes, Teva Pharmaceutical Industries Ltd. (Nov. 27, 2017).  Therefore, O'Grady knew that the revenue numbers for specialty medicines that he reported from the North America region to Teva's CEO and CFO were overstated in light of the Company's kickback scheme to pass patient co-pays through the Charitable PAPs.  O'Grady's knowledge of this information may be imputed to Teva.

181.    Defendants' statements regarding the Shared Solutions Program also evince that they understood how the program was used to fund Copaxone patient co-pays.  For example, on October 29, 2015, Koremans explained how the Shared Solutions Program helps patients obtain financial assistance, stating: "The shared solutions, they really helping to two things and do -- first of all, *make sure that patients have financial access, work with patients*.  *And help them to address their questions with their individual plans really well. And that really works*."  ¶105. On March 16, 2016, Derkacz explained that the Shared Solutions Program is one of the reasons

71

patients have continued to take Copaxone over the years, stating, "***the shared solutions, service and the loyalty and trust and confidence that these patients have had for many years.*** They like the product. They don't want to be upset what is working well for them and they also don't want to lose that relationship and that support that they've come to appreciate and trust and recognize over the last many years." ¶ 106.  The following year, on March 15, 2017, Derkacz explained that Teva goes out of its way to make it easy for patients to afford Copaxone, stating: "I can't disclose all of it.  But certainly the contracting strategy that we deploy, the approach that we take with our customers ensuring that they come first, that we make it easy for physicians and we make it easy for patients to stay on our therapy." ¶ 110.  As well, on June 3, 2016, Vigodman discussed the positive benefit the Shared Solutions Program has on patient retention on Copaxone, stating, "Look at the contribution of our shared services solution center to the brand and to the basically loyalty of our consumers and patients.  Look at the effect[.]" ¶ 107.

## C.     Defendants' Financial And Pharmaceutical Experience

182.   Defendants were highly educated, trained, and experienced in pharmaceutical sales, marketing, and/or financing and were therefore well-aware that their statements regarding Copaxone revenues and Teva's legal compliance were false and/or misleading and omitted material information.

183.   As set forth below, Defendants are sophisticated pharmaceutical executives who are well-versed in the customs and practices of their industry.  Therefore, Defendants were aware of the restrictions on donations to Charitable PAPs imposed by the United States government, or if they were not aware, knew that the investing public expected that they kept themselves abreast of the government's Medicare rules and restrictions.

72

184.    Michael Derkacz has more than 25 years of commercial operations and management experience in the pharmaceutical industry.  Prior to joining Teva, from 2008 to 2011, Derkacz served as Vice President, CNS for Cephalon, Inc.  Auspex Pharmaceuticals, Inc., Current Report (Form 8-K) 2 (May 25, 2015).  From 2003 to 2008, Derkacz served in various roles for pharmaceutical company, GlaxoSmithKline, ultimately becoming Executive Director, U.S. Marketing in 2008.  Michal Derkacz, LinkedIn, https://www.linkedin.com/in/mikederkacz/ (last visited May 16, 2021).  Derkacz received a B.A. in communications and advertising, with a minor in business administration and marketing, from the University of Texas, Arlington in 1991.  *Id.*

185.    Robert Koremans has more than 30 years of experience working at pharmaceutical companies.  In 1988 he began his career as a Business Unit Manager at Sanofi, S.A.  Robert Koremans, LinkedIn, https://www.linkedin.com/in/rob-koremans-5204096/?originalSubdomain=nl (last visited May 16, 2021).  He then worked for Serono, a Swiss biopharmaceutical company, and eventually became the President and CEO of pharmaceutical company, Zentiva in 2011.  *Id.*  Koremans has a medical degree from Erasmus University Rotterdam and an MBA from Babson college.  *Id.*

186.    Prior to joining Teva in 2015, Defendant McClellan spent nearly 20 years at global pharmaceutical company, Sanofi S.A., where he took on financial roles of increasing responsibility, resulting in ultimately becoming the U.S. CFO.  Teva Pharmaceutical Industries Ltd., Proxy Statement (Form 14A) 25 (Apr. 25, 2018).  McClellan received his BSBA, accounting and economics from the University of Missouri Trulaske College of Business.  *Id.*

187.    Defendant Schultz previously served as President and CEO of pharmaceutical company, H. Lundbeck A/S, from May 2015 to October 2017, after which time he joined Teva.

73

*Id.* at 10.  Prior to that, Schultz worked for nearly three decades at pharmaceutical company, Novo Nordisk, where he served in a number of leadership roles, including Chief Operating Officer.  *Id.*  Teva noted in its proxy statement published shortly after Schultz was hired, "Mr. Schultz's leadership positions in various healthcare corporations, including his experience as a chairman and a director of several international corporations and his service as the President and Chief Executive Officer at Teva, provides unique global perspective on the healthcare and pharmaceutical industries."  *Id.*

188.  Defendant O'Grady has spent his entire career working for pharmaceutical companies.  From 1995 to 2001, O'Grady worked for Sanofi-Aventis, ultimately becoming a Senior Regional Manager, Professional Education and Research.  In 2001, O'Grady joined Teva as a Regional Account Manager.  *See* Brendan O'Grady, LinkedIn, https://www.linkedin.com/in/brendan-o-grady-b108277/ (last visited May 19, 2021).  O'Grady held various roles in Teva's Managed Markets department and global division before becoming Executive Vice President and Head of North America Commercial in December 2017.  *Id.*  O'Grady holds a Bachelor of Science from State University of New York College at Genesco and an MBA from Baker University.  *Id.*

189.  Defendant Vigdoman has more than 20 years serving in a CEO position.  Between 1998 and 2001, Vigdoman served as the CEO of Elite, a coffee and confectionary company in Israel.  From 2001 to 2009 he served as the President and CEO of Strauss Group, a global food and beverage company.  Erez Vigdoman, AAE Speakers, https://www.allamericanspeakers.com/celebritytalentbios/Erez+Vigodman/416334 (last visited May 16, 2021).  Then, in 2010, Vigdoman became the President and CEO of Adama Agricultural Solutions, Ltd., the world's leading generic agricultural company.  *Id.*  Vigdoman is

a member of the Advisory Committee to the Israel National Economic Council and a member of the advisory board to the governor of the bank of Israel. *Id.*

190. Prior to joining Teva, Eyal Desheh served as the Executive Vice President and CFO of Checkpoint Software Technologies, Ltd. from 2000 to 2008. Eyal Desheh, LinkedIn, https://www.linkedin.com/in/eyal-desheh-99bba51ba/?originalSubdomain=il (last visited May 16, 2021). Desheh served on the board of directors for technology companies Stratasys, Ltd. from 2011 to 2016 and for Mobileye from 2013 to 2017. *Id.* Desheh holds an MBA and Bachelor's Degree in economics from the Hebrew University of Jerusalem. *Id.*

191. From 2001 to 2019 Defendant Kalif held various leadership and senior executive finance positions at Flex Ltd., a global technology, design and manufacturing service provider. Teva Pharmaceutical Industries, Inc., Proxy Statement (Form 14A) 29 (Apr. 22, 2020). From 1996 to 2001, Kalif worked for Deloitte Israel in various positions as a certified public accountant. *Id.* Kalif received his bachelor degree in accounting and economics from the College of Management Academic Studies in Israel and is a Certified Public Accountant. *Id.*

### D. The Importance of Copaxone To Teva's Financial Success

192. Because the fraud alleged herein relates to the primary business of Teva, knowledge of the facts underlying the fraud may be imputed to Defendants. Indeed, during the Class Period, Teva described Copaxone as "[o]ur leading medicine" and the drug made up half of revenues for all specialty medicines combined. 2015 20-F at 64; 2016 20-F at 69; 2017 10-K at 32, 68; 2018 10-K at 1, 59. Teva disclosed that it "has relied heavily on sales of Copaxone[,]" 2016 20-F at F-79, as Copaxone made up 20% of Teva's total revenues in 2015, 19% of Teva's total revenues in 2016, 17% of Teva's total revenues in 2017, 13% of total revenues in 2018, and 9% in 2019, and "contributed a significantly higher percentage to Teva's profits and cash flow

75

from operations" during those periods.  *See* 2015 20-F at 29; 2016 20-F at 32; 2017 10-K at 68; 2018 10-K at 59; 2019 10-K at 60.  At the beginning of the Class Period, the Company also advised that "[a]ny substantial decrease in the revenues derived from our specialty medicines would have an adverse effect on our results of operations[.]"  2015 20-F at 5.  As well, during a conference call on January 8, 2018, Schultz stated that Copaxone is "a major part of our revenue, it's a major part of our earnings[.]"  JPMorgan Healthcare Conference, Bloomberg Tr. at 1-2 (Jan. 8, 2018).

193.    The frequency with which Defendants and analysts spoke about Copaxone also indicates its importance to the Company, as it was often referenced on conference calls with analysts.  *See* ¶¶ 73, 75, 79, 83, 85, 89, 93, 97, 105-111, 131, 136, 141, 152, 162.  Based on the magnitude of the revenues attributed to Copaxone (¶¶ 193), Teva's public admissions regarding its reliance on Copaxone, and the Individual Defendants' routine discussions of the drug, it is reasonable to infer that Defendants were aware of the facts that were omitted and misrepresented by them as alleged herein.

### E.    Defendants Violated Teva's Code of Conduct

194.    Teva had established a company-wide policy for making charitable donations entitled the "Integrity Principles Policy."  Ex. A ¶ 13; Ex. A-4.  The Integrity Principles Policy provided that "[t]he review and approval process" for all charitable donations "is the responsibility of the appropriate Review Committee (Corporate Responsibility, Medical Advocacy, Medical Affairs and/or Compliance) which is separate from Sales and Marketing."  *Id.*  The Integrity Principles Policy also stated that "***Teva will not award charitable donations in exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or provide favorable formulary status for a Teva product***."  Ex. A-4.

195.    Defendants violated this policy for donations to CDF and TAF. *Id.* First, according to CW1, donation payments fell under the responsibility of the Corporate Responsibility department and thus, under the Integrity Policies, would have had to been approved by that department. However, Teva's marketing and patient services teams determined the payments, and Teva's senior sales, marketing, and finance executives approved the payments. *Id.* Second, Teva made the donations to CDF and TAF with the understanding that the foundations would apply the money given by the Company to only Copaxone. ¶¶ 44-45. Further, because Defendants intended the "Copaxone Donations" to generate sales, Teva treated the donations to CDF and TAF as business expenses rather than charitable donations for tax purposes. Ex. A ¶ 63.

### F.    SOX Certifications

196.    Defendants Vigodman and Desheh signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Teva's February 11, 2016 Form 20-F annual report for the fiscal year ended December 31, 2015. The certification states that the annual report "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *See* Ex. 13 to Teva Form 20-F (filed Feb. 11, 2016). The certifications also state, in relevant part:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

77

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

*See* Exs. 12(i)-(ii) to Teva Form 20-F (filed Feb. 11, 2016).

197. The February 15, 2017 Form 20-F contained substantially similar certifications for the fiscal year ended December 31, 2016 signed by Defendants Peterburg and Desheh. *See* Exs. 12(i)-(ii), 13 to Teva Form 20-F (filed Feb. 15, 2017).

198. The February 12, 2018 Form 10-K contained substantially similar certifications for the fiscal year ended December 31, 2017 signed by Defendants Schultz and McClellan. *See* Exs. 31.1, 31.2, 32 to Teva Form 10-K (filed Feb. 12, 2018).

199. The May 3, 2018 Form 10-Q contained substantially similar certifications for the quarter ended March 31, 2018 signed by Defendants Schultz and McClellan. *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed May 3, 2018).

200. The August 2, 2018 Form 10-Q contained substantially similar certifications for the quarter ended June 30, 2018 signed by Defendants Schultz and McClellan. *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Aug. 2, 2018).

201. The November 1, 2018 Form 10-Q contained substantially similar certifications for the quarter ended September 30, 2018 signed by Defendant Schultz and McClellan. *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Nov. 1, 2018).

202. The February 19, 2019 Form 10-K contained substantially similar certifications for the fiscal year ended December 31, 2018 signed by Defendants Schultz and McClellan. *See* Exs. 31.1, 31.2, 32 to Teva Form 10-K (filed Feb. 19, 2019).

203.    The May 2, 2019 Form 10-Q contained substantially similar certifications for the quarter ended March 31, 2019 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed May 2, 2019).

204.    The August 7, 2019 Form 10-Q contained substantially similar certifications for the quarter ended June 30, 2019 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Aug. 7, 2019).

205.    The November 7, 2019 Form 10-Q contained substantially similar certifications for the quarter ended September 30, 2019 signed by Defendants Schultz and McClellan.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Nov. 7, 2019).

206.    The February 21, 2020 Form 10-K contained substantially similar certifications for the fiscal year ended December 31, 2019 signed by Defendants Schultz and Kalif.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-K (filed Feb. 21, 2020).

207.    The May 7, 2020 Form 10-Q contained substantially similar certifications for the quarter ended March 31, 2020 signed by Defendants Schultz and Kalif.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed May 7, 2020).

208.    The August 5, 2020 Form 10-Q contained substantially similar certifications for the quarter ended June 30, 2020 signed by Defendants Schultz and Kalif.  *See* Exs. 31.1, 31.2, 32 to Teva Form 10-Q (filed Aug. 5, 2020).

## VI.    LOSS CAUSATION

209.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial damages.

210.    During the Class Period, Lead Plaintiff and other Class members purchased Teva securities at artificially inflated prices and suffered substantial losses and damages when the true

79

facts concealed by the Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Teva securities declined significantly causing Lead Plaintiff and other Class members to suffer losses and damages when the Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by the Defendants materialized.

211.    Defendants issued false and misleading statements and material omissions regarding Teva's revenues and market demand for Copaxone, the Company's Shared Solutions Program, and Teva's compliance with federal laws and regulations that impacted the price at which Teva securities traded.  On the strength of these false and misleading statements and material omissions, the price of the Company's securities was artificially inflated to a Class Period high of $62.37 per share on December 24, 2015.  Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities also served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Teva's business, operations, performance, and prospects.  On the dates that these false and misleading statements were corrected and/or the risks concealed by them materialized through the issuance of information regarding Teva's unlawful kickback scheme, the price at which Teva securities traded declined as a result of the truth being disclosed to the market and investors suffered losses due to this decline of  the price of Teva securities.

212.    The true facts and risks regarding Teva's kickback scheme which were omitted and/or misrepresented by the Defendants eventually caused the price of Teva securities to decline on two occasions, thereby causing harm to investors.

80

213.    First, Defendants' and Teva's statements were partially corrected, and the risks concealed by the undisclosed facts regarding Teva's kickback scheme materialized when Teva announced that it had received a subpoena from the U.S. Attorney's office in Boston, Massachusetts investigating the Company's charitable donations.  *See* ¶ 117.

214.    Second, Defendants' and Teva's statements were further partially corrected, and the risks concealed by the undisclosed facts regarding Teva's kickback scheme materialized, on November 2, 2017, when Teva cut its forecasts for the remainder of 2017 and reported lower revenues for Copaxone, causing investors to suffer losses as the price of Teva's shares price fell approximately 20%, from a closing securities price of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017.  *See* ¶ 124.

215.    Third, Defendants' and Teva's statements were further partially corrected, and the risks concealed by the undisclosed facts regarding Teva's kickback scheme materialized, on August 18, 2020, when the U.S. Attorney's Office for the District of Massachusetts filed a complaint against Teva alleging that the Company violated the False Claims Act, causing investors to suffer losses as the price of Teva's shares dropped $1.69, or approximately 15%, over the course of three trading days, from a close of $11.59 on August 17, 2020 to a close of $9.90 on August 20, 2020.  *See* ¶¶ 169-170.

216.    Accordingly, as a result of their purchases of Teva's publicly traded securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic losses and damages.

## VII.    CLASS ACTION ALLEGATIONS

217.    Lead Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of  all those who purchased or otherwise

acquired Teva securities during the Class Period and were damaged on the revelations of the alleged corrective disclosures. (the "**Class**").

218.   Excluded from the Class are the Defendants named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

219.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Teva securities were actively traded on the NYSE and TASE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Teva or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class action.

220.   The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Teva securities was actively traded on the NYSE and TASE, which are efficient markets.  While the exact number of Class members cannot be determined at this early stage, Lead Plaintiff believes that thousands of people held Teva securities during the Class Period.  Record owners and other members of the Class may be identified from records maintained by Teva or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

82

221.    Lead Plaintiff's claims are typical of the claims of the Class because Lead Plaintiff and all members of the Class were similarly affected by Defendants' unlawful conduct as complained herein.

222.    Lead Plaintiff will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action and securities litigation.  Lead Plaintiff have no interests that are contrary to or in conflict with those of the Class.

223.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

224.    Lead Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

   a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b)    Whether Defendants' publicly disseminated statements made during the Class Period contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   c)    Whether and to what extent Defendants' material untrue statements and/or omissions of material fact caused the market price of Synergy's securities to be artificially inflated during the Class Period;

   d)    Whether Defendants acted with the requisite level of scienter in omitting and/or misrepresenting material facts;

   e)    Whether Defendants were controlling persons of Synergy;

f)  Whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

g)  Whether Class members have sustained damages, and if so, the proper measure of damages.

225.  Lead Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

226.  A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is impracticable.  In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## VIII.  CONTROL PERSON LIABILITY

227.  The Individual Defendants, because of their positions with Teva, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, advertisements, promotional materials, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each Individual Defendant possessed the power to direct or cause the direction of the management and policies of Teva.  Each Individual Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to Teva's revenues and market demand for Copaxone, the Company's Shared Solutions Program, and Teva's compliance with federal laws and regulations.  Each Individual Defendant was provided with copies of the Company's SEC filings, reports, promotional materials, and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because

of their positions and access to material non-public information, each Individual Defendant knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## IX.    THE FRAUD ON THE MARKET PRESUMPTION

228.    The false and/or misleading statements alleged herein were material and public and, at all relevant times, the market for Teva's securities was an efficient market for the following reasons, among others:

a)    Teva's securities were listed on the NYSE and TASE stock markets, highly efficient markets;

b)    As a registered and regulated issuer of securities, Teva filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c)    Teva regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d)    The market reacted to public information disseminated by Teva; and

e)    At least fourteen analysts followed Teva's business and wrote reports which were publicly available and affected the marketplace.

85

229.    As a result of the above, the market for Teva's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical daily trading prices and volumes of Teva securities are incorporated herein by reference.

230.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Teva's securities.  Without knowledge of the misrepresented or omitted facts, Lead Plaintiffs and other members of the Class purchased Teva securities between the time that the Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Teva's securities was artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## X.    NO STATUTORY SAFE HARBOR

231.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

232.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

233.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

234. Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

235. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any pharmaceutical company, and misleadingly contained no factual disclosure of any of the specific details concerning Teva's kickback scheme, or similar important factors that would give investors adequate notice of such risks.

236. Fifth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Synergy who actually knew that each such statement was false or misleading when made.

## XI.    CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

237.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

238.    This Count is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

239.    During the Class Period, Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5(a) – (c) promulgated thereunder.

240.    The acts and scienter of Defendants and other Company employees are imputed to the Company under the principles of agency and *respondeat superior*.

241.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about Teva's revenues and market demand for Copaxone, the Company's Shared Solutions Program, and Teva's compliance with federal laws and regulations as reflected in the misrepresentations and omissions set forth above.

242.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately

88

refrained from taking steps necessary to discover whether the material facts were false or misleading.

243. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

244. Lead Plaintiff and other Class members purchased Teva securities, without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects. In doing so, Lead Plaintiff and other Class members relied on the integrity of the market price for Teva securities that was artificially inflated due to the false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.

245. Lead Plaintiff and other Class members were damaged as a result of Defendants' false and/or misleading statements and misrepresentations and omissions of material facts. Lead Plaintiff and other Class members would not have purchased Teva securities at the prevailing prices had they known the truth about the matters discussed above.

246. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other Class members have suffered damages in connection with their purchases or acquisitions of Teva securities.

247. Lead Plaintiffs filed this action within two years after the discovery of the facts constituting the violation, including facts establishing scienter and other elements of Lead

Plaintiff's claims, and within five years after the violations with respect to Lead Plaintiff's investments.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

248.    Lead Plaintiff re-alleges each allegation above as if fully set forth herein.

249.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

250.    As alleged herein, the Individual Defendants caused Teva to violate Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

251.    Each Individual Defendant, by reason of his status as a senior executive officer and/or director of Teva, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiff and other Class members, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases, and other statements related to Lead Plaintiff's and other Class members' investments in Teva securities within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

252.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC filings, press releases, promotional material, and other statements. Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the

90

opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

253. The Individual Defendants knew or recklessly disregarded the fact that Teva's representations were materially false and misleading and/or omitted material facts when made, and are therefore culpable participants in the fraud. In so doing, the Individual Defendants did not act in good faith. By virtue of their high-level positions and their participation in and awareness of Teva's operations and public statements, the Individual Defendants were able to and did influence and control Teva's decision making, including controlling the content and dissemination of the documents that Lead Plaintiff and other Class members contend contained materially false and misleading information and on which Lead Plaintiff and other Class members relied.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on their own behalf, and on behalf of the Class, demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as Class representative;

B. Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and statements alleged herein;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert and consultant fees, and other costs;

91

D.      Awarding damages in favor of Lead Plaintiff and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## XIII.  JURY TRIAL DEMAND

Lead Plaintiff hereby demands a trial by jury on all triable claims.

Dated: May 25, 2021                                    Respectfully submitted,

                                                      **FARUQI & FARUQI, LLP**

                                                      By:    */s/ Timothy J. Peter*
                                                             Timothy J. Peter

                                                      Timothy J. Peter
                                                      1617 John F Kennedy Blvd #1550
                                                      Philadelphia, PA 19103

                                                      James M. Wilson, Jr. (*pro hac vice* forthcoming)
                                                      Robert W. Killorin (*pro hac vice* forthcoming)
                                                      **FARUQI & FARUQI, LLP**
                                                      685 Third Avenue, 26th Floor
                                                      New York, NY 10017
                                                      Telephone: 212-983-9330
                                                      Facsimile: 212-983-9331
                                                      Email:  jwilson@faruqilaw.com
                                                              rkillorin@faruqilaw.com

                                                      *Attorneys for Lead Plaintiff and Lead*
                                                      *Counsel for the putative Class*

92

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 25, 2021, I caused true and correct copies of the

foregoing to be served on all counsel of record via CM/ECF.

Dated: May 25, 2021            By: /s/ *Timothy J. Peter*
                                       Timothy J. Peter

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>TEVA PHARMACEUTICALS USA, INC., and )<br>TEVA NEUROSCIENCE, INC., )<br><br>Defendants. ) | Civil Action No. 20-11548 |

## COMPLAINT

### Introduction

1.      This is an action against defendants Teva Pharmaceuticals USA, Inc., and Teva

Neuroscience, Inc. (collectively, "Teva"), to recover treble damages, restitution, and civil

penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, and the common law for causing

the submission of false claims to Medicare as a result of kickbacks that Teva paid in the form of

illegal co-pay subsidies for its multiple sclerosis ("MS") drug, Copaxone.  During the period

from late 2006 through at least 2015, Teva knowingly and willfully violated the anti-kickback

statute, 42 U.S.C. § 1320a-7b(b), by paying over $300 million to two third-party foundations,

Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF"), to cover the Medicare co-pay

obligations of Copaxone patients.  This conduct generated hundreds of millions of dollars in

false claims to Medicare and a corresponding amount of revenue for Teva.

2.      Teva used CDF and TAF as conduits:  it paid the foundations with the intent and

understanding that, in violation of the anti-kickback statute, they would use Teva's money to

cover the co-pays of patients taking Copaxone.  Teva intended the payments to ensure that

Copaxone patients never faced the steep prices that Teva charged for its drug, thus inducing the patients, including Medicare patients, to purchase the drug. As depicted in the graph below, during the period from late 2006 to 2015, while Teva was subsidizing Copaxone's cost through CDF and TAF, Teva raised the price of Copaxone at a rate over 19 times the rate of inflation, from approximately $17,000 per year to over $73,000 per year.



2

3.        Teva paid CDF and TAF tens of millions of dollars each year because it knew that the foundations would use Teva's money to cover Copaxone co-pays, thus increasing Copaxone sales and enriching Teva in amounts that far exceeded its payments to the foundations.  (A list of payments from Teva to CDF and TAF during the period from December 2006 through 2015 is attached as Exhibit 1.)  Ostensibly, CDF and TAF each operated a "MS" fund that covered co-pays for any of the many MS drugs on the market.  In practice, however, Teva conspired with the foundations so that they operated their MS funds to maximize the proportion of Copaxone patients who benefited whenever Teva made a payment to the foundations.

4.        Teva effectuated its scheme through a specialty pharmacy, Advanced Care Scripts, Inc. ("ACS"), to which Teva referred Copaxone patients who faced Medicare co-pays for the drug.  ACS, in turn, arranged for the patients to obtain Medicare co-pay coverage, initially from CDF, and later, after TAF was established, from both CDF and TAF.  ACS then reported back to Teva how many Copaxone patients were receiving co-pay coverage from each foundation.  During its annual budgeting process, Teva used information from ACS and the foundations to determine how much money each foundation would need to cover the Medicare co-pays of existing Copaxone patients in the following year, and Teva paid each foundation accordingly.  From the outset, ACS's founder, Edward Hensley "understood that Teva was purposefully utilizing ACS and structuring its donations to CDF in a manner that essentially ensured that such donations would benefit only Copaxone patients, and not patients who had

3

been prescribed competitor MS medications." Affidavit of Edward Hensley ("Hensley Aff.") ¶ 3 (attached as Exhibit 2). When Teva began paying TAF, in addition to CDF, Hensley ensured that Teva "understood that Teva effectively would be able to use TAF as it had CDF: essentially, as a 'pass-through' donation vehicle to get Teva monies into the hands of Copaxone patients." *Id.* ¶ 10.

5.      Teva and ACS also worked together to enable Teva to cover Medicare co-pays for Copaxone patients who started on the drug after the beginning of a year, when the TAF and CDF MS funds were often closed to new patients because the foundations had allocated all of their funding to existing patients. During the course of each year, ACS would provide periodic reports to Teva on the number of new Copaxone patients awaiting Medicare co-pay coverage. When an ACS report showed a substantial number of Copaxone patients waiting, Teva would multiply the number of waiting patients by the relevant foundation's grant amount for Copaxone patients, add the foundation's nine percent administrative fee, and then send a corresponding payment to the foundation. Just before sending the payment, Teva would notify ACS, which then would send a "batch file" of applications for all the waiting Copaxone patients to the foundation so that the foundation would act on those applications as soon as the fund re-opened. *See* Hensley Aff. ¶¶ 5-6. In this way, Teva and ACS ensured that the vast majority of Teva's payments to the foundations went to cover the Medicare co-pays of Copaxone patients.

4

6.     Thus, for Teva, both CDF and TAF functioned not as charities for MS patients, but as pass-through vehicles for money from Teva to Copaxone patients.  Indeed, Teva had a special review process for charitable donations, but did not use that process when making its payments to CDF and TAF.  Teva knew that, if it did not use CDF and TAF to subsidize Medicare patients' co-pays for Copaxone, substantially fewer patients would use Copaxone and Teva's revenues would suffer.  As one Teva employee noted once when the company was considering whether to reduce funding for TAF, "[n]ot funding these patients has a direct and immediate impact on units [sold]."  Teva avoided such lost sales by regularly paying CDF and TAF whatever it understood they needed to cover Medicare patients' co-pays for Copaxone.

7.     Teva's scheme circumvented the congressional design of the Medicare system, which requires drug co-pays, in part, to act as a market constraint against increasing prices. Instead, unbound by any market check on pricing due to its payment of illegal kickbacks, Teva left American taxpayers to shoulder the high prices that Teva set for Copaxone, while Teva reaped for itself the resulting profits.

**Jurisdiction and Venue**

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1345.  The Court has supplemental jurisdiction to entertain the common law cause of action under 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over both Teva Pharmaceuticals USA,

5

Inc., and Teva Neuroscience, Inc., and venue is appropriate in this Court, under 31 U.S.C.

§ 3732(a), because both entities caused false claims to be submitted in this District.

## The Parties

9. Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (Medicare).

10. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA"), is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Teva USA is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva Ltd."), an Israeli business entity whose shares are publicly traded in the United States.

11. Defendant Teva Neuroscience, Inc. ("Teva Neuroscience"), is a Delaware corporation with its principal place of business in Overland Park, Kansas. It is a wholly-owned subsidiary of Teva USA.

12. Teva Neuroscience and Teva USA were individually and collectively involved in the schemes alleged herein. Personnel from both entities proposed, coordinated and approved the payments to CDF and TAF. In many instances, Teva USA was the source of Teva's payments to the foundations. In other instances, Teva paid the foundations through Teva Neuroscience.

6

13.     Teva Ltd. approved the Teva Neuroscience and Teva USA budgets for payments

to CDF and TAF.  Senior Teva Neuroscience management reported to Teva USA's senior

management, who in turn reported to senior management at Teva Ltd. in Israel.  Senior

executives at Teva Ltd. directly approved some of the larger payments to TAF and CDF.  As

stated in a September 2015 e-mail regarding "Medicare Donations Process," the payments

required approval from increasingly senior executives, up to Teva Ltd. Chief Executive Officer

Erez Vigodman:

> Approval Authority Levels
> $0.5M Sr. Director
> $1M VP
> $5M SVP (Larry Downey in the past)
> $15M TEC members (Rob Koremans)
> $25M CFO (Eyal Desheh)
> >$25M CEO (Erez Vigodman)

(A copy of this e-mail is attached as Exhibit 3.)  Notably, Teva had a company process for

making charitable donations.  According to Teva's 2012 "Integrity Principles Policy" concerning

charitable donations, "[t]he review and approval process, including all funding decisions for

proposed donations, is the responsibility of the appropriate Review Committee (Corporate

Responsibility, Medical Advocacy, Medical Affairs and/or Compliance) which is separate from

Sales and Marketing."  (A copy of the Teva Integrity Principles Policy is attached as Exhibit 4.)

Teva did not follow this policy for payments to CDF and TAF; instead, Teva's marketing and

patient services teams determined the timing and amounts of those payments, which came from

7

the Copaxone marketing budget, and senior Teva sales, marketing and finance executives then approved the payments.

## Legal Background

### I. The Medicare Part D Program And Co-Pays Under Medicare Part D

#### A. Medicare Part D

14. Congress established Medicare in 1965 to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 1395 *et seq.*

15. Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health and Human Services ("HHS").

16. In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan Sponsors, to administer prescription drug plans. *See* 42 C.F.R. § 423.4.

17. Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. CMS regulates and subsidizes the Part D Sponsors pursuant to one-year, annually renewable contracts. Part D Sponsors, in turn, enter into

8

subcontracts with pharmacies, or other "downstream entities," to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

18.     These entities submit claims to Part D plans that pay for the drug using funds provided by CMS from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund.  42 C.F.R. § 423.315(a).

    B.      Medicare Part D Co-Pay Obligations

19.     By congressional design, under the Medicare statute, a Part D beneficiary may be required to make a partial payment for the cost of these prescription drugs in the form of a "co-payment," "coinsurance," or "deductible" (collectively "co-pays").  These co-pay obligations can be substantial for expensive medications and vary throughout the year, depending on the total Part D covered expenses the beneficiary has incurred in the year.  *See* 42 U.S.C. § 1395w-102. For example, after meeting an annual deductible (originally $250 in 2006), the standard Part D benefit requires a 25 percent patient co-pay up to an "initial coverage limit" (originally $2,250 in 2006).  *Id*. at b(1)-(2).

20.     After meeting the "initial coverage limit," there is a "coverage gap" during which patient co-pay obligations increase substantially until the patient meets an "annual out-of-pocket threshold" for the coverage year.  *See* 42 U.S.C. § 1395w-102(b)(2)(D).  For brand name drugs, the patient co-pay owed in the "coverage gap" was 100 percent through 2010, 50 percent in 2011 and 2012, 47.5 percent in 2013 and 2014, and 45 percent in 2015 and 2016.

9

21.     The financial thresholds for the "deductible," "initial coverage limit," and annual "out-of-pocket threshold" have increased each year since 2006 pursuant to a statutory and regulatory formula (from $250, $2,250, and $3,600, respectively, to $360, $3,310, and $4,850, respectively, by 2016).

22.     Medicare Part D coverage for costs incurred after the "coverage gap", *i.e.*, on costs incurred for the remainder of the benefit year above the "annual out-of-pocket threshold" (originally $3,600 in 2006), is commonly referred to as "catastrophic coverage."

23.     Congress determined that patients owe a co-pay obligation in the "catastrophic coverage" phase equaling the greater of:  1) five percent of the prescription drug costs; or 2) a small fixed dollar amount (originally $5 for brand name drugs in 2006).  42 U.S.C. § 1395w-102(b)(4).  As a practical matter, a patient will owe a five percent co-pay in the "catastrophic coverage" phase of Part D for any expensive, brand name drug.  As described below, the remaining costs are paid by a "reinsurance subsidy" from CMS (80 percent) and by the Part D plans (15 percent).

24.     In a July 2015 e-mail exchange, Teva employees shared the following visualization of the Medicare Part D co-pay structure:

10



(A copy of the e-mail exchange with this visual is attached as Exhibit 5.)

25.     Congress intended these Medicare co-pays to encourage physicians and beneficiaries to be efficient consumers of federally-reimbursed health care products, and also to encourage those manufacturing such products to price them based on market forces such as consumer sensitivity and competition.  Manufacturers paying the Medicare co-pays of those seeking to buy their drugs circumvent this congressionally-designed check on health care costs. As the United States Department of Health and Human Services, Office of the Inspector General

11

("HHS-OIG") has observed, drug manufacturers paying the Medicare Part D co-pays of patients taking their products "eliminat[e] a market safeguard against inflated prices."  HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625 (Nov. 22, 2005).

        C.        Medicare Payments For Prescription Drugs Under Medicare Part D

26.      Generally, after a physician writes a prescription for a Medicare Part D beneficiary, the patient can take the prescription to a pharmacy or submit it to a mail order specialty pharmacy to be filled.

27.      When the patient submits the prescription, the Medicare co-pay is due from the patient to complete the purchase of the drug and have the pharmacy fill the prescription.

28.      When the pharmacy dispenses a drug to a Part D beneficiary, the pharmacy submits a claim to the beneficiary's Part D Sponsor, which, in turn, submits an electronic record of the claim, called a Prescription Drug Event ("PDE"), to CMS.  After dispensing the drug, the pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the drug cost less the co-pay for which the Part D beneficiary was responsible.

29.      The PDE contains many specific representations regarding each Medicare prescription drug claim, including the patient's name, service provider of the drug, the prescriber of the drug, the name of the drug, and the quantity dispensed to the patient.  Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing

12

event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program.

30.     The creation and submission of PDE claims data is necessary for CMS to administer the Part D program and to reimburse Part D Plan Sponsors for qualified drug coverage that they provide to Medicare beneficiaries.  Submitting the required information, which is contained in the PDE, is a condition of payment for CMS's provision of Medicare funds to Part D Plan sponsors.  *See* 42 C.F.R. § 423.322.

31.     CMS pays Part D Plan Sponsors based upon these PDEs in various ways.  For example, CMS gives each Part D sponsor advance monthly payments to cover, among other things, the Part D Plan Sponsor's direct CMS subsidy per enrollee (which is based on a standardized bid made by the Part D sponsor) and estimated reinsurance subsidies (to account for CMS's anticipated 80 percent subsidy of the "catastrophic coverage" costs that will be incurred for all enrollees).  *See* 42 C.F.R. §§ 423.315, 423.329.  At the end of the payment year, CMS then reconciles the advance payments paid to each Part D Sponsor with the actual costs the sponsor has incurred, as documented by PDE data.  In this reconciliation process, CMS uses the PDE claims data submitted by the Part D Sponsor during the prior payment year to calculate the costs the Part D sponsor has actually incurred for prescriptions filled by Medicare beneficiaries under Part D that year.  In the case of the federal government's 80 percent reinsurance subsidy for catastrophic costs, for example, if CMS determines that it underpaid the sponsor, it will make

13

up the entire difference. The payments by CMS to the Part D sponsor — which in turn fund the provision of prescription drugs provided to beneficiaries at each drug dispensing event — come from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund. 42 C.F.R. § 423.315(a).

32. Part D Plan Sponsors must comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729, et seq.), and the anti-kickback statute (§ 1128B(b) of the Act)." 42 C.F.R. § 423.505(h)(1). Any "first tier, downstream, and related entity" that Part D Plans subcontract with (including pharmacies dispensing medication) must also comply with these, and any other, contractual obligations of the Part D Plan, *see* 42 C.F.R. § 423.505(i)(3)(iii), and separately comply with all applicable federal laws, regulations, and CMS instructions. *See* 42 C.F.R. § 423.505(i)(3)(iv).

33. CMS regulations require Part D Plan Sponsors and related "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the health care products or services reflected therein. 42 C.F.R. § 423.505(k).

34. Compliance with the regulatory requirement that claims data in the PDE record submitted to CMS be "true, accurate, and complete" is an express condition of payment under the Medicare Part D Program. 42 C.F.R. § 423.505(k).

14

35.     The submission of PDEs is essential to the functioning of the Part D Program, the singular purpose of which is to provide coverage for drug products for the Medicare population. The accuracy of the information contained in each PDE for each patient determines how much payment will be made by Part D for that particular prescription.

## II.     The False Claims Act

36.     The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of subparagraph (A) [or] (B),

. . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

37.     For purposes of the False Claims Act, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

15

38.     The False Claims Act defines the term "claim," in pertinent part, as

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

39.     For purposes of the False Claims Act, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## III.     The Anti-Kickback Statute

40.     The anti-kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are excessively costly, medically unnecessary, of poor quality, or potentially harmful to patients. To protect the integrity of Federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gives rise to overutilization, poor quality of care, or patient harm. In particular, when determining what conduct to prohibit, Congress determined that the inducements at issue would "contribute significantly to the cost" of

16

Federal health care programs absent federal penalties as a deterrent.  H.R. Rep. No. 95-393, at 53

(1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3056.  First enacted in 1972, Congress

strengthened the anti-kickback statute in 1977, 1987, and 2010 to ensure that kickbacks

masquerading as legitimate transactions did not evade its reach.  *See* Social Security

Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-

Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid

Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection and

Affordable Care Act, Pub. L. No. 111-148.

41.     The anti-kickback statute prohibits any person or entity from knowingly and

willfully offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or

indirectly, to induce or reward any person for purchasing, ordering, or recommending or

arranging for the purchasing or ordering of federally-funded medical goods or services:

> (b) Illegal remunerations
> * * *
> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.

17

Case 1:20-cv-11548   Document 1   Filed 08/18/20   Page 18 of 55

42 U.S.C. § 1320a-7b(b)(2).  Violation of the anti-kickback statute also can subject the perpetrator to exclusion from participation in Federal health care programs and civil monetary penalties.  42 U.S.C. § 1320a-7b(b)(2); 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

42.     The anti-kickback statute prohibits offering or paying anything of value, including "cash" and "in-kind" payments or rebates.  42 U.S.C. § 1320a-7b(b)(2).  Money and other forms of financial subsidies that can be used to pay or waive Medicare co-pays constitute remuneration under the anti-kickback statute.

43.     The anti-kickback statute defines a "Federal health care program" to mean "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government," except for the health insurance program for federal employees under 5 U.S.C. §§ 8901 *et seq.*  42 U.S.C. § 1320a-7b(f).  Medicare is a "Federal health care program" for purposes of the anti-kickback statute.

44.     The anti-kickback statute provides that, "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  42 U.S.C. § 1320a-7b(h).

45.     In 2010, Congress amended the anti-kickback statute to include language that reaffirmed prior case law and provided that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim for

18

purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). Under this provision, claims submitted to Federal health care programs that result from violations of the anti-kickback statute are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a). Accordingly, a person violates the False Claims Act when he or she knowingly submits or causes to be submitted claims to Federal health care programs that result from violations of the anti-kickback statute.

46.     Compliance with the anti-kickback statute is material to CMS's decision to pay a Medicare claim.

### Factual Allegations

## I.      Background

### A.      Teva And Copaxone

47.     Teva Ltd. licensed the rights to Copaxone from the Weizmann Institute of Science in 1987. The United States Food and Drug Administration approved Copaxone in 1996, and it subsequently became one of the best-selling drugs in the United States. For example, "[i]n 2015, Copaxone® revenues . . . amounted to $3.2 billion in the U.S. (approximately 29% of Teva's total 2015 U.S. revenues)." Teva Ltd., Annual Report (Form 20-k), Notes to Consolidated Financial Statements, F-64, *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516459785/d120587d20f.htm. In 2015, Medicare spent over $1.1 billion on catastrophic coverage for Copaxone. *See* HHS-OIG, *High Price Drugs Are Increasing Federal Payments For Medicare Part D Catastrophic Coverage* (Jan. 2017), *available at* https://oig.hhs.gov/oei/reports/oei-02-16-00270.pdf.

19

B.      Teva's "Shared Solutions" Program

48.      For Copaxone patients, Teva provided a suite of services called "Shared

Solutions."  According to Teva, Shared Solutions was "dedicated to getting and keeping patients

on" Copaxone.  Through Shared Solutions, Teva offered free injection devices that patients

could use to administer the drug, maintained a staff of nurses who provided patients with free

injection training, and assigned case managers who worked with patients to obtain insurance

coverage for the drug and helped them to identify means of covering the often substantial

insurance co-pays for the drug.  Physicians who prescribed Copaxone typically submitted an

enrollment form directly to Shared Solutions for each new Copaxone patient.  As a result, Shared

Solutions established relationships with the vast majority of all Copaxone patients.

49.      Teva explained the financial component of the Shared Solutions offering in a set

of talking points for its Copaxone sales team:

> - **Shared Solutions**® is committed to helping ensure that financial concerns do not come between patients and their treatment
> - No patient should have to choose, interrupt, or discontinue therapy because of financial concerns, nor should a health care provider have to make clinical decisions based on cost
> - **Shared Solutions**® is dedicated to finding the right assistance for both new and existing patients

20

> - Affordable access is the reality for the majority of COPAXONE® (glatiramer acetate injection) patients
> - **Shared Solutions**® supports 3 separate financial assistance programs for COPAXONE® patients
>   - Free product
>   - Medicare Part D assistance
>   - Private co-pay assistance

Similarly, in a 2011 Work Plan for Teva Neuroscience, the company noted that "Copaxone Patient Assistance Programs remove prescribing barriers and drive[] adherence and compliance." Thus, Shared Solutions served to assure both patients and their physicians that they need not worry about Copaxone's substantial cost.

50. In October 2006, Teva entered into a contract with ACS, a specialty pharmacy that Hensley and Jeff Spafford had co-founded earlier that year. (A copy of this contract is attached as Exhibit 6.) Hensley had a prior business relationship with Denise Lynch, who at the time was Teva's Director of Customer Resources and ran Teva's Shared Solutions program. (Lynch's title later changed to Vice President of Patient Services.) Pursuant to the contract, Shared Solutions referred to ACS patients who had been prescribed Copaxone and who either had or were eligible for Medicare Part D coverage. If a patient did not already have Medicare Part D coverage, ACS helped the patient sign up for coverage. If a patient was eligible for Medicare co-pay coverage from a foundation, ACS would gather the necessary information from the patient and submit an application for the patient to CDF.

51.     ACS generated revenue on its work for Teva from service fees that Teva paid to ACS to facilitate foundation coverage for Medicare patients, and from dispensing Copaxone. ACS dispensed Copaxone to the vast majority of the Copaxone patients for whom it arranged co-pay coverage through its arrangement with Teva.

52.     In 2008, Hensley and Spafford sold ACS to another pharmacy. They stayed on at ACS until late 2009. Meanwhile, during 2009, they founded TAF and a for-profit business called AssistRx. After TAF opened its MS fund in or about January 2010, ACS started helping Medicare patients obtain Copaxone co-pay coverage from both TAF and CDF. In September 2010, AssistRx started running Teva's free drug program for Copaxone patients who did not have insurance. As part of that program, AssistRx identified Medicare-eligible patients who were receiving free Copaxone from Teva. AssistRx arranged for those patients to obtain Medicare coverage, and referred them to ACS, which then would seek foundation co-pay funding for them. In February 2015, AssistRx also took over ACS's role of arranging Medicare co-pay funding for Copaxone patients referred by Shared Solutions.

53.     Throughout the course of its work for Teva, ACS provided Teva with regular updates on the number of Copaxone patients receiving co-pay funding from CDF or TAF. In these updates, ACS told Teva how many Copaxone patients each foundation was funding and broke down the totals into patients receiving their drug from ACS or from another pharmacy.

TAF, meanwhile, reported that it approved over 99 percent of the co-pay coverage applications it received when funding was available.

## II.     Teva Paid Foundations To Generate Medicare Claims For Copaxone.

54.     Even before the start of the Medicare Part D program in 2006, Teva paid foundations to increase sales of Copaxone.  In an article on December 1, 2005, the Wall Street Journal reported on an interview with Lynch:

> 'Market research told us early on that we needed to do a patient support program' because some people wouldn't be able to afford their co-payments, says Denise Lynch . . . .
>
> Ms. Lynch says Teva didn't calculate the profit it could receive when making its donation, 'but from a common-sense perspective, you can get there.' . . .
>
> Teva considered setting up a foundation on its own, she says, but concluded it was 'cleaner from a regulatory point of view to work through a third party.'

Geeta Anand, *Through Charities, Drug Makers Help People—and Themselves*, Wall St. J. (Dec. 1, 2005).  (A copy of this article is attached as Exhibit 7.)

55.     Soon after Teva started working with ACS, Lynch told Hensley that she would not authorize payments to Patient Services, Inc. ("PSI"), another co-pay foundation, because PSI had "burned" her with respect to a prior payment from Teva.  Hensley Aff. ¶ 4.  Lynch explained to Hensley that a payment Teva had made to PSI had not been passed to Copaxone patients but rather had been used to cover the co-pays of patients on other drugs.  *Id.*  According to Hensley, Lynch said she was "'tired' of other pharmaceutical manufacturers 'riding on [Teva's]

23

coattails.'" *Id.* Accordingly, as described further below, Teva financed the MS funds only at CDF and TAF, where it had assurance that its money would go to patients taking its drug, Copaxone.

56. ACS understood that Teva's goal was to use the foundations as a "pass-through vehicle." Hensley Aff. ¶ 10. In a February 2007 e-mail reflecting Hensley's understanding of Teva's goal, Hensley instructed his ACS colleagues that "particular manufacturer funds [should] go to their own drug as [that was] what was the intent of the project was originally." (A copy of this e-mail is attached as Exhibit 8.)

57. Teva showed its intent to make money from its financing of CDF and TAF through its refusal to include Medicare patients in its charitable free drug program so long as foundation co-pay coverage was available. Teva generally excluded Medicare patients from its free drug program because foundation-assisted patients generated revenue from Medicare reimbursement, whereas free drug patients did not. At least as early as 2008, Teva instructed ACS not to refer Medicare patients to Teva's Copaxone free drug program if foundations were accepting patients. Thus, in an August 2008 example of ACS implementing Teva's instruction, Hensley told Lynch: "Just an FYI. Since we are getting no rejections yet from the non profit sources we are utilizing here at ACS, we have not started any Free Drug program. I will let you know the moment it kicks in." (A copy of Hensley's e-mail is attached as Exhibit 9.) Years later, Teva's policy had not changed. In an April 2016 e-mail, a Shared Solutions supervisor

24

Case 1:20-cv-11548   Document 1   Filed 08/18/20   Page 25 of 59

described the eligibility for the company's free Copaxone program and noted that "[p]atients with government funded plans are not eligible to apply." (A copy of this e-mail is attached as Exhibit 10.) Teva made an exception to this policy for Copaxone patients who obtained new Copaxone prescriptions or Medicare Part D coverage for the first time near the end of a calendar year when no foundation coverage was available. Teva, ACS, and the foundations then worked to move those patients onto foundation coverage at the beginning of the following year. As Hensley wrote in November 2007, "[t]he Copaxone Cares [*i.e.*, free drug] patients will transition to CDF Med D program in January." (A copy of this e-mail is attached as Exhibit 11.)" Likewise, a Shared Solutions manager explained in an April 2016 e-mail that, "in the past when a new Med D patient needs assistance and at that time (usually close to the end of the calendar year) the Foundation has closed its funds[,] [i]f we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up for Foundation Assistance for the following January when funds will be available." (A copy of this e-mail is attached as Exhibit 12.)

58. Teva knew that there was a direct correlation between its foundation funding and Copaxone sales. In December 2011, for example, Katie Hiett, Teva Neuroscience's Director of Finance and Planning, and Felicia Ladin, Teva USA's Vice President of Finance, discussed the possibility of reducing Teva's planned 2011 fourth quarter payment to TAF from $10 million to $5 million. Hiett warned Ladin against such a cut: "Not funding these patients has a direct and

25

immediate impact on units." (A copy of this e-mail is attached as Exhibit 13.) A week later, Teva paid TAF $10 million, just as it had planned.

59. A year later, in December 2012, Mike Sheehy, a Teva marketing director, told his boss, John Hassler, that he had conferred with Lynch regarding the need for "patient assistance funding," and that Teva needed to pay about $15 million more in 2013 than Teva had planned. Sheehy further reported that he had "provided Denise [Lynch] the direction to move forward because *not doing so directly impacts the topline with existing patients*." (A copy of this e-mail is attached as Exhibit 14.) (Emphasis added.)

60. Similarly, in early 2015, as Teva again was considering whether to pay TAF less than it had planned, the company ended up paying the planned amount because it knew that paying less would reduce sales. In an e-mail dated January 9, 2015, Jennifer Clark, an Associate Director in Teva's Patient Services department, warned that, if Teva cut its foundation payments, the company's sales forecasts would be "overstated": "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made." (A copy of this e-mail is attached as Exhibit 15.) A few weeks later, in an e-mail dated February 2, 2015, Alejandro Castro, a Teva financial analyst, advised David Loughery, Teva's Vice President of Finance, that "Patient access has also mentioned that they will need between **$5M and $8M in donations** soon to avoid losing an estimated 1,500 Medicare Patients." (A copy of this e-mail is attached as Exhibit 16.) (Emphasis in original.) Castro then quantified the dollar value of losing those

26

patients: "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing donations." Shortly thereafter, instead of cutting the "donations budget," Teva agreed to pay TAF $8.5 million, which was over $2 million more than Teva previously had planned to pay at that time.

61.     In August 2015, in another discussion about potentially reducing Teva's future financial support of TAF, Clark reiterated her earlier warning, this time to Ryan Sloss, a Teva finance manager: "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill." (A copy of this e-mail is attached as Exhibit 17.) Sloss concurred: "we either pay it and go over budget or we don't make our sales numbers."

62.     Meanwhile, Teva consistently raised the price of Copaxone, and paid CDF and TAF to eliminate the bite of those increases on patients and their physicians, but not on the taxpayers who fund Medicare. Thus, for example in an e-mail on November 15, 2011, Katie Hiett forwarded Felicia Ladin a discussion of a potential price increase and wrote: "I discussed the need for Patient Assistance with Denise [Lynch] and incremental price increases of 9.9%/5% over planned amount of 8.9% would cause a potential patient assistance increase of $4M-$5M across all of the Copaxone patient assistance programs." (A copy of this e-mail is attached as

27

Exhibit 18.)  As Ms. Hiett later explained in testimony:  "Well, if you raise the price of your product, the patient's coinsurance for out of pocket goes up as well."

63.     Because Teva intended its payments to CDF and TAF to generate Copaxone sales, Teva's Tax department wrote that the company should treat those payments as business expenses rather than charitable donations.  In a July 2013 memorandum, a manager in Teva's Tax department reviewed Teva's recent payments to CDF and TAF and concluded that "[t]he payments . . . are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense."  (A copy of this memorandum is attached as Exhibit 19.)

64.     Tellingly, even though Teva's payments to CDF and TAF were ostensibly for the foundations' MS funds, which theoretically could assist patients on any MS drug, senior Teva executives commonly referred to those payments as "Copaxone donations."  Examples of such references include the following:

- A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of *Copaxone donations* to be mailed on Dec 29th."  (A copy of this e-mail is attached as Exhibit 20.)  (Emphasis added.)

- A January 2015 e-mail from Eyal Desheh, the Chief Financial Officer of Teva Ltd., approving a "*Copaxone Donation* payment."  (A copy of this e-mail is attached as Exhibit 21.)  (Emphasis added.)

- A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines ("NASM") unit, with the subject "Response requested: Approval for *Copaxone donation* payment."  Downey approved, and forwarded the e-mail to Rob Koremans,

28

President and CEO Global Specialty Medicines at Teva Ltd., who approved as
well.  (A copy of this e-mail chain is attached as Exhibit 22.)  (Emphasis added.)

- An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and
Support, approving a "*Copaxone Donation*."  (A copy of this e-mail is attached as
Exhibit 23.)  (Emphasis added.)

- A January 2017 e-mail from a Teva NASM VP of Finance to Koremans,
President and CEO Global Specialty Medicines at Teva Ltd., regarding
"*Copaxone donations* approval."  (A copy of this e-mail is attached as Exhibit
24.)  (Emphasis added.)

65.     Although Teva made its substantial payments to CDF and TAF in order to

generate revenue from Copaxone sales to Medicare patients, Teva generally avoided conducting

formal return on investment ("ROI") analyses of its foundation support, for fear of creating an

obvious compliance issue.  One former Patient Services manager, Jenny Jackson, testified that "it

was very clear that there was never to be any kind of ROI analysis on Medicare.  That was

widely known."  Still, Jackson's handwritten notes from a January 2010 meeting show that the

company did in fact calculate ROI from its payments to Medicare patients through TAF and

CDF.  The notes, which are entitled "Medicare" and are in a folder also entitled "Medicare,"

reflect Teva's understanding that a $28 million "expense" would support over 4,800 Copaxone

patients and generate over $114 million in net revenue.  In other words, Teva knew that

foundation support generated substantial ROI, which is why Teva paid CDF and TAF hundreds

of millions of dollars.  An image of Jackson's notes is below:

29



### III. Teva Understood That It Should Not Use Foundations As Conduits To Cover Copaxone Patients' Medicare Co-Pays.

66.     Teva knew that federal law prohibited it from covering a Medicare patient's co-pay directly.  Thus, while it operated a program to cover Copaxone co-pays for patients with private insurance, that program did not cover patients with government insurance.

67.     Teva further knew that federal law did not permit it to cover a Medicare patient's co-pay indirectly by using a foundation as a pass-through vehicle.  Lynch and other Teva employees knew that the AKS prohibited Teva from earmarking its money to patients on its drug, Copaxone.  They were aware of HHS-OIG's 2005 Special Advisory Bulletin on Patient

30

Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), and

HHS-OIG's 2014 Supplemental Special Advisory Bulletin, Independent Charity Patient

Assistance Programs, 79 Fed. Reg. 31120 (May 30, 2014).  In the 2005 Special Advisory

Bulletin, HHS-OIG advised that, notwithstanding the facial applicability of the anti-kickback

statute to payments by pharmaceutical manufacturers to patients via foundations,

"pharmaceutical manufacturers can donate to *bona fide* independent charity PAPs, provided

appropriate safeguards exist."  70 Fed. Reg. at 70625.  The 2005 Special Advisory Bulletin

spelled out these "safeguards," including that a foundation "must not function as a conduit for

payments by the pharmaceutical manufacturer to patients," and that a pharmaceutical

manufacturer should not "solicit or receive data from the charity that would facilitate the

manufacturer in correlating the amount or frequency of its donations with the number of

subsidized prescriptions for its products."  *Id.* at 70626, 70627.  The 2014 Supplemental Special

Advisory Bulletin reiterated these warnings and concluded with this specific caution:

> These opinions do not address actions by donors to correlate their funding of [co-pay foundations] with support for their own products.  Such actions may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the anti-kickback statute.

79 Fed. Reg. at 31123.

68.     Thus, not only did Teva know that it should not create bad appearances by

performing ROI analyses on its payments to co-pay foundations, it knew that the AKS prohibited

31

it from using the foundations as conduits for payments to patients on its drug, and it further knew

that HHS-OIG had similarly warned pharmaceutical manufacturers and co-pay foundations.

69.     Teva's first contract with CDF, which both Lynch and Larry Downey, the CEO of

Teva Neuroscience, signed in 2006, provided that CDF "shall be [] a *bona fide*, independent

charity as described by the [2005 HHS-OIG Special Advisory Bulletin]. Further, the Foundation

has received a favorable OIG opinion . . . as documented in OIG Opinion 06-10." (A copy of

this contract is attached as Exhibit 25.) Consistent with the 2005 Special Advisory Bulletin,

CDF's OIG Opinion relied on CDF's representation that its "reports to donors do not contain any

information that would enable a donor to correlate the amount or frequency of its donations with

the number . . . of patients that use its products." HHS-OIG, Advisory Opinion 06-10 at 5,

*available at* https://oig.hhs.gov/fraud/docs/advisoryopinions/2006/AdvOpn06-10A.pdf. The

CDF Advisory Opinion further noted that "Donors are not assured that the amount of financial

assistance their patients . . . receive will bear any relationship to the amount of their donations.

Indeed, donors are not guaranteed that any of their patients . . . will receive any financial

assistance whatsoever from [CDF]." Teva, however, knew and intended that CDF would use

Teva's money to cover Medicare co-pays for the vast majority of the Copaxone patients Teva

referred to CDF through ACS.

70.     In December 2010, after Teva began paying TAF, Hensley e-mailed Lynch with a

copy of the advisory opinion TAF had obtained from HHS-OIG earlier that year. (A copy of

32

Hensley's e-mail, with its attachments, is attached as Exhibit 26.)  Like the CDF Advisory Opinion, the Advisory Opinion for TAF noted that the foundation's conduct would be low risk under the anti-kickback statute so long as it did "not provide Donors with any data that would facilitate the Donor in correlating the amount or frequency of its donations with the amount or frequency of the use of its products or services," and "Donors would not be permitted to earmark contributions for specific Specialty Medications."  The opinion emphasized that anti-kickback statute concerns would dissipate only if "Donors would not be assured that the amount of financial assistance their patients . . . receive would bear any relationship to the amount of their donations," and "Donors would not be guaranteed that any of their patients . . . would receive any financial assistance whatsoever from [TAF]."  Teva, however, knew and intended that TAF would use Teva's money to cover Medicare co-pays for the Copaxone patients Teva referred to TAF through ACS.

71.     In December 2011, three Teva employees – Lynch, Clark, and Katie Hiett, Teva's Director of Finance and Planning – exchanged e-mails about information they would like from CDF.  (A copy of their e-mail exchange is attached as Exhibit 27.)  In one of these e-mails, Lynch wrote:  "Is there a way to get to total patients in the fund (what % of the fund is made up of Copaxone patients[)]…I don't believe they can provide this directly but is there some way you can back in to the answer?"

33

72.     In May 2012, a Teva employee circulated a 2008 PowerPoint presentation from a law firm, Sidley Austin, on "Legal Considerations in Developing Patient Assistance Programs." The presentation summarized the anti-kickback statute and noted that, according to HHS-OIG:

> PAPs present "all of the usual risks of fraud and abuse associated with kickbacks"
> -   Steering patients to particular drugs
> -   Increasing costs to Medicare
> -   Providing financial incentives over competing drugs
> -   Reducing enrollees' incentives to locate and use less expensive, equally effective drugs[.]

The presentation then reiterated HHS-OIG's warning that "the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients."  (A copy of this presentation is attached as Exhibit 28.)

73.     In May 2014, Hensley e-mailed Lynch a copy of HHS-OIG's recently-issued 2014 Special Advisory Bulletin.  (A copy of Hensley's e-mail is attached as Exhibit 29.)

74.     Lynch testified that she knew she "wasn't supposed to" obtain Copaxone numbers directly from a foundation.  She said that she had that "understanding . . . as a result of training that we received regarding anti-kickback."

75.     In addition, according to Hensley, after Lynch retired from Teva, she told Hensley that "she had warned Teva's senior leadership years before that Teva should 'take a reserve' to cover False Claims Act liabilities associated with Teva's donations to CDF and TAF 'in the event' that the donations came under government scrutiny."  Hensley Aff. ¶ 18.

Case 1:20-cv-11548 Document 1 Filed 08/18/20 Page 35 of 55

**IV.    In Coordination With ACS, Teva Used CDF And TAF As Conduits To Cover Copaxone Patients' Medicare Co-Pays**

76.    As noted above, from the outset, Teva made clear to ACS that it wanted its foundation support to go to Copaxone patients.  In a February 2007 e-mail reflecting Hensley's understanding of Teva's goal, Hensley instructed his colleagues that "particular manufacturer funds [should] go to their own drug as [that was] what was the intent of the project was originally."  (A copy of this e-mail is attached as Exhibit 8.)

77.    The mechanics of Teva's arrangements with ACS, CDF and TAF enabled it to ensure that its payments to the foundations went to Copaxone patients.  Unlike other foundations, CDF was willing to accept batch files from ACS, facilitating the mass enrollment of Copaxone patients whenever Teva made a payment to CDF.  TAF later accepted ACS's Copaxone batch files, too.  By timing its payments to TAF and CDF with ACS's submission of batch files of applications, Teva was able to ensure that each foundation would cover Copaxone patients whenever Teva provided funding.

78.    Knowing that CDF and TAF paid at least lip service to the HHS-OIG guidelines and were generally reluctant to provide Teva with precise data on the number of Copaxone patients they were assisting, Teva nonetheless obtained substantially the same information from ACS, which, as Teva knew, got its information from CDF and TAF.  At the end of each year, Teva used that information to correlate its funding of CDF and TAF with their anticipated spending on Copaxone patients' Medicare co-pays in the following year.  Teva performed

35

similar correlations during the course of each year when ACS told Teva how many new Copaxone patients were awaiting Medicare co-pay coverage; Teva used the information from ACS to calculate how much and when to pay CDF and TAF, and ACS then arranged for batch enrollment of Copaxone patients into the funds. Teva thus achieved its goal of using CDF and TAF as pass-through vehicles to funnel money to Copaxone patients who otherwise would have faced cost-prohibitive Medicare co-pays for Teva's expensive drug.

> A.  Teva's Receipt Of The Data Necessary For Its End-Of-Year Correlations

79.  Teva needed three data points to calculate how much to pay CDF and TAF at the end of each year to ensure that each foundation's MS fund would continue to cover Copaxone patients' Medicare co-pays in the following year: (1) the number of Copaxone patients enrolled in each fund, (2) each fund's annual per-patient grant amount; and (3) each fund's administrative fee, which was generally 9 percent during the relevant time period.

80.  Teva regularly received, from both CDF and TAF, the per-patient grant amount that each foundation provided to Copaxone patients at any given time. For example, the following series of e-mails shows how CDF conveyed per-patient grant amounts to Teva:

-  On October 28, 2010, CDF's President, Michael Banigan, sent an e-mail to Lynch: "We are estimating the per-patient grant amount of $3,950 next year. Math is simple. Number of patients times the grant amount divided by .91. We can chat at your convenience." (A copy of this e-mail is attached as Exhibit 30.) Banigan's e-mail presumed that Lynch knew the "[n]umber of patients," and, in fact, Lynch could get that from ACS. Banigan suggested the factor of .91 to take into account CDF's nine percent fee.

36

- On September 15, 2011, Banigan wrote to Lynch: "Do you have time for a call tomorrow? I have preliminary numbers for you." (A copy of this e-mail is attached as Exhibit 31.)

- On November 7, 2012, Lynch sent Banigan an e-mail asking for the "2013 patient contribution," and Banigan responded: "Everything is the same as last year. $3750 per patient [and] $1500 for [low-income subsidy]. Admin is 9%, but in reality we paid out 92% last year across all funds." (A copy of this e-mail chain is attached as Exhibit 31.) Later that day, Walley sent Lynch an e-mail clarifying that "the 2012 per patient allocation for the MS program is $4750. . . . The allocations will remain the same for the 2013 calendar year." (A copy of this e-mail is attached as Exhibit 33.)

- On December 20, 2013, Lynch asked Walley for the "per patient donation estimate for the MS fund for 2014," and Walley responded: "Initial allocation is $5000." (A copy of this e-mail is attached as Exhibit 34.)

Further, Lynch testified that CDF provided her with per-patient grant amounts.

81. Teva received similar information from TAF on a quarterly basis. Hensley often provided this information to Lynch over the phone or in person, but sometimes he provided it in writing. For example, on September 27, 2011, Hensley sent Lynch an e-mail that included the following:

> The allocation per patient for 2012 is $4,600. To give you a historical number of what it has been in the past:
>
> 2012 - $4,600
> 2011 - $4,400
> 2010 - $5,600

(A copy of this e-mail is attached as Exhibit 35.) *See also* Hensley Aff. ¶ 13 ("I would regularly provide either Ms. Lynch or Mr. Blanc (or both) the "per-patient allocation" that TAF was using

37

for its MS Fund at any given time.  I sometimes did this proactively, but usually did this in response to a specific request by Ms. Lynch.").

82.    With the per-patient grant amounts readily available directly from the foundations, Teva then obtained from ACS the number of Copaxone patients who were receiving co-pay coverage from each foundation.  ACS provided this information in writing and over the telephone.  The following e-mails exemplify ACS's provision of such information to Teva for budgeting purposes:

- On August 7, 2007, Teva sent ACS an e-mail noting that it had received a file from ACS.  Included within that file was a list of 1,082 Copaxone patients who were "Approved for Assistance" with CDF.  (A copy of the cover e-mail is attached as Exhibit 36.  The accompanying file is not attached because it contains protected health information.)

- On December 23, 2008, ACS sent Teva an e-mail reporting that a total of 2,499 Copaxone patients were receiving co-pay coverage from CDF at that time.  (A copy of this e-mail is attached as Exhibit 37.)

- On November 30, 2009, ACS sent Teva an e-mail reporting that a total of 3,230 Copaxone patients were receiving co-pay coverage from CDF at that time.  (A copy of this e-mail is attached as Exhibit 38.)

- On December 14, 2010, ACS sent Teva an e-mail reporting that, at that time, a total of 2,008 Copaxone patients were receiving co-pay coverage from CDF and a total of 2,714 Copaxone patients were receiving co-pay coverage from TAF.  (A copy of this e-mail is attached as Exhibit 39.)

- On August 30, 2011, Teva's Jennifer Clark sent an e-mail asking one of her colleagues, Barb Ross, to tell her the "Estimated # of Medicare Patients rcvg full/partial assistance by year-end."  Ross responded that "David and Zach [of ACS] will be getting numbers first thing in the morning, they are checking with CDF for total numbers."  (A copy of this e-mail is attached as Exhibit 40.)  A

38

week later, Ross was able to report to Clark: "There are 83 partial assistance with CDF, 153 partial assistance with TAF. Full assistance with CDF 1896 and full assistance with TAF 3440." The resulting totals were 1979 at CDF and 3593 at TAF. Ross also reported that there were 525 Copaxone patients who were receiving free product but were eligible for Medicare. (A copy of this e-mail is attached as Exhibit 41.)

- On August 27, 2012, ACS's Blanc sent an e-mail to Lynch with the "current numbers," as follows:

```
AF      4747
CDF     1456
PAN     2

Total of 6205 assisted via 501c3
```

(A copy of this e-mail is attached as Exhibit 42.) ("PAN" was another co-pay foundation that Teva did not support at that time.)

- On December 5, 2013, Blanc sent Lynch the latest numbers again:

```
Hey Denise –

Great catching up with you yesterday!

As requested, numbers:

TAF    5614
CDF    1188
LIS    3543

Let me know if you need anything further.

Thank you for the partnership –
```

(A copy of this e-mail is attached as Exhibit 43.)

39

B. ***Teva's Use Of Data From CDF, TAF, And ACS To Determine How Much To Pay*** CDF And TAF For Existing Copaxone Patients Each Year

83.     For each year from 2008 through at least 2014, Teva used data reflecting per-patient grant amounts and numbers of Copaxone patients CDF and TAF were assisting to determine how much Teva would pay the foundations to cover existing Copaxone patients in the next year.  As Hensley explained, Teva's receipt of information from TAF and ACS "would be sufficient to enable her [Lynch] to determine how much Teva should donate at the start of the year."  Hensley Aff. ¶ 14.

84.     Jennifer Clark, who in 2011 took over the process of preparing Teva's budgets for foundation payments, explained the process as follows:

> So, I would take an estimated number of Medicare patients, apply that towards what the typical average Medicare cost per patient might be for a calendar year, and then multiply that times those patients to determine what that might look like. And then I understood the administration fees for foundations were typically somewhere in the nine percent range, so I would do that calculation to determine how much we would need for the upcoming year.

Clark further explained that the "Medicare patients" she referenced were Copaxone patients.

85.     For example, in September 2011, after having just learned from her colleague, Barb Ross, that ACS was estimating 5,572 Copaxone patients would be receiving foundation co-

40

pay coverage by the end of that year, Clark put together the following budget spreadsheet:

| | A | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|
| 1 | | 2011 | 2012 | 2013 | 2014 | | "2013 is first year |
| 2 | 501c Funding per pt | | 4771 | 5004 | 5280 | | |
| 3 | Katie's portion | | 1867 | 1900 | 1900 | "patient picks up more than p |
| 4 | Govt Portion | | | | | | |
| 5 | Medicare Funding per pt. | $ 6,250 | $ 6,638 | $ 6,904 | $ 7,180 | | |
| 6 | Qual-new Medicare pt. | $ 150 | $ 150 | $ 150 | $ 150 | | |
| 7 | Requal-Medicare pt. | $ 125 | $ 125 | $ 125 | $ 125 | | |
| 8 | Adherence rate | 88% | 88% | 88% | 88% | | |
| 9 | Admin fee | 9% | 9% | 9% | 9% | | |
| 10 | Additional factor for | 120% | 120% | 120% | 120% | | |
| 11 | Estimated Fund Carryover | | | | | | |
| 12 | COGS & Shipping & Handling – Med D Free – per month ($60+$70) | $ 190 | $ 130 | $ 130 | $ 130 | | |
| 13 | Average # of Med D Free dispenses per pt | 4 | 3 | 3 | 3 | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | Beginning of Year | | 6300 | 5988 | 5330 | | |
| 17 | Additional new pts – assistance donated | | 500 | 506 | 473 | | |
| 18 | Med Free Roll-over | 525 | 525 | 483 | 452 | | |
| 19 | Retention – Patients at year-end (full funding & partial LIS) | 5775 | 5984 | 5715 | 5107 | Per Zach, 8/31 | |
| 20 | Full LIS | 2475 | 2723 | 2995 | 2750 | Per Zach, 8/31 | |
| 21 | Total Patient Count | 8775 | 9232 | 9193 | 8308 | | |
| 22 | | | | | | | |
| 23 | | | | | | | |
| 24 | Qualification-new pts. | $ 94,500.00 | $ 184,500.00 | $ 178,020.00 | $ 166,410.00 | | |
| 25 | Qualification-existing pts. | $ 78,750.00 | $ 1,098,750.00 | $ 1,046,592.00 | $ 938,212.67 | | |
| 26 | TN 50% portion on assisted pts | | | | | | |
| 27 | Donut Hole Funding | $ - | $ 32,442,800.00 | $ 32,494,259.87 | $ 30,639,197.37 | | |
| 28 | Total Donation | $ - | $ 35,651,428.57 | $ 35,707,977.87 | $ 33,669,447.66 | | |
| 29 | Admin fee | $ - | $ 3,208,628.57 | $ 3,213,718.01 | $ 3,030,250.29 | | |
| 30 | Estimated Fund Carryover | $ - | $ - | $ - | | | |
| 31 | TOTAL Medicare – excl | $ 173,250.00 | $ 36,934,678.57 | $ 36,932,589.87 | $ 34,774,070.32 | $5.5 M donation made 12/31/2009 | |

(A full copy of this spreadsheet is attached as Exhibit 44.  Other iterations from other years are attached as Exhibits 45, 46, 47, and 48.)  The number "5775" on line 19 of this spreadsheet was a rounding of the number Clark had received from ACS via Ross, as indicated by the note "Per Zach [Gammage at ACS], 8/31" in column H of line 19.  *See* Exhibits 40 and 41.  The figure immediately above that, 525 "Med Free Roll-over," also had come from ACS via Ross and reflected the number of Copaxone patients on Medicare who were then receiving free drug but for whom ACS would obtain foundation coverage in 2012.  *Id.*  The formula metadata in the

41

spreadsheet shows that Clark added 5,775 and 525 to get 6,300, which is the number that appears on line 16, the "Beginning of Year" patients for 2012. According to line 17 of the spreadsheet, Clark estimated that 500 additional Copaxone patients would need Medicare co-pay coverage in 2012. The spreadsheet formula metadata further shows that Clark added 6,300 to 500 and then multiplied the sum by 4,771, the "501c Funding per pt" on line 2, to get the "Donut Hole Funding" amount of $32,442,800 on line 27. ("501c Funding per pt" was the amount that Teva calculated it needed to fund per patient based on a standard Medicare Part D plan and the cost of Copaxone; "Donut Hole Funding" was a term that Teva used to describe the total amount it planned to pay for Medicare co-pays for Copaxone patients.) Teva added the foundations' 9 percent administrative fee to generate the "Total Donation" budget amount on Line 28.

86. During the last week of December 2011 and the first week of January 2012, Teva paid CDF and TAF a total of $33,200,000 from its foundation budget. Using data received from CDF and TAF via ACS, Teva paid the foundations what it understood they needed to cover co-pays for Copaxone patients in the upcoming year.

87. During each of the years from 2007 through at least 2014, Teva consistently followed this practice of using data from the foundations (via ACS) to calculate its budgets for TAF and CDF and to pay them what they needed to cover co-pays for Copaxone patients in the following year. After Teva made these payments, it then received confirmation from the

Case 1:20-cv-11548   Document 1   Filed 08/18/20   Page 43 of 59

foundations (via ACS) that they had covered the Copaxone patients who had sought to renew their annual Medicare co-pay grants.

### C.     Teva's Correlations For Payments To TAF During The Course Of The Year

88.     As soon as TAF's MS fund started accepting patients in January 2010, Teva, ACS and TAF engaged in schemes to enroll Copaxone patients into TAF's MS fund using Teva's payments.  Teva's use of TAF as a conduit started with Medicare patients on Teva's free drug program at ACS.  As an ACS vice president explained in an e-mail dated January 4, 2010, "Teva has funded all their Free drug patients through a new foundation called 'The Assistance fund.'" (A copy of this e-mail, with the subject "The Assistance Fund - A new copay foundation for Copaxone MS patients," is attached as Exhibit 49.)  Teva paid TAF $15.7 million in four payments between December 30, 2009, and January 25, 2010, during which time approximately 99.9% of the payments from TAF's MS fund went to Copaxone patients.  By February 4, 2010, ACS reported to Teva that TAF was covering Medicare co-pays for 2,322 Copaxone patients. (A copy of this e-mail is attached as Exhibit 50.)  The close cooperation between Teva, ACS, and TAF continued at least into 2015.

89.     Shortly after the beginning of each year, TAF generally closed its MS fund because it had committed all of its funding to existing patients who had just renewed their annual co-pay grants.  With TAF's MS fund closed and with CDF also generally not providing new grants after the beginning of a year, but with new MS patients still being prescribed Copaxone

and seeking Medicare co-pay coverage, Teva worked with ACS and TAF to ensure that these new Copaxone patients, too, would not have to pay co-pays for the drug. In doing so, Teva again sought to correlate its payments to TAF with TAF's anticipated spending on Copaxone patients.

90. To achieve this goal, Teva, ACS, and TAF engaged in a coordinated multi-step process. First, ACS told Teva how many new Copaxone patients were awaiting Medicare co-pay coverage at a particular time. Second, TAF told Teva the average Medicare co-pay grant amount for a Copaxone patient at that time. Third, Teva multiplied those two figures together and added an amount for TAF's administrative fee to determine how much to pay TAF. Fourth, Teva told ACS how much and when it planned to pay TAF. Fifth, ACS sent a "batch file" of Copaxone co-pay coverage applications to TAF as soon as TAF's MS fund opened upon receipt of Teva's payment. Finally, TAF provided co-pay grants to the Copaxone patients in ACS's batch file, which eliminated the backlog of Copaxone patients awaiting Medicare co-pay coverage. Lynch testified that this "was the normal way it was done." Likewise, Hensley described this same process. *See* Hensley Aff. ¶¶ 13-14. The following examples show how this process worked in practice.

91. On February 9, 2011, ACS sent Teva an e-mail showing, among other things, that there were 320 Copaxone patients awaiting Medicare co-pay assistance. (A copy of this e-mail is attached as Exhibit 51. 320 is the sum of the 155 patients "waiting paperwork return" and the 165 patients "pending new assistance.") At that time, the per-patient allocation in TAF's MS

44

Fund was $4,400, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 320 x $4,400 x 1.09 = $1,534,720. On February 10, 2011, Lynch e-mailed Jon Congleton, then the general manager of Teva's Neuroscience division, and asked "Are you OK with a $1.5MM Medicare contribution to AF (this is a little less than what I had though[t] when we talked on [February 8, 2011]." Congleton replied with his approval. (A copy of this e-mail exchange is attached as Exhibit 52.) The next day, February 11, 2011, Teva paid TAF $1.5 million. *See* Exhibit 1.

92. On the morning of June 30, 2011, Teva's Barb Ross, a Medicare Specialist in Teva's Patient Services department, sent Lynch an e-mail stating: "I just spoke with David [Blanc] and Zach [Gammage] @ ACS. We figure around 200. This includes the 100 they already have, in addition to the 50 I am getting ready to send over July 5th as July eligible and we estimated about another 120 for the 4 weeks in July. David thinks he can maybe count on 50 of those for funds. . . ." (A copy of this e-mail is attached as Exhibit 53.) At that time, the per-patient allocation in TAF's MS fund was $4,400, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 200 x $4,400 x 1.09 = $959,200. Later that day, Teva paid TAF $1 million. *See* Exhibit 1. On July 5, 2011, Blanc reported to his supervisors that, as to Teva, ACS had "[s]ecured additional funding for up to 200 patients." (A copy of this e-mail is attached as Exhibit 54.) On July 8, 2011, TAF's Maureen Boyd sent

Hensley and Spafford an e-mail reporting that, of 100 new patients TAF had approved on July 1, 2011, 94 were Copaxone patients. (A copy of this e-mail is attached as Exhibit 55.)

93.     On January 23, 2012, Kristin Wright, a Senior Supervisor in Teva's Patient Services department, sent an e-mail to Jennifer Clark stating: "I know funds are closed and AssistRx [the TAF affiliate that handled the Copaxone free drug program and referred Medicare-eligible Copaxone patients to ACS for co-pay coverage] will keep this patient on their list for when funds open back up." Clark forwarded this e-mail to Lynch, stating: "I know we're talking to Edward [Hensley] tomorrow night, this may be a topic of discussion." Lynch replied: "I agree…I talked with him today and learned that we will need to make a contribution. I will talk to David [Blanc at ACS] in the morning to understand how many patients they have in queue and then we can discuss the contribution amount!" (A copy of this e-mail exchange is attached as Exhibit 56.) On January 24, 2012, Blanc sent Lynch an e-mail reporting that 538 Copaxone patients were "pending [paperwork]" at TAF. (A copy of this e-mail is attached as Exhibit 57.) At that time, the per-patient allocation in TAF's MS fund was $4,600, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 538 x $4,600 x 1.09 = $2,697,532. On January 30, 2012, Teva paid TAF $2.75 million. *See* Exhibit 1.

94.     On June 25, 2012, Barb Ross sent Clark and Lynch an e-mail stating: "Holding as of 06-25-12: 215. . . . Estimate for the rest of this month 32 + July eligible so far this month

46

35[.]  Total to fund for to date would be 282.  I called Idy [Moeller of ACS] and confirmed actual amounts. . . .  Hope that gives you some idea of what we are needing."  (A copy of this e-mail is attached as Exhibit 58.)  At that time, the per-patient allocation for TAF's MS fund was $4,600, and TAF's administrative fee was 9 percent.  Factoring those figures results in the following calculation:  282 x $4,600 x 1.09 = $1,413,949.  On June 27, 2012, Teva paid TAF $1.4 million.  *See* Exhibit 1.  That same day, David Blanc of ACS sent his colleague, Idy Moeller, an e-mail with the subject "Copaxone TAF referral" and the following request:  "Can you prepare the list of patients for referral?"  (A copy of this e-mail is attached as Exhibit 59.)

95.     On August 22, 2012, Blanc sent Lynch an e-mail stating that "we currently have 165 patients in wait."  (A copy of this e-mail is attached as Exhibit 60.)  At that time, TAF's average grant amount for a Copaxone patient was $3,200, and TAF's administrative fee was 9 percent.  Factoring those figures results in the following calculation:  165 x $3,200 x 1.09 = $575,520.  On August 24, 2012, Teva paid TAF $575,000.  On August 27, 2012, Blanc sent Lynch an e-mail stating:  "Below are the current numbers – the AF numbers do not include approx. 164 patients who should be approved today."  (A copy of this e-mail is attached as Exhibit 42.)

96.     On September 19, 2012, Blanc sent Lynch an e-mail stating, "At this time we have 168 and 18 that we are still attempting to reach.  (A copy of this e-mail is attached as Exhibit 61.)  That same day, Lynch sent Hensley an e-mail stating:  "Need to talk with you about

another donation." (A copy of this e-mail is attached as Exhibit 62.) Hensley forwarded Lynch's email to TAF executives, including Boyd, and wrote: "What number should I give her? She intends to donate at the end of September. This would be only for patients till the end of the year of course. It's a couple hundred patients, I believe." *Id.* Boyd responded: "Good Morning Edward, The Allocation Amount was reduced from $4600 to **$3200** effective August 2012. If it was for 200 new patients the total ask will need to be $703,500.00 (which includes the 9% admin fee)." *Id.* (emphasis in original). On September 20, 2012, Blanc sent Lynch an e-mail stating that "[t]he up to the minute number is 197." (A copy of this e-mail is attached as Exhibit 63.) TAF's administrative fee at that time was 9 percent. Factoring those figures results in the following calculation: 197 x $3,200 x 1.09 = $687,136. On September 21, 2012, Teva paid TAF $700,000. On September 26, 2012, TAF's Maureen Boyd wrote to Hensley that TAF had "processed 202 new Copaxone patients from the ACS referral file." (A copy of this e-mail is attached as Exhibit 64.) On September 28, 2012, Hensley asked Boyd for an update on the same e-mail chain: "Can you please update the numbers below for me this morning, please. I am mtg with Denise [Lynch] at 2 at the hotel." *Id.* Boyd responded: "the final number of new patients created from September 24th, 2012: . . . Copaxone = 234." *Id.*

97.     On May 7, 2013, Blanc sent Lynch an e-mail stating that ACS had 176 Copaxone patients "ready for referral" and another 30 "pending contact." (A copy of this e-mail is attached as Exhibit 65.) At that time, TAF's per-patient allocation for its MS fund was $4,300, and

48

TAF's administrative fee was 9 percent.  (A copy of an e-mail from Hensley to Lynch reflecting the $4,300 average grant amount as of that time is attached as Exhibit 66.)  Factoring those figures results in the following calculation:  206 x $4,300 x 1.09 = $965,522.  On May 8, 2013, Teva paid TAF $925,000.  (A copy of an e-mail confirming this payment is attached as Exhibit 67.)  That same day, Lynch told Blanc that she was "just advised that the wire transfer was completed a few minutes ago."  (A copy of this e-mail is attached as Exhibit 65.)  Blanc wrote back:  "Terrific!  We are ready."  *Id.*

98.     On August 27, 2013, Blanc sent Lynch an e-mail stating:  "We are at 196 with 14 pending contact at this time."  (A copy of this e-mail is attached as Exhibit 68.)  The previous day, Lynch had asked Spafford of TAF for the "Q3 patient donation," and Stafford had responded "$3,700."  (A copy of this e-mail exchange is attached as Exhibit 69.)  At that time, TAF's administrative fee was 9 percent.  Factoring those figures results in the following calculation:  210 x $3,700 x 1.09 = $846,930.  On August 27, 2013, Teva paid TAF $850,000.  On the evening of August 27, 2013, Blanc sent an e-mail to his ACS colleagues stating:  "Please prep the file for referral to TAF ASAP!!"  (A copy of this e-mail is attached as Exhibit 70.)  On the morning of August 28, 2013, an ACS employee sent TAF the following question:  "David sent a file over with 200+ patients, he is wondering if we can have an update[] on it today?"  Later that day, TAF responded:  "The file has been processed.  199 patients.  1 duplicate."  (A copy of this e-mail exchange is attached as Exhibit 71.)

49

99. On March 11, 2014, Blanc sent Lynch an e-mail stating: "this morning's count is 162 queued up; 30 in process; received 9 new this morning." (A copy of this e-mail is attached as Exhibit 72.) At that time, TAF's per-patient allocation for its MS fund was $5,100, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 201 x $5,100 x 1.09 = $1,117,359. On March 11, 2014, Teva paid TAF $1,100,000. On March 13, 2014, Blanc reported to Lynch that there had been "189 Conditional Approvals this morning." (A copy of this e-mail is attached as Exhibit 73.)

100. On the morning of April 22, 2014, Lynch asked her Teva colleague, Barb Ross, for "the number of patients we have ready to go at ACS, May eligible and approx. how many we are sending over a day." (A copy of this e-mail is attached as Exhibit 74.) That afternoon, ACS sent Ross an e-mail with the subject line "CPA numbers" and a report that ACS had "appox. 187 and 27 pending interviews." (A copy of this e-mail is attached as Exhibit 75.) Shortly thereafter, Ross reported the following to Lynch: "Looks like we have 187 ready to go, 27 that still need financial assessments, and 40 for May eligible." (A copy of this e-mail is attached as Exhibit 76.) At that time, TAF's per-patient allocation for its MS fund was $4,500, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 254 x $4,500 x 1.09 = $1,245,870. On April 24, 2014, Teva paid TAF $1,275,000. (A copy of an e-mail confirming this payment is attached as Exhibit 77.) Hours later, Blanc sent an e-mail

50

to his ACS colleagues directing them "to prepare a file for referral to TAF for Copaxone in the morning tomorrow." (A copy of this e-mail is attached as Exhibit 78.)

## V. Teva Caused The Submission of Materially False Claims to Medicare

101. Teva's conduct caused the submission of false claims to Medicare as a result of its violations of the anti-kickback statute.

### A. Teva's Violations Were Material To Payment Decisions.

102. Compliance with the anti-kickback statute is a material condition of payment by Medicare.

103. Congress reaffirmed the centrality of the anti-kickback statute to the claims payment decision in amending the anti-kickback statute to provide that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

104. Entities submitting claims to Medicare are subject to mandatory exclusion from Federal health care programs by HHS-OIG if criminally convicted of an anti-kickback statute violation, *see, e.g.*, 42 U.S.C. § 1320a–7(a)(1), and subject to permissive exclusion if HHS-OIG determines that the entity "has committed an act" described in the anti-kickback statute, 42 U.S.C. § 1320a–7(b)(7).

105. The United States regularly enforces the anti-kickback statute and pursues False Claims Act liability based on underlying violations of the anti-kickback statute. In particular, it has pursued matters against drug companies like Teva for conduct like that alleged here.

51

Case 1:20-cv-11548   Document 1   Filed 08/18/20   Page 52 of 59

106.    The conduct by Teva undermined the core concerns of the anti-kickback statute — in particular, preventing excessive costs to Medicare resulting from illegal co-pay subsidies that facilitate high drug costs and push the financial burden of those costs to Medicare and the American taxpayer.

107.    Compliance with the regulatory requirement that the claims data in the PDE record submitted to CMS be "true, accurate, and complete" is an express condition of payment under the Medicare Part D Program.

108.    The submission of PDEs is essential to the functioning of the Part D Program, the singular purpose of which is to provide coverage for drug products for the Medicare population. The accuracy of the information contained in each PDE for each patient determines how much payment will be made by Part D for that particular prescription.

109.    The scheme that Teva spearheaded resulted in third parties' submissions of thousands of false PDEs to Part D over a period of multiple years, resulting in hundreds of millions of dollars of damage to Medicare.

B.    Sample False Copaxone Claims

110.    Throughout the time period in which Teva used CDF and TAF as conduits to pay illegal Copaxone co-pay subsidies, patients used these subsidies at pharmacies to purchase Copaxone prescriptions, and the pharmacies submitted claims to Medicare Part D sponsors seeking Medicare reimbursement for those prescriptions.  These false claims are documented in PDE data.  Moreover, Part D Plan Sponsors, in turn, submitted this false PDE data to CMS in

order to obtain payment from the federal government for expenses incurred for the illegally subsidized Copaxone prescriptions.

111.    Prescription Drug Event data attached as Exhibit 79 includes representative examples of false claims for Copaxone prescriptions that resulted from Teva's kickbacks and were reimbursed by Medicare.  Each line on Exhibit 79 represents a distinct Prescription Drug Event reflecting a false Medicare claim for Copaxone (*i.e.*, a Medicare-reimbursed purchase of Copaxone by a Medicare beneficiary to fill a Copaxone prescription using an illegal co-pay subsidy from Teva via CDF or TAF).  In each line item, the PDE data also shows the Medicare Part D Beneficiary who received the drug, reported here in the "CMS Beneficiary Name" field (using a de-identified value for purposes of the exhibit).

112.    For each line item, the "Date of Service" shows the date the pharmacy indicated as the date of service in its claim to CMS, *i.e.,* when the beneficiary purchased the Medicare-covered Copaxone prescription using the co-pay subsidy.  The reported Medicare cost of the prescription is reflected in the following PDE data fields:  Amount Below Out-Of-Pocket Threshold ("AMT Below OOPT") and Amount Above Out-Of-Pocket Threshold ("AMT Above OOPT").  "AMT Below OOPT" refers to total costs for that prescription considered to be below the "catastrophic coverage" threshold for that benefit year.  "AMT Above OOPT" represents the portion of the drug cost considered to be in the "catastrophic coverage" benefit phase, and subject to the Medicare Part D reinsurance subsidy.

53

113.    Exhibit 79 shows the illegal co-pay subsidy amounts that Teva paid for each sample false claim identified in Exhibit 79.  Teva paid, via CDF and TAF, the co-pay subsidy amounts reflected in the "Payment Amount" column for each claim, on the indicated date to induce each Medicare reimbursed-purchase of Copaxone.  CDF or TAF, in turn, covered the beneficiary's Medicare co-pay for Copaxone on the date identified in the "Date of Foundation Payment" column.

114.    The claims did not disclose that the patients received illegal remuneration to induce their purchases of Copaxone in violation of the anti-kickback statute.

C.      The Copaxone Claims That Teva Subsidized Through CDF And TAF Were False Claims.

115.    Teva knowingly and willfully paid remuneration to Medicare patients to induce the patients to purchase Copaxone by providing them with financial subsidies to satisfy the co-pay obligations necessary to buy the drug.

116.    Teva knowingly caused the submission of false claims for reimbursement to Medicare in each instance in which it provided a patient with a co-pay subsidy for Copaxone through CDF or TAF.

117.    The claims were per se false or fraudulent as a matter of law.  42 U.S.C. § 1320a-7b(g).

54

Case 1:20-cv-11548 Document 1 Filed 08/18/20 Page 55 of 59

118.    The claims were also false because the PDE data and the specific representations therein failed to disclose a violation of a requirement material to the agency's payment decision, namely compliance with the anti-kickback statute.

119.    The PDE data was not true, accurate, and complete because it did not disclose a violation of the anti-kickback statute.  The PDE data for each claim was a false record that Teva caused to be used to pay the false claims alleged herein.

120.    The representations of compliance with the anti-kickback statute made by the Part D Sponsors and downstream entities were false because the claims resulted from illegal kickbacks that Teva paid.  The representations were false records that Teva caused to be used for payment of the false claims alleged herein.

## COUNT I
### (False Claims Act:  Presentation Of False Claims)
### (31 U.S.C. § 3729(a)(1)(A) (2009), formerly 31 U.S.C. § 3729(a)(1))

121.    The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

122.    By virtue of the acts described above, Teva knowingly presented or caused to be presented materially false or fraudulent claims for payment or approval to Medicare in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2009), formerly 31 U.S.C. § 3729(a)(1); that is, Teva knowingly made or presented, or caused to be made or presented, to the United States claims for payment for Copaxone that were tainted by illegal kickbacks.

123.     Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Teva's conduct.

124.     By reason of the foregoing, the United States has been damaged in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

**COUNT II**
**(False Claims Act:  False Records Material To A False Or Fraudulent Claim)**
**(31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2))**

125.     The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

126.     By virtue of the acts described above, Teva knowingly made, used, or caused to be made or used, false records or statements, namely, false claims, false statements in PDEs, and false statements about compliance with the anti-kickback statute, all of which were material to false or fraudulent claims for Copaxone that were submitted to the United States, paid and approved by the Medicare program, and tainted by illegal kickbacks, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009), formerly 31 U.S.C. § 3729(a)(2).

127.     Payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Teva's statements and actions.

56

128. By reason of the false or fraudulent records or statements, the United States has been damaged in an amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

### COUNT III
**(False Claims Act: Conspiracy to Violate the False Claims Act)**
**(31 U.S.C. § 3729(a)(1)(C) (2009), formerly 31 U.S.C. § 3729(a)(3))**

129. The United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

130. By virtue of the acts described above, Teva, and known and unknown employees of Teva, conspired with ACS, CDF, and TAF, and known and unknown individuals at those entities, knowingly to present or to cause to be presented materially false or fraudulent claims for payment or approval to Medicare in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C) (2009), formerly 31 U.S.C. § 3729(a)(3); that is, Teva, and known and unknown employees of Teva, conspired with ACS, CDF, and TAF, and known and unknown individuals at those entities, knowingly to make or present, or to cause to be made or presented, to the United States claims for payment for Copaxone that were tainted by illegal kickbacks.

131. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of the conspiracy between and among (i) Teva, CDF, and ACS, and (ii) Teva, TAF, and ACS, and known and unknown individuals at those entities.

132.    By reason of the foregoing, the United States has been damaged in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

## COUNT IV
### (Unjust Enrichment)

133.    Plaintiff the United States re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

134.    The United States claims the recovery of all monies by which Teva has been unjustly enriched, including profits Teva earned because of illegal inducements Teva paid to Medicare patients via CDF and TAF.

135.    By obtaining monies as a result of its violations of federal and state law, Teva was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

136.    By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Teva on sales to Medicare patients who received Copaxone co-pay coverage via CDF or TAF, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff, the United States, requests that judgment be entered in its favor as follows:

I.        On Counts I, II, and III under the False Claims Act against Teva, for the amount of the United States' damages to be established at trial, trebled as required by law, and such civil penalties as are authorized by law, and all such further relief the Court deems just and proper.

II.       On Count IV for unjust enrichment, for the damages sustained and/or amounts by which Teva retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

III.     All other and further relief as the Court deems just and proper.

The United States hereby demands a jury trial on all claims alleged herein.

Respectfully submitted,

| | |
|---|---|
| ETHAN P. DAVIS | ANDREW E. LELLING |
| Acting Assistant Attorney General | United States Attorney |

| | |
|---|---|
| | */s/ Evan D. Panich* |
| ANDY J. MAO | GREGG SHAPIRO |
| DOUGLAS ROSENTHAL | ABRAHAM R. GEORGE |
| NELSON WAGNER | EVAN PANICH |
| Attorneys, Civil Division | Assistant United States Attorneys |
| United States Department of Justice | One Courthouse Way, Ste. 9200 |
| P.O. Box 261, Ben Franklin Station | Boston, MA 02210 |
| Washington, DC 20044 | Phone: (617) 748-3100 |
| Phone: (202) 305-2073 | gregg.shapiro@usdoj.gov |
| | abraham.george@usdoj.gov |
| | evan.panich@usdoj.gov |

August 18, 2020

59

# EXHIBIT A-1

| Teva Payments to CDF and TAF, 2006-2015* | | |
|---|---|---|
| Date | Recipient | Payment Amount |
| 12/31/2006 | Chronic Disease Fund | $6,067,000 |
| 9/24/2007 | Chronic Disease Fund | $480,000 |
| 10/1/2007 | Chronic Disease Fund | $3,600,000 |
| 1/3/2008 | Chronic Disease Fund | $2,800,000 |
| 1/4/2008 | Chronic Disease Fund | $7,000,000 |
| 2/1/2008 | Chronic Disease Fund | $630,000 |
| 7/2/2008 | Chronic Disease Fund | $1,500,000 |
| 12/31/2008 | Chronic Disease Fund | $3,800,000 |
| 1/5/2009 | Chronic Disease Fund | $10,000,000 |
| 1/6/2009 | Chronic Disease Fund | $2,000,000 |
| 1/26/2009 | Chronic Disease Fund | $2,175,000 |
| 2/26/2009 | Chronic Disease Fund | $1,300,000 |
| 3/31/2009 | Chronic Disease Fund | $500,000 |
| 4/22/2009 | Chronic Disease Fund | $575,000 |
| 5/28/2009 | Chronic Disease Fund | $1,150,000 |
| 12/17/2009 | The Assistance Fund | $80,000 |
| 12/30/2009 | The Assistance Fund | $5,500,000 |
| 1/6/2010 | The Assistance Fund | $2,000,000 |
| 1/6/2010 | Chronic Disease Fund | $10,000,000 |
| 1/13/2010 | The Assistance Fund | $5,000,000 |
| 1/25/2010 | The Assistance Fund | $3,200,000 |
| 3/16/2010 | The Assistance Fund | $1,800,000 |
| 4/5/2010 | The Assistance Fund | $1,200,000 |
| 6/30/2010 | The Assistance Fund | $1,450,000 |
| 1/3/2011 | The Assistance Fund | $14,650,000 |
| 1/3/2011 | Chronic Disease Fund | $10,500,000 |
| 1/18/2011 | The Assistance Fund | $2,725,000 |
| 2/11/2011 | The Assistance Fund | $1,500,000 |
| 5/17/2011 | The Assistance Fund | $1,050,000 |
| 6/30/2011 | The Assistance Fund | $1,000,000 |
| 8/17/2011 | The Assistance Fund | $720,000 |
| 11/17/2011 | The Assistance Fund | $15,000 |
| 12/27/2011 | The Assistance Fund | $10,000,000 |
| 12/29/2011 | The Assistance Fund | $2,000,000 |
| 1/4/2012 | The Assistance Fund | $8,000,000 |
| 1/13/2012 | Chronic Disease Fund | $13,200,000 |
| 1/30/2012 | The Assistance Fund | $2,750,000 |

| Date | Fund | Amount |
|---|---|---|
| 3/2/2012 | The Assistance Fund | $2,000,000 |
| 3/15/2012 | The Assistance Fund | $2,400,000 |
| 3/30/2012 | The Assistance Fund | $900,000 |
| 6/27/2012 | The Assistance Fund | $1,400,000 |
| 7/26/2012 | The Assistance Fund | $1,350,000 |
| 8/24/2012 | The Assistance Fund | $575,000 |
| 9/21/2012 | The Assistance Fund | $700,000 |
| 12/27/2012 | The Assistance Fund | $15,000,000 |
| 1/2/2013 | The Assistance Fund | $15,000,000 |
| 1/2/2013 | Chronic Disease Fund | $9,000,000 |
| 1/28/2013 | The Assistance Fund | $6,000,000 |
| 3/21/2013 | The Assistance Fund | $1,500,000 |
| 4/2/2013 | The Assistance Fund | $700,000 |
| 5/8/2013 | The Assistance Fund | $925,000 |
| 6/26/2013 | The Assistance Fund | $1,000,000 |
| 8/27/2013 | The Assistance Fund | $850,000 |
| 1/2/2014 | The Assistance Fund | $32,000,000 |
| 1/2/2014 | Chronic Disease Fund | $8,000,000 |
| 1/16/2014 | The Assistance Fund | $10,000,000 |
| 3/11/2014 | The Assistance Fund | $1,100,000 |
| 4/24/2014 | The Assistance Fund | $1,275,000 |
| 6/30/2014 | The Assistance Fund | $550,000 |
| 12/30/2014 | The Assistance Fund | $10,000,000 |
| 1/12/2015 | The Assistance Fund | $25,000,000 |
| 2/5/2015 | The Assistance Fund | $8,500,000 |
| 4/17/2015 | The Assistance Fund | $725,000 |
| 9/3/2015 | The Assistance Fund | $15,000 |
| 9/9/2015 | The Assistance Fund | $250,000 |
| 12/28/2015 | The Assistance Fund | $30,000,000 |
| | **Total** | **$328,632,000** |

* Based on financial data provided Teva, Chronic Disease Fund, and The Assistance Fund.

2

# EXHIBIT A-2

## AFFIDAVIT OF EDWARD H. HENSLEY

I, Edward Harvey Hensley, being over the age of 18 and of sound mind, do swear and hereby state and affirm, pursuant to 18 U.S.C. § 1621, that the following statements are true to the best of my knowledge and recollection:

### Background

1. I previously have agreed to answer questions that the United States Attorney's Office for the District of Massachusetts and the Department of Justice have put to me regarding my time at Advanced Care Scripts ("ACS") and The Assistance Fund ("TAF"), as well as my relationship with Teva Neurosciences ("Teva") and other pharmaceutical manufacturers. This includes sitting for multiple voluntary interviews and sworn testimony.

2. I am providing this affidavit in response to the demand by the United States Attorney's Office for the District of Massachusetts and the Department of Justice that I answer under oath additional questions they have put to me regarding my relationship with Teva.

### Relationship between Teva, ACS and the Chronic Disease Fund ("CDF")

3. By no later than 2008, I understood that Teva was purposefully utilizing ACS and structuring its donations to CDF in a manner that essentially ensured that such donations would benefit only Copaxone patients, and not patients who had been prescribed competitor MS medications.

4. I arrived at this understanding because, among other things, Teva employee Denise Lynch conveyed this to me. Specifically, in or around 2008, Ms. Lynch told me that she would not authorize donations to Patient Services, Inc. ("PSI") because PSI had "burned" her with respect to a prior donation. When I asked Ms. Lynch what she meant by this, Ms. Lynch explained that a donation that Teva had made to PSI had not been passed through to

Copaxone patients, but rather had been used to cover the co-pays of patients who had been prescribed competitor MS drugs. Ms. Lynch stated to me that she was "tired" of other pharmaceutical manufacturers "riding on [Teva's] coattails." Ms. Lynch told me, in sum and substance, that Teva would only authorize a donation to a charity that could provide Teva reasonable assurance that the donation would exclusively (or at least predominantly) benefit Copaxone patients.

5. Ms. Lynch and I identified CDF as a foundation that could provide Teva the assurance for which it was looking. Specifically, Ms. Lynch and I discussed the fact that CDF did not maintain a waitlist of patients who applied to its MS fund when funding was not available and that, when CDF did receive money and "opened" its fund, it accepted patients on a "first come, first serve" basis. Ms. Lynch and I discussed that this would provide a benefit to Teva's goal that its charitable contributions take care of as many of its patients as possible. In particular, CDF's patient intake process (*i.e.*, "first come, first serve" without a wait list) was designed to ensure that monies that a pharmaceutical manufacturer donated would flow through to that manufacturer's patients. In practice, this meant that within minutes (or even seconds) of receiving a Teva donation causing its MS fund to "open," CDF would accept from ACS, Teva's preferred specialty pharmacy, a "batch file" containing dozens and sometimes hundreds of Medicare Part D Copaxone patients whose co-pay obligations might otherwise deter them from filling their prescriptions.

### Teva's Coordinated Donations to CDF

6. While I worked at ACS, Ms. Lynch would regularly ask David Blanc or me how many of ACS's Copaxone patients were waiting to fill their prescriptions pending enrollment in a co-pay assistance fund. Mr. Blanc and/or I would provide Ms. Lynch that information.

-2-

Because the Medicare Part D "donut hole" amount was easily determinable, Ms. Lynch was able to determine the exact amount of money that Teva would need to donate to CDF to have all of the waiting Copaxone patients enrolled into the foundation. The amount was determined through simple multiplication: (number of patients) * (donut hole + estimated catastrophic coverage co-pay + estimated administrative fee). If Ms. Lynch needed assistance in determining the necessary donation figure, I would, and at times did, provide that assistance.

7. Based on my course of dealing with Ms. Lynch, various discussions I had with Ms. Lynch, statements that Ms. Lynch made to me, and Teva's donation patterns, it was clear to me that Teva was tailoring its donation amounts so that the donation would be sufficiently large to cover all of ACS's waiting Copaxone patients but not so large that any significant number of non-Copaxone patients would be benefitted. Although Ms. Lynch never expressly stated that the size of a particular donation was designed to be sufficient but not greater than necessary to cover ACS's waiting Copaxone patients, her statements that Teva did not want other pharmaceutical companies free-riding on Teva's charitable donations made it clear that this was a principal factor in Teva's determination of how large of a donation to give to CDF at any given time. I also understood from my conversations with Ms. Lynch that she needed approval from Teva's senior management, including potential management in Israel, to make the larger donations and that she might not obtain that approval unless she were able to demonstrate that the donations would substantially go to Copaxone patients.

**ACS's "Batch Files" of Copaxone Patients to CDF**

8. Ms. Lynch would provide me and/or Mr. Blanc advance notice that Teva would be making a donation to CDF. This advance notice could range from several days to several weeks. For example, I recall a specific occasion where Ms. Lynch told me that Teva would be sending a wire donation on "Thursday after three o'clock." Based on my course of dealing with Ms. Lynch, various discussions I had with Ms. Lynch, and statements that Ms. Lynch made to me, I knew that Ms. Lynch was providing this advance notice so that ACS would have sufficient time to ready its "batch file" of ACS's waiting Copaxone patients, which it could then send to CDF without delay (sometimes minutes or seconds after CDF received Teva's donation). In addition, when Teva finally wired funds to CDF, Ms. Lynch would immediately inform Mr. Blanc and me of this fact. Ms. Lynch provided us these notifications because they were essential to ensuring that ACS had a significant advantage in its ability to enroll Copaxone patients into CDF's MS Fund, and thereby to ensure that Teva's donations flowed through to Copaxone patients as Teva intended.

9. ACS was a contracted provider for Teva and, therefore, Teva expected ACS to be acting exclusively for Teva's benefit when enrolling ACS patients into CDF. However, Mr. Blanc and I would sometimes "pepper" a batch file with non-Copaxone patients who were in dire need of co-pay assistance (*i.e.*, randomly intersperse a relatively small number of non-Copaxone patients throughout the batch file that ACS and Teva otherwise intended to be filled exclusively with Copaxone patients). ACS never told Teva about the "peppering," at least in part because I had some concerns about whether Teva would consider the "peppering" to be inconsistent with its expectations of ACS's performance under the service contract.

-4-

**Teva's Change of Preferred Co-Pay Assistance Fund to TAF**

10. While on a phone call with Ms. Lynch and possibly Jennifer Clark, another Teva employee, in or around 2009, Ms. Lynch asked me several questions about the structure of TAF and how the fund would operate. In particular, Ms. Lynch asked me to confirm that TAF would not have waitlists, as waitlists would impair Teva's ability to get the maximum number of its patients covered by its donations. My response to Ms. Lynch and others at Teva was that TAF would provide all of the advantages that CDF did—including accepting "batch files" of patients from a manufacturer's "hub" or preferred specialty pharmacy, not utilizing waiting lists, and accepting donations at any time during the year. In other words, I made sure that Ms. Lynch understood that Teva effectively would be able to use TAF as it had CDF: essentially, as a "pass-through" donation vehicle to get Teva monies into the hands of Copaxone patients. (My recollection is that the questions that Teva asked me about TAF's structure and the information Teva hoped to receive about TAF's structure were consistent with questions asked by other pharmaceutical manufacturers that I spoke with regarding TAF.)

11. I told Ms. Lynch that TAF would be an improvement over CDF because TAF's administrative expenses would be lower (which meant an increased number of Copaxone patients would be covered by the manufacturer's donations) and because TAF would use any reserve funds to cover additional patients.

12. While at TAF, I knew, based on conversations with Mr. Blanc, who remained at ACS after I left, that Ms. Lynch continued to provide ACS with advance notice of Teva's forthcoming donations, such that ACS would have sufficient time to ready a batch file of Copaxone patients to send to TAF. TAF would accept these batch files no questions asked, despite

-5-

knowing that ACS had purposefully and strategically structured the batch file to benefit Copaxone patients rather than to fairly reflect ACS's population of financially needy MS patients.

**Teva's Donation Amounts to TAF**

13. I knew, based on conversations with Mr. Blanc, that Mr. Blanc continued to provide Ms. Lynch with information about how many of ACS's Copaxone patients were waiting to fill their prescription pending enrollment in a co-pay assistance foundation. I would regularly provide either Ms. Lynch or Mr. Blanc (or both) the "per-patient allocation" that TAF was using for its MS Fund at any given time. I sometimes did this proactively, but usually did this in response to a specific request by Ms. Lynch. Based on my course of dealing with Ms. Lynch, discussions I had with Ms. Lynch, and statements that Ms. Lynch made to me, I knew that the purpose of providing this information to Ms. Lynch was to enable her to determine how much money Teva needed to donate to TAF to cover all of ACS's waiting Copaxone patients.

14. I knew that Ms. Lynch was receiving information from both TAF and ACS that in combination would be sufficient to enable her to determine how much Teva should donate to TAF at the start of the year.

15. In the beginning of a new year, Teva would donate to TAF an amount less than what TAF requested in its "ask letter." TAF's "ask" amount was based on the number of patients in the MS Fund plus a projected increase in census over the course of the coming year. At sporadic times following that first donation, Teva would donate additional amounts, each of which brought Teva's donations for the year incrementally closer to TAF's "ask.". This indicated to me that, as of Teva's first donation of the year, Ms. Lynch had an awareness

Case 1:20-cv-11548   Document 1-2   Filed 08/18/20   Page 9 of 9

of (1) how many Copaxone patients were, at the start of the year, ready to be re-enrolled by TAF, and (2) how many new Copaxone patients ACS immediately had ready to refer to TAF. Based on the information that Ms. Lynch would then gather or receive from ACS, Ms. Lynch could determine the optimal timing and size of the smaller donations that Teva would tend to make after the initial, large donation that Teva typically would make during the first few days of January (*i.e.*, the timing and size that would be best cover the Copaxone patients that ACS had ready to refer to TAF at various points throughout the year, while minimizing the chances that non-Copaxone patients would receive any significant portion of these donations).

16. After TAF's processing of the batch file(s) that ACS had submitted, ACS would receive from TAF, in the ordinary course, information regarding each Copaxone patient that had been referred by ACS and successfully enrolled in the fund. Although not all Copaxone patients in the ACS Medicare Part D program used ACS as their specialty pharmacy, Teva knew, based on information it received from ACS, that approximately 90 percent of those patients did. This would enable ACS essentially to confirm for Teva how many Copaxone patients in fact were enrolled in TAF's MS Fund at any given time, which would enable Teva to determine the right size of its next start-of-year donations. Because the timing and information contained in the batch files sent by ACS to TAF were the same as the ones ACS had previously sent to CDF, and because ACS remained a contracted provider for Teva, I knew that Mr. Blanc would be providing such patient information to Ms. Lynch for that express purpose.

**Consideration of Anti-Kickback Statute and OIG Guidance**

17. While at ACS and at TAF, I understood that as a general matter a pharmaceutical manufacturer could not provide co-pay assistance directly to patients. While at TAF, I also understood that TAF's and other co-pay assistance charities' OIG Advisory Opinions required that the co-pay assistance charity be "independent" of the pharmaceutical manufacturer that made the donation. I understood that Teva's conduct in alerting ACS of a forthcoming Teva donation to CDF or TAF was contrary to the spirit of the OIG guidance and, in substance, caused CDF and/or TAF not to be truly "independent" of Teva but rather to be mere "pass-through" vehicles. I understood that, by not objecting to Teva's conduct, TAF was allowing Teva to use the foundation in a way that was contrary to the purpose and spirit of the OIG guidance. I also knew that the foundations to which Teva was donating, and to which ACS was then directing Copaxone patients, were "independent" from Teva in name only.

18. I believe that Teva knew that its conduct circumvented the Anti-Kickback Statute and would be viewed as problematic by the OIG and DOJ. Specifically, in or around 2018, after her retirement from Teva, Ms. Lynch disclosed to me that she had warned Teva's senior leadership years before that Teva should "take a reserve" to cover False Claims Act liabilities associated with Teva's donations to CDF and TAF "in the event" that the donations came under government scrutiny. In addition, I was aware that Ms. Lynch avoided asking me, while I was at TAF, for information that the OIG Advisory Opinion expressly prohibited TAF from providing to Teva (namely, the number of Copaxone patients in the TAF MS Fund at any given time). I was aware, however, that Teva was

nevertheless obtaining the functional equivalent of that information from ACS and tailoring its donation amounts and the timing of its donation accordingly.

19. Although I believed that ACS, CDF, and TAF were benefitting patients with medically necessary MS prescriptions and legitimate financial need, I understood from at least 2010 forward that the donation "playbook" that Teva was utilizing, and that TAF was agreeing to follow, was contrary to the independence that the OIG Advisory Opinion was seeking to require from co-pay assistance charities.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.



_____
Edward H. Hensley



Sworn to before me this

__11<sup>th</sup>__day of __MARCH__, 20_20_


_____
Notary Public


EMILY MARIE HESS
Notary Public - State of Florida
Commission # GG 322693
My Comm. Expires Aug 6, 2023
Bonded through National Notary Assn.


-9-

# EXHIBIT A-3

| | |
|---|---|
| **From:** | Mike Sheehy |
| **To:** | Dalton Tomlinson |
| **Sent:** | 12/28/2015 8:58:38 PM |
| **Subject:** | RE: Medicare Donations Process |

Yes it is good news however it is not like years before. We will now be required to reduce the 2016 budget by the $30 million and not get any relief from the 2016 challenge because of the donation.



**Mike Sheehy**
Director, Brand Product Marketing
Teva CNS - West
Office: (913) 777-3319  Mobile: (816) 547-5055  Mike.Sheehy@tevapharm.com

IMPROVING HEALTH, MAKING PEOPLE FEEL BETTER   GETTING IT DONE TOGETHER   CREATIVITY WHERE IT MATTERS   CARING   MAKING OUR FAMILIES PROUD   LEADING THE WAY

OUR PURPOSE & VALUES

---

**From:** Dalton Tomlinson
**Sent:** Monday, December 28, 2015 10:17 AM
**To:** Mike Sheehy
**Subject:** RE: Medicare Donations Process

Good news! Thanks for the copy.

Best regards,

**Dalton Tomlinson**   VP, CNS Marketing, NAm Specialty Medicines
Tel: 610-727-6432    Cell: 816-914-2755   Fax: +1-215-795-4273
Dalton.Tomlinson@tevapharm.com    sip:Dalton.Tomlinson@tevapharm.com    www.tevapharm.com

IMPROVING HEALTH, MAKING PEOPLE FEEL BETTER   GETTING IT DONE TOGETHER   CREATIVITY WHERE IT MATTERS   CARING   MAKING OUR FAMILIES PROUD   LEADING THE WAY

OUR PURPOSE & VALUES

---

**From:** Mike Sheehy
**Sent:** Monday, December 28, 2015 10:36 AM
**To:** Dalton Tomlinson
**Subject:** Fwd: Medicare Donations Process

Dalton:
You should have been copied on this.

Mike Sheehy
Teva CNS

CONFIDENTIAL – FOIA Exempt

Director, Brand Marketing
Mobile - (816) 547-5055

Begin forwarded message:

**From:** David Loughery <David.Loughery@tevapharm.com>
**Date:** December 28, 2015 at 9:15:27 AM CST
**To:** John Hassler <John.Hassler@tevapharm.com>, Tom Gawlick <Tom.Gawlick@tevapharm.com>, Mike Sheehy <Mike.Sheehy@tevapharm.com>, Alejandro Castro <Alejandro.Castro@tevapharm.com>
**Cc:** Larry Downey <Larry.Downey@tevapharm.com>, Laurie Thibodeau <Laurie.Thibodeau@tevapharm.com>
**Subject: FW: Medicare Donations Process**

Team,

Based upon some over performance this quarter, primarily in Pain sales and GTN favorability across NASM, we were able to gain approval yesterday to remit $30M in donations this month.  As you can see below, the payment will be made this week.

DL

---

**From:** Thomas Dimitropoulos
**Sent:** Monday, December 28, 2015 10:11 AM
**To:** David Loughery
**Cc:** Michael McCartin; Ancy Varghese
**Subject:** RE: Medicare Donations Process

Hi David,

We found documentation from last year.  We are in the process of putting this through.  We will send you confirmation when it is complete.

Regards,
Tom

| | |
|---|---|
| TEVA | **Thomas Dimitropoulos**   Director, North American Treasury<br>Tel: (215) 591-8217   Fax: (215) 591-8806<br>Tom.Dimitropoulos@tevapharm.com   sip:Thomas.Dimitropoulos@tevapharm.com<br>www.tevapharm.com |

---

**From:** David Loughery
**Sent:** Monday, December 28, 2015 10:08 AM
**To:** Thomas Dimitropoulos
**Cc:** Michael McCartin; Ancy Varghese
**Subject:** RE: Medicare Donations Process

Tom,

Do you have everything that you need or is there more we can provide?

DL

---

Tev_008408

**From:** Thomas Dimitropoulos
**Sent:** Monday, December 28, 2015 7:18 AM
**To:** David Loughery
**Cc:** Michael McCartin; Ancy Varghese
**Subject:** RE: Medicare Donations Process

Hi David,

Do you have a document from the charity with the wire instructions?

Thanks,
Tom

| | |
|---|---|
| << OLE Object: Picture (Device Independent Bitmap) >> | **Thomas Dimitropoulos**  Director, North American Treasury<br>Tel: (215) 591-8217  Fax: (215) 591-8806<br>Tom.Dimitropoulos@tevapharm.com<br>sip:Thomas.Dimitropoulos@tevapharm.com  www.tevapharm.com |

**From:** David Loughery
**Sent:** Sunday, December 27, 2015 2:11 PM
**To:** Eyal Desheh; Eti Mitrany; Rob Koremans
**Cc:** Larry Downey; Thomas Dimitropoulos; Michael McClellan; Laurie Thibodeau; Jonathan Kashub
**Subject:** FW: Medicare Donations Process

Eyal,

Please find attached a request for a $30M donation payment to be made to assist MS patients with their co-pay. Based upon the size of this payment, I believe it may need approval from Erez as well. I have included US Treasury (Thomas) on this email and I made him aware last week that this might be a payment made in 2015.

DL

<< File: Copaxone Donation wire transfer.xlsx >>

**From:** Donna Faix
**Sent:** Friday, December 18, 2015 11:50 AM
**To:** David Loughery; Laurie Thibodeau; Alejandro Castro
**Subject:** RE: Medicare Donations Process

Dave,
This has been approved for $35 million by Laurie Thibodeau, Senior Director, Corporate Social Responsibility and Denise Bradley, Sr. Vice President, Global Corporate Reputation.
Thanks!

| | |
|---|---|
| << OLE Object: Picture (Device Independent Bitmap) >> | **Donna Faix**  Corporate & Social Responsibility Program Manager<br>Tel: 215-591-3056  Fax: 215.591.8836<br>Donna.Faix@tevapharm.com<br>sip:Donna.Faix@tevapharm.com  www.tevapharm.com |

Tev_008409

**From:** David Loughery
**Sent:** Friday, December 18, 2015 11:12 AM
**To:** Donna Faix; Laurie Thibodeau; Alejandro Castro
**Subject:** RE: Medicare Donations Process

Donna,

The money will be coming from Commercial for this.  The question remains whether in 2015 or 2016.  To what levels has this been approved?

DL

---

**From:** Donna Faix
**Sent:** Friday, December 18, 2015 11:11 AM
**To:** David Loughery; Laurie Thibodeau; Alejandro Castro
**Subject:** RE: Medicare Donations Process

Hi Dave,
Hope you are well.  Please know that we have approved the $35 million in our system for The Assistance Fund.  Can you please confirm that the money is coming from the commercial budget for this request?
Thanks!

| << OLE Object: Picture (Device Independent Bitmap) >> | **Donna Faix**   Corporate & Social Responsibility Program Manager<br>Tel: 215-591-3056   Fax: 215.591.8836<br>Donna.Faix@tevapharm.com<br>sip:Donna.Faix@tevapharm.com   www.tevapharm.com |
| --- | --- |

---

**From:** David Loughery
**Sent:** Friday, December 18, 2015 10:56 AM
**To:** Laurie Thibodeau; Alejandro Castro
**Cc:** Donna Faix
**Subject:** RE: Medicare Donations Process

Alejandro,

Please complete the form you provided to include the information for The Assistance Fund (address, wire information, etc). Once completed, please send to Laurie and me.  I will then coordinate with Mike to be able to provide to Eyal for approval should we be able.

DL

---

**From:** Laurie Thibodeau
**Sent:** Friday, December 18, 2015 10:53 AM
**To:** David Loughery; Alejandro Castro
**Cc:** Donna Faix
**Subject:** RE: Medicare Donations Process

CONFIDENTIAL – FOIA Exempt

Can you please resend – I did not get the attachment?  My understanding is that this will be one wire transfer to one vendor – The Assistance Fund.  I believe that there has been a similar donation at the end of each year the past several years.

We will approve for $35 million in our system today so this will be ready to go from our end.  I just want to confirm that you are handling the financial approvals and the wire transfer and that nothing else will be needed from us.  If you do need anything from us just let me know.  Thank you and happy holidays!

---

**From:** David Loughery
**Sent:** Friday, December 18, 2015 10:16 AM
**To:** Alejandro Castro; Laurie Thibodeau
**Subject:** RE: Medicare Donations Process

Laurie,

Attached is the routing for the proposed donations.  We would only do MS.  Is there more than one vendor that would be needed to reach the $35M?  Once we complete this, we should begin to gather approvals short of Eyal/Erez.

DL

---

**From:** Alejandro Castro
**Sent:** Friday, December 18, 2015 9:27 AM
**To:** David Loughery
**Subject:** RE: Medicare Donations Process

Dave,
Attached is the updated PAYMENT REQUEST FORM related to Medicare Donations.

I have updated the GL Account Coding to reflect changes in budget ownership.

- Information regarding Payee (Name, address, Bank Name, Routing #, Account Number) will need to be filled on a case by case.
- Other fields also need to be populated accordingly (Date Needed, amount, authorized signer, etc)

Please let me know if you have any questions

<< File: Copaxone Donation wire transfer.xlsx >>

Ale

Best regards,



| | **Alejandro Castro**  Associate Director, FP&A |
| --- | --- |
| | Tel: 913 777 3429    Cell: 913 689 0015 |
| | Alejandro.Castro@tevapharm.com |
| | www.tevapharm.com |

**From:** Rachel Svaty
**Sent:** Wednesday, September 23, 2015 5:05 PM
**To:** David Loughery; Alejandro Castro
**Subject:** FW: Medicare Donations Process

The Copaxone donation payment process has changed. Changes in Teva's policy have moved the ownership of the donation to Corporate Giving. I asked Ryan to schedule time with the Corporate Giving team (Laurie Thibodeau and Donna Faix) to make sure they understood what this meant. Since both of you are fairly new to this process, they are definitely new to it, and I'm leaving the group, I thought it would be best to document this process to ensure everyone knows what to do. J

See my email to Laurie below for the details. Let me know if you have any questions.

**From:** Rachel Svaty
**Sent:** Wednesday, September 23, 2015 4:59 PM
**To:** Laurie Thibodeau; Donna Faix
**Cc:** Jennifer Clark; Ryan Sloss
**Subject:** RE: Medicare Donations Process

Hi Laurie,

Thanks for meeting today to discuss the process to pay Copaxone donations. We didn't talk about it, but the Reslizumab team has budgeted for donations in their 2016 AOP as well. There will likely be activity related to both products; however, the Reslizumab donations are less than $1M.

A question for you - Is it possible to code the donation to the Copaxone Marketing department? Or does the donation have to be coded to Corporate Responsibility?

To recap the Copaxone donation wire transfer process…

- Laurie/Donna to receive a request for Copaxone donations from The Assistance Fund
- Laurie/Donna to request the perspective of the Copaxone Marketing team (Mike Sheehy) and determine the Marketing budget available
- Laurie/Donna to work with Dave Loughery (NASM CFO) and Mike McClellan (GSM CFO) to determine the timing of payment. For example, Teva may pay a portion of the 2016 budgeted donations in the last few days of 2015.
- Laurie/Donna to give Roberta Diver (Accounts Payable) and Millie Spencer (Treasury) a heads up of the payment about a week prior to payment. Millie will ensure Teva has the cash available to make the payment, and Roberta will ensure the proper attention is given to making a timely wire transfer. Roberta can also advise to the last possible time you will need to notify her and achieve a same day wire transfer. She will need a completed wire transfer form and written documentation of approval at the appropriate approval authority level.
- Laurie/Donna to request approval of donation payment.
- Laurie/Donna to communicate to A/P and Treasury with copies of the wire transfer form and written documentation of the appropriate approval authority.

The rest of this email is reference information only…

Approval Authority Levels
$0.5M Sr. Director
$1M VP
$5M SVP (Larry Downey in the past)
$15M TEC members (Rob Koremans)
$25M CFO (Eyal Desheh)
>$25M CEO (Erez Vigodman)
*** I'm not sure if there is a point in which Board of Directors approval is necessary. Anna Khais or Roberta Diver can advise.

Wire Form:
The financial coding in this form will need to change.

CONFIDENTIAL – FOIA Exempt                                                    Tev_008412

<< File: Copaxone Donation wire transfer.xls >> Document 1-3 Filed 08/18/20 Page 9 of 9

Sample approval escalation email:
<< Message: FW: Response requested: Approval for Copaxone donation payment >>

Sample A/P and Treasury heads up email:
<< Message: FW: Copaxone April Donation >>

Thanks,
Rachel

| | |
|---|---|
| << OLE Object: Picture (Device Independent Bitmap) >> | **Rachel Svaty,** Associate Director, Finance<br>Tel: (913) 777-3397    Cell: (816) 585-7753<br>Rachel.Svaty@tevapharm.com<br>OP desk: 5F42 |

-----Original Appointment-----
**From:** Ryan Sloss
**Sent:** Monday, September 21, 2015 12:31 PM
**To:** Ryan Sloss; Jennifer Clark; Laurie Thibodeau; Donna Faix; Rachel Svaty
**Subject:** Medicare Donations Process
**When:** Wednesday, September 23, 2015 3:30 PM-4:00 PM (UTC-06:00) Central Time (US & Canada).
**Where:** https://teva.globalmeet.com/RyanSloss

[X]

[X]

Sorry, I meant to add a Global Meet to this meeting!!!

Hello everyone,
With the Medicare donations (related to Copaxone and Cinqair) moving out of Patient Solutions and into the Brand Marketing Budgets in 2016, we just wanted to have a quick discussion around the process for getting payments approved/processed.

Thanks!
Ryan

_____

You're Invited.

You've been invited to a GlobalMeet® web meeting.

Have the

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-4

| TEVA Pharmaceuticals | TITLE Teva Integrity Principles Policy | | |
|---|---|---|---|
| **US POLICY - 100** | OWNER Compliance | DATE 7/1/2012 | SUPERSEDES --- |

# Teva Integrity Principles Policy

1 PURPOSE ...........................................................................................................2
2 SCOPE .............................................................................................................2
3 POLICY DETAILS ...............................................................................................3
  3.1 Guiding Principles ......................................................................................3
  3.2 Promotional Materials and Informational Presentations...............................5
    3.2.1 Informational Presentations ..............................................................5
    3.2.2 Requests for Off-Label Information ...................................................6
    3.2.3 Promotional Materials.......................................................................6
  3.3 Interactions with Medical Science Liaisons..................................................7
  3.4 Meals and Educational Items ......................................................................8
    3.4.1 Meals ..............................................................................................8
    3.4.2 Educational Items.............................................................................9
    3.4.3 Federal Guidelines ..........................................................................9
    3.4.4 State Laws .....................................................................................10
  3.5 Engaging Healthcare Professionals for Services .......................................11
    3.5.1 Consultant Meetings (Advisory Boards)...........................................11
    3.5.2 Speaker Programs..........................................................................12
    3.5.3 Healthcare Professional-Led Training Programs...............................14
    3.5.4 Medical Affairs Research Programs .................................................14
  3.6 Interactions with Patients..........................................................................16
    3.6.1 Privacy Guidelines .........................................................................16
    3.6.2 Appropriate Conversations with Patients..........................................18
    3.6.3 Engaging Patients ..........................................................................18
  3.7 Educational Grants and Charitable Donations ...........................................19
    3.7.1 Educational Grants .........................................................................19
    3.7.2 Charitable Donations ......................................................................20
  3.8 Promotional Support .................................................................................21
  3.9 Reimbursement, Billing Codes and Price ..................................................22
    3.9.1 Reimbursement Discussions ...........................................................22
    3.9.2 Diagnosis Code Information and ICD-9 Codes..................................22
    3.9.3 Pricing, Discounts and Rebates.......................................................23
  3.10 Samples...................................................................................................24
4 RESPONSIBILITY ............................................................................................25

CONFIDENTIAL – FOIA Exempt

## 1       PURPOSE

The Teva Integrity Principles is a policy that provides you with the foundation upon which you can frame your interactions with healthcare professionals to ensure compliance with company policy, as well as applicable laws, rules and regulations and applicable industry guidelines. This policy sets out various business practices in which Teva may engage to achieve its legitimate business objectives. It also details the key Integrity Principles that Teva must observe to ensure that it pursues these business practices in a manner that is consistent with the law, promotes patient benefit, enhances the practice of medicine and preserves our corporate culture.

Our Commitment

- o   Teva is committed to conducting its business consistent with all applicable laws, rules and regulations and applicable industry guidelines.
- o   Teva is committed to interacting with healthcare professionals in a manner that promotes patient benefit and the enhancement of the practice of medicine.
- o   Teva is committed to fostering a culture of compliance where it is understood that integrity is the bottom line and that employees must maintain high standards of conduct and professionalism.

## 2       SCOPE

This policy applies to all US Teva employees who interact with healthcare professionals, organizations and institutions.  A healthcare professional is defined as any individual directly involved in the delivery of patient care or treatment.  This includes those who have prescribing or dispensing authority over prescription products, such as physicians and pharmacists, as well as other support staff such as nurses or counselors who work with or treat patients, or any other individual or entity in a position to influence the use of Teva's prescription products.

As Teva employees we all have responsibilities. Whether you work in a Home Office setting or in the Field, you are responsible for conducting your business activities in a manner consistent with this policy.  It is expected that you will not only comply with the letter of this policy, but also that you will comply with the spirit.  If you do not understand something in this policy, it is your responsibility to seek advice on how to comply.  A lack of understanding will not excuse improper behavior.  Teva has an open door policy, and you should feel free to consult with your manager, Compliance, Legal, Human Resources or call the Teva Advantage Hotline (1-877-277-3220).

Failure to comply with this policy could cause considerable harm to Teva's reputation and could result in criminal or civil liability.  Please understand that:
- o   Anyone who violates this policy is subject to disciplinary action, up to and including termination of employment.
- o   Individual managers are not empowered to waive or modify this policy.
- o   Teva reserves the right to change or modify this policy based upon the needs of the business at that time or changes in law and regulations.

Also understand that it is your responsibility to report suspected violations of this policy to your manager, Compliance, Legal, Human Resources or call the Teva Advantage hotline (877-277-3220).

CONFIDENTIAL – FOIA Exempt                                                                                          Tev_082982

## 3    POLICY DETAILS

### 3.1    Guiding Principles

A number of government agencies, including the Food and Drug Administration (FDA), the Department of Health and Human Services (HHS), the Federal Trade Commission (FTC), and the Department of Justice, among others, regulate Teva's US business based on various federal laws and regulations. States have also enacted similar laws and regulations. Teva intends to comply with these laws and regulations as well as applicable industry guidelines.

Teva has established polices designed to (1) prevent conduct which would result in violations of the laws and regulations that protect the integrity of payments for healthcare products and services and (2) detect and correct violations of those laws and regulations should they occur. All Teva employees must conduct their business activities in compliance with these policies – not just because it's the law, but also because it is consistent with our commitment to integrity.

Three basic principles govern our interactions with healthcare professionals, institutions and organizations, no matter where the interaction takes place:

- o   Our promotional messages are always on-label, truthful and fair balanced.
- o   We do not buy business.
- o   We do not present false information to our customers, the company or to the government.

**Principle 1:  Our promotional messages are always on-label, truthful and fair balanced.**

Our drugs are approved for particular indications, and we are required by law to promote our drugs for only approved indications. Even though a drug may be widely used for indications outside the label, the law prevents us from promoting this use. Therefore, our promotional messages are always within label, truthful and fair balanced as required by the Food Drug and Cosmetic Act and the relevant FDA regulations.

**Principle 2:  We do not buy business.**

U.S. law, specifically the Anti-kickback Statute, prohibits our employees from giving kickbacks and engaging in bribes when conducting business with healthcare professionals.

- o   A kickback is giving anything of value, directly or indirectly, to a healthcare professional, organization or institution if one purpose is to improperly influence the prescribing of our drugs.
- o   A bribe is a conditional exchange or a quid pro quo – "I'll give you something if you give me something."

Whenever we hire a healthcare professional to perform services for us or on our behalf, we must be mindful of the Anti-kickback Statute. There are safe harbors in the law that allow us to obtain a healthcare professional's services for sound business reasons, and we always pay a fair market price for those services. The same principle applies to any support that we might provide to a patient, institution or other organization.

When we provide modest meals and educational items to healthcare professionals, it is only so that we can provide them with information relevant to our products or disease states so that they

3

make independent and informed judgments about whether it is appropriate to prescribe our products.

It is also a violation of law to provide anything of value to a patient to influence their behavior in ordering or suggesting a particular product or treatment.

**Principle 3**: **We do not provide false information to the company, our customers or the government.**

Providing false information to the company, our customers or the government is a violation of Company policy and federal and state law.

Company policy requires that information provided to the company related to personal or business matters (e.g., expense reports) must always be truthful to the best of your knowledge. Ignorance is not an excuse for providing false information.

Additionally, the federal False Claims Act (and relevant state False Claims Acts) prohibits providing false information to the government in connection with a claim for payment from the government. It may be violated by not adhering to Principles 1 and 2: paying kickbacks to healthcare professionals and/or off-label promotion that ultimately results in Company reimbursement from the government or a lesser rebate payment owed to the government. It may also be violated by submitting false claims to the government regarding pricing information, such as Average Manufacturer Price and Best Price under the Medicaid Drug Rebate Program.

The False Claims Act is violated by even the mere submission of a false claim for payment, regardless of whether the claim is paid. For that reason, you must exercise caution in advising healthcare professionals about government reimbursement for Teva products.

4

 Tev_082984

## 3.2      Promotional Materials and Informational Presentations

Teva sales and marketing employees perform many activities where they convey information specifically related to the safety and efficacy of our products.  Anytime we do this, the activity is considered promotional and very specific regulations apply.

Teva's promotional materials and informational presentations (including sales calls/details, Speaker Programs and discussions at display/exhibit booths), provide valuable scientific and educational information to healthcare professionals regarding Teva's pharmaceutical products.

All promotional materials and promotional presentations must:

- o   Be consistent with approved product labeling;
- o   Be accurate and not misleading;
- o   Make claims about a product only when properly substantiated;
- o   Reflect the balance between risks and benefits and
- o   Comply with all other applicable FDA regulations.

Promotional materials and informational presentations for Teva products must be presented only to appropriate target audiences – defined as those healthcare professionals whose practice includes patients that could be treated with the Teva product being promoted and based on such practice would have reason to prescribe the Teva product consistent with its approved product labeling.  Based on each Teva product label, indications and/or contra-indications, Teva sales and marketing management may determine specific specialties or types of healthcare professionals to whom the Company will not promote or detail those products.

### 3.2.1   Informational Presentations

When you engage in a product discussion with a healthcare professional, Teva may be responsible for, and may be bound by, any and all representations that you make.  Healthcare professionals must receive complete and accurate information about Teva's products.  Any promotional claim that you make that is inconsistent with the full prescribing information can render the product misbranded.  Therefore, the following guidelines apply when discussing our products with healthcare professionals:

- o   Always remain strictly within approved promotional claims for our products.
- o   Never extend claims or "over promise" our products' efficacy.
- o   Never seek to minimize or obscure the safety risks that are associated with the use of our products.
- o   Always direct the healthcare professional in the proper use of the product consistent with the FDA-approved labeling.
- o   Never promote or discuss a new product or a new indication prior to FDA approval without explicit permission and direction from the Home Office.

The FDA requires our promotional messages to be fair balanced.  The message must contain a balanced discussion of the risks and benefits associated with the use of the product.  The sum total of the discussion for any particular product must provide a complete picture of the product's benefits, the risks associated with those benefits and its appropriate use.

5

Whether a discussion is fair balanced takes into account:

- o   The scope and frequency of previous communications about the product;
- o   The healthcare professional's experience level with the drug and
- o   The context of the discussion at issue.

Comparative claims of safety, efficacy or tolerability among products can only be made based on scientifically valid data from head to head studies.  Consequently, an employee can never initiate such a comparative claim discussion without an approval through the Company's promotional materials review process.

### 3.2.2   Requests for Off-Label Information

Employees may not solicit, or attempt to solicit, questions from healthcare professionals about off-label uses of Teva products.   In the event that a healthcare professional initiates a discussion about a use of a product that is not within the product's label, it is the responsibility of the employee to state that the product is not indicated for that use and refer any questions or requests for information to Medical Affairs using a Medical Information Request Form (MIRF).  A MIRF should also be used if a healthcare professional would like to speak with a Medical Science Liaison.  Only those individuals specifically designated by Teva may answer unsolicited questions related to unapproved uses of a product.

### 3.2.3   Promotional Materials

Teva employees, and any individual hired on Teva's behalf to promote our products, may only use promotional materials that have been reviewed and authorized by Copy Approval.. Because regulatory requirements regarding promotional materials are complex, Copy Approval must specifically approve, in advance, any and all materials used to promote our products.

Materials that are created and/or distributed by sales representatives that have not gone through Copy Approval (e.g., home-made sales aids) are prohibited.  Examples of home-made sales aids include, but are not limited to: showing or distributing unapproved reprints or journal articles; writing non-administrative emails, memos or notes to healthcare professionals which mention products; creating or reproducing any other document that mentions products and is shown or distributed to a healthcare professional.

Teva employees, and any individual hired on Teva's behalf to promote our products must not alter, revise, add to, delete from or in any way modify by highlighting, underlining, adding notes with comments or deleting any portion of promotional materials that are to be left behind at a healthcare professional's office.  Promotional materials must not be photocopied or otherwise reproduced and must be current and carry the most recent package insert. Out-of-date promotional material must be destroyed.

CONFIDENTIAL – FOIA Exempt                                                                       Tev_082986

### 3.3    Interactions with Medical Science Liaisons

Medical Science Liaison (MSLs) are Medical Affairs employees who are responsible for interacting with healthcare professionals in peer to peer exchanges that provide current and comprehensive medical and scientific information.  MSLs may not engage in field activities that are promotional in support of Teva products. MSLs do not promote Teva products.

Accordingly, sales employees may interact with MSLs on only a limited basis.  A sales employee and MSL may interact to facilitate an introduction of a healthcare professional.  For example, a sales representative may be in the best position to introduce a longstanding customer to a new MSL.  However, the MSL should not "ride along" with the sales representative for any length of time.  Once the introduction is over, the sales representative and MSL should not interact together with the HCP.  Sales and marketing employees must not be present when the MSL provides a response to an unsolicited request for information (whether on or off-label).

CONFIDENTIAL – FOIA Exempt                                                                                 Tev_082987

### 3.4 Meals and Educational Items

Meals and educational items must never be given in exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or provide favorable formulary status for a Teva product. We must always engage in an informational presentation (e.g., sales calls/details, Speaker Programs and discussions at display/exhibit booths) as part of any activity during which a meal or educational item is provided to the healthcare professional. The informational presentation may take place immediately before, during or immediately after the activity and the statements we make and the materials we use must comply with the promotional materials and informational presentation guidelines stated above.

Any educational item and/or meal provided to a healthcare professional, whether In-Office or Outside-Office, whether breakfast, lunch dinner or a snack, must be properly allocated to the healthcare professional whether paid by an employee's company credit card or paid for by an outside vendor.

### 3.4.1 Meals

<u>In-Office Meals</u>

Employees can provide modest food and beverages, such as breakfast or lunch, to a healthcare professional and his/her staff as part of a planned and scheduled informational presentation (e.g., sales calls/details, Speaker Programs) at the office of that healthcare professional or in a hospital.

In-Office meals must not exceed $40 per person, including food/beverage tax and tip and must only be provided occasionally. The number of attendees at these events should be small enough and include an appropriate mix of healthcare professionals, staff and Teva employees to foster meaningful interaction.

An informational presentation must be delivered by a Teva employee either immediately before, during or after the meal. Teva employees may never order a meal and have it delivered without being present in the office.

<u>Outside-Office Meals</u>

Field-based sales representatives and/or their immediate managers may provide Outside-Office modest meals to healthcare professionals, only in conjunction with a Speaker Program. Other field-based (e.g., Area Directors, Managed Markets Account Managers) and Home Office employees may provide Outside-Office meals as part of an educational, scientific or business discussion. Entertainment can never be provided.

Outside Office meals must not exceed $125 per person, including food/beverage tax and tip and must only be provided occasionally. The venue must be conducive to the sharing of information, and must be attended by a reasonable number of people in order to foster meaningful communication that provides scientific or educational value.

8

Tev_082988

Because the purpose of an out-of-office meal is always to host a Speaker Program or to facilitate an educational, scientific or business discussion, not a social one, spouses and personal guests of healthcare professionals cannot be invited and should not attend. Employees are responsible for informing healthcare professionals of Teva's policy prohibiting guests before inviting them to the event.  If an attendee or speaker brings a spouse or other guest uninvited, employees can be courteous and permit attendance on that occasion, but employees must tell the attendee/speaker that it is against Teva policy to bring a guest and if practicable, they should not pay for the guest's meal.  However, once on notice that a healthcare professional is inclined to bring a guest, best efforts need to be made to avoid the issue in the future.

Snacks

Employees may occasionally bring snacks (e.g., bagels, coffee, cookies, candy) to a healthcare professional's office or clinic or hospital in conjunction with an informational presentation. Spending on snacks must be nominal and must be allocated like any other meal.

### 3.4.2   Educational Items

Items designed for the education of healthcare professionals and/or patients, such as textbooks, anatomical models or informational brochures, may occasionally be provided to healthcare professionals.  All such educational items must be approved by Compliance and Copy Approval.

Permissible educational items must not:

- o  be substantial in value (i.e., not to exceed $100 per healthcare professional);
- o  have independent value to a healthcare professional outside of his/her professional responsibilities (floral arrangements, artwork, music CDs, or tickets to a sporting or musical event).;
- o  be in the form of cash, personal checks, gift certificates, credit cards or other cash equivalents and
- o  be given on more than an occasional basis.

Educational items must advance disease or treatment education and cannot be practice-related items, even of minimal value. Teva employees cannot offer such non-educational items to healthcare professionals or members of their staffs, even if they are accompanied by patient or physician educational materials.

Educational items designed for use by patients to assist in the administration of their treatment or management of their condition, such as patient starter kits, may also be provided to healthcare professionals, when delivery through a healthcare professional is an appropriate method of delivery to the patient.  Items that treat side effects of a disease or drug are not appropriate educational items for patients because they are not educational in nature.

### 3.4.3   Federal Guidelines

Federal guidelines place additional restrictions on government employees regarding accepting meals and items including:

9

CONFIDENTIAL – FOIA Exempt                                                                                    Tev_082989

- o Federal employees are prohibited from directly or indirectly accepting meals and items with a market value that exceeds $20 per occasion or $50 in total by Teva as a whole per calendar year.
- o Any federal government employee with formulary decision-making authority is prohibited from attending Speaker Programs.  This could include a government healthcare professional.
- o All federal employees are prohibited under US Office of Government Ethics (OGE) rules from receiving honoraria for teaching, speaking, or writing from anyone that has interests that may be substantially affected by the performance or nonperformance of the government employee's duties.  This includes government employees that serve on a pharmacy or therapeutics committee.

The Department of Veterans Affairs publishes specific guidelines governing the process for accessing VA facilities.  Before accessing a VA facility, ensure you are familiar with both the guidelines, as well as any facility-specific rules.

### 3.4.4   State Laws

Certain state laws place additional restrictions on meals and/or items provided to healthcare professionals and/or require the reporting of items provided to healthcare professionals.

- o Minnesota's state law restricts meals and items provided to healthcare professionals. Consequently, we are limited to spending a company-wide total of $50 in meals and educational items per healthcare professional per year in Minnesota.
- o Massachusetts state law restricts meals provided to Massachusetts healthcare professionals outside of the office.  This means sales reps in Massachusetts cannot hold Speaker Programs outside of the office.
- o Vermont state law restricts providing meals and items to any Vermont healthcare professional inside or outside of the office.  Vermont sales representatives cannot bring food or items to Vermont healthcare professionals, even inside the office.

10

Tev_082990

### 3.5   Engaging Healthcare Professionals for Services

Appropriate Teva departments may engage healthcare professionals to conduct legitimate services such as advisory, speaking or consulting on the Company's behalf.

To engage a healthcare professional the following criteria must be met:

- o There is an actual, bona fide and objective business need to hire the healthcare professional.
    - o The number of healthcare professionals hired for the service is actually required to satisfy the business need.
- o The healthcare professional selected is qualified to render the services (e.g., medical or clinical knowledge, experience and background in a pertinent therapeutic area).
- o The healthcare professional selected has been chosen by Teva employees (or contractors) qualified to assess the healthcare professional's expertise and ability to effectively provide the requested services.
- o The healthcare professional is compensated for the services at fair market value and reimbursed for reasonable travel, lodging, meals and other related expenses.
    - o Compensation and reimbursement cannot vary based upon the volume or value of prescriptions written or based upon the value of any business generated between the individual and Teva.
    - o Compensation and reimbursement is not paid in the form of cash, personal checks, gift certificates, credit cards or other cash equivalents.
- o The services are obtained pursuant to a fully executed written agreement that contains the following and conforms to company policies regarding generating and completion of agreements:
    - o A description of the services to be provided;
    - o The total compensation to be paid for the services and
    - o The term of the agreement
        - ▪ If the services are to be provided on a periodic basis over time, the agreement must specify the schedule upon which the services will be provided
- o The services are not a duplication of other services but offer some real additional value to the business.
- o The services are rendered and used by the business and documented accordingly.
- o The arrangement is never used in an effort to induce, influence or reward a healthcare professional for using any Teva product or as a way to build a relationship with or to gain access to the healthcare professional.

### 3.5.1   Consultant Meetings (Advisory Boards)

<u>General Guidelines</u>

Appropriate Teva departments will engage healthcare professionals to obtain expert information for use in the business.  These consultant meetings, such as Advisory Boards, are opportunities to obtain feedback from experts and opinion leaders regarding scientific, clinical/medical, marketing strategies and/or promotional materials for which the consultants are paid a reasonable fee.  Teva will not pay consultants for the opportunity to sell or promote our products to them.

CONFIDENTIAL – FOIA Exempt

In addition to the criteria set forth above, consultant meetings must comply with the following:

- o The format and content of the meeting must be designed to solicit and receive the participants' views and opinions.
- o The purpose and objectives of the meeting/arrangement must be documented and clearly communicated to the consultants.
- o A written record of meeting activities and copies of any material obtained from the consultants (e.g., questionnaire responses) must be collected and summarized, including action steps to be taken, or not taken as the case may be, as a result of the recommendations or information obtained from the consultants.
- o Every payment that Teva makes directly to a consultant must be made under an agreement.

Consultant Selection and Meeting Logistics

When assessing whether there is a true business need for the meeting, particular attention should be paid to the selection of consultants and the location of the consultant meeting. Consultant meetings are designed to facilitate meaningful discussion and must meet the following requirements:

- o The meeting consists of an appropriate sample of healthcare professionals in a given market.
- o The number of participants is not larger than that required to accomplish that objective. Participants are not selected based on their volume of business or a "return on investment" analysis, nor should this analysis be performed for participants subsequent to a meeting.
- o Consultants are selected based upon clinical or other relevant experience or background.  Consultants are not selected because they are difficult for employees to see.
- o Only a consultant's travel-related expenses, supported by adequate, detailed receipts, are reimbursed.
- o The meetings are held in modest locations and not exotic and/or resort locales.
- o Modest meals or receptions may be provided when appropriate; however, recreation and entertainment is not allowed.
- o Depending on the size, nature, location, and length of the consultant meeting, it may be acceptable for a participant to bring a spouse or guest, at the participant's expense. However, Teva cannot invite spouses or guests to attend any Company-sponsored activities or programs and cannot pay any expenses of the spouse or guest. Employees should explain this to healthcare professionals prior to, or as part of, the invitation.

### 3.5.2  Speaker Programs

Speaker Selection, Services and Training

Teva engages healthcare professionals to speak at Teva sponsored promotional Speaker Programs regarding the use of Teva products as well as information on disease states.  The FDA regulates Speaker Programs in the same way in which advertisements and promotional materials are regulated.  Accordingly, Teva controls the content of the programs and the speakers act as agents for Teva delivering a promotional message.

CONFIDENTIAL – FOIA Exempt

Tev_082992

Speakers are selected based on defined criteria, such as their experience, knowledge and expertise in a particular therapeutic area.  Speakers will not be selected in exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or provide favorable formulary status for a Teva product.

Teva will pay healthcare professionals a fee for speaker services and for the time associated with Teva's speaker training program based on fair market value.  Teva will reimburse reasonable expenses, supported by adequate, detailed receipts, incurred by speakers during training and for the travel to/from and during speaking events.

In order to represent Teva in a promotional capacity, speakers must be appropriately trained on our products and related Speaker Program materials, as well as the on promotional regulatory requirements for communications made on behalf of Teva at Speaker Programs.

The number of speakers trained must be based on the reasonable expectation that they will be utilized as a speaker within a year.

Speakers must have at least a one-year, fully executed speaker agreement and have completed the Teva speaker training program prior to conducting any Speaker Programs.  Teva will maintain caps limiting the annual total compensation the Company pays to any individual speaker and/or the number of Speaker Programs that an individual speaker may conduct during a calendar year.

Speaker Program Execution

 The following guidelines apply for all Speaker Programs:

- o Identifications
    - o Teva must be identified as the sponsor of the program.
    - o The Speaker must be identified as presenting on Teva's behalf.
- o Attendees
    - o The number of attendees should be small enough and include an appropriate mix of healthcare professionals to foster a meaningful communication that provides scientific or educational value.
    - o The number of attendees shall also be large enough to derive the greatest possible promotional value out of the Speaker Program.
    - o Attendees must be an appropriate target audience, so personal guests or healthcare professionals who would not prescribe the promoted medication are not permitted to attend Speaker Programs.
    - o Only healthcare professionals may attend out of office Speaker Programs
- o Content
    - o The content of the presentations given by speakers during Speaker Programs must be on-label using materials approved by Copy Approval and may not be altered (i.e., add, delete, modify content).
- o Venue
    - o Speaker programs must be held in a venue conducive to delivering a structured presentation and not in a resort location.
    - o Speaker programs may occur in or out of the office.
- o Meals
    - o At all times, meals provided in conjunction with a Speaker Program must be modest and reasonable and comply with the Meals section in this policy.

13

CONFIDENTIAL – FOIA Exempt

- $40 in office per person
- $125 out of office per person
  - Sign in Sheet
    - An approved attendee sign-in sheet must fully completed and be signed by all program attendees (HCPs and non HCPs), and is considered proof that the program occurred.

If speakers receive an unsolicited request for off-label information, they may answer the question using the following guidelines:

- Inform the audience that the question relates to an unapproved use or to information not included in the approved product labeling;
- Explain that their answers are based on their own clinical knowledge and experience and do not necessarily represent Teva's view and
- State the approved indications for the product.

Depending on the therapeutic area/product, it may be appropriate for a Teva sales employee to be trained to act as a speaker and conduct Speaker Programs. The policies above apply to Teva employee led Speaker Programs and they too are regulated by the FDA. Teva employee led Speaker Programs, however, have different materials tailored to delivery by a Teva employee rather than a clinician. Additionally, sales employees are not permitted to answer off-label questions and must instead submit a MIRF.

### 3.5.3   Healthcare Professional-Led Training Programs

Teva is committed to having an educated sales force with relevant and current clinical insight pertaining to the therapeutic practice areas in which our products are marketed. Healthcare professionals may be engaged to train our employees on the role Teva's products may play in a clinical practice setting.

Teva may also engage qualified medical institutions to provide our employees with training on specific products, therapeutic categories and clinical practice in the form of residency programs. Typically, these programs are conducted for small groups of employees and include both a classroom component and patient case studies.

All such training programs must be approved by Sales Training to ensure they are in line with sales training curriculum.

### 3.5.4   Medical Affairs Research Programs

Teva often hires and collaborates with healthcare professionals to conduct post-marketing clinical trials and other types of research studies. These programs include Phase IV clinical trials, epidemiologic and observational studies, patient reported outcomes and clinical effectiveness trials, pharmaco-surveillance and other kinds of studies in which a Teva drug or licensed drug is, or has been administered, dispensed or prescribed to patients. These studies have as their goal the gathering of additional information and generation of new data about the disease states and patient populations our drugs are indicated in and a broader understanding of the clinical utility of our drugs in these patient populations.

CONFIDENTIAL – FOIA Exempt                                                                          Tev_082994

Medical Affairs studies are not sales and marketing tools.  Teva will not undertake studies in order to pay healthcare professionals to use our products.   To ensure their scientific integrity, these studies must be initiated by and performed under the direction of Medical Affairs.

Sales and marketing personnel cannot select investigators.  Sales representatives may only respond to questions regarding ongoing Medical Affairs trials or healthcare professional requests to participate in studies by referring the investigator to the Teva website or Medical Affairs.

Medical Affairs also manages Teva's Investigator Sponsored Studies (ISS) Program, which supports independent, investigator-initiated research projects by supplying study drug and/or funding for those proposals that are approved by the ISS Review Committee.  If healthcare professionals inquire about potential opportunities through the ISS Program, the employee should direct them to the Teva website, which contains a link to the ISS page where they can receive information and submit their proposals.  The employee can also contact Medical Affairs, who can assist in discussing the ISS Program with potential investigators.

CONFIDENTIAL – FOIA Exempt

Tev_082995

## 3.6      Interactions with Patients

### 3.6.1   Privacy Guidelines

Teva is committed to protecting the privacy of personal health information and cooperating with healthcare professionals in their efforts to comply with the Health Insurance Portability and Accountability Act (HIPAA) and any state laws governing protection of personal health information. Increasing our sensitivity to our customers' privacy concerns is critical to maintaining their trust — and their patients' trust.

The HIPAA Privacy Rule is a federal law designed to protect the privacy of patient health information. It restricts the ways in which an individual's health information can be used and disclosed. The Privacy Rule directly affects covered entities including:

- health care professionals (e.g., physicians, nurses, hospitals, nursing homes, skilled nursing facilities, outpatient surgical centers, health clinics);
- health plans and
- health care clearinghouses (e.g., certain claims processors).

Teva and Teva employees are not considered covered entities. This means that we are only indirectly affected by the Privacy Rule and that we are not required to implement the regulatory requirements associated with HIPAA.   However, we have to handle Protected Health Information (PHI) we obtain (directly or indirectly) appropriately.

PHI is any information that identifies an individual (or that could be used to identify an individual) and relates to the individual's health, health care services or payment for health care services. The Privacy Rule protects PHI in any form, whether electronic, paper, or oral.

Examples of PHI include:

- Name
- Biometric identifiers
- Full face images
- Geographic subdivisions
- Dates
- Social Security number
- Phone, FAX
- E-mail, IP, URL
- MR, health plan number
- Account number, certification, license
- Vehicle identifiers
- Device identifiers
- 

Our Commitment to Privacy

Although Teva is not a covered entity under the Privacy Rule, our customers are. With this in mind, we have adopted policies, procedures, and practices that will facilitate and promote our customers' compliance with the Privacy Rule.  It is part of our commitment to our customers to assist them with complying with HIPAA by being able to identify PHI and handle it appropriately.

16

CONFIDENTIAL – FOIA Exempt                                                                          Tev_082996

Interactions with Healthcare Professionals

HIPAA allows Teva employees to interact with physicians and other customers and provide them with information on our products and discuss their experiences using the products. During that interaction, healthcare professionals may share case histories, anecdotes and hypothetical situations where PHI may potentially be disclosed.

Additionally, sales representatives will often need to approach physicians in a clinical setting (e.g., sign sample requests) where you may interact with patients. However, you should avoid approaching physicians when they are consulting with patients.

Employees who may potentially have access to patient-specific information must:

o   Raise the issue of patient confidentiality with the physician before the start of any activities that may entail patient contact;
o   Respect the right of patients to keep their health information confidential and the physicians' duty to meet their obligations under applicable privacy regulations;
o   Not make or keep any type of notes, including hand-written or computer notes, of any patient health information with which they may inadvertently come into contact;
o   Never handle or review a patient's chart;
o   Never observe a physician-patient interaction without that patient's explicit written consent; and
o   Ensure that any patient he/she works in the presence of understands that he/she is a Teva employee and is not a member of the doctor's staff or part of a treatment team.

If you overhear or accidentally view PHI, this is not necessarily a violation of the Privacy Rule. You may overhear or obtain PHI incidentally by hearing a receptionist call a patient's name or seeing a sign in sheet.  Covered entities are required only to take reasonable precautions, not to prevent all inadvertent disclosures of PHI. You must treat this information as PHI and follow the requirements above.

Accessing Patient Information

It is appropriate to access patient information or observe treatment when the healthcare professional has obtained any required authorization from the patient who is involved.
In certain situations, sales employees may be asked to obtain PHI. Before you can directly receive PHI, you must present a Confidentiality Agreement, prepared by the Legal Department, to the healthcare professional.

In no circumstance should you sign a Business Associates Agreement in lieu of our Confidentiality Agreement.   Business associates are individuals or entities that assist the covered entity in the performance of certain functions or activities involving the use or disclosure of PHI. Under the Privacy Rule, covered entities must enter into agreements that require their business associates to keep PHI confidential. These agreements also require business associates to use the PHI they receive only for the purpose of providing a service or performing a function on behalf of the covered entity.

The Privacy Rule also allows covered entities to disclose PHI to a sales representative in order to report an adverse event, defect or problem related to a drug or biologic that is regulated by the FDA. Patient authorizations are not necessary for such disclosures. You should follow Company policies with respect to adverse event reporting.

17

CONFIDENTIAL – FOIA Exempt                                                            Tev_082997

There may be an opportunity to observe patients in a clinical setting as part of a training program. Even when you merely observe patient care, you will almost certainly have access to PHI. Under HIPAA, a healthcare professional may not permit you to observe patient care without obtaining prior written authorization from each patient.  Generally, you should avoid speaking with patients or asking them questions. Obviously, a patient may speak to you or ask questions, but you should try not to interfere in the treatment activity.

### 3.6.2   Appropriate Conversations with Patients

Teva employees may come into contact with patients at healthcare professionals' offices or during promotional activities (e.g., walks or galas where Teva employees are present promoting).  You are permitted to speak with patients; however, you may not discuss how a Teva product may treat the patient's disease state – you could inadvertently be engaging in the practice of medicine.  Even if you know the answer to a patient's question, you must refer the patient to his or her healthcare professional for any treatment related discussion.

You may participate in a social conversation and indicate you are a Teva employee and acknowledge that you sell a particular product.

Copy approved promotional and educational materials for patients should be given to the healthcare professional to provide to the patients for educational purposes. You should not discuss the content in the patient materials with the patient yourself.

### 3.6.3   Engaging Patients

Like with healthcare professionals, appropriate Teva departments may engage patients to conduct legitimate services such as advisory, speaking or consulting on the Company's behalf. To engage a patient, all of the requirements under the "Engaging Healthcare Professionals" section must be met (e.g., legitimate business need, fair market value payment, written agreement, etc.).

18

CONFIDENTIAL – FOIA Exempt

### 3.7 Educational Grants and Charitable Donations

### 3.7.1 Educational Grants

Teva often receives grant requests from healthcare organizations or institutions to provide financial support to fund Independent Medical Education initiatives. Programs may be accredited, such as Continuing Medical Education (CME) or Continuing Education (CE), or unaccredited, such as grand rounds, fellowships, or enduring material.

Independent Medical Education programs are intended to enhance a healthcare professional's ability to care for patients. They are typically peer-to-peer activities, sponsored by an organization that is recognized as customarily conducting such programs. All such programs supported by Teva must be independent, objective, balanced and reflect scientific rigor in content. In sum, they must remain free of all commercial influence.

For accredited programs, under an approved and signed agreement, Teva may provide educational grants that follow the principles outlined in the Accreditation Council for Continuing Medical Education (ACCME) or equivalent standards (e.g., CE) for commercial support of CME. To remain independent and not subject to FDA regulations for promotion, the provider organization must retain sole responsibility for, and control over, the selection of faculty, development of educational objectives and content and materials for the CME program. Accreditation for CME credit adds an additional level of evidence that the program is independent of commercial influence.

Although a CME provider may, at its own discretion, apply Teva's funding to participant meals, Teva will not sponsor or host a meal directly at a CME event.

Requests are made through the Teva Request Management system by the requestor. The review and approval process, including all funding decisions for proposed grants, is the responsibility of the appropriate Grant Review Committee (Medical, Legal and Compliance) which is separate from Sales and Marketing.

Activities funded by grants are not promotional in nature. Teva will never award educational grants in exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or provide favorable formulary status for a Teva product.

Teva's decision to fund grants and donations will be made without any commercial influence. The review committees that have been put in place do not include any sales or marketing employees.

In order to ensure the independence of all Independent Medical Education programs, under no circumstances should sales or marketing employees engage in any discussion with healthcare professionals, organizations or institutions about potential independent medical education programs to include:

- o Facilitation of the grant application in any way;
- o Provide suggestions for speaker selection and/or development of content;
- o Give any indication as to the probability of a grant request being approved;
- o Ask for exhibit space or invitations for Teva employees to attend a program;

19

Tev_082999

- o Check on the status of the grant request submission on behalf of a requestor and
- o Discuss Teva's products or the content with attendees.

Sales and Marketing employees may, however:

- o Direct a healthcare organization/institution to www.tevagrants.com to make a request for funding
- o May attend educational events, subject to their Manager's approval, but may not ask questions, discuss the program or engage in sales activities while in the room where the event takes place.
- o Participate in a commercial exhibit associated with an Independent Medical Education activity. No commercial promotional materials shall be displayed or distributed in the same room immediately before, during or immediately after an educational event, and such promotional activities must not be in a direct path to the room where the education program is occurring.
- o Distribute invitations or Business Reply Cards (BRCs) only if (a) the CME provider requests Teva's help in writing, and (b) the distribution of invitations or BRCs has been approved by Teva.

### 3.7.2  Charitable Donations

Teva supports charitable organizations and events in order to provide access to high-quality healthcare, especially to those who need it the most. Through our Corporate Charitable Donation Program, we provide funding to qualified non-profit organizations to improve the overall health and well-being of our communities.

Organizations eligible for charitable donations include, but are not limited to hospitals, universities, patient groups and other organizations that qualify for tax-exempt status under the U.S. Internal Revenue Code.

Organizations seeking charitable donations must submit a written request to the Teva Request Management system that includes a description of the organization and/or the event/program that the donation will be supporting and a cost breakdown setting out how the organization intends to use the donation. The review and approval process, including all funding decisions for proposed donations, is the responsibility of the appropriate Review Committee (Corporate Responsibility, Medical Advocacy, Medical Affairs and/or Compliance) which is separate from Sales and Marketing.

Organizations and events themselves funded by charitable donations are not promotional in nature. Promotional support may, however, be paid to a charitable organization in exchange for the ability to promote consistent with the principles below. Teva will not award charitable donations in exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or provide favorable formulary status for a Teva product.

CONFIDENTIAL – FOIA Exempt

Tev_083000

### 3.8    Promotional Support

Sales and marketing employees may chose to offer promotional support to healthcare organizations or institutions in exchange for the ability to promote Teva or Teva products at the event.   Promotional support may be paid to fund booth space with the ability to promote products, distribute promotional material, wear brand or logo clothing and display company or brand signage at CME programs (in designated exhibit hall) or non CME programs, walks/runs, etc.

Promotional support may not be paid to fund: specific CME credits or courses; entertainment (sporting events, shows); honorarium, travel, expenses for faculty or attendees; etc.

Compliance will review requests for promotional support in the amount of $5001 and more to ensure the fee is being properly assessed.  However, Compliance and Corporate Responsibility will review and approve any request for promotional support that ultimately goes to a charitable organization (that qualify for tax-exempt status under the U.S. Internal Revenue Code), regardless of the amount.

CONFIDENTIAL – FOIA Exempt

Tev_083001

### 3.9     Reimbursement, Billing Codes and Price

### 3.9.1   Reimbursement Discussions

Sales representatives may proactively discuss on-label reimbursement issues with healthcare professionals and other staff who are involved with reimbursement. Any such discussion must be based on either Copy Approved pieces or on-label reimbursement information that is provided/approved by Managed Markets. In addition, sales representatives may only distribute reimbursement material that has been approved for that purpose by Copy Approval.

Some divisions, depending on the type of product, utilize reimbursement hotlines as a resource to assist patients and healthcare professionals with reimbursement issues related to Teva's products.  This service provides information regarding insurance coverage, reimbursement and limitations and can assist with the prior-authorization and denied claims process.

If a healthcare professional or other staff requests reimbursement coverage information beyond that which sales representatives can speak to, the sales representative should either refer the healthcare professional to the appropriate reimbursement hotline, refer the healthcare professional to the third party payor and/or offer to bring in an Account Manager from Managed Markets.

Teva does not conduct appeals for denied claims, as the responsibility for obtaining prior authorization and seeking appeals rests with the patients and healthcare professionals.  We can, however, when requested, provide support for the appeals process.

In response to a specific unsolicited question or comment from a healthcare professional about a denied claim, the sales representative may obtain the reimbursement form, such as a letter or denied prior authorization, from the healthcare professional, as long as such material is HIPAA-compliant.  HIPAA-compliant means that all patient identifiable information must be omitted or blocked by the office prior to the sales representative seeing the document.  The sales representative may not discuss the claim denial with the healthcare professional and must forward the HIPAA-compliant material to Managed Markets.

If Managed Markets identifies an administrative error that was made by the healthcare professional, an Account Manager may contact the healthcare professional and point out the administrative error. The Account Manager may also discuss the general components of the prior authorization, appeal and external review process; however, he/she may never discuss any coding or reimbursement strategies with the healthcare professional. The Account Manager may also contact the Plan if he/she believes that the Plan is not following its own policy.

### 3.9.2   Diagnosis Code Information and ICD-9 Codes

Accurate diagnoses, procedure and product coding is essential to ensure proper reimbursement.  Various billing codes are publicly available and used to report drugs, supplies and services.

Sales representatives may only discuss billing codes that are contained in Copy Approved materials and cannot otherwise suggest codes or diagnoses to obtain reimbursement. Healthcare professionals with questions about coding should be referred to their own coding book or to reimbursement hotlines for the applicable product.

22

### 3.9.3   Pricing, Discounts and Rebates

It is appropriate to quote wholesale acquisition cost of a product if a healthcare professional requests this information, because it is publicly available information.  It is also appropriate to state what a cash paying patient's price would be at a certain pharmacy, if known.

Discount and rebate programs may be initiated by Marketing.  Sales representatives may only discuss certain discount programs contained in approved (e.g., materials approved by Copy Approval and/or term sheets approved by Legal).

Sales representatives should never discuss a combination of pricing, reimbursement and/or discount programs that would enable a healthcare professional to make money on prescribing a certain product.

CONFIDENTIAL – FOIA Exempt

Tev_083003

**3.10   Samples**

Teva provides free drug samples to appropriately licensed healthcare professionals to allow them to try the product with their patients who may benefit from the medication.  To ensure compliance with the Prescription Drug Marketing Act (PDMA), Teva employees must abide by the following principles:

- o  Samples may only be distributed to appropriately licensed or authorized healthcare professionals.
- o  Signed requests for samples must be accurately recorded and obtained in the presence of the licensed healthcare professional.
- o  Samples are not provided to induce a healthcare professional to purchase or prescribe a Teva product for any purpose other than a patient's healthcare needs.
- o  Samples cannot be provided for the personal use or benefit of a healthcare professional.
- o  Samples cannot be bought, sold, traded, or submitted to third party payors for reimbursement
- o  Samples cannot be used to promote any off-label or unapproved use of a Teva product.

24

**4      RESPONSIBILITY**

Compliance will update this policy, when appropriate.

---

**Approving Vice President:**          **Michael Dearborn**

CONFIDENTIAL – FOIA Exempt

Tev_083005

# EXHIBIT A-5

| | |
|---|---|
| **From:** | Jennifer Clark |
| **Sent:** | Friday, July 24, 2015 8:25 PM |
| **To:** | Chris Gumbs; Vince Loucks; Jay Simpson |
| **Cc:** | Barry Oberkrom; Machelle Henks |
| **Subject:** | RE: Medicare Patient Assistance |

I would say that adherence is pretty strong for patients who are receiving assistance, very similar to our other coupon programs or financial qualification programs.  Getting started is usually the hardest piece for the assisted patients because they may have to wait for foundations to receive funding.  I would think adherence would be tougher for those patients who do not qualify for assistance.  The LIS patients have been pretty adherent as well when they've been filling with the specialty pharmacies.

  **Jennifer Clark, CPA**   Associate Director, Patient Services & Support
Tel: 913-777-3949      Cell: 816-332-2873
Jennifer.Clark@tevapharm.com    www.tevapharm.com

---

**From:** Chris Gumbs
**Sent:** Thursday, July 23, 2015 9:07 PM
**To:** Jennifer Clark; Vince Loucks; Jay Simpson
**Cc:** Barry Oberkrom; Machelle Henks
**Subject:** RE: Medicare Patient Assistance

Thanks all, this is quite clear.

I guess it would be nice to know what avg. adherence looks like for Copaxone Med-D patients?  Do we see the effect on scripts during this donut hole period around Month 2 or 3?  Given the price of Copaxone they should be out of the Donut Hole by month 3-4 given the logic below?

Where does LIS enter into the equation below?

Best regards,

**Chris Gumbs**   Sr Mgr, CNS Marketing Huntington's Disease
Tel: +1-913-777-3396     Cell: 816 728-7142    Fax:
Chris.Gumbs@tevapharm.com    sip:Chris.Gumbs@tevapharm.com    www.tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Thursday, July 23, 2015 2:25 PM
**To:** Vince Loucks; Chris Gumbs; Jay Simpson
**Cc:** Barry Oberkrom; Machelle Henks
**Subject:** RE: Medicare Patient Assistance

That's a great illustration below.  Most of the Copaxone patients land in the donut hole in months 2 or 3, similar to what it shows below & similar to what I would anticipate for this product.  You are correct, that we cannot directly help any government patient with their OOP costs, so this is a product that is a great candidate for getting a foundation started for this disease state.  We could then make donations to that foundation & patient services could help patients identify plans that best meet their needs & refer them to 3rd parties who could help the patients find funding.  Based on what I've heard, the foundations appear to help patients regardless of the reason they were prescribed the product, as long as the payer has agreed to pay for it.

**Jennifer Clark, CPA**   Associate Director, Patient Services & Support
Tel: 913-777-3949      Cell: 816-332-2873
Jennifer.Clark@tevapharm.com    www.tevapharm.com

---

**From:** Vince Loucks
**Sent:** Thursday, July 23, 2015 1:47 PM
**To:** Chris Gumbs; Jay Simpson; Jennifer Clark
**Cc:** Barry Oberkrom; Machelle Henks
**Subject:** RE: Medicare Patient Assistance

Hey,

Long email, but below is some info regarding the Out of Pocket (OOP) for MPD.  Patients will hit the donut hole after $2960.

The "defined standard plan" for Medicare Part D is depicted below.  While only a couple percent of people actually have this type of plan, all other Part D plans are actuarial equivalents so the amounts should be in the ballpark.  Each individual Medicare Plan will differ, but this gives you an idea.

We can have a whole meeting on how MPD works and the impact of the donut hole.  Travis Kenney found the graphic and provided the explanation below.  You are correct on earlier points that we cannot provide direct patient assistance to a Medicare patient (no coupons or direct PAP).

| Patient responsibility: | Running Total |
|---|---|
| Deductible: $320 | $320 |
| Initial Coverage Phase: $740 (shown in the graph below) | $1060 (this is the 320 + 740) |
| Donut Hole: ~$1675 (assuming only branded products) | $2735 (1060 + 1675) |
| Catastropic Coverage: $6.60 or 5% (whichever is MORE) | |

There is no MOOP (Max out of pocket) because they would continue to pay the 5% in catastrophic coverage.

1

CONFIDENTIAL – FOIA Exempt

Tev_191697



Best regards,

**Vince Loucks**  Health Systems Marketing
Tel: +1-913-777-3075    Cell: 816 591-7286    Fax:
Vince.Loucks@tevapharm.com    www.tevapharm.com

---

**From:** Chris Gumbs
**Sent:** Wednesday, July 22, 2015 8:41 AM
**To:** Jay Simpson; Jennifer Clark
**Cc:** Barry Oberkrom; Vince Loucks; Machelle Henks
**Subject:** RE: Medicare Patient Assistance

Jay – Thanks – We are entering a high unmet need market with competition only coming from genetic Tetrabenazine.  If there are several generics (we only expect a few) then competition could be stiff.  But from initial interviews with PBMs and smaller payers we hear that this drug would be put on Tier 4 Specialty along with genetic Tetrabenazine and that some plans would require a soft step and some would not.  All plans will have a PA to label.

We have to be covered so essentially whatever it takes to ensure we don't enter that Not Covered status will be necessary.

I understand from Barry that most Medicare-D is moving to Co-Insurance and that the Max OOP are going up.

I need a clear picture of what the avg. Medicare 1 year journey for a Med-D patient on SD809 looks like:

- Start drug Month 1 – Monthly WAC Cost ~$10,000 – 25% Coinsurance (is this avg.?) – Patient OOP max $250 (Is this avg.?)
    o   Avg. patient would enter the donut hole in month 1?
    o   What does the process like on our end and on the patient's end for moving the patient through the donut hole and what happens if the $250 is too expensive for the patient?
- What happens in Month 2?
- Month 3…..?

Best regards,

**Chris Gumbs**  Sr Mgr, CNS Marketing Huntington's Disease
Tel: +1-913-777-3396    Cell: 816 728-7142    Fax:
Chris.Gumbs@tevapharm.com    sip:Chris.Gumbs@tevapharm.com    www.tevapharm.com

---

**From:** Jay Simpson
**Sent:** Tuesday, July 21, 2015 5:18 PM
**To:** Chris Gumbs; Jennifer Clark
**Cc:** Barry Oberkrom; Vince Loucks; Machelle Henks
**Subject:** RE: Medicare Patient Assistance

I will take a stab at the first question below.

It may make sense to rebate a specialty product. (ie Copaxone as an example).  Even if all products end up in the same tier, there are normally steps and PA's that distinguish between what is preferred and non-preferred.  A lot will hinge on how competitive the market place is, and if we are unique and have little direct competition, the need to contract may be lower.

CONFIDENTIAL – FOIA Exempt

Tev_191698

Remember that is the only difference may not just be to be preferred or non-preferred.  There is also the option of a plan moving a product to Not Covered status which would mean cash pay.  Part D plans have been using this tactic more and more to wring additional rebates out of products.  In addition, if you are not covered, you would lose access to LIS (Low income Subsidy) patients where the Copay is very low (normally about $6) and you always want to make sure you have access to LIS patients.

Again, however, it will more come down to whether you have competition in the market basket or not on whether you will get non-preferred status without contracting or if you have to pay to eliminate the Not covered status. From what I understand you are probably going to be okay without contracting.

*Jay Simpson*
Pricing and Contracting – US Market Access, Teva Brand Products
Tel: 913-777-3074,  Cell: 816-520-1909
Jay.Simpson@tevapharm.com    11100 Nall Ave, Overland Park, KS 66211

---

**From:** Chris Gumbs
**Sent:** Tuesday, July 21, 2015 1:44 PM
**To:** Jennifer Clark
**Cc:** Barry Oberkrom; Jay Simpson; Vince Loucks; Machelle Henks
**Subject:** Medicare Patient Assistance

Hey Jennifer and Access Colleagues – I'm trying to get a better feel for contracting and patient assistance will work re: Medicare patients for SD-809, please review my questions below and shoot me your answers in Red.  If you can't put this down on paper, please give me a call and we can discuss live.

- Does it make any sense to rebate Medicare-D plans for an expensive specialty drug like this or are we just going to end up on Tier 4 specialty at the end of the day not matter what?
- Is the only PaP provided to Medicare patients (by Teva) what patients are able to get from foundations to which we donate? i.e. no coupons in Medicare, no direct Donut Hole assistance etc.
- If Legal and Compliance tell us that we can NOT offer PaP to off-label patients, what does this mean, if anything, for our off-label Medicare-D patients?
    - It would seem that if all assistance comes from foundations then the treatment of off/on –label in Medicare would be the same….?

Best regards,

**Chris Gumbs**   Sr Mgr, CNS Marketing Huntington's Disease
Tel: +1-913-777-3396    Cell: 816 728-7142    Fax:
Chris.Gumbs@tevapharm.com    sip:Chris.Gumbs@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

Tev_191699

# EXHIBIT A-6

# SERVICES AGREEMENT

This Services Agreement (the "Agreement") is made as of the first day of October, 2006 (the "Effective Date") by and between TEVA Neuroscience, Inc., a Delaware corporation, located at 901 E. 104th Street, Suite 900, Kansas City, Missouri 64131 ("TEVA"), and Advanced Care Scripts, Inc., a Florida corporation located at 3160 Southgate Commerce Blvd., Suite 60, Orlando, Florida 32806 ("ACS").

## RECITALS

WHEREAS, in preparation for implementation of the Medicare Part D Program in 2006, TEVA engaged and trained a group of outside contractors and associates to assist Medicare-eligible COPAXONE® patients with (i) the financial evaluation of Medicare Part D Plan offerings based on the prescription drugs the patient was then using or planning to use, and (ii) with the search for financial assistance programs when necessary;

WHEREAS, TEVA is unable to support such an effort internally this year, and it is anticipated that there will be many changes to the Medicare Part D Plan offerings;

WHEREAS, TEVA desires to engage ACS to provide those benefit investigation services for Medicare-eligible individuals identified by TEVA who are taking COPAXONE®, or are contemplating initiating therapy with COPAXONE® ("Patients") who express a desire for such assistance, under the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth below, TEVA and ACS, hereby agree as follows.

## 1. SCOPE OF SERVICES

1.1 During the term of this Agreement, ACS shall provide benefit investigation services designed to assist Patients identified by TEVA with the evaluation of Medicare Part D Plans and sources of financial assistance where appropriate as described in Exhibit A attached hereto and incorporated herein (the "Services").

1.2 ACS shall provide necessary personnel, facilities, equipment and supplies required for fulfillment of its obligations under this Agreement. In fulfilling its obligations hereunder, ACS shall employ only persons with the appropriate knowledge, training and qualifications to perform the Services hereunder.

1.3 ACS agrees to comply with all licenses, regulations and laws applicable to the Services including all applicable federal, state and local laws including, for example, those concerning fraud and abuse in the health care industry, telephone, fax and e-mail communications, and the health information privacy regulations promulgated under the provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

## 2. TERM AND TERMINATION

2.1 <u>Term</u>. This Agreement shall be effective on the Effective Date and shall continue in full force and effect for a period of one (1) year unless earlier terminated as provided herein.

ACS/Teva Agreement 9-26-06                             1

CONFIDENTIAL - FOIA Exempt                                                            Tev_290261

2.2    TEVA's Right to Terminate Without Cause. TEVA shall have the right to terminate this Agreement at any time without cause upon thirty (30) days written notice to ACS.

2.3    TEVA's Right to Terminate Due to Regulation. TEVA shall have the right to immediately terminate this Agreement in the event the Federal Food and Drug Administration or Centers for Medicare and Medicaid or any other regulatory agency prohibits the Services which form the basis of this Agreement or by their intervention make the Services contained herein unfeasible or if TEVA withdraws a product which forms the basis of this Agreement.

2.4    Termination Upon Bankruptcy or Insolvency. In the event either party becomes insolvent, makes an assignment for the benefit of creditors, files a petition for bankruptcy, is the subject of a petition in bankruptcy which is not dismissed within sixty (60) days from the filing thereof, becomes the subject of any receivership proceeding or admits in writing its inability to pay its debts generally as they become due, the other party may immediately terminate this Agreement by written notice of termination to the other party.

2.5    Termination for Material Breach. If either party commits a material breach of any provision of this Agreement or at any time fails or refuses to fulfill obligations hereunder, the non-breaching party may give the breaching party notice specifying in reasonable detail the breach and requesting that the breach be cured . If the breach is not cured within 10 business days after written notice of such breach, the non-breaching party shall have the right to terminate the Agreement effective upon notice to the breaching party and to exercise all rights and remedies.

2.6    Effects of Termination. In the event of early termination as provided in this Article 2, TEVA's liability for payment shall be limited to payment for Services rendered or expenses incurred by ACS prior to the effective date of termination as specified in the notice. ACS agrees to provide an efficient and complete transfer of case files and work on case files associated with the Services to TEVA and/or its designated representative.

3.    COMPENSATION AND PAYMENT

3.1    Compensation. TEVA shall pay ACS compensation for the Services performed by ACS as set forth in Exhibit A. Such compensation may be modified only upon the prior written agreement of the parties. Should the scope of Services as set forth in Exhibit A be expanded, resulting in any change in compensation, both parties shall agree in writing prior to services commencing.

3.2    Invoicing and Payment. ACS shall submit an invoice to TEVA within fifteen (15) days following the end of each calendar month. Each such invoice will be accompanied by a report in a form mutually agreed upon detailing the computation of the compensation for the calendar month covered by such invoice and including information such as MRN, Part D Plan in which the patient enrolled, whether the patient qualified for the Medicare low income subsidy, and whether the patient qualified for other assistance programs. Payment shall be made to ACS within ten (10) days after receipt of an invoice. In the event there is a disputed charge, payment for that portion of the invoice shall be withheld, pending resolution of the dispute.

3.3    Expenses. Except for expenses approved in advance by TEVA, ACS shall be responsible for all costs and expenses incurred by ACS and its approved contractors in performing the Services.

4.    SUB-CONTRACTING

4.1    ACS shall not utilize any sub-contractors to perform Services without the prior written consent of TEVA. In the event ACS utilizes independent contractors approved by TEVA to perform certain

ACS/Teva Agreement 9-26-06                    2

CONFIDENTIAL - FOIA Exempt                                                    Tev_290262

portions of the Services, ACS shall be responsible for the quality of the Services performed by the independent contractors and for the payment of the independent contractors.

## 5. CHANGES AND MODIFICATIONS

5.1     The parties may at any time change the extent of the Services covered by this Agreement. In the event this change causes an increase or decrease in costs, then an equitable adjustment of the compensation to be paid to ACS shall promptly be negotiated by TEVA and ACS.

## 6. INDEMNIFICATION

6.1     ACS will indemnify and hold TEVA harmless from and against any and all claims, demands, liabilities and causes of action (including costs and reasonable attorney's fees) of third parties arising from or based upon (i) a breach of this Agreement, or (ii) negligent or intentional acts or omissions of ACS or its agents or employees related to this Agreement, provided that ACS will have no liability to Teva under this paragraph unless ACS is promptly notified in writing of all claims asserted and actions instituted against TEVA and is given the opportunity to defend the same at its own cost and expense.

6.2     TEVA will indemnify and hold ACS harmless from and against any and all claims, demands, liabilities and causes of action (including costs and reasonable attorney's fees) of third parties arising from or based upon negligent or intentional acts or omissions of TEVA or its agents or employees related to this Agreement, provided that Teva will have no liability to ACS under this paragraph unless Teva is promptly notified in writing of all claims asserted and actions instituted against ACS and is given the opportunity to defend the same at its own cost and expense.

6.3     This provision does not require a party to indemnify, defend or hold harmless the other party (including costs and reasonable attorney's fees) for any actions or conduct of the other party giving rise to liability, and nothing in this Article 6 shall be construed to transfer to the indemnifying party any liability for any acts or conduct of the other party.

6.4     The obligations of the parties pursuant to this Article 6 shall survive completion or termination of this Agreement.

## 7. CONFIDENTIALITY

7.1     Definition of Confidential Information.  As used herein, "Confidential Information" shall mean information, in whatever form, verbal or written, disclosed or becoming known by one party to the other in connection with ACS' provision of Services under this Agreement, including but not limited to patient information, except:

(a)     information that is or becomes publicly known or available through no breach of this Agreement;

(b)     documented information from a source other than the other party hereunder that is rightfully in each party's possession prior to the effective date of this Agreement;

ACS/Teva Agreement 9-26-06                    3

(c)      information that is disclosed to either party by a third party unless such disclosure constitutes, or either directly or indirectly results from, a breach of any agreement to which ACS or TEVA is a party; and

(d)      information that is independently developed or acquired by the other party without violating any provision of this Article 7.

7.2      Confidentiality Obligation.      The parties agree that they will make reasonable efforts to maintain all Confidential Information in strict confidence and that neither will permit Confidential Information in its possession to be disclosed to any third party or used for any purpose except to carry out the Services hereunder unless otherwise authorized by the disclosing party.  As outlined in Exhibit A, ACS shall follow strict security measures in maintaining patient information.

7.3      Required Disclosure.      If either party is required to disclose the Confidential Information of the other party as part of a judicial process, government investigation, legal proceeding, or other similar process, the recipient, if reasonably possible to do so, shall give prior written notice of the disclosure requirement to the other party.  Reasonable efforts shall be made to provide such prior written notice in sufficient time to allow the other party to seek an appropriate protective order or modification of any such required disclosure.

7.4      Destruction of Confidential Information. Upon request by either party, the receiving party will destroy or erase all copies of any Confidential Information supplied to it unless it is unlawful to do so.

7.5      Entity Responsibility.   The obligations contained in this Agreement shall extend to and be binding upon any employee, affiliate or consultant of the party who has access to Confidential Information pursuant to this Agreement.  Each party agrees that each of its employees, affiliates, and consultants who are granted access to the Confidential Information shall be subject to an obligation of confidentiality and nondisclosure with respect to the Confidential Information.

7.6      No Transfer of Rights.   No property, license, right or immunity, express or implied, shall arise from, or be derived by either party under this Agreement for commercial use of any Confidential Information now or hereafter owned or controlled by the other.

7.7      Survival.      The obligations of confidentiality established herein shall continue in full force and effect for a period of ten (10) years following the expiration or other termination of this Agreement.

## 8.      OWNERSHIP

8.1      TEVA Proprietary Property.      Except as otherwise provided by, and subject to the provisions of, this Article 8, TEVA shall own all rights, title and interests in and to (a) the data and information specific to the Services, including but not limited to, data regarding patients contacted in connection with the Services, that is (i) collected by ACS pursuant to this Agreement, (ii) provided to ACS by TEVA or TEVA vendors; (iii) reported by ACS to TEVA in its reports hereunder, or (iv) contained in any database used by ACS to conduct the Services and (b) all TEVA copyright materials, trademarks, tradenames and servicemarks (collectively, "TEVA Proprietary Property").  Unless required by law or agreed to in writing by TEVA, ACS shall maintain as Confidential Information and shall not provide to any third party or use for any purpose other than in connection with the Services provided hereunder any TEVA Proprietary Property or any information contained in ACS's case notes prepared hereunder without TEVA's prior written

ACS/Teva Agreement 9-26-06                              4

CONFIDENTIAL - FOIA Exempt

Tev_290264

consent. Notwithstanding the foregoing, ACS may provide to third party sources of patient assistance funds the patient information necessary to apply for such funds, provided that the patient has given consent.

8.2     ACS Proprietary Property. Notwithstanding any other provisions of this Agreement, ACS retains all right, title and interest in and to the (i) proprietary programs, processes or other materials owned by ACS, (ii) all ACS copyright materials, trademarks, tradenames and servicemarks, and (iii) nonpublic information designed or developed independently by ACS other than such data specific to the Services which is owned by TEVA pursuant to Section 8.1. Such materials shall be ACS' proprietary property (collectively, "ACS Proprietary Property"). Unless required by law, TEVA shall maintain in confidence and shall not provide to any third party or use for any purpose (other than TEVA's internal purposes in connection with the Services and its business) any ACS Proprietary Property without ACS' prior written consent.

8.3     Joint Developments. In the event that the parties desire to jointly develop a proprietary program, process or invention, the parties shall negotiate in good faith regarding the funding of such jointly developed program, process or invention and ownership and use rights with respect to such jointly developed program, process or invention prior to undertaking such joint development effort.

9.     WARRANTIES AND REPRESENTATIONS

9.1     TEVA and ACS each warrant and represent to the other that each has the authority to enter into this Agreement and to perform all obligations hereunder, and that the person whose signature appears below is duly authorized to enter into this Agreement on behalf of the party for whom such person is signing.

9.2     TEVA and ACS each warrant and represent to the other that the compensation described in this Agreement is based on the fair market value of the Services, and no other compensation of any type is being provided.

9.3     ACS warrants and represents that the Services shall be conducted in accordance with the specifications outlined in Exhibit A. ACS further warrants and represents that it shall perform all Services in a professional and ethical manner.

9.4     ACS warrants and represents that it neither has nor will enter into any arrangement with a Medicare Part D Plan Sponsor or its agent that would provide remuneration of any kind to ACS for referring Patients. ACS further warrants and represents that its evaluation of available Part D Plans for each Patient will be conducted with the best interests of the Patient in mind, and ACS will not in any way limit that evaluation to Part D Plans with which ACS has an agreement or any other type of arrangement with respect to ACS' specialty pharmacy business.

9.5     ACS represents and warrants that ACS is responsible for the payment of compensation to its personnel, including all personnel assigned to the performance of ACS's undertakings herein, federal and state income tax withholding, social security taxes and unemployment insurance applicable to such personnel as employees of ACS.

9.6     ACS represents and warrants that notwithstanding any other workers' compensation or insurance policies maintained by TEVA, ACS is responsible for the procurement and maintenance of workers' compensation coverage sufficient to meet the statutory requirements for ACS's personnel who are engaged in the performance of ACS's undertakings herein.

9.7     ACS warrants and represents that neither it nor any of its agents or employees performing Services pursuant to this Agreement is under investigation by the FDA for debarment action or is presently

ACS/Teva Agreement 9-26-06                    5

CONFIDENTIAL - FOIA Exempt                                                     Tev_290265

debarred pursuant to the Generic Drug Enforcement Act of 1992 (21 U.S.C. 301 et. seq.). Additionally, ACS agrees to notify TEVA immediately upon any inquiry concerning, or commencement of any such proceeding concerning, any such person. ACS agrees to ensure the continuity of personnel assigned to perform Services hereunder.

## 10.  RECORDS AND AUDIT

10.1   ACS shall maintain records pertaining to this Agreement on the basis of generally accepted accounting principles for three (3) years after this Agreement has expired or has been terminated. These records shall be available to TEVA or TEVA's authorized representative at mutually convenient times. TEVA shall have the right to audit ACS' records, at TEVA's sole expense, with TEVA internal auditing personnel or an independent auditing firm of TEVA's choice, upon reasonable notice to ACS for the purpose of ensuring ACS's compliance with the provisions of this Agreement and to verify the accuracy of ACS's invoices.

## 11.  INSURANCE

11.1   In addition to maintaining the statutory Employers Liability and Workers' Compensation Insurance, ACS shall carry commercial general liability insurance in the minimum amount of One Million Dollars ($1,000,000) during the term of this Agreement. ACS shall cause its insurance carrier to provide TEVA with at least thirty (30) days prior notice of cancellation of such insurance. The amount of insurance coverage shall not limit in any way ACS's obligations to indemnify TEVA pursuant to Article 6.

## 13.  MISCELLANEOUS

13.1   _Independent Contractor Status._ ACS is an independent contractor under this Agreement, and nothing herein shall be construed to create a partnership, joint venture or agency relationship between ACS and TEVA. Neither party shall have the authority to enter into agreements of any kind on behalf of the other party and shall have no power or authority to bind or obligate the other party in any manner to any third party. ACS has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed all work to be carried out by ACS hereunder, unless otherwise provided herein.

13.2   _Assignment._ This Agreement and the rights and duties hereunder shall not be assignable by ACS or TEVA except upon written consent of the other; provided, however, that TEVA may assign this Agreement and its rights and duties hereunder without the consent of ACS to any affiliate of TEVA or to any purchaser of all or substantially all of its assets. For purposes of this Section, an "affiliate" of TEVA is any entity that controls, is controlled by, or is under common control with TEVA. "Control" is the ability to direct the affairs of TEVA through the ownership of stock, contract or other means.

13.3   _Notice._ Whenever a party hereto desires or is required to give any notice, demand or request with respect to this Agreement, such communication shall be effective only if it is in writing and delivered by personal service, facsimile transmission (with satisfactory evidence of receipt), courier service (with satisfactory evidence of delivery) or mailed, certified mail, postage prepaid, addressed as follows:

If to TEVA, to:          TEVA Neuroscience, Inc.
                         901 East 104th Street, Suite 900
                         Kansas City, MO  64131
                         Attention: Assistant General Counsel.

ACS/Teva Agreement 9-26-06                    6

CONFIDENTIAL - FOIA Exempt                                                          Tev_290266

Fax: (816) 508-5503
Fax: 816-508-5015

If to ACS, to:      Advanced Care Scripts, Inc.
                    3160 Southgate Commerce Blvd.
                    Orlando, FL 32806
                    Attention: _____
                    Fax: _____

Such communications shall be effective when they are received by the addressee thereof, but if sent by certified mail in the manner set forth above, they shall be effective two (2) business days after being deposited in the mail or if sent by courier or facsimile transmission they shall be effective on the day after delivery. A party may change its address for such communications by giving notice thereof to the other party in conformity with this Section 13.3.

13.4    Entire Agreement.    This Agreement and all of its attachments constitute the entire agreement between TEVA and ACS with respect to the subject matter of this Agreement, and supersede all prior agreements and understandings with respect to the matters covered by this Agreement.

13.5    Governing Law.    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to the provisions thereof relating to conflicts of laws.

13.6    Remedies.    The rights and remedies of ACS and TEVA set forth herein with respect to failure of the other to comply with the terms of this Agreement (including, without limitation, rights of full termination of this Agreement) are not exclusive, the exercise thereof shall not constitute an election of remedies and the aggrieved party shall in all events be entitled to seek whatever additional remedies may be available in law or in equity.

13.7    Headings.    The headings of this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

13.8    No Waiver; Modifications.    No provision of this Agreement may be waived, amended or otherwise modified, except by a written agreement signed by each party hereto. The waiver by a party of the breach of any provision hereof shall not be construed as a waiver of subsequent breaches or as a continuing waiver of such breach.

13.9    Severability.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity and enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any person or entity or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid and unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other persons, entities or circumstances shall not be affected by such invalidity or enforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction, unless invalidity of a certain provision affects the entire basis of the bargain for a party.

13.10   Binding Agreement.    This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

ACS/Teva Agreement 9-26-06                        7

CONFIDENTIAL - FOIA Exempt

13.11   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which taken together shall constitute one and the same instrument.

13.12   Notice of Actions.  Each party hereto shall promptly notify the other party in writing of any claims, demands or actions having any bearing on this Agreement.

13.13   Publicity.  ACS shall not use the name of TEVA in any publicity releases, advertising or other promotional activities without the prior written consent of TEVA.  ACS shall not publish any results of the Services performed hereunder.

13.14   Force Majeure.  Neither party shall be liable for any delay or failure to perform any duty or obligation it may have pursuant to this Agreement where such delay or failure has been occasioned by any act of God, fire, strike, inevitable accident, war or any cause outside the parties reasonable control. Performance times under this Agreement shall be considered extended for a period of time equivalent to the time lost due to any such delay or failure which is excusable hereunder; provided, however, that if such delay shall, in the aggregate, last for a period of more than thirty (30) days, the party not relying on the excusable delay, at its option, may terminate this Agreement upon written notice.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first set forth above by their duly authorized representatives.

TEVA NEUROSCIENCE, INC.

By _____
Name _Denise C. Lynch_
Title _Director Customer Resources_
Date _10/4/06_

ADVANCE CARE SCRIPTS, INC.

By _____
Name _EDWARD HENSLEY_
Title _SVP_
Date _09/29/06_

ACS/Teva Agreement 9-26-06                    8

CONFIDENTIAL - FOIA Exempt                    Tev_290268

## EXHIBIT A
### STATEMENT OF WORK

**TEVA's Obligations**

- TEVA shall provide to ACS in an electronic, secure format specified by ACS the names, MSNs and contact information of Medicare-eligible individuals to whom Shared Solutions® has provided assistance during 2006 and patients who are new to therapy and indicate that they would like assistance with benefits investigation.

- TEVA will contact each Patient to explain the benefits investigation services being offered through ACS and determine if the Patient is interested in taking advantage of those services. If the Patient indicates such an interest, TEVA will notify ACS.

**ACS' Obligations**

- Database. ACS shall manage the initial download of information for approximately 1,400 Patients. The Patient database shall be maintained with strict security, and ACS shall notify TEVA if there is any breach of security that could lead to disclosure of any of the Patient information. The database will be updated to reflect the status of each Patient case. At the conclusion of the Services, the Patient data shall be returned to TEVA.

- Outreach. If requested by TEVA, ACS shall conduct a letter and/or telephone outreach program to inform Patients about the Services.

- Part D Plan Evaluation and Application.

  -- ACS will prepare a script for its calls with Patients which must be approved by TEVA. ACS will follow that script to the best of its ability in conducting the Services.

  -- After receiving an indication from TEVA that a Patient has consented to working with ACS on benefits investigation, ACS shall contact the Patient. ACS will verify that the Patient understands what ACS will be doing and consents.

  -- ACS will confirm with the Patient the current benefit structure offered by the Patient's Medicare Part D Plan, as defined in Section 423.4 of the Medicare Part D Regulations, ("Part D Plan"), if any, and solicit from the Patient any concerns that he or she may have with the current Part D Plan structure. ACS will also obtain a list of medications the Patient is currently taking in addition to COPAXONE for use in evaluating Part D Plan options that are best for that Patient.

  -- If appropriate, ACS will identify Part D Plans available to the Patient and which Plans may be most appropriate based on the Patient's list of medications and economic and other factors discussed with the Patient. ACS will explain the options to the Patient, but ACS will not recommend or endorse a specific Part D Plan. The decision regarding which Part D Plan to select must be the Patient's.

  -- Once the Patient has selected a Part D Plan, ACS will assist the Patient with completing and filing the application form to the extent the Patient is interested in such assistance. ACS must obtain the Patient's clear consent to assist with this step and will document the

ACS/Teva Agreement 9-26-06           9

CONFIDENTIAL - FOIA Exempt

Tev_290269

receipt of consent in a reasonable manner. ACS shall send the Patient written confirmation concerning actions taken by ACS on behalf of the Patient including enrollment in a Part D Plan. The format of such correspondence shall be mutually agreed upon by ACS and TEVA.

- <u>Low Income Subsidy</u>. ACS shall assess the Patient's eligibility for the Medicare low-income subsidy through Social Security. If applicable, ACS shall assist the Patient in applying for the subsidy on-line.

- <u>State Wrap-Around Coverage</u>. ACS shall assess the Patient's eligibility for a state prescription assistance program that provides "wrap-around" coverage when a patient reaches the Medicare Part D "doughnut hole." If applicable, ACS shall assist the Patient with the application for such assistance.

- <u>Patient Assistance Funds</u>. ACS shall assess the Patient's eligibility for certain charitable funds that may be available for Medicare Part D beneficiaries. If applicable, ACS shall assist the patient with the preparation of any credentialing forms and, where appropriate, submit such information to the fund.

## <u>Standards</u>

In conducting the Services outlined above, ACS will comply with the following :

- ACS must act in the best interests of the Patient. ACS must consider all appropriate Part D Plan options for the Patient whether or not ACS is in that Part D Plan's pharmacy network. Further, in evaluating available Part D Plans for a Patient, ACS must take into account all the Patient's medications, not just COPAXONE.

- ACS must ensure that it has the Patient's consent to work with that Patient and, if at any time the Patient withdraws that consent, ACS will end contact with the Patient.

- ACS must verbally provide a disclaimer to the Patient which includes at least the following elements: (i) ACS and Shared Solutions do not recommend or endorse any particular Medicare Part D Plan; (ii) ACS uses reasonable efforts to provide accurate information about Plans but makes no warranty or representation as to its accuracy; (iii) information ACS provides is based on input it receives from the Patient and from publicly-available sources, including internet sites of Part D Plans and communications with those Plan Sponsors; (iv) the Patient's use of information provided by ACS is solely the Patient's decision, and neither ACS nor Shared Solutions assumes any responsibility or liability for errors or omissions in the information provided; and (v) neither ACS nor Shared Solutions will be held responsible for any action taken by the Patient that is based on information ACS provides.

## <u>Fees</u>

- ACS shall receive a fee of $150.00 for each Patient to whom ACS provides benefits investigation services.

ACS/Teva Agreement 9-26-06                     10

CONFIDENTIAL - FOIA Exempt                                                      Tev_290270

# EXHIBIT A-7

Case 2:20-cv-04660-KSM  Document 64-2  Filed 08/10/21  Page 223 of 684
Case 1:20-cv-11548  Document 1-7  Filed 08/18/20  Page 1 of 10

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/SB113339802749110822

# Through Charities, Drug Makers Help People – and Themselves

## By Donating Money, Firms Keep Patients Insured And Medicine Prices High

*By Geeta AnandStaff Reporter of THE WALL STREET JOURNAL*
Updated Dec. 1, 2005 12:01 am ET

Nancy Oliva hadn't paid much attention to her insurance plan's requirement that she pay half the cost of prescription drugs. Then the cashier at ShopRite told her she owed $636 for seven pills.

Ms. Oliva, 60 years old, was diagnosed with a rare type of brain tumor earlier this year. She was prescribed a new drug to be taken in combination with radiation. The retail price of a one-week supply of the pill, called Temodar, is $1,272.

- [Drug Extends a Life, But at What Price?](#)
  11/16/05

- [How Drugs for Rare Diseases Became Lifeline for Companies](#)
  11/15/05

Ms. Oliva, who earns about $40,000 a year managing a clothing store in Long Beach Island, N.J., pulled out her American Express card that day in September and paid, unsure where she was going to find the money for the next week's supply. Fortunately, the nurse at her doctor's office found help for her from a charity, Patient Services Inc., which picked up her drug co-payments -- $3,800 for a six-week course of treatment.

The twist: The money for her co-payments came from Schering-Plough Corp., the drug's maker.

To cope with rising medical costs, insurers are requiring patients to pay higher premiums and co-payments for drugs. While poor uninsured patients can often get expensive medicine free from drug companies, people with insurance are increasingly finding it difficult to afford these drugs. In response, drug companies are giving money to charities that are specifically set up to help patients pay such costs.

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/18/20   Page 2 of 10
Case 1:20-cv-11548   Document 1-7   Filed 08/18/20   Page 224 of 684

Under this support system, drug-company money keeps patients insured -- and keeps insurers paying for the high-priced medicine.

"It's a win-win situation," says Dana Kuhn, co-founder and president of Patient Services, a Midlothian, Va., charity, which solicits money from drug companies. "Patients are helped and companies are helped. They make a small contribution to help the patient and get much more money back when the insurer pays for the drug."

Drug companies also often take a tax deduction for their donation.

But critics contend the arrangements unfairly let drug companies protect the prices of their most-expensive medicines. "I don't want to discount the legitimate help they provide to people in need," says Scott Howell, an internist who serves as vice president of pharmacy affairs at Highmark Inc., a Blue Cross and Blue Shield company in Pittsburgh. "But it's really a clumsy way for manufacturers to game the system so they can continue their high pricing."

The efforts, critics say, are a short-term fix that doesn't address the underlying problem: the soaring cost of ultra-expensive drugs. They argue that by paying patients' premiums or co-payments, drug companies are shifting most of the price of these medicines to the patients' insurers, who in turn spread the cost onto the other people they cover.

"This is not a sustainable level of spending," says Alan Garber, chairman of the Medicare Coverage Advisory Committee and director of the Center for Health Policy at Stanford University. "The idea of making drugs available to people who can't afford it is very appealing, but the net effect is for the drug company to appropriate most of the gain."



Dana A. Kuhn

Drug companies say the high prices of new drugs allow them to recoup development costs and invest in research, as well as provide return for their shareholders. Donating to groups that make insurance payments helps people get their medicine.

A Schering-Plough spokeswoman says the company contributes to Mr. Kuhn's charity "as a resource for patients." She declined to say how much Schering-Plough donates to such programs.

Patients are grateful for the help. "Whoever thought a week's worth of pills could cost $1,200?" says Ms. Oliva, who is now taking another round of Temodar. "But I'm so pleasantly surprised that someone is trying to help me stay alive and it's the drug company of all people."

The need for financial-assistance programs is growing. The biotechnology revolution has created hundreds of drugs for chronic, life-threatening illnesses. But many are coming to market at high prices. In May, the U.S. Food and Drug Administration approved a drug for a rare genetic disease, called MPS-VI, made by California-based BioMarin Pharmaceutical Inc., which costs an average of $300,000 a year. Other new drugs cost less, but are still pricey, such as cancer drugs Avastin, at $50,000 a year, and Erbitux at nearly $120,000 a year.

Unlike traditional medicines that are made by mixing chemicals, many newer drugs are proteins grown in cells, which is a complex, expensive process. Companies say costly manufacturing also leads to higher prices. On the other hand, the gross profit margins on some of these drugs can exceed 90%.

While Patient Services developed the concept of soliciting drug-company money to pay insurance premiums, the National Organization for Rare Disorders, a Connecticut nonprofit, recently began performing the same kind of middleman role. "Everybody knows what has to happen -- that these prices have to come down," says Abbey Meyers, the group's president. For now, she says, "we're trying to work with drug companies in a way that's acceptable to them and that also helps patients. We're doing the best we can." A few smaller charities have sprung up recently with similar plans.

Companies including Amgen Inc., Genentech Inc., Genzyme Corp., Teva Pharmaceutical Industries Ltd., Baxter International Inc., Novartis AG and ZLB Behring also donate to these programs.

## Approaching Companies

Mr. Kuhn, 52, who suffers from hemophilia, co-founded Patient Services, also known as PSI, in 1989 while working as a counselor at a Richmond, Va., hospital. He saw hemophiliacs struggling to pay rising premiums to maintain insurance coverage for Factor VIII, the blood-clotting protein they need to stay alive. The drug today costs about $100,000 a year.

Mr. Kuhn approached companies making the drug for a donation to help patients pay premiums. "Our argument was, 'If you donate $50,000, we can keep these people insured and provide revenue for you,' " he says.

Baxter and Armour Pharmaceutical Co., two of several companies that made the drug, each contributed $50,000 the first year. The program has grown steadily, now assisting people with 19 different chronic illnesses.

Case 2:20-cv-04660-KSM Document 64-2 Filed 08/18/21 Page 226 of 684
Case 1:20-cv-11548 Document 1-7 Filed 08/18/20 Page 4 of 10

Last year, Patient Services raised $22 million, helping nearly 20,000 patients pay premiums and co-payments. About $17 million of that came from 13 drug companies.

When he makes his pitch to companies, Mr. Kuhn says he emphasizes that they can make money by donating. During a 2003 visit to Genzyme, for instance, he brought along a chart showing how a donation would affect a patient who needs the company's drug, Fabrazyme. Genzyme says the drug typically costs between $175,000 and $200,000 a year. The chart showed that if Genzyme donated $5,400 to cover the patient's premium for a year, it would bring in about $185,000 by getting its drug paid for by the patient's insurance.



Genzyme signed up. "We wanted to do whatever we could to make sure all patients who needed our treatment could get it," says a spokesman for the company, based in Cambridge, Mass. He declined to say how much Genzyme donates to Patient Services.

## 'Who Can Afford It?'

One of the first to get help was Jeremy Taylor, a 25-year-old auto mechanic in Phoenix, who suffers from Fabry disease, a rare genetic disorder that can cause kidney failure, heart attacks and death. It costs about $224,000 a year for him to receive Genzyme's drug. His insurance pays for most of that, but under the plan, he is required to pay about $27,000 annually, PSI says. Mr. Taylor declined to be interviewed.

"It's a real miracle drug for us," says his father, Larry Taylor. "But who can afford it?"

Patient Services says it provides $27,000, all donated by Genzyme, to keep Mr. Taylor insured. Mr. Taylor's insurer pays the remaining $197,000 cost of his treatment, according to PSI.

Until Mr. Taylor's drug was covered by insurance, Genzyme provided it to him for free, his father says.

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/18/20   Page 227 of 684
Case 1:20-cv-11548   Document 1-7   Filed 08/18/20   Page 5 of 10

Genzyme helps keep 167 patients with Fabry disease insured through its charitable program, PSI says. Genzyme is the only donor for PSI's Fabry program and it makes the only drug for the disease. The company donates less than $2 million to the program, Mr. Kuhn says.

It isn't clear how much revenue Genzyme receives from the sale of the drug to these patients. Assuming each patient receives the low-end estimate for a year's dose, that could generate revenue of about $29 million.

"Of course we get revenue from patients who are insured," says a Genzyme spokesman. But he declined to be specific on how much revenue the company receives for patients it helps stay insured, saying that would incorrectly imply the company makes donations "simply for financial gain." He says the company makes donations "simply to insure access to care for patients."

Genzyme struck a similar arrangement with the National Gaucher Care Foundation in 1993, soon after the company brought a drug to market to treat Gaucher disease. Genzyme makes the most widely prescribed treatment for this disease, which causes organs to swell and bones to deteriorate.

The foundation's patient-assistance budget this year is $1.6 million. The biggest donor is Genzyme, according to Barbara Lichtenstein, program director of the foundation. It helps about 200 patients with insurance premiums and other medical expenses. Genzyme says its drug for this disease costs an average of $200,000 per year.

Genzyme has a staff of 34 insurance specialists who try to keep patients who take its drugs insured. If no insurance can be found, the company gives the drug to patients free.

Gaucher patients "are like gerbils on a wheel," continuously finding and losing insurance, Ms. Lichtenstein says. Some who call her have hit their maximum lifetime caps of several million dollars on insurance coverage and have to find new jobs to get additional health-care coverage, she says.

Teva Neuroscience Inc. markets a multiple sclerosis drug that retails for about $18,000 annually. "Market research told us early on we needed to do a patient-support program" because some people wouldn't be able to afford their co-payments, says Denise Lynch, director of customer management.

Teva donates to the National Organization for Rare Disorders to provide co-payment assistance. Ms. Lynch says Teva didn't calculate the profit it could receive when making its donation, "but from a common-sense perspective, you can get there." She says Teva takes a tax deduction for its donation.

Teva considered setting up a foundation on its own, she says, but concluded it was "cleaner from a regulatory point of view to work through a third party."

Some companies have been nervous about donating to his charity, Mr. Kuhn says, fearing they might violate federal anti-kickback laws. These laws, passed in the 1970s, forbid drug companies from giving financial assistance to Medicare and other federally insured patients which could be an inducement to choose one drug over another. The laws don't apply to people who are privately insured.

To reassure drug companies it was legal to donate to his program, Mr. Kuhn sought an opinion in 2000 from the Office of the Inspector General of the U.S. Department of Health and Human Services.

In 2002, the Inspector General's office issued its opinion, saying it wouldn't seek civil or criminal penalties from participants in Mr. Kuhn's program. It said the program "interposes an independent charitable organization between donors and patients in a manner that effectively insulates" patients and doctors from making prescribing decisions based on the donations.

This is because PSI sets up programs not by individual drug, but rather by disease -- so that all the companies making, say, multiple sclerosis drugs, donate into a pool for patients with the disorder. Applicants receive help based on financial need, regardless of what drug they are prescribed, and even if the maker of a prescribed drug doesn't contribute to the program.

For certain rare diseases, however, only one company makes a drug to treat the condition.

After the favorable opinion, Mr. Kuhn says he found drug-company executives eager to donate. "You could see the dollar signs shining in their eyes and they would jump over the table and say, 'When can I start?' " he says.

He has raised $30 million so far this year and is assisting 25,000 patients.

Patient-assistance programs must walk a thin line. In 2002, the Inspector General also issued a separate, unfavorable opinion on the subject. This was to an unidentified drug company seeking to establish a nonprofit foundation to cover co-payments only for patients on its drug.

"The proposed arrangement poses all the usual risks of fraud and abuse associated with kickbacks," the opinion said. It said physicians would have an incentive to prescribe the drug in question, which is infused in doctors' offices, over another because they would be certain of being paid rather than risk collecting the co-payment from the patient.

The opinion noted patient-assistance programs can be "very profitable to manufacturers...Given that the marginal variable cost of a drug can be quite low, the profit can be considerable, especially for an expensive drug for a chronic condition."

## A Working Balance

Third-party charities struggle to maintain a working balance with corporate donors. Maria Hardin, vice president of patient services, at the National Organization of Rare Disorders, says companies routinely press the group to give out more patient information than it can legally provide. "There's a lot of whining going on with them asking, 'What percentage of the fund is taking care of our patients?' We can't provide that information," she says.

Mr. Kuhn's charity is growing so much that it plans to build a $1.7 million, 15,000-square-foot building. One reason he expects demand for assistance to rise is that next year, Medicare will start a program to help the elderly afford drugs. Currently, Medicare doesn't pay for most prescription drugs.

But the new Medicare program is structured so that some patients on expensive drugs will still have to come up with thousands of dollars to pay out-of-pocket costs.

Vivian Gushwa, 70, was prescribed the cancer drug Gleevec after her rare gastrointestinal tumor recurred last year. Her husband, Ronald, went to Rite Aid in Marion, Ohio, to pick up the medicine and came home crying. The retail price of her prescription was $2,000 for two weeks' supply, which would consume the couple's $2,000 a month in pension and Social Security income, they say.

"There's no way on God's green earth we can afford that," says Mr. Gushwa, 74, who worked most of his life at a local electric-power company.

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/10/21   Page 230 of 684
Case 1:20-cv-11548   Document 1-7   Filed 08/18/20   Page 8 of 10

He bought a two weeks' supply of the drug, using about half of their $4,000 in savings. Novartis, the Swiss company that makes Gleevec, provided free medicine for several months and then directed the couple to apply to the federal government for coverage under a pilot Medicare program.

The Gushwas again suffered sticker shock. Their income of $2,000 a month put them in a group required to pay $3,600 a year before being eligible for the drug benefit. They also have to pay 5% of each prescription.

"Medication has to be paid for. We understand that," says Mrs. Gushwa. "But how do people afford it? Do you just die?"

She says she overheard her husband weeping on the phone as he called around seeking help. An official from Medicare referred him to PSI, which had just started a program funded by Novartis. Mrs. Gushwa got help from the charity and received the Novartis drug. "I'm just thankful to my doctors and God and PSI," she says.

Paul Pochtar, executive director of oncology-managed marketing at Novartis, says his company began donating to PSI last year. "It's a fairly new phenomenon," he says.

Novartis donated several million dollars to PSI this year to help patients make drug co-payments, a spokeswoman says. She says the donation was less than $10 million, but wouldn't be more specific.

This generates revenue for the company. PSI says it helped 1,255 patients in two cancer programs for which Novartis is the only donor -- with almost all of them receiving Gleevec. The average wholesale price of the drug at the recommended dose is about $37,000 a year. If the patients in the program receive the recommended dose, that could generate tens of millions of dollars in revenue.

A Novartis spokeswoman wouldn't comment about the revenue generated. In a statement, she said that the company's donation to PSI "helps insured patients with co-pay obligations."

If these patients weren't insured, some might qualify for free drugs. Novartis says it gave away $100 million of Gleevec in 2004. The company says its patient-assistance programs have helped 12,000 people world-wide gain access to Gleevec. Sales of the drug last year were $1.6 billion.

Long-term support from the charities is uncertain. Mr. Kuhn says patients are guaranteed assistance for two years. After that, it is hoped that they can be weaned off the program, by finding a different insurance plan or a new job with better benefits. "We don't want to become a social-service agency," he says.

## A Letter to Ms. Samit

This is difficult for many. Carolyn Samit, 63, of Caldwell, N.J., suffers from primary immune deficiency, an inability to produce enough antibodies to fight off diseases. Because her care is expensive, her insurance premiums are high. Last year, PSI paid her health-insurance premium of $53,000.



Carolyn Samit

But Mr. Kuhn called her late last year, saying she needed to find some other way of paying for insurance this year. He followed up with a letter, saying, "This letter is being written to you, not to create panic, but to share the truth with you about your assistance being in jeopardy." The letter, written to all patients with immune disorders, said PSI couldn't guarantee help for them because corporate donations for their particular drug program had fallen.

Ms. Samit called Mr. Kuhn, crying and begging him not to drop her, saying she had failed for years to find another insurer that would cover her care for less. She takes Gamunex, an immune globulin or mix of antibodies purified out of donor blood, sold by Talecris Biotherapeutics, for which she says her insurer pays $47,000 annually. She also needs an antibiotic, vancomycin, which costs about $46,000 because of her frequent use. Her insurer, Celtic Insurance, of Chicago, didn't return calls.

The widow of an American Airlines executive, Ms. Samit lost coverage under his plan after he died. She lives on his $22,000-a-year pension and says she wiped out her savings and her daughter's trying to pay her rising premium until PSI stepped in.

Mr. Kuhn says he told Ms. Samit he could continue to pay her premium only if the charity received more money from companies that make her drug. So she began calling around, asking drug makers to boost their donations.

Officials at Baxter and Talecris acknowledge receiving Ms. Samit's calls. Both companies say they donated to PSI this year, but note that they don't control decisions on which patients get helped by their donations. Mr. Kuhn says the new money allowed him to pay Ms. Samit's premium and help other patients for another year.

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/10/21   Page 232 of 684

"I feel grateful every day for PSI and the companies that support them," Ms. Samit says. "I was a middle-class person living a comfortable middle-class life. It never occurred to me in a million years that I could lose insurance and die."

Mr. Kuhn says it's important to focus on the fact that people are being helped by drug companies' contributions to his charity. "Although they are making money hand over fist, they are doing wonderful things for patients," he says.

Write to Geeta Anand at geeta.anand@wsj.com

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# EXHIBIT A-8

| | |
|---|---|
| **From:** | Edward Hensley </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=EHENSLEY> |
| **To:** | Tom Dervin; Jeff Spafford; Jason Forgy; Adam Stotts; Andrew Barnett; David Blanc; Rosemary McDermott |
| **Sent:** | 2/14/2007 12:20:56 PM |
| **Subject:** | MS Projects |
| **Importance:** | High |

Thus far, if final processes go well, it looks like we have been "awarded" the Teva Neuro free drug program. Tom is in the process of evaluating and allocating resources to that project. One note is that the project is about half the size it was originally indicated to us. This is an excellent program for ACS to add to its product/program portfolio. With that being said, this project will definelty coincide with some of our larger projects going on. The following points must be considered immediately due to information we are receiving:

- The list that we received from Teva last week that was approximately 400 patients must be cross referenced with what we are looking at sending CDF this week (next point). Those patients should be removed from the "hot list" we were sent so that we don't count them towards free drug.
- The accounting process has closed for January at CDF. We should expect to transmit the number of "no go's" for each drug, Avonex and Copaxone accordingly any minute now. Please lets pay special attention so that we allocate the appropriate no go numbers so that the particular manufacturer funds go to their own drug as what the intent of the project was originally.
- We should be hearing also approximately another 250-300 Avonex patients will have availalble funding by either end of week or early next. We must get those patients in line as well so that we transmit accordingly.

Hopefully, the timing will happen so that the open slots and the new BIIB funding doesn't hit at the same time. But, as we know, that may just happen, so we need to be absolutely prepared for this occurence.

Also, as we plan for this undertaking and what we have already undertook, I ask you to look ahead and the probabality of us working on these same projects once again in October with these same patients. Any processes we can identify to continue to collect information, etc. will only assist us in a more streamlined successful outcome for the 2008 benefit year.

As of today and going forward, I will be in the Baldwin Park office, but available to any questions. ***Please relay any concerns to Jeff or Tom.***

Here we go again. GO ACS. 2007 belongs to us.

Edward

Confidential. Exempt From FOIA

# EXHIBIT A-9

| | |
|---|---|
| **From:** | Edward Hensley </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=EHENSLEY> |
| **To:** | 'Denise.Lynch@tevaneuro.com' |
| **CC:** | David Blanc |
| **Sent:** | 8/12/2008 1:21:58 PM |
| **Subject:** | ACS |

Just an FYI. Since we are getting no rejections yet from the non profit sources we are utilizing here at ACS, we have not started any Free Drug program. I will let you know the moment it kicks in.

**Edward Hensley | Executive Vice President | ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 407.854.6576 | eFax: 615.827.6335
Cellular: 407.579.7611 | email: edward.hensley@acs-rx.com

**Confidentiality Statement:** This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please delete the message from your Inbox. Thank you.

CVS306598

# EXHIBIT A-10

| From: | Kari Hess |
|---|---|
| To: | Mike Sheehy |
| CC: | Kristen Wright; Dustin Leach |
| Sent: | 4/13/2016 7:58:15 PM |
| Subject: | RE: Free product program (COPAXONE) |

Good Afternoon Mike,

See below for our business rules on free product for Copaxone patients.

**\*For internal knowledge only\***

Business Rules for COPAXONE 40 mg Free Product Program:
- As of January 1, 2015 Copaxone 20mg was removed from program
- Patients without insurance coverage are eligible for referral
- Patients considered under-insured (per criteria) are eligible for a referral
- Patients with access to Glatopa are not eligible for a referral
- Patients with government funded plans are not eligible to apply. More specifically, Patients enrolled in any state or federally funded healthcare program, including but not limited to, Medicare, Medicare Advantage Plans, Medicare Part D, Medicaid, Medigap, VA, DoD, TRICARE, and the Puerto Rico Government Health Insurance Plan are not eligible.
- Patients with commercial insurance coverage that have been denied coverage after 2 appeals are eligible to apply.
    - The denial reason <u>must</u> be related to exclusion from the medical policy/formulary coverage (exception-access to Glatopa are not eligible for referral)
    - The denial <u>cannot</u> relate to medical reasons, such as patient age, diagnosis, etc. to be eligible
- Patients do not have to be a United States citizen, but they do need to have at least one of the following:
    - Green Card
    - Visa
    - Social Security Number

Assist RX then sends an application to the patient and reviews for approval. Assist RX is aware of the current FPL guidelines, let me know if you need that information.

Best regards,

**Kari Hess, RN BSN MAOL**   Sr Supvr, Pt Serv & Support
Tel: <u>913-777-3743</u>   Cell: <u>913-624-4994</u>   Fax:
<u>Kari.Hess@tevapharm.com</u>   <u>www.tevapharm.com</u>

---

**From:** Dustin Leach
**Sent:** Wednesday, April 13, 2016 11:29 AM
**To:** Kari Hess
**Cc:** Mike Sheehy
**Subject:** FW: Free product program (COPAXONE)

Hi Kari,

Please see Mike's email below.  Do we have a summary document on the free program that we can share?

Best regards,

CONFIDENTIAL – FOIA Exempt


**Dustin Leach, Pharm.D.**    Assoc Dir, Nursing & Adherence Programs
Tel: (913) 777-3408    Cell: (727) 415-7805    Fax:
dustin.leach@tevapharm.com    sip:Dustin.Leach@tevapharm.com    www.tevapharm.com

---

**From:** Mike Sheehy
**Sent:** Wednesday, April 13, 2016 11:24 AM
**To:** Dustin Leach
**Subject:** Free product program (COPAXONE)

Dustin:
I am hoping this is an easy request – I am looking for the policy or process around the COPAXONE free product program.  What are the steps and qualifications required in order to receive free product?

Thanks,



**Mike Sheehy**
Director, Brand Product Marketing
Teva CNS - West
Office: (913) 777-3319  Mobile: (816) 547-5055 Mike.Sheehy@tevapharm.com

IMPROVING HEALTH, MAKING PEOPLE FEEL BETTER    GETTING IT DONE TOGETHER    CHARACTER WHERE IT MATTERS    CARING    MAKING OUR FAMILIES PROUD    LEADING THE WAY

## OUR PURPOSE & VALUES

# EXHIBIT A-11

| From: | Adam Stotts </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ADAM.STOTTS> |
|---|---|
| To: | David Blanc |
| Sent: | 12/12/2007 2:47:35 PM |
| Subject: | FW: CD Fund now administering Copaxone Private Copay Assistance Program |

**Adam Stotts | Director of Business Strategy | ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 407.854.6581 | Fax: 866.679.7131
Email: adam.stotts@acs-rx.com | www.advancedcarescripts.com

**From:** Edward Hensley
**Sent:** Tuesday, November 06, 2007 1:19 PM
**To:** Tami Hoffman; Adam Stotts; Jason Forgy; Megan Oliveira
**Cc:** John Ellett; Jeff Spafford
**Subject:** RE: CD Fund now administering Copaxone Private Copay Assistance Program

Current CDF patients are all Med D PDP patients that are on our service.  The Copaxone Cares patients will transition to CDF Med D program in January.  The new program below is only for commercial patients, not government.  The patient is already pre-approved for assistance when we get the referral from CDF in this program.

**From:** Tami Hoffman
**Sent:** Tuesday, November 06, 2007 12:28 PM
**To:** Adam Stotts; Jason Forgy; Megan Oliveira
**Cc:** John Ellett; Jeff Spafford; Edward Hensley
**Subject:** RE: CD Fund now administering Copaxone Private Copay Assistance Program

Adam,  Thank you for the summary this helps.

A few things I would like clarified:

- Current CDF Copaxone patients - are they all PDP patients?
- How will this and/or will it effect the Copaxone Cares Patients we currently have?
- I believe that currently we have a way to preapprove patients with CDF and get them on service right away,  If this is the case do you think this new program will slow down the Comm Copax patient's first treatment, if so how much (how long is it supposed to take to go from SS to CDF and then back to us?)

Thanks,
Tami Hoffman
Director of Reimbursement
Advanced Care Scripts
877-985-6337 Ext. 108

**From:** Adam Stotts
**Sent:** Tuesday, November 06, 2007 10:46 AM
**To:** Jason Forgy; Megan Oliveira; Tami Hoffman
**Cc:** John Ellett; Jeff Spafford; Edward Hensley
**Subject:** FW: CD Fund now administering Copaxone Private Copay Assistance Program

Here's the summary:

- Patients are <u>not</u> to be referred directly to CDF, instead, ACS will be referring to Shared Solutions and they refer to CDF.

Confidential. Exempt From FOIA

- Shared Solutions are responsible for notifying CDF with the pharmacy that's providing the medication, CDF will refer to the appropriate provider.
- The private co-pay assistance program only applies to patients that have commercial insurance.
- CDF will refer patients to ACS through the normal daily referral process.
- New diagnosis codes used MSC
- Same billing procedures currently performed on the Avonex and Copaxone Medicare projects.
- CPR+ UDF fields are the same besides using the new diagnosis codes.
- CDF will determine approval and patient responsibility.

I have a few questions around the operations process - I am supposed to have a conference call with Shared Solutions shortly to get more details for this program. Any extra details I can provide after our call I will be sure to let everyone know. If you have questions let me know and I will address them.

Regards,

Adam Stotts
Director of Business Strategy
Advanced Care Scripts
D: 407.854.6581
M: 407.247.9636
F: 866.679.7131

---

**From:** Jason Forgy
**Sent:** Monday, November 05, 2007 12:47 PM
**To:** Adam Stotts; John Ellett
**Cc:** Tami Hoffman; Megan Oliveira
**Subject:** FW: CD Fund now administering Copaxone Private Copay Assistance Program

Guys -

Could you two please put your heads together and summarize this program for Tami, Megan and I? Just would like to have a couple of bullets for us all to refer to.

---

**From:** Tami Hoffman
**Sent:** Monday, November 05, 2007 12:24 PM
**To:** Jason Forgy
**Subject:** RE: CD Fund now administering Copaxone Private Copay Assistance Program

Jason, I know you discussed this in the meeting but it was hard for me to here.

This will effect us how? Does this have anything to do with Copaxone Cares free drug program? Is this just a change in where we send Copaxone patient's that need assistance?

Tami Hoffman
Director of Reimbursement
Advanced Care Scripts
877-985-6337 Ext. 108

---

**From:** Jason Forgy
**Sent:** Monday, November 05, 2007 12:05 PM
**To:** Tami Hoffman; Jeff Spafford; Edward Hensley; JooHee Kim
**Cc:** John Ellett
**Subject:** FW: CD Fund now administering Copaxone Private Copay Assistance Program
**Importance:** High

FYI

---

 CVS306623

**From:** John Ellett
**Sent:** Monday, November 05, 2007 11:00 AM
**To:** Adam Stotts; Megan Oliveira
**Cc:** Jason Forgy; Debera Barton; Faith Taylor
**Subject:** FW: CD Fund now administering Copaxone Private Copay Assistance Program
**Importance:** High

Here is "official" information from CDF concerning the referral process for the Copaxone Private Copay Assistance Program (MSC diagnosis).  I believe you are already familiar with this info but just passing it on.

John Ellett
**Manager, Information Management**
Advanced Care Scripts, Inc.
Work: 407.850.7379
john.ellett@acs-rx.com

---

**From:** Melissa Ayles [mailto:MAyles@cdfund.org]
**Sent:** Monday, November 05, 2007 10:14 AM
**To:** admin@cdfund.org
**Subject:** CD Fund now administering Copaxone Private Copay Assistance Program
**Importance:** High

Dear Participating Specialty Pharmacy,

Please be advised that effective November 1, 2007, Chronic Disease Fund began administering the Copaxone Private Copay Assistance Program.  Should you identify privately insured patients in need of copay assistance, please refer them directly to Shared Solutions and identify yourself as making the referral.  Shared Solutions will provide a daily feed of referrals to us with the pharmacy assignment included and we will, in turn, refer the patient back to you via the normal daily referral process.  Please do not submit privately insured Copaxone patients to us via the daily referral process.

Please call me if you have any questions.

Best Regards,

Melissa Ayles
Senior Director, Partner Relations
Chronic Disease Fund, A Non-Profit Organization
10880 John W. Elliott Drive, Suite 400
Frisco, TX  75034

Direct:  (214) 975-5180
Fax: (214) 975-1114
Cell: (972) 998-0837

Confidential. Exempt From FOIA

# EXHIBIT A-12

| | |
|---|---|
| **From:** | Cindy French |
| **Sent:** | Thursday, April 28, 2016 10:10 PM |
| **To:** | Chris Gumbs |
| **Subject:** | RE: Proposed financial assistance slides for Cardinal meeting |

I am referring to how we have used this program in the past when a new Med D patient needs assistance and at that time (usually close to the end of calendar year) the Foundation has closed its funds. If we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up for Foundation Assistance for the following January when funds will be available. I understand that with current patients already receiving assistance through the Foundation would automatically qualify for our higher FPL level, but it could create an issue with a new patient.

It most likely won't be a large problem, but we may not want to publish the 700% FPL for this program broadly and just keep it "those patients meeting the eligibility requirement". Does that help?

Best regards,



**Cindy French** Manager, Program Development, Patient Services and Solutions
Tel: +1-913-777-3946   Cell: (816) 812-6732   Fax: (816) 508-5308
Cindy.French@tevapharm.com   sip:Cindy.French@tevapharm.com   www.tevapharm.com

**From:** Chris Gumbs
**Sent:** Thursday, April 28, 2016 5:00 PM
**To:** Cindy French
**Subject:** Re: Proposed financial assistance slides for Cardinal meeting

I understand the math but I guess I think of those programs as mutually exclusive. Not seeing how the rules of one create dependency on the other.

A med d patient would first seek foundational support and if they make more than 450%they would not qualify but could still qualify for outside of med d at 700%

Sent from my iPhone

On Apr 28, 2016, at 4:02 PM, Cindy French <Cindy.French@tevapharm.com> wrote:

> Chris,

1

CONFIDENTIAL - FOIA Exempt                                                                 Tev_320874

If we allow a patient with income at 700% FPL to be in Outside Part D assistance their income could be up to $110,000 for family of 2. The Foundation income limit of 450% FPL would only allow patients with income up to $72,090 for family of 2 to be eligible for assistance. Therefore if it were a new patient that was part of the free program that was being teed up for the following calendar year, they would not qualify if their income was over $72,090.

Does this help?

Best regards,



**Cindy French**   Manager, Program Development, Patient Services and Solutions
Tel: +1-913-777-3946    Cell: (816) 812-6732   Fax: (816) 508-5308
Cindy.French@tevapharm.com    sip:Cindy.French@tevapharm.com   www.tevapharm.com

<image002.png>

---

**From:** Chris Gumbs
**Sent:** Thursday, April 28, 2016 3:58 PM
**To:** Cindy French; Nick_Veomett@mckinsey.com
**Cc:** Adriana_Eisner@mckinsey.com; Todd Kunkel
**Subject:** RE: Proposed financial assistance slides for Cardinal meeting

I'm not tracking with how patients would not be eligible for foundational support @ 450% FPL if we make them eligible for outside of Med D @ 700%. Foundational support needs to be fully exhausted/declined prior to Outside of Med D consideration.

As for the Coupon comment in slide 4, I agree the 75% doesn't need to be shown to ChSP, it was a figure used to calc the breakeven point where it doesn't make sense to use the coupon and push to PAP. Thanks

Best regards,

**Chris Gumbs**   Sr Mgr, CNS Marketing Huntington's Disease
Tel: +1-913-777-3396    Cell: 816 728-7142   Fax:
Chris.Gumbs@tevapharm.com    sip:Chris.Gumbs@tevapharm.com   www.tevapharm.com

---

**From:** Cindy French
**Sent:** Thursday, April 28, 2016 3:26 PM
**To:** Nick_Veomett@mckinsey.com
**Cc:** Adriana_Eisner@mckinsey.com; Todd Kunkel; Chris Gumbs
**Subject:** RE: Proposed financial assistance slides for Cardinal meeting

I think the change you showed below will work. I would wait on a reply from the brand as to the change on the FPL on the outside Part D.

I have attached the file with a couple of comments regarding page 4. Please let me know if you have any questions. Thank you for all your assistance.

2

CONFIDENTIAL - FOIA Exempt                                                                              Tev_320875

Best regards,

 **Cindy French**   Manager, Program Development, Patient Services and Solutions
Tel: +1-913-777-3946    Cell: (816) 812-6732   Fax: (816) 508-5308
Cindy.French@tevapharm.com    sip:Cindy.French@tevapharm.com    www.tevapharm.com

<image002.png>

**From:** Nick_Veomett@mckinsey.com [mailto:Nick_Veomett@mckinsey.com]
**Sent:** Thursday, April 28, 2016 3:11 PM
**To:** Cindy French
**Cc:** Adriana_Eisner@mckinsey.com; Todd Kunkel; Chris Gumbs
**Subject:** RE: Proposed financial assistance slides for Cardinal meeting

Thanks Cindy,

Would changing the language under the Medicare Foundation line to the following work? Or should I remove any reference to LIS?

| Referrals for Medicare Patients[1] | • Patients who do not qualify for LIS[4]
• Referred to a third party who will seek foundation support
• Requalification annually on a calendar year |
|---|---|

Also, happy to take off the FPL reference under Medicare Outside Part D, or footnote that it is subject to change, whichever you prefer.

Did you have any comments on the last slide (p4)? Once that looks good I can send to Angelina along with the data slides that will be discussed tomorrow so there's one document to present.

Thanks!

Nick

-------------------------------------------------------------------------------------------------
Nicholas J Veomett, PhD | McKinsey & Company | M: +1 (415) 316-2542

**From:** Cindy French [mailto:Cindy.French@tevapharm.com]
**Sent:** Thursday, April 28, 2016 2:57 PM
**To:** Nick_Veomett@mckinsey.com
**Cc:** Adriana_Eisner@mckinsey.com; Todd Kunkel ; Chris Gumbs
**Subject:** RE: Proposed financial assistance slides for Cardinal meeting

Hi all,

In addition to my response below, I wonder if we want to adjust the FPL on the Outside Medicare D as well to match closer to what Caring Voices Coalition has if we are expecting patients that we put temporarily in this free product program to transition to Foundation Assistance.  If we allow 700% FPL for our program they may not qualify for the Foundation assistance.

3

CONFIDENTIAL - FOIA Exempt                                                                                    Tev_320876

Please let me know your thoughts.

Best regards,



**Cindy French**   Manager, Program Development, Patient Services and Solutions
Tel: +1-913-777-3946    Cell: (816) 812-6732   Fax: (816) 508-5308
Cindy.French@tevapharm.com    sip:Cindy.French@tevapharm.com    www.tevapharm.com

<image002.png>

---

**From:** Cindy French
**Sent:** Thursday, April 28, 2016 2:54 PM
**To:** 'Nick_Veomett@mckinsey.com'
**Cc:** Adriana_Eisner@mckinsey.com; Todd Kunkel; Chris Gumbs
**Subject:** RE: Proposed financial assistance slides for Cardinal meeting

Hi Nick,

I see one area that we may need to adjust on page 2.  The Medicare patients referred to the Foundation…..The Foundation determines the FPL and I believe it is closer to 450% FPL but I don't think we should state this on the document.

Can you take the reference to the FPL off this section?

Best regards,



**Cindy French**   Manager, Program Development, Patient Services and Solutions
Tel: +1-913-777-3946    Cell: (816) 812-6732   Fax: (816) 508-5308
Cindy.French@tevapharm.com    sip:Cindy.French@tevapharm.com    www.tevapharm.com

<image002.png>

---

**From:** Nick_Veomett@mckinsey.com [mailto:Nick_Veomett@mckinsey.com]
**Sent:** Wednesday, April 27, 2016 10:54 PM
**To:** Cindy French
**Cc:** Adriana_Eisner@mckinsey.com; Todd Kunkel; Chris Gumbs
**Subject:** Proposed financial assistance slides for Cardinal meeting

Cindy,

I have attached the latest version of the financial assistance program slides. This includes a new final slide (p4) with the considerations we discussed today. Please let me know if you have any comments.

4

CONFIDENTIAL - FOIA Exempt                                                                              Tev_320877

Also note I left the description of the Coupon on p2 with the current limits, with the footnote "Coupon limit increase and removal of monthly cap being considered." I'll let you know if this is officially increased before Fri.

Thanks,

Nick

----------------------------------------------------------------------------------------------------
Nicholas J Veomett, PhD | McKinsey & Company | M: +1 (415) 316-2542


+=================================================================================
=====+
This email is confidential and may be privileged. If you have received it
in error, please notify us immediately and then delete it. Please do not
copy it, disclose its contents or use it for any purpose.
+=================================================================================
=====+


This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.


+=================================================================================
=====+
This email is confidential and may be privileged. If you have received it
in error, please notify us immediately and then delete it. Please do not
copy it, disclose its contents or use it for any purpose.
+=================================================================================
=====+

CONFIDENTIAL - FOIA Exempt

Tev_320878

# EXHIBIT A-13

| | |
|---|---|
| **From:** | Larry Downey |
| **To:** | Katie Hiett |
| **Sent:** | 12/27/2011 5:22:42 PM |
| **Subject:** | RE: Q4 Expense Challenge - Approval to move forward with PAP donation |

Well managed!

---

**From:** Katie Hiett
**Sent:** Tuesday, December 27, 2011 11:18 AM
**To:** Mike Derkacz; John Hassler
**Cc:** Charles Friede; Lynn Dumas; Jessica Chung; Larry Downey
**Subject:** Q4 Expense Challenge - Approval to move forward with PAP donation

We will plan on moving forward with the Patient Assistance Donation that was forecasted in our Q4V2 based on the feedback below from Felicia. I will have Jessica get this ready and circulate for approval so we are not bumping up against Accounting deadlines on Thursday.

Regards,

TEVA    **Katie Hiett**   Dir, Finance & Planning
Tel: (816) 508-5088   Cell: (913) 709-0507   Fax: (913) 508-5592
Katie.Hiett@tevapharm.com    sip:Katie.Hiett@tevapharm.com    www.tevapharm.com

---

**From:** Felicia Ladin
**Sent:** Tuesday, December 27, 2011 10:59 AM
**To:** Katie Hiett
**Cc:** Deborah Griffin; Rachel Svaty
**Subject:** RE: Q4 Expense Challenge

Katie - at this point we do not need TN to cut any expenses vs. the Q4v2. Thanks for the efforts to identify opportunities.

---

**From:** Katie Hiett
**Sent:** Tuesday, December 20, 2011 6:08 PM
**To:** Felicia Ladin
**Subject:** Q4 Expense Challenge

Felicia,

I reviewed with Mike and John today. We have $10M in our V2 to fund Patient Assistance. If we cut this, it will impact 2012 as we will still need to fund these patients. The 2012 budget was based on the funding planned for Q4-2011. Not funding these patients has a direct and immediate impact on units. We will look for the $5M in other areas but it is late in the quarter to impact much change. We have our GTN review with Wendy/Kevin next week..we will see if we have any upside there as well as any normal fallout for the quarter. My proposal is to move forward with our Q4 Patient Assistance Funding (on 12/29) if we can get you close to the $5M in expenses that you are looking for.

We also have some grants in the queue but they were forecasted in 2012 so it does not sound like there will be any opportunity to pull those forward. We will plan on holding those.

I am keeping John, Mike, Chuck and Lynn in the loop on this so all are aware of the targets.

Regards,

---

CONFIDENTIAL – FOIA Exempt                                                                  Tev_115904

**Katie Hiett**   Dir, Finance & Planning
Tel: (816) 508-5088   Cell: (913) 709-0507   Fax: (913) 508-5592
Katie.Hiett@tevapharm.com   sip:Katie.Hiett@tevapharm.com   www.tevapharm.com

---

**From:** Felicia Ladin
**Sent:** Monday, December 19, 2011 8:58 AM
**To:** Katie Hiett
**Subject:** Re: Q4 info?

How much do you have we can decide last minute? Of course.....5M would be good.

---

**From:** Katie Hiett
**Sent:** Monday, December 19, 2011 09:54 AM
**To:** Felicia Ladin
**Subject:** RE: Q4 info?

how much are you looking for?

Regards,

**Katie Hiett**   Dir, Finance & Planning
Tel: (816) 508-5088   Cell: (913) 709-0507   Fax: (913) 508-5592
Katie.Hiett@tevapharm.com   sip:Katie.Hiett@tevapharm.com   www.tevapharm.com

---

**From:** Felicia Ladin
**Sent:** Monday, December 19, 2011 8:53 AM
**To:** Katie Hiett
**Cc:** Lynn Dumas
**Subject:** Re: Q4 info?

Thanks. Any flexibility with expenses?

---

**From:** Katie Hiett
**Sent:** Monday, December 19, 2011 09:50 AM
**To:** Felicia Ladin
**Cc:** Lynn Dumas
**Subject:** RE: Q4 info?

Felicia,

- They have not shipped but Pat has everything set to go with the wholesalers.
- The additional 5000 units of copaxone should give you about 14M in Net Sales $12M in Op Profit.
- We are paying an incentive to McKesson and should have their final order for the year today.
- Craig is working closely with Pat to manage year end inventories.  Craig is estimating year end inventory to be slightly under 30 days.
- We are still looking at Azilect but it should not be material.

- Expenses:  We are planning to execute on all expenses that we had in our V1 and V2 forecast.

CONFIDENTIAL – FOIA Exempt

Tev_115905

**Katie Hiett**  Dir, Finance & Planning
Tel: (816) 508-5088    Cell: (913) 709-0507    Fax: (913) 508-5592
Katie.Hiett@tevapharm.com    sip:Katie.Hiett@tevapharm.com    www.tevapharm.com

---

**From:** Felicia Ladin
**Sent:** Monday, December 19, 2011 8:39 AM
**To:** Katie Hiett
**Subject:** Re: Q4 info?

Thanks. Are they already shipped or do we need to do a buy?

---

**From**: Katie Hiett
**Sent**: Monday, December 19, 2011 09:37 AM
**To**: Felicia Ladin
**Subject**: RE: Q4 info?

The units are good..we will ship the additional 5K..I am trying to get the wholesaler DOH for you…give me a few minutes and I will get you an update.

Regards,

**Katie Hiett**  Dir, Finance & Planning
Tel: (816) 508-5088    Cell: (913) 709-0507    Fax: (913) 508-5592
Katie.Hiett@tevapharm.com    sip:Katie.Hiett@tevapharm.com    www.tevapharm.com

---

**From:** Felicia Ladin
**Sent:** Monday, December 19, 2011 8:33 AM
**To:** Katie Hiett
**Subject:** Q4 info?

Hi Katie

Hope you enjoyed your weekend.  When do you think you will have an update on Q4?  We need the info to make some decisions.

Thanks.

**Felicia Ladin**   Vice President, USBP Finance
Tel: 215-591-8733
Felicia.Ladin@tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-14

| | |
|---|---|
| **From:** | Mike Sheehy |
| **To:** | John Hassler |
| **Sent:** | 12/21/2012 3:55:38 PM |
| **Subject:** | FW: Updates |

One more thing:

Patient assistance funding:
- I have been visiting with Denise over the week regarding the need for the funding
- We are going to be about $15 million over the 2013 budget and that just gets us through January
- I have provided Denise the direction to move forward because not doing so directly impacts the topline with existing patients

Travel safe.

  **Mike Sheehy**
Director, Brand Product Marketing
Office: (816) 508-5082  Mobile: (816) 547-5055

**From:** Mike Sheehy
**Sent:** Friday, December 21, 2012 9:32 AM
**To:** John Hassler
**Subject:** Updates

John:
Here are a couple of updates:

Staffing:
- Interview being set up with DeAnne and you around CRM / Website PM
- Talked with Mike about Amanda:
  - Amanda is not interested in CRM / Web PM position
  - Mike D. feels that, if she is a good fit with our team, that she has the background and experience to be an AD
  - Given her potential for an AD position I have a proposal:
    § Schedule interviews with Amanda for you, Tom Gawlick and myself on January 3 or 4.
    § Assuming she is a good fit for our teams consider the following:
    1. Reorganize the COPAXONE team to have 3 ADs (Patient, Payer, Professional):
       - Doris continue to lead the Patient/Consumer team
         § Keep Karen, Ann & Bev
         § Add New Hire for CRM/Web
         § Potential have Janelle and Jenny report to Karen or New Hire with Patient programs
       - Amanda lead the Professional team
         § Inherit Adam for KOL and PA liaison
         § Inherit Scott for Sales Force liaison
         § Amanda to manage Speaker Bureau
       - Jeff lead the Payer team as well as lead 40mg launch planning team
    2. Move Gretchen to COPAXONE
       - Gretchen backfill Colette on COPAXONE team
       - Tom consider between Mendy and Amanda for AD spot on Azilect

- Next steps:
  - What are your thoughts regarding the options above

CONFIDENTIAL – FOIA Exempt

- o Contact Amanda to see if she would be interested in the potential COPAXONE or Azilect positions in KC, no promises
- o If interested, schedule interviews with Tom, John and Mike for Amanda on either January 3 or 4.


COPAXONE inventory:
- · Calls have increased over the past week regarding patients being told at the pharmacy level that COPAXONE was not available because of the recall.
- · I have spoken with the functional leads (Distribution, Account Management, ShS) and provided the direction that we need to continue to handle these on a case by case basis.  In total, I have been made aware of dozen or so calls / emails.  Chris Doerr is working with wholesalers and ensuring COPAXONE is being shipped where it is needed.
- · I talked with Jim G. and I sent out a communication to the sales leadership team to help pull product from wholesalers if they hear about issues within their areas, regions & territories.


Thanks,

 

**Mike Sheehy**
Director, Brand Product Marketing
Office: (816) 508-5082  Mobile: (816) 547-5055

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-15

| | |
|---|---|
| **From:** | Jennifer Clark |
| **To:** | Ryan Sloss |
| **Sent:** | 1/9/2015 5:53:54 PM |
| **Subject:** | RE: 2015 Copaxone Donation |

How did 2015 ever get lowered from $46.3M?

As for out years, we need to keep it as high as we can because sales is overstated.  They still have Medicare revenue in there which is highly unlikely if the donations are no longer made.

**Jennifer Clark**   Associate Director, Patient Svc & Support
Tel: +1-913-777-3949    Cell: 816 332-2873
Jennifer.Clark@tevapharm.com    www.tevapharm.com

---

**From:** Ryan Sloss
**Sent:** Friday, January 09, 2015 11:32 AM
**To:** Jennifer Clark
**Subject:** RE: 2015 Copaxone Donation

Ok.  Sorry, one follow up for Deganit.  For his cash flow model, we left 2016 and beyond at $46.3M.  Should I continue to show that amount for now?  I know we lowered our 2015 figure to $41.3M (before the $10M payment).  Should I lower those out years as well or are we still comfortable at the $46.3M?  I'm tempted to leave it as I'm sure it is easier explaining a decrease, vs and increase if we need to make one!

Thanks,
Ryan

---

**From:** Jennifer Clark
**Sent:** Friday, January 09, 2015 11:24 AM
**To:** Ryan Sloss
**Subject:** RE: 2015 Copaxone Donation

I would expect the $30M in Jan, not spread out.

**Jennifer Clark**   Associate Director, Patient Svc & Support
Tel: +1-913-777-3949    Cell: 816 332-2873
Jennifer.Clark@tevapharm.com    www.tevapharm.com

---

**From:** Ryan Sloss
**Sent:** Wednesday, January 07, 2015 4:42 PM
**To:** Jennifer Clark
**Subject:** 2015 Copaxone Donation

Hi Jennifer,
We are going to adjust the 2015 Q1V1 for the Copaxone Donations – decreasing it by $10M.  Attached is a file that just allocates the reduction based on a weighted average of the 2015 AOP.  Do you have a more exact feel of how the $31.3M will be paid or is this ok?  If you have something more exact, I wanted to use that for our Q1V1 and provide it to Deganit for his cash flow model.

CONFIDENTIAL – FOIA Exempt

Thank you!
Ryan

CONFIDENTIAL – FOIA Exempt
Tev_048396

# EXHIBIT A-16

| | |
|---|---|
| **From:** | Alejandro Castro |
| **Sent:** | Wednesday, February 4, 2015 2:21 PM |
| **To:** | David Loughery |
| **Subject:** | RE: Q1V2 Copaxone Donations |

Thank you Dave.

Best regards,

 **Alejandro Castro**   Associate Director, FP&A
Tel: (913) 777-3429    Cell: (913) 689-0015
Alejandro.Castro@tevapharm.com    www.tevapharm.com

**From:** David Loughery
**Sent:** Wednesday, February 04, 2015 8:03 AM
**To:** Alejandro Castro
**Cc:** Rachel Svaty; Mike Sheehy
**Subject:** RE: Q1V2 Copaxone Donations

Alejandro,

To keep you updated, we agreed yesterday to fund $8.5M today, which is ~$3M more than the remaining Q1 budget.  There is a possibility that more will be donated in March as well.  Please work with Mike and his team to explore ways that we can offset this in other areas of spend.  We also plan to take up sales in the Q1V2 and have asked that the increase there be a substitute for some reduced expenses.  We will however need to show some reductions so the $10M that was donated in 2014 will need to come out of the next projection.

DL

**From:** Alejandro Castro
**Sent:** Monday, February 02, 2015 4:47 PM
**To:** David Loughery
**Subject:** Q1V2 Copaxone Donations

Dave,
Per our conversation on Friday, Rachel and I talked about the donation budget for Copaxone.

**There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing donations.**

Here are a few highlights of the Donations situation.

- Patient access has told us that during 2015 about $25M have been donated already (this is in addition to any prior donations made late in 2014 that were pulled from 2015)

1

CONFIDENTIAL - FOIA Exempt

Tev_304357

- The 2015 Budget (per Q1V1) for Donations is $31.3M
- Thus, there are **$6.3M for the remaining of the year** ( $5.0 in Q1 and $1.3M in Q2)
- Patient access has also mentioned that they will need between **$5M and $8M in donations** soon to avoid losing an estimated 1,500 Medicare Patients.

I took a look at the Gross to Net metrics for a Medicare patient and ran several combinations of the 20 and 40mg split for the 1,500 patients to evaluate the risk on Gross Sales and risk on Net Sales if these patients are actually lost.



The chart above shows that:
- For Gross Sales, between $7.5M (if 100% of the 1,500 patients are in 40mg) and $9.2M (if 100% of the 1,500 patients are in 20mg) could be at risk per month
- For Net Sales, between $5.7M (if 100% of the 1,500 patients are in 40mg) and $6.1M (if 100% of the 1,500 patients are in 20mg) could be at risk per month
- **Patient Access' best guess is that 25% of these 1,500 patients are in the 20mg treatment and 75% are in the 40mg. That particular combination shows a risk of $7.9M in gross sales and $5.8M in net sales.**

I am mentioning these Net Sales risk since I believe this is what can be argued against reducing the Donation forecast.

I know Rachel is going to talk to Mike while they are in Orlando about this donation budget.

Please let me know if you have any questions, need any drivers of the analysis above or if want me to run other scenarios.

Thank you,

Ale

Best regards,

2

CONFIDENTIAL - FOIA Exempt

Tev_304358

 **Alejandro Castro**   Associate Director, FP&A
Tel: (913) 777-3429    Cell: (913) 689-0015
Alejandro.Castro@tevapharm.com    www.tevapharm.com

3

CONFIDENTIAL - FOIA Exempt

# EXHIBIT A-17

| | |
|---|---|
| **From:** | Jennifer Clark |
| **Sent:** | Thursday, August 13, 2015 10:03 PM |
| **To:** | Ryan Sloss |
| **Subject:** | RE: Cop donations |

As long as that's clear that it would be made in 2015, I'm fine.

 **Jennifer Clark, CPA**  Associate Director, Patient Services & Support
Tel: 913-777-3949    Cell: 816-332-2873
Jennifer.Clark@tevapharm.com   www.tevapharm.com

**From:** Ryan Sloss
**Sent:** Thursday, August 13, 2015 5:02 PM
**To:** Jennifer Clark
**Subject:** RE: Cop donations

If it is moved to the end of 15, there is really no impact is there ($10 Mill in Dec of 2015 and $40M in 2016)?
I think Dave is proposing this to point out how beneficial it would be to the budget to move it forward and trying to prompt a decision to do so.  BUT, I must admit it makes me nervous to not have it in…afraid someone will drop the ball and it won't be paid in 15 or put back into 16 and then it's as you say, we either pay it and go over budget or we don't make our sales numbers.
So, it is my understanding as of now that they are keeping with the $50M, just trying to prompt a decision about when payments are made.

**From:** Jennifer Clark
**Sent:** Thursday, August 13, 2015 4:56 PM
**To:** Ryan Sloss
**Subject:** RE: Cop donations

I also want to make sure that it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill.

 **Jennifer Clark, CPA**  Associate Director, Patient Services & Support
Tel: 913-777-3949    Cell: 816-332-2873
Jennifer.Clark@tevapharm.com   www.tevapharm.com

**From:** Ryan Sloss
**Sent:** Thursday, August 13, 2015 4:23 PM
**To:** Jennifer Clark
**Subject:** FW: Cop donations

1

CONFIDENTIAL - FOIA Exempt

Just a FYI – Told to reduce the Donation by $10M and they will show it as a risk – my understanding is that you are not losing this money, they are just trying to point out the benefit of pulling it forward to 2015.  Please see the explanation below from David Loughery.

---

**From:** Rachel Svaty
**Sent:** Thursday, August 13, 2015 2:21 PM
**To:** Ryan Sloss
**Subject:** FW: Cop donations

Ryan, please reduce the Copaxone donations from $50M to $40M with the $10M coming out of Q1.  And don't add the $10M to 2015.  See below for explanation.

---

**From:** David Loughery
**Sent:** Thursday, August 13, 2015 2:10 PM
**To:** Rachel Svaty; Alejandro Castro
**Subject:** RE: Cop donations

Yes.  I realize this is a bit awkward and inconsistent.  However, I think we will need to do these things to hit AOP and want to highlight that.  With the timing of the Q3V2, I hesitate to include in the submission until we've had more time to socialize the concept.  I think with the Allergan/Mylan and Q2 results, I doubt Eyal has had time to think about this.

---

**From:** Rachel Svaty
**Sent:** Thursday, August 13, 2015 2:45 PM
**To:** David Loughery; Alejandro Castro
**Subject:** Cop donations

Dave, after thinking about the 2016 activity (above $500k projects) that has been proposed to pull into 2015, I'm not sure I get it.  Is this how we should be thinking using Copaxone donations as an example?

- 2016 AOP – reduce 2016 Copaxone donations by $10M and show $10M as 2016 risk
- 2015 LBE – don't show the $10M since it hasn't been approved to shift the timing

2

CONFIDENTIAL - FOIA Exempt

Tev_318788

# EXHIBIT A-18

| From: | Katie Hiett |
|---|---|
| To: | Felicia Ladin |
| CC: | Reena Singh; Lynn Dumas |
| Sent: | 11/15/2011 10:38:15 PM |
| Subject: | RE: WP Pricing and Unit Scenarios |

Of the 20,550 incremental 2012 units, ~16K are due to delaying the JC Anti Virus assumption to Jan 1, 2012 (vs. Oct 1, 2011) and the remainder is demand...

I discussed the need for Patient Assistance with Denise and incremental price increases of 9.9%/5% over planned amount of 8.9% would cause a potential patient assistance increase of $4M-$5M across all of the Copaxone patient assistance programs. This was a high level estimate for now.

Regards,

**TEVA**     **Katie Hiett**   Dir, Finance & Planning
Tel: (816) 508-5088    Cell: (913) 709-0507    Fax: (913) 508-5592
Katie.Hiett@tevapharm.com    sip:Katie.Hiett@tevapharm.com    www.tevapharm.com

---

**From:** Felicia Ladin
**Sent:** Tuesday, November 15, 2011 1:17 PM
**To:** Katie Hiett
**Cc:** Reena Singh
**Subject:** FW: WP Pricing and Unit Scenarios

Katie,

How much of the units is based on units for 2012 and the delay of the JC Anti-virus test?

Thanks,
Felicia

---

**From:** Mike Derkacz
**Sent:** Tuesday, November 15, 2011 2:00 PM
**To:** Felicia Ladin
**Subject:** FW: WP Pricing and Unit Scenarios

---

**From:** Katie Hiett [mailto:Katie.Hiett@tevapharm.com]
**Sent:** Tuesday, November 15, 2011 9:58 AM
**To:** Derkacz, Mike
**Cc:** John Hassler; Lynn Dumas; Reena Singh
**Subject:** RE: WP Pricing and Unit Scenarios

Mike,

All scenarios reflect exiting 2011 at 975,000 units, which is the higher exit planned for upcoming Q4V2. The additional units in 2012 are reflected in the analysis but the incremental quantity is 20,551 units..not 16,000. Net Sales and Op Profit are all in millions. Let us know if you need anything else for your meeting today.

CONFIDENTIAL – FOIA Exempt

Q4V2 2011 = 975,000
Q4V1 2011 = 968,750
2011 WP     = 942,182

| **9.9% Jan 1 Higher Units Var to WP** | **2,012** | **2,013** | **2,014** |
|---|---|---|---|
| 20mg Units | 20,551 | 4,895 | -1,996 |
| 40mg Units | 0 | -62 | -1,009 |
| Net Sales | 78 | 30 | 5 |
| Gross Margin | 71 | 28 | 5 |

| **9.9% / 5.0% Jan 1 / June 1 Higher Units** | **2,012** | **2,013** | **2,014** |
|---|---|---|---|
| 20mg Units | 20,551 | 4,895 | -1,996 |
| 40mg Units | 0 | -62 | -1,009 |
| Net Sales | 146 | 148 | 112 |
| Gross Margin | 135 | 137 | 105 |

| **11.9% Jan 1 Higher Units Var to WP** | **2,012** | **2,013** | **2,014** |
|---|---|---|---|
| 20mg Units | 20,551 | 4,895 | -1,996 |
| 40mg Units | 0 | -62 | -1,009 |
| Net Sales | 122 | 72 | 43 |
| Gross Margin | 113 | 67 | 41 |

| **14.9% Jan 1 Higher Units Var to WP** | **2,012** | **2,013** | **2,014** |
|---|---|---|---|
| 20mg Units | 20,551 | 4,895 | -1,996 |
| 40mg Units | 0 | -62 | -1,009 |
| Net Sales | 190 | 135 | 101 |
| Gross Margin | 175 | 126 | 94 |

Regards,

**Katie Hiett**   Dir, Finance & Planning
Tel: (816) 508-5088    Cell: (913) 709-0507    Fax: (913) 508-5592
Katie.Hiett@tevapharm.com    sip:Katie.Hiett@tevapharm.com    www.tevapharm.com

---

**From:** Reena Singh
**Sent:** Monday, November 14, 2011 6:00 PM
**To:** Mike Derkacz
**Cc:** John Hassler; Katie Hiett; Lynn Dumas
**Subject:** WP Pricing and Unit Scenarios

Hello Mike,

Per your request I have completed 2 additional scenarios (Jan 1 9.9% and June 1 5% pricing actions with planned and higher units).

The attached file contains 2 tabs.  The first tab contains the TEC WP and a summary of the variances by scenario.  The 2nd tab reflects the net sales and gross margin for each scenario and the variances to WP.

Please let me know if you have any questions.  I will be leaving the office in about 30 minutes but will be available via cell or email this evening.

CONFIDENTIAL – FOIA Exempt

Tev_128513

Tev_128513

Kind Regards,
Reena


**Reena Singh**   Finance Analyst
Tel: (816) 508-8424    Cell: (816) 377-5850    Fax: (816) 508-5519
Reena.Singh@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

Tev_128514

Tev_128514

# EXHIBIT A-19

**Patient Services and
Solutions, Inc.**

# Memo

**To:**     File

**From:**   Mark Murtaugh

**CC:**

**Date:**   TIME

**Re:**     Contributions Deductible as Business Expenses

*Facts*

Beginning in 2013, Patient Services and Solutions, Inc. (PSS) provides pharmacy services for the distribution of first dose and refills of COPAXONE® on behalf of Teva Pharmaceutical Industries Ltd. (TPI) amongst other services that were historically performed by Teva Neuroscience Inc (TN).

PSS makes regular cash donations throughout the year to the Medicare Patient Assistance Program, a qualified 501(c)(3) organization specifically to subsidize co-pays of COPAXONE® patients who may need financial assistance. In 2012 and through 6/30/13 these contributions amounted to approximately $48.275 million and $34.125 million, respectively.

This donation is reimbursed fully by TPI.

*Issue*

Do the payments that PSS make to Medicare Patient Assistance Program qualify as a business expense instead of charitable contribution?

*Conclusion*

The payments to Medicare Patient Assistance Program are made with expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense.

*Discussion*

A business expense deduction is generally not allowable for a contribution made to a charitable organization[1] however donations to organizations which bear a direct relationship to the taxpayer's business and are made with a reasonable expectation of a financial return commensurate with the amount of the donation may constitute allowable deductions as business expenses.[2] With

---

[1] IRC §162(b)
[2] Federal Regulation §1.162-15(b)

CONFIDENTIAL – FOIA Exempt

COPAXONE® generating US sales of $2.95 billion in 2012, the taxpayer has a reasonable expectation of financial return commensurate with its contribution of $48.275 million in 2012 and $34.125 million through 6/30/13.

A strictly contractual obligation on the part of the charity *is not* required, as long as the consideration justifies a "reasonable expectation" of financial return. Yet, to entitle the taxpayer to a business expense deduction, the expected return must be:

    (1) of a *financial* nature; and

    (2) not only more than nominal, but "commensurate with" the payment or other transfer.[3]

In the Sarah Marquis case, the petitioner, a travel agent, regularly transacted a large portion of her business with clients who were exempt as charitable organizations under sec. 170. At the end of each year, she made payments to them keyed to the amount, character and profitability of such business. The contributions were allowed as business expenses because they were a substantial, continuing and integral part of the business.

---

[3] Marquis, Sarah, (1968) 49 TC 695, acq 1971-2 CB 3

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-20

| | |
|---|---|
| **From:** | Felicia Ladin |
| **To:** | Rachel Svaty |
| **CC:** | David Loughery |
| **Sent:** | 12/23/2014 6:56:59 PM |
| **Subject:** | Copaxone donations |

Please release $25M of Copaxone donations to be mailed on Dec 29th.  Please ask Accounting to check with me before any final action.  Thanks.

CONFIDENTIAL – FOIA Exempt

Tev_049216

# EXHIBIT A-21

| | |
|---|---|
| **From:** | Eyal Desheh |
| **Sent:** | Saturday, January 10, 2015 5:42 AM |
| **To:** | Felicia Ladin |
| **Cc:** | Rachel Svaty |
| **Subject:** | Re: Response requested: Approval for Copaxone donation payment |

I approve.

Eyal


On 10 2015 בינוי, at 00:03, Felicia Ladin <Felicia.Ladin@tevapharm.com> wrote:

> Eyal -
>
> Please approve the 2015 Copaxone donations of $25m.    This represents the AOP less the $10m payment we made in q4.
>
> Thanks.
>
>
> Begin forwarded message:
>
> > **From:** Rob Koremans <Rob.Koremans@tevapharm.com>
> > **Date:** January 9, 2015 at 3:52:49 PM EST
> > **To:** Larry Downey <Larry.Downey@tevapharm.com>
> > **Cc:** Rachel Svaty <Rachel.Svaty@tevapharm.com>, Felicia Ladin <Felicia.Ladin@tevapharm.com>, David Loughery <David.Loughery@tevapharm.com>, Jan Jones <Jan.Jones@tevapharm.com>, Jennifer Clark <Jennifer.Clark@tevapharm.com>
> > **Subject: Re: Response requested: Approval for Copaxone donation payment**
> >
> > I approve
> >
> > Rob Koremans, MD
> > President and CEO
> > Global Specialty Medicines
> > Teva Pharmaceutical Industries

1

CONFIDENTIAL - FOIA Exempt

Tev_317893

On 09 Jan 2015, at 14:50, Larry Downey <Larry.Downey@tevapharm.com> wrote:

I approve.

Rob:
Due to the new authority limits, our Q1 Copaxone Donation payment of $25M needs your approval.  This is standard for us to make a large lump sum payment in Q1 and is in the AOP.
Please approve.
Thanks, Larry

Sent from my iPad

Begin forwarded message:

> **From:** Rachel Svaty <Rachel.Svaty@tevapharm.com>
> **Date:** January 9, 2015 at 1:22:02 PM CST
> **To:** Larry Downey <Larry.Downey@tevapharm.com>
> **Cc:** Felicia Ladin <Felicia.Ladin@tevapharm.com>, David Loughery <David.Loughery@tevapharm.com>, Jan Jones <Jan.Jones@tevapharm.com>, Jennifer Clark <Jennifer.Clark@tevapharm.com>
> **Subject: Response requested: Approval for Copaxone donation payment**
>
> Hi Larry,
>
> In December, a $10M Copaxone donation payment was completed and pulled into 2014 from the 2015 budget.  The remainder of the budgeted Q1 2015 Copaxone donation needs to completed.  The payment amount is $25M and requires written approval from you, Rob, and Eyal.  Could you please reply all with your approval and include Rob requesting his approval?  After Rob approves, Felicia will obtain Eyal's approval.  The wire transfer form is attached for your reference.
>
> Thanks,
> Rachel

CONFIDENTIAL - FOIA Exempt                                                    Tev_317894



<image001.png>

**Rachel Svaty,** Associate Director, Finance
Tel: (913) 777-3397    Cell: (816) 585-7753
Rachel.Svaty@tevapharm.com    OP desk: 5F42

<Copaxone Donation wire transfer 010915.xls>

3

CONFIDENTIAL - FOIA Exempt

Tev_317895

# EXHIBIT A-22

| | |
|---|---|
| **From:** | Anna Khais |
| **Sent:** | Thursday, February 5, 2015 1:45 PM |
| **To:** | Rachel Svaty |
| **Cc:** | Roberta Diver |
| **Subject:** | FW: Response requested: Approval for Copaxone donation payment |

Rachel

FYI

Regards,

**Anna Khais, CPA**
Director, Finance
Tel: 215.591.8997   Fax: 215.795.4013
anna.khais@tevapharm.com   www.tevausa.com

---

**From:** Mildred Spencer
**Sent:** Thursday, February 05, 2015 8:27 AM
**To:** Anna Khais; Roberta Diver; Joan McNaney
**Subject:** RE: Response requested: Approval for Copaxone donation payment

Hi Anna,

The funds were released and below are the details.

**$8,500,000.00**

FED WIRE OUT ▮▮▮▮▮▮ RIGINATOR: TEVA PHARMACEUTICALS USA
AC/▮▮▮▮▮▮ BENEFICIARY: The Assistance Fund AC/▮▮▮▮▮▮
Millenia Blvd  Suite 500  Orlando  FL 32839 RECVBNK:SUNTRUST BANK
ABA ▮▮▮▮▮ RFB: ▮▮▮▮▮▮ OBI: Medicare Patient Assistance
Program - Teva Neuroscience; Attn: Edward Hensley TRN:▮▮▮▮▮▮ FED
REF/TIME:000170 /08:24:11 DATE:02-05-15 POST TIME:08:24:10

**Millie Spencer**
**Sr. Manager, Treasury Operations**
**Teva Pharmaceuticals USA, Inc.**
**1090 Horsham Road    North Wales, PA  19454**
**Tel:  215.641.6971**

---

**From:** Anna Khais
**Sent:** Thursday, February 05, 2015 6:35 AM
**To:** Mildred Spencer; Roberta Diver; Joan McNaney
**Subject:** Fwd: Response requested: Approval for Copaxone donation payment

1

CONFIDENTIAL - FOIA Exempt

Please see below and execute. Thanks

Anna Khais
Director, Finance
Teva Pharmaceuticals USA
(215) 591-8997 office

Begin forwarded message:

**From:** Rachel Svaty <Rachel.Svaty@tevapharm.com>
**Date:** February 4, 2015 at 9:47:03 PM EST
**To:** Anna Khais <Anna.Khais@tevapharm.com>, Roberta Diver <Roberta.Diver@tevapharm.com>
**Subject: FW: Response requested: Approval for Copaxone donation payment**

Anna/Roberta, here is the approval from Larry and Rob.  Please let me know when the transfer has been completed on Thursday.  Thank you!

Should I be copying someone in Treasury on these requests?  We may have a payment in March.

**From:** Rob Koremans
**Sent:** Wednesday, February 04, 2015 6:10 PM
**To:** Larry Downey
**Cc:** Rachel Svaty; David Loughery
**Subject:** Re: Response requested: Approval for Copaxone donation payment

Larry, thanks. I approve

Rob Koremans, M.D.
President and CEO Global Specialty Medicines
Teva Pharmaceutical Industries

On 4 feb. 2015, at 06:19, Larry Downey <Larry.Downey@tevapharm.com> wrote:

> Rob:
> Please approve the attached.  I support.
> Thanks, Larry
>
> Sent from my iPad
>
> Begin forwarded message:
>
>> **From:** Rachel Svaty <Rachel.Svaty@tevapharm.com>
>> **Date:** February 3, 2015 at 2:32:17 PM EST
>> **To:** Larry Downey <Larry.Downey@tevapharm.com>
>> **Cc:** David Loughery <David.Loughery@tevapharm.com>, Jan Jones <Jan.Jones@tevapharm.com>, Jennifer Clark <Jennifer.Clark@tevapharm.com>
>> **Subject: Response requested: Approval for Copaxone donation payment**
>>
>> Hi Larry,

2

CONFIDENTIAL - FOIA Exempt

Tev_317585

The 2015 AOP included $41.3M of Copaxone donations.  Teva has paid $35M, with $10M in December and $25M in January.  The remaining budget is $6.3M between Q1 and Q2.  We are requesting your approval to use the remaining funds and increase the payment to $8.5M.  Could you please reply all with your approval and include Rob requesting his approval?  After Rob approves, I will work with Accounting and Treasury to complete the payment.  The wire transfer form is attached for your reference.

Thanks,
Rachel

<image001.png>

**Rachel Svaty,** Associate Director, Finance
Tel: (913) 777-3397    Cell: (816) 585-7753
Rachel.Svaty@tevapharm.com    OP desk: 5F42

<Copaxone Donation wire transfer 013015.xls>

3

CONFIDENTIAL - FOIA Exempt

Tev_317586

# EXHIBIT A-23

| | |
|---|---|
| **From:** | Jan Jones |
| **Sent:** | Tuesday, April 14, 2015 5:39 PM |
| **To:** | Jennifer Clark; Rachel Svaty |
| **Subject:** | RE: Copaxone Donation wire transfer 041315.xls |

Please accept this email as my approval of the donation.

Best regards,

**Jan Jones**  Dir, Patient Svc & Support
Tel: 913-777-3929
Jan.Jones@tevapharm.com
www.tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Tuesday, April 14, 2015 6:51 AM
**To:** Jan Jones
**Subject:** FW: Copaxone Donation wire transfer 041315.xls

Jan,

We have the green light from Mike & Finance to move forward with this donation.  Please forward your approval to Rachel and she will move it through the process.  Thanks!

**Jennifer Clark**  Associate Director, Patient Svc & Support
Tel: +1-913-777-3949    Cell: 816 332-2873
Jennifer.Clark@tevapharm.com   www.tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Monday, April 13, 2015 2:17 PM
**To:** Jan Jones
**Subject:** Copaxone Donation wire transfer 041315.xls

Hi Jan,

Hope you're starting to feel better, especially before your trip tomorrow.  We would like to make another donation to TAF in the amount of $725,000.  The Q2 donation amount is $4,400 + 9% admin fee.  Based on the last forecast, I had $1.4M built into Q2.  I have not ran this past Mike or Finance yet.  I've attached a copy of the check request for your approval.  I would be happy to make the calls to Mike & Finance if you're aligned.  Let me know if you have any questions.  Thanks!

1

CONFIDENTIAL - FOIA Exempt

Tev_317574

# EXHIBIT A-24

| | |
|---|---|
| **From:** | David Loughery |
| **Sent:** | Thursday, January 19, 2017 3:23 PM |
| **To:** | Rob Koremans |
| **Cc:** | Larry Downey; Michael McClellan; Amanda Welsh; Laurie Thibodeau |
| **Subject:** | Copaxone donations approval |

Rob,

Very soon you will receive requests to approve 3 separate payments related to 2017 planned Copaxone donations totaling $38M.  This amount was planned in the AOP.  The team has reviewed these in terms of whether it would still make sense to make these payments should a negative court decision come in February concerning Copaxone.  Based upon the following, we still believe there is value in making these payments:

- These payments aid Medicare patients with their copays is they encounter the Donut Hole period.  35% of Copaxone patients have Medicare coverage.  With MS care being a fairly expensive condition, patients tend to enter and then exit the Donut Hole period within their first 2 fills of the year.  The majority of patients would receive the benefit before the end of February, thus why we make these funds available for the agencies early in the year.  In the event of generic entrants, we do not foresee a quick conversion, so we feel Copaxone would maintain a reasonable number of patients receiving this benefit.
- The Corporate Social Responsibility Team has communicated to these agencies our intent to fund and these agencies are funding patients currently based upon the expected receipt of these amounts.  While we do not see the makeup of the drugs these patients are receiving, Copaxone continues to be the #1 prescribed RMS therapy.

We have reviewed with Larry and Mike and they are both in agreement with making these donations.

Please let me know if you need further information or would like to discuss in more detail.

Best regards,

**David Loughery**  VP Finance, NASM
Office (610) 727-3215  Cell (215) 801-3418
David.Loughery@tevapharm.com    sip:David.Loughery@tevapharm.com    www.tevapharm.com

1

CONFIDENTIAL - FOIA Exempt

Tev_359528

# EXHIBIT A-25

Case 1:20-cv-11548 Document 1-25 Filed 08/13/20 Page 1 of 9

# DONATION AGREEMENT

THIS DONATION AGREEMENT (this "*Agreement*") is made and entered into as of December 28, 2006 (the "Effective Date"), by and between Chronic Disease Fund, Inc., a non-profit corporation and Teva Neuroscience, Inc., a Delaware corporation.

---

**1.  Recitals.**    Chronic Disease Fund, Inc. (the "Foundation") is a charitable, non-profit 501(c)(3) public charity, located at 6089 Sweeney Trail, Frisco, Texas 75034 formed for the purpose of providing financial support to underinsured patients with certain medical conditions.    The Foundation has an assistance program for patients being treated for Multiple Sclerosis with any medically appropriate therapy who meet certain financial and medical criteria ("*Program*"), which may include assistance paying or reimbursing such patients' deductibles, co-payments and co-insurance.  Teva Neuorscience, (the "Donor") desires to provide the Foundation with a donation for the Program.

**2.  Non-Profit Status of Foundation.**    The Internal Revenue Service ("*IRS*") recognizes the Foundation as a federal tax-exempt section 501(c)(3) organization; therefore, any donations received by the Foundation, including those made pursuant to this Agreement, will be tax-deductible to the fullest extent allowed by law.  Within thirty (30) days of the Donation, as defined in Section 4, provided to the Foundation, the Foundation will provide a copy of the Foundation's exemption determination letter from the IRS to Donor, as well as, a letter that attests to the existence of the Donation and that Donor may use such letter for its valid purposes.

**3.  Independence of the Foundation and Program.**

**(a)**  The Foundation will be governed by an independent Board of Directors (the "*Board*").  Administration and operation of the Foundation and Program will be at the sole discretion of the Board.  The Board will have complete authority regarding the distribution of all Program funds (including the Donation).  Program administration, operation, and allocation of funds will comport with the Foundation's charitable purpose, applicable local state and federal laws, rules and regulations, and the policies adopted by the Board. Specifically, the make-up and governance of the Board and the Foundation shall be as a *bona fide*, independent charity as described by the Office of the Inspector General in the November 2005 Special Advisory Bulletin titled "Patient Assistance Programs for Medicare Part D Enrollees" unaffiliated with the Donor as well as any other pharmaceutical manufacturer who donates to the Foundation. Further, the Foundation has received a favorable OIG opinion that supports the "Program" as documented in OIG Opinion 06-10.

**(b)**  Donor will not have any representative on the Board (or participate or otherwise observe any Board meeting), nor will Donor have any input regarding selection of the Foundation's directors or officers.  Further, Foundation and its Board shall not be formed, nor indirectly or directly influenced or controlled by any manufacturer or any of its affiliates (including, without limitation, any

wholesaler, distributor, or pharmacy benefits manager) who donates to the Foundation, including but not limited to the Donor.  Donor will not be the sole pharmaceutical manufacturer solicited for funding of the Foundation or the Program.

**(c)**  Program eligibility criteria will be developed by the Board without consideration or input by Donor.  A copy of the Program eligibility criteria shall be provided to Donor during the term of this Agreement.  Donor will have no control or participation in determinations affecting distributions of Program funds to providers, suppliers, or patients, the providers or suppliers used by patients, or the products or treatments provided to patients to treat or in connection with multiple sclerosis. The Donation shall not be attributed to the Donor by the Foundation or the Board, except as required by applicable IRS Regulations or other applicable Laws.

**(d)**  Lastly, the criteria established by the Board and the Foundation shall be based on a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner.  Some of the factors that will be considered will be:   local cost of living, a patient's assets and expenses, a patient's family size, and the scope and extent of a patient's medical bills.

**4.  Donation.**

**(a)**  Donor shall endeavor to provide the Foundation with funding to support the Foundation's mission of providing deductible, co-payment and co-insurance assistance (and/or such other forms of assistance as may be determined by the Foundation) to patients meeting the Program's objective financial eligibility criteria, so that such patients may obtain prescription drug (or biologic) therapy for or in connection with Multiple Sclerosis during the Term (as defined in Section 7(a) below) (the "Donation").

**(b)**  Donor shall provide the Foundation with funding in the amount of six million and sixty-seven thousand dollars ($6,067,000) payable within fifteen (15) days of the Effective Date of this Agreement ("Initial Donation").

**(c)**  If Foundation determines that the Initial Donation does not meet the needs of the patients who seek assistance from the Foundation for Multiple Sclerosis during the Term, Foundation shall notify the Donor in writing but no less than sixty (60) days before the Initial Donation has been depleted.  Both parties shall meet to discuss the potential for an additional donation and for what amount.  If both Parties mutually agree to an additional donation during the Term, the Parties shall execute an addendum that provides the terms and conditions  of  such  additional  donation  (an

"Addendum"). A sample Addendum is provided as Exhibit A.

**(d)** If Donor desires to provide additional donations to the Foundation, Donor shall notify the Foundation in writing of the contemplated donation amount, and both Parties shall discuss the contemplated donation amount and shall execute an Addendum for such amount.

**(e)** The Parties acknowledge and agree that the Donation does not represent a fee for any services rendered by the Foundation to Donor.

**(f)** Donor shall pay the Initial Donation and any additional donation amounts via wire transfer. Foundation's wire transfer information is as follows:

Mellon Bank, Pittsburgh, PA
ABA Routing 043 000 261
Credit to: Merrill Lynch
Account: 1011730
For Further Credit to: Chronic Disease Fund
Account # 540-02143

## 5. Use of Donation.

**(a)** The Foundation will use the Donation for purposes of administering the Program and providing financial assistance to eligible patients who are receiving therapy for treatment of Multiple Sclerosis as determined by the criteria established by the Board of the Foundation. For an amount that shall not exceed ten percent (10%) of the Donation, Foundation may pay for operation and capital expenditures of the Foundation as determined by the Board to be necessary to operate the Program (collectively, *"Administrative Expenses"*). Examples of Administrative Expenses include, but are not limited to, the following:

- costs and fees associated with: outside consultants, auditors and auditing or legal counsel providing services on behalf of the Foundation, e.g., costs incurred by the Foundation in connection with a Program Audit
- premiums for customary insurance purchased on behalf of the Foundation, its officers and directors;
- Foundation start-up and development costs, reasonable travel expenses and honoraria paid in connection with Board meetings; and
- payment for informational materials concerning the Foundation and the Program, including costs associated with a therapy management program.

Any payments made pursuant to this Section 5(a) shall be reasonable and necessary for the operation of the Program and shall be in an amount that is not in excess of fair market value.

**(b)** In operating the Program, the Foundation will not discriminate against or otherwise vary its procedures for processing a patient who applies to the Program based upon the treatment prescribed for such patient, specifically Foundation shall not preferentially treat or discriminate against a patient whose treatment is manufactured or marketed by Donor or upon any physician or supplier utilized by such patient.

**(c)** Nothing in this Agreement will prohibit the Foundation from collecting additional funds (*"Additional Funding"*) from sources other than Donor for this Program or other programs being operated by the Foundation, and nothing in this Agreement will restrict the Foundation's discretion with respect to the use of such Additional Funding consistent with its charitable purpose and the policies adopted by the Board from time to time during the term of the Agreement.

## 6. Representations and Warranties.

**(a)** Subject to applicable requirements that may be imposed by the IRS in connection with the Foundation obtaining tax-exempt status as a 501(c)(3) organization, each Party represents that (i) such Party is a corporation duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation; (ii) this Agreement constitutes a valid and binding obligation of such Party enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and the application of general principles of equity and judicial discretion; and (iii) neither the execution and delivery of this Agreement nor the performance hereunder (A) constitutes a violation of, default under, or conflicts with any agreement or instrument to which such Party is bound, terms of the articles of incorporation, bylaws or other organizational documents of such Party, or any provision of applicable law, regulation or published interpretive guidance or ruling to which such Party is bound or (B) requires any consent or other action by or filing with any third party or governmental body or agency to which such Party is bound.

**(b)** The Foundation represents and warrants that the Program (including any third parties retained by the Foundation to perform services under the Program, e.g., agents, contractors, consultants) will comply with the provisions of all applicable laws, statutes, rules and regulations, as amended from time to time, including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) or the corresponding provision of any future United States law (the *"Anti-Kickback Statute"*), and the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a(a)(5) or the corresponding provision of any future United States law (the *"Civil Monetary Penalties Law"*). The practices, procedures and forms the Foundation will use to administer the Program will be consistent in all material respects with the policies expressed by the Office of Inspector General (*"OIG"*) of the United States Department of Health and Human Services, including but not limited to the November 2005 Special Advisory Bulletin titled "Patient Assistance Programs for Medicare Part D Enrollees". The Foundation further agrees to notify Donor in writing within fifteen (15) days of being informed by any governmental or regulatory authority that any of its material practices, procedures or forms no longer satisfies any of the requirements described herein. Within thirty (30) days of the Foundation sending such

written notification to Donor, the parties may (i) discuss alterations to the Program and/or this Agreement that would bring all material practices, procedures or forms into compliance with the requirements described herein; or (ii) upon written notification by either party, terminate the Agreement. If, within thirty (30) days of the Foundation sending written notification to Donor, the parties have not agreed, in writing, to alterations to the Program and/or this Agreement that both parties agree cure all material practices, procedures, or forms deemed non-compliant by a governmental or regulatory authority, this Agreement will terminate immediately.

(c) Donor represents and warrants that its support of, and Foundation represents and warrants that its use of the Donation for purposes of the Program complies with all applicable laws, statutes, rules and regulations, as amended from time to time, including, but not limited to, the Anti-Kickback Statute, the Civil Monetary Penalties Law, and the policies of the OIG.

7. **Term and Termination.**

(a) The term of this Agreement will commence on the Effective Date and will continue for a period of one year (the "*Term*"), and the Parties have the option to renew for additional consecutive terms of one (1) year each (each a "*Renewal Term*"), unless earlier terminated in accordance with the terms hereof. To effectuate each Renewal Term, each Party must execute an amendment to this Agreement that establishes the Donation and terms for said Renewal Term.

(b) Upon not less than ninety (90) days advance written notice to the other Party, a Party may terminate this Agreement for any reason.

(c) This Agreement may be terminated by a Party at any time in the event the other Party materially breaches this Agreement. In such event, the non-breaching Party will notify the Party in breach of such breach in writing. The Party in breach will have thirty (30) days from the date of its receipt of such notice to cure such breach ("*Cure Period*"). If, at the conclusion of the Cure Period, the Party in breach has failed to cure the breach, the non-breaching Party may immediately terminate the Agreement.

(d) Each Party will have the right to terminate this Agreement upon not less than ninety (90) days' prior written notice in the event that any federal, state or local statute, law, legislation, regulation, rule guidance, order or other pronouncement from a court or governmental authority (collectively, "*Law*") is promulgated, issued or enacted, or a change or interpretation of an existing Law is promulgated, issued or made, which in the opinion of the Party giving such notice could result in this Agreement, or any performance hereunder, being found to violate applicable law or would otherwise have a material adverse effect on such Party and/or any of its affiliates if this Agreement remains in effect. During the 90-day period prior to termination, the Parties will in good faith discuss alterations to the Program and/or this Agreement that would bring it into compliance with applicable Law.

(e) Upon the termination or expiration of this Agreement for any reason, each Party will promptly return to the other Party all Confidential Information that is owned or was provided by the other Party (as such term is defined in Section 12 below).

(f) In addition, upon termination of this Agreement by Donor pursuant to Section 6(b), 7(c) or 7(d), if the Donation has not been depleted at such time, the parties shall meet to determine how any unused portion of the Donation shall be allocated, e.g., either among other similar programs administered by the Foundation or by forwarding such portion to another charitable organization designated by the Donor.

8. **Administration of the Program.** The Foundation may desire to engage third parties who shall perform services that are necessary to the Program, e.g., an independent consulting organization, for the purpose of providing certain administrative and management services to the Foundation in connection with the operation of the Program. Such third parties will perform their duties in a manner that does not conflict with any terms and conditions of this Agreement. To ensure the confidentiality of the Donors' Confidential Information, the Foundation shall enter into a written agreement with such third parties to protect such Confidential Information that is owned or was provided by the Donor to Foundation.

9. **Recordkeeping and Audits.**

(a) The Foundation agrees to maintain accurate and complete records of all contracts, papers, correspondence, copybooks, accounts, invoices and other information in the Foundation's possession relating to the Program.

(b) The Foundation agrees to undergo an independent annual audit of the Program ("*Program Audit*") consistent with the parameters set forth in Exhibit B. Any costs incurred by the Foundation in connection with the Program Audit will be paid from the Program's operational funding and will be considered Administrative Expenses for purposes of Section 5(a) of this Agreement.

(c) The Foundation agrees to undergo an audit by the Donor based on a reasonable basis by the Donor with respect to the Foundation's compliance with the terms and conditions of this Agreement (the "Donor Audit"). Donor shall describe in writing the basis of Donor's desire for such audit as well as requested timeframe to complete such audit. Within thirty (30) days of the Foundation's receipt of such written description, the Parties shall meet to determine the appropriate schedule and parameters of such Donor Audit. Donor shall hire an independent third party to conduct such audit who shall comply with all applicable laws, rules and regulations with respect to the receipt of the Foundation's information, e.g., HIPAA and state privacy laws. The findings of such Donor Audit shall be shared with the Foundation and the Board.

10. **Publicity of Foundation; Advertising.**

(a) Subject to the provisions of Section 10(b) or (c), the Foundation will use commercially reasonable efforts to ensure that appropriate physicians, suppliers, patient advocacy groups and other relevant third party organizations are informed about the availability of the Program and its potential benefits for patients suffering from Multiple Sclerosis. The Foundation may also use commercially reasonable efforts to publicize the availability of the Program directly to patients who may be eligible for assistance under the Program.

(b) Unless otherwise required by applicable Law or approved, in advance, in writing by Donor in response to Foundation's written request, the Foundation will not disclose to the public, media or any other third party the Donor's contribution and relationship with the Foundation, nor shall the Foundation communicate to third parties regarding Donor's products or identify Donor's products in public statements unless such communication or identification of Donor's products occurs such that the Foundation (i) discusses the products as part of a general description of the Foundation's activities, (ii) lists Donor's products as one of many products that are supported by the Foundation, and (iii) does not show preference or bias to Donor's products.

(c) Donor will not advertise or otherwise disclose to the public its financial support for the Program except as may be required by any court order or applicable Law.

11. **Data Collection and Reporting.**

(a) The Foundation will own all data that it collects pursuant to the Program. The Foundation will hold confidential all data that are individually identifiable or product-specific in compliance with applicable Law, specifically HIPAA and relevant state privacy laws, rules and regulations. However, the Foundation may use the data it collects to prepare aggregate data and analyses, which it may disclose to Donor and other third parties, consistent with the applicable guidelines, e.g., cannot facilitate the Donor in correlating the amount or frequency of its Donations with the number of subsidized prescriptions for its products

(b) The Foundation will submit monthly reports (the "*Monthly Reports*") relating to the Program to Donor within fifteen (15) days after the end of each calendar month, unless Donor otherwise agrees to a less frequent reporting period. Monthly Reports will contain only aggregate numbers of all applicants or clients according to classification of disease category. Monthly Reports will not include any information specific to a particular product or particular provider or supplier or any individually identifiable health information (as such term is defined at 45 CFR § 164.103). Each Monthly Report will include the following elements:

(i) Number of applications received for the Program;

(ii) Number of applicants accepted for the Program;

(iii) Number of applicants for the Program denied and reason(s) for denial;

(iv) Average amount paid to recipients in the Program for cost sharing obligations (e.g., co-payment, co-insurance);

(v) Total amount paid out by the Program (by month and year-to-date);

(vi) Total amount allocated to enrolled patients in the Program but not yet paid out.

Subject to notice provision in Section 4(a), as part of the Monthly Reports, the Foundation will track and report to Donor how much of Donor's Donation remains available for use in the Program, as determined by objective criteria utilized by the Foundation. The Foundation may provide additional information in each Monthly Report as approved by the Board and the Foundation's legal counsel.

12. **Confidentiality.** Donor and the Foundation acknowledge that each Party may have access to certain Confidential Information (as defined below) of the other Party. In consideration of any disclosure or release of Confidential Information by each Party, Donor and the Foundation hereby agree as follows:

(a) "*Confidential Information*" means all technical, scientific, trade, research, manufacturing, marketing, commercial, supplier, operational, administrative, corporate, financial and other proprietary information of any kind whatsoever furnished by one Party (the "*Disclosing Party*") to the other (the "*Receiving Party*"), whether in writing or orally. Confidential Information will be treated as the proprietary, confidential and trade secret information of the Disclosing Party and will not be disclosed by the Receiving Party to any other party or used by the Receiving Party in any manner whatsoever other than for carrying out its obligations set forth in this Agreement. Confidential Information does not include: (i) information that is or becomes in the public domain (provided that such information did not enter the public domain as a result of the Receiving Party's, or its employee's or agent's, breach of this Agreement); (ii) information that was disclosed to the Receiving Party by a third party without an obligation of confidentiality and having a legal right to make such disclosure; (iii) information that is approved for public release by the prior written authorization of the Disclosing Party; (iv) information that the Receiving Party can establish was independently developed (as evidenced by competent written documentation) and was not acquired, directly or indirectly from the Disclosing Party without breaching this Agreement; or (v) information which at the time of disclosure to the Receiving Party was known to the Receiving Party free of restriction (as evidenced by competent written documentation).

(b) The Receiving Party will (i) hold and maintain in confidence all Confidential Information, (ii) not use any Confidential Information for any purpose other than for carrying out its obligations set forth in this Agreement or as otherwise agreed in writing by the Disclosing Party and (iii) not disclose any Confidential Information to any person or entity other than to those directors, officers,

partners, managers, members, employees, representatives, agents and advisors (and those of its subsidiaries and affiliates) (collectively, "*Agents*") of the Receiving Party who need to know the Confidential Information for purposes of the Program and who will be advised by the Receiving Party of the terms of this Agreement and who will be bound by restrictions similar to those set forth herein regarding disclosure and use of such Confidential Information. The Receiving Party will be responsible for the breach of any of the terms hereof by any Agent to whom the Receiving Party discloses any Confidential Information.

(c) Each Party's obligations set forth in this Section 12 will remain in full force and effect during the term of this Agreement and for five (5) years after termination thereof.

(d) At any time upon the request of the Disclosing Party or upon the expiration or termination of this Agreement, the Receiving Party agrees to return to the Disclosing Party all Confidential Information in its possession, including without limitation, all paperwork, reports and program financial records, excluding patient names and other individually identifiable health information (as such term is defined at 45 CFR § 164.103); *provided, however*, that the Receiving Party may retain a copy of such Confidential Information for its confidential legal record keeping purposes.

(e) In the event that the Receiving Party is requested or required (pursuant to an applicable Law or by a subpoena, civil investigative demand or other process) to disclose any Confidential Information, the Receiving Party will provide the Disclosing Party with prompt notice of any such request or requirement; *provided*, that the Receiving Party (i) promptly notifies the Disclosing Party in writing of the existence, terms and circumstances of such required disclosure, (ii) consults with the Disclosing Party on the advisability of taking legally available steps to resist or narrow such disclosure and (iii) takes all reasonable and lawful actions to obtain confidential treatment for such disclosure.

(f) Nothing contained in this Agreement will be deemed (i) to be a license to the Receiving Party of any patent rights, trade secret rights or know-how rights related to Confidential Information or (ii) to create any obligation of the Disclosing Party to disclose any Confidential Information.

(g) The Parties acknowledge the restrictions contained in this Section 12 are reasonable and necessary to protect the legitimate business interests of the Parties and that any violation of any provisions hereof may result in irreparable injury to the Parties and the clients and patients each such Party services. Each Party also acknowledges that the other Party may be entitled to temporary and permanent injunctive relief if any violation of any provision occurs.

(h) The Receiving Party will indemnify the Disclosing Party for any breach of the Receiving Party's confidentiality obligation hereunder.

**13. Proprietary Rights.** Each Party reserves the right to control the use of its names and all symbols, trademarks or service marks presently existing or later established. Neither Party will use the other Party's 's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise, except with the prior written consent of such Party.

**14. Indemnification.**

(a) The Foundation will indemnify and hold harmless Donor and Donor's stockholders, officers, directors, employees, agents, representatives and affiliates for any loss, liability, claim, damage (including incidental and consequential damages) or expense (including costs of investigation and defense and reasonable attorneys' fees) (collectively, "*Claims*") arising from (i) the gross negligence or willful misconduct of the Foundation or its representatives or agents with respect to this Agreement or (ii) the breach by Foundation of any obligations, and representation or warranties under this Agreement, except to the extent that the loss, liability, claim, damage or expense arose from the gross negligence or willful misconduct of Donor.

(b) Donor will indemnify and hold harmless the Foundation and the Foundation's directors, officers, employees, agents, representatives and affiliates for any Claims arising from (i) the gross negligence or willful misconduct of Donor or its employees or agents with respect to this Agreement or (ii) the breach by Donor of any obligations and representation or warranties under this Agreement except to the extent that the loss, liability, claim, damage or expense arose from the gross negligence or willful misconduct of the Foundation.

(c) In the event of a Claim, the indemnification procedures will be as follows:

  (i) Promptly after receipt by any indemnified Party of notice of the assertion of any Claim, the indemnified Party will give written notice thereof to the indemnifying Party and will thereafter keep the indemnifying Party reasonably informed with respect thereto; *provided*, that failure to give the indemnifying Party prompt notice as provided in this Section 14 will not relieve the indemnifying Party of its obligations hereunder except to the extent, if any, that they will have been prejudiced thereby.

  (ii) In case any such Claim is brought against any indemnified Party, the indemnifying Party will be entitled to participate in (and, if they will wish, to assume) the defense thereof with counsel reasonably satisfactory to the indemnified Party. If the indemnifying Party assumes the defense of any claim or litigation as provided in this subsection, the indemnified Party will provide reasonable assistance to the indemnifying Party in its efforts to investigate and defend the Claim, including, without limitation, providing reasonable access by the indemnifying Party to such documentary evidence and witnesses as are available to the indemnified Party. If the indemnifying Party assumes the defense of any Claim provided in this subsection,

the indemnifying Party will, subject to subsection (iv) below, have the authority to settle or compromise the Claim. No compromise or settlement of a Claim by the indemnified Party will be binding on the indemnifying Party without the consent of the indemnifying Party.

(iii) If the indemnifying Party fails to assume the defense of such Claim within thirty (30) days after notice of such Claim or such shorter period of time as is necessary to avoid adversely affecting the defense of such Claim, the indemnified Party against whom such Claim has been made will have the right (upon further notice to the indemnifying Party) to undertake the defense, compromise and settlement of such claim on behalf of and for the account and risk, and at the expense of, the indemnifying Party, subject to the right of the indemnifying Party to assume the defense of such Claim at any time prior to settlement, compromise or final determination thereof.

(iv) Notwithstanding anything in this Section 14 to the contrary, neither Party will, without the written consent of the other Party (a) settle or compromise any Claim in any manner that includes an admission of fault or liability on the part of the other Party; or (b) settle or compromise any Claim in any manner that may adversely affect the other Party other than as a result of monetary damages or other money payments.

(d) The obligations under this Section 14 will survive until the expiration of the statute of limitations applicable to the event giving rise to the claim for indemnification.

15. **Miscellaneous.**

(a) *Governing Law.* This Agreement will be construed in accordance with the laws of Delaware without regard for the conflicts of laws and principles thereof.

(b) *Entire Agreement.* This Agreement, and the exhibits attached hereto and incorporated by reference, constitutes the entire agreement between the Parties with the respect to the subject matter hereof and supersedes all prior and contemporaneous oral, written and other agreements between the Parties with respect to the subject matter hereof. This Agreement may only be amended in a writing signed by the Parties.

(c) *Non-Assignment.* Except as otherwise set forth in Section 8, the Parties agree that none of the provisions of this Agreement will be assigned or delegated to any other person or entity; *provided, however,* that Donor may assign the rights and obligations hereunder to an affiliate or to a purchaser of substantially all of the equity interest in or assets of Donor. In the event Donor assigns its rights and obligations in this Agreement, Donor will notify the Foundation in writing within ten (10) days of said assignment, and the Foundation will have the right to terminate this Agreement upon thirty (30) days of receipt of such notice.

(d) *Notices.* All notices or other communications required or permitted hereunder will be in writing and will be delivered personally, by commercial overnight delivery service, by facsimile or sent by certified, registered or express air mail, postage prepaid, and will be deemed given when so delivered personally, by overnight delivery service or by facsimile, or if mailed, five (5) days after the date of mailing, addressed as follows:

*If to Donor:*      Denise Lynch
Teva Neuroscience, Inc.
901 E. 104th St., Suite 900
Kansas City, MO 64131

*With a copy to:*      Attn: Asst. General Counsel
Same address as above

*If to the Foundation:*

     Michael Banigan, President
Chronic Disease Fund
6089 Sweeney Trail
Frisco, TX 75034

(e) *Severability.* In the event any portion of this Agreement (or any future amendments), except Sections 4 or 5 will be held illegal, void or ineffective, the remaining portions of this Agreement will remain in full force and effect. If any of the terms or conditions of this Agreement are in conflict with any applicable Law, then such terms or conditions will be deemed inoperative to the extent that they may conflict therewith and will be deemed to be modified to conform with such Law.

(f) *Waiver.* No waiver hereunder will be valid unless set forth in a writing signed by the Party to be bound thereby. No waiver by either Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of either Party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

(g) *Force Majeure.* The Parties will be excused from performing their obligations under this Agreement if its performance is delayed or prevented by any event beyond such Party's reasonable control, including, but not limited to, acts of God, fire, strike, accidents, explosion, weather, disease, war, insurrection, civil strife, riots, government action or power failure; *provided,* that such performance will be excused only to the extent of and during such *force majeure.*

(h) *Limitation of Liability.* In no event will either party's liability under this Agreement exceed the annual amount of any Donation made by Donor in support of the Program. SUBJECT TO THE TERMS OF SECTION 14(a), UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE ENTITLED TO INCIDENTAL, INDIRECT, CONSEQUENTIAL OR SPECIAL DAMAGES ARISING IN CONNECTION WITH ANY

DEFAULT OR BREACH OF SAID PARTY'S OBLIGATIONS UNDER THIS AGREEMENT OR ANY ATTACHMENTS HERETO.

(i)  *Captions and Headings*.  The captions and headings in this Agreement are for convenience and reference only,

and they will in no way be held to explain, modify or construe the meaning of the terms in this Agreement.

(j)  *Counterparts*.  This Agreement may be executed in multiple counterparts, each of which is deemed an original, but all of which taken together will constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**Chronic Disease Fund, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____ 01/08/07. _____

**Donor:  Teva Neuroscience, Inc.**

By: _____

Print Name: Denise C. Lynch      Larry DICKINSON

Title: Director Customer Resources  VP, Commercial Ops

Date: 12/28/06                        12/28/06

By: _____

Print Name:  LARRY DOWNEY

Title:  CEO

Date:  1/2/07



*Exhibit A*

**Addendum for Additional Donation**

This Addendum for Additional Donation ("Addendum") is made and entered into as of the _____ day of _____, 20__ ("Effective Date of the Addendum"), by and between Chronic Disease Fund, a non-profit corporation ("Foundation"), and Teva Neuroscience ("Donor").

**WHEREAS**, Foundation and Donor are the only parties to that certain Donation Agreement dated _____ ("Agreement") pursuant to which Donor has agreed to provide financial support for the Program for treating patients with multiple sclerosis in accordance with the terms and conditions of the Agreement;

**WHEREAS**, during the Term of the Agreement, Donor has already provided to Foundation during the Term an Initial Donation in the amount of _____ Dollars ($_____,000) for_____;

**WHEREAS**, Donor desires to provide to Foundation, and Foundation desires to receive from the Donor during the Term an additional donation for _____ in the amount of _____Dollars ($____,000) (the "Additional Donation");

**WHEREAS**, Donor and Foundation desire to enter into this Addendum to memorialize (i) the parties' agreement that Donor shall provide to Foundation the Additional Donation for the Program during the Term, and (ii) the timing of Donor's payment of such Additional Donation to Foundation; and

**WHEREAS**, capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement;

**NOW THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Payment and Timing of Additional Donation**. Donor shall provide to Foundation during the Term the Additional Donation for the Program, and such Additional Donation shall be paid by Donor to Foundation within fifteen (15) days following the Effective Date of the Addendum.

2. **Treatment of Additional Donation.** The Additional Donation shall be deemed to be and treated as a "Donation" provided pursuant to the Agreement, and shall be governed by, and subject to, all of the terms and conditions of the Agreement.

3. **Remaining Provisions**. Except as specifically modified in this Addendum, all other provisions of the Agreement shall remain unchanged and in full force and effect.

4. **Modification, Waiver**. No modification or waiver of any provision of this Addendum shall be valid unless it is in writing and signed by the party against whom it is sought to be enforced. No waiver at any time of any provision of this Addendum shall be deemed a waiver of any provision of this Addendum at that time or a waiver of that or any other provision at any other time.

5. **Effective Date**. The modifications set forth in this Addendum shall be effective as of the Effective Date.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be duly executed as of the Effective Date.

Chronic Disease Fund


By_____
    Name: _____
    Title: _____


Donor:


By_____
    Name: _____
    Title: _____

*Exhibit B*
**PROGRAM AUDIT PARAMETERS**

**1.    Program Audit.**  For each year of the Agreement, the Foundation will engage an independent review organization ("*IRO*") to conduct a program audit (the "*Program Audit*") to assess and evaluate the Foundation's systems, processes, policies and practices related to the Program.

**2.    Frequency and Timing of Program Audit.**  The Program Audit will occur annually at the direction of the Board, provided that the Program Audit will be conducted only during the normal business hours of the Foundation and in a manner not to be disruptive to the Foundation's day-to-day business activities.

**3.    Audit by Independent Review Organization.**  The IRO will have expertise in non-profit organizations and in federal and state fraud and abuse laws, including the Anti-Kickback Statute and the Civil Monetary Penalties Law.  The Foundation will inform Donor of its selection of an IRO no later than ten (10) days after the commencement of the Program Audit.

**4.    Scope of Program Audit.**  The Program Audit will address and analyze the Foundation's systems, processes, policies and practices relating to administration of the Program.  The review will examine the Program and the Foundation's compliance with the requirements of this Agreement and the following criteria:

(a)  The Foundation is a *bona fide*, non-profit organization that serves the interests of patients with particular diseases or conditions.

(b)  The Foundation is independent of any donor to the Program, including Donor (collectively, the "*Program Donors*").  For purposes of determining independence, no members of the Foundation's governing body will be employed by a Program Donor.

(c)  The Program receives referrals from a number of sources, including physicians, suppliers, patient advocacy groups, other relevant third party organizations and Program Donors (e.g., through Program Donors' patient assistance programs).

(d)  The Foundation's determination of whether to provide assistance does not consider the source that referred the patient to the Program.

(e)  The Foundation bases all financial eligibility determinations on its own established criteria and does not take into account the identity of a provider, supplier or treatment that the patient may use or the identity of a Program Donor whose services or products are used by the applicant.

(f)  Assistance is available to financially needy beneficiaries who meet the Foundation's income and/or asset criteria, for a period of up to one (1) year, after which each beneficiary's eligibility is reevaluated.

(g)  Patient requests for assistance under the Program are reviewed on a first-come, first-served basis to the extent funding is available.

(h)  The Foundation informs patients that they are free to change providers, suppliers or treatments at any time and will not lose their assistance as a result (unless they become ineligible for other reasons).

(i)  The Foundation does not refer patients to, or recommend, a particular provider, supplier or product.

(j)  The Foundation does not inform patients of the identities of Program Donors.

(k)  To the extent feasible, the Foundation furnishes assistance under the Program to the provider, supplier or insurer on behalf of the patient, and where assistance is furnished directly to the patient, the Foundation obtains proof from the patient that the assistance is to satisfy qualifying expenses.

(l)  The Foundation has a process to solicit donations for the Program from a multitude of sources.

(m) The Foundation uses commercially reasonable efforts to publicize the availability of the Program to patient advocacy organizations, other relevant third parties and patients, consistent with the requirements of Section 10 of this Agreement.

**5.    Program Audit Report.**  The IRO will issue a written report (the "*Program Audit Report*") to the Foundation, based on its review, with a copy to Donor, addressing the following issues:

(a)  The Foundation's compliance with this Agreement;

(b)  The Foundation's compliance with federal and state fraud and abuse laws, including, but not limited to, the Anti-Kickback Statute and the Civil Monetary Penalties Law; and

(c)  The Foundation's compliance with the terms and conditions set forth in pertinent OIG Advisory Opinions (including but not limited to OIG Advisory Opinion 02-1) or guidance.

**6.    Patient and Program Information.**  Notwithstanding the foregoing, the Program Audit Report will not include or disclose:  (1) any individually identifiable health information (as defined at 45 CFR § 164.103) about any patient of the Program; or (2) other information protected from disclosure pursuant to a confidentiality or similar agreement executed between the Foundation and a donor (including Donor) to a Foundation program (including the Program).

# EXHIBIT A-26

| | |
|---|---|
| **From:** | Edward Hensley |
| **To:** | Denise Lynch |
| **Sent:** | 12/10/2010 3:05:20 PM |
| **Subject:** | Teva/TAF |
| **Attachments:** | image001.png; Supplemental Information - With Attachments.pdf - Adobe Acrobat Pro.pdf |

Denise – Here is what we are currently providing potential donors as far as information regarding The Fund. Also, Rebecca Simone from Nixon Peabody, our retained law firm, is putting together the letter/brief you have asked for as well.  When you have the opportunity it would be great to catch up on several things.  1) Medicare funding for next year, 2) Any updates on .5 conversion, 3) iAssist updates, etc.  Also, remind me to discuss with you the number 2,952.

Edward

---

**From:** Marilou Niggemann
**Sent:** Thursday, December 09, 2010 4:39 PM
**To:** Edward Hensley
**Subject:**



**Marilou Niggemann, M.P.A.**
**Patient Advocate Team Lead**

5323 Millenia Lakes Blvd | Ste 200 | Orlando, FL 32839
877.245.4412 Toll Free | 866.254.9411 Efax
Marilou.Niggemann@assistfund.org | www.assistfund.org

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this communication in error, please reply to the message and delete/destroy any copy of this message. The sender does not accept liability for any errors or omissions, integrity, or security in the contents of this message, which arise as a result of e-mail transmission.

Tev_167539



# SUPPLEMENTAL INFORMATION

Operating Metrics and Processes
Opinions
Application

CONFIDENTIAL – FOIA Exempt

Tev_167541

# Frequently Asked Questions
# and
# Frequently Requested Information

1. **Once a patient applies for co-pay assistance with your organization, what is the average turnaround for a final determination? How is this communicated to the patient? Do turnaround times vary by disease state areas?**
   The final determination notification timeline is the same for each disease state. For all funds, following receipt of an application from a patient for co-pay assistance, The Assistance Fund's final evaluation takes approximately two (2) days to conduct. If the patient is denied assistance, a letter detailing our decision and reasoning is mailed to the patient within one (1) business day after the assessment is made. Patients can appeal the decision by contacting The Assistance Fund if they feel they received the letter in error.

2. **How do patients apply for co-pay assistance with your organization (i.e; phone, mailed application, physician's office, internet)? What type of paperwork, if any, does the patient's physician need to complete? If the patient's physician does not complete paperwork at the time of application, how do you confirm the diagnosis and treatment?**
   Currently, patients apply for co-pay assistance via mail or fax. Patients can obtain enrollment applications via mail, fax, email, and on our website. The Assistance Fund does not require the patient's physician to complete any section of the application in order for the patient to be approved. Because the physician is not required to complete paperwork on behalf of the patient, the organization has alternate avenues for confirming the patient's diagnosis and treatment. Our employees work closely with the patient's desired pharmacy for confirmation. The Assistance Fund receives diagnosis and treatment verification from the pharmacy via telephone, mail, or fax.

3. **What is your process for handling emergency cases which need to be expedited?**
   When The Assistance Fund identifies a patient that requires immediate assistance, our organization quickly locates available dollars that can be reallocated for the individual. Providing funding is available, the patient's demographic and financial information is submitted for conditional evaluation in The Assistance Calculator. Patients are eligible for co-pay assistance within a maximum of two (2) business days following the referral provided that they successfully receive conditional approval.



4.  **Is the application process the same for all funds?**
    The application process is consistent for all patients across all funds.

5.  **What period of time does the application cover and do you guarantee assistance for any period of time?  Can a patient renew?**
    It is extremely important for patients to receive assistance quickly because of the urgency of starting therapy at the time of diagnosis. In an effort to expedite payment, The Assistance Fund offers conditional evaluations for our patients. If a patient meets household size and annual household income requirements, the patient automatically receives assistance for a predetermined period of time. During this set timeframe, the patient must submit the Co-Pay Enrollment Application and supporting documentation in order to continue receiving assistance.

    If the patient receives conditional approval, The Assistance Fund guarantees the patient co-pay assistance for thirty (30) days. Additionally, patients have an added sixty (60) days to submit the necessary paperwork but, during this time, are not eligible to receive co-pay assistance. When the completed applications and documentation is received and approved, patients obtain co-pay assistance from The Assistance Fund for the remainder of the calendar year.

    Provided funding is available, patients can renew assistance on a yearly basis. Approximately three (3) months prior to a patient's termination date, renewal applications are mailed to program participants. The renewal process does not include a conditional approval time period. Therefore, completed renewal applications and supporting documentation must be submitted by January 1 of the next year. The patient will be terminated from the program if the appropriate paperwork is not submitted by the January 1 deadline.

6.  **Please provide a clear description of the financial criteria you use to determine a patient's eligibility.   What additional factors are considered in establishing eligibility?**
    The Assistance Fund utilizes a formula to determine financial qualification. Program eligibility is based on the patient's cost of living by zip code, household size, and house hold income. Household income eligibility is evaluated by utilizing yearly Federal Poverty Level (FPL). Individuals qualify for the Co-Pay Program with The Assistance Fund as long as their FPL does not exceed 700%. While patients can receive assistance with income 700% of the FPL, 86% of our patients are low income and have an FPL of less than 300%.

7. **Can a donor make recommendations about how financial criteria are evaluated?**
All recommendations concerning financial criteria will be closely considered and reviewed by The Assistance Fund leadership. However, all changes to the financial criteria must be approved by our Board of Directors prior to implementation.

8. **How does your organization outreach to physicians and patient advocacy groups?**
The Assistance Fund conducts outreach to physicians and patient advocacy groups through multiple avenues on a continual basis. The Senior Director of Operations manages all contact with these entities via email, telephone, by fax and mail. The main purpose for contact is to update these entities on the status of our organization, inform these groups that funding is available for a specific therapy, and receive referrals for individuals who would benefit from our assistance.

Additionally, The Assistance Fund operates a program that contacts medical clinics throughout the United States in order to educate them about our organization and financial opportunities available to their patients for medication. Our organization contacts the offices via phone, mail, email and fax.

Furthermore, The Assistance Fund writes a quarterly e-newsletter that is distributed via email and posted on our website. The newsletter provides our patients, physicians, and partners with updates on the organization.

9. **Does your organization have a policy in place for HIPAA and patient privacy compliance?**
In order to protect our patients and abide by HIPAA, The Assistance Fund instituted the following organizational policies. These policies are instituted throughout all departments of The Assistance Fund, including the Information Technology, Program Development, Financial, and Fund Development Departments.

To start, our organization requires all employees to receive detailed HIPAA training at the start of their employment. The staff must adhere to HIPAA regulations at all times and through all forms of communication; violation of The Assistance Fund HIPAA policies can lead to disciplinary action up to and including termination of employment. Additionally, The Assistance Fund employs a certified HIPAA Compliance Officer to head all HIPAA-related issues and concerns.

CONFIDENTIAL – FOIA Exempt

Tev_167544

In order to comply with HIPAA and provide the best security for our program participants, The Assistance Fund employs specific security measures to ensure participant information is always safe and secure.

- Work computers are password protected and locked when employees are away from their desks.
- All paper files are stored in locked cabinets. The cabinet keys are only accessible to approved employees.
- Paper with program participant information is shredded daily and not disposed of with regular waste. Shredded paper product is properly disposed in a timely manner.

Moreover, our employees are expected to provide detailed documentation of any and all communication in order to protect our donors, patients, and organization. Electronic, paper, and oral communication with any individual, company, or agency in regards to a patient of The Assistance Fund must be accurately documented in the patient's file. Communication with another individual includes any contact via mail, email, instant messaging, phone, fax, and in-person meetings. The following policies have been implemented for inbound and outbound communication.

Inbound Communication
- Employees must not discuss a patient with anyone unless the patient gives prior verbal or written consent. All patient-authorized contacts are listed as Alternative Contacts in the patients' account.
- Employees must verify the identity of a person before discussing a patient. Verification is completed by asking for the other party to confirm the patient's demographic information on file. Employees only continue the conversation if the person you are talking with provides completely accurate information.
- Employees do not offer patients personal information.

Outbound Communication
- Employees must receive prior authorization from the patient before initializing contact with any non-covered entity besides the patient.
- Employees do not offer patient's personal information. Instead, employees ask the second party to state the patient's demographic information on file before engaging in conversation.

In addition to thorough HIPAA policies for our employees, The Assistance Fund maintains the highest standards of information technology security and reliability under the HIPAA compliance requirements. The architecture of all information systems within our organization are integrated as part of an overall information technology governance strategy. By utilizing best practices and information technology frameworks, such as Control Objectives for Information and related Technology



Tev_167545

(COBIT), The Assistance Fund's primary focus has been involved around protecting confidential patient information and maintaining data integrity.

The majority of patient information resides in a data warehouse on a server in a secure and locked data center facility. All systems interacting with the data warehouse are then compartmentalized, evaluated for security, and given access only to relevant processes and information so as to minimize the risk and exposure of sensitive material. As part of ongoing due diligence, security is reassessed daily as new threats and security schemes emerge.

The Assistance Fund also works with premier technology vendors in order to maintain the highest level of information security. All data shared via the internet is secured utilizing the strongest encryption available for every transmission. Our organization partners with Verisign to maintain our SSL security and we display their logo prominently in any secure areas of our website. The Assistance Fund also partners with McAfee to perform daily security audits of our infrastructure via proprietary technologies allowing any newly detected security gaps to be immediately patched.

HIPAA compliance and patients' information security is of great importance to The Assistance Fund and all of our departments. Accordingly, our employees continually work to meet all rules and regulations in all aspects of our organization.

10. **What other expenses are you willing to cover beyond co-pay assistance, i.e.; deductibles, premiums, etc.?**
In addition to co-pay assistance, The Assistance Fund is able to help patients with their deductibles.

11. **What happens when you cannot assist a patient? How do you communicate this to patients and how long does it take to send out the communication?**
When The Assistance Fund cannot assist a patient, we communicate our decision to the referral source. If the patient is self referred, a letter is mailed to the patient at the address on file within one (1) business day after the assessment is made. Alternatively, if the patient is referred to our organization by a pharmacy, The Assistance Fund notifies the pharmacy of our decision via our web portal and by telephone. Afterward, the pharmacy informs the patient of the outcome. The patient, or the pharmacy on behalf of the patient, can appeal the decision by contacting The Assistance Fund if they feel the decision was made in error.

CONFIDENTIAL – FOIA Exempt

Tev_167546

12. **Whom are you willing to reimburse for co-pay assistance (patient, physician, insurance provider, pharmacy)?**
The Assistance Fund will work with any party, including, but not limited to, the patient, physician, insurance provider, and pharmacy, to reimburse for co-pay assistance so long as the entity in question can submit a receipt of payment made during the patient's enrollment period for the patient's diagnosis-specific therapy.

13. **Will you provide a patient with retroactive reimbursement?  If so, for how long?**
Patients can be reimbursed for their diagnosis-specific therapy purchased a maximum thirty (30) days prior to receiving conditional approval into our Co-Pay Program.

14. **Can you provide assistance to patients to cover the Medicare Part D donut hole?**
The Assistance Fund strives to fully help Medicare Part D patients with their co-payment responsibilities during initial coverage, the coverage gap and with catastrophic coverage. As a result, our organization helps patients pay for their diagnosis-related therapy throughout the coverage gap when they are responsible for 100 percent of their medications.

Additionally, our Patient Advocates provide counseling and information to patients on their best options for paying for medication during the coverage gap. The Assistance Fund also works closely with the patient's pharmacy to avoid any lapse in treatment as a result of monetary issues.

15. **Do you require the patient to receive therapy from a given source?**
Our organization allows Co-Pay Assistance Program participants to receive therapy from any pharmacy or site of care their Medicare Part B or D insurance considers acceptable.

16. **Are patients required to do anything besides completing the application to get assistance?   For example, participate in other programs sponsored by your organization?  If yes, please elaborate on what they are and what is required of the patient.**
Successfully completing an application is the only requirement patients must satisfy in order to receive co-payment assistance with The Assistance Fund. However, in order to maintain assistance throughout the program year, patients are required to maintain therapy compliance.

CONFIDENTIAL – FOIA Exempt

17. **Do you "cap" assistance in any disease state area?  If yes, how do you determine the cap?**

The Assistance Fund "caps" assistance for all disease state areas our organization funds. However, The Assistance Fund continually reassesses the limit and is ready to increase the fund amount as needed. The maximum dollar amount is determined by analyzing the current cost of the therapy, expected cost increases for the upcoming calendar year, and the expected Medicare Part B and Part D out-of-pocket costs the patients will be accountable for during the program year.

18. **Do you allow for "expanded use" of a given product?**

The Assistance Fund does not allow patients to use any supported therapy for off-label use. However, patients are allowed to receive extended therapy fills, such as sixty (60) or ninety (90) day supplies of medication.

19. **What is your process when funds run low?  What amount prompts a request for additional funding?  How much notice do you give a donor when funds appear to be running low and a decision about additional funding will be required?**

The Assistance Fund closely monitors our fund levels so as to best assist our patients. Therefore, our organization ensures that every patient has funding available to finish their prescribed treatment. In order to ensure each patient received the necessary funding needed to complete therapy regimes, assistance is allocated to each patient upon entering the program. As a result, when funding gets low for a specific disease, The Assistance Fund does not accept new patients until additional funds are identified and reallocated. When ten (10) percent of the initial funding amount remains, The Assistance Fund will contact the Donor to discuss additional funding. Our organization will provide the Donor with sixty (60) days advanced notice of low funds.

20. **Are there any other activities that your organization participates in that we as the donor should know about?  For example, lobby efforts?  How are these activities funded?**

The Assistance Fund does not participate in activities that would interfere with our mission or your participation with our organization.

**21. Administration fee:**

    (a)    **What percent or amount do you require?**

        The administration fee for The Assistance Fund Co-Pay Assistance Program is nine (9) percent for donations made by December 31, 2010. The Fund is reviewing the 2011 budget to determine if an adjustment to this fee is required to meet operating expenses in 2011.

    (b)    **How is it managed and tracked?**

        In order to accurately track the administrative fee in a timely manner, the administrative fee is managed separately from the funding allocated for co-pay assistance. The Assistance Fund utilizes internal software to monitor our accounting and spending. Our organization also contracts with an accounting firm, Vestal and Wiler, Certified Public Accountants, to independently audit and monitor our financial statements and to file our Form 990.

    (c)    **What time period does it cover?**

        The administrative fee is utilized for costs from the date the funding is received until the end of the same calendar year.

    (d)    **What percentage of donated funds goes to direct patient assistance?**

        Ninety-one (91) percent of donated funds are directly used for patient co-pay assistance. Additionally, any interest made from donated dollars is added to the fund allocation for the disease state. Also, The Assistance Fund routinely monitors patients' allocation levels and funding needs. As a result, any dollars not used by patients is added to the fund allocation for the disease state.

    (e)    **Are there any other fees?**

        No additional fees are required.

**22. Does your organization have audited financial statements?**

As The Assistance Fund's first year fiscal year ended on June 30, 2010, the organization is undergoing our first audit and preparations to submit the IRS Form 990. The Assistance Fund's audit is scheduled to be conducted August 2010 by Vestal and Wiler, Certified Public Accountants. The opinion is expected to be issued September 2010.

## Fund Accounting Overview Flow Chart

Below illustrates how The Assistance Fund manages donated funds.



Each Disease State has a separate bank account. This helps facilitate reconciliation process for greater accuracy of cash balances.

DS (Disease State) Account

DS Accounts Payable    Customer Accounts    DS Reserves Account

Prior to issuing checks, a reconciliation process occurs in the accounting department to match accounts payable from the various funds.

The claims processor generates a billing statement and post the appropriate journal entries against accounts payable and cash.

Reconciliation    PDMI

Issue Check    Dispenses

Accounts are setup to represent the cash accounts for each disease state. Every disease state has sub accounts, such as customer accounts, reserves, and accounts payable.

Journal entries are recorded to manage cash on an accrual basis. This allows for more sophisticated reporting and is comparable to a GAAP accounting system.

Equivalent versions of Income Statements, Balance Sheets, and Cash Flow Statements are generated due to this architecture.

Assistance Fund

Tev_167550

**Patient Referral Breakout**

The Assistance Fund receives referrals from a variety of sources. Additionally, we are continually investigating how to efficiently and effectively further diversify our referral sources. Below indicates what percentages of our referrals are received from these diverse sources.

| Referral Source | Percentage |
|---|---|
| Specialty Pharmacy | 93% |
| Self | 3% |
| Physician | 3% |
| Patient Advocacy Group | 2% |
| TOTAL | 100% |

**OIG Advisory Opinion**
The following is The Assistance Fund's OIG Advisory Opinion from the U.S. Department of Health and Human Services.



CONFIDENTIAL – FOIA Exempt

Tev_167552

DEPARTMENT OF HEALTH & HUMAN SERVICES                                    Office of Inspector General

                                                                        Washington, D.C. 20201

                                                    MAY 2 6 2010

Mr. Jeffrey Spafford
The Assistance Fund, Inc.
5323 Millenia Lakes Boulevard
Suite 200
Orlando, FL 32839

                    Re: OIG Advisory Opinion No. 10-07

Dear Mr. Spafford:

We are writing in response to your request for an advisory opinion regarding a nonprofit,
tax-exempt, charitable organization's proposal to provide assistance with cost-sharing
obligations to financially needy individuals, including Medicare and Medicaid beneficiaries,
diagnosed with Multiple Sclerosis, cancer, or rheumatoid arthritis (the "Proposed
Arrangement"). Specifically, you have inquired whether the Proposed Arrangement would
constitute grounds for the imposition of sanctions under the civil monetary penalty
provision prohibiting inducements to beneficiaries, section 1128A(a)(5) of the Social
Security Act (the "Act"), or under the exclusion authority at section 1128(b)(7) of the Act,
or the civil monetary penalty provision at section 1128A(a)(7) of the Act, as those sections
relate to the commission of acts described in section 1128B(b) of the Act, the Federal anti-
kickback statute.

You have certified that all of the information provided in your request, including all
supplemental submissions, is true and correct and constitutes a complete description of the
relevant facts and agreements among the parties.

In issuing this opinion, we have relied solely on the facts and information presented to us.
We have not undertaken an independent investigation of such information. This opinion is
limited to the facts presented. If material facts have not been disclosed or have been
misrepresented, this opinion is without force and effect.

Based on the facts certified in your request for an advisory opinion and supplemental
submissions, we conclude that: (i) the Proposed Arrangement would not constitute grounds
for the imposition of civil monetary penalties under section 1128A(a)(5) of the Act; and (ii)
while the Proposed Arrangement could potentially generate prohibited remuneration under
the anti-kickback statute if the requisite intent to induce or reward referrals of Federal health

CONFIDENTIAL – FOIA Exempt                                          Tev_167553

Page 2 – OIG Advisory Opinion No. 10-07

care program business were present, the Office of Inspector General ("OIG") would not impose administrative sanctions on The Assistance Fund, Inc. under sections 1128(b)(7) or 1128A(a)(7) of the Act (as those sections relate to the commission of acts described in section 1128B(b) of the Act) in connection with the Proposed Arrangement. This opinion is limited to the Proposed Arrangement and, therefore, we express no opinion about any ancillary agreements or arrangements disclosed or referenced in your request for an advisory opinion or supplemental submissions.

This opinion may not be relied on by any persons other than The Assistance Fund, Inc., the requestor of this opinion, and is further qualified as set out in Part IV below and in 42 C.F.R. Part 1008.

## I.   FACTUAL BACKGROUND

The Assistance Fund, Inc. ("Requestor") is a non-profit, tax-exempt, charitable organization organized to establish grant programs to provide aid to financially needy patients, including Medicare and Medicaid beneficiaries, who have been diagnosed with Multiple Sclerosis, cancer, or rheumatoid arthritis ("Specified Diseases").[1] Requestor would establish a separate fund for each of the three Specified Diseases and a fourth fund for genetic testing, which would be available for genetic testing associated with any of the Specified Diseases. The grants would be used to assist patients with cost-sharing amounts related to certain prescribed medications ("Specialty Medications"[2]), or to cover up to 100% of the cost of a genetic test that a physician orders to determine an effective course of treatment for a Specified Disease. Requestor would also provide free therapy management information on its web site to assist patients in complying with their medication regimens.

Requestor would publicize the availability of the grant program on its web site and to medical providers and pharmacies that typically treat patients with the Specified Diseases. Patients would apply for assistance by completing a grant application that would include the patient's diagnosis, proof of income, and other financial disclosures. Patients must be under

---

[1] In the future, Requestor may expand the Proposed Arrangement to provide assistance to patients diagnosed with other diseases. The expanded program would include the same features and safeguards as the Proposed Arrangement. We express no opinion about the potential expansion of the Proposed Arrangement.

[2] For purposes of the Proposed Arrangement, Specialty Medications are costly medications for the Specified Diseases with particular features that complicate their use (i.e., the medications may require physician administration, the medications may be self-administrable but require injection or infusion, the medications may require special handling or storage, or effective use may require significant patient education). Requestor has provided us with a listing of currently available Specialty Medications.

CONFIDENTIAL – FOIA Exempt

Tev_167554

Page 3 – OIG Advisory Opinion No. 10-07

the care of a physician and already undergoing treatment for a Specified Disease at the time of application to be eligible for assistance, but patients would be free to change providers, suppliers, or Specialty Medications without losing eligibility for aid. Requestor would employ counselors to assist patients both in completing the grant application and in understanding other forms of financial assistance that might be available to them (e.g., Low Income Subsidy assistance available through the Social Security Administration). Requestor would process applications on a first-come, first-served basis, to the extent funding is available.

Grants would be awarded on a uniform sliding scale, based on Requestor's assessment of the patient's financial need. Requestor would not make eligibility determinations based in whole or in part on: the interest of any person or entity who contributes to Requestor's grant program funds ("Donor") or affiliate(s) of Donors[3]; the applicant's choice of provider, practitioner, insurer, insurance plan, supplier, test, or product; or the identity of the referring person or organization (including whether the referring person is a Donor). Requestor would assess an applicant's financial eligibility for a grant based on the Federal poverty guidelines. Patients would have to reapply for aid annually and would be required to notify Requestor if their financial situation changed during the grant period. Further, patients could be disenrolled from the grant program upon proof of continued non-compliance with their medication regimens.

Requestor has certified that it would define the Specified Diseases in accordance with widely recognized clinical standards and would not define the Specified Diseases by reference to specific symptoms, severity of symptoms, the method of administration of drugs, or the availability of associated genetic testing. As defined, the Specified Diseases cover a broad spectrum of available products. Requestor has further certified that no Donor or affiliate of any Donor directly or indirectly influences the identification or delineation of the Specified Diseases.

There are currently several different Specialty Medications, manufactured by a variety of different companies, available to treat each of the three Specified Diseases. Requestor has further certified that it would cover all new Specialty Medications as they become FDA-approved and available. Although Specialty Medications are often dispensed by specialty pharmacies, thousands of other pharmacies are also capable of dispensing the Specialty Medications. For a patient to qualify for assistance under the Proposed Arrangement, the Specialty Medication must have been prescribed as part of an approved course of treatment for a Specified Disease, and must not be for an off-label use. Patients may receive assistance with the cost of genetic testing if the test is ordered by a physician to determine

---

[3] The term "affiliate" of any Donor includes, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager) of a Donor.

CONFIDENTIAL – FOIA Exempt

Case 2:20-cv-04660-KSM   Document 16-2   Filed 08/10/21   Page 315 of 684
Case 1:20-cv-11548   Document 1-26   Filed 08/18/20   Page 17 of 34

Page 4 – OIG Advisory Opinion No. 10-07

an effective course of treatment for a Specified Disease. Requestor has certified that it would not refer applicants to, recommend, or arrange for the use of any particular medication, test, practitioner, provider, or supplier, and that patients would have complete freedom of choice in such matters. Requestor would provide the cost-sharing grants directly to the pharmacy, laboratory, or other health care provider or supplier whenever possible. However, if the patient's chosen provider or supplier does not accept third party payment, the patient may submit proof to Requestor that he or she incurred the cost, and then Requestor would make the grant payable to the patient.

Requestor intends to solicit donations from the general public, such as individuals, foundations, and corporations, including pharmaceutical manufacturers. All donations would be in the form of cash or cash equivalents. Donors would be able to change or discontinue their contributions to Requestor at any time. Donors could provide unrestricted donations, or could earmark their contributions either: (1) for the support of patients with a particular Specified Disease; or (2) for the support of patients requiring a genetic test. However, donations could not be earmarked for patients using a specific Specialty Medication, requiring a specific genetic test, or for genetic tests associated with a particular Specified Disease. Requestor's discretion to use the donations would be absolute, independent, and autonomous.

Requestor has certified that no health plan, affiliate of a health plan, Donor, or affiliate of any Donor, would exert any direct or indirect influence or control over Requestor or Requestor's program. No Donor, or immediate family members, directors, officers, employees, or persons otherwise affiliated with Donors, would be eligible to serve on Requestor's Board. Upon request, Requestor would inform Donors on a monthly basis of the aggregate number of all applicants qualifying for assistance for particular Specified Diseases, as well as the aggregate number of applicants qualifying for assistance for genetic testing. Requestor would not provide Donors with any individual patient information. Requestor's reports to Donors would not contain any information that would enable a Donor to correlate the amount or frequency of its donations with the number of patients that use its Specialty Medications or genetic tests, or the volume of those products or services. Requestor would not inform patients or Donors of the donations made to Requestor by others, although, as required by Internal Revenue Service ("IRS") regulations, Requestor's annual report and list of donations would be publicly available upon request.

## II.   LEGAL ANALYSIS

### A.   Law

The anti-kickback statute makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a Federal health care program. See section 1128B(b) of the Act. Where

                                                      Tev_167556

Page 5 – OIG Advisory Opinion No. 10-07

remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.

The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Greber, 760 F.2d 68 (3d Cir. 1985), cert. denied, 474 U.S. 988 (1985). Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Conviction will also lead to automatic exclusion from Federal health care programs, including Medicare and Medicaid. Where a party commits an act described in section 1128B(b) of the Act, the OIG may initiate administrative proceedings to impose civil monetary penalties on such party under section 1128A(a)(7) of the Act. The OIG may also initiate administrative proceedings to exclude such party from the Federal health care programs under section 1128(b)(7) of the Act.

Section 1128A(a)(5) of the Act provides for the imposition of civil monetary penalties against any person who gives something of value to a Medicare or state health care program (including Medicaid) beneficiary that the benefactor knows or should know is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of any item or service for which payment may be made, in whole or in part, by Medicare or a state health care program (including Medicaid). The OIG may also initiate administrative proceedings to exclude such party from the Federal health care programs. Section 1128A(i)(6) of the Act defines "remuneration" for purposes of section 1128A(a)(5) as including "transfers of items or services for free or for other than fair market value."

### B.    Analysis

Two aspects of the Proposed Arrangement require scrutiny under section 1128A(a)(5) of the Act and the anti-kickback statute: the Donor contributions to Requestor and Requestor's assistance to patients. We address them in turn.

### 1. Donor Contributions to Requestor

Long-standing OIG guidance makes clear that industry stakeholders can effectively contribute to the health care safety net for financially needy beneficiaries by contributing to independent, bona fide charitable assistance programs. Under a properly structured program, such donations should raise few, if any, concerns about improper beneficiary inducements.

CONFIDENTIAL – FOIA Exempt

Page 6 – OIG Advisory Opinion No. 10-07

In the instant case, Requestor's proposed design and administration of the Proposed Arrangement would interpose an independent, <u>bona fide</u> charitable organization between Donors and patients in a manner that would effectively insulate beneficiary decision-making from information attributing the funding of their benefit to any Donor.  Thus, it appears unlikely that Donor contributions would influence any beneficiary's selection of a particular provider, practitioner, supplier, test, or product.  Similarly, there appears to be a minimal risk that the Donor contributions would improperly influence referrals by Requestor.  We reach this conclusion based on a combination of the following factors.

<u>First</u>, no Donor or affiliate of any Donor would exert direct or indirect control over Requestor or its program.  Requestor is an independent, nonprofit, tax-exempt charitable organization that operates with absolute, independent, and autonomous discretion as to the use of donor contributions.  No Donor, or immediate family members, directors, officers, employees, or persons otherwise affiliated with Donors, would be eligible to serve on Requestor's Board.

<u>Second</u>, Requestor would award assistance in a truly independent manner that would sever any link between Donors and beneficiaries.  Requestor would make all financial eligibility determinations using its own objective criteria.  Applications would be considered on a first-come, first-served basis, to the extent of available funding.  Before applying for assistance, each patient will have already selected his or her health care providers, practitioners, suppliers, and products and will already have a treatment regimen in place.  All patients would remain free, while receiving Requestor's assistance, to change their health care providers, practitioners, suppliers, or Specialty Medications.  Requestor would not refer any patient to any Donor or affiliate of a Donor, or to any provider, practitioner, supplier, medication, or test.

<u>Third</u>, Requestor would award assistance without regard to any Donor's interests and without regard to the applicant's choice of provider, practitioner, supplier, test, or product.  When determining patient eligibility for the Proposed Arrangement, Requestor would not take into account the identity of any provider, practitioner, insurer, health plan, supplier of items or services, test, drug, or other product the patient may use; the identity of any referring person or organization; or the amount of any contributions made by a Donor whose services or products are used or may be used by the patient.

<u>Fourth</u>, based on Requestor's certifications, Requestor would provide assistance based on a reasonable, verifiable, and uniform measure of financial need that would be applied in a consistent manner.

<u>Fifth</u>, Requestor would not provide Donors with any data that would facilitate the Donor in correlating the amount or frequency of its donations with the amount or frequency of the use of its products or services.  No individual patient information would be conveyed to any

CONFIDENTIAL – FOIA Exempt

Page 7 – OIG Advisory Opinion No. 10-07

Donor, nor would be any data related to the identity, amount, or nature of products or services subsidized under the Proposed Arrangement. Some aggregate data may be provided to Donors as a courtesy, but this would be limited to aggregate numbers of qualifying patients for each Specified Disease or aggregate numbers of patients qualifying for assistance with genetic testing. Patients would not receive any information regarding Donors, and Donors would not receive any information regarding other Donors, except that Requestor's annual report and list of donations may be publicly available, as required by the IRS. In the instant case, we believe these safeguards appropriately minimize the potential risk otherwise presented by reporting Donor and patient data to Donors and patients.

Finally, the fact that Requestor permits Donors to earmark donations for particular Specified Diseases or for genetic testing, generally, should not, on the facts presented, significantly raise the risk of abuse. In this case, Requestor has certified that no Donor or affiliate of any Donor (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) would directly or indirectly influence the identification of the Specified Diseases. To ensure that Requestor's Specified Diseases are appropriately defined, Requestor has further certified that: (i) it would define its Specified Diseases in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products; and (ii) its Specified Diseases would not be defined by reference to specific symptoms, severity of symptoms, the method of administration of drugs, or the availability of associated genetic testing. Moreover, several different Specialty Medications are currently available to treat each Specified Disease, and Requestor has certified that it will cover all new Specialty Medications as they become FDA-approved and available. Donors would not be permitted to earmark contributions for specific Specialty Medications or genetic tests, nor could they earmark contributions for genetic tests applicable to a particular Specified Disease. Under these circumstances, it is unlikely that the earmarking would result in the Proposed Arrangement serving as a disguised conduit for financial assistance from a Donor to patients using its products.

In sum, Requestor's interposition as an independent charitable organization between Donors and patients and the design and administration of the Proposed Arrangement provide sufficient insulation so that Requestor's assistance to patients should not be attributed to any of its Donors. Donors would not be assured that the amount of financial assistance their patients, clients, or customers receive would bear any relationship to the amount of their donations. Indeed, Donors would not be guaranteed that any of their patients, clients, or customers would receive any financial assistance whatsoever from Requestor. In these circumstances, we do not believe that the contributions Donors would make to Requestor

CONFIDENTIAL – FOIA Exempt

Page 8 – OIG Advisory Opinion No. 10-07

can reasonably be construed as payments to eligible beneficiaries of the Medicare or Medicaid programs or to Requestor to arrange for referrals.[4]

## 2. Requestor's Assistance to Medicare and Medicaid Beneficiaries

In the circumstances presented by the Proposed Arrangement, Requestor's proposed provision of financial assistance with cost-sharing obligations for certain eligible, financially needy beneficiaries is not likely to influence improperly any beneficiary's selection of a particular provider, practitioner, supplier, product, or test.[5]  We reach this conclusion based on the following factors.

First, Requestor would assist all eligible, financially needy patients on a first-come, first-served basis, to the extent funding is available.  Patients would not be eligible for assistance unless they meet Requestor's financial need eligibility criteria.  In all cases, the patients would already be under the care of a physician with a treatment regimen in place at the time of application.  Requestor would make no referrals or recommendations regarding specific providers, practitioners, suppliers, tests, or products.  Patients would not be informed of the identity of Donors.

Second, Requestor's determination of an applicant's qualification for assistance would be based solely on his or her financial need, without considering the identity of any of his or her health care providers, practitioners, suppliers, products, or tests; the identity of any referring party; or the identity of any Donor that may have contributed for the support of the applicant's Specified Disease or the amount of the donation.  Requestor would provide assistance based on a reasonable, verifiable, and uniform measure of financial need that would be applied in a consistent manner.

Third, Requestor's assistance would in no way limit beneficiaries' freedom of choice.  Beneficiaries will have already selected a provider, practitioner, or supplier of items or services—and Specialty Medications or a genetic test will have already been ordered for

---

[4] This conclusion is consistent with the OIG's November 2005 Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees (70 Fed. Reg. 70623; November 22, 2005), in which the OIG made it clear that, in the circumstances described in the Bulletin, cost-sharing subsidies provided by bona fide, independent charities unaffiliated with donors should not raise anti-kickback concerns, even if the charities receive charitable contributions from those donors.

[5] Given this conclusion here—that the Proposed Arrangement is not likely to influence improperly beneficiary choice—we need not reach the issue of whether the new exception at section 1128A(i)(6)(F) of the Act, as added by the Patient Protection and Affordable Care Act (P.L. 111-148, 124 Stat. 119), might also apply.

Tev_167560

Page 9 – OIG Advisory Opinion No. 10-07

them—prior to their application for Requestor's assistance. Beneficiaries would remain free to select any provider, practitioner, supplier, product, or test, regardless of whether that provider, practitioner, supplier, or product or test manufacturer has made contributions to Requestor's support program. Similarly, beneficiaries would be free at any time to switch providers, practitioners, suppliers, or products without affecting their continued eligibility for assistance.

Finally, Requestor's own interest as a charitable, tax-exempt entity that must maximize use of its scarce resources to fulfill its charitable mission ensures that Requestor has a significant incentive to monitor utilization so as to keep expenditures to a minimum.

## III.   CONCLUSION

Based on the facts certified in your request for an advisory opinion and supplemental submissions, we conclude that: (i) the Proposed Arrangement would not constitute grounds for the imposition of civil monetary penalties under section 1128A(a)(5) of the Act; and (ii) while the Proposed Arrangement could potentially generate prohibited remuneration under the anti-kickback statute, if the requisite intent to induce or reward referrals of Federal health care program business were present, the OIG would not impose administrative sanctions on The Assistance Fund, Inc. under sections 1128(b)(7) or 1128A(a)(7) of the Act (as those sections relate to the commission of acts described in section 1128B(b) of the Act) in connection with the Proposed Arrangement. This opinion is limited to the Proposed Arrangement and, therefore, we express no opinion about any ancillary agreements or arrangements disclosed or referenced in your request for an advisory opinion or supplemental submissions.

## IV.   LIMITATIONS

The limitations applicable to this opinion include the following:

- This advisory opinion is issued only to The Assistance Fund, Inc., the requestor of this opinion. This advisory opinion has no application to, and cannot be relied upon by, any other individual or entity.

- This advisory opinion may not be introduced into evidence in any matter involving an entity or individual that is not a requestor of this opinion.

- This advisory opinion is applicable only to the statutory provisions specifically noted above. No opinion is expressed or implied herein with respect to the application of any other Federal, state, or local statute, rule, regulation, ordinance, or other law that may be applicable to the Proposed

Page 10 – OIG Advisory Opinion No. 10-07

> Arrangement, including, without limitation, the physician self-referral law, section 1877 of the Act.

- This advisory opinion will not bind or obligate any agency other than the U.S. Department of Health and Human Services.

- This advisory opinion is limited in scope to the specific arrangement described in this letter and has no applicability to other arrangements, even those which appear similar in nature or scope.

- No opinion is expressed herein regarding the liability of any party under the False Claims Act or other legal authorities for any improper billing, claims submission, cost reporting, or related conduct.

This opinion is also subject to any additional limitations set forth at 42 C.F.R. Part 1008.

The OIG will not proceed against The Assistance Fund, Inc. with respect to any action that is part of the Proposed Arrangement taken in good faith reliance upon this advisory opinion, as long as all of the material facts have been fully, completely, and accurately presented, and the Proposed Arrangement in practice comports with the information provided. The OIG reserves the right to reconsider the questions and issues raised in this advisory opinion and, where the public interest requires, to rescind, modify, or terminate this opinion. In the event that this advisory opinion is modified or terminated, the OIG will not proceed against The Assistance Fund, Inc. with respect to any action taken in good faith reliance upon this advisory opinion, where all of the relevant facts were fully, completely, and accurately presented and where such action was promptly discontinued upon notification of the modification or termination of this advisory opinion. An advisory opinion may be rescinded only if the relevant and material facts have not been fully, completely, and accurately disclosed to the OIG.

Sincerely,

Lewis Morris
Chief Counsel to the Inspector General

Tev_167562

**IRS Verification Letter**

Below is a copy of The Assistance Fund's IRS Determination Letter of 501(c) 3 status.



CONFIDENTIAL – FOIA Exempt

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date: NOV 0 9 2009

THE ASSISTANCE FUND INC
C/O NIXON PEABODY LLP
ANITA PELLETIER
1100 CLINTON SQ
ROCHESTER, NY  14604

Employer Identification Number:
 27-0270731
DLN:
 17053240344009
Contact Person:
 MITCHELL P STEELE          ID# 31360
Contact Telephone Number:
 (877) 829-5500
Accounting Period Ending:
 December 31
Public Charity Status:
 170(b)(1)(A)(vi)
Form 990 Required:
 Yes
Effective Date of Exemption:
 May 12, 2009
Contribution Deductibility:
 Yes
Addendum Applies:
 No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax
exempt status we have determined that you are exempt from Federal income tax
under section 501(c)(3) of the Internal Revenue Code.  Contributions to you are
deductible under section 170 of the Code.  You are also qualified to receive
tax deductible bequests, devises, transfers or gifts under section 2055, 2106
or 2522 of the Code.  Because this letter could help resolve any questions
regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified
as either public charities or private foundations.  We determined that you are
a public charity under the Code section(s) listed in the heading of this
letter.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, for some helpful information about your responsibilities as an
exempt organization.

Letter  947 (DO/CG)

CONFIDENTIAL – FOIA Exempt

THE ASSISTANCE FUND INC

Sincerely,

Robert Choi
Director, Exempt Organizations
Rulings and Agreements

Enclosure:   Publication 4221-PC

Letter  947 (DO/CG)

CONFIDENTIAL – FOIA Exempt

Tev_167565

**Co-Pay Assistance Enrollment Application Form**

In order to continue receiving assistance, patients must submit the following four (4) page application and supporting documentation within the designated time period.



CONFIDENTIAL – FOIA Exempt                                                                          Tev_167566

# Enrollment Application Form

**Assistance Fund**

Please complete the information listed below to apply for The Assistance Fund, Inc. Co-pay Assistance Program. If you need any assistance filling out the application, please call **877-245-4412**.
Completing this application does not guarantee acceptance in The Assistance Fund, Inc. Co-pay Assistance Program.

## Patient Information          Patient ID:

| Patient | | | | | |
|---|---|---|---|---|---|
| Patient Legal Last Name: | Legal First Name: | | Middle: | Marital Status: Married ☐ Single ☐ | |
| E-mail Address: | | Phone: H ☐ W ☐ Other ☐ ( ) | | Phone: H ☐ W ☐ Other ☐ ( ) | |
| Mailing Address: | | | P.O. Box: ☐ N/A | | |
| City: | | State: | | Zip Code: | |
| Social Security Number: ( - - ) | Date of Birth (MM/DD/YYYY): / / | Sex: ☐ M ☐ F | Pharmacy Related Medication: ☐ Unknown | | |
| Primary Diagnosis: | Name of Related Medication: | | Related Medication Daily Dosage: | | |

## Primary Diagnosis Physician Information

| Physician | | |
|---|---|---|
| Physician Last Name: | First Name: | Practice Name: |
| Email Address: | Phone: ( ) | Fax: ( ) |
| Mailing Address: | P.O. Box: ☐ N/A | |
| City: | State: | Zip Code: | Office Contact and Title (if applicable): |

## Prescription Drug Coverage Insurance Information[1]

| Insurance | | | |
|---|---|---|---|
| Insurer Name: | Cardholder Last Name: | First Name: | Middle: |
| Member ID #: | Group #: | Phone: ( ) | Secondary Phone: ( ) |

## Financial Information[2]

| Financial | | |
|---|---|---|
| Total Annual Household Income: | Household Size: | Current Employment Status: ☐ Employed ☐ Unemployed ☐ Retired ☐ Disabled |
| Has your annual income changed significantly in the last year? ☐ Yes ☐ No | | |
| If yes, how much: Up $_____ Down $_____ | | |

TAF_EA_3-1-10

CONFIDENTIAL – FOIA Exempt                              Tev_167567

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/19/21   Page 327 of 684
CASE 1:20-cv-11948   Document 1-26   Filed 08/18/20   Page 29 of 34

Page 2

Please do not staple

## Alternate Contact Information

| | | |
|---|---|---|
| Alternate Contact Last Name: | First Name: | Middle: |
| Relationship to Patient: | Phone:  H ☐ W ☐ Other ☐ <br> ( ) | Phone:  H ☐ W ☐ Other ☐ <br> ( ) |

(Alternate — vertical label in left margin)

## Supporting Documentation

Specific supporting documentation must be submitted along with the application in order to receive assistance from The Assistance Fund. Please read the following closely and return the appropriate paperwork with the completed application.

[1] **Prescription Drug Coverage Insurance Information Documentation**
- Copies of prescription drug coverage insurance card(s), both front and back.

**Please note:** Documentation verifying your **TOTAL ANNUAL HOUSEHOLD INCOME** is required to obtain assistance. You must provide **one or any combination of the following documents** (or their equivalents) in order to report the total annual household income:

[2] **Financial Information Supporting Documentation**
- Copy of most recent federal tax return
- Most recent W-2 or 1099 for each member of the household
- Statement of social security benefits (if you or members of the household collect Social Security benefits)
- Copy of most recent pay stub or letter from employer clearly stating compensation.

If no official documentation reflecting total annual income can be obtained, you may provide a letter from treating physician attesting to your income and medical costs.

Please call The Assistance Fund if any clarification is needed.

(Supporting Documentation — vertical label in left margin)

**The Assistance Fund, Inc.**
5323 Millenia Lakes Boulevard, Suite 200
Orlando, Florida 32839

Phone: (877)245-4412
Fax: (866)254-9411
Website: www.theassistfund.org

Please do not staple

# Agreements

<u>Compliance:</u>  I agree to be fully compliant in taking the drug for which financial assistance is being provided in accordance with my doctor's directions.  I understand that I may be dis-enrolled from The Assistance Fund if I am non-compliant with a prescription medication regimen.

<u>Certification and Acknowledgement:</u>  I agree that all of the information I have provided is truthful and accurate to the best of my knowledge. I understand that I am free at any time to switch providers, practitioners, suppliers, or covered specialty medications without affecting my continued eligibility for assistance.  I understand that my application for assistance does not guarantee funding will be available.  I understand that if I am awarded financial assistance that it will be provided on a calendar year basis.  I must reapply for assistance each calendar year.  There is no guarantee that funding will be available in any subsequent year.

Provision of Alternative Assistance: I acknowledge that The Assistance Fund has been established to help patients in need of financial assistance with their specialty medications and who qualify based on the guidelines established by the fund. I further agree that if approved for assistance I must maintain my qualification status throughout the period of approved assistance from The Assistance Fund.

I also agree that if at any time during the approved assistance period, the government benefit changes, I will be responsible to update the Assistance Fund.  If I am no longer in need of assistance, or in need of less assistance, my qualification status may change and The Assistance Fund may cease providing me assistance or may reduce the amount of assistance allocated to me for the balance of the year.

Furthermore, if at any time during the approved assistance period, I receive additional retroactive prescription drug financial assistance directly from the government, that assistance will be deducted from the amount of assistance provided by The Assistance Fund. In cases where the amount of retroactive funding provided directly from the government is in excess of the amount of remaining annual funding allocated to me by The Assistance Fund, I will be responsible for reimbursing The Assistance Fund for the amount of excess retroactive funding or, at the option of the Assistance Fund, the amount of any such excess retroactive funding may be deducted in a following year from funding that would otherwise be allocated to me by the Assistance Fund.

<u>Limitation of Liability:</u>  I agree that The Assistance Fund, its sponsors and donors shall not be liable for any damages of any kind, without limitation, arising out of or in connection with receiving co-pay assistance or other benefits or services provided as a part of this program.

_____                    _____

**Signature of Patient or Patient's Representative**                 **Date**

_____

**Print name of Patient's Representative** *(if applicable)*

_____

**Relationship to Patient** *(if applicable)*

---

**The Assistance Fund, Inc.**                         Phone: (877)245-4412
5323 Millenia Lakes Boulevard, Suite 200     Fax: (866)254-9411
Orlando, Florida 32839                               Website: www.theassistfund.org

CONFIDENTIAL – FOIA Exempt

Tev_167569

## Patient Authorization to use or release Protected Health Information

I authorize the use and disclosure of my individually identifiable health information ("Protected Health Information") by The Assistance Fund, Inc, a non-profit organization, to process my application for the Co-pay Assistance Program, to enroll me in the Co-pay Assistance program if I am eligible and there are funds available and to administer the Co-pay Assistance program if I am enrolled. I authorize my health care provider and insurance company to disclose to The Assistance Fund, Inc my health information verbally or written to be used for the purposes stated above. I understand that my Protected Health Information may be subject to re-disclosure pursuant to this authorization.  I may withdraw this authorization by mailing or faxing a letter of revocation to The Assistance Fund, but if I do, it will not have an effect on any actions The Assistance Fund took before it received revocation of this Authorization. If I revoke this authorization, I will no longer be eligible to receive assistance through this program. This authorization has no expiration date.

I authorize The Assistance Fund, Inc to use and disclose my Protected Health Information to Government Funded or other co-pay assistance programs that may assist me financially to obtain my medication.  I understand that I may request copies of the Protected Health Information described in this authorization if I request to do so.

_____          _____

**Signature of Patient or Patient's Representative**          **Date**

_____

**Print name of Patient's Representative** *(if applicable)*

_____

**Relationship to Patient** *(if applicable)*

---

**The Assistance Fund, Inc.**                Phone: (877)245-4412
5323 Millenia Lakes Boulevard, Suite 200      Fax: (866)254-9411
Orlando, Florida 32839                        Website: www.theassistfund.org

CONFIDENTIAL – FOIA Exempt

**Donor Agreement**

The following is The Assistance Fund Donor Agreement.



Nixon Peabody LLP Draft 8/27/2009

## DONOR AGREEMENT

AN AGREEMENT, dated this __ day of _____, 200_, by and between DONOR NAME, doing business at DONOR ADDRESS, CITY, STATE ZIP CODE (the "Donor"), and the Assistance Fund, located at 5323 Millenia Lakes Boulevard, Suite 200, Orlando, Florida 32839 (the "Fund").

WHEREAS, the Fund is a charitable organization that was formed to establish a grant program to assist needy individuals diagnosed with _____ amongst other disease states to afford their specialty medications; and

WHEREAS, the Donor wishes to make a gift for the benefit of the Fund to further the Fund's charitable activities; and

WHEREAS, the Fund recognizes its responsibility to the Donor with respect to the use of the Gift.

NOW, THEREFORE, the parties hereto agree as follows:

1.      Gift. The Donor, in consideration of its/his/her abiding interest in the Fund and its charitable works, hereby donates to the Fund the amount of _____Dollars ($_____) (the "Gift") which shall be used as follows:

      a.   Specific description and sub description here.

2.      Conditions for Acceptance of Gift.  Donor agrees and acknowledges that the Gift herein provided for is made in recognition of and subject to the terms and conditions of the Certificate of Incorporation and By-laws of the Fund as from time to time may be amended, and that the Gift shall at all times be subject to such terms and conditions.  The Donor acknowledges that, should the purposes for which the Gift is made ever becomes obsolete or incapable of fulfillment, the Fund's governing board may exercise its judgment to select a similar use for the Gift which will most nearly fulfill the original charitable intent of the Gift.

3.      Fund's Representations.  The Fund represents and covenants to the Donor, which representations and covenants shall survive this Agreement:

(a)  The Fund is an organization described in Internal Revenue Code ("Code') Section 501(c)(3) and is classified as a public charity under Code Sections 509(a) and 170(b)(1)(A)(vi).

(b)  The Fund shall furnish the Donor such documentation as may be required to substantiate the Gift.

(c)  The Fund has the corporate authority to enter into this Agreement with the Donor.

12686383.1

CONFIDENTIAL – FOIA Exempt                                                                    Tev_167572

- 2 -

4.      Entire Agreement.  This Agreement constitutes the entire agreement between the parties regarding the Agreement's subject, and supersedes all oral and written agreements entered before or at the same time as this Agreement concerning the Agreement's subject.

5.      Governing Law.  This Agreement shall be governed by and its terms and conditions construed in accordance with the laws of the State of Florida without reference to its conflict of laws rules.

6.      Counterparts.  This Agreement may be signed in one or more counterparts, all of which are deemed original.

IN WITNESS WHEREOF, the Donor and the Fund have executed this Agreement as of the date first set forth above.

DONOR NAME

By: _____
Name:
Title:

THE ASSISTANCE FUND, INC.

By: _____
Name:
Title:

12686383.1

CONFIDENTIAL – FOIA Exempt                                                                      Tev_167573

# EXHIBIT A-27

| | |
|---|---|
| **From:** | Denise Lynch |
| **To:** | Katie Hiett; Jennifer Clark |
| **Sent:** | 12/14/2011 1:38:07 PM |
| **Subject:** | RE: Questions for CDF Audit |

Thanks Katie,
This looks great.  I would like to add the following:
Is there a way to get to total patients in the fund (what % of the fund is made up of Copaxone patients....I don't believe they can provide this directly but is there some way you can back in to the answer?
What % of patients have reapplied for 2012 assistance?  How many are expected to reapply?
Doners to the fund?

*Denise C. Lynch*
Sr. Director, Patient Services and Support
Teva Neuroscience
901 E. 104th St.,  Suite 900
Kansas City, MO  64131
Phone: (816) 508-5139  Fax: (816) 508-5508
Email: denise.lynch@tevapharm.com

---

**From:** Katie Hiett
**Sent:** Tuesday, December 13, 2011 4:00 PM
**To:** Denise Lynch; Jennifer Clark
**Subject:** Questions for CDF Audit

Denise & Jennifer,

Below is the list of items I believe we want addressed in the audit with Chronic Disease Fund.  Please review and let me know if you want to make changes or additions:

· Count on LIS or partial LIS patients, if any
· Discrete patients who received assistance last year
· Scripts vs patients..looking for number of fills
· Pharmacy placement..ie who is at ACS and other pharmacies
· How much rollover money do we have
· Have all funds been returned back to the general fund that were not used at the patient level

Regards,

TEVA    **Katie Hiett**   Dir, Finance & Planning
Tel: (816) 508-5088   Cell: (913) 709-0507   Fax: (913) 508-5592
Katie.Hiett@tevapharm.com   sip:Katie.Hiett@tevapharm.com   www.tevapharm.com

CONFIDENTIAL – FOIA Exempt                                                                Tev_025551

# EXHIBIT A-28

| From: | Durand, Nancy S |
| --- | --- |
| To: | Lisa Holmes; Jennifer Clark; Connie McDonough |
| CC: | ONC Reimbursement; Peter T Benavente |
| Sent: | 5/31/2012 8:31:49 PM |
| Subject: | RE: Arzerra CI |
| Attachments: | ATT00001..txt; ATT00002..htm; OIG Ruling.pdf; OIG_Anti-Kick Back Statute.pdf |

Hi Everyone:

Please see the attached slide show and PAP Compliance for Manufacturers doc.

Best,
Nancy

---

**From:** Lisa Holmes [mailto:Lisa.Holmes@tevapharm.com]
**Sent:** Wednesday, May 30, 2012 4:09 PM
**To:** Jennifer Clark; Durand, Nancy S; Connie McDonough
**Cc:** ONC Reimbursement; Peter T Benavente
**Subject:** RE: Arzerra CI

Jennifer, It is interesting they throw it out there, but then pull it back in the criteria.   In fact, Arzerra is not available generically.  I appreciate any other clarification we can get from you, Nancy.  Thanks.

*Lisa Holmes*
*Senior Director, Reimbursement*
*Oncology Business Unit*
*Teva Pharmaceuticals*
*Office 610-727-6309*
*Mobile 610-766-1168*
*Fax 610-727-6150*

lisa.holmes@tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Tuesday, May 29, 2012 10:49 AM
**To:** Durand, Nancy S; Lisa Holmes; Connie McDonough
**Cc:** ONC Reimbursement; Peter T Benavente
**Subject:** RE: Arzerra CI

This is the first I've ever heard of anything like this.  However, I did notice on their website (under 'Other Criteria') that the patient cannot have prescription drug benefits, unless the coverage is limited to generic prescription medicine only.  Do we know if Arzerra is only available as a branded product?

I'll check with our legal to see if they can shed any light on this as well.

**Jennifer Clark, CPA**   Sr. Manager, Patient Services & Reimbursement
TEVA   Tel: (816) 508-5396    Cell: (816) 332-2873   Fax: (816) 508-5589
Jennifer.Clark@tevapharm.com    sip:Jennifer.Clark@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

Tev_170414

Case 1:20-cv-11548   Document 62-8   Filed 08/10/21   Page 337 of 684

**From:** Durand, Nancy S [mailto:Nancy.Durand@ACCESSMED.COM]
**Sent:** Friday, May 25, 2012 2:40 PM
**To:** Lisa Holmes; Connie McDonough; Jennifer Clark
**Cc:** ONC Reimbursement; Peter T Benavente
**Subject:** RE: Arzerra CI

Hi Everyone:

The attached opinion is from 2006. Let me see if I can dig up anythng more current from OIG on Part B/D. I ran this question by, Steve Chan recently on behalf of our ORS team. BTW Steve is the one who worked with Rich & I on the FRM Toolkit.

In addition to the attached he also shared this from his team:

While the below info is not directly related it suggests that at the time of this opinion, they had not issued an opinion on Part B.

http://oig.hhs.gov/fraud/docs/advisoryopinions/2006/AdvOpn06-03F.pdf

"We are writing in response to your request for an advisory opinion regarding a pharmaceutical company patient assistance program that provides free outpatient prescription drugs to financially-needy Medicare Part D enrollees entirely outside of the Part D benefit (the "Arrangement")"

"As we observed in our recent Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees (70 Fed. Reg. 70623 (November 22, 2005)), manufacturer PAPs that subsidize the cost-sharing amounts for the manufacturer's drugs payable in whole or in part by the Part D program present all of the usual risks of fraud and abuse associated with kickbacks, including steering enrollees to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing enrollees' incentives to locate and use less expensive, equally effective drugs."

"However, in this case, the Requestor operates the PAPs entirely outside of the Part D benefit. Operating outside of the Part D benefit means the enrollees obtain their drugs without using their Part D insurance benefit. No claims for payment for the drugs provided outside the Part D benefit are filed with a Part D plan or the beneficiary, and the assistance does not count toward the enrollee's TrOOP or total Part D spending for any purpose. Having reviewed the Arrangement, we conclude that the Arrangement contains safeguards sufficient to ensure that the PAPs operate entirely outside the Part D benefit, and, therefore, there is minimal risk of fraud and abuse under the Part D program."

"In addition, we caution that we might reach a different result were we to evaluate an arrangement similar to the Arrangement arising other than in the Part D context."

"Many of the uses of these drugs involve physician administration and coverage under Medicare Part B. The Arrangement is limited to the uses of these drugs that are eligible for coverage under Medicare Part D, without regard to whether or not an individual enrollee's Part D plan actually covers that drug. PAP A does not provide free drugs to Medicare beneficiaries for uses that are eligible for coverage under Medicare Part B."

Here is the link to the Arzerra Program:


http://www.commitmenttoaccess.com/enrollment/eligibility-arzerra.html


**Eligibility Criteria for Patients Taking ARZERRA™**

Patients with prescription drug benefits through Medicare Part B or through a commercial plan may be eligible for COMMITMENT TO ACCESS® when they have a copayment that exceeds $2,000, subject to other criteria. Advocates may call 1-8ONCOLOGY1 (1-866-265-6491) for more information.

Well, it's a start.

CONFIDENTIAL – FOIA Exempt                                                      Tev_170415

Best,

**Nancy**

---

**From:** Lisa Holmes [mailto:Lisa.Holmes@tevapharm.com]
**Sent:** Friday, May 25, 2012 12:18 PM
**To:** Connie McDonough; Durand, Nancy S; Jennifer Clark
**Cc:** ONC Reimbursement; Peter T Benavente
**Subject:** Re: Arzerra CI

Nancy and Jennifer
Will you get some advice from your network...any knowledge of an OIG opinion allowing access to copay assistance for Medicare pts?

Lisa Holmes

On May 25, 2012, at 11:03 AM, "Connie McDonough" <Connie.McDonough@tevapharm.com> wrote:

One of my WI customers told me that there was both a commercial and Medicare copay assist for arzerra directly.  Patient copay for commercial capped at 100 and Medicare 400.  I got the impression that GSK had gone through a special government approval of the Medicare program FYI.

*Connie K. McDonough, RN, MSN*
*Field Reimbursement Manager*
*Teva Oncology*
*connie.mcdonough@tevapharm.com*
*cell: 302-824-4189*

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

</pre>The contents of this electronic mail message and any attachments are confidential, possibly privileged and intended for the addressee(s) only.<br>Only the addressee(s) may read, disseminate, retain or otherwise use this message. If received in error, please immediately inform the sender and then delete this message without disclosing its contents to anyone.</pre>

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.



SIDLEY AUSTIN
## SIDLEY

BEIJING BRUSSELS CHICAGO DALLAS FRANKFURT GENEVA HONG KONG LONDON LOS ANGELES NEW YORK SAN FRANCISCO SHANGHAI SINGAPORE SYDNEY TOKYO WASHINGTON, D.C.

Legal Considerations in Developing Patient Assistance Programs
September 19, 2008

Perry Knight, MHA, JD
pknight@sidley.com
(202) 736-8256

---

### Agenda

- Overview of Fraud & Abuse Laws
- Key PAP Risk Areas Identified by the OIG
- Price Reporting Considerations
- Other Considerations
- Questions

September 19, 2008                                          SIDLEY

---

### Federal Anti-Kickback Statute (AKS)
(42 USC 1320a-7b(b))

**Prohibits any person from knowingly and willfully soliciting, offering, paying, or receiving any remuneration in return for making referrals or otherwise generating business for which payment may be made under federal or state health care programs.**

- AKS applies to "any person" who gives, receives, offers, or solicits remuneration
  - Applies to both sides of the transaction and anyone in between
- Remuneration is defined broadly to include *anything of value*, including discounts and free items or services

"Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the antikickback statute is violated." OIG, SAB

September 19, 2008                                          SIDLEY

---

CONFIDENTIAL – FOIA Exempt

1

Tev_170432

---

### Federal Anti-Kickback Statute ("AKS")

- "One purpose" test
  - If even one purpose of remuneration is to induce referrals, the statute is violated, regardless of other beneficial purposes
- Applies only where payment may be made under a Federal or State health care program.
- Violation is a felony. Penalties include:
  - Maximum $25,000 fine
  - 5 years imprisonment (or both)
  - Exclusion from Federal health care programs.
- Violation may also trigger civil monetary penalties.

**Intended to prevent financial considerations from interfering with:**
- Medical decision-making
- Choice of Provider
- Amount of medical care provided

4  September 19, 2008                                            SIDLEY

---

### Civil Monetary Penalties
(42 USC 1320a-7a(a)(5))

- "Any person... that— ... offers to or transfers _remuneration_ to any individual eligible for benefits under [Medicare], or under a State health care program... [e.g., Medicaid] that such person knows or should know is likely to influence such individual to order or receive from a _particular provider, practitioner, or supplier_ any item or service for which payment may be made, in whole or in part, under [such program]... shall be subject ... to a civil money penalty of not more than _$10,000 for each item or service_ ... . In addition, such a person shall be subject to an assessment of not more than _3 times the amount claimed_ for each such item or service.... In addition the Secretary may make a determination...to _exclude the person from participation in the Federal health care programs_ (as defined in section 1128B(f)(1))and to direct the appropriate State agency to exclude the person from participation in any State health care program."

- "Remuneration" defined to include waiver of coinsurance and deductibles and "transfers of items or services for free or for other than fair market value."

5  September 19, 2008                                            SIDLEY

---

### Department of Health and Human Services Office of the Inspector General ("OIG")

- OIG polices fraud & abuse concerns
- Investigate internal (HHS) and external arrangements for fraud & abuse concerns
- Issue Advisory Opinions ("AOs")
  - Can be requested by parties to a real transaction or parties intending in good faith to enter into an arrangement
  - Opinion speaks _only to the specific factual situation_
  - Can only be relied upon by the party seeking the Opinion
  - But can be important guidance for others

6  September 19, 2008                                            SIDLEY

2

CONFIDENTIAL – FOIA Exempt                                    Tev_170433

## OIG on PAPs

- Medicare Part D was a watershed event for PAP fraud & abuse guidance
  - Medicare Part D brought federal healthcare program funds into play for prescriptions filled for Medicare beneficiaries. This necessarily entailed AKS considerations.
  - PAPs still needed for un-enrolled individuals and costs in coverage gap.
  - Concern for TrOOP, use PAPs to "speed through" the coverage gap.
- Special Advisory Bulletin (SAB) November 2005
  - 70 Fed. Reg. 70623 (Nov. 22, 2005)
  - Addresses how PAPs can assist Medicare beneficiaries
  - Does not apply to PAPs assisting the uninsured

7  September 19, 2008 — SIDLEY

## OIG on PAPs

- "[P]harmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts present **heightened risks** under the antikickback statute. However, in the circumstances described in this Bulletin, cost-sharing subsidies provided by *bona fide*, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions. In addition, we believe other arrangements described in this Bulletin, if properly structured, may pose reduced risk. Thus, we believe lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D beneficiaries can afford medically necessary drugs."

8  September 19, 2008 — SIDLEY

## OIG on PAPs

- Whether a PAP arrangement violates the AKS, requires a case-by-case analysis
  - "For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are necessarily relevant to the analysis." OIG, SAB
- PAPs raise two questions
  1. Does the subsidy count towards TrOOP?
     - Under CMS regulations yes, BUT
  2. Does the subsidy implicate the AKS?
     - "Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (i.e., the subsidy) to beneficiaries to use its product." OIG, SAB
- PAPs present "all of the usual risks of fraud and abuse associated with kickbacks"
  - Steering patients to particular drugs
  - Increasing costs to Medicare
  - Providing financial incentives over competing drugs
  - Reducing enrollees' incentives to locate and use less expensive, equally effective drugs

9  September 19, 2008 — SIDLEY

CONFIDENTIAL – FOIA Exempt

Tev_170434

---

## Medicare Part D PAP Options: "Inside Part D"

- *Bona Fide* Independent Charitable Foundation
  - Manufacturer donates money to independent charitable foundation
  - Foundation awards assistance to individuals
  - Assistance counts as TrOOP

  > "Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choice." OIG, SAB

10   September 19, 2008                                            SIDLEY

---

## Medicare Part D PAP Options: "Inside Part D"

- Safeguards
  - Manufacturer exerts no influence or control over the program
  - Foundation awards assistance in a truly independent manner
  - Assistance awarded without regard to manufacturer interests or beneficiary choice of provider or Part D plan
  - Assistance based on "reasonable, verifiable, and uniform measure of financial need applied in a consistent manner" (flexibility permitted)
  - Manufacturer cannot solicit data to correlate donations with product use
  - Donations may be earmarked for broad disease categories - BUT
    - "[M]anufacturers should limit their earmarked donations to PAPs that define categories in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products." OIG, SAB

11   September 19, 2008                                            SIDLEY

---

## Medicare Part D PAP Options: "Inside Part D"

- Footnote:
  - "In-kind donations of drugs to independent charity PAPs pose additional risks not yet directly addressed in prior OIG guidance, and we have insufficient experience with them to offer detailed guidance here. While in-kind donations have the potential benefit of increasing the value of donations (because marginal costs of drugs are generally low), they also have the effect of creating a direct correlation between the donation and use of a particular donor's product, thereby weakening important safeguards of an independent charity PAP arrangement." OIG, SAB

12   September 19, 2008                                            SIDLEY

4

CONFIDENTIAL – FOIA Exempt                                    Tev_170435

---

## Medicare Part D PAP Options: "Outside Part D"

- Operates like a standard PAP
  - Patients apply directly to manufacturer (or agent)
  - Manufacturer determines eligibility requirements and manages application process
  - Manufacturer provides product to patients
    - Directly or through retail/mail-order pharmacies
  - Does not count as TrOOP
- Safeguards
  - Notify Part D plan
    - CMS Voluntary Data Sharing Agreement
  - Assistance provided for remainder of the coverage year
  - Assistance available even for periodic use
  - Accurate and contemporaneous records
  - Assistance based on "reasonable, verifiable, and uniform measure of financial need applied in a consistent manner"
  - Comply with CMS guidance

September 19, 2008 — SIDLEY

---

## Medicare Part D PAP Options: Bulk Replacement

- Bulk Replacement Programs
  - Difference between PAPs and bulk replacement is the more formal involvement of the provider (e.g., the hospital or clinic)
    - Creates a greater opportunity for inappropriate arrangements
    - Institutions have formulary power, can influence market share within their own house and potentially beyond

> "These programs potentially implicate the Federal anti-kickback statute if the free drugs are given to a recipient that is in a position to generate Federal health care program business for the donor manufacturer." OIG, SAB

  - Safeguards
    - Prevent steering based on the financial interests of their health care providers
    - Prevent increased costs to Federal health care programs
    - Ensure replacement drugs are not improperly charged to Federal health care programs

September 19, 2008 — SIDLEY

---

## Post-SAB OIG PAP Opinions

- 2006
  - 06-03  Manufacturer-Sponsored PAP, Outside Part D
  - 06-04  Independent Charity Model
  - 06-08  Free Clinic
  - 06-09  Independent Charity Model
  - 06-10  Independent Charity Model
  - 06-13  Independent Charity Model
  - 06-14  Manufacturer-Sponsored PAP, Outside Part D
  - 06-19  Manufacturer-Sponsored PAP, Outside Part D
  - 06-21  Manufacturer-Sponsored PAP, Outside Part D
- 2007
  - 07-04  Manufacturer-Sponsored PAP, Outside Part D
  - 07-11  Independent Charity Model
  - 07-18  Independent Charity Model
- 2008
  - 08-01  Partnership Bulk Replacement
  - 08-04  Hemophilia A Trial Sample Program
  - (04-15) Modification of non-profit charitable model

September 19, 2008 — SIDLEY

5

CONFIDENTIAL – FOIA Exempt                    Tev_170436

---

## Recent Advisory Opinions:
### 08-01 Partnership Bulk Replacement

- Program
  - Non-profit, tax-exempt corporation serves as a liaison between manufacturers and free clinics, FQHCs.
  - The "Partnership" manages bulk replacement product donations from participating manufacturers.
  - Patient eligibility
    - Income test: 200% FPL
    - No prescription drug insurance (no Medicaid, Medicare Part D)
- Process
  - Partnership determines which clinics may participate (pharmacy license, technology considerations)
  - Manufacturers provide initial free supply to clinics/FQHCs
  - Clinics/FQHCs document patient eligibility, dispense product, invoice Partnership
  - Partnership invoices manufacturers
  - Manufacturers ship bulk replacement product directly to clinic/FQHC
  - Partnership audits clinics/FQHCs annually

16   September 19, 2008                                     SIDLEY

---

## Recent Advisory Opinions:
### 08-01  Partnership Bulk Replacement

- Overall Analysis
  - First, opinion only relates to the Partnership, and not to manufacturers' bulk replacement PAPs.
  - "[W]hile nothing in the request suggests that the PAPs are problematic, we have insufficient information about them to determine whether they are, in fact, properly structured."
- Free Clinic Analysis:
  - Two concerns
    - Does the arrangement induce clinics to purchase manufacturers' products?
      - Neither the clinics nor the Partnership are compensated for prescribing or dispensing drugs
      - Clinics do not benefit financially because they do not bill for services.
      - Clinics receive no financial relief because not obligated to provide care.
      - There is benefit to the clinic, but the benefit inures to the public good.

17   September 19, 2008                                     SIDLEY

---

## Recent Advisory Opinions:
### 08-01  Partnership Bulk Replacement

  - Does the arrangement influence physician prescribing patterns of clinic physicians with respect to products payable by Federal health care programs?
    - The compensation arrangement between the clinics and the physicians does not incentivize physicians to prescribe drugs available under the arrangement.
- FQHC Analysis:
  - Same concerns as with clinics, but greater because FQHCs bill Federal health care programs
  - Several factors mitigate AKS risk:
    - Minimal excess stock (monthly shipments)
    - Arrangement is transparent
    - Manufacturers do not control which FQHCs participate
    - Physicians are not compensated based on prescribing patterns
    - FQHCs and participating manufacturers are adequately separated
      - Conflict of interest policy
      - Manufacturer marketing representatives restricted from discussing the arrangement with FQHCs.

16   September 19, 2008                                     SIDLEY

6

CONFIDENTIAL – FOIA Exempt

Tev_170437

---

**Recent Advisory Opinions:**
08-04: Hemophilia A Trial Sample Program

- Program
  - Manufacturer of a recombinant antihemophiliac factor VIII A product provides a free trial supply of product to new patients, including Medicare and Medicaid patients
  - Medicare Part B coverage is available
- Process
  - Manufacturer provides enrollment forms to Hemophilia Treatment Centers (HTCs) and physician offices
    - Limited to 10% of a physician's patients or 20 per year
  - Physicians and patients complete the forms, mail form and prescription to program administrator
  - Program administrator processes prescription and ships drug to patient.

September 19, 2008 — SIDLEY

---

**Recent Advisory Opinions:**
08-04: Hemophilia A Trial Sample Program

- Analysis
  - Arrangement carries a low risk of fraud and abuse
  - Two Concerns
    - Does the arrangement constitute a kickback from the manufacturer to the physician?
      - Unlikely because the drug goes directly to the patient and not the physician. No direct or indirect remuneration to the physician.
    - Does the arrangement induce patients to use the drug in the future?
      - The arrangement does not create any costs for Federal health care programs.
      - Lack of on-going financial assistance and significant beneficiary cost-sharing guards against overutilization.
      - Drug itself is not prone to overutilization.

September 19, 2008 — SIDLEY

---

**Recent Advisory Opinions:**
(04-15): Modification of Non-Profit Charitable Foundation Model

- AO originally issued 10/29/04
  - Non-profit charitable organization, operating a PAP to provide grants to financially-needy patients suffering from specific chronic or life-threatening diseases
  - Assists with the cost of prescription drugs
  - Revision would to the following:
    - Provide donors with monthly aggregate applicant data including the number of applicants & qualified applicants in particular disease categories. No individual patient information, no information that would enable a donor to correlate the amount or frequency of its donations with the medical condition or number of patients that use its products or services, or the volume of those products or services.
    - Modify its standard donation agreement to permit donors to change or terminate their contributions without cause upon 120 days prior written notice. (Currently, donors commit to participate for at least three years.)
    - Expand the Requestor's existing disease categories

September 19, 2008 — SIDLEY

7

CONFIDENTIAL – FOIA Exempt                    Tev_170438

**Recent Advisory Opinions:**
(04-15): Modification of non-profit charitable model

- OIG approved of the modifications
  - "[W]e conclude that the three modifications would not affect our conclusion in OIG Advisory Opinion No. 04-15."
- OIG determined that the revised arrangement:
  - No grounds for imposition of civil monetary penalties
  - Potential AKS issue if intent to induce or reward referrals of Federal health care program business
  - No administrative sanctions

22  September 19, 2008                                          SIDLEY

---

**Price Reporting Considerations**

- Manufacturers are required to report certain pricing data to certain federal programs
  - Average Manufacture Price (AMP) and Best Price (BP) for Medicaid
  - 340B ceiling price
  - Average Sales Price (ASP) for Medicare Part B
  - Non-Federal Average Manufacturer Price (non-FAMP) for Federal Supply Schedule (FSS)
- There are differences in the types of sales that are included or excluded in these different price reporting systems
- It is critical to understand the requirements for PAP assistance to be excluded. If assistance is included:
  - AMP goes down, BUT
  - BP goes down (potentially to $0)
  - 340B price goes down
  - ASP goes down
  - Non-FAMP goes down

23  September 19, 2008                                          SIDLEY

---

**Medicaid: AMP & BP Exclusions**

- The AMP Final Rule (July 17, 2007) provides specific AMP and BP exclusions and *exclusion criteria* for the following types of programs:
  - Patient Assistance Programs
  - Co-Pay Assistance Programs
  - Drug Discount Cards
  - Free Goods
  - Coupons
  - Vouchers
- Correctly characterizing a program vis-à-vis these exclusions is critical to understanding which exception criteria should apply.
- Unfortunately, the exclusions are often poorly defined within the Rule and the question of which exclusion should be applied to various means of offering assistance is largely not addressed in the guidance.

24  September 19, 2008                                          SIDLEY

8

CONFIDENTIAL – FOIA Exempt                                          Tev_170439

## AMP & BP PAP Exclusion

- PAPs must meet the following four criteria for exclusion:

"1. The program is focused on extending free products not contingent upon any purchase requirement or extending financial assistance to low income individuals and families, as determined by CMS.

2. Each manufacturer establishes an amount of the subsidy to be given to individual patients, without any negotiation between the manufacturer and any other third party (such as an insurer or PBM) as to that amount.

3. The entire amount of the free product or subsidy is made available to the individual patient, without any opportunity for the retail pharmacy or any third party (such as an insurer or PBM), to reduce that subsidy, or take a portion of it, for its own purposes.

4. The pharmacy collects no additional payment, other than the benefit amount and a bona fide service fee, from the patient assistance program." 72 Fed. Reg. 39,188 (July 17, 2007) (Emphasis added)

25   September 19, 2008                                    SIDLEY

---

## AMP & BP Co-Pay Assistance Program Exclusion

- Co-Pay Assistance Programs
  - Not defined in the rule
    - No specific AMP exclusion in the regulations
  - CMS provides that co-pay assistance programs are "another form of patient assistance programs and should receive similar treatment provided they otherwise qualify for exclusion from AMP under this final rule at § 447.504(h)(12) [the PAP exclusion]."
  - Consider the financial need requirement of the PAP exclusion.
- Distinguish from coupons?

26   September 19, 2008                                    SIDLEY

---

## AMP & BP Drug Discount Card Program

- "Manufacturer-sponsored drug discount card programs"
  - No other description in the Final Rule
  - Potentially a reference to the discount card program that preceded Part D
  - Potentially a reference to savings cards offered by manufacturers
- Separate regulatory exclusion, but in the preamble, CMS refers to PAPs for specific exclusion criteria

27   September 19, 2008                                    SIDLEY

9

CONFIDENTIAL – FOIA Exempt                                    Tev_170440

**Free Goods Exclusion**

- AMP & BP
  - Must be "not contingent on a purchase requirement".
    - "Future purchase"
- ASP
  - Must not be "contingent on any purchase requirement."
- Non-FAMP
  - Must not be "contingent on any written or verbal commercial agreements"
- What does it mean to be "contingent"?

26   September 19, 2008

SIDLEY

---

**Other Considerations**

- Consider PAP issues when purchasing other manufacturers
  - Ensure due diligence team appreciates the unique AKS issues and pricing issues associated with PAPs
- Consider state anti-kickback statutes and state insurance law vis-à-vis privately insured patients

29   September 19, 2008

SIDLEY

---

**Questions?**

30   September 19, 2008

SIDLEY

10

CONFIDENTIAL – FOIA Exempt

Tev_170441

# EXHIBIT A-29

| | |
|---|---|
| **From:** | Edward Hensley (External) |
| **To:** | Denise Lynch |
| **Sent:** | 5/29/2014 7:49:18 PM |
| **Subject:** | FW: PDF |
| **Attachments:** | Sbizhub14052914470.pdf |

This is what was sent out to all the foundations.  Pages 7-9 of the actual document is pretty interesting.

EH



**Edward Hensley**
Chief Brand & Business Development Officer
4700 Millenia Blvd | Ste 500 | Orlando, FL 32839
p: 407.367.4478 | c: 407.579.7611
edward.hensley@assistrx.com | assistrx.com

Confidentiality Note: This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. All information contained herein is subject to amendment and modification. If you are not the intended recipient (s) of this communication, please contact the sender and delete all copies immediately.

CONFIDENTIAL – FOIA Exempt

Tev_022403



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC 20201



**MAY 21 2014**

Mr. Mark P. McGreevy, Executive Director
The Assistance Fund, Inc.
4700 Millenia Boulevard, Suite 310
Orlando, Florida 32839

**Re: OIG Advisory Opinion 10-07, as modified**

Dear Mr. McGreevy:

The Office of Inspector General (OIG) issued Advisory Opinion 10-07 to The Assistance Fund, Inc. (Requestor) on May 26, 2010 and modified it on May 19, 2011. This advisory opinion is among a number of similar opinions that we issued regarding patient assistance programs (PAPs) operated by independent charities since we published the "OIG Special Advisory Bulletin on Patient Assistance Programs for Part D Enrollees"[1] in 2005 (2005 SAB). In that guidance, we explained that we could only speculate on fraud and abuse risk areas, because the Part D benefit had not yet begun.

Since the issuance of the 2005 SAB and Advisory Opinion 10-07, we have gained experience with the Part D program and with the operations of independent charity PAPs. That experience has taught us that these types of PAPs have not always operated as we expected. As a result, we are issuing additional guidance to the public regarding independent charity PAPs. A copy of our "Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs" (Supplemental Bulletin) is enclosed with this letter.

Through the advisory opinion process, we approve only those arrangements or proposed arrangements that we conclude pose a minimal risk of fraud and abuse. Pursuant to 42 CFR 1008.45, advisory opinions are issued without prejudice to the right of the OIG to reconsider the questions involved and, where the public interest requires, to rescind, terminate or modify the advisory opinions. Because we no longer believe that certain aspects of Advisory Opinion 10-07, as modified, pose a sufficiently low risk of fraud and abuse, we will require certain changes going forward for Requestor to retain its favorable advisory opinions.

(1) Requestor certified that it would define its disease funds: (a) in accordance with widely recognized clinical standards; (b) without reference to specific symptoms, the severity of symptoms, the method of administration of drugs, or the availability of associated genetic testing; and (c) in a manner that covers a broad spectrum of available products. We are concerned that some organizations are defining disease funds too narrowly. Going forward, we will expressly require that disease funds not be defined with reference to stages of a disease or the drugs or treatments to be included in the fund. Although we believed these criteria to be implicit, we want to be clear in the opinion. Thus, with this more explicit explanation, we ask Requestor to certify that its disease funds will not be defined by reference to specific symptoms, severity of symptoms, method of

---

[1] 70 Fed. Reg. 70623 (Nov. 22, 2005).

Tev_022404

Page 2 - Re: OIG Advisory Opinion 10-07, as modified

administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

(2) Many of the opinions we have issued include a caveat that there may be "rare instances" of single-drug funds. This language did not appear in Advisory Opinion 10-07 because Requestor certified that each of the proposed funds identified in that opinion would provide copayment assistance for several different specialty medications. However, Requestor's initial request letter, dated November 4, 2009, included this caveat, and we recognize that Requestor could be relying on it as it develops additional disease funds. We intend to remove this or similar language from any opinion in which it appears. Therefore, we ask Requestor to certify that it does not maintain any disease funds that cover only one drug covered by Medicare for the disease(s) in a particular disease fund or only one pharmaceutical manufacturer (including its affiliates) that makes or markets all of the Medicare-covered drugs for the disease(s) in a particular disease fund. Alternatively, if Requestor maintains, and proposes to continue to maintain, a particular disease fund, which is legitimately defined, that covers only a single drug or the drugs of a single manufacturer, we ask that Requestor provide specific information about that fund, and we would consider each such fund on a case-by-case basis. Before submitting information regarding a single-drug fund for our consideration, please consider alternatives to single-drug coverage. Such alternatives include, but are not limited to: combining two or more related disease funds; expanding the definition of a disease fund; covering any drugs needed by financially qualified patients with the particular disease that is the subject of the fund; or covering copayments for all items and services needed by such patients.

(3) We also have issued a number of advisory opinions that allow PAPs to include only high-cost or specialty drugs. For the reasons articulated in the attached Supplemental Bulletin, we no longer believe, as a general matter, that disease funds that cover copayments only for expensive or specialty drugs pose a sufficiently low risk of fraud and abuse to permit us to continue to grant PAPs prospective immunity in connection with those disease funds. Thus, to maintain a favorable opinion, we ask that Requestor's disease funds include all products, including generic or bioequivalent drugs, that are covered by Medicare when prescribed for the treatment of the disease state(s) covered by the fund. Alternatively, Requestor may certify that its disease funds include all products, including generic or bioequivalent drugs, approved by the Food and Drug Administration for treatment of the disease state(s) covered by the fund. If Requestor desires to maintain a particular fund that does not support all drugs approved for the relevant disease state, please provide evidence that the fund poses a minimal risk of fraud and abuse and therefore warrants a favorable opinion.

Enclosed is a draft document including proposed certifications to address the points described above. You may propose new certifications or modifications to these proposed certifications to update Advisory Opinion 10-07, as modified, consistent with OIG guidance.

As stated in Advisory Opinion 10-07, the OIG will not proceed against Requestor with respect to any action that is part of the arrangement described in the opinion, taken in good faith reliance on the opinion, as long as all of the material facts were fully, completely, and accurately presented, and the arrangement in practice has comported with the information provided. Requestor's

CONFIDENTIAL – FOIA Exempt

Page 3 - Re: OIG Advisory Opinion 10-07, as modified

favorable advisory opinion will continue to protect the arrangement described in the opinion until such time as we issue a final notice of modification or termination to Requestor. Conversely, as we reference in the Supplemental Bulletin, to the extent that any material facts were not fully, completely, and accurately presented, or the arrangement in practice has not comported with the information provided in connection with the advisory opinion, as modified, then the arrangement would not be protected.

We would like to work with you to achieve a further modification of Advisory Opinion 10-07 that will permit Requestor to continue to meet the needs of patients, while reducing the risk of fraud and abuse. As part of this process, this letter constitutes preliminary notice to you, pursuant to 42 CFR 1008.45, of our intent to terminate or modify Advisory Opinion 10-07, as modified, as described above, subject to your right to respond. You have 30 days from the date of this letter to provide the information solicited above, and any other information you want the OIG to consider in evaluating the need to modify or terminate this opinion.

Please send such information to the following address:

Chief, Industry Guidance Branch
United States Department of Health and Human Services
Office of Counsel to the Inspector General
Cohen Building - Room 5527
330 Independence Avenue, SW
Washington, DC 20201

If you have any questions regarding this letter or the Supplemental Bulletin or anticipate that you will be unable to submit a complete response within 30 days despite a good faith effort, please contact the Industry Guidance Branch attorney assigned to your opinion, Heather Westphal within 14 days. Ms. Westphal can be reached at (202) 205-8877 or Heather.Westphal@oig.hhs.gov. If you do not submit a response or contact the assigned attorney within the relevant time period, the OIG will make its decision based on currently available information. You will be informed of the decision.

Sincerely,

Gregory E. Demske
Chief Counsel to the Inspector General

Enclosures

CONFIDENTIAL – FOIA Exempt

Tev_022406

Draft
Proposed Certifications

The Assistance Fund, Inc. (Requestor) certifies as follows, in connection with the proposed further modification of Advisory Opinion 10-07, as previously modified on May 19, 2011:

(1) Requestor will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

(2) Requestor will not maintain any disease fund that provides copayment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates.

(3) Requestor will not limit its assistance to high-cost or specialty drugs. Instead, Requestor will make assistance available for all products, including generic or bioequivalent drugs, covered by Medicare when prescribed for the treatment of the disease states covered by the fund. [Alternate: Requestor will make assistance available for all products, including generic or bioequivalent drugs, approved by the Food and Drug Administration for treatment of the disease state(s) covered by the fund.]

(4) [Reserved: to be added by Requestor, if necessary.]

Except as expressly provided above, all other facts to which Requestor certified in its submissions in connection with Advisory Opinion 10-07 and its modification remain accurate.

CONFIDENTIAL – FOIA Exempt

**Supplemental Special Advisory Bulletin:   Independent Charity Patient Assistance Programs**

## I.   Introduction

Patients who cannot afford their cost-sharing obligations for prescription drugs may be able to obtain financial assistance through a patient assistance program (PAP).  PAPs have long provided important safety net assistance to such patients, many of whom have chronic illnesses and high drug costs.  Many PAPs also present a risk of fraud, waste, and abuse with respect to Medicare and other Federal health care programs. We issued a Special Advisory Bulletin regarding PAPs in 2005[1] (the 2005 SAB) in anticipation of questions likely to arise in connection with the Medicare Part D benefit.  In the 2005 SAB, we addressed different types of PAPs and stated that we believed lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D beneficiaries can afford medically necessary drugs.[2]  We also noted in the 2005 SAB that we could only speculate on fraud and abuse risk areas, because

---

[1] OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), available at: http://oig.hhs.gov/fraud/docs/alertsandbulletins/2005/2005PAPSpecialAdvisoryBulletin.pdf.

[2]  The 2005 SAB focused on PAPs under the then-upcoming Part D program, but the guidance also referenced co-payment assistance programs for drugs covered under Medicare Part B.  Although these Medicare programs differ, and the types of PAPs may differ, the principles set forth in the 2005 SAB and herein apply regardless of which Federal health care program (as defined in section 1128B(f) of the Social Security Act (the Act)) covers the drugs.

1

CONFIDENTIAL – FOIA Exempt

the Part D benefit had not yet begun. This Supplemental Special
Advisory Bulletin (Supplemental Bulletin) is based on experience
we have gained in the intervening years; it is not intended to
replace the 2005 SAB, nor does it replace other relevant
guidance, such as the 2002 OIG Special Advisory Bulletin on
Offering Gifts and Other Inducements to Beneficiaries.[3]

We continue to believe that properly structured PAPs can
help Federal health care program beneficiaries. This
Supplemental Bulletin provides additional guidance regarding
PAPs operated by independent charities (Independent Charity
PAPs) that provide cost-sharing assistance for prescription
drugs. To address some of the specific risks that have come to
our attention in recent years, this guidance discusses
problematic features of PAPs with respect to the anti-kickback
statute, section 1128B(b) of the Act,[4] and the provision of the
Civil Monetary Penalties Law prohibiting inducements to Medicare
and Medicaid beneficiaries (Beneficiary Inducements CMP),
section 1128A(a)(5) of the Act.[5] Other potential risk areas,
including, for example, potential liability under the False

---

[3] The 2002 OIG Special Advisory Bulletin on Offering Gifts and Other
Inducements to Beneficiaries is available at:
http://oig.hhs.gov/fraud/docs/alertsandbulletins/SABGiftsandInducements.pdf.

[4] 42 U.S.C. 1320a-7b(b).

[5] 42 U.S.C. 1320a-7a(a)(5).

2

CONFIDENTIAL – FOIA Exempt

Tev_022409

Claims Act, 31 U.S.C. 3729-33, or other Federal or State laws, are not addressed here.

## II.   The Anti-Kickback Statute and the Beneficiary Inducements CMP

The anti-kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program, including Medicare and Medicaid.  Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated.  By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction.  For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.  The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to give or obtain money for the referral of services or to induce further referrals.  Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to 5 years, or both.  OIG may also initiate administrative proceedings to exclude a person from Federal health care

3

CONFIDENTIAL – FOIA Exempt

Tev_022410

programs or to impose civil monetary penalties for kickback violations under sections 1128(b)(7) and 1128A(a)(7) of the Act.[6]

Two remunerative aspects of PAP arrangements require scrutiny under the anti-kickback statute:  donor contributions to PAPs (which can also be analyzed as indirect remuneration to patients) and PAPs' grants to patients.  If a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items, the statute could be violated.  Similarly, if a PAP's grant of financial assistance to a patient is made to influence the patient to purchase (or to induce the patient's physician to prescribe) certain items, the statute also could be violated.  A determination regarding whether a particular arrangement violates the anti-kickback statute requires an individualized evaluation of all of the relevant facts and circumstances, including the parties' intent.  For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are factors relevant to the analysis.

The Beneficiary Inducements CMP provides for the imposition of civil monetary penalties against any person that offers or transfers remuneration to a Medicare or State health care program (as defined under section 1128(h) of the Act)

---

[6] 42 U.S.C. 1320a-7(b)(7) and 42 U.S.C. 1320a-7a(a)(7).

4

CONFIDENTIAL – FOIA Exempt

Tev_022411

beneficiary that the benefactor knows or should know is likely to influence the beneficiary to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, by Medicare or a State health care program. OIG may initiate administrative proceedings to seek such CMPs and exclude such person from the Federal health care programs. A subsidy for cost-sharing obligations provided by a pharmaceutical manufacturer through a PAP may implicate the Beneficiary Inducements CMP, if the subsidy is likely to influence a Medicare or State health care program beneficiary's selection of a particular provider, practitioner, or supplier, such as by making eligibility dependent on the patient's use of certain prescribing physicians or certain pharmacies to dispense the drugs.

## III. Independent Charity PAPs

Longstanding OIG guidance, including the 2005 SAB, makes clear that pharmaceutical manufacturers can effectively contribute to the safety net by making cash donations to independent, bona fide charitable assistance programs. The 2005 SAB sets forth a number of factors that we continue to believe are fundamental to a properly structured Independent Charity PAP. See 70 Fed. Reg. at 70626-27. Many of these factors relate to the independence of the charity, as discussed further

5

Tev_022412

below.  In this Supplemental Bulletin, we expand on our previous guidance in that regard, focusing on three areas:  disease funds, eligible recipients, and the conduct of donors.

### A.    Disease Funds

As we explained in the 2005 SAB, we recognize that bona fide independent charities may reasonably focus their efforts on patients with particular diseases (such as cancer or diabetes) and that, in general, the fact that a pharmaceutical manufacturer's donations to an independent charity are earmarked for one or more broad disease funds should not significantly raise the risk of abuse.  At the time, however, we also expressed our concern that, in some cases, charities might define their disease funds so narrowly that the earmarking effectively results in a donor's subsidization of its own products.  Over the past several years, we have become aware that some Independent Charity PAPs are, in fact, establishing narrowly defined disease funds and covering a limited number of drugs within those funds.  To address this development, we discuss and expand on some of the safeguards that we originally set forth in the 2005 SAB to reduce the risk of abuse.  We reiterate here that an Independent Charity PAP must not function as a conduit for payments or other benefits from the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices.

6

CONFIDENTIAL – FOIA Exempt

Tev_022413

One of the points we made in the Independent Charity PAPs section of the 2005 SAB was that pharmaceutical manufacturers and their affiliates should not exert any direct or indirect influence or control over the charity or its assistance program. We also stated that donors should not influence the identification of disease funds[7] and that we would be concerned if disease funds were defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs. These were merely examples--not an exclusive list--of improperly narrow approaches to defining disease funds. For example, we also are concerned about disease funds defined by reference to the stages of a particular disease, the type of drug treatment, and any other ways of narrowing the definition of widely recognized disease states. A charity with narrowly defined disease funds may be subject to scrutiny if the disease funds result in funding exclusively or primarily the products of donors or if other facts and circumstances suggest that the disease fund is operated to induce the purchase of donors' products.[8]

---

[7] The 2005 SAB used the term "disease categories." Our experience since 2005 suggests that the term "disease fund" is more accurate in this context.

[8] This is true even if the charity has obtained a favorable advisory opinion, because favorable opinions related to PAPs typically are based upon the charity's certifications that: (1) no donor or affiliate of any donor has exerted or will exert any direct or indirect influence or control over the

7

CONFIDENTIAL – FOIA Exempt

Tev_022414

We also are increasingly concerned about Independent Charity PAPs that choose to establish or operate disease funds that limit assistance to a subset of available products. Through our advisory opinion process, we have seen Independent Charity PAPs seeking to cover few drugs, such as by covering copayments only for expensive or specialty drugs. We are concerned that funds limited in this manner may not be beneficial to patients or Federal health care programs. Beneficiaries should not be tied to a particular product, or to a subset of available products, to receive or continue their assistance. Although we recognize that a patient prescribed an expensive drug may have a greater need for financial assistance than a patient prescribed a less expensive alternative, we are concerned that limiting PAP cost-sharing support to expensive products may steer patients in a manner that is costly to Federal health care programs and may even facilitate increases in drug prices. Moreover, whether a drug is "expensive" is a relative question that depends, in part, on the financial

---

charity or any of the charity's programs; (2) the charity will define its disease funds in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products; and (3) the charity's disease funds will not be defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs. If the arrangement does not in practice comport with the facts presented in the advisory opinion, then the arrangement is not protected by the opinion. All of our advisory opinions are available on the OIG Web site at: http://oig.hhs.gov/compliance/advisory-opinions/index.asp.

8

CONFIDENTIAL – FOIA Exempt

Tev_022415

resources of the consumer; even a generic drug can be expensive for some patients. Finally, limiting assistance to certain drugs may steer patients away from potentially more beneficial products because assistance is available for one treatment and not another. Consequently, a fund will be subject to more scrutiny if it is limited to a subset of available products, rather than all products approved by the Food and Drug Administration (FDA) for treatment of the disease state(s) covered by the fund or all products covered by the relevant Federal health care program when prescribed for the treatment of the disease states (including generic or bioequivalent drugs).[9]

The 2005 SAB acknowledged that, in rare circumstances, there may be only one drug covered by Part D for the disease(s) in a particular disease fund or only one pharmaceutical manufacturer (including its affiliates) that makes all of the Part D covered drugs for the disease(s) in a particular disease fund. The 2005 SAB noted that, in these unusual circumstances, the fact that a disease fund includes only one drug or drugs made by one manufacturer would not, standing alone, be determinative of an anti-kickback statute violation. A

---

[9] An Independent Charity PAP is not required to provide assistance for drugs prescribed off-label. However, we would expect a truly independent charity to treat all its funds equally. Thus, if the Independent Charity PAP offered assistance for all drugs covered by Medicare in Fund A, but limited assistance offered for Fund B to FDA-approved uses, the funds could be subject to scrutiny to determine whether either coverage determination was made to benefit a donor.

9

CONFIDENTIAL – FOIA Exempt

Tev_022416

determination of an anti-kickback statute violation can be made only on a case-by-case basis after examining the applicable facts and circumstances, including the intent of the parties. Notwithstanding the need for an individualized analysis, a disease fund that covers only a single product, or the products made or marketed by only a single manufacturer that is a major donor to the fund, will be subject to scrutiny. When determining whether an anti-kickback violation occurred, we would consider, among other factors, whether the disease fund in question appears to be narrowly defined in a manner that favors any of the fund's donors.

While we understand that many charities have limited resources and seek to use them to assist patients with the greatest financial need, assessing a patient's financial need is a separate concern from determining which drugs to include in a disease fund. Narrowly defining disease funds or limiting disease funds to provide assistance only for expensive drugs can result in steering patients to the drugs for which assistance is available. This type of steering increases the likelihood that the donors could use the PAPs as improper conduits to provide a subsidy to patients who use the donors' own products. This potentially increases costs to the Federal health care programs in cases where a lower cost, equally effective drug is available. Moreover, the ability to subsidize copayments for

10

CONFIDENTIAL – FOIA Exempt

Tev_022417

their own products may encourage manufacturers to increase prices, potentially at additional cost to Federal health care programs and beneficiaries who are unable to obtain copayment support.

In short, disease funds should be defined in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of products; disease funds should not be defined for the purpose of limiting the drugs for which the Independent Charity PAP provides assistance.

## B.   Eligible Recipients

It has come to our attention that some Independent Charity PAPs have started operating, or seek to operate, funds that provide financial assistance only to Federal health care program beneficiaries.  We do not believe that the mere fact that a fund serves only Federal health care program beneficiaries increases risk to the Federal health care programs.  In fact, we issued a favorable advisory opinion to an Independent Charity PAP that intended to develop a fund to serve only Medicare beneficiaries.[10]  The safeguards regarding defining disease funds and recipient eligibility described in the 2005 SAB and in this Supplemental Bulletin, when properly implemented, should sufficiently protect Federal health care programs.

---

[10]   See Modification of OIG Advisory Opinion 07-06, available at: http://oig.hhs.gov/fraud/docs/advisoryopinions/2011/AdvOpn07-06_mod.pdf.

11

CONFIDENTIAL – FOIA Exempt

Tev_022418

Regardless of whether a fund is available to all patients or is limited to Federal health care program beneficiaries, the Independent Charity PAP must determine eligibility according to a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner. Some Independent Charity PAPs base their eligibility criteria on the poverty guidelines, which take into account family size, for determining financial need. As we explained in the 2005 SAB, Independent Charity PAPs also have the flexibility to consider relevant variables beyond income. Other variables Independent Charity PAPs may choose to consider, for example, are the local cost of living and the scope and extent of a patient's total medical bills. We are not recommending or requiring any particular method for assessing financial need. We do, however, want to emphasize that the cost of the particular drug for which the patient is applying for assistance is not an appropriate stand-alone factor in determining individual financial need; it is likely one of many obligations that affects the patient's financial circumstances. We also note that generous financial need criteria, particularly when a fund is limited to a subset of available drugs or the drugs of a major donor, could be evidence of intent to fund a substantial part of the copayments for a particular drug (or drugs) for the purpose of inducing the

12

CONFIDENTIAL – FOIA Exempt

Tev_022419

use of that drug (or those drugs), rather than for the purpose of supporting financially needy patients diagnosed with a particular disease.

## C.  Conduct of Donors

Thus far, this Supplemental Bulletin has focused on the conduct of Independent Charity PAPs.  Similarly, when we have issued favorable advisory opinions regarding Independent Charity PAPs, the focus has been on the charities that requested the opinions--not the donors.[11]  In requesting an opinion, a charity certifies to actions it will take to ensure the independence of the PAP from the donors.  The charity is not in a position to certify as to the actions of the donors with parties outside the arrangement.  For example, an advisory opinion issued to an independent charity regarding the PAP it operates typically states that the charity has certified that it will provide donors only with reports including data such as the aggregate number of applicants for assistance, the aggregate number of patients qualifying for assistance, and the aggregate amount disbursed from the fund during that reporting period.  Thus, the charity would not give a donor any information that would enable a donor to correlate the amount or frequency of its donations

---

[11]  An advisory opinion has no application to, and cannot be relied upon by, any individual or entity other than the requestor of the opinion.  Thus, a donor is not protected by an advisory opinion issued only to the entity to which it donates.  See section 1128D(b)(4)(A) of the Act (42 U.S.C. 1320a-7d(b)(4)(A)); 42 CFR 1008.53.

13

CONFIDENTIAL – FOIA Exempt

Tev_022420

with the number of aid recipients who use its products or services or the volume of those products supported by the PAP. The procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the anti-kickback statute.

## IV. Conclusion

OIG continues to believe that properly structured, Independent Charity PAPs provide a valuable resource to financially needy patients. We also believe that Independent Charity PAPs raise serious risks of fraud, waste, and abuse if they are not sufficiently independent from donors. This Supplemental Bulletin reiterates and amplifies our guidance, based on practices and trends we have seen in the industry. We recognize that some charitable organizations with PAPs have received favorable advisory opinions that may include features that are discouraged in this Supplemental Bulletin. We are writing to all Independent Charity PAPs that have received favorable opinions to explain how we intend to work with them to ensure that approved arrangements are consistent with our

14

CONFIDENTIAL – FOIA Exempt

Tev_022421

guidance. We anticipate that some opinions will need to be modified. We will post any such modifications on our Web site with the original opinions, consistent with our current practice. Favorable advisory opinions will continue to protect the arrangements described in the opinions until we issue any final notice of modification or termination to the requestors of those opinions. It is our intent that there be no disruption of patient care during this process. Should donors or PAPs continue to have questions about the structure of a particular organization or transaction, the OIG Advisory Opinion process remains available. Information about the process may be found at: http://oig.hhs.gov/faqs/advisory-opinions-faq.asp.

15

CONFIDENTIAL – FOIA Exempt

Tev_022422

# EXHIBIT A-30

| | |
|---|---|
| **From:** | Mike Banigan |
| **To:** | Denise Lynch |
| **Sent:** | 10/28/2010 7:21:28 PM |
| **Subject:** | MS |

Denise:

We are estimating the per patient grant amount of $3,950 next year. Math is simple. Number of patients times the grant amount divided by .91

We can chat at your convenience.

Thanks.

Mike

Mike Banigan
President & Founder

(972) 608-7160  Direct
(972) 837-7356  Mobile

www.cdfund.org

Chronic Disease Fund

Tev_021654

# EXHIBIT A-31

| | |
|---|---|
| **From:** | Mike Banigan |
| **To:** | Denise Lynch |
| **Sent:** | 9/15/2011 6:03:04 PM |
| **Subject:** | Call |

Denise:

Do you have time for a call tomorrow?  I have preliminary numbers for you.

Mike

Mike Banigan
President & Founder

6900 North Dallas Parkway, Suite 200
Plano, TX  75024

(972) 608-7160  Direct
(972) 837-7356  Mobile

www.cdfund.org

Chronic Disease Fund

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-32

| | |
|---|---|
| **From:** | Mike Banigan |
| **Sent:** | Wednesday, November 7, 2012 3:20 PM |
| **To:** | Denise Lynch; Clorinda Walley |
| **Subject:** | Re: 2013 CDF Contribution and Admin Fees |

Denise

Everything is the same as last year. $3750 per patient $1500 for LIS.  Admin is 9%, but in reality we paid out 92% last year across all funds.

Clo, please confirm amounts and arrange audit with Katie.

Mike

Mike Banigan
(972) 837-7356

Denise Lynch <Denise.Lynch@tevapharm.com> wrote:

Hi Mike,
Good talking with you the other day.  Could you please reconfirm the 2013 patient contribution (is there a partial contribution for LIS patients), as well as the Admin Fee.  Also wanted to let you know I have been talking with Katie about doing an audit, so am hoping to follow up with you shortly to find a good date.  Hope all is well with you.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Proprietary and Confidential - Produced Pursuant to DOJ Request/Contains Protected Health Information   GD 0075213

# EXHIBIT A-33

| | |
|---|---|
| **From:** | Denise Lynch <Denise.Lynch@tevapharm.com> |
| **Sent:** | Wednesday, November 7, 2012 4:15 PM |
| **To:** | Clorinda Walley; Mike Banigan |
| **Subject:** | RE: 2013 CDF Contribution and Admin Fees |

Thanks Clorinda....I thought that was probably the case! Have a good evening.

**From:** Clorinda Walley [mailto:cwalley@cdfund.org]
**Sent:** Wednesday, November 07, 2012 4:06 PM
**To:** Mike Banigan
**Cc:** Denise Lynch
**Subject:** Re: 2013 CDF Contribution and Admin Fees

Hi Denise,

Just wanted to clarify the 2012 per patient allocation for the MS program is $4750 and for the MS LIS program it is $1500. (Mike miskeyed below)

The allocations will remain the same for the 2013 calendar year.

Regards,

Clorinda Walley


On Nov 7, 2012, at 3:20 PM, "Mike Banigan" <mbanigan@cdfund.org> wrote:

> Denise
>
> Everything is the same as last year. $3750 per patient $1500 for LIS.  Admin is 9%, but in reality we paid out 92% last year across all funds.
>
> Clo, please confirm amounts and arrange audit with Katie.
>
> Mike
>
>
> Mike Banigan
> (972) 837-7356
>
> Denise Lynch <Denise.Lynch@tevapharm.com> wrote:
>
> Hi Mike,
> Good talking with you the other day.  Could you please reconfirm the 2013 patient contribution (is there a partial contribution for LIS patients), as well as the Admin Fee.  Also wanted to let you know I have been talking with Katie about doing an audit, so am hoping to follow up with you shortly to find a good date.  Hope all is well with you.

1

Proprietary and Confidential - Produced Pursuant to DOJ Request/Contains Protected Health Information   GD 0093960

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Proprietary and Confidential - Produced Pursuant to DOJ Request/Contains Protected Health Information    GD 0093961

# EXHIBIT A-34

| | |
|---|---|
| **From:** | cwalley@cdfund.org |
| **Sent:** | Friday, December 20, 2013 10:54 AM |
| **To:** | Denise Lynch |
| **Subject:** | Re: 2014 Donation |

Initial allocation is $5000

Clorinda Walley

On Dec 20, 2013, at 9:45 AM, "Denise Lynch" <Denise.Lynch@tevapharm.com> wrote:

Thanks Clorinda...could you please send the per patient donation estimate for the MS fund for 2014.

Thanks!

.........................................................................................................

**From:** Clorinda Walley [mailto:cwalley@cdfund.org]
**Sent:** Thursday, December 19, 2013 8:00 PM
**To:** Denise Lynch
**Subject:** RE: 2014 Donation

Good Evening Denise,

It was great speaking with you. Please find attached the 2012 OIG compliance audit, our 2012 financial audit and CDF's standard donation agreement for review. I did not know you all moved so the address in the agreement may be incorrect!

I look forward to continuing to support the multiple sclerosis community.

Kindest Regards,

Clorinda

Clorinda Walley
Executive Director

(972) 608-7163  Direct
(214) 498-8504  Mobile
www.cdfund.org
<image001.gif>

-----Original Message-----
**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Wednesday, December 18, 2013 4:43 PM
**To:** Clorinda Walley
**Subject:** 2014 Donation

Hi Clorinda,

1

Proprietary and Confidential - Produced Pursuant to DOJ Request/Contains Protected Health Information    GD 0014599

Would it be possible for you to forward a 2014 donation agreement? I apologize for the lateness of my request but would like to get this executed through legal in the next couple of days if possible. Could you also include a copy of the 2012 audit and put me on the list for the 2013 when it is completed. Thanks and look forward to talking with you soon. Did you know we moved a few months ago?

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

2

Proprietary and Confidential - Produced Pursuant to DOJ Request/Contains Protected Health Information    GD 0014600

# EXHIBIT A-35

**From:**       Edward Hensley
**To:**         Denise Lynch
**Sent:**       9/27/2011 6:15:28 PM
**Subject:**    ARX/TAF

Good Afternoon Denise – I just wanted to follow up on some deliverables from our last meeting.  The only thing remaining other than some internal conversations we are having around Tev-Tropin and Azilect are the two pieces of legislation I promised you.  Once I receive the actual reference for them from counsel I will forward them onto you ASAP.

In regards to Express Prior Authorization or ePA
·       2,500 Monthly Maintenance upon launch of product
·       15.00 Per Transaction

In regards to the fund allocation for the year 2012 for patients receiving funding through the Assistance Fund, the troop actually went up slightly as expected. The allocation per patient for 2012 is $4,600.  To give you a historical number of what it has been in the past:

·       2012 - $4,600
·       2011 - $4,400
·       2010 - $5,600

I will be in touch very shortly with the rest of the deliverables.  If you have any questions, please do not hesitate to contact me directly.

Edward



Edward H Hensley
**Chief Brand Officer**

5323 Millenia Lakes Blvd | Ste 200 |Orlando, FL 32839
407.367.4478 Direct | 407.579.7611 Cellular
407.540.9753 eFax | edward.hensley@assist-rx.com

CONFIDENTIAL – FOIA Exempt                                                                    Tev_025204

# EXHIBIT A-36

| From: | Adam Stotts </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ADAM.STOTTS> |
|---|---|
| To: | Edward Hensley; Tom Dervin; Jason Forgy; James McGuire; Andrew Barnett |
| CC: | Adam Stotts |
| Sent: | 8/7/2007 10:50:17 PM |
| Subject: | FW: ACS & TEVA data files |
| Attachments: | ACS & Teva Combined lookup.xls |

Please see response from TEVA regarding the data I sent them last week. It appears that they have 141 patients that we do not have in our database. Also – we have 149 that are not in their database. They had 636 duplicates which caused the high numbers they talked about in our call.

Jane just called me and said they are much more comfortable with the data now that they've pinpoint where each patient's position is at ACS. I'll follow-up with Martha to see what our next steps should be – my assumption will be to add the missing patients to the free drug program to see if they qualify.

Any questions please let me know.
I'll keep everyone posted.

**Adam Stotts**
**Implementation Manager**
**Advanced Care Scripts - ACS**
**Toll Free: 877.985.6337 ext. 107**
**Direct: 407.854.6581**
**Fax: 866.679.7131**
**Cellular: 407.247.9636**

---

**From:** Jane.Bowser@tevaneuro.com [mailto:Jane.Bowser@tevaneuro.com]
**Sent:** Tuesday, August 07, 2007 3:42 PM
**To:** Martha.Becker@tevaneuro.com; Adam Stotts
**Cc:** Dot.Parker@tevaneuro.com; Denise.Lynch@tevaneuro.com
**Subject:** ACS & TEVA data files

I have compared the files that we sent to ACS with the file received from ACS. I am listing a summary below and attaching the analysis detail. The password is the same as always.

Adam - the tab titled On TEVA not on ACS are the patients in our file that were not in the file received from ACS - 141 patients

Martha - the tab titled On ACS not on TEVA are the patients on the ACS file but not in our file. - 149 patients

If you have any questions please let me know.

Confidential. Exempt From FOIA

|                 | TEVA | ACS  |
| --------------- | ---- | ---- |
| Total File count | 4176 | 3578 |
| Duplicates      | 636  | 30   |
| Total           | 3540 | 3548 |
| Not on file     | 141  | 149  |
|                 | 3399 | 3399 |

Duplicates

TEVA

|     |   |     |
| --- | - | --- |
| 2   | 4 | 6   |
| 9   | 3 | 18  |
| 612 | 2 | 612 |
|     | Total | 636 |

ACS

|    |   |    |
| -- | - | -- |
| 30 | 2 | 30 |
|    | Total | 30 |

Thank you,


Jane Bowser
Statistical Analyst
Teva Neuroscience
816.508.5314
jane.bowser@tevaneuro.com

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message.
If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

CVS205521

# EXHIBIT A-37

**From:** Lilliana Wysocki </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=LILLIANA.WYSOCKI>
**To:** 'Donna.cheidt@tevaneuro.com'
**CC:** Edward Hensley; David Blanc
**Sent:** 12/23/2008 6:11:37 PM
**Subject:** Med D Numbers

| | | 2008 Free Drug | Adds2009 | Existing | Grand Total |
|---|---|---|---|---|---|
| Current Confirmed 12/23/08 | | | | | |
| | | | | | |
| | | | | | |
| Copay Assistance | Full | 562 | 160 | 1673 | 2395 |
| | Accepted Partial | | | | |
| | LIS | 11 | 5 | 88 | 104 |
| | | | | | |
| Full LIS Assistance | | 21 | 213 | 375 | 609 |
| | | | | | |
| Med D Enrollment Assistance | | 33 | 9 | 6 | 48 |

**Lilliana Wysocki | Program Liaison  | ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 866-293-1756 | Fax: 866-291-6114
Email: lilliana.wysocki@acs-rx.com

Confidential. Exempt From FOIA

# EXHIBIT A-38

| | |
|---|---|
| **From:** | David Blanc </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DBLANC> |
| **To:** | 'Denise.Lynch@tevaneuro.com' |
| **CC:** | Edward Hensley |
| **Sent:** | 11/30/2009 2:23:22 PM |
| **Subject:** | Medicare Numbers |

Hi Denise –

I hope you had a fantastic holiday!  As you requested, see below for updated numbers.

Current copay assisted patients at ACS:  3230 (broken down below)

| | |
|---|---|
| Full Copay | 3100 |
| Partial Copay | 130 |

| | |
|---|---|
| Free Drug | 720 |
| (Potential LIS) | 20 |

The number of approvals that were filling at other SPP's:  550 (latest number is unavailable at this time, I am attempting to get update, will let you know when I get an updated number)

Let me know if you need anything further or clarification.

Regards,

**David Blanc | Director, Patient Assistance Programs | ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 407.816.2371 | Fax: 866.679.7131
email: david.blanc@acs-rx.com

Confidential. Exempt From FOIA

# EXHIBIT A-39

| | |
|---|---|
| **From:** | David Blanc |
| **To:** | Denise Lynch |
| **CC:** | Jenny Jackson |
| **Sent:** | 12/14/2010 4:09:05 PM |
| **Subject:** | Numbers |

Hi Denise –

Here are the latest numbers for Medicare program and Free Drug

**CDF**

| | |
|---|---|
| Approved at ACS | 1943 |
| Approved at ACS and transferred to other SP | 65 |
| CDF Total | **2008** |

**AF**

| | |
|---|---|
| Approved at ACS | 2463 |
| Approved at ACS and transferred to other SP | 251 |
| AF Total | **2714** |

**FDP**

| | |
|---|---|
| Active Patients | **499** |
| Pending Patients | 51 |

**NON FDP**

| | |
|---|---|
| 2011 Copay Only Additions | **96** |

| | |
|---|---|
| **Total Patients** | 5331 |

**LIS Patients at ACS**      2045

Last total for LIS – will update numbers as yearend nears.

Let me know if you have any questions.

**David Blanc | Director, Patient Assistance | ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 407.816.2371 | Fax: 866.679.7131
email: david.blanc@acs-rx.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-40

**From:** Jennifer Clark
**To:** Barb Ross
**Sent:** 8/30/2011 8:48:42 PM
**Subject:** RE: Medicare Patients

Thanks!

**Jennifer Clark, CPA**   Mgr, Patient Svc & Support
Tel: (816) 508-5396   Cell: (816) 332-2873   Fax: (816) 508-5589
Jennifer.Clark@tevapharm.com   www.tevapharm.com

---

**From:** Barb Ross
**Sent:** Tuesday, August 30, 2011 3:47 PM
**To:** Jennifer Clark
**Subject:** RE: Medicare Patients

Jennifer,

David and Zach will be getting numbers first thing in the morning, they are checking with CDF for total nubmers. Hope that is alright.

Best regards,

**Barb Ross**   Medicare Specialist
Tel: (816) 508-5478   Cell:   Fax:
Barb.Ross@tevapharm.com   sip:Barb.Ross@tevapharm.com   www.tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Tuesday, August 30, 2011 12:13 PM
**To:** Barb Ross
**Subject:** Medicare Patients

Can you give me an update on the below?  If you don't have them, I can reach out to David.  Thanks!

Estimated # of Medicare Patients rcvg full/partial assistance by year-end
# of Free Product patients (525, correct?  Are there any others beyond what we're expecting for the remainder of the year?)
Full LIS Patients

Thanks!

**Jennifer Clark, CPA**   Mgr, Patient Svc & Support
Tel: (816) 508-5396   Cell: (816) 332-2873   Fax: (816) 508-5589
Jennifer.Clark@tevapharm.com   www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-41

| From: | Barb Ross |
| To: | Jennifer Clark |
| Sent: | 9/7/2011 2:00:34 PM |
| Subject: | RE: Medicare Patients |

There are 83 partial assistance with CDF, 153 partial assistance with TAF. Full assistance with CDF 1896 and full assistance with TAF 3440.  Total CDF 1979, total TAF 3593. Hope this helps clarify.  Have a great day!

Best regards,

TEVA    **Barb Ross**   Medicare Specialist
Tel: (816) 508-5478    Cell:    Fax:
Barb.Ross@tevapharm.com    sip:Barb.Ross@tevapharm.com    www.tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Wednesday, August 31, 2011 1:24 PM
**To:** Barb Ross
**Subject:** FW: Medicare Patients

Got your vm, but I think this may have only answered #1 below.  Here's what I heard:

3,440+1,896+83+153+200 = 5,772 patients receiving full/partial assistance
525 on free, correct?
How many LIS?

TEVA    **Jennifer Clark, CPA**   Mgr, Patient Svc & Support
Tel: (816) 508-5396    Cell: (816) 332-2873   Fax: (816) 508-5589
Jennifer.Clark@tevapharm.com    www.tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Tuesday, August 30, 2011 12:13 PM
**To:** Barb Ross
**Subject:** Medicare Patients

Can you give me an update on the below?  If you don't have them, I can reach out to David.  Thanks!

Estimated # of Medicare Patients rcvg full/partial assistance by year-end
# of Free Product patients (525, correct?  Are there any others beyond what we're expecting for the remainder of the year?)
Full LIS Patients

Thanks!

TEVA    **Jennifer Clark, CPA**   Mgr, Patient Svc & Support
Tel: (816) 508-5396    Cell: (816) 332-2873   Fax: (816) 508-5589
Jennifer.Clark@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-42

**From:** Blanc, David
**To:** Denise Lynch
**Sent:** 8/27/2012 6:23:34 PM
**Subject:** Numbers

Hi Denise –

Below are the current numbers – the AF numbers do not include approx. 164 patients who should be approved today.

AF     4747
CDF   1456
PAN   2

Total of 6205 assisted via 501c3

3395 LIS patients

Let me know if you need anything further – or any clarification.

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.

# EXHIBIT A-43

**From:** Blanc, David
**To:** Denise Lynch
**Sent:** 12/5/2013 6:21:17 PM
**Subject:** ACS

Hey Denise –

Great catching up with you yesterday!

As requested, numbers:

TAF 5614
CDF 1188
LIS 3543

Let me know if you need anything further.

Thank you for the partnership –

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-44

| From: | Jennifer Clark |
| --- | --- |
| To: | Katie Hiett |
| CC: | Denise Lynch |
| Sent: | 9/13/2011 9:43:06 PM |
| Subject: | 2012 COP Financial Assistance.xls |
| Attachments: | 2012 COP Financial Assistance.xls |

Katie,

Per your request, attached is how we were coming up with our patient assistance figures.  I'd be happy to walk you through them when you have a minute.  Thanks!

CONFIDENTIAL – FOIA Exempt

Tev_050019

| | 2011 | 2012 | 2013 |
|---|---|---|---|
| **501c Funding per pt** | | 4771 | 5004 |
| **Katie's portion** | | 1867 | 1900 |
| **Govt Portion** | | | |
| Medicare Funding per pt. | $ 6,250 | $ 6,638 | $ 6,904 |
| Qual-new Medicare pt. | $ 150 | $ 150 | $ 150 |
| Requal-Medicare pt. | $ 125 | $ 125 | $ 125 |
| Adherence rate | 88% | 88% | 88% |
| Admin fee | 9% | 9% | 9% |
| Additional factor for qualification | 120% | 120% | 120% |
| Estimated Fund Carryover | | | |
| COGS & Shipping & Handling - Med D Free - per month ($60+$70) | $ 190 | $ 130 | $ 130 |
| Average # of Med D Free dispenses per pt | 4 | 3 | 3 |
| | | | |
| Beginning of Year | | 6300 | 5988 |
| Additional new pts - assistance donated | | 500 | 506 |
| Med Free Roll-over | 525 | 525 | 483 |
| Retention - Patients at year-end (full funding & partial LIS) | 5775 | 5984 | 5715 |
| Full LIS | 2475 | 2723 | 2995 |
| Total Patient Count | 8775 | 9232 | 9193 |
| | | | |
| Qualification-new pts. | $ 94,500.00 | $ 184,500.00 | $ 178,020.00 |
| Qualification-existing pts. | $ 78,750.00 | $ 1,098,750.00 | $ 1,046,592.00 |
| TN 50% portion on assisted pts | | | |
| Donut Hole Funding | $ - | $ 32,442,800.00 | $ 32,494,259.87 |
| Total Donation | $ - | **$ 35,651,428.57** | **$ 35,707,977.87** |
| Admin fee | $ - | $ 3,208,628.57 | $ 3,213,718.01 |
| Estimated Fund Carryover | $ - | $ - | $ - |
| **TOTAL Medicare - excl free** | $ 173,250.00 | $ 36,934,678.57 | $ 36,932,589.87 |
| | | | |
| Total Med D Free (COGS & S&H) | 399,000.00 | 204,750.00 | 188,370.00 |
| **Total Medicare - incl free** | $ 572,250.00 | $ 37,139,428.57 | $ 37,120,959.87 |
| S&H only | 147,000 | 110,250 | 101,430 |
| COGS | | 94,500 | 86,940 |
| **Potential Additional Expense - due to legistative changes related to health care** | | | |
| Total Med-D pts - 50% donut hole | 13,000 | 15,000 | 17,000 |
| # of donut hole assisted pts | 462 | 7,325 | 6,977 |
| Remainder of med d pts w/out dh assist | 12,538 | 7,675 | |
| Incremental presumed TN portion of donut hole - per patient - above those otherwise assisted | $ 1,806 | $ 1,885 | $ 1,885 |
| **Total presumed TN portion of paying 50% on unassisted pts** | | 13,807,625 | 18,892,827 |

# EXHIBIT A-45

| | |
|---|---|
| **From:** | Jenny Jackson |
| **To:** | Katie Hiett |
| **Sent:** | 8/11/2010 7:25:13 PM |
| **Subject:** | Re: Financial Assistance-with Drivers-timing of donations-2011-2013.xls (Projected vs Actual) |
| **Attachments:** | Financial Assistance-with Drivers-timing of donations-2011-2013.xls; Medicare and Private Copay 2008_2010 Actuals.xls |

Katie - I've bulleted a few points regarding the variances below.

For Private Copay assistance - 2009: We estimated $10.9M (I left out in house expense since actuals didn't include that) and actuals show $9M. Variance comes from:

We over-estimated the number of patients that would request assistance in 2009.
Compliance rate we assumed was high by about 2%.
We limited the amount of money we would pay for deductibles vs what we planned. In January the deductible dollars were so high that we backed off approving patients with a deductible because we thought we would run out of money.

Medicare - 2009: We estimated $25M and actuals were $24.3M. Because this is a Disease State Fund some of our patients could receive funds from other donations other then ours which we believe occured in 2009.

Is this helpful information? Jessica is out and I'm in the office til 1:00 tomorrow and then out.


Jenny Jackson
Sr. Manager - Patient Services
Teva Neuroscience
(816)508-5958
Jenny.Jackson@tevaneuro.com

| **Katie Hiett/KAN /TEVA/IL**<br><br>08/11/2010 09:42 AM | To | Jessica Chung/KAN/TEVA/IL@TEVANEW |
|---|---|---|
| | cc | Jenny Jackson/KAN/TEVA/IL@TEVANEW, Denise Lynch/KAN/TEVA/IL@TEVANEW |
| | Subject | Financial Assistance-with Drivers-timing of donations-2011-2013.xls (Projected vs Actual) |


Jessica & Jenny,

I need to make a presentation to Deb Griffin on Friday morning regarding Patient Assistance vs Medicare changes.

I need to reconcile the two attached sheets and why the differences between jenny's sheets for prior year exp vs what actually hit the P&L.

Can you both take a look at this so we can resolve by tomorrow and put together a presentation for Deb by end of day.

Medicare and Private Copay 2008_2010 Actuals.xls


Katie Hiett, CPA
Director of Finance
Teva Neuroscience
Phone: (816) 508-5088

CONFIDENTIAL – FOIA Exempt                                                          Tev_136958

Fax: (816) 508-5592   Case 1:20-cv-11548   Document 1-45   Filed 08/18/20   Page 2 of 4
E-Mail: katie.hiett@tevaneuro.com



Financial Assistance-with Drivers-timing of donations-2011-2013.xls

CONFIDENTIAL – FOIA Exempt                                                          Tev_136959

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/18/21   Page 407 of 684
Case 1:20-cv-11548   Document 1-45   Filed 08/18/20   Page 3 of 4
Medicare 2009

| | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Medicare Funding per pt. | $ 4,750 | $ 5,250 | $ 5,750 | $ 6,250 | $ 6,750 |
| Qual-new Medicare pt. | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 |
| Requal-Medicare pt. | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 |
| Adherence rate | 88% | 88% | 88% | 88% | 88% |
| Admin fee | 9% | 9% | 9% | 9% | 9% |
| Additional factor for qualification | 120% | 120% | 120% | 120% | 120% |
| Estimated Fund Carryover | | | | | |
| COGS & Shipping & Handling - Med D Free - per month | | $ 190 | $ 190 | $ 190 | $ 190 |
| Average # of Med D Free dispenses per pt | | 4 | 6 | 6 | 6 |
| | | | | | |
| | | | | | |
| Beginning of Year | 0 | 3397 | 4718 | 5879 | 6902 |
| Additional new pts - assistance donated | 0 | 600 | 600 | 600 | 600 |
| Med Free Roll-over | 825 | 1200 | 1200 | 1200 | 1200 |
| Retention - Patients at year-end (full funding & partial LIS) | 2572 | 3518 | 4679 | 5702 | 6602 |
| Full LIS | 345 | 825 | 908 | 998 | 1098 |
| Total Patient Count | 3742 | 5543 | 6787 | 7900 | 8900 |
| | | | | | |
| | | | | | |
| Qualification-new pts. | $ 148,500.00 | $ 324,000.00 | $ 324,000.00 | $ 324,000.00 | $ 324,000.00 |
| Qualification-existing pts. | $ 509,586.00 | $ 779,586.00 | $ 977,635.68 | $ 1,151,919.40 | $ 1,305,289.07 |
| Donut Hole Funding | | $ 20,985,510.00 | $ 30,576,034.40 | $ 40,496,641.60 | $ 50,638,008.18 |
| Total Donation | | $ 23,061,000.00 | $ 33,600,037.80 | $ 44,501,803.96 | $ 55,646,162.83 |
| Admin fee | | $ 2,075,490.00 | $ 3,024,003.40 | $ 4,005,162.36 | $ 5,008,154.65 |
| Estimated Fund Carryover | | $ - | $ - | $ - | $ - |
| **TOTAL Medicare - excl free** | | $ 24,164,586.00 | $ 34,901,673.48 | $ 45,977,723.35 | $ 57,275,451.90 |
| | | | | | |
| Total Med D Free (COGS & S&H) | | 912,000.00 | 1,368,000.00 | 1,368,000.00 | 1,368,000.00 |
| **Total Medicare - incl free** | | $ 25,076,586.00 | $ 36,269,673.48 | $ 47,345,723.35 | $ 58,643,451.90 |

**Potential  Additional Expense - due to legistative changes related to health care**

| | | | | | |
|---|---|---|---|---|---|
| Total Med-D pts - 50% donut hole | | 12,000 | 12,156 | 12,399 | 12,796 |
| Subset of Med-D pts that need assist beyond that provided in line above | | 6,022 | 7,425 | 8,678 | 9,800 |
| Market Growth | | 1% | 2% | 3% | 3.8% |
| | | | | | |
| Incremental presumed TN portion of donut hole - per patient - above those otherwise assisted | | | | $ 3,000 | $ 3,000 |
| **Total presumed TN portion of donut hole** | | | | 11,164,222 | 8,987,669 |

| | | 2009 | | 2010 | | 2011 | | 2012 |
|---|---|---|---|---|---|---|---|---|
| Medicare Funding per pt. | $ | 5,250 | $ | 6,250 | $ | 7,000 | $ | 8,000 |
| Qual-new Medicare pt. | $ | 150 | $ | 150 | $ | 150 | $ | 150 |
| Requal-Medicare pt. | $ | 125 | $ | 125 | $ | 125 | $ | 125 |
| Adherence rate | | 88% | | 88% | | 88% | | 88% |
| Admin fee | | 9% | | 9% | | 9% | | 9% |
| Additional factor for qualification | | 120% | | 120% | | 120% | | 120% |
| Estimated Fund Carryover | | | | | | | | |
| COGS & Shipping & Handling - Med D Free - per month ($120+$70) | $ | 190 | $ | 190 | $ | 190 | $ | 190 |
| Average # of Med D Free dispenses per pt | | 4 | | 4 | | 4 | | 4 |
| | | | | | | | | |
| | | | | | | | | |
| Beginning of Year | | 3397 | | 4718 | | 5489 | | 6308 |
| Additional new pts - assistance donated | | 600 | | 440 | | 600 | | 700 |
| Med Free Roll-over | | 1200 | | 950 | | 950 | | 950 |
| Retention - Patients at year-end (full funding & partial LIS) | | 3518 | | 4539 | | 5358 | | 6167 |
| Full LIS | | 825 | | 2200 | | 2420 | | 2662 |
| Total Patient Count | | 5543 | | 7689 | | 8728 | | 9779 |
| | | | | | | | | |
| | | | | | | | | |
| Qualification-new pts. | $ | 324,000.00 | $ | 250,277.18 | $ | 279,000.00 | $ | 297,000.00 |
| Qualification-existing pts. | $ | 779,586.00 | $ | 916,200.00 | $ | 1,055,856.00 | $ | 1,193,753.28 |
| Donut Hole Funding | $ | 20,985,510.00 | $ | 32,237,500.00 | $ | 42,623,280.00 | $ | 56,066,841.60 |
| Total Donation | $ | 23,061,000.00 | $ | 35,425,824.18 | $ | 46,838,769.23 | $ | 61,611,913.85 |
| Admin fee | $ | 2,075,490.00 | $ | 3,188,324.18 | $ | 4,215,489.23 | $ | 5,545,072.25 |
| Estimated Fund Carryover | $ | - | $ | - | $ | - | $ | - |
| **TOTAL Medicare - excl free** | $ | 24,164,586.00 | $ | 36,592,301.36 | $ | 48,173,625.23 | $ | 63,102,667.13 |
| | | | | | | | | |
| Total Med D Free (COGS & S&H) | | 912,000.00 | | 722,000.00 | | 722,000.00 | | 722,000.00 |
| **Total Medicare - incl free** | $ | 25,076,586.00 | $ | 37,314,301.36 | $ | 48,895,625.23 | $ | 63,824,667.13 |

**Potential Additional Expense - due to legistative changes related to health care**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total Med-D pts - 50% donut hole | | | | 13,000 | | 15,000 | | 16,000 |
| # of donut hole assisted pts | | | | 5,375 | | 7,039 | | 7,958 |
| Remainder of med d pts w/out dh assist | | | | 7,625 | | 7,961 | | |
| | | | | | | | | |
| Incremental presumed TN portion of donut hole - per patient - above those otherwise assisted | | | $ | 1,806 | $ | 1,806 | $ | 3,000 |
| **Total presumed TN portion of donut hole** | | | $ | 13,770,678 | | 14,377,494 | | 24,124,934 |

# EXHIBIT A-46

| | |
|---|---|
| **From:** | Laurence Fowler |
| **To:** | Denise Lynch |
| **Sent:** | 10/10/2012 8:19:35 PM |
| **Subject:** | 2013 COP Financial Assistance.xls |
| **Attachments:** | 2013 COP Financial Assistance.xls |

Denise – Per our conversation, the $ 43 Million is referenced in cell F34.

Thanks

CONFIDENTIAL – FOIA Exempt

Tev_023275

| Donut Hole Payo | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Mfr | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Patient | | 50% | 47.50% | 47.50% | 45% | 45% | 40% | 35% | 30% | 25% |
| Plan | | | 2.50% | 2.50% | 5% | 5% | 10% | 15% | 20% | 25% |

**Example:  No Deductible, 33% Co-Insurance**

| | 2011 | | | | | |
|---|---|---|---|---|---|---|
| Copaxone Cost | 3520 *Actual: 3,475.77 | | | | | |
| Coverage Limit | 2840 | | | | | |
| Gap Ends | 4686 *Actual: 4,550 | | | | | |

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 937 | 1,903 | | 2,840 | | |
| Donut Hole | 340 | | 340 | 680 | | |
| | | | | | 1,617 | 3,069 |
| | | | | 3,520 | | |
| FEB | | | | | | |
| Donut Hole | 1,534 | | 1,534 | 3,069 | | - |
| Catastrophic | 23 | 429 | | 451 | 4,709 | |
| | | | | 3,520 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 176 | 3,344 | | 3,520 | 4,885 | |
| | | | | 3,520 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 1,584 | 30,096 | | 31,680 | 6,469 | |
| | | | | 31,680 | | |
| | **4,594** | 35,771 | **1,874** | 84,480 | | |

**Example:  No Deductible, 33% Co-Insurance**

| | 2012 | | | | | |
|---|---|---|---|---|---|---|
| Copaxone Cost | 3,785 | | | | | |
| Coverage Limit | 2930 | | | | | |
| Gap Ends | 4700 | | | | | |

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 967 | 1,963 | | 2,930 | | |
| Donut Hole | 428 | | 428 | 855 | | |
| | | | | | 1,822 | 2,878 |
| | | | | 3,785 | | |
| FEB | | | | | | |
| Donut Hole | 1,439 | | 1,439 | 2,878 | | - |
| Catastrophic | 45 | 862 | | 907 | 4,745 | |
| | | | | 3,785 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 189 | 3,596 | | 3,785 | 4,935 | |
| | | | | 3,785 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 1,703 | 32,363 | | 34,066 | 6,638 | |
| | **4,771** | 38,783 | **1,867** | 45,421 | | |
| | **5,201** | | | | | |

**Example:  No Deductible, 33% Co-Insurance**

| | 2013 | | | | | |
|---|---|---|---|---|---|---|
| Copaxone | 4,389 | | | | | |
| Coverage L | 2970 (ICL) initial coverage limit | | | | | |
| Gap Ends | 4750 | | | | | |

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 980 | 1,990 | | 2,970 | | |
| Donut Ho | 674 | 35 | 710 | 1,419 | | |
| | | | | | 2,364 | 2,386 |
| | | | | 4,389 | | |
| FEB | | | | | | |
| Donut Ho | 1,133 | 60 | 1,193 | 2,386 | | - |
| Catastrop | 100 | 1,903 | | 2,003 | 4,791 | |
| | | | | 4,389 | | |
| MAR | | | | - | | |
| Donut Ho | - | | - | - | - | |
| Catastrop | 219 | 4,170 | | 4,389 | 5,010 | |
| | | | | 4,389 | | |
| APR - DEC | | | | - | | |
| Donut Ho | - | | - | - | - | |
| Catastrop | 1,975 | 37,529 | | 39,505 | 6,985 | |
| | **5,083** | 45,688 | **1,903** | 52,673 | | |
| Admin Fee | **5,540** | | | | | |

Medicare 2012-14

| | 2008 | 2009 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| **501c Funding per pt** | | | | 4771 | 5083 |
| **Katie's portion** | | | | 1867 | 1903 |
| **Govt Portion** | | | | | |
| Medicare Funding per pt. | $ 4,750 | $ 5,250 | $ 6,250 | $ 6,638 | $ 6,985 |
| Qual-new Medicare pt. | $ 150 | $ 150 | $ 150 | $ 150 | $ 150 |
| Requal-Medicare pt. | $ 125 | $ 125 | $ 125 | $ 125 | $ 125 |
| Adherence rate | 88% | 88% | 88% | 88% | 88% |
| Admin fee | 9% | 9% | 9% | 9% | 9% |
| Additional factor for qualification | 120% | 120% | 120% | 120% | 120% |
| Estimated Fund Carryover | | | | | |
| COGS & Shipping & Handling - Med D Free - per month ($60+$70) | | $ 190 | $ 190 | $ 130 | $ 130 |
| Average # of Med D Free dispenses per pt | | 4 | 4 | 3 | 3 |
| | | | | | |
| Beginning of Year | 0 | 3397 | | | 7044 |
| Additional new pts - assistance donated | 0 | 600 | | | 460 |
| Med Free Roll-over | 825 | 1200 | 525 | 600 | 552 |
| Retention - Patients at year-end (full funding & partial LIS) | 2572 | 3518 | 5775 | 7056 | 6603 |
| Full LIS | 345 | 825 | 2475 | 3400 | 3740 |
| Total Patient Count | 3742 | 5543 | 8775 | 11056 | 10895 |
| | | | | | |
| Qualification-new pts. | $ 148,500.00 | $ 324,000.00 | $ 94,500.00 | $ 108,000.00 | $ 182,160.00 |
| Qualification-existing pts. | $ 509,586.00 | $ 779,586.00 | $ 78,750.00 | $ 90,000.00 | $ 1,208,328.00 |
| TN 50% portion on assisted pts | | | | | |
| Donut Hole Funding | | $ 20,985,510.00 | $ - | $ - | $ 38,136,882.68 |
| Total Donation | | $ 23,061,000.00 | $ - | $ - | $ 41,908,662.28 |
| Admin fee | | $ 2,075,490.00 | $ - | $ - | $ 3,771,779.61 |
| Estimated Fund Carryover | $ - | $ - | $ - | $ - | $ - |
| **TOTAL Medicare - excl free** | | $ 24,164,586.00 | $ 173,250.00 | $ 198,000.00 | $ 43,299,150.28 |
| Medicare Project | | | | | 43,415,070.28 |
| Total Med D Free (COGS & S&H) | | 912,000.00 | 399,000.00 | 234,000.00 | 215,280.00 |
| **Total Medicare - incl free** | | $ 25,076,586.00 | $ 572,250.00 | $ 432,000.00 | $ 43,514,430.28 |
| S&H only | | | 147,000 | 126,000 | 115,920 |
| COGS | | | | 108,000 | 99,360 |
| **Potential Additional Expense - due to legistative changes related to health care** | | | | | |
| Total Med-D pts - 50% donut hole | | | 13,000 | 15,000 | 17,000 |
| # of donut hole assisted pts | | | 462 | 600 | 8,056 |
| Remainder of med d pts w/out dh assist | | | 12,538 | 14,400 | |
| Incremental presumed TN portion of donut hole - per patient - above those otherwise assisted | | | $ 1,806 | $ 1,885 | $ 1,885 |
| **Total presumed TN portion of paying 50% on unassisted pts** | | | | 1,131,000 | 16,860,345 |

Private 2012-14

|  | 2012 |
|---|---|
| Average monthly award per pt | $ 385.00 |
| # pts referred monthly | 180 |
| # months | 12 |
| % pts referred that are approved/funded | 82% |
| Prorated Annual fill factor for new referrals | 6.5 |
| Compliance rate | 88% |
| Adherence rate | 82% |
| Admin fee | |
| Deductible $ Planned | |
| % New Pts - new referrals | 50% |
| % Existing Pts - new referrals | 50% |
| | |
| Reapps sent | 5,480 |
| | |
| Approved Reapps for 2013 | 4,658 |
| New Referrals: | 2,160 |
|   New Pts - new referrals - funded | 886 |
|   Existing Pts - new referrals - funded | 886 |
| Patients Retained at Year End | 5,272 |
| Patients Receiving Funding during year | 6,429 |
| "Full-year weighting" Patients Receiving Funding | 5,617 |
| | |
| | |
| Deductible $ Planned | $ - |
| Funding-Rollover pts | $ 15,528,803 |
| Funding-New Pts-new referrals | $ 1,599,220 |
| Funding-Existing Pts-new referrals | $ 1,599,220 |
| Total Donation - excluding admin fee | $ 18,727,243 |
| Admin fee | $ - |
| In-house expense for Private Pgm | $ 425,000 |
|   TOTAL Private Assistance | $ 19,152,243 |

Expenses
DiseaseTrak license fees          396000
Team members

Case 1:20-cv-11548   Document 1-46   Filed 08/13/20   Page 5 of 17

**CCS Admin Fees**

| | | | | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Monthly Rate | 3,000 | | Est. Pts @ YE | 12,783 | 12,780 | 12,086 |
| Transaction Processing Fee | 1.15 | | Compliance Rate | 82% | 82% | 82% |
| Misc - Postage, etc. | | | # of fills | 12 | 12 | 12 |
| | | | Est. Transactions | 125,789 | 125,751 | 118,927 |
| | | | Annual Transaction Costs | 144,657 | 144,614 | 136,766 |
| | | | Annual Mgmt Fees | 36,000 | 36,000 | 36,000 |
| | | | Misc. Admin Fees | 2,500 | 2,500 | 2,500 |
| | | | CCS Admin | 183,157 | 183,114 | 175,266 |

**E-Prescribing**

| | | | | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| Monthly Maintenance Fee | 17,000 | | # of Transactions/Month | 300 | 500 | 500 |
| Transactional Fee | 100 | | Annual Transactions | 3,600 | 6,000 | 6,000 |
| w/ PA | 15 | | Avg. Cost Per Transaction | 108 | 108 | 108 |
| new feature (Lexus Nexus DE | 5 | | Annual Transaction Costs | 387,000 | 645,000 | 645,000 |
| | | | Annual Maint. | 204,000 | 204,000 | 204,000 |
| | | | Opportunity Costs-Projects | 150,000 | 100,000 | 50,000 |
| | | | | 741,000 | 949,000 | 899,000 |

| Program | | Free | | |
|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** |
| Year | **Planned** | **Planned** | **Planned** | **Planned** |
| Pts budgeted (year-end) | 4,400 | 4,500 | 4,500 | 4,250 |
| COGS Units | 44,880 | 45,900 | 45,900 | 43,350 |
| COGS $ | $ 2,692,800 | $ 2,754,000 | $ 2,754,000 | $ 2,601,000 |
| Shipping & Handling | $ 1,047,200 | $ 1,071,000 | $ 1,071,000 | $ 1,011,500 |
| Admin Fee | $ 650,000 | $ 725,000 | $ 700,000 | $ 650,000 |
| | $ 4,390,000 | $ 4,550,000 | $ 4,525,000 | $ 4,262,500 |

| | | | | |
|---|---|---|---|---|
| Medicare Free | 96000 | 100000 | 95000 | 85000 |
| CAP/Replacement | 37000 | 50000 | 50000 | 40000 |

breakdown by qtr

| | | | 2012 WP | 2012 FC | 2013 Q1 | 2013 Q2 | 2013 Q3 | 2013 Q4 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581000 PATIENT ACCESS PROGRAM-COP MEDICARE | 280 - Charitable Donations | $ 28,050,000 | 32,500,000 | 38,500,000 | 2,250,000 | 1,250,000 | | 42,000,000 | 38,500,000 | 36,000,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581000 PATIENT ACCESS PROGRAM-COP MEDICARE | 540 - Patient Support Programs | | 1,084,140 | 125,000 | 70,000 | 70,000 | 1,125,488 | 1,390,488 | 1,235,188 | 1,112,467 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581001 PATIENT ACCESS PROGRAM-COP CO-PAY SOLUTIONS | 540 - Patient Support Programs | $ 6,745,000 | 17,072,987 | 7,290,866 | 6,560,666 | 6,074,691 | 4,373,777 | 24,300,000 | 24,300,000 | 23,000,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581002 PATIENT ACCESS PROGRAM-COP PRIVATE COPAY | 540 - Patient Support Programs | 25,100,000.00 | 16,477,550 | 5,750,000 | 3,500,000 | 3,400,000 | 2,993,135 | 15,643,135 | 12,820,509 | 10,980,321 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581003 PATIENT ACCESS PROGRAM-COP FREE GOODS | 540 - Patient Support Programs | $ 6,605,000 | 1,842,088 | 455,000 | 450,000 | 446,000 | 445,000 | 1,796,000 | 1,771,000 | 1,661,500 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581004 PATIENT ACCESS PROGRAM-COP COPAY SOL OFFGTN | 540 - Patient Support Programs | (6,745,000) | (17,072,987) | (7,290,866) | (6,560,666) | (6,074,691) | (4,373,777) | (24,300,000) | (24,300,000) | (23,000,000) |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581005 PATIENT ACCESS PROGRAM-COP COPAY SOL ADMIN | 320 - Consultants | | 268,569 | | 75,000 | | 100,000 | 175,000 | 100,000 | 100,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581005 PATIENT ACCESS PROGRAM-COP COPAY SOL ADMIN | 540 - Patient Support Programs | | 214,261 | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 | 200,000 | 175,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352094301-1581001 COP COPAY PASSTHRU TO TUSA-COP DISC P/T TO TUSA | 540 - Patient Support Programs | | 0 | | | | | | | |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352010512-1581001 COP COGS-COP COGS | 540 - Patient Support Programs | | 2,528,640 | 667,920 | 696,960 | 726,000 | 813,120 | 2,904,000 | 2,899,000 | 2,726,000 |
| 7022 - CALL CENTER (L4) | TNS3352021009-1681000 BSL-CASE MGMT-COP BENEFITS INVEST | 540 - Patient Support Programs | $ 700,000 | 611,625 | 203,000 | 147,000 | 161,000 | 189,000 | 700,000 | 700,000 | 650,000 |
| 7022 - CALL CENTER (L4) | TNS3352021009-1681001 BSL-CASE MGMT-COP E-PRESCRIBING | 540 - Patient Support Programs | $ 500,000 | 464,391 | 130,000 | 215,000 | 225,000 | 170,000 | 740,000 | 950,000 | 900,000 |
| | TNS3352020900-1581009 PATIENT ACCESS PROGRAM-COP PREMIUM ASSISTAN | 280 - Charitable Donations | $ 1,500,000 | | | | | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| | Patient Access R&T | | | | 6,250 | 6,250 | 6,250 | 6,250 | 25,000 | 30,000 | 25,000 |
| | Patient Access Meetings | | | | 1,250 | 1,250 | 1,250 | 1,250 | 5,000 | 5,000 | 5,000 |
| | Patient Access Supplies | | | | 5,000 | 5,000 | 5,000 | 5,000 | 20,000 | 20,000 | 20,000 |
| | Patient Access Training | | | | 3,750 | 3,750 | 3,750 | 3,750 | 15,000 | 15,000 | 15,000 |

Tev_023276.xls

| Cost Center | Bus Unit | Product | Expense Item | FY 2013 | FY 2014 | FY 2015 | | Notes |
|---|---|---|---|---|---|---|---|---|
| 8505 - Centralized Nursi | 86 | Copaxone | Road & Travel | 84,000 | 86,688 | 89,462 | | $1,500 per trip; Jan -- 1 trip/mo; Judy 1 trip/qtr; 4 Sups -- 1 trip/yr; Vanessa 2 trips/mo; Nurses 1 trip/mo |
| 8505 - Centralized Nursi | 86 | Copaxone | Office Supplies | 61,430 | 63,396 | 65,424 | | 86 FTE/$505; 2013 MO/KS lic 60 assoc nurses/$200; Insurance 60 assoc nurses/$100 |
| 8505 - Centralized Nursi | 86 | Copaxone | Training | 30,000 | 30,000 | 30,000 | | 60 assoc nurses/$50 CEU; 86 FTE/$325; |
| | | | | | | | | |
| | | | | | | | | |
| 8505 - Centralized Nursi | 86 | Copaxone | Recruiting/Buyout | 20,000 | 20,000 | 20,000 | | |

Tev_023276.xls

| Cost Center | Bus Unit | Product | Expense Item | FY 2013 | FY 2014 | FY 2015 | | Notes |
|---|---|---|---|---|---|---|---|---|
| 8504 - Patient Service | 86 | All | Road & Travel | 60,000 | 61,920 | 63,901 | | |
| 8504 - Patient Service | 81 | Copaxone | Language Line | 46,200 | 47,678 | 49,204 | | |
| 8504 - Patient Service | 86 | All | Office Supplies | 17,170 | 17,719 | 18,286 | | |
| 8504 - Patient Service | 81 | Copaxone | Telephone | 200,000 | 206,400 | 212,592 | | |
| 8504 - Patient Service | 86 | All | Training | 50,000 | 50,000 | 50,000 | | This includes $40,000 for the department with the remainder for Pt Services cost center training |
| 8504 - Patient Service | 86 | All | HIPAA Training | 50,000 | 10,000 | 10,000 | | |
| | | | | | | | | |
| | | | | | | | | |
| 8504 - Patient Service | 86 | All | Associate Relations | 90,000 | 90,000 | 90,000 | | These two items were provided to Brooke to be included in the Labor module |
| 8504 - Patient Service | 86 | All | Recruiting/Buyout | 20,000 | 20,000 | 20,000 | | |

| WP | | Input_Version | | | FY13 Jan | FY13 Feb | FY13 Mar | FY13 Apr | FY13 May | FY13 Jun | FY13 Jul | FY13 Aug | FY13 Sep | FY13 Oct | FY13 Nov | FY13 Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 86-Shared Services USBP | | No Project | 8508 - Ph: 7170004 - PROFESSIONAL FEES | | | | 12,500 | | | 12,500 | | | 12,500 | | | 12,500 |
| 86-Shared Services USBP | | No Project | 8508 - Ph: 7410002 - POSTAGE & FREIGHT - OUT | | | | 186,480 | | | 251,126 | | | 251,126 | | | 295,053 |

| | # Prescriptions | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan-Apr 2013 | May-Aug 2013 | Sept-Dec 2013 | Jan-June 2014 | July-Dec 2014 | Jan-June 2015 | July-Dec 2015 | |
| Copaxone 1st Ship | 275 | 275 | 275 | 350 | 350 | 350 | 350 | needs ramped up from beginning to end |
| Copaxone Free/Replacement | 0 | 0 | 0 | | | | | In Jen's WP #'s. |
| Copaxone Ongoing | | 140 | 280 | 420 | 630 | 840 | 840 | |
| AJ2 | 850 | 850 | 650 | 500 | 250 | 0 | 0 | |
| AJ2 40 mg | 0 | 250 | 500 | 500 | 850 | 850 | 850 | |
| Paragard | 0 | 0 | 75 | 200 | 500 | 900 | 1150 | |
| Omacetaxine | 0 | 0 | 0 | 75 | 75 | 75 | 75 | |
| T-Jet | | | | 25 | 25 | 25 | 25 | |
| Other Teva Products | | | | | | | | |
| Total per week | 1125 | 1515 | 1780 | 2070 | 2680 | 3040 | 3290 | |
| Total per day | 225 | 303 | 356 | 414 | 536 | 608 | 658 | |

In Jen's WP #'s. 14300

Paragard 4675 7470 9435

Total per day 23400

| | | 35% | 17% | 16% | 29% | 13% | 8% | 20592 |
|---|---|---|---|---|---|---|---|---|

| Q4 2012 | | Q1 13 | Q2 13 | Q3 13 | Q4 13 | 14 | 15 | 14414.4 |
|---|---|---|---|---|---|---|---|---|
| | 177600 | 186480 | 251126.4 | 251126.4 | 295052.8 | 362561.9633 | 401821.1 | 277.2 |
| | | | | | 945620.6 | | | |

| | Q1 13 | Q2 13 | Q3 13 | | | | |
|---|---|---|---|---|---|---|---|
| Copaxone Shipping | 27.5 | 27.5 | 27.5 | 657,615 | Autoject FedEx-Mo. | 32000 |
| COGS - First Ship | 0 | 0 | 0 | | | 3,583.33 |
| | 27.5 | 27.5 | 27.5 | | FedEx Cost/ship | 8.93 |
| # of Weeks in time frame | 17 | 18 | 17 | | 10% Increa | 9.82 |
| # of ships/week | 275 | 415 | 555 | | 2013 Autojects | 43000 |
| Copaxone Commercial Ship | 128,563 | 205,425 | 259,463 | | | 422,400.00 |
| | | | | | Supplies cost | 1.00 |
| | | | | | | 43,000.00 |
| | | | | | S&H | 465,400.00 |
| | | | | | Autojects | 804,100 |
| | | | | | | 1,269,500.00 |

| | |
|---|---|
| Bubble Envelopes | 19,200 |
| Package Inserts | 8,000 |
| Labels | 10,000 |
| Annual Supplies | 37,200 |
| | 0.93 |
| 2013 | 39,990 |

| WP | Input_Version | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FY13 | FY13 | FY13 | FY13 | FY13 | FY14 | FY15 |
| BU | CC | Project | | Q1 | Q2 | Q3 | Q4 | YearTotal | YearTotal | YearTotal |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | gl_600000 | 71,497 | 69,512 | 69,512 | 69,512 | 280,032 | 218,374 | 218,374 |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7030022 - MEETINGS | 2,500 | 2,500 | 2,500 | 2,500 | 10,000 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7030999 - TRAVELLING EXPENSES | 2,500 | 2,500 | 2,500 | 2,500 | 10,000 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7157999 - SUNDRY EXPENSES | 40,000 | 40,000 | 40,000 | 40,000 | 160,000 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7170004 - PROFESSIONAL FEES | 12,500 | 12,500 | 12,500 | 12,500 | 50,000 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7210999 - IT EXPENSES | 9,000 | 9,000 | 9,000 | 9,000 | 36,000 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7410002 - POSTAGE & FREIGHT - C | 186,480 | 240,754 | 240,754 | 277,633 | 945,621 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | No Product - Projects | 7460107 - TRAINING | 1,500 | 1,500 | 1,500 | 1,500 | 6,000 | - | - |
| 86-Shared Services USBP | 8508 - Pharmacy | Task - USBP-COPAXONE - Pharmacy AJ2 Product | 7460117 - A&P - PRODUCT DEVICE | 216,000 | 216,000 | 216,000 | 216,000 | 864,000 | - | - |

**Q1 & Q2 Pre-Approval Spending**

| Project Name | Q1 | Q2 |
|---|---|---|
| **Patient Services & Reimbursement** | | |
| CNE Opp Funds | 255,250 | 255,250 |
| Injection Training Meeting | - | 530,250 |
| ShSol Pharmacy--Consulting | 50,000 | 50,000 |
| COPAXONE Copay Solutions (GTN) | 7,290,866 | 6,560,666 |
| COPAXONE Copay Solutions (Expense) | 50,000 | 50,000 |
| Private Copay Program | 5,750,000 | 3,500,000 |
| Free Product | 1,122,920 | 1,146,960 |
| Medicare Patient Assistance | 38,625,000 | 2,320,000 |
| BI Test Claims | 203,000 | 147,000 |
| Online Enrollment | 130,000 | 215,000 |

**Funtional Area: Patient Services & Reimbursement**

| Project Name | Brief Description | Project Initiative | 2013 Timing | Proposed Budget | | |
|---|---|---|---|---|---|---|
| | | | | 2013 | 2014 | 2015 |
| **Patient Access** | | | | | | |
| COPAXONE Copay Solutions (GTN) | $35 coupon pgm; $2,500 cap | **Patient** | All Year | $ 24,300,000 | $ 24,300,000 | $ 23,000,000 |
| COPAXONE Copay Solutions (Expense) | Mgmt fees, admin, & analysis | **Patient** | Q2, Q4 | $ 375,000 | $ 300,000 | $ 275,000 |
| Private Copay Program | Financial qualifcation co-pay assist. | **Patient** | All Year | $ 15,640,000 | $ 12,820,000 | $ 11,000,000 |
| Free Product | Comm. & Medicare free, syringe replacement, & CAP pgm | **Patient** | All Year | $ 4,700,000 | $ 4,670,000 | $ 4,387,500 |
| Medicare Patient Assistance | 501c(3) Donations | **Patient** | All Year | $ 43,390,488 | $ 39,735,188 | $ 37,112,467 |
| Premium Assistance | 501c(3) Donations | **Patient** | Q4 | $ 1,500,000 | $ 1,500,000 | $ 1,500,000 |
| BI Test Claims | Test claims | **Patient** | All Year | $ 700,000 | $ 700,000 | $ 650,000 |
| Online Enrollment | iAssist e-prescribing | **Patient** | All Year | $ 740,000 | $ 950,000 | $ 900,000 |
| | | | | | | |
| **Pharmacy** | | | | | | |
| ShSol Pharmacy--Autoject Distribution | Autojects, S&H, Harte Hanks | **Patient** | All Year | $ 1,269,500 | $ 3,532,975 | $ 1,399,624 |
| ShSol Pharmacy--Commercial Ship | | **Patient** | All Year | $ 593,450 | $ 682,468 | $ 750,714 |
| ShSol Pharmacy--Free/Replacement Product | Cost Savings to Teva; no additional spend | **Patient** | All Year | $ - | $ - | $ - |
| ShSol Pharmacy--Consulting | | | All Year | $ 100,000 | $ - | $ - |
| ShSol Pharmacy--Overhead | | | All Year | $ 132,000 | $ 138,600 | $ 145,530 |
| ShSol Pharmacy--Rent | | | All Year | $ 113,000 | $ 120,000 | $ 120,000 |
| Existing/New Depr | TBD | | All Year | | | |
| | | | | | | |
| **Field Nursing** | | | | | | |
| Injection Training | | **Patient** | All Year | $ 7,063,000 | $ 8,274,890 | $ 7,493,137 |
| Opp Funds | | **Patient** | All Year | $ 1,021,000 | $ 1,051,630 | $ 1,083,179 |
| R&T/Meetings | | **Patient** | All Year | $ 1,655,102 | $ 1,704,755 | $ 1,755,898 |
| Injection Training Support | Meetings, Training, Field Auditing & Extended Services | **Patient** | All Year | $ 1,187,000 | $ 1,222,610 | $ 1,259,288 |
| | | | | | | |
| | | | | | | |
| Existing/New Depr | TBD | | All Year | | | |
| Overhead (R&T, Mtgs, Training, etc.) | Excludes Pharmacy | | All Year | $ 896,200 | $ 878,802 | $ 893,870 |
| IT Allocations | | | All Year | $ 1,240,000 | $ 1,302,000 | $ 1,367,100 |
| | | | | | | |

**Total Budget:** $ 106,615,740    $ 103,883,918    $ 95,093,306

**Funtional Area: Patient Services and Support**

| Initiative | Issue/Strategy | Success Factor | 2012 Timing | Proposed Budget | | | Comments |
|---|---|---|---|---|---|---|---|
| | | | | 2012 | 2013 | 2014 | |
| *Patient Assistance* | | | | | | | |
| COPAXONE Copay Solutions | Access/Competitive Marketplace | DOT, Compliance, Adherence & Conversion | Q1 - Q4 | $ 6,745,000 | $ 7,335,000 | $ 7,450,000 | |
| COPAXONE Copay Solutions - Reporting | | | Q1 - Q4 | $ 200,000 | | | |
| Private Copay Program | Access | # of patients assisted, synchronization of costs/rebates | Q1 - Q4 | $ 25,365,000 | $ 22,180,000 | $ 20,400,000 | |
| Free Product | Access | # of patients assisted, 'halo' effect | Q1 - Q4 | $ 6,445,000 | $ 6,600,000 | $ 6,605,000 | |
| Medicare Patient Assistance | Access | | Q1 - Q4 | $ 40,050,000 | $ 40,035,000 | $ 37,870,000 | |
| Premium Assistance | Access | | Q3 - Q4 | $ 2,000,000 | $ 4,000,000 | $ 5,000,000 | |
| Syringe Replacement/CAP Program | Access | | Q1 - Q4 | $ 165,000 | $ 165,000 | $ 165,000 | |
| | | | | **$ 80,970,000** | **$ 80,315,000** | **$ 77,490,000** | |
| | | | | | | | |
| *Patient Services* | | | | | | | |
| BI Test Claims | Access | Time to product, Conversion | Q1 - Q4 | $ 700,000 | $ 750,000 | $ 750,000 | |
| Online Enrollment | Access/Competitive Marketplace | Time to product | Q1 - Q4 | $ 500,000 | $ 250,000 | $ 250,000 | |
| Clinical Nurse Educators* (INCLUDES PEOPLE CO | Retain/Gain | Calls on targeted physicians; number of injection trainings | Q1-Q4 | $ 9,000,000 | $ 7,416,000 | $ 5,730,000 | 100% allocated in 2012, 80% in 2013, 60% in 2014 |
| Call Center Nurse Support | Retain/Gain | 90-day, 12-month, 24-month adherence | Q1-Q4 | $ 50,000 | $ 50,000 | $ 50,000 | |
| Patient Database Development (incl. in new depr) | Retain/Gain | Authorization to market | Q2-Q4 | | | | |
| ShSol Pharmacy--Autoject Distribution | Retain/Gain | Time to Product | Q1-Q4 | $ 1,268,000 | $ 1,087,000 | $ 906,000 | |
| ShSol Pharmacy--Free/Replacement Product | Retain/Gain | Cost Savings to Teva | | $ - | $ - | $ - | Reduction of Expense-No Incremental Cost |
| Injection Training | Retain/Gain | Time to Product, # of Trainings completed, Compliance/ Adherence | Q1-Q4 | $ 3,487,000 | $ 2,989,000 | $ 2,491,000 | |
| | | | | | | | |
| Operational Expenses (INCLUDES CONTRACTORS) | | | | $ 5,900,000 | $ 6,200,000 | $ 6,500,000 | |
| | | | | | | | |
| Asset Write-off | | | | $ 195,500 | | | |
| New Depr | | | | $ 350,000 | $ 350,000 | $ 350,000 | |

**Total Budget:** $ 102,420,500   $ 99,407,000   $ 94,517,000

Case 1:20-cv-11548    Document 1-46    Filed 08/18/20    Page 16 of 17

<mark>NEEDS UPDATE</mark>D

|  | Current Patients | Additional Patients | Total # of Patients |
|---|---|---|---|
| Private Copay | 6,300 | 1,771 | 8,071 |
| Medicare | 6,300 | 500 | 6,800 |
| Free | 3,950 | 400 | 4,350 |
| Copay Solutions | 5,700 | 5,000 | 10,700 |
| Free Product - Co | 22,250 | 7,671 | 29,921 |
|  |  |  |  |
| SCP | 17,500 | (4,200) | 13,300 |

not updated

|  | Net Sales | Cost | Operating Profit |  |
|---|---|---|---|---|
| Private Copay | 255,515,951 | #REF! | #REF! | |
| Copay Solutions | #REF! | #REF! | 1,075,000 | |
| Free Conversion | 13,605,863 | #REF! | #REF! | * Plus Halo Effect |
|  | #REF! | #REF! | #REF! | |

Medicare - Charitable Donation
Free Product - Convert 15%; 7% to Medicare, 6% to Commercial, 2% to Medicaid

# EXHIBIT A-47

| | |
|---|---|
| **From:** | Jennifer Clark |
| **To:** | Denise Lynch; Jan Jones; Donna Scheidt |
| **CC:** | Laurence Fowler |
| **Sent:** | 7/25/2013 6:34:40 PM |
| **Subject:** | 2014 AOP_Patient Access.xlsx |
| **Attachments:** | 2014 AOP_Patient Access.xlsx |

Denise, Jan, Donna & Laurence,

I'm sending you my 2014 AOP file for Copaxone just in case I'm not around and questions come up.  My brand team template is on the far right tab, the tab next to it is by my projects/tasks that I will send to Rachel for Hyperion input, and the rest of the tabs are supporting calculations of how I arrived at my figures.  I'm still planning on leading the meeting on Aug. 5th to consolidate all of our spending into the brand team template, however, I wanted to provide this to you in case I'm not around.  Thanks!

CONFIDENTIAL – FOIA Exempt

Tev_022856

| Donut Hole Payer | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mfr | | 50% | 50% | 50% | 50% | 50% | | 50% | 50% | 50% | 50% |
| Patient | | 50% | 47.50% | 47.50% | 45% | 45% | | 40% | 35% | 30% | 25% |
| Plan | | | 2.50% | 2.50% | 5% | 5% | | 10% | 15% | 20% | 25% |

| Donut Hole | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Mfr | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Patient | | 50% | 47.50% | 47.50% | 45% | 45% | 40% | 35% | 30% | 25% |
| Plan | | | 2.50% | 2.50% | 5% | 5% | 10% | 15% | 20% | 25% |

**Example: No Deductible, 33% Co-Insurance**

### 2011

Copaxone Cost 3520 *Actual: 3,475.77
Coverage Limit 2840
Gap Ends 4686 *Actual: 4,550

| | Patient | HP | Pharma | Total | Patient/Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 937 | 1,903 | | 2,840 | | |
| Donut Hole | 340 | | 340 | 680 | | |
| | | | | | 1,617 | 3,069 |
| | | | | 3,520 | | |
| FEB | | | | | | - |
| Donut Hole | 1,534 | | 1,534 | 3,069 | | |
| Catastrophic | 23 | 429 | | 451 | 4,709 | |
| | | | | 3,520 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 176 | 3,344 | | 3,520 | 4,885 | |
| | | | | 3,520 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 1,584 | 30,096 | | 31,680 | 6,469 | |
| | | | | 31,680 | | |
| | 4,594 | 35,771 | 1,874 | 84,480 | | |

**Example: No Deductible, 33% Co-Insurance**

### 2012

Copaxone Cost 3,785
Coverage Limit 2930
Gap Ends 4700

| | Patient | HP | Pharma | Total | Patient/Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 967 | 1,963 | | 2,930 | | |
| Donut Hole | 428 | | 428 | 855 | | |
| | | | | | 1,822 | 2,878 |
| | | | | 3,785 | | |
| FEB | | | | | | - |
| Donut Hole | 1,439 | | 1,439 | 2,878 | | |
| Catastrophic | 45 | 862 | | 907 | 4,745 | |
| | | | | 3,785 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 189 | 3,596 | | 3,785 | 4,935 | |
| | | | | 3,785 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 1,703 | 32,363 | | 34,066 | 6,638 | |
| | 4,771 | 38,783 | 1,867 | 45,421 | | |
| | 5,201 | | | | | |

**Example: No Deductible, 33% Co-Insurance**

### 2013

Copaxone 4,389
Coverage Limit 2970 (ICL) initial coverage limit
Gap Ends 4750

| | Patient | HP | Pharma | Total | Patient/Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 980 | 1,990 | | 2,970 | | |
| Donut Hole | 674 | 35 | 710 | 1,419 | | |
| | | | | | 2,364 | 2,386 |
| | | | | 4,389 | | |
| FEB | | | | | | - |
| Donut Hole | 1,133 | 60 | 1,193 | 2,386 | | |
| Catastrophic | 100 | 1,903 | | 2,003 | 4,791 | |
| | | | | 4,389 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 219 | 4,170 | | 4,389 | 5,010 | |
| | | | | 4,389 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 1,975 | 37,529 | | 39,505 | 6,985 | |
| | 5,083 | 45,688 | 1,903 | 52,673 | | |
| Admin Fee | 5,540 | | | | | |

**Example: No Deductible, 33% Co-Insurance**

### 2014

Copaxone 5,060
Coverage Limit 2850 (ICL) initial coverage limit
Gap Ends 4550

| | Patient | HP | Pharma | Total | Patient/Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 941 | 1,910 | | 2,850 | | |
| Donut Hole | 1,050 | 55 | 1,105 | 2,210 | | |
| | | | | | 3,096 | 1,454 |
| | | | | 5,060 | | |
| FEB | | | | | | - |
| Donut Hole | 691 | 36 | 727 | 1,454 | | |
| Catastrophic | 180 | 3,426 | | 3,606 | 4,694 | |
| | | | | 5,060 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 253 | 4,807 | | 5,060 | 4,947 | |
| | | | | 5,060 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | | - | - | - | |
| Catastrophic | 2,277 | 43,266 | | 45,543 | 7,224 | |
| | 5,392 | 53,500 | 1,832 | 60,724 | | |
| Admin Fee | 5,877 | | | | | |

Medicare 2014

|  | 2013 | 2014 |
|---|---|---|
| 501c Funding per pt | 5083 | 5392 |
| Katie's portion | 1903 | 1832 |
| **Govt Portion** | | |
| Medicare Funding per pt. | $ 6,985 | $ 7,224 |
| Qual-new Medicare pt. | $ 150 | $ 150 |
| Requal-Medicare pt. | $ 125 | $ 125 |
| Adherence rate | 88% | 88% |
| Admin fee | 9% | 9% |
| Additional factor for qualification | 120% | 120% |
| Estimated Fund Carryover | | |
| Shipping & Handling - Med D Free - per month ($70) | $ 70 | $ 70 |
| Average # of Med D Free dispenses per pt | 3 | 3 |
| | | |
| Beginning of Year (2013 as of 5/15) | 10443 | 8429 |
| Additional new pts - assistance donated | 276 | 516 |
| Med Free Roll-over | 368 | 516 |
| Retention - Patients at year-end (full funding & partial LIS) | 9433 | 7871 |
| Full LIS | 3640 | 3500 |
| Total Patient Count | 13441 | 11887 |
| | | |
| Qualification-new pts. | $ 115,920.00 | $ 185,760.00 |
| Qualification-existing pts. | $ 1,663,050.00 | $ 1,419,092.88 |
| TN 50% portion on assisted pts | | |
| Donut Hole Funding | $ 54,479,663.60 | $ 48,226,909.16 |
| **Total Donation** | $ 59,867,762.20 | $ 52,996,603.47 |
| Admin fee | $ 5,388,098.60 | $ 4,769,694.31 |
| Estimated Fund Carryover | $ - | |
| **TOTAL Medicare - excl free** | $ 61,646,732.20 | $ 54,601,456.35 |
| Medicare Project | 61,724,012.20 | 54,709,816.35 |
| Total Med D Free (COGS & S&H) | 77,280.00 | 108,360.00 |
| **Total Medicare - incl free** | $ 61,724,012.20 | $ 54,709,816.35 |
| S&H only | 77,280 | 108,360 |
| COGS | - | - |

*2013 is first year where govt subsidy kicks in & patient's responsibility drops to 47.5%

*patient picks up more than pharma company as price increases.

Assumes funding through June.

$ 1,604,852.88  Qualification

$ 52,996,603.47  Donation

Included in Medicare project - admin.

**...tential Additional Expense - due to legistative changes related to health car...**

| Total Med-D pts - 50% donut hole | 17,000 |
|---|---|
| # of donut hole assisted pts | 11,087 |
| Remainder of med d pts w/out dh assist | 2761.031018 |
| Incremental presumed TN portion of donut hole - per patient - above those otherwise assisted | $ 1,885 $ 1,885 |
| **Total presumed TN portion of paying 50% on unassisted pts** | **11,146,005** |

TN portion of 50% dh on assisted pts already inc in row 27

DH amount for 2012 and 2013 50% pharma responsibility - where to capture that?

Case 2:20-cv-04660-KSM   Document 64-2   Filed 08/18/21   Page 431 of 684
Case 1.20-cv-11548   Document 647   Filed 08/18/20   Page 4 of 11
Private 2012-14

| | | | | | | |
|---|---|---|---|---|---|---|
| Average monthly award per pt | $ 380.00 | $ 400.00 | | 20 mg | 847,000 | 661,704 |
| # pts referred monthly | 100 | 82 | *decrease in units due to competi | 40 mg | 0 | 31,450 |
| # months | 12 | 12 | | | 847,000 | 693,154 |
| % pts referred that are approved/funded | 82% | 82% | | | (153,846) | -18% |
| Prorated Annual fill factor for new referrals | 6.5 | 6.5 | | | | |
| Compliance rate | 88% | 88% | | | | |
| Adherence rate | 82% | 82% | | | | |
| Admin fee | | | | | | |
| Deductible $ Planned | | | | | | |
| % New Pts - new referrals | 50% | 50% | | | | |
| % Existing Pts - new referrals | 50% | 50% | | | | |
| | | | | | | |
| Reapps sent | 4,534 | 4,600 | | | | |
| | | | | | | |
| Approved Reapps for 2013 | 3,854 | 3,910 | | | | |
| New Referrals: | 1,200 | 982 | | | | |
| New Pts - new referrals - funded | 492 | 403 | | | | |
| Existing Pts - new referrals - funded | 492 | 403 | | | | |
| Patients Retained at Year End | 3,967 | 3,867 | | | | |
| Patients Receiving Funding during year | 4,838 | 4,715 | | | | |
| "Full-year weighting" Patients Receiving Funding | 4,387 | 4,346 | | | | |
| | | | | | | |
| | | | | | | |
| Deductible $ Planned | | | | | | |
| Funding-Rollover pts | $ 12,680,884 | $ 13,542,989 | | | | |
| Funding-New Pts-new referrals | $ 876,917 | $ 755,408 | | | | |
| Funding-Existing Pts-new referrals | $ 876,917 | $ 755,408 | | | | |
| Total Donation - excluding admin fee | $ 14,434,718 | $ 15,053,804 | | | | |
| Admin fee | | | | | | |
| In-house expense for Private Pgm | $ 396,000 | $ 406,000 | | | | |
| TOTAL Private Assistance | $ 14,830,718 | $ 15,459,804 | | | | |

Expenses
DiseaseTrak license fees
Team members

From Ranbir's file dated 5/17/10

| Referred to | Jun-10 | Jun-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | AVG | Total |
|---|---|---|---|---|---|---|---|---|
| New CoPay | 147 | 147 | 147 | 147 | 147 | 147 | | 1902 |
| Existing CoPay | 154 | 154 | 154 | 154 | 154 | 154 | | 2190 |
| Total | 301 | 301 | 301 | 301 | 301 | 301 | 341 | 4092 |
| | | | | | | | | 0.75 |
| | | | | | | | | 3069 |

**CCS Admin Fees**

| | | | 2013 | 2014 | |
|---|---|---|---|---|---|
| Monthly Rate | 3,000 | Est. Pts @ YE | 22,000 | 18,040 | includes SCP |
| Transaction Processing Fee | 1.15 | Compliance Rate | 88% | 88% | |
| Misc - Postage, etc. | | # of fills | 12 | 12 | |
| | | Pro-rated Annual Fill factor | 82% | 82% | |
| | | Est. Transactions | 190,502 | 156,212 | |
| | | Annual Transaction Costs | 219,078 | 179,644 | |
| | | Annual Mgmt Fees | 36,000 | 36,000 | |
| | | Misc. Admin Fees | 2,500 | 2,500 | |
| | | CCS Admin | 257,578 | 218,144 | |
| | | 40 mg Modifications | | 5000 | |
| | | | | 223,144 | |

---

**E-Prescribing**

| | | | 2013 | 2014 | |
|---|---|---|---|---|---|
| Monthly Maintenance Fee | 17,000 | # of Transactions/Month | 75 | 86.66 | |
| Transactional Fee | 100 | Annual Transactions | 900 | 1,040 | |
| w/ PA | 15 | Avg. Cost Per Transaction | 108 | 108 | |
| new feature (Lexus Nexus DI | 5 | Annual Transaction Costs | 96,750 | 111,791 | |
| | | Annual Maint. | 204,000 | 204,000 | |
| | | Opportunity Costs-Projects | 150,000 | 100,000 | 40 mg readiness |
| | | E-check Run on All Patients | | 375,000 | Batch Run - Cut Costs in Half.  Volume Discount.  Assume run in Jan & Dec. |
| | | | 450,750 | 790,791 | |

Decrease in Unit Volume in 2014          -18%

| Program | Free | |
|---|---|---|
| | **2013** | **2014** |
| **Year** | **Planned** | **Planned** |
| **Pts budgeted (year-end)** | 4,250 | 3,478 |
| **COGS Units** | 43,350 | 35,476 |
| **COGS $** | $ 3,251,250 | $ 2,660,705 |
| **Shipping & Handling** | $ 939,250 | $ 768,648 |
| **Admin Fee** | $ 725,000 | $ 619,920 |
| | $ 1,664,250 | $ 1,388,568 |

*assumes 85% compliance
-> Moved to COGS

188 Avg monthly approvals
564 3 mo lag
4124 avg # of free prod patients          As of 7/22

eCheck Addition ($5 ea.)                    17,390
Cap/Replacement Shipping          $      25,500
                                   $ 1,431,458

| For Lynn COGS: | 30 Day Suppli | Shipping Costs | |
|---|---|---|---|
| Free | 35,476 | included above | |
| Medicare | 400 | included in Medicare line | |
| Cap | 100 | 55 | 5,500 |
| Replacement | 500 | 40 | 20,000 |
| | 36,476 | Provided to Ly | 25,500 |

| | | | | | |
|---|---|---|---|---|---|
| Units Sold | $ 179,344.25 | $ 173,806.44 | $ 169,848.52 | $ 167,009.80 | $ 690,009.00 |
| Price per Unit | $ 5,060.33 | $ 8,217.64 | $ 9,796.29 | $ 9,796.29 | $ 8,217.64 |
| Coupons/Vouchers/PAP | $ 6,131,595.25 | $ 6,717,181.45 | $ 6,717,181.45 | $ 6,717,181.45 | $ 26,283,139.60 |

| COPAXONE - BASE | | | Total Customers LRP Input Input_Version FY14 | Neuroscience | | Total Cost Centers |
|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | YearTotal |
| 68546-0317-30 - COPAXONE LIQ PREFILLED SYRINGE 30 | Units Sold | 179,344.25 | 171,269.27 | 160,447.82 | 150,642.75 | 661,704.08 |
| 68546-0317-30 - COPAXONE LIQ PREFILLED SYRINGE 30 | Price per Unit | $ 5,060.33 | $ 5,060.33 | $ 5,060.33 | $ 5,060.33 | $ 5,060.33 |
| 68546-0317-30 - COPAXONE LIQ PREFILLED SYRINGE 30 | Coupons/Vouchers/PAP | $ 6,131,595.25 | $ 6,131,595.25 | $ 6,131,595.25 | $ 6,131,595.25 | $ 24,526,381.01 |
| COPAXONE 40mg | Units Sold | $ - | $ 2,819.08 | $ 10,445.21 | $ 18,185.62 | $ 31,449.91 |
| COPAXONE 40mg | Price per Unit | 0 | $ 3,157.30 | $ 4,735.95 | $ 4,735.95 | $ 3,157.30 |
| COPAXONE 40mg | Coupons/Vouchers/PAP | $ - | $ 650,651.33 | $ 650,651.33 | $ 650,651.33 | $ 1,951,953.98 |
| | Units Sold | $ 179,344.25 | $ 174,088.35 | $ 170,893.04 | $ 168,828.36 | $ 693,154.00 |
| | Price per Unit | $ 5,060.33 | $ 8,217.64 | $ 9,796.29 | $ 9,796.29 | $ 8,217.64 |
| | Coupons/Vouchers/PAP | $ 6,131,595.25 | $ 6,782,246.58 | $ 6,782,246.58 | $ 6,782,246.58 | $ 26,478,334.99 |

100% 20 Mg
90% 40 Mg

**2013-2015 Coupon Program Plan**

*Assumes same benefit design of $2,500 for 30 day max with $12,000 annual cap.*
Assumes same specialty pharmacy strategy as current and slight uptake with retail expansion.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Patient Carried Over from PY | - | 4,965 | 8,517 | 12,314 | 12,557 | 12,104 | 10,545 | 8,605 | 6,783 | 5,359 |
| Patients New to Program | 4,965 | 9,400 | 6,500 | 3,000 | 2,572 | 1,415 | 778 | 320 | 268 | 266 |
| Patients Retained at YE | 4,965 | 11,779 | 12,314 | 12,557 | 12,104 | 10,545 | 8,605 | 6,783 | 5,359 | 4,275 |
| | | | | | | | | | | |
| Avg. # Pts Enrolled Monthly | | 460 | 490 | 250 | 214 | 118 | 65 | 27 | 22 | 22 |
| Compliance Rate | | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% |
| Adherence Rate | | 82% | 82% | 82% | 80% | 78% | 76% | 76% | 76% | 76% |
| Avg. Monthly Coupon Costs | | 170 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 |
| Discount Rate for adding patients monthly v | | 90% | 90% | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| | | | | | | | | | | |
| Estimated GTN Costs | | 19,031,579 | 26,332,129 | 26,852,810 | 25,882,935 | 22,548,848 | 18,401,769 | 14,505,414 | 11,460,460 | 9,142,367 |
| Admin Fees | | | | | | | | | | |
| Analysis & Reporting Costs | | | | | | | | | | |
| If Modify 40mg Program to $10 | | | $ 786,248 | *not risk adjusted | | | | | | |
| | Q2V2 | | 28,382,553 | 27,639,058 | | | | | | |

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| SCP Patients @ YE | 12,000 | 9,000 | 6,300 | 4,410 | 3,087 | 2,161 | 1,513 | 1,000 | 900 |
| | 7,683,149 | 2,509,056 | 1,712,431 | 1,167,966 | 817,576 | 572,303 | 400,612 | 264,845 | 238,360 |
| | | *this is higher than booked. | | | | | | | |

| | | | Q1 | Q2 | Q3 | Q4 | | After | Before | Variance |
|---|---|---|---|---|---|---|---|---|---|---|
| | Quarterly Allocations | | 30% | 27% | 25% | 18% | | | | |
| CoPay | | 2013 | 7,899,638.79 | 7,109,674.91 | 6,583,032.32 | 4,739,783.27 | - | 26,332,129.30 | 24,298,762.75 | (2,033,366.54) |
| CoPay | | 2014 | 8,055,843.01 | 7,250,258.71 | 6,713,202.51 | 4,833,505.80 | - | 26,852,810.02 | 24,291,405.26 | (2,561,404.76) |
| CoPay | | 2015 | 7,764,880.37 | 6,988,392.33 | 6,470,733.64 | 4,658,928.22 | - | 25,882,934.57 | 22,973,165.37 | (2,909,769.20) |
| CoPay | | 2016 | 6,764,654.52 | 6,088,189.07 | 5,637,212.10 | 4,058,792.71 | - | 22,548,848.41 | 19,942,409.27 | (2,606,439.14) |
| CoPay | | 2017 | 5,520,530.69 | 4,968,477.62 | 4,600,442.24 | 3,312,318.41 | - | 18,401,768.96 | 16,526,192.72 | (1,875,576.24) |
| CoPay | | 2018 | 4,351,624.16 | 3,916,461.75 | 3,626,353.47 | 2,610,974.50 | - | 14,505,413.88 | 13,124,809.60 | (1,380,604.28) |
| CoPay | | 2019 | 3,438,138.05 | 3,094,324.24 | 2,865,115.04 | 2,062,882.83 | - | 11,460,460.16 | 10,449,711.19 | (1,010,748.96) |
| CoPay | | 2020 | 2,742,709.99 | 2,468,438.99 | 2,285,591.66 | 1,645,625.99 | - | 9,142,366.63 | 8,412,874.31 | (729,492.32) |
| | | | | | | | | | | |
| SCP | | 2013 | 752,716.80 | 677,445.12 | 627,264.00 | 451,630.08 | - | 2,509,056.00 | 831,600.00 | (1,677,456.00) |
| SCP | | 2014 | 513,729.22 | 462,356.29 | 428,107.68 | 308,237.53 | - | 1,712,430.72 | 582,120.00 | (1,130,310.72) |
| SCP | | 2015 | 350,389.67 | 315,350.70 | 291,991.39 | 210,233.80 | - | 1,167,965.57 | 407,484.00 | (760,481.57) |
| SCP | | 2016 | 245,272.77 | 220,745.49 | 204,393.97 | 147,163.66 | - | 817,575.90 | 285,238.80 | (532,337.10) |
| SCP | | 2017 | 171,690.94 | 154,521.84 | 143,075.78 | 103,014.56 | - | 572,303.13 | 199,667.16 | (372,635.97) |
| SCP | | 2018 | 120,183.66 | 108,165.29 | 100,153.05 | 72,110.19 | - | 400,612.19 | 139,767.01 | (260,845.18) |
| SCP | | 2019 | 79,453.44 | 71,508.10 | 66,211.20 | 47,672.06 | - | 264,844.80 | 99,000.00 | (165,844.80) |
| SCP | | 2020 | 71,508.10 | 64,357.29 | 59,590.08 | 42,904.86 | - | 238,360.32 | 89,100.00 | (149,260.32) |

Need to make sure next round this is updated.

**Shared Commitment Program**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| SCP Patients @ YE | 12,000 | 8,400 | 5,880 | 4,116 | 2,881 | 2,017 | 1,412 | 1,000 | 900 |
| Compliance Rate | | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% |
| Adherence Rate | | 80% | 78% | 76% | 76% | 76% | 76% | 76% | 76% |
| Avg. Monthly Coupon Costs | | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Months to Accrue | | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | | | | | | | | | |
| Estimated GTN Costs | | 2,341,786 | 1,598,269 | 1,090,101 | 763,071 | 534,150 | 373,905 | 264,845 | 238,360 |

**Base**　　MS Therapeutic Area　　　　　Tasks　　TN Business Units

|  | Final WP 2013 to 2015 FY14 YearTotal | Final WP 2013 to 2015 FY15 YearTotal | Final WP 2013 to 2015 FY16 YearTotal | Final WP 2013 to 2015 FY17 YearTotal | Final WP 2013 to 2015 FY18 YearTotal | Final WP 2013 to 2015 FY19 YearTotal | Final WP 2013 to 2015 FY20 YearTotal | ESTIMATE | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  | FY21 YearTotal | FY22 YearTotal | FY23 YearTotal |
| Shared Commitment | 1,598,269 | 1,090,101 | 285,239 | 199,667 | 139,767 | 99,000 | 89,100 | 89,100 | 89,100 | 89,100 |
| CoPay Solutions | 24,093,819 | 22,606,355 | 19,543,401 | 16,152,235 | 9,310,000 | 7,883,886 | 7,884,003 | 7,884,003 | 7,884,003 | 7,884,003 |

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | FY14 | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
| product - COPAXONE 20mg 30ct | 661,704 | 421,897 | 87,045 | 42,211 | 40,991 | 40,107 | 36,965 | 33,963 | 31,158 | 28,567 |
| product - COPAXONE 40mg | 31,450 | 170,526 | 238,571 | 138,290 | 33,140 | 21,973 | 21,007 | 20,223 | 19,531 | 18,898 |
|  | 693,154 | 592,422 | 325,616 | 180,500 | 74,131 | 62,080 | 57,972 | 54,186 | 50,690 | 47,465 |
|  | 95% | 71% | 27% | 23% | 55% | 65% | 64% | 63% | 61% | 60% |
|  | 5% | 29% | 73% | 77% | 45% | 35% | 36% | 37% | 39% | 40% |
| Buy down to $10 from $35 | 786,248 | 4,263,143 | 5,964,283 | 3,457,238 | 828,500 | 549,314 | 525,178 | 505,576 | 488,283 | 472,446 |
| Adjusted CoPay total | 24,880,066 | 26,869,498 | 25,507,684 | 19,609,473 | 10,138,499 | 8,433,200 | 8,409,181 | 8,389,578 | 8,372,286 | 8,356,449 |
| 20mg - CoPay | 23,000,629 | 16,099,232 | 5,224,407 | 3,777,259 | 5,147,978 | 5,093,458 | 5,027,101 | 4,941,558 | 4,846,201 | 4,745,016 |
| 3TW - CoPay | 1,879,437 | 10,770,266 | 20,283,277 | 15,832,214 | 4,990,521 | 3,339,741 | 3,382,080 | 3,448,020 | 3,526,085 | 3,611,434 |
| 20mg SCP | 1,525,752 | 776,321 | 76,251 | 46,693 | 77,284 | 63,960 | 56,813 | 55,846 | 54,769 | 53,625 |
| 3TW - SCP | 72,517 | 313,780 | 208,988 | 152,974 | 62,483 | 35,040 | 32,287 | 33,254 | 34,331 | 35,475 |
| Total | 26,478,335 | 27,959,600 | 25,792,923 | 19,809,140 | 10,278,266 | 8,532,200 | 8,498,281 | 8,478,678 | 8,461,386 | 8,445,549 |
| Mike's Estimate | 27,000,000 | 28,000,000 | 26,000,000 | 20,000,000 | 10,000,000 | 8,500,000 | 8,500,000 | 8,500,000 | 8,500,000 | 8,500,000 |

Note: This is conservative, assumes that all 40mg patients are Commercial patients on CCS.
Guidance is to assume 40% conversion instead of 20%, which would equate to $400k. ($786k * 25% of patients participate in CCS * 2 for double conversion)

| | | 2013 WP | 2013 FC | 2014 | |
|---|---|---|---|---|---|
| TNS3352020900-1581000 PATIENT ACCESS PROGRAM-COP MEDICARE | 280 - Charitable Donations | $ 32,000,000 | 34,625,000 | 53,000,000 | |
| TNS3352020900-1581000 PATIENT ACCESS PROGRAM-COP MEDICARE | 540 - Patient Support Programs | 1,390,488 | 1,085,000 | 1,713,000 | |
| TNS3352020900-1581001 PATIENT ACCESS PROGRAM-COP CO-PAY SOLUTIONS | 540 - Patient Support Programs | $ 24,300,000 | 28,382,553 | 27,639,058 | *assumes $10 program for 40mg.  (Removed $785k if no change in design.) |
| TNS3352020900-1581002 PATIENT ACCESS PROGRAM-COP PRIVATE COPAY | 540 - Patient Support Programs | 15,643,135 | 15,941,272 | 15,460,000 | |
| TNS3352020900-1581003 PATIENT ACCESS PROGRAM-COP FREE GOODS | 540 - Patient Support Programs | $ 1,796,000 | 1,790,000 | 1,430,000 | *includes eCheck on all free prod pts |
| TNS3352020900-1581004 PATIENT ACCESS PROGRAM-COP COPAY SOL OFFGTN | 540 - Patient Support Programs | (24,300,000) | (28,382,553) | (27,639,058) | |
| TNS3352020900-1581005 PATIENT ACCESS PROGRAM-COP COPAY SOL ADMIN | 320 - Consultants | 175,000 | 175,000 | 150,000 | |
| TNS3352020900-1581005 PATIENT ACCESS PROGRAM-COP COPAY SOL ADMIN | 540 - Patient Support Programs | 200,000 | 220,000 | 225,000 | |
| TNS3352094301-1581001 COP COPAY PASSTHRU TO TUSA-COP DISC P/T TO TUSA | 540 - Patient Support Programs | - | 0 | | *need task for TUSA pass thru |
| TNS3352021009-1681000 BSL-CASE MGMT-COP BENEFITS INVEST | 540 - Patient Support Programs | $ 700,000 | 606,000 | 875,000 | *assumes test claims remain at Assurance & 20% of eEligibility checks will need test claims |
| TNS3352021009-1681001 BSL-CASE MGMT-COP E-PRESCRIBING | 540 - Patient Support Programs | $ 740,000 | 465,000 | 790,000 | |
| TNS3352020900-1581009 PATIENT ACCESS PROGRAM-COP PREMIUM ASSISTAN | 280 - Charitable Donations | $ 1,500,000 | | 1,500,000 | *exchange plans |

**Funtional Area: Patient Services**

| Project Name | Brief Description | 2014 Timing | Proposed $'s 2014 | Priority Critical | Need | Nice |
|---|---|---|---|---|---|---|
| **Patient Assistance** | | | | | | |
| COPAXONE Copay Solutions (GTN & Expense) | $35 pgm for 20mg, $10 pgm for 40mg | Q1-Q4 | $ 28,014,058 | X | | |
| Shared Commitment Program (GTN) | Pay 1st $50 | Q1-Q4 | $ 1,500,000 | X | | |
| Private Copay Program | Financial qualification program for $0 OOP | Q1-Q4 | $ 15,460,000 | X | | |
| Free Product | Includes free prod, CAP, & Replacements | Q1-Q4 | $ 1,430,000 | X | | |
| Medicare Patient Assistance | Donations, free prod shipping, & Qualification Fees | Q1-Q4 | $ 54,713,000 | X | | |
| Premium Assistance | | Q1-Q4 | $ 1,500,000 | | X | |
| | | | | | | |
| | | | | | | |
| **Patient Services** | | | | | | |
| BI Test Claims | | Q1-Q4 | $ 875,000 | X | | |
| Online Enrollment | | Q1-Q4 | $ 605,000 | | X | |
| eCheck | | Q1 | $ 185,000 | | | X |
| Call Center Nurse Support | | | | | | |
| Patient Database Development (incl. in new depr) | | | | | | |
| ShSol Pharmacy--Autoject Distribution | | | | | | |
| ShSol Pharmacy--Free/Replacement Product | | | | | | |
| Injection Training | | | | | | |
| Patient Sensitivity to Co-Pay for GA | | | | | | |
| Asset Write-off | | | | | | |
| New Depr | | | | | | |
| | | | | | | |

**Total Budget:** $ 104,282,058

Critical = Critical to the Brand success
Need = Really need to do but not critical
Nice = Nice to do

# EXHIBIT A-48

**From:**         Jennifer Clark
**To:**           Laurence Fowler
**Sent:**         1/14/2015 3:38:10 PM
**Subject:**      2015 AOP_Patient Access_072414.xlsx
**Attachments:**  2015 AOP_Patient Access_072414.xlsx

CONFIDENTIAL – FOIA Exempt                                                          Tev_049217

| Donut Hole Payers | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Mfr | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Patient | | 50% | 47.50% | 47.50% | 45% | 45% | 40% | 35% | 30% | 25% |
| Plan | | | 2.50% | 2.50% | 5% | 5% | 10% | 15% | 20% | 25% |

| Donut Hole Payers | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Mfr | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| Patient | | 50% | 47.50% | 47.50% | 45% | 45% | 40% | 35% | 30% | 25% |
| Plan | | | 2.50% | 2.50% | 5% | 5% | 10% | 15% | 20% | 25% |

**Example: No Deductible, 33% Co-Insurance**

### 2011

Copaxone Cost 3520 *Actual: 3,475.77
Coverage Limit 2840
Gap Ends 4686 *Actual: 4,550

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 937 | 1,903 | | 2,840 | | |
| Donut Hole | 340 | | 340 | 680 | 1,617 | 3,069 |
| FEB | 1,534 | | 1,534 | 3,069 | | |
| Donut Hole | | | | | | |
| Catastrophic | 23 | 429 | 451 | | 4,709 | - |
| | | | | 3,520 | | |
| MAR | | | | - | | |
| Donut Hole | | | | - | | |
| Catastrophic | 176 | 3,344 | - | 3,520 | 4,885 | |
| | | | | 3,520 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | - | - | - | | |
| Catastrophic | 1,584 | 30,096 | | 31,680 | 6,469 | |
| | | | | 31,680 | | |
| | 4,594 | 35,771 | 1,874 | 84,480 | | |

### 2012

Copaxone Cost 3,785
Coverage Limit 2930
Gap Ends 4700

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 967 | 1,963 | | 2,930 | | |
| Donut Hole | 428 | | 428 | 855 | 1,822 | 2,878 |
| FEB | 1,439 | | 1,439 | 2,878 | | |
| Catastrophic | 45 | 862 | | 907 | 4,745 | - |
| | | | | 3,785 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | | |
| Catastrophic | 189 | 3,596 | - | 3,785 | 4,935 | |
| | | | | 3,785 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | - | - | - | | |
| Catastrophic | 1,703 | 32,363 | - | 34,066 | 6,638 | |
| | 4,771 | 38,783 | 1,867 | 45,421 | | |
| | 5,201 | | | | | |

### 2013

Copaxone Cost 4,389
Coverage Limit 2970 (ICL) initial coverage limit
Gap Ends 4750

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 980 | 1,990 | | 2,970 | | |
| Donut Hole | 674 | 35 | 710 | 1,419 | 2,364 | 2,386 |
| FEB | 1,133 | 60 | 1,193 | 2,386 | | |
| Catastrophic | 100 | 1,903 | | 2,003 | 4,791 | - |
| | | | | 4,389 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | | |
| Catastrophic | 219 | 4,170 | | 4,389 | 5,010 | |
| | | | | 4,389 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | - | - | - | | |
| Catastrophic | 1,975 | 37,529 | | 39,505 | 6,985 | |
| | 5,083 | 45,688 | 1,903 | 52,673 | | |
| Admin Fee | 5,540 | | | | | |

### 2014

Copaxone Cost 5,060
Coverage Limit 2850 (ICL) initial coverage limit
Gap Ends 4550

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 941 | 1,910 | | 2,850 | | |
| Donut Hole | 1,050 | 55 | 1,105 | 2,210 | 3,096 | 1,454 |
| FEB | 691 | 36 | 727 | 1,454 | | |
| Catastrophic | 180 | 3,426 | | 3,606 | 4,694 | - |
| | | | | 5,060 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | | |
| Catastrophic | 253 | 4,807 | | 5,060 | 4,947 | |
| | | | | 5,060 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | - | - | - | | |
| Catastrophic | 2,277 | 43,266 | | 45,543 | 7,224 | |
| | 5,392 | 53,500 | 1,832 | 60,724 | | |
| Admin Fees | 5,877 | | | | | |

### 2015

Copaxone 5,215   *using 40mg pricing only.
Coverage Limit 2960 (ICL) initial coverage limit
Gap Ends 4700

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 977 | 1,983 | | 2,960 | | |
| Donut Hole | 1,015 | 113 | 1,127 | 2,255 | 3,119 | 1,581 |
| FEB | 711 | 79 | 791 | 1,581 | | |
| Catastrophic | 182 | 3,452 | | 3,634 | 4,803 | - |
| | | | | 5,215 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | | |
| Catastrophic | 261 | 4,954 | | 5,215 | 5,063 | |
| | | | | 5,215 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | - | - | - | | |
| Catastrophic | 2,347 | 44,587 | | 46,934 | 7,410 | |
| | 5,492 | 55,169 | 1,918 | 62,579 | | |
| Admin Fee | 5,986 | | | | | |

### 2015 - Generic

Copaxone 4,172
Coverage Limit 2960 (ICL) initial coverage limit
Gap Ends 4700
*Generic example: pt pays 65% through donut hole

| | Patient | HP | Pharma | Total | Patient/ Pharma OOP | Gap Remaining |
|---|---|---|---|---|---|---|
| JAN | 977 | 1,983 | | 2,960 | | |
| Donut Hole | 788 | 424 | - | 1,212 | 1,765 | 2,935 |
| FEB | 1,908 | 1,027 | - | 2,935 | | |
| Catastrophic | 62 | 1,175 | 1,236 | 3,734 | - |
| | | | | 4,172 | | |
| MAR | | | | - | | |
| Donut Hole | - | | - | - | | |
| Catastrophic | 209 | 3,963 | - | 4,172 | 3,943 | |
| | | | | 4,172 | | |
| APR - DEC | | | | - | | |
| Donut Hole | - | - | - | - | | |
| Catastrophic | 1,877 | 35,670 | - | 37,547 | 5,820 | |
| | 5,820 | 44,243 | - | 50,063 | | |
| Admin Fee | 6,344 | | | | | |

| | 2013 |
|---|---|
| **501c Funding per pt** | **5083** |
| **Katie's portion** | **1903** |
| **Govt Portion** | |
| Medicare Funding per pt. | $ 6,985 |
| Qual-new Medicare pt. | $ 150 |
| Requal-Medicare pt. | $ 125 |
| Adherence rate | 88% |
| Admin fee | 9% |
| Additional factor for qualification | 120% |
| Estimated Fund Carryover | |
| Shipping & Handling - Med D Free - per month ($70) | $ 70 |
| Average # of Med D Free dispenses per pt | 3 |
| | |
| | |
| Beginning of Year (2013 as of 5/15) | 10443 |
| Additional new pts - assistance donated | 276 |
| Med Free Roll-over | 368 |
| Retention - Patients at year-end (full funding & partial LIS) | 9433 |
| Full LIS | 3640 |
| Total Patient Count | 13441 |
| | |
| | |
| Qualification-new pts. | $ 115,920.00 |
| Qualification-existing pts. | $ 1,663,050.00 |
| TN 50% portion on assisted pts | |
| Donut Hole Funding | $ 54,479,663.60 |
| Total Donation | **$ 59,867,762.20** |
| Admin fee | $ 5,388,098.60 |
| Estimated Fund Carryover | $ - |
| **TOTAL Medicare - excl free** | **$ 61,646,732.20** |
| Medicare Project | 61,724,012.20 |
| | |
| Total Med D Free (COGS & S&H) | 77,280.00 |
| **Total Medicare - incl free** | **$ 61,724,012.20** |
| S&H only | 77,280 |
| COGS | - |
| **Potential  Additional Expense - due to legistat** | |
| | |
| Total Med-D pts - 50% donut hole | 17,000 |
| # of donut hole assisted pts | 11,087 |
| Remainder of med d pts w/out dh assist | |
| | |
| Incremental presumed TN portion of donut hole - per patient - above those otherwise assisted | $ 1,885 |
| | |
| **Total presumed TN portion of paying 50% on unassisted pts** | **11,146,005** |

| |
|---|
| |
| Average monthly award per pt |
| # pts referred monthly |
| # months |
| % pts referred that are approved/funded |
| Prorated Annual fill factor for new referrals |
| Compliance rate |
| Adherence rate |
| Admin fee |
| Deductible $ Planned |
| % New Pts - new referrals |
| % Existing Pts - new referrals |
| |
| Reapps sent |
| |
| Approved Reapps for 2015 |
| New Referrals: |
|   New Pts - new referrals - funded |
|   Existing Pts - new referrals - funded |
| Patients Retained at Year End |
| Patients Receiving Funding during year |
| "Full-year weighting" Patients Receiving Funding |
| |
| |
| Deductible $ Planned |
| Funding-Rollover pts |
| Funding-New Pts-new referrals |
| Funding-Existing Pts-new referrals |
| Total Donation - excluding admin fee |
| Admin fee |
| DiseaseTrak |
|   TOTAL Private Assistance |

Expenses
DiseaseTrak license fees
Team members

|  | 2013 | 2014 | 2015 |  |
|---|---|---|---|---|
| Est. Pts @ YE | 22,000 | 18,040 | 15700 | includes SCP |
| Compliance Rate | 88% | 88% | 88% | |
| # of fills | 12 | 12 | 13 | |
| Pro-rated Annual Fill factor | 82% | 82% | 82% | |
| Est. Transactions | 190,502 | 156,212 | 147,279 | |
| Annual Transaction Costs | 219,078 | 179,644 | 169,370 | |
| Annual Mgmt Fees | 36,000 | 36,000 | 36,000 | |
| Misc. Admin Fees | 2,500 | 2,500 | 2,500 | |
| CCS Admin | 257,578 | 218,144 | 207,870 | |
| Modifications if coupon is blocked | | | 10000 | |
| | | 218,144 | 217,870 | |

(margin: 3,000 / 1.15)

|  | 2013 | 2014 | 2015 |  |
|---|---|---|---|---|
| # of Transactions | 92.42 | 166.67 | 125 | |
| Annual Transactions | 1,109 | 2,000 | 1500 | |
| # w/ PA | | | 390 | |
| Avg. Cost Per Transaction | 108 | 108 | - | |
| Annual Transaction Costs | 119,218 | 215,000 | 155,850 | |
| Annual Maint. | 204,000 | 204,000 | 204,000 | |
| Opportunity Costs-Projects | 150,000 | 100,000 | - | |
| E-check Run on All Patients | | 375,000 | 200,000 | Batch Run - Cut Costs in Half.  Volume Discount.  Assume run in Jan & Dec. |
| | 473,218 | 894,000 | 559,850 | |
| | | | 335,910 | w/ generic in Jan '15          *based on % drop in patients |
| | | | 503,865 | w/ generic in Sept. '15 |

(margin: 17,000 / 100 / 15 / 5)

*flat year for new pts

| | 2013 | 2014 | 2015 - no Generic | 2015 Sep Generic | 2015 Jan Generic |
|---|---|---|---|---|---|
| New Patients | 20,000 | | 18,000 | 18,000 | 13,500 |
| Addtl BIs | | | 7,000 | 7,000 | 5,400 |
| Transition Patients-post Generic | | | | 880 | 2,640 |
| Total BI's | | | | | |
| Cost | 25 | 25 | 25 | 25 | 25 |
| **Spending** | 500,000 | 1,050,000 | 625,000 | 647,000 | 538,500 |

| | | | | | |
|---|---|---|---|---|---|
| Avg Enrollments/day | 65 | | 68 | | 51 With reduced new pts |
| # of days/year | 264 | | 264 | | 264 |
| | 17,160 | | 17952 | | 13464 |
| Additional BI's Estimated | 2,840 | | 7,181 | | 5,386 |
| % above new patients | 17% | | 40% | | 40% |
| Total BI's | 20,000 | | 25,133 | | 18,850 |

| | | | | | |
|---|---|---|---|---|---|
| Transition patients post generic/day | | | | 10 | 10 *heavier earlier in the year than later |
| Transition patients post generic/month | | | | 220 | 220 |

**Assumptions:**
-After generic launches, BI's will be completed on new & transition patients.  Prior to generic, only new patients receive BI's.
-New patients are primarily 40mg
-Based on Kris's patient volume V1

Current state
250 Faxes/day
75 New/day
175

| | 2013 | 2014 | 2015 - no Generic | 2015 Sep Generic | 2015 Jan Generic |
|---|---|---|---|---|---|
| 40mg Patients | | 1,400 | 3,000 | 3,000 | 2,100 |
| 40mg Units | | 12,376 | 22,675 | 22,675 | 15,872 |
| COGS | 32.40 | 32.40 | 32.40 | 32.40 | 32.40 |
| COGS $'s | | 400,982 | 734,657 | 734,657 | 514,260 |
| Shipping & Handling-$65 | | 268,146.67 | 491,283.00 | 491,283.00 | 343,898.10 |
| | | | | | |
| 20mg Patients | 4,000 | 2,600 | - | - | 0 |
| 20mg Units | 37,602.00 | 21,216 | - | - | - |
| COGS | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 |
| COGS $'s | 2,859,750.00 | 1,591,200 | - | - | - |
| Shipping & Handling-$65 | 725,000.00 | 459,680.00 | - | - | - |
| | | | | | |
| Qualification Fees | 715,000.00 | 993,173.33 | 630,000.00 | 560,000.00 | 308,000.00 |
| Grand Total-MAP Pgm | 1,440,250.00 | 1,721,000.00 | 1,121,283.00 | 1,051,283.00 | 651,898.10 |
| **COGS** | **2,859,750.00** | **1,992,182.40** | **734,657.04** | **734,657.04** | **514,259.93** |
| **Total Free Product** | **4,300,000.00** | **727,826.67** | **491,283.00** | **491,283.00** | **343,898.10** |
| | | | | | |
| Cap/Replacement 20mg Units | | | 1,000 | 670 | - |
| Cap/Replacement 40mg Units | | | 3,500 | 3,500 | 3,500 |
| CAP/Replacement-20mg Shipping | | | 43,000.00 | 28,810.00 | - |
| CAP/Replacement-40mg Shipping | | | 150,500.00 | 150,500.00 | 150,500.00 |
| Total CAP/Replacement | | | 193,500.00 | 179,310.00 | 150,500.00 |
| | | | | | |
| **Grand Total - Project** | | | **1,314,783.00** | **1,230,593.00** | **802,398.10** |

Assumptions:
-No Generic; volume remains status quo compared to 2014.
-7/16/14 - Jeff Pribly confirmed COGS assumptions noted above for plan.
-Driven on Kris's patient model & Lynn's unit model provided week of July 7th.
-Upon generic launch, 20mg free product closes.
-CAP program costs $55/shipment, Replacement is $40/shipment.  Weighted avg. is about $43.

Questions:
Thoughts on moving these patients to exchange plans?  Not built in above.
Thoughts on 40mg Medicare free product?

| 2014 Planning Notes | | |
|---|---|---|
| 188 | Avg monthly approvals | |
| 564 | 3 mo lag | |
| 4124 | avg # of free prod patients | As of 7/22 |

| | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Patients | 9,447 | 8,884 | 11,090 | 12,494 | 13,358 | 14,115 | 15,500 | 16500 | 17500 | 18300 | 19000 | 19600 | 15500 | 16700 | 17700 | 18700 | 19700 | 20700 | 21700 | 22700 | 23500 | 24200 | 24800 | 25300 | | |
| Patients Not Using The Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | -500 | -1000 | -1000 | -1000 | -2000 | 0 | -1000 | -2000 | -3500 | -5000 | -6000 | -7500 | -8500 | -9500 | -9000 | -10500 | -11500 | | |
| Unique Patients (Used CCS During Month) | 9,447 | 8,884 | 11,090 | 12,494 | 13,358 | 14,115 | 15,074 | 16000 | 16500 | 17300 | 18000 | 17600 | 15500 | 15700 | 15700 | 15200 | 14700 | 14700 | 14200 | 14200 | 14000 | 15200 | 14300 | 13800 | | |
| 20mg | 9,447 | 8,023 | 6,883 | 5,775 | 4,929 | 4,498 | 4,804 | 4,672 | 4,221 | 3,867 | 3,498 | 3,338 | 3,410 | 3,454 | 3,454 | 3,344 | 3,234 | 3,234 | 3,124 | 3,124 | 3,080 | 3,344 | 3,146 | 3,036 | | |
| 40mg | 0 | 923 | 4318 | 6802 | 8491 | 9653 | 10309 | 10902 | 10853 | 11007 | 11076 | 11836 | 12090 | 12246 | 12246 | 11856 | 11466 | 11466 | 11076 | 11076 | 10920 | 11856 | 11154 | 10764 | | |
| % 20mg | 100% | 90% | 62% | 46% | 37% | 32% | 32% | 30% | 28% | 26% | 24% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | 22% | | |
| % 40mg | 0% | 10% | 39% | 54% | 64% | 68% | 68% | 70% | 72% | 74% | 76% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | 78% | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| New Patients Per Month | 1,408 | 1,106 | 1,742 | 1,924 | 1,754 | 1,460 | 1,200 | 1,000 | 1,000 | 800 | 700 | 600 | 1,500 | 1,200 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 800 | 700 | 600 | 500 | | |
| 20mg | 1,408 | 817 | 512 | 388 | 347 | 341 | 240 | 200 | 200 | 120 | 105 | 90 | 225 | 180 | 150 | 150 | 150 | 150 | 150 | 150 | 120 | 105 | 90 | 75 | | |
| 40mg | 0 | 289 | 1,230 | 1,536 | 1,407 | 1,119 | 960 | 800 | 800 | 680 | 595 | 510 | 1,275 | 1,020 | 850 | 850 | 850 | 850 | 850 | 850 | 680 | 595 | 510 | 425 | | |
| % 20mg | 100% | 74% | 29% | 20% | 20% | 23% | 20% | 20% | 20% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | | |
| % 40mg | 0% | 26% | 71% | 80% | 80% | 77% | 80% | 80% | 80% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Units | 11,947 | 10,863 | 14,763 | 16,497 | 17,570 | 18,793 | 19,596 | 20,000 | 20,625 | 21,625 | 22,500 | 22,000 | 20,150 | 20,410 | 20,410 | 19,760 | 19,110 | 19,110 | 18,460 | 17,750 | 17,500 | 19,000 | 17,875 | 17,250 | 216,779 | 226,785 |
| 20mg | 11,947 | 9,464 | 8,355 | 7,027 | 5,943 | 5,436 | 5,668 | 5,800 | 5,981 | 6,271 | 6,525 | 6,380 | 5,844 | 5,919 | 5,919 | 5,730 | 5,542 | 5,542 | 5,353 | 5,148 | 5,075 | 5,510 | 5,184 | 5,003 | 84,798 | 65,768 |
| 40mg | 0 | 1,399 | 6,408 | 9,470 | 11,627 | 13,357 | 13,928 | 14,200 | 14,644 | 15,354 | 15,975 | 15,620 | 14,307 | 14,491 | 14,491 | 14,030 | 13,568 | 13,568 | 13,107 | 12,603 | 12,425 | 13,490 | 12,691 | 12,248 | 131,981 | 161,017 |
| % 20mg | 100% | 87% | 57% | 43% | 34% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | 29% | | |
| % 40mg | 0% | 13% | 43% | 57% | 66% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | 71% | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Units Per Patient | 1.26 | 1.22 | 1.33 | 1.32 | 1.32 | 1.33 | 1.3 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Coupon Amount | $7,361,673 | $4,375,679 | $3,864,854 | $3,547,167 | $3,005,343 | $2,856,197 | $2,978,269 | $2,516,000 | $2,594,625 | $2,287,925 | $2,380,500 | $2,327,600 | 11,243,700 | 10,368,280 | 7,735,390 | 4,082,857 | 3,233,061 | 2,905,011 | 2,098,902 | 2,018,175 | 1,989,750 | 1,997,850 | 1,879,556 | 1,813,838 | $40,095,833 | $51,366,370 |
| 20mg | $7,361,673 | $3,920,648 | $2,455,274 | $1,760,064 | $1,168,823 | $999,022 | $1,041,719 | $812,000 | $837,375 | $752,550 | $783,000 | $765,600 | $4,090,450 | $3,847,285 | $2,663,505 | $1,435,302 | $1,089,938 | $1,018,484 | $722,709 | $694,913 | $685,125 | $716,300 | $673,888 | $650,325 | $22,657,747 | $18,288,223 |
| 40mg | $0 | $455,031 | $1,409,581 | $1,787,104 | $1,836,520 | $1,857,176 | $1,936,550 | $1,704,000 | $1,757,250 | $1,535,375 | $1,597,500 | $1,562,000 | $7,153,250 | $6,520,995 | $5,071,885 | $2,647,555 | $2,143,123 | $1,886,527 | $1,376,193 | $1,323,263 | $1,304,625 | $1,281,550 | $1,205,669 | $1,163,513 | $17,438,086 | $33,078,147 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Cost Per Unit | $616 | $403 | $262 | $215 | $171 | $152 | $152 | $126 | $126 | $106 | $106 | $106 | $558 | $508 | $379 | $207 | $169 | $152 | $114 | $114 | $114 | $105 | $105 | $105 | | |
| 20mg | $616 | $414 | $294 | $250 | $197 | $184 | $184 | $140 | $140 | $120 | $120 | $120 | $700 | $650 | $450 | $250 | $197 | $184 | $135 | $135 | $130 | $130 | $130 | | | |
| 40mg | $0 | $325 | $220 | $189 | $158 | $139 | $139 | $120 | $120 | $100 | $100 | $100 | $500 | $450 | $350 | $189 | $158 | $139 | $105 | $105 | $105 | $95 | $95 | $95 | | |

**Needs**

**% breakdown of 20 & 40 patients overall forecast**

| | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Existing 20mg We Won't Get | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| | -3410 | -3454 | -3454 | -3344 | -3234 | -3234 | -3124 | -3124 | -3080 | -3344 | -3146 | -3036 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| % New 20mg We Will Get | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

**Notes**
When you use both CCS and SCP to calculate CPU, the Jan-2014 number is $415
There will be more patients in the higher end buckets in 2015
The cost per unit is decreasing because there are more SCP type patients in the program
Assumes more patients will be in exchange plans or have higher out of pocket costs for prescription drugs
Although the jump from 2014 to 2015 looks big, consider dollars from both SCP and PAP will be flowing into this program.

**Generic Jan 2015 Assumptions**

| | | 2014 | 2015 | |
|---|---|---|---|---|
| Assuming Accredo utilizes "House Brand". They have 38% market share. | | $40,095,833 | $44,300,473 | |
| Not aware of any other house brand candidates at this point. | | 216,779 | 190,744 | $232.25 |

**Generic Sep 2015 Assumptions**

| | | | | |
|---|---|---|---|---|
| Assuming Accredo utilizes "House Brand". They have 38% market share. | | $40,095,833 | $50,425,976 | |
| Not aware of any other house brand candidates at this point. | | 216,779 | 217,938 | $231.38 |

**No Generic Assumptions**

| | | | | |
|---|---|---|---|---|
| | | $40,095,833 | $51,366,370 | |
| | | 216,779 | 226,785 | $226.50 |

**General Assumptions**

Market research to provide patient and unit projections. Not received as of 7/10/14. Could impact numbers.
40mg has 13 vs 12 fills for 20 in a calendar year. This drives the program cost up for copay patients.

**2013-2015 Coupon Program Plan**

*Assumes same benefit design of $2,500 for 30 day max with $12,000 annual cap.
Assumes same specialty pharmacy strategy as current and slight uptake with retail expansion.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Patient Carried Over from PY | - | 4,965 | 8,517 | 12,314 | 12,557 | 12,104 | 10,545 | 8,605 | 6,783 | 5,359 |
| Patients New to Program | 4,965 | 9,400 | 6,500 | 3,000 | 2,572 | 1,415 | 778 | 320 | 268 | 266 |
| Patients Retained at YE | 4,965 | 11,779 | 12,314 | 12,557 | 12,104 | 10,545 | 8,605 | 6,783 | 5,359 | 4,275 |
| | | | | | | | | | | |
| Avg. # Pts Enrolled Monthly | | 460 | 490 | 250 | 214 | 118 | 65 | 27 | 22 | 22 |
| Compliance Rate | | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% |
| Adherence Rate | | 82% | 82% | 82% | 80% | 78% | 76% | 76% | 76% | 76% |
| Avg. Monthly Coupon Costs | | 170 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 |
| Discount Rate for adding patients monthly vs | | 90% | 90% | 90% | 90% | 90% | 90% | 90% | 90% | 90% |
| | | | | | | | | | | |
| Estimated GTN Costs | | 19,031,579 | 26,332,129 | 26,852,810 | 25,882,935 | 22,548,848 | 18,401,769 | 14,505,414 | 11,460,460 | 9,142,367 |
| Admin Fees | | | | | | | | | | |
| Analysis & Reporting Costs | | | | | | | | | | |
| If Modify 40mg Program to $0 | | | #REF! | *not risk adjusted | | | | | | |
| | | Q2V2 | 28,382,553 | #REF! | | | | | | |

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| SCP Patients @ YE | 12,000 | 9,000 | 6,300 | 4,410 | 3,087 | 2,161 | 1,513 | 1,000 | 900 |
| | 7,683,149 | 2,509,056 | 1,712,431 | 1,167,966 | 817,576 | 572,303 | 400,612 | 264,845 | 238,360 |

*this is higher than booked.

| | | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|
| Quarterly Allocations | | 30% | 27% | 25% | 18% |

| | | Q1 | Q2 | Q3 | Q4 | | After | Before | Variance |
|---|---|---|---|---|---|---|---|---|---|
| CoPay | 2013 | 7,899,638.79 | 7,109,674.91 | 6,583,032.32 | 4,739,783.27 | - | 26,332,129.30 | 24,298,762.75 | (2,033,366.54) |
| CoPay | 2014 | 8,055,843.01 | 7,250,258.71 | 6,713,202.51 | 4,833,505.80 | - | 26,852,810.02 | 24,291,405.26 | (2,561,404.76) |
| CoPay | 2015 | 7,764,880.37 | 6,988,392.33 | 6,470,733.64 | 4,658,928.22 | - | 25,882,934.57 | 22,973,165.37 | (2,909,769.20) |
| CoPay | 2016 | 6,764,654.52 | 6,088,189.07 | 5,637,212.10 | 4,058,792.71 | - | 22,548,848.41 | 19,942,409.27 | (2,606,439.14) |
| CoPay | 2017 | 5,520,530.69 | 4,968,477.62 | 4,600,442.24 | 3,312,318.41 | - | 18,401,768.96 | 16,526,192.72 | (1,875,576.24) |
| CoPay | 2018 | 4,351,624.16 | 3,916,461.75 | 3,626,353.47 | 2,610,974.50 | - | 14,505,413.88 | 13,124,809.60 | (1,380,604.28) |
| CoPay | 2019 | 3,438,138.05 | 3,094,324.24 | 2,865,115.04 | 2,062,882.83 | - | 11,460,460.16 | 10,449,711.19 | (1,010,748.96) |
| CoPay | 2020 | 2,742,709.99 | 2,468,438.99 | 2,285,591.66 | 1,645,625.99 | - | 9,142,366.63 | 8,412,874.31 | (729,492.32) |
| | | | | | | | | | |
| SCP | 2013 | 752,716.80 | 677,445.12 | 627,264.00 | 451,630.08 | - | 2,509,056.00 | 831,600.00 | (1,677,456.00) |
| SCP | 2014 | 513,729.22 | 462,356.29 | 428,107.68 | 308,237.53 | - | 1,712,430.72 | 582,120.00 | (1,130,310.72) |
| SCP | 2015 | 350,389.67 | 315,350.70 | 291,991.39 | 210,233.80 | - | 1,167,965.57 | 407,484.00 | (760,481.57) |
| SCP | 2016 | 245,272.77 | 220,745.49 | 204,393.97 | 147,163.66 | - | 817,575.90 | 285,238.80 | (532,337.10) |
| SCP | 2017 | 171,690.94 | 154,521.84 | 143,075.78 | 103,014.56 | - | 572,303.13 | 199,667.16 | (372,635.97) |
| SCP | 2018 | 120,183.66 | 108,165.29 | 100,153.05 | 72,110.19 | - | 400,612.19 | 139,767.01 | (260,845.18) |
| SCP | 2019 | 79,453.44 | 71,508.10 | 66,211.20 | 47,672.06 | - | 264,844.80 | 99,000.00 | (165,844.80) |
| SCP | 2020 | 71,508.10 | 64,357.29 | 59,590.08 | 42,904.86 | - | 238,360.32 | 89,100.00 | (149,260.32) |

Need to make sure next round this

**Shared Commitment Program**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| SCP Patients @ YE | 12,000 | 8,400 | 5,880 | 4,116 | 2,881 | 2,017 | 1,412 | 1,000 | 900 |
| Compliance Rate | | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% |
| Adherence Rate | | 80% | 78% | 76% | 76% | 76% | 76% | 76% | 76% |
| Avg. Monthly Coupon Costs | | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| Months to Accrue | | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | | | | | | | | | |
| Estimated GTN Costs | | 2,341,786 | 1,598,269 | 1,090,101 | 763,071 | 534,150 | 373,905 | 264,845 | 238,360 |

| | | | 2013 WP | 2013 FC | 2014 |
|---|---|---|---|---|---|
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581000 PATIENT ACCESS PROGRAM-COP MEDICARE | 280 - Charitable Donations | $ 32,000,000 | 34,625,000 | 53,000,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581000 PATIENT ACCESS PROGRAM-COP MEDICARE | 540 - Patient Support Programs | 1,390,488 | 1,085,000 | 1,713,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581001 PATIENT ACCESS PROGRAM-COP CO-PAY SOLUTIONS | 540 - Patient Support Programs | $ 24,300,000 | 28,382,553 | #REF! |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581002 PATIENT ACCESS PROGRAM-COP PRIVATE COPAY | 540 - Patient Support Programs | 15,643,135 | 15,941,272 | 12,757,765 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581003 PATIENT ACCESS PROGRAM-COP FREE GOODS | 540 - Patient Support Programs | $ 1,796,000 | 1,790,000 | 1,430,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581004 PATIENT ACCESS PROGRAM-COP COPAY SOL OFFGTN | 540 - Patient Support Programs | (24,300,000) | (28,382,553) | #REF! |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581005 PATIENT ACCESS PROGRAM-COP COPAY SOL ADMIN | 320 - Consultants | 175,000 | 175,000 | 150,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352020900-1581005 PATIENT ACCESS PROGRAM-COP COPAY SOL ADMIN | 540 - Patient Support Programs | 200,000 | 220,000 | 225,000 |
| 7004 - PATIENT ASSISTANCE (L4) | TNS3352094301-1581001 COP COPAY PASSTHRU TO TUSA-COP DISC P/T TO TUSA | 540 - Patient Support Programs | - | 0 | |
| 7022 - CALL CENTER (L4) | TNS3352021009-1681000 BSL-CASE MGMT-COP BENEFITS INVEST | 540 - Patient Support Programs | $ 700,000 | 606,000 | 1,250,000 |
| 7022 - CALL CENTER (L4) | TNS3352021009-1681001 BSL-CASE MGMT-COP E-PRESCRIBING | 540 - Patient Support Programs | $ 740,000 | 465,000 | 790,000 |
| | TNS3352020900-1581009 PATIENT ACCESS PROGRAM-COP PREMIUM ASSISTAN | 280 - Charitable Donations | $ 1,500,000 | | 1,500,000 |

**Funtional Area: Patient Services**

| Project Name | Brief Description | 2014 Timing | Proposed $'s 2014 | Priority Critical | Need | Nice | |
|---|---|---|---|---|---|---|---|
| **Patient Assistance** | | | | | | | |
| COPAXONE Copay Solutions (GTN & Expense) | $35 pgm for 20mg, $10 pgm for 40mg | Q1-Q4 | #REF! | X | | | |
| Shared Commitment Program (GTN) | Pay 1st $50 | Q1-Q4 | $ 1,500,000 | X | | | |
| Private Copay Program | Financial qualification program for $0 OOP | Q1-Q4 | $ 12,757,765 | X | | | |
| Free Product | Includes free prod, CAP, & Replacements | Q1-Q4 | $ 1,430,000 | X | | | |
| Medicare Patient Assistance | Donations, free prod shipping, & Qualification Fees | Q1-Q4 | $ 54,713,000 | X | | | |
| Premium Assistance | | Q1-Q4 | $ 1,500,000 | | X | | |
| Office Visit Co-Pay Assistance? | | | | | | | |
| | | | | | | | |
| **Patient Services** | | | | | | | |
| BI Test Claims | Increased test claims for 40mg transition and eCheck patients | Q1-Q4 | $ 1,250,000 | X | | | |
| Online Enrollment | | Q1-Q4 | $ 605,000 | | X | | |
| eCheck | | Q1 | $ 185,000 | | | X | |
| Centralized Nursing | | | | X | | | Jan |
| CNEs | Opp Funds, R&T, Mtgs, Training | | | X | | | Jan |
| Injection Training | Patient training, Ntl Mtgs, Materials, Training | | | X | | | Jan |
| Staff Training | | | | X | | | Jan |
| 40mg Incentive Program | | | | | X | | Jan |
| 40mg Retention Program | | | | X | | | Jan |
| ShSol Pharmacy--Autoject Distribution | Autojects, S&H, Harte Hanks, and all supplies | | | X | | | Susan |
| ShSol Pharmacy--Commercial Ship | | | | X | | | Susan |
| ShSol Pharmacy--Free/Replacement Product | Cost Savings to Teva; no additional spend | | | X | | | Susan |
| ShSol Pharmacy--Consulting | | | | X | | | Susan |
| Systems & Reporting | | | | X | | | Donna |
| Depreciation - New & Existing | To Be Input by Finance | | | X | | | |
| Patient Privacy | | | $ 150,000 | X | | | |
| VHA? | | | | | | | |

**Total Budget:** #REF!

Critical = Critical to the Brand success
Need = Really need to do but not critical
Nice = Nice to do

# EXHIBIT A-49

| | |
|---|---|
| **From:** | Megan Oliveira </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=MEGAN.OLIVEIRA> |
| **To:** | Patient Care Services |
| **CC:** | Order Management |
| **Sent:** | 1/4/2010 10:13:05 PM |
| **Subject:** | The Assistance Fund - A new copay foundation for Copaxone MS patients |
| **Importance:** | High |

Team,

I wanted to make you all aware of a new copay assistance foundation we will be working with this year. Teva has funded all their Free drug patients through a new foundation called "The Assistance fund." We have already received some approvals this morning and have uploaded them in CPR+. As the Assistance fund starts to contact these patients, we may begin to receive phone calls from patients stating they have been approved for assistance. Please look up the patient to see if it is one of these patients. Example – Angela Adams MRN 201214

**How to identify these patients:**

Clinical and billing alerts state "Approved for The Assistance Fund – 2010". A secondary payor named "The Assistance Fund" has been added to each approved patient.  Also, there are 10 new user define fields #99-#109 with information in
regards to their status of their approval and patient responsibility. Please do not edit any of these fields!

Patients have been approved for $5400 dollars for 2010 and can have pt responsibilities of $0, $10, and $25 per delivery. This assistance will be a secondary payor to their Medicare part D plan which will require an ECOB or electronic secondary claim. The billing for this program should work the same as our patients who have PANF. The ECOB must be done at the time of dispense, so if you schedule an order please email Andrew Evans, Amanda Shade, and Zach Gammage to complete the ECOB for now.

All patients have been conditionally approved until they return the required paperwork (just like CDF) to the fund. The paperwork will come directly from The Assistance fund. If patients have questions about the paperwork please warm transfer them to the number below.

The Assistance Fund
5323 Millenia Lakes Boulevard
Orlando, Florida 32839
877.245.4412.

Also, please Do NOT refer any patients waiting for assistance to this foundation as the fund is already closed. We will be notified if any more funds become available. See your Team Lead or Manager with questions.

Thank you!!!

**Megan Oliveira | Vice President, Patient Services |  ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 407.854.6580  | eFax: 407.386.8160 |email: megan.oliveira@acs-rx.com

Confidential. Exempt From FOIA     CVS266265

# EXHIBIT A-50

| | |
|---|---|
| **From:** | David Blanc </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DBLANC> |
| **To:** | 'Denise.Lynch@tevaneuro.com' |
| **CC:** | 'Jenny.Jackson@tevaneuro.com' |
| **Sent:** | 2/4/2010 3:28:00 PM |
| **Subject:** | Numbers |

Good morning Denise –

Let me know if you have any questions regarding below numbers.

**CDF**

| | |
|---|---|
| Approved at ACS | 1950 |
| Approved at ACS and transferred to other SP | 20 |
| CDF Total | **1970** |

**AF**

| | |
|---|---|
| Approved at ACS | 2206 |
| Approved at ACS and transferred to other SP | 116 |
| AF Total | **2322** |

**LIS Patients at ACS**      1723

**David Blanc | Director, Patient Assistance Programs | ACS, Inc.**
2400 Lake Orange Drive | Suite 200 | Orlando, Florida 32837
Phone: 407.816.2371 | Fax: 866.679.7131
email: david.blanc@acs-rx.com

Confidential. Exempt From FOIA

CVS269340

# EXHIBIT A-51

| | |
|---|---|
| **From:** | David Blanc |
| **To:** | David Blanc; Denise Lynch; Jenny Jackson |
| **Sent:** | 2/9/2011 4:51:50 PM |
| **Subject:** | RE: Numbers |

Denise –

I verified with AF that they have no patients at this time who have returned paperwork and awaiting funding – so the numbers that we discussed should be good.

Let me know if you need anything further.

Take care.

**David Blanc | Director, Patient Assistance | ACS, Inc.**
Phone: 407.816.2371 | Fax: 866.679.7131

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** David Blanc
**Sent:** Tuesday, February 08, 2011 6:41 PM
**To:** Denise Lynch; Jenny Jackson
**Subject:** Numbers

Hello Denise and Jenny -

Sorry for the delay – what a "technically difficult" day I had today. Below are the latest numbers, if you all would like to discuss – I am available tomorrow anytime but 9-10:30 EST.

Legend:

- Approved and at ACS        We have approvals and the patient is at ACS
- Approved but transferred      Patient was approved and funding was moved to another pharmacy
- Approved but NOGO'd        Patient was approved but was NOGO'd and funding was not utilized – we recycle these as the funding becomes available again, sometimes quarterly
- Waiting Paperwork Return     Our annual fun – these patients have not returned paperwork
- Paper Returned            Per CDF – these patients have returned paperwork but they have no funding

**CDF**

| | | |
|---|---|---|
| **CDF Approved** | **1701** | |
| | | |
| Approved and at ACS | 1623 | |
| Approved but transferred | 19 | |
| Approved but NOGO'd | 59 | |
| Waiting Paperwork Return | | 146 |
| Paper Returned - Awaiting Funds | | 92 |

**AF**

| | |
|---|---|
| **AF Approved** | **3163** |

Tev_021610

| Approved/Conditional and at ACS | 3105 | |
|---|---|---|
| Approved but transferred | 31 | |
| Approved but NOGO'd | 27 | |
| Waiting Paperwork Return | | 155 |

| Pending New Assistance | | 165 |

**LIS**

2115 currently confirmed –

Again, my apologies for the delay – have a good evening.

**David Blanc | Director, Patient Assistance | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 866.679.7131
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-52

| | |
|---|---|
| **From:** | Jon Congleton |
| **To:** | Denise Lynch |
| **Sent:** | 2/10/2011 8:02:57 PM |
| **Subject:** | RE: Donut Hole Contribution |

Go ahead and proceed and you can update me next week.

---

**From:** Denise Lynch
**Sent:** Thursday, February 10, 2011 2:32 PM
**To:** Jon Congleton
**Subject:** Donut Hole Contribution

Hi Jon...Are you OK with a $1.5MM Medicare contribution to AF (this is a little less than what I had though when we talked on Tuesday)....I would be happy to provide rationale when you have a minute to discuss.  I asked Larry to sign but thought I should double back around with you since the amount was different.

*Denise C. Lynch*
Sr. Director, Patient Services and Support
Teva Neuroscience
901 E. 104th St.,  Suite 900
Phone: (816) 508-5139  Fax: (816) 508-5508
Email: denise.lynch@tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-53

| From: | Denise Lynch |
|-------|-------------|
| To: | Barb Ross |
| Sent: | 6/30/2011 3:39:37 PM |
| Subject: | RE: Numers |

This is perfect….thanks so much Barb!

*Denise C. Lynch*
Sr. Director, Patient Services and Support
Teva Neuroscience
901 E. 104th St.,  Suite 900
Phone: (816) 508-5139  Fax: (816) 508-5508
Email: denise.lynch@tevapharm.com

---

**From:** Barb Ross
**Sent:** Thursday, June 30, 2011 10:01 AM
**To:** Denise Lynch
**Cc:** Pilar Grayson
**Subject:** Numers

Hi Denise,

I spoke with David and Zach @ ACS. We figure around 200. This includes the 100 they already have, in addition to the 50 I am getting ready to send over July 5th as July eligibles and we estimated about another 120 for the 4 weeks in July. David thinks he can maybe count on 50 of those for funds that people have not been compliant and the other 50 in the 200 figure. Let me know if you need verification.

Best regards,

TEVA    **Barb Ross**   Medicare Specialist
Tel: (816) 508-5478   Cell:    Fax:
Barb.Ross@tevapharm.com    sip:Barb.Ross@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-54

| | |
|---|---|
| **From:** | David Blanc |
| **To:** | Hileman, David |
| **CC:** | 'Dennis Wilson'; David Glinter; Jain, Amit; Steve Lynch |
| **Sent:** | 7/5/2011 3:00:58 PM |
| **Subject:** | IOI |

IOI:

- Biogen
    - o Infusion cost copay assistance program launched 7/5.
    - o Contract finalization approved by Reed Smith – at Biogen Idec awaiting clean copy for execution.

- Bayer
    - o Continuing development of Requirements Document for Physician Access/ePrescribing portal.

- Celgene
    - o Finalizing Celgene management requested reports.

- Novartis
    - o GSA for Novartis copay final version approved by Reed Smith – awaiting clean copy from Novartis for execution.
    - o FDO Concentra Medicare program set to launch 7/25 for ACS dispense – volume should be minimal at best
    - o Discussions regarding adding Armada to the network for copay assistance access for their pharmacy members continues. Plans still for late July/early August launch.

- Genentech
    - o BioOnc copay program contract executed by Genentech and ACS.
    - o Updated program launched 7/5.

- Teva
    - o Secured additional funding for up to 200 patients, submitted 93 patients today – reaching out to additional patient count of 53 newly eligible (July 1) Medicare patients.

**David Blanc | Director, Patient Assistance | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 866.679.7131
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

CVS180267

# EXHIBIT A-55

| Message | |
|---|---|
| From: | Maureen Boyd [/O=ASSIST/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MAUREEN BOYD891D1F27] |
| Sent: | 7/8/2011 2:49:52 PM |
| To: | Edward Hensley [edward.hensley@assistfund.org]; Jeff Spafford [jeff.spafford@assistfund.org] |
| Subject: | New Patients as of July 1, 2011 |

Edward and Jeff,

Here is the breakdown of new patients as of July 1, 2011 when Funds opened.

| | |
|---|---|
| Betaseron: | 1 |
| Copaxone: | 94 |
| Gilenya: | 2 |
| Rebif: | 1 |
| Tysabri: | 2 |
| Total | 100 |

Regards,

Maureen



Maureen N. Boyd
**Director of Operations**

5323 Millenia Lakes Blvd | Ste 200 | Orlando, FL 32839
407.367.2890 Direct | 866.254.9411 Efax
Maureen.Boyd@assistfund.org | www.assistfund.org

CONFIDENTIAL

TAF0011683

# EXHIBIT A-56

| | |
|---|---|
| **From:** | Denise Lynch |
| **To:** | Jennifer Clark |
| **Sent:** | 1/24/2012 3:09:08 AM |
| **Subject:** | RE: Urgent - High Risk Patient - Call to TAF |

I agree...I talked with him today and learned that we will need to make a contribution.  I will talk to David in the morning to understand how many patients they have in queue and then we can discuss the contribution amount!

*Denise C. Lynch*
Sr. Director, Patient Services and Support
Teva Neuroscience
901 E. 104th St.,  Suite 900
Kansas City, MO  64131
Phone: (816) 508-5139  Fax: (816) 508-5508
Email: denise.lynch@tevapharm.com

---

**From:** Jennifer Clark
**Sent:** Monday, January 23, 2012 8:47 PM
**To:** Denise Lynch
**Subject:** FW: Urgent - High Risk Patient - Call to TAF
**Importance:** High

Denise,

I know we're talking to Edward tomorrow night, this may be a topic of discussion.  It sounds like TAF is out of funds, we have a high risk pool patient that we're trying to get assistance for.

**Jennifer Clark**   Manager, Patient Services & Reimbursement
Tel: (816) 508-5396    Cell: (816) 332-2873    Fax: (816) 508-5589
Jennifer.Clark@tevapharm.com    sip:Jennifer.Clark@tevapharm.com    www.tevapharm.com

---

**From:** Kristen Wright
**Sent:** Monday, January 23, 2012 3:33 PM
**To:** Jennifer Clark
**Cc:** Pilar Grayson
**Subject:** FW: Urgent - High Risk Patient - Call to TAF
**Importance:** High

Hi Jennifer,

I know funds are closed and AssistRx will keep this patient on their list for when funds open back up.  Do you have any insight on when this might happen?

Best regards,

**Kristen Wright**   Sr Supvr, Pt Serv & Support
Tel: (816) 508-8318
Kristen.Wright@tevapharm.com    www.tevapharm.com

   Tev_168830

**From:** Becky Nickols
**Sent:** Monday, January 23, 2012 9:59 AM
**To:** Pilar Grayson; Kristen Wright
**Subject:** Urgent - High Risk Patient - Call to TAF
**Importance:** High

Good Morning,

Jessica Lopez MRN 1-4AU75S

I referred this patient on 1/18/12 to TAF. I put "High Risk Pool" in the subject line and sent all her information. I gave her the TAF phone number to call if she didn't hear from them by today. She called and was told that she wasn't in their system and they are out of funding. Would that be the correct response to a high risk pool patient?

I told the patient I would call her back and let her know,
Thanks,
Becky

TEVA    **Becky Nickols**   Sr Case Administrator, Patient Assistance Program
Tel: (816) 508-5244   Cell:    Fax: (866) 5500617
Becky.Nickols@tevapharm.com    sip:Becky.Nickols@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-57

| From: | David Blanc |
|---|---|
| To: | Denise Lynch |
| Sent: | 1/25/2012 8:14:15 PM |
| Subject: | RE: Numbers |

Hey Denise –

Yes the conditional approvals are the newly referred and they must return paperwork in 30 days to continue, but they are funded.

**David Blanc | VP, Client Services | ACS, Inc.**
Phone: 407.816.2371 | Fax: 407.816.2398

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

---

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Wednesday, January 25, 2012 2:36 PM
**To:** David Blanc
**Subject:** RE: Numbers

Thanks for the update David….Are the conditional approvals funded?

*Denise C. Lynch*
Sr. Director, Patient Services and Support
Teva Neuroscience
901 E. 104th St.,  Suite 900
Kansas City, MO  64131
Phone: (816) 508-5139  Fax: (816) 508-5508
Email: denise.lynch@tevapharm.com

---

**From:** David Blanc [mailto:David.Blanc@acs-rx.com]
**Sent:** Tuesday, January 24, 2012 4:02 PM
**To:** Denise Lynch
**Subject:** Numbers

Hi Denise –

|  | App'd | Cond | Pending PPWK |
|---|---|---|---|
| AF | 2765 | 768 | 538 |
| CD | 1708 |  | 198 |

Sorry for the delay – I was hoping to confirm info with CD, but was unable to connect today.  If I hear tonight, I will let you know.

Enjoy Orlando – call me if you need.

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.816.2398
email: david.blanc@acs-rx.com

CONFIDENTIAL – FOIA Exempt

Case 1:20-cv-11548   Document 1-57   Filed 08/18/20   Page 2 of 2

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message.
If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-58

| | |
|---|---|
| **From:** | Barb Ross |
| **To:** | Jennifer Clark |
| **CC:** | Denise Lynch; Pilar Grayson |
| **Sent:** | 6/25/2012 2:00:10 PM |
| **Subject:** | Medicare pending patients |

Holding as of 06-25-12:  215, estimate additional 8 per day for 26th, 27th, 28th, 29th (32) and then eligible for July so far an additional 35. So total that are actually there = 215.

Estimate for the rest of this month 32 + July eligible so far this month 35
Total to fund for todate would be 282.

I called Idy and confirmed actual amounts, the 32 is an estimate for the next four days and the July eligible could go up a couple.

Hope that gives you some idea of what we are needing. Please let me know if you have any questions.

Best regards,


**Barb Ross**   Medicare Specialist
Tel: (816) 508-5478   Cell:   Fax:
Barb.Ross@tevapharm.com   sip:Barb.Ross@tevapharm.com   www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-59

| From: | David Blanc </O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DBLANC> |
|---|---|
| To: | Idy Moeller |
| CC: | Tawny Elwess |
| Sent: | 6/27/2012 2:17:39 PM |
| Subject: | Copaxone TAF referral |

Can you prepare the list of patients for referral?

Thanks.

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

# EXHIBIT A-60

| | |
|---|---|
| **From:** | Blanc, David |
| **To:** | Denise Lynch |
| **Sent:** | 8/22/2012 12:43:37 PM |
| **Subject:** | Call |

Good morning Denise –

We just seem to always miss each other!!  I stepped away for coffee and see what happens!!

In case you need prior to us touching base – we currently have 165 patients in wait.

Take care.

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

**-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-61

| | |
|---|---|
| **From:** | Blanc, David </O=OMNICARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DAVID BLANC6056D52B> |
| **To:** | Denise C Lynch (Denise.Lynch@tevaneuro.com) |
| **Sent:** | 9/19/2012 3:29:22 PM |
| **Subject:** | ACS |

Hi Denise –

Hope that you are well.  Just wanted to give you a status update on patients that are queued up.

At this time we have 168 and 18 that we are still attempting to reach.

Best,

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

# EXHIBIT A-62

Message
From:        Maureen Boyd [/O=ASSIST/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MAUREEN BOYD891D1F27]
Sent:        9/19/2012 2:35:09 PM
To:          Joshua Shin [joshua.shin@assistrx.lan]
Subject:     RE: ARX

Joshua,

We've had this conversation before.  For allocation I cannot use the factor of usage....  Allocation is what determines the total ask.

Regards,

M

---

**From:** Joshua Shin
**Sent:** Wednesday, September 19, 2012 10:29 AM
**To:** Maureen Boyd
**Subject:** RE: ARX

Maureen,

Understood.  But two factors play into this.

1.   We need to factor in actual usage; and
2.   That allocation may be lower in October, which is the month that we are planning for.

Joshua

---

**From:** Maureen Boyd
**Sent:** Wednesday, September 19, 2012 10:24 AM
**To:** Joshua Shin
**Subject:** RE: ARX

Josh,

ACS provided the number of patients they had pending to TEVA along with what our Allocation amount was.

I'm sure ACS has already provided TEVA with how many patients they still have and what our current allocation amount is....  which right now is $3200.

M

---

**From:** Joshua Shin
**Sent:** Wednesday, September 19, 2012 10:17 AM
**To:** Maureen Boyd
**Subject:** RE: ARX

Sorry Maureen, I didn't want you to spend any more time on this.   This is also in line with what they gave us several of weeks ago $575K.

CONFIDENTIAL                                                                    TAF0029014

Joshua

**From:** Maureen Boyd
**Sent:** Wednesday, September 19, 2012 10:14 AM
**To:** Joshua Shin; Maureen Boyd; Edward Hensley
**Cc:** Jeff Spafford
**Subject:** RE: ARX

I guess there is not a need to forward any additional details after Josh's email...

**From:** Joshua Shin
**Sent:** Wednesday, September 19, 2012 10:11 AM
**To:** Maureen Boyd; Edward Hensley
**Cc:** Jeff Spafford
**Subject:** RE: ARX

Edward,

Let's make it $2,800 allocation for Q4, which is the Q4 allocation for next year.  So with 200 patients, please request $615,000 (inclusive of admin fees).

Joshua

**From:** Maureen Boyd
**Sent:** Wednesday, September 19, 2012 10:08 AM
**To:** Edward Hensley; Maureen Boyd; Joshua Shin
**Cc:** Jeff Spafford
**Subject:** RE: ARX

Edward,

Last September is when we reduced the amount from $4400 to $3300. We then reduced it two additional times.  I know for sure we reduced it to $300 for the new patients that came in during the month of December.

I'm researching what the change was for Oct/Nov and will forward once determined.

M

**From:** Edward Hensley
**Sent:** Wednesday, September 19, 2012 9:56 AM
**To:** Maureen Boyd; Joshua Shin
**Cc:** Jeff Spafford
**Subject:** Re: ARX

Do we really need to ask for 3200.00 this late in the year.  It would just be for the third quarter.  Now realizing they would go through the donut hole probably on the first fill.

EH

CONFIDENTIAL                                                                 TAF0029015

**From:** Maureen Boyd <Maureen.Boyd@AssistFund.org>
**Date:** Wednesday, September 19, 2012 9:53 AM
**To:** Edward Hensley <Edward.Hensley@Assistfund.org>, Joshua Shin <Joshua.Shin@Assistfund.org>
**Cc:** Jeff Spafford <Jeff.Spafford@AssistFund.org>
**Subject:** RE: ARX

Good Morning Edward,

The Allocation Amount was reduced from $4600 to **$3200** effective August 2012.

If it was for 200 new patients the total ask will need to be $703,500.00 (which includes the 9% admin fee)

Regards,

Maureen



Maureen N. Boyd
**Director of Operations**

4700 Millenia Blvd | Ste 500 | Orlando, FL 32839
407.367.2890 Direct | 407.227.9676 Cell | 866.254.9411 Efax
Maureen.Boyd@assistfund.org | www.assistfund.org

Find The Assistance Fund on Facebook and GoodSearch

**From:** Edward Hensley
**Sent:** Wednesday, September 19, 2012 9:35 AM
**To:** Joshua Shin; Maureen Boyd
**Cc:** Jeff Spafford
**Subject:** FW: ARX

What number should I give her? She intends to donate at the end of September. This would be only for patients till the end of the year of course. It's a couple hundred patients, I believe.

**From:** Denise Lynch <Denise.Lynch@tevapharm.com>
**Date:** Wednesday, September 19, 2012 8:44 AM
**To:** Edward Hensley <Edward.Hensley@Assist-RX.com>
**Subject:** RE: ARX

Hi Edward,
Glad you are home. I was out all last week and things have been kind of crazy here this week so hopefully we will be able to catch up soon. Give me a call when you have a minute. Also need to talk with you about another donation.

**From:** Edward Hensley [mailto:Edward.Hensley@Assist-RX.com]
**Sent:** Tuesday, September 18, 2012 6:06 PM
**To:** Denise Lynch
**Subject:** ARX

CONFIDENTIAL

TAF0029016

Good Evening Denise -
I am traveling the rest of the week, but would like to catch up on a couple of things.  Also, wanted to have a chat about your pharmacy "build out."  I had an interesting conversation today with someone that you know and had an idea I wanted to pass by you.


Talk soon,
Edward



**Edward H Hensley**
Chief Brand Officer

4700 Millenia Blvd | Ste 500 | Orlando, FL 32839
407.367.4478 direct | 407.579.7611 cellular
407.540.9753 efax | assist-rx.com

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

CONFIDENTIAL

# EXHIBIT A-63

**From:** Blanc, David
**To:** Denise Lynch
**Sent:** 9/20/2012 8:17:37 PM
**Subject:** Numbers

Hi Denise –

The up to the minute number is 197 – had a productive 2 days.

Hope that all is well with you – looking forward to seeing you next week at Carnavalia!

Best,

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 866.679.7131
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

---

**-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-64

Message

| | |
|---|---|
| **From:** | Maureen Boyd [/O=ASSIST/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MAUREEN BOYD891D1F27] |
| **Sent:** | 9/28/2012 4:44:35 PM |
| **To:** | Edward Hensley [edward.hensley@assistfund.org] |
| **Subject:** | RE: Copaxone |

Now that the fund is closed, here is the final number of new patients created from Sept 24th, 2012

Total = 314
Avonex = 18
Betaseron = 4
Copaxone = 234
Gilenya = 26
Rebif = 22
Tysabri = 10

Regards,

Maureen



Maureen N. Boyd
**Director of Operations**

4700 Millenia Blvd | Ste 500 | Orlando, FL 32839
407.367.2890 Direct | 407.227.9676 Cell | 866.254.9411 Efax
Maureen.Boyd@assistfund.org | www.assistfund.org

Find The Assistance Fund on Facebook and GoodSearch

**From:** Maureen Boyd
**Sent:** Friday, September 28, 2012 8:44 AM
**To:** Edward Hensley
**Subject:** RE: Copaxone

Good morning Edward,

The Fund is still open, however, based on the limited slots (10) I'm sure it will close today.

New patients created from Sept 24, 2012.

Total = 302
Avonex = 17
Betaseron = 3
Copaxone = 231
Gilenya = 26
Rebif = 21
Tysabri = 4

Regards,

 TAF0029556

Maureen

---

**From:** Edward Hensley
**Sent:** Friday, September 28, 2012 7:09 AM
**To:** Maureen Boyd
**Subject:** Re: Copaxone

Can you update the numbers below for me this morning, please. I am mtg with Denise at 2 at the hotel. I take it the fund is still not closed.

Edward Hensley
Chief Brand Officer
AssistRx, Inc
407.367.4478 direct
407.579.7611 cell

AssistRx - Tomorrow's Technology...Today.

Sent from my iPad2, which has the new really cool iAssist app loaded on it.

On Sep 26, 2012, at 6:20 PM, "Maureen Boyd" <Maureen.Boyd@AssistFund.org> wrote:

> Edward,
>
> We processed 202 new Copaxone patients from the ACS referral file.
>
> However as of today at 6:00pm we have created 278 new patients:
> Avonex = 9
> Betaseron = 1
> Copaxone = 229
> Gilenya = 17
> Rebif = 18
> Tysabri = 4
>
> Regards,
>
> Maureen

Maureen N. Boyd
**Director of Operations**

4700 Millenia Blvd | Ste 500 | Orlando, FL 32839
407.367.2890 Direct | 407.227.9676 Cell | 866.254.9411 Efax
Maureen.Boyd@assistfund.org | www.assistfund.org

Find The Assistance Fund on Facebook and GoodSearch

CONFIDENTIAL                                                                                           TAF0029557

**From:** Edward Hensley
**Sent:** Wednesday, September 26, 2012 4:49 PM
**To:** Maureen Boyd
**Subject:** Copaxone

Maureen – How many Copaxone patients were approved in the last donation?

FH

CONFIDENTIAL                                                                                          TAF0029558

# EXHIBIT A-65

| | |
|---|---|
| **From:** | Blanc, David |
| **To:** | Denise Lynch |
| **Sent:** | 5/8/2013 4:58:08 PM |
| **Subject:** | RE: ACS |

Terrific!  We are ready.

Thanks Denise

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Wednesday, May 08, 2013 12:56 PM
**To:** Blanc, David
**Subject:** RE: ACS

Hi David…just advised that the wire transfer was completed a few minutes ago.  Please let me know if you have questions.  Thx.

**From:** Blanc, David [mailto:david.blanc@acs-rx.com]
**Sent:** Tuesday, May 07, 2013 8:09 AM
**To:** Denise Lynch
**Subject:** RE: ACS

Good morning Denise!

176 are ready for referral
30 are pending contact

Let me know if you need anything else.

Best,

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Tuesday, May 07, 2013 7:41 AM
**To:** Blanc, David
**Subject:** RE: ACS

Hi David,
Wondered if you could give me a quick update…double checking funding.  Thx!

**From:** Blanc, David [mailto:david.blanc@acs-rx.com]
**Sent:** Wednesday, May 01, 2013 10:04 AM
**To:** Denise Lynch
**Subject:** RE: ACS

CONFIDENTIAL – FOIA Exempt

Great minds...

They re not included - we received the 37 this morning. We are good, but not quite that good!! The Ready for Referral numbers could be sent on a moments notice.

David Blanc | VP, Client Services | ACS, Inc.
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

-----Original Message-----
**From:** Denise Lynch [Denise.Lynch@tevapharm.com]
**Sent:** Wednesday, May 01, 2013 10:50 AM Eastern Standard Time
**To:** Blanc, David
**Subject:** RE: ACS

Hi David...you read my mind.  Are the newly eligible included in the ready for referral #?  Thanks for the info!!

**From:** Blanc, David [mailto:david.blanc@acs-rx.com]
**Sent:** Wednesday, May 01, 2013 8:58 AM
**To:** Denise Lynch
**Subject:** ACS

Good morning Denise –

Wanted to provide an update on referred patients –

Ready for referral:  133
Waiting for contact:  19
Newly eligible May:  37

Hope all is well –

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

**-- NOTICE --** The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in

**reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-66

**From:** Edward Hensley
**To:** Denise Lynch
**Sent:** 5/8/2013 6:54:58 PM
**Subject:** Re: Hensley

At Armada, but made the call.

Edward Hensley
Chief Brand & Business Development Officer
AssistRx, Inc.
407.367.4478 direct
407.579.7611 cell

AssistRx is the proud parent of iAssist - Tomorrow's Technology Today

On May 8, 2013, at 9:58 AM, "Denise Lynch" <Denise.Lynch@tevapharm.com> wrote:

> Hi Edward,
> I was just advised that the wire transfer was completed a few minutes ago. Please let me know if you have questions. Thx.
>
> -----Original Message-----
> From: Edward Hensley [mailto:Edward.Hensley@Assistrx.com]
> Sent: Thursday, May 02, 2013 12:30 PM
> To: Denise Lynch
> Subject: Hensley
>
> 4300.00 for all of Q2.
>
> Edward Hensley
> Chief Brand & Business Development Officer AssistRx, Inc.
> 407.367.4478 direct
> 407.579.7611 cell
>
> AssistRx is the proud parent of iAssist - Tomorrow's Technology Today
>
> This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
>

CONFIDENTIAL – FOIA Exempt

Tev_021000

# EXHIBIT A-67

| From: | Joan McNaney |
|---|---|
| To: | Janette Bollinger; Denise Lynch |
| CC: | Christine Shaltens; Mildred Spencer; Michael McCartin; Theresa Hale |
| Sent: | 5/8/2013 4:04:28 PM |
| Subject: | FW: Wire Transfer - 5/8/13 |
| Attachments: | Scan_20130508.1.pdf |

Hi Janette,

The wire was sent with the details below.

Also, would you please add Michael McCartin and Theresa Hale on future payment request emails? This way we will be covered if some people are out of the office. Thanks!

$925,000.00
FED WIRE OUT ███████ ORIGINATOR:TEVA PHARMACEUTICALS USA
AC/███████ BENEFICIARY:The Assistance Fund AC/███████4700
Millenia Blvd Suite 500 Orla ndo FL 32839 RECVBNK:SUNTRUST BANK
ABA:███████ RFB:███████ OBI:Medicare Patient Assistance
Program - Teva Neuroscience; Attn: Edward HensleyMedicare Patient Assistance
Program 5/8/13 TRN███████ED REF/TIME:000477 /11:57:57 DATE:05-08-
13 POST TIME:11:57:56

Regards,
Joan

Joan M. McNaney, Sr. Treasury Analyst
Teva Pharmaceuticals USA, 1070 Horsham Road, North Wales, PA 19454
Tel: 215-591-8730 <tel:215-591-8730> Fax: 215-591-8806 <mailto:[fax:215-591-8806]>
Joan.McNaney@tevapharm.com <mailto:Joan.McNaney@tevausa.com>

_____
From: Janette Bollinger
Sent: Wednesday, May 08, 2013 11:11 AM
To: Christine Shaltens; Mildred Spencer; Joan McNaney
Cc: Denise Lynch
Subject: Wire Transfer - 5/8/13

Attached is a wire transfer for Assistance Fund. If you have any questions please feel free to contact me.

Thank You,

Janette Bollinger
Sr Coordinator, Patient Services and Solutions
901 E 104th St, Suite 900
Kansas City, MO 64131
Tel: (816) 508-5142 <tel:(816)%20508-5142%20> Fax: (816) 508-5508 <mailto:
[fax:(816)%20508-5508]>

www.janette.bollinger@tevapharm.com www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

**** If you have a VENDOR Invoice, DO NOT USE THIS FORM, submit Invoices directly to AP
Return completed form to Christine Shaltens


TEVA PHARMACEUTICALS USA

# PAYMENT REQUEST FORM

SELECT PAYMENT TYPE:     ACH     WIRE          CHECK

Payee: The Assistance Fund

Address: 4700 Millenia Blvd., Suite 500

Orlando, FL 32839

☐ Separate Payment is Necessary

Ach or Wire: Bank Name  Suntrust Bank - 200 S. Orange Avenue - Orlando, FL 32801

Routing #  ███████

Account #  ███████

Date Needed:     5/8/2013          Payment Amount:          $925,000.00

| Project Coding | GL Account | Amount | Reason for Payment Request |
|---|---|---|---|
| COM0000000001/014 | ██████████ | $925,000.00 | Medicare Patient Assistance Program |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Total Amount: | | $925,000.00 | |

##### ***** PLEASE ATTACH SUPPORTING DOCUMENTATION *****

PAYMENT REQUESTED BY:   Janette Bollinger

**MAILING INSTRUCTIONS FOR CHECK:**

☐ Mailed by Accounting          ☐ Mailed w/Attachment(s)

☐ Return To - Name:                         Dept./ Facility Patient Services and Solutions

Print Name of Authorized Signer*: Denise Lynch

Authorized Signature*:  _Denise C. Lynch_          Date: 5/8/13

* In accordance with Limits of Authority

#### **** DO NOT WRITE BELOW THIS LINE ****

Invoice #:

Invoice Date:

CONFIDENTIAL – FOIA Exempt

Tev_020996

# EXHIBIT A-68

**From:** Blanc, David
**To:** Denise Lynch
**Sent:** 8/27/2013 2:59:36 PM
**Subject:** Numbers

Hi Denise –

Was in a meeting all morning sorry I missed your call, I understand you are in a meeting until 1:30.

We are at 196 with 14 pending contact at this time.

Thanks.

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.

Tev_167115

# EXHIBIT A-69

**From:** Denise Lynch
**To:** Jeff Spafford
**Sent:** 8/27/2013 2:41:05 PM
**Subject:** RE: Hi Jeff-Q3 patient donation?

That's great….I have a conference call that is supposed to begin at 10, so if that doesn't work hopefully we can connect later. I need to talk to you about a free first ship for 40mg and how that would impact Med D patients.

**From:** Jeff Spafford [mailto:Jeff.Spafford@Assistrx.com]
**Sent:** Tuesday, August 27, 2013 9:29 AM
**To:** Denise Lynch
**Subject:** RE: Hi Jeff-Q3 patient donation?

Absolutely. I will call you after I get off the telephone.



**Jeff Spafford**
President and CEO

4700 Millenia Blvd | Ste 500 |Orlando, FL 32839
407.367.4476 Direct | 410.458.4129 Cellular
815.346.1068 eFax | jeff.spafford@assist-rx.com

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Tuesday, August 27, 2013 10:28 AM
**To:** Jeff Spafford
**Subject:** RE: Hi Jeff-Q3 patient donation?

My fault….didn't check my cell. Would you have time for a quick call?
**From:** Jeff Spafford [mailto:Jeff.Spafford@Assistrx.com]
**Sent:** Monday, August 26, 2013 3:20 PM
**To:** Denise Lynch
**Subject:** RE: Hi Jeff-Q3 patient donation?

$3,700

I had left you a vmail. Sorry you did not receive it.

Jeff



**Jeff Spafford**
President and CEO

4700 Millenia Blvd | Ste 500 |Orlando, FL 32839
407.367.4476 Direct | 410.458.4129 Cellular
815.346.1068 eFax | jeff.spafford@assist-rx.com

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Monday, August 26, 2013 2:54 PM
**To:** Jeff Spafford
**Subject:** Hi Jeff-Q3 patient donation?

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary

CONFIDENTIAL – FOIA Exempt

information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-70

| | |
|---|---|
| **From:** | Blanc, David </O=OMNICARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DBLANC> |
| **To:** | Elwess, Tawny |
| **CC:** | Haskell, Heather |
| **Sent:** | 8/27/2013 7:40:58 PM |
| **Subject:** | RE: Numbers |
| **Importance:** | High |

Please prep the file for referral to TAF ASAP!!

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Elwess, Tawny
**Sent:** Tuesday, August 27, 2013 9:42 AM
**To:** Blanc, David
**Subject:** RE: Numbers

I hope it's not too late there's actually 196 with complete interviews forgot to remove active CDF. Sorry  I'm having my team call pt's now to try and get the rest done. J

**From:** Blanc, David
**Sent:** Tuesday, August 27, 2013 9:35 AM
**To:** Elwess, Tawny
**Subject:** RE: Numbers

Thank you Tawny!

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Elwess, Tawny
**Sent:** Tuesday, August 27, 2013 9:35 AM
**To:** Blanc, David
**Subject:** Numbers

203 with complete interviews (this is including 363786)
7 with attempted pt contact
7 without contact

**Tawny Elwess | MS Team Lead |  ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 877.985.6337 Ext: 65167 | Fax: 866.679.7131
Email: tawny.elwess@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

# EXHIBIT A-71

| From: | Niki Dixon <Niki.Dixon@Assistfund.org> |
|---|---|
| To: | Oliveras, Gladielis |
| CC: | Maureen Boyd; Blanc, David |
| Sent: | 8/28/2013 4:57:03 PM |
| Subject: | Re: MS Copay Asssitance Fund Notification |

Good afternoon,

The file has been processed. 199 patients. 1 duplicate.

Sent from my iPhone

On Aug 28, 2013, at 11:31 AM, "Oliveras, Gladielis" <Gladielis.Oliveras@acs-rx.com> wrote:

Thanks!

**Gladys Oliveras | Patient Assistance Coordinator | ACS, Inc.**
6251 Chancellor Dr. Ste. #101 | Orlando, FL. | 32809
Phone: 877-985-6337 Agent#: 79470 | Fax: 866-679-7131
Email: gladielis.oliveras@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Niki Dixon [mailto:Niki.Dixon@Assistfund.org]
**Sent:** Wednesday, August 28, 2013 11:31 AM
**To:** Oliveras, Gladielis
**Cc:** Maureen Boyd
**Subject:** Re: MS Copay Asssitance Fund Notification

Yes ma'am. Once it is processed we will let you know.

Sent from my iPhone

On Aug 28, 2013, at 11:25 AM, "Oliveras, Gladielis" <Gladielis.Oliveras@acs-rx.com> wrote:

Hey girl,
    David sent a file over with 200+ pt's, he is wondering if we can have an updates on it today?

**Gladys Oliveras | Patient Assistance Coordinator | ACS, Inc.**
6251 Chancellor Dr. Ste. #101 | Orlando, FL. | 32809
Phone: 877-985-6337 Agent#: 79470 | Fax: 866-679-7131
Email: gladielis.oliveras@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Niki Dixon [mailto:Niki.Dixon@Assistfund.org]
**Sent:** Wednesday, August 28, 2013 9:37 AM
**Subject:** MS Copay Asssitance Fund Notification

Good afternoon Ladies and Gentlemen,

Please be advised that our Multiple Sclerosis Copay Assistance Fund is now open and we are accepting new

CVS224602

referrals.

If you have any questions and/or concerns, please advise.

Regards,

Niki

| | |
|---|---|
| <image001.png> | **Niki Dixon**<br>**Operations Manager**<br><br>4700 Millenia Blvd \| Ste 310 \| Orlando, FL 32839<br>Direct line: 407-377-1311 Efax: 866.254.9411<br>niki.dixon@assistfund.org \| www.assistfund.org<br><br>Find The Assistance Fund on Facebook and GoodSearch |

CONFIDENTIALITY NOTICE - This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain information that is confidential or legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that you must not read this transmission and that any disclosure, copying, printing, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify the sender by telephone or return e-mail and delete the original transmission and its attachments without reading or saving in any manner.  Thank you.

**-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

# EXHIBIT A-72

| From: | Blanc, David |
|---|---|
| To: | Denise Lynch |
| Sent: | 3/11/2014 2:44:59 PM |
| Subject: | RE: ACS |

For the most part – absolutely.

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Tuesday, March 11, 2014 10:43 AM
**To:** Blanc, David
**Subject:** RE: ACS

Thanks David….that is good news….am I thinking correctly that these will be 40mg for the most part?

**From:** Blanc, David [mailto:david.blanc@acs-rx.com]
**Sent:** Tuesday, March 11, 2014 9:37 AM
**To:** Denise Lynch
**Subject:** ACS

Denise – this morning's count is 162 queued up; 30 in process; received 9 new this morning.

Let me know if you have any questions or need clarification.

Thanks

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Tev_022185

**-- NOTICE --** The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-73

| From: | Denise Lynch |
|---|---|
| To: | Jennifer Clark; Pilar Grayson |
| Sent: | 3/13/2014 5:03:13 PM |
| Subject: | FW: referrals |

FYI

---

**From:** Blanc, David [mailto:david.blanc@acs-rx.com]
**Sent:** Thursday, March 13, 2014 11:29 AM
**To:** Denise Lynch
**Subject:** RE: referrals

189 Conditional Approvals this morning -

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

---

**From:** Denise Lynch [mailto:Denise.Lynch@tevapharm.com]
**Sent:** Thursday, March 13, 2014 12:01 PM
**To:** Blanc, David
**Subject:** referrals

Hi David,
Wondered if you would be able to provide an update?  Thanks.

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

---

**-- NOTICE -- The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error please contact the sender and destroy the materials contained in this message.**

# EXHIBIT A-74

| | |
|---|---|
| **From:** | Barb Ross |
| **To:** | Denise Lynch |
| **Sent:** | 4/22/2014 5:30:05 PM |
| **Subject:** | RE: Med D |

I'm pulling the numbers..having a question on total…just trying to verify before we get you the correct number


**Barb Ross**   Sr Case Administrator/Medicare Specialist
TEVA   Tel: 913-777-3800   Cell:   Fax:
Barb.Ross@tevapharm.com   sip:Barb.Ross@tevapharm.com   www.tevapharm.com


---

**From:** Denise Lynch
**Sent:** Tuesday, April 22, 2014 9:34 AM
**To:** Barb Ross
**Subject:** Med D

Hi Barb….Do you know the number of patients we have ready to go at ACS, May eligible and approx. how many we are sending over a day.  Thx.

Best regards,


**Denise Lynch**   VP, Patient Services & Support
TEVA   Tel: +1-913-777-3700   Cell: +1-913-568-7257   Fax: +1-215-795-4077
Denise.Lynch@tevapharm.com   www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-75

| From: | Elwess, Tawny </O=OMNICARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TAWNY ELWESS> |
|---|---|
| To: | Barb.Ross@tevapharm.com |
| CC: | Blanc, David |
| Sent: | 4/22/2014 7:03:54 PM |
| Subject: | CPA numbers |

We have approx. 187 and 27 pending interviews that includes todays referrals.

**Tawny Elwess | MS Team Lead |  ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 877.985.6337 Ext: 65167 | Fax: 866.679.7131
Email: tawny.elwess@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited.  If you received this in error, please contact the sender and destroy the materials contained in this message.

                                              CVS369058

# EXHIBIT A-76

| From: | Barb Ross |
|---|---|
| To: | Denise Lynch |
| Sent: | 4/22/2014 8:47:10 PM |
| Subject: | RE: Med D |

Denise, Sorry for the delay..just wanted to make sure we had good numbers.  Looks like we have 187 ready to go, 27 that still need financial assessments, and 40 for May eligible.  They sure do add up fast!!

**Barb Ross**   Sr Case Administrator/Medicare Specialist
Tel: 913-777-3800    Cell:    Fax:
Barb.Ross@tevapharm.com    sip:Barb.Ross@tevapharm.com    www.tevapharm.com

---

**From:** Denise Lynch
**Sent:** Tuesday, April 22, 2014 9:34 AM
**To:** Barb Ross
**Subject:** Med D

Hi Barb….Do you know the number of patients we have ready to go at ACS, May eligible and approx. how many we are sending over a day.  Thx.

Best regards,

**Denise Lynch**   VP, Patient Services & Support
Tel: +1-913-777-3700    Cell: +1-913-568-7257    Fax: +1-215-795-4077
Denise.Lynch@tevapharm.com    www.tevapharm.com

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-77

| From: | Michael McCartin |
|---|---|
| To: | Sally Ivarra; Christine Shaltens; Kelly Schneider; Mildred Spencer; Joan McNaney; Theresa Hale |
| CC: | Denise Lynch; Janette Bollinger |
| Sent: | 4/25/2014 3:51:43 PM |
| Subject: | RE: WIRE TRANSFER - THE ASSISTANCE FUND |

Below is the confirmation that the wire was sent

1,275,000.00

FED WIRE OUT⬛⬛⬛ORIGINATOR:TEVA PHARMACEUTICALS USA
AC⬛⬛⬛BENEFICIARY:The Assistance Fund AC/⬛⬛⬛⬛700
Millenia Blvd  Suite 500  Orla ndo  FL 32839 RECVBNK:SUNTRUST BANK
ABA⬛⬛⬛RFB⬛⬛⬛Medicare Patient Assistance
Program - Teva Neuroscience; Attn: Edward Hensley TRN:⬛⬛⬛ED
REF/TIME:000723 /11:42:34 DATE:04-25-14 POST TIME:11:42:34

Best regards,

**Michael McCartin,**  Treasury Specialist
Teva Pharmaceuticals USA, 1070 Horsham Road, North Wales, PA 19454
Tel: 267-468-4268   Michael.McCartin@tevapharm.com

---

**From:** Sally Ivarra
**Sent:** Thursday, April 24, 2014 4:39 PM
**To:** Christine Shaltens; Kelly Schneider; Mildred Spencer; Joan McNaney; Michael McCartin; Theresa Hale
**Cc:** Denise Lynch; Janette Bollinger
**Subject:** WIRE TRANSFER - THE ASSISTANCE FUND
**Importance:** High

Attached is a wire transfer for The Assistance Fund for tomorrow, April 25. Let me know if you have any questions.


*Sally Ivarra, Sr. Coordinator*
*Patient Services and Solutions*
*sally.ivarra@tevapharm.com*
*913-777-3926 (Office)*
*816-719-0573 (Office Cell)*

CONFIDENTIAL – FOIA Exempt

# EXHIBIT A-78

| | |
|---|---|
| **From:** | Blanc, David </O=OMNICARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DBLANC> |
| **To:** | Barton, Debera; Haskell, Heather; Richards, John |
| **CC:** | Elwess, Tawny |
| **Sent:** | 4/25/2014 1:52:42 PM |
| **Subject:** | RE: File for TAF |

Hells yeah!!!

**David Blanc | VP, Client Services | ACS, Inc.**

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

**From:** Barton, Debera
**Sent:** Friday, April 25, 2014 9:16 AM
**To:** Haskell, Heather; Blanc, David; Richards, John
**Cc:** Elwess, Tawny
**Subject:** RE: File for TAF

And we are going to get all 249 on service by the 30th, rightJ

**Debera Barton | Director of Patient Care Services | ACS, Inc.**
6251 Chancellor Dr. | Suite 101 | Orlando, Florida 32809
Phone: 407-854-6584 | Fax:407-386-8160  Email:debera.barton@acs-rx.com
information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message

**From:** Haskell, Heather
**Sent:** Friday, April 25, 2014 9:11 AM
**To:** Blanc, David; Richards, John
**Cc:** Barton, Debera; Elwess, Tawny; Data Services
**Subject:** RE: File for TAF

Hi David,

I sent the file to IT. There were 249 patients. I will let you know once I get it back and its ready to refer.

**Heather Haskell | MS Manager | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407-888-5364 | eFax: 866-679-7131
Email: heather.haskell@acs-rx.com
**Confidentiality Statement:** This e-mail transmission may contain confidential or legally privileged information that is intended only for the individual or entity named in the e-mail address. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this e-mail is strictly prohibited. If you have received this e-mail transmission in error, please delete the message from your Inbox.

**From:** Blanc, David
**Sent:** Thursday, April 24, 2014 8:23 PM
**To:** Richards, John; Haskell, Heather
**Cc:** Barton, Debera; Elwess, Tawny; Data Services
**Subject:** File for TAF

We will need to prepare a file for referral to TAF for Copaxone in the morning tomorrow.

PCS team – please pull the most recent patient MRN list, should be over 235 patients from what Tawny last spoke

CVS246002

Data – copied you as we will need to react quickly and hope that we will be able to refer tomorrow and get approvals so that we can ship patients in April.

Thanks team!

**David Blanc | VP, Client Services | ACS, Inc.**
6251 Chancellor Drive | Suite 101 | Orlando, Florida 32809
Phone: 407.816.2371 | Fax: 407.854.6589
email: david.blanc@acs-rx.com

This information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material, the disclosure of which is governed by applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy the materials contained in this message.

# EXHIBIT A-79

| Foundation | CMS Beneficiary Name | Beneficiary state | Date of Foundation Payment | Payment Amount | Date of Service | AMT Above OOPT | AMT Below OOPT |
|---|---|---|---|---|---|---|---|
| CDF | AM | MA | 1/22/2008 | $25.00 | 1/22/2008 | $0.00 | $1,719.16 |
| CDF | AM | MA | 7/28/2008 | $106.14 | 7/28/2008 | $2,122.74 | $0.00 |
| CDF | AM | MA | 11/25/2008 | $116.64 | 11/25/2008 | $2,332.89 | $0.00 |
| CDF | AM | MA | 12/29/2008 | $116.64 | 12/29/2008 | $2,332.89 | $0.00 |
| CDF | BB | MA | 2/4/2009 | $752.06 | 2/4/2009 | $0.00 | $2,278.97 |
| CDF | BB | MA | 3/5/2009 | $2,075.94 | 3/5/2009 | $0.00 | $2,278.97 |
| CDF | BB | MA | 4/6/2009 | $1,559.85 | 4/6/2009 | $756.97 | $1,522.00 |
| CDF | BB | MA | 4/29/2009 | $125.23 | 4/29/2009 | $2,504.59 | $0.00 |
| CDF | BB | MA | 5/28/2009 | $125.23 | 5/28/2009 | $2,504.59 | $0.00 |
| TAF | MG | MA | 2/3/2011 | $1,380.94 | 2/3/2011 | $939.72 | $2,667.90 |
| TAF | MG | MA | 3/1/2011 | $180.38 | 3/1/2011 | $3,607.62 | $0.00 |
| TAF | MG | MA | 4/1/2011 | $180.38 | 4/1/2011 | $3,607.62 | $0.00 |
| TAF | MG | MA | 6/22/2011 | $180.38 | 6/22/2011 | $3,607.62 | $0.00 |
| TAF | MG | MA | 8/3/2011 | $180.38 | 8/3/2011 | $3,607.62 | $0.00 |
| TAF | MG | MA | 10/19/2011 | $180.38 | 10/19/2011 | $3,607.62 | $0.00 |
| TAF | PL | MA | 8/16/2010 | $3,005.36 | 8/16/2010 | $161.61 | $2,997.28 |
| TAF | PL | MA | 9/13/2010 | $157.94 | 9/13/2010 | $3,158.89 | $0.00 |
| TAF | PL | MA | 11/15/2010 | $157.94 | 11/15/2010 | $3,158.89 | $0.00 |
| TAF | PL | MA | 12/13/2010 | $157.94 | 12/13/2010 | $3,158.89 | $0.00 |
| CDF | TC | MA | 6/26/2014 | $6.35 | 6/26/2014 | $4,734.07 | $0.00 |
| CDF | TC | MA | 7/23/2014 | $6.35 | 7/23/2014 | $4,734.07 | $0.00 |
| CDF | TC | MA | 8/29/2014 | $6.35 | 8/29/2014 | $4,734.07 | $0.00 |
| CDF | TC | MA | 9/22/2014 | $6.35 | 9/22/2014 | $4,734.07 | $0.00 |
| CDF | TC | MA | 12/2/2014 | $6.35 | 12/2/2014 | $4,734.07 | $0.00 |
| CDF | TC | MA | 12/30/2014 | $6.35 | 12/30/2014 | $4,734.07 | $0.00 |
| CDF | TP | MA | 8/24/2015 | $252.45 | 8/24/2015 | $5,049.06 | $0.00 |
| CDF | TP | MA | 9/17/2015 | $252.45 | 9/17/2015 | $5,049.06 | $0.00 |
| CDF | TP | MA | 10/13/2015 | $252.45 | 10/13/2015 | $5,049.06 | $0.00 |
| CDF | TP | MA | 11/16/2015 | $256.66 | 11/16/2015 | $5,133.20 | $0.00 |
| CDF | TP | MA | 12/9/2015 | $256.66 | 12/9/2015 | $5,133.20 | $0.00 |

# EXHIBIT B



# **Drug Pricing Investigation**

Teva—*Copaxone*

Staff Report
Committee on Oversight and Reform
U.S. House of Representatives
September 2020
oversight.house.gov

CAROLYN B. MALONEY
CHAIRWOMAN

ONE HUNDRED SIXTEENTH CONGRESS

JAMES COMER
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5051
MINORITY   (202) 225–5074
https://oversight.house.gov

September 30, 2020

Members of the Committee on Oversight and Reform
U.S. House of Representatives
Washington, D.C. 20515

Dear Colleague:

Last year, the Committee on Oversight and Reform launched one of the most comprehensive and in-depth investigations of drug price increases that Congress has ever conducted.  Initiated by then-Chairman Elijah E. Cummings as our first investigation of the 116th Congress, the Committee sent letters on January 14, 2019, to some of the largest and most profitable drug companies in the world.  These letters sought a broad range of documents and information regarding price increases, executive compensation, and strategies the companies use to limit competition and maximize profits.

Based on dramatic price increases over many years, Chairman Cummings made this sweeping investigation a top priority.  He explained:

> For the past decade, I have been trying to investigate the actions of drug companies for all sorts of drugs—old and new, generic and brand-name.  We have seen time after time that drug companies make money hand over fist by raising the prices of their drugs—often without justification, and sometimes overnight—while patients are left holding the bill.

After Chairman Cummings passed away in October 2019, we continued to aggressively pursue this investigation, repeatedly pressing the companies for documents and information in response to the Committee's requests.

As a result, the Committee has now reviewed more than a million pages of documents.  Many of these documents are internal corporate strategy documents and communications among top executives that provide significant new insights into how and why drug companies keep increasing their prices so dramatically.  The Committee has given each company an opportunity to explain the context and significance of these documents as we determined which to release to the American public.

This week, in conjunction with our hearings with drug company CEOs, I will begin releasing a number of staff reports describing these documents and explaining in detail the following key findings based on our review:

Members of the Committee on Oversight and Reform
Page 2

- At the broadest level, the Committee's investigation shows that although drug companies make products we all need for our health and well-being, their skyrocketing price increases are simply unsustainable going forward.

- The Committee's investigation also reveals new details about the specific tactics drug companies are using to raise prices, maximize profits, and suppress competition among other companies.

- Finally, the Committee's investigation demonstrates that drug companies are taking full advantage of the federal law that currently prohibits Medicare from negotiating directly with drug companies to lower prices.  The drug companies are bringing in tens of billions of dollars in revenues, making astronomical profits, and rewarding their executives with lavish compensation packages—all without any apparent limit on what they can charge.

One of the key legislative reforms being considered by Congress is to finally allow Medicare to negotiate directly with drug companies to lower prices.  On March 8, 2017, Chairman Cummings went to the White House with Committee Member Peter Welch to meet with President Trump, to present their draft legislation to implement this change, and to seek his support for their legislation.

They were hopeful because President Trump, as a candidate and as President-elect, had promised that Americans could save hundreds of billions of dollars if Medicare were allowed to negotiate directly with drug companies.  "We don't do it," the President said.  "Why?  Because of the drug companies."  He said the U.S. must "create new bidding procedures for the drug industry."  He added:  "Pharma has a lot of lobbies and a lot of lobbyists and a lot of power, and there's very little bidding on drugs."  He pledged to create a "fair and competitive bidding process" that would result in prices "coming way, way, way down."  He also warned that the pharmaceutical industry is "getting away with murder."

According to a statement from Chairman Cummings after the White House meeting, President Trump "seemed enthusiastic about the idea" and pledged to work together.  However, despite numerous good faith efforts by Chairman Cummings to follow-up, President Trump never responded again.  Instead, he abandoned his commitment to work jointly on this issue.

On December 12, 2019, the House of Representatives passed H.R. 3, the Elijah E. Cummings Lower Drug Costs Now Act, landmark legislation that includes the key provision to allow Medicare to negotiate directly with drug companies to lower prices.  Unfortunately, this legislation has languished as President Trump openly opposed it and Senate Republicans refused to schedule a vote.  The White House issued a statement opposing the legislation, declaring, "If H.R. 3 were presented to the President in its current form, he would veto the bill."

Instead of supporting H.R. 3, taking on the pharmaceutical industry, and giving Medicare the authority to negotiate directly, President Trump appointed former pharmaceutical industry executives to key health care positions, including Secretary of Health and Human Services Alex Azar and former Director of White House Domestic Policy Council Joe Grogan.  Mr. Grogan,

Members of the Committee on Oversight and Reform
Page 3

who met with drug company executives on multiple occasions, led the Administration's opposition to H.R. 3, even penning an op-ed opposing the legislation a week before it was passed by the House of Representatives.

Now, as the November election draws near, President Trump is scrambling to create the impression that he is addressing a problem he has failed to take on for the past four years. But his actions—such as claiming he will send seniors a "$200 drug discount card" for medications that cost tens of thousands of dollars per month, or approving a "demonstration project" after failing to reach a voluntary deal with the pharmaceutical industry—are deficient and inconsequential, according to experts.

The bottom-line is that, as a result of the President's decision to go back on his campaign promise, drug prices have continued to skyrocket over the past four years. A recent report found that drug companies have raised the list prices of more than 600 single-source brand name drugs by a median 21.4% between January 2018 and June 2020.

My hope is that these hearings and staff reports will shed additional light on this problem and spur the President and the Senate to finally act on H.R. 3. While the current trajectory of drug prices rewards corporate executives handsomely, it is not sustainable for the American taxpayers or American families.

Sincerely,

Carolyn B. Maloney
Chairwoman

**EXECUTIVE SUMMARY**

This staff report describes the actions of Teva Pharmaceuticals in repeatedly raising the price of Copaxone, a drug used to treat multiple sclerosis. Copaxone is Teva's leading brand name medicine, accounting for nearly a fifth of the company's North America net revenue from 2017 to 2019.

The Committee has reviewed more than 300,000 pages of internal documents, communications and data related to Copaxone. This staff report focuses on Teva's pricing practices, business strategies to maximize sales, and tactics it uses to minimize generic competition.

- **Uninhibited Price Increases:** Since launching Copaxone in 1997, Teva raised the price of the drug 27 times. Due to these price increases, a yearly course of Copaxone is priced at nearly $70,000 today as compared to less than $10,000 in 1997.

- **Price Increases Driving Growing Corporate Revenue:** Teva's price increases enabled the company to collect more than $34 billion in Copaxone net U.S. revenue since launching the drug in 1997. Teva's net U.S. revenue for Copaxone increased from $411 million in 2002 to over $3.3 billion in 2016.

- **Millions in Executive Compensation and Bonuses:** As Teva raised the price of Copaxone, it paid its top executives millions of dollars per year. From 2012 to 2017—Teva's peak years for U.S. Copaxone revenue—the company paid its top executives more than $190 million. Lower level employees were aware of the direct link between their compensation and Copaxone's price and revenue. In response to a February 2017 advisory notice that generic competition to Copaxone had been delayed, one executive told his colleagues that the delay "[m]ight be good for cash flow and debt pay down and some of your bonuses."

- **Targeting the U.S. for Higher Prices and Lack of Medicare Negotiation:** With the federal government prohibited from negotiating directly with drug companies to lower prices, Teva targeted the U.S. market for price increases while maintaining or cutting prices for the rest of the world. Internal Teva documents warned that the legislative reform that posed the greatest threat to Teva's future revenue was "Medicare Reform: Removal of government non-interference." In 2015, the net price of Copaxone 40 mg/ml was $126 per day in the U.S., as compared to $33 in Germany, $26 in Spain, $25 in the United Kingdom, and $18 in Russia. Teva emphasized that one of its key strengths was its ability to "increase prices successfully," which was "influenced heavily by US [Teva's U.S. Business] being allowed to hike prices."



**What does Teva do well in Pricing? (Overall GSM & GGM)**

- Pricing negotiation strategy and able to increase prices successfully
  - Influenced heavily by US being allowed to hike prices p.a

- We have dedicated pricing negotiation packages & strategy for all key accounts and tenders

- We apply more frequent price changes
  - Once, twice a year and many on a continuous basis - adaptive

- Teva pricing organization set-up in the right place
  - Pricing established as a business partner
  - Reporting directory to CEO, Marketing or Business Unit
  - Organized by Pricing activity or Business Unit

- Timely, reliable and actionable market intelligence data in place, feeding into pricing strategy and models

| TEVA | CONFIDENTIAL

- **Lobbying Campaign Opposing Reform:**  In response to the threat of reform, Teva's senior executives engaged in an intense lobbying campaign, including meeting with senior Trump Administration officials on three occasions in 2017.  Two meetings included Joe Grogan, former pharmaceutical executive and then-Associate Director of Health Programs at the Office of Management and Budget.  Mr. Grogan later became Director of the Domestic Policy Council in the White House, where he mobilized the Administration against Medicare negotiation.

- **Costs to Medicare:**  Medicare spent hundreds of millions of dollars more on Copaxone each year because of its inability to negotiate directly to lower prices.  Teva's internal data shows that from 2010 to 2013, taxpayers and patients would have spent $1.4 billion less on Copaxone if Medicare had received the same price as the Department of Defense and Department of Veterans Affairs, which are permitted to negotiate directly.

- **Harm to Patients:**  Teva's price increases on Copaxone have resulted in thousands of dollars in out-of-pocket costs for U.S. patients and have left many unable to afford the drug.  A recent study found that the median annual out-of-pocket cost for a Medicare patient on Copaxone was $6,672 in 2019.  Even Teva's own employees could not afford Copaxone at its price.  In one July 2018 exchange, a Teva employee explained that she could no longer afford Copaxone because she would have to pay $1,673.33 out of pocket as compared to $12 for Mylan's generic product.  Ultimately, Teva gave the employee free product, a solution unavailable to most Copaxone patients

- **Donation to Third-Party Foundations as "Investment" to Drive Medicare Sales:**  Internal presentations, emails, and payment authorization documents reveal that between 2008 and 2017, Teva paid hundreds of millions of dollars to third-party foundations to subsidize co-pay and other cost-sharing obligations incurred by Medicare Part D patients.

Teva referred to these donations as an "investment" for future returns, with an expectation that the donations would drive Copaxone sales. For example, Teva's 2008 Copaxone Work Plan estimated that the company would spend approximately $97 million on "Medicare Financial Assistance" between 2008 and 2011 and that this expenditure would result in the sale of an additional 155,113 units of Copaxone worth nearly $300 million.

- **Donations to Third-Party Foundations Continuing Through 2018:** The Department of Justice recently filed a civil suit against Teva alleging that its donations from 2006 to 2015 violated the federal Anti-Kickback Statute. The Committee's investigation suggests that Teva continued this conduct through at least 2018—three years beyond the scope of DOJ's complaint. Teva's donations from 2016 to 2018 appear to have continued to be made with the expectation that they would be delivered to Copaxone patients to drive Teva's Medicare sales.

- **Profit-Driven Co-Pay Assistance Program:** Teva's internal strategy documents frequently emphasized the rate of return of its co-pay assistance program for commercial patients. A 2011 presentation touted that Teva's co-pay program had an average return on investment of 451%.

## COPAXONE Expense Drivers

| Expense Driver | Budget | ROI (>0 is considered positive) |
|---|---|---|
| Patient Assistance | $81M direct | • Returns for commercial patients average 451% with a range of 205% to 761% <br> • Medicare D grants are not included in the assessment |
| Sales Force | $41M people related | • 178% short term ROI <br> • 95% carryover at 6 months |
| Patient Services | $14M direct <br> $17M people related | • 29M invested in 2011 generated $363M with a ROI of 1152% <br> • PAP is not included in this ROI |
| Opportunity and Educational Funds | $17M direct | • Not tracked, but assumed similar to Peer to Peer |
| Peer to Peer | $10M direct | • AHM is the surrogate metric <br> • Average ROI for AHM programs is 701% |
| Scientific Communications | $7M | • Not Tracked |

We make quality healthcare accessible around the world

27

iii

According to internal figures, Teva collected $257.5 million in net revenue from $54.6 million in expenditures on commercial co-pay programs in 2014 and $148.2 million in net revenue from $68.4 million in expenditures on the programs in 2015.

- **New Dosage as "Generic Defense Strategy":**  In 2014, Teva introduced a 40 mg/ml formulation of Copaxone in part to extend its monopoly pricing for Copaxone by shifting patients to that formulation—which still enjoyed market exclusivity—before the 20 mg/ml formulation began facing lower-priced generic competition.  To push patients to the 40 mg/ml formulation of Copaxone, Teva increased the price of the 20 mg/ml formulation.  To press patients to make the move, Teva explored a plan to "Discontinue 20mg Financial Programs (Patient Services)," its financial assistance program for patients.  Teva's strategy was successful in maintaining its profits and limiting competition.  Experts estimate that the strategy cost the U.S. health care system between $4.3 and $6.5 billion in excess spending.

- **Exclusionary Tactics to Limit Generic Competition:**  After Mylan introduced a lower-priced generic version of Copaxone 40 mg/ml in October 2017, Teva implemented several new exclusionary tactics to limit generic competition and maintain profits.  First, Teva contracted with specialty pharmacies and pharmacy benefit managers to limit generic substitution.  Second, Teva lobbied doctors to write prescriptions for Copaxone that prohibited generic substitution.  Third, Teva used its patient programs to convince patients to remain on the more expensive brand name version of the drug.  Teva summarized these strategies in the following slide to its Board of Directors:

## Key Activities to Defend Against Generic Erosion

**Brand over Generic (House Brand) Contracting Strategy**
- Contracting with major payors, PBMs and pharmacies
- Contracts range from Brand over Generic terms (all 40mg Rx will be switched to Brand), to loyalty allowing access to COPAXONE 40mg alongside generic

**Sales force DAW messaging and activities**
- Sales force proactively messages to HCP customers the need for "Dispense as Written" on all new Rx and refills
- Working with office accounts to ensure they have the capabilities and resources need to communicate DAW through verbal, written and electronic means

**Outbound efforts to 40mg patients through Shared Solutions**
- Call center outbound effort to contact all current 40mg patients with active marketing authorization
- Emails to all patients with DAW messaging
- Ability to produce current 40mg patient lists for HCP offices to proactively DAW scripts

**Legal pathways also being explored**

PRIVILEGED AND CONFIDENTIAL - DRAFT FOR INTERNAL DISCUSSION ONLY.                    4

- **<u>Price Increases Not Justified by Rebates</u>:** Teva's internal data undermine the pharmaceutical industry's claims that price increases are the result of increased rebates, discounts, and other fees provide to pharmacy benefit managers. The average net price per unit of Copaxone—the amount of money the company makes on the drug after all rebates and discounts—increased for both the 20 mg/ml and 40 mg/ml doses of Copaxone from 2009 to 2017. The annual rise in average net price ended only after Mylan introduced generic versions of both doses.

- **<u>Price Increases Not Justified by R&D</u>**: Contrary to its public talking points, Teva invested only a small portion of its Copaxone revenue in further research and development to help Copaxone patients. Teva identified a total of $689 million in research and development expenditures related to Copaxone since 1987—only 2% of its $34.2 billion in net U.S. revenue of Copaxone from 2002 to 2019.

v

**TABLE OF CONTENTS**

I.      PRICE INCREASES ................................................................................................... 1

II.     GROWING CORPORATE REVENUE ................................................................... 2

III.    EXECUTIVE BONUSES .......................................................................................... 3

IV.     HIGH U.S. PRICES AND LACK OF MEDICARE NEGOTIATION ..................... 5

      A.      Targeting U.S. Market for Price Increases .................................................. 5

      B.      Cost to Medicare and Patients ..................................................................... 8

      C.      Lobbying Campaign to Prevent Negotiation and Other Reforms ............... 10

V.      PROFIT-DRIVEN PATIENT SUPPORT PROGRAMS .......................................... 12

      A.      Commercial Co-Pay Program ...................................................................... 13

      B.      Donations to Third-Party Foundations ........................................................ 14

      C.      Patient Services ............................................................................................ 22

VI.     NEW DOSE AS "GENERIC DEFENSE STRATEGY" .......................................... 24

      A.      Launching Copaxone 40 mg to Extend Monopoly and Minimize Competition ........ 24

      B.      Price Increases, Contracting, and Marketing to Pressure Patients to Switch ........... 30

      C.      Strategy Successfully Maintained High Prices ............................................ 33

VII.    EXCLUSIONARY TACTICS TO LIMIT GENERIC COMPETITION ................... 35

      A.      "House Brand" Contracting Strategy ........................................................... 36

      B.      "Dispense as Written" Campaign ................................................................. 39

VIII.   COSTS DO NOT JUSTIFY PRICE OF COPAXONE ............................................ 41

      A.      Rebates and Manufacturing .......................................................................... 41

      B.      Research and Development ........................................................................... 42

IX.     CONCLUSION ......................................................................................................... 45

## I.    PRICE INCREASES

Copaxone (glatiramer acetate) is an injectable drug approved to treat relapsing forms of multiple sclerosis (MS).  MS is a disease of the central nervous system that afflicts nearly one million adults in the United States.[1]

Teva first launched Copaxone in March 1997 as a 20 mg/ml injection administered once per day.[2]  In 2014, Teva launched a 40 mg/ml injection administered three times per week and at least 48 hours apart.[3]

Since launching Copaxone 20 mg/ml, Teva has raised the price of the drug 27 times.  As a result of Teva's price increase, the price of Copaxone 20 mg/ml today is almost ten times the price of the drug in 1997.  Today, a monthly course of Copaxone 20 mg/ml is priced at $7,114, as compared to $769.15 in 1997.  A monthly course of Copaxone 40 mg/ml is priced at $5,832 today.[4]

(See Section VI for Teva's business rationale for launching the 40 mg/ml dose of Copaxone and pricing Copaxone 40 mg/ml lower than Copaxone 20 mg/ml as a tactic to limit generic competition.)

MS patients take Copaxone month after month, year after year.  The price of an annual course of Copaxone 20 mg/ml has jumped from $9,230 in 1997 to $85,368 today.[5]  The cost of an annual course of Copaxone 40 mg/ml is $69,984.[6]

Figure 1 below shows the increase in the price of a monthly course of Copaxone injections from 1997 to the present.

---

[1] Teva Pharmaceuticals Industries, Ltd., *Annual Report (Form 10-K) for Fiscal Year 2019* (Feb. 21, 2020) (online at www.sec.gov/ix?doc=/Archives/edgar/data/818686/000119312520044221/d852939d10k.htm); National Multiple Sclerosis Society, *Landmark Study Estimates Nearly 1 Million in the U.S. Have Multiple Sclerosis* (Feb. 15, 2019) (online at www.nationalmssociety.org/About-the-Society/News/Landmark-Study-Estimates-Nearly%C2%A01-Million-in-the-U).

[2] Letter from Robert Temple, Director, Office of Drug Evaluation, Food and Drug Administration, to Debora Jaskot, Teva Pharmaceuticals USA (Dec. 20, 1996) (online at www.accessdata.fda.gov/drugsatfda_docs/nda/pre96/020622Orig1s000rev.pdf).

[3] Letter from Billy Dunn, Acting Director, Division of Neurology Products, Food and Drug Administration, to Dennis Ahern, Teva Pharmaceuticals USA (Jan. 28, 2014) (online at www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/020622Orig1s089ltr.pdf).

[4] IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone*.

[5] This calculation is based on the Whole Sale Acquisition cost of 12 monthly packages of Copaxone 20 mg/ml, each of which includes 30 syringes.

[6] This calculation is based on the Whole Sale Acquisition cost of 12 monthly packages of Copaxone 40 mg/ml, each of which includes 12 syringes.



Figure 1:  Copaxone Price Increases 1997-2020

## II.   GROWING CORPORATE REVENUE

Teva's price increases have fueled significant growth in net U.S. revenue for Copaxone. In 2002, Teva reported net U.S. revenue of $411 million.  Net U.S. revenue grew consistently for the next 11 years, peaking at $3.2 billion in 2013.  From 2014 to 2017, Copaxone net U.S. revenue leveled at between $3.1 billion and 3.3 billion per year—nearly an eight-fold increase over 2002.  Teva's net U.S. revenue began to decrease only when the first 40 mg/ml generic and the second 20 mg/ml generic came to market in October 2017.[7]

Figure 2 below reflects Teva's net U.S. revenue over time.[8]

---

[7] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 25, 2020); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019); Teva Pharmaceuticals Industries, Ltd., *Annual Reports (Forms 10-K or 20-F)* (2002-2019) (online at https://ir.tevapharm.com/financials/sec-filings/default.aspx).

[8] *Id.*



Figure 2: Net U.S. Revenue for Copaxone

## III.    EXECUTIVE BONUSES

From 2012 to 2017, Teva's net U.S. revenue for Copaxone averaged more than $3 billion per year, driven in part by its executives' decision to raise the list price of Copaxone from $3,475 to $5,832 per month.[9] Teva's top executives were in turn paid more than $190 million in total compensation over that same period.[10]

Teva's compensation policy makes clear that a significant portion of its executive compensation is based on "overall company performance measures," including net revenue and

---

[9] Teva Pharmaceuticals Industries, Ltd., *Annual Reports (Forms 10-K or 20-F)* (2002-2019) (online at https://ir.tevapharm.com/financials/sec-filings/default.aspx); IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone.* The 2012 price is for a daily 20 mg/ml dose on January 1, 2012, while the 2017 price is for a 40 mg/ml dose taken three times per week (which is less expensive than the 20 mg/ml dose) on Jan. 1, 2017. The 40 mg/ml dose was not introduced until 2014. From 2012 to 2017, the average net price of Copaxone increased from $3,113 to $3,886 per month. Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 25, 2020); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019).

[10] Teva Pharmaceuticals Industries, Ltd., *Annual Reports (Forms 10-K or 20-F)* (2002-2019) (online at https://ir.tevapharm.com/financials/sec-filings/default.aspx). The 2012 to 2016 figures are based on Teva's reporting of aggregate executive compensation for executive officers. The 2017 figure is based on Teva's reporting of compensation for ten named executive officers.

earnings.[11]  From 2012 to 2017, Copaxone's net U.S. revenue made up 15% of Teva's net worldwide revenue for all products.  Teva's price increases for Copaxone had a direct impact on executive bonuses.[12]

Figure 3 below provides compensation data for Teva's highest compensated executives in 2015 and 2016—two of the years with the highest net revenue from Copaxone.[13]

Figure 3

| Teva Senior Executive Compensation | | | | | |
|---|---|---|---|---|---|
| | 2015 | | | | |
| | Base Salary | Cash Bonuses | Stock & Option Awards | All Other Compensation | Total |
| Erez Vigodman, President and CEO | $ 1,363,692 | $ 2,253,581 | $ 1,327,657.00 | $ 722,627 | $ 5,667,557 |
| Michael Hayden, President of Global R&D and Chief Scientific Officer | $ 1,050,000 | $ 1,608,239 | $ 2,295,677.00 | $ 1,449,857 | $ 6,403,773 |
| Eyal Desheh,Chief Financial Officer | $ 733,863 | $ 1,110,824 | $ 1,701,057.00 | $ 786,020 | $ 4,331,764 |
| Sigurdur Olafsson, President, Global Generic Medicines Group | $ 954,955 | $ 1,499,375 | $ 958,432 | $ 537,507 | $ 3,950,269 |
| Carlo de Notaristefani, EVP, Global Operations | $ 877,231 | $ 1,189,398 | $ 1,559,349 | $ 204,297 | $ 3,830,275 |
| Total | | | | | $ 24,183,638 |
| | 2016 | | | | |
| | Base Salary | Cash Bonuses | Stock & Option Awards | All Other Compensation | Total |
| Erez Vigodman, Former President and CEO | $ 1,528,437 | $ - | $ 2,952,979 | $ 824,040 | $ 5,305,456 |
| Michael Hayden, President of Global R&D | $ 1,071,000 | $ 970,202 | $ 2,155,849 | $ 1,401,419.00 | $ 5,598,470 |
| Richard Egosi, Former Group Executive Vice President | $ 743,487 | $ 458,949 | $ 3,837,397 | $ 304,285 | $ 5,344,118 |
| Sigurdur Olafsson, Former President, Global Generic Medicines Group | $ 1,060,084 | $ 885,822 | $ 2,623,004 | $ 131,109.00 | $ 4,700,019 |
| Carlo de Notaristefani, EVP, Global Operations | $ 835,832 | $ 872,532 | $ 2,013,316 | $ 228,467 | $ 3,950,147 |
| Total | | | | | $ 24,898,210 |

Internal documents produced by Teva suggest that employees at all levels of the company were incentivized to exceed financial targets.  For example, a 2016 strategy presentation

---

[11] *Id.*; *see also* Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 28, 2020)

[12] *Id.*; Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 25, 2020); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019).

[13] Teva Pharmaceuticals Industries, Ltd., *Annual Reports (Forms 10-K or 20-F)* (2015-2017*)* (online at https://ir.tevapharm.com/financials/sec-filings/default.aspx).

4

recommended that the company build "more attractive career paths for pricers, train them and reward them based on profit."[14]

Email exchanges between employees show that they were aware of the direct link between compensation and Copaxone sales. In response to a February 2017 advisory notice that generic competition to Copaxone had been delayed, one executive told his colleagues that the delay "[m]ight be good for cash flow and debt pay down and some of your bonuses."[15]



## IV.    HIGH U.S. PRICES AND LACK OF MEDICARE NEGOTIATION

Under current law, the federal government is prohibited from negotiating directly with pharmaceutical companies to lower prices for Medicare beneficiaries. [16] With the federal government unable to negotiate, Teva targeted the U.S. market for price increases while maintaining or cutting prices in the rest of the world.

### A.    Targeting U.S. Market for Price Increases

Teva's 2007-2009 strategic plan warned that the company was facing "downward prices [sic] pressure in Europe." [17] Over the same two year period, Teva raised the U.S. price of Copaxone by 60%.[18] By 2013, Teva was charging more than three times as much for Copaxone

---

[14] TEVA_HCO_IC_005040409, at Page 42.

[15] TEVA_HCO_IC_005008955 (Feb. 2017 email regarding delay of generic Copaxone 40 mg because of fill/finish issues).

[16] 42 U.S.C. § 1395w-111.

[17] TEVA_HCO_IC_005182598, at Slide 19.

[18] *Id.*; IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone.*

in the United States than in England, New Zealand, the Netherlands, and Spain, according to an independent study by the International Federation of Health Plans.[19]

An internal Teva presentation from 2016 compared the price of Copaxone in the United States to the rest of the world. According to the presentation, the 2015 net price of Copaxone 20 mg/ml was $97 per day of therapy in the United States as compared to $18 per day in Russia, $24 per day in Italy, $26 per day in the United Kingdom, $28 per day in France, $29 per day in Spain, $33 per day in Canada, and $40 per day in Germany. The net price difference between the U.S. and the rest of the world for Copaxone 40 mg/ml was even more drastic: $126 per day of therapy in the U.S., as compared to $18 per day in Russia, $25 per day in the United Kingdom, $26 per day in Spain, and $33 in Germany.[20]

Figure 4 below summarizes the prices listed in the presentation.

<div align="center">Figure 4: 2015 Net Price Per Day of Therapy[21]</div>



In another 2016 presentation, Teva emphasized that one of its key strengths was its ability to "increase prices successfully," which was "influenced heavily by US [Teva's U.S. Business] being allowed to hike prices."[22]

---

[19] International Federation of Health Plans, *2013 Comparative Price Report: Variation in Medical and Hospital Prices by Country* (2013) (online at https://s3.amazonaws.com/assets.fiercemarkets.net/public/005-LifeSciences/ifhpreport.pdf).

[20] TEVA_HCO_IC_005025464, at Slide 27.

[21] *Id.*

[22] TEVA_HCO_IC_005040409, at Slide 32



A draft 2017 presentation comparing Copaxone pricing trends in the United States to Europe emphasized that in the United States, "Premium prices are available—current list prices average $80k per patient per year," while in Europe, "Current list price (average $13k per patient per year) [is] much lower than US price."  The presentation also emphasized that in the United States, "Payers do not generally dictate prescribing despite higher cost."[23]

## Pricing Trends

DRAFT

Generitization of multiple classes on the 5 year horizon potential to change the pricing paradigm

|  | US dynamic | EU dynamic |
|---|---|---|
| Current pricing dynamic | • Premium prices are available – current list prices average $80k per patient per year<br>• But payers demand competitive discounting – highest discounts for older DMTs, lower for newer DMTs - but averaging ~25% in GTN w/ COP 40 at 40% GTN<br>• HEOR is a key lever for preferred plan coverage<br>• Payers do not generally dictate prescribing despite high cost | • Health technology assessment is the firmly established P&R gatekeeper<br>• Current list price (average $13k per patient per year) much lower than US price<br>• With discounts averaging ~10 to 15%<br>• H2H comparisons against SoC are expected, but do not guarantee success (if no H2H comparator – DMT is relegated to lowest priced DMT or reference pricing)<br>• Country-specific eligibility guidelines and prescribing restrictions may be narrower then EMA labeling |
| Future pricing dynamic | • Generitization of oral (small molecule) DMTs could potentially drive pricing erosion of ~85% within two years¹<br>• Biosimilars expected to drive pricing erosion of only ~35% within two years¹<br>  • Rebate range for biosimilars are not expected to be significantly different from the originator rebate; biosimilars are hampered by volume-based contracts and longer originator contracts<br>• Payers are interested in piloting outcomes-based contracts<br>• Potential HHS negotiation power for Medicare and Medicaid | • (Compared to the US,) generic or follow on products drive significantly less price and sales erosion happening over a significantly longer period of time<br>• Possible move to rejection of placebo-controlled studies for reimbursement consideration (e.g., Italy)<br>• More focus on cost-effectiveness analysis; budget impact management<br>• To reduce spending, focus on simpler contracts (e.g., straight discounts) over risk-sharing and outcome-based contracts (where administrative cost and compliance decrease effectiveness) |

Sources: Evidera Policy Change presentation, Feb 2017; Decision Resources Disease Landscape & Forecast, November 2016 BY2015
1. Decision Resources Market Forecast Assumptions, November 2016 BY2015

teva

---

[23] TEVA_HCO_IC_005199492, at Slide 12.

By contrast, Teva has been forced to *decrease* the list price of Copaxone 40 mg/ml in other countries.  For example, an October 2017 internal presentation noted that Australia was expected to impose "a mandatory price decrease of 15%" in 2018 because Copaxone was an "old product" and that France was expected to impose a mandatory price decrease of 11% when a generic version of the drug entered the market in 2019.[24]  In May 2018, Teva executives expressed concerns that an expected "25-30% transparent price reduction on Copaxone 20 and Copaxone 40 in Canada" might "harm the situation of Copaxone in US in any way (e.g. from public perception of view, due to the large difference in price levels)."[25]

### B.    Cost to Medicare and Patients

Taxpayers and patients spent hundreds of millions of dollars more on Copaxone each year because of the prohibition on Medicare's ability to negotiate directly for lower prices.

Teva's internal data show that government payers that are permitted to negotiate directly with manufacturers—such as the Department of Defense (DOD) and the Department of Veterans Affairs (VA)—obtained much larger discounts on Copaxone, even when there was no lower-priced generic on the market.[26]  In 2013, the average net price that VA and DOD paid for a monthly course of Copaxone 20 mg/ml was $2019.88, while Medicare Part D plans paid on average $4,206.33.  If Medicare had secured the same net price as the VA and DOD, Medicare would have saved more than $1.4 billion on Copaxone from 2010 to 2013. [27]  Figure 5 below highlights the differences in these discounts and the lost savings.

Figure 5:  Lost Medicare Part D Savings for Copaxone 20 mg/ml[28]

| | Copaxone 20 mg/ml | | | | | |
|---|---|---|---|---|---|---|
| Year | Gross Medicare Part D Sales | Average Part D Discount % | Net Part D Expenditures | Average VA/DOD Discount % | Net Part D Expenditures if VA/DOD Discount | Lost Part D Savings |
| 2010 | $ 539,431,248.38 | 7.1% | $ 501,131,629.75 | 48.6% | $ 277,267,661.67 | $ 223,863,968.08 |
| 2011 | $ 707,725,488.16 | 10.5% | $ 633,414,311.90 | 54.5% | $ 322,015,097.11 | $ 311,399,214.79 |
| 2012 | $ 911,468,903.08 | 10.9% | $ 812,118,792.64 | 47.4% | $ 479,432,643.02 | $ 332,686,149.62 |
| 2013 | $ 1,120,491,044.47 | 8.6% | $ 1,024,128,814.65 | 56.1% | $ 491,895,568.52 | $ 532,233,246.12 |
| Total | $ 3,279,116,684.09 | 9.40% | $ 2,970,793,548.94 | 52.10% | $ 1,570,610,970.32 | $ 1,400,182,578.62 |

---

[24] TEVA_HCO_IC_005093861, at Slide 2.

[25] TEVA_HCO_IC_005008283.

[26] Although the Veterans Health Care Act of 1992 set a ceiling price that may be charged to the Department of Veterans Affairs (VA), the Department of Defense, the Public Health Service, and the Coast Guard for prescription drugs, the VA uses a national formulary to secure even steeper discounts on behalf of beneficiaries. *See* Health Affairs, *Health Policy Brief:  Veterans Health Administration* (Aug. 10, 2017) (online at www.healthaffairs.org/do/10.1377/hpb20171008.000174/full/healthpolicybrief_174.pdf).

[27] *See* Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Sept. 25, 2020) (stating average discount percentages for Medicare Part D and "VA/DOD").  To arrive at this calculation, Committee staff also relied on gross sales data published by the Centers for Medicare and Medicaid Services; *See* Centers for Medicare and Medicaid Services, *Medicare Part D Drug Spending Dashboard & Data* (online at www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Information-on-Prescription-Drugs/MedicarePartD).

[28] *Id.*

8

Medicare Part D also paid thousands of dollars more for Copaxone 40 mg/ml than the VA or DOD. Figure 6 below shows the difference between Medicare Part D's net price for Copaxone 40 mg/ml and VA and DOD's net price for Copaxone 40 mg/ml.

Figure 6: Medicare Part D's Higher Price for Copaxone 40 mg/ml[29]

| Monthly Pack of Copaxone 40 mg/ml | |
|---|---|
| Year | Medicare Part D's Additional Cost (Compared to VA/DOD) |
| 2014 | $ 1,903.14 |
| 2015 | $ 2,015.10 |
| 2016 | $ 2,420.91 |
| 2017 | $ 2,473.47 |
| 2018 | $ 1,453.95 |
| 2019 | $ 1,334.74 |

Teva's price increases on Copaxone have imposed thousands of dollars in out-of-pocket costs on U.S. patients and have left many unable to afford the drug. A recent Kaiser Family Foundation study found that the median annual out-of-pocket cost for a Medicare patient on Copaxone was $6,672 in 2019.[30]

Internal documents indicate that Teva executives understood that their price increases contributed to higher out-of-pocket costs. For example, in 2016, one Teva employee reported to General Manager of Teva Neuroscience John Hassler, "you can definitely see a trend in the increase in OOP [out of pocket] costs that the payers are shifting to patients and some of this may be our price increases as well."[31]

---

[29] *Id.*

[30] Kaiser Family Foundation, *The Out-of-Pocket Cost Burden for Specialty Drugs in Medicare Part D in 2019* (Feb. 2019) (online at http://files.kff.org/attachment/Issue-Brief-the-Out-of-Pocket-Cost-Burden-for-Specialty-Drugs-in-Medicare-Part-D-in-2019).

[31] TEVA_HCO_IC_005001166 (Aug. 2016 email exchange analyzing Teva's expenditures on patient assistance programs).

**From:** ████████████
**Sent:** Thursday, August 18, 2016 4:56 PM
**To:** John Hassler
**Subject:** RE: Financial Assistance

Hi John,

Please see the attached summary of the activity that we have been seeing on Copaxone over the past few years. There definitely have been increases in out of pocket costs to patients. As you look at the first graph, please take note that the 'patient cost' reflects the amount that Teva incurs on behalf of the patient and in 2014 to 2015 is when we introduced the $0 program. Some of the increased costs during this time period relates to the additional $35 that we were picking up for transition or new 40mg patients, not all of this is attributable to plan designs. However, you can definitely see a trend in the increase in OOP costs that the payers are shifting to patients and some of this may be our price increases as well. Please let me know if you have any questions.

Even Teva's own employees could not afford Copaxone at its price. In one July 2018 exchange, a Teva employee explained that she could no longer afford Copaxone because she would have to pay $1,673.33 out of pocket as compared to $12 for Mylan's generic. Ultimately, Teva gave the employee free product, a solution unavailable to most Copaxone patients.[32]

Some Teva employees urged the company to slow its price increases or reduce the price of Copaxone. According to a December 2017 spreadsheet summarizing employee responses to solicitation for social impact ideas, one employee proposed capping price increases and reducing the price of Copaxone, and another suggested that Teva should commit to not increasing list prices above a certain percentage each year.[33]

### C.    Lobbying Campaign to Prevent Negotiation and Other Reforms

Teva's internal documents reveal a deep concern that Congress would pass drug pricing legislation to allow direct negotiations that could harm the company's bottom line. In response, Teva launched a "Drug Price Task Force" and an associated lobbying campaign to identify the risks of various potential reforms and develop a strategy to defeat them.[34]

In May 2017, the Drug Price Task Force emphasized that the reform presenting the greatest threat to Teva's future revenue was "Medicare Reform: Removal of government non-interference," which refers to repealing the prohibition on Medicare negotiating directly with drug companies to lower prices.[35]

In response to the threat of reform, Teva engaged in an intense lobbying campaign. From 2017 to 2020, Teva reported spending $11.6 million to lobby the House of Representatives and

---

[32] TEVA_HCO_IC_005127328.

[33] TEVA_HCO_IC_005062856.

[34] TEVA_HCO_IC_005121399.

[35] *Id.*

the Senate.[36]  Senior Teva executives also met with senior Trump Administration officials on three occasions in 2017.[37]  Two of these meetings included Joe Grogan, former pharmaceutical executive and then Associate Director of Health Programs at the Office of Management and Budget.[38]

Mr. Grogan later became the Director of the Domestic Policy Council at the White House, where he argued against Medicare negotiation—the same reform that Teva's Drug Price Task Force had identified as the company's greatest threat.[39]

Teva also relied on the trade association, Pharmaceutical Research and Manufacturers of America (PhRMA), to lobby against reforms that would lower the price of drugs like Copaxone. For example, in May 2017, Teva executives discussed sharing talking points with PhRMA to address criticisms of Copaxone's price.  The talking points emphasized that "Teva makes financial contributions/donations to patient assistance funds annually to help patients with out of pocket costs." [40]  As explained in Section V below, Teva's contributions and donations were in its own self-interest and drove millions of dollars in additional sales.

Teva's talking points for PhRMA attempted to justify Copaxone's price by stressing that "Copaxone is a complex molecule which requires precise manufacturing capabilities" and noting that manufacturers "offer different levels of discounts and rebates to make the medications more affordable."[41]  As explained in Section VIII below, Teva's own internal data undermine its claims that manufacturing costs or rebates drove its price increases for Copaxone.

In an email to Teva's Senior Director of Public Policy in April 2017, a Teva executive identified "two issues I would like to see Pharma start lobbying for:"  imposing a statute of limitation on when states could seek Medicaid rebates; and second, by reducing or exempting Medicaid rebates on beneficiaries who are dually eligible for Medicaid and Medicare.[42]

---

[36] United States Congress Lobbying Disclosure Database, *Query Results for Teva Pharmaceuticals USA, Inc.* (online at www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm) (accessed Sept. 28, 2020).

[37] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Mar. 19, 2019).

[38] *Id.*

[39] *Grogan and Philipson:  We Can Lower Drug Prices and Spur Medical Innovation.  Pelosi's H.R. 3 is Not the Answer*, Fox Business (Dec. 6, 2019) (online at www.foxbusiness.com/money/lower-drug-prices-medical-innovation-pelosi-hr3-grogan-philipson).

[40] TEVA_HCO_IC_005022375.

[41] *Id.*

[42] TEVA_HCO_IC_005007009.

11

> **From:** Katie Hiett
> **Sent:** Thursday, April 06, 2017 4:21 PM
> **To:** ▮▮▮▮▮▮
> **Subject:** Question
>
> ▮▮▮▮▮▮
>
> I am looking for some direction on who can help me with some policy changes I would like to see Pharma start pushing for when it comes to the Medicaid program and Medicaid Expansion.
>
> There are two issues I would like to see Pharma start lobbying for.
>
> - There is no statute of limitation on the states on when they can submit Medicaid.  They can go back forever and we have no way of knowing about these liabilities.  We continue to get hit with surprises and if Medicaid continues to expand this will only get worse.  This is millions of dollars for Teva and I know all other pharma gets hit with the same amounts.  It has been referenced on some earnings calls when they miss earnings.
> - Medicaid currently collects 100% of the rebate even if they only pay a penny against the claim.  We are seeing more and more of this with the aging population.  They have dual coverage so we get hit with the rebate from the payer claim and then we get hit with the full rebate from Medicaid even though Medicaid was the secondary payer.  Currently Teva has several products that have 100% rebate in Medicaid due to best price and a long history of price increases or just being on the market for a long time.  Copaxone 20, ▮▮▮▮▮▮▮ are all at 100% WAC rebate in Medicaid meaning we don't ever cover our COGS or other GTN discounts.
>
> I think we need to start advancing some of these changes given the massive increase in this program since ACA and our voice needs to be heard.  Don't know where to start.

In April 2017, Teva pressed the American Academy of Neurology (AAN) not to criticize the price of Copaxone during an upcoming AAN webinar on drug pricing and other policy priorities.  Prior to the webinar, a Teva executive spoke with AAN's corporate relations department and "expressed our [Teva's] displeasure that Copaxone was the only MS drug mentioned in their policy paper on drug pricing."  After watching the webinar, the executive reported to his colleagues that "Copaxone was not mentioned during today's webinar."[43]

## V.    PROFIT-DRIVEN PATIENT SUPPORT PROGRAMS

In recent years, Teva has responded to criticism about the price of Copaxone by citing its patient assistance programs.[44]  These programs consist primarily of three separate initiatives:

- "Copaxone Co-Pay Solutions," which covers the co-pays of Copaxone patients with commercial insurance;[45]

---

[43] TEVA_HCO_IC_005039313.

[44] *See, e.g.*, TEVA_HCO_IC_005000887 (Oct. 2016 talking points instructing Teva executives to pivot to Teva's "Copaxone Co-Pay Solutions" and other Shared Solutions services if asked "How can you justify the price escalation of Copaxone over the last decade?"); Letter from Debra Barrett, Senior Vice President of Global Government Affairs and Public Policy, Teva Pharmaceuticals, to Ranking Member Elijah E. Cummings, Committee on Oversight and Government Reform (Oct. 6, 2017) (emphasizing patient programs in response to previous Congressional inquiry).

[45] *See* Teva Neuroscience Inc., *Teva's Shared Solutions for Copaxone* (online at www.copaxone.com/shared-solutions) (accessed Sept. 28, 2020).

12

- Cash donations to third-party foundations that pay the out-of-pocket costs of Medicare beneficiaries;[46] and

- Patient services, including injection training.[47]

In contrast to Teva's public claims that its programs justify its price increases, the Committee's investigation revealed that Teva profited greatly from increased sales due to these same programs.

A.      **Commercial Co-Pay Program**

Teva's internal strategy documents frequently emphasize the rate of return of its commercial co-pay program. For example, Teva's 2008 Copaxone Work Plan estimated that the company would spend approximately $70 million on "Private Insurance Financial Assistance" between 2008 and 2011 and that this expenditure would result in the sale of 198,930 units of Copaxone that otherwise would have been lost.[48] Assuming a list price of $1,886 per unit (the price of Copaxone on the date of the presentation), these sales were worth $373,484,580—a 433% return on investment.[49]

The 2008 Work Plan's estimate proved conservative. Its Workplan for 2012 to 2014 reported that Teva's co-pay program had an average return on investment of 451% for commercial patients.[50]

---

[46] *See* TEVA_HCO_IC_005095143 (Jan. 17, 2017, email and attachments documenting $38 million in total "2017 Copaxone donations" to HealthWell Foundation's MS Medicare Access Fund, PAN Foundation's "MS Fund," and The Assistance Fund's "MS Copay Assistance Program"); *see also* Exhibit 1 to Complaint, *United States v. Teva Pharmaceuticals USA, Inc.*, No. 20-11548 (D. Mass. Aug. 18, 2020) (online at www.justice.gov/usao-ma/press-release/file/1305491/download) (showing $328,632,000 in payments to two foundations between 2006 and 2015).

[47] *See* Teva Neuroscience Inc., *Teva's Shared Solutions for Copaxone* (online at www.copaxone.com/shared-solutions) (accessed Sept. 28, 2020).

[48] TEVA_HCO_IC_005141925, at Slide 37. To arrive at this calculation, Committee staff totaled the "Cost" and "Units Not Lost" figures for "Private Insurance Financial Assistance" from 2008 to 2011.

[49] *Id.*; IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone.* Committee staff used list price here because Teva did not provide the Committee with Copaxone's net price per unit for 2008. But the $1,886 list price used in this analysis is significantly lower than the drug's *net* price in 2009-2011, making the analysis conservative.

[50] TEVA_HCO_IC_005142081, at Slide 27. The presentation was careful to note that "Medicare D grants are not included in the assessment."

13

In the years that followed, Teva continued to profit from its investments in commercial co-pay programs. Internal strategy documents indicate that Teva collected $257.5 million in net revenue from its $54.6 million in expenditures on the commercial co-pay programs in 2014.[51] Teva collected $148.2 million in net revenue from its $68.4 million in expenditures on the programs in 2015.[52]

A 2017 strategy presentation explained that the commercial co-pay programs benefited Teva's sales by ensuring that patients stayed on Copaxone over time. Teva estimated that a patient on the program was 15% more likely to stay on the drug for 12 months than a patient that was not on the program.

### B.    Donations to Third-Party Foundations

---

[51] TEVA_HCO_IC_005083616, at Slide 11. To arrive at this calculation, Committee staff totaled the expenditures and net sales figures for "Commercial Co-Pay (PAP)" and "Coupon (CCS)" (which stands for Commercial Co-Pay Solutions), which were Teva's two commercial co-pay programs at the time.

[52] TEVA_HCO_IC_005083616, at Slide 16. To arrive at this calculation, Committee staff totaled the expenditures and net sales figures for "Comercial Co-Pay (PAP)" and "Coupon (CCS)" (which stands for Commercial Co-Pay Solutions), which were Teva's two commercial co-pay programs at the time.

14

The federal Anti-Kickback Statute prohibits pharmaceutical manufacturers from subsidizing the co-pay and other cost-sharing obligations incurred by Medicare Part D patients.[53] Manufacturers are permitted to make donations to "independent, *bona fide* charitable assistance programs" when appropriate safeguards exist.[54]  According to the Office of Inspector General (OIG) of the Department of Health and Human Services (HHS):  "Simply put, the independent charity PAP [patient assistance program] must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices."[55]

The documents reviewed by the Committee indicate that Teva's donations to third-party foundations were made as an "investment" for future returns, with the expectation that such donations would drive Copaxone sales.[56]  For example, Teva's 2008 Copaxone Work Plan estimated that the company would spend approximately $97 million on "Medicare Financial Assistance" between 2008 and 2011 and that this expenditure would result in the sale of an additional 155,113 units of Copaxone that were "incremental" or "not lost."[57]  Assuming a list price of $1,886 per unit (the price of Copaxone on the date of the presentation), these Part D sales were worth $292,543,118—a 200% return on investment.[58]

Teva's 2008 Copaxone Work Plan estimated that Teva would lose $11.4 million in sales if it reduced its "investment" in "Medicare Part D Grants" by $4.3 million.  Similarly, the Work Plan estimated that Copaxone net sales would decline by $16 million in 2009, $33 million in 2010, and $45 million in 2011 if Teva were to "eliminate Medicare PAP Investment."[59]

---

[53] *See* 42 U.S.C. § 1320a-7b(b); Department of Health and Human Services, Office of Inspector General, *Special Advisory Bulletin:  Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623 (Nov. 22, 2005) (online at www.govinfo.gov/content/pkg/FR-2005-11-22/pdf/05-23038.pdf); Department of Health and Human Services, Office of Inspector General, *Supplemental Special Advisory Bulletin:  Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120 (May 30, 2014) (online at https://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/independent-charity-bulletin.pdf).

[54] Department of Health and Human Services, Office of Inspector General, *Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623 (Nov. 22, 2005) (online at www.govinfo.gov/content/pkg/FR-2005-11-22/pdf/05-23038.pdf).

[55] *Id.*

[56] TEVA_HCO_IC_005141925, at Slide 50.

[57] TEVA_HCO_IC_005141925, at Slide 37.  To arrive at this calculation, Committee staff totaled the "Incremental Units," "Units Not Lost," and "Cost" figures for "Medicare Financial Assistance" from 2008 to 2011.

[58] *Id.*; IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone*.  Committee staff used list price here because Teva did not provide the Committee with Copaxone's net price per unit for 2008.  But the $1886 list price used in this analysis is significantly lower than the drug's *net* price in 2009-2011, making the analysis conservative.

[59] TEVA_HCO_IC_005141925, at Slide 46, 50.  At Teva's request, Committee staff agreed to redact non-relevant information.

**Downside to Plan V1** — TEVA NEUROSCIENCE

| | | | |
|---|---|---|---|
| Probable Net Sales | 1,742 | 1,957 | 2,150 |
| | | | |
| Downside Events: | 2009 | 2010 | 2011 |
| No Pricing Action | (144) | (324) | (517) |
| Discount Rx - No Impact on Compliance | (53) | (74) | (75) |
| Eliminate Medicare PAP investment | (16) | (33) | (45) |
| | | | |
| Private PAP Programs does not increase Patients | (14) | (26) | (35) |
| Probable Contribution | 894 | 1,390 | 1,671 |
| | | | |
| Downside Events: | 2009 | 2010 | 2011 |
| No Pricing Action | (94) | (272) | (468) |
| Discount Rx - No Impact on Compliance | (34) | (63) | (68) |
| Eliminate Medicare PAP investment | (11) | (28) | (41) |
| | | | |
| Private PAP Programs does not increase Patients | (9) | (22) | (31) |

Confidential
Teva Neuroscience                    9/28/2020 12:01:12 AM                    50

A September 23, 2015, email reveals that Teva's most senior executives were required to approve large donations to the third-party foundations, such as the investments described above. The email explains that after Teva received "a request for Copaxone donations from The Assistance Fund" and determined the timing of the donation, it would need "written documentation from the appropriate approval authority."[60]  The email lists the "Approval Authority Levels" as:

Approval Authority Levels
$0.5M Sr. Director
$1M VP
$5M SVP (Larry Downey in the past)
$15M TEC members (Rob Koremans)
$25M CFO (Eyal Desheh)
>$25M CEO (Erez Vigodman)

Given the size of Teva's donations to third-party foundations, this policy would have required them to have been approved by the company's Executive Committee, Chief Financial Officer (CFO), or Chief Executive Officer (CEO).[61]

---

[60] TEVA_HCO_IC_005095970.

[61] *Id.*  Teva originally attempted to redact this portion of the email in its productions to the Committee. Teva reversed course after the Department of Justice released a version of this email that was unredacted.  *See* Letter

16

On August 18, 2020, the Department of Justice (DOJ) filed a civil lawsuit against Teva regarding its payments to third-party foundations.  DOJ's complaint alleged:

> During the period from late 2006 through at least 2015, Teva knowingly and willfully violated the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), by paying over $300 million to two third-party foundations, Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF"), to cover the Medicare co-pay obligations of Copaxone patients.  This conduct generated hundreds of millions of dollars in false claims to Medicare and a corresponding amount of revenue for Teva.[62]

DOJ's complaint also alleged:

> Teva paid CDF and TAF tens of millions of dollars each year because it knew that the foundations would use Teva's money to cover Copaxone co-pays, thus increasing Copaxone sales and enriching Teva in amounts that far exceeded its payments to the foundations. [63]

According to data attached to DOJ's complaint, Teva paid a total of $328,632,000 to CDF and TAF between December 2006 and December 2015.[64]

Documents reviewed by the Committee indicate that Teva continued its payments to TAF and other third-party foundations through at least 2018—three years beyond the scope of DOJ's complaint.  These documents suggest that Teva's donations continued to be based on the expectation that they ultimately would be delivered to Copaxone patients.

In January 2016, executives sought approval for a $10 million "Copaxone Donation wire transfer" to TAF.  In seeking the approval, the executives emphasized that "this is a common payment we make each year."[65]

---

from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Sept. 10, 2020).

[62] Complaint, *U.S. v. Teva Pharmaceuticals USA, Inc.*, No. 1:20-cv-11548 (D. Mass.) (Aug. 18, 2020) (www.justice.gov/usao-ma/press-release/file/1305806/download).

[63] *Id.*

[64] Exhibit 1 to Complaint, *U.S. v. Teva Pharmaceuticals USA, Inc.*, No. 1:20-cv-11548 (D. Mass.) (Aug. 18, 2020) (online at www.justice.gov/usao-ma/press-release/file/1305491/download) (showing $328,632,000 in payments to two foundations between 2006 and 2015).

[65] TEVA_HCO_IC_05293411.

From: David Loughery
Sent: Thursday, January 28, 2016 11:26 AM
To: Larry Downey; Michael McClellan
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮
Subject: Copaxone Donation wire transfer -$10M January 2016-.xlsx
Attachments: Copaxone Donation wire transfer -$10M January 2016-.xlsx

Larry/Mike,

Attached is a request to pay another $10M for Copaxone donations. Mike Sheehy has approved. As this is a common payment we make each year, I'm not clear on what further approvals we need beyond the 2 of you. This amount is included in the 2016 AOP.

DL

In October 2016, executives circulated a business plan that included a $40 million "Medicare donation" as part of its Copaxone "marketing" strategy.[66]

## Marketing: Supporting Activities and Spend

**KBQ: What supporting activities are needed to successfully execute key tactics?**

$ million

| SI | CSF | Key Tactics | Supporting Activities | Owner | Start Month | End Month | Budget |
|---|---|---|---|---|---|---|---|
| 1 | a. | HCP Personal HCP Promotion | Field Sales and Materials | US Sales | Jan | Dec | 2 |
| | | | Speaker Programs | US Marketing / US Sales | Jan | Dec | 7 |
| | | | Conventions | US Marketing | Jan | Dec | 1 |
| 1 | a | HCP Non Personal Promotion | COPAXONEHCP.com | US Marketing | Jan | Dec | 4 |
| | | | MSKnowledgeSeries.com (unbranded) | | | | |
| | | | Email and other Digital Media | | | | |
| 2 | a | Medicare Donation | - | US Marketing | Jan | Dec | 40 |
| 1 | a | Advocacy | Charitable Donations and Sponsorships | US Marketing | Jan | Dec | 2 |

Continued on next slide

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR INTERNAL DISUCSSION ONLY

In January 2017, an executive sought approval for "3 payments totaling $38M related to 2017 Copaxone Donations."[67] Attached to the email were three spreadsheets:

---

[66] TEVA_HCO_IC_005036573, at Slide 28

[67] TEVA_HCO_IC_005095143.

18

- A Payment Request Form to deliver $10 million to HealthWell Foundation, Inc. for its "MS Medicare Access Fund;"[68]

- A Payment Request Form to deliver $13 million to the Patient Access Network (PAN) Foundation for its "MS Fund;"[69] and

- A Payment Request Form with the filename "Copaxone Donation wire transfer," which requested payment of $15 million to TAF for its "MS Copay Assistance Program."[70]

Later in 2017, Teva Neuroscience requested an additional $5 million payment for the PAN Foundation. In discussing whether to approve the request for funds, David Loughery, Teva's Vice President of Finance for North America Specialty Medicines (NASM), told NASM President Larry Downey:

> Considering how hard we've cut other areas, I would suggest we ask them [Teva Neuroscience] to find other areas to cover this. I don't doubt this makes sense but maybe we need to reduce other areas that are less impactful.[71]

Teva Neuroscience agreed to make future cuts to its fourth quarter 2017 budget to fund the payment to PAN Foundation.[72] This decision indicates that Teva's Vice President for Finance viewed the payment to PAN Foundation as an "impactful" business investment, and more impactful than other business expenses that it had.

As Teva began planning for 2018, early drafts of one of its strategic documents noted that eliminating its "Medicare Donation" to third-party foundations would cost Teva up to $261 million in Copaxone sales.[73]

---

[68] TEVA_HCO_IC_005095144.

[69] TEVA_HCO_IC_005095146

[70] TEVA_HCO_IC_005095148.

[71] TEVA_HCO_IC_005011650, at Slide 1.

[72] TEVA_HCO_IC_005012554; TEVA_HCO_IC_005000898. It appears that the payment was delayed until May 2017. *See* TEVA_HCO_IC_005095844.

[73] TEVA_HCO_IC_005001347, at Slide 1. Committee staff accommodated Teva's request that its Sales Force expenditure be redacted.

19



On August 30, 2017, Mr. Loughery told General Manager of Teva Neuroscience John Hassler to remove the analysis from the presentation because he was "not comfortable including the sales impact of the reduced donations."[74]

**From:** David Loughery
**Sent:** Wednesday, August 30, 2017 3:49 PM
**To:** John Hassler
**Subject:** FW: LRP Expense Reduction

John,

Larry forwarded this to me and I then asked Mark to prepare something similar for Respiratory that I could then consolidate and allow Larry to provide to Rob. I am not comfortable including the sales impact of the reduced donations. Since the table is attached as a picture, could you have someone send this to me with the 0-$128M range line excluded. I will however, add a comment that we believe that reducing the level of donations could mean that a significant number of patients will not be able to remain on Copaxone due to financial constraints.

Thanks,

DL

---

[74] TEVA_HCO_IC_005001345.

Documents and information reviewed by the Committee indicate that Teva continued making donations to third-party foundations in 2018. Teva reported to the Committee that it provided $23,286,429 in "charitable cash contributions in connection with Copaxone" in 2018.[75]

At the beginning of 2018, Teva's Executive Vice President for North America Brendan O'Grady received a presentation on the company plan for the year. One slide emphasized:

> 27% of patients on Copaxone 40mg are Medicare Part D. Patients who are unable to meet the donut hole deductible in Q1 may not fill Rx and go off therapy, which would result in a negative impact to the brand of $210-280M. [76]



In the speaker's notes to that slide, Teva executives identified "Donations" as one of the "High priority projects for execution."[77]

---

[75] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceutical Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (May 24, 2019).

[76] TEVA_HCO_IC_005028530, at Slide 5.

[77] Id.

> High priority projects for execution:
> Q1 patient programs
> Donations
> Cover my meds

A few weeks after receiving that presentation, Mr. O'Grady told a colleague that an insurer's decision to move Copaxone to the non-preferred tier of its formulary for both commercial and Medicare patients "means little because we buy the patients [sic] copay down to zero anyway."[78]

### C.    Patient Services

Through its Shared Solutions program, Teva offers injection training and other educational resources to Copaxone patients.  Internal documents show that Teva also relied on these services to drive additional Copaxone sales.

For example, Teva's 2012-2014 workplan reported that its $29 million "investment" in patient services in 2011 had "generated" $363 million in sales.  The workplan emphasized that this expenditure reflected a significant return on investment:  "ROI of 1152%."[79]

**COPAXONE Expense Drivers**

| Expense Driver | Budget | ROI (>0 is considered positive) |
|---|---|---|
| Patient Assistance | $81M direct | • Returns for commercial patients average 451% with a range of 205% to 761%<br>• Medicare D grants are not included in the assessment |
| Sales Force | $41M people related | • 178% short term ROI<br>• 95% carryover at 6 months |
| Patient Services | $14M direct<br>$17M people related | • 29M invested in 2011 generated $363M with a ROI of 1152%<br>• PAP is not included in this ROI |
| Opportunity and Educational Funds | $17M direct | • Not tracked, but assumed similar to Peer to Peer |
| Peer to Peer | $10M direct | • AHM is the surrogate metric<br>• Average ROI for AHM programs is 701% |
| Scientific Communications | $7M | • Not Tracked |

We make quality healthcare accessible around the world

27

---

[78] TEVA_HCO_IC_005002063.

[79] TEVA_HCO_IC_005142081, at Slide 27.

22

Similarly, Teva executives estimated in 2017 that conducting an additional 1,200 injection trainings would cost the company $250,000, but "net $2.5M [million] in incremental sales."[80]

Teva also uses its patient services to promote Copaxone over lower-priced generics.  An October 2017 presentation to Teva's Board of Directors identified Teva's Shared Solutions services as "key activities to defend Copaxone Against Generic erosion."[81]

In 2017, Teva launched a Dispense As Written (DAW) campaign to convince doctors to place a special notation on their prescriptions of Copaxone to prevent pharmacists from substituting the brand name with a lower-priced generic equivalent.[82]  (See Section VII below for more information on Teva's DAW strategy.)  According to the presentation, Teva employees used the Shared Solutions services to "contact all current 40mg patients with active marketing authorization" and send "Emails to all patients with DAW messaging."[83]  An August 2018

---

[80] TEVA_HCO_IC_005104023 (June 2017 email exchange regarding investments in Copaxone marketing/support).

[81] TEVA_HCO_IC_005021634, at Slide 4.

[82] *See, e.g.*, William H. Shrank, et al., *The Consequences of Requesting "Dispense as Written,"* American Journal of Medicine (Apr. 2011) (online at https://scholar.harvard.edu/files/nkc/files/2011_dispense_as_written_am_j_med.pdf).

[83] TEVA_HCO_IC_005021634, at Slide 4.

23

presentation emphasized the need to "reinforce DAW on every call" and use "Marketing driven patient programs and telecons to supplement patient education/support."[84]

## VI.  NEW DOSE AS "GENERIC DEFENSE STRATEGY"

In 2002, Teva's senior executives began holding meetings on Copaxone "Life Cycle Management," an industry term for the use of incremental research to extend a profitable drug's market monopoly.[85]  The executives later emphasized to Teva's Board of Directors that one objective of life cycle management was to "Minimize the risk of generic competition."[86]

Over the past decade, Teva's research and development decisions have focused on maximizing profits by shielding Copaxone from generic competition for as long as possible. Teva's primary strategy to extend the life cycle of Copaxone was to introduce a new formulation of Copaxone—a 40 mg/ml dose injected three times per week.  Teva publicly framed the new dose as more convenient than the 20 mg/ml formulation, which is injected every day.[87]  Internal company documents, however, reveal that Teva developed Copaxone 40 mg/ml in part to extend its monopoly pricing for Copaxone by shifting patients to the new dose—which still enjoyed market exclusivity—before the existing 20 mg/ml dose began facing generic competition.

Teva introduced Copaxone 40 mg/ml in 2014.[88]  Through this strategy, Teva was able to shift many patients to the new dose before another pharmaceutical company, Sandoz, released Glatopa, a lower-priced generic version of Copaxone 20 mg/ml, in 2015.  Independent experts estimate that Teva's 40 mg/ml strategy cost the U.S. health care system between $4.3 billion and $6.5 billion in additional health care expenditures.[89]

### A.  Launching Copaxone 40 mg to Extend Monopoly and Minimize Competition

Until 2008, Teva's strategy to minimize generic competition for Copaxone centered on introducing a daily dose of Copaxone 40 mg/ml, which it believed would be more effective than generic versions of Copaxone 20 mg/ml.[90]  In support of a daily version of Copaxone 40 mg/ml,

---

[84] TEVA_HCO_IC_005126952, at Slide 10.

[85] *See* TEVA_HCO_IC_005158339, at Pages18-21 (summary of 2002 meeting in Boca Raton, Florida); TEVA_HCO_IC_05220331 (summary of 2002 meeting in Berlin, Germany).

[86] TEVA_HCO_IC_005132388, at Slide 2.

[87] Teva Pharmaceuticals, Ltd., *Press Release: Teva Announces U.S. FDA Approval of Three-Times-a-Week Copaxone (Glatiramer Acetate Injection) 40 mg/mL* (Jan. 28, 2014) (online at www.businesswire.com/news/home/20140128006747/en/Teva-Announces-U.S.-FDA-Approval-Three-Times-a-Week-COPAXONE%C2%AE).

[88] Letter from Billy Dunn, Acting Director, Division of Neurology Products, Food and Drug Administration, to Dennis Ahern, Senior Director for Regulatory Affairs, Teva Pharmaceuticals USA (Jan. 28, 2014) (online at www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/020622Orig1s089ltr.pdf).

[89] Benjamin N. Rome, et al., *US Spending Associated with Transition from Daily to 3-Times-Weekly Glatiramer Acetate*, Journal of the American Medical Association Internal Medicine (July 20, 2020) (online at https://jamanetwork.com/journals/jamainternalmedicine/article-abstract/2768653).

[90] *See* National Institutes of Health, *Information for Clinical Trial Identifier NCT00202982* (online at https://clinicaltrials.gov/ct2/show/record/NCT00202982) (2003 Teva-sponsored Phase II study examining efficacy

24

Teva sponsored the FORTE Trial, a Phase III clinical trial examining its efficacy, safety, and tolerability as compared to daily Copaxone 20 mg/ml.[91]  In July 2008, Teva announced that the trial had found no difference in efficacy between the two doses of Copaxone.[92]

Unable to market Copaxone 40 mg/ml as a *more* effective dose of Copaxone, Teva shifted its strategy to selling Copaxone 40 mg/ml as an equally effective—but less frequent—dose.  Notably, Teva had previously rejected this strategy as less profitable.  In January 2007, one executive wrote:

> The reason I've been given why less frequent dosing of a higher dose of glatiramer should not even be considered is pricing:  for the 40 mg once daily, one can not [sic] double the price, let alone when 40 mg would be used less frequent dosing ie [sic] once a week.  Moreover, it has also been argued that some patients may use 20 mg less frequently in case 40 mg will show an efficacy when used in less frequent dosing than once daily and this will cut sales of 20mg.  A counterargument in that case could be that 20 mg should no longer be available in the market.  I of course do not suggest that such arguments be exposed to external people.[93]

Another executive had previously noted that Teva had "no data to support similar / better efficacy of GA [Copaxone] 40mg in every other day administration."  The executive also emphasized that "every other day over once daily does not represent a significant improvement in convenience" and that "GA 40 mg every other day will result in price reduction by half, being much lower than GA 20mg!!" [94]

After the FORTE Trial failed, Teva began reexamining whether it could combat generic competition through the launch of Copaxone 40 mg/ml injected three times per week.  Within weeks of announcing the FORTE Trial's results, Teva's executives presented new Copaxone "Life Cycle Initiatives" to the company's Board of Directors, including "40 mg every other day."[95]

---

of Copaxone 40 mg/ml); TEVA_HCO_IC_05210570 (Aug. 2007 presentation to Board of Directors on daily Copaxone 40 mg/ml); TEVA_HCO_IC_05253089 (Jan. 2008 strategy document on pricing for daily Copaxone 40 mg/ml if Phase III clinical trial was successful).

[91] *See* National Institutes of Health, *Information on Clinical Trial Identifier NCT00337779* (online at https://clinicaltrials.gov/ct2/show/NCT00337779).

[92] Teva Pharmaceuticals, Ltd., *Press Release:  Teva Provides Update on FORTE Trial* (July 7, 2008) (online at https://ir.tevapharm.com/news-and-events/press-releases/press-release-details/2008/Teva-Provides-Update-on-FORTE-Trial/default.aspx).

[93] TEVA_HCO_IC_005152181.

[94] TEVA_HCO_IC_005152124.

[95] TEVA_HCO_IC_005235121, at Slide 6.

**GA Life Cycle Initiatives**
**Lower frequency of injections**

*No formal dose ranging or frequency humans studies (PK/PD)*
*have been performed to link with clinical outcomes*

- **40 mg every other day**
  - Based upon "sameness" of 40mg to 20mg in the FORTE trial
  - **Issue**: existing data from every other day with Copaxone may prompt patients using generic COPAXONE every other day

- **Higher doses in less frequent dose regimen (i.e once weekly)**
  - How do we justify the use of higher doses after Forte?
  - Solubility of a higher dose, increased injection site reactions
  - Once weekly injections of 15 and 30 mg TV-5010 in MS patients provided equivocal MRI results, anti TV5010 antibodies profile looks different from that induced by daily GA

- **Issue for consideration : costs of yearly treatment of the lower frequency regimen compared with COPAXONE daily**

GIR — Global Innovative Products TEVA

In August 2008, the executives also began asking whether Teva could "patent the frequency" of injections, thereby limiting the ability of generic competitors to introduce a similar generic version of the drug.[96]

| | |
|---|---|
| From: | ▮ |
| Sent: | Tuesday, August 26, 2008 8:26 PM |
| To: | ▮ |
| Cc: | ▮ |
| Subject: | Re: brief update from GIR meeting on GA LCM |

Thanks for the update. A few points:
1. The limiting step with GA is the density of the solution. I assume that ▮ has the information for the 60mg back from the days we have worked on the 80mg.
2. Please consider the ISR we saw in the rats with the 80mg (so we may not want to go to high).
3. In addition, we have currently a 5 fold safety ration based on monkeys only and excluding the ISRs - we should consider whether this should guide us when choosing the next dose.
4. What is the TPP - efficacy as 20mg?
5. Can we patent the frequency?
6. This is also a long term plan, assuming Phase II and Phase III bringing us to 2016 - still relevant?

By December 2008, Teva's business executives had decided to pursue research supporting a Copaxone dose of three times per week. Many of Teva's scientists opposed this decision. One scientist wrote that Teva's Innovative Research and Development (IR&D)

---

[96] TEVA_HCO_IC_005132452.

26

management was "strongly against" Teva's study into the less-frequent dosing of Copaxone "since it has no scientific rationale/value":[97]



Dear both,

Please find below the presentation prepared for the discussion in the GA LCM meeting one month ago (the relevant study design can be found in slides 7-9- Option 2- Superiority study GA 32 mg thrice a week vs, placebo, and the appropriate FTE slide can be found in slide 14).

I would like to make it clear that the IR&D management, led by ▆▆▆ are **strongly against the study** since it has no scientific rationale/ value. The IR&D decision was conveyed to the GA LCM team; however, the GA LCM members, though agree with IR&D decision, think that such a study has its business value.

I know from ▆▆▆▆ that a GIR meeting is planned for 08-09 Jan 09, so I assume that a final decision will be taken then by ▆▆▆

Please contact me if you need any further clarifications.

All the best

▆▆▆▆▆

In June 2009, Teva's executives prepared a presentation on "Copaxone LCM—Mid Term Initiatives" for then-CEO Shlomo Yanai. The presentation stressed the need to "Develop a low frequency formulation of GA" to ensure "the competitiveness of Copaxone in the future and address the market [sic] unmet need for less frequent injections."[98]

### Development of High dose/ low frequency formulation of GA

- **Situation**
  - There is a need to develop a low frequency formulation of GA to:
    - Ensure the competitiveness of Copaxone in the future and to address the market unmet need for less frequent injections
    - Prepare a mid-term solution as an insurance policy in case ▆▆▆▆ fail and our next launch is not before 2016 / 17
- **Complications**
  - No supporting clinical data for the selected dose or dosing regimen
  - Regulatory authorities may request a dose range finding study and comparison of the new formulation to daily GA and placebo
  - The new formulation must be approved no later than 2014
- **Possible Resolution**
  - To conduct a 2-arm PC study, using the 40mg/ml configuration e.g. 32-40 mg GA 2-3 times a week
  - Do not consult with regulatory authorities before study initiation – they will most probably not accept this design
- **Risks**
  - The cost of the study is $52 M
  - Regulatory authorities may not approve the new formulation based on a single study results
  - Recruitment to a PC study will be slow and the TTM may be later than 2014

---

[97] TEVA_HCO_IC_005233185.

[98] TEVA_HCO_IC_005159378, at Slide 2.

27

The presentation acknowledged that, at that time, there was "No supporting clinical data for the selected dose or dosing regimen."  The presentation also suggested that the strategy would be more profitable in the United States than in Europe because Teva would get "No market exclusivity in Europe."[99]



**High dose /low frequency formulation Challenges**

- No supporting data for the selected dose or dosing regimen
    - There is no supportive clinical data - no POC study
    - Less frequent injections may delay the onset of action
    - Overall, the data available to date do not support going to higher doses
    - Immunogenicity - twice weekly injections may induce a different antibody response – it is not clear how it would affect the clinical efficacy since the correlation was never proven
- In the absence of rationale for dose selection, the regulatory authorities may not approve the product based on a single study exploring only one dosing regimen
- No market exclusivity in Europe

Internal discussions in November 2009 undermine Teva's claims that it launched the 40 mg/ml three times per week to benefit patients and not to protect the Copaxone franchise.  That month, Teva decided against doing research on the efficacy of administering Copaxone 40 mg/ml *once* per week—which presumably would have been even more convenient for patients.  Teva's then-CEO Shlomo Yanai feared that such research would lead patients to take two injections of a cheaper generic version of Copaxone 20 mg/ml once per week rather than Teva's Copaxone 40 mg/ml.[100]

In 2010, Teva sponsored the GALA Trial, a Phase III trial examining the efficacy of Copaxone 40 mg/ml administered three times per week.[101]  As it awaited the results of the trial, Teva continued assessing the business strengths of the new dose.  Teva's marketing team circulated a draft analysis noting that the new formulation of Copaxone would provide a "Patent

---

[99] *Id.* at Slide 5; *see also* TEVA_HCO_IC_005151509 (similar presentation for Teva's Chief Executive Officer).

[100] TEVA_HCO_IC_005151470 ("As you stated Shlomo does not support this for fear of a follow on GA [i.e. generic Copaxone] being used 20 mg two shots, once a week (BIW).").

[101] *See* National Institutes of Health, *Information on Clinical Trial Identifier NCT01067521* (online at https://clinicaltrials.gov/ct2/show/study/NCT01067521).

protection extension" in addition to "better convenience, compliance, adherence, resulting in theoretical better QoL [quality of life]."  The team emphasized that the new dose would be a "Barrier to Generic entrance."  Given Teva's status as the largest generic manufacturer in the world, a more senior executive suggested that the team replace the words "Barrier to Generic entrance" with "extension of Life Cycle" noting, "we don't want to be seen as 'creating' barriers to generics as this is Teva's core business." [102]



The analysis also acknowledged that the new dose provided "No major advantage on GA 20 mg."[103]

After the GALA Trial demonstrated that Copaxone 40 mg/ml three times per week was safe and effective, Teva sought approval from the Food and Drug Administration (FDA) to

---

[102] TEVA_HCO_IC_05239258, at Slide 4.

[103] *Id.* at Slide 3.

market the new dose.  FDA granted Teva's application on January 28, 2014.[104]  Teva launched the drug the next day.[105]

### B.    Price Increases, Contracting, and Marketing to Pressure Patients to Switch

Teva launched Copaxone 40 mg/ml nearly 18 months before Sandoz launched Glatopa, a lower-priced generic competitor to Copaxone 20 mg/ml.[106]  During the intervening period, Teva implemented a comprehensive "generic defense strategy" to switch patients to Copaxone 40 mg/ml and avoid generic competition.[107]

To incentivize patients and payers to make the switch, Teva set a launch price for Copaxone 40 mg/ml that was slightly less expensive per week of treatment than Copaxone 20 mg/ml.  Teva's internal documents indicate that this decision was a tactic to minimize future generic competition rather than to reduce costs for patients.  In its memorandum approving the decision, Teva's pricing committee emphasized:  "We want rapid transition of COPAXONE 20mg to 40mg prior to expected generics in mid-2014."[108]

To further encourage patients to switch from Copaxone 20 mg/ml to Copaxone 40 mg/ml, Teva also increased the price of Copaxone 20 mg/ml by 9.8% on August 22, 2014.[109]  This price increase was part of Teva's 2014 strategic plan, which emphasized that one method to "Divert to 40" was to "raise 20mg price."[110]  Some Teva executives advocated for the price increase to happen earlier.  One wrote:

> Just for clarity … an important part of our generic defense strategy is creating price separation between 20mg and 40mg.  We can do that via increased discounts on 40mg or raising the price on 20mg.  I prefer the latter.  Delaying a pricing action to mid-August or later, impedes our ability to gain access for 40mg with resistant payers, [sic] makes a generic more appealing to payers, and could dampen further conversion strategies.[111]

In addition to increasing the price of Copaxone 20 mg/ml, Teva explored a plan to "Discontinue 20mg Financial Programs (Patient Services)"—its financial assistance program for

---

[104] Letter from Billy Dunn, Acting Director, Division of Neurology Products, Food and Drug Administration, to Dennis Ahern, Teva Pharmaceuticals USA (Jan. 28, 2014) (online at www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/020622Orig1s089ltr.pdf).

[105] IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone.*

[106] *Id.*; Sandoz, *Press Release:  Sandoz Announces U.S. Launch of Glatopa, the First Generic Competitor to Copaxone 20 mg* (June 19, 2015) (online at www.us.sandoz.com/news/media-releases/sandoz-announces-us-launch-glatopatm-first-generic-competitor-copaxoner-20mg).

[107] TEVA_HCO_IC_005147355.

[108] TEVA_HCO_IC_005135778, at Page 5.

[109] IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone.*

[110] TEVA_HCO_IC_005134707, at Page 13.

[111] TEVA_HCO_IC_005147355 (ellipses in original).

30

patients—which would make it more expensive for patients to remain on the lower dose of the medication.[112]

Documents show that Teva exerted pressure on pharmacy benefit managers (PBMs) by tying contractual rebates on Copaxone 20 mg/ml—the discounts provided to PBMs that are primarily passed on to insurance plans to reduce premiums—to adding Copaxone 40 mg/ml to their formularies.[113]  For example, Teva's internal emails suggest that on PBM forfeited its 2015 rebates on Copaxone 20 mg/ml because it declined to add Copaxone 40 mg/ml to is formulary.[114] This pressure campaign was successful.  The PBM added 40 mg/ml to its formulary the next year.[115]

---

[112] TEVA_HCO_IC_005141157, at Slide 41.

[113] TEVA_HCO_IC_005006452; Department of Health and Human Services, Office of Inspector General, *Rebates for Brand Name Drugs in Part D Substantially Reduced the Growth in Spending from 2011 to 2015* (Sept. 2019) (online at https://oig.hhs.gov/oei/reports/oei-03-19-00010.pdf).

[114] TEVA_HCO_IC_005006452.

[115] *Id.*

31

Teva incentivized other PBMs to lobby doctors on behalf of Copaxone 40 mg/ml. For example, after generic Glatopa entered the market, Teva contracted with Humana to implement a "Copaxone conversion initiative." Teva internally described the arrangement as follows:

> Humana is committed to converting current Copaxone 20mg patients over to Copaxone 40mg with their physician members. Specifically, Humana is contacting the prescribers via fax and phone to make them aware of which patients are still on Copaxone 20mg and encourage them to switch these patients to Copaxone 40mg. Should a prescriber choose not to switch, the patient would simply remain on Copaxone 20mg.[116]

Teva also incentivized its sales force to convert patients to Copaxone 40 mg/ml by making their bonuses entirely dependent on 40 mg/ml sales.[117]

Finally, Teva executed a marketing campaign to encourage patients and physicians to switch to 40 mg/ml Copaxone. Teva's 2014 strategic plan included telling patients that switching to Copaxone 40 mg/ml would give them the "Freedom to … Be Bold. Be True. Be You. It's your future."[118]

The company targeted doctors through its sales force. Teva's "Brand Plan" for 2017 identified the following "Behavioral Objectives" for physicians:

- "Encourage physicians to initiate and upgrade any remaining patients to TIW [three times weekly] Copaxone 40mg";

- "Encourage physicians to switch patients to TIW Copaxone 40mg if payers force to generic GA for daily dose";

- "Prescribe Copaxone DAW [Dispense as Written] for new and existing patients"; and

- "Encourage their patients to accept only branded Copaxone."[119]

---

[116] TEVA_HCO_IC_005006534; *see also* TEVA_HCO_IC_005141157, at Slide 43.

[117] *Id.*; TEVA_HCO_IC_005001181,at Page 1 ("The sales force is only paid on 40mg sales."); *see also* TEVA_HCO_IC_005028494 (Jan. 2018 presentation suggesting that Teva continued to structure its sales representatives' bonuses to drive "transition from Copaxone 20 mg to 40mg while protecting total Copaxone share").

[118] TEVA_HCO_IC_005134707, at Page 15 (ellipses in original).

[119] TEVA_HCO_IC_005102935, at Page 10.

C.        **Strategy Successfully Maintained High Prices**

The introduction of Copaxone 40 mg/ml successfully increased Teva's market share and profits despite the launch of Glatopa, Sandoz's lower-priced generic version of Copaxone, in June 2015.

In December 2015, then-CEO Erez Vigodman boasted that Teva had successfully converted 76.9% of Copaxone patients to 40 mg/ml and had limited "Glatopa 20mg Market Share" to 19.3%.[120]  In June 2016—nearly one year after Glatopa entered the market—General Manager of Teva Neuroscience John Hassler circulated a presentation which boasted in the speaker's notes:  "The strategy of switching patients to 40mg version of the medicine is

---

[120] TEVA_HCO_IC_005188452, at Slide 15.

continuing to be successful and reduce [sic] the impact of generic competition."[121]  An outside consultant to Teva agreed with the assessment, writing:

> Prior to Glatopa's launch, Teva released and promoted a long-acting Copaxone 40MG, effectively pushing existing and new patients to the branded 40MG and minimizing generic substitution.[122]



By shifting patients to Copaxone 40 mg/ml, Teva reduced its rebate obligations to health insurance plans.  Teva's internal data show that in every year since 2014, the average negotiated payer discount to commercial and Medicare Part D plans for Copaxone 40 mg/ml was lower than Copaxone 20 mg/ml—with the difference in the commercial channel exceeding 10% in some years.[123]

Teva also avoided paying millions in rebates to Medicaid by shifting of patients to Copaxone 40 mg/ml.  According to data Teva produced to the Committee, between 2014 and

---

[121] TEVA_HCO_IC_005018280, at Slide 1.

[122] TEVA_HCO_IC_005045517, at Slide 2.

[123] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Sept. 25, 2020).

2018, Teva paid Medicaid rebates for Copaxone 20 mg/ml equal to nearly 100% of its list price, due to the inflationary rebates that manufacturers are required to pay when they raise prices.[124] Over the same period, Teva paid Medicaid rebates for Copaxone 40 mg/ml equal to between 23% and 68% of its list price because it was a new product that had not yet increased in price.[125] Shifting a patient from Copaxone 20 mg/ml to 40 mg/ml allowed Teva to collect from Medicaid between $1,852 and $3,569 in additional net revenue, per patient per month.[126]

Teva's internal documents support this conclusion. A September 2015 presentation calculated, "For each unit of Cop 20 converted to Cop 40, Teva saves $3180 in rebate."[127] Similarly, in November 2016, a Teva executive estimated that Teva pays a 100% rebate to Medicaid for Copaxone 20 mg/ml but nets "$2500 on 40mg after rebates."[128]

By shifting patients from Copaxone 20 mg/ml to 40 mg/ml, Teva maintained more than $3 billion in annual net revenue from 2015 to 2017, despite competition from Sandoz's 20 mg/ml Glatopa.[129] Researchers at Harvard University estimate that Teva's strategy of shifting patients from Copaxone 20 mg/ml to Copaxone 40 mg/ml prior to generic entry created a 2.5 year delay in generic completion and cost the U.S. health care system between $4.3 and $6.5 billion in excess expenditures.[130]

## VII.    EXCLUSIONARY TACTICS TO LIMIT GENERIC COMPETITION

Documents reviewed by the Committee indicate that Teva implemented several new exclusionary tactics aimed at limiting generic competition and maintaining profits. A presentation to Teva's Board of Directors identified three "Key Activities to Defend Against Generic Erosion."[131] First, Teva contracted with specialty pharmacies and PBMs to limit generic substitution. Second, Teva lobbied doctors to write prescriptions for Copaxone that prohibited generic substitution. Third, Teva used its patient programs to convince patients to remain on the more expensive brand name version of the drug (see Section V above for more information regarding patient programs). [132]

---

[124] TEVA_HCO_IC_005012834

[125] *Id.*

[126] *Id.*

[127] TEVA_HCO_IC_005053396.

[128] TEVA_HCO_IC_005117117.

[129] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019).

[130] Benjamin N. Rome, et al., *US Spending Associated with Transition from Daily to 3-Times-Weekly Glatiramer Acetate*, Journal of the American Medical Association Internal Medicine (July 20, 2020) (online at https://jamanetwork.com/journals/jamainternalmedicine/article-abstract/2768653).

[131] TEVA_HCO_IC_005021634, at Slide 4.

[132] *Id.*

35

## Key Activities to Defend Against Generic Erosion

**Brand over Generic (House Brand) Contracting Strategy**
- Contracting with major payors, PBMs and pharmacies
- Contracts range from Brand over Generic terms (all 40mg Rx will be switched to Brand), to loyalty allowing access to COPAXONE 40mg alongside generic

**Sales force DAW messaging and activities**
- Sales force proactively messages to HCP customers the need for "Dispense as Written" on all new Rx and refills
- Working with office accounts to ensure they have the capabilities and resources need to communicate DAW through verbal, written and electronic means

**Outbound efforts to 40mg patients through Shared Solutions**
- Call center outbound effort to contact all current 40mg patients with active marketing authorization
- Emails to all patients with DAW messaging
- Ability to produce current 40mg patient lists for HCP offices to proactively DAW scripts

**Legal pathways also being explored**

PRIVILEGED AND CONFIDENTIAL - DRAFT FOR INTERNAL DISCUSSION ONLY.                    4

---

Through these tactics, Teva successfully defended Copaxone 40 mg/ml's market share. Nearly two years after Mylan began selling a generic version of Copaxone 40 mg/ml in October 2017, and after Sandoz followed suit by introducing Glatopa in February 2018, Teva reported that it maintained 63% of the market despite Copaxone having a higher list price than its generic alternatives.[133]

### A.    "House Brand" Contracting Strategy

Teva responded to generic entry by implementing a "House Brand Strategy" to contract with—and pay rebates to—PBMs and specialty pharmacies to make Copaxone 40 mg/ml the only version of the drug covered or dispensed.[134] A January 2017 document titled "At-Risk Gx [Generic] Readiness" explained that the strategy would prevent a patient's insurance plan from covering a generic alternative to Copaxone and prevent a specialty pharmacy from dispensing the generic:

- "2 of the House Brand target accounts will be executed at the formulary level. Blocking the generic via formulary restriction"; and

---

[133] Teva Pharmaceuticals Industries, Ltd., *Third Quarter 2019 Results* (Nov. 7, 2019) (online at https://s24.q4cdn.com/720828402/files/doc_presentations/Teva_Q3-2019_Earnings-Presentation_FINAL.pdf).

[134] It is Committee staff's understanding that such contracts required the pharmacy to ensure that patients and health plans are left in the same position as if the prescription had been filled with the generic. *See, e.g.*, TEVA_HCO_IC_005119478 (February 2018 contract with a specialty pharmacy).

36

- "2 of the House Brand target accounts will be executed at the specialty pharmacy level. Pharmacy will fill brand regardless if prescribed as generic."[135]

When Mylan received FDA approval on October 3, 2017, to bring its generic version of Copaxone to market, Teva immediately began executing the House Brand Strategy. On October 26, 2017, General Manager of Teva Neuroscience John Hassler notified Teva CNS CEO Larry Downey: "Two weeks post generic approval, the team has had early success in achieving key Brand Over Generic goals," and "45% of units have been targeted via House Brand Agreements."[136]

In a series of emails in January 2018, Teva's Executive Vice President for North America, Brendan O'Grady, explained how Teva's House Brand agreement with a specialty pharmacy was successfully preventing generic competition. An employee asked Mr. O'Grady whether Teva's position would be harmed by a health insurer decision to place Copaxone 40 mg/ml on more restrictive tiers on commercial and Medicare Part D formularies, in favor of generic alternatives. Mr. O'Grady responded that the insurer's decision had "almost zero impact on actual prescriptions." At the time, the insurer's patients accessed Copaxone through a

---

[135] TEVA_HCO_IC_005035591, at Slide 11.

[136] TEVA_HCO_IC_005001334.

37

specialty pharmacy, which is wholly owned by a pharmacy benefit manager.  According to Mr. O'Grady:

> Because [PBM] is getting an additional rebate to fill all 'glatiramer' or Copaxone scripts with Copaxone … if a doctor orders generic glatiramer or the pharmacy benefit mandates it be filled as a generic, it will come in a plain box with Copaxone inside.  Win-win for all [137]

On Jan 31, 2018, at 3:56 PM, Brendan O'Grady [Highly Confidential] wrote:

Because [PBM] is getting an additional rebate to fill all "glatiramer" or Copaxone scripts with Copaxone...if a doctor orders generic glatiramer or the pharmacy benefit mandates it be filled as a generic, it will come in a plain box with Copaxone inside.  Win-win for all...

Best regards,

<image001.png>  Brendan P. O'Grady  EVP and Head of North America
**Highly Confidential**

<image002.png>

Earlier in the email, a Teva executive had warned subordinates that the contract with [specialty pharmacy] should "not be formally shared with the sales team" because of the "confidential nature of the [specialty pharmacy] House Brand strategy."[138]

---

[137] TEVA_HCO_IC_005002063 (ellipses in original).  Committee staff accommodated Teva's request for redactions of the specific PBM, specialty pharmacy, or payor in the email.

[138] *Id.*



In follow-up to our discussion on this topic from last Friday's call, ▮▮▮ the COPAXONE brand team, ▮▮▮▮▮▮ and I agreed that **the house brand strategy with** Specialty Pharmacy **that impacts this formulary change should not be formally shared with the sales team.** We did agree, however, to communicate this detail with ▮▮▮▮▮▮ nd the ASDs personally - which I completed yesterday. I also confirmed with the COPAXONE IC team that representatives WILL get credit for scripts getting filled with the brand at Specialty Pharmacy through Insurer

When supporting the TN sales force on this coverage change, please align to the confidential nature of the Specialty Pharmacy House Brand strategy and encourage representatives to use DAW as their reactive response in the field.
Don't hesitate to reach out to ▮▮▮▮▮ or me if you would like to discuss further.

Best regards,

By April 2018, Teva had entered into House Brand Agreements with a number of PBMs for Medicare and commercial patients.  Some of these agreements blocked generics from formularies while others replaced generics at the specialty pharmacy.[139]

## B.    "Dispense as Written" Campaign

Pharmacists are permitted to substitute brand-name drugs with lower-cost generic versions if patients consent.[140]  However, doctors can prohibit substitutions by writing "Dispense as Written" (DAW) on prescriptions.[141]  In response to the introduction of generics, Teva lobbied doctors to write DAW on prescriptions of Copaxone to prevent generic substitution.  Teva's DAW campaign limited generic market share, despite their lower prices.

Teva's strategy documents identified the DAW campaign as a key tactic to limiting generic competition.  In the months leading up to Mylan's 40 mg/ml generic entering the market, Teva began encouraging physicians to:  "Prescribe Copaxone DAW for new and existing patients."[142]  Teva also leveraged its patient support program, "Shared Solutions," to push the DAW campaign on patients.  According to an internal analysis in August 2017, DAW was written on 87% of Copaxone 40 mg/ml prescriptions requested through Teva's "Shared Solutions Copaxone Prescription Service Request Form."[143]

---

[139] TEVA_HCO_IC_005007799, at Slides 2-3.

[140] Yan Song and Douglas Barthold, *The Effects of State-Level Pharmacist Regulations on Generic Substitution of Prescription Drugs*, Health Economics (Nov. 2018) (online at ncbi.nlm.nih.gov/pmc/articles/PMC6172151/pdf/nihms975944.pdf) (summarizing state generic substitution laws).

[141] William H. Shrank, et al., *The Consequences of Requesting "Dispense as Written,"* American Journal of Medicine (Apr. 2011) (online at https://scholar.harvard.edu/files/nkc/files/2011_dispense_as_written_am_j_med.pdf).

[142] TEVA_HCO_IC_005102935, at Page 10.

[143] TEVA_HCO_IC_005002781.

When Mylan's generic entered the market in October 2017, Teva intensified its DAW campaign.  In a presentation to Teva's Board of Directors, executives emphasized that they would engage in "Outbound efforts to 40mg patients through Shared Solutions," including sending "Emails to all patients with DAW messaging."  The executives also touted their "Ability to produce current 40mg patient lists for HCP [Health Care Professional] offices" to "proactively" write DAW on prescriptions.[144]

Teva's DAW campaign changed doctors' prescribing patterns.  By February 2018, 77% of Copaxone prescriptions were written with the "DAW" notation.[145]



In August 2018, Executive Vice President for North America Brendan O'Grady congratulated his team on the success of the DAW strategy:

> Keep up pressure on Copaxone and maximize office calls up to the launch of [Another Teva Product].  The DAW campaign combined with the legacy and house brand access strategy has paid great dividends.  I want to exceed $1.5b for the year on Copaxone.  We did $900m in H1 so we only need to do $500m+ in H2 to accomplish this goal.[146]

---

[144] TEVA_HCO_IC_005021634.

[145] TEVA_HCO_IC_005007799, at Slide 4.

[146] TEVA_HCO_IC_005127231.

Teva achieved Mr. O'Grady's goal.  In 2018, the company collected $1.6 billion in net revenue for Copaxone despite competition from generics.[147]

## VIII.   COSTS DO NOT JUSTIFY PRICE OF COPAXONE

### A.   Rebates and Manufacturing

The pharmaceutical industry often attributes price increases to rebates, discounts, and other fees provided to PBMs and other third parties within the distribution chain.[148]  Teva's internal data, however, suggest that its decades of price increases for Copaxone cannot be attributed to growing rebates or discounts provided to PBMs, pharmacies, health insurance plans, employers, or other payers.

The average net price per unit of Copaxone—the amount of money the company makes on the drug after all rebates—increased for both the 20 mg/ml and 40 mg/ml doses of Copaxone from 2009 to 2017.  This rise ended only after Mylan introduced its 20 mg/ml and 40 mg/ml generics.[149]

---

[147] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019).

[148] *See* Pharmaceutical Research and Manufacturers of America, *Let's Talk About Cost* (online at www.letstalkaboutcost.org/).

[149] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 25, 2020); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019).

Figure 7 below shows the average net price per unit for Copaxone between 2009 and 2019.

Figure 7: Net Price Per Unit Increased Until Generic Entry[150]

Teva cannot attribute its price increases for Copaxone to the cost of manufacturing the drug. According to internal data, Teva's cost of goods sold for Copaxone is miniscule—between 0.5% and 3% of the net price of the drug.[151] From 2013 to 2018, Teva's costs to manufacture Copaxone declined significantly while Teva increased the list price of Copaxone 20 mg/ml by $2,053 per month and the list price of Copaxone 40 mg/ml increased by $1,190 per month. [152]

## B.    Research and Development

Teva has attempted to defend its Copaxone price increases by claiming that they are needed to fund future research and development (R&D). For example, in October 2016, Teva

---

[150] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 25, 2020).

[151] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July. 18, 2019); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Aug. 9, 2019).

[152] IBM Micromedex Redbook, *Wholesale Acquisition Cost and Average Wholesale Price History for Copaxone.* Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Aug. 9, 2019).

42

developed talking points directing executives to emphasize that the price of Copaxone "reflects the clinical utility of the drug, while maintaining [Teva's] commitment to ongoing clinical research."  The talking points instructed executives to argue that Teva's prices increases are justified because the company continues "to invest in researching new developments that directly translate to increased options for Copaxone patients."[153]

Contrary to Teva's talking points, the company was unable to identify any R&D expenditures related to Copaxone after 2015.[154]  In fact, internal data show that Teva invested only a small portion of its Copaxone revenue in further R&D to help Copaxone patients.

Figure 8 below reflects Teva's total R&D expenditures for Copaxone compared to its net U.S. revenue for the drug.  Teva identified a total of $689 million R&D expenditures related to Copaxone since 1987—only 2% of its $34.2 billion in net U.S. revenue of Copaxone from 2002 to 2019.[155]

---

[153] Bates No. TEVA_HCO_IC_005000887, at Page 5.

[154] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Aug. 9, 2019); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform (Aug. 25, 2020) ("Teva is writing to confirm that it had no additional Copaxone research and development expenditures other than those identified in our prior letter.").

[155] Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Aug. 9, 2019); Letter from Kirkland and Ellis LLP, on behalf of Teva Pharmaceuticals Industries, Ltd., to Chairman Elijah E. Cummings, Committee on Oversight and Reform (July 18, 2019); Teva Pharmaceuticals Industries, Ltd., *Annual Reports (Forms 10-K or 20-F) 2002-2019* (online at https://ir.tevapharm.com/financials/sec-filings/default.aspx).

Figure 8



**Total U.S. Net Revenue vs R&D Costs from 2002-2019**

$689,106,000.00

Total U.S. Net Revenue:
$34,283,720,000

■ R&D Costs

A 2016 internal presentation to the Science and Technology Committee of Teva's Board of Directors confirmed that Teva spent the least on R&D among all major pharmaceutical companies.[156]

### Benchmarking our budget and multiples

| | R&D Budget (Est. 2015 $M) | R&D Budget (2015 % of Rev) | EPS (Est. 2015) | Multiples (Est. 2015) ↓ |
|---|---|---|---|---|
| UCB | 1,116 | 26.6% | 1.9 | 48.4 |
| Novo Nordisk | 2,214 | 13.5% | 2 | 28.4 |
| Celgene | 2,394 | 25.9% | 4.1 | 28.3 |
| Eli Lilly | 4,821 | 24.0% | 3.3 | 24.6 |
| Roche | 8,380 (2014) | 21.5% | 15 | 19.1 |
| Biogen | 2,093 | 19.4% | 16 | 18.5 |
| GSK | 4,802 | 12.8% | 1.2 | 18.3 |
| Bayer | 2,283 (2014) | 15.6% | 7.9 | 17.4 |
| Novartis | 7,331 (2014) | 22.4% | 5.3 | 16.9 |
| J&J | 6,213 (2014) | 19.2% | 6.3 | 16.3 |
| Pfizer | 7,510 | 15.8% | 2.1 | 16 |
| Sanofi | 5,864 (2014) | 14.3% | 6.3 | 15.4 |
| Merck | 6,744 | 16.7% | 3.6 | 15.2 |
| Abbvie | 3,630 | 15.8% | 4.3 | 15 |
| Teva (specialty) | 897 | 10.0% | 5.4 | 11.2 |
| AstraZeneca | 5,211 | 22.5% | 4.1 | 7.8 |

Source: EvaluatePharma (where indicated, 2014 data was used due to lack of separate forecast for pharma segment)

---

[156] TEVA_HCO_IC_005178747, at Slide 3.

44

## IX.    CONCLUSION

Teva's price increases and business practices for Copaxone are not unique. During President Trump's first term, drug companies have continued to aggressively raise prices. A recent report found that drug companies have raised list price of over 600 single-source brand name drugs by a median 21.4% between January 2018 and June 2020.[157]

The Committee's investigation makes clear that without significant structural reforms like Medicare negotiation, the pharmaceutical industry will continue to raise prices on critical and lifesaving medications, and many Americans will remain unable to afford their prescriptions.

---

[157] *See* State of California, Office of Statewide Health Planning and Development, *Prescription Drug Wholesale Acquisition Cost (WAC) Increases* (Aug. 17, 2020) (online at oshpd.ca.gov/visualizations/prescription-drug-wholesale-acquisition-cost-increases/).

# EXHIBIT B-1



# **Drug Pricing Investigation**

Teva—*Copaxone*

*Selected Investigation Documents*

Staff Report
Committee on Oversight and Reform
U.S. House of Representatives
September 2020
oversight.house.gov

## Teva Selected Documents

| Document #* | Citation | Short Description |
|---|---|---|
| Teva 31 | TEVA_HCO_IC_005008955 | February 2017 Emails |
| Teva 32 | TEVA_HCO_IC_005040409, at Slide 32 | September 2016 Presentation Excerpt |
| Teva 33 | TEVA_HCO_IC_005199492, at Slide 12 | February 2017 Presentation Excerpt |
| Teva 34 | TEVA_HCO_IC_005001166 | August 2016 Emails |
| Teva 35 | TEVA_HCO_IC_005007009 | April 2017 Emails |
| Teva 36 | TEVA_HCO_IC_005142081, at Slide 27 | August 2011 Presentation Excerpt |
| Teva 37 | TEVA_HCO_IC_005141925, at Slides 46, 50 | August 2008 Presentation Excerpt |
| Teva 38 | TEVA_HCO_IC_005095970 | March 2017 Emails |
| Teva 39 | TEVA_HCO_IC_005293411 | January 2016 Email |
| Teva 40 | TEVA_HCO_IC_005036573, at Slide 28 | October 2016 Presentation Excerpt |
| Teva 41 | TEVA_HCO_IC_005001347, at Slide 1 | 2018 Presentation Excerpt |
| Teva 42 | TEVA_HCO_IC_005001345 | August 2017 Emails |
| Teva 43 | TEVA_HCO_IC_005028530, at Slide 5 | January 2018 Presentation Excerpt |
| Teva 44 | TEVA_HCO_IC_005021634, at Slide 4 | October 2017 Presentation Excerpt |
| Teva 45 | TEVA_HCO_IC_005235121, at Slide 6 | July 2008 Presentation Excerpt |
| Teva 46 | TEVA_HCO_IC_005132452 | August 2008 Emails |
| Teva 47 | TEVA_HCO_IC_005233185 | December 2008 Emails |
| Teva 48 | TEVA_HCO_IC_005159378, at Slide 2 | June 2009 Presentation Excerpt |
| Teva 49 | TEVA_HCO_IC_005159378, at Slide 5 | June 2009 Presentation Excerpt |
| Teva 50 | TEVA_HCO_IC_05239258, at Slide 4 | April 2011 Presentation Excerpt |
| Teva 51 | TEVA_HCO_IC_005141157, at Slide 41 | November 2014 Presentation Excerpt |
| Teva 52 | TEVA_HCO_IC_005045517, at Slide 2 | October 2017 Presentation Excerpt |
| Teva 53 | TEVA_HCO_IC_005035591, at Slide 11 | January 2017 Presentation Excerpt |
| Teva 54 | TEVA_HCO_IC_005002063 | January 2018 Emails |
| Teva 55 | TEVA_HCO_IC_005007799, at Slide 4 | April 2015 Presentation Excerpt |
| Teva 56 | TEVA_HCO_IC_005178747, at Slide 3 | November 2015 Presentation Excerpt |
| Teva 57 | TEVA_HCO_IC_005000887 | October 2016 Talking Points |
| Teva 58 | TEVA_HCO_IC_005147355 | July 2014 Emails |

*The document numbers for Teva begin at 31 to avoid confusion with documents for another company.

# EXHIBIT B-31

---

**From:** ██████████████
**Sent:** Saturday, February 18, 2017 8:46 AM
**Subject:** Fwd: generic Copaxone 40 mg delayed because of fill/finish issues
**Attachments:** image001.png; ATT00001.htm; image001.png; ATT00002.htm; MYL, TEVA - Quick Take Teva, Mylan - Another Hanukkah miracle; but will it last (Bernstein Research) 7 Pages - 17-Feb-17.pdf; ATT00003.htm

Best regards
██████████████

Sent from my iPhone

Begin forwarded message:

> **From:** ██████████████████████████████
> **Date:** February 18, 2017 at 7:23:58 AM EST
> **Subject: Fwd: generic Copaxone 40 mg delayed because of fill/finish issues**
>
> Might be good for cash flow and debt pay down and some of your bonuses :)
>
> Best regards
> ████████████████
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **Subject: Fwd: generic Copaxone 40 mg delayed because of fill/finish issues**
> >
> > Begin forwarded message:
> >
> > > **From:** TevaInvestorRelations ████████████████████
> > > **Date:** February 17, 2017 at 10:33:54 PM EST
> > > **Subject: generic Copaxone 40 mg delayed because of fill/finish issues**
> > >
> > > Below is Evercore's note, and attached is a Bernstein report on the matter.
> > >
> > > In a press release filed by MNTA just now, it seems that Copaxone generic is delayed
> > >
> > > As a reminder, at least 5 generics are in development for Copaxone. However, only MNTA/Sandoz was approved for 20 mg generic (where patent expired already).

# Teva Document 31

Street has widely expecting an approval of 40 mg generic - at least from MNTA/Sandoz (mostly because their 20 mg is already approved). In fact, i was hearing investor feedback that a generic 40 mg from MNTA/Sandoz is likely launching in 1Q17 (and Novartis' Sandoz had actually put up a slide on this on recent earnings call).

As per press release just now, here's what MNTA is saying:

1. **MNTA's contract manufacturer (Pfizer) got a warning letter**

2. The warning letter does NOT restrict the 20 mg generic

3. **However, the approval of 40 mg generic depends on successful resolution of this warning letter. Thus MNTA/Sandoz generic is delayed**

We also touched base with Momenta who aren't giving additional details until Tuesday's press conference

This is very good news for Teva - for now. At the very least, it delays MNTA/Sandoz for few months (am waiting to hear back from MNTA).

In some ways, it explains why MNTA did not get approved when 30-month stay on Copaxone 40 mg expired last week.

In light of Teva/MNTA news just now (generic Copaxone 40 mg delayed because of fill/finish issues), we thought it would be helpful to look at precedents.

Here's what we just did:
1. Look at all warning letters in last 20 yrs
2. Zoom in specifically on warning letters relating to CGMP issues on finished pharmaceuticals
- The implied sample size was 31 cases

Here's what we're seeing: ~13-17 months for resolution (median/avg) ... and minimum of 5 months

Teva Document 31

# EXHIBIT B-32

# GSP & GHE
# Kick-Off

Sheraton Valley Forge Hotel
13th & 14th September, 2016

teva



Teva Document 32

## What does Teva do well in Pricing? (Overall GSM & GGM)

- Pricing negotiation strategy and able to increase prices successfully
  - Influenced heavily by US being allowed to hike prices p.a

- We have dedicated pricing negotiation packages & strategy for all key accounts and tenders

- We apply more frequent price changes
  - Once, twice a year and many on a continuous basis - adaptive

- Teva pricing organization set-up in the right place
  - Pricing established as a business partner
  - Reporting directory to CEO, Marketing or Business Unit
  - Organized by Pricing activity or Business Unit

- Timely, reliable and actionable market intelligence data in place, feeding into pricing strategy and models

**teva**

Teva Document 32

# EXHIBIT B-33

# Multiple Sclerosis Franchise Strategy

"MS Disease Area Strategy"—Confidential Working Draft

February, 2017

# Pricing Trends



Generitization of multiple classes on the 5 year horizon potential to change the pricing paradigm

| | US dynamic | EU dynamic |
|---|---|---|
| Current pricing dynamic | • Premium prices are available – current list prices average $80k per patient per year<br>• But payers demand competitive discounting – highest discounts for older DMTs, lower for newer DMTs - but averaging ~25% in GTN w/ COP 40 at 40% GTN<br>• HEOR is a key lever for preferred plan coverage<br>• Payers do not generally dictate prescribing despite high cost | • Health technology assessment is the firmly established P&R gatekeeper<br>• Current list price (average $13k per patient per year) much lower than US price<br>• With discounts averaging ~10 to 15%<br>• H2H comparisons against SoC are expected, but do not guarantee success (if no H2H comparator – DMT is relegated to lowest priced DMT or reference pricing)<br>• Country-specific eligibility guidelines and prescribing restrictions may be narrower then EMA labeling |
| Future pricing dynamic | • Generitization of oral (small molecule) DMTs could potentially drive pricing erosion of ~85% within two years[1]<br>• Biosimilars expected to drive pricing erosion of only ~35% within two years[1]<br>  • Rebate range for biosimilars are not expected to be significantly different from the originator rebate; biosimilars are hampered by volume-based contracts and longer originator contracts<br>• Payers are interested in piloting outcomes-based contracts<br>• Potential HHS negotiation power for Medicare and Medicaid | • (Compared to the US,) generic or follow on products drive significantly less price and sales erosion happening over a significantly longer period of time<br>• Possible move to rejection of placebo-controlled studies for reimbursement consideration (e.g., Italy)<br>• More focus on cost-effectiveness analysis; budget impact management<br>• To reduce spending, focus on simpler contracts (e.g., straight discounts) over risk-sharing and outcome-based contracts (where administrative cost and compliance decrease effectiveness) |

Sources: Evidera Policy Change presentation, Feb 2017; Decision Resources Disease Landscape & Forecast, November 2016 BY2015<br>1. Decision Resources Market Forecast Assumptions, November 2016 BY2015



# EXHIBIT B-34

| From: | John Hassler |
|---|---|
| Sent: | Friday, August 19, 2016 9:20 AM |
| To: | Dalton Tomlinson; ██████████ |
| Subject: | FW: Financial Assistance |
| Attachments: | Patient Assistance Spending Trends_081816.pptx |

FYI, I had asked ██████ for an update on patient assistance spend and she provided the attached information on Copaxone.

Best regards,

John



John Hassler
Senior Vice President and General Manager, Teva CNS
**Highly Confidential**

██████████████

**Sent:** Thursday, August 18, 2016 4:56 PM
**To:** John Hassler
**Subject:** RE: Financial Assistance

Hi John,

Please see the attached summary of the activity that we have been seeing on Copaxone over the past few years. There definitely have been increases in out of pocket costs to patients. As you look at the first graph, please take note that the 'patient cost' reflects the amount that Teva incurs on behalf of the patient and in 2014 to 2015 is when we introduced the $0 program. Some of the increased costs during this time period relates to the additional $35 that we were picking up for transition or new 40mg patients, not all of this is attributable to plan designs. However, you can definitely see a trend in the increase in OOP costs that the payers are shifting to patients and some of this may be our price increases as well. Please let me know if you have any questions.



**From:** John Hassler
**Sent:** Friday, August 12, 2016 7:46 AM
██████████████

**Subject:** Financial Assistance

██████████

# Teva Document 34

What changes have we seen over the past couple of years in overall patient assistance spending? I am interested in understanding what you are seeing in terms of shifts in patient volumes in the various channels and how out of pocket exposure for the patients are changing. We have experienced rapid growth in patient assistance while prices were rising rapidly. Now price increases have moderated and I'd like to see whether the cost increase in assistance is still increasing at the same rate or whether it has changed.

Best regards,

John

John Hassler
Senior Vice President and General Manager, Teva CNS

**Highly Confidential**

# EXHIBIT B-35

From:        Katie Hiett
Sent:        Friday, April 7, 2017 11:56 AM
To:        ███████████████
Subject:        RE: Question

███████████

████ is probably not aware that I am raising the issue but he is aware of the issue itself. We get hammered by prior period corrections from Medicaid going back years and we are getting hammered with duplicate claims between Medicare and Medicaid and I know I am not finding all of it. Looking forward to doing something other than just taking it.

Best regards,

**Katie Hiett, CPA**    Vice President - US Market Access Pricing and Contracting

## Highly Confidential

IMPROVING HEALTH, MAKING PEOPLE FEEL BETTER     CARING     FAMILIES PROUD     LEADING THE WAY

OUR PURPOSE & VALUES

**From:** ███████████
**Sent:** Friday, April 07, 2017 8:58 AM
**To:** Katie Hiett
**Cc:** ███████████
**Subject:** RE: Question

Good Morning Katie,
Thank you for the outreach—you've come to the right place. I am going to ask ████ to set you and I up with a call to discuss this a bit further. We are also in the process right now of developing proactive policy strategy for Teva and these may fit well into that effort. I have a meeting with ██████ a week from Monday where we will be discussion some of the policy options we are considering including—is he well aware of this pain point?

Look forward to speaking soon.

██████ please find at least 30 minute for Katie and I as soon as possible (Katie I am on vacation next week).

 **Highly Confidential**

**From:** Katie Hiett
**Sent:** Thursday, April 06, 2017 4:21 PM
**To:** ▮▮▮▮▮▮▮
**Subject:** Question

I am looking for some direction on who can help me with some policy changes I would like to see Pharma start pushing for when it comes to the Medicaid program and Medicaid Expansion.

There are two issues I would like to see Pharma start lobbying for.

- There is no statute of limitation on the states on when they can submit Medicaid. They can go back forever and we have no way of knowing about these liabilities. We continue to get hit with surprises and if Medicaid continues to expand this will only get worse. This is millions of dollars for Teva and I know all other pharma gets hit with the same amounts. It has been referenced on some earnings calls when they miss earnings.
- Medicaid currently collects 100% of the rebate even if they only pay a penny against the claim. We are seeing more and more of this with the aging population. They have dual coverage so we get hit with the rebate from the payer claim and then we get hit with the full rebate from Medicaid even though Medicaid was the secondary payer. Currently Teva has several products that have 100% rebate in Medicaid due to best price and a long history of price increases or just being on the market for a long time. Copaxone 20, [Redacted - Other Product Information] are all at 100% WAC rebate in Medicaid meaning we don't ever cover our COGS or other GTN discounts.

I think we need to start advancing some of these changes given the massive increase in this program since ACA and our voice needs to be heard. Don't know where to start.

Best regards,

Katie Hiett, CPA   Vice President - US Market Access Pricing and Contracting

**Highly Confidential**

IMPROVING HEALTH SO PEOPLE FEEL BETTER   GETTING IT DONE   CREATING BOLDER FUTURES   CARING   FAMILIES PROUD   LEADING THE WAY

OUR PURPOSE & VALUES

# EXHIBIT B-36

**Teva Neuroscience
2012-2014 Workplan
August 18, 2011**

# COPAXONE Expense Drivers



| Expense Driver | Budget | ROI (>0 is considered positive) |
|---|---|---|
| Patient Assistance | $81M direct | ▪ Returns for commercial patients average 451% with a range of 205% to 761%<br>▪ Medicare D grants are not included in the assessment |
| Sales Force | $41M people related | ▪ 178% short term ROI<br>▪ 95% carryover at 6 months |
| Patient Services | $14M direct<br>$17M people related | ▪ 29M invested in 2011 generated $363M with a ROI of 1152%<br>▪ PAP is not included in this ROI |
| Opportunity and Educational Funds | $17M direct | ▪ Not tracked, but assumed similar to Peer to Peer |
| Peer to Peer | $10M direct | ▪ AHM is the surrogate metric<br>▪ Average ROI for AHM programs is 701% |
| Scientific Communications | $7M | ▪ Not Tracked |

# EXHIBIT B-37

# COPAXONE®

## 2009-2011 WP Review
### USMT and LT
### 2008.08.06





# +/- 10 M Impact V1

| Tactic | Investment | 2009 Impact |
|---|---|---|
| Medicare Part D Grants | - 4.3 M | - 11.4 M |
| MOP | - 5.7 M | No ST impact |
| CNE program | + 2 M | Est @ 3.0 M |
| MCO rebates | + 7 M | unknown |
| DTC | + 1 M | Est @ 1.5 M |

Confidential
Teva Neuroscience

9/29/2020 8:21:08 PM



# Downside to Plan V1

| Probable Net Sales | 1,742 | 1,957 | 2,150 |
|---|---|---|---|
| Downside Events: | 2009 | 2010 | 2011 |
| No Pricing Action | (144) | (324) | (517) |
| Discount Rx - No Impact on Compliance | (53) | (74) | (75) |
| Eliminate Medicare PAP investment | (16) | (33) | (45) |
| | | | |
| Private PAP Programs does not increase Patients | (14) | (26) | (35) |
| **Probable Contribution** | **894** | **1,390** | **1,671** |
| Downside Events: | 2009 | 2010 | 2011 |
| No Pricing Action | (94) | (272) | (468) |
| Discount Rx - No Impact on Compliance | (34) | (63) | (68) |
| Eliminate Medicare PAP investment | (11) | (28) | (41) |
| | | | |
| Private PAP Programs does not increase Patients | (9) | (22) | (31) |

Confidential
Teva Neuroscience

# EXHIBIT B-38

| | |
|---|---|
| **From:** | Larry Downey |
| **Sent:** | Thursday, March 30, 2017 11:21 AM |
| **To:** | David Loughery |
| **Subject:** | RE: Urgent: 2017 Copaxone Donation-- Medicare Donations Process |

I approve, but I have not seen the Oracle notice...

**From:** David Loughery
**Sent:** Thursday, March 30, 2017 9:52 AM
**To:** Larry Downey
**Subject:** Fwd: Urgent: 2017 Copaxone Donation-- Medicare Donations Process

FYI

Sent from my iPad

Begin forwarded message:

**From:** ███████████ **Highly Confidential**
**Date:** March 30, 2017 at 10:45:00 AM EDT
**To:** David Loughery **Highly Confidential** ▷, ████████
**Highly Confidential**
**Cc:** ████████ **Highly Confidential** ▷, ████████████
◁ **Highly Confidential** ▷, ████████ **Highly Confidential** ▷
**Subject: RE: Urgent: 2017 Copaxone Donation-- Medicare Donations Process**

David
Thank you for your approval, however, the request is pending Larry's approval through Oracle. Please
have him approve so payment can be initiated once Global Treasury provides their approval.

Thank you



**Highly Confidential**

**From:** David Loughery
**Sent:** Thursday, March 30, 2017 10:29 AM

**To:**

**Cc:**

**Subject:** Re: Urgent: 2017 Copaxone Donation-- Medicare Donations Process

I'm not sure if there is anything I need to do system wise but both Larry and I approve this payment.

Sent from my iPad

On Mar 29, 2017, at 4:16 PM ▮▮▮▮▮ **Highly Confidential** wrote:

Hi,

Hope you are well. Please know that I have completed the check request in Oracle ▮▮▮▮ and have also attached the wire transfer instructions from PAN with the check request. Per ▮▮▮▮ would request that this be taken care of and processed early next week?

Thanks!

<image001.png>

**Donna Faix** Corporate & Social Responsibility Program Manager

## Highly Confidential

**From:** ▮▮▮▮▮▮▮

**Sent:** Wednesday, March 29, 2017 9:46 AM

**To:** ▮▮▮▮▮▮

**Subject:** Urgent: 2017 Copaxone Donation-- Medicare Donations Process

See below and attached details from laurie on exactly the process she followed for the donation. I'm copying Alejandro here so he's aware we're attempting to do this urgently (if possible to accrue against Q1). Because it's only a $5M donation we're intending to make this quarter, I don't think you need to seek approval from Mike M, I think you only need approval from Dave Loughery. I'm sure you do need to connect with ▮▮▮▮▮▮ sap to ensure we have the funds we could send immediately. The attached email notes the 3 funds we donated to this year; the first fund, the assistance fund, was the one we donated to in the previous year.

I am also attaching the couple of emails Laurie sent which contain the paperwork and other files needed for the donation to occur as a reference.

**From:** ▮▮▮▮▮▮▮

**Sent:** Friday, January 13, 2017 5:23 PM

**To:** ▮▮▮▮▮▮

**Subject:** RE: Medicare Donations Process

Will do. I had already reached out to ▮▮▮▮▮▮▮ see attached email) because he is the Treasury person we worked with last year but I will reach out to ▮▮▮▮ and ▮▮▮▮ and make sure we are all set. Just so I am clear, who is seeking approval from Larry, Rob etc. and if it is me do they know this request is coming? Thank you!

2

**From:** ██████████████
**Sent:** Friday, January 13, 2017 6:14 PM
**To:** ████████████████████
**Subject:** RE: Medicare Donations Process

Based on the grant of authority levels, I think that's exactly who needs to approve, and likely who approved. ████████ I think if you can do the part below that notes connecting with AP and Treasury that will also help us with next steps.

**From:** ██████████████
**Sent:** Friday, January 13, 2017 5:03 PM
**To:** ████████████████████
**Subject:** RE: Medicare Donations Process

I just reached out to Dave L and asked him if we would be asking Mike Mc, Larry D, and Rob K (amount needs TEC member approval) for their approvals.

Best regards,

█████████████████ Dir Business Finance

<image001.png>    **Highly Confidential**

**From:** █████████████████
**Sent:** Friday, January 13, 2017 4:53 PM
**To:** █████████████████
**Cc:** █████████████████
**Subject:** Re: Medicare Donations Process

Hi! Thank you for sending this. However, this is not how the process actually worked. We requested the funds by completing the wire transfer, but we were not involved in securing the appropriate levels of approval. I am happy to do this, but need to know who has the authority to approve these payments. Please let me know and we will move it forward ASAP. Thank you!

Sent from my iPhone

On Jan 13, 2017, at 4:51 PM, █████████████████    **Highly Confidential**
wrote:

Per your process noted below,

**Completed Actions:**

? ██████████████ to receive a request for Copaxone donations from The Assistance Fund – done, received from 3 funds
? ██████████████ to request the perspective of the Copaxone Marketing team █████████ and determine the Marketing budget available— done, ██████confirms $38M available in Copaxone 2017 budget for donations

3

**To Be Completed:**

? ▮▮▮▮▮▮ to work with Dave Loughery (NASM CFO) and Mike McClellan (GSM CFO) to determine the timing of payment. For example, Teva may pay a portion of the 2016 budgeted donations in the last few days of 2015.—In progress- ▮▮▮ Copied here, see attached documents for 3 donations

? ▮▮▮▮▮▮ to give ▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮ ▮▮▮▮ Treasury) a heads up of the payment about a week prior to payment. ▮▮▮ will ensure Teva has the cash available to make the payment, and ▮▮▮▮ will ensure the proper attention is given to making a timely wire transfer. ▮▮▮▮ can also advise to the last possible time you will need to notify her and achieve a same day wire transfer. She will need a completed wire transfer form and written documentation of approval at the appropriate approval authority level.

? ▮▮▮▮▮▮ to request approval of donation payment.

? ▮▮▮▮▮▮ to communicate to A/P and Treasury with copies of the wire transfer form and written documentation of the appropriate approval authority.

---

**From:** ▮▮▮▮▮▮▮
**Sent:** Friday, January 13, 2017 3:27 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ David Loughery
**Subject:** FW: Medicare Donations Process

Regarding the process to take place when making a donation, I found this e-mail from 2015 when the process changed to move ownership of the donation to Corporate Giving.

Best regards,



<< OLE Object: Picture (Device Independent Bitmap) >> 

Dir Business Finance

**Highly Confidential**

**From:** ████████████
**Sent:** Wednesday, September 23, 2015 5:05 PM
**To:** David Loughery; ███████████████
**Subject:** FW: Medicare Donations Process

The Copaxone donation payment process has changed. Changes in Teva's policy have moved the ownership of the donation to Corporate Giving. I asked ██████ o schedule time with the Corporate Giving team (████████████████████████████) to make sure they understood what this meant. Since both of you are fairly new to this process, they are definitely new to it, and I'm leaving the group, I thought it would be best to document this process to ensure everyone knows what to do. ☺

See my email to ██████ below for the details. Let me know if you have any questions.

---

**From:** ████████████
**Sent:** Wednesday, September 23, 2015 4:59 PM
**To:** ████████████████████
**Cc:** ████████████████████
**Subject:** RE: Medicare Donations Process

Hi Laurie,

Thanks for meeting today to discuss the process to pay Copaxone donations. We didn't talk about it, but the Reslizumab team has budgeted for donations in their 2016 AOP as well. There will likely be activity related to both products; however, the Reslizumab donations are less than $1M.

A question for you - Is it possible to code the donation to the Copaxone Marketing department? Or does the donation have to be coded to Corporate Responsibility?

To recap the Copaxone donation wire transfer process...

? ████████████ to receive a request for Copaxone donations from The Assistance Fund
? ████████████ to request the perspective of the Copaxone Marketing team ████████ and determine the Marketing budget available
? ████████████ to work with Dave Loughery (NASM CFO) and Mike McClellan (GSM CFO) to determine the timing of payment. For example, Teva may pay a portion of the 2016 budgeted donations in the last few days of 2015.
? Laurie/Donna to give ████████ Accounts Payable) and ████████ ████████ (Treasury) a heads up of the payment about a week prior to payment. ████ will ensure Teva has the cash available to make the payment, and ████ will ensure the proper attention is given to making a timely wire transfer. ████ can also advise to the last

possible time you will need to notify her and achieve a same day wire transfer. She will need a completed wire transfer form and written documentation of approval at the appropriate approval authority level.

? ████████ to request approval of donation payment.
? ████████ to communicate to A/P and Treasury with copies of the wire transfer form and written documentation of the appropriate approval authority.

The rest of this email is reference information only...

Approval Authority Levels
$0.5M Sr. Director
$1M VP
$5M SVP (Larry Downey in the past)
$15M TEC members (Rob Koremans)
$25M CFO (Eyal Desheh)
>$25M CEO (Erez Vigodman)
*** I'm not sure if there is a point in which Board of Directors approval is necessary. ████████████ can advise.

Wire Form:
The financial coding in this form will need to change.
<< File: Copaxone Donation wire transfer.xls >>

Sample approval escalation email:
<< Message: FW: Response requested: Approval for Copaxone donation payment >>

Sample A/P and Treasury heads up email:
<< Message: FW: Copaxone April Donation >>

Thanks,

████████

<< OLE Object: Picture (Device Independent Bitmap) >>

████████ Associate Director, Finance

**Highly Confidential**

-----Original Appointment-----
**From:** ████████
**Sent:** Monday, September 21, 2015 12:31 PM
**To:** ████████
**Subject:** Medicare Donations Process
**When:** Wednesday, September 23, 2015 3:30 PM-4:00 PM (UTC-06:00) Central Time (US & Canada).
**Where:** **Highly Confidential**

[X]

[X]

Sorry, I meant to add a Global Meet to this meeting!!!

Hello everyone,
With the Medicare donations (related to Copaxone and Cinqair) moving out of Patient Solutions and into the Brand Marketing Budgets in 2016, we just wanted to have a quick discussion around the process for getting payments approved/processed.

Thanks!
████████████

---

You're Invited.

You've been invited to a GlobalMeet® web meeting.

Have the

&lt;mime-attachment&gt;
&lt;mime-attachment&gt;
&lt;mime-attachment&gt;
&lt;mime-attachment&gt;

# EXHIBIT B-39

| From: | David Loughery |
|---|---|
| Sent: | Thursday, January 28, 2016 11:26 AM |
| To: | Larry Downey; Michael McClellan |
| Cc: | ███████████ |
| Subject: | Copaxone Donation wire transfer -$10M January 2016-.xlsx |
| Attachments: | Copaxone Donation wire transfer -$10M January 2016-.xlsx |

Larry/Mike,

Attached is a request to pay another $10M for Copaxone donations. Mike Sheehy has approved. As this is a common payment we make each year, I'm not clear on what further approvals we need beyond the 2 of you. This amount is included in the 2016 AOP.

DL

# EXHIBIT B-40



# Go To Market Action Plan (GTMAP)

**COPAXONE**

*Launched*
*Relapsing Forms of Multiple Sclerosis*

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR INTERNAL DISUCSSION ONLY

 ## Marketing: Supporting Activities and Spend

28

**KBQ: What supporting activities are needed to successfully execute key tactics?**

$ million

| SI | CSF | Key Tactics | Supporting Activities | Owner | Start Month | End Month | Budget |
|----|-----|-------------|----------------------|-------|-------------|-----------|--------|
| 1 | a. | HCP Personal HCP Promotion | Field Sales and Materials | US Sales | Jan | Dec | 2 |
| | | | Speaker Programs | US Marketing / US Sales | Jan | Dec | 7 |
| | | | Conventions | US Marketing | Jan | Dec | 1 |
| 1 | a | HCP Non Personal Promotion | COPAXONEHCP.com | US Marketing | Jan | Dec | 4 |
| | | | MSKnowledgeSeries.com (unbranded) | | | | |
| | | | Email and other Digital Media | | | | |
| 2 | a | Medicare Donation | - | US Marketing | Jan | Dec | 40 |
| 1 | a | Advocacy | Charitable Donations and Sponsorships | US Marketing | Jan | Dec | 2 |

Continued on next slide

PRIVILEGED AND CONFIDENTIAL – DRAFT FOR INTERNAL DISUCSSION ONLY

Teva Document 40

# EXHIBIT B-41

# COPAXONE Highlights - Changes on August 3 from June Submission and Subsequent August 21st Changes

| Summary of Changes | Total 2018 expense reduction of $71M (31%), $159M vs. original submission of $229M |
|---|---|
| Key Areas of Change | • Sales Force reduced by $▮▮<br>  - *Assumes Sales Force COPAXONE weighting reduced from 60% to 50%*<br>• Marketing Direct Tactical reduced by $2M<br>• Medicare Donation reduced by $22M– *Donation reduced a further $21M to $0M*<br>• Commercial Operations reduced by $3M<br>• Patient Solutions reduced by $11M<br>  - *Anticipate 75% reduction in call center capacity*<br>• *Market Access reduced by $3M*<br>• *Marketing other reduced $1M* |
| Risk to Topline (Net Sales) By Areas of Change | • Sales Force: ▮▮▮▮<br>• Marketing Direct Tactical: $5 - $14M<br>• Medicare Donation: $0 - $128M– *revised impact $0M-$261M*<br>• Patient Solutions: $50 - $80M |
| Overall Risk to Topline | • *$75M - $413M (revised total impact)* |

# EXHIBIT B-42

| From: | John Hassler |
|---|---|
| Sent: | Wednesday, August 30, 2017 6:24 PM |
| To: | David Loughery |
| Subject: | RE: LRP Expense Reduction |
| Attachments: | 8-17-17 2018 LRP August 21st COPAXONE Submission Changes and Impacts 2017.08.17 530pm.pptx |

Dave,

The first slide in the attached deck is what is in the memo and it is editable.

Best regards,

John



John Hassler
Senior Vice President and General Manager, Teva CNS
**Highly Confidential**

---

**From:** David Loughery
**Sent:** Wednesday, August 30, 2017 3:49 PM
**To:** John Hassler
**Subject:** FW: LRP Expense Reduction

John,

Larry forwarded this to me and I then asked Mark to prepare something similar for Respiratory that I could then consolidate and allow Larry to provide to Rob. I am not comfortable including the sales impact of the reduced donations. Since the table is attached as a picture, could you have someone send this to me with the 0-$128M range line excluded. I will however, add a comment that we believe that reducing the level of donations could mean that a significant number of patients will not be able to remain on Copaxone due to financial constraints.

Thanks,

DL

---

**From:** Larry Downey
**Sent:** Friday, August 18, 2017 9:16 AM
**To:** John Hassler
**Cc:** David Loughery
**Subject:** FW: LRP Expense Reduction

John:
I appreciate your very good summary and quantification of the situation. I agree we are getting to the point that we are making it impossible to achieve the top line.

If you do not mind, I would like to forward your document to Rob and Asaph to give them a feel of the situation and to get their direction as to how they want us to proceed. They may want to get on the phone with us if they have any questions.

Dave:
Any other thoughts on how to proceed?
Thanks, Larry

---

**From:** John Hassler
**Sent:** Friday, August 18, 2017 7:29 AM
**To:** Larry Downey
**Subject:** LRP Expense Reduction

Larry,

We have completed the expense reductions that have been requested. I want to communicate the impact of these changes and have tried to objectively capture what we have done and the anticipated impact. I'd like to get your thoughts on the assessment and if appropriate, how to ensure that those who ultimately make these budget allocation decisions are aware of the expected impact.

Best regards,

John

John Hassler
Senior Vice President and General Manager, Teva CNS
**Highly Confidential**

# EXHIBIT B-43

Teva Document 43

# AOP Review

Teva NA Specialty Marketing
Tuesday January 9, 2018

**teva**



Teva Document 43

# COPAXONE Executive Summary

**COPAXONE: Upside and Downside**

- Compared to current AOP (1st Gx Oct 2017, 2nd Gx April 2018); less than anticipated erosion of COPAXONE 40mg post generic introduction has led to a Q4 2017 upside and an anticipated Q1 2018 upside of approximately $174M.
  - Current COPAXONE brand AOP net sales: $1.054B
  - Potential revised AOP net sales with Q1 adjustment: $1.228B
- Additionally, competitive intelligence suggests a delay in introduction of 2nd generic to the market, which may lead to further upside in 2018.
  - Potential revised AOP net sales with Q1 adjustment and 2nd Gx in Dec: $1.562B

- Forecast Risk: 27% of patients on COPAXONE 40mg are Medicare Part D. Patients who are unable to meet the donut hole deductible in Q1 may not fill Rx and go off therapy, which would result in a negative impact to the brand of $210-280M.
- Holding the execution of high priority tactics during ongoing budget reviews may place additional risk in the topline forecast.
- Current AOP investment: $65.6M (minus labor e.g. sales force and ShS).
  - ▮▮▮ direct marketing investment planned for 2018 ▮▮▮ tactical marketing, ▮▮▮ shared services direct marketing) + ▮▮▮ indirect marketing costs (driven by MR, MCM and HSM)
  - Need to confirm we are covering expenses beyond labor that are included with indirect expense

**teva**

# EXHIBIT B-44

# Generic COPAXONE 40mg Update*

Board, October 2017

*first preliminary analysis – for internal use only

**teva**

# Key Activities to Defend Against Generic Erosion

**Brand over Generic (House Brand) Contracting Strategy**
- Contracting with major payors, PBMs and pharmacies
- Contracts range from Brand over Generic terms (all 40mg Rx will be switched to Brand), to loyalty allowing access to COPAXONE 40mg alongside generic

**Sales force DAW messaging and activities**
- Sales force proactively messages to HCP customers the need for "Dispense as Written" on all new Rx and refills
- Working with office accounts to ensure they have the capabilities and resources need to communicate DAW through verbal, written and electronic means

**Outbound efforts to 40mg patients through Shared Solutions**
- Call center outbound effort to contact all current 40mg patients with active marketing authorization
- Emails to all patients with DAW messaging
- Ability to produce current 40mg patient lists for HCP offices to proactively DAW scripts

**Legal pathways also being explored**

PRIVILEGED AND CONFIDENTIAL - DRAFT FOR INTERNAL DISCUSSION ONLY.

4

# EXHIBIT B-45



## GA Life Cycle Initiatives
## Lower frequency of injections

*No formal dose ranging or frequency humans studies (PK/PD)
have been performed to link with clinical outcomes*

- **40 mg every other day**
  - ❖ Based upon "sameness" of 40mg to 20mg in the FORTE trial
  - ❖ **Issue**: existing data from every other day with Copaxone may prompt patients using generic COPAXONE every other day

- **Higher doses in less frequent dose regimen (i.e once weekly)**
  - ❖ How do we justify the use of higher doses after Forte?
  - ❖ Solubility of a higher dose, increased injection site reactions
  - ❖ Once weekly injections of 15 and 30 mg TV-5010 in MS patients provided equivocal MRI results, anti TV5010 antibodies profile looks different from that induced by daily GA

- **Issue for consideration : costs of yearly treatment of the lower frequency regimen compared with COPAXONE daily**

**GIR**  6  Global Innovative Products **TEVA**

# EXHIBIT B-46

| From: | ████████████ |
|---|---|
| Sent: | Tuesday, August 26, 2008 8:26 PM |
| To: | ████████ |
| Cc: | ████████████████████████ |
| Subject: | Re: brief update from GIR meeting on GA LCM |

Thanks for the update. A few points:

1. The limiting step with GA is the density of the solution. I assume that █████ has the information for the 60mg back from the days we have worked on the 80mg.
2. Please consider the ISR we saw in the rats with the 80mg (so we may not want to go to high).
3. In addition, we have currently a 5 fold safety ration based on monkeys only and excluding the ISRs - we should consider whether this should guide us when choosing the next dose.
4. What is the TPP - efficacy as 20mg?
5. Can we patent the frequency?
6. This is also a long term plan, assuming Phase II and Phase III bringing us to 2016 - still relevant?

26/08/2008 18:55

To

cc

Subject   brief update from GIR meeting on GA LCM

Dear all,

In the Gir meeting today the following decisions were made:

1. 0.5 ml GA 20 mg - Go decision. However it was decided that TN will run the clinical trial in parallel to the 6 M stability to see if indeed we get better /same injection side reaction and not worse.

2. Gir accepted the LCM recommendation not to pursue the 40 mg every other day. Instead of that it is requested that we prepare a development plan with GA 50 mg or even higher if feasible for once or twice weekly injections. My input was that the highest feasible dose is 60 mg and therefore the 50 mg was accepted. A CDP for this product should be developed as well.

3. New formulations/pumps etc.. - the concept of looking on new GA products of such kind was accepted. we need to work with ██████ nd TN, map the relevant options and make a recommendation for these products developments. Vera,  it will be very helpful to organize a CMC meeting asap.

Thank you all,

Senior Director,

1

Special Innovative Projects
Innovative R&D
Tel: [ Highly Confidential ]
Fax: [ Highly Confidential ]
Mobile: [ Highly Confidential ]

CONFIDENTIAL ATTORNEY CLIENT PRIVILEGE

# EXHIBIT B-47

| From: | Ronit Weiss |
|---|---|
| Sent: | Monday, December 29, 2008 3:41 AM |
| To: | Yifat Shorer |
| Cc: | Ety Klinger; Yossi Gilgun |
| Subject: | Re: GA Infrequent injection proposed study |

Totals added. Yossi and I will compere the numbers between projects tomorrow as soon as Vera will give as the allocation for the CMC FTEs.

**Yifat Shorer** Highly Confidential

28/12/2008 21:50

To   Ronit Weiss **Highly Confidential**

cc   Yossi Gilgun **Highly Confidential**

Klinger **Highly Confidential**

Subject

DocLink1.ndl

Re: GA Infrequent injection proposed study

Thanks, Ronit.

Could you please add the 'total FTEs' for each stage?

Thanks,
Yifat

**Ronit Weiss** Highly Confidential

28/12/2008 13:56

To   Yifat Shorer **Highly Confidential**

cc   Yossi Gilgun **Highly Confidential**

Subject

DocLink2.ndl

Re: GA Infrequent injection proposed study

Hi

Here are the number of FTEs per department from the Copaxone 40mg development per stage:
1. From G/NG to FPI (2-9/2006):

2. <u>From FPI to LPO (10/2006-5/2008):</u>

3. <u>From LPO to Results - (6-7/2008):</u>

Yossi - as you can see the CMC allocation is far from zero and this needs to get attention here as well. I think we need to sit on this together.

Regards,
Ronit

**Yifat Shorer** [Highly Confidential]

24/12/2008 22:38

To  Yossi Gilgun  **Highly Confidential**

cc  Ronit Weiss  **Highly Confidential**

Subject

DocLink3.ndl

Re: GA Infrequent injection proposed study

Ronit,
Can you please check how many FTEs were invested in 40mg for MS (+ in which department, globally)? do you think it might be used as a benchmark?
Best regards,
Yifat

**Yossi Gilgun** [Highly Confidential]

24/12/2008 12:13

To  Ronit Weiss  **Highly Confidential**

Shorer  **Highly Confidential**

cc

Subject  GA Infrequent injection proposed study

Dear both,

Please find below the presentation prepared for the discussion in the GA LCM meeting one month ago (the relevant study design can be found in slides 7-9- Option 2- Superiority study GA 32 mg thrice a week vs. placebo, and the appropriate FTE slide can be found in slide 14).

I would like to make it clear that the IR&D management, led by ▮▮▮▮ are **strongly against the study** since it has no scientific rationale/ value. The IR&D decision was conveyed to the GA LCM team; however, the GA LCM members, though agree with IR&D decision, think that such a study has its business value.

I know from ▮▮▮▮▮▮ that a GIR meeting is planned for 08-09 Jan 09, so I assume that a final decision will be taken then by ▮▮▮▮

Please contact me if you need any further clarifications.

All the best

▮▮▮▮▮▮▮▮

[attachment "GA infrequent injection- Optional scenarios- 19 Nov 08.ppt" deleted by Yifat Shorer/NTA/TEVA/IL]

Yossi Gilgun-Sherki, Ph.D.
Global Clinical Leader
Clinical Development Section
Global Innovative R&D
Teva Pharmaceutical Industries, Ltd.
Netanya, Israel

**Highly Confidential**

# EXHIBIT B-48



# Development of High dose/ low frequency formulation of GA



- **Situation**
    - There is a need to develop a low frequency formulation of GA to:
        - Ensure the competitiveness of Copaxone in the future and to address the market unmet need for less frequent injections
        - Prepare a mid-term solution as an insurance policy in case ████████ fail and our next launch is not before 2016 / 17

- **Complications**
    - No supporting clinical data for the selected dose or dosing regimen
    - Regulatory authorities may request a dose range finding study and comparison of the new formulation to daily GA and placebo
    - The new formulation must be approved no later than 2014

- **Possible Resolution**
    - To conduct a 2 -arm PC study, using the 40mg/ml configuration e.g. 32-40 mg GA 2-3 times a week
    - Do not consult with regulatory authorities before study initiation – they will most probably not accept this design

- **Risks**
    - The cost of the study is $52 M
    - Regulatory authorities may not approve the new formulation based on a single study results
    - Recruitment to a PC study will be slow and the TTM may be later than 2014

# EXHIBIT B-49



**Copaxone LCM - Mid Term Initiatives**

## High dose /low frequency formulation Challenges



- No supporting data for the selected dose or dosing regimen
  - There is no supportive clinical data - no POC study
  - Less frequent injections may delay the onset of action
  - Overall, the data available to date do not support going to higher doses
  - Immunogenicity - twice weekly injections may induce a different antibody response – it is not clear how it would affect the clinical efficacy since the correlation was never proven
- In the absence of rationale for dose selection, the regulatory authorities may not approve the product based on a single study exploring only one dosing regimen
- No market exclusivity in Europe

# EXHIBIT B-50

# GA 40mg SWOT

**Marketing Team**

**GSM, 2011**



# GA 40mg– Opportunities & Threats



**Opportunities**

- Barrier to Generic entrance – Suggest the opportunity is extension of Life Cycle and new IP vs. your proposed statement – we don't want to been seen as "creating" barriers to generics as this is Teva's core business
- Capture IFN patients that switch because of Tolerability (no flu-like syndrome, same convenience)
- Capture GA 20mg aiming at less injection / more convenience
- Reinforce the "franchise in MS" of Teva.

**Threats**

- Crowded & competitive market, physicians not ready to accept additional "minor" innovation/benefit
  - Peg-avonex
  - Orals (Gilenya, ▮▮▮, TeriF, BG12)
  - ▮
- GA 20mg
  - CIS Indication
  - Owns positioning territory
- Challenging Teva MS franchise Strategy [20mg, 40mg, ▮▮▮, *0.5 ml at the horizon*]
- We are putting patients in play for a switch who might have been otherwise satisfied
- GA market share is declining overtime due to fragmentation of the market
- Generic or biosimilar GA

# EXHIBIT B-51

# Gx GA Readiness Work Team

November 18, 2014

**COPAXONE**
(glatiramer acetate injection)

# Marketing: Deliverables

| Deliverables | Status | Responsible Party | Start Date | Completion Date |
|---|---|---|---|---|
| **Pre-Gx Launch** | | | | |
| Gx Strategy | Complete | Jeff | 8/14 | 9/14 |
| Tactical Plan | In Development | Jeff / Marcy | 8/14 | 10/14 |
| Field Communications / TPs | Complete | Scott / Karen | 2/14 | 4/14 |
| Discontinue 20mg Financial Programs (Patient Services) | In Process | Karen / DeAnne | 8/14 | 12/14 |
| **Post-Gx Launch** | | | | |
| Tactical Plan | In Development | Jeff / Marcy | 8/14 | 10/14 |
| Field Communications / TPs | In Development | Marcy / Karen | 9/14 | 12/14 |

CONFIDENTIAL – FOR INTERNAL PURPOSES ONLY – NOT FOR USE IN PROMOTION

**COPAXONE** (glatiramer acetate injection)

# EXHIBIT B-52



9/27/2020



**Copaxone Payer Segmentation Analysis**
Final Readout

Prepared for TEVA
Date October 6, 2017

Copyright © 2017 QuintilesIMS. All rights reserved.

# Teva is interested in understanding payer control in MS, anticipating a potential entry of generic Copaxone 40mg

| **Market and Project Background** | <ul><li>Teva's Copaxone franchise is a mature MS brand and long time market leader</li><li>Copaxone currently has two formulations – 20MG and 40MG, and the 20MG formulation's branded generic Glatopa was launched in 2015 by Sandoz</li><li>Prior to Glatopa's launch, Teva released and promoted a long-acting Copaxone 40MG, effectively pushing existing and new patients to the branded 40MG and minimizing generic substitution</li><li>As part of Copaxone's life-cycle management and preparing for its LoE, Teva is interested in contracting strategy optimization</li></ul> |
|---|---|
| **Project Objectives** | <ul><li>The primary objective for the project is to assist Teva in understanding payer control across therapeutic areas – namely Multiple Sclerosis (MS), Rheumatoid Arthritis (RA), and Type II Diabetes (GLP-1s)</li><li>Our segmentation analysis examines a payer's willingness to control vs. its ability to control utilization, using analog markets to assess risk of increased controls</li></ul> |



**AMUNDSEN**
CONSULTING
a division of QuintilesIMS

2

# EXHIBIT B-53



At-Risk Gx Readiness

Jan 2017

**3-TIMES-A-WEEK** 40 mg/mL

**COPAXONE**
(glatiramer acetate injection)

## Market Access Update

- House Brand Accounts:
  - Contracting Strategy for Brand over Generic.  Discussions have taken place with these designated accounts.
    - 2 of the  House Brand target accounts will be executed at the formulary level. Blocking the generic via formulary restriction.
    - 2 of the House Brand target accounts will be executed at the specialty pharmacy level. Pharmacy will fill brand regardless if prescribed as generic.

- Loyalty Accounts:
  - Contracting for continued formulary access, without any step edits through  Gx. These plans may decide to add Gx to their formulary.  Assume modest increases in rebate for this strategy (1-5 points)
    - HCP loyalty and DAW strategy will help retain many of these branded units.
    - Assumed retention of 50% of 40mg units

11  **3-TIMES-A-WEEK** 40 mg/mL

**COPAXONE**
glatiramer acetate injection

Teva Document 53

# EXHIBIT B-54

**From:** Brendan O'Grady
**Sent:** Wednesday, January 31, 2018 4:05 PM
**To:** ▆▆▆▆▆▆▆▆▆
**Subject:** RE: CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

I have to get up in 2.5 hours to fly to Switzerland. I may just stay up and work on email.

Best regards,

Brendan P. O'Grady   EVP and Head of North America
**Highly Confidential**

---

**From:** ▆▆▆▆▆▆▆
**Sent:** Wednesday, January 31, 2018 3:05 PM
**To:** Brendan O'Grady
**Subject:** Re: CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

I know that! I guess I am missing my pint in texting. We will talk live someday. Safe travels

Sent from my iPhone

On Jan 31, 2018, at 4:02 PM, Brendan O'Grady ▆ Highly Confidential ▆ wrote:

No as last I understood, Specialty Pharmacy only ships brand Copaxone no matter how it is written or what the formulary states. That is why this has little impact. Then again, my knowledge may be dated.

Best regards,

<image001.png> Brendan P. O'Grady   EVP and Head of North America
**Highly Confidential**

<image002.png>

---

**From:** ▆▆▆▆▆▆▆
**Sent:** Wednesday, January 31, 2018 3:01 PM

1

**To:** Brendan O'Grady
**Subject:** Re: CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

Ok- thanks. I thought they only received that for non- mail order and since 95% of Insurer is mail order through Specialty Pharmacy it doesn't sound so great, so I obviously need to understand it better

Sent from my iPhone

On Jan 31, 2018, at 3:56 PM, Brendan O'Grady [ Highly Confidential ] wrote:

Because PBM is getting an additional rebate to fill all "glatiramer" or Copaxone scripts with Copaxone...if a doctor orders generic glatiramer or the pharmacy benefit mandates it be filled as a generic, it will come in a plain box with Copaxone inside. Win-win for all...

Best regards,

**Brendan P. O'Grady** EVP and Head of North America
**Highly Confidential**

---

**From:**
**Sent:** Wednesday, January 31, 2018 2:54 PM
**To:** Brendan O'Grady
**Subject:** RE: CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

Sorry for the question – I worked it out in my piddly little mind today, and kind of understand it better. Just don't know how PBM benefits from this, as they are the PBM for Insurer I get how Specialty Pharmacy and Insurer would benefit .......oh well – another learning curve will possibly keep my mind young.

Warm Regards,

**Highly Confidential**

---

**From:** Brendan O'Grady
**Sent:** Wednesday, January 31, 2018 3:52 PM
**To:**
**Subject:** RE: CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

Because they are looking at the future...this has almost zero impact on actual prescriptions – I will explain later. Also, the NP status means little as we buy the patients copay down to zero anyway. Unless they NDC block Copaxone 40mg, we are fine. That is why they did not inform the reps because the actual impact is very low and it would just confuse them.

Best regards,

<image001.png>

Brendan P. O'Grady   EVP and Head of North America

**Highly Confidential**

<image002.png>

---

**From:** ▮▮▮▮▮▮▮▮
**Sent:** Wednesday, January 31, 2018 1:02 PM
**To:** Brendan O'Grady
**Subject:** FW: CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

Hi,

I thought I would take you down five million levels and let your brain totally veg out on things so below your pay grade.

I realize we have the Specialty Pharmacy House Brand Strategy that will lessen the blow on this Insurer decision, but – do why would a plan of this size make this type of move if they were being offered a rebate that made a brand drug more economical than a generi? (at least I am assuming that is the case, but haven't spoken to ▮▮▮▮▮ about it yet, as it is not official that this is my account. )
Wish you weren't so important and busy with higher level decisions and control – I need you as my mentor!  Ahahahha!

Warm Regards,

<image001.png>

**Highly Confidential**

<image002.png>

---

**From:** ▮▮▮▮▮▮▮▮
**Sent:** Thursday, January 18, 2018 6:37 PM
**To:** USKAN_DIST_MANAGED_MARKETS_FIELD
**Subject:** CONFIDENTIAL: ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

Greetings,

In follow-up to our discussion on this topic from last Friday's call, ████ the COPAXONE brand team, ████████ and I agreed that **the house brand strategy with** Specialty Pharmacy **that impacts this formulary change should not be formally shared with the sales team**. We did agree, however, to communicate this detail with ████████ nd the ASDs personally - which I completed yesterday. I also confirmed with the COPAXONE IC team that representatives WILL get credit for scripts getting filled with the brand at Specialty Pharmacy through Insurer

When supporting the TN sales force on this coverage change, please align to the confidential nature of the Specialty Pharmacy House Brand strategy and encourage representatives to use DAW as their reactive response in the field.

Don't hesitate to reach out to ████████ or me if you would like to discuss further.

Best regards,

<image003.png> **Highly Confidential**

<image004.jpg>

**From:** ████████
**Sent:** Thursday, January 18, 2018 3:33 PM
**To:** TevaUS_TNS_Sales_Regional_Managers
**Cc:** USKAN_DIST_MANAGED_MARKETS_FIELD
**Subject:** ***FORMULARY UPDATE*** Insurer Commercial/MPD & COPAXONE 40mg

Greetings TN Sales Leadership,

See below for a COPAXONE 40mg coverage update. Effective immediately, Insurer Commercial and Medicare Part D will move COPAXONE 40mg to *non-preferred* status. This change impacts new starts immediately, and current COPAXONE patients will be grandfathered until annual PA re-submission. Providers should document DAW on the PSR to ensure highest probability of a branded fill.

Please don't hesitate to contact me if you have any questions about this coverage change.

Best regards,

<image003.png> **Highly Confidential**

<image004.jpg>

## Effective 1/1/17, COPAXONE 40mg is Non-Preferred on Insurer Commercial & Medicare Part D

Effective immediately, COPAXONE 40mg is Non-Preferred on Insurer Commercial & Medicare Part D (representing ~15 million and ~1 million lives respectively).

- This formulary change impacts new patients where HCPs should request DAW on the PSR
- Current COPAXONE 40mg patients will be grandfathered until their annual PA submission, then will also be subject to restrictions listed below

**Restrictions:**

- Requests for Brand Copaxone 20mg/ml or Brand Copaxone 40 mg/ml must meet the following criteria:
  - Individual has had a trial (medication samples/coupons/discount cards are excluded from consideration as a trial) and inadequate response or intolerance to one of the following:
    - One preferred beta interferon agent (Avonex, Betaseron Plegridy) or
    - Tecfidera or
    - Glatiramer 20mg/ml, glatiramer 40mg/ml, or Glatopa 20mg/ml
- Current COPAXONE patients will be grandfathered until their annual PA submission, then will also be subject to the step edit through generic GA
- Providers should document DAW on the PSR to ensure highest probability of a branded fill

**Effective Date:** January 1, 2018

**Plan Details:**

- **Insurer** Commercial Pharmacy Benefit represents ~15 million lives (includes health exchange)
- **Insurer** Medicare Part D represents ~1 million lives
- This announcement does not impact **Insurer** Managed Medicaid (~5 million lives) as branded COPAXONE 40mg is non-formulary
- **Insurer** formulary decisions impact the following health plans:

# Health Plans

Contact your manager if you have any questions about this formulary change.

**BACKGROUND USE ONLY. DO NOT COPY. DO NOT DISTRIBUTE.**

# EXHIBIT B-55

# Copaxone House Brand Review

**April 5th, 2018**

teva



— For internal use only

# Copaxone 40mg National DAW



**Percent DAW**

Source: IMS

■ Percent DAW

teva

Teva Document 55

# EXHIBIT B-56



Teva Document 56

## Benchmarking our budget and multiples

| | R&D Budget (Est. 2015 $M) | R&D Budget (2015 % of Rev) | EPS (Est. 2015) | Multiples (Est. 2015) |
|---|---|---|---|---|
| UCB | 1,116 | 26.6% | 1.9 | 48.4 |
| Novo Nordisk | 2,214 | 13.5% | 2 | 28.4 |
| Celgene | 2,394 | 25.9% | 4.1 | 28.3 |
| Eli Lilly | 4,821 | 24.0% | 3.3 | 24.6 |
| Roche | 8,380 (2014) | 21.5% | 15 | 19.1 |
| Biogen | 2,093 | 19.4% | 16 | 18.5 |
| GSK | 4,802 | 12.8% | 1.2 | 18.3 |
| Bayer | 2,283 (2014) | 15.6% | 7.9 | 17.4 |
| Novartis | 7,331 (2014) | 22.4% | 5.3 | 16.9 |
| J&J | 6,213 (2014) | 19.2% | 6.3 | 16.3 |
| Pfizer | 7,510 | 15.8% | 2.1 | 16 |
| Sanofi | 5,864 (2014) | 14.3% | 6.3 | 15.4 |
| Merck | 6,744 | 16.7% | 3.6 | 15.2 |
| Abbvie | 3,630 | 15.8% | 4.3 | 15 |
| Teva (specialty) | 897 | 10.0% | 5.4 | 11.2 |
| AstraZeneca | 5,211 | 22.5% | 4.1 | 7.8 |

Source: EvaluatePharma (where indicated, 2014 data was used due to lack of separate forecast for pharma segment)

Teva Document 56

# EXHIBIT B-57

**Healthcare Costs in the U.S. Talking Points**

*Intended for use by Corporate Communications,*

*IR and Teva Leadership with media and analyst audiences only (Oct 18, 2016)*

## Background

Recent events have placed an increased focus and request for commentary on healthcare costs in the U.S., including:

- Mylan Inc. has come under sharp criticism from a variety of stakeholders, including political candidates and patients, for the recent dramatic price increase of EpiPen, as well as the salary increases for top executives, especially CEO Heather Bresch
    - In September 2016, Heather Bresch testified before the House Oversight and Government Reform Committee, justifying that the profits the company has collected compared to the price is not what people assume
    - The Committee called for a Justice Department investigation to determine if the company acted illegally when it classified EpiPen as a generic drug and qualified for lower rebate payments to states
    - In response to the criticism, Mylan announced a series of measures to mitigate the cost to consumers, including the release of their own generic version and a direct-ship option, which allows consumers to buy the product directly from the company instead of through pharmacies
        - While positioned as a positive from Mylan's perspective, there is still a focus on the extremely high price of the branded EpiPen, as well as scrutiny surrounding the company making a generic version of its own branded product and ultimately, still profiting
- Shortly following the Mylan issues, Allergan CEO Brent Saunders posted commentary on the company's position on drug pricing on his executive blog
    - Resulting response has been factual and mostly positive
- In May 2016, Valeant issued a press release announcing the formation of a committee to oversee drug pricing following their pricing scandal and subsequent Senate hearings in October 2015
- In addition to highly critical media response to these events, several Federal and State legislative proposals are currently being floated whose professed aim is lowering prescription drug spending, and there is increasingly negative election rhetoric surrounding the upcoming U.S. Presidential election.

## Key Messages – Teva Overall:

- Teva is a diversified, world-leading pharmaceutical company dedicated to the development of safe, effective and quality medicines. Upholding our commitment to maintaining a fundamental focus on patients and improving their treatment experiences has been, and remains, at the core of Teva's heritage.

- Teva acknowledges that the pharmaceutical industry as a whole needs to be mindful and responsible as to what the healthcare system can tolerate when pricing medications and each company's role in keeping down healthcare costs.

- Teva is committed to the development and production of high-quality, affordable generic medicines and innovative specialty medicines for doctors, pharmacists, and most importantly, patients.
    - With nearly 600 generic medicines available, Teva has the largest portfolio of FDA-approved generic products on the market.

       o   Teva is disciplined in our R&D and branded commercial strategies and our approach has resulted in research treatments and technologies that have fundamentally changed the way diseases are understood and treated.

- The pharmaceutical industry as a whole provides tremendous overall value to the healthcare system.

- Recent attention on the cost of medications in the U.S. stemming from both the political arena and specific actions by select companies raises an important issue to the forefront of today's conversation– but also paint a narrow view of industry practices and undermines the important strides Teva and other companies are making through investment in research and drug discovery to prevent and treat complex life altering disorders.

- Industry pricing decisions are largely reflective of investments made to research, develop and commercialize high quality, safe and effective products, the health benefits of products and the invaluable patient services companies provide.


**Generics-Specific Messages:**

- Generics, specifically, create tremendous additional savings.
- As the largest generic drug manufacturer in the U.S. market, Teva is responsible for 12.7 percent of the total savings accruing from generic drugs. This amounts to approximately $214 billion in savings in the last decade attributable to Teva. Of the $214 billion in generic healthcare savings attributable to Teva, $82 billion accrued to the federal government, $62 billion to Medicare, and $20 billion to Medicaid (state and federal)..[i]
- It is a misconception that the overall cost of generic drugs is increasing.
  - Recent data shows that the generic cost trend continues to decline. In fact, drug costs are a small portion (approximately 10%) of overall health system costs and generic drugs are an even smaller fraction of that expenditure.
  - To date, we continue to see depreciation of our generic product prices year over year.
- Like all commodity markets, the generic drug market is dynamic and prices fluctuate based on external factors.
  - The number of competitors in the market.
  - The cost of ingredients can fluctuate based on supply and demand (i.e., fewer suppliers in the market, the cost of ingredients increases).
  - The cost of production can change due to requirements by the FDA.
- Generic drug manufacturers can proudly point to a legacy of savings and access that brings expensive treatments within reach for millions of people:
  - The IMS Institute for Health Informatics found that generic drugs were responsible for $254 billion in health system savings in 2014, bringing the total savings over the last 10 years to $1.68 trillion. A May 2015 report from AARP notes that retail prices for generic drugs dropped an average of 4% in 2013, marking nearly a decade of consecutive years of decreasing generic drug costs. The report also notes that 73% of generic drugs in the study experienced price decreases.
  - An August 2015 Drug Channels blog noted that in the second quarter of 2015 almost half (44%) of generic drugs experienced a decline in cost.


**Key Messages - Specialty:**

- We will continue to make calculated investments to research, develop and commercialize safe and effective treatments in areas of true unmet need and innovation aimed at improving the treatment experience for patients. For example:
  - Teva has invested in numerous development programs in CNS focused on complex high unmet need areas such as neurodegeneration and movement disorders which include orphan diseases like Huntington's disease, as well as Tourette syndrome, Parkinson's disease, multiple sclerosis, and tardive dyskinesia. Teva is currently developing [Redacted - Other Product Information] pridopidine, [Redacted - Other Product Information] and other undisclosed assets in the neurodegenerative category.
  - Further, Teva works to ensure proven safe and effective treatments, such as a COPAXONE® (glatiramer acetate injection), are available to patients. Through continued innovation to the product to enhance the patient experience, three-times-a-week COPAXONE® 40 mg/mL now offers the same proven COPAXONE® that patients and physicians know and trust with 60 percent fewer injections compared to the daily injection regimen with COPAXONE® 20 mg/mL.

## Copaxone Specific Pricing-Related Messages (*reactive only*):

- The current wholesale acquisition cost (WAC) for COPAXONE® (glatiramer acetate injection) is competitive relative to other therapies in the category. COPAXONE® 40 mg/mL offers a strong value proposition when compared to Glatopa™.
- Teva continually evaluates the needs of MS patients to ensure our supportive services, like Shared Solutions®, appropriately meet patient needs. We believe that patients should not have to choose, interrupt or discontinue their MS therapy because of financial reasons. As a part of Shared Solutions®, COPAXONE Co-Pay Solutions® is one of several financial assistance offerings that help people living with a relapsing form of MS start and/or stay on COPAXONE®.

- For more than 30 years, Teva has pursued its MS research with the goal of providing effective, safe and tolerable therapies for MS patients. This ongoing commitment to patients was evidenced by the development of three-times-a-week COPAXONE® 40 mg/mL, thereby expanding the suite of COPAXONE® formulations and services to benefit patients with relapsing forms of MS.

## Questions & Answers/Generics:

**Q1: Why is Teva pricing its generic drugs higher, when generics are supposed to be affordable alternatives to branded therapeutic options?**
A1: It is a misconception that the overall costs of generic drugs are increasing. Like all commodity markets, the generic drug market is dynamic and prices fluctuate based on external factors. Generic medicines continue to be an affordable alternative to brand therapies.

**Q2. What are the circumstances that cause Teva to increase price on a generic drug?**
A2: As a commodity market, the generic drug market is dynamic and prices fluctuate based on external factors. A generic drug price is adjusted (either up or down) because the market demands a change.

**Q3: What percentage are prices usually increased?**
A3: It is a misconception that the overall cost of generic drugs is increasing.
- Express Scripts Prescription Price index shows that generic drug prices have been cut in half since 2008. Compared to generic drug prices in December 2012, in December 2013 generic drug prices were15.9% lower.
- According to a recent survey of insurance plan benefit designs, the average copay for generic drugs is generally one-third the copay for preferred brand drugs and one-fifth the copay for non-preferred brand drugs. Similarly, research from the Department of Labor's Bureau of Labor Statistics shows that the median copay for generic drugs in 2012 was $10 and for brand drugs, $30. Despite price fluctuations that could affect pharmacy costs, median generic drug copays have remained constant in recent years.
- To date, we continue to see depreciation of our generic product prices year over year.

**Q4: What impact does a generic price increase have on patients?**
A4: For patients with insurance, there is no impact based on the pre-determined copay with the insurance provider. For patients that pay out-of-pocket for medicines, they pay the price that each pharmacy sets for a product, and not a price set by Teva.

## Question & Answers/Copaxone (Specialty):

**Q1: What is the current price of COPAXONE®?**

A1: The current wholesale acquisition cost (WAC) for COPAXONE® (glatiramer acetate injection) is competitive relative to other therapies in the category. COPAXONE® 40 mg/mL offers a strong value proposition when compared to Glatopa™.

**Q2: Will you take further pricing actions?**

A2: We do not comment on future pricing actions.

**Q3: Can you explain the COPAXONE® gross profit margin in relation to the cost of the therapy?**

A3: The profit margin associated with COPAXONE® (glatiramer acetate injection) is similar to other branded molecules in this category, and is largely reflective of investments made to research, develop and commercialize a safe and effective relapsing MS product. We plan to continue to focus on innovation aimed at improving the treatment experience for patients.

**Q4: Why is COPAXONE® 40 mg/mL priced lower than COPAXONE® 20 mg/mL?**

A4: COPAXONE® (glatiramer acetate injection) remains competitively priced within the category, particularly considering it is the market leading product. Three-times-a-week COPAXONE® 40 mg/mL offers an outstanding value proposition and a co-pay assistance program that will allow eligible commercial patients to access the product with no out-of-pocket cost. Certain terms and conditions apply.

**Q5: What was the most recent price increase for COPAXONE® and when did it happen?**

A5:

The current wholesale acquisition cost (WAC) for COPAXONE® (glatiramer acetate injection) is competitive relative to other therapies in the category. COPAXONE® 40 mg/mL offers a strong value proposition when compared to Glatopa™, as there is only a XX% difference on annual wholesale acquisition cost of therapy.

- **IF PRESSED**: As of January 1, 2016, the WAC for a 30 day package of COPAXONE® (glatiramer acetate injection) 20 mg is $6,593.23 and a 28 day package of COPAXONE® 40 mg/mL is $5,403.00.

# Teva Document 57

**Q6: Why did Teva increase the price of COPAXONE®?**

**A6:** The decision to increase pricing is determined by a number of factors as we constantly evaluate the marketplace and needs of our patients. We work hard to ensure the price of COPAXONE® - the global market-leading treatment for patients with relapsing forms of MS - reflects the clinical utility of the drug, while maintaining our commitment to ongoing clinical research.

- *If pressed:* We do not comment on specifics of our pricing strategy.

**Q7: What are the factors that determined this price increase?**

**A7:** We do not comment on specifics of our pricing strategy. We remain committed to ensuring the price of COPAXONE® reflects the clinical utility of the drug, while maintaining our commitment to ongoing clinical research.

**Q8: Why is there a difference in the out-of-pocket costs for daily COPAXONE® 20 mg/mL and three-times-a-week COPAXONE® 40 mg/mL?**

**A8:** The co-pay assistance for COPAXONE® 40 mg/mL was enhanced to help patients maintain financial access to the therapy.

**Q9: How can you justify the price escalation of COPAXONE® over the last decade?**

**A9:** COPAXONE® remains competitively priced within the category, particularly considering it is the market leading product. While COPAXONE® was approved for relapsing forms of MS in 1996, Teva's investment in the MS category spans three decades. Teva works to ensure we meet patient's needs and we continue to invest in researching new developments that directly translate to increased options for COPAXONE® patients. This is evidenced by:

- A robust ongoing clinical trial program designed to continue innovation that has included studying alternative dosing options such as the FORTE (double dose) and 0.5 mL studies, investment in the GALA study to bring three-times-a-week COPAXONE® 40 mg to market, plus continued investment in our overall MS program with 4 major trials for [Redacted - Other Product Information]
- Research has also led to an evolution in the way COPAXONE® in administrated with advances taking COPAXONE® from a frozen product to a pre-filled syringe and now the availability of the **auto**ject®2 *for glass syringe*
- We have also invested in the Shared Solutions® network of personalized support, education, and training with free tools to help patients stay on track of their therapy with the goal of enhancing compliance and a co-pay assistance program allow eligible commercial patients to access the product with no out-of-pocket cost.

**If pressed:** Three-times-a-week COPAXONE® 40 mg/mL offers an outstanding value proposition based on the efficacy, safety, and tolerability that the medicine offers patients and physicians. Further, COPAXONE® 40 mg/mL offers a strong value proposition when compared to the one available generic, as there is only a 2-3% difference on annual wholesale acquisition cost of therapy, but an enhanced patient experience with three-times-a-week COPAXONE® 40 mg/mL with 208 fewer injections per year as compared to daily COPAXONE® 20 mg/mL.

**Q10: What is Teva doing to help patients who cannot afford COPAXONE®?**

**A10:** Teva continually evaluates the needs of MS patients to ensure our services, like Shared Solutions®, appropriately meet patient needs. We believe that patients should not have to choose, interrupt or discontinue their RMS therapy because of financial reasons. As part of Shared Solutions®, COPAXONE Co-Pay Solutions® is one of several financial assistance offerings that help people living with a relapsing form of MS start and/or stay on COPAXONE®. These efforts contribute to helping patients maintain financial access to COPAXONE®.

Patients who require financial assistance are invited to call the Shared Solutions® team at 1-800-887-8100. Shared Solutions® has assisted thousands of patients for more than a decade and has completed more than two million patient calls.

###

---

[i] Matrix, "Teva Pharmaceuticals: Providing Critical Health and Economic Benefits in the United States." June 2016.

# EXHIBIT B-58

# Teva Document 58

| | |
|---|---|
| **From:** | Katie Hiett |
| **Sent:** | Tuesday, July 1, 2014 7:56 PM |
| **To:** | Brendan O'Grady |
| **Subject:** | Re: APPROVAL REQUIRED: COPAXONE 20MG JULY 2nd, 2014 PROPOSED PRICE INCREASE |

Maybe we still have time to convince them to sit on the CP until FDA accepts or separate it from the price increase.

Sent from my iPhone

On Jul 1, 2014, at 6:10 PM, "Brendan O'Grady" [ **Highly Confidential** ] wrote:

> Just for clarity...an important part of our generic defense strategy is creating price separation between 20mg and 40mg. We can do that via increased discounts on 40mg or raising the price on 20mg. I prefer the latter. Delaying a pricing action to mid-August, or later, impedes our ability to gain access for 40mg with resistant payers, makes a generic more appealing to payers, and could dampen further conversion strategies.
>
> Sent from my iPhone
>
> On Jul 1, 2014, at 5:50 PM, ' [ **Highly Confidential** ] wrote:
>
> > I just spoke to [ ] nd, although this may be approved by the pricing committee via this email, please do NOT take any action with customers, pricing compendia, contracts or the system until there is a final confirmation from Rob Koremans relative to the proposed increase. We will have a decision one way or another from Rob tomorrow.
> >
> > Thank you.
> >
> > Teva Pharmaceuticals
> > Director, Trade Operations
> >
> > **Highly Confidential**
> >
> > Sent from my iPhone.
> >
> > On Jul 1, 2014, at 6:42 PM, ' [ **Highly Confidential** ] wrote:
> >
> > > Good afternoon,
> > >
> > > Attached is the July 2nd, 2014 Proposed Price Increase documentation and supporting analysis for Copaxone 20mg. Your approval is required to move forward.

1

Teva Document 58

# Teva Document 58

For your reference, following are the actions taken thus far:

- The proposed price increase was submitted by the BU.
- The Pricing Group prepared the financial evaluation. Please see attached.
- A final confirmation was received by the BU regarding this proposed price increase, to be effective July 2nd, 2014 at 3:01p (ET). Based on discussions with ████████ the July 2nd timing was suggested as there could be issues with customers who have closed for the holiday. This will allow them enough time to implement the new price in their systems.
- Proposed price increase provides a 10% disparity on a daily cost of therapy basis between Copaxone 20mg and Copaxone 40mg.

**ACTION REQUIRED:** **Due to the urgency of this request, please review the attached support and respond via email with your approval so we may execute the pricing action. I will circulate the formal documentation for signature in the next few days.**

**DUE BY:** **Please respond via email by noon, June 2nd.** We typically like to provide more lead time for you, but with the sensitivity of this pricing action and resulting tight timeframe, we appreciate your help and quick response.

Please let me or Katie know if you have any questions.

Thank you in advance for your help!

████████



<image001.png>  ████ Senior Pricing Analyst, US Market Access

**Highly Confidential**

<COPAXONE 20MG Price Increase_07.02.2014.pdf>