**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD.**, *Individually and On Behalf of All Others Similarly Situated*,<br><br>     Plaintiff,<br><br>     *v.*<br><br>**TEVA PHARMACEUTICALS INDUSTRIES LIMITED, et al.**,<br><br>     Defendants. | **CIVIL ACTION**<br><br>**NO. 20-4660-KSM** |

## MEMORANDUM

**MARSTON, J.**                                                                    **March 25, 2022**

     Lead Plaintiff Gerald Forsythe, individually and on behalf of all others similarly situated, alleges that Teva Pharmaceuticals Industries Limited ("Teva") and Teva executives Erez Vigodman, Eyal Desheh, Robert Koremans, Michael Derkacz, Kåre Schultz, Michael McClellan, Brendan O'Grady, and Eli Kalif (collectively, the "Individual Defendants," and together with Teva, "Defendants") violated Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 by making false and misleading statements and by failing to disclose material information about Teva's drug Copaxone. (Doc. No. 1.) Plaintiff also claims that the Individual Defendants violated Section 20(a) of the Exchange Act because they knew or recklessly disregarded that Teva was making materially false and misleading statements and material omissions. (*Id.* ¶¶ 249–254.)

     Presently before the Court is Defendants' motion to dismiss. (Doc. No. 66.) For the reasons below, Defendants' motion is granted in part and denied in part.

## I.     BACKGROUND

### A.     *Factual Background*

Taking the allegations in the Corrected Amended Complaint as true, the relevant facts are as follows.

#### 1.     Teva's Business

Teva is a global pharmaceutical company that sells generics, specialty medicines, and over-the-counter products.  (Doc. No. 64-2 ¶ 27.)  One of Teva's products is Copaxone (glatiramer acetate injection), an injectable drug used to treat patients with multiple sclerosis. (*Id.* ¶ 28.)  Teva offers two dosages of Copaxone:  a 20 mg/mL dose that is injected daily, and a 40 mg/mL that is injected three times a week.  (*Id.*)  Copaxone is "one of the leading" therapies for multiple sclerosis in the United States, and in the mid-2010s, it was responsible for nearly half of the revenue in Teva's specialty medicines portfolio.  (*Id.* ¶ 30.)

#### 2.     Shared Solutions Program

Teva sponsors "Shared Solutions," a program designed to increase patient access to Copaxone.  (*Id.* ¶ 41.)  Through the program, Teva trains patients on how to inject the drug, offers patients injection devices to administer the drug, and assigns patients case managers who help patients secure insurance coverage for the drug.  (*Id.*)  In 2006, in connection with the Shared Solutions program, Teva contracted with Advanced Care Scripts, Inc. ("ACS"), a specialty pharmacy.  (*Id.* ¶ 42.)  Teva sent ACS prescriptions for patients participating in Shared Solutions who "either had or were eligible for Medicare Part D coverage."  (*Id.*)  For the patients who did not already have Medicare Part D coverage, ACS assisted with the enrollment process. (*Id.*)  And for the patients who already had Medicare Part D coverage and were eligible for co-

pay coverage from a patient assistance program ("PAP"),[1] ACS helped them apply for PAP assistance.  (*Id.*)  Teva also provided free Copaxone to low- or no-income patients; however, if those patients were eligible for Medicare Part D, Teva sent those patients to ACS for assistance enrolling in Medicare Part D and applying for PAP assistance.  (Doc. No. 57 ¶ 43.)

ACS referred Teva's Copaxone patients to two PAPs for co-pay assistance:  the Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF").  (*Id.* ¶ 42.)  Both CDF and TAF maintained funds dedicated to assisting multiple sclerosis patients, through which they "provided co-pay assistance to patients for, ostensibly, any of the [multiple sclerosis] drugs on the market." (*Id.*)  Teva regularly donated to both PAPs.  (*Id.*)  Under the applicable regulations, pharmaceutical companies may donate to PAPs; however, "the funds received through donations must be applied generally to all beneficiaries, and it is illegal for a Charitable PAP to apply the funds received to any particular drug."  (*Id.* ¶ 35.)  The Department of Health and Human Services has cautioned that, if a pharmaceutical company makes a donation in order to "channel its financial support to copayments of its own products," such conduct "would implicate the anti-kickback statute."  (*Id.* ¶ 36.)

Teva allegedly ran afoul of those regulations.  (*Id.* ¶ 48.)  Teva did not intend its donations to CDF and TAF to cover co-payments for multiple sclerosis treatments generally; rather, it intended its donations to CDF and TAF to cover patients' co-pays on Copaxone specifically.  (*Id.*)  In fact, Teva executives regularly described the company's donations to CDF and TAF as "Copaxone donations."  (*Id.*)  Teva's intentions bore out.  (*Id.* ¶ 46.)  For instance, in December 2009 and January 2010, Teva donated $15.7 million to TAF, "approximately 99% of

---

[1] A PAP is a charitable program that provides financial assistance to help patients cover Medicare Part D co-pays.  (Doc. No. 57 ¶ 35.)

which was paid to Copaxone patients." (*Id.*)  Teva worked with ACS, CDF, and TAF "to ensure that the foundations would continue to cover all of [the] Copaxone patients' Medicare co-pays in the following year." (*Id.* ¶ 49.)  ACS, CDF, and TAF provided Teva with information on the number of Copaxone patients enrolled in Medicare Part D, which Teva used to estimate the Copaxone patients' total co-pays for the year and calculated its donations based on this estimate. (*Id.* ¶¶ 50–52.)

Specifically, at the beginning of each year, TAF closed its multiple sclerosis assistance fund "because it had committed all of its funding to existing patients who had renewed their annual co-pay grants." (*Id.* ¶ 55.)  But Teva, ACS, and TAF worked together to ensure that new patients could benefit from TAF's funding throughout the year.  (*Id.*)  ACS would tell Teva how many Copaxone patients were awaiting Medicare co-pay assistance, and TAF would tell Teva the average co-pay per Medicare patient.  (*Id.*)  Teva would then calculate how much it would cost to pay each of those patients' Medicare co-pays and donated that amount to TAF.  (*Id.*)  As soon as TAF received a donation from Teva, ACS would send a "batch file" of all the Copaxone patients awaiting Medicare co-pay assistance to TAF.  (*Id.*)  Several of the Individual Defendants approved wire transfers for "Copaxone donations" to CDF and TAF.  (*Id.* ¶ 48 (quoting from email from Defendant Desheh "approving a 'Copaxone Donation payment'"); *id.* (quoting from an email to Defendant Koremans requesting "Approval for Copaxone donation payment"); *id.* ¶ 66 (quoting from email to Defendant McClellan requesting "to pay another $10M for Copaxone donations . . . a common payment we make each year").)

In all, Teva donated tens of millions of dollars to CDF and TAF annually to fund Copaxone co-pays.  (*See id.* ¶ 53 (indicating that Teva made the following donations to CDF and TAF:  $36,934,678 in 2012, $36,932,589 in 2013, and $34,774,070 in 2014).)

Copaxone patients receiving Medicare co-pay assistance from CDF and TAF made up roughly 27% of patients on Copaxone.  (*Id.* ¶ 62.)  Teva recognized that if it stopped funding these co-pay assistance programs, these patients "may not fill Rx and go off therapy, which would result in a negative impact to the brand of $210-280M."  (*Id.*; *see also id.* ¶ 59 (quoting from email from Teva finance manager, stating that if donations to CDF and TAF were reduced by $10 million, "the sales [of Copaxone] will decrease as well, as there will be Medicare patients out there that won't be able to fill").)

While Teva was donating to CDF and TAF, it "raised the price of Copaxone at a rate . . . over 19 times the rate of inflation, from approximately $17,000 per year to $73,000 per year."  (*Id.* ¶ 69.)

### 3.     Defendants' Relevant, Pre-Subpoena Statements

During this period, Teva made various statements regarding Copaxone, the Shared Solutions program, and Teva's compliance with federal law.  But in each statement, Teva failed to disclose its scheme with ACS to make "Copaxone donations" to PAPs.

#### i.     Copaxone's Market Share

Plaintiff alleges that due to Teva's material omissions, Teva and its executives' statements about Copaxone's success made through SEC filings, in financial reports, on earnings calls, and at industry conferences were false and misleading.  Plaintiff identifies the following statements (and other similar statements) as false or misleading:

- *October 29, 2015 Form 6-K*: Teva stated that Copaxone "continued to be the leading multiple sclerosis therapy in the United States," and attributed Copaxone's success to "patient and physician choice of the 40 mg/mL version, supported by payor access and patient support activities."  (*Id.* ¶ 71; *see also, e.g.*,

*id.* ¶ 81 (May 9, 2016 Form 6-K stating the same); *id.* ¶ 87 (August 4, 2016 Form 6-K stating the same).)

