# APPENDIX A

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| ¶ 4: Defendants employed this scheme so that Teva could raise the price of Copaxone without Medicare patients bearing the brunt of the steep price increases, in order to be able to artificially inflate revenues, and increase the price at which Teva's securities traded.  Due to this scheme, from late 2006 to 2015, Teva raised the price of Copaxone at a rate over 19 times the rate of inflation from approximately $17,000 per year to over $73,000 per year:<br><br> | ¶ 2: Teva used CDF and TAF as conduits: it paid the foundations with the intent and understanding that, in violation of the anti-kickback statute, they would use Teva's money to cover the co-pays of patients taking Copaxone. Teva intended the payments to ensure that Copaxone patients never faced the steep prices that Teva charged for its drug, thus inducing the patients, including Medicare patients, to purchase the drug.  As depicted in the graph below, during the period from late 2006 to 2015, while Teva was subsidizing Copaxone's cost through CDF and TAF, Teva raised the price of Copaxone at a rate over 19 times the rate of inflation, from approximately $17,000 per year to over $73,000 per year.<br><br> |

1

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| ¶ 31: Congress established Medicare in 1965 to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 1395 *et seq.*  In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D.  Under Medicare Part D, Medicare contracts with private entities, including pharmaceutical companies, known as Part D Plan Sponsors, to administer prescription drug plans.  *See* 42 C.F.R. § 423.4. | ¶ 14: Congress established Medicare in 1965 to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 1395 *et seq.*<br><br>¶ 16: In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D.  Under Medicare Part D, Medicare contracts with private entities, known as Part D Plan Sponsors, to administer prescription drug plans.  *See* 42 C.F.R. § 423.4. |
| ¶ 32: Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the HHS.  *See* Ex A ¶ 15.  Patients on Medicare Part D, a/k/a "Medicare Part D beneficiaries" who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. *Id.* ¶ 17. Part D Sponsors, in turn, enter into subcontracts with pharmacies, or other "downstream entities," to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans. *Id.*  These downstream entities submit claims to Part D Plans that pay for the drug using funds provided by CMS from the Medicare Prescription Drug Account, an account within the Federal Supplementary Medical Insurance Trust Fund.  42 C.F.R. § 423.315(a). | ¶ 15: Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("CMS"), which is part of the United States Department of Health and Human Services ("HHS").<br><br>¶ 17: Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. CMS regulates and subsidizes the Part D Sponsors pursuant to one-year, annually renewable contracts.  Part D Sponsors, in turn, enter into subcontracts with pharmacies, or other "downstream entities," to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.<br><br>¶ 18: These entities submit claims to Part D plans that pay for the drug using funds provided by CMS from the Medicare Prescription Drug Account, an account within the Federal |

2

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| | Supplementary Medical Insurance Trust Fund.  42 C.F.R. § 423.315(a). |
| ¶ 33: Under the statute, a Medicare Part D beneficiary may be required to make a partial payment for the cost of the prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "**co-pays**").  These co-pay obligations can be substantial for expensive medications and vary throughout the year, depending on the total Part D covered expenses the beneficiary has incurred in the year.  *See* 42 U.S.C. § 1395w-102.  Congress included co-pay requirements in this program, in part, to encourage market forces to serve as a check on health care costs, including the prices that pharmaceutical manufacturers may charge for their drugs.  *See* Press Release, U.S. Attorney's Office District of Massachusetts, Foundations Resolve Allegations of Enabling Pharmaceutical Companies to Pay Kickbacks to Medicare Patients (Oct. 25, 2019). | ¶ 19: By congressional design, under the Medicare statute, a Part D beneficiary may be required to make a partial payment for the cost of these prescription drugs in the form of a "copayment," "coinsurance," or "deductible" (collectively "co-pays").  These co-pay obligations can be substantial for expensive medications and vary throughout the year, depending on the total Part D covered expenses the beneficiary has incurred in the year.  *See* 42 U.S.C. § 1395w-102.  For example, after meeting an annual deductible (originally $250 in 2006), the standard Part D benefit requires a 25 percent patient co-pay up to an "initial coverage limit" (originally $2,250 in 2006).  *Id*. at b(1)-(2). |
| ¶ 37: The Federal False Claims Act, 31 U.S.C. §§ 3729 – 3733, was enacted in 1863 by Congress to combat fraud against the United States government.  *See* The False Claims Act, United States Department of Justice, https://www.justice.gov/civil/false-claims-act (last visited May 12, 2021).  The False Claims Act provides that anyone who: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B), . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment | ¶ 36: The False Claims Act provides, in pertinent part, that any person who: (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation of subparagraph (A) [or] (B), . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1). |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a)(1). | |
| ¶ 34: Generally, after a physician writes a prescription for a Medicare Part D beneficiary, the patient can take the prescription to a pharmacy or submit it to a mail order specialty pharmacy to be filled.  *See* Ex. A ¶ 26.  When the patient submits the prescription, the Medicare co-pay is due from the patient to complete the purchase of the drug and have the pharmacy fill the prescription.  *Id.* ¶ 27.  When the pharmacy dispenses a drug to a Medicare Part D beneficiary, the pharmacy submits a claim to the beneficiary's Part D Sponsor, which, in turn, submits an electronic record of the claim to CMS.  *Id.* ¶ 28. After dispensing the drug, the pharmacy receives reimbursement from the CMS-funded Part D Sponsor for the drug cost less the co-pay for which the Medicare Part D beneficiary was responsible.  *Id.* | ¶ 26: Generally, after a physician writes a prescription for a Medicare Part D beneficiary, the patient can take the prescription to a pharmacy or submit it to a mail order specialty pharmacy to be filled.<br><br>¶ 27: When the patient submits the prescription, the Medicare co-pay is due from the patient to complete the purchase of the drug and have the pharmacy fill the prescription. |
| ¶ 38: The anti-kickback statute, 42 U.S.C. § 1320a-7b(b) (the "**Anti-Kickback Statute**"), was passed by Congress to address knowing and willful payments made to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients).  *See* Roadmap for New Physicians: Fraud & Abuse Laws, Office of the Inspector General, https://oig.hhs.gov/compliance/physician-education/01laws.asp (last visited May 12, 2021).  Congress determined that the inducements at issue would "contribute significantly to the cost" of Federal health care programs absent federal penalties as a | ¶ 40: The anti-kickback statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are excessively costly, medically unnecessary, of poor quality, or potentially harmful to patients. To protect the integrity of Federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gives rise to overutilization, poor quality of care, or patient harm.  In particular, when determining what conduct to prohibit, Congress determined that the inducements at issue would "contribute significantly to the cost" of Federal health care programs absent |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| deterrent.  H.R. Rep. No. 95-393, at 53 (1977), reprinted in 1977 U.S.C.C.A.N. 3039, 3056. | federal penalties as a deterrent.  H.R. Rep. No. 95-393, at 53 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3039, 3056.  First enacted in 1972, Congress strengthened the anti-kickback statute in 1977, 1987, and 2010 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93; Patient Protection and Affordable Care Act, Pub. L. No. 111-148. |
| ¶ 39: The Anti-Kickback Statute provides: (b) Illegal remunerations (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-- (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.  42 U.S.C. § 1320a-7b(b)(2). | ¶ 41: The anti-kickback statute prohibits any person or entity from knowingly and willfully offering, making, soliciting, or accepting remuneration, in cash or in kind, directly or indirectly, to induce or reward any person for purchasing, ordering, or recommending or arranging for the purchasing or ordering of federally-funded medical goods or services: (b) Illegal remunerations * * * (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-- (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.  42 U.S.C. § |

