**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD.**, *Individually and On Behalf of All Others Similarly Situated,*<br><br>Plaintiff,<br><br>*v.*<br><br>**TEVA PHARMACEUTICALS INDUSTRIES LIMITED, et al.**,<br><br>Defendants. | **CIVIL ACTION**<br><br>**NO. 20-4660-KSM** |

**MEMORANDUM**

**MARSTON, J.**                                                                                                    **August 2, 2022**

Lead Plaintiff Gerald Forsythe, individually and on behalf of all others similarly situated, alleges that Teva Pharmaceuticals Industries Limited ("Teva") and Teva executives Erez Vigodman, Eyal Desheh, Robert Koremans, Michael Derkacz, Kåre Schultz, Michael McClellan, and Brendan O'Grady (collectively, the "Individual Defendants," and together with Teva, "Defendants") violated Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 by making false and misleading statements and by failing to disclose material information about Teva's drug Copaxone. (Doc. No. 64-2.) Plaintiff also claims the Individual Defendants violated Section 20(a) of the Exchange Act because they knew or recklessly disregarded that Teva was making materially false and misleading statements and material omissions. (*Id.* ¶¶ 249–54.)

On March 25, 2022, the Court granted in part and denied in part Defendants' motion to dismiss. (Doc. No. 74.) The case is now ripe for discovery; however, Defendants seek to stay

the case, except as to class certification, pending the resolution of a related enforcement action brought against Teva by the U.S. Department of Justice (the "DOJ Action"). (Doc. No. 83.) Plaintiff opposes the motion. (Doc. No. 85.) For the reasons below, the motion is granted.

I.  BACKGROUND

   A.  *Factual Background*

Taking the allegations in the Corrected Amended Complaint as true, the relevant facts are as follows.

   1.  **Teva's Business**

Teva is a global pharmaceutical company that sells generics, specialty medicines, and over-the-counter products. (Doc. No. 64-2 ¶ 27.) One of Teva's products is Copaxone (glatiramer acetate injection), an injectable drug used to treat patients with multiple sclerosis. (*Id.* ¶ 28.) Copaxone is "one of the leading" therapies for multiple sclerosis in the United States, and in the mid-2010s, it was responsible for nearly half of the revenue in Teva's specialty medicines portfolio. (*Id.* ¶ 30.)

   2.  **Shared Solutions Program**

Teva sponsors "Shared Solutions," a program designed to increase patient access to Copaxone. (*Id.* ¶ 41.) Through the program, Teva trains patients on how to inject the drug, offers patients injection devices to administer the drug, and assigns patients case managers who help patients secure insurance coverage for the drug. (*Id.*) In 2006, in connection with the Shared Solutions program, Teva contracted with Advanced Care Scripts, Inc. ("ACS"), a specialty pharmacy. (*Id.* ¶ 42.) Teva sent ACS prescriptions for patients participating in Shared Solutions who "either had or were eligible for Medicare Part D coverage." (*Id.*) For the patients who did not already have Medicare Part D coverage, ACS assisted with the enrollment process. (*Id.*) And for the patients who already had Medicare Part D coverage and were eligible for co-

pay coverage from a patient assistance program ("PAP"),[1] ACS helped them apply for PAP assistance. (*Id.*) Teva also provided free Copaxone to low- or no-income patients; however, if those patients were eligible for Medicare Part D, Teva sent those patients to ACS for assistance enrolling in Medicare Part D and applying for PAP assistance. (Doc. No. 57 ¶ 43.)

ACS referred Teva's Copaxone patients to two PAPs for co-pay assistance: the Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF"). (*Id.* ¶ 42.) Both CDF and TAF maintained funds dedicated to assisting multiple sclerosis patients, through which they "provided co-pay assistance to patients for, ostensibly, any of the [multiple sclerosis] drugs on the market." (*Id.*) Teva regularly donated to both PAPs. (*Id.*) Under the applicable regulations, pharmaceutical companies may donate to PAPs; however, "the funds received through donations must be applied generally to all beneficiaries, and it is illegal for a Charitable PAP to apply the funds received to any particular drug." (*Id.* ¶ 35.)

