# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD.,**<br><br>Plaintiff,<br><br>*v.*<br><br>**TEVA PHARMACEUTICALS INDUSTRIES LIMITED, et al.,**<br><br>Defendants. | **CIVIL ACTION**<br><br>**NO. 20-4660-KSM** |

## <u>MEMORANDUM</u>

Marston, J.                                                                November 3, 2023

## Contents

I.      Introduction .................................................................................................................. 1

II.     Background .................................................................................................................. 1

    A.   Teva's Business ..................................................................................................... 1

    B.   Shared Solutions Program .................................................................................... 2

    C.   The DOJ Subpoena ................................................................................................ 3

    D.   The DOJ Action .................................................................................................... 4

III.    Procedural History ....................................................................................................... 4

IV.     Discussion .................................................................................................................... 6

    A.   Legal Standard ...................................................................................................... 6

    B.   Class Definition and Ascertainability ................................................................... 7

        1.   Overlap with *Ontario* Settlement Class ......................................................... 8

        2.   Applicability of *Morrison* .............................................................................. 15

    C.   Rule 23(a) ............................................................................................................. 20

        1.   Numerosity ...................................................................................................... 21

        2.   Commonality .................................................................................................... 22

      3.     Typicality .................................................................................................... 22

      4.     Adequacy .................................................................................................... 28

   D.    Rule 23(b) ............................................................................................................ 34

    1.     Predominance ............................................................................................ 35

    2.     Superiority ................................................................................................. 54

V.   Conclusion ................................................................................................................... 55

## I.      Introduction

Lead Plaintiff Gerald Forsythe, individually and on behalf of all others similarly situated, alleges that Teva Pharmaceuticals Industries Limited ("Teva") and Teva executives Erez Vigodman, Eyal Desheh, Robert Koremans, Michael Derkacz, Kåre Schultz, Michael McClellan, and Brendan O'Grady (collectively, the "Individual Defendants," and together with Teva, "Defendants") violated Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 by making false and misleading statements and by failing to disclose material information about Teva's specialty drug Copaxone.  (Doc. No. 1.)  Plaintiff also claims that the Individual Defendants violated Section 20(a) of the Exchange Act because they knew or recklessly disregarded that Teva was making materially false and misleading statements and material omissions.  (*Id.* ¶¶ 249–254.)  Presently before the Court is Plaintiff's Motion to Certify the Class.  (Doc. No. 90.)  For the reasons below, the Court grants the motion for class certification.

## II.      Background

### A.  Teva's Business[1]

Teva is a global pharmaceutical company that sells generics, specialty medicines, and over-the-counter products.  (Doc. No. 64-2 ¶ 27.)  Teva shares are dual-listed on the New York Stock Exchange ("NYSE") and the Tel Aviv Stock Exchange ("TASE").  (Doc. No. 90-1 at 12.)  Shares purchased on the NYSE are American Depository Shares ("ADSs"), and shares purchased on the TASE are labeled "ordinary shares."  (*Id.*)  Each ADS represents one ordinary

---

[1] Because the Court has previously described the factual background extensively in several prior memoranda (*see, e.g.*, Doc. No. 74), the Court will only briefly summarize it here.

share.  (*Id.*)  One of Teva's primary products is the specialty drug, Copaxone (glatiramer acetate injection), an injectable drug used to treat patients with multiple sclerosis.  (*Id.* ¶ 28-29.)

### B.  Shared Solutions Program

Teva sponsors "Shared Solutions," a program designed to increase patient access to Copaxone.  (*Id.* ¶ 41.)  Through the program, Teva trains patients on how to inject the drug, offers patients injection devices to administer the drug, and assigns patients case managers who help patients secure insurance coverage for the drug.  (*Id.*)  In 2006, in connection with the Shared Solutions program, Teva contracted with Advanced Care Scripts, Inc. ("ACS"), a specialty pharmacy.  (*Id.* ¶ 42.)  Teva sent ACS prescriptions for patients participating in Shared Solutions who "either had or were eligible for Medicare Part D coverage."  (*Id.*)  For the patients who did not already have Medicare Part D coverage, ACS assisted with the enrollment process.  (*Id.*)  And for the patients who already had Medicare Part D coverage and were eligible for co-pay coverage from a patient assistance program ("PAP"),[2] ACS helped them apply to a PAP for coverage.  (*Id.*)  Teva also provided free Copaxone to low- or no-income patients; however, if those patients were eligible for Medicare Part D, Teva sent those patients to ACS for assistance enrolling in Medicare Part D or applying for coverage from a PAP.  (Doc. No. 57 ¶ 43.)

ACS referred Teva's Copaxone patients to two PAPs for co-pay assistance: the Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF").  (*Id.* ¶ 42.)  Both CDF and TAF maintained funds dedicated to assisting multiple sclerosis patients, through which they "provided co-pay assistance to patients for, ostensibly, any of the [multiple sclerosis] drugs on the market."  (*Id.*)  Teva regularly donated to both PAPs.  (*Id.*)  Under the applicable regulations,

---

[2] A PAP is a charitable program that provides financial assistance to help patients cover Medicare Part D co-pays. (Doc. No. 57 ¶ 35.)

pharmaceutical companies may donate to PAPs; however, "the funds received through donations must be applied generally to all beneficiaries, and it is illegal for a Charitable PAP to apply the funds received to any particular drug." (*Id.* ¶ 35.)

Teva allegedly ran afoul of those regulations. (*Id.* ¶ 48.) Teva did not intend its donations to CDF and TAF to cover co-payments for multiple sclerosis treatments generally; rather, it intended for its donations to CDF and TAF to only cover patients' co-pays on Copaxone. (*Id.*) Teva's intentions bore out. (*Id.* ¶ 46.) For instance, in December 2009 and January 2010, Teva donated $15.7 million to TAF, "approximately 99% of which was paid to Copaxone patients." (*Id.*) In all, Teva donated tens of millions of dollars annually to CDF and TAF to fund Copaxone co-pays. (*See id.* ¶ 53 (indicating that Teva made the following donations to CDF and TAF: $36,934,678 in 2012, $36,932,589 in 2013, and $34,774,070 in 2014).)

Copaxone patients receiving Medicare co-pay assistance from CDF and TAF made up roughly 27% of patients on Copaxone. (*Id.* ¶ 62.) Teva recognized that if it stopped funding these co-pay assistance programs, the patients "may not fill Rx and go off therapy, which would result in a negative impact to the brand of $210-280M." (*Id.*) While Teva was donating to CDF and TAF, it "raised the price of Copaxone at a rate . . . over 19 times the rate of inflation, from approximately $17,000 per year to $73,000 per year." (*Id.* ¶ 69.)

### C. The DOJ Subpoena

On March 21, 2017, the United States Attorney's Office for the District of Massachusetts subpoenaed Teva for information about the company's donations to charitable organizations, including PAPs. (*Id.* ¶ 118.) Teva disclosed the subpoena in its next Form 6-K filed on May 11, 2017. (Doc. No. 67 at 39.) Despite receiving this subpoena, Teva continued operating the

Shared Solutions program and making donations to CDF and TAF through at least 2018.  (Doc. No. 64-2 ¶ 120.)  Plaintiff alleges that both before and after receiving the subpoena, Teva made various misrepresentations regarding Copaxone and Teva's Shared Solutions program.  Plaintiff alleges that Teva never disclosed its scheme to make "Copaxone donations" to PAPs.  (*See, e.g.*, *id.* ¶ 71.)

### D.  The DOJ Action

On August 18, 2020, the U.S. Attorney's Office for the District of Massachusetts filed a complaint ("DOJ complaint") against Teva for alleged violations of the False Claims Act.[3]  (*Id.* ¶ 168.)  In the DOJ complaint, the Government contends that Teva's payments to CDF and TAF were "kickbacks" that allowed the company to increase the price of Copaxone while leaving the "American taxpayers to shoulder the high prices that Teva set."  (*Id.*)  Plaintiff alleges that the DOJ complaint is the corrective disclosure which revealed Teva's Copaxone scheme to the market.  (*Id.*)

### III.   **Procedural History**

On September 23, 2020, Halman Aldubi Provident and Pension Funds Ltd. ("Halman Aldubi") commenced this lawsuit individually and on behalf of all others similarly situated.[4]  It alleged that Teva committed securities fraud by making false and misleading statements regarding Copaxone and its Shared Solutions program under an "artificial inflation maintenance"

---

[3] On July 14, 2023, the Honorable Nathaniel M. Gorton denied Teva's motion for summary judgment and granted the government's motion for partial summary judgment.  *See* Mem. And Order (Doc. No. 195), *United States v. Teva Pharms. USA, Inc.*, Civil Action No. 1:20-cv-11548-NMG (D. Mass. July 14, 2023).  Subsequently, Judge Gorton allowed Teva's motion to certify the question of whether the government "must demonstrate a but-for causal connection between Teva's donations to CDF and TAF and the resulting co-pay assisted Copaxone claim that Medicare reimbursed," for interlocutory appeal. (Doc. No. 112-1 at 6.)  Presently, this motion is pending before the First Circuit Court of Appeals.

[4] On March 1, 2021, this case was reassigned from the calendar of the Honorable Jan E. DuBois to the docket of the Honorable Karen Spencer Marston.  (Doc. No. 37.)

4

theory.[5]  (Doc. No. 1.)  On March 26, 2021, the Court named The Investor Group, consisting

only of Gerald Forsythe, as lead plaintiff and appointed Faruqi & Faruqi, LLP as lead counsel.

*See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 529 F. Supp.

3d 385, 411 (E.D. Pa. 2021)*.*

  Plaintiff's operative complaint, the Corrected Amended Complaint, was filed on August

10, 2021.  (Doc. Nos. 64-2, 65.)  Defendants filed a motion to dismiss (Doc. No. 66), which the

Court granted in part and denied in part in March 2022.  (Doc. No. 74.)  The Court granted the

motion only as to one individual defendant, Eli Kalif.  (*Id.* at 41.)  The Court held that while

Defendants did not have an affirmative duty to disclose illegal activity, Plaintiff sufficiently

alleged that Teva repeatedly attributed Copaxone's success to legitimate business factors, thus

requiring disclosure of the scheme.  (*Id.* at 20.)  And, in analyzing three categories of

misrepresentations alleged by Plaintiff, the Court held that one category—statements relating to

Teva's compliance with federal law—was not materially misleading.  (*Id.* at 24-25.)

  Plaintiff now seeks certification of the following class: "All persons or entities that

purchased or otherwise acquired Teva securities between October 29, 2015 and August 18, 2020,

inclusive, and were damaged thereby."  (Doc. No. 90-1 at 8.)  Plaintiff also requests appointment

as class representative and appointment of Faruqi & Faruqi, LLP as lead counsel.  Defendants

oppose certification on three grounds:  (1) Plaintiff's proposed class is overly broad; (2) Plaintiff

is not an adequate class representative; and (3) Plaintiff fails to provide a method to calculate

class-wide damages that matches Plaintiff's theory of liability.  (Doc. No. 101-1.)

---

[5] Plaintiff alleges that "Defendants' misrepresentations maintained Teva's stock price at artificially
inflated levels, and the stock price declined when the truth emerged causing financial loss to Plaintiff and
the class."  (Doc. No. 102 at 18 (cleaned up).)

# IV.     Discussion

## A.  Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes,* 564 U.S. 338, 348 (2011) (internal citation omitted).  To invoke this exception, every putative class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(2) or (b)(3). *See* Fed. R. Civ. P. 23(a)–(b).  Rule 23(a) requires that (1) the class be so numerous that joinder is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

Plaintiff bears the burden of proving the prerequisites to class certification are met and that the class fits within one of the 23(b) categories.  *Marcus*, 687 F.3d at 591.  Plaintiff relies on Rule 23(b)(3) as the basis for certification.  (Doc. No. 90 at 16–29.)  Rule 23(b)(3) requires that common class questions predominate over questions affecting only individual members and that the class action mechanism be superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  "Although the plaintiff need not establish the merits of his case at this stage, the Third Circuit has held that '[a]n overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes when necessary to determine whether a class certification requirement is met.'" *Suboxone*, 421 F. Supp. 3d at 45–46 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008)).  Ultimately, class certification is "proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Hydrogen*

*Peroxide*, 552 F.3d at 309 (cleaned up).

Before considering Rule 23(a) and Rule 23(b)(3), the Court must determine two matters. First, that the class has clearly defined parameters and claims to be given class treatment as required by Rule 23(c)(1)(B). *Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 593 (3d Cir. 2012). Second, that the class is currently and readily ascertainable based on objective criteria. *Id.* The Court will begin with the class definition and ascertainability requirements before turning to the Rule 23(a) and Rule 23(b)(3) requirements.

