**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

————————————————————

HALMAN ALDUBI PROVIDENT AND        CIVIL ACTION NUMBER:
PENSION FUNDS LTD.

                                   2020-4660

        Plaintiff,

                                   ORAL ARGUMENT HEARING

        v.

TEVA PHARMACEUTICAL
INDUSTRIES LIMITED, ET. AL.

        Defendant.
————————————————————
        JAMES A. BYRNE, U.S. COURTHOUSE
        601 Market Street
        Philadelphia, PA
        September 21, 2023
        Commencing at 10:30 a.m.

B E F O R E:              THE HONORABLE KAREN S. MARSTON
                          UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

        FARUQI & FARUQI
        BY:  ROBERT W. KILLORIN, ESQUIRE
        BY:  TIMOTHY JOHN PETER, ESQUIRE
        BY:  JAMES MILLIGAN WILSON, JR., ESQUIRE
        3975 Roswell Road, Suite A
        Atlanta, GA 30342
        For the Plaintiff

        WINSTON & STRAWN, LLP
        BY:  JAMES P. SMITH, III, ESQUIRE
        BY:  KERRY C. DONOVAN, ESQUIRE
        200 Park Avenue
        New York, NY  10166
        For the Defendant


            Maureen McHugh, Official Court Reporter
                maureen_mchugh@paed.uscourt.gov

    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.


*United States District Court*

**APPEARANCES CONTINUED:**

OBERMAYER, REBMANN, MAXWELL & HIPPEL
BY:  MATHIEU J. SHAPIRO, ESQUIRE
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
For the Defendant

**WITNESS INDEX**

EXAMINATIONS                                           PAGE


**DR. ZACHARY NYE**
DIRECT EXAMINATION BY MR. KILLORIN              5
CROSS EXAMINATION BY MR. SMITH                  27


**DR. JENNIFER MARIETTA-WESTBERG**
DIRECT EXAMINATION BY MS. DONOVAN              52
CROSS EXAMINATION BY MR. KILLORIN              64, 80
REDIRECT EXAMINATION BY MS. DONOVAN           83

*United States District Court*

THE COURTROOM DEPUTY:  All rise.

(In open court at 10:28 a.m.)

THE COURT:  You may be seated.

All right.  Can I please have counsel state their names for the record.

MR. KILLORIN:  Good morning, Your Honor.  I'm Robert Killorin, and my partner, James Wilson, and my other partner, Tim Peter from our Philadelphia office, Faruqi & Faruqi.

THE COURT:  Okay.  Great to have you here today.

MR. SMITH:  Good morning, Your Honor.  James Smith from Winston & Strawn for the defendants.  With me is my partner, Kerry Donovan and Matthew Shapiro.

THE COURT:  I'm sorry, who are you?

MR. SHAPIRO:  Matthew Shapiro.

THE COURT:  Okay.  Good to see all of you.  Thank you for being here.

All right.  And thank you all for making the arrangements for, I think, a few experts to be here today.  I think I want to start with that, if that works for everybody.

So I'm going to hear -- and do you want -- I think they should hear -- do I see maybe your expert right there and is this Dr. Nye?  Okay.  Great, all right.

All right.  Would you like to present Dr. Nye first?

MR. KILLORIN:  Yes, we would.  Thank you.

Where would you like Dr. Nye?

*United States District Court*

THE COURT:  The witness stand would be great, and you can come to the podium.

THE COURTROOM DEPUTY:  Remain standing.  Raise your right hand, sir.

(**DR. ZACHARY ROLAND NYE**, HAVING BEEN DULY SWORN OR DULY AFFIRMED, TESTIFIED AS FOLLOWS:)

THE COURTROOM DEPUTY:  Please be seated.  Thank you.

Try to keep your voice up, please talk into your mic, and state and spell your name for the record please.

Go ahead, sir.

MR. KILLORIN:  I have extra copies of his original report and reply report, and I'm not going to put those into the record unless he needs the copy or --

THE COURT:  Do you want to have copy with him?

MR. KILLORIN:  I think he's got --

THE COURT:  He's got it all memorized?  Including all Exhibit 11A, B, C, D, and 12.

MR. KILLORIN:  Good point.  Thank you.

THE COURT:  I am joking.

MR. KILLORIN:  No, no.  Actually, I was thinking he was going to bring his copy up.

THE COURT:  I'm sure we all have our copies of everybody's expert reports and exhibits.

It's been a lot of fun, let's just say.

THE WITNESS:  Yes, Your Honor.

*United States District Court*

THE COURTROOM DEPUTY:  Excuse me.

Will the witness please state and spell his name for the record, please.

THE WITNESS:  Yes, sir.  My name is Zachary Roland Nye.  Z-A-C-H-A-R-Y, middle name is R-O-L-A-N-D, last name is N-Y-E.

DIRECT EXAMINATION

BY MR. KILLORIN:

Q.   Dr. Nye, do you wear or affirm the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

A.   Yes, sir.

Q.   All right.  Dr. Nye, would you please tell us about your background and experience, briefly?

A.   Sure.

I'm a financial economist.  I work at the Stanford Consulting Group.  I'm a vice president there.

My academic background is I have a bachelor's degree in quantitative economics from Princeton University; a master's of science in financial economics from the London Business School; and a Ph.D. in financial economics from the University of California at Irvine.

Q.   All right.  And you've been retained to provide expert opinion in the case; is that correct?

A.   That's correct.

*United States District Court*

Q.    And what was the scope of your assignment?

A.    I was asked to assess the market efficiency of the Teva's securities during the class period, as well as describe or opine as to whether damages can be estimated in this matter using a method that's common to the class and in a manner that's consistent with plaintiffs' theory of liability.

Q.    And have you ever provided such an analysis before?

A.    I have, many times at this point.

Q.    Can you estimate how many times you have provided expert opinions at the class certification phase of a proceeding?

A.    I think it's around 40 times over the past 10, 12 years. And the issues -- it used to be just market efficiency, but then --

THE COURT:   That was easy, right?

THE WITNESS:  Yeah.  I mean, not so hard.  We've got to do it.

THE COURT:   You have job security.

THE WITNESS:  Well, I hope so.  There's AI.  I'm worried about AI.

THE COURT:   Well, that's true.

THE WITNESS:  And then Comcast, in my understanding, that came along and all of a sudden, we started talking about damages methods at the class certificate phase.

But yeah, I think around 40 times.

BY MR. KILLORIN:

*United States District Court*

Q.   Okay.  And regarding the damages methods, what methodology did you feel was most appropriate for this case?

A.   In this case, as in most of the cases, because mostly my cases are securities class actions under Section 10(b), sometimes there's other statutes for Section 11, whatever is involved, but for Section 10(b), my understanding is that the out-of-pocket method of estimating damages -- it's referred to as the events study methodology -- is the standard and traditional measure of damages in these settings.

Q.   And after your report was issued, a new Third Circuit case came out, University of Puerto Rico Retirement System versus Lynette.

     Have you had a chance to review that recent decision which comments on your methodology?

A.   Well, I think it's another expert that was in that case, but it's the same methodology.

Q.   No, no.  I'm just asking, have you seen the case?

A.   Yes, I have.

Q.   And does that change any of the opinions you rendered in your report?

A.   No.  I think that's -- my reading of that order is that the out-of-pocket method is appropriate for Section 10(b) cases.

Q.   Okay.  And have your prior opinions been accepted by federal courts in the class certification phase?

*United States District Court*

A.   Yes.  I've never had a court exclude or reject my testimony at the limited class certification phase. Sometimes -- you know, my opinions are not challenged in any way.  Sometimes there's a price impact argument, sometimes there's a market efficiency challenge, sometimes, like here, there's a challenge to the damages methodology.

I guess what's relevant today is I've had, I think, about 12 reports over my career courts specifically comment that my methodology is appropriate for estimating damages in those Section 10(b) cases and could be employed in a manner that's consistent with plaintiff's theory of liability.

Q.   Does your damage of methodology include the ability to disaggregate or parse out confounding factors?

A.   Yes, it does.  The out-of-pocket method is -- has been used many times, hundreds of times over the decades, and it's an offshoot of the academic and study literature, you know, finance and accounting and economics professors put forth in their research, and it is robust to confounding information in escalating the effects of fraud-related information that is company specific.

I have had to disentangle the company's specific returns in my event studies on other cases, and I use the tools of financial economics to do so.

Q.   All right.  And at the class certification phase, before discovery has been had, do you attempt to imagine all the

*United States District Court*

possible compounding factors that may present during the case and explain how you would disentangle them?

A. No. I'm not asked to do that at this phase ever because my understanding is the fact discovery is incomplete and there's issues of lost causation, which is the effort that would determine what's good founding information, would be what is -- what part of those financial losses that investors suffer as a result of the revelation of the alleged truth, how much of that is causally connected to the alleged misrepresentations.

That exercise, actually, is premature to do at class certificate phase, so I'm not asked to do that. And the Courts who have accepted my methodology have commented to that fact as well; that it's premature to do at this stage.

Q. All right. And you have seen the expert opinion of defense expert, Dr. Marietta-Westberg, who I understand prefers the title Dr. Marietta, so I'll use that unless there's an objection.

THE COURT: That's fine. Thank you.

BY MR. KILLORIN:

Q. So you've seen the expert report of Dr. Marietta?

A. Yes, I have.

Q. And you prepared a reply report that addresses her thoughts in that report; is that correct?

A. Yeah, that's correct.

Q. And the Third Circuit case you reviewed, do you know who

the defense expert was in that case?

A.   Yes.  I believe it was Dr. Marietta.

Q.   And in -- let me ask it this way.

Does Dr. Marietta opine that the alleged misrepresentations in this case affect price impact, or does she give an opinion at all?

A.   No.  I believe in her deposition she clarified she does not have an opinion on price impact in this matter.  And I don't think she analyzed the price decline on August 18, 2020, in response to the DOJ complaint at all.  Or examined the contents of the complaint.

Q.   All right.  And is it true that on that day, the price of Teva securities took a substantial decline on that day?

A.   Yes.  According to my progression model, which I prepared for the purpose of analyzing market efficiency, net of market industry effects appears that the Teva Securities suffered a statistically significant decline on August 18, 2020.

Q.   Does Dr. Marietta in her report offer any explanation for that price drop?

A.   No.

Q.   Was that actually excluded from her assignment?

A.   I believe so.  I'm sure we'll talk about it, but my understanding is her assignment was more to discuss potential challenges with the estimation of damages in this case.

Q.   And did Dr. Marietta propose an alternative methodology?

A.   For estimated damages?

Q.   Yes.

A.   No, she did not.  Nor does she dispute the general applicability of the out-of-pocket method for estimating damages in Section 10(b) cases, or that that's a common measure; that it can be applied commonly across a class of investors.

Q.   And did she have any opinion at all legally as to when that methodology, the application of that methodology, is complete in a case to calculate damages for investors?

MR. SMITH:  Objection.

THE COURT:  Basis?

MR. SMITH:  Calls for legal opinion.

MR. KILLORIN:  It calls for his understanding of her report.

THE COURT:  I'll overrule it.

THE WITNESS:  Sorry.  Could you repeat the question?

BY MR. KILLORIN:

Q.   Sure.

Did she provide any opinion as to when that methodology would be completed at a securities case to render a result on actual damages suffered by investors?

A.   In her report, there's no discussion of the timing of when these analysis occurred.  I want to say in the deposition, but I may be incorrect in my recollection, that that merits phase

*United States District Court*

was what was the appropriate time to actually estimate damages, if that's answering your question.

Q.   It basically does.

And were her critiques of your proposed methodology, from a purely economic point of view, untethered to the legal requirements of a securities case?

A.   Honestly, I look at her opinions as almost legal analysis. It's talking about whether certain parts of the decline are causally connected to the alleged misrepresentations.

So I don't feel like the -- the economic side of it is not a hundred percent clear to me.  It's really seems to be a dispute over what's compensable in terms of damages.

Q.   And do you ever make that determination at the class certification phase?

A.   I never make that determination.  I'm an economist, and I use the tools of finance and economics, such as regression analyses, discounted cash flow modelling, to hopefully help the trier of fact determine losses and causation of damages.

Q.   And is that actual determination, as you said, reserved in the merits phase of litigation?

A.   That's my understanding.

Q.   Does Dr. Marietta have an affirmative opinion that damages cannot be estimated on a classified basis in this matter?

A.   No, she does not.

Q.   Does Dr. Marietta challenge your opinion on the -- that

*United States District Court*

the out-of-pocket method can be used to quantify damages on a class on a live basis ultimately in the case?

A.   She doesn't dispute that it could be performed using out-of-pocket methods, and she -- my understanding is that she's raising challenges to the implementation of that method so that it can be fashioned in a manner consistent with plaintiffs' theory of liability.

Q.   And what -- I'd like to talk now about those specific challenges that she raises.

Can you briefly summarize what you say in your reply to Dr. Marietta's opinion that, quote:  Information about pharmaceutical companies' donations to charitable paths generally, and Teva's donations to charitable paths specifically, was publically available prior to the DOJ complaint filed on August 18, 2020?

A.   Sure.  And by "paths," Patient Assistance Programs.

Dr. Marietta, in her report, has a long section about the fact that there was other companies, pharmaceutical companies and general foundations, that had either settled or been investigated by regulators for these donation structures; and that it was public knowledge that those other companies had potentially run afoul of regulations.

She also points to Teva's own risk disclosure in their SEC filings; that they are doing their best to comply with federal regulations but that it may not work out, and they could have a

*United States District Court*

material adverse affect on their stock price if they're found to be non-compliant.

However, in my opinion, she omits the fact that all that information would be already reflected in the stock price prior to the August 18, 2020, DOJ complaint.  And in an efficient market, stock price changes occur to the revelation of new information, not old information, because it's already reflected in the price.

And the information she cites is not even close, in my opinion, to the information revealed from the DOJ complaint, which is 400-plus pages long, has 70 exhibits with evidence, is my understanding outlined, and it's, like, affidavit testimony from the founder of -- I think it's Acute Care Scripts and the co-founder of the assistance fund describing what is alleged to be anti -- I'm sorry, kickback scheme in this case with those foundations.

There's internal emails.  There's spreadsheets that describe the amounts that are trading hands.  There's a lot of information and it's previously (inaudible).

It's also commented on by the analyst and the financial news media that this is a new, shocking development.  And it is -- they attribute the price decline to the DOJ complaint, including, yes, the ramifications of the DOJ complaint, which includes the potential for treble damages, fines, penalties, reputational consequences.

*United States District Court*

But that's all part of the alleged harm here, at least based on my understanding of plaintiff's theory of liability.

It's also well known that if you violate or a company violates the False Claims Act, there is a potential for treble damages.  That's in the statute, my understanding is that it's there, and I cite it in my report.

So it's not a surprise when a company gets in trouble or runs afoul of regulators that there could be these adverse consequences, foreseeable consequences of the underlying conduct.

So I should have started with this, but that whole section about prior information was -- I think Dr. Marietta uses to motivate the notion that there may be problems with using the company's specific declines on August 18, 2020.  But I believe that it depends on the loss causation, what is causally connected between the loss and the alleged misrepresentations.

Q.   All right.  From a high-level view, is the efficient market presumed -- well, first of all, Dr. Marietta, she did not challenge that this is an efficient market; is that correct?

A.   That's correct.  She assumes that it's sufficient for analysis.

Q.   It's part of the efficient market theory that the market --

(Reporter clarification.)

*United States District Court*

Q. Does the efficient market theory presume that all publicly available information has been digested by the market and is reflected in the current price?

A. Yes.

Q. And is it true that your analysis focuses on not the old information listed or stale information listed by Dr. Marietta leading up to that day but the new information that you believe caused the price decline?

A. Yeah. Right. I think if you're going to say that you can't use the full price decline on an event, you should analyze the event rather than prior events.

Q. Did Dr. Marietta ever look at what information in the complaint was new as opposed to the long list of old information she listed?

A. Just based on my reading of her deposition transcript, no.

Q. All right. And in your reading of her report too.

A. Yes, not in her report at all. And I think it was clarified in deposition that she did not analyze the contents or whether there was new information conveyed by the DOJ complaint.

Q. Okay. Do you consider that makes her criticism fatally flawed?

A. Yes, I do. I think an event, somebody has to examine the event.

Q. Not prior events, but an efficient market.

*United States District Court*

A.   Yes.

Q.   Can you briefly summarize your reply to Dr. Marietta's opinion that you have failed to put forth a damage methodology that addresses the economic implications of the mismatch between the filing of the DOJ complaint and the alleged misrepresentations?

A.   Sure.

This is kind of the second half of Dr. Marietta's report, and it concerns whether there's a mismatch, which in her opinion there is.  But the definition she gives seems to me to read if it's not a mirror image disclosure at a corrective event, you can't possibly have a match.

She also provides no source or authority for her definition, and so I point that out in her report and describe also what appears to be a match, in my opinion, and just as an economist, to me the alleged misrepresentations, which plaintiff is alleging that defendants concealed or failed to disclose the alleged kickback scheme for paying Copaxone copays, wasn't revealed in a corrective disclosure in which the Department of Justice alleged that Teva was engaged in a kickback scheme that violated the kickback statute in the False Claims Act.

There's more nuances to that in my report, but fundamentally it seems like they both -- the subject of both alleged misrepresentations and the corrective event are the

same.  It is the alleged kickback scheme.

Q.  All right.  Can you briefly summarize your reply to Dr. Marietta's opinion that you have failed to put forth a damages methodology that accounts for any price decline in Teva's securities due to Teva's increased financial exposure to potential trebled damages award, penalties, or settlement of the DOJ?

A.  So this is a byproduct of Dr. Marietta's mismatch opinion, but ultimately it's a loss causation issue.  Are those ramifications, as I describe them, of the DOJ complaint causally connected to the --

THE COURT:  Aren't you calling them "foreseeable consequences"?

THE WITNESS:  Yes, I am, both.

THE COURT:  I just want to make sure.

THE WITNESS:  Yeah, sorry.

And foreseeable -- yes.  Let's call them foreseeable consequences.

Are they causally connected by the company's failure to disclose the underlying kickback scheme.  And if they are causally connected, then foreseeable consequences of that failure to disclose the scheme, then the full price declines, which include the effects of potential trebled damages, fines -- there's, like, regulatory oversight.  Sometimes they'll park a monitor at the company and it creates a real

*United States District Court*

inefficiency.

All those effects seem to me to be part of the alleged harm under plaintiff's theory of liability, which is what I'm doing right now, or at this phase, is, given that theory of liability, can damages be estimated in the manner consistent with that?

Well, the theory is alleged harm from those uncommon effects -- or foreseeable consequences -- of fraud. The complaint mentions that the alleged kickback scheme increased the likelihood of regulatory scrutiny, fines, penalties, and I believe reputational consequences. And so those are, at least under that theory, seem to be fundamentally at its core caused by the alleged kickback scheme.

And I just want to reiterate the Department of Health and Human Services, I believe, HHS, I might be getting that wrong, but Special Advisory Bulletins in 2005 and 2014 which said that these types of conduit structures between pharmaceutical companies and these charitable paths implicate the kickback statute; that they pose a significant risk of program and patient fraud and abuse.

The bulletin states that these structures squarely -- are squarely prohibited by the antikickback statute, but that they don't necessarily violate the antikickback statute because it would be required to have a review to go on a case-by-case basis of the facts and circumstances and intent of the parties,

*United States District Court*

but that these structures will invite heightened regulatory scrutiny if uncovered, and that's exactly what happened, it seems to me, based on the DOJ's complaint on August 18, 2020.

Q. Is it true that most securities complaints do not venture to list every type of possible regulatory scrutiny alleged and proven?

A. Sorry. Can you please repeat that question?

Q. Yeah.

Is it true that most securities cases do not attempt to postulate or list every possible federal law violation and every possible type of regulatory scrutiny and then allege every element of those violations and prove them in the securities case?

MR. SMITH: Objection. That's outside the scope of this witness's expertise, Your Honor.

MR. KILLORIN: I can -- will you let the witness answer it, or I can withdraw it. I think it goes to his expertise.

THE COURT: I'm going to sustain the objection.

MR. KILLORIN: That was based on his experience. That's all right.

BY MR. KILLORIN:

Q. Can you briefly summarize your reply that -- your reply to Dr. Marietta's opinion that you have failed to put forth a damages methodology that accounts for any price declines in

Teva's securities due to the market's re-assessment for potential outcomes for unrelated Teva litigation and general increased regulatory scrutiny on Teva?

A.   Yes.

     Dr. Marietta describes four analyst reports that, in her opinion, support the notion that the DOJ complaint may have heightened investor fears regarding Teva's other litigation risks.  I think mostly the opioid litigation.

     Two of those -- and it's in her report -- they just say that the DOJ complaint as to the company's legal overhangs.  So that's not a compounding effect, that's not an incrementally indirect effect.  It's a direct effect of the so-called Copaxone donation kickback scheme, according to those analysts.

     One does say that -- and I believe it could have a compounding effect on the company's current legal overhangs. I'm not sure necessarily what that means.  But it's all in the context of, hey, the DOJ report just happened.  It is bad news for Teva, and it's similarly bad to their other legal liabilities.

     So there's no new information on this day about opioid litigation or other legal problems that Teva was having.  The only information disclosed was the DOJ complaint.

     And then I think there's a fourth analyst report that describes if they are increasing their liability forecast by a billion dollars, based on today's event, five hundred million

is due the DOJ complaint involving Copaxone, and the balance, they say, is due to other legal overhangs.

At the beginning of that report, the author talks about a recent development in the opioid litigation that occurred on Monday, so the day before. And it appears to me, written context, to me that the analyst is updating its model for both events that occurred within a couple of days. Either way, it's a lost causation issue and whether these effects are causally connected to the DOJ report or not.

And at this point, we have -- neither I or Dr. Marietta-Westberg have actually done that lost causation event study analysis. So it's premature for either of us to say whether those had a material contribution to the stock decline on August 18, 2020.

Q. In your experience in securities litigation, do both sides ultimately do those studies after discovery?

A. That's my experience, is that the merit -- so-called merits phase, that's when I've been asked to examine corrective events and their influence on pricing.

Q. And have defendants prepared their own expert's calculation?

A. Sometimes, yes.

Q. Can you briefly summarize your reply to Dr. Marietta's opinion that you have failed to put forth a damaged methodology to account for the DOJ complaint and associated price responses

being at least in part materialization of a previously

disclosed risk?

A.   Yes.

So fundamentally, and I describe this in my report, this is another issue involving market efficiency.  The so-called previously disclosed risks are again what Dr. Marietta describes as the other pharmaceutical companies having issues with regulators during the class period and Teva's own risk disclosure.

All of that information, all those previously exposed risks are going to be embedded in the stock price immediately prior to the publication of the DOJ report.  We see that when the DOJ report is published, stock prices fall significantly, which is consistent with market efficiency in that only material, new, value-relevant information should influence stock prices.  And after reading the DOJ complaint, it appears to contain a lot of that.

Q.   Are you aware that plaintiff's theory in the case -- in plaintiff's theory of the case, the legality or illegality of Teva's actions regarding the antikickback statute and any federal violation, whether it's the legality or illegality, is immaterial, or largely immaterial?

A.   Sorry.  Please repeat the question.

Q.   Sure, sure.

Are you aware that in plaintiff's theory of the case,

*United States District Court*

whether or not Teva violated any federal statutes is largely immaterial?

A.   My understanding is that yes, that's true, in that there it requires a determination by a trier of fact as to whether something is in violation of an antikickback statute or False Claims Act.  That's, indeed, what the Special Advisory Bulletins the Federal Government issued prior to the class period said.  What they did say is that such charitable PAP conduit structures would implicate any kickback statute and raise regulatory scrutiny, and that's what occurred at the end of the class period.

Q.   Are you aware that plaintiff only has one count of violation of federal statutes and that two, that they are related?  And that is Section 10(b) of the Securities Exchange Act and in Section 20(a) for control person liability?

A.   That's my understanding, yeah.

Q.   And is it your understanding that that's all plaintiff has to prove to prevail in this case?

A.   I'm not a lawyer.

Q.   Okay.  That's fine.  That's not a trick question.  That's okay.

Is it your testimony that that stock price decline on the day the DOJ complaint was released was not because of proof of illegality but fear of investors; that potential damages from alleged illegality?

*United States District Court*

A.   Yes, that is true.

So stock prices are basically a game of probabilities. But what is the probability of certain states in the world in the future?  Is it going to be lined roses, or is it going to be trouble with a regulator, or something in between?  And investors are constantly updating the probabilities associated with those future states of the world, and how information affects investor expectations is what ultimately leads to stock price changes.

Here, there were allegations made by the Department of Justice involving potential violations of the False Claims Act and the antikickback statute, not a finding of guilty, or illegality, as Dr. Marietta describes in her report.

Q.   And was there also details of the scheme providing all the evidence that the Department of Justice cared to put in their complaint to prove those allegations?

A.   Yeah.  As I describe them today in my report, there's north of 400 pages of evidence that DOJ describes in the complaint.

Q.   Does 427 sound right?

A.   Yes.

Q.   And would a reasonable investor look at all the details to the scheme and reasonably have fear of economic repercussions for Teva and, thus, lower their estimate of the fair stock price?

*United States District Court*

MR. SMITH:  Objection.  Calls for legal conclusion, and outside the scope of the witness's expertise.

THE COURT:  Can you repeat the question?

MR. KILLORIN:  Sure.  I'll try.

BY MR. KILLORIN:

Q.   Could a reasonable investor look at all the details included in the 427-page DOJ complaint and have a rational fear of possible economic or financial problems for Teva down the road and, therefore, on that day lower what they consider a fair stock price for the stock to be?

THE COURT:  All right.  I'm going to sustain the objection.

MR. KILLORIN:  All right.  Give me just a minute, Your Honor.  I think I'm finished.

THE COURT:  Okay.  That's fine.

MR. KILLORIN:  Dr. Nye, that's all the questions I have.  Thank you.

THE COURT:  I mean, this is not a *Daubert* hearing, but are we in agreement that both these experts will be qualified?

MR. KILLORIN:  Yes, that's fine with us, Your Honor.

THE COURT:  He didn't move to qualify as an expert, but I'm going to assume that you're okay with him.

MR. SMITH:  We're okay.  We're not challenging his qualifications, Your Honor, because there's been no *Daubert* motions.

*United States District Court*

THE COURT:  Okay.  Great.  Thank you.

MR. KILLORIN:  Thank you.

THE COURT:  Do you have some cross-examination?

MR. SMITH:  I'd love to do a little brief cross-examination.  Thank you.

CROSS-EXAMINATION

BY MR. SMITH:

Q.  Good morning, Dr. Nye.

A.  Good morning.

Q.  Good to see you again.

A.  In person this time.

Q.  In person this time.  That's correct.

Just a couple of questions.  I know you spent a good bit of your direct testimony talking about your views of Dr. Marietta's report.  I want to talk a little more about your own opinions in your report.

First, I want to make sure I heard clearly your answer to one of the last questions, which was that the stock drop in this case was the result of fear of investors of potential consequences of alleged illegality.  And you said yes.

Right?

A.  Was that the last question that was objected to?

THE COURT:  No, you didn't answer the last question.

MR. SMITH:  No, it was before that one.

THE WITNESS:  Sorry.  Repeat the question.

*United States District Court*

BY MR. SMITH:

Q.   Mr. Killorin asked you, is it your opinion that the stock drop in the case was the result of fear of investors of potential consequences of alleged illegality.

MR. KILLORIN:  Objection, Your Honor.  I'm not sure if that's the question I asked.  I would like --

THE COURT:  All right.  Well, he can ask the question.

MR. KILLORIN:  Why don't --

BY MR. SMITH:

Q.   Is that your understanding?

MR. KILLORIN:  Objection, Your Honor.  I don't know the question I asked.  If he wants to ask a fresh question, I think that would be the most appropriate --

MR. SMITH:  I'll do that, Your Honor.

THE COURT:  Thank you.

BY MR. SMITH:

Q.   Is it your understanding that the stock drop in the case was the result of fear of investors of the potential consequences of alleged illegality?

A.   I don't think I said that.

THE COURT:  He's not asking that now.

BY MR. SMITH:

Q.   I'm just asking if that's your opinion?

THE COURT:  We've moved on.

THE WITNESS:  Okay.  The term "illegalities," I know,

*United States District Court*

is the hot button issue here.

THE COURT:  It clearly is.

THE WITNESS:  So I'm hesitant to answer anything to that effect.

What I've been trying to describe is how the Government, the Department of Health and Human Services, describe in their Special Advisory Bulletins that this type of charitable PAP structure was prohibited by the antikickback statute and would implicate the antikickback statute and invite regulatory scrutiny.

BY MR. SMITH:

Q.  Thank you, Doctor.  That was not my question, but I appreciate the answer.

I'm going to take a step back here.  So you understand that the allegations in this case relate to Teva's donations to what are referred to as paths.  As you pointed out, those are patient system programs, right?

A.  Right.

Q.  And you understand the alleged misrepresentations and omissions in the case to be that the company misrepresented the true source of its income related to Copaxone, and through its alleged kickback scheme involving donations to paths artificially inflated demand for the drug, right?

A.  The complaint speaks for itself.  My understanding is that by failing to describe the alleged kickback scheme, defendants

*United States District Court*

misled the market with respect to the source of income from Copaxone.

Q.   Okay.  And you understand the admissions -- you know there are misrepresentations and omissions.  You understand the omissions that are alleged, where the company didn't disclose the allege kickback scheme and its effect on revenues and profits.  That's essentially your understanding, correct?

A.   Sounds okay to me.

Q.   But it's your understanding that it was the regulatory scrutiny that in the end caused the stock price to decline, correct?

A.   No.  So the way I've been thinking about this is in a but-for world, which Dr. Cornerstone and Dr. Marietta asked me to contemplate, what would happen if the company had disclosed the true source of their income and elaborated on the alleged kickback scheme.  It would have informed investors of something -- a structure that implicated the antikickback statute that was -- posed a significant risk of program patient fraud and abuse, would invite or be subject to heightened regulatory scrutiny, which was squarely prohibited by the antikickback statute.

They also were aware that the False Claims Act would be triggered by violations of the -- or implications of the antikickback statute, potentially, and that would carry with it potentially trebled damages.

*United States District Court*

So at its core, it's the underlying conduct that it seems, under their theory, to be the source of the alleged harm.

Q.   Well, I'm asking your opinion as opposed to their theory.

You remember I took your deposition in the case, right?

A.   Yes, I do.

Q.   Okay.  And I don't know if you've got your deposition transcript handy or not, but at page 108 of your deposition transcript --

MR. SMITH:  Your Honor, I believe, has the transcripts, and I think we have multiple copies.

BY MR. SMITH:

Q.   But on page 108, line 6, I asked you:

"What's your understanding of the alleged misrepresentations and omissions in this case?"

And you, consistent with your testimony here today, indicated that:  "The company misrepresented the true source of its income related to Copaxone, and through its alleged kickback scheme, artificially inflated demand for the drug and invited regulatory scrutiny that, in the end, caused the stock price to decline in August of 2020."

Do you remember that testimony?

A.   Sounds about right, yeah.

Q.   Do you stand by the testimony today?

A.   I do.

Q.   Okay.  Now, you understand that plaintiff has consistently

*United States District Court*

argued that his Section 10(b) claims do not depend on whether Teva's action violated the antikickback statute of the False Claims Act, right?

MR. KILLORIN:  Objection, Your Honor.  I think that mischaracterizes our position so there's no basis for that question.

MR. SMITH:  Your Honor, it's a quote from plaintiffs' motion to stay.

THE COURT:  You may ask him.

MR. SMITH:  Thank you, Your Honor.

BY MR. SMITH:

Q.  Do you understand that the plaintiff consistently argued that their Section 10(b) claims do not depend on whether Teva's actions violated the antikickback statute for the False Claims Act?

A.  Do I understand that to be the case?

Q.  Yes.

A.  I -- it's maybe a little more nuanced than that in my mind, but it -- I think it's technically true.

Q.  Have you seen the judge's decision on the motion to dismiss in the case?

A.  I have, yes.

Q.  You have, okay.

So you know that in that decision, the Court found that it is largely immaterial whether Teva's actions were illegal

*United States District Court*

because plaintiff does not argue that Teva was required to disclose the scheme merely because it may have been illegal; rather, plaintiff argues that Teva was required to disclose the scheme because it's what made Copaxone so successful.

You understand that that's the theory of the case, correct?

A. You were just quoting the court's order --

Q. I was quoting the court's opinion, which you indicated you read.

A. Yeah.

Q. Yet your understanding of plaintiffs' theory of liability is that the revelation of previously concealed potentially illegal conduct is what caused investors to suffer harm, right?

A. I think it's part of it. You know, it's, again, the implication -- this type of donation structure implicates the antikickback statute according to the Government for (inaudible); it doesn't necessarily violate it, though, and that's also clear in the Government's Special Advisory Bulletins in 2005 and 2014.

Q. Do you have your reply report in front of you, Doctor?

A. I think so.

Q. Okay. If you do, could you take a look and turn to page 11. And there's a footnote 43 that depends (sic) from paragraph 16.

Are you with me?

*United States District Court*

A.    I am.

Q.    And I'm going to read that footnote.  And it says:

"My understanding of plaintiffs' theory of liability is that the relevance" -- "the revelation of previously concealed potentially illegal conduct caused investors to suffer harm."

Do you see that?

A.    I do.

Q.    You wrote that, right?

A.    Yes, sir.

Q.    And you stand by that?

A.    Yes.  I described it today.

Q.    And, in fact, in explaining why, according to plaintiff, the company's reported revenue of Copaxone -- reported revenues for Copaxone were false and misleading, you say it's because defendants failed to disclose Teva was engaged in an illegal kickback scheme using ACS, TDF, and TAF as unlawful conduits, right?

A.    Are you referring to the quote from the complaint in my report?

Q.    I am.

A.    Yeah, I think that issue's been discussed, at least the motion to dismiss phase.  Those two words, "illegal" and "unlawful," don't necessarily apply to the plaintiffs' theory of liability.  I was just quoting from the complaint as it was originally written.

*United States District Court*

Q.    Well, I'm going to bypass that for now.

I want to go back to your testimony about the efficient market theory and its implications for Dr. Marietta's report, her Exhibit 4 which I think you testified about.

And it's your testimony you found that there was an efficient market for Teva stock, correct?

A.    Yes.

MR. KILLORIN:  Excuse me.  Exhibit 4, which report?

MR. SMITH:  I think it's Exhibit 4 to Dr. Marietta's report.

MR. KILLORIN:  Okay.

MR. SMITH:  Which Dr. Nye testified about on direct.

BY MR. SMITH:

Q.    Your testimony is that all of that information that -- that Dr. Marietta talked about that was pre-corrective disclosure, because there was an efficient market for Teva, stock was already impounded in the stock price, correct?

A.    Correct.

Q.    So as a result of that, the price decline that was observed following the DOJ complaint must have been in response to some incremental new information, correct?

A.    Correct.

Q.    Okay.  Now, let's go back to your reply report and take a look at paragraph 41.  Okay?  It's very long and expands several pages.  But what I'm looking at specifically is on

*United States District Court*

page 34 of your report.

Okay?  Are you there?

A.   Which page?

Q.   34.

A.   Okay.

Q.   And your bullet pointing a number of post-DOJ complaint analyst reports here; is that correct?

A.   Yes.

Q.   And if you look at the -- I think it's the 1, 2, 3 -- the fourth bullet on this page, it says "Truist."

Do you see that?

A.   Yes.

Q.   And Truist says, quote:  What's incremental to our view... The Government alleges that Teva violated the antikickback statute and the False Claims Act.

Do you see that?

A.   Yes.

Q.   So at least in the view of Truist, one of the analyst was the incremental information that caused the stock price to move, right?

A.   That the Government had alleged violations of antikickback statute and False Claims Act --

Q.   Yes.

A.   -- that was part of the information set that was revealed on this day and did contribute to the price decline.

*United States District Court*

Q. Okay. Now you agree, don't you, that any actual penalty or fine resulting from violations of the False Claims Act or the antikickback statute would be the result of the illegal conduct, right?

A. No, not necessarily. I mean -- well, I guess you didn't mention settlement. I was thinking settlement that could be made without any finding of guilty.

But yes, I think the ultimate determination -- I'm speculating. I'm not a lawyer or a regulator, but I could imagine that the final payments of fines and penalties and damages would be towards the end where there is a determination of a violation.

Q. Okay. Let's go back to your report for a minute, and I want to go to Section 10 of your report.

THE COURT: Which report?

MR. SMITH: Thank you, Your Honor.

Your reply report.

THE COURT: What page?

MR. SMITH: I'm going to go to paragraph 54, which if Your Honor would indulge me for a moment, I'll give you the page reference.

THE COURT: 53.

MR. SMITH: Thank you, Your Honor.

BY MR. SMITH:

Q. So on page 53, here you're discussing analyst reactions to

*United States District Court*

the DOJ complaint, correct?

A.   Correct.

Q.   And, again, you've got a series of bulletins.  In the second bullet here, it's Raymond James.

Do you see that?

A.   I do.

Q.   And do you see where it says "Assuming the Government's case is a hundred percent spot on"?

A.   I do.

Q.   And that would mean that Teva had, in fact, engaged in illegal conduct, right, if the Government's case were a hundred percent spot on?

A.   I don't know whether it would be considered illegal or whether it's a violation of some kind of civil statute.  So I'm not a lawyer, so I don't know the technical terms.

Q.   Okay.  It would be as a result of a finding of a violation, right?  If the Government is a hundred percent spot on, the alleged violation and the antikickback statute and the False Claims Act.

A.   Sure.

Q.   Okay.

A.   The finding of some violation, yeah.

Q.   And then it goes on to say "The worst case scenario under the filed action would be the imposition of trebled damages approaching one billion."

*United States District Court*

You may have actually referred to this report on your direct examination.

You see that, don't you?

A.  I do see that.

Q.  And he, at least Raymond James, was highlighting that as what it found significant after the filing of the DOJ complaints, and you've laid that out in your report, correct?

A.  No.  I think while the ultimate determination is certainly significant, or potentially significant, what is incremental new material information to -- relative to the price of Teva stock on this day are -- is the creation of the potential of those adverse outcomes caused by the DOJ complaint.  It's not the finding or violation.  It's merely just a probability of these very extreme outcomes are now more likely to occur.

And in this paragraph, I quote an analyst to -- Jeffrey's talking about it potentially being $6 billion in liabilities.  That's -- you know, this -- it's not about the -- stock prices and investing is about the future always.  It's not necessarily I need it to be a final determination before I update my expectations and assessment of true value.  It's that -- just the potential for there to be these adverse outcomes, implications for foreseeable consequences, that is what can cause and does cause stock prices to change.  And it's the fear of those outcomes, which has significantly increased, in their own words, on the DOJ complaint.

*United States District Court*

Q.   Okay.  Thank you for that.

And to be clear, in this section, what you're doing is you're -- your point is that these analyst reports show that there were revised market expectations for Copaxone profit as a result of the DOJ complaint, right?

A.   Yeah.  I mean, these are now future costs or potential future costs that they are including in these worst case scenarios.  It is what is lowering the expected future cash flows in models in efficient markets, and it's what causes the stock price to decline.

Q.   Right.  So you anticipated my next question.

You're talking about future costs as a result of this.  And by "costs," you mean potential fines and penalties and legal expenses, correct?

A.   Yeah.  There's more to it than that.  There's reputational harm.  There's the direct monitoring.  Is it consent?

THE COURT:  Corporate Integrity Agreement?

THE WITNESS:  Yeah.  That's exactly right.

Those types of burdens can be quite inefficient and costly for firms.  And so it also affects their investor's projections of cash flows going forward.

BY MR. SMITH:

Q.   Okay.  Let's talk about that.

You don't have an opinion on whether any part of Teva's price decline following the August 18th DOJ complaint was

attributable to a change in expected Copaxone revenue or profits on a go-forward basis, do you?  You haven't offered an opinion on that, have you?

A.   No, I have not -- I have analyzed a state in my reply report; I have conducted an event study.  I know that this event, the DOJ complaint, caused the significant price decline on this day, and I've explained in gory detail why.

And we just talked about how the liabilities and other costs are associated with the alleged -- or so-called Copaxone donation kickback scheme.  So that would be applied to Copaxone and other drug future profits.

THE COURT:  Let me make sure I'm understanding.  So are you talking about it would go directly to the bottom line as to Copaxone?

THE WITNESS:  Just in principle, the investors are -- it's a huge part of the company.

THE COURT:  Right.

THE WITNESS:  And so it has its own -- in my model, it would have its own mind on the Copaxone business.

THE COURT:  Right.  Even under those speciality drugs it's a huge --

THE WITNESS:  Yeah.

THE COURT:  Right.

THE WITNESS:  Exactly.  And so it would be if I've gotten out of liabilities because of Copaxone --

*United States District Court*

THE COURT:  It comes out of --

THE WITNESS:  That's how I would model it.

BY MR. SMITH:

Q.   Right.  So as you said before, you're talking about costs. Forget about exactly how it's accounted for, but what you are not offing an opinion on is any impact on a go-forward basis on Copaxone revenues, right?  Or sales?

A.   I don't have an opinion on that.  The analyst -- I may, upon further review.  The analyst reports are very much focused on the DOJ complaint and the outcome.  And the -- I don't think it -- I think gotten around to now wrapping their heads going forward as far as Copaxone sales.  That would be something to examine further if necessary.

Q.   Well, those same analyst reports do, on a number of occasions which you enumerate, refer to the alleged scheme having taken place from 2006 to 2015, right?

A.   Well, that's the allegation.  That's the time period covered by the DOJ.  I believe the DOJ complaint, someone at some authority, acknowledges that at least until 2018.

THE COURT:  I thought I saw 2018 somewhere, too.

MR. SMITH:  I think that was an independent report as opposed to the DOJ complaint.  It may incorporate it in there, Your Honor, but I think the DOJ complaint alleges that at least as of 2015 and starting in 2006 was the duration of the scheme --

*United States District Court*

THE COURT:  And that is actually the question I have, which you may not be able to answer.  I mean, is it anywhere that the scheme that was in place that brought about the DOJ complaint, whether or not it is ever deemed illegal, that conduct has stopped?

MR. SMITH:  Your Honor, it is somewhere.

THE COURT:  It is somewhere.

MR. SMITH:  I don't have it at my fingertips, but yes.

THE COURT:  We can also agree that whatever scheme was in place, they may not like that word "scheme," but whatever program was in place from the time alleged in the DOJ complaint is no longer in place in that manner.

MR. SMITH:  Yes, Your Honor.

THE COURT:  Okay.

MR. SMITH:  And if it's helpful, between now and the time that we're going to have argument later, I can try to find something.

THE COURT:  If you can find where that is, it's not -- yeah, that would be helpful, but it's not a rush.

MR. SMITH:  Thank you.

BY MR. SMITH:

Q.  So shifting gears a bit.

Now -- so you've testified, and I think it's fairly clear, you believe that the price declines as a result of the DOJ complaint related to potential penalties and fines, and you

*United States District Court*

testified a little bit about the litigation overhang and compounding effects.

But you believe that all of this would be recoverable as damages and that -- I know you don't like the term "backcast," but you understand the term, but you would essentially backcast the entire price decline on the date of the -- on the corrective disclosure date as the measure of price inflation during the class period.

That -- that's essentially the methodology we follow, correct?

MR. KILLORIN:  Quick objection.  That misstates part of the testimony.  He listed settlements as one of the costs involved.  So, with that, please proceed.

MR. SMITH:  Go ahead.  I'm just asking a question.

THE COURT:  I'm going to overrule the objection, and the witness can clarify if he needs to.

MR. SMITH:  Thank you, Your Honor.

THE WITNESS:  I think I testified that the price decline on August 18, 2020, was in response to the DOJ complaint revealing the alleged mechanisms by which the charitable PAP donation structure occurred and that that information implicated antikickback statute, causing the DOJ to sue under false claims violations which carry with it potential damages, fines, penalties, settlement, reputational harm too.

And that's the other thing in your previous question,

if I may.  The reputational harm of these types of regulatory enforcement actions can actually affect the company's ability to sell a product going forward or all their products.  There's academic literature which discuss that as well.  Reputation matters, and that might be the title to the paper.

As far as backcasting is concerned, I have not estimated damages.  I think I explained that in my deposition. I have done that in other cases, and it might be the way to go here.  But first of all, I haven't been asked to estimate damages throughout the class period yet.  And when I do, it will be -- usually it's settled when -- sorry, when plaintiffs have benefit of complete discovery.

Q.  Well, if you weren't going to backcast the entire amount of the stock drop, what other things might you do?

I appreciate you haven't been asked to do it yet, but --

THE COURT:  Isn't this really going to lost causation that I don't have to deal with right now?

MR. SMITH:  I don't think so, Your Honor.

BY MR. SMITH:

Q.  And I want to stop there for a second -- because Your Honor's asked a question -- and shift, maybe, to this notion of foreseeable consequences, Dr. Nye, that you've talked about multiple times.  And I know you levelled the criticism on direct examination about Dr. Marietta's report being essentially loss causation, but foreseeable consequences is

your term that you've injected into this.  And that's a legal term, isn't it?

A.   Yes, it is.  And I think I've been pretty clear about it. It's something that resolved the merits phase.  Right now I have opined on damages and try to disentangle compound information, which I'm never asked to do, but that you need to do in those types of analyses.  I am highlighting, though, in response to Dr. Marietta, and defendant's opposition to the class certification, this argument that you have to disentangle these things.  And I'm just trying to explain why it may not be necessary, and I cite today a number of cases I've been involved with personally where it's been determined at the class certificate phase that it is unnecessary to consider those regulatory enforcement actions and any ensuing fines needing to be disentangled from the disclosures of the underlying conduct itself.

And I am referring to the Waggoner v. Barclays decision.

Q.   But you agree that it's a legal principle, and there's no economic definition of foreseeable consequences, correct?

A.   Well, there is a definition of a foreseeable consequence outside of the legal realm.  And I also in my report try to describe how trebled damages for a False Claims Act is a foreseeable consequence.  That is written in the statute. Charitable PAP structures that are constructed from the manner alleged from the case.  The Government -- the Department of

*United States District Court*

Health and Human Services specifically states that implicates the antikickback statute and will be subject to regulatory screening.

So those are, like, stated consequences of these actions. So --

Q.  My question is a little different, Doctor.

Is there a principle of financial economics called foreseeable consequences that you're aware of?

A.  So there's a related -- in finance, financial economics, it's the science of valuation.  And I described this earlier: What are the future states of the world constantly trying to map out what could happen and the probability of those events.

So yeah, in asset valuation, asset pricing theory, economists are thinking of foreseeable consequences to actions.

Q.  Okay.  When you say "economists are thinking of foreseeable consequences," I'm actually asking a very specific question.

Is there a principle of financial economics in which -- we've conceded you're an expert -- what's called foreseeable consequences?

MR. KILLORIN:  Objection.  Ambiguous.

THE COURT:  Overruled.

BY MR. SMITH:

Q.  You can answer.

A.  I would -- in asset pricing theory we would call it

*United States District Court*

modeling the future states of the world.

Q. So no.

A. I think it's a similar term, but --

THE COURT: But it's not called "foreseeable consequences"?

THE WITNESS: I just can't rule that out.

THE COURT: But he's asking whether there's a term, a term of art. I understand what you're saying, it's taken into account under what you're describing, but as to his specific question, I guess --

THE WITNESS: I just don't know if there's some academic paper that doesn't use that term and define it. There's thousands of finance papers.

THE COURT: All right. That's your answer.

BY MR. SMITH:

Q. As you sit here today, do you have a methodology that you would use to determine whether the DOJ complaint was a foreseeable consequence?

A. Yeah. I think I've outlined in my report what did the Government warn would happen if you implicate the antikickback statute and be subject to heightened regulatory scrutiny.

So I think the -- like I do an event study, following how the information set changes over time can at least be helpful in determining whether it's a foreseeable consequence.

My understanding, though, is that the determination of

*United States District Court*

that is ultimately up to the trier of fact in their loss of causation.

Q.   Okay.  So I'm not going to use the term "lost causation," and I'm not going to use the term "confounding news" because as you mentioned at the outset of your testimony, what we're really talking about here is Comcast.  And so I'm going to ask the next question without all of the loaded terms that have been bantered about here.

If it was ultimately determined that the risk of potential fines and penalties in the event of a finding of the legality on one hand and the details of the PAP donation program or scheme on the other hand had to be disentangled, you haven't been asked to opine on how you would do that, right?

A.   I elaborated in my deposition about how I would do, and how I've done that in other cases, for sure.  And it's all part of the event study methodology that's been implanted by myself, you know, dozens of times, and other experts across decades for hundreds of times.

So event study is robust to this entangling confining information.

Q.   Again, I want to ask my question very precisely, which is, have you put forward an opinion on how in this case, if you were required to disaggregate the risk of potential fines and penalties and the underlying facts of the PAP scheme, how you would do that?

*United States District Court*

A.    Yes.

Q.    What is it?

A.    The event study methodology described in my report and also as I elaborated on in my deposition.

Q.    The event study methodology would disentangle those two?

A.    Yes.

Q.    How?

A.    Upon completion of fact discovery, a full record and understanding of what plaintiffs can prove at that point and trying to assess whether the -- trying to fashion the damages model that's consistent with that theory of liability.  If it's determined that you have disentangled litigation costs, there's an economic literature which I described earlier that discusses this.  They go through samples of regulatory enforcement actions and do reliably and scientifically got published in the Journal of Finance estimate what the impact of litigation costs are, what reputational costs are, what the impact of the actual truth of the underlying misconduct is.

So it is possible to do, and I would look at those papers specifically for guidance.  I'd also look at the analyst, as I described in my report, as you can see, describe a whole lot of expectations of major liabilities.  That is helpful in gauging how big of a potential outcome we're looking at using discount cash models.  You say, okay, well, I know at least one.  I'm going to assume it takes about 10 years to get these payments

all paid to cover these liabilities.  There's other commentary to that effect, understanding what they felt, and then discounting those costs to present value as of August 18, 2020, to get a sense of the value implications we're dealing with.

So there are tools, as I've described now in my deposition in more detail, to allow one to disentangle these effects.

Q.  So there are tools, and you've now testified, and testified at your deposition and report, to multiple different types of tools that are available.  You haven't testified as to which one you would use.

A.  I haven't been asked to do it.

Q.  That was my question.

MR. SMITH:  Thank you.  I have nothing further.

THE COURT:  Okay.

MR. KILLORIN:  Nothing further, Your Honor.

THE COURT:  Okay.  Dr. Nye give me one minute to make sure I don't have anything.

THE WITNESS:  Okay.

THE COURT:  Okay.  I'm good.  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Why don't we take a five-minute recess before we put Dr. Marietta up.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Brief recess at 11:41 a.m.)

THE COURTROOM DEPUTY:  Court is now back in session.

*United States District Court*

THE COURT:  You may be seated.  Thank you.

Are we missing somebody?  We are.

MR. SMITH:  Your Honor, Ms. Donovan is actually going to present Dr. Marietta.  She should be back momentarily.

THE COURT:  That's fine.

(Brief pause.)

MS. DONOVAN:  With the Court's permission, defense will call our expert.

THE COURTROOM DEPUTY:  Remain standing.  Raise your right hand, please.

(**DR. JENNIFER BROOKE MARIETTA-WESTBERG**, HAVING BEEN DULY SWORN OR DULY AFFIRMED, TESTIFIED AS FOLLOWS:)

THE COURTROOM DEPUTY:  State and spell your name for the record, please.

THE WITNESS:  Yes.  Jennifer Brooke Marietta-Westberg. J-E-N-N-I-F-E-R, B-R-O-O-K-E, Marietta, M-A-R-I-E-T-T-A, hyphen, Westberg, W-E-S-T-B-E-R-G.

MS. DONOVAN:  With the Court's permission, do you mind if I just -- I think you have Dr. Nye's report.  I'm going to hand you a copy of yours, just so you have it.

THE WITNESS:  Thank you.

MS. DONOVAN:  You have one, right, Your Honor?

THE COURT:  Is this her report?  Yes, I do.

DIRECT EXAMINATION

BY MS. DONOVAN:

*United States District Court*

Q.   So good morning, Dr. Marietta.  As you discussed, you prefer to go by Dr. Marietta in circumstances, so I'm going to go with that here, if that's okay with you.

A.   Sound good.  It will save everyone a lot of time today.

THE COURT:  The court reporter especially.

BY MS. DONOVAN:

Q.   Could you tell us briefly about the scope of your assignment here?

A.   Yes.

I was asked to evaluate the report of Dr. Nye and whether he has put forward a method to calculate damages on a class-wide basis consistent with plaintiffs' theory of liability.

Q.   And just to clarify, were you asked to draw any legal conclusions as part of your assignment?

A.   No, I was not.  I'm here as an economist.

Q.   Again, just to clarify, were you asked to opine on lost causation as part or your analysis?

A.   No, I was not.

Q.   So contextualize the opinions, we'll walk through today, can you just briefly tell us about your educational and professional background?

A.   Sure.

I have a Ph.D. in finance from the University of Iowa.

Subsequent to that, I was a professor at Michigan State

*United States District Court*

for several years where I taught the foundational investments course to undergraduate students.

Then I spent 10 years at the U.S. Securities and Exchange Commission in a variety of capacities and positions, provided economic analysis to support the SEC's mandate, including topics such as corporate disclosure, corporate issuers, among many other items.

Once I left the SEC, I joined Cornerstone Research where I work broadly on litigation or regulatory investigations affecting the financial markets. And also subsequent to leaving the SEC, I served for four years on the SEC's investor advisory committee and chaired the committee in my final year.

Q.  So I want to walk through today the conclusions that you raised in your report regarding Dr. Nye's opinions.

But first, what do you understand that plaintiff has to do at this point to show that damages can be calculated on a classified basis in a manner consistent with their theory of liability?

A.  I understand that plaintiffs' expert needs to put forth a method to measure damages that can isolate damages attributable to the alleged misrepresentation and is consistent with plaintiffs' theory of liability.

Q.  Here, based on your view of Dr. Nye's report, what is the framework that he put forward?

A.  He puts forward the out-of-pocket measure.

*United States District Court*

Q.   And what is the out-of-pocket measure of damages?

A.   Generally it's the difference between the inflation at the time of sale for the securities minus any inflation of securities at the time of purchase.

Q.   So I think Dr. Nye and you both use this term, "price inflation."  Can you tell us exactly what price inflation is?

A.   Sure.

So that refers to the security price being artificially high because of the information and the alleged misrepresentations and the fact that a company may not have revealed the truth to the market yet.

Q.   So as an economist, when you review Dr. Nye's report, what conclusion did you reach as to the reliability of Dr. Nye's opinion?

A.   In my opinion, Dr. Nye's opinions are unreliable and unsupported.  He ignores what I refer to in my report as the "mismatch issue" between the alleged corrective disclosure and the alleged misrepresentation that plaintiffs have put forward. And so he has not himself put forward a damages method that can be calculated on a class-wide basis consistent with plaintiffs' theory of liability.

Q.   So you just used this term, "mismatch"; Dr. Nye using the term "mismatch" earlier today.

What exactly do you mean when you use that term?

A.   Again, from an economic perspective, this generally would

refer to when information is revealed at the time of the corrective disclosure that's different from the information in the alleged misrepresentations.  So the price decline may contain information other than that in the alleged misrepresentation.

Q.   And in this case, what is the mismatch you identified here?

A.   So here, the alleged corrective disclosure is the DOJ complaint and the -- which goes to whether Teva has violated the False Claims Act, whether there's potential illegality of the donation program versus what plaintiffs put forward as their alleged misrepresentations, which goes to whether Teva concealed what made the drug Copaxone so successful.

Q.   Just to clarify an identified mismatch, did you review the DOJ complaint?

A.   Yes, I did review the DOJ complaint, and I'm analyzing that, though, as an economist.

Q.   So in direct and in his reply report, Dr. Nye raised this again; that you are demanding something he called a mirror image mismatch.  Is this the standard by which you identified mismatches?

A.   No, it's not.  Nowhere in my report do I refer to the (inaudible).

THE COURT:  When you say "mismatch" as to the DOJ complaint, you specifically talked about that fact that

*United States District Court*

obviously the DOJ complaint is raising allegations that they believe will result in a violation of the antikickback statute or False Claims Act, right?

THE WITNESS:  Correct.

THE COURT:  But what the DOJ complaint has in it is an underlying scheme relating to those donations, correct?

THE WITNESS:  Correct.  And so the DOJ complaint is going to whether there's a potential --

THE COURT:  I know what the ultimate end result that the DOJ wants, but what I think that this corrective disclosure plaintiffs' theory is, that the corrective disclosure, whether or not DOJ wins their case, because we don't know what's going to happen there, it's this scheme that's 429 pages that is what they are saying mismatch.

Are you saying that that 429 pages of the DOJ complaint doesn't have the scheme?

THE WITNESS:  No, that's not what I'm saying.  What I'm saying is that the -- and, again, I am approaching this from the economic perspective.  I'm looking at the analyst commentaries, how they characterize the price decline upon the release of the DOJ complaint.  And the analyst commentary is focused on the potential for fines and penalties, so the illegality of the issue.

THE COURT:  I get that.  But I want to deal with what we're dealing with right now and your definition of mismatch.

*United States District Court*

That's what I'm trying to understand.

THE WITNESS:  My definition of mismatch, as I understand how plaintiffs put forward the alleged misrepresentations, they are focused on the factors that made Copaxone so successful.  And I think plaintiffs have said they are not focused on the illegality.

THE COURT:  Forget the illegality.  What made Copaxone so successful, doesn't the DOJ complaint have, in its allegations, of what made that drug successful?

THE WITNESS:  I think that the DOJ complaint has information about the donation program.

THE COURT:  Which made the drug successful, allegedly.

THE WITNESS:  Allegedly made the drug successful.  But I would also note, as was discussed this morning, that much of that information was already in the marketplace.

THE COURT:  You agree it's an efficient market, right?

THE WITNESS:  I don't dispute that it's an efficient market.

THE COURT:  Okay.  Thank you.

BY MS. DONOVAN:

Q.  So as an economic matter, then, why would this mismatch be important?

A.  Because Dr. Nye's method proposes to use the full price decline upon the release of the DOJ complaint as the measure of the impact from the alleged misrepresentation.  But that price

*United States District Court*

decline may contain economic losses attributable to other factors outside of the alleged misrepresentations.

Q.   And you may have just answered this when responding to the judge's questions, but what leads you to think that the price decline included losses that were not tied to plaintiffs' alleged misrepresentations?

A.   Because of the analyst commentary that I noted the analysts were focused on for the potential for fines and penalties when they reviewed that price decline, which would go to whether Teva's donation program was determined to be illegal by the DOJ.

Q.   And in your opinion, has Dr. Nye provided any way to address this mismatch?

A.   No.  He waives the waiving issue through the concept of foreseeable consequences.

Q.   So in your opinion, what is the economic impact of waiving away this mismatch?

A.   Essentially, he's not addressing the mismatch issue by just assuming that everything would be a foreseeable consequence.

Q.   And has Dr. Nye provided any economic methodology for this concept of foreseeable consequences?

A.   No, he has not provided any economic support through academic literature or elsewhere, nor am I aware of any.

Q.   So in Dr. Nye's testimony, he has claimed that he has

*United States District Court*

provided an economic methodology for foreseeable consequences. Hearing his testimony today, do you agree that he has done so?

A.   Well, I can't speak as a matter of law, but as a matter of economics, no, I don't believe he's provided any economic support for the concept of foreseeable consequences.

Q.   And have you ever heard of the concept of foreseeable consequences as an economic matter?

A.   No, I have not.

Q.   As an economist, could you think of a way to evaluate this concept of foreseeable consequences?

A.   Well, an economist might ask the question, as we've discussed there's information already in the public domain, about Teva's donation program, the timing, the amount of donations, other pharmaceutical company programs, but there was also information about prior settlements that name Teva.

So if the DOJ complaint is a mere certainty, one could look to whether the market, upon the release of the prior settlement information, reacted at all.  And using Dr. Nye's own model and statistical testing, when the information was released prior about the settlements that names Teva, there was no stock price decline, which goes against this concept of foreseeable consequences.

THE COURT:  How does it go against it?

THE WITNESS:  Well, it goes against whether the subsequent release of the DOJ complaint is a near certainty.

*United States District Court*

So when information comes out as to how is the market reacting when they are hearing that Teva is named in these settlements, the market is not reacting using Dr. Nye's model.

BY MS. DONOVAN:

Q.   So as we've discussed, you have done analysis of the analyst's reaction after the filing of the DOJ complaint, correct?

A.   I have, yes.

Q.   And what did you determine as a result of that analysis?

A.   Well, this goes to the mismatch issue and whether Dr. Nye has put forward a framework that can measure damages consistent with plaintiffs' theory of liability.

So the analyst commentary is focused on potential for fines and penalties when analyzing that price decline.  The analysts are not focused on any decrease demand or negative impact on Copaxone sales, and they don't contain any revisions to their estimates accounting for a potential decrease demand or a decline in Copaxone sales.

Q.   And what sort of conclusion can you draw from that analysis?

A.   Again, that Dr. Nye's method framework that he's put forward is not a method that -- he's not put forward a method that can calculate damages on the class-wide basis consistent with plaintiffs' theory of liability due to this mismatch issue.

*United States District Court*

Q.   So in Dr. Nye's report, in paragraph 53, which is page 52 of the report, he states -- Dr. Nye states that, quote: Analyst commentary provides strong evidence that the market reduced its expectations for future Copaxone profits.

Did Dr. Nye's reply change your opinion?

A.   No, it did not.  And, in fact, he cites several of the same analyst quotes that I do, in noting in my report that the analysts are focused on potential for the DOJ to bring a finding of violation of False Claims Act, they are focused on fines and penalties.

Q.   So overall, in your opinion, what has what we've just discussed show in terms of Dr. Nye's claim that he wouldn't disentangle the price decline attributable to potential penalties and the like because there were a foreseeable consequence of the alleged conduct?

A.   Well, as I noted earlier, he waives away this issue through the concept of foreseeable consequences.  He waives away the mismatch issue.  And the problem with that is that he would then take the full price decline following the DOJ complaint to use that as an estimate of the impact of the alleged misrepresentations; meaning, he's not put forward a method that's consistent -- a damages method consist at the present time with plaintiffs' theory of liability.

Q.   So we've used this term a lot today, but are you familiar with the term "confounding information"?

*United States District Court*

A.   Yes, I am.

Q.   What exactly is confounding information?

A.   In general, it's when there is information contained in the corrective disclosure that's unrelated to the alleged misrepresentations.

Q.   And in paragraph 19 of Dr. Nye's reply report, and that is on page 12, Dr. Nye states that "To the extent that any truly confounding information unrelated to the alleged frauds is disclosed simultaneously, it is widely recognized that an event study can be fashioned so as to isolate the effects of confounding events."

In your opinion, has Dr. Nye presented an event study that would solve the problem you identified with Dr. Nye's damages framework?

A.   No, he has not.  So Dr. Nye has a vague reference to an event study.  Also references just several other general tools that a financial economist could use.

When I was a professor teaching students or supervising economists at the SEC, if someone came to me with vague tools that say they could solve the problem, I would send them back and say, "Actually bring me a method that's specific to the situation that we're in front of."

Q.   So if a determination is made that the DOJ complaint is not a foreseeable consequence of the alleged conduct but is, instead, confounding information, has Dr. Nye put forth a

methodology to account for the economic implications of the mismatch between the filing of the DOJ complaint and the alleged misrepresentations here?

A.   No.  Almost by definition he has not because this concept of foreseeable consequences just sidesteps the mismatch issue. And Dr. Nye himself has said he would not disentangle information that's untethered from plaintiffs' theory of liability.

MS. DONOVAN:  So thank you very much, Dr. Marietta.

No further questions from me.

THE COURT:  Okay.

MR. KILLORIN:  I had to check.  I was about to say good afternoon.

Dr. Marietta, how are you?

THE WITNESS:  I'm good, thank you.

CROSS-EXAMINATION

BY MR. KILLORIN:

Q.   Dr. Marietta, is it your understanding that plaintiff is not claiming damages for loss of Teva shares due to analyst fears of potential civil and criminal penalties from the DOJ?

A.   My understanding is that plaintiffs' alleged misrepresentations go to whether Teva concealed the true success of Copaxone.  And I believe in one of the briefing materials, plaintiffs have said that their claims do not rest on whether the donation program was illegal.

*United States District Court*

Q.   So it's your understanding plaintiffs are not making claims for misrepresentation regarding potential liability from the DOJ?

A.   I want to be careful.  I'm not here to give a legal opinion, so I want to go by what I understand was in your briefing, which is what I stated previously.

Q.   All right.  And it's your understanding that plaintiffs' theory of liability is that any loss of value because of misrepresentations that mask the potential for liability and penalties is not part of this case?

A.   So my understanding, again, by what is in the briefs, is that that plaintiffs' alleged misrepresentations do not rest on whether the donation scheme was illegal, which is the subject of the DOJ complaint.  So that's the mismatch that -- economic mismatch that I'd find --

Q.   So, therefore, in your opinion, if the stock price dropped because of potential illegality, those damages would not be recoverable by plaintiff; is that correct?

A.   That sounds like a legal determination.  I can -- I don't want to give a legal determination.  I'm focused on the price decline and how Dr. Nye's damages framework would address and use the full price decline upon the raise of the DOJ complaint as a measure of any impact from the alleged misrepresentation.

          THE COURT:  But nobody did price impact.  You didn't do it, right?

*United States District Court*

THE WITNESS:  No.

THE COURT:  And he didn't do it, Dr. Nye.

THE WITNESS:  To my understanding, no.  But I'm speaking to the fact that his method would use the full price decline as he has described it.

BY MR. KILLORIN:

Q.  As a quick aside, have you ever seen an expert report of the lead plaintiff's stage that provides a methodology for every possible thing that might need to be disentangled at the end of discovery?

A.  I can't speak to whether there are reports that speak to every possible factor that would need to be disentangled.  I'm here to evaluate Dr. Nye's report, and I find that Dr. Nye's method does not account for all of the issues that I have laid out here today; the mismatch through his concept of foreseeable consequences.

Q.  Okay.  As an expert here today, have you ever seen any report at the class certification stage that disentangles anything?

A.  I am reviewing whether there is a method put forward by Dr. Nye that is capable of measuring damages consistent with plaintiffs' theory of liability.  So I'm focused on the method and whether one has been put forward capable of doing that.

THE COURT:  That wasn't his question.  Do you want to ask your question again?

*United States District Court*

MR. KILLORIN:  I apologize.  If you could read that back.

(Record read.)

THE COURT:  Are you talking about in your training, experience, all the years you've been involved with the SEC and other places, have you ever seen an expert report that does disentangle at this stage where we are in the litigation?

THE WITNESS:  There's a lot of expert reports out there.  I'm --

THE COURT:  At least the ones you've seen.  If you remember.

THE WITNESS:  I'm not aware that there's one that has conducted the disentangling, but it's important to note that that's not how I'm evaluating what Dr. Nye has put forward. I'm evaluating whether his method is capable of dealing with the mismatch between the alleged corrective disclosure and the alleged misrepresentation.

THE COURT:  If his method -- do you believe his method could disentangled if he chose to disentangle?

THE WITNESS:  My finding is that he's not put forward such a method, no, that's capable of doing that, based on my review of everything that he has done.

BY MR. KILLORIN:

Q.  Are you saying he could possibly put forth a method that would satisfy your criteria?

*United States District Court*

A.   Well, based on what I reviewed from what Dr. Nye put forward, he has not put forward a method that's capable of addressing all of these issues I've raised.

Q.   So you are not willing to say it couldn't be done?

A.   Well, I've not been asked to evaluate my own model whether that is possible.

But based on what I reviewed from Dr. Nye, my opinion is that his method is not capable of addressing the mismatch issue and, of course, the other issues I noted in my report.

Q.   On the day of the drop, August 18, 2020, would you agree that some of the stock drop might have been attributable to misrepresentations regarding a scheme that inflated Teva's earnings for the sale of Copaxone?  Would some of the stock drop have been attributable to that scheme?

A.   Well, I think -- I would refer back to the fact that I'm reviewing, how did the analyst who viewed the stock price decline characterize what factors drove the stock price decline.  They are not focused on revising their estimates for potential increased demand of Copaxone; they are focused on potential for fines and penalties.

Q.   That's my next question.

Could part of that drop also be attributable to potential fines and penalties?

A.   Based on my review of the analyst's commentary, that's what they are focused on in characterizing price decline.

*United States District Court*

Q.   That's the part of the price decline you say needs to be disentangled; is that correct?

A.   So just to be careful, my opinion is that Dr. Nye, through his framework, would use the full price decline on that day, but the full price decline contains reactions based on the potential for fines and penalties which is separate from what's set out in plaintiffs' alleged misrepresentations.

Q.   Okay, good.

So it's your understanding plaintiffs haven't alleged any misrepresentations that would go to fines and penalties?

A.   No, I don't think that's what I'm saying.

But just to state what I understand, is that plaintiffs' alleged misrepresentations go to whether Teva concealed the true source of what made Copaxone so successful.

Q.   Do you think they also go to the foreseeable outcome that there might be fines and penalties based on that conduct that was misrepresented?

A.   Well, again, I have to be careful I'm not making a legal conclusion.  So as an economist, I'm looking at how sophisticated market participants, such as analysts, characterize the price decline upon the DOJ complaints, and they are focussed on fines and penalties.  None of them are revising their estimates for decreased demand for Copaxone.

Q.   Okay.  So the drops due to the fines and penalties need to be disaggregated because that's not part of plaintiffs' case.

Isn't that what you are saying, in a nutshell?

A.   What I'm saying is that Dr. Nye proposes to use the full price decline as a measure of the impact from the misrepresentations.

THE COURT:  But aren't you saying that the full price decline is because of the fines and penalties that the analysts are all talking about?

THE WITNESS:  That's what the analyst's commentary is focused on.  It's not focused on reduced demand or potential decline in sales for Copaxone.

THE COURT:  So in your opinion, the decline on August 18, 2020, based on what the analysts that you have reviewed were talking about, it's all focused on the fines and penalties.

THE WITNESS:  Based on my review, it's all focused on the fines and penalties, which seems to be separate from plaintiffs' alleged misrepresentations.

BY MR. KILLORIN:

Q.   As I understand it, fines and penalties are not part of plaintiffs' case.

A.   Again, I don't think I should be making legal determinations about plaintiffs' case.  I'm trying to discuss from an economic perspective how I am trying to understand Dr. Nye's method and use economics to respond.

THE COURT:  But you have to understand plaintiffs'

theory of the case in order to do what you need to do is an economics.

THE WITNESS:  That's right.  And I've stated my understanding.  But I thought his question was separate in asking me to do additional interpretation.

THE COURT:  I think he's asking you whether or not in plaintiffs' theory of the case, as you see it, it incorporates fines and penalties.

THE WITNESS:  No, I don't see that.  I see it's focused on what truly made Copaxone so successful and not on the potential for illegality.

Sorry if I misunderstood the question.

BY MR. KILLORIN:

Q.   Right.  That's okay.

So the drop, due to potential fines and penalties, should be disaggregated for plaintiffs' claims for damages.

A.   So Dr. Nye does not propose to do that, the concept of foreseeable consequences.

Q.   But you think he should.  That's my question.

A.   I'm proposing he needs to have a framework, yes, that can calculate damages solely based on the impact of the alleged misrepresentations.

Q.   Which only goes to lost revenues from sales historically.

A.   Again, that's my understanding of plaintiffs' allegations.

Q.   Okay.  You recall in your deposition I asked you about

*United States District Court*

what I call the Lynette case, which is a Third Circuit opinion, is *University of Puerto Rico versus Lynette*. At the district court level that case had a different title, but you were the defense expert in that case?

A.    That's correct.

Q.    And in that case, I think you testified that that case was similar to this case.

A.    I don't recall testifying that that case is similar to this case. I was asked to provide opinions in both matters.

Q.    Okay. Do you recall stating that you wanted to be careful what you said about that case because it was on appeal?

A.    That's correct.

Q.    And you called -- the district judge rejected your opinion that defense expert opinions were unreliable?

A.    I defer to the Court in their decision, but from an economic perspective, obviously, I disagreed.

Q.    And your testimony is purely from an economic perspective, right? You take no position as to what needs to occur as to estimate damages at different phases of litigation?

A.    Well, it started with my understanding of what plaintiffs' expert needs to put forward in terms of the damages method, to measure damages consistent with plaintiffs' theory of liability. Outside of that, I'm not here to make a legal conclusion.

Q.    All right. Would you please turn to page 185 of your

*United States District Court*

deposition transcript, if you have it.  If you don't, I have a copy for you.

A.   I don't have it in front of me.

Q.   Okay.  And at that time, I said:

"Is it fair to say your criticisms of Dr. Nye's report was from a purely economic point of view, not from a legal point of view?"

A.   I see that question.

Q.   And you said you're certainly not here as a legal expert -- I'm sorry.  You're certainly not here as a legal expert.  "I'm here as an economic expert," and that's the basis of your opinions.  That's correct?

A.   Yes.

Q.   And then if you would please turn to page 170.

A.   Okay.

Q.   Do you -- I'm just going to ask the question.  I'm not going to worry about the transcript too much, but it's there for you to review.

You never proposed a methodology to calculate damages in this case; is that correct?

A.   No, I've not been asked to do that.

Q.   And you've never proposed a methodology about which this mismatch that you believe there is, because of your understanding of plaintiffs' theory of the case, you've never produced your own methodology of how that could be

*United States District Court*

disentangled?

A.   I've been requested to evaluate Dr. Nye's framework.  I've not been asked to put forward my own methodology.

Q.   Right.

Have you ever been asked to put forth a damage calculation in a securities case?

A.   I don't believe so.

Q.   And you are a part owner now of Cornerstone Research; is that correct?

A.   That's correct.  I'm a vice president of Cornerstone.

Q.   How long have you been giving testimony in securities cases?

A.   Five years or so.

And I would just note for your prior question, I have, as an expert, provided damages calculations.  I think you had asked about in the context of a securities case.

Q.   That's true.

But tell me, when have you provided testimony regarding damages?  When have you done damage calculation methodology?

A.   I have listed my prior testimony in the back, so I refer to those cases.  But largely they've dealt with damages related to ERISA matters, investment disputes, general damages.  And I did serve as an expert at the merit stage on the First Solar matter.

Q.   Okay.  So you have actually done a damages calculation in

*United States District Court*

those cases of actual losses suffered by plaintiffs?

A.   My role at the merit stage was in reviewing and interpreting analyst commentary.

Q.   Now I'm confused.  I thought you said you had done a damage calculation yourself.

A.   I was clarifying.  You had asked about securities cases, and I have done -- provided damages opinions in other types of matters, and then I was just noting what those were, ERISA --

Q.   Oh, I'm sorry.  My question was, have you done a damages calculation in another case?

A.   And my response was yes, in ERISA matters and other investment disputes.

Q.   And are those cases listed in your current curriculum vitae?

A.   Yes.  I've served as a damages expert -- maybe I'm not understanding precisely what you're asking, but I've served as a damages expert in other matters.

Q.   I'm asking if you've prepared a methodology yourself to come up with a calculation of damages.

        THE COURT:  As an expert.

        THE WITNESS:  As an expert, yes.  I believe the way that you're describing it, yes, I have.  And so I'm not sure exactly what you're asking.

BY MR. KILLORIN:

Q.   Well, as opposed to critiquing other experts.

*United States District Court*

A.   As part of that critique, I'm often putting forward through the critique what I think are the appropriate revisions to the method and what the resulting damages could be because of that.

Q.   Okay.  So you never put together your standalone damage methodology for calculating damages; you've just critiqued others?

A.   I've both critiqued and then revised others, yes.

Q.   All right.  Thank you.

In the *Lynette* case, you also found that there was a mismatch between the plaintiffs' theory in the case and the damage methodology proposed by the expert in class certification.

A.   Yes.  Of course my analysis there was unique to the facts and circumstances of the *Lynette* case.  But I was discussing whether from an economic perspective there was a mismatch.

MR. KILLORIN:  I think that's all I've got.  Thank you.

THE COURT:  Before -- do you have any redirect?

MS. DONOVAN:  No redirect.

THE COURT:  I have a couple questions that may spur you all to ask questions.  I don't know.

I want to talk a minute about the discussion in your report about the present value of the firm.

Do you recall talking about that?

*United States District Court*

THE WITNESS: Yes. And I can look to the specific point if --

THE COURT: Okay. I'm just curious. I think your discussion of present value of the firm being equal to the cash flow, why should we look at just the sales and revenue alone and not the profits?

THE WITNESS: Well, the mismatch issue would result whether you're looking at the sales or the profits. And so the fact that the analyst used -- happened to use the word "profit," one of them -- or two of them in their discussions, they're not focused on decreased demand of Copaxone that could result in a decrease of the profits. They are focussed, when they use the word "profit," on the potential for fines and penalties.

That's how I would draw the distinction.

THE COURT: And you're saying that the days of the series of events, articles, I guess, analyst's discussion that you have outlined, which is a number of them, I think, I don't know, maybe ten pages' worth of different things that happened on different days, and a lot related to other settlements, not involving Teva and, obviously, the IRS subpoena and the declaration that was out there in the public, publicly available, that there was no -- well, you did -- you analyzed -- did you look at the price drop for each of those days? You didn't. Did you just do two?

*United States District Court*

THE WITNESS:  I did.  And to be specific, I believe it's paragraph 103 of my report, which refers to the -- yes, paragraph 102, excuse me, on page 49, at the end of paragraph 102, which discusses "No statistically significant price movements on the days of the TAF and ECF settlements."

THE COURT:  Tell me again what that means in terms of your criticism of Dr. Nye's report.

THE WITNESS:  Yes.

So that goes to the concept of foreseeable consequences.  If the issuance of the DOJ complaint is a near certainty, then let's look at what the market expectations were when Teva was mentioned in other settlements.

When you use Dr. Nye's model, there's no stock price reaction when these other settlements are mentioned in Teva. And so this speaks to whether this issuance of a DOJ complaint would be a near certainty.  The market is not reacting at all.

THE COURT:  I guess I'm confused.  Where are you getting this language of "near certainty" from?

THE WITNESS:  Well, if it's a foreseeable consequence based on Dr. Nye's framework.  So if the information about Teva 's donation program would, with near certainty, lead to a DOJ complaint, which is what he's saying with foreseeable consequence concept, that once you know Teva is involved in a donation program, the issuance of a DOJ complaint coming out of that is a foreseeable consequence, a near certainty.

*United States District Court*

THE COURT: I was thinking the foreseeable consequence, it was more the DOJ complaint comes out and the foreseeable consequences are any fines and penalties, settlements related to either a conviction -- I mean, that's not -- a violation as it relates -- sorry -- a violation as to that DOJ complaint, that those are the foreseeable consequences.

THE WITNESS: I understand the way it was described, but the foreseeable consequences are once you know that Teva is involved in a donation program, that the issuance of the DOJ complaint is a foreseeable consequence of that activity.

THE COURT: You would agree there might be a way to be involved in a donation program without resulting in a DOJ complaint?

THE WITNESS: Yes, but that's not how I understand Dr. Nye's framework.

THE COURT: Okay. So I hesitate to ask this question, but I think I will.

You're not -- the evidence that you have put forth regarding these other dates when things have happened, that show no price decline on the market, for example, the IRS subpoena, or the other settlement that did mention Teva -- and I'm focusing more on the ones that mention Teva --

THE WITNESS: Uh-huh.

THE COURT: -- you are not suggesting that those are

*United States District Court*

alternative corrective disclosures, correct?

THE WITNESS:  No, I'm not.

THE COURT:  Because there's no price decline.

THE WITNESS:  I'm not.  I'm using those in a way to evaluate Dr. Nye's consent of foreseeable consequences.

THE COURT:  Okay.

Does anybody have any questions based on what I've asked?

MR. KILLORIN:  One question.

THE COURT:  Okay.  Let me see if she has --

MR. KILLORIN:  Go ahead.

MS. DONOVAN:  I said no.

MR. KILLORIN:  I have one quick question, Your Honor. I'm not sure, honestly, how closely it falls under the umbrella of what you asked, but it's all one question.

THE COURT:  Okay go ahead.

MR. KILLORIN:  One question for follow-up.

THE COURT:  You should never say one question.  Didn't you learn that in law school?

(Laughter.)

FURTHER CROSS-EXAMINATION

BY MR. KILLORIN:

Q.  Are you aware of the fact that when you say -- you've seen plaintiffs' complaint in this case, right?

A.  I have.

*United States District Court*

Q.   And it's your understanding that plaintiffs' theory of the case is now a little different than what was alleged in the complaint; is that correct?

A.   Again, I'm not here to -- I put forward what I understand plaintiffs' --

Q.   Okay.  Fair enough.

A.   -- theory of liability to be.

Q.   Do you recall seeing in the complaint at paragraphs 116 and 167, the plaintiffs' allegations, and I quote:  Teva's illegal kickback scheme increased the likelihood that the company would be subject to regulatory scrutiny enforcement and/or penalties?

A.   I don't remember every word of the complaint so I'll take your word that those --

THE COURT:  What paragraph are you at?

MR. KILLORIN:  Two places:  Paragraph 116 and paragraph 167.

THE WITNESS:  So I'll take your word that you read the phrases.

BY MR. KILLORIN:

Q.   Yeah.  Teva's illegal kickback scheme increased the likelihood that the company would be subject to regulatory scrutiny enforcement and/or penalties.

A.   So what I wanted to say is, I'll take your word that those are the phrases there, but I understand that there's been

*United States District Court*

subsequently additional plaintiff briefings, a motion to dismiss, where plaintiffs clarify that their theory did not go to whether Teva's donation program was illegal, and that theory focused on what factors may have been concealed that attributed to the true success of Copaxone.

Q.   Okay.  Is it also your understanding that plaintiffs' theory abandoned any claims for damages due to, quote, increased likelihood that the company would be subject to regulatory scrutiny enforcement and/or penalties?

A.   So, again, I'm not here to provide a legal opinion.  I would refer back to my previous answer based on what I've seen in the motion to dismiss and the plaintiffs' subsequent briefings.

I understand that their alleged misrepresentations are not speaking to whether Teva's donation program was illegal.

Q.   Would you agree that the majority of the price drop on the day of the DOJ complaint would have been due to revelations of a scheme that made the market concerned about the increased likelihood that the company would be subject to regulatory scrutiny enforcement and/or penalties?

A.   So I believe my review of the analyst commentary is that they are focused on potential finding of illegality and focused on fines and penalties that could stem from that.

Q.   And that's the part, you say, Dr. Nye failed to disaggregate; is that correct?

*United States District Court*

A.   Just to be careful, I'm not saying that he has not disaggregated.  I'm saying that Dr. Nye's framework does not put forward a method that could account for a mismatch between the alleged misrepresentations and what came out of the DOJ complaint.

MR. KILLORIN:  Thank you.  No further questions.

MS. DONOVAN:  Can I just ask one quick question?

THE COURT:  Sure.

REDIRECT EXAMINATION

BY MS. DONOVAN:

Q.   So in response to Mr. Killorin's questioning, you just were asked about whether you required -- Dr. Nye put forward a methodology that wouldn't disaggregate certain information.

Is it your view -- did you recall that Dr. Nye has testified that he wouldn't disentangle certain information?

A.   That's right.  And so I'm speaking to first whether he's put forward a framework that -- again, his framework would use the full price decline which doesn't account for the mismatch.

And as I stated in my testimony earlier, Dr. Nye had said that he would not disentangle information that's unrelated to that in the alleged misrepresentations.

Q.   And is your opinion that issues that you have opined on regarding Dr. Nye's framework is the level of detail that should have been in his framework as opposed to whether or not he has put forth a methodology that is linked to plaintiffs'

*United States District Court*

theory of liability?

A.   No.  I've tried to be clear I'm not focused on the detail or whether he needs to provide more detail.  I'm focused on what I view is a fundamentally flawed framework that he put forward.

THE COURT:  Okay.

MR. KILLORIN:  That's it, Your Honor.  Thank you.

THE COURT:  Okay.  Let's take a three-minute break. And the experts can just stay in the courtroom, please.  Leave and come back.  Don't leave-leave, just in case I need you for a minute.

Let's take a three-minute break, and I'll be right back.

THE COURTROOM DEPUTY:  All rise.

(Brief recess at 12:39 p.m.)

THE COURTROOM DEPUTY:  This Court is now again in session.

THE COURT:  All right, so it's 12:42.  How long do you all think you have for argument on the motion for class certification?

MR. KILLORIN:  Your Honor, an hour would be fine with us.

THE COURT:  Total?  Or just for you?

MR. KILLORIN:  Total.  Well, I was thinking I'm flexible, Your Honor.

*United States District Court*

THE COURT:  I have all afternoon.  So I'm just trying to figure out how much time.

MR. KILLORIN:  I'll match my esteemed colleague.

MR. SMITH:  It's your motion.

MR. KILLORIN:  I can be as short as --

THE COURT:  It's your issues, though.

(Laughter.)

MR. SMITH:  Thank you for that preview, Your Honor.

MR. KILLORIN:  Your Honor, we can say what we need to say in 30 minutes.  It's all briefed, I think, very well.

THE COURT:  Would you like to take a short break for lunch?  I'll give you a short break for lunch if you'd like to take a short break.

MR. KILLORIN:  I would like that.

MR. SMITH:  I'm fine either way.

THE COURT:  All right, so then 1:15.  We'll resume at 1:15, gives you about 30, 31 minutes.

MR. KILLORIN:  Yeah, with a little follow-up possibly.

THE COURT:  With what?

MR. KILLORIN:  With a little follow-up possibly.  My first thing will be 30 minutes.  I'm sure I'm going to want to respond.

THE COURT:  Oh, no, no, no.  I mean 30 minutes for lunch.

MR. KILLORIN:  Oh, great, yes.  I apologize.

*United States District Court*

THE COURT:  You better get going because your time's a'ticking.

Experts, thank you both for being here.  I really do appreciate it and you all, I appreciate you making rearrangements with a short notice to get here so that's extremely helpful.  Thank you.

I'll see everyone else back at 1:15, thank you.

MR. SMITH:  Thank you, Your Honor.

MR. KILLORIN:  Thank you, Your Honor.

(Luncheon recess taken at 12:44 p.m.)

THE COURTROOM DEPUTY:  Court is now again in session.

(In open court at 1:18 p.m.)

THE COURT:  You may be seated.  All right.  You may begin.

MR. KILLORIN:  Thank you Your Honor.  Shall I approach the podium?

THE COURT:  Either way.  Whichever way is easier for you.

MR. KILLORIN:  All right, I'll sit down then if that's agreeable.

THE COURT:  Fine.

MR. KILLORIN:  Your Honor, I'll just tell you, I intend to go ahead and address the damages issues since it's fresh on everybody's mind, and then briefly touch on the rest of our motion for class certification.  And then the Court had

*United States District Court*

stated that we would have a hearing on the motion to stay, but maybe we do that separately.

THE COURT:  That would be separate, I agree with that, thanks.

MR. KILLORIN:  Thank you, Your Honor.

So regarding damages, in the briefing of this case, plaintiffs were surprised to learn that they had walked away from 95% of their case.  We didn't know that until we read the defendant's papers.  And I think that all stems from a very fundamental disagreement on how to interpret the Court's motion to dismiss order.  In that order, you stated plaintiff does not argue that Teva was required to disclose the scheme merely because it may have been illegal.  Rather, plaintiff argues that Teva was required to disclose the scheme because it is what made Copaxone so successful.  I think if the word "also" had been in the second part of that sentence, we wouldn't have a disagreement.  But the defendants have sort of abandoned the first part of that sentence where it says, Plaintiff does not argue that Teva was required to disclose the scheme merely because it had been illegal, and simply say in the second part of that sentence means that plaintiff have abandoned the claim that Teva was required to disclose the scheme because it may have been illegal.  That's not our position.  It never has been.  There was no briefing on that in the motion to dismiss that just that angle of damages should be dismissed, but

plaintiff in their opposition brief says quote, "Plaintiff insists his claims have nothing to do with this alleged illegality.

THE COURT:  You mean defense in their opposition?

MR. KILLORIN:  I'm sorry?

THE COURT:  You said plaintiffs but I think you meant defense.

MR. KILLORIN:  No, I'm sorry.  I'm quoting the opposition brief filed by defendants.  What they say is plaintiff insists his claims have nothing to do with his alleged illegality.  And that's just not our position at all. And then they sort of double down and say that under plaintiff's current theory of liability, it is "largely immaterial whether plaintiff's actions are illegal."  And so we believe that Dr. Marietta may have genuinely been told that what we consider to be a defective damage expert report based on a complete misunderstanding of plaintiff's theory in the case, we have, in no way, abandoned our claim to damages resulting from the statements that survive a motion to dismiss. And there were two broad categories of those misstatements.  As the Court will recall in the motion to dismiss, the misstatements by Teva that its actions were legal in compliance with law was deemed by the Court to not be misleading.  But the other statements disclosing the scheme were misleading, and with those misleading statements disclosing the scheme under

*United States District Court*

about a million securities cases, we are entitled to seek damages for all losses attributable to those false and misleading statements about the scheme, and clearly fear of damages and prosecution arising from the scheme would be reasonably foreseeable damages, would be the kind of damages that you would expect a plaintiff to seek in a securities case and exactly the kind of damages that we have pled.  You know, and the Comcast case, they talk about a mismatch between different theories of liability in an antitrust.  But the Third Circuit distinguished Comcast from securities cases because there is only one theory of liability, and that is a violation of Section 10B of the Security Exchange Act.  We have successfully proved a violation of that statute and that claim, and we are entitled to all damages flowing from that violation, from those misrepresentations.  And I can assure you that our damage expert, and I think most damage experts would agree that the whole details of the scheme that were alleged and were misled that Teva made misleading statements on, could reasonably lead to a fear of criminal prosecution.  And even in the motion to dismiss hearing, we stated our position to the Court on page 62, quote, what made this scheme material was not whether or not it was illegal in a technical sense because nobody can know that.  What made this scheme material to investors is because everything about it smelled bad.  It looked illegal; it looked like it would lead to huge

*United States District Court*

liabilities.  That was our argument.  Our argument was pertaining to all the misstatements at issue including the two large groups of misstatements that survived.  That is still our position, that it looked illegal, it looked like the scheme which was disclosed and which Teva had misled the market about, it looked like it would lead to huge liabilities.  That is part and parcel.  It's absolutely predictable.  To us it's, you know, how do you choose the right words?  Mistaken on the part of defendants to try to parlay the Judge's wording in that sentence to say we have walked away from all of those claims for damages for the market's concern about illegality from the scheme.  Everything about the scheme that was disclosed might cause a drop in stock price.  Dr. Marietta never addressed what caused the drop in stock price, she didn't have an opinion, she can't have an opinion.  But I will agree with you that today for the first time in this hearing she sort of waded away from the formal words of her complaint and did basically opine that the stock price was caused by analysts being concerned about a major stock drop, a major stock drop due to criminal prosecution and liability.  In her report she basically said well, there's been no projection of lost earnings for Teva.  And since this case only involves a scheme for inflated earnings there basically can be no damages.  So that's her wonderful, tidy, narrow position.  No damages because no projection of lost earnings.  That's just wrong.  Our position

is that Teva's balance sheet is at risk of getting slammed.

In the Ontario case, they talk about Enterprise threatening liability.  And so in this case the clear concern to the market was large liabilities arising from the scheme. We have never walked away from that claim of damages, as I mentioned earlier in paragraph 116 and 167, we allege in the complaint, "Teva's illegal kickback scheme increased the likelihood that the company would be subject to regulatory scrutiny, enforcement, and/or penalties."  This Court did not dismiss those allegations in the complaint and we think it's just not any kind of fair interpretation of the Court's order on motion to dismiss that say that we have walked away from that.  In fact, actually, one of the first times I read that sentence I was like, wow, this is perfect support for us at the hearing.  It says, "Plaintiff does not allege that Teva" -- this is a motion to dismiss order.  "Plaintiff does not allege that Teva was required to disclose a scheme merely because it may have been illegal."  I thought, wow, we win.  But then looking at the construct of the sentence and then it goes semicolon, "Rather plaintiff argues that Teva was required to disclose a scheme because it made Copaxone so successful."  And on the strength of that possible, I guess, contrived ambiguity, defendants are taking the position that we have waived all claims of damages resulting from the scheme causing fear of criminal -- fear of penalties and fees, from regulators.

*United States District Court*

That's just not the case.

And then defendants sort of show their hand a little bit on the motion to stay, where it behooves them to take a sort of different position. On the motion to stay, defendants say, "Plaintiffs purport to stay claims based on the notion that defendants misled the market about the true reasons about the success of Copaxone, when in reality, paren, he says, the success was due to a kickback scheme that when exposed would not be allowed to continue." Well, that's, you know, hinting around that they understand the exposure of the kickback scheme may lead to regulation and changes in the company procedure. And then also in the motion to dis -- their motion to stay, page 3, they say, "Indeed the complaint makes clear that plaintiff seeks to prove that Teva's patient assistant program, PAP, donations, the two charitable foundations violated the AKS and FCA, meaning that this Court will inevitably be asked to decide whether the donations were illegal. So when it suits their purposes, they interpret the complaint properly. But when they are trying to come up with a false damage narrative attacking one of the nation's best respected damages experts in my opinion, Dr. Nye, they come up with this contrived interpretation of a motion to dismiss and say that he didn't disaggregate all the damages caused by fear of fines and sanctions. And in his report he says, what do you mean? Of course I didn't try to disaggregate that here. First, mainly,

*United States District Court*

because it's premature at the class certification stage. But then secondly, you know, why are you asking the question. And now it's clear. They are asking the question because of their theory of our theory that we never knew existed. So they are trying to create sort of a mismatch that doesn't exist because it's just simply a misinterpretation of the Court's order. And for those reasons, we think Dr. Marietta's report is deficient. And just to step back, if you think about this, this would be a dream. This would be like spawning a new sub Comcast analysis in these cases that every time any portion of a plaintiff complaint was disallowed, that then, at a class certification stage, the expert would be supposed to put forth a methodology to disaggregate whatever portions of the plaintiff's claim were dismissed, with no clue what discovery is, what the rest of the claims were going to look like at the end of discovery, without any of the facts and without a full understanding of what it might mean to deny certain allegations of falsity, because the case is simply not mature enough to understand any of that. But their idea is that you would disentangle the damages analysis for any claims dismissed, and like I say, they are trying to, I guess, revive Comcast. But that's not the way Comcast or the Third Circuit works on the higher level, which is this is a 10(b)-5 Securities Act violation, a single act, a single violation. And we are entitled to all the damages that flow from the violation of that act, as will be proven at

*United States District Court*

trial. And so at this stage to try to come up with these clever, crafty attacks on our expert's report, which is the tried and true out-of-pocket damage methodology that the Third Circuit has ratified we think is simply misplaced, and that's it for our comments on damages. If the Court has any questions, I'll answer them to the best of my ability, if not, I'll move on to other parts of our motion for class certification.

THE COURT: All right. Just give me a minute.

MR. KILLORIN: Sure.

THE COURT: Okay, you may go on.

MR. KILLORIN: Your Honor, I'm not going to belabor the next parts of our motion, I would like to reserve time to respond to anything that needs responding to. But this is a classic, what Judge McMahon in the Second Circuit calls garden variety securities case. In our opinion, that just meets all the classic elements of misrepresentation to the market, revelation of the truth resulting stock drop causing damages. Third Circuit has in the recent Lynette decision, has said that class actions are particularly well suited for securities cases. We think that this fits the mold. The class is numerous, they are common questions of law. Lead plaintiff's claims are typical, although we will get into the little bit of two challenges on that point, and we believe plaintiff will protect the class interest. So we think this is a classic case

for certification of class.  Defendants then raise this issue of a release in the Ontario case, which it's -- first off, we think about the flat-out, easy to read, straightforward terms of that release in the Ontario case.  The claims in this case are not released.  And then, but then if you move past that, this case is a little bit unique because we've had an overlap of the Ontario case already at the lead plaintiff phase.  One of our arguments was the counsel in the Ontario case could not adequately serve as lead counsel in this case because of his conflict of interest.  The cases were different, different allegations.  The Ontario case is simply unrelated in this. The Ontario case does not mention -- it lists a whole bunch of drugs Teva was engaged in price fixing on.  It does not list Copaxone.

THE COURT:  Isn't it all generic?

MR. KILLORIN:  I'm sorry?

THE COURT:  It's all generic, the drug price-fixing; right?

MR. KILLORIN:  No.  In the complaint they list certain drugs that were included and it's my understanding that it would not include Copaxone based on the fact it was never mentioned in a long list of drugs.

THE COURT:  Yeah, I agree it doesn't include Copaxone, but I guess I'm just trying to understand, I thought the purpose of the Ontario case was to resolve the issues with the

class regarding generic drug price fixing.

MR. KILLORIN:  I think generally that is correct, Your Honor.  But I think the pleadings and allegations are more specific to that and the particular generics involved are drugs other than Copaxone.

THE COURT:  Okay.

MR. KILLORIN:  And so we think that case is completely distinct from this case and not only that, the allegations conflict with each other, as we went over at lead plaintiff hearing where we said an attorney in the Ontario case is not qualified to be an attorney in this case, because this case was alleging certain periods of inflation of the stock price due to misrepresentations.  The Ontario case with complete overlap was alleging deflation of the stock price due to the allegations in that case.  They are similarly two separate cases.  So we think we've got two winning arguments.  We think the clear terms of the release exclude this case as, you know, written up in our brief, and we think that we have additional evidence and detailed evidence that there's a conflict between the allegations of that case and this case.  The Ontario release says that it "Releases claims that were asserted or could have been asserted in the Ontario complaint, too, and any other actions; and in any way relies, or based upon concerns the claims for allegations or transactions of facts in circumstances and disclosures" -- and this is in our brief, so,

you know, it's a little bit of a list, but I'm not going to read all of it -- "And which could have been raised in the Ontario action."  These claims could not have been raised in the Ontario action.  They conflict with the claims in that action as we talked about, so that action is just distinctive and the case law basically says that -- you know, releases always have this catch-all broad language.  And so if you read that completely literally, any time a company settled a case, you know, for the delivery man stumping his toe, that all claims against the company would be released no matter how big or unrelated they are, because that's how general the release language usually is.  But the Courts have said, No, you don't get broad releases, they have to be tethered to reality and the actual claims of case, and the factual predicate has to be the same.  And the factual predicate in these two cases is simply distinct and different.  That was a price fixing case, and this is a price inflation case based on fraudulent charity scheme on the market.  So we think there's no way that the Ontario release would release any claims in this case, which means a number of things.  It means that the lead plaintiff, Gerald Forsythe's trades in Teva would not be subject to any kind of special defenses if the class period were shortened, but while we're on the topic, lead plaintiff in this case, who is a successful businessman, has multiple accounts, only had five trades in Teva.  They were all purchases.  He still owns all of

*United States District Court*

his shares in Teva, as far as we know, we haven't updated it lately, I guess, in the last few months, but he only has five purchases; he still owns all his Teva stock.  He held them, you know, through all the operative dates, the 90-day lookback period in the filing of this complaint.  Even if there were a shortened class period, it would not impact him because he only has three purchases and he's still a loser on his purchases in Teva.  And defendant cites some odd ball case regarding a vociferous short-seller, where the Court says some kind of special matching needing to be used for his trades.  That case is completely inapplicable here because Mr. Forsythe only had three purchases of Teva stock and there's a 90-day lookback period after these cases end, and you only collect if the price you purchased at was above the 90-day lookback.  And so the 90-day lookback price was a little bit higher than Teva was at the end of the class period, and so to be on the money and say well, we do a plaintiff's allocation, his purchases had to be above a certain price.  Well, two of his purchases were below that price so they are not in the money.  But his first purchase was above that price and so it was inflated under the securities clause, including the ninety day lookback, and he was in the money as far as plaintiff allocation goes, but it's all very, very simple.  And so he would still be perfectly qualified to be a lead plaintiff, if the Court were to shorten the class period.  But again, because their release is

*United States District Court*

completely distinctive and distinguishable, we don't think that that would be appropriate.

Next issue, we have included in our claims, claims for all securities of Teva, as was done in the original complaint before we became lead plaintiff.  We thought about it carefully and we have respect for the fact that this case sought to protect all purchasers of Teva shares, including purchasers on the TASE, the Tel Aviv Stock Exchange.  The reasons for that are straightforward.  Teva is dual-listed on both exchanges.  We have put in an expert report from a fairly accomplished professor, a Harvard law graduate from the United States, and a professor in Israel.  He has opined on these matters for years and was part of the canescent(phonetic), I think, when some of these laws were passed in Israel, where Israel has basically adopted rules that say their 10(b) security law mirrors U.S. 10(b) security law.  U.S. Court's rulings on 10(b) disputes will be respected by the Israeli courts, and therefore it's just entirely appropriate -- and the class actions filed in Israel have been stayed.  And because we believe those principles, that the Israeli courts defer to the U.S. Courts.  So if this Court were to not certify class including Israeli investors, this case would go on.  We believe, as we understand it, only 7% of the average trading volume of Teva occurs on the TASE, the Tel Aviv Stock Exchange, but the stocks aren't dual listed and it's simply consistent with Israeli law and I think

U.S. law, to include those shareholders in the class to find this case, and we have cited case authority to this effect, including the Verifone case where the settlement class was certified and included investors on the TASE. And I'll just say as an aside because I realize this is not a black and white situation. U.S. Court in Morrison was Justice Scalia was pretty dogmatic that the U.S. laws should only cover trades that occur territorially in the United States, or on the U.S. stock exchange. However, he cited a bunch of amicus briefs from countries that said we don't want the U.S. basically overreaching its laws into our laws. Israel takes just the opposite approach. It sort of invites the U.S. to take over the securities litigation and defers to the U.S., and we believe that that rationale would be why under courts, including courts in this circuit, have certified class members be traded on the TASE, the Tel Aviv Stock Exchange. And as our one exhibit for this hearing that we have shown to defense counsel, it's not much of a big deal but it's more for convenience, if I may approach the bench?

THE COURT: Sure.

MR. KILLORIN: This is simply an excerpt from a 10K filed by Teva about a year ago where they go through the history of transferring the listing of their ADSs to the New York Stock Exchange. And there are two things -- again, the part is highlighted. This is all public record and part of

*United States District Court*

Teva's securities filings.  It says, In 2012 Teva transferred the listing of the ADSs to New York Stock Exchange, they had been on different U.S. exchange.  The point is they pay money to be traded in the United States.  That's where 90 percent of the trading occurs, they file a 10K, which is a form not all form corporations file.  But because they are dual listed on the stock exchange they file a 10K.  And so all of the investors, both in Israel and the U.S., would have had access to the same publically disclosed information, they would all be in the same position, all be subject to harm caused by the same omissions, so we think it makes sense to simply certify a class in this case that includes not only investors on the New York Stock Exchange, but investors on the TASE.

Now, moving on --

THE COURT:  And you think the fact that you talked about securities, plural, using the word "securities" it incorporates ordinary shares?

MR. KILLORIN:  Yes.  That is true, and that brings up just a point of known inflature (sic).  ADSs are the certificates for -- each single ADS matches up with a share of Teva stock.  The way that they trade on the U.S. is a mechanism where they put ADSs, transfer ADSs to a depository bank, and then the ADSs reside in United States.  We actually have an FCC bulletin on ADRs.  Technically when those banks put those shares out to trade on the market, they reissue -- I'm sorry,

*United States District Court*

when they put the ADSs out to trade, the ADSs represent the shares.  They are in a depository bank.  And then the actual certificates that are being traded on the stock exchange are ADRs.  They are the functional equivalent of ADSs.  They simply -- it's one or more below the layer of red tape for the trading process, but we have an SEC bulletin.  I'm happy to provide the Court a copy, but it simply says investors often use the terms ADR, ADSs interchangeably; Courts use those terms interchangeably.  They say the ADSs trade on the U.S. or they say the ADRs trade.  In the Morrison case, the Supreme Court have said the ADRs trade, which I think is the most technically correct way to say it, but as the Court, I think, in the Ontario case said, "It's a distinction without a difference." And that's another case where they included investors on the TASE.

THE COURT:  Okay.

MR. KILLORIN:  Now, finally, the adequacy of the plaintiff, Gerald Forsythe, he is a very successful senior gentleman.  He is very enthusiastic about this case.  He is a successful and experienced businessman.  He serves on the board of five or more different corporations.  He is a sophisticated investor.  Recently, his daughter has taken over as the President of this corporation that they built, and we believe he is a perfectly more than adequate lead plaintiff in this case.  He is not 100 percent perfect; for example, he did not

get all of his records gathered from his different accounts in a perfectly timely manner.  It was completely inconsequential when he actually found some extra trades from Teva had increased his losses, not, (inaudible).  All of these records were timely produced to defendants before his deposition took place and his understanding of this case is more than adequate under the standards for a lead plaintiff.  When we say, do you understand -- or I think I actually responded to defense counsel, but I'm not sure.  "Do you understand what your responsibilities to be in the role as lead plaintiff?"  And he said I believe I'm qualified to be a lead plaintiff.  And he says, "At this time I've lost in excess of a million dollars, I'm interested in assisting in any way I can to get this and the Court to obtain a judgment on behalf of all the class Teva shareholders."  And then the question was, "So what do you understand your responsibilities to be as lead plaintiff?"  And his answer:  "To assist anything that I can with our legal counsel."  And then the question was, "Do you believe you have duties to other class members?"  The answer was, "Absolutely."  Question:  "What are those duties?"  Answer:  "Well, that's why I'm doing it."  Question:  "Sorry, I didn't mean to cut you off."  Answer:  "To make sure everything is done properly to get this in court and get a judgment."

So Forsythe is active.  He participates.  He's an experienced businessman, experienced investor, his trades in

*United States District Court*

Teva are succinct and to the point and he has very substantial losses.  So in our opinion, he is a perfectly adequate lead plaintiff for this case, and we think this is a perfectly fine securities case to certified class.

THE COURT:  Do you have anything to say about the fact that yes, he has purchased shares in the company after being appointed as the plaintiff?

MR. KILLORIN:  Yeah, I do have something to say about it.  You know, we represent a lot of institutions.  And I get asked the question, "Hey, our money manager, after this fraud came out and the stock took a big drop in price, he went back and bought more of the stock."  And then I said, that may be perfectly fine, it's an efficient market we work in.  And after the fraud was revealed the price was corrected.  And there's no predicting whether a company will go up or down after a correction like that.  And so if you have been led to believe that the company has certain fundamentals in place that haven't changed, it might be perfectly reasonable to reinvest in a company.  We got a $135,000,000 settlement with the Coca Cola Company over securities fraud.  Does that mean that it would have been improper for a Coca Cola investor to, or unwise for a Coca Cola investor to buy more stock after that?  No.  I think that is absolutely inconsequential and unrelated and does nothing -- it's actually a rational decision of many times.  So I don't think it leads to any kind of unique defenses for him.

*United States District Court*

THE COURT: All right, well, what about the passing, sort of, reference in the response by the defendants that they may be able to rebut the presumption as to the lead plaintiff because he said this line about due diligence, that if he had done his due diligence he might not have purchased.

MR. KILLORIN: Oh, well, Your Honor, honestly, I'm not exactly sure what you're talking about. I would have to refresh my recollection. I probably read it.

THE COURT: I'm sure you read it a hundred times but every time you read, you find something else.

MR. KILLORIN: I'm sorry. My partner refreshed me on what you're talking about. I know what you're talking about. He was asked had he known some of the stuff at the time he might not have made the purchases that he made.

THE COURT: Right.

MR. KILLORIN: Again, there's case law. We believe that just does nothing to go to adequacy of lead plaintiff. No lead plaintiff has perfect information about a company or any plaintiff, any member of the class.

THE COURT: Well, I mean, if they are going to rebut presumption, wouldn't they be doing it now?

MR. KILLORIN: I'm sorry, what's that?

THE COURT: If they were going to rebut a presumption, they'd be doing it now, right?

MR. KILLORIN: I would think so.

*United States District Court*

THE COURT:  Anything further?

MR. KILLORIN:  No, Your Honor.  That covers it for us right now.  Thank you.

THE COURT:  All right.

MR. SMITH:  Your Honor, I need just a second to get something out of my bag that I didn't think I was going to need but based on what I heard, I do.  Thank you.

I'm going to go old school with the podium.

THE COURT:  That's fine.

MR. SMITH:  Your Honor, I'll start in the same order that Mr. Killorin did, and discuss first the Comcast issue, unless Your Honor has some different way you'd rather proceed.

THE COURT:  That's fine.

MR. SMITH:  I think that makes the most sense.

You know, Your Honor, I think this has become a case of ships passing in the night.  I don't think there's a lot of dispute about what Mr. Nye has done, would or wouldn't do.  He's essentially said that he would not disaggregate the effects of potential fines and penalties.  So we now understand the plaintiff's views of what appropriate damages are in the case.  Just to be very clear, we've never suggested that at the class certification stage the plaintiff's expert actually has to do disentangling to the extent it's required.  All we've said is that they needed to propose a methodology for doing that.  And you know, our expert has testified that that hasn't

been done, but that's really not the primary issue at this point.  The real question is, should fines and penalties and the risk presented by fines and penalties be appropriately taken into account.  Mr. Nye says that it should be.  We think decidedly that it should not be.

And I think Your Honor only needs to look at three cases to reach that conclusion.  The first is Comcast, obviously.  The second is actually Lynette, and the third is Your Honor's own decision on a motion to dismiss.  And both Mr. Killorin and Mr. Nye in his reply statement have pointed unabashedly to allegations in the complaint that we believe, based on Your Honor's decision in the motion to dismiss, are no longer operative and therefore cannot be a basis for damages in the complaint.  Your Honor's decision has effectively redefined the theory of liability in this case.  And as a result, there's a Comcast issue with including the potential fines and penalties in the damages methodology, and presenting no methodology to account for them.

Your Honor, one of the things I heard is that the plaintiffs have not, themselves, recognized the extent to which Your Honor's decision on the motion to dismiss has impacted their claims in the way that we have.

And as Your Honor may recall, when I was cross-examining Dr. Nye this morning, I asked him whether it was his understanding that the theory of the case had changed

*United States District Court*

in the way that defendants suggest, and Mr. Killorin objected and said that's not what they had said. And I read verbatim from their papers on the motion to stay, their re-characterization of the theory. And it's very consistent with Your Honor's decision. That the immateriality -- that the illegality, the potential illegality, the scheme, is not material to the theory of the case. And the theory of the case as it currently stands is that what was misrepresented or omitted was the true driver of Copaxone's success and the extent to which it was driven by the donations to the charitable -- PAPs. It's a bit through the looking glass, Your Honor, to say that as plaintiffs do, the illegality is immaterial, and yet claim that merely the totality of damages precede.

THE COURT:  Do I say it's immaterial?  Don't I say "largely" immaterial?

MR. SMITH:  You say largely immaterial, Your Honor. In fact, it probably makes sense and I was going to do this in a bit anyhow, but the key portions of Your Honor, I mentioned Comcast, Lynette, which I want to come back to, and Your Honor's decision. And I think it's very important to look closely to what Your Honor has said in a couple of different places, not just the line that Mr. Killorin focused on, which is important. But Your Honor characterizes the plaintiff's claims in a variety of different claims that the plaintiffs

*United States District Court*

assert.  The first place that I look in Your Honor's opinion is on page 9 of the slip opinion, where you talk about plaintiff's allegations with respect to Teva's compliance with federal law.

THE COURT:  Unfortunately, I don't have my slip with me.  I don't have my opinion, but it's not going to be the same page 9 I think.

MR. SMITH:  I apologize for that, Your Honor.

THE COURT:  What section are you in?

MR. SMITH:  The section is, it's Romanette III, where Your Honor is, "Defendants relevant pre-subpoena statements" is the section, Your Honor, which I guess is Section 3 under Background.

THE COURT:  Okay.

MR. SMITH:  Factual background, Section 3, and then it's Romanette III, I believe.  Yes.  And it's headed Teva's compliance with federal law.

THE COURT:  Okay.

MR. SMITH:  Okay.  And Your Honor says, "Plaintiff also contends that Teva and its executives' omissions caused the company's compliance with federal law through SEC filings to be false and misleading.  "Teva explained -- and I want to read this because when I get to Lynette, Your Honor, and I try to explain why it is I think this case is actually very different from Lynette, this becomes significant.  But in characterizing the allegations, Your Honor, it says, "Teva

explained the pharmaceutical industry is highly regulated, and cautioned that the company's failure to comply with applicable laws, rules, and regulations may result in civil and/or criminal legal proceedings.  Teva also noted government investigations into sales and marketing practices, particularly, our specialty pharmaceutical products may result in substantial penalties."  Now, let's think about what the plaintiffs are arguing now, okay, which is basically that this is what materialized and caused their damages.  That's what they've said repeatedly today.  So that's the first place that I think it's important to look, Your Honor.  If you then go a little bit further forward in the opinion to the section, Defendant's Relevant Post Subpoena Statements, which is No. 6 in the background section and Romanette III, again, under that says Teva's compliance with federal laws.  And again, Your Honor points to the statement governmental investigations into sales and marketing practices particularly for our specialty pharmaceutical products may result in substantial penalties. And the plaintiffs allege that those statements were false and misleading.  And they say they are false and misleading originally because we said that much but no more, which I guess the additional one was, "and by the way, we're going to get hit with this."  So that was the allegation as Your Honor characterized in your opinion.

Your Honor then discusses the case law that generally

companies do not have a legal duty to disclose uncharged, unadjudicated wrongdoing.  And then Your Honor, I know you don't have the same pagination that I do so I'm going to try to find a section reference.  This is in the discussion section of the opinion.  Section A1, which is headed Misleading Statements.  And then this is a couple of pages into that.  I don't know if that's helpful or not.

THE COURT:  That's fine.

MR. SMITH:  I can just read from Your Honor's opinion. You say, "Here the Court agrees with defendants that companies are not required to disclose illegal activity."  And then this is where it gets to the quote that has been much discussed, where Your Honor says, "And as the case law discussed above demonstrates, it is largely immaterial whether Teva's actions were illegal because plaintiff does not argue that Teva was required to disclose the scheme merely because it was illegal. Rather, plaintiff argues that Teva was required to disclose the scheme because it was what made Copaxone so successful."  And Your Honor is referring above to your analysis of the Allergan case, which you relied on in leaving those claims in.  And Your Honor then says, "Taking all the allegations in the light most favorable to the plaintiffs, the Court finds that plaintiff has sufficiently alleged that Teva repeatedly attributed Copaxone's success to legitimate factors, such as the quality of the product and physician/patient loyalty."  And then I'm skipping

*United States District Court*

forward. "Because Teva put the sources of Copaxone's success into play, its failure to reveal the true reasons for Copaxone's success renders these statements misleading."

Now, Your Honor asked some questions to Dr. Marietta when she was on the stand that I think are very telling. Your Honor asked the question, "Could you have had a charitable donation program or scheme that would not lead to fines and penalties and was not illegal?" And the answer to that is yes, you could. And if it wasn't illegal, and wasn't going to lead to fines and penalties, then you would have no stock drop.

So the issue there, Your Honor, and Your Honor asks me that question and I have some further information for you, is you know, when did the charitable donations end? Because if you think about the theory of the case as it now stands, the theory is the charitable donation program, those donations were essentially juicing sales of Copaxone. And if those sales ended, so too would the artificial inflation of sales -- or, I'm sorry, if the donations ended, so the artificial inflation. And if what the market was reacting to in the DOJ complaint was that fact, then the problem is those donations ended in 2018. So it would have been two years before the DOJ complaint was filed that that had ended, and the inflation, therefore, was gone. So we come full circle around to the only thing the market could have been reacting to was the risk of fines and penalties, which brings me to the last part of Your Honor's

opinion that I actually wanted to focus on, where Your Honor says -- this is on -- it's a little further on Your Honor's opinion under the heading, Teva's Compliance with Federal Laws yet again.  Your Honor quotes the Pelletier case saying, "Companies do not have a duty to disclose uncharged, unadjudicated wrong doing."  Unlike with the statements about Copaxone and the Shared Solutions Program, Teva's disclosures regarding the company's compliance with federal law do not put the source of Copaxone's success into issue.  So Teva was not required to disclose an uncharged, unadjudicated wrong doing in connection with its statements regarding compliance with governing laws and regulations.  Accordingly, Teva's statements regarding compliance with governing laws were not misleading.

And then if you skip to almost the very end of Your Honor's decision, there's a discussion under the heading Complaint Filed, and Your Honor then begins to start to talk about lost causation issues, and has the following statement: "Here, although the allegations in the government complaint are just that, allegations, they provided the market with information regarding the scheme by which Teva made donations to PAPs that indirectly funded Copaxone copays and made Copaxone seem so successful."  That's how Your Honor characterizes the significance of the DOJ complaint. Accordingly, the Government's complaint constitutes a corrective disclosure.  A corrective disclosure, again, with

respect to the indirect funding of Copaxone and the propping up of its sales.  So I think if you look at Your Honor's decision in totality, it's interesting in the following respect. Lynette is a case the plaintiffs have cited; the Third Circuit decided the case after the briefing had closed.  But there was the Neil case here in the Third Circuit prior to Lynette in interpreting Comcast, made some comments that could lead one to conclude that the Third Circuit thought that Comcast was somehow limited to antitrust cases, and didn't have broader applicability -- or at least it was limited to its facts and may not apply to securities fraud class actions.  The one thing that we can say with certainly after the Third Circuit's decision in the Lynette case is yes, Comcast does apply to federal securities class actions and the Third Circuit notes with approval the district court's decision in that case saying yes, we have to start with the fundamental principle in Comcast, that a damages theory that connects with the theory -- a damages methodology that connects with the theory of liability is a starting place for a predominance analysis also under 23(B)3.  So that is now essentially established.  So then the question is okay, if that's the case, what did the Third Circuit end up doing in Lynette.  And I think to understand why this case is Comcast and not Lynette, it's important to actually look at the lower Court's opinion in Lynette because it's really a guidepost to the problem in this case.  And this

*United States District Court*

is at -- of the Westlaw decision, it's star 1 of the district court's opinion in Lynette.

Now, Your Honor will remember, the defendants in Lynette -- and Dr. Marietta-Westberg was the expert there -- made an argument that on its face looks very similar to what we're arguing here, which is there was a dismissed claim and the plaintiff's damages methodology had to effectively disaggregate damage from that dismissed claim from what was left in the case. And what the ultimate determination was, was that, unlike here where in our view the damages methodology expressly is the damages from the dismissed claim. In that case, the Court found that expert's methodology did not include damages from the dismissed claim. So there was no need to disaggregate, but more importantly, I want to focus Your Honor in what was left in Lynette, and what was susceptible to the damages methodology that was put forward in Lynette. What was left in Lynette -- I'm going to read from the district court's characterization of the claims remaining in the case.

THE COURT: Where are you?

MR. SMITH: Star one, the first page of the decision. And it begins with "Plaintiffs contend that defendant's statements during the class period in the public regulatory filings, press releases, and by the individual defendants during earnings calls and public events were materially false and misleading in that" -- I don't know if Your Honor is

*United States District Court*

following along with me, but I'm getting to what I think is the critical part of this.  So the Court is now characterizing the claims that remain in Lynette, and the Court puts them into two buckets.  The first one is, "Defendants misrepresented to class members that Lynette's growth was the result of competitive market forces that afforded an opportunity for Lynette's aggressive pricing campaign, whereas Lynette's price increases in actuality were caused by extensive price-fixing schemes and anti-competitive conduct throughout the generic drug industry that indirectly implicated Lynette's competitors in markets or profits."  Okay?  So that's the first theory. That sounds a lot like what Your Honor allowed to go forward in this case, that we were representing that Copaxone was succeeding because of fundamentals and various other things, when in reality it was the undisclosed details of the patent, quote, unquote scheme.  But then two, this remained in the case.  "As regulatory scrutiny into price fixing and anti-competitive conduct increase, defendants issued a series of misleading statements from omissions of material fact that misled plaintiffs and class members regarding the risk that Lynette would be implicated in price fixing and anti-competitive conduct."  Now I want Your Honor to remember the parts of your opinion that I read and the risk disclosures that plaintiffs tried to claim were misleading about the risks of regulatories fines and penalties that Your Honor dismissed,

okay?  That sounds a lot like that one which remained in Lynette.  But it goes on.  So again, the first one is very much what Your Honor did, very much like Allergan, a case Your Honor relied on.

The second one is that in that case there were public statements made that were misleading about the risks of regulatory action.  And then the third one is defendant's statements that the company had complied with the law in the pricing of its products, created the false impression that Lynette had conducted a complete and thorough investigation as to whether Lynette engaged in anti-competitive conduct, and the risk that Lynette would be implicated in an action alleging anti-competitive conduct.  But in actuality, Lynette's internal investigation was not completed and had limited focus.

Your Honor, those were the claims Your Honor dismissed out of this case, and they remained in the case in Lynette.  And that's why in Lynette the Court found with no trouble that the expert's damages methodology didn't require disaggregation or separation because the dismissed claim was none of those three, it was something else that was no longer in the case and not accounted for in the damages analysis.

I would submit to Your Honor that we now have a case where very similar claims to the ones in Lynette actually need to be disaggregated to comply with Comcast because Your Honor dismissed the ones that relate to allegedly misleading

*United States District Court*

statements about compliance with law.  They are out of the case and it's those are the ones --

THE COURT:  Let's just take a minute here.  You're using the word "claim" and your opposing counsel is using the word "claim" to go to the claims in this complaint, is Section 10B, and the Rule 10(b)-5, okay, as well as Section 20A, but we're focusing on 10(b) right now I guess.  So I didn't dismiss the 10(b) claims.  I discussed at length different alleged misrepresentations that plaintiff has put forward but it didn't dismiss the claims.

MR. SMITH:  I agree, Your Honor.  I can be more precise in the language because I think it's actually helpful.  We're not talking about claims in that sense.  We're talking about theories of liability.  And again this comes back to Comcast, same thing.  The Court wasn't talking about a claim under the Sherman Act.  The Court was talking about what are the theories of liability that have been allowed to go forward in the case, that remain in the case, and that the damages need to tie to.  And Your Honor's right.  There's a 10(b)-5 claim in the case.  What plaintiffs would like Your Honor to do, I would submit, would read Comcast out of 10(b)-5.  And as I said, Lynette clearly contemplates that it has a role in the 10(b)-5 case.  If you simply define the theory of liability in a 10(b)-5 case to be you violated 10(b)-5, well, then it's a closed loop.  Yes, it's true, the out-of-pocket measure of

*United States District Court*

damages at that level of generality is the response to a damages methodology that corresponds to the claim as Your Honor said.  But that's not the theory of liability in the case.  And I'll concede, Your Honor, that if you read the Lynette Third Circuit decision on its face, it almost seems to suggest that, but it can't be right and that's why I wanted to go through with Your Honor --

THE COURT:  You want to tell the Third Circuit that.

MR. SMITH:  Nope, no, I didn't mean to say that the Third Circuit wasn't right.  I meant that reading of the case can't be right.  Because the Third Circuit says elsewhere in the same case that clearly Comcast doesn't like 10(b)-5 claims and it takes into account, and while it gives it a little bit briefer recitation in the district court, it noticed the theories of liability that remain in that case and those are ones that I just read to Your Honor.  And as I said, I think there are literally two of them are gone from this case, years of liability, not claims.  Because Lynette, same deal, 10(b)-5 case.  That was the claim.  But one remains.  That is the Allergan Light claim, sorry, theory that Your Honor allowed to proceed here.  And the other is gone from this case.  And what plaintiffs had done is not only suggested how they could account for damages arising out of the one but not the other had said, We're taking the other damages.  We're expressly relying on those other damages.  The fines and penalties

*United States District Court*

arising out of -- to simplify this to the greatest extent possible, if there is no illegality, there will never be any fines or penalties.  It's as simple as that.

THE COURT:  Right.

MR. SMITH:  And so if the statements about compliance of law are out of the case, then if the market was reacting to the threat of fines and penalties as a result of illegality, that's not the theory of liability in this case anymore, Your Honor.  It just isn't, and so that's the problem that the plaintiffs have.  And I think it's sort of irrelevant at this point whether you credit Dr. Nye's theories about how he would go about doing damages that account for and include penalties, fines, et cetera.  Because the law just doesn't admit it in a case like this.  If there's ever a 10(b)-5 case that is Comcast it's this one.  As soon as you accept the proposition that Comcast applies to the 10(b)-5 and you match Judge Scalia's decision up with this case, that's this case.  So unless Your Honor has further questions on that, I can address some of the other arguments that we've made.

I guess then first I would go to -- and by the way, I'm not going to belabor adequacy and typicality.  I think it's all in the briefs.  There was a little bit of colloquy, Your Honor.  Two things I'll just note, which is Mr. Forsythe, by Mr. Killorin's count is very actively interested in this case.  He is not here, okay?  This is the hearing to certify as a

*United States District Court*

class -- and we asked by the way if he was coming because we knew Your Honor was going to have an evidentiary hearing.  He's not here.  I also heard Mr. Killorin say when he was talking about --

THE COURT:  Well, I didn't ask him to come.

MR. SMITH:  No, I know you didn't, Your Honor.  I know you didn't.  I didn't mean to suggest otherwise.  But Mr. Killorin also made an off-hand reference to not knowing because they haven't checked in a couple of months whether he's engaged in anymore trading.  I don't know what that means in terms of his level of involvement and interest in the case, but I'm not going to say anything more about that.  And so instead, where I intend to focus the rest of my time is really on what I'll call the Ontario issue, which is the release, and the Morrison issue, which is the extraterritoriality effect.

THE COURT:  Okay.

MR. SMITH:  So with respect to the release, I agree with Mr. Killorin that it's important to look at the words.  And so with Your Honor's indulgence, I'll do that.  By the way, I don't think there's any dispute that in terms of the parties that are covered in the release, it's Teva.  It's a number of the named individual defendants in this case.  There's a definition of released parties that ropes in the rest of them.  So at that level they are included.

I would also note that unlike a number of the cases

where supposed conflicts are pointed to, in this case, first, Mr. Forsythe is a member of the Ontario class. As Your Honor knows from the briefing, he made a considered decision not to opt out of that class. So he got the notice, he could have opted out and he chose to basically do nothing in response to the notice knowing that he would be bound by the release. Conversely, Ontario is part of this class. And I don't think there's any dispute about that either. So the notion that there's a conflict created because in one case there's allegations that there were corrective disclosures that brought the stock price down. If you remember back to the whole damages theory that Mr. Nye was talking about, you're talking about some inflation band that was a result, a constant inflation ban that was a result of the alleged misstatements in this case, and those stay in there regardless of whether the stock price comes down for other reasons. So there's no conflict in that sense, and there's no conflict in the way they worded some of these other cases. I think there's a Ninth Circuit case that's cited, that where one class rep is not a member of the other. They are both members of both classes. So the conflict issue is a red herring. So to is the notion that there's any sort of due process issue as we just talked about. Everyone got a notice. The reason you're allowed to opt out of 23(B)3 classes is to comply with due process. If you want to get out, you can get out. Again, Mr. Forsythe

*United States District Court*

chose not to do so in this case, but there's no due process issue at all associated with this, so it really comes down to, in our view, the scope of the release.  And there's also no policy reason why a broad release would not be enforced.  To the contrary, we've cited case law that suggests particularly in class actions, this is the Freeman case among others, that the policy favors broad releases in class actions, and I'll just read from the Third Circuit's opinion in Freeman very briefly.  The Court says, "It's settled in this circuit that a class representative can enter into a settlement that bars future claims by class members, even though the precluded claims -- precluded claim was not presented and could not have been presented in the class action itself."  The Court goes on, and this is this language that plaintiffs pointed to, to say that the key inquiry is whether the factual predicate for future claims is identical for the factual predicate underlying the settlement agreement.  What that means is not what plaintiffs claim it means.  If you look at Freeman itself, Your Honor, there was a class action that related to sales practices in connection with insurance policies and there was a broad release in there, and the new action was a breach of contract claim, breach of the insurance policy, and nevertheless, the release was enforced.  And what the Court looked at in saying the same factual predicate is, not what are the allegations, the underlying conduct or anything else, but it's the same

insurance policy. And for every single person in this class, Your Honor, the analogous transactions is their purchase or sale of Teva shares. And it's the same in both. So I would suggest that the factual predicate part of that is also a red herring and so what are we left with? The scope of the release and is it broad enough and the answer is it absolutely is. In fact, it's even broader than would be necessary. And I think this, by the way, Your Honor, is Exhibit 4 to our memorandum of law. That's the stipulation of settlement in the Ontario case. And it's ECF-101.5. I'm just going to parse the language here and I think it's very important to parse it appropriately, so there's going to be a lot of ellipses in what I say, but I think if Your Honor is going to follow along, you'll see that this is a fair parsing of the language. I'm at page 10 of the document, and it's Section 1.25 of the stipulation of settlement in Ontario. And this is the definition of released claims. And it says released claims means any and all claims -- now the parsing is going to begin. So I'm skipping a bunch of verbiage. "Release claims means any and all claims that any member of the settlement class could have asserted in the litigation or in any other action, that in any way arise out of, are based upon, relate to, or concern the transactions" -- here, again, I would submit that's the purchase or sale of stock in a 10(b)5 case -- "disclosures, statements, representations, omissions, alleged, referred to, involved in,

*United States District Court*

or which could have been raised in the litigation or the complaint, and that in any way arise out of, are based upon, relate to, or concern the purchase or acquisition of Teva Securities during the class period." The class period in Ontario, again, for Your Honor's benefit is basically the first three and a half years of the class period alleged in this case. "Including without limitations claims that arise out of or relate to any disclosures including financial statements, U.S. Security and Exchange commission filings, press releases, investor calls, registration statements, offering memoranda, web postings, presentations, or other statements made by defendants during the class period." Okay. That clearly encompasses the claims in this case. And in fact, Your Honor, I went and checked and 24 of I think it's 49 alleged misstatements in our case during this overlapping time period are in the Ontario case, in the same SEC filings, press releases, et cetera. It's not the identical statement per se, but 24 of the alleged misrepresentations in our case appear in the exact same SEC filings, conferences, press releases, et cetera, as alleged misrepresentations in the Ontario case.

So I think that's pretty much all I have to say about that, Your Honor, and I think what that means is that this class period, based on that release, cannot start any earlier than the day after the end of the Ontario class because those claims are released. Unless Your Honor has anymore questions

*United States District Court*

on that I'll go to Morrison.

THE COURT:  Well, what are the cases that it got listed?  To avoid any doubt.  Such non-release claims and those asserted.  What do those involve?

MR. SMITH:  Oh, actually I'm glad you raised that, Your Honor.  Because another thing I wanted to address before because I think at some point this may have just been inadvertent on Mr. Killorin's part.  He said this was like a price fixing case.  And it's not.  It's a 10(b)5 case.  Okay, it's a 10(b)-5 case where the underlying scheme, et cetera, relates --

THE COURT:  You mean --

MR. SMITH:  I mean Ontario.  Clearly, our case is not prejudiced.

THE COURT:  Oh, he might have been going off what I thought.  I thought it had to do -- okay.

MR. SMITH:  Yeah, you were asked about generic drugs, et cetera.  It was a 10(b)-5 case just like ours.

THE COURT:  All right, a 10(b)-5 case but as to generic.  Not involving Copaxone.

MR. SMITH:  Right.  The ones that are carved out, it's a couple of cases pending in Israel.  It's not the one that overlaps almost precisely with our case.  Those could have been carved out, but they were not.  And we consider that significant as well.  That the parties made a considered

*United States District Court*

decision to specifically enumerate cases, other pending class actions that were not going to be released in this case. And this case, which was already pending, was not carved out. So we consider that significant as well.

Not a bad segue way into Morrison, Your Honor, now that we're talking about cases that are pending in Israel. Morrison, I think, this argument is really, pretty simple. Morrison applies. Obviously, the ordinary shares are not traded on a U.S. exchange; that's conceded. The definition of securities, Your Honor asked some questions about that in the complaint. The class definition does talk about securities, but there's a footnote that defines securities as ADR. Not ordinary shares. So as originally framed in the complaint, ordinary shares were not in this case. Now, the case law is a bit all over the map about whether you're even allowed to do what they are trying to do here, which is expand your class at the class certification stage when you didn't put it in your complaint. You've cited cases that say they shouldn't be permitted to do that, and we think from a notice standpoint that that's right. But I'm not even going to hesitate over that because it just doesn't work. So they are not traded on U.S. exchanges, and that means very clearly under the Georgiou case out of the Third Circuit, that if they are not traded on U.S. exchanges, then they've got to have a domestic transaction to be included. Right? And that means, what do

*United States District Court*

you look at for a domestic transaction?  You look at basically where the transaction was entered into.  You don't even look at the residency or citizenship of the person transacting.  You look at where they ultimately incur liability on the contract.  So in terms of the stock sale, that's a myriad of individual inquiries.  What the plaintiffs say in response is -- and the reason that Professor Licht's very interesting report is totally irrelevant is that under the Israeli securities clause, Israeli courts will look to 10(b)-5 to determine liability.  But the cases plaintiffs cite that were allowed to proceed with stock -- with shares traded on the TASE, were ones where they had asserted a claim under Israel securities laws.  So the Court said okay, we have the 10(b)-5 case and I'm going to exercise ancillary or supplemental jurisdiction under Israel law securities claims that have been asserted in this case.  It wasn't entered around Morrison.  And in fact, that's what Professor Licht says in his affidavit if you look at the actual language that he uses.  He makes clear that what he's saying is that this can be done -- I'll read it directly.  What he says, the plaintiffs quote the Licht declaration as saying, "Israeli law grants a 10(b)-5 cause of action to TASE traders, who trade in the U.S. listed securities, subject to dual listings province."  That's true.  But the plaintiffs say, as a result of that, "Concerns about 10(b)-5 extraterritorial reach at issue in Morrison is irrelevant."  Well, what the paragraph

*United States District Court*

actually says in Professor Licht's declaration is "Israel law grants a 10(b)-5 cause of action" -- Israel law -- "grants a 10(b)-5 cause of action to TASE traders who U.S. listed securities, subject to the dual listing requirement even if Morrison would not recognize that cause of action under U.S. law.

So, I mean, we're accused of basically calling that irrelevant.  It is.  And so are the cases that plaintiffs cite because they all fall into that bucket.  So that leaves them with nothing.  So the shares, the ordinary shares, trade on the TASE, the synonymous exchange on a class-wide basis in a case like this, trying to determine whether there are domestic transactions in Israeli-listed securities on an individual by individual basis can't be done.  And I think that's all I have, Your Honor, unless you have any further questions.

THE COURT:  All right, let's take a five-minute recess and then I'll let you respond but let me just take that five-minute break.

MR. SMITH:  Thank you, Your Honor.

MR. KILLORIN:  Thank you, Your Honor.

(Brief recess at 2:32 p.m.)

(In open court at 2:40 p.m.)

THE COURT:  I have a couple of questions for plaintiff before we -- I mean, I'm sorry, for defense.

So what if I were not to include those that purchased

*United States District Court*

ordinary shares?  What's going to happen to them?

MR. SMITH:  Sorry, what's going to happen to them, Your Honor?

THE COURT:  Yes?  What happens to them?  Do they join the stayed case and?

MR. SMITH:  I don't know what happens to them.  Join the stayed case in Israel?

THE COURT:  Yeah?

MR. SMITH:  I guess -- I don't want to speak out of school here, but presumably the Israeli law claims that I was referring to are asserted on their behalf there.  I'm going to look at Ms. Donovan to confirm that I'm not getting that wrong.  So I think they are covered in that regard, Your Honor.

THE COURT:  Okay.  So are they in both?

MR. SMITH:  They are -- well, they would be in this one if Your Honor didn't accept my Morrison argument.

THE COURT:  Right, right.  I understand.

MR. SMITH:  But only by virtue of U.S. 10(b)-5 claims, which I think is counter to Morrison, my point is that there is an Israeli class action asserting Israeli securities laws claims, which Mr. Killorin pointed out are going to follow U.S. 10(b)-5 law, that if Your Honor is concerned about protecting the interest of those people, I think they are covered in that action.  And again, I don't want to speak out of school, but as Your Honor knows, that case was stayed pending this one.  It

*United States District Court*

sort of stands to reason, if you think about the way the Israel securities laws are set up, that they would allow U.S. 10(b)-5 class actions to be resolved first, before addressing issues that under their own law look to 10(b)-5.

THE COURT:  In terms of I think you said the only thing the market was reacting to is the risk of penalties, right?  How -- the risk of penalties is different than the actual penalty.

MR. SMITH:  It is, Your Honor, but price reaction upon the revelation -- this is all the cases that we cited to Your Honor that led Your Honor to dismiss the claims about the compliance with law.  Which is, there's no obligation to accuse yourself in real time of uncharged misconduct.  And typically, the mere allegation of illegal conduct is not itself the basis for a securities claim.  Can it cause a stock to drop?  Yeah. Because the market is as all the analyst reports that Dr. Marietta points to, people are looking and saying well, yeah, there's a risk, because you've now been accused of illegal conduct that -- and I harken back to the one that I pointed to in cross-examining Dr. Nye, that says if the government is a hundred percent successful in its case, then you could have a billion dollars in liability.  That's what's causing the stock drop.  It's one step further that actual conviction -- well, not conviction, that's the wrong word as Your Honor pointed out before, but in the determination of liability.

*United States District Court*

THE COURT: All right. Let me hear from plaintiff's response. I'll let you all know that I have to stop for a brief recess at like, 2:58. I have to go do a 3 o'clock call but I'll be back. It won't take more than 10 minutes. Do you want to address the ordinary share thing first?

MR. KILLORIN: Sorry?

THE COURT: Will you address the ordinary share thing?

MR. KILLORIN: Absolutely, Your Honor. First, they talk about we didn't allege a claim for ordinary shares in the complaint. That's just not right. We allege claim for all Teva securities and that would obviously include ordinary shares. But I don't disagree with what the defendant said about what might happen, Israeli law controls, and I would -- I don't want to speak out of school either, but I assume that the cases involved that are stayed, would remain stayed pending the outcome of this case. And I, again, there's a possibility, although I don't know, that even if they were excluded, we would then try to include them in a class action settlement class like was done in the Verifone case where there were no Israeli claims. Actually, no Israeli law was included in the complaint but the class certified for settlement did include Israeli investors on the TASE. However, given the fact that there's just no reason to do it that way, I think it makes more sense to include the TASE traders just because this is a fungible product, and it is very much like the fact that shares

*United States District Court*

were getting -- the problem is, in the modern world, things are connected and old terms don't have their same old meaning.  So people used to say I have shares of Coca Cola, and they had two stock certificates.  Now it's all the street names.  I would imagine it might be the same way on the TASE in Israel.  They don't really have security certificates for their shares there; there would be some kind of street name.  And it's the same process with the.

ADSs and the ADRs.  The real key here is that these stocks were both listed, dual listed on both exchanges and so to own a share of Teva stock which is common parlance, it's very academic whether it's an ADS, an ADR, which is the ADR is your actual certificate to write the ADS.  The ADS is your certificate to write the share.  It's all basically a street name system run by the depository banks, and so we think simply -- and Israel courts and law defer to the US Courts to resolve these disputes when they can.  So we think it makes sense for this Court to simply keep jurisdiction of those investors that were in the original complaint.  That's our position.

THE COURT:  Okay.

MR. KILLORIN:  Now, moving on to the damages discussion.  Your Honor, we think that the Third Circuit absolutely has disposed of this theory that defendants have. First, we believe that this Court has in no way denied us of

our right to seek natural damages flowing from the misrepresentations.  This Court and the motion to dismiss listed three categories of misrepresentation.  Statements regarding Copaxone market share.  Statements regarding its Teva shares solution program, and statements regarding the alleged violations of the -- I'm sorry, statements regarding compliance with applicable law.  The Court said that those particular statements regarding compliance of law were not misleading; however, the Court said that the statements regarding Copaxone market share and Teva's participation in the shared solution program.  That's what smelled like a rat.  That's what was -- would worry investors about illegality.  Those statements, that class of misrepresentation is very much a part of this case, and it would make no sense to not be allowed to get damages naturally flowing from the revelation of the truth that those misleading statements were hiding.  And so we believe that what defendants are doing is simply playing around with semantics and jargon, and known inflature.  Those are not dismissed claims.  Those are all just little components supporting our big claim of a 10(b)-5 violation, any misrepresentations to the market.  That's the claim.  That claim has not been dismissed.  That claim is fully there.  It is supported by this Court finding that Teva made misrepresentations regarding the shared solution program.  This Court has never said that when the revelation regarding the shared solution program, the truth of

*United States District Court*

it was revealed to the market, that we couldn't get damages for the drop that that would cause.  As we said in the motion to dismiss hearing, it smells fishy; raises concerns with illegality.  As Dr. Nye said, the market reacts on probability. And we said repeatedly, it is largely immaterial whether or not we allege illegality or possible illegality, because nobody can really know.  That's why we're more than happy to take out that descriptive term from the complaint, that in no way means that we are trying to waive our claim of damages for the result of those false statements, those false and misleading statements. You know, and typically we think of these securities flaws as a reason for falsity.  And that's what survived and those statements were false and they were material.  And defendants are conflating reasons for falsity with materiality.  We've proven why those statements were false but they were also material to investors.  And the Court never ruled on that. Court never said, Oh, those statements were regarding compliance of law -- were -- I'm sorry, let me go back.  That statements regarding participation in that scheme were material to investors but only for certain reasons.  They wouldn't have been material to investors because of the implications of federal penalties.  That's completely incorrect.  They were material to investors exactly because as we said at the hearing of their implications for fines and penalties.  The reasons for falsity of those statements, of Teva's statements -- again,

we've got two out of three categories.  So that means the statements were false.  But then the next item, the next consideration was why were those false statements material to investors.  There's been no dismissal of the notion that they were immaterial because of the concern of the prosecution or -- sorry, not prosecution -- concern of fines and penalties, which would be huge.  Obviously, that was one of the biggest concerns in the whole scheme, which is why we called it a scheme, would raise.  So to me this is -- you have to get into semantics, contrived semantics to go with defendant's position.  And it's the same thing with the new Third Circuit case in Lynette. That Court made it, I think, abundantly clear, that even there, while there may have been a change in plaintiff's theory of the case, that in no way impacted the damage calculation because the damage calculation was based on a single claim and that is there were misrepresentations made in the market that caused the share price to go down.  And again, the Court there would have nothing to do with parsing the reasons for the decline, especially at a class certification stage.  So as an initial matter, there's no reason to deny class certification on those arguments, and if class certification is granted, I'm sure that one of the first issues on discovery is going to be, you know, do we get discovery on damages that naturally flow from those misrepresentations, because it's our position that those claims have in no way been dismissed by the Court or by us, and it's

simply a contrived interpretation of the Court's order to claim they have been, so that is our position on damages.

Regarding the release, we think that the predicate facts -- and we cite plenty of case law for this -- are completely different on the Ontario case.  That was a 10(b) case but the predicate facts involved a collusion in price fixing.  The predicate facts in this case involve a scheme to defraud the government under the antikickback statute and what is it?  The federal Fair Claims Act?

MR. WILSON:  False Claims Act.

MR. KILLORIN:  False Claims Act.

THE COURT:  False Claims Act.

MS. KILLORIN:  Seems to slip away.  Anyway, the predicate of this case is completely distinguishable from the predicate of the Ontario case, and therefore, the release would not apply to this case and we cite plenty of case law to that effect.

Your Honor, I believe that's all I've got.

THE COURT:  All right.  Very briefly.

MR. SMITH:  Okay, Your Honor.  I really don't have much at all.

THE COURT:  Two minutes.

MR. SMITH:  The one thing I really do feel I need to correct is this continuing notion that somehow ordinary shares were in the original complaint.

*United States District Court*

THE COURT:  I know the word wasn't in the complaint but the word security.  You would agree that an ordinary share is a security; right?

MR. SMITH:  No.  For the following reason, Your Honor.  Here's the footnote in their complaint.

THE COURT:  Yeah, I know the complaint.

MR. SMITH:  Literally it says for convenience, Teva's ADRs are referred to as, quote, shares, quote, securities, or quote, stock.  Which means in this complaint when you see those words, it means ADRs.  It's the only fair reading on the footnote.  I don't think it even turns on this at the end of the day because under Morrison, they are out.  And I hear Mr. Killorin said he thinks it might be better to include them, but the only reason it's not is you're not allowed to do that under Supreme Court (inaudible).  I'm not going to belabor the Comcast point much further, Your Honor, other than to say that if you start analyzing the truth that was allegedly hidden that then leads to the risk of fines and penalties, it can only be that we were not as forthcoming in talking about our compliance with law as we should have been.  There's no other way around it and those are in the complaint, Your Honor.

THE COURT:  Say that again?

MR. SMITH:  So Mr. Killorin was talking about they are entitled to recover damages when the truth we were hiding comes out and the risk of fines and penalties inexorably follows from

*United States District Court*

the truth coming out.  The only truth coming out that could have been concealed and would lead to fines or penalties is something about our compliance with law, that our statements that here are the risks that we face of fines and penalties that we should have said more about that.  What Your Honor said was the truth that was not revealed is that Copaxone's success, its revenues, et cetera, were supported not necessarily by fundamentals or other things, but by the Patient Assistance Program, the DOD donations, those are two completely different things.  So, I claimed I wasn't going to belabor and then I did.  I don't think I have anything else, Your Honor.

THE COURT:  All right, so let's break for about 10 minutes and we'll come back and quickly deal with the stay.

MR. SMITH:  Thank you, Your Honor.

MR. KILLORIN:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  All rise.

(Brief recess at 2:57 p.m.)

THE COURTROOM DEPUTY:  All rise, this Court is now again in session.

(In open court at 3:15 p.m.)

THE COURT:  Okay, so if I don't accept your arguments and I do certify a class -- big if -- let's quickly hear your petitions on motions to stay.  I want to start with you just because I think you want the stay in place; right?

MR. SMITH:  You're correct, Your Honor.  And I can

*United States District Court*

also bring Your Honor quickly up to speed on where things stand because I think the basis for plaintiff's request relief is essentially to grant the interlocutory appeal in the summary judgment decision in the other case.

THE COURT:  Only as to causation.

MR. SMITH:  Yes, yeah.  We don't think that substantively it has any implications in this case.

THE COURT:  No, no, I realize that.

MR. SMITH:  But it's also proceeding pace.  So it's interlocutory appeal.  There is no appeal yet in the case.  It could still be denied or granted.  That's fully briefed, so the Circuit Court has that now.  The last brief was filed on the 14th of this month.  The whole thing was briefed up between August 14th when the district court originally allowed the interlocutory appeal and now, and our best guesstimate is that there will be a ruling on that within two months or so.  So the only thing that's changed since Your Honor granted the stay is the trial date that was originally then scheduled for September is in suspense, I guess I would say, pending termination of the interlocutory appeal.  If anything or at best, the request for relief now is premature because we don't know what the circuit court is going to do yet.  It could deny interlocutory appeal and they'll be right back at it.  But beyond that, the fundamental reasons for Your Honor's grant stay in the first place, while they did of course first take into account that

*United States District Court*

there was at the time a relatively prompt trial schedule, were based more on considerations of judicial economy and avoiding inconsistent adjudications, none of that has changed in any way.  So that's our position unless Your Honor has any questions.

THE COURT:  Okay.

All right, sir.

MR. KILLORIN:  All right, thank you, Your Honor.

THE COURT:  Is your request premature?

MR. KILLORIN:  Your Honor.

(Laughter.)

MR. KILLORIN:  Not in our opinion, not in our opinion of our punitive class members' opinions.  No, we think more than a year is more than enough, just wait and see what might happen in a case that everybody agrees is, our case is only marginally related to illegality.

THE COURT:  Be careful.

MR. KILLORIN:  Believe me, I have to choose my words carefully.  I know, I can't say a case is not related to illegality, I'd never hear the end of it.  It's only marginally related for purposes of calculating damages of response to illegality.  But it's a 10-B fraud case.  It's a misrepresentation about the facts that give rise to a concern of illegality.  And so we think -- we think this case that -- that case will not, as we've said all along, that case is not

*United States District Court*

dispositive of this case.  So there is no risk of inconsistent adjudication.  Our case, I think they would completely agree, is not dispositive of their case.  I don't think if we win a securities fraud violation in front of a jury, that they are going to say, oh, yes, that must show that we are guilty of violating the antikickback statute.  No.  They are completely different cases waiting to hear, to get guidance from that case and let them finish discovery.  We'll totally concede that their completion of their discovery of the DOJ case would be very useful.  But we will not have competing discovery with the DOJ.  And we agree --

THE COURT:  Discovery is completed?

MR. SMITH:  Discovery is complete.

THE COURT:  Okay.

MR. KILLORIN:  Discovery is complete.  We won't be bumping into the DOJ and slowing them down in their management of the discovery process like does happen in these cases. We've been involved in that, and now, they are done.  They got to get in, get their evidence and get out.  And so discovery is complete.  The case is unrelated.  We waited over a year.  And then to say well, there should be a decision on whether or not it goes up on appeal in two months is completely, you know, speculative, plus let's assume it doesn't go up on appeal.  How long is it going to take any busy Judge to then reschedule this trial and how long is the trial going to take?

*United States District Court*

THE COURT:  Hopefully their September date is still sitting there.  Oh, you mean if they go up on appeal.

MR. KILLORIN:  No, I mean if the appeal is denied in two months, it comes back from district court.  And unless somebody knows something I don't, it could take months before the trial starts.

THE COURT:  You don't think the trial date is still in place?

MR. KILLORIN:  No.  The trial date, they blew right past it.

THE COURT:  Oh, it was this September.  Oh, oh, all right.

MR. SMITH:  Yes, Your Honor, yes.

MR. KILLORIN:  So there is no trial scheduled.  There's just an appeal process going on that may result in either an appeal getting granted, which means as we've said before, even if an appeal is denied, it could take more months for district court could schedule this big trial.  And we don't -- obviously, we oppose the stay to begin.

THE COURT:  Well, we know what they are going to do if they lose on appeal, right?

MR. KILLORIN:  Sorry, what's that?

THE COURT:  We know what they are going to do if they lose on appeal.

MR. KILLORIN:  Exactly, Your Honor.

*United States District Court*

THE COURT:  They want another Comcast.  Just kidding.

MR. KILLORIN:  That's also our opinion.  You don't get resolution in these cases.  In security cases, 99 percent of them, over 99 percent settle.  So if somebody says, oh, we want to wait for a resolution in a securities case where (inaudible) inconsistent adjudication, well, justification for that would be less than 1 percent chance.  So we think there's a, as always, a large chance of settlement.  We think that any adjudication will not be final.  It, itself, may go up on appeal and don't think it's worth worrying about inconsistent adjudication.  We do think that we've waited through discovery and that's beneficial, but we think we're ready -- the stay should be lifted, and in many cases, we dual track with class certification in discovery.  So as far as we're concerned, we ought to start discovery immediately and even while we wait on class certification motion.

THE COURT:  He just raised it.

MR. SMITH:  Your Honor, so the only new thing I heard there was that this case has nothing or only marginally to do with illegality, only for damages, which I guess pregnant silence means not for liability.  But the rest of those arguments are identical to the ones that were made to Your Honor when Your Honor stayed the case.  They don't regress in the reasons for the stay in the first instance.  The fact that discovery is concluded doesn't have anything to do with various

other things that Your Honor pointed to, which is the band width of witnesses if this comes back down from the appellate court and goes to trial.  So all of those issues are going to be there as well.  The policy reasons that Your Honor articulated, we don't want to front run the DOJ, et cetera, it's literally exactly the same posture as it was before but for this delay which I would submit in the grand scheme of things is potentially brief, which is why we say that this is a premature application.  Let's see what the circuit court does.  If there was going to be a time we should be having this discussion ever, it would be then not now.  But even then, I think all the same reasons are here.  Your Honor stayed the case pending the final resolution of the DOJ case and you know --

THE COURT:  Well, that was upon knowing it was going to be a September trial date.

MR. SMITH:  Understood, Your Honor.  But without a resolution, it needs something broader than the trial and that was, at least then, the parameters at stay.  So I guess the fundamental point is that the none of the arguments that have been made today other than the issue of a calendar, which, again, not be mandated in consideration Your Honor 's decision while it was taken note of.  Your Honor highlighted that most compelling factors, which you're considering for judicial economy and inconsistent adjudications.  We demonstrated on the

underlying motion fairly well that some number of many, many, many allegations were identical from ones -- factual allegations from the ones taken from the DOJ complaint, the notion that the cases have nothing to do with each other, we disprove walking away aside any legal issues discussed in the class certification in terms of the underlying facts of the case and Your Honor took cognizance of that decision as well. So we don't see any reason, particularly as we sit here today, for Your Honor to revisit.  The earlier decision before continues to make sense.

THE COURT:  Okay.

MR. KILLORIN:  Your Honor, I just have two quick points.  First, one of the things that is new, as we pointed out, is discovery has been completed.  And regarding illegality, when they filed this motion to stay, this is what they said.  Indeed the complaint makes clear that plaintiff seeks to prove that Teva's patient assistant program donations to two charitable foundations violated the AKS and FCA. Meaning that this Court will inevitably be asked to decide whether the donations were legal.  That was their reading of our case, our theory of the case after -- initially after the Judge's ruling on the motion to dismiss.  So you can see why we're surprised that now their damage expert said 95 percent of our case is gone.

THE COURT:  Okay.

*United States District Court*

MR. KILLORIN:  That's it, Your Honor.

MR. SMITH:  Just very briefly on that, Your Honor.  I think what we were pointing to is plaintiff's expressed intent to pursue what we believe were dismissed claims.

THE COURT:  Not claims.  Theories.

MR. SMITH:  Theories.  I stand corrected yet again. Thank you, Your Honor.

THE COURT:  All right, thank you all.  Obviously, I'm taking everything under advisement.  And I hope to have something for you in short order, okay.

MR. KILLORIN:  Thank you, Your Honor.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  All right, thank you all for your time today.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Can you guys make sure you order the transcript from her?

(Matter adjourned at 3:26 p.m.)

- - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/ Maureen McHugh, RPR*
*Court Reporter/Transcriber*

*October 2, 2023*
        *Date*

*United States District Court*

**$**

**$135,000,000** [1] - 104:19

**/**

**/S** [1] - 147:23

**1**

**1** [3] - 36:9, 115:1, 144:7
**1.25** [1] - 124:15
**10** [7] - 6:11, 37:14, 50:25, 54:3, 124:14, 132:4, 139:12
**10(b** [14] - 7:4, 7:6, 7:22, 8:10, 11:5, 24:14, 32:1, 32:13, 99:15, 99:16, 118:7, 118:8, 137:5
**10(b)-5** [25] - 93:23, 118:6, 118:19, 118:21, 118:22, 118:24, 119:12, 119:18, 120:14, 120:16, 126:10, 126:18, 126:19, 128:9, 128:13, 128:21, 128:24, 129:2, 129:3, 130:18, 130:22, 131:2, 131:4, 134:20
**10(b)5** [2] - 124:24, 126:9
**10-B** [1] - 141:22
**100** [1] - 102:25
**10166** [1] - 1:21
**102** [2] - 78:3, 78:4
**103** [1] - 78:2
**108** [2] - 31:7, 31:12
**10:28** [1] - 3:2
**10:30** [1] - 1:11
**10B** [2] - 89:12, 118:6
**10K** [3] - 100:21, 101:5, 101:7
**11** [2] - 7:5, 33:23
**116** [3] - 81:8, 81:16, 91:6
**11:41** [1] - 51:24
**11A** [1] - 4:17
**12** [4] - 4:17, 6:11, 8:8, 63:7
**12:39** [1] - 84:15
**12:42** [1] - 84:18
**12:44** [1] - 86:10
**14th** [2] - 140:13, 140:14
**1500** [1] - 2:4

**16** [1] - 33:24
**167** [3] - 81:9, 81:17, 91:6
**170** [1] - 73:14
**18** [11] - 10:9, 10:17, 13:15, 14:5, 15:14, 20:3, 22:14, 44:19, 51:3, 68:10, 70:12
**185** [1] - 72:25
**18th** [1] - 40:25
**19** [1] - 63:6
**19102** [1] - 2:4
**1:15** [3] - 85:16, 85:17, 86:7
**1:18** [1] - 86:12

**2**

**2** [2] - 36:9, 147:25
**20(a** [1] - 24:15
**200** [1] - 1:20
**2005** [2] - 19:16, 33:19
**2006** [2] - 42:16, 42:24
**2012** [1] - 101:1
**2014** [2] - 19:16, 33:19
**2015** [2] - 42:16, 42:24
**2018** [3] - 42:19, 42:20, 112:20
**2020** [12] - 10:9, 10:17, 13:15, 14:5, 15:14, 20:3, 22:14, 31:20, 44:19, 51:3, 68:10, 70:12
**2020-4660** [1] - 1:4
**2023** [2] - 1:11, 147:25
**20A** [1] - 118:7
**21** [1] - 1:11
**23(B)3** [2] - 114:20, 122:24
**24** [2] - 125:14, 125:18
**27** [1] - 2:10
**2:32** [1] - 129:21
**2:40** [1] - 129:22
**2:57** [1] - 139:17
**2:58** [1] - 132:3

**3**

**3** [5] - 36:9, 92:13, 109:11, 109:14, 132:3
**30** [4] - 85:10, 85:17, 85:21, 85:23
**30342** [1] - 1:17
**31** [1] - 85:17
**34** [2] - 36:1, 36:4
**3400** [1] - 2:4
**3975** [1] - 1:17
**3:15** [1] - 139:20
**3:26** [1] - 147:18

**4**

**4** [4] - 35:4, 35:8, 35:9, 124:8
**40** [2] - 6:11, 6:24
**400** [1] - 25:18
**400-plus** [1] - 14:11
**41** [1] - 35:24
**427** [1] - 25:20
**427-page** [1] - 26:7
**429** [2] - 57:13, 57:15
**43** [1] - 33:23
**49** [2] - 78:3, 125:14

**5**

**5** [1] - 2:9
**52** [2] - 2:12, 62:1
**53** [3] - 37:22, 37:25, 62:1
**54** [1] - 37:19

**6**

**6** [3] - 31:12, 39:16, 110:13
**601** [1] - 1:10
**62** [1] - 89:21
**64** [1] - 2:12

**7**

**7%** [1] - 99:23
**70** [1] - 14:11

**8**

**80** [1] - 2:12
**83** [1] - 2:13

**9**

**9** [2] - 109:2, 109:6
**90** [1] - 101:4
**90-day** [4] - 98:4, 98:12, 98:14, 98:15
**95** [1] - 146:23
**95%** [1] - 87:8
**99** [2] - 144:3, 144:4

**A**

**a'ticking** [1] - 86:2
**a.m** [3] - 1:11, 3:2, 51:24
**A1** [1] - 111:5
**abandoned** [4] - 82:7, 87:17, 87:21, 88:18
**ability** [3] - 8:12, 45:2, 94:6
**able** [2] - 43:2, 105:3

**above-entitled** [1] - 147:21
**Absolutely** [1] - 103:19
**absolutely** [5] - 90:7, 104:23, 124:6, 132:8, 133:24
**abundantly** [1] - 136:12
**abuse** [2] - 19:20, 30:19
**academic** [6] - 5:18, 8:16, 45:4, 48:12, 59:24, 133:12
**accept** [3] - 120:15, 130:16, 139:21
**accepted** [2] - 7:24, 9:12
**access** [1] - 101:8
**accomplished** [1] - 99:10
**according** [4] - 10:14, 21:13, 33:16, 34:12
**accordingly** [2] - 113:12, 113:24
**account** [12] - 22:25, 48:9, 64:1, 66:14, 83:3, 83:18, 107:4, 107:18, 119:13, 119:23, 120:12, 140:25
**accounted** [2] - 42:5, 117:21
**accounting** [2] - 8:17, 61:17
**accounts** [4] - 18:4, 20:25, 97:24, 103:1
**accuse** [1] - 131:12
**accused** [2] - 129:7, 131:18
**acknowledges** [1] - 42:19
**acquisition** [1] - 125:3
**ACS** [1] - 34:16
**act** [2] - 93:23, 93:25
**Act** [23] - 15:4, 17:22, 24:6, 24:15, 25:11, 30:22, 32:3, 32:15, 36:15, 36:22, 37:2, 38:19, 46:22, 56:10, 57:3, 62:9, 89:12, 93:23, 118:16, 137:9, 137:10, 137:11, 137:12
**ACTION** [1] - 1:3
**action** [19] - 32:2, 38:24, 97:3, 97:4, 97:5, 117:7, 117:12, 123:13, 123:19, 123:21, 124:21,

128:21, 129:2, 129:3, 129:5, 130:20, 130:24, 132:18
**actions** [21] - 7:4, 23:20, 32:14, 32:25, 45:2, 46:14, 47:4, 47:14, 50:15, 88:14, 88:22, 94:20, 96:23, 99:18, 111:14, 114:11, 114:14, 123:6, 123:7, 127:2, 131:3
**active** [1] - 103:24
**actively** [1] - 120:24
**activity** [2] - 79:11, 111:11
**actual** [11] - 11:22, 12:19, 37:1, 50:18, 75:1, 97:14, 102:2, 128:17, 131:8, 131:23, 133:13
**actuality** [2] - 116:8, 117:13
**Acute** [1] - 14:13
**additional** [4] - 71:5, 82:1, 96:18, 110:22
**address** [7] - 59:13, 65:21, 86:23, 120:18, 126:6, 132:5, 132:7
**addressed** [1] - 90:13
**addresses** [2] - 9:22, 17:4
**addressing** [4] - 59:18, 68:3, 68:8, 131:3
**adequacy** [3] - 102:17, 105:17, 120:21
**adequate** [3] - 102:24, 103:6, 104:2
**adequately** [1] - 95:9
**adjourned** [1] - 147:18
**adjudication** [4] - 142:2, 144:6, 144:9, 144:11
**adjudications** [2] - 141:3, 145:25
**admissions** [1] - 30:3
**admit** [1] - 120:13
**adopted** [1] - 99:15
**ADR** [4] - 102:8, 127:12, 133:12
**ADRs** [7] - 101:24, 102:4, 102:10, 102:11, 133:9, 138:8, 138:10
**ADS** [4] - 101:20, 133:12, 133:13

**ADSs** *[12]* - 100:23, 101:2, 101:19, 101:22, 101:23, 102:1, 102:4, 102:8, 102:9, 133:9
**adverse** *[4]* - 14:1, 15:8, 39:12, 39:21
**advisement** *[1]* - 147:9
**advisory** *[1]* - 54:12
**Advisory** *[4]* - 19:16, 24:6, 29:7, 33:18
**affect** *[3]* - 10:5, 14:1, 45:2
**affecting** *[1]* - 54:10
**affects** *[2]* - 25:8, 40:20
**affidavit** *[2]* - 14:12, 128:17
**affirm** *[1]* - 5:9
**AFFIRMED** *[2]* - 4:6, 52:12
**afforded** *[1]* - 116:6
**afoul** *[2]* - 13:22, 15:8
**afternoon** *[2]* - 64:13, 85:1
**aggressive** *[1]* - 116:7
**ago** *[1]* - 100:22
**agree** *[17]* - 37:1, 43:9, 46:18, 58:16, 60:2, 68:10, 79:12, 82:16, 87:3, 89:16, 90:15, 95:23, 118:11, 121:17, 138:2, 142:2, 142:11
**agreeable** *[1]* - 86:20
**agreement** *[2]* - 26:19, 123:17
**Agreement** *[1]* - 40:17
**agrees** *[2]* - 111:10, 141:15
**ahead** *[5]* - 4:10, 44:14, 80:11, 80:16, 86:23
**AI** *[2]* - 6:18, 6:19
**aided** *[1]* - 1:25
**AKS** *[2]* - 92:15, 146:18
**AL** *[1]* - 1:7
**ALDUBI** *[1]* - 1:3
**allegation** *[3]* - 42:17, 110:23, 131:14
**allegations** *[25]* - 25:10, 25:16, 29:15, 57:1, 58:9, 71:24, 81:9, 91:10, 93:17, 95:11, 96:3, 96:8, 96:14, 96:20, 96:24, 107:11, 109:3, 109:25, 111:21,

113:18, 113:19, 122:10, 123:24, 146:2, 146:3
**allege** *[9]* - 20:11, 30:6, 91:6, 91:15, 91:16, 110:19, 132:9, 132:10, 135:6
**alleged** *[81]* - 9:8, 9:9, 10:4, 12:9, 14:14, 15:1, 15:16, 17:5, 17:16, 17:18, 17:20, 17:25, 18:1, 19:2, 19:7, 19:9, 19:13, 20:5, 24:25, 27:20, 28:4, 28:19, 29:19, 29:22, 29:25, 30:5, 30:15, 31:2, 31:13, 31:17, 36:21, 38:18, 41:9, 42:15, 43:11, 44:20, 46:25, 54:21, 55:9, 55:17, 55:18, 56:3, 56:4, 56:8, 56:12, 58:3, 58:25, 59:2, 59:6, 62:15, 62:21, 63:4, 63:8, 63:24, 64:3, 64:21, 65:12, 65:23, 67:16, 67:17, 69:7, 69:9, 69:13, 70:17, 71:21, 81:2, 82:14, 83:4, 83:21, 88:2, 88:11, 89:17, 111:23, 118:9, 122:14, 124:25, 125:6, 125:14, 125:18, 125:20, 134:5
**allegedly** *[4]* - 58:12, 58:13, 117:25, 138:17
**alleges** *[2]* - 36:14, 42:23
**alleging** *[4]* - 17:17, 96:12, 96:14, 117:12
**Allergan** *[3]* - 111:19, 117:3, 119:20
**allocation** *[2]* - 98:17, 98:22
**allow** *[2]* - 51:6, 131:2
**allowed** *[10]* - 92:9, 116:12, 118:17, 119:20, 122:23, 127:15, 128:10, 134:14, 138:14, 140:14
**almost** *[5]* - 12:7, 64:4, 113:14, 119:5, 126:23
**alone** *[1]* - 77:5
**alternative** *[2]* - 10:25, 80:1

**ambiguity** *[1]* - 91:22
**ambiguous** *[1]* - 47:21
**amicus** *[1]* - 100:9
**amount** *[2]* - 45:13, 60:13
**amounts** *[1]* - 14:18
**analogous** *[1]* - 124:2
**analyses** *[2]* - 12:17, 46:7
**analysis** *[17]* - 6:7, 11:24, 12:7, 15:22, 16:5, 22:12, 53:18, 54:5, 61:5, 61:9, 61:20, 76:14, 93:9, 93:20, 111:19, 114:19, 117:21
**analyst** *[25]* - 14:20, 21:5, 21:23, 22:6, 36:7, 36:18, 37:25, 39:15, 40:3, 42:8, 42:9, 42:14, 50:20, 57:19, 57:21, 59:7, 61:13, 62:3, 62:7, 64:19, 68:16, 75:3, 77:9, 82:21, 131:16
**analyst's** *[4]* - 61:6, 68:24, 70:8, 77:17
**analysts** *[8]* - 21:13, 59:8, 61:15, 62:8, 69:20, 70:6, 70:12, 90:18
**analyze** *[2]* - 16:11, 16:18
**analyzed** *[3]* - 10:9, 41:4, 77:24
**analyzing** *[4]* - 10:15, 56:16, 61:14, 138:17
**ancillary** *[1]* - 128:14
**AND** *[1]* - 1:3
**angle** *[1]* - 87:25
**answer** *[16]* - 20:17, 27:17, 27:23, 29:3, 29:13, 43:2, 47:24, 48:14, 82:11, 94:6, 103:17, 103:19, 103:20, 103:22, 112:8, 124:6
**answered** *[1]* - 59:3
**answering** *[1]* - 12:2
**anti** *[6]* - 14:15, 116:9, 116:18, 116:22, 117:11, 117:13
**anti-competitive** *[5]* - 116:9, 116:18, 116:22, 117:11, 117:13
**anticipated** *[1]* - 40:11
**antikickback** *[23]* - 19:22, 19:23, 23:20, 24:5, 25:12, 29:8,

29:9, 30:17, 30:21, 30:24, 32:2, 32:14, 33:16, 36:14, 36:21, 37:3, 38:18, 44:22, 47:2, 48:20, 57:2, 137:8, 142:6
**antitrust** *[2]* - 89:9, 114:9
**anyhow** *[1]* - 108:19
**anyway** *[1]* - 137:13
**apologize** *[3]* - 67:1, 85:25, 109:7
**appeal** *[17]* - 72:11, 140:3, 140:10, 140:15, 140:20, 140:22, 142:22, 142:23, 143:2, 143:3, 143:15, 143:16, 143:17, 143:21, 143:24, 144:10
**appear** *[1]* - 125:18
**APPEARANCES** *[1]* - 2:1
**appellate** *[1]* - 145:2
**applicability** *[2]* - 11:4, 114:10
**applicable** *[2]* - 110:2, 134:7
**application** *[2]* - 11:9, 145:9
**applied** *[2]* - 11:6, 41:10
**applies** *[2]* - 120:16, 127:8
**apply** *[4]* - 34:23, 114:11, 114:13, 137:16
**appointed** *[1]* - 104:7
**appreciate** *[4]* - 29:13, 45:15, 86:4
**approach** *[3]* - 86:15, 100:12, 100:19
**approaching** *[2]* - 38:25, 57:18
**appropriate** *[9]* - 7:2, 7:22, 8:9, 12:1, 28:13, 76:2, 99:2, 99:18, 106:20
**appropriately** *[2]* - 107:3, 124:11
**approval** *[1]* - 114:15
**argue** *[4]* - 33:1, 87:12, 87:19, 111:15
**argued** *[2]* - 32:1, 32:12
**argues** *[4]* - 33:3, 87:13, 91:20, 111:17
**arguing** *[2]* - 110:8, 115:6

**ARGUMENT** *[1]* - 1:5
**argument** *[9]* - 8:4, 43:16, 46:9, 84:19, 90:1, 115:5, 127:7, 130:16
**arguments** *[7]* - 95:8, 96:16, 120:19, 136:21, 139:21, 144:22, 145:20
**arise** *[3]* - 124:21, 125:2, 125:7
**arising** *[4]* - 89:4, 91:4, 119:23, 120:1
**arrangements** *[1]* - 3:18
**art** *[1]* - 48:8
**articles** *[1]* - 77:17
**articulated** *[1]* - 145:5
**artificial** *[2]* - 112:17, 112:18
**artificially** *[3]* - 29:23, 31:18, 55:8
**AS** *[2]* - 4:6, 52:12
**aside** *[3]* - 66:7, 100:5, 146:5
**assert** *[1]* - 109:1
**asserted** *[7]* - 96:21, 96:22, 124:20, 126:4, 128:12, 128:15, 130:11
**asserting** *[1]* - 130:20
**assess** *[2]* - 6:2, 50:10
**assessment** *[2]* - 21:1, 39:20
**asset** *[3]* - 47:13, 47:25
**assignment** *[5]* - 6:1, 10:21, 10:23, 53:8, 53:15
**assist** *[1]* - 103:17
**assistance** *[1]* - 14:14
**Assistance** *[2]* - 13:16, 139:8
**assistant** *[2]* - 92:14, 146:17
**assisting** *[1]* - 103:13
**associated** *[4]* - 22:25, 25:6, 41:9, 123:2
**assume** *[4]* - 26:22, 50:25, 132:14, 142:23
**assumes** *[1]* - 15:21
**assuming** *[1]* - 59:19
**Assuming** *[1]* - 38:7
**assure** *[1]* - 89:15
**Atlanta** *[1]* - 1:17
**attacking** *[1]* - 92:20
**attacks** *[1]* - 94:2
**attempt** *[2]* - 8:25,

20:9
**attorney** [2] - 96:10, 96:11
**attributable** [8] - 41:1, 54:20, 59:1, 62:13, 68:11, 68:14, 68:22, 89:2
**attribute** [1] - 14:22
**attributed** [2] - 82:4, 111:23
**August** [14] - 10:9, 10:17, 13:15, 14:5, 15:14, 20:3, 22:14, 31:20, 40:25, 44:19, 51:3, 68:10, 70:12, 140:14
**author** [1] - 22:3
**authority** [3] - 17:13, 42:19, 100:2
**available** [4] - 13:14, 16:2, 51:9, 77:23
**Avenue** [1] - 1:20
**average** [1] - 99:23
**Aviv** [3] - 99:8, 99:24, 100:16
**avoid** [1] - 126:3
**avoiding** [1] - 141:2
**award** [1] - 18:6
**aware** [8] - 23:18, 23:25, 24:12, 30:22, 47:8, 59:24, 67:12, 80:23

## B

**bachelor's** [1] - 5:18
**backcast** [3] - 44:4, 44:5, 45:13
**backcasting** [1] - 45:6
**Background** [1] - 109:12
**background** [5] - 5:14, 5:18, 53:22, 109:14, 110:14
**bad** [4] - 21:17, 21:18, 89:24, 127:5
**bag** [1] - 106:6
**balance** [2] - 22:1, 91:1
**ball** [1] - 98:8
**ban** [1] - 122:14
**band** [2] - 122:13, 145:1
**bank** [2] - 101:22, 102:2
**banks** [2] - 101:24, 133:15
**bantered** [1] - 49:8
**Barclays** [1] - 46:17
**bars** [1] - 123:10

**based** [30] - 15:2, 16:15, 20:3, 20:20, 21:25, 54:23, 67:21, 68:1, 68:7, 68:24, 69:5, 69:16, 70:12, 70:15, 71:21, 78:20, 80:7, 82:11, 88:16, 92:5, 95:21, 96:23, 97:17, 106:7, 107:12, 124:22, 125:2, 125:23, 136:15, 141:2
**basis** [17] - 11:12, 12:23, 13:2, 19:25, 32:5, 41:2, 42:6, 53:12, 54:17, 55:20, 61:23, 73:11, 107:13, 129:11, 129:14, 131:14, 140:2
**became** [1] - 99:5
**become** [1] - 106:15
**becomes** [1] - 109:24
**BEEN** [2] - 4:5, 52:11
**begin** [3] - 86:14, 124:18, 143:19
**beginning** [1] - 22:3
**begins** [2] - 113:16, 115:21
**behalf** [2] - 103:14, 130:11
**behooves** [1] - 92:3
**belabor** [4] - 94:12, 120:21, 138:15, 139:10
**below** [2] - 98:18, 102:5
**bench** [1] - 100:19
**beneficial** [1] - 144:12
**benefit** [2] - 45:12, 125:5
**best** [5] - 13:24, 92:20, 94:6, 140:15, 140:20
**better** [2] - 86:1, 138:13
**between** [14] - 15:16, 17:5, 19:17, 25:5, 43:15, 55:2, 55:17, 64:2, 67:16, 76:11, 83:3, 89:8, 96:19, 140:13
**beyond** [1] - 140:23
**big** [7] - 50:23, 97:10, 100:18, 104:11, 134:20, 139:22, 143:18
**biggest** [1] - 136:7
**billion** [4] - 21:25, 38:25, 39:16, 131:22
**bit** [14] - 27:13, 43:22,

44:1, 92:3, 94:23, 95:6, 97:1, 98:15, 108:11, 108:19, 110:12, 119:13, 120:22, 127:15
**black** [1] - 100:5
**blew** [1] - 143:9
**board** [1] - 102:20
**bottom** [1] - 41:13
**bought** [1] - 104:12
**bound** [1] - 122:6
**breach** [2] - 123:21, 123:22
**break** [7] - 84:8, 84:12, 85:11, 85:12, 85:13, 129:18, 139:12
**Brief** [5] - 51:24, 52:6, 84:15, 129:21, 139:17
**brief** [8] - 27:4, 88:1, 88:9, 96:18, 96:25, 132:3, 140:12, 145:8
**briefed** [3] - 85:10, 140:11, 140:13
**briefer** [1] - 119:14
**briefing** [6] - 64:23, 65:6, 87:6, 87:24, 114:5, 122:3
**briefings** [2] - 82:1, 82:13
**briefly** [12] - 5:14, 13:10, 17:2, 18:2, 20:23, 22:23, 53:7, 53:21, 86:24, 123:9, 137:19, 147:2
**briefs** [3] - 65:11, 100:9, 120:22
**bring** [4] - 4:21, 62:8, 63:21, 140:1
**brings** [2] - 101:18, 112:25
**broad** [7] - 88:20, 97:7, 97:13, 123:4, 123:7, 123:20, 124:6
**broader** [3] - 114:9, 124:7, 145:18
**broadly** [1] - 54:9
**BROOKE** [2] - 52:11, 52:16
**Brooke** [1] - 52:15
**brought** [2] - 43:3, 122:10
**bucket** [1] - 129:9
**buckets** [1] - 116:4
**built** [1] - 102:23
**bullet** [3] - 36:6, 36:10, 38:4
**bulletin** [3] - 19:21, 101:24, 102:6

**bulletins** [1] - 38:3
**Bulletins** [4] - 19:16, 24:7, 29:7, 33:19
**bumping** [1] - 142:16
**bunch** [3] - 95:12, 100:9, 124:18
**burdens** [1] - 40:19
**Business** [1] - 5:20
**business** [1] - 41:19
**businessman** [3] - 97:24, 102:20, 103:25
**busy** [1] - 142:24
**but-for** [1] - 30:13
**button** [1] - 29:1
**buy** [1] - 104:22
**BY** [45] - 1:15, 1:16, 1:16, 1:19, 2:3, 2:9, 2:10, 2:12, 2:12, 2:13, 5:8, 6:25, 9:19, 11:18, 20:22, 26:5, 27:7, 28:1, 28:9, 28:16, 28:22, 29:11, 31:11, 32:11, 35:13, 37:24, 40:22, 42:3, 43:21, 45:19, 47:23, 48:15, 52:25, 53:6, 58:20, 61:4, 64:17, 66:6, 67:23, 70:18, 71:13, 75:24, 80:22, 81:20, 83:10
**bypass** [1] - 35:1
**byproduct** [1] - 18:8
**BYRNE** [1] - 1:9

## C

**calculate** [5] - 11:10, 53:11, 61:23, 71:21, 73:19
**calculated** [2] - 54:16, 55:20
**calculating** [2] - 76:6, 141:21
**calculation** [9] - 22:21, 74:5, 74:19, 74:25, 75:5, 75:10, 75:19, 136:14, 136:15
**calculations** [1] - 74:15
**calendar** [1] - 145:21
**California** [1] - 5:22
**campaign** [1] - 116:7
**canescent(phonetic** [1] - 99:13
**cannot** [3] - 12:23, 107:13, 125:23
**capable** [6] - 66:21, 66:23, 67:15, 67:21,

68:2, 68:8
**capacities** [1] - 54:4
**Care** [1] - 14:13
**cared** [1] - 25:15
**career** [1] - 8:8
**careful** [6] - 65:4, 69:3, 69:18, 72:10, 83:1, 141:17
**carefully** [2] - 99:5, 141:19
**carry** [2] - 30:24, 44:23
**carved** [3] - 126:21, 126:24, 127:3
**case** [248] - 5:24, 7:2, 7:3, 7:10, 7:15, 7:17, 9:1, 9:25, 10:1, 10:5, 10:24, 11:10, 11:21, 12:6, 13:2, 14:15, 19:24, 20:13, 23:18, 23:19, 23:25, 24:18, 27:19, 28:3, 28:17, 29:15, 29:20, 31:4, 31:14, 32:16, 32:21, 33:5, 38:8, 38:11, 38:23, 40:7, 46:25, 49:22, 56:6, 57:12, 65:10, 69:25, 70:20, 70:22, 71:1, 71:7, 72:1, 72:3, 72:4, 72:6, 72:7, 72:8, 72:9, 72:11, 73:20, 73:24, 74:6, 74:16, 75:10, 76:10, 76:11, 76:15, 80:24, 81:2, 84:10, 87:6, 87:8, 88:18, 89:6, 89:8, 90:22, 91:2, 91:3, 92:1, 93:18, 94:16, 94:25, 95:2, 95:4, 95:6, 95:7, 95:8, 95:9, 95:11, 95:12, 95:25, 96:7, 96:8, 96:10, 96:11, 96:13, 96:15, 96:17, 96:20, 97:6, 97:8, 97:14, 97:16, 97:17, 97:19, 97:23, 98:8, 98:10, 99:6, 99:22, 100:2, 100:3, 101:12, 102:10, 102:13, 102:14, 102:19, 102:25, 103:6, 104:3, 104:4, 105:16, 106:15, 106:21, 107:15, 107:25, 108:7, 109:23, 110:25, 111:13, 111:20, 112:14, 113:4, 114:4, 114:5, 114:6,

114:13, 114:15,
114:21, 114:23,
114:25, 115:9,
115:12, 115:18,
116:13, 116:17,
117:3, 117:5,
117:16, 117:20,
117:22, 118:1,
118:18, 118:20,
118:23, 118:24,
119:3, 119:10,
119:12, 119:15,
119:17, 119:19,
119:21, 120:6,
120:8, 120:14,
120:17, 120:24,
121:11, 121:22,
122:1, 122:9,
122:15, 122:19,
123:1, 123:5, 123:6,
124:9, 124:24,
125:7, 125:13,
125:15, 125:16,
125:18, 125:20,
126:9, 126:10,
126:13, 126:18,
126:19, 126:23,
127:2, 127:3,
127:14, 127:23,
128:13, 128:15,
129:11, 130:5,
130:7, 130:25,
131:21, 132:16,
132:19, 134:13,
136:11, 136:14,
137:4, 137:5, 137:6,
137:7, 137:14,
137:15, 137:16,
140:4, 140:7,
140:10, 141:15,
141:19, 141:22,
141:24, 141:25,
142:1, 142:2, 142:3,
142:7, 142:9,
142:20, 144:5,
144:19, 144:23,
145:13, 146:7,
146:21, 146:24
**case-by-case** [1] -
19:24
**cases** [42] - 7:3, 7:4,
7:23, 8:10, 8:22,
11:5, 20:9, 45:8,
46:11, 49:15, 74:12,
74:21, 75:1, 75:6,
75:13, 89:1, 89:10,
93:10, 94:21, 95:10,
96:15, 97:15, 98:13,
107:7, 114:9,
121:25, 122:18,
126:2, 126:22,

127:1, 127:6,
127:18, 128:10,
129:8, 131:10,
132:15, 142:7,
142:17, 144:3,
144:13, 146:4
**cash** [5] - 12:17, 40:8,
40:21, 50:24, 77:4
**catch** [1] - 97:7
**catch-all** [1] - 97:7
**categories** [3] - 88:20,
134:3, 136:1
**causally** [7] - 9:9,
12:9, 15:15, 18:11,
18:19, 18:21, 22:8
**causation** [13] - 9:5,
12:18, 15:15, 18:9,
22:8, 22:11, 45:16,
45:25, 49:2, 49:3,
53:18, 113:17, 140:5
**caused** [17] - 16:8,
19:12, 30:10, 31:19,
33:13, 34:5, 36:19,
39:12, 41:6, 90:14,
90:18, 92:23,
101:10, 109:19,
110:9, 116:8, 136:16
**causes** [1] - 40:9
**causing** [4] - 44:22,
91:24, 94:18, 131:22
**cautioned** [1] - 110:2
**centre** [1] - 2:3
**certain** [10] - 12:8,
25:3, 83:13, 83:15,
93:17, 95:19, 96:12,
98:18, 104:17,
135:20
**certainly** [4] - 39:8,
73:9, 73:10, 114:12
**certainty** [7] - 60:16,
60:25, 78:11, 78:16,
78:18, 78:21, 78:25
**certificate** [5] - 6:23,
9:11, 46:13, 133:13,
133:14
**certificates** [4] -
101:20, 102:3,
133:4, 133:6
**certification** [22] -
6:10, 7:25, 8:2, 8:24,
12:14, 46:9, 66:18,
76:13, 84:20, 86:25,
93:1, 93:11, 94:8,
95:1, 106:22,
127:17, 136:19,
136:20, 136:21,
144:14, 144:16,
146:6
**certified** [4] - 100:4,
100:15, 104:4,

132:21
**certify** [5] - 99:21,
101:11, 120:25,
139:22, 147:20
**cetera** [7] - 120:13,
125:17, 125:20,
126:10, 126:18,
139:7, 145:5
**chaired** [1] - 54:12
**challenge** [4] - 8:5,
8:6, 12:25, 15:19
**challenged** [1] - 8:3
**challenges** [4] -
10:24, 13:5, 13:9,
94:24
**challenging** [1] -
26:23
**chance** [3] - 7:13,
144:7, 144:8
**change** [5] - 7:19,
39:23, 41:1, 62:5,
136:13
**changed** [4] - 104:18,
107:25, 140:17,
141:3
**changes** [4] - 14:6,
25:9, 48:23, 92:11
**characterization** [2] -
108:4, 115:18
**characterize** [3] -
57:20, 68:17, 69:21
**characterized** [1] -
110:24
**characterizes** [2] -
108:24, 113:23
**characterizing** [3] -
68:25, 109:25, 116:2
**charitable** [13] - 13:12,
13:13, 19:18, 24:8,
29:8, 44:21, 46:24,
92:15, 108:11,
112:6, 112:13,
112:15, 146:18
**charity** [1] - 97:17
**check** [1] - 64:12
**checked** [2] - 121:9,
125:14
**choose** [2] - 90:8,
141:18
**chose** [3] - 67:19,
122:5, 123:1
**circle** [1] - 112:23
**Circuit** [22] - 7:10,
9:25, 72:1, 89:10,
93:22, 94:4, 94:15,
94:19, 114:4, 114:6,
114:8, 114:14,
114:22, 119:5,
119:8, 119:10,
119:11, 122:19,

127:23, 133:23,
136:11, 140:12
**circuit** [4] - 100:15,
123:9, 140:21, 145:9
**Circuit's** [2] - 114:12,
123:8
**circumstances** [4] -
19:25, 53:2, 76:15,
96:25
**cite** [6] - 15:6, 46:11,
128:10, 129:8,
137:4, 137:16
**cited** [7] - 100:2,
100:9, 114:4,
122:19, 123:5,
127:18, 131:10
**cites** [3] - 14:9, 62:6,
98:8
**citizenship** [1] - 128:3
**CIVIL** [1] - 1:3
**civil** [3] - 38:14, 64:20,
110:3
**claim** [34] - 62:12,
87:21, 88:18, 89:13,
91:5, 93:13, 108:13,
115:6, 115:8,
115:11, 115:13,
116:24, 117:19,
118:4, 118:5,
118:15, 118:19,
119:2, 119:19,
119:20, 123:12,
123:18, 123:22,
128:12, 131:15,
132:9, 132:10,
134:20, 134:21,
134:22, 135:9,
136:15, 137:1
**claimed** [2] - 59:25,
139:10
**claiming** [1] - 64:19
**Claims** [19] - 15:4,
17:22, 24:6, 25:11,
30:22, 32:3, 32:14,
36:15, 36:22, 37:2,
38:19, 46:22, 56:10,
57:3, 62:9, 137:9,
137:10, 137:11,
137:12
**claims** [61] - 32:1,
32:13, 44:23, 64:24,
65:2, 71:16, 82:7,
88:2, 88:10, 90:10,
91:24, 92:5, 93:15,
93:20, 94:23, 95:4,
96:21, 96:24, 97:3,
97:4, 97:10, 97:14,
97:19, 99:3, 107:22,
108:25, 111:20,
115:18, 116:3,

117:15, 117:23,
118:5, 118:8,
118:10, 118:13,
119:12, 119:18,
123:11, 123:12,
123:16, 124:17,
124:19, 125:7,
125:13, 125:25,
126:3, 128:15,
130:10, 130:18,
130:21, 131:11,
132:20, 134:19,
136:24, 147:4, 147:5
**clarification** [1] -
15:25
**clarified** [2] - 10:7,
16:18
**clarify** [5] - 44:16,
53:14, 53:17, 56:14,
82:2
**clarifying** [1] - 75:6
**class** [92] - 6:3, 6:5,
6:10, 6:23, 7:4, 7:25,
8:2, 8:24, 9:10, 11:6,
12:13, 13:2, 23:8,
24:7, 24:11, 44:8,
45:10, 46:9, 46:13,
53:12, 55:20, 61:23,
66:18, 76:12, 84:19,
86:25, 93:1, 93:11,
94:7, 94:20, 94:21,
94:25, 95:1, 96:1,
97:22, 98:6, 98:16,
98:25, 99:18, 99:21,
100:1, 100:3,
100:15, 101:11,
103:14, 103:19,
104:4, 105:19,
106:22, 114:11,
114:14, 115:22,
116:5, 116:20,
121:1, 122:2, 122:4,
122:7, 122:19,
123:6, 123:7,
123:10, 123:11,
123:13, 123:19,
124:1, 124:20,
125:4, 125:6,
125:12, 125:23,
125:24, 127:1,
127:11, 127:16,
127:17, 129:11,
130:20, 131:3,
132:18, 132:19,
132:21, 134:13,
136:19, 136:20,
136:21, 139:22,
141:13, 144:13,
144:16, 146:6
**class-wide** [4] - 53:12,
55:20, 61:23, 129:11

**classes** [2] - 122:20, 122:24
**classic** [3] - 94:15, 94:17, 94:25
**classified** [2] - 12:23, 54:17
**clause** [2] - 98:21, 128:8
**clear** [14] - 12:11, 33:18, 40:2, 43:23, 46:3, 84:2, 91:3, 92:13, 93:3, 96:16, 106:21, 128:18, 136:12, 146:16
**clearly** [8] - 27:17, 29:2, 89:3, 118:22, 119:12, 125:12, 126:13, 127:22
**clever** [1] - 94:2
**close** [1] - 14:9
**closed** [2] - 114:5, 118:25
**closely** [2] - 80:14, 108:22
**clue** [1] - 93:14
**co** [1] - 14:14
**co-founder** [1] - 14:14
**Coca** [4] - 104:19, 104:21, 104:22, 133:3
**cognizance** [1] - 146:7
**Cola** [4] - 104:19, 104:21, 104:22, 133:3
**colleague** [1] - 85:3
**collect** [1] - 98:13
**colloquy** [1] - 120:22
**collusion** [1] - 137:6
**Comcast** [24] - 6:21, 49:6, 89:8, 89:10, 93:9, 93:21, 93:22, 106:11, 107:7, 107:16, 108:20, 114:7, 114:8, 114:13, 114:17, 114:23, 117:24, 118:15, 118:21, 119:12, 120:14, 120:16, 138:16, 144:1
**coming** [4] - 78:24, 121:1, 139:1
**Commencing** [1] - 1:11
**comment** [1] - 8:8
**commentaries** [1] - 57:20
**commentary** [9] - 51:1, 57:21, 59:7,

61:13, 62:3, 68:24, 70:8, 75:3, 82:21
**commented** [2] - 9:12, 14:20
**comments** [3] - 7:14, 94:5, 114:7
**commission** [1] - 125:9
**Commission** [1] - 54:4
**committee** [2] - 54:12
**common** [4] - 6:5, 11:5, 94:22, 133:11
**commonly** [1] - 11:6
**Companies** [1] - 113:5
**companies** [7] - 13:18, 13:21, 19:18, 23:7, 111:1, 111:10
**companies'** [1] - 13:12
**company** [25] - 8:20, 15:3, 15:7, 18:25, 29:20, 30:5, 30:14, 31:16, 41:16, 55:10, 60:14, 81:11, 81:22, 82:8, 82:19, 91:8, 92:11, 97:8, 97:10, 104:6, 104:15, 104:17, 104:19, 105:18, 117:8
**Company** [1] - 104:20
**company's** [10] - 8:21, 15:14, 18:19, 21:10, 21:15, 34:13, 45:2, 109:20, 110:2, 113:8
**compelling** [1] - 145:24
**compensable** [1] - 12:12
**competing** [1] - 142:10
**competitive** [6] - 116:6, 116:9, 116:18, 116:22, 117:11, 117:13
**competitors** [1] - 116:10
**complaint** [111] - 10:10, 10:11, 13:15, 14:5, 14:10, 14:22, 14:23, 16:13, 16:20, 17:5, 18:10, 19:9, 20:3, 21:6, 21:10, 21:22, 22:1, 22:25, 23:16, 24:23, 25:16, 25:19, 26:7, 29:24, 34:18, 34:24, 35:20, 36:6, 38:1, 39:12, 39:25, 40:5, 40:25, 41:6, 42:10, 42:18,

42:22, 42:23, 43:4, 43:11, 43:25, 44:20, 48:17, 56:9, 56:15, 56:16, 56:25, 57:1, 57:5, 57:7, 57:16, 57:21, 58:8, 58:10, 58:24, 60:16, 60:25, 61:6, 62:20, 63:23, 64:2, 65:14, 65:22, 78:10, 78:15, 78:22, 78:24, 79:2, 79:6, 79:11, 79:14, 80:24, 81:3, 81:8, 81:13, 82:17, 83:5, 90:17, 91:7, 91:10, 92:13, 92:18, 93:11, 95:19, 96:22, 98:5, 99:4, 107:11, 107:14, 112:19, 112:21, 113:18, 113:23, 113:24, 118:5, 125:2, 127:11, 127:13, 127:18, 132:10, 132:21, 133:19, 135:8, 137:25, 138:1, 138:5, 138:6, 138:9, 138:21, 146:3, 146:16
**Complaint** [1] - 113:16
**complaints** [3] - 20:4, 39:7, 69:21
**complete** [8] - 11:10, 45:12, 88:17, 96:13, 117:10, 142:13, 142:15, 142:20
**completed** [4] - 11:21, 117:14, 142:12, 146:14
**completely** [12] - 96:7, 97:8, 98:11, 99:1, 103:2, 135:22, 137:5, 137:14, 139:9, 142:2, 142:6, 142:22
**completion** [2] - 50:8, 142:9
**compliance** [16] - 88:22, 109:3, 109:16, 109:20, 110:15, 113:8, 113:11, 113:13, 118:1, 120:5, 131:12, 134:6, 134:8, 135:18, 138:19, 139:3
**Compliance** [1] - 113:3
**compliant** [1] - 14:2

**complied** [1] - 117:8
**comply** [4] - 13:24, 110:2, 117:24, 122:24
**components** [1] - 134:19
**compound** [1] - 46:5
**compounding** [4] - 9:1, 21:11, 21:15, 44:2
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concealed** [8] - 17:17, 33:12, 34:4, 56:13, 64:22, 69:13, 82:4, 139:2
**concede** [2] - 119:4, 142:8
**conceded** [2] - 47:19, 127:9
**concept** [12] - 59:14, 59:22, 60:5, 60:6, 60:10, 60:21, 62:17, 64:4, 66:15, 71:17, 78:9, 78:23
**concern** [7] - 90:11, 91:3, 124:22, 125:3, 136:5, 136:6, 141:23
**concerned** [5] - 45:6, 82:18, 90:18, 130:22, 144:14
**concerns** [4] - 17:9, 96:23, 135:3, 136:7
**Concerns** [1] - 128:24
**conclude** [1] - 114:8
**concluded** [1] - 144:25
**conclusion** [6] - 26:1, 55:13, 61:19, 69:19, 72:24, 107:7
**conclusions** [2] - 53:15, 54:13
**conduct** [19] - 15:10, 31:1, 33:13, 34:5, 37:4, 38:11, 43:5, 46:16, 62:15, 63:24, 69:16, 116:9, 116:18, 116:22, 117:11, 117:13, 123:25, 131:14, 131:19
**conducted** [3] - 41:5, 67:13, 117:10
**conduit** [2] - 19:17, 24:9
**conduits** [1] - 34:16
**conferences** [1] - 125:19
**confining** [1] - 49:19

**confirm** [1] - 130:12
**conflating** [1] - 135:14
**conflict** [8] - 95:10, 96:9, 96:19, 97:4, 122:9, 122:17, 122:21
**conflicts** [1] - 122:1
**confounding** [8] - 8:13, 8:18, 49:4, 62:25, 63:2, 63:8, 63:11, 63:25
**confused** [2] - 75:4, 78:17
**connected** [8] - 9:9, 12:9, 15:16, 18:11, 18:19, 18:21, 22:9, 133:2
**connection** [2] - 113:11, 123:20
**connects** [2] - 114:17, 114:18
**consent** [2] - 40:16, 80:5
**consequence** [12] - 46:20, 46:23, 48:18, 48:24, 59:20, 62:15, 63:24, 78:19, 78:23, 78:25, 79:2, 79:11
**consequences** [37] - 14:25, 15:9, 18:13, 18:18, 18:21, 19:8, 19:11, 27:20, 28:4, 28:19, 39:22, 45:22, 45:25, 46:19, 47:4, 47:8, 47:14, 47:16, 47:20, 48:5, 59:15, 59:22, 60:1, 60:5, 60:7, 60:10, 60:22, 62:17, 64:5, 66:16, 71:18, 78:10, 79:3, 79:7, 79:9, 80:5
**consider** [6] - 16:21, 26:9, 46:13, 88:16, 126:24, 127:4
**consideration** [2] - 136:3, 145:22
**considerations** [1] - 141:2
**considered** [3] - 38:13, 122:3, 126:25
**considering** [1] - 145:24
**consist** [1] - 62:22
**consistent** [18] - 6:6, 8:11, 13:6, 19:5, 23:14, 31:15, 50:11, 53:12, 54:17, 54:21, 55:20, 61:11, 61:23, 62:22, 66:21, 72:22, 99:25, 108:4

*consistently* [2] - 31:25, 32:12
*constant* [1] - 122:13
*constantly* [2] - 25:6, 47:11
*constitutes* [1] - 113:24
*construct* [1] - 91:19
*constructed* [1] - 46:24
*Consulting* [1] - 5:17
*contain* [4] - 23:17, 56:4, 59:1, 61:16
*contained* [1] - 63:3
*contains* [1] - 69:5
*contemplate* [1] - 30:14
*contemplates* [1] - 118:22
*contend* [1] - 115:21
*contends* [1] - 109:19
*contents* [2] - 10:11, 16:18
*context* [3] - 21:17, 22:6, 74:16
*contextualize* [1] - 53:20
*continue* [1] - 92:9
*CONTINUED* [1] - 2:1
*continues* [1] - 146:10
*continuing* [1] - 137:24
*contract* [2] - 123:21, 128:4
*contrary* [1] - 123:5
*contribute* [1] - 36:25
*contribution* [1] - 22:13
*contrived* [4] - 91:22, 92:21, 136:10, 137:1
*control* [1] - 24:15
*controls* [1] - 132:13
*convenience* [2] - 100:19, 138:7
*conversely* [1] - 122:7
*conveyed* [1] - 16:19
*conviction* [3] - 79:4, 131:23, 131:24
*Copaxone* [50] - 17:18, 21:13, 22:1, 29:21, 30:2, 31:17, 33:4, 34:13, 34:14, 40:4, 41:1, 41:9, 41:10, 41:14, 41:19, 41:25, 42:7, 42:12, 56:13, 58:5, 58:7, 61:16, 61:18, 62:4, 64:23, 68:13, 68:19, 69:14, 69:23, 70:10, 71:10, 77:11, 82:5,

87:15, 91:21, 92:7, 95:14, 95:21, 95:23, 96:5, 111:18, 112:16, 113:7, 113:21, 113:22, 114:1, 116:13, 126:20, 134:4, 134:9
*Copaxone's* [6] - 108:9, 111:23, 112:1, 112:3, 113:9, 139:6
*copays* [2] - 17:19, 113:21
*copies* [3] - 4:11, 4:22, 31:10
*copy* [6] - 4:13, 4:14, 4:21, 52:20, 73:2, 102:7
*core* [2] - 19:12, 31:1
*Cornerstone* [4] - 30:13, 54:8, 74:8, 74:10
*corporate* [3] - 40:17, 54:6
*corporation* [1] - 102:23
*corporations* [2] - 101:6, 102:21
*correct* [42] - 5:24, 5:25, 9:23, 9:24, 15:20, 15:21, 27:12, 30:7, 30:11, 33:6, 35:6, 35:17, 35:18, 35:21, 35:22, 36:7, 38:1, 38:2, 39:7, 40:14, 44:10, 46:19, 57:4, 57:6, 57:7, 61:7, 65:18, 69:2, 72:5, 72:12, 73:12, 73:20, 74:9, 74:10, 80:1, 81:3, 82:25, 96:2, 102:12, 137:24, 139:25, 147:20
*corrected* [2] - 104:14, 147:6
*correction* [1] - 104:16
*corrective* [17] - 17:11, 17:19, 17:25, 22:18, 35:15, 44:7, 55:17, 56:2, 56:8, 57:10, 57:11, 63:4, 67:16, 80:1, 113:25, 122:10
*corresponds* [1] - 119:2
*costly* [1] - 40:20
*costs* [11] - 40:6, 40:7, 40:12, 40:13, 41:9, 42:4, 44:12, 50:12,

50:17, 51:3
*counsel* [7] - 3:4, 95:8, 95:9, 100:18, 103:9, 103:18, 118:4
*count* [2] - 24:12, 120:24
*counter* [1] - 130:19
*countries* [1] - 100:10
*couple* [8] - 22:7, 27:13, 76:21, 108:22, 111:6, 121:9, 126:22, 129:23
*course* [5] - 54:2, 68:9, 76:14, 92:25, 140:25
*Court* [47] - 1:23, 32:24, 72:15, 84:16, 86:25, 88:21, 88:23, 89:21, 91:9, 92:16, 94:5, 98:9, 98:24, 99:21, 100:6, 102:7, 102:10, 102:12, 103:14, 111:10, 111:22, 115:12, 116:2, 116:3, 117:17, 118:15, 118:16, 123:9, 123:13, 123:23, 128:13, 133:18, 133:25, 134:2, 134:7, 134:9, 134:22, 134:24, 135:16, 136:12, 136:17, 136:25, 138:15, 139:18, 140:12, 146:19, 147:23
*COURT* [191] - 1:1, 3:3, 3:9, 3:13, 3:15, 4:1, 4:14, 4:16, 4:19, 4:22, 6:14, 6:17, 6:20, 9:18, 11:12, 11:16, 18:12, 18:15, 20:19, 26:3, 26:11, 26:15, 26:18, 26:21, 27:1, 27:3, 27:23, 28:7, 28:15, 28:21, 28:24, 29:2, 32:9, 37:15, 37:18, 37:22, 40:17, 41:12, 41:17, 41:20, 41:23, 42:1, 42:20, 43:1, 43:7, 43:9, 43:14, 43:18, 44:15, 45:16, 47:22, 48:4, 48:7, 48:14, 51:14, 51:16, 51:19, 51:21, 52:1, 52:5, 52:23, 53:5, 56:24, 57:5, 57:9, 57:24, 58:7, 58:12, 58:16,

58:19, 60:23, 64:11, 65:24, 66:2, 66:24, 67:4, 67:10, 67:18, 70:5, 70:11, 70:25, 71:6, 75:20, 76:19, 76:21, 77:3, 77:16, 78:6, 78:17, 79:1, 79:12, 79:17, 79:25, 80:3, 80:6, 80:10, 80:16, 80:18, 81:15, 83:8, 84:6, 84:8, 84:18, 84:23, 85:1, 85:6, 85:11, 85:16, 85:19, 85:23, 86:1, 86:13, 86:17, 86:21, 87:3, 88:4, 88:6, 94:9, 94:11, 95:15, 95:17, 95:23, 96:6, 100:20, 101:15, 102:16, 104:5, 105:1, 105:9, 105:15, 105:20, 105:23, 106:1, 106:4, 106:9, 106:13, 108:15, 109:4, 109:8, 109:13, 109:17, 111:8, 115:19, 118:3, 119:8, 120:4, 121:5, 121:16, 126:2, 126:12, 126:15, 126:19, 129:16, 129:23, 130:4, 130:8, 130:14, 130:17, 131:5, 132:1, 132:7, 133:21, 137:12, 137:19, 137:22, 138:1, 138:6, 138:22, 139:12, 139:21, 140:5, 140:8, 141:6, 141:9, 141:17, 142:12, 142:14, 143:1, 143:7, 143:11, 143:20, 143:23, 144:1, 144:17, 145:15, 146:11, 146:25, 147:5, 147:8, 147:13, 147:16
*court* [18] - 3:2, 8:1, 51:25, 53:5, 72:3, 86:11, 86:12, 103:23, 119:14, 129:22, 135:17, 139:20, 140:14, 140:22, 143:4, 143:18, 145:3, 145:9
*Court's* [8] - 52:7, 52:18, 87:10, 91:11,

93:6, 99:16, 114:24, 137:1
*court's* [5] - 33:7, 33:8, 114:15, 115:2, 115:17
*COURTHOUSE* [1] - 1:9
*courtroom* [1] - 84:9
*COURTROOM* [14] - 3:1, 4:3, 4:7, 5:1, 51:23, 51:25, 52:9, 52:13, 84:14, 84:16, 86:11, 139:16, 139:18, 147:15
*courts* [8] - 7:25, 8:8, 99:17, 99:20, 100:14, 100:15, 128:9, 133:16
*Courts* [5] - 9:11, 97:12, 99:20, 102:8, 133:16
*cover* [2] - 51:1, 100:7
*covered* [4] - 42:18, 121:21, 130:13, 130:23
*covers* [1] - 106:2
*crafty* [1] - 94:2
*create* [1] - 93:5
*created* [2] - 117:9, 122:9
*creates* [1] - 18:25
*creation* [1] - 39:11
*credit* [1] - 120:11
*criminal* [5] - 64:20, 89:19, 90:19, 91:25, 110:4
*criteria* [1] - 67:25
*critical* [1] - 116:2
*criticism* [3] - 16:21, 45:23, 78:7
*criticisms* [1] - 73:5
*critique* [2] - 76:1, 76:2
*critiqued* [2] - 76:6, 76:8
*critiques* [1] - 12:4
*critiquing* [1] - 75:25
*cross* [4] - 27:3, 27:5, 107:24, 131:20
*CROSS* [5] - 2:10, 2:12, 27:6, 64:16, 80:21
*cross-examination* [2] - 27:3, 27:5
*CROSS-EXAMINATION* [3] - 27:6, 64:16, 80:21
*cross-examining* [2] - 107:24, 131:20
*curious* [1] - 77:3

*United States District Court*

**current** *[4]* - 16:3, 21:15, 75:13, 88:13
**curriculum** *[1]* - 75:13
**cut** *[1]* - 103:21

**D**

**damage** *[16]* - 8:12, 17:3, 74:5, 74:19, 75:5, 76:5, 76:12, 88:16, 89:16, 92:19, 94:3, 115:8, 136:14, 136:15, 146:23
**damaged** *[1]* - 22:24
**damages** *[121]* - 6:4, 6:23, 7:1, 7:7, 7:9, 8:6, 8:9, 10:24, 11:1, 11:5, 11:10, 11:22, 12:1, 12:12, 12:18, 12:22, 13:1, 14:24, 15:5, 18:4, 18:6, 18:23, 19:5, 20:25, 24:24, 30:25, 37:11, 38:24, 44:4, 44:24, 45:7, 45:10, 46:5, 46:22, 50:10, 53:11, 54:16, 54:20, 55:1, 55:19, 61:11, 61:23, 62:22, 63:14, 64:19, 65:17, 65:21, 66:21, 71:16, 71:21, 72:19, 72:21, 72:22, 73:19, 74:15, 74:19, 74:21, 74:22, 74:25, 75:7, 75:9, 75:15, 75:17, 75:19, 76:3, 76:6, 82:7, 86:23, 87:6, 87:25, 88:18, 89:2, 89:4, 89:5, 89:7, 89:14, 90:11, 90:23, 90:24, 91:5, 91:24, 92:20, 92:23, 93:19, 93:24, 94:5, 94:18, 106:20, 107:13, 107:17, 108:13, 110:9, 114:17, 114:18, 115:7, 115:10, 115:11, 115:13, 115:16, 117:18, 117:21, 118:18, 119:1, 119:2, 119:23, 119:24, 119:25, 120:12, 122:12, 133:22, 134:1, 134:14, 135:1, 135:9, 136:23, 137:2, 138:24, 141:21, 144:20
**Date** *[1]* - 147:25
**date** *[7]* - 44:6, 44:7,

140:18, 143:1, 143:7, 143:9, 145:16
**dates** *[2]* - 79:20, 98:4
**Daubert** *[2]* - 26:18, 26:24
**daughter** *[1]* - 102:22
**days** *[5]* - 22:7, 77:16, 77:20, 77:25, 78:5
**deal** *[5]* - 45:17, 57:24, 100:18, 119:18, 139:13
**dealing** *[3]* - 51:4, 57:25, 67:15
**dealt** *[1]* - 74:21
**decades** *[2]* - 8:15, 49:17
**decide** *[2]* - 92:17, 146:19
**decided** *[1]* - 114:5
**decidedly** *[1]* - 107:5
**decision** *[28]* - 7:13, 32:20, 32:24, 46:17, 72:15, 94:19, 104:24, 107:9, 107:12, 107:14, 107:21, 108:5, 108:21, 113:15, 114:2, 114:13, 114:15, 115:1, 115:20, 119:5, 120:17, 122:3, 127:1, 140:4, 142:21, 145:22, 146:7, 146:9
**declaration** *[3]* - 77:22, 128:20, 129:1
**decline** *[48]* - 10:9, 10:13, 10:17, 12:8, 14:22, 16:8, 16:10, 18:4, 22:13, 24:22, 30:10, 31:20, 35:19, 36:25, 40:10, 40:25, 41:6, 44:6, 44:19, 56:3, 57:20, 58:24, 59:1, 59:5, 59:9, 60:21, 61:14, 61:18, 62:13, 62:19, 65:21, 65:22, 66:5, 68:17, 68:18, 68:25, 69:1, 69:4, 69:5, 69:21, 70:3, 70:6, 70:10, 70:11, 79:21, 80:3, 83:18, 136:18
**declines** *[4]* - 15:14, 18:22, 20:25, 43:24
**decrease** *[3]* - 61:15, 61:17, 77:12
**decreased** *[2]* - 69:23, 77:11
**deemed** *[2]* - 43:4,

88:23
**defective** *[1]* - 88:16
**Defendant** *[3]* - 1:8, 1:21, 2:5
**defendant** *[2]* - 98:8, 132:12
**Defendant's** *[1]* - 110:13
**defendant's** *[5]* - 46:8, 87:9, 115:21, 117:7, 136:10
**Defendants** *[2]* - 109:10, 116:4
**defendants** *[25]* - 3:11, 17:17, 22:20, 29:25, 34:15, 87:17, 88:9, 90:9, 91:23, 92:2, 92:4, 92:6, 95:1, 103:5, 105:2, 108:1, 111:10, 115:3, 115:23, 116:18, 121:22, 125:12, 133:24, 134:17, 135:13
**defense** *[10]* - 9:15, 10:1, 52:7, 72:4, 72:14, 88:4, 88:7, 100:17, 103:8, 129:24
**defenses** *[2]* - 97:22, 104:25
**defer** *[3]* - 72:15, 99:20, 133:16
**defers** *[1]* - 100:13
**deficient** *[1]* - 93:7
**define** *[2]* - 48:12, 118:23
**defines** *[1]* - 127:12
**definition** *[11]* - 17:10, 17:14, 46:19, 46:20, 57:25, 58:2, 64:4, 121:23, 124:16, 127:9, 127:11
**deflation** *[1]* - 96:14
**defraud** *[1]* - 137:8
**degree** *[1]* - 5:18
**delay** *[1]* - 145:7
**delivery** *[1]* - 97:9
**demand** *[8]* - 29:23, 31:18, 61:15, 61:17, 68:19, 69:23, 70:9, 77:11
**demanding** *[1]* - 56:19
**demonstrated** *[1]* - 145:25
**demonstrates** *[1]* - 111:14
**denied** *[4]* - 133:25, 140:11, 143:3, 143:17

**deny** *[3]* - 93:17, 136:20, 140:22
**Department** *[6]* - 17:20, 19:14, 25:10, 25:15, 29:6, 46:25
**deposition** *[15]* - 10:7, 11:24, 16:15, 16:18, 31:4, 31:6, 31:7, 45:7, 49:14, 50:4, 51:5, 51:8, 71:25, 73:1, 103:5
**depository** *[3]* - 101:22, 102:2, 133:15
**DEPUTY** *[14]* - 3:1, 4:3, 4:7, 5:1, 51:23, 51:25, 52:9, 52:13, 84:14, 84:16, 86:11, 139:16, 139:18, 147:15
**describe** *[11]* - 6:3, 14:18, 17:14, 18:10, 23:4, 25:17, 29:5, 29:7, 29:25, 46:22, 50:21
**described** *[8]* - 34:11, 47:10, 50:3, 50:13, 50:21, 51:5, 66:5, 79:8
**describes** *[5]* - 21:5, 21:24, 23:7, 25:13, 25:18
**describing** *[3]* - 14:14, 48:9, 75:22
**descriptive** *[1]* - 135:8
**detail** *[5]* - 41:7, 51:6, 83:23, 84:2, 84:3
**detailed** *[1]* - 96:19
**details** *[6]* - 25:14, 25:22, 26:6, 49:11, 89:17, 116:15
**determination** *[14]* - 12:13, 12:15, 12:19, 24:4, 37:8, 37:11, 39:8, 39:19, 48:25, 63:23, 65:19, 65:20, 115:9, 131:25
**determinations** *[1]* - 70:22
**determine** *[6]* - 9:6, 12:18, 48:17, 61:9, 128:9, 129:12
**determined** *[4]* - 46:12, 49:9, 50:12, 59:10
**determining** *[1]* - 48:24
**development** *[2]* - 14:21, 22:4
**difference** *[2]* - 55:2,

102:13
**different** *[25]* - 47:6, 51:8, 56:2, 72:3, 72:19, 77:19, 77:20, 81:2, 89:9, 92:4, 95:10, 97:16, 101:3, 102:21, 103:1, 106:12, 108:22, 108:25, 109:24, 118:9, 131:7, 137:5, 139:9, 142:7
**digested** *[1]* - 16:2
**diligence** *[2]* - 105:4, 105:5
**DIRECT** *[4]* - 2:9, 2:12, 5:7, 52:24
**direct** *[7]* - 21:12, 27:14, 35:12, 39:2, 40:16, 45:24, 56:18
**directly** *[2]* - 41:13, 128:19
**dis** *[1]* - 92:12
**disaggregate** *[10]* - 8:13, 49:23, 82:25, 83:13, 92:23, 92:25, 93:13, 106:18, 115:8, 115:14
**disaggregated** *[4]* - 69:25, 71:16, 83:2, 117:24
**disaggregation** *[1]* - 117:18
**disagree** *[1]* - 132:12
**disagreed** *[1]* - 72:16
**disagreement** *[2]* - 87:10, 87:17
**disallowed** *[1]* - 93:11
**disclose** *[19]* - 17:18, 18:20, 18:22, 30:5, 33:2, 33:3, 34:15, 87:12, 87:14, 87:19, 87:22, 91:17, 91:21, 111:1, 111:11, 111:16, 111:17, 113:5, 113:10
**disclosed** *[8]* - 21:22, 23:2, 23:6, 30:14, 63:9, 90:5, 90:12, 101:9
**disclosing** *[2]* - 88:24, 88:25
**disclosure** *[16]* - 13:23, 17:11, 17:19, 23:9, 35:16, 44:7, 54:6, 55:17, 56:2, 56:8, 57:10, 57:11, 63:4, 67:16, 113:25
**disclosures** *[8]* - 46:15, 80:1, 96:25, 113:7, 116:23,

122:10, 124:24, 125:8

**discount** [1] - 50:23

**discounted** [1] - 12:17

**discounting** [1] - 51:3

**discovery** [23] - 8:25, 9:4, 22:16, 45:12, 50:8, 66:10, 93:14, 93:15, 136:22, 136:23, 142:8, 142:9, 142:10, 142:12, 142:13, 142:15, 142:17, 142:19, 144:11, 144:14, 144:15, 144:25, 146:14

**discuss** [4] - 10:23, 45:4, 70:22, 106:11

**discussed** [10] - 34:21, 53:1, 58:14, 60:12, 61:5, 62:12, 111:12, 111:13, 118:8, 146:5

**discusses** [3] - 50:14, 78:4, 110:25

**discussing** [2] - 37:25, 76:15

**discussion** [8] - 11:23, 76:23, 77:4, 77:17, 111:4, 113:15, 133:23, 145:11

**discussions** [1] - 77:10

**disentangle** [13] - 8:21, 9:2, 46:5, 46:9, 50:5, 51:6, 62:13, 64:6, 67:7, 67:19, 83:15, 83:20, 93:19

**disentangled** [8] - 46:15, 49:12, 50:12, 66:9, 66:12, 67:19, 69:2, 74:1

**disentangles** [1] - 66:18

**disentangling** [2] - 67:13, 106:23

**dismiss** [22] - 32:21, 34:22, 82:2, 82:12, 87:11, 87:24, 88:19, 88:21, 89:20, 91:10, 91:12, 91:16, 92:22, 107:9, 107:12, 107:21, 118:8, 118:10, 131:11, 134:2, 135:3, 146:22

**dismissal** [1] - 136:4

**dismissed** [15] - 87:25, 93:14, 93:20, 115:6, 115:8,

115:11, 115:13, 116:25, 117:15, 117:19, 117:25, 134:18, 134:21, 136:25, 147:4

**disposed** [1] - 133:24

**dispositive** [2] - 142:1, 142:3

**disprove** [1] - 146:5

**dispute** [7] - 11:3, 12:12, 13:3, 58:17, 106:17, 121:20, 122:8

**disputes** [4] - 74:22, 75:12, 99:16, 133:17

**distinct** [2] - 96:8, 97:16

**distinction** [2] - 77:15, 102:13

**distinctive** [2] - 97:5, 99:1

**distinguishable** [2] - 99:1, 137:14

**distinguished** [1] - 89:10

**district** [9] - 72:2, 72:13, 114:15, 115:1, 115:17, 119:14, 140:14, 143:4, 143:18

**DISTRICT** [3] - 1:1, 1:1, 1:13

**Doctor** [3] - 29:12, 33:20, 47:6

**document** [1] - 124:15

**DOD** [1] - 139:9

**dogmatic** [1] - 100:7

**DOJ** [89] - 10:10, 13:14, 14:5, 14:10, 14:22, 14:23, 16:19, 17:5, 18:7, 18:10, 21:6, 21:10, 21:17, 21:22, 22:1, 22:9, 22:25, 23:12, 23:13, 23:16, 24:23, 25:18, 26:7, 35:20, 36:6, 38:1, 39:6, 39:12, 39:25, 40:5, 40:25, 41:6, 42:10, 42:18, 42:22, 42:23, 43:3, 43:11, 43:24, 44:19, 44:22, 48:17, 56:8, 56:15, 56:16, 56:24, 57:1, 57:5, 57:7, 57:10, 57:12, 57:15, 57:21, 58:8, 58:10, 58:24, 59:11, 60:16, 60:25, 61:6, 62:8, 62:19, 63:23, 64:2, 64:20, 65:3, 65:14,

65:22, 69:21, 78:10, 78:15, 78:21, 78:24, 79:2, 79:6, 79:10, 79:13, 82:17, 83:4, 112:19, 112:21, 113:23, 142:9, 142:11, 142:16, 145:5, 145:13, 146:3

**DOJ's** [1] - 20:3

**dollars** [3] - 21:25, 103:12, 131:22

**domain** [1] - 60:12

**domestic** [3] - 127:24, 128:1, 129:12

**donation** [20] - 13:20, 21:13, 33:15, 41:10, 44:21, 49:11, 56:11, 58:11, 59:10, 60:13, 64:25, 65:13, 78:21, 78:24, 79:10, 79:13, 82:3, 82:15, 112:7, 112:15

**donations** [17] - 13:12, 13:13, 29:15, 29:22, 57:6, 60:14, 92:15, 92:17, 108:10, 112:13, 112:15, 112:18, 112:20, 113:20, 139:9, 146:17, 146:20

**done** [22] - 22:11, 45:8, 49:15, 60:2, 61:5, 67:22, 68:4, 74:19, 74:25, 75:4, 75:7, 75:9, 99:4, 103:22, 105:5, 106:17, 107:1, 119:22, 128:19, 129:14, 132:19, 142:18

**Donovan** [3] - 3:12, 52:3, 130:12

**DONOVAN** [15] - 1:20, 2:12, 2:13, 52:7, 52:18, 52:22, 52:25, 53:6, 58:20, 61:4, 64:9, 76:20, 80:12, 83:7, 83:10

**double** [1] - 88:12

**doubt** [1] - 126:3

**down** [10] - 26:8, 86:19, 88:12, 104:15, 122:11, 122:16, 123:2, 136:17, 142:16, 145:2

**dozens** [1] - 49:17

**dr** [1] - 5:9

**DR** [4] - 2:9, 2:11, 4:5,

52:11

**Dr** [114] - 3:22, 3:23, 3:25, 5:13, 9:15, 9:16, 9:20, 10:2, 10:4, 10:18, 10:25, 12:22, 12:25, 13:11, 13:17, 15:12, 15:18, 16:6, 16:12, 17:2, 17:8, 18:3, 18:8, 20:24, 21:5, 22:10, 22:23, 23:6, 25:13, 26:16, 27:8, 27:15, 30:13, 35:3, 35:9, 35:12, 35:15, 45:22, 45:24, 46:8, 51:16, 51:22, 52:4, 52:19, 53:1, 53:2, 53:10, 54:14, 54:23, 55:5, 55:12, 55:13, 55:15, 55:22, 56:18, 58:23, 59:12, 59:21, 59:25, 60:18, 61:3, 61:10, 61:21, 62:1, 62:2, 62:5, 62:12, 63:6, 63:7, 63:12, 63:13, 63:15, 63:25, 64:6, 64:9, 64:14, 64:18, 65:21, 66:2, 66:13, 66:21, 67:14, 68:1, 68:7, 69:3, 70:2, 70:24, 71:17, 73:5, 74:2, 78:7, 78:13, 78:20, 79:16, 80:5, 82:24, 83:2, 83:12, 83:14, 83:19, 83:23, 88:15, 90:13, 92:21, 93:7, 107:24, 112:4, 115:4, 120:11, 131:16, 131:20, 135:4

**draw** [3] - 53:14, 61:19, 77:15

**dream** [1] - 93:9

**driven** [1] - 108:10

**driver** [1] - 108:9

**drop** [22] - 10:19, 27:18, 28:3, 28:17, 45:14, 68:10, 68:11, 68:14, 68:22, 71:15, 77:24, 82:16, 90:13, 90:14, 90:19, 94:18, 104:11, 112:10, 131:15, 131:23, 135:2

**dropped** [1] - 65:16

**drops** [1] - 69:24

**drove** [1] - 68:17

**drug** [10] - 29:23, 31:18, 41:11, 56:13, 58:9, 58:12, 58:13,

95:17, 96:1, 116:10

**drugs** [6] - 41:20, 95:13, 95:20, 95:22, 96:4, 126:17

**dual** [7] - 99:9, 99:24, 101:6, 128:22, 129:4, 133:10, 144:13

**dual-listed** [1] - 99:9

**due** [19] - 18:5, 21:1, 22:1, 22:2, 61:24, 64:19, 69:24, 71:15, 82:7, 82:17, 90:19, 92:8, 96:12, 96:14, 105:4, 105:5, 122:22, 122:24, 123:1

**DULY** [4] - 4:5, 4:6, 52:12

**duration** [1] - 42:24

**during** [9] - 6:3, 9:1, 23:8, 44:8, 115:22, 115:24, 125:4, 125:12, 125:15

**duties** [2] - 103:19, 103:20

**duty** [2] - 111:1, 113:5

## E

**earnings** [5] - 68:13, 90:21, 90:23, 90:25, 115:24

**easier** [1] - 86:17

**EASTERN** [1] - 1:1

**easy** [2] - 6:14, 95:3

**ECF** [1] - 78:5

**ECF-101.5** [1] - 124:10

**economic** [26] - 12:5, 12:10, 17:4, 25:23, 26:8, 46:19, 50:13, 54:5, 55:25, 57:19, 58:21, 59:1, 59:16, 59:21, 59:23, 60:1, 60:4, 60:7, 64:1, 65:14, 70:23, 72:16, 72:17, 73:6, 73:11, 76:16

**economics** [12] - 5:19, 5:20, 5:21, 8:17, 8:23, 12:16, 47:7, 47:9, 47:18, 60:4, 70:24, 71:2

**economist** [10] - 5:16, 12:15, 17:16, 53:16, 55:12, 56:17, 60:9, 60:11, 63:17, 69:19

**economists** [3] - 47:14, 47:15, 63:19

**economy** [2] - 141:2,

145:25
**educational** [1] - 53:21
**effect** [10] - 21:11, 21:12, 21:15, 29:4, 30:6, 51:2, 100:2, 121:15, 137:17
**effectively** [2] - 107:14, 115:7
**effects** [10] - 8:19, 10:16, 18:23, 19:2, 19:8, 22:8, 44:2, 51:6, 63:10, 106:19
**efficiency** [6] - 6:2, 6:12, 8:5, 10:15, 23:5, 23:14
**efficient** [13] - 14:5, 15:17, 15:19, 15:23, 16:1, 16:25, 35:2, 35:6, 35:16, 40:9, 58:16, 58:17, 104:13
**effort** [1] - 9:5
**either** [9] - 13:19, 22:7, 22:12, 79:4, 85:15, 86:17, 122:8, 132:14, 143:16
**elaborated** [3] - 30:15, 49:14, 50:4
**element** [1] - 20:12
**elements** [1] - 94:17
**ellipses** [1] - 124:12
**elsewhere** [2] - 59:24, 119:11
**emails** [1] - 14:17
**embedded** [1] - 23:11
**employed** [1] - 8:10
**encompasses** [1] - 125:13
**end** [16] - 24:10, 30:10, 31:19, 37:11, 57:9, 66:10, 78:3, 93:15, 98:13, 98:16, 112:13, 113:14, 114:22, 125:24, 138:11, 141:20
**ended** [4] - 112:17, 112:18, 112:20, 112:22
**enforced** [2] - 123:4, 123:23
**enforcement** [8] - 45:2, 46:14, 50:15, 81:11, 81:23, 82:9, 82:20, 91:9
**engaged** [6] - 17:20, 34:15, 38:10, 95:13, 117:11, 121:10
**ensuing** [1] - 46:14
**entangling** [1] - 49:19
**enter** [1] - 123:10

**entered** [2] - 128:2, 128:16
**Enterprise** [1] - 91:2
**enthusiastic** [1] - 102:19
**entire** [2] - 44:6, 45:13
**entirely** [1] - 99:18
**entitled** [5] - 89:1, 89:14, 93:24, 138:24, 147:21
**enumerate** [2] - 42:15, 127:1
**equal** [1] - 77:4
**equivalent** [1] - 102:4
**ERISA** [3] - 74:22, 75:8, 75:11
**escalating** [1] - 8:19
**especially** [2] - 53:5, 136:19
**ESQUIRE** [6] - 1:15, 1:16, 1:16, 1:19, 1:20, 2:3
**essentially** [9] - 30:7, 44:5, 44:9, 45:25, 59:18, 106:18, 112:16, 114:20, 140:3
**established** [1] - 114:20
**esteemed** [1] - 85:3
**estimate** [7] - 6:9, 12:1, 25:24, 45:9, 50:16, 62:20, 72:19
**estimated** [5] - 6:4, 11:1, 12:23, 19:5, 45:7
**estimates** [3] - 61:17, 68:18, 69:23
**estimating** [3] - 7:7, 8:9, 11:4
**estimation** [1] - 10:24
**ET** [1] - 1:7
**et** [7] - 120:13, 125:17, 125:19, 126:10, 126:18, 139:7, 145:5
**evaluate** [6] - 53:10, 60:9, 66:13, 68:5, 74:2, 80:5
**evaluating** [2] - 67:14, 67:15
**event** [20] - 8:22, 16:10, 16:11, 16:23, 16:24, 17:12, 17:25, 21:25, 22:11, 41:5, 41:6, 48:22, 49:10, 49:16, 49:19, 50:3, 50:5, 63:9, 63:12, 63:16
**events** [9] - 7:8, 16:11, 16:25, 22:7, 22:19,

47:12, 63:11, 77:17, 115:24
**evidence** [8] - 14:11, 25:15, 25:18, 62:3, 79:19, 96:18, 96:19, 142:19
**evidentiary** [1] - 121:2
**exact** [1] - 125:19
**exactly** [13] - 20:2, 40:18, 41:24, 42:5, 55:6, 55:24, 63:2, 75:23, 89:7, 105:7, 135:23, 143:25, 145:6
**EXAMINATION** [11] - 2:9, 2:10, 2:12, 2:12, 2:13, 5:7, 27:6, 52:24, 64:16, 80:21, 83:9
**examination** [4] - 27:3, 27:5, 39:2, 45:24
**EXAMINATIONS** [1] - 2:7
**examine** [3] - 16:23, 22:18, 42:13
**examined** [1] - 10:10
**examining** [2] - 107:24, 131:20
**example** [2] - 79:21, 102:25
**excerpt** [1] - 100:21
**excess** [1] - 103:12
**Exchange** [10] - 24:14, 54:3, 89:12, 99:8, 99:24, 100:16, 100:24, 101:2, 101:13, 125:9
**exchange** [6] - 100:9, 101:3, 101:7, 102:3, 127:9, 129:11
**exchanges** [4] - 99:9, 127:22, 127:24, 133:10
**exclude** [2] - 8:1, 96:17
**excluded** [2] - 10:21, 132:17
**excuse** [3] - 5:1, 35:8, 78:3
**executives'** [1] - 109:19
**exercise** [2] - 9:10, 128:14
**exhibit** [1] - 100:17
**Exhibit** [5] - 4:17, 35:4, 35:8, 35:9, 124:8
**exhibits** [2] - 4:23, 14:11

**exist** [1] - 93:5
**existed** [1] - 93:4
**expand** [1] - 127:16
**expands** [1] - 35:24
**expect** [1] - 89:6
**expectations** [6] - 25:8, 39:20, 40:4, 50:22, 62:4, 78:11
**expected** [2] - 40:8, 41:1
**expenses** [1] - 40:14
**experience** [5] - 5:14, 20:20, 22:15, 22:17, 67:5
**experienced** [3] - 102:20, 103:25
**expert** [38] - 3:21, 4:23, 5:23, 6:9, 7:15, 9:14, 9:15, 9:20, 10:1, 26:21, 47:19, 52:8, 54:19, 66:7, 66:17, 67:6, 67:8, 72:4, 72:14, 72:21, 73:10, 73:11, 74:15, 74:23, 75:15, 75:17, 75:20, 75:21, 76:12, 88:16, 89:16, 93:12, 99:10, 106:22, 106:25, 115:4, 146:23
**expert's** [4] - 22:20, 94:2, 115:12, 117:18
**expertise** [3] - 20:15, 20:18, 26:2
**experts** [8] - 3:18, 26:19, 49:17, 75:25, 84:9, 86:3, 89:16, 92:20
**explain** [3] - 9:2, 46:10, 109:23
**explained** [4] - 41:7, 45:7, 109:21, 110:1
**explaining** [1] - 34:12
**explanation** [1] - 10:18
**exposed** [2] - 23:10, 92:8
**exposure** [2] - 18:5, 92:10
**expressed** [1] - 147:3
**expressly** [2] - 115:11, 119:24
**extensive** [1] - 116:8
**extent** [5] - 63:7, 106:23, 107:20, 108:10, 120:1
**extra** [2] - 4:11, 103:3
**extraterritorial** [1] - 128:24
**extraterritoriality** [1] -

121:15
**extreme** [1] - 39:14
**extremely** [1] - 86:6

## F

**face** [3] - 115:5, 119:5, 139:4
**fact** [31] - 9:4, 9:12, 12:18, 13:18, 14:3, 24:4, 34:12, 38:10, 49:1, 50:8, 55:10, 56:25, 62:6, 66:4, 68:15, 77:9, 80:23, 91:13, 95:21, 99:6, 101:15, 104:5, 108:18, 112:20, 116:19, 124:7, 125:13, 128:16, 132:22, 132:25, 144:24
**factor** [1] - 66:12
**factors** [8] - 8:13, 9:1, 58:4, 59:2, 68:17, 82:4, 111:24, 145:24
**facts** [11] - 19:25, 49:24, 76:14, 93:16, 96:24, 114:10, 137:4, 137:6, 137:7, 141:23, 146:6
**factual** [8] - 97:14, 97:15, 109:14, 123:15, 123:16, 123:24, 124:4, 146:2
**failed** [7] - 17:3, 17:17, 18:3, 20:24, 22:24, 34:15, 82:24
**failing** [1] - 29:25
**failure** [4] - 18:19, 18:22, 110:2, 112:2
**Fair** [1] - 137:9
**fair** [7] - 25:24, 26:10, 73:5, 81:6, 91:11, 124:14, 138:10
**fairly** [3] - 43:23, 99:10, 146:1
**fall** [2] - 23:13, 129:9
**falls** [1] - 80:14
**False** [16] - 15:4, 17:21, 24:5, 25:11, 30:22, 32:2, 32:14, 36:15, 36:22, 37:2, 38:19, 46:22, 56:10, 57:3, 62:9, 137:11
**false** [17] - 34:14, 44:23, 89:2, 92:19, 109:21, 110:19, 110:20, 115:24, 117:9, 135:10, 135:13, 135:15,

136:2, 136:3, 137:10, 137:12
**falsity** [4] - 93:17, 135:12, 135:14, 135:25
**familiar** [1] - 62:24
**far** [5] - 42:12, 45:6, 98:1, 98:22, 144:14
**FARUQI** [2] - 1:15
**Faruqi** [2] - 3:8
**fashion** [1] - 50:10
**fashioned** [2] - 13:6, 63:10
**fatally** [1] - 16:21
**favorable** [1] - 111:22
**favors** [1] - 123:7
**FCA** [2] - 92:16, 146:18
**FCC** [1] - 101:23
**fear** [12] - 24:24, 25:23, 26:7, 27:19, 28:3, 28:18, 39:23, 89:3, 89:19, 91:24, 91:25, 92:23
**fears** [2] - 21:7, 64:20
**federal** [14] - 7:25, 13:24, 20:10, 23:21, 24:1, 24:13, 109:3, 109:16, 109:20, 110:15, 113:8, 114:14, 135:22, 137:9
**Federal** [2] - 24:7, 113:3
**fees** [1] - 91:25
**felt** [1] - 51:2
**few** [2] - 3:18, 98:2
**figure** [1] - 85:2
**file** [3] - 101:5, 101:6, 101:7
**filed** [8] - 13:15, 38:24, 88:9, 99:18, 100:22, 112:22, 140:12, 146:15
**Filed** [1] - 113:16
**filing** [5] - 17:5, 39:6, 61:6, 64:2, 98:5
**filings** [7] - 13:24, 101:1, 109:20, 115:23, 125:9, 125:16, 125:19
**final** [5] - 37:10, 39:19, 54:12, 144:9, 145:13
**finally** [1] - 102:17
**finance** [5] - 8:17, 12:16, 47:9, 48:13, 53:24
**Finance** [1] - 50:16
**financial** [14] - 5:16, 5:20, 5:21, 8:23, 9:7,

14:20, 18:5, 26:8, 47:7, 47:9, 47:18, 54:10, 63:17, 125:8
**fine** [14] - 9:18, 24:20, 26:15, 26:20, 37:2, 52:5, 84:21, 85:15, 86:21, 104:3, 104:13, 106:9, 106:13, 111:8
**fines** [49] - 14:24, 18:24, 19:10, 37:10, 40:13, 43:25, 44:24, 46:14, 49:10, 49:23, 57:22, 59:8, 61:14, 62:10, 68:20, 68:23, 69:6, 69:10, 69:16, 69:22, 69:24, 70:6, 70:13, 70:16, 70:19, 71:8, 71:15, 77:13, 79:3, 82:23, 92:23, 106:19, 107:2, 107:3, 107:16, 112:7, 112:10, 112:24, 116:25, 119:25, 120:3, 120:7, 120:13, 135:24, 136:6, 138:18, 138:25, 139:2, 139:4
**fingertips** [1] - 43:8
**finish** [1] - 142:8
**finished** [1] - 26:14
**firm** [2] - 76:24, 77:4
**firms** [1] - 40:20
**First** [1] - 74:23
**first** [33] - 3:23, 15:18, 27:17, 45:9, 54:15, 83:16, 85:21, 87:18, 90:16, 91:13, 92:25, 95:2, 98:19, 106:11, 107:7, 109:1, 110:10, 115:20, 116:4, 116:11, 117:2, 120:20, 122:1, 125:5, 131:3, 132:5, 132:8, 133:25, 136:22, 140:24, 140:25, 144:24, 146:13
**fishy** [1] - 135:3
**fits** [1] - 94:21
**five** [8] - 21:25, 51:21, 74:13, 97:24, 98:2, 102:21, 129:16, 129:18
**five-minute** [3] - 51:21, 129:16, 129:18
**fixing** [9] - 95:13, 95:17, 96:1, 97:16,

116:8, 116:17, 116:21, 126:9, 137:7
**flat** [1] - 95:3
**flat-out** [1] - 95:3
**flawed** [2] - 16:22, 84:4
**flaws** [1] - 135:11
**flexible** [1] - 84:25
**flow** [4] - 12:17, 77:5, 93:25, 136:23
**flowing** [3] - 89:14, 134:1, 134:15
**flows** [2] - 40:9, 40:21
**focus** [4] - 113:1, 115:14, 117:14, 121:13
**focused** [26] - 42:9, 57:22, 58:4, 58:6, 59:8, 61:13, 61:15, 62:8, 62:9, 65:20, 66:22, 68:18, 68:19, 68:25, 70:9, 70:13, 70:15, 71:10, 77:11, 82:4, 82:22, 84:2, 84:3, 108:23
**focuses** [1] - 16:5
**focusing** [2] - 79:23, 118:7
**focussed** [2] - 69:22, 77:12
**follow** [6] - 44:9, 80:17, 85:18, 85:20, 124:13, 130:21
**follow-up** [3] - 80:17, 85:18, 85:20
**following** [8] - 35:20, 40:25, 48:22, 62:19, 113:17, 114:3, 116:1, 138:4
**follows** [1] - 138:25
**FOLLOWS** [2] - 4:6, 52:12
**footnote** [5] - 33:23, 34:2, 127:12, 138:5, 138:11
**FOR** [1] - 1:1
**forces** [1] - 116:6
**forecast** [1] - 21:24
**foregoing** [1] - 147:20
**foreseeable** [45] - 15:9, 18:12, 18:17, 18:21, 19:8, 39:22, 45:22, 45:25, 46:19, 46:20, 46:23, 47:8, 47:14, 47:16, 47:19, 48:4, 48:18, 48:24, 59:15, 59:19, 59:22, 60:1, 60:5, 60:6, 60:10, 60:22, 62:14, 62:17, 63:24, 64:5,

66:15, 69:15, 71:18, 78:9, 78:19, 78:22, 78:25, 79:1, 79:3, 79:6, 79:9, 79:11, 80:5, 89:5
**forget** [2] - 42:5, 58:7
**form** [2] - 101:5, 101:6
**formal** [1] - 90:17
**Forsythe** [6] - 98:11, 102:18, 103:24, 120:23, 122:2, 122:25
**Forsythe's** [1] - 97:21
**forth** [12] - 8:17, 17:3, 18:3, 20:24, 22:24, 54:19, 63:25, 67:24, 74:5, 79:19, 83:25, 93:12
**forthcoming** [1] - 138:19
**forward** [37] - 40:21, 41:2, 42:6, 42:12, 45:3, 49:22, 53:11, 54:24, 54:25, 55:18, 55:19, 56:11, 58:3, 61:11, 61:22, 62:21, 66:20, 66:23, 67:14, 67:20, 68:2, 72:21, 74:3, 76:1, 81:4, 83:3, 83:12, 83:17, 84:5, 110:12, 112:1, 115:16, 116:12, 118:10, 118:17
**foundational** [1] - 54:1
**foundations** [4] - 13:19, 14:16, 92:15, 146:18
**founder** [2] - 14:13, 14:14
**founding** [1] - 9:6
**four** [2] - 21:5, 54:11
**fourth** [2] - 21:23, 36:10
**framed** [1] - 127:13
**framework** [16] - 54:24, 61:11, 61:21, 63:14, 65:21, 69:4, 71:20, 74:2, 78:20, 79:16, 83:2, 83:17, 83:23, 83:24, 84:4
**fraud** [10] - 8:19, 19:8, 19:20, 30:19, 104:10, 104:14, 104:20, 114:11, 141:22, 142:4
**fraud-related** [1] - 8:19
**frauds** [1] - 63:8
**fraudulent** [1] - 97:17

**Freeman** [3] - 123:6, 123:8, 123:18
**fresh** [2] - 28:12, 86:24
**front** [5] - 33:20, 63:22, 73:3, 142:4, 145:5
**full** [14] - 16:10, 18:22, 50:8, 58:23, 62:19, 65:22, 66:4, 69:4, 69:5, 70:2, 70:5, 83:18, 93:16, 112:23
**fully** [2] - 134:22, 140:11
**fun** [1] - 4:24
**functional** [1] - 102:4
**fund** [1] - 14:14
**fundamental** [4] - 87:10, 114:16, 140:24, 145:20
**fundamentally** [4] - 17:24, 19:12, 23:4, 84:4
**fundamentals** [3] - 104:17, 116:14, 139:8
**funded** [1] - 113:21
**funding** [1] - 114:1
**FUNDS** [1] - 1:4
**fungible** [1] - 132:25
**FURTHER** [1] - 80:21
**future** [13] - 25:4, 25:7, 39:18, 40:6, 40:7, 40:8, 40:12, 41:11, 47:11, 48:1, 62:4, 123:11, 123:16

### G

**GA** [1] - 1:17
**game** [1] - 25:2
**garden** [1] - 94:15
**gathered** [1] - 103:1
**gauging** [1] - 50:22
**gears** [1] - 43:22
**general** [7] - 11:3, 13:19, 21:2, 63:3, 63:16, 74:22, 97:11
**generality** [1] - 119:1
**generally** [5] - 13:13, 55:2, 55:25, 96:2, 110:25
**generic** [6] - 95:15, 95:17, 96:1, 116:9, 126:17, 126:20
**generics** [1] - 96:4
**gentleman** [1] - 102:19
**genuinely** [1] - 88:15
**Georgiou** [1] - 127:22

*United States District Court*

Gerald *[2]* - 97:20, 102:18
given *[2]* - 19:4, 132:22
glad *[1]* - 126:5
glass *[1]* - 108:11
go-forward *[2]* - 41:2, 42:6
gory *[1]* - 41:7
governing *[2]* - 113:12, 113:13
Government *[8]* - 24:7, 29:6, 33:16, 36:14, 36:21, 38:17, 46:25, 48:20
government *[4]* - 110:4, 113:18, 131:20, 137:8
Government's *[4]* - 33:18, 38:7, 38:11, 113:24
governmental *[1]* - 110:16
graduate *[1]* - 99:11
grand *[1]* - 145:7
grant *[2]* - 140:3, 140:24
granted *[4]* - 136:21, 140:11, 140:17, 143:16
grants *[3]* - 128:21, 129:2
great *[5]* - 3:9, 3:22, 4:1, 27:1, 85:25
greatest *[1]* - 120:1
Group *[1]* - 5:17
groups *[1]* - 90:3
growth *[1]* - 116:5
guess *[17]* - 8:7, 37:5, 48:10, 77:17, 78:17, 91:22, 93:21, 95:24, 98:2, 109:11, 110:21, 118:7, 120:20, 130:9, 140:19, 144:20, 145:19
guesstimate *[1]* - 140:15
guidance *[2]* - 50:20, 142:7
guidepost *[1]* - 114:25
guilty *[3]* - 25:12, 37:7, 142:5
guys *[1]* - 147:16

**H**

half *[2]* - 17:8, 125:6
HALMAN *[1]* - 1:3
hand *[7]* - 4:4, 49:11,

49:12, 52:10, 52:20, 92:2, 121:8
hands *[1]* - 14:18
handy *[1]* - 31:7
happy *[2]* - 102:6, 135:7
hard *[1]* - 6:15
harken *[1]* - 131:19
harm *[10]* - 15:1, 19:3, 19:7, 31:2, 33:13, 34:5, 40:16, 44:24, 45:1, 101:10
Harvard *[1]* - 99:11
HAVING *[2]* - 4:5, 52:11
headed *[2]* - 109:15, 111:5
heading *[2]* - 113:3, 113:15
heads *[1]* - 42:11
Health *[3]* - 19:14, 29:6, 47:1
hear *[7]* - 3:20, 3:21, 132:1, 138:12, 139:22, 141:20, 142:7
heard *[6]* - 27:17, 60:6, 106:7, 107:19, 121:3, 144:18
HEARING *[1]* - 1:5
hearing *[13]* - 26:18, 60:2, 61:2, 87:1, 89:20, 90:16, 91:15, 96:10, 100:17, 120:25, 121:2, 135:3, 135:23
heightened *[4]* - 20:1, 21:7, 30:19, 48:21
held *[1]* - 98:3
help *[1]* - 12:17
helpful *[7]* - 43:15, 43:19, 48:23, 50:22, 86:6, 111:7, 118:12
herring *[2]* - 122:21, 124:5
hesitant *[1]* - 29:3
hesitate *[2]* - 79:17, 127:20
HHS *[1]* - 19:15
hidden *[1]* - 138:17
hiding *[2]* - 134:16, 138:24
high *[2]* - 15:17, 55:9
high-level *[1]* - 15:17
higher *[2]* - 93:22, 98:15
highlighted *[2]* - 100:25, 145:23
highlighting *[2]* - 39:5, 46:7

highly *[1]* - 110:1
himself *[2]* - 55:19, 64:6
hinting *[1]* - 92:9
HIPPEL *[1]* - 2:2
historically *[1]* - 71:23
history *[1]* - 100:23
hit *[1]* - 110:22
honestly *[3]* - 12:7, 80:14, 105:6
Honor *[157]* - 3:6, 3:10, 4:25, 20:15, 26:14, 26:20, 26:24, 28:5, 28:11, 28:14, 31:9, 32:4, 32:7, 32:10, 37:16, 37:20, 37:23, 42:23, 43:6, 43:13, 44:17, 45:18, 51:15, 52:3, 52:22, 80:13, 84:7, 84:21, 84:25, 85:8, 85:9, 86:8, 86:9, 86:15, 86:22, 87:5, 94:12, 96:3, 105:6, 106:2, 106:5, 106:10, 106:12, 106:15, 107:6, 107:19, 107:23, 108:12, 108:17, 108:19, 108:22, 108:24, 109:7, 109:10, 109:11, 109:18, 109:22, 109:25, 110:11, 110:16, 110:23, 110:25, 111:2, 111:13, 111:19, 111:21, 112:4, 112:6, 112:11, 113:1, 113:4, 113:16, 113:22, 115:3, 115:14, 115:25, 116:12, 116:22, 116:25, 117:3, 117:15, 117:22, 117:24, 118:11, 118:20, 119:2, 119:4, 119:7, 119:16, 119:20, 120:9, 120:18, 120:23, 121:2, 121:6, 122:2, 123:19, 124:2, 124:8, 124:13, 125:13, 125:22, 125:25, 126:6, 127:5, 127:10, 129:15, 129:19, 129:20, 130:3, 130:13, 130:16, 130:22, 130:25,

131:9, 131:11, 131:24, 132:8, 133:23, 137:18, 137:20, 138:4, 138:16, 138:21, 139:5, 139:11, 139:14, 139:15, 139:25, 140:1, 140:17, 141:4, 141:8, 141:10, 143:13, 143:25, 144:18, 144:23, 145:1, 145:4, 145:12, 145:17, 145:22, 145:23, 146:7, 146:9, 146:12, 147:1, 147:2, 147:7, 147:11, 147:12
Honor's *[17]* - 45:21, 107:9, 107:12, 107:14, 107:21, 108:5, 108:21, 109:1, 111:9, 112:25, 113:2, 113:15, 114:2, 118:19, 121:19, 125:5, 140:24
HONORABLE *[1]* - 1:12
hope *[2]* - 6:18, 147:9
hopefully *[2]* - 12:17, 143:1
hot *[1]* - 29:1
hour *[1]* - 84:21
huge *[5]* - 41:16, 41:21, 89:25, 90:6, 136:7
Human *[3]* - 19:15, 29:6, 47:1
hundred *[7]* - 12:11, 21:25, 38:8, 38:11, 38:17, 105:9, 131:21
hundreds *[2]* - 8:15, 49:18
hyphen *[1]* - 52:17

**I**

idea *[1]* - 93:19
identical *[4]* - 123:16, 125:17, 144:22, 146:2
identified *[4]* - 56:6, 56:14, 56:20, 63:13
ignores *[1]* - 55:16
III *[4]* - 1:19, 109:9, 109:15, 110:14
illegal *[34]* - 32:25, 33:2, 33:13, 34:5,

34:15, 34:22, 37:3, 38:11, 38:13, 43:4, 59:10, 64:25, 65:13, 81:10, 81:21, 82:3, 82:15, 87:13, 87:20, 87:23, 88:14, 89:22, 89:25, 90:4, 91:7, 91:18, 92:17, 111:11, 111:15, 111:16, 112:8, 112:9, 131:14, 131:18
illegalities *[1]* - 28:25
illegality *[33]* - 23:19, 23:21, 24:24, 24:25, 25:13, 27:20, 28:4, 28:19, 56:10, 57:23, 58:6, 58:7, 65:17, 71:11, 82:22, 88:3, 88:11, 90:11, 108:6, 108:12, 120:2, 120:7, 134:12, 135:4, 135:6, 141:16, 141:20, 141:22, 141:24, 144:20, 146:15
image *[2]* - 17:11, 56:20
imagine *[3]* - 8:25, 37:10, 133:5
immaterial *[12]* - 23:22, 24:2, 32:25, 88:14, 108:13, 108:15, 108:16, 108:17, 111:14, 135:5, 136:5
immateriality *[1]* - 108:5
immediately *[2]* - 23:11, 144:15
impact *[15]* - 8:4, 10:5, 10:8, 42:6, 50:16, 50:18, 58:25, 59:16, 61:16, 62:20, 65:23, 65:24, 70:3, 71:21, 98:6
impacted *[2]* - 107:21, 136:14
implanted *[1]* - 49:16
implementation *[1]* - 13:5
implicate *[4]* - 19:18, 24:9, 29:9, 48:20
implicated *[5]* - 30:17, 44:22, 116:10, 116:21, 117:12
implicates *[2]* - 33:15, 47:1
implication *[1]* - 33:15
implications *[9]* -

17:4, 30:23, 35:3, 39:22, 51:4, 64:1, 135:21, 135:24, 140:7
**important** [8] - 58:22, 67:13, 108:21, 108:24, 110:11, 114:23, 121:18, 124:11
**importantly** [1] - 115:14
**imposition** [1] - 38:24
**impounded** [1] - 35:17
**impression** [1] - 117:9
**improper** [1] - 104:21
**inadvertent** [1] - 126:8
**inapplicable** [1] - 98:11
**inaudible** [2] - 33:17, 144:5
**inaudible)** [4] - 14:19, 56:23, 103:4, 138:15
**include** [13] - 8:12, 18:23, 95:21, 95:23, 100:1, 115:12, 120:12, 129:25, 132:11, 132:18, 132:21, 132:24, 138:13
**included** [9] - 26:7, 59:5, 95:20, 99:3, 100:4, 102:14, 121:24, 127:25, 132:20
**includes** [2] - 14:24, 101:12
**including** [13] - 4:16, 14:23, 40:7, 54:5, 90:2, 98:21, 99:7, 99:21, 100:3, 100:15, 107:16, 125:7, 125:8
**income** [4] - 29:21, 30:1, 30:15, 31:17
**incomplete** [1] - 9:4
**inconsequential** [2] - 103:2, 104:23
**inconsistent** [5] - 141:3, 142:1, 144:6, 144:10, 145:25
**incorporate** [1] - 42:22
**incorporates** [2] - 71:7, 101:17
**incorrect** [2] - 11:25, 135:22
**increase** [1] - 116:18
**increased** [11] - 18:5, 19:9, 21:3, 39:24, 68:19, 81:10, 81:21,

82:8, 82:18, 91:7, 103:4
**increases** [1] - 116:8
**increasing** [1] - 21:24
**incremental** [4] - 35:21, 36:13, 36:19, 39:9
**incrementally** [1] - 21:11
**incur** [1] - 128:4
**indeed** [2] - 24:6, 146:16
**Indeed** [1] - 92:13
**independent** [1] - 42:21
**INDEX** [1] - 2:7
**indicated** [2] - 31:16, 33:8
**indirect** [2] - 21:12, 114:1
**indirectly** [2] - 113:21, 116:10
**individual** [5] - 115:23, 121:22, 128:5, 129:13, 129:14
**indulge** [1] - 37:20
**indulgence** [1] - 121:19
**INDUSTRIES** [1] - 1:7
**industry** [3] - 10:16, 110:1, 116:10
**inefficiency** [1] - 19:1
**inefficient** [1] - 40:19
**inevitably** [2] - 92:16, 146:19
**inexorably** [1] - 138:25
**inflated** [5] - 29:23, 31:18, 68:12, 90:22, 98:20
**inflation** [12] - 44:7, 55:2, 55:3, 55:6, 96:12, 97:17, 112:17, 112:18, 112:22, 122:13, 122:14
**inflature** [2] - 101:19, 134:18
**influence** [2] - 22:19, 23:15
**information** [57] - 8:18, 8:19, 9:6, 13:11, 14:4, 14:7, 14:9, 14:10, 14:19, 15:12, 16:2, 16:6, 16:7, 16:12, 16:14, 16:19, 21:20, 21:22, 23:10, 23:15, 25:7, 35:14, 35:21, 36:19,

36:24, 39:10, 44:22, 46:6, 48:23, 49:20, 55:9, 56:1, 56:2, 56:4, 58:11, 58:15, 60:12, 60:15, 60:18, 60:19, 61:1, 62:25, 63:2, 63:3, 63:8, 63:25, 64:7, 78:20, 83:13, 83:15, 83:20, 101:9, 105:18, 112:12, 113:20
**informed** [1] - 30:16
**initial** [1] - 136:19
**injected** [1] - 46:1
**inquiries** [1] - 128:6
**inquiry** [1] - 123:15
**insists** [2] - 88:2, 88:10
**instance** [1] - 144:24
**instead** [2] - 63:25, 121:12
**institutions** [1] - 104:9
**insurance** [3] - 123:20, 123:22, 124:1
**Integrity** [1] - 40:17
**intend** [2] - 86:23, 121:13
**intent** [2] - 19:25, 147:3
**interchangeably** [2] - 102:8, 102:9
**interest** [4] - 94:25, 95:10, 121:11, 130:23
**interested** [2] - 103:13, 120:24
**interesting** [2] - 114:3, 128:7
**interlocutory** [5] - 140:3, 140:10, 140:15, 140:20, 140:22
**internal** [2] - 14:17, 117:13
**interpret** [2] - 87:10, 92:18
**interpretation** [4] - 71:5, 91:11, 92:22, 137:1
**interpreting** [2] - 75:3, 114:7
**investigated** [1] - 13:20
**investigation** [2] - 117:10, 117:14
**investigations** [3] - 54:9, 110:5, 110:16
**investing** [1] - 39:18
**investment** [2] -

74:22, 75:12
**investments** [1] - 54:1
**investor** [10] - 21:7, 25:8, 25:22, 26:6, 54:11, 102:22, 103:25, 104:21, 104:22, 125:10
**investor's** [1] - 40:20
**investors** [29] - 9:7, 11:7, 11:10, 11:22, 24:24, 25:6, 27:19, 28:3, 28:18, 30:16, 33:13, 34:5, 41:15, 89:24, 99:22, 100:4, 101:8, 101:12, 101:13, 102:7, 102:14, 132:22, 133:19, 134:12, 135:16, 135:20, 135:21, 135:23, 136:4
**invite** [3] - 20:1, 29:9, 30:19
**invited** [1] - 31:19
**invites** [1] - 100:12
**involve** [2] - 126:4, 137:7
**involved** [12] - 7:6, 44:13, 46:12, 67:5, 78:23, 79:10, 79:13, 96:4, 124:25, 132:15, 137:6, 142:18
**involvement** [1] - 121:11
**involves** [1] - 90:22
**involving** [6] - 22:1, 23:5, 25:11, 29:22, 77:21, 126:20
**Iowa** [1] - 53:24
**irrelevant** [4] - 120:10, 128:8, 128:25, 129:8
**IRS** [2] - 77:21, 79:21
**Irvine** [1] - 5:22
**isolate** [2] - 54:20, 63:10
**Israel** [16] - 99:12, 99:14, 99:19, 100:11, 101:8, 126:22, 127:6, 128:12, 128:14, 129:1, 129:2, 130:7, 131:1, 133:5, 133:16
**Israeli** [15] - 99:17, 99:20, 99:21, 99:25, 128:8, 128:9, 128:20, 129:13, 130:10, 130:20, 132:13, 132:20, 132:22

**Israeli-listed** [1] - 129:13
**issuance** [4] - 78:10, 78:15, 78:24, 79:10
**issue** [30] - 18:9, 22:8, 23:5, 29:1, 55:17, 57:23, 59:14, 59:18, 61:10, 61:25, 62:16, 62:18, 64:5, 68:8, 77:7, 90:2, 95:1, 99:3, 106:11, 107:1, 107:16, 112:11, 113:9, 121:14, 121:15, 122:21, 122:22, 123:2, 128:25, 145:21
**issue's** [1] - 34:21
**issued** [3] - 7:10, 24:7, 116:18
**issuers** [1] - 54:6
**issues** [15] - 6:12, 9:5, 23:7, 66:14, 68:3, 68:9, 83:22, 85:6, 86:23, 95:25, 113:17, 131:3, 136:22, 145:3, 146:5
**item** [1] - 136:2
**items** [1] - 54:7
**itself** [6] - 29:24, 46:16, 123:13, 123:18, 131:14, 144:9

**J**

**James** [4] - 3:7, 3:10, 38:4, 39:5
**JAMES** [3] - 1:9, 1:16, 1:19
**jargon** [1] - 134:18
**Jeffrey's** [1] - 39:15
**Jennifer** [1] - 52:15
**JENNIFER** [3] - 2:11, 52:11, 52:16
**job** [1] - 6:17
**JOHN** [1] - 1:16
**join** [2] - 130:4, 130:6
**joined** [1] - 54:8
**joking** [1] - 4:19
**Journal** [1] - 50:16
**JR** [1] - 1:16
**judge** [1] - 72:13
**Judge** [3] - 94:15, 120:16, 142:24
**JUDGE** [1] - 1:13
**Judge's** [2] - 90:9, 146:22
**judge's** [2] - 32:20, 59:4
**judgment** [3] - 103:14,

103:23, 140:4
**judicial** [2] - 141:2, 145:24
**juicing** [1] - 112:16
**jurisdiction** [2] - 128:14, 133:18
**jury** [1] - 142:4
**Justice** [4] - 17:20, 25:11, 25:15, 100:6
**justification** [1] - 144:6

## K

**KAREN** [1] - 1:12
**keep** [2] - 4:8, 133:18
**Kerry** [1] - 3:12
**KERRY** [1] - 1:20
**key** [3] - 108:19, 123:15, 133:9
**kickback** [23] - 14:15, 17:18, 17:21, 18:1, 18:20, 19:9, 19:13, 19:19, 21:13, 24:9, 29:22, 29:25, 30:6, 30:16, 31:18, 34:16, 41:10, 81:10, 81:21, 91:7, 92:8, 92:10
**kidding** [1] - 144:1
**Killorin** [9] - 3:7, 28:2, 106:11, 108:1, 108:23, 121:8, 130:21, 138:13, 138:23
**KILLORIN** [103] - 1:15, 2:9, 2:12, 3:6, 3:24, 4:11, 4:15, 4:18, 4:20, 5:8, 6:25, 9:19, 11:14, 11:18, 20:16, 20:20, 20:22, 26:4, 26:5, 26:13, 26:16, 26:20, 27:2, 28:5, 28:8, 28:11, 32:4, 35:8, 35:11, 44:11, 47:21, 51:15, 64:12, 64:17, 66:6, 67:1, 67:23, 70:18, 71:13, 75:24, 76:17, 80:9, 80:11, 80:13, 80:17, 80:22, 81:16, 81:20, 83:6, 84:7, 84:21, 84:24, 85:3, 85:5, 85:9, 85:14, 85:18, 85:20, 85:25, 86:9, 86:15, 86:19, 86:22, 87:5, 88:5, 88:8, 94:10, 94:12, 95:16, 95:19, 96:2, 96:7, 100:21, 101:18, 102:17, 104:8, 105:6, 105:11,

105:16, 105:22, 105:25, 106:2, 129:20, 132:6, 132:8, 133:22, 137:11, 137:13, 139:15, 141:8, 141:10, 141:12, 141:18, 142:15, 143:3, 143:9, 143:14, 143:22, 143:25, 144:2, 146:12, 147:1, 147:11
**killorin** [3] - 107:10, 121:3, 121:18
**Killorin's** [2] - 83:11, 120:24
**killorin's** [1] - 126:8
**kind** [9] - 17:8, 38:14, 89:5, 89:7, 91:11, 97:21, 98:9, 104:25, 133:7
**knowing** [3] - 121:8, 122:6, 145:15
**knowledge** [1] - 13:21
**known** [4] - 15:3, 101:19, 105:13, 134:18
**knows** [3] - 122:3, 130:25, 143:5

## L

**laid** [2] - 39:7, 66:14
**language** [8] - 78:18, 97:7, 97:12, 118:12, 123:14, 124:10, 124:14, 128:18
**large** [3] - 90:3, 91:4, 144:8
**largely** [9] - 23:22, 24:1, 32:25, 74:21, 88:13, 108:16, 108:17, 111:14, 135:5
**last** [7] - 5:5, 27:18, 27:22, 27:23, 98:2, 112:25, 140:12
**lately** [1] - 98:2
**Laughter** [2] - 80:20, 141:11
**laughter** [1] - 85:7
**law** [44] - 20:10, 60:3, 80:19, 88:23, 94:22, 97:6, 99:11, 99:15, 99:16, 99:25, 100:1, 105:16, 109:3, 109:16, 109:20, 110:25, 111:13, 113:8, 117:8, 118:1,

120:6, 120:13, 123:5, 124:9, 127:14, 128:15, 128:21, 129:1, 129:2, 129:6, 130:10, 130:22, 131:4, 131:12, 132:13, 132:20, 133:16, 134:7, 134:8, 135:18, 137:4, 137:16, 138:20, 139:3
**laws** [11] - 99:14, 100:7, 100:11, 110:3, 110:15, 113:12, 113:13, 128:12, 130:20, 131:2
**Laws** [1] - 113:3
**lawyer** [3] - 24:19, 37:9, 38:15
**layer** [1] - 102:5
**Lead** [1] - 94:22
**lead** [26] - 66:8, 78:21, 89:19, 89:25, 90:6, 92:11, 95:7, 95:9, 96:9, 97:20, 97:23, 98:24, 99:5, 102:24, 103:7, 103:10, 103:11, 103:16, 104:2, 105:3, 105:17, 105:18, 112:7, 112:9, 114:7, 139:2
**leading** [1] - 16:7
**leads** [4] - 25:8, 59:4, 104:25, 138:18
**learn** [2] - 80:19, 87:7
**least** [13] - 15:1, 19:11, 23:1, 34:21, 36:18, 39:5, 42:19, 42:23, 48:23, 50:24, 67:10, 114:10, 145:19
**leave** [3] - 84:9, 84:10
**leave-leave** [1] - 84:10
**leaves** [1] - 129:9
**leaving** [2] - 54:11, 111:20
**led** [2] - 104:16, 131:11
**left** [5] - 54:8, 115:9, 115:15, 115:17, 124:5
**legal** [30] - 11:13, 12:5, 12:7, 21:10, 21:15, 21:18, 21:21, 22:2, 26:1, 40:14, 46:1, 46:18, 46:21, 53:14, 65:4, 65:19,

65:20, 69:18, 70:21, 72:23, 73:6, 73:9, 73:10, 82:10, 88:22, 103:17, 110:4, 111:1, 146:5, 146:20
**legality** [3] - 23:19, 23:21, 49:10
**legally** [1] - 11:8
**legitimate** [1] - 111:24
**length** [1] - 118:8
**less** [1] - 144:7
**level** [7] - 15:17, 72:3, 83:23, 93:22, 119:1, 121:11, 121:24
**levelled** [1] - 45:23
**liabilities** [9] - 21:19, 39:16, 41:8, 41:25, 50:22, 51:1, 90:1, 90:6, 91:4
**liability** [46] - 6:6, 8:11, 13:7, 15:2, 19:3, 19:5, 21:24, 24:15, 33:11, 34:3, 34:24, 50:11, 53:13, 54:18, 54:22, 55:21, 61:12, 61:24, 62:23, 64:8, 65:2, 65:8, 65:9, 66:22, 72:23, 81:7, 84:1, 88:13, 89:9, 89:11, 90:20, 91:3, 107:15, 114:19, 118:14, 118:17, 118:23, 119:3, 119:15, 119:18, 120:8, 128:4, 128:9, 131:22, 131:25, 144:21
**Licht** [2] - 128:17, 128:20
**Licht's** [2] - 128:7, 129:1
**lifted** [1] - 144:13
**Light** [1] - 119:20
**light** [1] - 111:21
**likelihood** [6] - 19:10, 81:10, 81:22, 82:8, 82:19, 91:8
**likely** [1] - 39:14
**limitations** [1] - 125:7
**limited** [4] - 8:2, 114:9, 114:10, 117:14
**LIMITED** [1] - 1:7
**line** [4] - 31:12, 41:13, 105:4, 108:23
**lined** [1] - 25:4
**linked** [1] - 83:25
**list** [7] - 16:13, 20:5, 20:10, 95:13, 95:19,

95:22, 97:1
**listed** [16] - 16:6, 16:14, 44:12, 74:20, 75:13, 99:9, 99:25, 101:6, 126:3, 128:22, 129:3, 129:13, 133:10, 134:3
**listing** [3] - 100:23, 101:2, 129:4
**listings** [1] - 128:22
**lists** [1] - 95:12
**literally** [4] - 97:8, 119:17, 138:7, 145:6
**literature** [4] - 8:16, 45:4, 50:13, 59:24
**litigation** [16] - 12:20, 21:2, 21:7, 21:8, 21:21, 22:4, 22:15, 44:1, 50:12, 50:17, 54:9, 67:7, 72:19, 100:13, 124:21, 125:1
**live** [1] - 13:2
**LLP** [1] - 1:19
**loaded** [1] - 49:7
**London** [1] - 5:20
**look** [31] - 12:7, 16:12, 25:22, 26:6, 33:22, 35:24, 36:9, 50:19, 50:20, 60:17, 77:1, 77:5, 77:24, 78:11, 93:15, 107:6, 108:21, 109:1, 110:11, 114:2, 114:24, 121:18, 123:18, 128:1, 128:2, 128:4, 128:9, 128:17, 130:12, 131:4
**lookback** [5] - 98:4, 98:12, 98:14, 98:15, 98:21
**looked** [6] - 89:25, 90:4, 90:6, 123:23
**looking** [8] - 35:25, 50:23, 57:19, 69:19, 77:8, 91:19, 108:11, 131:17
**looks** [1] - 115:5
**loop** [1] - 118:25
**lose** [2] - 143:21, 143:24
**loser** [1] - 98:7
**loss** [7] - 15:15, 15:16, 18:9, 45:25, 49:1, 64:19, 65:8
**losses** [8] - 9:7, 12:18, 59:1, 59:5, 75:1, 89:2, 103:4, 104:2

**lost** [11] - 9:5, 22:8, 22:11, 45:16, 49:3, 53:17, 71:23, 90:21, 90:25, 103:12, 113:17
**love** [1] - 27:4
**lower** [3] - 25:24, 26:9, 114:24
**lowering** [1] - 40:8
**loyalty** [1] - 111:25
**LTD** [1] - 1:4
**lunch** [3] - 85:12, 85:24
**Luncheon** [1] - 86:10
**Lynette** [34] - 7:12, 72:1, 72:2, 76:10, 76:15, 94:19, 107:8, 108:20, 109:22, 109:24, 114:4, 114:6, 114:13, 114:22, 114:23, 114:24, 115:2, 115:4, 115:15, 115:16, 115:17, 116:3, 116:21, 117:2, 117:10, 117:11, 117:12, 117:16, 117:17, 117:23, 118:22, 119:4, 119:18, 136:11
**Lynette's** [5] - 116:5, 116:7, 116:10, 117:13

## M

**major** [3] - 50:22, 90:19
**majority** [1] - 82:16
**man** [1] - 97:9
**management** [1] - 142:16
**manager** [1] - 104:10
**mandate** [1] - 54:5
**mandated** [1] - 145:22
**manner** [8] - 6:5, 8:10, 13:6, 19:5, 43:12, 46:24, 54:17, 103:2
**map** [2] - 47:12, 127:15
**marginally** [3] - 141:16, 141:20, 144:19
**MARIETTA** [3] - 2:11, 52:11, 52:16
**Marietta** [35] - 9:15, 9:16, 9:20, 10:2, 10:4, 10:18, 10:25, 12:22, 12:25, 13:17,

15:12, 15:18, 16:6, 16:12, 21:5, 22:11, 23:6, 25:13, 30:13, 35:15, 46:8, 51:22, 52:4, 52:15, 52:16, 53:1, 53:2, 64:9, 64:14, 64:18, 88:15, 90:13, 112:4, 115:4, 131:17
**Marietta's** [12] - 13:11, 17:2, 17:8, 18:3, 18:8, 20:24, 22:23, 27:15, 35:3, 35:9, 45:24, 93:7
**MARIETTA-WESTBERG** [2] - 2:11, 52:11
**Marietta-Westberg** [4] - 9:15, 22:11, 52:15, 115:4
**Market** [2] - 1:10, 2:4
**market** [52] - 6:2, 6:12, 8:5, 10:15, 14:6, 15:18, 15:19, 15:23, 15:24, 16:1, 16:2, 16:25, 23:5, 23:14, 30:1, 35:3, 35:6, 35:16, 40:4, 55:11, 58:16, 58:18, 60:17, 61:1, 61:3, 62:3, 69:20, 78:11, 78:16, 79:21, 82:18, 90:5, 91:4, 92:6, 94:17, 97:18, 101:25, 104:13, 112:19, 112:24, 113:19, 116:6, 120:6, 131:6, 131:16, 134:4, 134:10, 134:21, 135:1, 135:4, 136:16
**market's** [2] - 21:1, 90:11
**marketing** [2] - 110:5, 110:17
**marketplace** [1] - 58:15
**markets** [3] - 40:9, 54:10, 116:11
**MARSTON** [1] - 1:12
**mask** [1] - 65:9
**master's** [1] - 5:19
**match** [4] - 17:12, 17:15, 85:3, 120:16
**matches** [1] - 101:20
**matching** [1] - 98:10
**material** [14] - 14:1, 22:13, 23:15, 39:10, 89:21, 89:23, 108:7, 116:19, 135:13, 135:16, 135:19,

135:21, 135:23, 136:3
**materiality** [1] - 135:14
**materialization** [1] - 23:1
**materialized** [1] - 110:9
**materially** [1] - 115:24
**materials** [1] - 64:24
**MATHIEU** [1] - 2:3
**matter** [11] - 6:4, 10:8, 12:23, 58:21, 60:3, 60:7, 74:24, 97:10, 136:20, 147:21
**Matter** [1] - 147:18
**matters** [7] - 45:5, 72:9, 74:22, 75:8, 75:11, 75:17, 99:12
**Matthew** [2] - 3:12, 3:14
**mature** [1] - 93:18
**maureen** [1] - 1:23
**Maureen** [1] - 147:23
**maureen_mchugh@ paed.uscourt.gov** [1] - 1:23
**MAXWELL** [1] - 2:2
**McHugh** [2] - 1:23, 147:23
**McMahon** [1] - 94:15
**mean** [24] - 6:15, 26:18, 37:5, 38:10, 40:6, 40:13, 43:2, 55:24, 79:4, 85:23, 88:4, 92:24, 93:17, 103:21, 104:20, 105:20, 119:9, 121:7, 126:12, 126:13, 129:7, 129:24, 143:2, 143:3
**meaning** [4] - 62:21, 92:16, 133:2, 146:19
**means** [19] - 21:16, 78:6, 87:21, 97:19, 97:20, 121:10, 123:17, 123:18, 124:17, 124:19, 125:22, 127:22, 127:25, 135:8, 136:1, 138:9, 138:10, 143:16, 144:21
**meant** [2] - 88:6, 119:10
**measure** [12] - 7:9, 11:6, 44:7, 54:20, 54:25, 55:1, 58:24, 61:11, 65:23, 70:3, 72:22, 118:25

**measuring** [1] - 66:21
**mechanical** [1] - 1:24
**mechanism** [1] - 101:21
**mechanisms** [1] - 44:20
**media** [1] - 14:21
**meets** [1] - 94:16
**member** [4] - 105:19, 122:2, 122:20, 124:20
**members** [6] - 100:15, 103:19, 116:5, 116:20, 122:20, 123:11
**members'** [1] - 141:13
**memoranda** [1] - 125:10
**memorandum** [1] - 124:8
**memorized** [1] - 4:16
**mention** [4] - 37:6, 79:22, 79:23, 95:12
**mentioned** [6] - 49:5, 78:12, 78:14, 91:6, 95:22, 108:19
**mentions** [1] - 19:9
**mere** [2] - 60:16, 131:14
**merely** [7] - 33:2, 39:13, 87:12, 87:19, 91:17, 108:13, 111:16
**merit** [3] - 22:17, 74:23, 75:2
**merits** [4] - 11:25, 12:20, 22:18, 46:4
**method** [32] - 6:5, 7:7, 7:22, 8:14, 11:4, 13:1, 13:5, 53:11, 54:20, 55:19, 58:23, 61:21, 61:22, 62:22, 63:21, 66:4, 66:14, 66:20, 66:22, 67:15, 67:18, 67:21, 67:24, 68:2, 68:8, 70:24, 72:21, 76:3, 83:3
**methodology** [48] - 7:1, 7:8, 7:14, 7:16, 8:6, 8:9, 8:12, 9:12, 10:25, 11:9, 11:20, 12:4, 17:3, 18:4, 20:25, 22:24, 44:9, 48:16, 49:16, 50:3, 50:5, 59:21, 60:1, 64:1, 66:8, 73:19, 73:22, 73:25, 74:3, 74:19, 75:18, 76:6, 76:12, 83:13, 83:25, 93:12, 94:3, 106:24,

107:17, 107:18, 114:18, 115:7, 115:10, 115:12, 115:16, 117:18, 119:2
**methods** [3] - 6:23, 7:1, 13:4
**mic** [1] - 4:8
**Michigan** [1] - 53:25
**middle** [1] - 5:5
**might** [19] - 19:15, 45:5, 45:8, 45:14, 60:11, 66:9, 68:11, 69:16, 79:12, 90:12, 93:17, 104:18, 105:5, 105:14, 126:15, 132:13, 133:5, 138:13, 141:14
**MILLIGAN** [1] - 1:16
**million** [3] - 21:25, 89:1, 103:12
**mind** [4] - 32:19, 41:19, 52:18, 86:24
**minus** [1] - 55:3
**minute** [12] - 26:13, 37:13, 51:16, 51:21, 76:23, 84:8, 84:11, 84:12, 94:9, 118:3, 129:16, 129:18
**minutes** [7] - 85:10, 85:17, 85:21, 85:23, 132:4, 137:22, 139:13
**mirror** [2] - 17:11, 56:19
**mirrors** [1] - 99:15
**mischaracterizes** [1] - 32:5
**misconduct** [2] - 50:18, 131:13
**misinterpretation** [1] - 93:6
**Misleading** [1] - 111:5
**misleading** [19] - 34:14, 88:23, 88:24, 88:25, 89:3, 89:18, 109:21, 110:20, 112:3, 113:13, 115:25, 116:19, 116:24, 117:6, 117:25, 134:8, 134:16, 135:10
**misled** [5] - 30:1, 89:18, 90:5, 92:6, 116:20
**mismatch** [35] - 17:4, 17:9, 18:8, 55:17, 55:22, 55:23, 56:6, 56:14, 56:20, 56:24,

*United States District Court*

| | | | | |
|---|---|---|---|---|
| 57:14, 57:25, 58:2, 58:21, 59:13, 59:17, 59:18, 61:10, 61:24, 62:18, 64:2, 64:5, 65:14, 65:15, 66:15, 67:16, 68:8, 73:23, 76:11, 76:16, 77:7, 83:3, 83:18, 89:8, 93:5 | **Monday** [1] - 22:5 **money** [5] - 98:16, 98:19, 98:22, 101:3, 104:10 **monitor** [1] - 18:25 **monitoring** [1] - 40:16 **month** [1] - 140:13 **months** [7] - 98:2, 121:9, 140:16, 142:22, 143:4, 143:5, 143:17 | 28:5, 28:8, 28:9, 28:11, 28:14, 28:16, 28:22, 29:11, 31:9, 31:11, 32:4, 32:7, 32:10, 32:11, 35:8, 35:9, 35:11, 35:12, 35:13, 37:16, 37:19, 37:23, 37:24, 40:22, 42:3, 42:21, 43:6, | 146:12, 147:1, 147:2, 147:6, 147:11, 147:12 **MS** [15] - 2:12, 2:13, 52:7, 52:18, 52:22, 52:25, 53:6, 58:20, 61:4, 64:9, 76:20, 80:12, 83:7, 83:10, 137:13 | 87:23, 90:13, 91:5, 93:4, 95:21, 106:21, 120:2, 134:24, 135:16, 135:17, 141:20 **nevertheless** [1] - 123:22 **New** [4] - 1:21, 100:23, 101:2, 101:12 |
| **mismatches** [1] - 56:21 **misplaced** [1] - 94:4 **misrepresentation** [11] - 54:21, 55:18, 56:5, 58:25, 65:2, 65:23, 67:17, 94:17, 134:3, 134:13, 141:23 | **morning** [7] - 3:6, 3:10, 27:8, 27:9, 53:1, 58:14, 107:24 **Morrison** [13] - 100:6, 102:10, 121:15, 126:1, 127:5, 127:7, 127:8, 128:16, 128:25, 129:5, | 43:8, 43:13, 43:15, 43:20, 43:21, 44:11, 44:14, 44:17, 45:18, 45:19, 47:21, 47:23, 48:15, 51:13, 51:15, 52:3, 64:12, 64:17, 66:6, 67:1, 67:23, 70:18, 71:13, 75:24, | **multiple** [4] - 31:10, 45:23, 51:8, 97:24 **must** [2] - 35:20, 142:5 **myriad** [1] - 128:5 | **new** [15] - 7:10, 14:6, 14:21, 16:7, 16:13, 16:19, 21:20, 23:15, 35:21, 39:10, 93:9, 123:21, 136:11, 144:18, 146:13 **news** [3] - 14:21, 21:17, 49:4 |
| **misrepresentations** [42] - 9:9, 10:5, 12:9, 15:16, 17:6, 17:16, 17:25, 29:19, 30:4, 31:14, 55:10, 56:3, 56:12, 58:4, 59:2, 59:6, 62:21, 63:5, 64:3, 64:22, 65:9, 65:12, 68:12, 69:7, 69:10, 69:13, 70:4, 70:17, 71:22, 82:14, 83:4, 83:21, 89:15, 96:13, 118:9, 125:18, 125:20, 134:2, 134:20, 134:23, 136:16, 136:24 | 130:16, 130:19, 138:12 **most** [10] - 7:2, 7:3, 20:4, 20:9, 28:13, 89:16, 102:11, 106:14, 111:21, 145:23 **mostly** [2] - 7:3, 21:8 **motion** [33] - 32:8, 32:20, 34:22, 82:1, 82:12, 84:19, 85:4, 86:25, 87:1, 87:10, 87:24, 88:19, 88:21, 89:20, 91:12, 91:16, 92:3, 92:4, 92:12, 92:22, 94:7, 94:13, 107:9, 107:12, 107:21, 108:3, | 76:17, 80:9, 80:11, 80:13, 80:17, 80:22, 81:16, 81:20, 83:6, 84:7, 84:21, 84:24, 85:3, 85:4, 85:5, 85:8, 85:9, 85:14, 85:15, 85:18, 85:20, 85:25, 86:8, 86:9, 86:15, 86:19, 86:22, 87:5, 88:5, 88:8, 94:10, 94:12, 95:16, 95:19, 96:2, 96:7, 100:21, 101:18, 102:17, 104:8, 105:6, 105:11, | **N** **N-Y-E** [1] - 5:6 **name** [9] - 4:9, 5:2, 5:4, 5:5, 52:13, 60:15, 133:7, 133:15 **named** [2] - 61:2, 121:22 **names** [3] - 3:5, 60:20, 133:4 **narrative** [1] - 92:19 **narrow** [1] - 90:24 **nation's** [1] - 92:20 **natural** [1] - 134:1 **naturally** [2] - 134:15, 136:23 **near** [6] - 60:25, | **next** [7] - 40:11, 49:7, 68:21, 94:13, 99:3, 136:2 **night** [1] - 106:16 **ninety** [1] - 98:21 **Ninth** [1] - 122:18 **nobody** [3] - 65:24, 89:23, 135:6 **non** [2] - 14:2, 126:3 **non-compliant** [1] - 14:2 **non-release** [1] - 126:3 **none** [4] - 69:22, 117:19, 141:3, 145:20 **north** [1] - 25:18 **note** [6] - 58:14, |
| **misrepresented** [5] - 29:20, 31:16, 69:17, 108:8, 116:4 **missing** [1] - 52:2 **misstatements** [6] - 88:20, 88:22, 90:2, 90:3, 122:14, 125:15 **misstates** [1] - 44:11 **mistaken** [1] - 90:8 **misunderstanding** [1] - 88:17 **misunderstood** [1] - 71:12 **model** [9] - 10:14, 22:6, 41:18, 42:2, 50:11, 60:19, 61:3, 68:5, 78:13 **modeling** [1] - 48:1 **modelling** [1] - 12:17 **models** [2] - 40:9, 50:24 **modern** [1] - 133:1 **mold** [1] - 94:21 **moment** [1] - 37:20 **momentarily** [1] - 52:4 | 134:2, 135:2, 144:16, 146:1, 146:15, 146:22 **motions** [2] - 26:25, 139:23 **motivate** [1] - 15:13 **move** [4] - 26:21, 36:20, 94:7, 95:5 **moved** [1] - 28:24 **movements** [1] - 78:5 **moving** [2] - 101:14, 133:22 **MR** [193] - 2:9, 2:10, 2:12, 3:6, 3:10, 3:14, 3:24, 4:11, 4:15, 4:18, 4:20, 5:8, 6:25, 9:19, 11:11, 11:13, 11:14, 11:18, 20:14, 20:16, 20:20, 20:22, 26:1, 26:4, 26:5, 26:13, 26:16, 26:20, 26:23, 27:2, 27:4, 27:7, 27:24, 28:1, | 105:16, 105:22, 105:25, 106:2, 106:5, 106:10, 106:14, 108:17, 109:7, 109:9, 109:14, 109:18, 111:9, 115:20, 118:11, 119:9, 120:5, 121:6, 121:17, 126:5, 126:13, 126:17, 126:21, 129:19, 129:20, 130:2, 130:6, 130:9, 130:15, 130:18, 131:9, 132:6, 132:8, 133:22, 137:10, 137:20, 137:23, 138:4, 138:7, 138:23, 139:14, 139:15, 139:25, 140:6, 140:9, 141:8, 141:10, 141:12, 141:18, 142:13, 142:15, 143:3, 143:9, 143:13, 143:14, 143:22, 143:25, 144:2, 144:18, 145:17, | 78:10, 78:16, 78:18, 78:21, 78:25 **necessarily** [7] - 19:23, 21:16, 33:17, 34:23, 37:5, 39:18, 139:7 **necessary** [3] - 42:13, 46:11, 124:7 **need** [14] - 39:19, 46:6, 66:9, 66:12, 69:24, 71:1, 84:10, 85:9, 106:5, 106:6, 115:13, 117:23, 118:18, 137:23 **needed** [1] - 106:24 **needing** [2] - 46:15, 98:10 **needs** [11] - 4:13, 44:16, 54:19, 69:1, 71:20, 72:18, 72:21, 84:3, 94:14, 107:6, 145:18 **negative** [1] - 61:15 **Neil** [1] - 114:6 **net** [1] - 10:15 **never** [19] - 8:1, 12:15, 46:6, 73:19, 73:22, 73:24, 76:5, 80:18, | 67:13, 74:14, 120:23, 121:25, 145:23 **noted** [4] - 59:7, 62:16, 68:9, 110:4 **notes** [1] - 114:14 **nothing** [12] - 5:10, 51:13, 51:15, 88:2, 88:10, 104:24, 105:17, 122:5, 129:10, 136:18, 144:19, 146:4 **notice** [5] - 86:5, 122:4, 122:6, 122:23, 127:19 **noticed** [1] - 119:14 **noting** [2] - 62:7, 75:8 **notion** [9] - 15:13, 21:6, 45:21, 92:5, 122:8, 122:21, 136:4, 137:24, 146:4 **nowhere** [1] - 56:22 **nuanced** [1] - 32:18 **nuances** [1] - 17:23 **number** [8] - 36:6, |

42:14, 46:11, 77:18, 97:20, 121:21, 121:25, 146:1
**NUMBER** [1] - 1:3
**numerous** [1] - 94:22
**nutshell** [1] - 70:1
**NY** [1] - 1:21
**Nye** [44] - 3:22, 3:23, 3:25, 5:5, 5:9, 5:13, 26:16, 27:8, 35:12, 45:22, 51:16, 53:10, 55:5, 55:22, 56:18, 59:12, 59:21, 61:10, 62:2, 63:7, 63:12, 63:15, 63:25, 64:6, 66:2, 66:21, 67:14, 68:1, 68:7, 69:3, 70:2, 71:17, 82:24, 83:12, 83:14, 83:19, 92:21, 106:17, 107:4, 107:10, 107:24, 122:12, 131:20, 135:4
**NYE** [2] - 2:9, 4:5
**Nye's** [30] - 52:19, 54:14, 54:23, 55:12, 55:13, 55:15, 58:23, 59:25, 60:18, 61:3, 61:21, 62:1, 62:5, 62:12, 63:6, 63:13, 65:21, 66:13, 70:24, 73:5, 74:2, 78:7, 78:13, 78:20, 79:16, 80:5, 83:2, 83:23, 120:11

### O

**o'clock** [1] - 132:3
**OBERMAYER** [1] - 2:2
**objected** [2] - 27:22, 108:1
**objection** [12] - 9:17, 11:11, 20:14, 20:19, 26:1, 26:12, 28:5, 28:11, 32:4, 44:11, 44:15, 47:21
**obligation** [1] - 131:12
**observed** [1] - 35:20
**obtain** [1] - 103:14
**Obviously** [1] - 147:8
**obviously** [8] - 57:1, 72:16, 77:21, 107:8, 127:8, 132:11, 136:7, 143:19
**occasions** [1] - 42:15
**occur** [4] - 14:6, 39:14, 72:18, 100:8
**occurred** [5] - 11:24, 22:4, 22:7, 24:10,

44:21
**occurs** [2] - 99:23, 101:5
**October** [1] - 147:25
**odd** [1] - 98:8
**OF** [1] - 1:1
**off-hand** [1] - 121:8
**offer** [1] - 10:18
**offered** [1] - 41:2
**offering** [1] - 125:10
**office** [1] - 3:8
**Official** [1] - 1:23
**offing** [1] - 42:6
**offshoot** [1] - 8:16
**often** [2] - 76:1, 102:7
**old** [6] - 14:7, 16:5, 16:13, 106:8, 133:2
**omissions** [8] - 29:20, 30:4, 30:5, 31:14, 101:11, 109:19, 116:19, 124:25
**omits** [1] - 14:3
**omitted** [1] - 108:9
**once** [3] - 54:8, 78:23, 79:9
**one** [54] - 21:14, 24:12, 27:18, 27:24, 36:18, 38:25, 44:12, 49:11, 50:24, 51:6, 51:10, 51:16, 52:22, 60:16, 64:23, 66:23, 67:12, 77:10, 80:9, 80:13, 80:15, 80:17, 80:18, 83:7, 89:11, 91:13, 92:20, 95:7, 100:17, 102:5, 107:19, 110:22, 114:7, 114:11, 115:20, 116:4, 117:1, 117:2, 117:5, 117:7, 119:19, 119:23, 120:15, 122:9, 122:19, 126:22, 130:16, 130:25, 131:19, 131:23, 136:7, 136:22, 137:23, 146:13
**ones** [11] - 67:10, 79:23, 117:23, 117:25, 118:2, 119:16, 126:21, 128:11, 144:22, 146:2, 146:3
**Ontario** [28] - 91:2, 95:2, 95:4, 95:7, 95:8, 95:11, 95:12, 95:25, 96:10, 96:13, 96:20, 96:22, 97:3, 97:4, 97:18, 102:13,

121:14, 122:2, 122:7, 124:9, 124:16, 125:5, 125:16, 125:20, 125:24, 126:13, 137:5, 137:15
**open** [4] - 3:2, 86:12, 129:22, 139:20
**operative** [2] - 98:4, 107:13
**opine** [5] - 6:4, 10:4, 49:13, 53:17, 90:17
**opined** [3] - 46:5, 83:22, 99:12
**opinion** [66] - 5:24, 9:14, 10:6, 10:8, 11:8, 11:13, 11:20, 12:22, 12:25, 13:11, 14:3, 14:10, 17:3, 17:10, 17:15, 18:3, 18:8, 20:24, 21:6, 22:24, 28:2, 28:23, 31:3, 33:8, 40:24, 41:3, 42:6, 42:8, 49:22, 55:14, 55:15, 59:12, 59:16, 62:5, 62:11, 63:12, 65:5, 65:16, 68:7, 69:3, 70:11, 72:1, 72:13, 82:10, 83:22, 90:14, 90:15, 92:21, 94:16, 104:2, 109:1, 109:2, 109:5, 110:12, 110:24, 111:5, 111:9, 113:1, 113:3, 114:24, 115:2, 116:23, 123:8, 141:12, 144:2
**opinions** [14] - 6:10, 7:19, 7:24, 8:3, 12:7, 27:16, 53:20, 54:14, 55:15, 72:9, 72:14, 73:12, 75:7, 141:13
**opioid** [3] - 21:8, 21:20, 22:4
**opportunity** [1] - 116:6
**oppose** [1] - 143:19
**opposed** [5] - 16:13, 31:3, 42:22, 75:25, 83:24
**opposing** [1] - 118:4
**opposite** [1] - 100:12
**opposition** [4] - 46:8, 88:1, 88:4, 88:9
**opt** [2] - 122:4, 122:24
**opted** [1] - 122:5
**OR** [2] - 4:5, 52:12
**ORAL** [1] - 1:5
**order** [12] - 7:21, 33:7,

71:1, 87:11, 91:11, 91:16, 93:6, 106:10, 137:1, 147:10, 147:16
**ordinary** [12] - 101:17, 127:8, 127:13, 127:14, 129:10, 130:1, 132:5, 132:7, 132:9, 132:11, 137:24, 138:2
**original** [4] - 4:11, 99:4, 133:19, 137:25
**originally** [5] - 34:25, 110:21, 127:13, 140:14, 140:18
**otherwise** [1] - 121:7
**ought** [1] - 144:15
**out-of-pocket** [10] - 7:7, 7:22, 8:14, 11:4, 13:1, 13:4, 54:25, 55:1, 94:3, 118:25
**outcome** [4] - 42:10, 50:23, 69:15, 132:16
**outcomes** [5] - 21:2, 39:12, 39:14, 39:21, 39:24
**outlined** [3] - 14:12, 48:19, 77:18
**outset** [1] - 49:5
**outside** [5] - 20:14, 26:2, 46:21, 59:2, 72:23
**overall** [1] - 62:11
**overhang** [1] - 44:1
**overhangs** [3] - 21:10, 21:15, 22:2
**overlap** [2] - 95:6, 96:13
**overlapping** [1] - 125:15
**overlaps** [1] - 126:23
**overreaching** [1] - 100:11
**overrule** [2] - 11:16, 44:15
**overruled** [1] - 47:22
**oversight** [1] - 18:24
**own** [14] - 13:23, 22:20, 23:8, 27:16, 39:25, 41:18, 41:19, 60:19, 68:5, 73:25, 74:3, 107:9, 131:4, 133:11
**owner** [1] - 74:8
**owns** [2] - 97:25, 98:3

### P

**p.m** [8] - 84:15, 86:10, 86:12, 129:21,

129:22, 139:17, 139:20, 147:18
**PA** [2] - 1:10, 2:4
**pace** [1] - 140:9
**page** [20] - 31:7, 31:12, 33:23, 36:1, 36:3, 36:10, 37:18, 37:21, 37:25, 62:1, 63:7, 72:25, 73:14, 78:3, 89:21, 92:13, 109:2, 109:6, 115:20, 124:14
**PAGE** [1] - 2:7
**pages** [6] - 14:11, 25:18, 35:25, 57:13, 57:15, 111:6
**pages'** [1] - 77:19
**pagination** [1] - 111:3
**paid** [1] - 51:1
**PAP** [7] - 24:8, 29:8, 44:21, 46:24, 49:11, 49:24, 92:15
**paper** [2] - 45:5, 48:12
**papers** [4] - 48:13, 50:19, 87:9, 108:3
**PAPs** [2] - 108:11, 113:21
**paragraph** [14] - 33:24, 35:24, 37:19, 39:15, 62:1, 63:6, 78:2, 78:3, 78:4, 81:15, 81:16, 81:17, 91:6, 128:25
**paragraphs** [1] - 81:8
**parameters** [1] - 145:19
**parcel** [1] - 90:7
**paren** [1] - 92:7
**park** [1] - 18:25
**Park** [1] - 1:20
**parlance** [1] - 133:11
**parlay** [1] - 90:9
**parse** [3] - 8:13, 124:10, 124:11
**parsing** [3] - 124:14, 124:18, 136:18
**part** [35] - 9:7, 15:1, 15:23, 19:2, 23:1, 33:14, 36:24, 40:24, 41:16, 44:11, 49:15, 53:15, 53:18, 65:10, 68:22, 69:1, 69:25, 70:19, 74:8, 76:1, 82:24, 87:16, 87:18, 87:20, 90:6, 90:8, 99:13, 100:25, 112:25, 116:2, 122:7, 124:4, 126:8, 134:13
**participants** [1] -

69:20
**participates** *[1]* - 103:24
**participation** *[2]* - 134:10, 135:19
**particular** *[2]* - 96:4, 134:7
**particularly** *[5]* - 94:20, 110:6, 110:17, 123:5, 146:8
**parties** *[4]* - 19:25, 121:20, 121:23, 126:25
**partner** *[4]* - 3:7, 3:12, 105:11
**parts** *[4]* - 12:8, 94:7, 94:13, 116:23
**passed** *[1]* - 99:14
**passing** *[2]* - 105:1, 106:16
**past** *[3]* - 6:11, 95:5, 143:10
**patent** *[1]* - 116:15
**paths** *[6]* - 13:12, 13:13, 13:16, 19:18, 29:16, 29:22
**patient** *[5]* - 19:20, 29:17, 30:18, 92:14, 146:17
**Patient** *[2]* - 13:16, 139:8
**pause** *[1]* - 52:6
**pay** *[1]* - 101:3
**paying** *[1]* - 17:18
**payments** *[2]* - 37:10, 50:25
**Pelletier** *[1]* - 113:4
**penalties** *[61]* - 14:24, 18:6, 19:10, 37:10, 40:13, 43:25, 44:24, 49:10, 49:24, 57:22, 59:9, 61:14, 62:10, 62:14, 64:20, 65:10, 68:20, 68:23, 69:6, 69:10, 69:16, 69:22, 69:24, 70:6, 70:14, 70:16, 70:19, 71:8, 71:15, 77:14, 79:3, 81:12, 81:23, 82:9, 82:20, 82:23, 91:9, 91:25, 106:19, 107:2, 107:3, 107:17, 110:7, 110:18, 112:8, 112:10, 112:25, 116:25, 119:25, 120:3, 120:7, 120:12, 131:6, 131:7, 135:22, 135:24, 136:6,

138:18, 138:25, 139:2, 139:4
**penalty** *[2]* - 37:1, 131:8
**pending** *[8]* - 126:22, 127:1, 127:3, 127:6, 130:25, 132:15, 140:19, 145:13
**PENNSYLVANIA** *[1]* - 1:1
**PENSION** *[1]* - 1:4
**people** *[3]* - 130:23, 131:17, 133:3
**per** *[1]* - 125:17
**percent** *[11]* - 12:11, 38:8, 38:12, 38:17, 101:4, 102:25, 131:21, 144:3, 144:4, 144:7, 146:23
**perfect** *[3]* - 91:14, 102:25, 105:18
**perfectly** *[7]* - 98:23, 102:24, 103:2, 104:2, 104:3, 104:13, 104:18
**performed** *[1]* - 13:3
**period** *[20]* - 6:3, 23:8, 24:8, 24:11, 42:17, 44:8, 45:10, 97:22, 98:5, 98:6, 98:13, 98:16, 98:25, 115:22, 125:4, 125:6, 125:12, 125:15, 125:23
**periods** *[1]* - 96:12
**permission** *[2]* - 52:7, 52:18
**permitted** *[1]* - 127:19
**person** *[5]* - 24:15, 27:11, 27:12, 124:1, 128:3
**personally** *[1]* - 46:12
**perspective** *[6]* - 55:25, 57:19, 70:23, 72:16, 72:17, 76:16
**pertaining** *[1]* - 90:2
**PETER** *[1]* - 1:16
**Peter** *[1]* - 3:8
**petitions** *[1]* - 139:23
**Ph.D** *[2]* - 5:21, 53:24
**PHARMACEUTICAL** *[1]* - 1:7
**pharmaceutical** *[8]* - 13:12, 13:18, 19:18, 23:7, 60:14, 110:1, 110:6, 110:18
**phase** *[16]* - 6:10, 6:23, 7:25, 8:2, 8:24, 9:3, 9:11, 11:25, 12:14, 12:20, 19:4,

22:18, 34:22, 46:4, 46:13, 95:7
**phases** *[1]* - 72:19
**Philadelphia** *[3]* - 1:10, 2:4, 3:8
**phrases** *[2]* - 81:19, 81:25
**physician/patient** *[1]* - 111:25
**place** *[13]* - 42:16, 43:3, 43:10, 43:11, 43:12, 103:6, 104:17, 109:1, 110:10, 114:19, 139:24, 140:25, 143:8
**places** *[3]* - 67:6, 81:16, 108:23
**plaintiff** *[48]* - 17:17, 24:12, 24:17, 31:25, 32:12, 33:1, 33:3, 34:12, 54:15, 64:18, 65:18, 82:1, 87:11, 87:13, 87:21, 88:1, 88:10, 89:6, 91:16, 91:20, 92:14, 93:10, 94:24, 95:7, 96:9, 97:20, 97:23, 98:22, 98:24, 99:5, 102:18, 102:24, 103:7, 103:10, 103:11, 103:16, 104:3, 104:7, 105:3, 105:17, 105:18, 105:19, 111:15, 111:17, 111:22, 118:9, 129:23, 146:16
**Plaintiff** *[6]* - 1:5, 1:18, 87:18, 88:1, 91:15, 109:18
**plaintiff's** *[22]* - 8:11, 15:2, 19:3, 23:18, 23:19, 23:25, 66:8, 88:13, 88:14, 88:17, 93:13, 94:22, 98:17, 106:20, 106:22, 108:24, 109:2, 115:7, 132:1, 136:13, 140:2, 147:3
**plaintiffs** *[32]* - 45:11, 50:9, 55:18, 56:11, 58:3, 58:5, 64:24, 65:1, 69:9, 75:1, 82:2, 87:7, 88:6, 107:20, 108:12, 108:25, 110:8, 110:19, 111:22, 114:4, 116:20, 116:24, 118:20,

119:22, 120:10, 123:14, 123:18, 128:6, 128:10, 128:20, 128:23, 129:8
**Plaintiffs** *[2]* - 92:5, 115:21
**plaintiffs'** *[41]* - 6:6, 13:7, 32:7, 33:11, 34:3, 34:23, 53:12, 54:19, 54:22, 55:20, 57:11, 59:5, 61:12, 61:24, 62:23, 64:7, 64:21, 65:7, 65:12, 66:22, 69:7, 69:12, 69:25, 70:17, 70:20, 70:22, 70:25, 71:7, 71:16, 71:24, 72:20, 72:22, 73:24, 76:11, 80:24, 81:1, 81:5, 81:9, 82:6, 82:12, 83:25
**play** *[1]* - 112:2
**playing** *[1]* - 134:17
**pleadings** *[1]* - 96:3
**pled** *[1]* - 89:7
**plenty** *[2]* - 137:4, 137:16
**plural** *[1]* - 101:16
**plus** *[1]* - 142:23
**pocket** *[10]* - 7:7, 7:22, 8:14, 11:4, 13:1, 13:4, 54:25, 55:1, 94:3, 118:25
**podium** *[3]* - 4:2, 86:16, 106:8
**point** *[21]* - 4:18, 6:8, 12:5, 17:14, 22:10, 40:3, 50:9, 54:16, 73:6, 77:2, 94:24, 101:3, 101:19, 104:1, 107:2, 120:11, 126:7, 130:19, 138:16, 145:20
**pointed** *[9]* - 29:16, 107:10, 122:1, 123:14, 130:21, 131:19, 131:24, 145:1, 146:13
**pointing** *[2]* - 36:6, 147:3
**points** *[4]* - 13:23, 110:16, 131:17, 146:13
**policies** *[1]* - 123:20
**policy** *[5]* - 123:4, 123:7, 123:22, 124:1, 145:4
**portion** *[1]* - 93:10

**portions** *[2]* - 93:13, 108:19
**pose** *[1]* - 19:19
**posed** *[1]* - 30:18
**position** *[16]* - 32:5, 72:18, 87:23, 88:11, 89:20, 90:4, 90:24, 90:25, 91:23, 92:4, 101:10, 133:20, 136:10, 136:24, 137:2, 141:4
**positions** *[1]* - 54:4
**possibility** *[1]* - 132:16
**possible** *[12]* - 9:1, 20:5, 20:10, 20:11, 26:8, 50:19, 66:9, 66:12, 68:6, 91:22, 120:2, 135:6
**possibly** *[4]* - 17:12, 67:24, 85:18, 85:20
**post** *[1]* - 36:6
**Post** *[1]* - 110:13
**post-DOJ** *[1]* - 36:6
**postings** *[1]* - 125:11
**postulate** *[1]* - 20:10
**posture** *[1]* - 145:6
**potential** *[44]* - 10:23, 14:24, 15:4, 18:6, 18:23, 21:2, 24:24, 25:11, 27:19, 28:4, 28:18, 39:11, 39:21, 40:6, 40:13, 43:25, 44:23, 49:9, 49:23, 50:23, 56:10, 57:8, 57:22, 59:8, 61:13, 61:17, 62:8, 62:13, 64:20, 65:2, 65:9, 65:17, 68:19, 68:20, 68:22, 69:6, 70:9, 71:11, 71:15, 77:13, 82:22, 106:19, 107:16, 108:6
**potentially** *[8]* - 13:22, 30:24, 30:25, 33:12, 34:5, 39:9, 39:16, 145:8
**practices** *[3]* - 110:5, 110:17, 123:19
**pre** *[2]* - 35:15, 109:10
**pre-corrective** *[1]* - 35:15
**pre-subpoena** *[1]* - 109:10
**precede** *[1]* - 108:14
**precise** *[1]* - 118:12
**precisely** *[3]* - 49:21, 75:16, 126:23
**precluded** *[2]* - 123:11, 123:12

| | | | | |
|---|---|---|---|---|
| **predicate** *[11]* - 97:14, 97:15, 123:15, 123:16, 123:24, 124:4, 137:3, 137:6, 137:7, 137:14, 137:15<br>**predictable** *[1]* - 90:7<br>**predicting** *[1]* - 104:15<br>**predominance** *[1]* - 114:19<br>**prefer** *[1]* - 53:2<br>**prefers** *[1]* - 9:15<br>**pregnant** *[1]* - 144:20<br>**prejudiced** *[1]* - 126:14<br>**premature** *[7]* - 9:10, 9:13, 22:12, 93:1, 140:21, 141:9, 145:9<br>**prepared** *[4]* - 9:22, 10:14, 22:20, 75:18<br>**present** *[7]* - 3:23, 9:1, 51:3, 52:4, 62:23, 76:24, 77:4<br>**presentations** *[1]* - 125:11<br>**presented** *[4]* - 63:12, 107:3, 123:12, 123:13<br>**presenting** *[1]* - 107:17<br>**president** *[2]* - 5:17, 74:10<br>**President** *[1]* - 102:23<br>**press** *[4]* - 115:23, 125:9, 125:16, 125:19<br>**presumably** *[1]* - 130:10<br>**presume** *[1]* - 16:1<br>**presumed** *[1]* - 15:18<br>**presumption** *[3]* - 105:3, 105:21, 105:23<br>**pretty** *[4]* - 46:3, 100:7, 125:21, 127:7<br>**prevail** *[1]* - 24:18<br>**preview** *[1]* - 85:8<br>**previous** *[2]* - 44:25, 82:11<br>**previously** *[7]* - 14:19, 23:1, 23:6, 23:10, 33:12, 34:4, 65:6<br>**price** *[98]* - 8:4, 10:5, 10:8, 10:9, 10:12, 10:19, 14:1, 14:4, 14:6, 14:8, 14:22, 16:3, 16:8, 16:10, 18:4, 18:22, 20:25, 22:25, 23:11, 24:22, 25:9, 25:25, 26:10, | 30:10, 31:20, 35:17, 35:19, 36:19, 36:25, 39:10, 40:10, 40:25, 41:6, 43:24, 44:6, 44:7, 44:18, 55:5, 55:6, 55:8, 56:3, 57:20, 58:23, 58:25, 59:4, 59:9, 60:21, 61:14, 62:13, 62:19, 65:16, 65:20, 65:22, 65:24, 66:4, 68:16, 68:17, 68:25, 69:1, 69:4, 69:5, 69:21, 70:3, 70:5, 77:24, 78:5, 78:13, 79:21, 80:3, 82:16, 83:18, 90:13, 90:14, 90:18, 95:13, 95:17, 96:1, 96:12, 96:14, 97:16, 97:17, 98:13, 98:15, 98:18, 98:19, 98:20, 104:11, 104:14, 116:7, 116:8, 116:17, 116:21, 122:11, 122:16, 126:9, 131:9, 136:17, 137:6<br>**price-fixing** *[2]* - 95:17, 116:8<br>**prices** *[5]* - 23:13, 23:16, 25:2, 39:17, 39:23<br>**pricing** *[5]* - 22:19, 47:13, 47:25, 116:7, 117:9<br>**primary** *[1]* - 107:1<br>**Princeton** *[1]* - 5:19<br>**principle** *[5]* - 41:15, 46:18, 47:7, 47:18, 114:16<br>**principles** *[1]* - 99:20<br>**probabilities** *[2]* - 25:2, 25:6<br>**probability** *[4]* - 25:3, 39:13, 47:12, 135:4<br>**problem** *[7]* - 62:18, 63:13, 63:20, 112:20, 114:25, 120:9, 133:1<br>**problems** *[3]* - 15:13, 21:21, 26:8<br>**procedure** *[1]* - 92:11<br>**proceed** *[4]* - 44:13, 106:12, 119:21, 128:10<br>**proceeding** *[2]* - 6:10, 140:9<br>**Proceedings** *[1]* - 1:24<br>**proceedings** *[2]* - | 110:4, 147:21<br>**process** *[7]* - 102:6, 122:22, 122:24, 123:1, 133:8, 142:17, 143:15<br>**produced** *[3]* - 1:25, 73:25, 103:5<br>**product** *[3]* - 45:3, 111:25, 132:25<br>**products** *[4]* - 45:3, 110:6, 110:18, 117:9<br>**professional** *[1]* - 53:22<br>**Professor** *[3]* - 128:7, 128:17, 129:1<br>**professor** *[4]* - 53:25, 63:18, 99:11, 99:12<br>**professors** *[1]* - 8:17<br>**profit** *[3]* - 40:4, 77:10, 77:13<br>**profits** *[8]* - 30:7, 41:2, 41:11, 62:4, 77:6, 77:8, 77:12, 116:11<br>**program** *[23]* - 19:20, 30:18, 43:11, 49:11, 56:11, 58:11, 59:10, 60:13, 64:25, 78:21, 78:24, 79:10, 79:13, 82:3, 82:15, 92:14, 112:7, 112:15, 134:5, 134:11, 134:24, 134:25, 146:17<br>**Program** *[2]* - 113:7, 139:9<br>**Programs** *[1]* - 13:16<br>**programs** *[2]* - 29:17, 60:14<br>**progression** *[1]* - 10:14<br>**prohibited** *[3]* - 19:22, 29:8, 30:20<br>**projection** *[2]* - 90:21, 90:25<br>**projections** *[1]* - 40:21<br>**prompt** *[1]* - 141:1<br>**proof** *[1]* - 24:23<br>**properly** *[2]* - 92:18, 103:22<br>**propose** *[3]* - 10:25, 71:17, 106:24<br>**proposed** *[4]* - 12:4, 73:19, 73:22, 76:12<br>**proposes** *[2]* - 58:23, 70:2<br>**proposing** *[1]* - 71:20<br>**proposition** *[1]* - 120:15<br>**propping** *[1]* - 114:1<br>**prosecution** *[5]* - | 89:4, 89:19, 90:20, 136:5, 136:6<br>**protect** *[2]* - 94:25, 99:7<br>**protecting** *[1]* - 130:22<br>**prove** *[6]* - 20:12, 24:18, 25:16, 50:9, 92:14, 146:17<br>**proved** *[1]* - 89:13<br>**proven** *[3]* - 20:6, 93:25, 135:15<br>**provide** *[6]* - 5:23, 11:20, 72:9, 82:10, 84:3, 102:7<br>**provided** *[12]* - 6:7, 6:9, 54:4, 59:12, 59:21, 59:23, 60:1, 60:4, 74:15, 74:18, 75:7, 113:19<br>**PROVIDENT** *[1]* - 1:3<br>**provides** *[3]* - 17:13, 62:3, 66:8<br>**providing** *[1]* - 25:14<br>**province** *[1]* - 128:23<br>**public** *[7]* - 13:21, 60:12, 77:22, 100:25, 115:22, 115:24, 117:5<br>**publically** *[2]* - 13:14, 101:9<br>**publication** *[1]* - 23:12<br>**publicly** *[2]* - 16:1, 77:22<br>**published** *[2]* - 23:13, 50:16<br>**Puerto** *[2]* - 7:11, 72:2<br>**punitive** *[1]* - 141:13<br>**purchase** *[5]* - 55:4, 98:20, 124:2, 124:23, 125:3<br>**purchased** *[4]* - 98:14, 104:6, 105:5, 129:25<br>**purchasers** *[2]* - 99:7<br>**purchases** *[8]* - 97:25, 98:3, 98:7, 98:12, 98:17, 98:18, 105:14<br>**purely** *[3]* - 12:5, 72:17, 73:6<br>**purport** *[1]* - 92:5<br>**purpose** *[2]* - 10:15, 95:25<br>**purposes** *[2]* - 92:18, 141:21<br>**pursue** *[1]* - 147:4<br>**put** *[49]* - 4:12, 8:17, 17:3, 18:3, 20:24, 22:24, 25:15, 49:22, 51:22, 53:11, 54:19, 54:24, 55:18, 55:19, | 56:11, 58:3, 61:11, 61:21, 61:22, 62:21, 63:25, 66:20, 66:23, 67:14, 67:20, 67:24, 68:1, 68:2, 72:21, 74:3, 74:5, 76:5, 79:19, 81:4, 83:3, 83:12, 83:17, 83:25, 84:4, 93:12, 99:10, 101:22, 101:24, 102:1, 112:1, 113:8, 115:16, 118:9, 127:17<br>**puts** *[2]* - 54:25, 116:3<br>**putting** *[1]* - 76:1<hr>**Q**<hr>**qualifications** *[1]* - 26:24<br>**qualified** *[4]* - 26:19, 96:11, 98:24, 103:11<br>**qualify** *[1]* - 26:21<br>**quality** *[1]* - 111:24<br>**quantify** *[1]* - 13:1<br>**quantitative** *[1]* - 5:19<br>**questioning** *[1]* - 83:11<br>**questions** *[18]* - 26:16, 27:13, 27:18, 59:4, 64:10, 76:21, 76:22, 80:7, 83:6, 94:6, 94:22, 112:4, 120:18, 125:25, 127:10, 129:15, 129:23, 141:5<br>**quick** *[5]* - 44:11, 66:7, 80:13, 83:7, 146:12<br>**quickly** *[3]* - 139:13, 139:22, 140:1<br>**quite** *[1]* - 40:19<br>**quote** *[16]* - 13:11, 32:7, 34:18, 36:13, 39:15, 62:2, 81:9, 82:7, 88:1, 89:21, 111:12, 116:16, 128:20, 138:8, 138:9<br>**quotes** *[2]* - 62:7, 113:4<br>**quoting** *[4]* - 33:7, 33:8, 34:24, 88:8<hr>**R**<hr>**raise** *[6]* - 4:3, 24:10, 52:9, 65:22, 95:1, 136:9<br>**raised** *[8]* - 54:14, 56:18, 68:3, 97:2, 97:3, 125:1, 126:5, 144:17 |

raises [2] - 13:9, 135:3
raising [2] - 13:5, 57:1
ramifications [2] - 14:23, 18:10
rat [1] - 134:11
Rather [1] - 91:20
rather [5] - 16:11, 33:3, 87:13, 106:12, 111:17
ratified [1] - 94:4
rational [2] - 26:7, 104:24
rationale [1] - 100:14
Raymond [2] - 38:4, 39:5
re [2] - 21:1, 108:4
re-assessment [1] - 21:1
re-characterization [1] - 108:4
reach [3] - 55:13, 107:7, 128:24
reacted [1] - 60:18
reacting [7] - 61:1, 61:3, 78:16, 112:19, 112:24, 120:6, 131:6
reaction [3] - 61:6, 78:14, 131:9
reactions [2] - 37:25, 69:5
reacts [1] - 135:4
read [24] - 17:11, 33:9, 34:2, 67:1, 67:3, 81:18, 87:8, 91:13, 95:3, 97:2, 97:7, 105:8, 105:9, 105:10, 108:2, 109:22, 111:9, 115:17, 116:23, 118:21, 119:4, 119:16, 123:8, 128:19
reading [7] - 7:21, 16:15, 16:16, 23:16, 119:10, 138:10, 146:20
ready [1] - 144:12
real [4] - 18:25, 107:2, 131:13, 133:9
reality [3] - 92:7, 97:13, 116:15
realize [2] - 100:5, 140:8
really [13] - 12:11, 45:16, 49:6, 86:3, 107:1, 114:25, 121:13, 123:2, 127:7, 133:6, 135:7, 137:20, 137:23
realm [1] - 46:21

rearrangements [1] - 86:5
reason [10] - 122:23, 123:4, 128:7, 131:1, 132:23, 135:12, 136:20, 138:4, 138:14, 146:8
reasonable [3] - 25:22, 26:6, 104:18
reasonably [3] - 25:23, 89:5, 89:19
reasons [13] - 92:6, 93:7, 99:8, 112:2, 122:16, 135:14, 135:20, 135:24, 136:18, 140:24, 144:24, 145:4, 145:12
REBMANN [1] - 2:2
rebut [3] - 105:3, 105:20, 105:23
recent [3] - 7:13, 22:4, 94:19
recently [1] - 102:22
recess [8] - 51:21, 51:24, 84:15, 86:10, 129:16, 129:21, 132:3, 139:17
recitation [1] - 119:14
recognize [1] - 129:5
recognized [2] - 63:9, 107:20
recollection [2] - 11:25, 105:8
Record [1] - 67:3
record [8] - 3:5, 4:9, 4:13, 5:3, 50:8, 52:14, 100:25, 147:21
recorded [1] - 1:24
records [2] - 103:1, 103:4
recover [1] - 138:24
recoverable [2] - 44:3, 65:18
red [3] - 102:5, 122:21, 124:4
redefined [1] - 107:14
redirect [2] - 76:19, 76:20
REDIRECT [2] - 2:13, 83:9
reduced [2] - 62:4, 70:9
refer [7] - 42:15, 55:16, 56:1, 56:22, 68:15, 74:20, 82:11
reference [5] - 37:21, 63:15, 105:2, 111:4, 121:8

references [1] - 63:16
referred [5] - 7:7, 29:16, 39:1, 124:25, 138:8
referring [4] - 34:18, 46:17, 111:19, 130:11
refers [2] - 55:8, 78:2
reflected [3] - 14:4, 14:8, 16:3
refresh [1] - 105:8
refreshed [1] - 105:11
regard [1] - 130:13
regarding [29] - 7:1, 21:7, 23:20, 54:14, 65:2, 68:12, 74:18, 79:20, 83:23, 87:6, 96:1, 98:8, 113:8, 113:11, 113:13, 113:20, 116:20, 134:4, 134:5, 134:6, 134:8, 134:9, 134:23, 134:25, 135:17, 135:19, 137:3, 146:14
regardless [1] - 122:15
registration [1] - 125:10
regress [1] - 144:23
regression [1] - 12:16
regulated [1] - 110:1
regulation [1] - 92:11
regulations [4] - 13:22, 13:25, 110:3, 113:12
regulator [2] - 25:5, 37:9
regulatories [1] - 116:25
regulators [4] - 13:20, 15:8, 23:8, 91:25
regulatory [25] - 18:24, 19:10, 20:1, 20:5, 20:11, 21:3, 24:10, 29:10, 30:9, 30:20, 31:19, 45:1, 46:14, 47:2, 48:21, 50:14, 54:9, 81:11, 81:22, 82:9, 82:19, 91:8, 115:22, 116:17, 117:7
reinvest [1] - 104:18
reissue [1] - 101:25
reiterate [1] - 19:14
reject [1] - 8:1
rejected [1] - 72:13
relate [5] - 29:15, 117:25, 124:22, 125:3, 125:8

related [13] - 8:19, 24:14, 29:21, 31:17, 43:25, 47:9, 74:21, 77:20, 79:4, 123:19, 141:16, 141:19, 141:21
relates [2] - 79:5, 126:11
relating [1] - 57:6
relative [1] - 39:10
relatively [1] - 141:1
release [26] - 57:21, 58:24, 60:17, 60:25, 95:2, 95:4, 96:17, 96:20, 97:11, 97:19, 98:25, 121:14, 121:17, 121:21, 122:6, 123:3, 123:4, 123:21, 123:23, 124:5, 124:19, 125:23, 126:3, 137:3, 137:15
released [9] - 24:23, 60:20, 95:5, 97:10, 121:23, 124:16, 124:17, 125:25, 127:2
Releases [1] - 96:21
releases [7] - 97:6, 97:13, 115:23, 123:7, 125:9, 125:17, 125:19
relevance [1] - 34:4
Relevant [1] - 110:13
relevant [3] - 8:7, 23:15, 109:10
reliability [1] - 55:13
reliably [1] - 50:15
relied [2] - 111:20, 117:4
relief [2] - 140:2, 140:21
relies [1] - 96:23
relying [1] - 119:25
remain [6] - 4:3, 52:9, 116:3, 118:18, 119:15, 132:15
remained [3] - 116:16, 117:1, 117:16
remaining [1] - 115:18
remains [1] - 119:19
remember [7] - 31:4, 31:21, 67:11, 81:13, 115:3, 116:22, 122:11
render [1] - 11:21
rendered [1] - 7:19
renders [1] - 112:3
rep [1] - 122:19
repeat [5] - 11:17,

20:7, 23:23, 26:3, 27:25
repeatedly [3] - 110:10, 111:23, 135:5
repercussions [1] - 25:23
reply [16] - 4:12, 9:22, 13:10, 17:2, 18:2, 20:23, 22:23, 33:20, 35:23, 37:17, 41:4, 56:18, 62:5, 63:6, 107:10
report [79] - 4:12, 7:10, 7:20, 9:20, 9:22, 9:23, 10:18, 11:15, 11:23, 13:17, 15:6, 16:16, 16:17, 17:8, 17:14, 17:23, 21:9, 21:17, 21:23, 22:3, 22:9, 23:4, 23:12, 23:13, 25:13, 25:17, 27:15, 27:16, 33:20, 34:19, 35:3, 35:8, 35:10, 35:23, 36:1, 37:13, 37:14, 37:15, 37:17, 39:1, 39:7, 41:5, 42:21, 45:24, 46:21, 48:19, 50:3, 50:21, 51:8, 52:19, 52:23, 53:10, 54:14, 54:23, 55:12, 55:16, 56:18, 56:22, 62:1, 62:2, 62:7, 63:6, 66:7, 66:13, 66:18, 67:6, 68:9, 73:5, 76:24, 78:2, 78:7, 88:16, 90:20, 92:24, 93:7, 94:2, 99:10, 128:7
reported [2] - 34:13
Reporter [2] - 1:23, 15:25
reporter [1] - 53:5
Reporter/ Transcriber [1] - 147:23
reports [10] - 4:23, 8:8, 21:5, 36:7, 40:3, 42:9, 42:14, 66:11, 67:8, 131:16
represent [2] - 102:1, 104:9
representations [1] - 124:25
representative [1] - 123:10
representing [1] - 116:13
reputation [1] - 45:4

*reputational* [6] - 14:25, 19:11, 40:15, 44:24, 45:1, 50:17
*request* [3] - 140:2, 140:20, 141:9
*requested* [1] - 74:2
*require* [1] - 117:18
*required* [16] - 19:24, 33:1, 33:3, 49:23, 83:12, 87:12, 87:14, 87:19, 87:22, 91:17, 91:20, 106:23, 111:11, 111:16, 111:17, 113:10
*requirement* [1] - 129:4
*requirements* [1] - 12:6
*requires* [1] - 24:4
*reschedule* [1] - 142:24
*Research* [2] - 54:8, 74:8
*research* [1] - 8:18
*reserve* [1] - 94:13
*reserved* [1] - 12:19
*reside* [1] - 101:23
*residency* [1] - 128:3
*resolution* [4] - 144:3, 144:5, 145:13, 145:18
*resolve* [2] - 95:25, 133:17
*resolved* [2] - 46:4, 131:3
*respect* [6] - 30:1, 99:6, 109:3, 114:1, 114:3, 121:17
*respected* [2] - 92:20, 99:17
*respond* [4] - 70:24, 85:22, 94:14, 129:17
*responded* [1] - 103:8
*responding* [2] - 59:3, 94:14
*response* [12] - 10:10, 35:20, 44:19, 46:8, 75:11, 83:11, 105:2, 119:1, 122:5, 128:6, 132:2, 141:21
*responses* [1] - 22:25
*responsibilities* [2] - 103:10, 103:16
*rest* [7] - 64:24, 65:12, 86:24, 93:14, 121:13, 121:23, 144:21
*result* [27] - 9:8, 11:21, 27:19, 28:3, 28:18, 35:19, 37:3, 38:16,

40:5, 40:12, 43:24, 57:2, 57:9, 61:9, 77:7, 77:12, 107:15, 110:3, 110:6, 110:18, 116:5, 120:7, 122:13, 122:14, 128:23, 135:9, 143:15
*resulting* [6] - 37:2, 76:3, 79:13, 88:19, 91:24, 94:18
*resume* [1] - 85:16
*retained* [1] - 5:23
*Retirement* [1] - 7:11
*returns* [1] - 8:21
*reveal* [1] - 112:2
*revealed* [8] - 14:10, 17:19, 36:24, 55:11, 56:1, 104:14, 135:1, 139:6
*revealing* [1] - 44:20
*revelation* [8] - 9:8, 14:6, 33:12, 34:4, 94:18, 131:10, 134:15, 134:25
*revelations* [1] - 82:17
*revenue* [3] - 34:13, 41:1, 77:5
*revenues* [5] - 30:6, 34:13, 42:7, 71:23, 139:7
*review* [11] - 7:13, 19:24, 42:9, 55:12, 56:14, 56:16, 67:22, 68:24, 70:15, 73:18, 82:21
*reviewed* [5] - 9:25, 59:9, 68:1, 68:7, 70:13
*reviewing* [3] - 66:20, 68:16, 75:2
*revised* [2] - 40:4, 76:8
*revising* [2] - 68:18, 69:23
*revisions* [2] - 61:16, 76:2
*revisit* [1] - 146:9
*revive* [1] - 93:21
*Rico* [2] - 7:11, 72:2
*rise* [7] - 3:1, 51:23, 84:14, 139:16, 139:18, 141:23, 147:15
*risk* [19] - 13:23, 19:19, 23:2, 23:8, 30:18, 49:9, 49:23, 91:1, 107:3, 112:24, 116:20, 116:23, 117:12, 131:6,

131:7, 131:18, 138:18, 138:25, 142:1
*risks* [6] - 21:8, 23:6, 23:11, 116:24, 117:6, 139:4
*road* [1] - 26:9
*Road* [1] - 1:17
*Robert* [1] - 3:6
*ROBERT* [1] - 1:15
*robust* [2] - 8:18, 49:19
*Roland* [1] - 5:4
*ROLAND* [2] - 4:5, 5:5
*role* [3] - 75:2, 103:10, 118:22
*Romanette* [3] - 109:9, 109:15, 110:14
*ropes* [1] - 121:23
*roses* [1] - 25:4
*Roswell* [1] - 1:17
*RPR* [1] - 147:23
*rule* [1] - 48:6
*Rule* [1] - 118:6
*ruled* [1] - 135:16
*rules* [2] - 99:15, 110:3
*ruling* [2] - 140:16, 146:22
*rulings* [1] - 99:16
*run* [3] - 13:22, 133:15, 145:5
*runs* [1] - 15:8
*rush* [1] - 43:19

### S

*sale* [5] - 55:3, 68:13, 124:3, 124:23, 128:5
*sales* [15] - 42:7, 42:12, 61:16, 61:18, 70:10, 71:23, 77:5, 77:8, 110:5, 110:17, 112:16, 112:17, 114:2, 123:19
*samples* [1] - 50:14
*sanctions* [1] - 92:24
*satisfy* [1] - 67:25
*save* [1] - 53:4
*saw* [1] - 42:20
*Scalia* [1] - 100:6
*Scalia's* [1] - 120:16
*scenario* [1] - 38:23
*scenarios* [1] - 40:8
*schedule* [2] - 141:1, 143:18
*scheduled* [2] - 140:18, 143:14
*scheme* [71] - 14:15,

17:18, 17:21, 18:1, 18:20, 18:22, 19:9, 19:13, 21:13, 25:14, 25:23, 29:22, 29:25, 30:6, 30:16, 31:18, 33:2, 33:4, 34:16, 41:10, 42:15, 42:25, 43:3, 43:9, 43:10, 49:12, 49:24, 57:6, 57:13, 57:16, 65:13, 68:12, 68:14, 81:10, 81:21, 82:18, 87:12, 87:14, 87:19, 87:22, 88:24, 88:25, 89:3, 89:4, 89:17, 89:21, 89:23, 90:4, 90:12, 90:22, 91:4, 91:7, 91:17, 91:21, 91:24, 92:8, 92:10, 97:17, 108:6, 111:16, 111:18, 112:7, 113:20, 116:16, 126:10, 135:19, 136:8, 137:7, 145:7
*schemes* [1] - 116:9
*school* [5] - 80:19, 106:8, 130:10, 130:24, 132:14
*School* [1] - 5:20
*science* [2] - 5:20, 47:10
*scientifically* [1] - 50:15
*scope* [6] - 6:1, 20:14, 26:2, 53:7, 123:3, 124:5
*screening* [1] - 47:3
*Scripts* [1] - 14:13
*scrutiny* [17] - 19:10, 20:2, 20:5, 20:11, 21:3, 24:10, 29:10, 30:10, 30:20, 31:19, 48:21, 81:11, 81:23, 82:9, 82:20, 91:9, 116:17
*se* [1] - 125:17
*seated* [4] - 3:3, 4:7, 52:1, 86:13
*SEC* [9] - 13:23, 54:8, 54:11, 63:19, 67:5, 102:6, 109:20, 125:16, 125:19
*SEC's* [2] - 54:5, 54:11
*second* [8] - 17:8, 38:4, 45:20, 87:16, 87:20, 106:5, 107:8, 117:5
*Second* [1] - 94:15
*secondly* [1] - 93:2
*Section* [17] - 7:4, 7:5,

7:6, 7:22, 8:10, 11:5, 24:14, 24:15, 32:1, 32:13, 37:14, 89:12, 109:11, 109:14, 118:6, 118:7, 124:15
*section* [11] - 13:17, 15:11, 40:2, 109:8, 109:9, 109:11, 110:12, 110:14, 111:4, 111:5
*Securities* [5] - 10:16, 24:14, 54:3, 93:23, 125:4
*securities* [49] - 6:3, 7:4, 10:13, 11:21, 12:6, 18:5, 20:4, 20:9, 20:13, 21:1, 22:15, 55:3, 55:4, 74:6, 74:11, 74:16, 75:6, 89:1, 89:6, 89:10, 94:16, 94:20, 98:21, 99:4, 100:13, 101:1, 101:16, 104:4, 104:20, 114:11, 114:14, 127:10, 127:11, 127:12, 128:8, 128:12, 128:15, 128:22, 129:4, 129:13, 130:20, 131:2, 131:15, 132:11, 135:11, 138:8, 142:4, 144:5
*Security* [2] - 89:12, 125:9
*security* [8] - 6:17, 55:8, 99:15, 99:16, 133:6, 138:2, 138:3, 144:3
*see* [24] - 3:15, 3:21, 23:12, 27:10, 34:6, 36:11, 36:16, 38:5, 38:7, 39:3, 39:4, 50:21, 71:7, 71:9, 73:8, 80:10, 86:7, 124:13, 138:9, 141:14, 145:9, 146:8, 146:22
*seeing* [1] - 81:8
*seek* [3] - 89:1, 89:6, 134:1
*seeks* [2] - 92:14, 146:17
*seem* [3] - 19:2, 19:12, 113:22
*segue* [1] - 127:5
*sell* [1] - 45:3
*seller* [1] - 98:9
*semantics* [3] - 134:17, 136:9,

136:10
**semicolon** *[1]* - 91:20
**send** *[1]* - 63:20
**senior** *[1]* - 102:18
**sense** *[11]* - 51:4,
  89:22, 101:11,
  106:14, 108:18,
  118:13, 122:17,
  132:24, 133:18,
  134:14, 146:10
**sentence** *[6]* - 87:16,
  87:18, 87:21, 90:10,
  91:14, 91:19
**separate** *[5]* - 69:6,
  70:16, 71:4, 87:3,
  96:15
**separately** *[1]* - 87:2
**separation** *[1]* -
  117:19
**September** *[5]* - 1:11,
  140:18, 143:1,
  143:11, 145:16
**series** *[3]* - 38:3,
  77:17, 116:18
**serve** *[2]* - 74:23, 95:9
**served** *[3]* - 54:11,
  75:15, 75:16
**serves** *[1]* - 102:20
**Services** *[3]* - 19:15,
  29:6, 47:1
**session** *[4]* - 51:25,
  84:17, 86:11, 139:19
**set** *[4]* - 36:24, 48:23,
  69:7, 131:2
**settings** *[1]* - 7:9
**settle** *[1]* - 144:4
**settled** *[4]* - 13:19,
  45:11, 97:8, 123:9
**settlement** *[16]* - 18:6,
  37:6, 44:24, 60:18,
  79:22, 100:3,
  104:19, 123:10,
  123:17, 124:9,
  124:16, 124:20,
  132:18, 132:21,
  144:8
**settlements** *[9]* -
  44:12, 60:15, 60:20,
  61:2, 77:20, 78:5,
  78:12, 78:14, 79:4
**several** *[4]* - 35:25,
  54:1, 62:6, 63:16
**shall** *[1]* - 86:15
**SHAPIRO** *[2]* - 2:3,
  3:14
**Shapiro** *[2]* - 3:12,
  3:14
**share** *[9]* - 101:20,
  132:5, 132:7,
  133:11, 133:14,

134:4, 134:10,
  136:17, 138:2
**Shared** *[1]* - 113:7
**shared** *[3]* - 134:10,
  134:23, 134:25
**shareholders** *[2]* -
  100:1, 103:15
**shares** *[23]* - 64:19,
  98:1, 99:7, 101:17,
  101:25, 102:2,
  104:6, 124:3, 127:8,
  127:13, 127:14,
  128:11, 129:10,
  130:1, 132:9,
  132:12, 132:25,
  133:3, 133:6, 134:5,
  137:24, 138:8
**sheet** *[1]* - 91:1
**Sherman** *[1]* - 118:16
**shift** *[1]* - 45:21
**shifting** *[1]* - 43:22
**ships** *[1]* - 106:16
**shocking** *[1]* - 14:21
**short** *[7]* - 85:5, 85:11,
  85:12, 85:13, 86:5,
  98:9, 147:10
**short-seller** *[1]* - 98:9
**shorten** *[1]* - 98:24
**shortened** *[2]* - 97:22,
  98:6
**show** *[6]* - 40:3, 54:16,
  62:12, 79:21, 92:2,
  142:5
**shown** *[1]* - 100:17
**sic** *[1]* - 33:23
**sic)** *[1]* - 101:19
**side** *[1]* - 12:10
**sides** *[1]* - 22:15
**sidesteps** *[1]* - 64:5
**significance** *[1]* -
  113:23
**significant** *[11]* -
  10:17, 19:19, 30:18,
  39:6, 39:9, 41:6,
  78:4, 109:24,
  126:25, 127:4
**significantly** *[2]* -
  23:13, 39:24
**silence** *[1]* - 144:21
**similar** *[5]* - 48:3,
  72:7, 72:8, 115:5,
  117:23
**similarly** *[2]* - 21:18,
  96:15
**simple** *[3]* - 98:23,
  120:3, 127:7
**simplify** *[1]* - 120:1
**simply** *[16]* - 87:20,
  93:6, 93:18, 94:4,
  95:11, 97:15, 99:25,

100:21, 101:11,
  102:5, 102:7,
  118:23, 133:16,
  133:18, 134:17,
  137:1
**simultaneously** *[1]* -
  63:9
**single** *[5]* - 93:23,
  93:24, 101:20,
  124:1, 136:15
**sit** *[3]* - 48:16, 86:19,
  146:8
**sitting** *[1]* - 143:2
**situation** *[2]* - 63:22,
  100:6
**skip** *[1]* - 113:14
**skipping** *[2]* - 111:25,
  124:18
**slammed** *[1]* - 91:1
**slip** *[3]* - 109:2, 109:4,
  137:13
**slowing** *[1]* - 142:16
**smelled** *[2]* - 89:24,
  134:11
**smells** *[1]* - 135:3
**SMITH** *[92]* - 1:19,
  2:10, 3:10, 11:11,
  11:13, 20:14, 26:1,
  26:23, 27:4, 27:7,
  27:24, 28:1, 28:9,
  28:14, 28:16, 28:22,
  29:11, 31:9, 31:11,
  32:7, 32:10, 32:11,
  35:9, 35:12, 35:13,
  37:16, 37:19, 37:23,
  37:24, 40:22, 42:3,
  42:21, 43:6, 43:8,
  43:13, 43:15, 43:20,
  43:21, 44:14, 44:17,
  45:18, 45:19, 47:23,
  48:15, 51:13, 52:3,
  85:4, 85:8, 85:15,
  86:8, 106:5, 106:10,
  106:14, 108:17,
  109:7, 109:9,
  109:14, 109:18,
  111:9, 115:20,
  118:11, 119:9,
  120:5, 121:6,
  121:17, 126:5,
  126:13, 126:17,
  126:21, 129:19,
  130:2, 130:6, 130:9,
  130:15, 130:18,
  131:9, 137:20,
  137:23, 138:4,
  138:7, 138:23,
  139:14, 139:25,
  140:6, 140:9,
  142:13, 143:13,

144:18, 145:17,
  147:2, 147:6, 147:12
**Smith** *[1]* - 3:10
**so-called** *[4]* - 21:12,
  22:17, 23:5, 41:9
**Solar** *[1]* - 74:23
**solely** *[1]* - 71:21
**solution** *[4]* - 134:5,
  134:10, 134:24,
  134:25
**Solutions** *[1]* - 113:7
**solve** *[2]* - 63:13,
  63:20
**someone** *[2]* - 42:18,
  63:19
**sometimes** *[7]* - 7:5,
  8:3, 8:4, 8:5, 18:24,
  22:22
**somewhere** *[3]* -
  42:20, 43:6, 43:7
**soon** *[1]* - 120:15
**sophisticated** *[2]* -
  69:20, 102:21
**Sorry** *[1]* - 143:22
**sorry** *[27]* - 3:13,
  11:17, 14:15, 18:16,
  20:7, 23:23, 27:25,
  45:11, 71:12, 73:10,
  75:9, 79:5, 88:5,
  88:8, 95:16, 101:25,
  103:21, 105:11,
  105:22, 112:18,
  119:20, 129:24,
  130:2, 132:6, 134:6,
  135:18, 136:6
**sort** *[12]* - 61:19,
  87:17, 88:12, 90:16,
  92:2, 92:4, 93:5,
  100:12, 105:2,
  120:10, 122:22,
  131:1
**sought** *[1]* - 99:6
**sound** *[2]* - 25:20,
  53:4
**sounds** *[5]* - 30:8,
  31:22, 65:19,
  116:12, 117:1
**source** *[8]* - 17:13,
  29:21, 30:1, 30:15,
  31:2, 31:16, 69:14,
  113:9
**sources** *[1]* - 112:1
**spawning** *[1]* - 93:9
**speaking** *[3]* - 66:4,
  82:15, 83:16
**speaks** *[2]* - 29:24,
  78:15
**Special** *[4]* - 19:16,
  24:6, 29:7, 33:18
**special** *[2]* - 97:22,

98:10
**speciality** *[1]* - 41:20
**specialty** *[2]* - 110:6,
  110:17
**specific** *[10]* - 8:20,
  8:21, 13:8, 15:14,
  47:16, 48:9, 63:21,
  77:1, 78:1, 96:4
**specifically** *[7]* - 8:8,
  13:14, 35:25, 47:1,
  50:20, 56:25, 127:1
**speculating** *[1]* - 37:9
**speculative** *[1]* -
  142:23
**speed** *[1]* - 140:1
**spell** *[3]* - 4:9, 5:2,
  52:13
**spent** *[2]* - 27:13, 54:3
**spot** *[3]* - 38:8, 38:12,
  38:17
**spreadsheets** *[1]* -
  14:17
**spur** *[1]* - 76:21
**Square** *[1]* - 2:3
**squarely** *[3]* - 19:21,
  19:22, 30:20
**stage** *[12]* - 9:13, 66:8,
  66:18, 67:7, 74:23,
  75:2, 93:1, 93:12,
  94:1, 106:22,
  127:17, 136:19
**stale** *[1]* - 16:6
**stand** *[6]* - 4:1, 31:23,
  34:10, 112:5, 140:1,
  147:6
**standalone** *[1]* - 76:5
**standard** *[2]* - 7:8,
  56:20
**standards** *[1]* - 103:7
**standing** *[2]* - 4:3,
  52:9
**standpoint** *[1]* -
  127:19
**stands** *[3]* - 108:8,
  112:14, 131:1
**Stanford** *[1]* - 5:16
**star** *[2]* - 115:1, 115:20
**start** *[8]* - 3:19,
  106:10, 113:16,
  114:16, 125:23,
  138:17, 139:23,
  144:15
**started** *[3]* - 6:22,
  15:11, 72:20
**starting** *[2]* - 42:24,
  114:19
**starts** *[1]* - 143:6
**state** *[6]* - 3:4, 4:9, 5:2,
  41:4, 52:13, 69:12
**State** *[1]* - 53:25

*statement* [4] - 107:10, 110:16, 113:17, 125:17
*statements* [38] - 88:19, 88:24, 88:25, 89:3, 89:18, 109:10, 110:19, 112:3, 113:6, 113:11, 113:12, 115:22, 116:19, 117:6, 117:8, 118:1, 120:5, 124:24, 125:8, 125:10, 125:11, 134:5, 134:6, 134:8, 134:9, 134:12, 134:16, 135:10, 135:13, 135:15, 135:17, 135:19, 135:25, 136:2, 136:3, 139:3
*Statements* [4] - 110:13, 111:6, 134:3, 134:4
*States* [4] - 99:11, 100:8, 101:4, 101:23
*states* [9] - 19:21, 25:3, 25:7, 47:1, 47:11, 48:1, 62:2, 63:7
*STATES* [2] - 1:1, 1:13
*stating* [1] - 72:10
*statistical* [1] - 60:19
*statistically* [2] - 10:17, 78:4
*statute* [30] - 15:5, 17:21, 19:19, 19:22, 19:23, 23:20, 24:5, 24:9, 25:12, 29:9, 30:18, 30:21, 30:24, 32:2, 32:14, 33:16, 36:15, 36:22, 37:3, 38:14, 38:18, 44:22, 46:23, 47:2, 48:21, 57:2, 89:13, 137:8, 142:6
*statutes* [3] - 7:5, 24:1, 24:13
*stay* [19] - 32:8, 84:9, 87:1, 92:3, 92:4, 92:5, 92:12, 108:3, 122:15, 139:13, 139:23, 139:24, 140:17, 140:24, 143:19, 144:12, 144:24, 145:19, 146:15
*stayed* [8] - 99:19, 130:5, 130:7, 130:25, 132:15, 144:23, 145:12

*stem* [1] - 82:23
*stems* [1] - 87:9
*stenography* [1] - 1:24
*step* [3] - 29:14, 93:8, 131:23
*still* [8] - 90:3, 97:25, 98:3, 98:7, 98:23, 140:11, 143:1, 143:7
*stipulation* [2] - 124:9, 124:15
*stock* [62] - 14:1, 14:4, 14:6, 22:13, 23:11, 23:13, 23:16, 24:22, 25:2, 25:8, 25:24, 26:10, 27:18, 28:2, 28:17, 30:10, 31:19, 35:6, 35:17, 36:19, 39:11, 39:17, 39:23, 40:10, 45:14, 60:21, 65:16, 68:11, 68:13, 68:16, 68:17, 78:13, 90:13, 90:14, 90:18, 90:19, 94:18, 96:12, 96:14, 98:3, 98:12, 100:9, 101:7, 101:21, 102:3, 104:11, 104:12, 104:22, 112:10, 122:11, 122:16, 124:24, 128:5, 128:11, 131:15, 131:22, 133:4, 133:11, 138:9
*Stock* [6] - 99:8, 99:24, 100:16, 100:24, 101:2, 101:13
*stocks* [2] - 99:24, 133:10
*stop* [2] - 45:20, 132:2
*stopped* [1] - 43:5
*straightforward* [2] - 95:3, 99:9
*STRAWN* [1] - 1:19
*Strawn* [1] - 3:11
*street* [3] - 133:4, 133:7, 133:14
*Street* [2] - 1:10, 2:4
*strength* [1] - 91:22
*strong* [1] - 62:3
*structure* [4] - 29:8, 30:17, 33:15, 44:21
*structures* [6] - 13:20, 19:17, 19:21, 20:1, 24:9, 46:24
*students* [2] - 54:2, 63:18
*studies* [2] - 8:22, 22:16

*study* [12] - 7:8, 8:16, 22:12, 41:5, 48:22, 49:16, 49:19, 50:3, 50:5, 63:10, 63:12, 63:16
*stuff* [1] - 105:13
*stumping* [1] - 97:9
*sub* [1] - 93:9
*subject* [14] - 17:24, 30:19, 47:2, 48:21, 65:13, 81:11, 81:22, 82:8, 82:19, 91:8, 97:21, 101:10, 128:22, 129:4
*submit* [4] - 117:22, 118:21, 124:23, 145:7
*Subpoena* [1] - 110:13
*subpoena* [3] - 77:21, 79:22, 109:10
*subsequent* [4] - 53:25, 54:10, 60:25, 82:12
*subsequently* [1] - 82:1
*substantial* [4] - 10:13, 104:1, 110:7, 110:18
*substantively* [1] - 140:7
*succeeding* [1] - 116:14
*success* [10] - 64:23, 82:5, 92:7, 92:8, 108:9, 111:24, 112:1, 112:3, 113:9, 139:6
*successful* [17] - 33:4, 56:13, 58:5, 58:8, 58:9, 58:12, 58:13, 69:14, 71:10, 87:15, 91:21, 97:24, 102:18, 102:20, 111:18, 113:22, 131:21
*successfully* [1] - 89:13
*succinct* [1] - 104:1
*sudden* [1] - 6:22
*sue* [1] - 44:23
*suffer* [3] - 9:7, 33:13, 34:5
*suffered* [3] - 10:16, 11:22, 75:1
*sufficient* [1] - 15:21
*sufficiently* [1] - 111:23
*suggest* [4] - 108:1, 119:5, 121:7, 124:4
*suggested* [2] -

106:21, 119:22
*suggesting* [1] - 79:25
*suggests* [1] - 123:5
*Suite* [2] - 1:17, 2:4
*suited* [1] - 94:20
*suits* [1] - 92:17
*summarize* [5] - 13:10, 17:2, 18:2, 20:23, 22:23
*summary* [1] - 140:3
*supervising* [1] - 63:18
*supplemental* [1] - 128:14
*support* [5] - 21:6, 54:5, 59:23, 60:5, 91:14
*supported* [2] - 134:22, 139:7
*supporting* [1] - 134:19
*supposed* [2] - 93:12, 122:1
*Supreme* [2] - 102:10, 138:15
*surprise* [1] - 15:7
*surprised* [2] - 87:7, 146:23
*survive* [1] - 88:19
*survived* [2] - 90:3, 135:12
*susceptible* [1] - 115:15
*suspense* [1] - 140:19
*sustain* [2] - 20:19, 26:11
*SWORN* [2] - 4:5, 52:12
*synonymous* [1] - 129:11
*System* [1] - 7:11
*system* [2] - 29:17, 133:15

**T**

*TAF* [2] - 34:16, 78:5
*talks* [1] - 22:3
*tape* [1] - 102:5
*TASE* [13] - 99:8, 99:24, 100:4, 100:16, 101:13, 102:15, 128:11, 128:21, 129:3, 129:11, 132:22, 132:24, 133:5
*taught* [1] - 54:1
*TDF* [1] - 34:16
*teaching* [1] - 63:18
*technical* [2] - 38:15,

89:22
*technically* [3] - 32:19, 101:24, 102:11
*Tel* [3] - 99:8, 99:24, 100:16
*ten* [1] - 77:19
*term* [18] - 28:25, 44:4, 44:5, 46:1, 46:2, 48:3, 48:7, 48:8, 48:12, 49:3, 49:4, 55:5, 55:22, 55:23, 55:24, 62:24, 62:25, 135:8
*termination* [1] - 140:19
*terms* [16] - 12:12, 38:15, 49:7, 62:12, 72:21, 78:6, 95:3, 96:16, 102:8, 121:11, 121:20, 128:5, 131:5, 133:2, 146:6
*territorially* [1] - 100:8
*testified* [11] - 35:4, 35:12, 43:23, 44:1, 44:18, 51:7, 51:8, 51:9, 72:6, 83:15, 106:25
*TESTIFIED* [2] - 4:6, 52:12
*testifying* [1] - 72:8
*testimony* [20] - 5:9, 8:2, 14:12, 24:22, 27:14, 31:15, 31:21, 31:23, 35:2, 35:5, 35:14, 44:12, 49:5, 59:25, 60:2, 72:17, 74:11, 74:18, 74:20, 83:19
*testing* [1] - 60:19
*tethered* [1] - 97:13
*TEVA* [1] - 1:7
*Teva* [80] - 10:13, 10:16, 17:20, 21:2, 21:3, 21:18, 21:21, 24:1, 25:24, 26:8, 33:1, 33:3, 34:15, 35:6, 35:16, 36:14, 38:10, 39:10, 56:9, 56:12, 60:15, 60:20, 61:2, 64:19, 64:22, 69:13, 77:21, 78:12, 78:14, 78:20, 78:23, 79:9, 79:22, 79:23, 87:12, 87:14, 87:19, 87:22, 88:22, 89:18, 90:5, 90:21, 91:15, 91:17, 91:20, 95:13, 97:21, 97:25, 98:1,

98:3, 98:8, 98:12, 98:15, 99:4, 99:7, 99:9, 99:23, 100:22, 101:1, 101:21, 103:3, 103:14, 104:1, 109:19, 109:21, 109:25, 110:4, 111:15, 111:17, 111:23, 112:1, 113:9, 113:20, 121:21, 124:3, 125:3, 132:11, 133:11, 134:4, 134:23

**Teva's** [36] - 6:2, 13:13, 13:23, 18:5, 21:1, 21:7, 23:8, 23:20, 29:15, 32:2, 32:13, 32:25, 40:24, 59:10, 60:13, 68:12, 81:9, 81:21, 82:3, 82:15, 91:1, 91:7, 92:14, 101:1, 109:3, 109:15, 110:15, 111:14, 113:3, 113:7, 113:12, 134:10, 135:25, 138:7, 146:17

**THE** [260] - 1:1, 1:12, 3:1, 3:3, 3:9, 3:13, 3:15, 4:1, 4:3, 4:7, 4:14, 4:16, 4:19, 4:22, 4:25, 5:1, 5:4, 6:14, 6:15, 6:17, 6:18, 6:20, 6:21, 9:18, 11:12, 11:16, 11:17, 18:12, 18:14, 18:15, 18:16, 20:19, 26:3, 26:11, 26:15, 26:18, 26:21, 27:1, 27:3, 27:23, 27:25, 28:7, 28:15, 28:21, 28:24, 28:25, 29:2, 29:3, 32:9, 37:15, 37:18, 37:22, 40:17, 40:18, 41:12, 41:15, 41:17, 41:18, 41:20, 41:22, 41:23, 41:24, 42:1, 42:2, 42:20, 43:1, 43:7, 43:9, 43:14, 43:18, 44:15, 44:18, 45:16, 47:22, 48:4, 48:6, 48:7, 48:11, 48:14, 51:14, 51:16, 51:18, 51:19, 51:20, 51:21, 51:23, 51:25, 52:1, 52:5, 52:9, 52:13, 52:15, 52:21, 52:23, 53:5, 56:24, 57:4, 57:5, 57:7, 57:9, 57:17,

57:24, 58:2, 58:7, 58:10, 58:12, 58:13, 58:16, 58:17, 58:19, 60:23, 60:24, 64:11, 64:15, 65:24, 66:1, 66:2, 66:3, 66:24, 67:4, 67:8, 67:10, 67:12, 67:18, 67:20, 70:5, 70:8, 70:11, 70:15, 70:25, 71:3, 71:6, 71:9, 75:20, 75:21, 76:19, 76:21, 77:1, 77:3, 77:7, 77:16, 78:1, 78:6, 78:8, 78:17, 78:19, 79:1, 79:8, 79:12, 79:15, 79:17, 79:24, 79:25, 80:2, 80:3, 80:4, 80:6, 80:10, 80:16, 80:18, 81:15, 81:18, 83:8, 84:6, 84:8, 84:14, 84:16, 84:18, 84:23, 85:1, 85:6, 85:11, 85:16, 85:19, 85:23, 86:1, 86:11, 86:13, 86:17, 86:21, 87:3, 88:4, 88:6, 94:9, 94:11, 95:15, 95:17, 95:23, 96:6, 100:20, 101:15, 102:16, 104:5, 105:1, 105:9, 105:15, 105:20, 105:23, 106:1, 106:4, 106:9, 106:13, 108:15, 109:4, 109:8, 109:13, 109:17, 111:8, 115:19, 118:3, 119:8, 120:4, 121:5, 121:16, 126:2, 126:12, 126:15, 126:19, 129:16, 129:23, 130:4, 130:8, 130:14, 130:17, 131:5, 132:1, 132:7, 133:21, 137:12, 137:19, 137:22, 138:1, 138:6, 138:22, 139:12, 139:16, 139:18, 139:21, 140:5, 140:8, 141:6, 141:9, 141:17, 142:12, 142:14, 143:1, 143:7, 143:11, 143:20, 143:23, 144:1, 144:17, 145:15, 146:11, 146:25, 147:5,

147:8, 147:13, 147:15, 147:16

**themselves** [1] - 107:20

**theories** [7] - 89:9, 118:14, 118:17, 119:15, 120:11, 147:5, 147:6

**theory** [69] - 6:6, 8:11, 13:7, 15:2, 15:23, 16:1, 19:3, 19:4, 19:7, 19:12, 23:18, 23:19, 23:25, 31:2, 31:3, 33:5, 33:11, 34:3, 34:23, 35:3, 47:13, 47:25, 50:11, 53:12, 54:17, 54:22, 55:21, 57:11, 61:12, 61:24, 62:23, 64:7, 65:8, 66:22, 71:1, 71:7, 72:22, 73:24, 76:11, 81:1, 81:7, 82:2, 82:3, 82:7, 84:1, 88:13, 88:17, 89:11, 93:4, 107:15, 107:25, 108:4, 108:7, 112:14, 112:15, 114:17, 114:18, 116:11, 118:23, 119:3, 119:20, 120:8, 122:12, 133:24, 136:13, 146:21

**therefore** [6] - 26:9, 65:16, 99:17, 107:13, 112:22, 137:15

**they've** [3] - 74:21, 110:10, 127:24

**thinking** [7] - 4:20, 30:12, 37:6, 47:14, 47:15, 79:1, 84:24

**thinks** [1] - 138:13

**Third** [21] - 7:10, 9:25, 72:1, 89:9, 93:22, 94:3, 94:19, 114:4, 114:6, 114:8, 114:12, 114:14, 114:21, 119:4, 119:8, 119:10, 119:11, 123:8, 127:23, 133:23, 136:11

**third** [2] - 107:8, 117:7

**thorough** [1] - 117:10

**thoughts** [1] - 9:23

**thousands** [1] - 48:13

**threat** [1] - 120:7

**threatening** [1] - 91:3

**three** [9] - 84:8, 84:12,

98:7, 98:12, 107:7, 117:20, 125:6, 134:3, 136:1

**three-minute** [2] - 84:8, 84:12

**throughout** [2] - 45:10, 116:9

**tidy** [1] - 90:24

**tie** [1] - 118:19

**tied** [1] - 59:5

**Tim** [1] - 3:8

**time's** [1] - 86:1

**timely** [2] - 103:2, 103:5

**timing** [2] - 11:23, 60:13

**TIMOTHY** [1] - 1:16

**title** [3] - 9:16, 45:5, 72:3

**today** [22] - 3:9, 3:18, 8:7, 25:17, 31:15, 31:23, 34:11, 46:11, 48:16, 53:4, 53:20, 54:13, 55:23, 60:2, 62:24, 66:15, 66:17, 90:15, 110:10, 145:21, 146:8, 147:14

**today's** [1] - 21:25

**toe** [1] - 97:9

**together** [1] - 76:5

**took** [5] - 10:13, 31:4, 103:5, 104:11, 146:7

**tools** [7] - 8:22, 12:16, 51:5, 51:7, 51:9, 63:16, 63:19

**topic** [1] - 97:23

**topics** [1] - 54:6

**total** [2] - 84:23, 84:24

**totality** [2] - 108:13, 114:3

**totally** [2] - 128:8, 142:8

**touch** [1] - 86:24

**towards** [1] - 37:11

**track** [1] - 144:13

**trade** [8] - 101:21, 101:25, 102:1, 102:9, 102:10, 102:11, 128:21, 129:10

**traded** [7] - 100:16, 101:4, 102:3, 127:9, 127:21, 127:23, 128:11

**traders** [3] - 128:21, 129:3, 132:24

**trades** [6] - 97:21, 97:25, 98:10, 100:7, 103:3, 103:25

**trading** [5] - 14:18, 99:23, 101:5, 102:6, 121:10

**traditional** [1] - 7:9

**training** [1] - 67:4

**transacting** [1] - 128:3

**transaction** [3] - 127:25, 128:1, 128:2

**transactions** [4] - 96:24, 124:2, 124:22, 129:13

**transcript** [8] - 1:24, 16:15, 31:7, 31:8, 73:1, 73:17, 147:17, 147:20

**transcription** [1] - 1:25

**transcripts** [1] - 31:10

**transfer** [1] - 101:22

**transferred** [1] - 101:1

**transferring** [1] - 100:23

**treble** [2] - 14:24, 15:4

**trebled** [5] - 18:6, 18:23, 30:25, 38:24, 46:22

**trial** [13] - 94:1, 140:18, 141:1, 142:25, 143:6, 143:7, 143:9, 143:14, 143:18, 145:3, 145:16, 145:18

**trick** [1] - 24:20

**tried** [3] - 84:2, 94:3, 116:24

**trier** [3] - 12:18, 24:4, 49:1

**triggered** [1] - 30:23

**trouble** [3] - 15:7, 25:5, 117:17

**true** [23] - 6:20, 10:12, 16:5, 20:4, 20:9, 24:3, 25:1, 29:21, 30:15, 31:16, 32:19, 39:20, 64:22, 69:14, 74:17, 82:5, 92:6, 94:3, 101:18, 108:9, 112:2, 118:25, 128:23

**Truist** [3] - 36:10, 36:13, 36:18

**truly** [2] - 63:7, 71:10

**truth** [14] - 5:10, 5:11, 9:8, 50:18, 55:11, 94:18, 134:15, 134:25, 138:17, 138:24, 139:1, 139:6

**try** [11] - 4:8, 26:4, 43:16, 46:5, 46:21,

90:9, 92:25, 94:1, 109:22, 111:3, 132:18

**trying** [16] - 29:5, 46:10, 47:11, 50:10, 58:1, 70:22, 70:23, 85:1, 92:19, 93:5, 93:21, 95:24, 127:16, 129:12, 135:9

**turn** [3] - 33:22, 72:25, 73:14

**turns** [1] - 138:11

**two** [29] - 21:9, 24:13, 34:22, 50:5, 77:10, 77:25, 81:16, 88:20, 90:2, 92:15, 94:24, 96:15, 96:16, 97:15, 98:18, 100:24, 112:21, 116:4, 116:16, 119:17, 120:23, 133:3, 136:1, 139:9, 140:16, 142:22, 143:4, 146:12, 146:18

**Two** [1] - 137:22

**type** [4] - 20:5, 20:11, 29:7, 33:15

**types** [6] - 19:17, 40:19, 45:1, 46:7, 51:9, 75:7

**typical** [1] - 94:23

**typicality** [1] - 120:21

**typically** [2] - 131:13, 135:11

## U

**U.S** [26] - 1:9, 54:3, 99:15, 99:16, 99:20, 100:1, 100:6, 100:7, 100:8, 100:10, 100:12, 100:13, 101:3, 101:8, 101:21, 102:9, 125:9, 127:9, 127:22, 127:24, 128:22, 129:3, 129:5, 130:18, 130:21, 131:2

**ultimate** [4] - 37:8, 39:8, 57:9, 115:9

**ultimately** [7] - 13:2, 18:9, 22:16, 25:8, 49:1, 49:9, 128:4

**umbrella** [1] - 80:14

**unabashedly** [1] - 107:11

**unadjudicated** [3] - 111:2, 113:6, 113:10

**uncharged** [4] - 111:1, 113:5, 113:10, 131:13

**uncommon** [1] - 19:7

**uncovered** [1] - 20:2

**under** [30] - 7:4, 19:3, 19:12, 31:2, 38:23, 41:20, 44:23, 48:9, 80:14, 88:12, 88:25, 98:20, 100:14, 103:7, 109:11, 110:14, 113:3, 113:15, 114:20, 118:16, 127:22, 128:8, 128:12, 128:14, 129:5, 131:4, 137:8, 138:12, 138:14, 147:9

**undergraduate** [1] - 54:2

**underlying** [12] - 15:9, 18:20, 31:1, 46:16, 49:24, 50:18, 57:6, 123:16, 123:25, 126:10, 146:1, 146:6

**understood** [1] - 145:17

**undisclosed** [1] - 116:15

**unfortunately** [1] - 109:4

**unique** [3] - 76:14, 95:6, 104:25

**UNITED** [2] - 1:1, 1:13

**United** [4] - 99:11, 100:8, 101:4, 101:23

**University** [5] - 5:19, 5:21, 7:11, 53:24, 72:2

**unlawful** [2] - 34:16, 34:23

**unless** [8] - 4:13, 9:16, 106:12, 120:17, 125:25, 129:15, 141:4, 143:4

**unlike** [3] - 113:6, 115:10, 121:25

**unnecessary** [1] - 46:13

**unquote** [1] - 116:16

**unrelated** [8] - 21:2, 63:4, 63:8, 83:20, 95:11, 97:11, 104:23, 142:20

**unreliable** [2] - 55:15, 72:14

**unsupported** [1] - 55:16

**untethered** [2] - 12:5,

64:7

**unwise** [1] - 104:21

**up** [26] - 4:8, 4:21, 16:7, 49:1, 51:22, 75:19, 80:17, 85:18, 85:20, 92:19, 92:21, 94:1, 96:17, 101:18, 101:20, 104:15, 114:1, 114:22, 120:17, 131:2, 140:1, 140:13, 142:22, 142:23, 143:2, 144:9

**update** [1] - 39:19

**updated** [1] - 98:1

**updating** [2] - 22:6, 25:6

**US** [1] - 133:16

**useful** [1] - 142:10

**uses** [2] - 15:12, 128:18

## V

**vague** [2] - 63:15, 63:19

**valuation** [2] - 47:10, 47:13

**value** [7] - 23:15, 39:20, 51:3, 51:4, 65:8, 76:24, 77:4

**value-relevant** [1] - 23:15

**variety** [3] - 54:4, 94:16, 108:25

**various** [2] - 116:14, 144:25

**venture** [1] - 20:4

**verbatim** [1] - 108:2

**verbiage** [1] - 124:19

**Verifone** [2] - 100:3, 132:19

**versus** [3] - 7:11, 56:11, 72:2

**vice** [2] - 5:17, 74:10

**view** [10] - 12:5, 15:17, 36:18, 54:23, 73:6, 73:7, 83:14, 84:4, 115:10, 123:3

**view..** [1] - 36:13

**viewed** [1] - 68:16

**views** [2] - 27:14, 106:20

**violate** [3] - 15:3, 19:23, 33:17

**violated** [9] - 17:21, 24:1, 32:2, 32:14, 36:14, 56:9, 92:15, 118:24, 146:18

**violates** [1] - 15:4

**violating** [1] - 142:6

**violation** [22] - 20:10, 23:21, 24:5, 24:13, 37:12, 38:14, 38:17, 38:18, 38:22, 39:13, 57:2, 62:9, 79:5, 89:11, 89:13, 89:14, 93:23, 93:24, 93:25, 134:20, 142:4

**violations** [7] - 20:12, 25:11, 30:23, 36:21, 37:2, 44:23, 134:6

**virtue** [1] - 130:18

**vitae** [1] - 75:14

**vociferous** [1] - 98:9

**voice** [1] - 4:8

**volume** [1] - 99:23

## W

**W-E-S-T-B-E-R-G** [1] - 52:17

**waded** [1] - 90:16

**Waggoner** [1] - 46:17

**wait** [3] - 141:14, 144:5, 144:15

**waited** [2] - 142:20, 144:11

**waiting** [1] - 142:7

**waive** [1] - 135:9

**waived** [1] - 91:23

**waives** [3] - 59:14, 62:16, 62:17

**waiving** [2] - 59:14, 59:16

**walk** [2] - 53:20, 54:13

**walked** [4] - 87:7, 90:10, 91:5, 91:12

**walking** [1] - 146:5

**wants** [2] - 28:12, 57:10

**warn** [1] - 48:20

**wear** [1] - 5:9

**web** [1] - 125:11

**West** [1] - 2:3

**Westberg** [5] - 9:15, 22:11, 52:15, 52:17, 115:4

**WESTBERG** [2] - 2:11, 52:11

**Westlaw** [1] - 115:1

**whereas** [1] - 116:7

**whichever** [1] - 86:17

**white** [1] - 100:5

**whole** [8] - 5:10, 15:11, 50:21, 89:17, 95:12, 122:11, 136:8, 140:13

**wide** [4] - 53:12, 55:20, 61:23, 129:11

**widely** [1] - 63:9

**width** [1] - 145:2

**willing** [1] - 68:4

**WILSON** [2] - 1:16, 137:10

**Wilson** [1] - 3:7

**win** [2] - 91:18, 142:3

**winning** [1] - 96:16

**wins** [1] - 57:12

**WINSTON** [1] - 1:19

**Winston** [1] - 3:11

**withdraw** [1] - 20:17

**witness** [4] - 4:1, 5:2, 20:16, 44:16

**WITNESS** [55] - 2:7, 4:25, 5:4, 6:15, 6:18, 6:21, 11:17, 18:14, 18:16, 27:25, 28:25, 29:3, 40:18, 41:15, 41:18, 41:22, 41:24, 42:2, 44:18, 48:6, 48:11, 51:18, 51:20, 52:15, 52:21, 57:4, 57:7, 57:17, 58:2, 58:10, 58:13, 58:17, 60:24, 64:15, 66:1, 66:3, 67:8, 67:12, 67:20, 70:8, 70:15, 71:3, 71:9, 75:21, 77:1, 77:7, 78:1, 78:8, 78:19, 79:8, 79:15, 79:24, 80:2, 80:4, 81:18

**witness's** [2] - 20:15, 26:2

**witnesses** [1] - 145:2

**wonderful** [1] - 90:24

**word** [14] - 43:10, 77:9, 77:13, 81:13, 81:14, 81:18, 81:24, 87:15, 101:16, 118:4, 118:5, 131:24, 138:1, 138:2

**worded** [1] - 122:18

**wording** [1] - 90:9

**words** [7] - 34:22, 39:25, 90:8, 90:17, 121:18, 138:10, 141:18

**works** [2] - 3:19, 93:22

**world** [6] - 25:3, 25:7, 30:13, 47:11, 48:1, 133:1

**worried** [1] - 6:19

**worry** [2] - 73:17, 134:12

**worrying** [1] - 144:10

**worst** [2] - 38:23, 40:7

**worth** [2] - 77:19, 144:10

**wow** [2] - 91:14, 91:18
**wrapping** [1] - 42:11
**write** [2] - 133:13, 133:14
**written** [4] - 22:5, 34:25, 46:23, 96:17
**wrongdoing** [1] - 111:2
**wrote** [1] - 34:8

## Y

**year** [4] - 54:12, 100:22, 141:14, 142:20
**years** [11] - 6:11, 50:25, 54:1, 54:3, 54:11, 67:5, 74:13, 99:12, 112:21, 119:17, 125:6
**York** [4] - 1:21, 100:24, 101:2, 101:12
**yourself** [3] - 75:5, 75:18, 131:13

## Z

**ZACHARY** [3] - 2:9, 4:5, 5:5
**Zachary** [1] - 5:4

*United States District Court*