- ***October 29, 2015 Quarterly Financial Report***:  Teva listed Copaxone revenues as $1,085,000,000 for the "Three Months Ended September 30, 2015."  (*Id.* ¶ 72; *see also, e.g.*, *id.* ¶ 88 (August 4, 2016 Quarterly Report reporting Copaxone revenue information).)

- ***October 29, 2015 Earnings Call***:  Defendant Desheh stated that Copaxone had, "in total, [a] strong quarter"—"[a]ctually a record quarter."  (*Id.* ¶ 73.)

- ***November 19, 2015 Jeffries Healthcare Conference***:  Defendant Desheh attributed Copaxone's success to "brand loyalty" and explained that patients "don't want a generic [version of Copaxone] because they are not 100% sure that it would treat them as well as the original."  (*Id.* ¶ 75.)

- ***February 11, 2016, Teva 2015 Annual Report***:  Teva stated that "key elements" of the company's strategy included "[m]aintaining Copaxone and other key specialty products" and that Copaxone revenues increased "mainly due to higher volumes" and that Copaxone "accounted for 20% of our revenues in 2015."  (*Id.* ¶ 77; *see also id.* ¶ 95 (February 15, 2017 Annual Report including similar statements).)

- ***March 16, 2016 Barclays Healthcare Conference***:  Defendants Derkacz and Desheh both touted Copaxone's success at the Barclays Healthcare Conference. Defendant Derkacz stated, "I don't know how many people in the room would have thought that Copaxone 40 mg would have been the first product that physicians go to in 2016 . . . ."  And Defendant Desheh stated, "[T]here is a very,

very significant pushback from doctors on the generic product of Copaxone, very strong pushback from the patient . . . ."  (*Id.* ¶ 79.)

- ***May 9, 2016 Earnings Call***:  Defendant Koremans stated that "Copaxone [was] doing really well" because "of a fantastic underlying demand" and explained that the "key going forward is . . . to demonstrate value to stakeholders, to patients, to payers, and overall for your products."  (*Id.* ¶ 83.)

- ***June 9, 2016 Jeffries Healthcare Conference***:  Defendant Derkacz expressed confidence in Teva's ability "to increase and sustain" Copaxone's status as a leading multiple sclerosis drug and stated that the Copaxone "business is very durable."  (*Id.* ¶ 85.)

- ***August 4, 2016 Earnings Call***:  Defendant Derkacz stated that Copaxone's success "speaks to the support by payers, by patients, by physicians around the long-proven track record of safety and efficacy of the product."  (*Id.* ¶ 89.)

- ***February 13, 2017 Earnings Call***:  Defendant Koremans stated, "[W]hen forced to use a generic of Copaxone, about 70% of patients and doctors would opt to an oral therapy, rather than do a generic."  (*Id.* ¶ 93.)

Plaintiff claims that these statements are "false and/or misleading" because Teva failed to disclose the scheme with ACS through which it made "Copaxone donations to PAPs."  (*Id.* ¶ 74.)

### ii.    Teva's Shared Solutions Program

Plaintiff also alleges that Teva and its executives made various false and misleading statements about the Shared Solutions program on earnings calls and at industry conferences because they failed to disclose a key component of Copaxone's success was its scheme involving PAPs.  Plaintiff identifies the following statements (and other similar statements) as false or

misleading:

- ***October 29, 2015 Earnings Call***:  Defendant Koremans stated that the Shared Solutions program helped "make sure that [Copaxone] patients have financial access . . . [and] address their questions with their individual plans."  (*Id.* ¶ 105; *see also id.* ¶ 109 (November 15, 2016 earnings call attributing Copaxone's success to "the value [patients] place on our support programs").)

- ***March 16, 2016 Barclay's Healthcare Conference***:  Defendant Derkacz stated that, in connection with the Shared Solutions programs, Copaxone patients built "trust and confidence" and "like the product."  (*Id.* ¶ 106.)

- ***June 3, 2016 Sanford C. Bernstein Strategic Decisions Conference***:  Defendant Vigdoman attributed Copaxone's success, in part, to the Shared Solutions program:  "Look at the contribution of our shared services solution center to the brand and to the—basically—loyalty of our consumers and patients.  Look at the effect, at the lack of human data pertaining to generic Copaxone.  And when you look at all those things in the aggregate, I think it explains why erosion might be slower than what is expected."  (*Id.* ¶ 107.)

- ***June 9, 2016 Jeffries Healthcare Conference***:  Defendant Derkacz attributed Copaxone's success to a combination of patient wishes, the drug's efficacy, and the Shared Solutions program:  "And so when you have a patient that's doing well on therapy [for multiple sclerosis], . . . the resistance to switch is very high. . . . So that, coupled with the fact that we've had a long, proven track record of safety and efficacy, coupled with the fact that we have an incredible relationship with patients and physicians primarily through our Shared Solution service that we

8

provide."  (*Id.* ¶ 108.)

Plaintiff claims that these statements are "false and/or misleading" because Teva failed to disclose the underlying scheme.  (*Id.* ¶ 112.)

### iii.   Teva's Compliance with Federal Law

Plaintiff also contends that Teva and its executives' omissions caused the company's compliance with federal law through SEC filings to be false and misleading.  For instance, Plaintiff alleges that Teva made material misstatements about Teva's compliance in the company's 2015 Annual Report, filed on February 11, 2016.  (*Id.* ¶ 114.)  Teva explained that the pharmaceutical industry is highly regulated and cautioned that the company's "failure to comply with applicable laws, rules and regulations may result in civil and/or criminal legal proceedings."  (*Id.*)  Teva also noted, "Governmental investigations into sales and marketing practices, particularly for our specialty pharmaceutical products, may result in substantial penalties."  (*Id.*)  Plaintiff claims that these statements are "false and/or misleading" because Teva failed to disclose Teva's underlying scheme with ACS and PAPs, which "increased the likelihood that the Company would be subject to regulatory scrutiny, enforcement, and/or penalties."  (*Id.* ¶ 116.)

### 4.   The DOJ Subpoena

On March 21, 2017, the United States Attorney's Office for the District of Massachusetts subpoenaed Teva for information about the company's donations to charitable organizations, including PAPs.  (*Id.* ¶ 118.)  Teva disclosed the subpoena in the next Form 6-K it filed on May 11, 2017.  (Doc. No. 67 at 39 (Teva's May 11, 2017 6-K disclosing, "On March 21, 2017, Teva received a subpoena from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs.  Teva is in the process of

responding to the subpoena.").)  Despite receiving this subpoena, Teva continued operating the

Shared Solutions program and making donations to CDF and TAF through at least 2018.  (Doc.

No. 64-2 ¶ 120.)

Plaintiff does not allege that Teva's stock price fell after the subpoena was disclosed.

(*See generally id.*)

### 5.    Teva's New CEO

In early 2017, Teva announced that Defendant Vigodman was resigning from his position

as the company's CEO.  (*Id.* ¶ 117.)  On September 11, 2017, Teva named a new CEO,

Defendant Schultz.  (*Id.* ¶ 121.)  In November 2017, under Schultz's leadership, Teva cut its

sales and earnings forecasts down from $4.30 to $4.50 billion to $3.77 to $3.87 billion.  (*Id.* ¶

122.)  Teva also reported a decline in Copaxone revenues.  (*Id.*)

On the news that Teva had missed its forecasts and that Copaxone revenues had declined,

Teva's stock price fell from $14.02 per share to $11.23 per share.  (*Id.* ¶ 124.)

### 6.    Defendants' Relevant, Post-Subpoena Statements

Although Teva disclosed the subpoena, it did not disclose specific information about the

Shared Solutions program or its donations to CDF and TAF and continued to omit details

"regarding Copaxone's financial results and market demand for the drug, Teva's shared solutions

program, and the company's compliance with federal laws."  (*Id.*)

### i.    <u>Copaxone's Market Share</u>

Plaintiff alleges that even after the disclosure of the DOJ subpoena, Teva and its

executives continued to provide false and misleading statements about Copaxone's success in

Teva's SEC filings and on earnings calls.  Plaintiff identifies the following statements (and other

similar statements) as false or misleading:

- *May 11, 2017 Form 6-K*:  Teva stated that "Global revenues of Copaxone (20 mg/mL and 40 mg/mL), the leading multiple sclerosis therapy in the U.S. and globally, were $970 million in the first quarter of 2017."  (*Id.* ¶ 99.)