5

**Appendix A:**
**Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint**

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| | 1320a-7b(b)(2).  Violation of the anti-kickback statute also can subject the perpetrator to exclusion from participation in Federal health care programs and civil monetary penalties.  42 U.S.C. § 1320a-7b(b)(2); 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7). |
| ¶ 40: In 2010, Congress amended the Anti-Kickback Statute to include language providing that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim" under the False Claims Act. 42 U.S.C. § 1320a-7b(g).  Thus, under 42 U.S.C. § 1320a-7b(g) of the statute, claims submitted to Federal health care programs that result from violations of the Anti-Kickback Statute are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a).  Accordingly, when a person submits or causes to be submitted claims to Federal health care programs violate the Anti-Kickback Statute, he or she also violates the False Claims Act. | ¶ 45: In 2010, Congress amended the anti-kickback statute to include language that reaffirmed prior case law and provided that any Medicare claim "that includes items or services resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g).  Under this provision, claims submitted to Federal health care programs that result from violations of the anti-kickback statute are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a).  Accordingly, a person violates the False Claims Act when he or she knowingly submits or causes to be submitted claims to Federal health care programs that result from violations of the anti-kickback statute. |
| ¶ 41: In order to increase patient enrollment on Copaxone, Teva provided a suite of services called its "Shared Solutions" Program. Ex. A ¶ 48.  Through the Shared Solutions Program, Teva offered free injection devices to administer the drug, maintained staff of nurses who provided patients with injection training, and assigned case managers to assist patients in obtaining insurance coverage for the drug.  *Id.*  Teva represented that it was committed to addressing the financial concerns raised by patients so that they were not faced with discontinuing therapy due to cost.  *Id.* ¶ 49. | ¶ 48: For Copaxone patients, Teva provided a suite of services called "Shared Solutions."  According to Teva, Shared Solutions was "dedicated to getting and keeping patients on" Copaxone.  Through Shared Solutions, Teva offered free injection devices that patients could use to administer the drug, maintained a staff of nurses who provided patients with free injection training, and assigned case managers who worked with patients to obtain insurance coverage for the drug and helped them to identify means of covering the often substantial insurance co-pays for the drug.  Physicians who prescribed Copaxone typically submitted an enrollment form directly to Shared Solutions for each new |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
|  | Copaxone patient.  As a result, Shared Solutions established relationships with the vast majority of all Copaxone patients.<br><br>¶ 49: Teva explained the financial component of the Shared Solutions offering in a set of talking points for its Copaxone sales team:<br><br>• **Shared Solutions**® is committed to helping ensure that financial concerns do not come between patients and their treatment<br>• No patient should have to choose, interrupt, or discontinue therapy because of financial concerns, nor should a health care provider have to make clinical decisions based on cost<br>• **Shared Solutions**® is dedicated to finding the right assistance for both new and existing patients<br><br>• Affordable access is the reality for the majority of COPAXONE® (glatiramer acetate injection) patients<br>• **Shared Solutions**® supports 3 separate financial assistance programs for COPAXONE® patients<br>   o  Free product<br>   o  Medicare Part D assistance<br>   o  Private co-pay assistance<br><br><br>Similarly, in a 2011 Work Plan for Teva Neuroscience, the company noted that "Copaxone Patient Assistance Programs remove prescribing barriers and drive[] adherence and compliance."  Thus, Shared Solutions served to assure both patients and their physicians that they need not worry about Copaxone's substantial cost. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| ¶ 42: As part of the Shared Solutions Program, in 2006, Teva entered into a contract with ACS, a specialty pharmacy. *Id.* ¶ 50. ACS was co-founded by Edward Hensley ("**Hensley**"), who had a prior working relationship with Teva's Director of Customer Resources at the time, Denise Lynch ("**Lynch**"). *Id.* As part of the contract, Teva sent to ACS the prescriptions for Copaxone received through the Shared Solutions Program for patients who either had or were eligible for Medicare Part D coverage. *Id.* If a patient was eligible for but did not already have Medicare Part D coverage, ACS would assist that patient with enrollment. *Id.* If the patient was eligible for Medicare co-pay coverage from a Charitable PAP, ACS would gather the information from the patient and submit the application to the foundation. *Id.* The two Charitable PAPs to which ACS referred Teva's Copaxone reimbursement payments were the CDF and TAF. Both CDF and TAF maintained "MS" funds, through which they provided copay assistance to patients for, ostensibly, any of the MS drugs on the market. Ex. A ¶ 3. | ¶ 50: In October 2006, Teva entered into a contract with ACS, a specialty pharmacy that Hensley and Jeff Spafford had co-founded earlier that year. (A copy of this contract is attached as Exhibit 6.) Hensley had a prior business relationship with Denise Lynch, who at the time was Teva's Director of Customer Resources and ran Teva's Shared Solutions program. (Lynch's title later changed to Vice President of Patient Services.) Pursuant to the contract, Shared Solutions referred to ACS patients who had been prescribed Copaxone and who either had or were eligible for Medicare Part D coverage. If a patient did not already have Medicare Part D coverage, ACS helped the patient sign up for coverage. If a patient was eligible for Medicare co-pay coverage from a foundation, ACS would gather the necessary information from the patient and submit an application for the patient to CDF.<br><br>¶ 3: Teva paid CDF and TAF tens of millions of dollars each year because it knew that the foundations would use Teva's money to cover Copaxone co-pays, thus increasing Copaxone sales and enriching Teva in amounts that far exceeded its payments to the foundations. (A list of payments from Teva to CDF and TAF during the period from December 2006 through 2015 is attached as Exhibit 1.) Ostensibly, CDF and TAF each operated a "MS" fund that covered copays for any of the many MS drugs on the market. In practice, however, Teva conspired with the foundations so that they operated their MS funds to maximize the proportion of Copaxone patients who benefited whenever Teva made a payment to the foundations. |
| ¶ 43: ACS's founder, Hensley, founded TAF in 2009. *Id.* ¶ 52. As well, during that same year, his for-profit business that he | ¶ 52: In 2008, Hensley and Spafford sold ACS to another pharmacy. They stayed on at ACS until late 2009. Meanwhile, |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| also founded, AssistRx, began running Teva's free drug program for Copaxone patients who did not have insurance. *Id.* The free drug program is operated through Teva's non-profit organization called the Teva Cares Foundation that provides medications at no cost to patients who meet certain insurance and income criteria. *See* Welcome to the Teva Cares Foundation, Teva, https://www.tevacares.org/ (last visited May 17, 2021). While running that program, AssistRx identified Medicare-eligible patients who were receiving free Copaxone from Teva. Ex. A ¶ 52. AssistRx arranged for those patients to instead obtain Medicare coverage, and referred them to ACS, which then would seek foundation co-pay funding for them. *Id.* In February 2015, AssistRx also took over ACS's role of arranging Medicare co-pay funding for Copaxone patients referred through Shared Solutions. *Id.* | during 2009, they founded TAF and a for-profit business called AssistRx. After TAF opened its MS fund in or about January 2010, ACS started helping Medicare patients obtain Copaxone co-pay coverage from both TAF and CDF. In September 2010, AssistRx started running Teva's free drug program for Copaxone patients who did not have insurance. As part of that program, AssistRx identified Medicare-eligible patients who were receiving free Copaxone from Teva. AssistRx arranged for those patients to obtain Medicare coverage, and referred them to ACS, which then would seek foundation co-pay funding for them. In February 2015, AssistRx also took over ACS's role of arranging Medicare co-pay funding for Copaxone patients referred by Shared Solutions. |
| ¶ 44: When Teva began working with ACS, Teva and Hensley came to the agreement that the donations Teva provided to TAF and CDF would be used solely to reimburse Copaxone co-payments and would not be applied to other drugs funded by the foundations. *Id.* ¶ 55; Ex. A-2. ACS understood that Teva's goal was to use the Charitable PAPs as a "pass-through vehicle" to generate revenues for Copaxone. Ex. A ¶ 56. Indeed, in a 2007 email, Hensley explained to his colleagues at ACS that "particular manufacturer funds [should] go to their own drug as [that was] what was the intent of the project was originally." *Id.*; Ex. A-8. | ¶ 55: Soon after Teva started working with ACS, Lynch told Hensley that she would not authorize payments to Patient Services, Inc. ("PSI"), another co-pay foundation, because PSI had "burned" her with respect to a prior payment from Teva. Hensley Aff. ¶ 4. Lynch explained to Hensley that a payment Teva had made to PSI had not been passed to Copaxone patients but rather had been used to cover the co-pays of patients on other drugs. *Id.* According to Hensley, Lynch said she was "'tired' of other pharmaceutical manufacturers 'riding on [Teva's] coattails.'" *Id.* Accordingly, as described further below, Teva financed the MS funds only at CDF and TAF, where it had assurance that its money would go to patients taking its drug, Copaxone. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
|  | ¶ 56: ACS understood that Teva's goal was to use the foundations as a "pass-through vehicle." Hensley Aff. ¶ 10. In a February 2007 e-mail reflecting Hensley's understanding of Teva's goal, Hensley instructed his ACS colleagues that "particular manufacturer funds [should] go to their own drug as [that was] what was the intent of the project was originally." (A copy of this e-mail is attached as Exhibit 8.)<br><br>*See* Ex. A-2.[1] |
| ¶ 45: In fact, Teva instructed ACS to not refer Medicare patients to Teva's Copaxone free drug program if foundation funds were accepting patients, because foundation-funded patients generated revenue from reimbursement, whereas free drug payments did not. Ex. A ¶ 57; A-10. For example, in an email sent in April 2016, a Shared Solutions supervisor explained that "[p]atients with government funded plans are not eligible to apply[]" for Teva's free Copaxone program. Ex. A-10. Teva made an exception to this policy for Copaxone patients who obtained prescriptions or Medicare Part D coverage near the end of the calendar year when no foundation coverage was available. Ex. A ¶ 57. At the beginning of the following year, Teva, ACS, and the Charitable PAPs worked to promptly move those patients onto foundation coverage. *Id.* For example, in an April 2016 email, a Shared Solutions employee stated, "in the past when a new Med D patient needs assistance and at that time (usually close to the end of the calendar year) the Foundation has closed its funds[,] [i]f we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up | ¶ 57: Teva showed its intent to make money from its financing of CDF and TAF through its refusal to include Medicare patients in its charitable free drug program so long as foundation co-pay coverage was available. Teva generally excluded Medicare patients from its free drug program because foundation-assisted patients generated revenue from Medicare reimbursement, whereas free drug patients did not. At least as early as 2008, Teva instructed ACS not to refer Medicare patients to Teva's Copaxone free drug program if foundations were accepting patients. Thus, in an August 2008 example of ACS implementing Teva's instruction, Hensley told Lynch: "Just an FYI. Since we are getting no rejections yet from the non profit sources we are utilizing here at ACS, we have not started any Free Drug program. I will let you know the moment it kicks in." (A copy of Hensley's e-mail is attached as Exhibit 9.) Years later, Teva's policy had not changed. In an April 2016 e-mail, a Shared Solutions supervisor described the eligibility for the company's free Copaxone program and noted that "[p]atients with government funded plans are not eligible to apply." (A |