Teva allegedly ran afoul of those regulations. (*Id.* ¶ 48.) Teva did not intend its donations to CDF and TAF to cover co-payments for multiple sclerosis treatments generally; rather, it intended its donations to CDF and TAF to cover patients' co-pays on Copaxone specifically. (*Id.*) In fact, Teva executives regularly described the company's donations to CDF and TAF as "Copaxone donations." (*Id.*) Teva's intentions bore out. (*Id.* ¶ 46.) For instance, in December 2009 and January 2010, Teva donated $15.7 million to TAF, "approximately 99% of which was paid to Copaxone patients." (*Id.*) In all, Teva donated tens of millions of dollars to CDF and TAF annually to fund Copaxone co-pays. (*See id.* ¶ 53 (indicating that Teva made the

---

[1] A PAP is a charitable program that provides financial assistance to help patients cover Medicare Part D co-pays. (Doc. No. 57 ¶ 35.)

3

following donations to CDF and TAF: $36,934,678 in 2012, $36,932,589 in 2013, and $34,774,070 in 2014).)

Copaxone patients receiving Medicare co-pay assistance from CDF and TAF made up roughly 27% of patients on Copaxone. (*Id.* ¶ 62.) Teva recognized that if it stopped funding these co-pay assistance programs, the patients "may not fill Rx and go off therapy, which would result in a negative impact to the brand of $210-280M." (*Id.*) While Teva was donating to CDF and TAF, it "raised the price of Copaxone at a rate . . . over 19 times the rate of inflation, from approximately $17,000 per year to $73,000 per year." (*Id.* ¶ 69.)

### 3. The DOJ Subpoena

On March 21, 2017, the United States Attorney's Office for the District of Massachusetts subpoenaed Teva for information about the company's donations to charitable organizations, including PAPs. (*Id.* ¶ 118.) Teva disclosed the subpoena in the next Form 6-K it filed on May 11, 2017. (Doc. No. 67 at 39 (Teva's May 11, 2017 6-K disclosing, "On March 21, 2017, Teva received a subpoena from the U.S. Attorney's office in Boston, Massachusetts requesting documents related to Teva's donations to patient assistance programs. Teva is in the process of responding to the subpoena.").) Despite receiving this subpoena, Teva continued operating the Shared Solutions program and making donations to CDF and TAF through at least 2018. (Doc. No. 64-2 ¶ 120.)

### 4. Defendants' Relevant, Post-Subpoena Statements

Both before and after receiving the subpoena, Teva made various statements regarding Copaxone and the Shared Solutions program. But Teva never disclosed its scheme to make "Copaxone donations" to PAPs. (*See, e.g.*, *id.* ¶ 71.) Plaintiff also contends that Teva and its

4

executives' omissions caused the company's disclosures regarding its compliance with federal law to be false and misleading.  (*See, e.g.*, *id.* ¶ 114.)

### 5. **The DOJ Action**

On August 18, 2020, the U.S. Attorney's Office for the District of Massachusetts filed a complaint against Teva for alleged violations of the False Claims Act.  (*Id.* ¶ 169.)  Specifically, the Government alleges that Teva's payments to CDF and TAF were "kickbacks" that allowed the Company to increase the price of Copaxone while leaving "American taxpayers to shoulder the high prices that Teva set."  (*Id.*)  In September 2021, the Honorable Nathaniel M. Gorton denied Teva's motion to dismiss.  *See United States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412 (D. Mass. 2021).  Discovery is underway, dispositive motions will be fully briefed on May 21, 2023, and the case is set for trial on September 18, 2023.  (*See United States v. Teva Pharms. USA, Inc.*, Civil Action No. 1:20-cv-11548-NMG (D. Mass.), Doc. No. 45.)