### B.  Class Definition and Ascertainability

Plaintiff moves to certify a Rule 23(b)(3) class under the following definition:

> All persons or entities that purchased or otherwise acquired Teva securities between October 29, 2015 and August 18, 2020, inclusive, and were damaged thereby.  Excluded from the Class are the Defendants; the officers, directors, and affiliates of Teva, at all relevant times; Teva's employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Teva securities through any such plan(s); any entity in which Defendants have or had controlling interest; immediate family members of any excluded person; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

(Doc. No. 90-1 at 8.)  The plaintiff has the burden of showing, by a preponderance of the evidence, that "(1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"  *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)).  Courts have discussed three reasons for this standard.  "First, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class.  Second, it ensures that a defendant's rights are protected by the class action mechanism, and that those persons who

will be bound by the final judgment are clearly identifiable.  Finally, it ensures that the parties

can identify class members in a manner consistent with the efficiencies of a class action."  *City*

*Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 439 (3d Cir. 2017) (cleaned

up).

Plaintiff contends that his proposed class definition's reference to "Teva securities"

includes both Teva's ADSs, which are publicly traded on the NYSE, and Teva's ordinary shares,

which are publicly traded on the TASE.  (Doc. No. 102 at 11, n.4.)  Defendants object to this

class definition and argue that the Court should deny or, at a minimum, narrow Plaintiff's

proposed class for two reasons: (1) Plaintiff released his current claims as part of a settlement of

a separate class action lawsuit brought by the Ontario Teachers' Pension Plan Board and

Anchorage Police & Fire Retirement System in the District of Connecticut (referred to herein as

the *Ontario* litigation) (Doc. No. 101-1 at 16–18); and (2) Plaintiff impermissibly seeks to

expand Plaintiff's class to include holders of ordinary shares which only trade on the TASE.  (*Id.*

at 18–20).  The Court addresses each argument in turn.

### 1.  Overlap with *Ontario* Settlement Class

In November 2016, the *Ontario* plaintiffs filed a class action against Teva and certain

individual defendants present in this case.  *Ontario Teachers' Pension Plan Bd. v. Teva Pharm.*

*Indus. Ltd.*, 432 F. Supp. 3d 131, 145 (D. Conn. 2019).  The *Ontario* complaint alleged that

between February 6, 2014 and May 10, 2019, the defendants misrepresented the reasons for

Teva's financial success, when in reality the reason was that Teva was "artificially and

collusively inflating the prices of certain generic drugs that it manufactured."  *In re Teva Sec.*

*Litig.*, No. 3:17-cv-558 (SRU), 2021 WL 872156, at *1 (D. Conn. Mar. 9, 2021); (Doc. No. 101-

1 at 16).  On January 18, 2022, the *Ontario* case settled with a comprehensive settlement

release.[6]  (Doc. No. 101-5.)

Defendants concede that the claims in the two cases are different (Doc. No. 101-1 at 17

---

[6] "Released Claims" in the settlement is defined as:

> any and all claims, rights, actions, issues, controversies, causes of action, duties, obligations, demands, actions, debts, sums of money, suits, contracts, agreements, promises, damages, and liabilities of every kind, nature and description (including Unknown Claims as defined in ¶ 1.41 herein) whether arising under federal, state or foreign law, or statutory, common or administrative law, or any other law, rule or regulation, whether asserted as claims, cross-claims, counterclaims or third party claims, whether fixed or contingent, choate or inchoate, accrued or not accrued, matured or unmatured, liquidated or un-liquidated, perfected or unperfected, whether class or individual in nature, that previously existed, currently exist, exist as of the date of the Court approval of the Settlement or that may arise in the future, that Class Representatives or any other member of the Settlement Class asserted in the Second Amended Consolidated Class Action Complaint (ECF 310) or could have asserted in the Litigation or in any other action or in any forum (including, without limitation, any federal or state court, or in any other court, arbitration proceeding, administrative agency or other forum, in the U.S. or elsewhere) that in any way arise out of, are based upon, relate to or concern the claims, allegations, transactions, facts, circumstances, events, acts, disclosures, statements, representations, omissions or failures to act alleged, set forth, referred to, involved in, or which could have been raised in the Litigation or the Complaint, and that in any way arise out of, are based upon, relate to or concern the purchase or acquisition of Teva Securities during the Class Period, including, without limitation, claims that arise out of or relate to any disclosures (including in financial statements), U.S. Securities and Exchange Commission filings, press releases, investor calls, registration statements, offering memoranda, web postings, presentations or any other statements by Defendants during the Class Period. Released Claims do not include any claims asserted by Direct Action Plaintiffs who have not both (i) dismissed their claims and (ii) sought to be included in the Settlement Class by timely submitting a completed Proof of Claim and Release. Released Claims also do not include claims to enforce the settlement and the Stipulation, any and all claims against Defendants currently pending in the courts of Israel based on purchases of common stock trading on the Tel Aviv Stock Exchange, or any claims brought derivatively. For the avoidance of doubt, such non-released claims include those asserted in *Gat et al. v. Teva Pharmaceutical Industries Ltd., et al.*, No. 17017-11-16 (Tel Aviv – Jaffa District), *Lightcom (Israel) Ltd. et al. v. Teva Pharmaceutical Industries Ltd., et al.*, No. 5407-09-17 (Tel Aviv – Jaffa District), and the derivative actions consolidated in Israel as *Schneider v. Teva Pharmaceutical Industries Ltd., et al.*, No. 1944-03-20.

(Doc. No. 101-5, ¶ 1.25.)

("Although the claims in the two cases are different . . . .")); however, Defendants argue that under the "plain terms" of the *Ontario* release, Plaintiff's claims are barred. (*Id.*) Defendants argue the broad language of the release requires the Court to "reject or substantially narrow the proposed class."[7] (*Id.* at 16.) In making this argument, Defendants rely on Plaintiff's admission during his deposition that the claims in the instant action arise out of or are related to the same disclosures that were at issue in the *Ontario* case. (*Id.* at 17.)

Plaintiff disagrees with Defendants' overly broad interpretation of the *Ontario* release. (Doc. No. 102 at 7–8.) Plaintiff states the *Ontario* release only applies to claims that: (1) were asserted or could have been asserted in *Ontario*, (2) arise out of circumstances that were alleged or could have been raised in *Ontario*, and (3) arise out of the purchase of Teva securities during the class period. (*Id.* at 7–9.) Plaintiff argues his claims do not meet the first and second criteria. (*Id.* at 8.) And Plaintiff claims that even if the release could arguably be read to include Plaintiff's claims, the release does not bar this action because the two cases do not share an "identical factual predicate." (*Id.* at 9.)

For purposes of determining if the identical factual predicate doctrine applies here, the Court assumes without deciding that the *Ontario* release encompasses Plaintiff's claims in this case. To determine whether a class plaintiff's subsequent claims are barred by a previous class settlement release, the Third Circuit has stated that, "[t]he key inquiry is whether the factual predicate for future claims is identical to the factual predicate underlying the settlement agreement." *Freeman v. MML Bay State Life Ins. Co.*, 445 F. App'x 577, 579 (3d Cir. 2011). The purpose of this doctrine is to guard against "the danger that a class representative not sharing

---

[7] Defendants argue the class period must be narrowed to include only claims that fall outside of the *Ontario* release class period, that is from May 11, 2019 through August 18, 2020. (Doc. No. 101-1 at 18.)

the common interest with other class members [will] endeavor to obtain a better settlement by sacrificing the claims of others at no cost to themselves by throwing the others' claims 'to the winds.' . . . But these concerns are not implicated when the released claim rests on the same factual predicate as the class action claim." *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 462 (2d Cir. 1982).  This doctrine thus "acts as a limitation on a class settlement release." *Scott*, 2015 WL 8764491, at *4; *see also Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994) (the identical factual predicate doctrine "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action") (cleaned up).

Although Defendants argue that the "factual predicate [aspect of Plaintiff's argument] is a red herring," (Hr'g Tr. at 124:3-5), the Court disagrees.[8]  Applying the doctrine to the *Ontario* litigation and Plaintiff's instant case, the Court concludes the claims here do not share the necessary "identical factual predicate."

In *Ontario*, the plaintiffs alleged that the defendants misrepresented that their "financial success was due to good business decisions, and not because of pricing, when, in fact, they were consistently raising prices of many of their generic drugs."  *In re Teva Sec. Litig.*, 432 F. Supp. at 146.  The plaintiffs also alleged that the defendants "misrepresented that the generics market was

---

[8] Although the *Ontario* settlement agreement is a contract that should be interpreted according to the law of contracts of the state of New York, the identical factual predicate doctrine serves as a limitation on the applicability of the settlement release.  (*See* Doc. No. 101-5, ¶ 8.20 ("[This *Ontario* settlement release] shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of New York")); *see also Pyle v. N.Y. Life Ins. Co.*, No. 07-00360, 2008 WL 11510607, at *44 (W.D. Pa. Mar. 19, 2008) ("A settlement agreement is a contract and, therefore, is to be interpreted as such according to the law of contracts of the state of New York."); *Reorganized FLI, Inc. v. Oneok, Inc.* 725 F. App'x 560, 562–64 (9th Cir. 2018) ("Therefore, the language of the NYMEX Releases is broad enough to encompass RFLI's instant claims.  The NYMEX Releases are nonetheless not enforceable against RFLI under the so-called 'identical factual predicate' rule."); *Scott*, 2015 WL 8764491, at *3–4 (providing that the identical factual predicate doctrine "acts as a limitation on a class settlement release").

highly competitive when, in fact, the defendants and its competitors were engaged in a collusive agreement to raise prices, further inflating Teva's profits," what the plaintiffs referred to as a "price-fixing conspiracy." *Id.* Finally, the plaintiffs in *Ontario* alleged that Teva was the subject of numerous investigations into its pricing and profits, but concealed that information from the public and investors. *Id.*

Here, Plaintiff's claims involve very different facts. Plaintiff does not allege misrepresentations relating to an alleged price fixing conspiracy. Plaintiff does not allege that Teva failed to disclose to investors information about the success of its *generic* drugs. And, Plaintiff does not allege that Teva concealed information regarding government investigations into its pricing and profits. Rather, Plaintiff's case relies on an alleged scheme relating to Teva's *charitable contributions* to funnel funds to *specialty drug* (Copaxone) patients. *See supra* Section II.

The only similarity between *Ontario* and the instant case is that during the overlapping time period,[9] the claims in both cases rely on some of the same SEC filings, press releases, presentations and other disclosures relating to the Plaintiff's same purchase of Teva shares.[10] But there is no substantial overlap as to the material misrepresentations and omissions relied upon in the two cases. The Court finds that this case is easily analogized to *Scott v. Bimbo*

---

[9] The *Ontario* class and the putative class in this action overlap from October 29, 2015 through May 10, 2019. (*See* Doc. No. 101-1 at 18.)

[10] Although during oral argument Defendants stated that 24 of the 49 misstatements which took place during overlapping time period "appear in the exact same SEC filings, press releases, et cetera," (Hr'g Tr. 125:13-20), Defendants do not provide any exhibits to substantiate this claim. Instead, Defendants rely solely on Mr. Forsythe's deposition testimony where he agreed that his claims "arise out of or relate to . . . disclosures (including in financial statements), [SEC] filings, press releases, investor calls . . . , presentations or any other statements by Defendants during the [*Ontario*] Class Period," and are clearly "based upon, relate to or concern the purchase or acquisition of Teva Securities during the [*Ontario*] Class Period." (Doc. No. 101-1 at 17.)