- *February 12, 2018 Teva 2017 Annual Report*:  Teva stated that Copaxone revenues decreased by twelve percent "mainly due to generic competition."  (*Id.* ¶ 126; *see also id.* ¶ 128 (May 3, 2018 Form 10-Q reporting similar information); *see also id.* ¶ 133 (August 2, 2019 Form 10-Q reporting similar information).)

- *May 3, 2018 Earnings Call*:  Defendant Schultz stated that "there hasn't been any real change to [Copaxone's] market share."  Defendant O'Grady added, "[W]e maintain about 85% of the overall Copaxone market."  (*Id.* ¶ 131; *see also id.* ¶ 136 (statements from Defendant McClellan at Morgan Stanley Healthcare Conference on the same).)

- *November 1, 2018 Earnings Call*:  Defendant O'Grady stated, "I will highlight Copaxone and say that we continue to compete in the [multiple sclerosis] market and are taking the appropriate measures to preserve market shares and maximize profit."  (*Id.* ¶ 141.)

- *November 7, 2019 Earnings Call*:  Defendant Schultz stated that unknown factors affecting Copaxone's likelihood for future success in the United States were whether one additional generic competitor would enter the market.  (*Id.* ¶ 152.)

In all, most of the statements regarding Copaxone that Plaintiff identifies as false and misleading during this period are simple statements of Teva's revenue on Copaxone.  (*See, e.g.*, *id.* ¶ 155 (stating Teva's revenue on Copaxone in 2019).)  Plaintiff claims that these statements are "false and/or misleading" because Teva failed to disclose their scheme involving their

Copaxone donations. (*Id.* ¶ 130.)

### ii.    Teva's Shared Solutions Program

Plaintiff also alleges that after the DOJ subpoena was issued, Teva and its executives

made a false and misleading statement regarding Teva's Shared Solutions program.  (*Id.* ¶¶ 161–

62.)  On March 13, 2018, at the Cowen & Company Health Care Conference, Defendant

McClellan explained how to make a program like Shared Solutions effective:  "You need to

make sure that you get the patients accustomed to the reimbursement process, get them through

the hurdles that they may face on the payer side and also help them in many cases get

accustomed to the therapy itself."  (*Id.* ¶ 162.)  Plaintiff claims that this statement is "false and/or

misleading" because Teva failed to disclose that Shared Solutions's success was actually due to

Teva's scheme with ACS and its Copaxone donations.  (*Id.* ¶ 163.)

### iii.    Teva's Compliance with Federal Law

Finally, Plaintiff alleges that Teva's statements regarding its compliance with Federal law

were misleading.  For instance, in the Form 10-K filed February 12, 2018, Teva stated,

"Governmental investigations into sales and marketing practices, particularly for our specialty

pharmaceutical products, may result in substantial penalties."  (*Id.* ¶ 165.)  Plaintiff alleges these

statements are "false and/or misleading" because Teva failed to disclose that it was engaged in a

scheme, which increased the likelihood of "regulatory scrutiny, enforcement, and/or penalties."

(*Id.* ¶ 168.)

### 7.    The DOJ Complaint

On August 18, 2020, the U.S. Attorney's Office for the District of Massachusetts filed a

complaint against Teva for alleged violations of the False Claims Act.  (*Id.* ¶ 169.)  Specifically,

the government alleges that Teva's payments to CDF and TAF were "kickbacks" that allowed

the Company to increase the price of Copaxone while leaving "American taxpayers to shoulder the high prices that Teva set."[2]  (*Id.*)

When the news of the complaint reached the market, Teva's stock price immediately dropped from $11.59 per share to $9.90 per share.  (*Id.* ¶ 172.)

### *B.    Procedural History*

On September 23, 2020, Halman Aldubi Provident and Pension Funds Ltd. ("Halman Aldubi") commenced this lawsuit individually and on behalf of all others similarly situated.  It alleged that Teva committed securities fraud by making fraudulent and misleading statements regarding Copaxone and the Shared Solutions program.[3]  (Doc. No. 1.)  On March 26, 2021, the Court named The Investor Group, consisting only of Gerald Forsythe, as lead plaintiff and appointed Faruqi & Faruqi, LLP as lead counsel.  *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*, 529 F. Supp. 3d 385, 411 (E.D. Pa. 2021).

On May 25, 2021, Plaintiff filed an Amended Complaint.  (Doc. No. 57.)  The parties "met and conferred regarding the substance of Defendants' planned motion to dismiss," and Defendants notified Plaintiff of a technical inaccuracy in the Amended Complaint.  (Doc. No. 64 at 2.)  On August 10, 2021, Plaintiff moved to strike the Amended Complaint and file a corrected amended complaint to correct the inaccuracy, which Defendants did not oppose.  (*Id.*)  The Court granted the motion (Doc. No. 65), and Plaintiff's Corrected Amended Complaint (Doc. No. 64-2) became the operative complaint.

---

[2] The Honorable Nathaniel M. Gorton denied Teva's motion to dismiss in September 2021.  *See United States v. Teva Pharmaceuticals USA, Inc.*, --- F. Supp. 3d ---, Civil Action No. 20-11548-NMG, 2021 WL 4132592 (D. Mass. Sept. 9, 2021).

[3] On March 1, 2021, this case was reassigned from the Honorable Jan E. DuBois to the Honorable Karen Spencer Marston.  (Doc. No. 37.)

Defendants filed a motion to dismiss on August 23, 2021.  (Doc. No. 66.)  Defendants argue that Teva's failure to confess to an allegedly "illegal kickback scheme" does not constitute securities fraud.  (Doc. No. 66-3 at 8.)  Plaintiff opposes the motion and contends that Teva misled the market by failing to disclose the true source of Copaxone's success.  (Doc. No. 68 at 8.)

## II.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Because Plaintiffs allege securities fraud, they must satisfy the heightened pleading standards set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires parties to plead fraud with particularity. *See* Fed. R. Civ. P. 9(b).  That is, parties must plead "the who, what, when, where and how" of the alleged fraud. *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009).  "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an

increased measure of protection for their reputations, and reduces the number of frivolous suits

brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

1418 (3d Cir. 1997).

"The PSLRA imposes two exacting and distinct pleading requirements for securities

fraud actions." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010).  First, "the

complaint shall specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is

made on information and belief, the complaint shall state with particularity all facts on which

that belief is formed."  15 U.S.C. § 78u–4(b)(1).  Second, "the complaint must state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind."  *Id.* § 78u-4(b)(2)(A).

## III.    DISCUSSION

Plaintiff brings two counts against Defendants:  one under Section 10(b) of the Exchange

Act and Rule 10b-5 against all Defendants and another under Section 20(a) of the Exchange Act

against the Individual Defendants.  (Doc. No. 64-2 ¶¶ 238–54.)  The Court considers each claim

in turn.

### A.    *Section 10(b) and Rule 10b-5*

Section 10(b) prohibits the "use or employ . . . [of] any manipulative or deceptive device"

"in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  Rule 10b-5, which

the SEC promulgated to enforce Section 10(b), "creates a private cause of action for investors

harmed by false or misleading statements."  *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97,

100 (3d Cir. 2007).  Rule 10b-5 makes it illegal "[t]o make any untrue statement of a material

fact or to omit to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5(b).

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must demonstrate:

> (1)  A material misrepresentation (or omission);
>
> (2)  scienter (a wrongful state of mind);
>
> (3)  a connection between the misstatement and the purchase or sale of a security;
>
> (4)  reliance upon the misstatement;
>
> (5)  economic loss; and
>
> (6)  loss causation.

*Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 (3d Cir. 2019) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 879 (3d Cir. 2018)).

Defendants argue Plaintiff has failed to state a claim under Section 10(b) and Rule 10b-5 because (1) he has not identified any false or misleading statements; (2) he has failed to plead scienter with particularity; and (3) he has failed to plead loss causation.  (Doc. No. 66-3 at 8–9.)

### 1.    Misleading Statements

First, Defendants argue that "none of the three categories of alleged misstatements in this case can be the basis for a claim."  (*Id.* at 18.)  The Court considers whether the Corrected Amended Complaint identifies false or misleading statements in connection with each of the three categories of alleged misstatements in turn.