[1] The citations to "Ex. A-#" refer to the exhibits to the DOJ complaint itself, which Plaintiff cites and refers to ubiquitously.

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| for Foundation Assistance for the following January when funds will be available."  A-12. | copy of this e-mail is attached as Exhibit 10.) Teva made an exception to this policy for Copaxone patients who obtained new Copaxone prescriptions or Medicare Part D coverage for the first time near the end of a calendar year when no foundation coverage was available.  Teva, ACS, and the foundations then worked to move those patients onto foundation coverage at the beginning of the following year.  As Hensley wrote in November 2007, "[t]he Copaxone Cares [*i.e.*, free drug] patients will transition to CDF Med D program in January."  (A copy of this e-mail is attached as Exhibit 11.)" Likewise, a Shared Solutions manager explained in an April 2016 e-mail that, "in the past when a new Med D patient needs assistance and at that time (usually close to the end of the calendar year) the Foundation has closed its funds[,] [i]f we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up for Foundation Assistance for the following January when funds will be available".. (A copy of this e-mail is attached as Exhibit 12.)  <br><br>*See* Ex. A-10.  <br><br>*See* Ex. A-12. |
| ¶ 46: Teva's intention was to provide exactly the amount of money needed to fund the Copaxone co-payments to each foundation.  For example, on December 30, 2009 and January 25, 2010, Teva paid TAF $15.7 million, approximately 99.9% of which was paid to Copaxone patients.  Ex. A ¶ 88. | ¶ 88: As soon as TAF's MS fund started accepting patients in January 2010, Teva, ACS and TAF engaged in schemes to enroll Copaxone patients into TAF's MS fund using Teva's payments. Teva's use of TAF as a conduit started with Medicare patients on Teva's free drug program at ACS.  As an ACS vice president explained in an e-mail dated January 4, 2010, "Teva has funded all their Free drug patients through a new foundation called 'The Assistance fund.'" (A copy of this e-mail, with the subject "The |

11

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| | Assistance Fund – A new copay foundation for Copaxone MS patients," is attached as Exhibit 49.) Teva paid TAF $15.7 million in four payments between December 30, 2009, and January 25, 2010, during which time approximately 99.9% of the payments from TAF's MS fund went to Copaxone patients. By February 4, 2010, ACS reported to Teva that TAF was covering Medicare co-pays for 2,322 Copaxone patients. (A copy of this e-mail is attached as Exhibit 50.) The close cooperation between Teva, ACS, and TAF continued at least into 2015. |
| ¶ 47: As well, given that Teva intended for the donation payments to fund all of its Copaxone Medicare co-pays, Teva's Tax department determined in 2013 that the Company should treat the payments to the Charitable PAPs as business expenses rather than charitable donations. *Id.* ¶ 63. In a July 2013 memorandum, a manager in Teva's Tax department reviewed Teva's recent payments to CDF and TAF and concluded that "[t]he payments . . . are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense." *Id.*; Ex. A-19. | ¶ 63: Because Teva intended its payments to CDF and TAF to generate Copaxone sales, Teva's Tax department wrote that the company should treat those payments as business expenses rather than charitable donations. In a July 2013 memorandum, a manager in Teva's Tax department reviewed Teva's recent payments to CDF and TAF and concluded that "[t]he payments . . . are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense." (A copy of this memorandum is attached as Exhibit 19.)<br><br>*See* Ex. A-19. |
| ¶ 48: Further, Teva's payments to CDF and TAF were supposed to be applied to the foundations' MS funds generally, and thus in theory could assist patients on any MS drug. However, senior Teva executives recognized that was not the case and commonly referred to the payments as "Copaxone donations." Ex. A ¶ 64. For example: • A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of | ¶ 64: Tellingly, even though Teva's payments to CDF and TAF were ostensibly for the foundations' MS funds, which theoretically could assist patients on any MS drug, senior Teva executives commonly referred to those payments as "Copaxone donations" Examples of such references include the following: - A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of *Copaxone* |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| ***Copaxone donations*** to be mailed on Dec 29th[.]" *Id.* • A January 2015 e-mail from Desheh, approving a "***Copaxone Donation*** payment" Ex. A-21. • A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines unit, with the subject "Response requested: Approval for ***Copaxone donation*** payment" Downey approved, and forwarded the email to Koremans, who approved as well.  Ex. A-22. • An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and Support, approving a "***Copaxone Donation***" in the amount of $725,000. Ex. A-23. • A January 2017 e-mail from a Teva NASM VP of Finance to Koremans regarding "***Copaxone donations*** approval" Ex. A-24. | *donations* to be mailed on Dec 29th"  (A copy of this e-mail is attached as Exhibit 20.) (Emphasis added.) - A January 2015 e-mail from Eyal Desheh, the Chief Financial Officer of Teva Ltd., approving a "*Copaxone Donation* payment" (A copy of this e-mail is attached as Exhibit 21.) (Emphasis added.) - A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines ("NASM") unit, with the subject "Response requested: Approval for *Copaxone donation* payment" Downey approved, and forwarded the e-mail to Rob Koremans, President and CEO Global Specialty Medicines at Teva Ltd., who approved as well.  (A copy of this e-mail chain is attached as Exhibit 22.) (Emphasis added.) - An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and Support, approving a "*Copaxone Donation*."  (A copy of this e-mail is attached as Exhibit 23.) (Emphasis added.) - A January 2017 e-mail from a Teva NASM VP of Finance to Koremans, President and CEO Global Specialty Medicines at Teva Ltd., regarding "*Copaxone donations* approval."  (A copy of this e-mail is attached as Exhibit 24.) (Emphasis added.)<br><br>*See* Ex. A-21.<br><br>*See* Ex. A-22.<br><br>*See* Ex. A-23.<br><br>*See* Ex. A-24. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| ¶ 49: Teva was able to accomplish this scheme through the mechanics of its arrangements with ACS, CDF, and TAF.  Teva needed three data points to calculate how much to pay CDF and TAF at the end of each year to ensure that the foundations would continue to cover all of Copaxone patients' Medicare co-pays in the following year: (1) the number of Copaxone patients enrolled in each fund; (2) each fund's annual per-patient grant amount; and (3) each fund's administrative fee, which was generally 9%.  Ex. A ¶ 79. | ¶ 79: Teva needed three data points to calculate how much to pay CDF and TAF at the end of each year to ensure that each foundation's MS fund would continue to cover Copaxone patients' Medicare co-pays in the following year: (1) the number of Copaxone patients enrolled in each fund, (2) each fund's annual per-patient grant amount; and (3) each fund's administrative fee, which was generally 9 percent during the relevant time period. |
| ¶ 50: Teva regularly received from CDF and TAF the per-patient grant amount that the foundations provided to Copaxone patients. *Id.* ¶ 80; Ex. A-2 ¶ 13.  For example, an email Hensley sent to Lynch on September 17, 2011 (attached hereto as A-35), stated the following: The allocation per patient for 2012 is $4,600.  To give you a historical number of what it has been in the past:<br><br>2012 - $4,600<br><br>2011 - $4,400<br><br>2010 - $5,600 | ¶ 80: Teva regularly received, from both CDF and TAF, the per-patient grant amount that each foundation provided to Copaxone patients at any given time.  For example, the following series of e-mails shows how CDF conveyed per-patient grant amounts to Teva: - On October 28, 2010, CDF's President, Michael Banigan, sent an e-mail to Lynch: "We are estimating the per-patient grant amount of $3,950 next year.  Math is simple.  Number of patients times the grant amount divided by .91.  We can chat at your convenience." (A copy of this e-mail is attached as Exhibit 30.) Banigan's e-mail presumed that Lynch knew the "[n]umber of patients," and, in fact, Lynch could get that from ACS.  Banigan suggested the factor of .91 to take into account CDF's nine percent fee. – On September 15, 2011, Banigan wrote to Lynch: "Do you have time for a call tomorrow? I have preliminary numbers for you." (A copy of this e-mail is attached as Exhibit 31.) – On November 7, 2012, Lynch sent Banigan an e-mail asking for the "2013 patient contribution," and Banigan responded: "Everything is the same as last year.  $3750 per patient [and] $1500 for [low-income subsidy].  Admin is 9%, but in reality we paid out 92% last year across all funds." (A copy of this e-mail chain is attached as |