### B. *Procedural History*

On September 23, 2020, Halman Aldubi Provident and Pension Funds Ltd. ("Halman Aldubi") commenced this lawsuit individually and on behalf of all others similarly situated.  It alleged that Teva committed securities fraud by making false and misleading statements regarding Copaxone and the Shared Solutions program.[2]  (Doc. No. 1.)  On March 26, 2021, the Court named The Investor Group, consisting only of Gerald Forsythe, as lead plaintiff and appointed Faruqi & Faruqi, LLP as lead counsel.  *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus. Ltd.*, 529 F. Supp. 3d 385, 411 (E.D. Pa. 2021).

---

[2] On March 1, 2021, this case was reassigned from the calendar of the Honorable Jan E. DuBois to the calendar of the Honorable Karen Spencer Marston.  (Doc. No. 37.)

On May 25, 2021, Plaintiff filed an Amended Complaint. (Doc. No. 57.) The parties "met and conferred regarding the substance of Defendants' planned motion to dismiss," and Defendants notified Plaintiff of a technical inaccuracy in the Amended Complaint. (Doc. No. 64 at 2.) On August 10, 2021, Plaintiff moved to strike the Amended Complaint and file a corrected amended complaint to correct the inaccuracy, which Defendants did not oppose. (*Id.*) The Court granted the motion (Doc. No. 65), and Plaintiff's Corrected Amended Complaint (Doc. No. 64-2) became the operative complaint.

In August 2021, Defendants filed a motion to dismiss (Doc. No. 66), which the Court granted in part and denied in part in March 2022 (Doc. No. 74). On May 23, Defendants filed an answer (Doc. No. 80), and the Court scheduled a telephonic pretrial conference to be held on June 14, 2022 (Doc. No. 81). In advance of the conference, the parties submitted a Joint Report Pursuant to Rule 26(f), wherein Defendants indicated their intention "to move to stay merits discovery while proceeding with class certification discovery and briefing."[3] (Doc. No. 83-2, Ex. B at 7). At the conference, Defendants offered argument why they sought to stay the case (except as related to class certification), Plaintiff offered argument why a stay was inappropriate, and the Court set an expedited briefing schedule for the motion.

On June 28, Defendants filed a motion to stay all proceedings, except those related to class certification, pending resolution of the DOJ Action. (Doc. No. 83.) Defendants argue the stay is necessary to "avoid inefficiencies . . . and the risk of inconsistent adjudications" given the connection between this matter and the DOJ action. (Doc. No. 83-1 at 5.) Although they contend the case must be stayed, Defendants argue discovery and briefing related to class

---

[3] In the 26(f) Report, Plaintiff indicated it would "vigorously oppose" any such motion. (Doc. No. 83-2, Ex. B at 6.)

certification must proceed to "increase efficiency and further the interests of judicial economy." (*Id.* at 19.)

Plaintiff opposes the motion.  (Doc. No. 84.)  He argues this matter does not "inextricably overlap" with the DOJ Action and it may take years to resolve the DOJ Action, so an indefinite stay pending resolution of the DOJ Action "would unfairly prejudice Plaintiff and other class members[]."  (*Id.* at 6.)  Plaintiff also opposes Defendants' request to allow class certification proceedings to move forward.  (*Id.* at 8.)  He argues bifurcating class and merits discovery would be "particularly prejudicial," as "class certification issues and merits issues may overlap."  (*Id.*)

## II.     MOTION TO STAY

### A.     *Legal Standard*

The Court has broad discretion to stay proceedings.  *See Bechtel Corp. v. Local 215, Laborer's Int'l Union of N. Am.*, 544 F.2d 1207, 1215 (3d Cir. 1976).  This power is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  In considering whether to stay a case pending a related criminal action (or civil enforcement action), courts in this district consider the following factors:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal [or civil enforcement] litigation.

*Golden Quality Ice Cream Co. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 56 (E.D. Pa. 1980).

### B. Discussion

We consider each of the *Golden Quality* factors in turn.