*Bakeries*, which held that even though the present case involved the same distribution agreement that was the subject of a previous settlement release, the new claims were not barred because "the events giving rise to the allegations [in the previous case] were completely separate and distinct from those in [the present case.]" 2015 WL 8764491, at *4–5.  The plaintiffs in an earlier collective action case had alleged that the defendants improperly classified them as independent operators when in actuality they were employees.  *Id.* at *5.  In *Scott*, by contrast, the plaintiff alleged that the defendants breached the implied covenant of good faith and fair dealing under state law because the defendants allegedly forced the plaintiff to lower his sale price for his distribution route.  *Id.*  None of the *Scott* plaintiff's factual allegations had "anything to do with his status as an employee, the number of hours he worked . . . , his rate of pay, his ability to sell competing products, or his adherence to certain unwritten policies imposed by [defendants]."  *Id.*  "The only similarity between [the two cases] is that the Distribution Agreement established the contractual relationship between the parties.  However, that does not also mean that the cases share an 'identical factual predicate.'"[11]  *Id.*  The court in *Scott* thus held that the two cases did

---

[11] Defendants' emphasis on *Freeman* is inapposite.  In *Freeman*, the Third Circuit held that the plaintiff's claims relating to defendant insurance company's breach of the express terms of the insurance policy were barred under a previous class action settlement release.  *Freeman*, 445 F. App'x at 580.  In *Freeman*, the earlier class action asserted ten causes of action, including breach of express and implied contract, challenging several of defendants' practices, including "improper practices in marketing, selling, servicing, and administering permanent and term life insurance as well as disability income insurance policies."  *Id.* at 579 n.4.  The class members agreed to a comprehensive settlement release in the earlier litigation. Crucially, the settlement release stated that "it is the intention of … the Class Members in executing this Release fully, finally, and forever [to] settle . . . all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed … with respect to their Policies…."  *Id.* at 578.  In the later suit at issue in *Freeman*, the plaintiff alleged that the defendant breached the terms of the same insurance policy "by deducting as mortality charges, amounts unrelated to mortality."  *Id.* at 579.  Although the plaintiff in the new case argued that the present claim was not barred by the release because the claims do not share the same factual predicate, the Third Circuit held that the new claims were barred by the previous release because "the fact that the plaintiffs [in the previous case] were challenging different [of defendants'] practices with respect to the policies does not mean that the factual predicates are different.  The settlement does not define of the scope of the Release by reference to the claims alleged in [previous] complaint, but rather, extends to the extensive list of released transactions partially

not share the necessary identical factual predicate because the events giving rise to the allegations in the new case "were completely separate and distinct" from those in the original case. *Id.*

Here, Plaintiff's claims are also "completely separate and distinct" from the *Ontario* claims. In *Ontario*, the complaint alleged that Teva misrepresented its financial success based on good business decisions, when in fact it was "*artificially and collusively inflating the prices of certain generic drugs that it manufactured.*" *In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), 2021 WL 872156, at *1 (D. Conn. Mar. 9, 2021) (emphasis added). Plaintiff's complaint in this case alleges that Teva misrepresented the reasons for the success of a *nongeneric* specialty drug, Copaxone; he alleges that Teva concealed information regarding its scheme to donate money to charities specifically to cover Copaxone patients' copay, allegedly in violation of the Anti-Kickback statute. (Doc. No. 74 at 3.) Although investors brought both claims against Teva under Section 10b-5 of the Securities Exchange Act, the underlying conduct does not overlap in any respect with *Ontario*—conduct implicating federal antitrust laws, versus conduct implicating federal anti-kickback statutes. In fact, as this Court discussed in its memorandum appointing Plaintiff as class representative, the two cases rest on contradictory theories when it comes to calculating damages: "The reality is that the parties to [*Ontario*] have an incentive to argue that

recounted *supra*. [Plaintiff here] seeks to challenge precisely what he is barred from challenging by the Release, to wit, the amount or calculation of charges." *Id.* at 579–80.

Here, the connection between the *Ontario* class settlement and the current class claims is far more attenuated. In *Freeman* the two cases involved calculations of administrative charges under the same insurance agreement. *Id.* Here, both cases involve Plaintiff's purchase of Teva stock and rely on some of the same SEC filings and related disclosures, but the similarities end there.

And, the Third Circuit in *Freeman* emphasized that the current plaintiff's claims were barred because the release did not define its scope by reference to the claims alleged in the previous complaint. *Id.* The release at issue here clearly defines the scope with reference to the claims alleged in *Ontario*. (Doc. No. 101-5, ¶ 1.25.)

Teva's statements partially disclosing its alleged violation of antitrust laws deflated its share prices. And, to maximize their damages, they have an incentive to argue that the deflationary impact of those statements was as high as possible. In this matter, however, the putative class has an incentive to argue that some of the statements at issue in [*Ontario*] inflated Teva's share prices by not disclosing Teva's alleged involvement in a kickback scheme." (Doc. No. 55 at 16; *see supra* n.5.) The fact that one case rests on a theory of price deflation and another rests on price inflation further highlights how this case does not share a factual predicate with *Ontario*.

After considering the claims in both cases and the conflicting theories of liability, the Court finds that Plaintiff's claims here do not share the necessary identical factual predicate as the underlying factual allegations in *Ontario*.[12] Thus, the Court concludes that Plaintiff's claims are not barred by the *Ontario* settlement release.[13]

## 2. Applicability of *Morrison*

Next, Defendants assert that the class definition should exclude purchasers of ordinary shares based on the Supreme Court's holding in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010). (Doc. No. 101-1 at 18–19.) As discussed above, Teva's shares are dual-listed on the NYSE and the TASE. (Doc. No. 90-1 at 12.) Shares purchased on the NYSE are

---

[12] If the *Ontario* release barred Plaintiff's claims in this case simply because Plaintiff relied on the same purchase of Teva stock, then Defendants could hypothetically bar *any* future securities class actions that arise during the same time period. This cannot be the case. *See Scott*, 2015 WL 8764491, at *6 (citing *TBK Partners, Ltd.*, 675 F.2d at 462 ("Application of these principles to this case would mean that every class plaintiff would have released any claim stemming from the Distribution Agreement because the operative language of Paragraph 1.18 released claims 'that otherwise [arose] out of, related to, or [were] in connection with, the Distribution Agreement.' However, the unique policy considerations at work in class settlements—which are not present in ordinary settlement release provisions—require an added layer of protection to ensure that an individual class plaintiff's interests are not thrown 'to the winds.'")).

[13] Because the Court finds the identical factual predicate bars the *Ontario* release's applicability, the Court does not need to reach the issue of whether Plaintiff's claims arose out of or could have been asserted in the *Ontario* litigation.

ADSs, and shares purchased on the TASE are labeled "ordinary shares."  (*Id.*)  Each ADS represents one ordinary share.  (*Id.*)  "Trading in dual-listed stocks is completely seamless. . . . Dual-listed securities thus can be purchased on one market and sold on the other to take advantage of trading hours or arbitrage opportunities."  (Doc. No. 90-4 at ¶¶ 50–51.)

Plaintiff acknowledges that *Morrison* held that U.S. securities law applies only to transactions in securities listed on domestic exchanges and domestic transactions, but he argues that the facts in this case are distinguishable.  (Doc. No. 102 at 11–12.)  Plaintiff offers Israeli law expert, Dr. Amir Licht, to support his argument that *Morrison* should not serve as an obstacle to the inclusion of the ordinary share members in the class.  (Doc. No. 90-4.)  Plaintiff also points to case law—albeit, in a different procedural posture—as further support that *Morrison* is distinguishable here.  *See In re Verifone Holdings, Inc. Sec. Litig.*, C-07-6140 EMC, 2014 WL 12646027, at *3 (N.D. Cal. Feb. 18, 2014) (holding that *Morrison* did not deprive the court of its ability to approve the class settlement which included a general release of all claims, including those of Israeli investors based on foreign law); *In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 357 (D. Conn. 2021) (holding that *Morrison* did not preclude the court's exercise of supplemental jurisdiction over the Israeli plaintiffs' Israeli law securities claims).

In *Morrison*, the Supreme Court held that Section 10(b) of the Exchange Act does not provide an extraterritorial cause of action.  561 U.S. at 267.  A plaintiff can allege a Section 10(b) violation only based on "transactions in securities listed on domestic exchanges, and domestic transactions in other securities."  *Id.*  The policy reasoning for this decision included concerns for international comity and the goal of minimizing interference in foreign securities regulation, since other countries may have different regulations as to what constitutes fraud, what disclosures must be made, what damages are recoverable, etc.  *See id.* at 269 ("[Foreign

countries submitting amicus briefs] all complain of the interference with foreign securities regulation that application of § 10(b) abroad would produce, and urge the adoption of a clear test that will avoid that consequence.").

Few courts have addressed whether *Morrison* should apply to cases involving the dual-listing arrangement with Israel's TASE in the traditional class certification context. *See Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 89 (D.N.J. 2019) (certifying a class which included investors who purchased Perrigo stock (1) on the NYSE, and (2) on the TASE, but without any reference to or thoughtful analysis of *Morrison*). *But see CLAL Finance Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*, No. 09 Civ. 2255(TPG), 2011 WL 5331648, at *2 (S.D.N.Y. Sept. 28, 2011) (in a case decided one year after *Morrison*, dismissing the securities claims of the lead plaintiffs because they purchased their stocks on the TASE; however, the court conducted very little analysis beyond the plain language of *Morrison*).

But the district court in *In re Teva Securities Litigation* provides helpful background regarding Israel's dual-listing arrangement, based on evidence provided by the same Israeli law expert offered here, Dr. Licht. The *Teva* court explained the origin of the Israeli dual-listing securities regime:

> In the late 1990s, the TASE had a relatively small market capitalization; as a result, many Israeli companies eschewed listing on the TASE and, instead, listed exclusively on a foreign market's stock exchange. If they listed on the TASE, Israeli companies would have had to comply with two separate legal regimes, one in Israel and one in the country of their other listing, with all the concomitant costs. That was an unattractive proposition, and Israel sought to address the situation by adopting the dual-listing regime. . . . [B]y Israeli statutory law, a dual-listed company's reporting requirements for listing on the TASE are determined entirely by the foreign market's reporting and disclosure requirements.[14]   Thus, Israel

---

[14] Dual-listed companies submit disclosures in exactly the same format for Israel and abroad.  (Doc. No. 90-3 at ¶ 26, n.35.)

> intentionally adopted a dual-listing regime that includes **explicit concessions on its sovereignty by subordinating its jurisdiction** to prescribe, to adjudicate, and to enforce relevant securities laws and anti-fraud statutes to that of foreign jurisdictions, including the United States.

512 F. Supp. at 341 (emphasis added) (internal citations omitted).

Here, Dr. Licht also supports Plaintiff's argument that *Morrison* should not exclude the ordinary shareholders from the class definition. Dr. Licht explains that the Israel Securities Authority ("ISA") submitted a comment letter to the SEC in 2011 reflecting its view that *Morrison*'s reasoning applies poorly to Israeli dual-listed companies. (Doc. No. 90-4 at ¶ 64). The ISA letter states, "[A]ny argument that hearing a claim in the US constitutes unreasonable interference with foreign sovereignty ignores both the essence and the practical consequences of the dual listing arrangement." (*Id.*) Dr. Licht also asserts that Israeli law mandates that Israeli courts deciding Israeli securities law claims *must* apply U.S. securities law in their analysis. (Doc. No. 90-4 at ¶¶ 56–57, 59, 71, 83.) (*See also id.* ¶ 55 (citing Class Action (CT) 3912-01-08 Verifone Holdings, Inc. v. Stern (2008) (Isr.) "the Israeli legal system shall serve as 'a second fiddle' as opposed to the foreign legal system, primarily the American legal system.")). The court in *Teva* agreed: "[I]t is settled as a matter of Israeli law that United States securities law establishes civil liability under the ISL, 1968. . . . At least three Israeli district courts—*Verifone I*, *Damti*, and *Tower*—have reached that conclusion. Further the Israeli Supreme Court has now said that the *Damti* and *Tower* district courts were correct 'when they ruled with respect to the application of the foreign law.'" *In re Teva Sec. Litig.*, 512 F. Supp. at 358.

The Court finds persuasive these policy considerations and the fact that Israeli law requires application of U.S. law, and concludes that the facts here are distinguishable from *Morrison*. *Morrison* did not consider the applicability of Section 10(b) of the Securities

Exchange Act in the unique circumstance of a security dual-listed between the United States and Israel. Instead, *Morrison*'s stated concerns for its holding—nonintervention in foreign securities regulation—have been mitigated entirely by the Israeli Supreme Court's ruling that U.S. substantive law governs Israeli securities law claims. *In re Teva Sec. Litig.*, 512 F. Supp. at 358. Defendants argue that *In re Teva* and *Verifone* do not apply because this case does not involve Israeli securities law claims. But Israel's absolute deference to U.S. substantive law is still relevant because the class seeks to include purchasers of ordinary shares sold only on the TASE, who would otherwise only bring Israeli law claims. (*See also* Doc. No. 90-4 at ¶ 14 ("The unique legal framework created by the Israeli dual listing regime is thus independent from the regime created by the U.S. Supreme Court in *Morrison v. National Australia Bank.* In this setting, by virtue of *its* application of U.S. law, Israeli law grants a U.S.-law cause of action regarding dual-listed securities purchased in Israel, while deferring to—and in fact preferring—the U.S. courts' jurisdiction. Comity considerations thus militate *for* adjudicating disputes over such securities in the United States.").)

Last, Defendants argue that the class definition should not include purchasers of ordinary shares because Plaintiff failed to specifically use the term "ordinary share" in the complaint. (Doc. No. 101-1 at 18.) The complaint alleges that the class includes "all those who purchased or otherwise acquired Teva *securities* during the Class Period." (Doc. No. 64-2 at ¶ 219; Doc. No. 102 at 11 (emphasis added).) And the complaint states that during the class period, "Teva *securities* were actively traded on the NYSE *and the TASE*." (*Id.* (emphasis added).) The Court finds that these allegations provide sufficient notice to Defendants that the class includes both ADS and ordinary share purchasers.[15] *See also* Compl. (Doc. No. 1), at ¶ 42, *Roofer's Pension*

---

[15] Defendants assert that Plaintiff improperly expanded the definition of the class because Plaintiff's

*Fund v. Papa*, 2:16-cv-02805-MCA-LDW (D.N.J. May 18, 2016) (in a putative class action involving both US and Israeli investors, the complaint is brought "on behalf of all persons who purchased the *common stock* of Perrigo during the Class Period.") (emphasis added).