### i.    Copaxone's Market Share

Plaintiff identified over 20 statements regarding Copaxone's market share that Teva or its executives made *before* it received the subpoena.  (*See* Doc. No. 64-2 ¶¶ 70–103.)  These statements discuss Teva's revenue on Copaxone, Copaxone's market share in the United States

and globally, and Copaxone's likelihood for continued success in the face of new generic competition. (*See, e.g.*, *id.* ¶ 75.) Many of these statements attribute Copaxone's success to "patient and physician choice of the 40mg/mL version, supported by payor access and patient support activities." (Doc. No. 64-2 ¶ 71; *see also, e.g.*, *id.* ¶ 79 ("[T]here is a very, very significant pushback from doctors on the generic product or Copaxone, very strong pushback from the patient . . . ."); *id.* ¶ 83 (stating that "Copaxone [was] doing really well" because "of a fantastic underlying demand").) Plaintiff also identified over 25 statements regarding Teva's revenue on Copaxone and the drug's market share issued *after* Teva received the subpoena. (*Id.* ¶¶ 125–60.) These statements focused primarily on the revenue Teva had earned and expected to earn on Copaxone and touted that Teva continued to maintain its market share. (*See, e.g.*, *id.* ¶ 126.)

Plaintiff does not assert that these statements are factually inaccurate; instead, he claims that these statements are "false and/or misleading" because Teva failed to disclose (1) its underlying scheme with ACS involving Teva's charitable donations to PAPs, (2) that, if not for this scheme, "many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenue," and (3) that this "artificially inflated" market demand for Copaxone. (*Id.* ¶ 74.)

Defendants argue that the statements Plaintiff identified are inactionable because Defendants have no affirmative obligation to disclose any purported wrongdoing, certain of the statements are mere puffery, and other of the statements are statements of opinion or forward-looking statements. (Doc. No. 66-3 at 19–21.)

Plaintiff responds that Teva "squarely put [its] sources of income at issue" by touting Copaxone's success and attributing that success to "brand loyalty," "patient and physician

choice," and Copaxone's "track record of safety and efficacy." (Doc. No. 68 at 18 (quoting *In re Mylan N.V. Sec. Litig.*, 16-CV-7926 (JPO), 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018).) This, Plaintiff contends, made it "misleading for Defendants to speak about what drove Copaxone's financial results and market demand while omitting the actual reason for Copaxone's success—that Teva was engaged in a kickback scheme . . . ." (*Id.*)

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 41 (2011). "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5(b)). "[N]on-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (quoting *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000)). "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Id.* (citing *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 490–91 (3d Cir. 1994)).

Generally, "[c]ompanies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 465 (E.D. Pa. 2020) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)). However, statements that attribute revenues to "legitimate business factors" "put the source of the revenue at issue" and thus "mak[e] the company's failure to disclose a source of that revenue misleading." *In re Allergan Generic Drug Pricing Sec. Litig.*, Civil Action No. 16-9449 (KSH) (CLW), 2019 WL 3562134, at *10 (D.N.J. Aug. 6, 2019). For instance, in *Allergan*,

the defendant, a pharmaceutical company, was engaged in anticompetitive conduct. *Id.* It made statements that it would be able to take price increases on certain of its products due to its "strong supply chain," its "diverse portfolio," and the "uniqueness of its pipeline and product line," but it did not disclose its anticompetitive conduct. *Id.* The court held that the defendant's statements about the sources of its revenue were misleading because it failed to disclose one of the true sources of its revenue—its anticompetitive conduct. *Id.* Similarly, in *Boston Retirement System v. Alexion Pharmaceuticals, Inc.*, the defendant, also a pharmaceutical company, repeatedly stated that its revenue growth was "largely due to physicians globally requesting Soliris [one of the defendant's drugs]" and "the increase in uptake of Soliris among . . . patients." --- F. Supp. 3d ---, Civil No. 3:16-cv-2127(AWT), 2021 WL 3675180, at *10 (D. Conn. Aug. 19, 2021). However, the defendant failed to disclose that it was also employing "illegal sales tactics." *Id.* The court determined that the defendant had opened the door to the source of its financial success, thereby rendering its failure to disclose its illegal sales practices misleading. *Id.* at *10–11 ("Courts in this circuit have found that statements which speak specifically about the source of a company's financial or other success are misleading when they fail to disclose illegal or unethical conduct that is a source of that success."); *accord In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824 (E.D. Pa. 2001) ("Having put the issue in play, Providian is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."); *Mylan*, 2018 WL 1595985, at *6 ("Mylan's Forms 8-K squarely put its sources of income at issue. For example, attributing EpiPen's strength to 'favorable pricing and volume' may have been misleading in the absence of an additional statement disclosing that the EpiPen's strength was also due to anticompetitive agreements and knowingly miscalculated Medicaid rebates.").

Here, the Court agrees with Defendants that companies are not required to disclose illegal activity; however, Teva contends its program of making donations to PAPs in connection with ACS is legal, and it continued making the donations even after receiving the subpoena.  (*See* Mar. 22, 2022 Hr'g Tr. at 9 (Defendants' counsel stating that Teva and the Individual Defendants had a "good faith belief that the charitable donation program was perfectly legal and permissible").)  And as the case law discussed above demonstrates, it is largely immaterial whether Teva's actions were illegal because Plaintiff does not argue that Teva was required to disclose this scheme merely because it may have been illegal; rather, Plaintiff argues that Teva was required to disclose this scheme *because it is what made Copaxone so successful*.

Taking the allegations in the light most favorable to the Plaintiff, the Court finds that Plaintiff has sufficiently alleged that Teva repeatedly attributed Copaxone's success to legitimate business factors, such as the quality of the product and physician and patient loyalty.  (*See, e.g.*, Doc. No. 64-2 ¶ 71 (October 29, 2015 Form 6-K attributing Copaxone's success to "patient and physician choice of the 40 mg/mL version, supported by payor access and patient support activities"); *id.* ¶ 75 (statements at the November 19, 2015 Jeffries Healthcare Conference attributing Copaxone's success to "brand loyalty" and explaining that patients "don't want a generic [version of Copaxone] because they are not 100% sure that it would treat them as well as the original"); *id.* ¶ 79 ("[T]here is a very, very significant pushback from doctors on the generic product or Copaxone, very strong pushback from the patient . . . ."); *id.* ¶ 89 (statements on an August 4, 2016 Earnings Call stating that Copaxone's success "speaks to the support by payers, by patients, by physicians around the long-proven track record of safety and efficacy of the product").)  Plaintiff alleges these statements regarding Copaxone's success required Teva to disclose the driving reason for this success, i.e. the partnership with ACS and the underlying

scheme involving the Copaxone donations to PAPs.  Yet, Teva failed to make any mention of the "Copaxone donations" to CDF and TAF that covered patients' Medicare Part D co-pays, enabling and encouraging those patients to continue using Copaxone.  Because Teva put the sources of Copaxone's success into play, its failure to reveal the true reason for Copaxone's success rendered these statements misleading.

Moreover, Defendants' arguments that certain of Teva's statements are inactionable puffery are unavailing.  Teva's statements expressing optimism about Copaxone's market share and revenue forecasts would ordinarily constitute nothing more than puffery; however, "they must be considered within the context of [Teva's] statements attributing [Copaxone's] revenue, growth, and [success] to legitimate business factors and conditions."  *Allergan*, 2019 WL 3562134, at *10.  Because these optimistic statements were made in connection with other statements attributing Copaxone's success to physician and patient loyalty, they "fall outside the bounds of mere puffery and are actionable."  *Id.*; *see also Providian*, 152 F. Supp. 3d at 824 (holding that the defendant's statements attributing its income and revenue success to its "customer-focused approach" were not mere puffery because the defendant's failure to disclose the primary reason for its success (its illegal profit-inflating practices) rendered these statements misleading).

Next, Defendants argue that "many" of the statements Plaintiff identified as misleading are inactionable because they are "statements of opinion."  (Doc. No. 66-3 at 21.)  The Court has identified at least one statement that may be properly categorized as an "opinion":  At the June 9, 2016 Jeffries Healthcare Conference, Defendant Derkacz discussed Copaxone's revenue and market share and said, "I think this gives us an incredible amount of confidence that we've been able to increase and sustain [Copaxone's] trajectory over a long period of time."  (*Id.* ¶ 85.)