14

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| | Exhibit 31.) Later that day, Walley sent Lynch an e-mail clarifying that "the 2012 per patient allocation for the MS program is $4750. . . . The allocations will remain the same for the 2013 calendar year." (A copy of this email is attached as Exhibit 33.) – On December 20, 2013, Lynch asked Walley for the "per patient donation estimate for the MS fund for 2014," and Walley responded: "Initial allocation is $5000." (A copy of this e-mail is attached as Exhibit 34.) Further, Lynch testified that CDF provided her with per-patient grant amounts. <br><br> ¶ 81: Teva received similar information from TAF on a quarterly basis. Hensley often provided this information to Lynch over the phone or in person, but sometimes he provided it in writing. For example, on September 27, 2011, Hensley sent Lynch an e-mail that included the following: The allocation per patient for 2012 is $4,600. To give you a historical number of what it has been in the past: <br><br> 2012 - $4,600 <br><br> 2011 - $4,400 <br><br> 2010 - $5,600 <br><br> (A copy of this e-mail is attached as Exhibit 35.) *See also* Hensley Aff. ¶ 13 ("I would regularly provide either Ms. Lynch or Mr. Blanc (or both) the "per-patient allocation" that TAF was using for its MS Fund at any given time. I sometimes did this proactively, but usually did this in response to a specific request by Ms. Lynch."). |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| | Ex. A-2 ¶ 13: I knew, based on conversations with Mr. Blanc, that Mr. Blanc continued to provide Ms. Lynch with information about how many of ACS's Copaxone patients were waiting to fill their prescription pending enrollment in a co-pay assistance foundation. I would regularly provide either Ms. Lynch or Mr. Blanc (or both) the "per-patient allocation" that TAF was using for its MS Fund at any given time. I sometimes did this proactively, but usually did this in response to a specific request by Ms. Lynch. Based on my course of dealing with Ms. Lynch, discussions I had with Ms. Lynch, and statements that Ms. Lynch made to me, I knew that the purpose of providing this information to Ms. Lynch was to enable her to determine how much money Teva needed to donate to TAF to cover all of ACS's waiting Copaxone patients. |
| ¶ 51: Then, Teva periodically obtained from ACS the number of Copaxone patients who were receiving co-pay coverage from each foundation. Ex. A ¶ 82. For example, on December 5, 2013, ACS employee David Blanc sent an email to Lynch with the latest numbers, showing "TAF 5614 . . . CDF . . . 1188 . . . LIS 3543[.]" A-43. | ¶ 82: With the per-patient grant amounts readily available directly from the foundations, Teva then obtained from ACS the number of Copaxone patients who were receiving co-pay coverage from each foundation. ACS provided this information in writing and over the telephone. The following e-mails exemplify ACS's provision of such information to Teva for budgeting purposes: - On August 7, 2007, Teva sent ACS an e-mail noting that it had received a file from ACS. Included within that file was a list of 1,082 Copaxone patients who were "Approved for Assistance" with CDF. (A copy of the cover e-mail is attached as Exhibit 36. The accompanying file is not attached because it contains protected health information.) - On December 23, 2008, ACS sent Teva an e-mail reporting that a total of 2,499 Copaxone patients were receiving co-pay coverage from CDF at that time. (A copy of this e-mail is attached as Exhibit 37.) - On November 30, 2009, ACS sent Teva an e-mail |

16

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| | reporting that a total of 3,230 Copaxone patients were receiving co-pay coverage from CDF at that time.  (A copy of this e-mail is attached as Exhibit 38.) - On December 14, 2010, ACS sent Teva an e-mail reporting that, at that time, a total of 2,008 Copaxone patients were receiving co-pay coverage from CDF and a total of 2,714 Copaxone patients were receiving co-pay coverage from TAF.  (A copy of this e-mail is attached as Exhibit 39.) - On August 30, 2011, Teva's Jennifer Clark sent an e-mail asking one of her colleagues, Barb Ross, to tell her the "Estimated # of Medicare Patients rcvg full/partial assistance by year-end."  Ross responded that "David and Zach [of ACS] will be getting numbers first thing in the morning, they are checking with CDF for total numbers."  (A copy of this e-mail is attached as Exhibit 40.) A week later, Ross was able to report to Clark: "There are 83 partial assistance with CDF, 153 partial assistance with TAF.  Full assistance with CDF 1896 and full assistance with TAF 3440."  The resulting totals were 1979 at CDF and 3593 at TAF.  Ross also reported that there were 525 Copaxone patients who were receiving free product but were eligible for Medicare.  (A copy of this e-mail is attached as Exhibit 41.) - On August 27, 2012, ACS's Blanc sent an e-mail to Lynch with the "current numbers," as follows: <br><br> AF     4747 <br> CDF   1456 <br> PAN   2 <br><br> Total of 6205 assisted via 501c3 <br><br> (A copy of this e-mail is attached as Exhibit 42.) ("PAN" was another co-pay foundation that Teva did not support at that |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
|  | time.) - On December 5, 2013, Blanc sent Lynch the latest numbers again: <br><br> Hey Denise – <br><br> Great catching up with you yesterday! <br><br> As requested, numbers: <br><br> TAF    5614 <br> CDF    1188 <br> LIS      3543 <br><br> Let me know if you need anything further. <br><br> Thank you for the partnership – <br><br> (A copy of this e-mail is attached as Exhibit 43.) <br><br> *See* Ex. A-43. |
| ¶ 52: With those numbers in hand, Teva simply had to multiply the number of patients by the grant allocation per patient and factor in the administration fee to calculate how much to pay each foundation. Ex. A ¶ 83. As Jennifer Clark ("**Clark**"), an Associate Director in Teva's Patient Services department, explained: So, I would take an estimated number of Medicare patients, apply that towards what the typical average Medicare cost per patient might be for a calendar year, and then multiply that times those patients to determine what that might look like. And then I understood the administration fees for foundations were typically somewhere in the nine percent range, so I would do that calculation to determine how much we would need for the upcoming year. *Id.* ¶ 84. | ¶ 83: For each year from 2008 through at least 2014, Teva used data reflecting per patient grant amounts and numbers of Copaxone patients CDF and TAF were assisting to determine how much Teva would pay the foundations to cover existing Copaxone patients in the next year. As Hensley explained, Teva's receipt of information from TAF and ACS "would be sufficient to enable her [Lynch] to determine how much Teva should donate at the start of the year." Hensley Aff. ¶ 14. <br><br> ¶ 84: Jennifer Clark, who in 2011 took over the process of preparing Teva's budgets for foundation payments, explained the process as follows: So, I would take an estimated number of Medicare patients, apply that towards what the typical average Medicare cost per patient might be for a calendar year, and then |