#### 1. Plaintiff's Interest in Proceeding Expeditiously and Prejudice to Plaintiff if the Case Is Stayed

Although Plaintiff has an interest in proceeding expeditiously, a stay is unlikely to prejudice Plaintiff. As an initial matter, the stay is not likely to be in place for an extended period of time, as the DOJ Action is much further along in the discovery process, dispositive motion practice will begin in March 2023, and the trial is set to begin in September 2023. (Doc. No. 85-2 at 2–3.)

Moreover, Plaintiff has not shown how a stay would *prejudice* him. "[T]he court may insist that plaintiff establish more 'prejudice' than simply the right to pursue his case and vindicate his claim expeditiously." *See Morgenstern v. Fox Television Stations of Phila.*, Civil Acton No. 08-0562, 2010 WL 678113, at *3 (E.D. Pa. Feb. 23, 2010) (quoting *State Farm Mut. Auto. Ins. Co. v. Beckham-Easley*, No. 01-5530, 2002 WL 31111766, at *1 (E.D. Pa. Sept. 18, 2002)). "Instead, the plaintiff should demonstrate a unique injury, such as the dissipation of assets or an attempt to gain an unfair advantage from the stay." *In re Derivative Litig.*, Civil Action No. 06-02964, 2007 WL 1101276, at *2 (E.D. Pa. Apr. 11, 2007). Plaintiff has not identified any such injury, so this factor weighs in favor of entering the stay. *See In re Adelphia Commc'ns Sec. Litig.*, No. 02-1781, 2003 WL 22358819, at *4 (E.D. Pa. May 13, 2003) ("Plaintiffs have not shown any prejudice other than delay in pursuing their suits, which is insufficient to support vacating the stay.").

#### 2. Burden on Defendants if the Case Proceeds

Teva is likely to face a great burden if this case proceeds prior to the resolution of the DOJ Action. Both cases will require broad discovery, and there is likely to be substantial

overlap in terms of the documents being produced, the individuals being deposed, and the individuals tasked with managing the logistics of the two massive discovery processes. (Doc. No. 83 at 14.) It may be unduly burdensome to force a defendant to undergo two parallel discovery processes, especially where the process "is likely to spread thin the time of certain key individuals" at the defendant-corporation already tasked with "providing essential information to those attempting to [defend a case]." *Golden Quality Ice Cream*, 87 F.R.D. at 56; *see also Onyx Enters. Int'l Corp. v. Volkswagen Grp. of Am., Inc.*, Case No. 3:20-cv-09976 (BRM) (ZNQ), 2021 WL 1338731, at *4 (D.N.J. Apr. 9, 2021) ("Because this case will be, in some way, shaped by the other proceedings, the litigation expenses can be deemed a valid hardship.").

Managing discovery can be difficult, and trying to juggle separate discoveries in two large, somewhat related (but somewhat different) proceedings at the same time is that much more difficult. Accordingly, were this case to proceed, Defendants would face a great burden, and this factor weighs in favor of granting the motion to stay.

### 3. Efficient Use of Judicial Resources

"The Court has an interest in efficiently managing its caseload," *see In re Adelphia Commc'ns Sec. Litig.*, 2003 WL 22358819, at *5, and staying the case would allow the Court to realize several efficiencies.

First, staying this case pending the resolution of the DOJ Action will narrow the issues to be resolved in this action and avoids the risk of inconsistent adjudications. Defendants prepared a side-by-side comparison showing the substantial overlap between Plaintiff's Corrected Amended Complaint and the complaint in the DOJ Action—there are over 30 overlapping allegations. (*See* Doc. No. 85-1.) *See Simms v. Philip Morris, Inc.*, Civil Action No. 01-1107 (GK), 2003 WL 27394525, at *1 (D.D.C. July 7, 2003) ("[A] comparison of the two Complaints

9

shows that whole portions of Plaintiffs' sixty-eight page Complaint are virtually identical to the Government's complaint in the DOJ Case. Therefore, there is likely to be substantial overlap of both factual and legal issues between the two cases. A stay will avoid duplicative litigation because rulings in the DOJ case are virtually certain to 'illuminate or resolve' many issues which will arise in [the instant case]."). Given the substantial overlap in issues, a stay is warranted.