*   *   *

In sum, the Court finds the *Ontario* settlement release does not bar Plaintiff's claims and *Morrison* is distinguishable from the facts in the instant case.  Plaintiff's class definition is clear and properly includes all persons or entities that purchased or otherwise acquired Teva securities, including ADSs on the NYSE and ordinary shares on the TASE, between October 29, 2015 and August 18, 2020, inclusive.  The class is also ascertainable.  The amount and identities of investors purchasing common stock and ordinary shares in the United States and Israel respectively is recorded.  *See* Order Granting the Plaintiff's Motion for Class Certification (Doc. No. 736) at 19, *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 3:17-cv-00558-SRU (D. Conn. Mar. 9, 2021) ("[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries.  The proposed Class here is ascertainable because records document the purchasers of the relevant Teva securities.") (cleaned up).

## C.  Rule 23(a)

Rule 23(a) requires that (1) the class is so numerous that joinder is impracticable; (2)

---

footnote 2 in the Corrected Amended Complaint says, "Teva's American Depository Receipts ('ADRs') trade on the New York Stock Exchange ('NYSE') and the Tel Aviv Stock Exchange ('TASE') under the symbol 'TEVA.'  For convenience, Teva's ADRs are referred to as 'shares', 'securities', or 'stock'."  (Hr'g Tr. 127:9–14, 138:7–11; Doc. No. 64-2 at ¶ 4 n.2.)  The Court does not interpret this to mean that Plaintiff only intended to include shares purchased on the NYSE.  Plaintiff clearly refers to stocks purchased on the TASE.  Plaintiff further clarified at the class certification hearing that "investors often use the terms ADR, ADSs interchangeably; Courts use those terms interchangeably."  (Hr'g Tr. 102:7–9.)  Plaintiff asserts that "[t]he real key here is that these stocks were both listed, dual-listed on both exchanges and so to own a share of Teva stock which is common parlance, it's very academic whether it's an ADS [or] an ADR."  (*Id.* 133:9–12.)

there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  Defendants challenge only two factors — typicality and adequacy of the named representative.  (Doc. No. 101-1 at 25–31.)  As such, the Court only briefly addresses numerosity and commonality.

### 1. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  There is no minimum number of members required for a suit to proceed as a class action, but a class with at least forty potential plaintiffs generally satisfies the numerosity requirement.  *Marcus*, 687 F.3d at 595.  However, mere speculation is insufficient and Rule 23(a)(1) "requires the examination of the specific facts of the case."  *Id.* at 595–96.  But, the rule does not require a plaintiff to offer direct evidence of the exact number and identities of the class members.  *Id.* at 596.  In the absence of direct evidence, a plaintiff must show sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding.  *Id.*

Here, it is without dispute that the class is sufficiently numerous to warrant class treatment.  More than 850 million Teva ordinary shares and 727 million Teva ADSs were outstanding during the class period, and the average weekly trading volume for Teva ordinary shares and ADSs during the class period was about 4.9 million and 64 million shares respectively.  (Doc. No. 90-1 at 12.)  "This is sufficient to establish by a preponderance of the evidence that there are greater than 40 persons in the proposed class who [purchased or

otherwise acquired Teva securities] during the class period, and therefore that the class is so numerous that joinder of all members is impracticable." *Utesch v. Lannett Co.*, CIVIL ACTION NO. 16-5932, 2021 WL 3560949, at *3 (E.D. Pa. Aug. 12, 2021), *aff'd sub. nom. Univ. of P.R. Ret. Sys. v. Lannett Co.*, No. 21-3150, 2023 WL 2985120 (3d Cir. Apr. 18, 2023).

### 2. Commonality

Rule 23(a)(2) requires there be "questions of law or fact common to the class" in order to certify such a class. Fed. R. Civ. P. 23(a)(2). This commonality requirement "demands that class members' claims 'depend upon a common contention of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Utesch*, 2021 WL 3560949, at *4 (citing *Wal-Mart*, 564 U.S. at 350) (cleaned up). Commonality is established "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Plaintiff satisfies the commonality requirement because to succeed on his securities fraud claims, Plaintiff "must establish that [Teva] made material misrepresentations or omissions and did so with scienter." *Utesch*, 2021 WL 3560949, at *4. This inquiry necessarily requires consideration of Teva's actions, and "the answers to questions raised in the inquiry would be answered not from the perspective of each prospective class member, but from an examination of what [Teva] did and said. The 'classwide answers' to these questions lead inexorably to the conclusion that the commonality requirement of Rule 23(a) is met." *Id.* (internal citation omitted).

### 3. Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "To evaluate typicality, we ask

whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus*, 457 F.3d 291, 295–96 (3d Cir. 2006) (cleaned up).  There is a "'low threshold' for typicality"; provided "the interests of the class and the class representative are aligned," courts will find typicality even when class members' claims are only legally similar, and not factually similar.  *In re Nat'l Football League Players*, 821 F.3d at 427–28 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001)); *see also Beck*, 457 F.3d at 296 ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  (cleaned up)).  The purpose of the typicality requirement under Rule 23(a) is to ensure that "the class representatives are sufficiently *similar* to the rest of the class – in terms of their legal claims, factual circumstances, and stake in the litigation – so that certifying those individuals to represent the class will be fair to the rest of the proposed class."  *Utesch*, 2021 WL 3560949, at *5 (citations omitted).

Defendants claim that the named class representative, Gerald Forsythe, fails to meet the requirements for typicality for three reasons: (1) Mr. Forsythe released his claims in the *Ontario* settlement, (2) Mr. Forsythe never purchased ordinary shares, and (3) Mr. Forsythe is subject to unique defenses.  The Court has already determined that the *Ontario* settlement release is not a bar here.  *See supra* Section IV(B)(1)*.*  The Court addresses Defendants' two remaining objections to Mr. Forsythe's typicality.

### *Ordinary shares*

Defendants claim that Mr. Forsythe fails to satisfy the typicality requirement because he never purchased ordinary shares.  The Third Circuit has held that a named plaintiff in a securities

case does not need to have purchased every type of security as other class members as long as all class members rely on the same legal theory. *See Newton*, 259 F.3d at 185 (emphasis added) ("Any differences then among class members are factual—*which security*, at what price, under what circumstances, etc. The alleged *cause* of their injuries, however, remains typical throughout the class."); *Pub. Emps. Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) (citing *In re Marsh & McLennan Cos. Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009) (emphasis added) ("Factual differences involving the date of acquisition, *type of securities purchased* and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct).[16] Since both purchasers of ADSs and ordinary shares rely on the same legal theory, Plaintiff's purchases of ADSs during the class period is sufficient to satisfy the typicality requirement.

### Unique Defenses

Defendants also argue that Mr. Forsythe cannot satisfy the requirements of typicality because he will be subject to unique defenses. Defendants argue that Mr. Forsythe will likely

---

[16] Defendants' case citations are easily distinguished. In *Smith v. Dominion Bridge*, the court held that the named representative's claim was not typical of "class members who purchased stock on the Vancouver Stock Exchange *because* those purchases will not benefit from the rebuttable presumption of reliance from the fraud-on-the-market theory unless [the named plaintiff] establishes that the Vancouver Stock Exchange is efficient. Because [the named plaintiff] did not purchase stock on the Vancouver Stock Exchange, he has no interest in establishing [its] efficiency." No. CIV. A. 96–7580, 1998 WL 98998, at *4 (E.D. Pa. Mar. 6, 1998) (emphasis added). As the Court discusses *infra* Section IV(D)(1)(a), Plaintiff here has demonstrated the efficiency of both the U.S. and Israeli markets and Defendants have not argued otherwise, so this argument is inapplicable.

Similarly, Defendants' citation to *In re Laidlaw Sec. Litig.* is not persuasive. In *Laidlaw*, the court held that the named plaintiff—who purchased securities on the NYSE—was not typical of the class who purchased on the Canadian stock exchange because the Canadian exchange was not efficient, and the named plaintiff "would have no interest in demonstrating the efficiency of [the Canadian] markets." No. 91–CV–1829, 1992 WL 68341, at *4–6 (E.D. Pa. Mar. 31, 1992). Here, Defendants do not argue that the Tel Aviv market is inefficient.

become the major focus of litigation because (1) he purchased Teva securities *after* the alleged revelation of fraud and filing of the motion to be appointed lead plaintiff, (2) he may not be able to rely on the presumption of reliance, and (3) he will lack any damages in this case if the netting methodology applies to calculate damages.  (Doc. No. 101-1 at 27–29.)

"[A] proposed class representative is not 'typical' under Rule 23(a)(3) if (1) the representative is subject to a unique defense that (2) is likely to become a major focus of the litigation."  *Utesch*, 2021 WL 3560949, at *6 (citations omitted).  "Considerations in evaluating whether a defense will become a major focus of the litigation include whether the unique defense is unlikely to be meritorious; whether challenging the defense will impose exacting requirements on the proposed class representative; and, if meritorious, whether the defense would completely dispose of the proposed class representative's claims."  *Id.*  A defendant has the burden to show that a unique defense defeats typicality.  *Beck v. Maximus*, 457 F.3d 291, 300 (3d Cir. 2006).  If a defense is broadly applicable to the class, then the defense is not unique to the proposed representative and will not defeat certification.  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Defendants rely on *In re Safeguard Scientifics*, 216 F.R.D. 577, 582–83 (E.D. Pa. 2003), and urge the Court to find that Mr. Forsythe is atypical because he purchased additional shares of Teva after the revelation of the alleged fraud.  But *Safeguard* represents the minority view that post-disclosure purchases render a named representative atypical.  *Id.*  This Court finds *Pelletier v. Endo*, cited by Plaintiff, more persuasive.  338 F.R.D 446, 476 (E.D. Pa. 2021).  In *Pelletier*, the Honorable Judge Michael Baylson explained that the majority view is that post-disclosure purchases do not demonstrate atypicality or inadequacy because the purchaser is still relying on the efficiency of the market.  *Id.*  "Taking advantage of lower prices is a common investment

strategy, not an atypical one." *Id.* (citing *Roofer's Pension Fund*, 333 F.R.D. at 77); *see also In re NIO, Inc. Sec. Litig.*, 19-CV-1424 (NGG) (JRC), 2023 WL 5048615, at *26 (E.D.N.Y. Aug. 8, 2023) ("That Huang chose to purchase additional stock after the corrective disclosure and—assuming the NIO market was efficient—the related drop in stock price simply shows that with full information, Huang was willing to invest in NIO at a lower price, not that the fraud was irrelevant to her original decision to buy stock at the inflated price. To the contrary, this is the essence of the efficient market theory: the fraud artificially raises the price by concealing certain risks from the market, causing investors to pay more than they would with full knowledge. Once the truth is revealed and the price of shares drops to incorporate the newly disclosed facts, the same investors can choose to invest without undermining the claim that they would not have paid the earlier, higher price had they known."). Moreover, attempting to reduce the price impact per share is a valid strategy, and other courts have approved of class representatives who bought stock very late. *See In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 298 (D. Del. 2003) ("Courts have repeatedly recognized that it is a common investment strategy for entities to engage in subsequent purchases in order to decrease the average cost of their investment, and therefore, such investment strategies are not atypical for purposes of satisfying the requirements for class certification."); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1263 (S.D. Cal. 2010) ("The weight of authority recognizes that an investment strategy, such as averaging down or Sitton's hunt for bargains, does not rebut the fraud on the market presumption as a matter of law."). And, whether Mr. Forsythe purchased his shares immediately after the alleged fraud was revealed or after he was named lead plaintiff does not impact his reliance on the market for purchases during the class period. Mr. Forsythe's post-disclosure purchases of Teva ADSs do not support a conclusion of atypicality or inadequacy.

Next, Defendants assert that they may rebut the presumption of reliance as to Mr. Forsythe because he testified in his deposition that he wouldn't have purchased Teva stock if he had been paying attention to Teva's disclosures during the class period (such as its announcement of the U.S. Attorney subpoena).  (Doc. 101-1 at 28.)  But Mr. Forsythe's lack of knowledge of the disclosures before buying shares actually suggests that he *was relying* on the efficient market principle.[17]  At class certification, Defendants need to do more than speculate that they *may* be able to rebut the presumption of reliance as to Mr. Forsythe.  *See Roofer's Pension Fund*, 333 F.R.D. at 75 (providing that "[s]peculative defenses will not suffice" to rebut typicality).