Opinions are generally not actionable statements, but they are actionable if (1) "the speaker did not hold the belief she professed" and "if the supporting fact[s] she supplied were untrue"; or (2) if the speaker "omits material facts" about her knowledge concerning the statement and "those facts conflict with what a reasonable investor would take from the statement itself."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188–89 (2015).  Here, any statements of opinion that Teva and its executives may have made regarding Copaxone's success are actionable because the speakers omitted material facts supporting their understanding of Copaxone's success—namely, that the drug's success was driven in large part by Teva's donations to CDF and TAF.  *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176–77 (2d Cir. 2020).

Finally, Defendants argue that, to the extent Teva's statements predict future performance, they fall within the safe harbor for forward-looking statements.  (Doc. No. 66-3 at 22.)  The PSLRA "immunizes from liability any forward-looking statement, provided that:  the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood."  *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)).

Here, Defendants have not pointed to and the Court has not independently identified any forward-looking statements regarding Copaxone's likelihood for success.  And even so, as discussed above, Teva's statements regarding the reasons for Copaxone's historical success were misleading because they attributed Copaxone's success to legitimate factors when, in reality, Copaxone's success was significantly attributable to the scheme of making donations to PAPs.

Teva put the source of Copaxone's success in play by attributing the drug's success to legitimate business factors, such as physician and patient demand.  Because Teva put the source

of Copaxone's success at issue, the company's failure to disclose the real source of Copaxone's success—the underlying scheme involving Copaxone donations to PAPs—rendered its statements about Copaxone's success and market share misleading.

**ii.   Teva's Shared Solutions Program**

Plaintiff identifies seven statements regarding the Shared Solutions program that Teva or its executives made prior to receiving the DOJ subpoena.  (Doc. No. 64-2 ¶¶ 104–11.)  These statements credit the Shared Solutions program with cementing patients' loyalty to Copaxone. (*Id.*)  Plaintiff argues that these statements are misleading because they fail to disclose (1) that "Teva used the Shared Solutions program to carry out its illegal kickback scheme,"[4] (2) that "the Shared Solutions program was successful in maintaining patient loyalty because Teva's kickback scheme made Copaxone free to Medicare patients," and (3) that, as a result, "marked demand for Copaxone and patient retention on the drug were materially overstated."  (*Id.* ¶ 163.)

Defendants argue that these statements are inactionable for the same reasons the statements about Copaxone are inactionable—they are technically correct; they are primarily puffery or statements of opinion; they are forward-looking statements; and Teva had no duty to disclose an "uncharged, unadjudicated wrongdoing."  (Doc. No. 66-3 at 23.)

However, as with the statements about Copaxone's success, these statements put the true sources of the Shared Solutions program's and Copaxone's success at issue.  (*See, e.g.*, Doc. No. 64-2 ¶ 105 (on October 29, 2015 Earnings Call, Defendant Koremans attributing Copaxone's "incredible durability" to "a combination of the [Shared Solutions program], the way we interact with [the] patients, [and] the trust they have in the brand itself"); *id.* ¶ 106 (at March 16, 2016

---

[4] At oral argument, Plaintiff stated that it would be willing to strike the word "illegal" and "unlawful" from the Corrected Amended Complaint to the extent those words are used to describe Teva's scheme.  (*See* Mar. 22, 2022 Hr'g Tr. at 37.)

Barclay's Healthcare Conference, Defendant Derkacz stating that, in connection with the Shared

Solutions programs, Copaxone patients built "trust and confidence" and "like the product"); *id.*

¶ 107 ("Look at the contribution of our shared services solution center to the brand and to the—

basically—loyalty of our consumers and patients.  Look at the effect, at the lack of human data

pertaining to generic Copaxone.  And when you look at all those things in the aggregate, I think

it explains why erosion might be slower than what is expected.").)  Thus, Teva's failure to

disclose the true reason for Copaxone's success makes these statements misleading. *Alexion*,

2021 WL 3675180, at *10; *Allergan*, 2019 WL 3562134, at *10.

### iii.    Teva's Compliance with Federal Law

Finally, Defendants argue that statements in Teva's SEC filings regarding the company's

compliance with applicable laws and regulations[5] are not misleading because "Teva was not

required to speculate—much less admit—that its contributions to government-approved patient

assistance programs might constitute an 'illegal kickback scheme.'"  (Doc. No. 66-3 at 23.)

Plaintiff responds that these statements are misleading because Teva said that it was complying

with laws and regulations but failed to disclose information about the scheme, which "increased

[the] likelihood that [the company] would be subject to regulatory scrutiny, enforcement, and/or

penalties."  (Doc. No. 64 ¶ 113.)

"[C]ompanies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'"

*Pelletier*, 439 F. Supp. at 465.  Unlike with the statements about Copaxone and the Shared

Solutions program, Teva's disclosures regarding the company's compliance with federal law do

not put the source of Copaxone's success into issue.  So Teva was not required to disclose an

---

[5] Specifically, these disclosures state that the company operates in a complex regulatory environment and warns that failure to comply with requirements "may result in substantial penalties. (Doc. No. 64-2 ¶ 114.)

"uncharged, unadjudicated wrongdoing" in connection with its statements regarding its compliance with governing laws and regulations. *See id.*; *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 651–53 (S.D.N.Y. 2017); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004). Accordingly, Teva's statements regarding its compliance with governing laws were not misleading.

* * *

Plaintiff has identified dozens of potentially misleading statements regarding Copaxone's success and the Shared Solutions Program made by each of the Individual Defendants, except Defendant Kalif.[6, 7] Accordingly, the Court finds that Plaintiff has satisfied this element for establishing liability under Section 10(b) and Rule 10b-5, except as to Defendant Kalif.

### 2. Scienter

Second, Defendants argue that "[t]he complaint . . . fails to satisfy the heightened pleading standard for scienter." (Doc. No. 66-3 at 24 (citing 15 U.S.C. § 78u-4(b)(2)(A)).)

Scienter can be shown if "the plaintiff's pleadings conjure a 'strong inference' that the defendant acted with . . . intent to defraud shareholders." *Fan v. StoneMor Partners LP*, 927

---

[6] But, as indicated above, Teva's statements regarding the company's compliance with federal law were not misleading.

[7] Defendant Kalif has served as Teva's Executive Vice President, Chief Financial Officer since December 2019. (Doc. No. 64-2 ¶ 25.) In 2020, Kalif signed SEC filings listing factual, historical information about Copaxone's revenues. (*Id.* ¶ 156.) He never made any statements about Copaxone's success or the Shared Solutions program. (*See generally id.*)

"Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *Galati*, 220 F. App'x at 100. And unlike the other Defendants' statements, Kalif's statements do not put the source of Copaxone's success at issue. So, even though his statements do not disclose the true source of Copaxone's success, they are not misleading. *Id.* Accordingly, the Court grants the motion to dismiss as to Kalif. *See Allegheny Cty. Emps. Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 233 (E.D. Pa. 2021) (granting motion to dismiss as to defendants who "are not alleged to have made any of the misleading statements at issue").

25

F.3d 710, 717–18 (3d Cir. 2019) (citing 15 U.S.C. § 78u-4(b)(2)(A)).  However, scienter can also

be shown by demonstrating that the defendants acted with a "knowing or reckless state of mind."

*Id.*  In the securities fraud context, recklessness can be demonstrated by pleading "an extreme

departure from the standards of ordinary care" that "presents a danger of misleading buyers or

sellers that is either known to the defendant or is so obvious that the actor must have been aware

of it.  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).  The "strong

inference" of scienter "need not be irrefutable"; that is, it need not be a "smoking gun" or even

"the most plausible of competing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 324 (2007).  The inference must be "cogent and compelling"—"at least as compelling

as any opposing inference one could draw from the facts alleged."  *Id.*

    The inquiry into whether a plaintiff has pleaded a strong inference of scienter is holistic.

*Avaya*, 564 F.3d at 267–68.  The court must consider the complaint as a whole.  *Id.*  The strength

or weakness of any single allegation standing alone is not dispositive.  *Id.*  Rather, "[t]he

pertinent question is whether *all* of the facts alleged, taken collectively, give rise to a strong

inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the

standard."  *Id.*

    Before considering whether Plaintiff has pleaded scienter as to each Defendant, the Court

addresses Plaintiff's argument that Copaxone is one of Teva's "core operations," thereby making

it even more likely that Defendants knew that their statements about the product's success were

misleading.  Under the "core operations doctrine," a court may infer scienter "if the complaint

alleges that a defendant made misstatements concerning the 'core matters' of central importance

to a company."  *Martin v. GNC Holdings, Inc.*, 757 F. App'x 151, 155 (3d Cir. 2018); *see also*

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) ("[W]hen the

misrepresentations and omissions involve 'core matters of central importance' to a company and its executives, an inference of scienter may arise.").