18

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
| --- | --- |
| | multiply that times those patients to determine what that might look like.  And then I understood the administration fees for foundations were typically somewhere in the nine percent range, so I would do that calculation to determine how much we would need for the upcoming year.  Clark further explained that the "Medicare patients" she referenced were Copaxone patients. |
| ¶ 53: For example, in September 2011, after having just learned that ACS was estimating that 5,572 Copaxone patients would be receiving foundation co-pay coverage by the end of that year, Clark put together the following budget spreadsheet:<br><br><br><br>*Id.* ¶ 85; Ex. A-44.  The number "5775" on line 19 was the number Clark had received from ACS, rounded up, as indicated by the note, "Per Zach [Grammage at ACS], 8/31" in column H. *Id.*  The figure 525 in "Med Free Roll-Over" on line 18 had also | ¶ 85: For example, in September 2011, after having just learned from her colleague, Barb Ross, that ACS was estimating 5,572 Copaxone patients would be receiving foundation co-pay coverage by the end of that year, Clark put together the following budget spreadsheet:<br><br><br><br>(A full copy of this spreadsheet is attached as Exhibit 44.  Other iterations from other years are attached as Exhibits 45, 46, 47, and 48.)  The number "5775" on line 19 of this spreadsheet was a |

19

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| been provided by ACS and represented the number of Copaxone patients who were then receiving the drug for free but would obtain foundation coverage in 2012. *Id.* Clark added 5,775 to 525 to arrive at 6,300, which appears in line 16 of the spreadsheet as the estimated "Beginning of the Year" patients who would receive foundation funding for 2012. In line 17 of the spreadsheet, Clark estimated that an additional 500 patients would receive foundation co-pay coverage during the course of 2012. Clark then added 6,300 to 500 to reach 6,800 as the estimated total number of patients receiving foundation co-pay coverage in 2012, and then multiplied that number by $4,771, the "501c Funding per pt" amount in line 2, to reach the "Donut Hole Funding" amount of $32,442,800 on line 27. Clark then added the foundations' 9% administration fee to generate the "Total Donation" amount of $35,651,428.57 on line 28. *See also* Ex. A-48 showing the Copaxone donation calculation for 2015. | rounding of the number Clark had received from ACS via Ross, as indicated by the note "Per Zach [Gammage at ACS], 8/31" in column H of line 19. *See* Exhibits 40 and 41. The figure immediately above that, 525 "Med Free Roll-over," also had come from ACS via Ross and reflected the number of Copaxone patients on Medicare who were then receiving free drug but for whom ACS would obtain foundation coverage in 2012. *Id.* The formula metadata in the spreadsheet shows that Clark added 5,775 and 525 to get 6,300, which is the number that appears on line 16, the "Beginning of Year" patients for 2012. According to line 17 of the spreadsheet, Clark estimated that 500 additional Copaxone patients would need Medicare co-pay coverage in 2012. The spreadsheet formula metadata further shows that Clark added 6,300 to 500 and then multiplied the sum by 4,771, the "501c Funding per pt" on line 2, to get the "Donut Hole Funding" amount of $32,442,800 on line 27. ("501c Funding per pt" was the amount that Teva calculated it needed to fund per patient based on a standard Medicare Part D plan and the cost of Copaxone; "Donut Hole Funding" was a term that Teva used to describe the total amount it planned to pay for Medicare co-pays for Copaxone patients.) Teva added the foundations' 9 percent administrative fee to generate the "Total Donation" budget amount on Line 28.<br><br>*See* Ex. A-44.<br><br>*See* Ex. A-48. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| ¶ 54: During the last week of December 2011 and the first week of January 2012, Teva paid CDF and TAF a total of $33,200,000 from its foundation budget.  Ex. A ¶ 86. | ¶ 86: During the last week of December 2011 and the first week of January 2012, Teva paid CDF and TAF a total of $33,200,000 from its foundation budget.  Using data received from CDF and TAF via ACS, Teva paid the foundations what it understood they needed to cover copays for Copaxone patients in the upcoming year. |
| ¶ 55: After the beginning of each calendar year, TAF closed its MS fund because it had committed all of its funding to existing patients who had renewed their annual co-pay grants.  *Id.* ¶ 89.  In order to ensure that new Copaxone patients were able to sign up and receive funding from TAF through the remainder of the year, Teva, ACS, and TAF engaged in a coordinated process to enroll these patients.  *Id.* ¶ 90.  First, ACS would tell Teva how many new Copaxone patients were awaiting Medicare co-pay funding at a particular time.  *Id.*  Second, TAF would tell Teva the average per-patient Medicare co-pay grant amount at that time.  *Id.*  Third, Teva would multiply those amounts together and factor in TAF's standard administration fee to determine how much to donate to TAF.  *Id.*  Fourth, Teva would tell ACS how much it planned to pay TAF.  *Id.*  Fifth, ACS would send a "batch file" of Copaxone co-pay coverage applications to TAF as soon as TAF received funding from Teva.  *Id.* | ¶ 89: Shortly after the beginning of each year, TAF generally closed its MS fund because it had committed all of its funding to existing patients who had just renewed their annual co-pay grants.  With TAF's MS fund closed and with CDF also generally not providing new grants after the beginning of a year, but with new MS patients still being prescribed Copaxone and seeking Medicare co-pay coverage, Teva worked with ACS and TAF to ensure that these new Copaxone patients, too, would not have to pay co-pays for the drug.  In doing so, Teva again sought to correlate its payments to TAF with TAF's anticipated spending on Copaxone patients.<br><br>¶ 90: To achieve this goal, Teva, ACS, and TAF engaged in a coordinated multi-step process.  First, ACS told Teva how many new Copaxone patients were awaiting Medicare co-pay coverage at a particular time.  Second, TAF told Teva the average Medicare co-pay grant amount for a Copaxone patient at that time.  Third, Teva multiplied those two figures together and added an amount for TAF's administrative fee to determine how much to pay TAF.  Fourth, Teva told ACS how much and when it planned to pay TAF.  Fifth, ACS sent a "batch file" of Copaxone co-pay coverage applications to TAF as soon as TAF's MS fund opened upon receipt of Teva's payment.  Finally, TAF provided co-pay grants to the Copaxone patients in |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
|  | ACS's batch file, which eliminated the backlog of Copaxone patients awaiting Medicare co-pay coverage. Lynch testified that this "was the normal way it was done." Likewise, Hensley described this same process. *See* Hensley Aff. ¶¶ 13-14. The following examples show how this process worked in practice. |
| ¶ 56: For example, on April 22, 2014, Lynch sent an email to her colleague Barb Ross, requesting "the number of patients we have ready to go to ACS, May eligible and approx. how many we are sending over a day." Ex. A-76. Later that day, ACS sent Ross an e-mail with the subject line "CPA numbers" stating that ACS had "approx. 187 and 27 pending interviews." Ex. A-75. Thereafter, Ross reported back to Lynch that "we have 187 ready to go, 27 that still need financial assessments, and 40 for May eligible." Ex. A-76. At that time, TAF's per-patient grant amount was $4,500 and its administrative fee was 9%. Ex. A ¶ 100. A calculation of those amounts, (187 + 27 + 40) x $4,500 x 1.09, resulted in a total of $1,245,870. *Id.* Thus, on April 24, 2014, Teva paid TAF $1,275,000. Ex. A-77. Shortly after Teva sent the payment to TAF, ACS employee Blanc instructed his colleagues at ACS to "prepare a file for referral to TAF for Copaxone in the morning tomorrow." Ex. A-78. | ¶ 100: On the morning of April 22, 2014, Lynch asked her Teva colleague, Barb Ross, for "the number of patients we have ready to go at ACS, May eligible and approx. how many we are sending over a day." (A copy of this e-mail is attached as Exhibit 74.) That afternoon, ACS sent Ross an e-mail with the subject line "CPA numbers" and a report that ACS had "appox. 187 and 27 pending interviews." (A copy of this e-mail is attached as Exhibit 75.) Shortly thereafter, Ross reported the following to Lynch: "Looks like we have 187 ready to go, 27 that still need financial assessments, and 40 for May eligible." (A copy of this e-mail is attached as Exhibit 76.) At that time, TAF's per-patient allocation for its MS fund was $4,500, and TAF's administrative fee was 9 percent. Factoring those figures results in the following calculation: 254 x $4,500 x 1.09 = $1,245,870. On April 24, 2014, Teva paid TAF $1,275,000. (A copy of an e-mail confirming this payment is attached as Exhibit 77.) Hours later, Blanc sent an e-mail to his ACS colleagues directing them "to prepare a file for referral to TAF for Copaxone in the morning tomorrow." (A copy of this e-mail is attached as Exhibit 78.)