The U.S. District Court for the Southern District of New York's ruling in *UnitedHealthcare Insurance Company v. Regeneron Pharmaceuticals, Inc.*, 20 CV 10664 (VB), 2021 WL 6137097, at *4 (S.D.N.Y. Dec. 29, 2021) is instructive. The DOJ brought a civil enforcement action against Regeneron, alleging the company engaged in an illegal kickback scheme to promote a drug it manufactured (the "DOJ Case"). *Id.* at *1. UnitedHealthcare, an insurer, separately brought claims against Regeneron, alleging, among other things, that Regeneron defrauded UnitedHealthcare and engaged in civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") through the kickback scheme (the "Civil RICO Action"). *Id.* at *1–2. Regeneron sought to stay the Civil RICO Action pending the DOJ Case. *Id.* at *2. The court found that staying the Civil RICO Action would best serve Regeneron's interests and best preserve judicial economy because "[c]ourts disfavor duplicative litigation," and, absent a stay, there was a risk of inconsistent adjudications in the two suits. *Id.* at *4–5. The court explained,

> [A]lthough plaintiffs' claims are not identical to the claims asserted in the DOJ Action, each claim hinges on an adjudication that Regeneron engaged in an illegal kickback scheme. Thus, both this Court and the district court in Massachusetts must determine whether Regeneron actually engaged in an illegal kickback scheme, and the two courts could potentially come to different conclusions. This weighs in favor of a stay.

*Id.* at *4. Given the risk of inconsistent adjudications and the fact that that the DOJ Case would streamline other issues in the Civil RICO Action, the Court granted a stay. *Id.* at *5.

10

The same risks of inconsistent adjudication are present in this case.  Although the claims in this case and the DOJ Action are not identical, they are based on the same underlying activity, and the resolution of certain issues in the DOJ Action could affect the adjudication of this matter. For instance, if Teva is found "not liable" in the DOJ Action, Plaintiff may be foreclosed from arguing that Defendants made false statements or could be precluded from establishing materiality.  (*See* Doc. No. 85 at 7.)  A "not liable" finding could also make it more difficult to establish scienter.  (*Id.*)  *See Regeneron*, 2021 WL 6137097, at *5; *see also Doe v. Schneider*, Civil Action No. 08–3805, 2010 WL 11561113, at *2 (E.D. Pa. June 8, 2010) (explaining that one of the key issues in determining the propriety of a stay is "whether the issues in the . . . cases overlap" and entering a stay where the defendant's alleged wrongful act was "the central issue in both cases and . . . the cornerstone for the claims against the [other] defendants"); *Resco Prods., Inc. v. Bosai Minerals Grp. Co., Ltd.*, Civil Action No. 06–235, 2010 WL 2331069, at *7 (W.D. Pa. June 4, 2010) ("Staying the proceedings in this case . . . may reduce the duplication of effort between the WTO panel and this court, as the two proceedings involve overlapping facts with regard to the Chinese government's alleged involvement in price-fixing of exported bauxite.").

In addition to avoiding inconsistent rulings, the outcome of the DOJ Action (regardless of whether Teva is found liable) may incentivize Defendants to settle this action, which further weighs in favor of granting the stay.  *Cf. In re Adelphia Commc'ns Sec. Litig.*, 2003 WL 22358819, at *5 ("Additionally, criminal convictions against any of the civil defendants will likely encourage them to settle the civil suits, thereby eliminating the need to litigate some issues in the civil cases.").

Because the Court can realize several efficiencies by staying this case pending the resolution of the DOJ Action, this factor supports the stay.