Last, Defendants argue that Mr. Forsythe's trading style will subject him to questions about whether he suffered any damages under the netting methodology of calculations.  (Doc. No. 101-1 at 28–29.)  The "netting" approach is used to calculate damages "by taking the actual amount of harm suffered as a result of buying shares at an inflated price and deducting the actual amount of gain accrued as a result of selling shares at an inflated share price."  *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 158 (S.D.N.Y. 2012).  In contrast, under the "transactional" approach, "each transaction is treated separately and losses from unprofitable transactions are not offset with gains from profitable transactions."  *Id.* at 159.  At this stage of the litigation, this Court does not make any determination as to which method should be used to

---

[17] Defendants cite to *Ashland Inc. v. Morgan Stanley & Co.*, which states, "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth."  652 F.3d 333, 337–38 (2d Cir. 2011).  However, this argument could apply to any investor in the class who purchased shares following Teva's disclosures.  Because a defense broadly applicable to the class is not a unique defense, this does not support the argument that Mr. Forsythe is an atypical representative.  *See Schering Plough*, 5890 F.3d at 598 (noting that a defense is not unique to the named plaintiff if it is broadly applicable to the class).

calculate damages.[18]  To the extent that Defendants assert that Mr. Forsythe has not suffered any

losses using the netting methodology, Defendants' calculation only accounts for netting based on

a limited timeframe because they assume that Mr. Forsythe released his claims which overlap

with the *Ontario* class period.  (*See* Doc. No. 101-1 at 29, n.16 "Between the close of the

*Ontario* class period and the close of the putative class period here (i.e., from May 11, 2019

through August 18, 2020), Plaintiff purchased 60,000 shares of Teva ADSs.").)  As the Court

finds that the *Ontario* release does not bar Plaintiff's claims here (*see supra*), Defendants would

have to show, taking into account the entire class period, that Plaintiff does not suffer any

damages using the netting methodology.  Defendants fail to provide any such evidence.

### 4.  Adequacy

Finally, Rule 23(a)(4) requires that the representative party fairly and adequately protect

the interests of the class.  Fed. R. Civ. P. 23(a)(4).  Courts considering adequacy of

representation examine both "the qualifications of class counsel and the class representatives."

*In re Nat'l Football League Players*, 821 F.3d at 428; *see also In re Viropharma Inc. Secs. Litig.*,

Civil Action No. 12-2714, 2016 WL 312108, at *7 (E.D. Pa. Jan. 25, 2016) ("Adequacy of

representation is met by a two-fold showing: that (1) class counsel is competent and qualified to

conduct the litigation; and (2) class representatives have no conflicts of interests.").  "A class

representative need only possess a minimal degree of knowledge necessary to meet the adequacy

standard."  *Utesch*, 2021 WL 3560949, at *13 n.4.

Defendants do not challenge the adequacy of Plaintiff's counsel, Faruqi & Faruqi, LLP.

---

[18] *See In re Vivendi*, 284 F.R.D. at 159 (determining, upon plaintiff's motion to *amend the class definition*, that the "partial netting" methodology should apply); *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 356 (E.D. Pa. 2006) (concluding that the transaction-based methodology is a possible method to quantify economic loss, but that there are disputes of material fact related to economic loss and damages that would make summary judgment inappropriate).

Rather, they focus their efforts on challenging the adequacy of Mr. Forsythe as the named class representative.  (Doc. No. 101-1 at 29–31.)  Defendants set forth four arguments that Mr. Forsythe is inadequate, namely that: (1) Mr. Forsythe failed to negotiate a contingency fee cap with his attorneys; (2) Mr. Forsythe is a "mere mouthpiece for lawyer-driven litigation"; (3) Mr. Forsythe misstated the number of Teva shares he purchased; and (4) Mr. Forsythe delayed in producing certain documents.  (*Id.*)

### Contingency Fee Cap

Defendants assert that Mr. Forsythe is an inadequate class representative because he failed to negotiate a cap on his attorneys' contingency fees.  (*Id.* at 29.)  The Court previously addressed this argument in its appointment of Mr. Forsythe as lead plaintiff.  (*See* Doc. No. 55 at 31–32.)  Defendants have not presented any new facts for the Court to reconsider its previous ruling.  As the Court previously held, the 28% contingency fee is reasonable, and is not a basis for finding Mr. Forsythe is an inadequate class representative.  (*Id.*)

### Lawyer-Driven Litigation

Defendants also argue that Mr. Forsythe is inadequate because he is a "mere mouthpiece for lawyer-driven litigation."  (Doc. No. 101-1 at 29.)  Defendants point to a variety of actions as examples of his inadequacy, including that Mr. Forsythe defers to counsel on strategy, that he is "not aware of the basic facts of the case, including the identities of Defendants, how many complaints had been filed and where the alleged misstatements could be found," and that he failed to review drafts, provide input on the pleadings, or participate in strategy discussions.  (*Id.* at 30.)  Plaintiff responds that Mr. Forsythe demonstrates an appropriate level of familiarity with this litigation and that Defendants mischaracterize Mr. Forsythe's deposition testimony.  (Doc. No. 102 at 7.)

29

The Court finds that Mr. Forsythe is an adequate class representative because he demonstrates that he understands the nature of the claims, is involved in reviewing draft filings, and is willing to commit "whatever's necessary" to contribute to the successful outcome of the case.  (*See* Doc. No. 101–11.)  Contrary to Defendants' assertions, Mr. Forsythe testified several times during his deposition that he reviewed draft filings and has a broad understanding of the nature of the suit.  (*Id.* at 20:5–9, 48:11–13, 15:24–16:19.)  Mr. Forsythe stated that he spent at least ten hours working on matters related to this lawsuit.  (*Id.* at 58:3–19.)  Although Mr. Forsythe defers to counsel on litigation strategy (*id.* at 59:22), this does not render him inadequate as class representative.  Mr. Forsythe is entitled to rely on his counsel for assistance with legal strategy decisions.  This is a complex case, and Plaintiff has shown that he possesses the requisite minimum degree of knowledge of the claims in this action to be the class representative.  *See Utesch*, 2021 WL 3560949, at *13 n.4 ("Defendants contend that adequacy is not established because both UPRRS and Ironworkers lack even a basic understanding of the facts underlying this action and defer to counsel in making decisions about the case.  But, a class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.  The deposition testimony of Plaintiffs' designated Rule 30(b)(6) witnesses demonstrate that Plaintiffs understand the nature of their causes of action - to wit, that this is a class action lawsuit against Lannett and its executives premised on their false and misleading statements about drug pricing which caused investors, including Plaintiffs and class members, to lose money.  There is no need for Plaintiffs to have mastered the factual and legal issues presented in the case to satisfy the adequacy requirement, because their representation of the class will be accomplished through adequate counsel.") (internal citations omitted) (cleaned up); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 213 (E.D. Pa. 2001) (citing *Lewis v. Curtis*,

671 F.2d 779 (3d Cir. 1982), *recognized as superseded on other grounds*) ("[T]he Third Circuit held that a plaintiff who "displayed a complete ignorance of facts concerning the transaction that he was challenging" was able to represent the interests of other shareholders.")); *In re Cephalon Sec. Litig.*, No. CIV.A. 96–0633, 1998 WL 470160, at *3 (E.D. Pa. Aug. 12, 1998) (citing *Barnes v. Am. Tobacco Co.*, 176 F.R.D. 479, 486 (E.D. Pa. 1997) ("It is unrealistic to require a class action representative to have an in-depth grasp of the legal theories of recovery behind his or her claim.  It is more important that the representative actively seeks vindication of his or her rights and engages competent counsel to prosecute the claims.")); *In re Merck & Co., Sec. Derivative & ERISA Litig.*, MDL No. 1658 (SRC), Civil Action No. 05-1151 (SRC), 2013 U.S. Dist. LEXIS 13511, at *52–53 (D.N.J. Jan. 30, 2013) ("Though Defendants protest that Lead Plaintiff Le Van has no knowledge of this action beyond the information he obtains from his attorneys, Defendants' criticisms of Le Van's lack of sophisticated legal understanding or independent knowledge concerning this action are completely inapposite to an evaluation of his adequacy.  The Third Circuit has held that the adequacy-of-representation test is not concerned with whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel.  Indeed, it is to be expected in a complex lawsuit such as the one at bar that a litigant may rely heavily on his counsel.") (internal citations omitted) (cleaned up).

### *Inaccuracy as to Shares Purchased*

Next, Defendants assert that Mr. Forsythe is not an adequate class representative because he "falsely swore" that he purchased 100,000 shares, when in fact he purchased 205,000 shares throughout the class period.  (Doc. 101-1 at 30–31.)  However, the named plaintiff need not be a model of perfection in order to serve as an adequate representative.  *See In re Spero*

*Therapeutics, Inc. Sec. Litig.*, 22-CV-3125 (LDH) (RLM)**,** 2022 U.S. Dist. LEXIS 168778, *21–24 (S.D.N.Y. Sept. 19, 2022) ("The goal of the PSLRA [Private Securities Litigation Reform Act] was not to select individuals for lead plaintiff who make no mistakes.") (cleaned up). Minor mistakes such as this do not render Plaintiff an inadequate representative.

Defendants cite to *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316–17 (E.D. Va. 2007) for support that this renders Mr. Forsythe an inadequate representative.  (*Id.*)  In that case, the court held that the named representative was inadequate because he filed sworn affidavits on two occasions falsely overstating his losses.[19]  *Id.*  The *Shiring* court considered this "inadvertence or indifference" to the PSLRA's certification requirements a "demonstrat[ion] [of the plaintiff's] lack of diligence and candor."  *Id.* at 317.  In contrast here, Mr. Forsythe did not overstate his losses but accidently stated that he purchased 100,000 shares rather than 205,000 shares.  But this lower number does not make a material difference in whether Mr. Forsythe is motivated to adequately represent the class.  Rather, the fact that Mr. Forsythe purchased more shares than he initially thought makes it likely that he will be even more motivated as he has a potentially greater loss.  *See Spero Therapeutics*, 2022 U.S. Dist. LEXIS 168778, *21–24 (holding that plaintiff's erroneous omission of two transactions that should have been accounted for in the named plaintiff's loss calculation were "relatively minor" mistakes and that the named plaintiff was still an adequate representative because he "maintains a sufficient financial interest in the outcome of the case with respect to all claims under the Exchange Act to vigorously advocate on behalf of the class").

---

[19] In *Shiring*, the plaintiff certified that he had purchased 3,000 shares at a stock price of $8.50 per share when, in fact he had purchased his shares at a lower price.  244 F.R.D. at 317; *see also Karp v. Diebold Nixdorf, Inc.*, 19 Civ. 6180(LAP), 2019 WL 5587148, at *6 (S.D.N.Y. Oct. 30, 2019) (finding that the movants failed to satisfy adequacy showing where they *overcalculated* their losses by 34 percent).

In other words, Mr. Forsythe's inadvertent undercalculation as to the number of shares he purchased is not evidence of bad faith.  (Doc. No. 101-11 at 32:25–33:14.)  *See In re Apple Sec. Litig.*, No. 4:19-cv-2033-YGR, 2022 WL 354785 at *4–5 (N.D. Cal. Feb. 4, 2022) ("The Court declines to find that the discrepancies [in the plaintiff's certification of his trading history] corrected in plaintiff's notice of errata, without more, preclude a finding of adequacy here.  An error in claimed losses may render a movant inadequate if there is 'evidence of bad faith or intent to deceive the court or the parties.'  However, defendants do not make such a showing.  Plaintiff already corrected its inadvertent errors on the certification (albeit two years after the fact).  Nevertheless, defendants contend that even such inadvertent misstatements show a lack of diligence inconsistent with adequate representation of the class.  Although plaintiff's errors in its trade certification may demonstrate carelessness, they are not the types of errors that would normally preclude a finding of adequacy to represent the class.").

**Delayed Production of Documents**

Finally, Defendants contend Mr. Forsythe's delay in producing certain documentation illustrates that he is an inadequate representative.[20]  (Doc. No. 101-1 at 31.)  The Court disagrees.  In *In re DVI Inc. Securities Litigation*, 249 F.R.D. 196 (E.D. Pa. 2008), this court held that an inadvertent failure to produce a handful of documents until the evening prior to a deposition did not undermine the credibility of the lead plaintiffs because Defendants did not allege that the materials were withheld in bad faith or that they were significantly prejudiced by the delayed production.  *Id.* at 206.  Likewise, here Defendants do not suggest there is any

---

[20] Defendants only mention that Plaintiff failed to timely produce the *Ontario* settlement notice.  (Doc. No. 101-1 at 31.)  And they do not contend they were prejudiced by this delay.

evidence of bad faith or that Mr. Forsythe purposely withheld key information.[21]  Defendants received all of the materials prior to Mr. Forsythe's deposition, and fail to show any prejudice by the delay.  (Doc. No. 102 at 15.)  The Court finds that this limited delayed production of documentation does not render Mr. Forsythe an inadequate class representative.

*     *     *

The Court finds that Plaintiff satisfies all of the Rule 23(a) requirements for class certification.

### D.  Rule 23(b)

As discussed above, Plaintiff moves for class certification under Rule 23(b)(3), which provides for certification when the court finds that (1) questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); (Doc. No. 90 at 16–29).  The matters pertinent to these findings include:  (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).

---

[21] It appears that Mr. Forsythe followed the logical steps in terms of producing documents to his counsel. He previously organized his files so that all Teva documents were categorized together, and this folder was forwarded to counsel for purposes of production.  (Doc. No. 101-11 at 38:21–39:13.)  It was only later that Plaintiff searched financial folders for each of his family members and discovered additional relevant materials.  (*Id.* at 32:5–33:14.)  Mr. Forsythe testified that this was an inadvertent mistake.  (*Id.* at 33:12–14.)  The Court finds no evidence of bad faith in this inadvertent omission.