Teva has described Copaxone as the company's "leading medicine" and has disclosed that it "has relied heavily on the sales of Copaxone." (Doc. No. 64-2 ¶ 193.) In fact, "the drug made up half of revenues for all specialty medicines combined," and 20% of Teva's total revenues in 2015. (*Id.*) In a 2015 SEC filing, the Company cautioned investors that "[a]ny substantial decrease in the revenues derived from our specialty medicines would have an adverse effect on our results of operations." (*Id.*) Copaxone remained a critical drug in Teva's portfolio into 2018. (*Id.*) On a January 2018 Earnings Call, Defendant Schultz told investors that Copaxone was "a major part of our revenue, [] a major part of our earnings."[8] (*Id.*)

Because Copaxone made up such a large share of Teva's overall revenue and because Teva repeatedly underscored the drug's importance to the company, the Court finds that Copaxone was one of Teva's "core operations," supporting an inference of scienter. *See Energy Transfer*, 532 F. Supp. 3d at 233 (applying the core operations inference to statements about a project that was discussed in every investor presentation given in the class period, that analysts asked for updates on at every earnings call, and that had independent reputational value to the company); *Hall v. Johnson & Johnson*, Civil Action No.: 18-1833 (FLW), 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019) (concluding that Talc Products were a "core matter of central importance" to the defendant even though they made up only .3% of the defendant's total sales where the defendant viewed Talc Products as "an institution," "flagship product," and "sacred cow"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015)

---

[8] At oral argument, Defendants' counsel did not concede that Copaxone is necessarily one of Teva's "core" operations but acknowledged that Copaxone is "a significant part of their revenue." (Mar. 22, 2022 Hr'g Tr. at 27.)

(finding that a division that accounted for 44% of all sales by the defendant was a core operation of the defendant).

Although Copaxone is alleged to be one of Teva's "core operations," the core operations doctrine does not establish a strong inference of scienter "absent some additional allegation of specific information conveyed to management and related to the fraud." *Martin*, 757 F. App'x at 155. Accordingly, the Court must now consider whether the complaint includes sufficient allegations to give rise to a strong inference of scienter as to each of the Defendants.

### i.   Erez Vigodman

Defendant Vigodman served as Teva's Chief Executive Officer and Chairman of the Board of Directors from February 2014 through February 2017. (Doc. No. 64-2 ¶ 18.) As Plaintiff alleges, Vigodman touted "all the measures [Teva] conducted in order to maintain [] Copaxone" (*id.* ¶ 73) and has contributed Copaxone's success to "the contribution of our shared services solution center . . . and to the basically [sic] loyalty of our consumers and patients" (*id.* ¶ 107).

Vigodman made these statements in his capacity as Teva's CEO. (*Id.* ¶ 18.) And he spoke in great detail about Copaxone, its success, and the reason for its success. (*Id.* ¶¶ 73, 107.) The fact that he was CEO and held himself out as an expert on Copaxone supports a finding of scienter. *See Energy Transfer*, 532 F. Supp. 3d at 228 (finding that the fact that the speaker was the CEO supported an inference of scienter); *SEB Inv. Mgmt.* AB, 351 F. Supp. 3d at 906 (presuming that officers who spoke as "authoritative sources" spoke with scienter and knew that "withholding the negative data . . . contradicted their public statements [and] was misleading to investors").

Moreover, in Vigodman's first year as CEO, the company made nearly $35 million in

28

"Copaxone donations."  (*Id.* ¶ 53.)  Given the size of these donations, the culpable inference—

that he knew these "donations" were being used to help Medicare patients buy Copaxone—is just

as likely (and perhaps even more likely) as the innocent inference—that he truly thought these

were donations to help patients afford a variety of treatments for multiple sclerosis.  *See Makor*

*Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("*Tellabs II*") ("Is it

conceivable that [the CEO] was unaware of the problems of his company's two major products

and merely repeating lies fed to him by other executives of the company?  It is conceivable, yes,

but it is exceedingly unlikely.").

Considering these factors together, and accounting for the core operations inference, the

Court finds that Plaintiff has alleged a strong inference of scienter as to Vigodman.

### ii.   Eyal Desheh

Defendant Desheh served as Teva's Chief Financial Officer from April 2008 through

June 2017.  (Doc. No. 64-2 ¶ 19.)  He made many of the statements Plaintiff identifies as

"misleading."  For instance, at the Jeffries Autumn Global Healthcare Conference in 2015,

Desheh attributed Copaxone's success to "something which is simply called brand loyalty."  (*Id.*

¶ 75; *see also id.* ¶¶ 79, 106.)

Desheh regularly spoke about Copaxone's financial success and attributed that success to

physician and patient loyalty, driven in large part by the Shared Solutions program.  (*Id.* ¶ 106.)

In this capacity, he held himself out as an expert on Copaxone and the reason for its financial

success, which supports an inference of scienter.  *See Energy Transfer*, 532 F. Supp. 3d at 228.

However, he is even more likely to have known that Copaxone's success was due, in large part,

to Teva's donations to CDF and TAF (which, in turn, covered patients' Copaxone co-pays)

because *he approved those donations*.  For instance, in December 2015, he approved "a request

29

for a $30M donation payment to be made to assist MS patients with their co-pay." (Doc. No. 64-2 ¶ 64.) And in the following weeks, he approved "Copaxone donation payments" of $25 million and $8.5 million. (*Id.* ¶ 65.) Critically, these donations were not executed at the request of Teva's Corporate Social Responsibility department. (*Id.* ¶ 67.) Rather, they were executed at the request of and from the budget of the "Copaxone Marketing team." (*Id.*) These donations were incredibly large, were described as "Copaxone donations" rather than as "donations to help patients with multiple sclerosis,"[9] and were made at the direction of the Copaxone marketing team. Viewing these factors together with Desheh's demonstrated knowledge of Copaxone *strongly* suggests that Desheh and others involved in approving Copaxone donations knew the true source of Copaxone's success was this scheme, not physician or patient loyalty. *See Tellabs II,* 513 F.3d at 711.

Accordingly, the Court finds that Plaintiff has pleaded a strong inference that Desheh made misleading statements with scienter.

### iii.    <u>Robert Koremans</u>

Defendant Koremans served as Teva's President and Chief Executive Officer for Global Specialty Medicines from April 2013 through December 2017. (Doc. No. 64-2 ¶ 20.) He made several of the statements Plaintiff identifies as misleading. For instance, on an Earnings Call in 2016, Koremans said, "Copaxone is doing well . . . . It's actually really a result of fantastic

---

[9] The Court agrees with Defendants that the fact that these donations were described as "Copaxone donations" does not necessarily mean that the Individual Defendants who approved the donations *knew* the donations were going to Copaxone specifically (as opposed to multiple sclerosis drugs generally). (*See* Mar. 22, 2022 Hr'g Tr. at 10 ("They were giving . . . to charitable PAP funds in the multiple sclerosis space. Teva had a multiple sclerosis product that was called Copaxone, and so that's how they described the donations.").) Nevertheless, this labeling does support a strong inference that the executives knew that these donations were intended to cover Copaxone co-pays alone especially in light of the significant revenue made from this drug alone.

underlying demand." (*Id.* ¶ 83.) He also attributed Copaxone's success to the Shared Solutions program and the "way we interact with our patients." (*Id.* ¶ 105.)

Koremans repeatedly held himself out as an expert on Copaxone, which weighs in favor of a finding that he made these statements with scienter. *Energy Transfer*, 532 F. Supp. 3d at 228. He also has more than 30 years' experience in the pharmaceutical industry (Doc. No. 64-2 ¶ 186), further supporting an inference of scienter, *see McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 657 (E.D. Pa. 2021). Further, like Desheh, Koremans was responsible for approving "Copaxone donations" on multiple occasions. (*Id.* ¶ 48.) Again, these donations came from the Copaxone marketing team, were labeled as "Copaxone" donations (and not something more general like "Donations to CDF and TAF"),[10] and were incredibly large—some of the individual donations Koremans approved were for tens of millions of dollars. (*Id.* ¶¶ 64–65.) These facts make it likely that Koremans was aware that these were not truly "donations" but instead were intended to cover patients' co-pays *on Copaxone*. *See Tellabs II,* 513 F.3d at 711.

Given his knowledge of the industry and his familiarity with the "Copaxone donations," the Court finds that Plaintiff has pleaded a strong inference of scienter as against Desheh.