*See* Ex. A-76.

*See* Ex. A-75 |

22

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| | *See* Ex. A-77<br><br>*See* Ex. A-78. |
| ¶ 57: Executives at the Company were aware that Teva's sales of Copaxone were directly correlated with the amount of money the Company donated to Charitable PAPs because all of the money Teva donated to the foundations was being used to cover only Copaxone copays. *See* Ex. A ¶ 58.  According to Confidential Witness 1 ("**CW1**"), who served as Teva's Director of Marketing from June 2014 to August 2016 and Senior Director of Marketing from January 2018 to December 2018, donations to Charitable PAPs were included in the profit and loss statements under the individual line item, "Charitable Contributions." | ¶ 58: Teva knew that there was a direct correlation between its foundation funding and Copaxone sales.  In December 2011, for example, Katie Hiett, Teva Neuroscience's Director of Finance and Planning, and Felicia Ladin, Teva USA's Vice President of Finance, discussed the possibility of reducing Teva's planned 2011 fourth quarter payment to TAF from $10 million to $5 million.  Hiett warned Ladin against such a cut: "Not funding these patients has a direct and immediate impact on units."  (A copy of this e-mail is attached as Exhibit 13.) A week later, Teva paid TAF $10 million, just as it had planned. |
| ¶ 58: Further, in an e-mail dated January 9, 2015, Clark warned that, if Teva cut its foundation payments, the company's sales forecasts would be "overstated[,]" explaining that "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made." Ex. A-15.  A few weeks later, on February 2, 2015, Alejandro Castro, a Teva financial analyst, emailed David Loughery, Teva's Vice President of Finance, to advise him that "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing donations." Ex. A-16.  Castro continued on to explain that he was told by the Patient Access department "that they will need between $5M and $8M in donations soon to avoid losing an estimated 1,500 Medicare Patients." Ex. A-16.  In response, Loughrey told Castro that, instead of cutting the budget, "we agreed yesterday to fund | ¶ 60: Similarly, in early 2015, as Teva again was considering whether to pay TAF less than it had planned, the company ended up paying the planned amount because it knew that paying less would reduce sales.  In an e-mail dated January 9, 2015, Jennifer Clark, an Associate Director in Teva's Patient Services department, warned that, if Teva cut its foundation payments, the company's sales forecasts would be "overstated": "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made."  (A copy of this e-mail is attached as Exhibit 15.) A few weeks later, in an e-mail dated February 2, 2015, Alejandro Castro, a Teva financial analyst, advised David Loughery, Teva's Vice President of Finance, that "Patient access has also mentioned that they will need between **$5M and $8M in donations** soon to avoid losing an estimated 1,500 Medicare Patients."  (A copy of this e-mail is attached as Exhibit 16.) (Emphasis in original.) Castro then quantified the |

23

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| $8.5M today, which is ~$3M more than the remaining Q1 budget." *Id.* | dollar value of losing those patients: "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing donations."  Shortly thereafter, instead of cutting the "donations budget," Teva agreed to pay TAF $8.5 million, which was over $2 million more than Teva previously had planned to pay at that time. <br><br> *See* Ex. A-15. <br><br> *See* Ex. A-16. |
| ¶ 59: Later that year, on August 13, 2015, Jennifer Clark warned Ryan Sloss, a Teva finance manager, that "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill." Ex. A-17.  Sloss agreed, stating, "we either pay it and go over budget or we don't make our sales numbers." *Id.* | ¶ 61: In August 2015, in another discussion about potentially reducing Teva's future financial support of TAF, Clark reiterated her earlier warning, this time to Ryan Sloss, a Teva finance manager: "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill."  (A copy of this e-mail is attached as Exhibit 17.) Sloss concurred: "we either pay it and go over budget or we don't make our sales numbers." <br><br> *See* Ex. A-17. |
| ¶ 64: Senior management at Teva was aware of the donations to CDF and TAF because large payments had to be approved by Teva's higher-ups. Ex. A ¶ 13.  According to Confidential Witness 2 ("**CW2**"), who served as the Associate Director of Treasury from July 2015 to September 2019, the largest disbursements to the Charitable PAPs always took place toward the end of a given year.  A member of the treasury department would set up the payment and make sure that all of the necessary | ¶ 13: Teva Ltd. approved the Teva Neuroscience and Teva USA budgets for payments to CDF and TAF.  Senior Teva Neuroscience management reported to Teva USA's senior management, who in turn reported to senior management at Teva Ltd. in Israel.  Senior executives at Teva Ltd. directly approved some of the larger payments to TAF and CDF.  As stated in a September 2015 e-mail regarding "Medicare Donations Process," the payments required approval from |