### 4. Interests of Persons Not Party to the Litigation

The interests of nonparties also weigh in favor of staying this case pending the resolution of the DOJ Action. Several nonparties are potential witnesses and may have to be deposed and produce documents in both actions, and it may be preferable to keep them from having to coordinate their responses to two complicated third-party discovery processes simultaneously.[4] *See Golden Quality Ice Cream*, 87 F.R.D. at 56; *see also Kaiser v. Stewart*, No. Civ. A. No. 96-6643, 1997 WL 66186, at *3 (E.D. Pa. Feb. 6, 1997) (recognizing that "[t]he burden on nonparties, particularly those who hold relevant documents, may be significant" where "[b]oth the civil and criminal actions involve literally thousands of documents").

### 5. Interest of the Public in the Pending Litigation

Finally, the public has an interest in the efficient resolution of the DOJ Action. Although it is not a criminal proceeding, the DOJ Action is a civil enforcement action brought by the Department of Justice on behalf of the general public. The public interest is served by permitting the DOJ Action to proceed smoothly and without distraction from this matter. *See Regeneron*, 2021 WL 6137097, at *5 ("[A]lthough the DOJ Action is not a criminal prosecution, it is a civil enforcement proceeding brought by the government, which represents the public interest. Thus, plaintiffs' interests will likely be protected in the DOJ Action."). *Cf. Dennis v. City of Philadelphia*, --- F. Supp. 3d. ---, CIVIL ACTION NO. 18-2689, 2022 WL 1590858, at *5 (E.D. Pa. May 20, 2022) ("[A] stay may benefit the public by allowing the Government to conduct a complete, unimpeded investigation into potential criminal activity." (cleaned up)); *Doe*, 2010 WL 11561113, at *4 ("We agree with the Government that allowing discovery to continue would

---

[4] The Court acknowledges nonparties could benefit if the parties to both actions were able to coordinate depositions; however, there is no indication that the parties have undertaken any efforts to coordinate discovery between this case and the DOJ Action. And the Court notes that the DOJ Action is much further along in its discovery process.

allow Schneider to gain an advantage for his criminal trial, which would run contrary to the public's interest in the precedence of a criminal case over a civil case.").

\* \* \*

Weighing these factors together, the Court finds that it is appropriate to stay this matter pending the resolution of the DOJ Action. The Court recognizes that Plaintiff has an interest in the expedient resolution of this matter; however, he will not be unfairly prejudiced by a delay, and any delay is likely to be limited, as the DOJ Action is set to be resolved by fall of next year.[5] Unlike Plaintiff, Defendants are likely to be prejudiced were this action to proceed—they will be forced to undertake two similar (and likely very complex) discovery processes simultaneously, which could spread potential witnesses and other points of contact at Teva thin. The interest of third parties and the public interest also weigh in favor of granting the stay. But perhaps the most important factor counseling in favor of staying this matter is the interest in preserving judicial economy and avoiding the risk of inconsistent adjudications. Considering these factors together, we find a stay is warranted in this action.

### III.     MOTION TO BIFURCATE

Having determined that a stay is warranted, the Court must now decide whether to allow proceedings relating to class certification to move forward.

####      A.     *Legal Standard*

The Court has discretion to bifurcate class and merits discovery on a showing that bifurcation would promote interests in expediency and economy. *See* Fed. R. Civ. P. 42(b); *see also Wesley v. Samsung Elecs. Am., Inc.*, Civil Action No. 20-18629-JMV-AME, 2022 WL 2870200, at *2 (D.N.J. July 21, 2022) ("The Court, in its discretion, may bifurcate discovery . . .