### 1.  Predominance

The predominance requirement is similar to commonality and "tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation."  *Suboxone*, 421 F.

Supp. 3d at 51 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  The plaintiff

does not need to prove his claims for the purpose of the predominance inquiry; rather, "Rule

23(b)(3) requires a showing that *questions* common to the class predominate, not that those

*questions* will be answered, on the merits, in favor of the class."  *Amgen, Inc. v. Conn. Ret. Plans*

*& Tr. Funds*, 568 U.S. 455, 459 (2013).  "Although the plaintiff need not establish the merits of

his case at this stage, the Third Circuit has held that '[a]n overlap between a class

certification requirement and the merits of a claim is no reason to decline to resolve relevant

disputes when necessary to determine whether a class certification requirement is met.'"

*Suboxone*, 421 F. Supp. 3d at 45-46 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d

305, 316 (3d Cir. 2008)).  Common questions are those "where the same evidence will suffice

for each member to make a prima facie showing or the issue is susceptible to generalized, class-

wide proof."  *Tyson Foods, Inc. v. Bouaphakeo*, 577, U.S. 442, 453 (2016) (cleaned up).

Conversely, individual questions are those "where members of a proposed class will need to

present evidence that varies from member to member."  *Id.*  In assessing predominance, the court

at class certification must "predict how specific issues will play out at trial 'in order to determine

whether common or individual issues predominate in a given case.'"  *Suboxone*, 421 F. Supp. 3d

at 52 (quoting *Malack v. BDO Seidman, LLP*, 617 F.3d 743, 746 (3d Cir. 2010)).

In securities fraud actions, the predominance inquiry begins with the elements of a

Section 10(b) securities fraud claim, which are "(1) a material misrepresentation or omission by

the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation." *Malack*, 617 F.3d at 746.  Most of these elements are clearly

susceptible to classwide proof, especially the alleged misrepresentations made by the defendants,

scienter, and loss.  *In re Apple Sec. Litig.*, 2022 WL 354785 at *6.  A plaintiff is not required to

prove materiality or loss causation at class certification.  *Amgen Inc.*, 568 U.S. at 469–70

(materiality); *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 810

(2011) (loss causation).

Defendants do not dispute that Plaintiff has established reliance and do not attempt to

rebut the presumption of reliance.  (Doc. No. 106 at 1.)  Rather, Defendants challenge Plaintiff's

showing of predominance by arguing that Plaintiff fails to provide a method of measuring

damages on a class-wide basis that is consistent with Plaintiff's theory of liability.  (Doc. No.

101-1 at 20–25.)  Because the Court must ensure the element of reliance is established, the Court

will address it before turning to the disputed issue of damages.

### a. Reliance

Most securities cases, including this one, allege a fraud-on-the-market theory of reliance.

*See* Recurring issues in the predominance analysis—Reliance—Reliance excused, presumed, or

not required, 2 Newberg and Rubenstein on Class Actions § 4:60 (6th ed.).  In order to satisfy

this reliance requirement, the United States Supreme Court held in *Basic Inc., v. Levinson*, 485

U.S. 224 (1988), that investors could "invoke[e] the presumption that the price of stock traded in

an efficient market reflects all public, material information–including material misstatements."

*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 268 (2014) (citing

*Basic Inc.*, 485 U.S. at 246).  The *Basic* presumption of reliance requires plaintiffs show "(1) that

the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock

traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021).  As mentioned above, "materiality should be left to the merits stage because it does not bear on Rule 23's predominance requirement," so the burden is on Plaintiff to establish the remaining three *Basic* prerequisites.  *Id.* at 1959 (citing *Halliburton II*, 573 U.S. at 276).

Here, there is no dispute that the alleged misrepresentations were public.  (*See* Doc. No. 64-2 at ¶¶ 71–102, 105–11, 124–59, 160–62.)  And Plaintiff alleges, with evidentiary support, that the class members purchased Teva stock during the class period.  (Doc. No. 8-5 at 5–6.)  The remaining *Basic* prerequisite—market efficiency—is typically examined using the *Cammer* factors.  *See Roofer's Pension Fund*, 333 F.R.D. at 81 (reciting the *Cammer* factors); *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) (same).  "[T]he *Cammer* factors are: (1) the stock's average weekly trading volume; (2) coverage of a company's stock in securities analyst reports; (3) the reported number of market makers; (4) the company's eligibility to file an S-3 registration statement; and (5) stock price reaction to unexpected corporate events or financial releases."  *Roofer's Pension Fund*, 333 F.R.D. at 81 (internal citations omitted).  In addition to the *Cammer* factors, courts also consider the three *Krogman* factors when analyzing whether the market for a stock is efficient.  *Waggoner*, 875 F.3d at 94.  These factors include "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')."  *Id.* (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)).  Defendants do not dispute Plaintiff's showing of the efficiency of the market, and as described next, the Court finds that the *Cammer* and *Krogman* factors confirm a finding of market efficiency.

**Cammer Factors**

First, the *Cammer* factors suggest an efficient market.  Teva stock experienced a high average weekly trading volume throughout the class period—6.7% of Teva's ADSs and ordinary shares outstanding.  (Doc. 90-3 at ¶ 20.)  These figures indicate market efficiency (*Cammer* One).[22]  During the class period, at least thirty-seven analysts issued over 2,700 analysts reports pertaining to Teva during the Class Period (*Cammer* Two).[23]  (Doc. No. 90-3 at ¶ 24.)  Teva also traded on NASDAQ and on the NYSE during the class period, where it was assigned a designated market-maker.  Teva had no fewer than 661 institutional investors who held between 60% and 93.6% of Teva's outstanding ADSs, and more than 200 active market makers traded Teva stock during that period.  Teva ADSs' average short interest during the class period was 4.11% of the number of ADSs outstanding, suggesting that "investors with negative views of Teva were able to remain active in the market."  (*Cammer* Three).[24]  *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084, at *12 (S.D.N.Y. July 10, 2019); (Doc No. 90-3 at ¶¶ 29–37.)  Finally, Teva was eligible for S-3 registration and filed such registration prior to, during, and after the class period.[25]  (*Cammer* Four) (Doc. No. 90-3 at ¶ 45.)

---

[22] *See also In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089 (CM)(GWG), 2021 WL 4077942, at *10 (S.D.N.Y. Sept. 8, 2021) (holding that a weekly trading volume of 3.9% was evidence of an efficient market).

[23] *See Allergan*, 2021 WL 4077942, at *10 (holding that 1,200 reports filed by at least twenty-nine analysts was evidence of an efficient market).

[24] *See also Allergan*, 2021 WL 4077942, at *10 ("Allergan also traded on the NYSE and NASDAQ during the class period, and its common stock was held by more than 1,500 institutional investors which accounted for approximately 84% of the public float (*Cammer* Three).").

[25] As noted in the next section, because the Court finds Plaintiff satisfies the three *Krogman* factors, the Court need not evaluate the fifth *Cammer* factor.  *See Signet*, 2019 WL 3001084, at *13 ("[W]here the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispose of *Cammer*'s fifth factor completely."); *Allergan*, 2021 WL 4077942, at *10 ("All together, these factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor.").

*Krogman Factors*

Second, the *Krogman* factors also suggest an efficient market.  During the class period, Teva's market capitalization ranged from $6.72 billion to $64.29 billion, making it larger than 75.7%, 92.9%, and 97.9% of NYSE-listed, NASDAQ-listed, and TASE-listed stocks, respectively (*Krogman* One).[26]  (Doc. No. 90-3 at ¶¶ 53–54.)  Also, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Allergan*, 2021 WL 4077942, at *10 (citing *Krogman*, 202 F.R.D. at 478).  Teva's median and average bid-ask spreads were an average of 0.06% and 0.07% for the NYSE and TASE respectively, which were smaller than those of a random sample of stocks listed on the NYSE and TASE (0.09% average spread for NYSE sample and 4.62% average spread for TASE) (*Krogman* Two).[27]  (Doc. No. 90-3 at ¶ 38, 55.)  Finally, during the class period, Teva stock was overwhelmingly owned by the public—on average, Teva's public float was 99% of ordinary shares and ADSs outstanding.[28]  (Doc. No. 90-3 at ¶¶ 56.)  All together, these factors demonstrate strong support for the presumption of market efficiency.

The Court finds that Plaintiff has shown that Teva securities were traded on an efficient market in both the United States and Israel and therefore, has established a rebuttable presumption of reliance.[29]

---

[26] *See also Signet* 2019 WL 3001084, at *12 (holding that an average market capitalization of $7.3 billion is "certainly large enough to support a finding of market efficiency").

[27] *See also Allergan*, 2021 WL 4077942, at *10 ("[D]uring the class period, the average bid-ask spread was 0.01% for Allergan common stock and 0.19% for Allergan preferred stock. These spreads are sufficiently low for the second *Krogman* factor to support a presumption of efficiency.") (citations to factual record omitted).

[28] *See also Signet* 2019 WL 3001084, at *12 (holding that an average public float ranging from 99.4% to 99.8% of Signet's shares weighed heavily in favor of a finding of market efficiency).

[29] Although the Court has done its own analysis of the factors, the Court notes that Plaintiff's expert, Dr. Zachary Nye comprehensively addressed the *Cammer* and *Krogman* factors and found that Teva

### b. Damages

Here, the only dispute over predominance is whether Plaintiff has provided a method of measuring damages on a class-wide basis that is consistent with his theory of liability.  Plaintiff's damages expert, Dr. Nye, suggests that the use of an event study will be sufficient to quantify per-security damages on a class-wide basis.  (Doc. No. 90-3 at ¶¶ 67–71.)  Dr. Nye opines that he may use an event study to isolate company-specific price movement caused by the revelation of true facts related to the alleged fraud in the DOJ complaint from price movement caused by other factors.  (*Id.* at ¶ 69.)  Defendants disagree.  (Doc. No. 101-1 at 21–25.)  Defendants claim that Dr. Nye's damages framework fails to address "the economic implications of the mismatch between the filing of the DOJ complaint and the alleged misrepresentations."  (*Id.* at 22.)  Without a proper damages model, Defendants argue this Court must deny class certification.

### i. Legal Standard

The predominance requirement applies to damages because "the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations . . . overwhelm questions common to the class.'"  *Suboxone*, 421 F. Supp. 3d at 63 (quoting *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016)).  "At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis."  *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 144 (E.D. Pa. 2011).  In other words, Plaintiff must demonstrate that there is a reliable methodology for

---

securities were sold on an efficient market.  (Doc. No. 90-3 at 6–29.)  Also, Defendants' own expert assumed market efficiency for the purpose of her analysis.  *See also* Order Granting the Plaintiff's Motion for Class Certification (Doc. No. 736), at 27–32, *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, No. 3:17-cv-00558-SRU (D. Conn. Mar. 9, 2021) (holding that the markets for all the Teva securities are efficient).

measuring damages with reasonable accuracy. *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 202 (E.D. Pa. 2015). "Variation of damages between and among class members does not necessarily defeat predominance." *Suboxone*, 421 F. Supp. 3d at 63.

In *Comcast v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Id.* at 35. The plaintiffs in *Comcast* alleged that Comcast had violated antitrust law in its telecommunications business under four distinct legal theories. *Id.* at 30–31. The plaintiffs' proposed damages model calculated damages based on all four theories. *Id.* at 31–32. At class certification, the district court concluded that only one of the plaintiffs' theories was amenable to class-wide proof. *Id.* The court also held that the damages that resulted from the remaining theory of liability could be calculated on a class-wide basis. *Id.* at 31. The Supreme Court reversed the district court's grant of class certification, finding that the plaintiffs' damages model "failed to measure damages resulting from the particular antitrust injury on which [the defendants'] liability" was premised. *Id.* at 37. The Supreme Court concluded that the district court relied on a damages model that "did not isolate damages resulting from any one theory of antitrust impact," but instead calculated damages that occurred due to the antitrust violations collectively. *Id.* at 36. The Supreme Court held that the plaintiffs' damages model "must measure only those damages attributable to [their remaining viable theory]. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. *Comcast* directed courts to "examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis." *In re Vale S.A. Sec. Litig.*, 19-CV-526-RJD-SJB, 2022 WL

122593, at *18 (E.D.N.Y. Jan. 11, 2022) (citing *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 128 n.8 (2d Cir. 2013)).