### iv.   Michael Derkacz

Defendant Derkacz served as Teva's Senior Vice President and "GM" for the Global Central Nervous System unit from January 2015 through June 2017. (Doc. No. 64-2 ¶ 21.) Derkacz made several of the statements Plaintiff identifies as misleading. For instance, in response to a question from an analyst on an Earnings Call in 2016, Derkacz touted Copaxone's success and said, "I think this just speaks to the support by payers, by patients, by physicians

---

[10] *See supra* note 9.

around the long-proven track record of safety and efficacy by the product."  (Doc. 64-2 ¶ 89; *see also id.* ¶¶ 79, 85.)  The fact that Derkacz responded to the analyst's questions with such certitude evinces scienter.  *See Avaya*, 564 F.3d at 270 (finding that an executive spoke with scienter where, among other things, he denied repeated analyst questions regarding the central events with certitude).

Given Derkacz's position as the Senior Vice President over the unit responsible for Copaxone, his repeated statements attributing Copaxone's success to patient loyalty and the Shared Solutions program, his more than 25 years' management experience in the pharmaceutical industry, and Copaxone's key position in Teva's portfolio, the Court finds that Plaintiffs have sufficiently alleged a strong inference of scienter as to Derkacz.  *See Energy Transfer*, 532 F. Supp. 3d at 231.

**v.    <u>Kåre Schultz</u>**

Defendant Schultz has served as Teva's President and Chief Executive Officer since November 2017.  (Doc. No. 64-2 ¶ 22.)  On a November 2019 Earnings Call, Schultz stated that Copaxone sales remained "stable" and stated that there were "a lot of moving parts," such as generic competitors, affecting Copaxone's potential for success.  (*Id.* ¶ 151.)

Schultz joined the company *after* it received the subpoena for information on its charitable practices (*id.* ¶¶ 118, 120), so it is more likely than not that he would have quickly been updated regarding the company's "Copaxone donations" to CDF and TAF which the government's subpoena was investigating.  "Ongoing investigations into [potentially wrongful behavior] may represent a piece of the puzzle when taking a holistic view of the purported facts as they related to scienter."  *Utesch v. Lannet Co.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (cleaned up); *see also Allergan*, 2019 WL 3562134, at *11.  This, coupled with Copaxone's

32

integrality to Teva's operations and Schultz's decades of experience in the pharmaceutical industry (Doc. No. 64-2 ¶ 188), suggests that Schultz acted with scienter.  *See Energy Transfer*, 532 F. Supp. 3d at 229–30.

### vi.   Michael McClellan

Defendant McClellan served as Teva's Senior Vice President and Chief Financial Officer for Global Specialty Medicines from 2015 through November 2017.  (Doc. No. 64-2 ¶ 23.) From July 2017 through November 2017, he also served as Teva's Interim Group Chief Financial Officer.  (*Id.*)  And from November 2017 through November 2019, he served as Teva's Executive Vice President, Chief Financial Officer.  (*Id.*)  He made several statements Plaintiff identifies as misleading.  For instance, at the Morgan Stanley Healthcare Conference in September 2018, McClellan promised that Teva was "managing the Copaxone situation" and explained that "there [were] a couple of different dynamics," including the introduction of more competition, "affecting the situation."  (*Id.* ¶ 135.)  Similarly, at the March 2018 Cowen & Company Health Care Conference, McClellan explained that, for Shared Solutions or similar programs to be successful, "[y]ou need to make sure that you get the patients accustomed to the reimbursement process [and] get them through the hurdles that they may face on the payer side." (*Id.* ¶ 161.)

McClellan, like Desheh and Koremans, approved large-scale "Copaxone donations" and was involved in "determin[ing] timing of [the Copaxone donation] payment[s]."  (*Id.* ¶ 66 (alleging that McClellan received an email "seeking approval of a wire transfer" for "$10M in Copaxone donations"); *id.* ¶ 67.)  As discussed above, this suggests that he not only likely knew that Teva operated a scheme to pay Copaxone co-pays, but actually played an integral role in the scheme, which weighs strongly in favor of an inference of scienter.  *See Tellabs II,* 513 F.3d at

711.  This inference is further supported by his more than 20 years' experience in the

pharmaceutical industry.  *See McDermid*, 520 F. Supp. 3d at 657.

Considering these factors together with Copaxone's core position in Teva's operations,

the Court finds that the allegations support a strong inference of scienter as to McClellan.

### vii.    Brendan O'Grady

Defendant O'Grady served as Teva's Chief Commercial Officer of Global Specialty

Medicines from August 2016 through December 2017.  (Doc. No. 64-2 ¶ 21.)  Since December

2017, he has served as Teva's Executive Vice President and Head of North America,

Commercial.  (*Id.*)  On a May 2018 Earnings Call, O'Grady told investors that the market for

Copaxone was evolving, due in large part to generic competition.  (*Id.* ¶ 130.)  And on the

Earnings Call in November 2018, he told investors that Teva "continue[d] to compete in the

[multiple sclerosis] market" and was "taking the appropriate measures to preserve market share

and maximize profit."  (*Id.* ¶ 140.)

These statements were made after the government began investigating the company's

charitable donation practices, *see Utesch*, 385 F. Supp. 3d at 423, and O'Grady has spent his

entire career in the pharmaceutical industry, which suggests he knew that Copaxone's success

was tied to the company's payments to CDF and TAF, *see McDermid*, 520 F. Supp. 3d at 657.

But the inference of scienter is even stronger in O'Grady's situation because Plaintiff's

complaint is rife with allegations that O'Grady was aware of and understood the Copaxone

scheme.  For instance, in early 2018, O'Grady received a presentation on the Company plan for

the year, which stated that "27% of patients on Copaxone 40mg are Medicare Part D patients"

who "may not fill [their prescription] and go off therapy" if they did not receive co-pay

assistance.  (*Id.* ¶ 62.)  Around the same time, he explained that the company "buy[s] the patients

[sic] copay down to zero anyway." (*Id.* ¶ 63.)  These allegations are direct evidence that

O'Grady understood how the scheme operated and recognized that it was critical to Copaxone's

ongoing success.  *See Hall*, 2019 WL 7207491, at *22 (holding that allegations that an executive

was directly aware of scientific studies that revealed the defendant's products were carcinogenic

but nevertheless touted the products as safe supported a strong inference of scienter).

Accordingly, Plaintiff has pleaded sufficient allegations to support a strong inference of

scienter as to O'Grady.

### viii.    Teva

A plaintiff can show a corporate defendant's scienter if "the pleaded facts . . . create a

strong inference that someone whose intent could be imputed to the corporation acted with the

requisite scienter."  *Pelletier*, 439 F. Supp. 3d at 467 (quoting *Teamsters Local 445 Freight Div.*

*Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  Because the Individual

Defendants acted with scienter when they made the statements Plaintiff identifies as misleading,

the Court imputes the Individual Defendants' scienter to Teva.

\* \* \*

In sum, the Court finds that Plaintiff has pleaded a strong inference of scienter as to each

of the remaining Defendants.

### 3.    Loss Causation

Finally, Defendants argue that Plaintiff fails to plead "that the misstatements 'caused the

loss for which plaintiff seeks to recover.'"  (Doc. No. 66-3 at 28 (quoting *Dura Pharm., Inc. v.*

*Broudo*, 544 U.S. 336, 345–46 (2005)).)  To establish loss causation, a plaintiff must

demonstrate "that the act or omission of the defendant . . . caused the loss for which the plaintiff

seeks to recover damages."  *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir.

2007); *see also Dura Pharm.*, 544 U.S. at 347 (holding that, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "the relevant economic loss" and "the causal connection . . . between that loss and the [defendant's] misrepresentation"). The PSLRA does not impose a heightened pleading standard as to loss causation. *Dura Pharm.* 544 U.S. at 347. Rather, as to this element, "[t]he Third Circuit has adopted 'a practical approach, in effect applying general causation principles,' which requires the plaintiff to show 'that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" *Allergan*, 2019 WL 3562134, at *13 (quoting *McCabe*, 494 F.3d at 426). A plaintiff cannot prove loss causation simply by showing that the price of a security was inflated due to a misrepresentation. *Dura Pharm.*, 544 U.S. at 347. Rather, a plaintiff must show that the share's price "fell significantly after the truth became known." *Id.*; *see also In re DVI, Inc. Sec. Litig.*, Civil Action No. 2:03–cv–05336, 2010 WL 3522090, at *5 (E.D. Pa. Sept. 3, 2010). The "truth [may] become known" through "corrective disclosures." *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *5.