24

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| management approvals were obtained.  CW1 explained that the approvals from top management depended upon the amount of the donation payment.  For example, a September 21, 2015 email discussing the Copaxone donations process set forth the following payment approval levels:<br><br>Approval Authority Levels<br>$0.5M Sr. Director<br>$1M VP<br>$5M SVP (Larry Downey in the past)<br>$15M TEC members (Rob Koremans)<br>$25M CFO (Eyal Desheh)<br>>$25M CEO (Erez Vigodman)<br>*** I'm not sure if there is a point in which Board of Directors approval is necessary.  Anna Khais or Roberta Diver can advise.<br><br>Ex. A-3.  Later in the email chain, on December 27, 2015, David Loughery, Teva's Vice President of Finance for North America, Specialty Medicines, emailed Eyal Desheh seeking approval of a large foundation payment, stating, "Please find attached a request for a $30M donation payment to be made to assist MS patients with their co-pay.  Based upon the size of this payment, I believe it may need approval from Erez as well."  *Id.* | increasingly senior executives, up to Teva Ltd. Chief Executive Officer Erez Vigodman:<br><br>Approval Authority Levels<br>$0.5M Sr. Director<br>$1M VP<br>$5M SVP (Larry Downey in the past)<br>$15M TEC members (Rob Koremans)<br>$25M CFO (Eyal Desheh)<br>>$25M CEO (Erez Vigodman)<br><br>(A copy of this e-mail is attached as Exhibit 3.) Notably, Teva had a company process for making charitable donations. According to Teva's 2012 "Integrity Principles Policy" concerning charitable donations, "[t]he review and approval process, including all funding decisions for proposed donations, is the responsibility of the appropriate Review Committee (Corporate Responsibility, Medical Advocacy, Medical Affairs and/or Compliance) which is separate from Sales and Marketing."  (A copy of the Teva Integrity Principles Policy is attached as Exhibit 4.) Teva did not follow this policy for payments to CDF and TAF; instead, Teva's marketing and<br><br>patient services teams determined the timing and amounts of those payments, which came from the Copaxone marketing budget, and senior Teva sales, marketing and finance executives then approved the payments.<br><br>*See* Ex. A-3. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| ¶ 65: Koremans and Desheh approved payments earlier that year as well.  On January 9 and 10, 2015, Koremans and Desheh approved a "Copaxone Donation payment" of $25M.  Ex. A-21.  On February 4, 2015, Koremans approved a "Copaxone donation payment" of $8.5 million.  Ex. A-22. | ¶ 64: Tellingly, even though Teva's payments to CDF and TAF were ostensibly for the foundations' MS funds, which theoretically could assist patients on any MS drug, senior Teva executives commonly referred to those payments as "Copaxone donations."  Examples of such references include the following: - A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of *Copaxone donations* to be mailed on Dec 29th."  (A copy of this e-mail is attached as Exhibit 20.) (Emphasis added.) - A January 2015 e-mail from Eyal Desheh, the Chief Financial Officer of Teva Ltd., approving a "*Copaxone Donation* payment."  (A copy of this e-mail is attached as Exhibit 21.) (Emphasis added.) - A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines ("NASM") unit, with the subject "Response requested: Approval for *Copaxone donation* payment."  Downey approved, and forwarded the e-mail to Rob Koremans, President and CEO Global Specialty Medicines at Teva Ltd., who approved as well.  (A copy of this e-mail chain is attached as Exhibit 22.) (Emphasis added.) - An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and Support, approving a "*Copaxone Donation*."  (A copy of this e-mail is attached as Exhibit 23.) (Emphasis added.) - A January 2017 e-mail from a Teva NASM VP of Finance to Koremans, President and CEO Global Specialty Medicines at Teva Ltd., regarding "*Copaxone donations* approval."  (A copy of this e-mail is attached as Exhibit 24.) (Emphasis added.) <br><br> *See* Ex. A-21. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| | *See* Ex. A-22. |
| ¶ 68: Several days later, on January 19, 2017, David Loughery sought approval of the $38M donation from Koremans.  Ex. A-24.  Loughrey emailed Koremans regarding "Copaxone donations approval" and explaining the rationale behind the payments: "Very soon you will receive requests to approve 3 separate payments related to 2017 planned Copaxone donations totaling $38M. . . . These payments aid Medicare patients with their copays is [sic] they encounter the Donut Hole period. . . . The majority of patients would receive the benefit before the end of February, thus why we make these funds available for agencies early in the year. . . . The Corporate Social Responsibility Team has communicated to these agencies our intent to fund and these agencies are funding patients currently based upon the expected receipt of these amounts." *Id.* | *See* ¶ 64: Tellingly, even though Teva's payments to CDF and TAF were ostensibly for the foundations' MS funds, which theoretically could assist patients on any MS drug, senior Teva executives commonly referred to those payments as "Copaxone donations" … - A January 2017 e-mail from a Teva NASM VP of Finance to Koremans, President and CEO Global Specialty Medicines at Teva Ltd., regarding "*Copaxone donations approval*."  (A copy of this e-mail is attached as Exhibit 24.)  (Emphasis added.)<br><br>*See* Ex. A-24. |
| ¶ 69: While this scheme was going on, Teva raised the price of Copaxone at a rate of over 19 times the rate of inflation, from approximately $17,000 per year to $73,000 per year.  Ex. A ¶ 2. | *See* ¶ 2: … As depicted in the graph below, during the period from late 2006 to 2015, while Teva was subsidizing Copaxone's cost through CDF and TAF, Teva raised the price of Copaxone at a rate over 19 times the rate of inflation, from approximately $17,000 per year to over $73,000 per year. |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| | |
| ¶¶ 74, 78, 84, 92, 96, 103, 129, 134, 149, 159:  The statements made… were false and/or misleading when made because Defendants failed to disclose the following material, adverse facts… b) If Teva had not covered the co-payments through its kickback scheme, many patients would have stopped taking Copaxone, leading to hundreds of millions of dollars in lost sales and revenues (¶¶ 58-62).[2] | ¶ 60: Similarly, in early 2015, as Teva again was considering whether to pay TAF less than it had planned, the company ended up paying the planned amount because it knew that paying less would reduce sales.  In an e-mail dated January 9, 2015, Jennifer Clark, an Associate Director in Teva's Patient Services department, warned that, if Teva cut its foundation payments, the company's sales forecasts would be "overstated": "They still have Medicare revenue in [the forecast] which is highly unlikely if the donations are no longer made."  (A copy of this e-mail is attached as Exhibit 15.) A few weeks later, in an e-mail dated February 2, 2015, Alejandro Castro, a Teva financial analyst, |

---

[2] As noted *supra,* ¶¶ 58-62 rely on ¶¶ 60-61 of the DOJ complaint.

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| | advised David Loughery, Teva's Vice President of Finance, that "Patient access has also mentioned that they will need between **$5M and $8M in donations** soon to avoid losing an estimated 1,500 Medicare Patients." (A copy of this e-mail is attached as Exhibit 16.) (Emphasis in original.) Castro then quantified the dollar value of losing those patients: "There is about $6.3M in donations budget that are the target of possible cost reductions but there may be a risk to Net Sales of approximately $5.8M per month associated with reducing donations." Shortly thereafter, instead of cutting the "donations budget," Teva agreed to pay TAF $8.5 million, which was over $2 million more than Teva previously had planned to pay at that time.<br><br>¶ 61: In August 2015, in another discussion about potentially reducing Teva's future financial support of TAF, Clark reiterated her earlier warning, this time to Ryan Sloss, a Teva finance manager: "it's clear that if the $10M gets removed, the sales will decrease as well, as there will be Medicare patients out there that won't be able to fill." (A copy of this e-mail is attached as Exhibit 17.) Sloss concurred: "we either pay it and go over budget or we don't make our sales numbers." |
| ¶ 168: … The DOJ explained that Teva used "ostensibly independent charitable foundations as vehicles to pay hundreds of millions of dollars in kickbacks, all while raising the price of its drug, Copaxone, at a rate over 19 times the rate of inflation[,]" leaving "American taxpayers to shoulder the high prices that Teva set for Copaxone." Press Release, United States Department of Justice, United States Files False Claims Act | ¶ 7: Teva's scheme circumvented the congressional design of the Medicare system, which requires drug co-pays, in part, to act as a market constraint against increasing prices. Instead, unbound by any market check on pricing due to its payment of illegal kickbacks, Teva left American taxpayers to shoulder the high prices that Teva set for Copaxone, while Teva reaped for itself the resulting profits. |

29

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| Complaint Against Drug Maker Teva Pharmaceuticals Alleging Illegal Kickbacks (Aug. 18, 2020); Ex. A ¶ 7. | |
| ¶ 176: Desheh, Koremans and McClellan were aware that the donations to Charitable PAPs were intended to be applied to only Copaxone co-payments because they were repeatedly included in communications where the payments were described as a "Copaxone Donation payment[,]" "Copaxone donations approval[,]" and "Copaxone donations." *See* ¶¶ 48, 65, 66, 68.[3] Given that the Charitable PAPs were supposed to apply the donations from Teva to all MS drugs indiscriminately, the only conclusion from the payment descriptions is that Teva employees were aware that the payments were being only applied to Copaxone. | ¶ 64: Tellingly, even though Teva's payments to CDF and TAF were ostensibly for the foundations' MS funds, which theoretically could assist patients on any MS drug, senior Teva executives commonly referred to those payments as "Copaxone donations." Examples of such references include the following: - A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of *Copaxone donations* to be mailed on Dec 29th." (A copy of this e-mail is attached as Exhibit 20.) (Emphasis added.) - A January 2015 e-mail from Eyal Desheh, the Chief Financial Officer of Teva Ltd., approving a "*Copaxone Donation* payment." (A copy of this e-mail is attached as Exhibit 21.) (Emphasis added.) - A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines ("NASM") unit, with the subject "Response requested: Approval for *Copaxone donation* payment." Downey approved, and forwarded the e-mail to Rob Koremans, President and CEO Global Specialty Medicines at Teva Ltd., who approved as well. (A copy of this e-mail chain is attached as Exhibit 22.) (Emphasis added.) - An April 2015 e-mail from Jan Jones, Teva's Director of Patient Services and Support, approving a "*Copaxone Donation*." (A copy of this e-mail is attached as Exhibit 23.) (Emphasis added.) - A January 2017 e-mail from a Teva NASM VP of Finance to Koremans, President and CEO Global Specialty Medicines at Teva Ltd., regarding |

---

[3] As noted *supra,* ¶¶ 48, 65, 66 and 68 rely on ¶ 64 of the DOJ complaint.