---

[5] Should the DOJ Action's trial date of September 18, 2023, be continued, Plaintiff may move the Court to reconsider the stay in this matter.

upon a demonstration by the moving party that bifurcation will promote judicial economy and not prejudice the non-moving parties."). Courts generally allow bifurcation where it "serves the interests of fairness and efficiency." *See In re Plastics Additives Antitrust Litig.*, No. Civ. A. 03–2038, 2004 WL 2743591, at *2 (E.D. Pa. Nov. 29, 2004). "Accordingly, . . . the prime considerations in whether bifurcation is efficient and fair include whether merits-based discovery is sufficiently intermingled with class-based discovery and whether the litigation is likely to continue absent class certification." *Conner v. Perdue Farms, Inc.*, Civil Action No. 11–888 (MAS)(LHG), 2013 WL 5977361, at *3 (D.N.J. Nov. 7, 2013).

### B.     Analysis

Defendants argue the Court should bifurcate discovery because "[p]roceeding with class certification now is not only practicable, but will actually increase the interests of judicial economy." (Doc. No. 83-1 at 19.) Plaintiff opposes the request to bifurcate, arguing that it "will serve only to needlessly complicate matters to Plaintiff's detriment," especially given the potential overlap between class certification and merits issues. (Doc. No. 84 at 18.) The Court agrees with Defendants—despite the stay, class certification should move forward.

Permitting class certification proceedings to move forward promotes interests of fairness and efficiency. As an initial matter, Federal Rule of Civil Procedure 23(c)(1)(A) requires the Court to determine whether to certify an action as a class action "[a]t an *early practicable time* after a person sues . . . as a class representative." Fed. R. Civ. P. 23(c)(1)(A) (emphasis added). Similarly, Local Rule of Civil Procedure 23.1(c) requires the Court to "issue an order scheduling all proceedings relating to the filing of the motion for class certification" "*[a]s early as practicable*." E.D. Pa. Loc. R. 23.1(c) (emphasis added). Bifurcation permits the Court to do just that—certify as class as early as practicable. *See Conner*, 2013 WL 5977361, at *4 ("[I]n light of the mandate set forth in the Federal Rules, requiring that class certification must be made

as soon as possible after commencement of the action . . . , the Court is wary of permitting additional delays in the motion for class certification. For these reasons, the Court finds that reasons of fairness and efficiency counsel in favor of bifurcating discovery.")

Further, two of the primary issues on class certification are whether Plaintiffs can fairly and adequately protect the interests of the purported class and whether Defendants' alleged misstatements actually affected the price of Teva's securities. (*See* Doc. No. 83-1 at 19.) Neither of these issues bear directly on any issues to be resolved in the DOJ Action. (*Id.*) The Court acknowledges certain other issues are likely relevant to both class and merits discovery, but Plaintiff's concerns that bifurcation will force duplicative discovery are unfounded. Defendants' counsel has agreed not to request duplicative discovery: if they request a category of documents in class discovery, they will not request the same category in merits discovery; if they depose an individual in the class discovery phase, they will not seek to depose the same individual in the merits discovery phase. Moreover, if the Court ultimately deems class certification inappropriate, Plaintiff may no longer be motivated to continue litigating this action. (*Id.*)

Given the interest in certifying a class "as early as practicable," the fact that duplicative discovery is not a major concern, and the fact that this litigation may not continue if a class is certified, the Could finds that bifurcation is appropriate, and discovery and briefing into class certification should continue despite the stay. *See Conner*, 2013 WL 5977361, at *4–7 (bifurcating class and merits discovery); *Golden Quality Ice Cream*, 87 F.R.D. at 59–60 (permitting the plaintiffs to "move forward promptly on the class certification issue" in spite of stay in order to give the court "a leg up on this first order of business"); *see also Lee v. Lamas*, CIVIL ACTION NO. 19-241, 2021 WL 2351962, at *2 & n.15 (E.D. Pa. June 9, 2021)

(illustrating that discovery was bifurcated between "class certification discovery" and "merits discovery"); *Anthony v. Small Tube Mfg. Corp.*, 580 F. Supp. 2d 409, 412 (E.D. Pa. Sept. 30, 2008) (same).

## IV.    CONCLUSION

For these reasons, Defendants' motion is granted, and this action is stayed (except as to class certification) pending the resolution of the DOJ Action. An appropriate Order follows.