Yet, "*Comcast* [] pose[s] a low bar" to class certification. *Id.* (citing *Strougo v. Barclays PLC*, 312 F.R.D. 307, 313 (S.D.N.Y. 2016) ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.")). For instance, a proposed damages calculation method can survive "notwithstanding the feasibility-related issue of the potential need for manual input of certain limited information" and "no actual calculation needs to be performed at certification." *Id.* (internal citations omitted) (cleaned up). The Third Circuit in *Neale v. Volvo Cars of North America LLC*, 794 F.3d 353 (3d Cir. 2015) suggested that "[a] close reading of the text [of *Comcast*] makes it clear that the predominance analysis was specific to the antitrust claim at issue." *Id.* at 374.[30] The Third Circuit also concluded that "[e]very question of class certification will depend on the nature of the claims and evidence presented by the plaintiffs. What we know for sure is that whatever *Comcast*'s ramifications for antitrust damages models or proving antitrust impact, a trial court must consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." *Id.* (cleaned up); *see also In re EQT Corp. Sec. Litig.*, 2:19-cv-00754-RJC, 2022 WL 3293518, at *27 (W.D. Pa. Aug. 11, 2022) (citing *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 485 (3d Cir. 2015)) ("The Third Circuit has also explained that 'it is important for the District Court to remember that an inability to calculate damages on a classwide basis will not, on its own, bar certification[,]' and that '[a] district court errs when it holds a plaintiff seeking class certification to a higher standard of proof than proof by a

---

[30] *Comcast* analysis is also applicable here where Plaintiff's claims involve securities rather than antitrust claims. *See Univ. of Puerto Rico Ret. Sys. v. Lannett, Co.*, No. 21-3150, 2023 WL 2985120 (3d Cir. Apr. 18, 2023) (affirming the district court's *Comcast* analysis in a securities case).

preponderance of the evidence.'").

### ii.    Analysis

Defendants argue that Plaintiff's damages methodology fails to match Plaintiff's theory

of liability because this Court found that misstatements related to illegality were not

misleading.[31]  (*See* Doc. No. 101-1 at 21 ("Under Plaintiff's current theory of liability, it is

'largely immaterial whether Teva's actions were illegal.'").)  And, because this Court stated the

illegality of Defendants' underlying scheme is "largely immaterial," Defendants contend

Plaintiff must "provide a class-wide measure of damages that captures the price impact, if any, of

information in the DOJ complaint ***distinct from*** the news of Teva's potential exposure to future

legal fees, penalties, treble damages, fines, settlements, or reputation harm."[32]  (*Id*.)  Defendants

further argue that Plaintiff's expert's proposed event study is too vague to constitute a sufficient

showing that damages can reasonably be calculated.  (Doc. No. 101-1 at 21.)  The Court is not

persuaded.  For the reasons that follow, the Court holds that Plaintiff's theory of liability matches

Plaintiff's proposed damages model.

***Motion to Dismiss Ruling***

In this Court's prior Motion to Dismiss ruling, the Court focused on three categories of

alleged misstatements: (1) misstatements relating to Copaxone's market share, (2) misstatements

relating to Teva's Shared Solutions program, and (3) misstatements relating to Teva's

compliance with federal law.  (Doc. No. 74 at 16–25.)  The Court held that Teva's alleged

---

[31] During oral argument, Defendants argued that this Court's motion to dismiss ruling "dismissed" Plaintiff's "claims" relating to Defendants' statements that the company had complied with federal law. (Hr'g Tr. at 109:14–110:7, 110:11–24, 116:4–117:21.)  They suggest that Plaintiff is now impermissibly arguing that Teva's disclosure relating to its compliance with federal law has "materialized and caused their damages."  (*Id.* at 110:7–9.)

[32] To reiterate, the DOJ complaint is the sole corrective disclosure in Plaintiff's case. (Doc. No. 74 at 39.)

misstatements relating to Copaxone's market share and Teva's Shared Solutions program were misleading, but that the statements relating to Teva's compliance with federal law were not misleading.  (*Id.*)  The Court's analysis relied on precedent suggesting that Defendants had no affirmative duty to disclose any purported wrongdoing unless Defendants put the source of the revenue at issue.[33]  (*Id.* at 18.)  Defendants point to the Court's statement that "it is largely immaterial whether Teva's actions were illegal because Plaintiff does not argue that Teva was required to disclose this scheme merely because it may have been illegal; rather, Plaintiff argues that Teva was required to disclose this scheme *because it is what made Copaxone so successful.*"[34]  (*Id.* at 20 (emphasis in original).)  For further context, the Court included this explanation because Defendants argued that their alleged donation program is legal.  (*Id.*)  In all, the Court held that Plaintiff sufficiently alleged that Teva's statements relating to Copaxone's market share and relating to the Shared Solutions Program were misleading because they put the source of Copaxone's success at issue, whether or not the scheme was illegal.  (*Id.* at 20–23.)  Now, Defendants argue these statements by the Court "effectively redefined [Plaintiff's] [] theory of liability in this case."  (Hr'g Tr. 107:14–15.)  The Court disagrees.

This Court's prior ruling did *not* dismiss any of Plaintiff's claims or theories.[35]  (*See generally* Doc. No. 74.)  Although the Court held that Teva's statements relating to compliance with federal law were not *misleading*, this holding did not alter Plaintiff's theory of the case.  (*Id.*

---

[33] Although this Court found that the first and second categories of misstatements put the source of Teva's Copaxone revenue at issue, the third category did not put the source of revenue at issue.  (Doc. No. 74 at 16–25.)

[34] Previously, Plaintiff also acknowledged that "illegal" is "absolutely a gratuitous adjective to describe [Defendants'] scheme." (Doc. No. 76 (Motion to Dismiss Hr'g) at 38:24–25; *see also id.* at 38:6–8 (Mr. Killorin: "If we were to replead, . . . we'd certainly strike the word 'illegal.'")

[35] During oral argument, the Court remarked that the Court's Motion to Dismiss ruling did not dismiss any of Plaintiff's claims.  (Hr'g Tr. 118: :3–119:7.)  Defendants conceded that use of the term "claims" was imprecise when, in fact, Defendants were referring to "theories of liability."  (*Id.*)

at 24–25.)  Instead, all three categories of misstatements identified by Plaintiff ultimately reach

the same theory of the case, that "Defendants made material misrepresentations and omissions;

that Defendants' misrepresentations maintained Teva's stock price at artificially inflated levels;

and the stock price declined when the truth emerged causing financial loss to Plaintiff and the

class." (Doc. 102 at 18 (cleaned up); Hr'g Tr. 134:19–22.)  This is similar to *In re Processed*

*Egg Products*, where the court held that "[t]he fact that those 'complementary' actions—

including '(1) a series of explicit, short-term production restriction programs, such as

slaughtering prematurely; (2) a pretextual animal-welfare program; and (3) a series of exports of

eggs at below-market prices'—were distinct/enumerable did not make them independent theories

of liability such that the plaintiff's model 'would have needed to have been able to isolate [any]

single theory's effects from the effects of the [other] theories[.]'"  *In re: Domestic Drywall*

*Antitrust Litig.*, 322 F.R.D. 188, 234 (E.D. Pa. 2017) (citing *In re Processed Egg Products*

*Antitrust Litig.*, 312 F.R.D. at 193).

　　　During oral argument, Defendants argued that because Plaintiff cannot rely upon the

misstatements related to Teva's compliance with federal law, this case is identical to *Comcast*

and the Court must deny class certification.  (Hr'g 120:14–15.)  In support of that argument,

Defendants point to *Utesch v. Lannett*, arguing that although the court in *Utesch* granted class

certification, the district court's analysis in that case supports Defendants' argument here that

Plaintiff's damages calculation fails to match his theory of liability.  *See* 2021 WL 3560949.  In

*Utesch*, the district court noted in the background section that the plaintiff's case involved three

categories of misstatements:  (1) "Lannett's growth was the result of competitive market forces .

. . [when] in actuality [it was] caused by 'extensive pricing schemes'"; (2) "as regulatory scrutiny

into price-fixing and anticompetitive conduct increased, [Lannett] issued a series of misleading

statements and omissions . . . regarding the risk that Lannett would be implicated in price-fixing and anticompetitive conduct" and (3) Lannett's "statements that the company had complied with the law in the pricing of its products 'created the false impression that Lannett had conducted a complete and thorough investigation . . . , but in actuality Lannett's internal investigation was not completed, and had a limited focus." *Id.* at *1.

Defendants' argument suggests that each category of misstatements in *Utesch* constituted a separate claim or theory of liability.  And, in turn, Defendants argue here that because this Court found that the misstatements related to compliance with federal law were not misleading, Plaintiff can no longer rely on these misstatements as a theory of liability in connection with its calculation of damages, unlike the plaintiffs in *Utesch*, who could rely on the similar third category.  (Hr'g 119:14–120:10; *see also id.* at 120:5–9 ("[I]f the statements about compliance of law are out of the case, then if the market was reacting to the threat of fines and penalties as a result of illegality, that's not the theory of liability in this case anymore."))  As such, Defendants contend that the absence of misstatements relating to Teva's compliance with federal law creates a mismatch with Plaintiff's damages model because the model incorporates damages relating to penalties based on Teva's lack of compliance with federal law.

This argument fails to consider the remainder of the *Utesch* court's analysis. Importantly, the *Utesch* court held that *Comcast* was inapposite because the "numerical mismatch between damages model (one model) and liability theory (four theories) at issue in that case is not present here." *Utesch*, 2021 WL 3560949 at *12 (emphasis added).  The court emphasized that "[a]lthough the Complaint alleges many misrepresentations about various, interrelated topics, because each of Defendants' alleged misrepresentations is part of their broader alleged concealment of the lack of competition in the generic drug market and the potential adverse

46

consequences on Lannett's business, *each misrepresentation is categorically part of the same, single theory.*" *Utesch*, 2021 WL 3560949 at *12 (emphasis added).  The same is true in this case.

Even though this Court determined that Plaintiff's reliance on misstatements related to compliance with federal law were not misleading, those misstatements are part of the same, single theory of liability.[36]  (Hr'g Tr. 134:19–22 ("Those [categories of misstatements] are all just little components supporting our big claim of a 10b-5 violation, any misrepresentations to the market.  That's the claim.  That claim has not been dismissed.").)  And, because Plaintiff's theory of liability has not changed, the Court is not convinced that Plaintiff improperly relies on these misstatements in connection with its model of damages.  At bottom, this Court's prior motion to dismiss ruling does not impact Plaintiff's theory of liability and there is no *Comcast* issue.  *See also In re Vivendi*, *S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("[I]ndividual alleged misstatements . . . relat[ing] to different aspects of a larger problem . . . [were part of] a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie.").

Defendants relatedly argue that this Court's motion to dismiss ruling altered Plaintiff's theory of liability because this Court stated that "it is largely immaterial whether Teva's actions were illegal."[37]  (Doc. No. 74 at 20; Doc. No. 101-1 at 21; Hr'g Tr. 111:9–18.)  But this

---

[36] The court in *Utesch* also distinguished *Comcast* because in that case, "[t]he district court rejected three of [plaintiffs'] theories at class certification, after the damages model had been developed" based on all four theories.  *Utesch*, 2021 WL 3560949 at *13.  The same distinction applies here where Plaintiff's expert also had the benefit of understanding this Court's previous holdings prior to proposing his damages model.

[37] Defendants state that "if [the 'scheme'] wasn't illegal, and wasn't going to lead to fines and penalties, then you would have no stock drop."  (Hr'g Tr. 112:9–11.)  Defendants suggest that because there was a stock drop, Plaintiff *must* be relying on the illegality of Defendants' conduct.  (Doc. No. 101-1 at 22.)

47

statement—which was made in the context of understanding whether certain statements were misleading—does not change the conclusion that Plaintiff's model may include damages which flow from their theory of liability, such as any harms resulting from a stock price decline due to the risk of fines and penalties from the DOJ complaint.  To reiterate, Plaintiff's theory is that "Defendants made material misrepresentations and omissions, that Defendants' misrepresentations maintained Teva's stock price at artificially inflated levels[, that] the stock price declined when the truth emerged causing financial loss to Plaintiff and the class," and that they should receive damages for those harms.[38]  (Doc. No. 102 at 18 (cleaned up).)  Whether Plaintiff's model can potentially incorporate damages relating to the risk of fines and penalties remains to be seen, but the Court cannot conclude at the class certification stage, that this constitutes a mismatch between Plaintiff's single theory of liability and his proposed method calculating damages.