Plaintiff argues that the misstatements regarding the reasons for Copaxone's success and the Shared Solutions program were corrected through a series of three disclosures: (1) when Teva disclosed that it had received a subpoena; (2) when Teva reduced its earnings forecast and reported lower revenues on Copaxone; and (3) when the government filed suit against Teva in the District of Massachusetts. (Doc. No. 68 at 30.) Defendants respond that none of these events constitute "corrective disclosures" and thus cannot serve as the bases for loss causation. (Doc. No. 66-3 at 30–31.) The Court considers whether Plaintiff has established loss causation in connection with each of the three purported corrective disclosures in turn.

### i.   Subpoena Disclosed

On May 11, 2017, Teva filed a Form 6-K disclosing that it had "received a subpoena from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs."  (Doc. No. 67 at 39.)  The Court need not consider whether this constitutes a corrective disclosure[11] because Teva's stock price *did not fall* when this information was revealed to the market.  (Doc. No. 64-2 ¶ 213.)  Given the absence of a "corresponding drop in stock price," this disclosure does not establish loss causation.  *See Hall*, 2019 WL 7207491, at *27.

### ii.   Forecasts Updated

Next, on November 2, 2017, Teva reduced its earnings forecasts and reported lower revenues for Copaxone."[12]  (Doc. No. 64-2 ¶ 214.)  In response to this news, "Teva's share price fell approximately 20%" from $14.02 to $11.23.  (*Id.*)  But Teva did not disclose any information to correct its misstatements regarding the reason for Copaxone's success at this point.  (*Id.*)

Earnings statements do not, on their own, constitute "corrective disclosures," when they do not specifically relate to—or correct—the alleged misrepresentations.  *See Hull v. Glob. Digital Sols., Inc.*, Civ. Action No. 16–5153(FLW), 2017 WL 6493148, at *13 (D.N.J. Dec. 19, 2017) ("Plaintiff has not alleged that the Forms revealed the falsity of GDS's November 2013

---

[11] At oral argument, Plaintiff's counsel conceded that the SEC filing disclosing the subpoena was not a corrective disclosure because it did not provide any detail on the scheme in which Teva made donations to PAPs that supported patients with multiple sclerosis.  (*See* Mar. 22, 2022 Hr'g Tr. at 44 (Plaintiff's counsel stating, "The subpoena did nothing.  The subpoena was generic.  They just disclosed its existence and the high-level topics that it involved. . . . Completely kept all the details of the scheme or course of action undisclosed from investors.").)

[12] At oral argument, Defendants' counsel explained that Teva decreased Copaxone's forecasted revenues because a generic version of 40mg/mL dosage entered the market.  There had already been generic competitors to the 20mg/mL dosage, but patients prefer the 40mg/mL dosage because they only have to use it three times a week, rather than daily, so the entry of a 40 mg/mL generic competitor more greatly impacted Copaxone's forecasts.  (*See* Mar. 22, 2022 Hr'g Tr. at 20–21.)

press release; at best, the Forms, on their face, merely show lower revenues, which is not a disclosure of GDS's alleged scheme."); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 561–62 (D.N.J. 2010) (holding that the plaintiff failed to demonstrate loss causation because it "relies on negative financial results after each of the quarterly public disclosures" but failed to allege "that the market recognized any of the alleged fraud"); *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *23 (holding that revised earnings forecasts did not constitute corrective disclosures because they "[did] not alert the market to the truth regarding [the defendant's] loan loss reserves, or its liquidity crisis, but only to the deteriorating financial condition of [the defendant]"); *In re Tellium, Inc. Sec. Litig.*, No. Civ.A. 02CV5878FLW, 2005 WL 2090254, at *3 (D.N.J. Aug. 26, 2005) (holding that the defendant's disclosure that it was unlikely to meet its revenue forecasts did not constitute a corrective disclosure and explaining that the plaintiffs had to allege that they suffered economic losses when "the concealed scheme was disclosed to the market").

Teva allegedly made misrepresentations regarding the reason for Copaxone's success and the Shared Solutions program. But the disclosure that Copaxone revenues were lower than expected did not correct the misleading statements; it left the market unaware of the underlying scheme that allegedly allowed Copaxone to be so successful in the first place. Because Teva's revised forecast and earnings report did not correct the misrepresentations about Copaxone, it is not a corrective disclosure and cannot serve as the basis for Plaintiff's claimed loss.

### iii.    Complaint Filed

Finally, on August 18, 2020, the government filed a complaint against Teva in the District of Massachusetts, alleging that the company violated the False Claims Act. (Doc. No. 64-2 ¶ 215.) When this information reached the market, Teva's shares dropped $1.69 over the

course of three trading days, from $11.59 on August 17, 2020 to $9.90 on August 20, 2020. (*Id.*) Defendants argue that this complaint "contains mere allegations of unproven misconduct and thus cannot be a corrective disclosure." (Doc. No. 66-3 at 30.) However, a corrective disclosure "need not take a particular form." *Hull*, 2017 WL 6493148, at *14–15. What matters is "the exposure of the falsity of the fraudulent representation." *Id.* A complaint that reveals a publicly traded company may have engaged in some wrongdoing can constitute a corrective disclosure if the company previously made false statements regarding the purported wrongdoing. *See In re Navient Corp. Sec. Litig.*, Civil No. 17-8373 (RBK/AMD), 2019 WL 7288881, at *12 (D.N.J. Dec. 30, 2019) (holding that the complaint in a lawsuit filed by the Pennsylvania Attorney General was a corrective disclosure because the complaint "disclosed a new time period during which the alleged forbearance-steering scheme operated"); *Hull*, 2017 WL 6493148, at *14–15 ("Because, here, Plaintiff alleges that the SEC Complaint contains information that directly reveals the truth regarding the alleged false statements made by Defendants in their various press releases, and because the SEC's disclosure caused a drop in stock price, I find that SEC Complaint can be the basis for a corrective disclosure"); *cf. Allergan*, 2019 WL 3562134, at *14 (holding that the disclosure of the government's investigation into Allergan's potentially anticompetitive conduct "can be the basis for a corrective disclosure"); *In re Bradley Pharm. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (holding that the defendant's disclosure of an SEC inquiry was a corrective disclosure and could be the basis for loss causation).

Here, although the allegations in the government's complaint are just that, allegations, they provided the market with information regarding the scheme by which Teva made donations to PAPs that indirectly funded Copaxone co-pays and made Copaxone seem so successful. Accordingly, the government's complaint constitutes a corrective disclosure. Because Teva's

share price dropped by 15% upon this disclosure, Plaintiff has adequately pleaded loss causation.

\* \* \*

In sum, Plaintiff has failed to plead loss causation in connection with the company's disclosure of the subpoena and in connection with the revised forecasts, but Plaintiff has sufficiently pleaded loss causation in connection with the filing of the complaint.

\*      \*      \*

Because Plaintiff has pleaded all the requirements necessary to state a claim under Section 10(b) and Rule 10b-5 as to all Defendants (except as to Defendant Kalif), Defendant's motion to dismiss is denied (except as to Defendant Kalif).

### B.      Section 20(a)

Section 20(a) provides that individuals who "control[] any person liable . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To state a claim under Section 20(a), a plaintiff must demonstrate (1) that the defendant controlled another person or entity; and (2) that the "controlled" person committed a predicate violation. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013). In the Third Circuit, a plaintiff must also establish that the control person "induced and was a culpable participant in the controlled person's [predicate wrongdoing]." *Sec. & Exch. Comm'n v. J.W. Barclay & Co.*, 442 F.3d 834, 837 (3d Cir. 2006).

Defendants argue that "because Plaintiff has not pleaded a primary violation under Section 10(b), he cannot establish 'control person' liability under Section 20(a)." (Doc. No. 66-3 at 31.) However, as discussed above, Plaintiff *has* pleaded a primary violation under Section 10(b) as to all Defendants except Defendant Kalif, so the Court finds that Plaintiff has stated a claim for control person liability as against all Individual Defendants except Defendant Kalif.

*See Allergan*, 2019 WL 3562134, at \*14 ("[T]he Court has concluded that plaintiffs have adequately pleaded a claim under Section 10(b).  Accordingly, Allergan's motion to dismiss plaintiffs' Section 20(a) claim is denied.").

## IV.   CONCLUSION

For the reasons above, Defendants' motion is granted *only* as to Defendant Kalif and denied as to the other Defendants.  An appropriate Order follows.