30

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
|  | "*Copaxone donations* approval."  (A copy of this e-mail is attached as Exhibit 24.) (Emphasis added.) |
|  | *See* Ex. A-21. |
|  | *See* Ex. A-22. |
|  | *See* Ex. A-23. |
|  | *See* Ex. A-24. |
| ¶ 177: Further, considering that the Charitable PAP donations were so large, the Individual Defendants had to approve the payments before they were made.  Indeed, payments over $15 million had to be approved by Teva Executive Committee Members, which included defendant Koremans, and payments over $25 million had to be approved by the CFO and CEO which included Desheh, McClellan, Kalif, Vigodman, and Schultz.  *See* ¶ 64.  The allegations above show that the Individual Defendants did in fact approve these payments prior to and during the Class Period.  In January 2015, Koremans and Desheh approved a "Copaxone Donation payment" of $25 million and in February 2015, Koremans approved a "Copaxone donation payment" of $8.5 million.  *See* ¶¶ 65, 66.  Later that year, in December 2015, Desheh and Vigodman approved a payment for a $30 million donation.  *See* ¶ 64.  In January 2016 McClellan approved a $10 million in "Copaxone donations" and in January 2017, | ¶ 64: Tellingly, even though Teva's payments to CDF and TAF were ostensibly for the foundations' MS funds, which theoretically could assist patients on any MS drug, senior Teva executives commonly referred to those payments as "Copaxone donations."  Examples of such references include the following: - A December 2014 e-mail from a Teva Senior Vice President directing her subordinate to "release $25M of *Copaxone donations* to be mailed on Dec 29th."  (A copy of this e-mail is attached as Exhibit 20.) (Emphasis added.) - A January 2015 e-mail from Eyal Desheh, the Chief Financial Officer of Teva Ltd., approving a "*Copaxone Donation* payment."  (A copy of this e-mail is attached as Exhibit 21.) (Emphasis added.) - A February 2015 e-mail from a Teva Associate Director of Finance to Larry Downey, the President of Teva's North America Specialty Medicines ("NASM") unit, with the subject "Response requested: Approval for *Copaxone donation* payment."  Downey approved, and forwarded the e-mail to Rob Koremans, President and CEO Global Specialty Medicines at Teva Ltd., who approved as well.  (A copy of this e-mail chain is attached as Exhibit 22.) (Emphasis added.) - An April 2015 e-mail from Jan |

31

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| **Plaintiff's Corrected Amended Complaint Allegation** | **Corresponding DOJ Complaint Allegation** |
|---|---|
| McClellan and Desheh approved a $38 million donation payment. *See* ¶¶ 66-68.[4] | Jones, Teva's Director of Patient Services and Support, approving a "*Copaxone Donation*." (A copy of this e-mail is attached as Exhibit 23.) (Emphasis added.) - A January 2017 e-mail from a Teva NASM VP of Finance to Koremans, President and CEO Global Specialty Medicines at Teva Ltd., regarding "*Copaxone donations* approval." (A copy of this e-mail is attached as Exhibit 24.) (Emphasis added.)<br><br>*See* Ex. A-21.<br><br>*See* Ex. A-22. |
| ¶ 194: Teva had established a company-wide policy for making charitable donations entitled the "Integrity Principles Policy." Ex. A ¶ 13; Ex. A-4. The Integrity Principles Policy provided that "[t]he review and approval process" for all charitable donations "is the responsibility of the appropriate Review Committee (Corporate Responsibility, Medical Advocacy, Medical Affairs and/or Compliance) which is separate from Sales and Marketing." *Id.* The Integrity Principles Policy also stated that "***Teva will not award charitable donations in exchange for an explicit or implicit agreement to purchase, prescribe, dispense, recommend or provide favorable formulary status for a Teva product***." Ex. A-4. | *See* ¶ 13 above: … Notably, Teva had a company process for making charitable donations. According to Teva's 2012 "Integrity Principles Policy" concerning charitable donations, "[t]he review and approval process, including all funding decisions for proposed donations, is the responsibility of the appropriate Review Committee (Corporate Responsibility, Medical Advocacy, Medical Affairs and/or Compliance) which is separate from Sales and Marketing." (A copy of the Teva Integrity Principles Policy is attached as Exhibit 4.) …<br><br>*See* Ex. A-4. |
| ¶ 195: Defendants violated this policy for donations to CDF and TAF. *Id.* First, according to CW1, donation payments fell under the responsibility of the Corporate Responsibility department and thus, under the Integrity Policies, would have had to been | ¶ 63: Because Teva intended its payments to CDF and TAF to generate Copaxone sales, Teva's Tax department wrote that the company should treat those payments as business expenses rather than charitable donations. In a July 2013 memorandum, a |

---

[4] As noted *supra,* ¶¶ 64-66 and 68 rely on ¶¶ 13 and 164 of the DOJ complaint.

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| approved by that department.  However, Teva's marketing and patient services teams determined the payments, and Teva's senior sales, marketing, and finance executives approved the payments. *Id.*  Second, Teva made the donations to CDF and TAF with the understanding that the foundations would apply the money given by the Company to only Copaxone. ¶¶ 44-45.[5]  Further, because Defendants intended the "Copaxone Donations" to generate sales, Teva treated the donations to CDF and TAF as business expenses rather than charitable donations for tax purposes.  Ex. A ¶ 63. | manager in Teva's Tax department reviewed Teva's recent payments to CDF and TAF and concluded that "[t]he payments . . . are made with the expectation of financial return commensurate with the amount donated and should therefore be deducted as business expense."  (A copy of this memorandum is attached as Exhibit 19.)<br><br>¶ 55: Soon after Teva started working with ACS, Lynch told Hensley that she would not authorize payments to Patient Services, Inc.  ("PSI"), another co-pay foundation, because PSI had "burned" her with respect to a prior payment from Teva.  Hensley Aff. ¶ 4.  Lynch explained to Hensley that a payment Teva had made to PSI had not been passed to Copaxone patients but rather had been used to cover the co-pays of patients on other drugs.  *Id.*  According to Hensley, Lynch said she was "'tired' of other pharmaceutical manufacturers 'riding on [Teva's] coattails.'"  *Id.*  Accordingly, as described further below, Teva financed the MS funds only at CDF and TAF, where it had assurance that its money would go to patients taking its drug, Copaxone.<br><br>¶ 56: ACS understood that Teva's goal was to use the foundations as a "pass-through vehicle."  Hensley Aff. ¶ 10. In a February 2007 e-mail reflecting Hensley's understanding of Teva's goal, Hensley instructed his ACS colleagues that "particular manufacturer funds [should] go to their own drug as [that was] what was the intent of the project was originally."  (A copy of this e-mail is attached as Exhibit 8.) |

[5] As noted *supra,* ¶¶ 44-45 rely on ¶¶ 55-57 of the DOJ complaint.

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
| --- | --- |
| | *See* ¶ 57: Teva showed its intent to make money from its financing of CDF and TAF through its refusal to include Medicare patients in its charitable free drug program so long as foundation co-pay coverage was available. Teva generally excluded Medicare patients from its free drug program because foundation-assisted patients generated revenue from Medicare reimbursement, whereas free drug patients did not. At least as early as 2008, Teva instructed ACS not to refer Medicare patients to Teva's Copaxone free drug program if foundations were accepting patients. Thus, in an August 2008 example of ACS implementing Teva's instruction, Hensley told Lynch: "Just an FYI. Since we are getting no rejections yet from the non profit sources we are utilizing here at ACS, we have not started any Free Drug program. I will let you know the moment it kicks in." (A copy of Hensley's e-mail is attached as Exhibit 9.) Years later, Teva's policy had not changed. In an April 2016 e-mail, a Shared Solutions supervisor described the eligibility for the company's free Copaxone program and noted that "[p]atients with government funded plans are not eligible to apply." (A copy of this e-mail is attached as Exhibit 10.) Teva made an exception to this policy for Copaxone patients who obtained new Copaxone prescriptions or Medicare Part D coverage for the first time near the end of a calendar year when no foundation coverage was available. Teva, ACS, and the foundations then worked to move those patients onto foundation coverage at the beginning of the following year. As Hensley wrote in November 2007, "[t]he Copaxone Cares [*i.e.*, free drug] patients will transition to CDF Med D program in January." (A copy of this e-mail is attached as Exhibit 11.)" Likewise, a Shared Solutions manager explained in an April 2016 e-mail that, "in the past when a new Med D patient needs assistance |

*Appendix A:*
*Comparison of Plaintiff's Corrected Amended Complaint and DOJ Complaint*

| Plaintiff's Corrected Amended Complaint Allegation | Corresponding DOJ Complaint Allegation |
|---|---|
| | and at that time (usually close to the end of the calendar year) the Foundation has closed its funds[,] [i]f we want the patient to start drug we provide free product for the remainder of the calendar year and tee them up for Foundation Assistance for the following January when funds will be available." (A copy of this e-mail is attached as Exhibit 12.)<br><br>*See* Ex. A-2.<br><br>*See* Ex. A-8.<br><br>*See* Ex. A-10.<br><br>*See* Ex. A-12. |

35