Plaintiff's expert, Dr. Nye, proposes an event study to "isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors."  (Doc. No. 90-3 at ¶ 69.)  Because the true facts are revealed

---

[38] Plaintiff's only corrective disclosure, the DOJ complaint, is just that—a complaint.  There has been no formal finding of liability against Teva for the "kickback scheme."  *United States v. Teva Pharms. USA, Inc.*, Civil Action No. 1:20-cv-11548-NMG (D. Mass.), Doc. Nos. 195, 235; *see also In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-cv-02324-GPC-KSC, 2021 WL 3742924, at *6, *9 (S.D. Cal. Aug. 24, 2021) ("Defendants contend that the proposed damages model does not align with Plaintiff's theory of liability as required under *Comcast*, because it fails to account for [the idea that] . . . the impact of the allegations in the *Erhart* Complaint [are] not attributable to the alleged actionable misstatements. . . . [T]here is no basis for treating the *Erhart* Complaint as categorically different from other corrective disclosures, which short of an admission by the defendant or a *formal finding* of fraud … will necessarily take the form of contestable allegations of wrongdoing, such that the proposed model would be inappropriate.") (cleaned up) (emphasis added); *cf. Waggoner*, 875 F.3d at 106 ("The *Comcast* standard is met notwithstanding that some of the decline in the price of Barclays' ADS may have been the result of the New York Attorney General's action and potential fines.  Investors were concerned with lack of management honesty because . . . such problems could result in considerable costs related to defending a regulatory action and, ultimately, in the imposition of substantial fines.  Thus, the regulatory action and any ensuing fines were a part of the alleged harm the Plaintiffs suffered, and the failure to disaggregate the action and fines did not preclude class certification.").

in the DOJ complaint, Dr. Nye states that the DOJ complaint's ramifications,[39] such as the

potential penalties, "are foreseeable consequences of the alleged misrepresentations and

omissions."  (Doc. No. 102-2 at ¶ 24.)  Defendants agree that an event study like the one

proposed by Dr. Nye is a common methodology in securities cases, (Doc. No. 101-1 at 21), but

argue here Plaintiff's theory of liability is uncommon because it no longer includes illegality.

(*Id.*)  Defendants contend that Dr. Nye's event study fails to disentangle the confounding effect

of Teva's potential exposure to fines and penalties, as well as unrelated litigation and increased

regulatory scrutiny (the "foreseeable consequences").  (*Id.*)  Defendants present their damages

expert, Dr. Jennifer Marietta-Westberg, who asserts that "Dr. Nye's damages framework fails to

address the economic implications of the mismatch between the filing of the DOJ complaint and

the alleged misrepresentations."  (*Id.* at 22 (citing Doc. No. 101-2 ¶¶ 90–122).)  Dr. Marietta-

Westberg posits that Dr. Nye provided "no economic basis for his assumption that the DOJ

complaint was a foreseeable consequence of the alleged conduct" or any "economic

methodology for determining whether" it was.  (Doc. No. 101-2 at ¶ 91.)

    The Court finds that the question of whether the damages resulting from the market's

reaction to the risk of penalties and fines following the DOJ complaint are a foreseeable

consequence caused by Defendants' misrepresentations and whether these damages must be

disentangled, is a question of loss causation not properly before the Court at this time.  *See*

*Amgen*, 568 U.S. at 475 ("[P]laintiffs are not required to establish loss causation . . . on class

certification.");  *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM) (RWL), 2019 WL

3001084, at *20 (S.D.N.Y. July 10, 2019) ("Professor Ferrell's contention that Plaintiff's

---

[39] Dr. Nye also considers the "compounding effects" of the DOJ complaint "on the market's reassessment of potential outcomes for unrelated Teva litigation and general increased regulatory scrutiny of Teva" as foreseeable consequences of the alleged misrepresentations.  (Doc. No. 102-2 at ¶ 24 (citation omitted).)

methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, *because it tests the causal relationship between the alleged misstatements and the price decline*.") (emphasis added); *Apple*, 2022 WL 354785 at *12 ("[A]ttacks on the fit between an alleged corrective disclosure and a prior alleged fraudulent statement are nothing more than attacks on loss causation.") (cleaned up).

And, even if this Court later finds that the damages relating to the market's reaction to the risk of penalties were not caused by the Defendants' original misrepresentations, and must be disaggregated, this does not impede class certification. *See Signet Jewelers*, 2019 WL 3001084, at *16 ("[T]he Court rejects the suggestion that an event study is incapable of disaggregating the effects of confounding information. . . . [W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate."); *Allergan*, 2021 WL 4077942, at *15 (same); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018) ("Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone."). Such disaggregation of the effects of confounding information—e.g., loss from drops in the stock price unrelated to the Plaintiff's theory of harm— need not be established at this juncture.[40] *Id.* Plaintiff's expert testified that it would be possible

---

[40] Defendants also argue that Plaintiff's damages methodology is inconsistent with their theory of liability because there is no evidence that market analysts changed their expectations of Teva's future Copaxone revenues upon the filing of the DOJ complaint, and a central economic principle is that the value of the firm is equal to the present value of its expected future cash flow. (Doc. No. 101-1 at 24.) Defendants suggest that future sales projections did not decrease because the market was already aware of the practice of donations by pharmaceutical companies to charities. (*Id.*) However, Defendants do not provide any case law to support the application of this theory to the damages predominance analysis. (*Id.*) To the extent that Defendants argue that this Court should deny the motion for class certification because the market was already aware of Teva's conduct, this is an argument relating to reliance, which Defendants

to disaggregate the risk of potential fines and penalties from the underlying facts of Defendants' scheme using his event study methodology.  (Hr'g Tr. 49:9–51:12.)  Additionally, he explained that he would disentangle these price impacts upon the completion of fact discovery by "go[ing] through samples of regulatory enforcement actions [which] reliably and scientifically got published in the Journal of Finance [and] estimate what the impact of litigation costs are, what reputational costs are, what the impact of the actual truth of the underlying misconduct is."  (*Id.* at 50:8–18; *see also* Doc. No. 101-14 at 110:13–115:16 (Dr. Nye testifying during his deposition regarding his methodology for disaggregating confounding effects on stock price).)  Significantly, whether or how to disaggregate losses relating to the risk of penalties after the DOJ complaint is a question common to the class, and does not defeat Plaintiff's showing of predominance.  *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 98–99 (S.D.N.Y. 2018) (in a case where the plaintiff's damages model incorporated the damages resulting from both the illegal activity (which was not actionable) and the defendant's false statements, holding that this did "not impede class certification" because "[e]ven if this case had only one plaintiff who bought only one share, we would still have to figure out the same issue: whether there is a quantifiable difference between the two theories of liability, and if so, how much of the price drop is attributable to the alleged cover-up as opposed to the actual illegality. . . . .  The answer for the class will be the same as the answer for the hypothetical lone plaintiff.").  (cleaned up).

---

have not properly argued.  And, at bottom, Defendants "cash flow" argument is an issue of loss causation, which is not properly decided at this stage of litigation.  *Amgen*, 568 U.S. at 475.  Defendants remarked in their argument only that Teva analysts did not change their expectations of Teva *revenues* following the DOJ complaint.  (Doc. No. 101-1 at 24.)  But, the economic principle states that the value of the firm is equal to the present value of its expected future *cash flow*, which includes both revenues *and* losses. (Doc. No. 102-2 at ¶ 53.)  These losses could include those losses related to the potential fines and penalties following the outcome of the DOJ complaint.  (*Id.* at ¶¶ 54–55.)  As discussed, this involves the same question of loss causation regarding whether Plaintiff should recover damages relating to the price impact of the market's reaction to the risk of fines and penalties.  Again, loss causation is not addressed at the class certification stage.

***Overly Vague Damages Model***

Finally, the Court addresses Defendants' argument that Dr. Nye's damages model is

overly vague.[41]  Dr. Nye proposes an out-of-pocket event study methodology to measure class-

wide damages.[42]  (Doc. No. 90-3 at ¶¶ 67–71.)  The proposed out-of-pocket methodology has

---

[41] Defendants argue that "saying an event study could be used is almost as generic as saying 'financial economics' would allow [Dr. Nye] to calculate damages."  (Doc. No. 101-1 at 21.)  Defendants suggest that Dr. Nye's "trust me" argument is insufficient under Rule 23 to establish that damages are capable of measurement on a classwide basis."  (*Id.* at 25.)  The Court disagrees.

[42] The "out-of-pocket" measure is the "difference between the inflation at the time of sale for the securities minus any inflation of securities at the time of purchase."  (Hr'g Tr. at 55:2–4.)  Dr. Nye's proposed methodology is as follows:

> In what follows, I set forth the general economic framework for quantifying per-security damages on a Class-wide basis, which reflects methodologies I would propose to use if asked to calculate damages in this matter.  Although damages, if any, for each individual class member may vary, the methodologies for calculating damages described below would be commonly applicable to each Class member in this matter. . . . Price inflation may be measured on a Class-wide basis by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk.  The decline in a security's price in response to such events reflects the dissipation of price inflation created by earlier misrepresentations and/or omissions.  An event study can be used to isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors.  Other factors can include changes in market and industry conditions or the dissemination of material, non-fraud-related, Company-specific information.  This event study analysis applies to all Class members, regardless of the extent to which the price movement is due to corrective disclosures and/or the materialization of a concealed risk.  After isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the Class Period, and on a Class-wide basis for each member of the class.  Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis.  For each Class member, damages incurred on a security acquired during the Class Period and retained through the end of the Class Period are equal to the amount of inflation at purchase. For a security acquired during the Class Period and sold later in the Class Period, damages are the price inflation at purchase minus the price inflation at sale. Given my understanding of the Supreme Court's ruling in *Dura*, a security purchased during the Class Period and sold before the first corrective disclosure and/or the materialization of a concealed risk is ineligible for damages.

been widely accepted. *See Vrakas v. U.S. Steel Corp.*, Civil Action No. 17-579, 2019 WL
7372041, at *9 (W.D. Pa. Dec. 31, 2019) (citing *City of Miami Gen. Empls. Ret. Tr. v. RH, Inc.*,
Case No. 17-cv-00554-YGR, 2018 WL 4931542, at *3 (N.D. Cal. Oct. 11, 2018) ("[T]he out-of-
pocket, or event study, method is the standard measurement of damages in Section 10(b)
securities cases.")).  Although Defendants argue that Dr. Nye's damages model does not
appropriately specify how damages would be calculated in this case, other courts have accepted
nearly identical methodology at the class certification stage as capable of measuring damages on
a class-wide basis. *See Roofer's Pension Fund*, 333 F.R.D. 66 *and* Motion to Certify Class,
Exhibit 1, Expert Report of Dr. Zachery Nye (Doc. No. 163-2), at ¶¶ 61–65, *Roofer's Pension
Fund v. Papa*, 2:16-cv-02805-MCA-LDW (D.N.J. Nov. 30, 2018) (nearly identical damages
methodology proposed by Dr. Nye accepted at class certification); *Waggoner*, 875 F.3d 79 *and*
Motion to Certify Class, Exhibit A Expert Report (Doc. No. 57-1), at ¶¶ 76-80,  *Strougo v.
Barclays PLC*, 1:14-cv-05797-SAS (S.D.N.Y. July 24, 2015) (same); *see also EQT Corp.*, 2022
WL 3293518, at *28 ("At this stage of litigation, Plaintiffs are not required to produce a detailed
damages model.") (cleaned up); *Set Cap. LLC v. Credit Suisse Grp. AG*, 18 Civ. 2268 (AT),
2023 WL 2535175, at *6 (S.D.N.Y. Mar. 23, 2023) ("Defendants argue that Mitts' proposed
methodology for measuring the Misrepresentation Class' damages is unsound and unreliable
because he 'fail[s] to identify a corrective disclosure" for his proposed event study or to explain
how he would "undertake an event study without a corrective disclosure.' . . . .  However, at the

---

Similarly, a security that is both purchased and sold between two
consecutive disclosures of corrective information is ineligible for
damages.  Finally, per-security damages should also incorporate the so-
called '90-day lookback' provision of the Private Securities Litigation
Reform Act of 1996, which also can be applied on a Class-wide basis. . . .

(Doc. No. 90-3 at ¶¶ 67–71 (citations omitted).)

class certification stage, and before the completion of fact discovery**, *it is sufficient for Mitts to outline his methodology and how he will apply it.*") (emphasis added and citations omitted).

*     *     *

The Court concludes that Plaintiff's proposed damages model is consistent with Plaintiff's theory of liability.  Plaintiff has established that the class is sufficiently cohesive to warrant adjudication by class representation.

### 2.  Superiority

Last, Rule 23(b)(3) requires that a class action be the "superior [method] to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Rule provides a "nonexhaustive list of factors" relevant to evaluating the superiority of the class action mechanism, including (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action."  *Id.*; *Amchem*, 521 U.S. at 615.

Defendants do not dispute that the superiority requirement is met.  And the Court agrees that the class action is the superior method.  "[A]bsent the class action device many potential claims would not be filed: Numerous potential plaintiffs with small damages claims would not be warranted in litigating a lengthy securities fraud action such as this, while others, who may have more at stake, would flood the courts with individual cases seeking damages on the same theory."  *Utesch*, 2021 WL 3560949, at *10.  "Certainly, class members would have no ability to control the prosecution of separate actions."  *Id.*  "Further, concentration of the case in a class

action would be an efficient use of limited judicial resources." *Id.* "Adjudication by class action presents no obvious manageability problems, as common questions of law and fact are central to each class member's claims." *Id.*

\*      \*      \*

Plaintiff satisfies the Rule 23(b)(3) requirements and class certification is appropriate.

**V.**     <u>**Conclusion**</u>

For the reasons discussed above, the Court grants Plaintiff's motion for class certification.